USDC SCAN INDEX SHEET

















SWD    10/14/05    10:15

3:05-CV-01945   UPPER DECK COMPANY V. AMERICAN INTL

*1*

*CMP.*

1 | Richard K. Howell (State Bar No. 144241)
Duke F. Wahlquist (State Bar No. 117722)
2 | Bradley A. Chapin (State Bar No. 232885)
RUTAN & TUCKER, LLP
3 | 611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
4 | Telephone: 714-641-5100
Facsimile: 714-546-9035
5 | Email: rhowell@rutan.com

6 | Attorneys for Plaintiffs and Petitioners
The Upper Deck Company and Richard P.
7 | McWilliam

FILED

05 OCT 13 PM 12: 35

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | '05 CV 1945 IEG     (RBB)

11 | THE UPPER DECK COMPANY, a
California corporation, and
12 | RICHARD P. MCWILLIAM,
individually, and as Trustee for the MPR
13 | Trust,

14 |        Plaintiffs.

15 |        v.

16 | AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
17 | COMPANY and DOES 1 through 10,
inclusive,

18 |        Defendants.

19 |

CASE NO.

**COMPLAINT FOR:**

**(1) DECLARATORY RELIEF;**
**(2) BREACH OF INSURANCE
CONTRACT;**
**(3) TORTIOUS BREACH OF THE
COVENANT OF GOOD FAITH
AND FAIR DEALING IMPLIED
IN THAT INSURANCE
CONTRACT**

<u>DEMAND FOR JURY TRIAL</u>

20

21      The Upper Deck Company, a California corporation, and Richard P.

22 McWilliam, individually and as trustee of the MPR Trust, for their complaint

23 against defendant American International Specialty Lines Insurance Company and

24 Does 1 through 10, inclusive, allege and pray as follows:

25                **JURISDICTION AND VENUE**

26     1.    Jurisdiction is proper based upon 28 U.S.C. § 1332, in that this is a civil

27 action in which the amount in controversy exceeds the sum or value of $75,000,

28 exclusive of interest and costs, and is between citizens of different States.

ORIGINAL

Rutan & Tucker LLP
attorneys at law

373/017994-0003
630478.03 a10/13/05

-1-

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district.

## GENERAL ALLEGATIONS

3.     Plaintiff The Upper Deck Company ("Upper Deck") is a California corporation duly organized and in good standing under the laws of the State of California.  Upper Deck's principal place of business is now, and at all times relevant hereto was, in the City of Carlsbad, California.

4.     Plaintiff Richard P. McWilliam is an individual residing in the State of Nevada.

5.     Richard P. McWilliam also serves as trustee of plaintiff MPR Trust ("Trustee").  Upper Deck and Richard P. McWilliam, individually and as Trustee, are hereinafter referred to collectively as "Plaintiffs."

6.     Plaintiffs are informed and believe and based thereon allege that defendant American International Specialty Lines Insurance Company ("AISLIC") is now, and at all times relevant hereto was, an Alaska corporation authorized to underwrite insurance in the State of California as a surplus lines insurer with its principal place of business in New York, New York.  However, plaintiffs are informed and believe and based thereon allege that AISLIC is not authorized to conduct the business of insurance in the State of New York and is not subject to the supervision of insurance regulators in the State of New York.

7.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names.  Plaintiffs will amend this complaint to show the true names and capacities of Does 1 through 10, inclusive, when they have been ascertained.  Plaintiffs are informed and believe and based thereon allege that each of the fictitiously named defendants Does 1 through 10

Rutan & Tucker LLP
attorneys at law

1  participated in and are in some manner responsible for the acts alleged in this

2  complaint and the damage resulting therefrom.

3       8.     In or about October 2001, for good and valuable consideration

4  including the payment of $3,250,000 in premiums by the Plaintiffs (hereinafter

5  sometimes also referred to collectively as "Insureds"), AISLIC issued its Fiscal

6  Event Insurance Policy no. 405-88-33 to the Insureds (the "Policy").  AISLIC

7  represented to Plaintiffs and Plaintiffs believed that AISLIC had designed the Policy

8  to insure against risks that federal and state taxing authorities would challenge the

9  tax benefits claimed by the Insureds to inure to the Insureds' benefit as the result of

10 the Insureds' implementation of a tax strategy designed by KPMG. LLP ("KPMG")

11 and referred to as "$SC^2$."  Plaintiffs had implemented KPMG's $SC^2$ tax strategy in a

12 related series of transactions which had taken place earlier in the calendar year 2001.

13      9.     The Policy contains an insuring agreement which is set forth in Section

14 1, INSURING AGREEMENT.  The provisions of that insuring agreement are

15 quoted below; the quoted text has associated endnotes which include the Policy's

16 definition of selected terms used in the insuring agreement; this convention is used

17 hereinafter in other quotations of the Policy's language.  The insuring agreement

18 provides:

19            The Insurer [American International Specialty Lines
             Insurance Company] shall pay, subject to the applicable
20            Retention (as defined herein)[i] and other terms and
             conditions of this Policy[ii]; the Loss of the Insureds[iii]
21            arising from a Claim first made against any Insured during
             the Policy Period [August 29, 2001 to at least November
22            30, 2006][iv] and reported to the Insurer pursuant to the
             terms of this Policy.  The Insurer shall, in accordance with
23            and subject to Clause 7 hereof, advance Contest Expenses
             of such Claim excess of the Retention prior to its Final
24            Determination.

