Richard K. Howell (State Bar No. 144241)
Duke F. Wahlquist (State Bar No. 117722)
Bradley A. Chapin (State Bar No. 232885)
RUTAN & TUCKER, LLP
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
Telephone: 714-641-5100
Facsimile: 714-546-9035
Email: rhowell@rutan.com

Attorneys for Plaintiffs and Petitioners
The Upper Deck Company and Richard P. McWilliam

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UPPER DECK COMPANY, a California corporation, and RICHARD P. MCWILLIAM, individually, and as Trustee for the MPR Trust, <br><br> Plaintiffs. <br><br> v. <br><br> AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 05 CV 1945 IEG (RBB) <br><br> **DECLARATION OF DUKE F. WAHLQUIST IN SUPPORT OF PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD** <br><br> DATE: May 29, 2007 <br> TIME: 10:30 a.m. <br> CTROOM: 1 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

I, Duke F. Wahlquist declare as follows:

1.     I am an attorney at the law firm of Rutan & Tucker, LLP, counsel of record for plaintiffs The Upper Deck Company and Richard P. McWilliam (the "Insureds") in this action. I am a member in good standing of the State Bar of California and am licensed to practice law in all of the courts in the State of California and this District Court. I make this declaration in support of the Insureds' Motion to Vacate Arbitration Award Pursuant to 9 U.S.C. § 10. I have (unless indicated to the contrary) personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     This action was filed by the Insureds in October 2005. In February 2006, this Court stayed the action and ordered the parties to arbitrate their dispute pursuant to an arbitration provision in the parties' insurance agreement. The parties arbitrated their dispute in New York City, the site of defendant's North American headquarters, before a three-member panel ("Arbitrators") of the American Arbitration Association ("AAA") over the course of seven days in October and November 2006. By agreement of the parties, the Arbitrators were to issue a "reasonable award." On January 9, 2007, the AAA's Arbitrators issued a four-and-a-half page award ("Award") denying the Insureds any policy benefits whatsoever. Filed concurrently with this declaration is an **Appendix of Exhibits in Support of Motion to Vacate Arbitration Award** ("Appendix of Exhibits"), which contains all of the exhibits referenced in this Declaration. **Exhibit A** of the Appendix of Exhibits is a true and correct copy of the Arbitrators' January 9, 2007 Award, which I received by fax on January 9, 2007.

3.     I am a 1982 graduate of UCLA school of law and have been practicing law for nearly 25 years. The majority of my practice is devoted to insurance coverage litigation. I was one of the trial counsel for the Insureds in the AAA arbitration that led to the Award that is now at issue before this Court. I actively participated in the preparation of this matter for the arbitration hearings, and I assisted in drafting the pleadings, briefs and letters submitted to the Arbitrators. I attended each of the seven days of hearings, examined witnesses and participated in the closing arguments before the Arbitrators. I reviewed each of the 390 exhibits that were received by the arbitrators as evidence during the arbitration hearings. In addition, I have read each of the

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
801840.02 a04/09/07

DECLARATION OF DUKE F. WAHLQUIST

1 │ transcripts for all seven days of hearings in the arbitration.

2 │     4.      This case involves a $50 million insurance coverage dispute between the Insureds

3 │ and defendant American International Specialty Lines Insurance Company ("AIG"), a wholly

4 │ owned subsidiary of American International Group, Inc. In conjunction with KPMG, LLP's

5 │ development and sale of a tax strategy known as "SC2" (or "Subchapter S Charitable Contribution

6 │ Strategy"), AIG created its Fiscal Event Insurance Policy, which was made available for KPMG's

7 │ SC2 clients. According to testimony at the arbitration hearings, AIG sold at least four of these

8 │ specialized policies to KPMG SC2 clients. (A summary of the four policies was prepared by AIG

9 │ and received by the arbitrators as evidence during the arbitration hearings.) Effective August 29,

10 │ 2001, AIG issued to the Insureds a Fiscal Event Insurance Policy (the "Policy"), which provided

11 │ the Insureds with <u>$50 million</u> in coverage in exchange for a premium of <u>$3.25 million</u>. Filed

12 │ concurrently herewith in the Appendix of Exhibits as **Exhibit B** is a true and correct copy of the

13 │ Policy issued to the Insureds by AIG. Attached to the Policy as exhibits A through E are several