25      10.    In a portion of the Policy captioned Section 8. PROCEDURE FOR

26 TIME OF PAYMENT, AISLIC promised that: "Payment of Loss required

27 hereunder  shall be made to the Named Insured [Upper Deck Company] at the

28 address set forth in Item 1(a) of the Declarations [5909 Sea Otter Place, Carlsbad,

Rutan & Tucker LLP
attorneys at law

373/017994-0003
630478.03 a10/13/05                    -3-

1   CA 92008-6621].” AISLIC was, therefore, to perform its obligations under the

2   Policy in this judicial district.

3       11.    The insured “Loss” defined in the Policy at Section 2. DEFINITIONS

4   ¶ (1)[v] is comprised of three constituent parts, each of which is also defined in

5   Section 2. DEFINITIONS ¶¶ (j), (d) & (f) of the Policy respectively as:  (1) ”Insured

6   Tax Loss”[vi]; (2) ”Contest Expenses”[vii]; and (3) ”Gross-Ups.”[viii]

7       12.    The Policy’s definitions of two of the constituent parts of “Loss,”

8   “Insured Tax Loss” and “Contest Expenses,” both make reference to an “Insured

9   Tax Event,” the definition of which is set forth in Endorsement No. 1 of the Policy

10  and relevant portions of which are quoted below:

11              ‘Insured Tax Event’ means an assertion, at any time
             during the Policy Period, by a Taxing Authority that with
12           respect to the tax years 2001 through 2005, (a) as a result
             of any action taken by the Named Insured or Additional
13           Insureds prior to the Inception Date [August 29, 2001],[ix]
             The Upper Deck Company, a California corporation
14           (“Upper Deck”) has more than one class of stock for
             purposes of Section 1361 of the Code[x], . . . (c) deductions
15           for charitable contributions are not allowable to the pre-
             gift shareholder of Upper Deck in the year of gift in an
16           amount equal to the fair market value, reduced by any
             adjustments pursuant to Section 170(e)(1) of the Code, of
17           such shareholder’s gift of non-voting stock to the
             Municipal Plan, (d) the post-gift allocations of Upper
18           Deck’s taxable income to the Municipal Plan are not
             correct or proper; . . ., (e) as a result of the gift of the
19           Upper Deck non-voting common stock to the Municipal
             Plan by the pre-gift shareholder, any Upper Deck
20           shareholder or Upper Deck, itself, assigned income to the
             Municipal Plan,. . . .  For purposes of this definition, the
21           term ‘pre-gift shareholder’ shall mean the MPR Trust; the
             term’ gift’ shall mean the gift of 8,280,000 shares of non-
22           voting stock of Upper Deck made by the pre-gift
             shareholder to the Municipal Plan on March 31, 2001; and
23           the total number of shares of Upper Deck voting and non-
             voting common stock outstanding shall not include shares
24           of stock of Upper Deck that may be acquired pursuant to
             the Warrant Agreement attached as Exhibit D to this
25           Policy (“Warrant Shares”) unless and until any such
             Warrant Shares are purchased and paid for pursuant to
26           such Warrant Agreement. . . .

27      13.    On April 9, 2002, the IRS summoned KPMG to reveal the identity of

28  its clients, including the Plaintiffs, utilizing various tax strategies which had been

1  promoted by KPMG, including the tax strategy referred to as "SC$^2$."  KPMG

2  notified Upper Deck of this on April 9 or 10, 2003, and Upper Deck in turn

3  promptly notified AISLIC no later than April 10, 2003.

4      14.    Thereafter, the IRS published a list of those transactions it was going to

5  investigate -- Notice 2004-30 -- and Upper Deck and its voting shareholders

6  subsequently received various Information Document Requests from the IRS.  The

7  IRS (a "Taxing Authority"[xi] as defined in the Policy) published Notice 2004-30 as

8  Internal Revenue Bulletin 2004-17 on April 26, 2004 (during the "Policy Period").

9  Notice 2004-30 addresses and describes an "S Corporation Tax Shelter" which is the

10  SC$^2$ tax strategy.

11      15.    Notice 2004-30 is also the subject of a Coordinated Issue Paper ("CIP")

12  issued by the IRS on November 8, 2004 (during the "Policy Period") "discuss[ing]

13  the grounds for taxing the proper taxpayers on the income from the corporation's

14  business and disallowing deductions the taxpayers improperly claim as a result of

15  participating in Notice 2004-30 transactions."

16      16.    The Policy's definition of "Insured Tax Event" provides that an

17  "'Insured Tax Event' includes:  an assertion, at any time during the Policy Period,

18  by a Taxing Authority that with respect to the tax years 2001 through 2005, (a) as a

19  result of any action taken by the Named Insured or the Additional Insureds prior to

20  the Inception Date [August 29, 2003], The Upper Deck Company, a California

21  corporation ('Upper Deck') has more than one class of stock for purposes of

22  Section 1361 of the Code.'"  (Emphasis added.)  Such an assertion was made in

23  Notice 2004-30 which stated that "the Service may also argue that the existence of

24  . . . [certain] warrants [issued by Upper Deck on March 29, 2001 – before the

25  Inception Date] result[ed] in a violation of the single class of stock requirements of

26  § 1361(b)(1)(D), thus terminating the corporation's status as an S corporation.  See,

27  e.g., §§ 1.1361-1(l)(4)(ii) and (iii)."  (Emphasis added.)  The IRS' assertion in this

28  regard was published in I.R.B. 2004-17 on April 26, 2004 during the Policy Period.

1    17.    The IRS' Coordinated Issue Paper, issued November 8, 2004, further

2 explains the grounds for the IRS' assertion: "[T]he capital structure created in the

3 Notice 2004-30 transaction violates the single class of stock requirement of

4 § 1361(b)(1)(D) of the Internal Revenue Code and § 1.1361-1(l) of the Income Tax

5 Regulations.  The S corporation election will terminate on the date the second class

6 of stock is issued and the corporation will be treated as a C corporation.  Thus, the

7 income will not be allocated to the shareholders and the income will be taxable to

8 the C corporation." (CIP, pp. 1-2, 6.) (Emphasis added.)  The Coordinated Issue

9 Paper states several points in support of this conclusion:

10          •   [A] corporation is treated as having only one class of
               stock if all of its outstanding shares confer identical
11             rights to distributions and liquidation proceeds
               § 1.1361-1(l)(1).  Section 1.1361-1(l)(4)(iii)(A)
12             provides, in part, that a call option, warrant or similar
               instrument issued by a corporation is treated as a
13             second class of stock of the corporation if, taking into
               account all of the facts and circumstances, the
14             instrument is substantially certain to be exercised by
               the holder and has a strike price substantially below the
15             fair market value of the underlying stock on the date
               that the instrument is issued.