14 │ documents that were executed in connection with the Insureds' implementation of SC2, as well as

15 │ the Insureds' "Representation Letter," which was executed on September 4, 2001 by the Insureds

16 │ in connection with the issuance of the Policy. The exhibits attached to the Policy (and included as

17 │ Exhibit B to the Appendix of Exhibits) are as follows:

18 │     A.     Three KPMG, LLP Opinion Letters, dated May 1, 2001, issued

19 │           to the Insureds in connection with their purchase and

20 │           implementation of SC2;

21 │     B.     The September 4, 2001 Representation Letter;

22 │     C.     The Shareholders Agreement;

23 │     D.     The Warrant Agreement; and

24 │     E.     The FMV Valuation, dated March 31, 2001.

25 │     5.      The evidence at the hearing showed that the Insureds purchased SC2 from KPMG

26 │ and implemented the strategy in March of 2001. All of the following facts are evidenced by the

27 │ exhibits to the Policy, attached as Exhibit B to the Appendix of Exhibits. I recite them to put the

28 │ balance of this Declaration in context.

Rutan & Tucker LLP
attorneys at law

As of March 28, 2001, Upper Deck had 920,000 shares of stock outstanding, all of which were owned by the MPR Trust. On the advice of KPMG, Upper Deck amended its Articles of Incorporation on March 28, 2001 to permit the issuance of 8,280,000 shares of Non-Voting Common Stock in Upper Deck and these shares were issued to the MPR Trust on March 29, 2001.

On March 29, 2001 Upper Deck and the MPR Trust entered into a "Warrant Agreement", which was attached to the Policy as Exhibit D, in which Upper Deck issued warrants to purchase an additional 82,800,000 shares of non-voting common stock (the "Warrants").

Two days later, on March 31, 2001, the MPR Trust donated all of the Non-Voting Common Stock Shares to the Austin Firefighters Relief and Retirement Fund ("Firefighters"). Fair Market Value, Inc. ("FMV") appraised the Non-Voting Common Stock in Upper Deck as of that date. FMV's written appraisal, which was attached to the Policy as Exhibit E, concluded that the shares donated to the Firefighters had a fair market value as of March 31, 2001 of $1,357,920. (Policy Exhibit E, p. 3.)

On March 31, 2001 the MPR Trust also entered into a Shareholders Agreement with the Firefighters. The Shareholders Agreement is attached to the Policy as Exhibit C.

6.      The evidence showed that approximately a year after the Insureds purchased and implemented SC2, the IRS begin investigating SC2, which investigation would lead to the IRS listing SC2 as an abusive tax shelter that the IRS would vigorously challenge. An early sign of the IRS' investigation was in April 2002, when the IRS issued summonses and document requests to KPMG, requiring KPMG to reveal all of its clients using a variety of tax strategies, including all SC2 participants. The IRS then specifically sought out each SC2 participant's cooperation in the investigation into SC2 through the issuance of its Announcement 2002-2, a voluntary disclosure initiative released in April 2002. Filed concurrently herewith in the Appendix of Exhibits as **Exhibit E** is a true and correct copy of the IRS' Announcement 2002-2, which was received by the arbitrators as evidence at the arbitration hearings.

The evidence showed that in April 2004, the IRS issued Notice 2004-30, which confirmed that the IRS considered <u>all</u> SC2 transactions to be "abusive tax shelter[s]." Filed concurrently herewith in the Appendix of Exhibits as **Exhibit F** is a true and correct copy of Notice 2004-30.

1  Notice 2004-30 officially placed the Insureds and all other SC2 participants on notice that the IRS

2  would not allow the tax benefits claimed by the SC2 participants; the same tax benefits KPMG

3  had opined (and AIG insured) would not be successfully challenged by the IRS or FTB.

4      The evidence further showed that following the publication of Notice 2004-30, the IRS

5  served the Insureds with several IDRs (Information Document Requests) for information

6  pertaining to the Insureds' implementation of SC2.  Each of the IDRs and the Insureds responses

7  thereto were received by the Arbitrators as evidence at the arbitration hearings.