16
           •   The warrants in these transactions are a second class of
17             stock.

18 (CIP, p. 7.) (Emphasis added.)

19          18.    With respect to all of its assertions (others being discussed below),

20 Notice 2004-30 states the Internal Revenue "Service and the Treasury Department

21 recognize that some taxpayers may have filed tax returns taking the position they

22 were entitled to the purported tax benefits of the type of transaction described in this

23 notice.  Those taxpayers should take appropriate corrective action and ensure that

24 their transactions are disclosed properly."  Notice 2004-30 also "alerts taxpayers and

25 their representatives that these transactions are tax avoidance transactions."

26 Notice 2004-30 provides the "Service intends to challenge the purported tax benefits

27 from this transaction."

28          19.    Following publication of Notice 2004-30 on April 16, 2004, on

1  August 5, 2004 (again during the "Policy Period"), correspondence from the

2  Department of the Treasury, the Internal Revenue Service (a "Taxing Authority")

3  addressed to the Upper Deck Company and its counsel transmitted "three IDR

4  Forms 4564, numbered S608B2, S608C, S701A" (the "August 2004 IDRs"). One

5  of the August 2004 IDRs, request S608B2, specified that the "Internal Revenue

6  Service has identified certain transactions as 'listed transactions' for the purposes of

7  § 1.601104(b)(2) of the Income Tax Regulations. The IRS considers transactions

8  that are the same as or substantially similar to listed transactions to be tax avoidance

9  transactions."

10      20.    Among the "listed transactions" identified in IDR No. S608B2 were

11  those described in "Notice 2004-30, 2004-17 I.R.B. -- S Corporation Tax Shelter"

12  which are discussed above. Request S608B2 identifies its purpose as "to determine

13  whether The Upper Deck Company has directly or indirectly participated in

14  transactions that are the same as or substantially similar to any listed transaction,"

15  including Notice 2004-30. In correspondence dated August 6, 2004, addressed to

16  counsel for The Upper Deck Company, stating it pertained to "examination of

17  Upper Deck Co., Notice 2004-30 transactions," the Department of the Treasury,

18  Internal Revenue Service advised that the IRS "ha[d] begun an examination of the

19  tax returns indicated above [returns of Upper Deck Co.] with respect to transactions

20  described in Notice 2004-30[.] . . . See Notice 2004-30 for the government's

21  position. The aforementioned examination is proceeding and must still be

22  concluded." This August 2004 assertion by the IRS matches the definition of an

23  "Insured Tax Event" set forth in Endorsement No. 1, ¶ (a).

24      21.    The IRS has therefore made multiple assertions that the warrants issued

25  by Upper Deck Company on March 29, 2001 were a second class of stock and these

26  assertions are an "Insured Tax Event."

27      22.    The Policy also provides "'Insured Tax Event' means: an assertion, at

28  any time during the Policy Period, by a Taxing Authority that with respect to the tax

Rutan & Tucker LLP
attorneys at law

1   years 2001 through 2005, . . . (c) deductions for charitable contributions are not

2   allowed to the pre-gift shareholder of Upper Deck in the year of gift in an amount

3   equal to the fair market value, reduced by any adjustments pursuant to

4   Section 170(e)(1) of the Code, of such shareholder's gift of non-voting stock to the

5   Municipal Plan." The IRS made such an assertion in Notice 2004-30 which

6   describes a transaction in which "the original shareholders donate the non-voting

7   stock to the exempt party . . . . The original shareholders might also claim a

8   charitable contribution deduction under Section 170 for the donation of the non-

9   voting stock to the exempt party." Notice 2004-30 further asserts: "The Service

10  intends to challenge the purported tax benefits from this transaction . . . ." The IRS'

11  Coordinated Issue Paper regarding Notice 2004-30 amplifies this assertion stating

12  "the transfer of nonvoting stock to the exempt party does not qualify as a deductible

13  charitable contribution pursuant to § 170 and should be disallowed." (CIP, p. 2.)

14  The IRS explained that "to be a charitable contribution under § 170, a transfer to a

15  charitable organization must be a gift. . . . In a Notice 2004-30 transaction, the

16  nonvoting stock was not transferred to the exempt party with charitable intent.

17  [Rather], [t]he parties to the transaction entered into the transaction to generate a tax

18  benefit to the original shareholders, not to benefit the exempt party. . . . [T]he

19  amount received by the exempt party was an accommodation fee, not a charitable

20  gift." (CIP, pp. 8-9.) A "charitable contribution deduction taken on the transfer of

21  the nonvoting stock to the exempt party should be disallowed." (CIP, p. 9.) The

22  Notice 2004-30's assertion by the IRS that there has been no charitable contribution

23  by Richard McWilliam was another "Insured Tax Event."

24       23.   Similarly, the August 2004 IDRs reiterate the IRS Notice 2004-30's

25  assertions that deductions for the shareholder gift of Upper Deck stocks to the

26  Municipal Plan should be disallowed.

27       24.   Thereafter, in the April 7, 2005 correspondence ("April 7, 2005

28  Correspondence"), the Department of the Treasury, Internal Revenue Service (again,

Rutan & Tucker LLP
attorneys at law

1  a "Taxing Authority") informed all three Insureds that the IRS had "evaluated the

2  issues present in the transaction described in Notice 2004-30" and "propose[d] to

3  resolve issues related to the S corporation charitable contribution transactions,

4  including related penalties" by:

5              3.     The transfer of non-voting stock to the tax
        exempt party does not qualify as a charitable contribution
6       under IRC section 170 and no charitable contribution
        deduction will be allowed.
7

8  This is another "Insured Tax Event" under Section 2. DEFINITIONS ¶ (c) of the

9  Policy.

10         25.     The Policy's definition of "'Insured Tax Event' [also provides that that