8      The evidence also showed that on November 8, 2004 the IRS issued a Coordinated Issue

9  Paper outlining the reasons for and its basis for challenging every SC2 transaction as attempting to

10 illegally shelter income, and further instructing its agents on how to proceed with attacking each

11 and every SC2 transaction.  Filed concurrently herewith in the Appendix of Exhibits as **Exhibit G**

12 is a true and correct copy of the IRS' Coordinated Issue Paper, which was received by the

13 Arbitrators as evidence at the arbitration hearings.

14      Concurrently with the IRS investigation into SC2, the California Franchise Tax Board

15 conducted an independent investigation, which ultimately led to the FTB challenging SC2 in a

16 manner similar to the IRS.  Filed concurrently herewith in the Appendix of Exhibits as **Exhibit H**

17 is a true and correct copy of the FTB's Voluntary Compliance Initiative ("VCI"), which the

18 Insureds participated in with AIG's consent.  The VCI was received by the Arbitrators as evidence

19 at the arbitration hearings.  Participation allowed the Insureds to amend their tax returns for the

20 impacted tax years (2001 and 2002), effectively unwinding the SC2 transaction while paying back

21 taxes and interest for those years, but allowing the Insureds to avoid penalties for their

22 participation in SC2.

23      Ultimately, with AIG's consent, the Insureds settled with the IRS for approximately $80

24 million in back taxes and interest and settled with the FTB for approximately $17 million in back

25 taxes and interest.  Documents reflecting these settlement figures were received by the Arbitrators

26 as evidence at the arbitration hearings.

27      7.      The evidence showed that based on, *inter alia*, the foregoing, the Insureds made a

28 claim on AIG requesting Policy benefits.  The Insureds and AIG went back and forth for over two

1  years with letters, emails, telephone conferences, and in person meetings before AIG finally made

2  a coverage determination on July 29, 2005. In a letter to counsel for the Insureds dated July 29,

3  2005, AIG denied that any of the Insureds' losses were covered by the Policy. Filed concurrently

4  herewith in the Appendix of Exhibits as part of **Exhibit D** is a true and correct copy of AIG's July

5  29, 2005 coverage denial letter. Also filed concurrently herewith in the Appendix of Exhibits as

6  part of **Exhibit D** is a true and correct copy of AIG's July 9, 2004 letter in which AIG set forth its

7  preliminary analysis of its coverage position. Both of these letters were received by the arbitrators

8  as evidence at the arbitration hearings.

9      8.      On November 14, 2005, AIG filed its Demand for Arbitration and Arbitration

10  Complaint with the AAA in New York. AIG's Arbitration Complaint sought a declaration that

11  AIG owed no Policy benefits to Insureds. Filed concurrently herewith in the Appendix of Exhibits

12  as **Exhibit I** is a true and correct copy of AIG's Arbitration Complaint.

13      On January 5, 2006, the Insureds filed an Answer and Counterclaim against AIG seeking

14  damages for breach of the insurance contract stated in the Policy. Filed concurrently herewith in

15  the Appendix of Exhibits as **Exhibits J and K** respectively are true and correct copies of the

16  Insureds' Answer and Counterclaim.

17      Filed concurrently herewith in the Appendix of Exhibits as **Exhibit L** is a true and correct

18  copy of AIG's Response to Upper Deck's Counterclaim, which AIG submitted to AAA on March

19  3, 2006.

20      9.      In accordance with a schedule of briefing coordinated by the Arbitrators, each party

21  filed a Pre-Hearing Opening Brief, a Pre-Hearing Reply Brief, and a Post-Hearing Closing Brief.

22  Filed concurrently herewith in the Appendix of Exhibits as **Exhibits M thru R** respectively are

23  true and correct copies of the six aforementioned briefs filed by the Insureds and AIG during the

24  course of the arbitration.

25      10.     In addition to the pleadings and the briefing described above, the parties submitted

26  expert reports from individually retained insurance experts. On behalf of the Insureds, reports

27  were submitted by Raphael Cotkin (insurance expert) and Steven R. Mather (tax expert); and on

28  behalf of AIG, reports were submitted on behalf of Linda B. Burke and Robert Burke (both tax

1 experts – no relation). Filed concurrently herewith in the Appendix of Exhibits as **Exhibits S thru**

2 **V** respectively are true and correct copies of the expert reports submitted by Mr. Cotkin, Mr.