11  term] means:  an assertion, at any time during the Policy Period, by a Taxing

12  Authority that with respect to the tax years 2001 through 2005, . . . (d) the post-gift

13  allocations of Upper Deck's taxable income to the Municipal Plan are not correct or

14  proper; . . . ."  Notice 2004-30 describes a transaction in which "the parties to the

15  transaction claim that, after the donation of the non-voting stock, the exempt party

16  owns 90 percent of the stock of the S corporation. . . .  For tax purposes . . . during

17  that period, 90 percent of the S corporation's income is allocated to the exempt party

18  and 10 percent of the S corporation's income is allocated to the original

19  shareholders."  Notice 2004-30 asserts such a "transaction . . . is designed to

20  artificially shift the incidents of taxation on S corporation income away from taxable

21  shareholders to the exempt party.  In this manner, the original shareholders attempt

22  to avoid paying income tax on most of the S corporation's income over a period of

23  time.  The Service intends to challenge the purported tax benefits from this

24  transaction."  The IRS' Coordinated Issue Paper reiterates "the transfer of the S

25  corporation stock to the exempt party will be disregarded for Federal tax purposes

26  under judicial doctrines.  Consequently, the S corporation and original shareholders

27  entering into transactions that are the same as or substantially similar to those

28  described in Notice 2004-30 shall be treated as if there had been no transfer to the

1   exempt party." (CIP, pp. 1, 3-6.)  The IRS' assertion the "transaction . . . is

2   designed to artificially shift the incidents of taxation on S corporation income away

3   from taxable shareholders to the exempt party" is clearly an "Insured Tax Event."

4        26.   The IRS reiterated these assertions in its August 2004 IDRs and the

5   August 6 , 2004 correspondence which promptly followed the IDRs.  That

6   correspondence stated it pertained to "examination of Upper Deck Co., Notice 2004-

7   30 transactions," the Department of the Treasury, Internal Revenue Service advised

8   that the IRS "ha[d] begun an examination of the tax returns indicated above [returns

9   of Upper Deck Co.] with respect to transactions described in Notice 2004-30[.] . . .

10  Notice 2004-30 states that the Service will challenge transactions in which

11  S corporation shareholders attempt to transfer the incidents of taxation on

12  S corporation income by purportedly donating the S corporation non-voting stock to

13  an exempt organization[.] . . .  See Notice 2004-30 for the government's position.

14  The aforementioned examination is proceeding and must still be concluded."  This

15  August 2004 assertion by the IRS matches the definition of an "Insured Tax Event"

16  set forth in Endorsement No. 1, ¶ (d) ["post-gift allocations of Upper Deck's taxable

17  income to the Municipal Plan are not correct or proper"].

18       27.   In the August 7, 2005 Correspondence (again, during the "Policy

19  Period"), the Department of the Treasury, Internal Revenue Service (again, a

20  "Taxing Authority") informed all three Insureds that the IRS had "evaluated the

21  issues present in the transaction described in Notice 2004-30" and "propose[d] to

22  resolve issues related to the S corporation charitable contribution transactions,

23  including related penalties" by:

24              2.    The transfer of the S corporate stock to the
            exempt party is disregarded for federal tax purposes.
25          S corporation income will be allocated as if there had been
            no transfer of stock to the exempt party.
26

27  This is yet another "Insured Tax Event" under Section 2. DEFINITIONS ¶ (d) in the

28  Policy.

1    28.   The Policy's definition of "'Insured Tax Event' [also provides that that

2   term] means:  an assertion, at any time during the Policy Period, by a Taxing

3   Authority that with respect to the tax years 2001 through 2005, . . . (e) as a result of

4   the gift of the Upper Deck's non-voting common stock to the Municipal Plan by the

5   pre-gift shareholder, any Upper Deck shareholder of Upper Deck, itself, assigned

6   income to the Municipal Plan." Notice 2004-30 describes a "transaction . . . in

7   which S corporation shareholders attempt to transfer the incidents of taxation on

8   S corporation income." Notice 2004-30 "alerts taxpayers and their representatives

9   that these transactions are tax avoidance transactions" and are "designed to

10   artificially shift the incidents of taxation on S corporation income away from taxable

11   shareholders to the exempt party." Notice 2004-30 states "the Service intends to

12   challenge the purported tax benefits of this transaction based on the application of

13   various theories, including judicial doctrines such as substance over form." This

14   assertion by the IRS (again clarified by the IRS' Coordinated Issue Paper (pp. 1, 3-

15   6) was another "Insured Tax Event."

16    29.   In the August 7, 2005 Correspondence (again, during the "Policy

17   Period"), the Department of the Treasury, Internal Revenue Service (again, a

18   "Taxing Authority") informed all three Insureds that the IRS had "evaluated the

19   issues present in the transaction described in Notice 2004-30" and "propose[d] to

20   resolve issues related to the S corporation charitable contribution transactions,

21   including related penalties" by:

22                2.   The transfer of the S corporate stock to the
        exempt party is disregarded for federal tax purposes.
23        S corporation income will be allocated as if there had been
        no transfer of stock to the exempt party.
24

25   This is yet another "Insured Tax Event" under Section 2. DEFINITIONS ¶ (e) in the

26   Policy.

27    30.   The Policy provides, in Section 2. DEFINITIONS ¶ (A):

28                'Claim' means any written notice from the Taxing
        Authority alleging any Insured may be liable for Taxes,

but only if such Taxes are directly related in whole or in
part to the Insured Tax Event.

(Emphasis added.)

31.     The Internal Revenue Service's April 26, 2004 publication of
Notice 2004-30 in Internal Revenue Bulletin 2004-17 in conjunction with the
Internal Revenue Service's August 5, 2004 correspondence transmitting "three IDR
Forms 4564, numbered S608B2, S608C and S701A" followed the next day by the
Internal Revenue Service's August 6, 2004 correspondence regarding "examination
of Upper Deck Co. Notice 2004-30 transactions" and the same "Taxing Authority's"
April 7, 2005 Correspondence (all during the "Policy Period") leave no room for
ambiguity about there being "written notice from the Taxing Authority alleging any
Insured may be liable for taxes." (Emphasis added.)  For reasons alleged above,
there is also no ambiguity that "such Taxes are directly related in whole or in part to
the Insured Tax Event."