3 Mather, Ms. Burke, and Mr. Burke (in that order). All of the expert reports were received by the

4 Arbitrators as evidence at the arbitration hearings.

5       11.     Filed concurrently herewith in the Appendix of Exhibits as **Exhibits w thru AA**

6 are true and correct copies of portions of the certified hearing transcript (condensed version),

7 inclusive of testimony from Peter Lathrop (was Vice President of Tax at AIG during relevant time

8 period), of Ms. Burke, of Mr. Burke, and of Mr. Mather; as well as the entire transcript from the

9 closing arguments session of the hearing. I have personally reviewed these transcripts and having

10 attended the hearings myself, can confirm that the transcripts reflect events at the hearings.

11       12.     In AIG's Arbitration Complaint, AIG raised for the first time a coverage defense

12 based on an assertion that the Insureds had failed to satisfy the Policy's Section 9: "It is a

13 condition precedent to the right of the Insureds to be indemnified hereunder that the . . . [t]he

14 Insureds shall have prepared and filed all applicable Tax Returns in a manner materially consistent

15 with that anticipated by the Opinions and/or the Representation Letter." AIG contended that Mr.

16 McWilliam's failure to take a charitable deduction on his 2001 tax return violated the

17 aforementioned Section 9(b) of the Policy. Despite citation of New York law to the Arbitrators

18 that AIG's failure to raise this defense at an earlier time constituted a legal waiver of the defense

19 (*see*, Appendix of Exhibits, pages 381, 395, 467), the Arbitrators failed to ever acknowledge or

20 address the fact that under New York law, AIG was barred from raising a new coverage defense at

21 this stage.

22       Moreover, AIG contended that material consistency with the Opinions required that Mr.

23 McWilliam claim a charitable deduction for the approximately $1.3 million appraised value of the

24 Non-Voting Common Stock on his income tax returns for 2001. However, during the entire

25 course of the arbitration proceedings AIG never once introduced evidence that (regardless of

26 whether or not consistency with the Opinions required claiming the deduction) the lack of a

27 charitable deduction on Mr. McWilliam's 2001 income tax returns was material to anything.

28 Nowhere in any of AIG's briefing, in any of its experts reports, in the oral testimony of any of its

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
801840.02 a04/09/07

DECLARATION OF DUKE F. WAHLQUIST

witnesses, or in its closing argument did AIG ever address how Mr. McWilliam's failure to claim a tax deduction in 2001 for his gift to the Firefighters materially impacted either the validity of the IRS/FTB's claim or the Insureds' Policy coverage. And the Arbitrators did address this issue, except to cite it as a basis for finding against the Insureds in the Award.

Moreover, Mr. McWilliam's AGI for the tax years 2001 and 2002 was $76,276 and a negative $106,336, respectively. Mr. McWilliam's federal tax returns were received by the Arbitrators as evidence at the hearing as exhibit nos. 352 and 356, respectively. Consequently, under limitations recognized by KPMG in its Opinions, any charitable deduction for the 2001 tax year would have been limited to $28,138 -- far short of the approximately $1.3 million appraised value of the Non-Voting Common Stock; and no deduction would have been permitted in 2002. Moreover, after other deductions and exemptions, Mr. McWilliam's taxable income for 2001 and 2002 was already $0. No tax benefits would have inured for taking a charitable deduction in either 2001 or 2002.

For the sake of maintaining Mr. McWilliam's privacy, his tax returns are not attached to this Motion, but can be made available for in camera review by the Court if the Court wishes to review them in connection with this Motion.

13. AIG's other primary argument during the arbitration was that the Insureds violated the Policy provisions by reacquiring the Non-Voting Common Stock from Firefighters without informing AIG or obtaining AIG's consent. In December 2002, the Insureds entered into a Share Purchase Agreement with Firefighters, and repurchased the shares for $2 million, a nearly 50% increase in value from the time the shares were gifted to Firefighters less than two years earlier. Filed concurrently herewith in the Appendix of Exhibits as **Exhibit C** is a true and correct copy of the December 2002 Share Purchase Agreement, which was received by the Arbitrators as evidence at the arbitration hearings.