32.     Implicit in the Policy is an implied Covenant of Good Faith and Fair
Dealing pursuant to which AISLIC and Does 1 through 10, inclusive, impliedly
promised not to unreasonably interfere with Plaintiffs' receipt of benefits under the
Policy (the "Implied Covenant").

33.     The magnitude of the "Insured Tax Loss"[xii] portion of the insured Loss
arising from the Insureds' implementation of KPMG's $SC^2$ tax strategy due to the
"Claim" made against the Insureds by the IRS will exceed the $50 million limits of
the Policy by millions of dollars even before any "Contest "Expenses"[xiii]" or
"Gross-Ups"[xiv] are included in the potential Loss.  In the April 7, 2005
Correspondence, the IRS proposed to resolve the IRS' Claim against the Insureds in
a manner that would still result in an "Insured Tax Loss" well in excess of the $50
million limits of the Policy but nevertheless result in a multi-million dollar savings
in the "Insured Tax Loss" might otherwise be if the Internal Revenue Service
aggressively pushed and prevailed on the issue that the Upper Deck Company had

1   more than one class of stock for purposes of Section 1362 of the Code; the proposal

2   in the April 7, 2005 Correspondence would resolve the amount of the "Insured Tax

3   Loss" that would essentially concede that the Upper Deck Company did not have

4   more than one class of stock.[1]

5        34.   The Insureds communicated the proposals in the IRS' April 7, 2005

6   Correspondence to AISLIC, communicated the Insureds' willingness to fund the

7   millions of dollars over and above the $50 million limit of AISLIC's Policy's limits

8   required to resolve the IRS' Claim on the terms of the April 7, 2005

9   Correspondence, and urged that AISLIC contribute its $50 million Policy limits to

10   avoid the potential for additional millions of dollars in "Insured Tax Loss".  The

11   Insureds also communicated to AISLIC that AISLIC's $50 million Policy limits

12   would be needed to consummate the settlement proposed in the IRS's April 7, 2005

13   Correspondence.

14        35.   AISLIC communicated its consent to the Insureds' acceptance of the

15   proposals in the April 7, 2005 Correspondence, but AISLIC initially declined to

16   state if and when it would contribute its $50 million Policy limits, or any portion

17   thereof, to consummate the resolution of the IRS' Claim in accordance with the

18   April 7, 2005 Correspondence.

19        36.   By way of letter to Plaintiffs' counsel from AISLIC'S counsel,

20   Peabody & Arnold, dated July 29, 2005, AISLIC denied that the Policy had any

21   application to the Claims asserted against the Insureds by the IRS or the Franchise

22   Tax Board and arising out of the Insureds' implementation of KPMG's SC[2] tax

23   strategy and further denied any responsibility to or obligation to the Insureds for the

24   Losses arising from those Claims.  AISLIC and Does 1 through 10 have thereby

25   repudiated their obligations under the Policy.

26

27   [1]Because of the magnitude of the "Insured Tax Loss" resulting from the IRS's
     Claim, the Insureds have not alleged the details of a similar claim asserted by the
     Taxing Authorities of the State of California, the Franchise Tax Board, giving rise to

28   an "Insured Tax Loss" of millions of dollars; however, the Insureds also allege the
     existence of such a loss.

37.   No Policy exclusions apply to the insured Losses for the Claim asserted by the IRS.[2]

## FIRST CAUSE OF ACTION

### (Against AISLIC and DOES 1 through 10, inclusive,
### for Declaratory Relief)

38.   Plaintiffs reallege paragraphs 1 through 37 above and incorporate them in this First Cause of Action as though fully set forth herein.

39.   A justiciable controversy has arisen between the Insureds, on one hand, and AISLIC and Does 1 through 10, on the other hand, regarding the obligations owed to the Insureds by AISLIC and Does 1 through 10 under the Policy in connection with the Claim asserted by the Internal Revenue Service against the Insureds.

40.   The Insureds believe, contend, and allege that AISLIC and Does 1 through 10 have a contractual obligation under the Policy to pay not less than the $50 million limit of liability provided for in the Policy as an "Insured Tax Loss" to fund the resolution of the IRS' Claim against the Insureds according to the terms of the resolution proposed in the IRS' April 7, 2005 Correspondence and accepted by the Insureds with the consent of AISLIC.

41.   Plaintiffs are informed and believe and thereon allege that AISLIC and Does 1 through 10, inclusive, now contend that they have no contractual obligation under the Policy to pay or fund any portion of the resolution of the IRS' Claim in the manner provided for in the IRS' April 7, 2005 Correspondence.

42.   Unless the rights of the Insureds under the Policy and the obligations of AISLIC and Does 1 through 10, inclusive, under the Policy are resolved, consummation of the resolution of the IRS' Claim in the manner provided for in the April 7, 2005 Correspondence is and will be jeopardized with the potential

---

[2]Nor do any Policy exclusions apply to the insured Losses for the Claim asserted by the Franchise Tax Board.

Ruton & Tucker LLP
attorneys at law

1  consequences of the imposition of millions of dollars in additional liability on the

2  Insureds – liability for which AISLIC and Does 1 through 10 deny they have any

3  responsibility.

4      43.   A judicial declaration of the rights and obligations of the Insureds,

5  AISLIC and Does 1 through 10, inclusive, is necessary immediately to avoid

6  potential loss and hardship to the parties.