14. Despite being developed and sold by one of the largest accounting firms in the world, and despite being insured by the largest insurer in the world, SC2 was seriously flawed. While this was not readily apparent to the Insureds initially, the government investigations into SC2 uncovered evidence that KPMG knew this. In addition to the investigation and crack down

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
801840.02 a04/09/07
DECLARATION OF DUKE F. WAHLQUIST

1    by the IRS and the FTB described above, KPMG and SC2 were the subject of two extensive

2    Senate investigations and the details of KPMG's intricate tax shelter infrastructure were set forth

3    in two United States Senate Subcommittee reports issued in late 2003 and early 2004.

4         In early 2002, under the chairmanship of Senator Carl Levin, the United States Senate

5    Permanent Subcommittee on Investigations of the Committee on Governmental Affairs

6    (hereinafter the "Levin Committee") began investigating abusive tax shelters developed, marketed,

7    and implemented by professional organizations such as accounting firms, banks, investment

8    advisors, and law firms. The Levin committee's investigation culminated in the issuance of a 130-

9    page report entitled "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial

10    Professionals – Four KPMG Case Studies: FLIP, OPIS, BLIPS, and SC2" (hereinafter the "Levin

11    Report"). The public report is available on the internet at www.senate.gov (and specifically at

12    http://www.senate.gov/~govt-aff/_files/sprt10834tax_shelters.pdf).

13         Subsequently, on April 13, 2005, the Permanent Subcommittee of the Committee On

14    Homeland Security and Governmental Affairs of the United States Senate (hereinafter the

15    "Homeland committee"), following its own investigation into KPMG, published a further report

16    entitled "The Role of Professional Firms In The U.S. Tax Shelter Industry" (hereinafter the

17    "Homeland Report"). The Homeland report is also available at www.senate.gov (and specifically

18    at http://frwebgate.access.gpo.gov/cgi-

19    bin/getdoc.cgi?dbname=109_cong_reports&docid=f:sr054.pdf).

20         Both of these reports were received by the Arbitrators as evidence at the arbitration

21    hearings.

22         Both of these reports contain findings related to KPMG's conduct and its apparent

23    disregard for flaws in the SC2 tax strategy. The Levin Report, published in November 2003,

24    revealed that even KPMG tax professionals considered SC2 a risky tax strategy, one that would

25    attract a vigorous and "at least partially successful" challenge if the IRS ever caught wind of it.

26    (Levin Report, p. 44.) And the Levin Report also identified AIG as one of the insurance

27    companies associated with KPMG and offering SC2 tax insurance policies to help market and sell

28    the SC2 product to KPMG clients. (Levin Report, p. 57.) The Levin Committee found that

Rutan & Tucker LLP
attorneys at law

1  KPMG aligned itself with other professional organizations (like AIG) to promote, sell, and
2  implement abusive and illegal tax shelters including SC2.

3        Ultimately, several of KPMG's most prominent tax partners were indicted by a federal
4  grand jury and charged with conspiracy to commit fraud in connection with several KPMG
5  abusive tax shelters.  In August 2005, KPMG entered into a Deferred Prosecution Agreement
6  ("DPA") in which it admitted that it unlawfully assisted United States taxpayers with avoiding
7  income taxes on billions of dollars in capital gain and ordinary income by "developing, promoting
8  and implementing unregistered and fraudulent tax shelters."  As part of the DPA, KPMG agreed to
9  pay $456 million to the United States and to cease operating its private client tax practice, to cease
10 its compensation and benefits tax practice, to cease developing, marketing, selling, or
11 implementing an pre-packaged tax products, cease charging or accepting flat fees for providing tax
12 services.  The DPA and related documents are available online at
13 http://taxprof.typepad.com/taxprof_blog/2005/08/kpmg_settlement.html.  The DPA was received
14 by the Arbitrators as evidence at the arbitration hearings.

15       Most recently, the Wall Street Journal (March 29, 2007) reported that the six-hundred
16 lawyer law firm of Jenkins & Gilchrist disbanded as a result of its involvement with questionable
17 tax shelters (including SC2) and has agreed to pay a $76 million fine to settle a federal criminal
18 tax shelter probe for its work related to KPMG's tax shelter practice.

19       I declare under penalty of perjury under the laws of the United States of America that the
20 foregoing is true and correct.  Executed at Costa Mesa, California this 9th day of April, 2007.

22                              _____
23                                    DUKE F. WAHLQUIST

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
801840.02 a04/09/07
DECLARATION OF DUKE F. WAHLQUIST