7      44.   The Policy includes a Section 16. ARBITRATION AND CHOICE OF

8  LAW which provides as follows:

9          It is hereby understood and agreed that all disputes
           or differences which may arise under or in connection with
10         this Policy, whether arising before or after termination,
           including any determination of the amount of Loss, shall
11         be submitted to the American Arbitration Association in
           New York, New York under and in accordance with its
12         commercial arbitration rules then in effect. On any
           specific dispute or claim, the parties shall agree on
13         whether there shall be one or three arbitrators. If the
           parties cannot agree on the number of arbitrators, there
14         shall be three arbitrators. The arbitrator(s) shall be
           disinterested, shall have knowledge of the legal, tax, and
15         insurance issues relevant to the matters in dispute or the
           claim, and shall otherwise be chosen in the manner
16         provided in such rules. The arbitration shall be subject to
           the Federal Arbitration Act and, to the extent such Act is
17         not applicable, the laws of the State of New York. The
           construction validity and performance of this Policy shall
18         be governed by the laws of the State of New York,
           provided, however, that the Policy shall be construed in
19         the manner most consistent with the relevant terms,
           conditions, provisions or exclusions of the Policy, without
20         regard to the authorship of the language and without any
           presumption in favor of either party. No award of the
21         arbitrators or judgment of any court with respect to any
           award, dispute or controversy shall be entered in an
22         amount exceeding the applicable Limit of Liability set
           forth in this Policy. The Insurer shall have no obligation
23         to pay or reimburse any Insured's legal expenses incurred
           in mediating or arbitrating a claim or dispute under this
24         Policy, except to the extent specified in the arbitrator(s)
           award, in which event such legal expenses will be
25         included in the Loss payable by the Insurer in accordance
           with, and subject to the Retention, Limit of Liability and
26         other terms, conditions and exclusions of this Policy.

27     45.   Consistent with the Policy's Section 16. ARBITRATION AND

28  CHOICE OF LAW, the Insureds are prepared to arbitrate the "Loss" owed by

1 | AISLIC's and Does 1 through 10  to the Insureds under the Policy with respect to an
2 | anticipated final resolution of the IRS's Claim consistent with the April 7, 2005
3 | Correspondence and will conditionally stipulate to an order requiring AISLIC, Does
4 | 1 through 10 and the Insureds to arbitrate that sole issue before a panel of three
5 | arbitrators – with a reservation of jurisdiction in this Court to resolve all other
6 | disputes between the parties including but not limited to the Insureds' rights to any
7 | extra-contractual recovery, including but not limited to punitive damages and
8 | attorneys fees.  Alternatively, the Insureds are willing to, and prefer to, litigate all
9 | issues in the Federal District Court.

10 | 46.   Plaintiffs are informed, believe, and thereon allege that AISLIC and
11 | Does 1 through 10 contend that a portion of the language of Section 16.
12 | ARBITRATION AND CHOICE OF LAW ("No award of the arbitrators or
13 | judgment of any court with respect to any award, dispute or controversy shall be
14 | entered in an amount exceeding the applicable Limit of Liability set forth in the
15 | Policy.  The Insurer shall have no obligation to pay or reimburse any Insured's legal
16 | expenses incurred in mediating or arbitrating a claim or dispute under this Policy,
17 | except to the extent specified in the arbitrator(s) award, in which event such legal
18 | expenses will be included in the Loss payable by the Insurer in accordance with, and
19 | subject to the Retention, Limit of Liability and other terms, conditions and
20 | exclusions of, this Policy.") –  the "Limitation Clause" – precludes any arbitration
21 | award or judgment in favor of Plaintiffs exceeding the sum of $50,000,000
22 | regardless of the amount or nature of the damages, contractual, consequential,  or
23 | extra-contractual, caused to the Insureds by AISLIC's and Does 1 through 10's
24 | behavior arising under or in connection with the Policy.

25 | 47.   Plaintiffs allege that the "Limitation Clause" as interpreted by AISLIC
26 | is illegal, unconscionable and unenforceable under both California and New York
27 | law under California Civil Code section 1668[3] and similar provisions of California's

28 |

---

[3]"All contracts which have for their object, directly or indirectly, to exempt

Reese & Tucker LLP
attorneys at law

1   and New York's statutory and common laws.  Plaintiffs do not stipulate to any order

2   divesting the trial court of jurisdiction to finally adjudicate the proper interpretation

3   or enforceability of the "Limitation Clause" and Plaintiffs reserve all rights to have

4   such issues resolved by this Court.   Plaintiffs allege that they are entitled to a

5   declaration of this Court that the "Limitation Clause" does not preclude an

6   arbitration award or judgment in favor of Plaintiffs in an amount exceeding the sum

7   of $50,000,000 if in fact the damages caused to the Insureds by AISLIC's and Does

8   1 through 10's behavior caused damages in excess of that amount.  Plaintiffs request

9   that any order compelling arbitration of any aspect of the parties' dispute declare

10   that the "Limitation Clause" does not so limit the arbitration panel.

11          48.    Plaintiffs are informed, believe, and thereon alleged that AISLIC and

12   Does 1 through 10 contend that both the Limitation Clause and another portion of

13   the language in Section 16. ARBITRATION AND CHOICE OF LAW  ("The

14   arbitration shall be subject to the Federal Arbitration Act and, to the extent such Act

15   is not applicable, the laws of the State of New York.  The construction validity and

16   performance of this Policy shall be governed by the laws of the State of New York,

17   provided, however, that the Policy shall be construed in the manner most consistent

18   with the relevant terms, conditions, provisions or exclusions of the Policy, without

19   regard to the authorship of the language and without any presumption in favor of

20   either party.") ("The "New York Law Clause") effectively prohibits any arbitrators

21   or court from awarding punitive damages or other extra contractual damages to the

22   Insureds in this case not only because the Insureds' "Insured Tax Loss" already

23   exceeds $50,000,000 but also because New York law limits the power of any

24   arbitrators with respect to the awarding of punitive damages and other extra-

25   contractual recoveries.

26          49.    Plaintiffs contend and allege that the Limitation Clause and the New

27

28   anyone from responsibility for his own fraud, or willful injury to the person or
     property of another, or violation of law, whether willful or negligent, are against the
     policy of the law."

Ruten & Tucker LLP
attorneys at law

1   York Law Clause as interpreted by AISLIC are illegal, unconscionable and

2   unenforceable and further allege that Plaintiffs are entitled to a judicial declaration

3   that that is the case and Plaintiffs request that any order that may be entered

4   compelling arbitration of any disputes between the parties provide that the neither

5   the Limitation Clause, nor the New York Law Clause nor any other provisions of

6   the Policy prohibit the arbitration panel from awarding damages (be those damages

7   compensatory, punitive, contractual or extra-contractual) in amounts in excess of the

8   $50,000,000 limit of the Policy if Plaintiffs damages are in fact proved to be in

9   excess of $50,000,000.

10                            **SECOND CAUSE OF ACTION**

11                   **(Against AISLIC and DOES 1 through 10, inclusive,**

12                          **for Breach of Insurance Contract)**

13          50.   Plaintiffs reallege paragraphs 1 through 49 above and incorporate them

14   in this Second Cause of Action as though fully set forth herein.

15          51.   Plaintiffs have performed each of their obligations under the Policy or

16   such performance has been waived, suspended or excused.  Moreover, all conditions

17   precedent to AISLIC and Does 1 through 10's performance of their obligations

18   under the Policy have occurred or have been waived.

19          52.   AISLIC's repudiation of any obligation to provide any Policy benefits

20   to the Insureds is a material breach of the Policy which has or will damage Plaintiffs

21   in an amount not less than the $50,000,000 Limit of Liability provided for in ITEM

22   4 in the DECLARATIONS for the Policy and which may consequentially damage

23   the Insureds in the amount of millions of dollars by disrupting resolution of the

24   IRS's Claim on the terms set forth in the April 7, 2005 Correspondence.

25                            **THIRD CAUSE OF ACTION**

26                   **(Against AISLIC and DOES 1 through 10, inclusive,**

27        **for Tortious Breach of the Covenant of Good Faith and Fair Dealing)**

28          53.   Plaintiffs reallege paragraphs 1 through 52 above and incorporate them

1  in this Third Cause of Action as though fully set forth herein.

2     54.   AISLIC and Does 1 through 10's, inclusive, actions tortiously breached
3  the Implied Covenant inherent in the Policy as well as the explicit terms and
4  conditions of the Policy. As a proximate and legal result of AISLIC and Does 1
5  through 10's, inclusive, breach of the Implied Covenant inherent in the Policy,
6  Plaintiffs have suffered damages which include not only deprivation of the explicit
7  benefits provided for in the Policy but also in the form of costs and attorneys' fees
8  which Plaintiffs have been forced to incur in order to recover the contractual
9  benefits under the Policy to which Plaintiffs are entitled. In addition Plaintiffs
10  anticipate suffering additional damages of millions of dollars as a result of AISLIC
11  and Does 1 through 10's refusal to pay Policy benefits to resolve the IRS's claim
12  consistent with the April 7, 2005 Correspondence which Plaintiffs anticipate may
13  disrupt such a resolution.

14     55.   AISLIC and Does 1 through 10's, inclusive, actions have been
15  fraudulent and malicious and Plaintiffs are entitled to recover exemplary damages
16  therefore under California Civil Code section 3294. Defendants' actions were
17  malicious in that defendants intended those actions to cause injury to Plaintiffs and
18  those actions were despicable conduct carried on by the defendants with the willful
19  and conscious disregard for the rights of Plaintiffs to receive benefits under the
20  Policy. Defendants' actions were fraudulent in that defendants misrepresented to
21  Plaintiffs that Plaintiffs were not entitled to benefits under the Policy with the
22  intention on the part of the defendants of depriving Plaintiffs of their legal rights
23  under the Policy and otherwise causing injury to Plaintiffs.

24     56.   Furthermore, the officers, directors and managing agents of AISLIC
25  and Does 1 through 10, inclusive, acting within the course and scope of their
26  employment, have authorized and ratified the wrongful acts and conduct alleged
27  herein, and AISLIC and Does 1 through 10 have themselves engaged in the
28  wrongful acts and conduct alleged herein which constitute oppression, fraud and

1  malice.

2      57.    Plaintiffs are entitled to recover punitive and exemplary damages from

3  AISLIC and Does 1 through 10 in amounts sufficient to punish and make an

4  example of AISLIC and Does 1 through 10.

5                          **DEMAND FOR JURY TRIAL**

6      Plaintiffs hereby demand a jury trial pursuant to rule 38 of the Federal Rules

7  of Civil Procedure.

8      WHEREFORE, Plaintiffs pray for judgment in their favor and against

9  AISLIC and Does 1 through 10, and each of them, as follows:

10     1.    For the Declaratory Relief to which Plaintiffs allege they are entitled to

11  in this complaint;

12     2.    In the amount of compensatory damages, both special and general,

13  proved at trial;

14     3.    In the amount of exemplary damages proved at trial;

15     4.    If and to the extent provided for by applicable law, for attorneys' fees

16  and costs incurred in this action;

17     5.    For prejudgment interest in the maximum amount allowed by law from

18  the date such damages became due; and

19     6.    For such further relief as the court in its discretion deems just and

20  appropriate.

21  Dated:  October 13, 2005            RUTAN & TUCKER, LLP

22

23                                      By: _____

24                                          Richard K. Howell
                                            Attorneys for Plaintiffs and Petitioners
25                                          The Upper Deck Company and Richard P.
                                            McWilliam

26

27

28

1

_____

2       [i]Section 5 RETENTION provides: "The Insurer shall only be liable for the amount of Loss which is in excess of the retention amount stated in Item 5 of the

3 Declarations (the 'Retention') [$500,000, in the aggregate). This Retention shall be carried by the Insureds at their own risk and remain uninsured. A single Retention

4 shall apply to all Loss arising from all Claims relating to the Insured Tax Event."

5       [ii]Section 2. DEFINITIONS ¶ (p) "'Policy' means this Fiscal Event Insurance Policy agreed to and underwritten by the Insurer for the benefit of the Insureds."

6

7       [iii]Section 2 DEFINITIONS ¶ (i) "'Insureds' means the Named Insured listed in Item 1(a) of the Declarations and the Additional Insureds listed in Item 1(b) of the Declarations." Item 1(a) of the Declarations identifies the NAMED INSURED as

8 "the Upper Deck Company." Item 1(b) identifies the ADDITIONAL INSUREDS as including "the MPR Trust [and] Mr. Richard McWilliam."

9

10      [iv]Section 2 DEFINITIONS ¶ (p) "'Policy Period' means the period of time shown in Item 3 of the Declarations, as the same may be extended pursuant to the terms and conditions hereof." Item 3 of the Declarations identifies the POLICY

11 PERIOD as "from August 29, 2001 to the later of (i) November 30, 2006 or (ii) the expiration of the applicable statute of limitations with respect to the tax items

12 described in the Insured Tax Event relating to the transactions described in the KPMGLLP opinions; provided, however, that in no event shall a policy with Policy

13 Period expire later than November 30, 2010."

14      [v]Section 2 DEFINITIONS ¶ (l) "'Loss' means 90% of Insured Tax Loss and, to the extent directly related to any Insured Tax Loss, 90% of any Contest Expenses

15 and 90% of any Gross-Ups."

16      [vi]Section 2 DEFINITIONS ¶ (j) "'Insured Tax Loss' means any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly

17 related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy." Section 2 DEFINITIONS ¶ (s) "'Taxes' mean (i) any

18 federal or California income taxes imposed by the Code or comparable provisions of applicable California law. (ii) any federal gift taxes imposed by the Code, and (iii)

19 the income taxes of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy." Section 2 DEFINITIONS ¶ (h)

20 "'Interest' means interest on an underpayment of Taxes assessed by a Taxing Authority."]

21

22      [vii]Section 2 DEFINITIONS ¶ (d) "'Contest Expenses' means the reasonable and necessary legal, accounting or appraisal expenses of outside legal and accounting advisors and appraisers (i.e. advisors and appraisers that are not

23 employees of the Insured) conducting that part of a Contest which directly relates to the Insured Tax Event, following the Named Insured having given notice under

24 Clause 6 of this Policy." Section 2 DEFINITIONS ¶ (c) "'Contest' means a dispute with a Taxing Authority over an adjustment in any Insured's liability for its Taxes as

25 it relates to an Insured Tax Event for which the Insurer may be required to indemnify the Insured hereunder."

26

27      [viii]Section 2 DEFINITIONS ¶ (f) "'Gross-Up' means the amount by which a payment under this Policy must be increased to take into account any federal or state

28 income taxes which will be imposed on any Insured in respect of such payment and any Gross-Up payment."

<sup>ix</sup>Section 2 DEFINITIONS ¶ (g) "'Inception Date' means the first date listed in Item 3 of the Declarations [August 29, 2001]."

<sup>x</sup>Section 2.   DEFINITIONS: "'Code' means the Internal Revenue Code of 1986, as amended and in effect as of the Inception Date and as the same may be amended after the Inception Date but only to the extent such amendments have retroactive effect."

<sup>xi</sup>Section 2.   DEFINITIONS ¶ (t) provides "'Taxing Authority' means (i) the Internal Revenue Service, (ii) the comparable authority of the State of California and (iii) the comparable authority of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy."

<sup>xii</sup>Section 2 DEFINITIONS ¶ (j) "'Insured Tax Loss' means any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy."   Section 2 DEFINITIONS ¶ (s) "'Taxes' mean (i) any federal or California income taxes imposed by the Code or comparable provisions of applicable California law. (ii) any federal gift taxes imposed by the Code, and (iii) the income taxes of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy."   Section 2 DEFINITIONS ¶ (h) "'Interest' means interest on an underpayment of Taxes assessed by a Taxing Authority."]

<sup>xiii</sup>Section 2 DEFINITIONS ¶ (d) "'Contest Expenses' means the reasonable and necessary legal, accounting or appraisal expenses of outside legal and accounting advisors and appraisers (i.e. advisors and appraisers that are not employees of the Insured) conducting that part of a Contest which directly relates to the Insured Tax Event, following the Named Insured having given notice under Clause 6 of this Policy."   Section 2 DEFINITIONS ¶ (c) "'Contest' means a dispute with a Taxing Authority over an adjustment in any Insured's liability for its Taxes as it relates to an Insured Tax Event for which the Insurer may be required to indemnify the Insured hereunder."

<sup>xiv</sup>Section 2 DEFINITIONS ¶ (f) "'Gross-Up' means the amount by which a payment under this Policy must be increased to take into account any federal or state income taxes which will be imposed on any Insured in respect of such payment and any Gross-Up payment."

OJS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

THE UPPER DECK COMPANY, a California corporation, and RICHARD P. McWILLIAM, individually, and as Trustee for the MPR Trust

## DEFENDANTS

AMERICAN INTERNATIONAL SPECIALITY LINES INSURANCE COMPANY; and DOES 1 through 10, inclusive

05 OCT 13 PM 2:38

**(b)** County of Residence of First Listed Plaintiff __San Diego__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
RICHARD K. HOWELL
Rutan & Tucker, LLP
611 Anton Blvd., Ste. 1400
Costa Mesa, CA 92626
(714) 641-5100

Attorneys (If Known)

DEPUTY

'05 CV 1945 IEG **(RBB)**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 871 IRS—Third Party | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC section 1332, 28 USC section 1391(a)
Brief description of cause:
BREACH OF INSURANCE CONTRACT

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____     DOCKET NUMBER _____

DATE
October 13, 2005

SIGNATURE OF ATTORNEY OF RECORD
RUTAN & TUCKER, LLPE   By

FOR OFFICE USE ONLY

RECEIPT # 117909   AMOUNT 250.00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

ORIGINAL

American LegalNet, Inc. | www.USCourtForms.com