# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration Between:
Case No. 13 195 02486 05
American International Specialty Lines
      Insurance Company             (Claimant)
          -and-
The Upper Deck Company, the MPR Trust
    and Richard P. McWilliam        (Respondents)

## AWARD OF ARBITRATORS

    WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration provisions of that certain Fiscal Event Insurance Policy Number 405-88-33 (the "Policy") effective August 29, 2001 and issued January 24, 2002; and having been duly sworn; and having heard and duly considered the proofs and allegations of American International Specialty Lines Insurance Company (hereinafter "Claimant" or "AISLIC") and of the Upper Deck Company, Richard P. McWilliam and the MPR Trust (hereinafter "Respondents"); do hereby DECIDE and AWARD as follows:

    Alleging Respondents' breach of the warranties given to induce coverage, applicability of the Policy's exclusions, absence of an insured "tax loss" and failure to comply with an express condition precedent, Claimant seeks a Declaration that the Policy it issued in August 2001 does not cover the more than $80 million in "losses" Respondents suffered in the aftermath of a failed tax shelter. In addition to seeking the Policy limits of $50 million in coverage, Respondents have counterclaimed for compensatory and punitive damages under California law on account of Claimant's alleged "bad faith" in handling, and ultimately denying, the claim for coverage, plus their costs and attorneys' fees.

### The Relevant Facts

    By early 2001, Respondents embarked upon a proposed tax savings plan being marketed by KPMG to Subchapter S Corporations like Upper Deck (the "SC2 Transaction"), the key components of which included (a) a donation to the tax-exempt Austin Firefighters Relief Fund ("Austin") of Upper Deck's non-voting stock, valued in an independent appraisal at approximately $1,357,900 in March 2001; and (b) a Shareholders Agreement between Respondents and Austin which gave Austin an 180-day "put option" commencing April 1. 2003, which would require Upper Deck to redeem that stock at fair market value as determined by an independent appraisal (and also gave Upper Deck a right of first refusal should Austin try to sell the stock elsewhere). If successful, as KPMG opined, Respondents should be able to save millions in state and

EXHIBIT  A , PAGE  1

Case No. 13 195 02486 05                                                                 Page 2
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

federal income taxes by allocating 90% of Upper Deck's income to Austin by virtue of this "gift" of stock. In May 2001, after Respondents' SC2 Transaction had closed, Claimant was solicited to insure this tax savings plan. After a few months of negotiation and investigation, and after Claimant had been provided with, among other things, Upper Deck's income projections, the Shareholders Agreement with Austin and related documents, KPMG opinion letters and a representation letter from Mr. McWilliam and Upper Deck, AISLIC issued a binder on August 29, 2001, and the subject Policy on or about January 24, 2002.

In April 2002, Respondents were advised that, in response to an IRS summons, KPMG had disclosed their identity as having engaged in the SC2 Transaction; and later that month Respondents made voluntary disclosures to the IRS describing the steps taken in consummating its transactions with Austin in 2001, including the existence and relevant provisions of the Shareholders Agreement. Before the end of December 2002, and without telling Claimant, Respondents redeemed/purchased for $2 million the stock it purportedly gifted to Austin in 2001, thereby effectively exiting the tax strategy that they had embarked upon and that AISLIC had insured. In April 2004, the IRS issued Notice 2004-30 listing the SC2 Transaction promoted by KPMG, and engaged in by Respondents in 2001, as a tax avoidance transaction that the IRS intended to challenge; and in August 2004 the IRS served a series of IDRs on Respondents, pursuant to which Respondents produced the documentation relating to the repurchase of the stock from Austin in December 2002. In April 2005, the IRS offered to settle all issues relating to Respondents' SC2 Transaction and its aftermath, the crux of which was to tax the Respondents as if the SC2 Transaction never occurred. Soon thereafter, Respondents accepted the IRS offer of settlement (albeit conditionally), the direct effect of which was the obligation to pay more than $80 million in federal and state taxes.

With respect to Respondents' communications with AISLIC after the Policy was issued, as early as August 2003 Claimant had agreed to advance defense costs as the IRS pursued their investigation of Respondents and the SC2 Transaction (notwithstanding that AISLIC disputed the existence of a "Claim" under the Policy). In March 2004, when AISLIC first learned that Upper Deck had repurchased its stock from Austin in December 2002 and effectively "exited" the SC2 strategy, Respondents communicated their apparent intention to defend the transactions (a position with which Claimant agreed). On May 11, 2004, AISLIC sent a "reservation of rights" letter to Respondents' then counsel. After the IRS made the offer of settlement in April 2005, Respondents' new counsel informed Claimant that, rather than defend the transactions as a viable tax shelter, Respondents intended to settle with the IRS. On July 29, 2005, AISLIC denied coverage.

EXHIBIT *A*, PAGE 2

Case No. 13 195 02486 05                                               Page 3
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

## The Relevant Policy Provisions

The KPMG opinions, the March 2001 Shareholders Agreement, the FMV, Inc. appraisal of more than $1.3 million for the shares gifted to Austin and related documents were all annexed to the Policy, made a part thereof and defined the transaction being insured. The representation letter annexed to the Policy stated in pertinent part: "The facts, assumptions of fact, and understandings of fact set forth in the opinions of KPMG LLP attached as Exhibit A to the Policy were true and correct on the date of such opinions and continue to be true and correct on [September 4, 2001]". Endorsement No. 1 essentially defines an "Insured Tax Event" as an assertion by a taxing authority that the tax strategy Respondents engaged in by virtue of the 2001 transactions with Austin, and with respect to which KPMG had opined, was invalid or an impermissible way to "shelter" from taxation 90% of the income of Upper Deck or served to "declassify" Upper Deck as a Subchapter S Corporation. The arguably relevant exclusions in the Policy include 3(a), involving acts of criminal or civil fraud; 3(b), involving a loss "arising out of, based upon or attributable to any material inaccuracy in the facts set forth or referenced in the Representation Letter"; and 3(h), which excludes from coverage a Loss "to the extent such Loss arises out of, is based upon, or is attributable to an amendment to the Shareholders Agreement . . . without the Insurer's prior written consent (which shall not be unreasonably withheld by Insurer)". The Policy recites that coverage is being provided "[i]n consideration of the payment of the premium [of $3.25 million], and in reliance upon the representations made and documents provided to" Claimant. The payment of insurance proceeds, for defense costs or otherwise, was subject to a $500,000 retention.

Paragraph 16 of the Policy provides for arbitration of disputes, and specifies that: "No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable Limit of Liability [$50 million] set forth in this Policy". Paragraph 16 also recites: "The construction, validity and performance of this Policy shall be governed by the laws of the State of New York, provided, however that the Policy shall be construed in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the Policy, without regard to the authorship of the language and without any presumption in favor of either party".

## The Claims

There are but two (2) simple truths here: First, Claimant insured a specific tax strategy, premised upon certain consummated and contemplated transactions, that KPMG opined "should" succeed or was "more likely than not" to succeed in sheltering from taxation 90% of Upper Deck's income. Second, without telling Claimant, Respondents abandoned that tax strategy, undid certain transactions and engaged in others that all but guaranteed the failure of the attempt to shelter from taxation Upper Deck's income.

EXHIBIT  *A* , PAGE  3

Case No. 13 195 02486 05                                    Page 4
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

Respondents made a business decision to change the "deal" that AISLIC insured, and
suffered the consequence of losing insurance coverage for the more than $80 million in
federal and state taxes imposed with respect to that business decision.

    When Respondents bought back its gift of stock from Austin in December 2002
for $2 million, without a fair market appraisal and without even telling Claimant let alone
seeking AISLIC's consent, and made a $75 million distribution to Mr. McWilliam
(presumably from the fortuitous increase in Upper Deck's earnings), Respondents
abandoned the Shareholders Agreement underlying the tax strategy the Policy insured
and materially impaired the underpinnings of a defense of that tax strategy before the IRS
or otherwise. There was no civil or criminal fraud here and, technically, there was no
"amendment" of the Shareholders Agreement, thereby making Exclusions 3(a) and 3(h)
inapplicable. However, there can be no doubt that the statements and assumptions of fact
in the KPMG opinion letters as to the allowance of the charitable contribution (*i.e.,* that
fair market value was essential at the time of contribution and at redemption), statements
and assumptions of fact that were warranted to be true in the Representation Letter, were
proven false by Respondents' redemption of the shares in December 2002. Indeed,
Respondent McWilliam did not even file his tax returns in a manner consistent with the
SC2 strategy as required by Paragraph 9(b) of the Policy: He failed to record his alleged
charitable contribution to Austin while nonetheless attempting to "shelter" income by
allocating 90% of it to this tax-exempt entity.

    For whatever reason(s), Respondents became uncomfortable with the tax strategy
that they had embarked upon in 2001 – the tax strategy that AISLIC insured. When they
abandoned that tax strategy, along with any reasonable semblance of a defense for their
business decision in consultation with AISLIC, they effectively abandoned any realistic
expectation of insurance coverage for the ensuing tax loss. Thus, whether viewed as
excluded by 3(b), precluded by a breach of warranty, a failure to comply with 9(b)'s
condition precedent or absence of an insured "loss", Respondents are not entitled to any
proceeds from the Policy. (Indeed, while the Panel expressed its willingness to consider
the "defense costs" agreed to by AISLIC in August 2003, Respondents' post-hearing
submissions solicited by the Panel failed to prove that, not including this arbitration, their
attorneys fees expended ($440,340) exceeded the $500,000 retention). Thus, for the
reasons set forth herein and otherwise, Claimant is entitled to a Declaration that there is
no coverage under the Policy.

**The Counterclaims**

    Respondents' attempts to recover compensatory and punitive damages on account
of Claimant's alleged "bad faith" are without merit. First, New York law, which, per
paragraph 16 of the Policy, expressly applies to the performance of the Policy, does not
recognize such a separate "tort" cause of action here. Second, even if California law were
deemed to apply, Respondents failed to carry their burden of proving that the positions

Case No. 13 195 02486 05                                          Page 5
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

taken by AISLIC were unreasonable or that AISLIC acted in bad faith by taking them.
Indeed, how can AISLIC be accused of acting in bad faith in withholding contest
expenses and coverage when there was no basis for same? Finally, there being no
agreement to the contrary, each party shall bear its own costs and expenses, including
attorneys fees, incurred in this arbitration.

    Accordingly, as and for an AWARD herein:

    1. It is hereby DECLARED that there is no coverage under the Policy and no
insurance proceeds payable to these Respondents.

    2. Respondents' counterclaims, and each of them, are DENIED.

    3. The administrative fees of the American Arbitration Association totaling
$27,000.00 and the compensation of the Arbitrators totaling $68,757.50 shall be borne as
incurred.

    4. This Award is in full and complete settlement and satisfaction of any and all
claims, counterclaims, defenses and offsets properly submitted to this Arbitration; and
any claim or counterclaim not specifically referenced herein is nonetheless DENIED.

    5. This Award may be executed in any number of counterparts, each of which
shall be deemed an original, and all of which together shall constitute one and the same
instrument.

 

_1/6/07_
Date

                                John F. Byrne, Esq.

 

Date                                         Stephen D. Kramer, Esq.

 

Date                                         Charles J. Moxley Jr., Esq.

EXHIBIT _A_, PAGE _5_

Case No. 13 195 02486 05                                                    Page 5
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

taken by AISLIC were unreasonable or that AISLIC acted in bad faith by taking them.
Indeed, how can AISLIC be accused of acting in bad faith in withholding contest
expenses and coverage when there was no basis for same? Finally, there being no
agreement to the contrary, each party shall bear its own costs and expenses, including
attorneys fees, incurred in this arbitration.

     Accordingly, as and for an AWARD herein:

     1. It is hereby DECLARED that there is no coverage under the Policy and no
insurance proceeds payable to these Respondents.

     2. Respondents' counterclaims, and each of them, are DENIED.

     3. The administrative fees of the American Arbitration Association totaling
$27,000.00 and the compensation of the Arbitrators totaling $68,757.50 shall be borne as
incurred.

     4. This Award is in full and complete settlement and satisfaction of any and all
claims, counterclaims, defenses and offsets properly submitted to this Arbitration; and
any claim or counterclaim not specifically referenced herein is nonetheless DENIED.

     5. This Award may be executed in any number of counterparts, each of which
shall be deemed an original, and all of which together shall constitute one and the same
instrument.

| | |
|---|---|
| _____ | _____ |
| Date | John F. Byrne, Esq. |
| | |
| 1/5/07 | _Stephen D. Kramer_ |
| Date | Stephen D. Kramer, Esq. |
| | |
| _____ | _____ |
| Date | Charles J. Moxley Jr., Esq. |

EXHIBIT  *A* , PAGE  6

Case No. 13 195 02486 05                                              Page 5
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

taken by AISLIC were unreasonable or that AISLIC acted in bad faith by taking them. Indeed, how can AISLIC be accused of acting in bad faith in withholding contest expenses and coverage when there was no basis for same? Finally, there being no agreement to the contrary, each party shall bear its own costs and expenses, including attorneys fees, incurred in this arbitration.

   Accordingly, as and for an AWARD herein:

   1. It is hereby DECLARED that there is no coverage under the Policy and no insurance proceeds payable to these Respondents.

   2. Respondents' counterclaims, and each of them, are DENIED.

   3. The administrative fees of the American Arbitration Association totaling $27,000.00 and the compensation of the Arbitrators totaling $68,757.50 shall be borne as incurred.

   4. This Award is in full and complete settlement and satisfaction of any and all claims, counterclaims, defenses and offsets properly submitted to this Arbitration; and any claim or counterclaim not specifically referenced herein is nonetheless DENIED.

   5. This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

---

_____                     _____
   Date                                                 John F. Byrne, Esq.


_____                     _____
   Date                                                 Stephen D. Kramer, Esq.


1/16/07
_____                     _____
   Date                                                 Charles J. Moxley Jr., Esq.


EXHIBIT  A , PAGE  7

Case No. 13 195 02486 05                                    Page 6
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

    I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Award.

_____1/6/07_____                          _____
Date                                          John F. Byrne, Esq.

    I, Stephen D. Kramer, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Award.

_____                       _____
Date                                          Stephen D. Kramer, Esq.

    I, Charles J. Moxley Jr., Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Award.

_____                       _____
Date                                          Charles J. Moxley Jr., Esq.

EXHIBIT __A__, PAGE __8__

Case No. 13 195 02486 05
AISLIC and Upper Deck, *et al.*                                         Page 6
Award of Arbitrators

I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one
of the individuals described in and who executed the foregoing instrument, which is my
Award.

_____                    _____
Date                                        John F. Byrne, Esq.


I, Stephen D. Kramer, Esq., do hereby affirm upon my Oath as Arbitrator that I
am one of the individuals described in and who executed the foregoing instrument, which
is my Award.

__1|5|07_____                         _____
Date                                        Stephen D. Kramer, Esq.


I, Charles J. Moxley Jr., Esq., do hereby affirm upon my Oath as Arbitrator that I
am one of the individuals described in and who executed the foregoing instrument, which
is my Award.


_____                    _____
Date                                        Charles J. Moxley Jr., Esq.




EXHIBIT _A_, PAGE _9_

Case No. 13 195 02486 05                                     Page 6
AISLIC and Upper Deck, *et al.*
Award of Arbitrators

    I, John F. Byrne, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Award.

| | |
|---|---|
| _____ | _____ |
| Date | John F. Byrne, Esq. |

    I, Stephen D. Kramer, Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Award.

| | |
|---|---|
| _____ | _____ |
| Date | Stephen D. Kramer, Esq. |

    I, Charles J. Moxley Jr., Esq., do hereby affirm upon my Oath as Arbitrator that I am one of the individuals described in and who executed the foregoing instrument, which is my Award.

| | |
|---|---|
| 1/16/07 | *[signature]* |
| Date | Charles J. Moxley Jr., Esq. |

EXHIBIT __A__, PAGE __10__

# EXHIBIT B

**AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY**
A CAPITAL STOCK INSURANCE COMPANY
70 PINE STREET
NEW YORK, NY 10270

NOTICE: THIS INSURANCE POLICY IS WRITTEN BY AN INSURER NOT LICENSED BY THE STATE OF NEW YORK AND NOT SUBJECT TO ITS SUPERVISION.

Policy No.: 405-88-33

## FISCAL EVENT INSURANCE POLICY

NOTICE: THIS IS A CLAIMS MADE POLICY. EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE (CONTEST EXPENSES). AMOUNTS INCURRED FOR LEGAL DEFENSE (CONTEST EXPENSES) SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MUST ADVANCE COVERED CONTEST EXPENSES PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

ITEM 1(a).   NAMED INSURED:   The Upper Deck Company, a California corporation and any Permitted Assignee thereof

MAILING ADDRESS:   5909 Sea Otter Place
Carlsbad, CA 92008-6621

ITEM 1(b).   ADDITIONAL INSUREDS: The MPR Trust, Mr. Richard McWilliam, any other person to which coverage under this Policy is extended in accordance with Endorsement No. 2 to this Policy, and any Permitted Assignee of any of the foregoing

EXHIBIT _B_, PAGE _11_

ITEM 2.     INSURED TAX EVENT:    See Endorsement No. 1.

ITEM 3.     POLICY PERIOD:   From August 29, 2001 to the later of (i) November 30, 2006 or (ii) the expiration of the applicable statute of limitations with respect to the tax items described in the Insured Tax Event relating to the transactions described in the KPMG LLP opinions; provided, however, that in no event shall the Policy Period expire later than November 30, 2010.
(12:01 A.M. Standard Time at the address stated in Item 1(a))

ITEM 4.     LIMIT OF LIABILITY:     $50,000,000, in the aggregate

ITEM 5.     RETENTION:              $500,000, in the aggregate

ITEM 6:     PREMIUM:                $3,250,000, exclusive of any applicable surplus lines taxes and/or independent procurement taxes, as well as any premium tax, stamping office fee, and/or any other surcharges or taxes required by law

It is the responsibility of the Insureds to pay all applicable surplus lines taxes and/or independent procurement taxes, as well as any premium tax, stamping office fee, and/or any other surcharges or taxes required by law.

Authorized Representative or Countersignature
(in states where applicable)

ii

EXHIBIT  B , PAGE 12

## AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY

**NOTICE: THIS INSURANCE POLICY IS WRITTEN BY AN INSURER NOT LICENSED BY THE STATE OF NEW YORK AND NOT SUBJECT TO ITS SUPERVISION.**

### FISCAL EVENT INSURANCE POLICY

In consideration of the payment of the premium, and in reliance upon the representations made and documents provided to American International Specialty Lines Insurance Company (the "Insurer"), the Insurer agrees as follows:

**1.    INSURING AGREEMENT**

The Insurer shall pay, subject to the applicable Retention (as defined herein) and other terms and conditions of this Policy, the Loss of the Insureds arising from a Claim first made against any Insured during the Policy Period and reported to the Insurer pursuant to the terms of this Policy. The Insurer shall, in accordance with and subject to Clause 7 hereof, advance Contest Expenses of such Claim excess of the Retention prior to its Final Determination.

**2.    DEFINITIONS**

(a)    "Claim" means any written notice from any Taxing Authority alleging any Insured may be liable for Taxes, but only if such Taxes are directly related in whole or in part to the Insured Tax Event.

(b)    "Code" means the Internal Revenue Code of 1986, as amended and in effect as of the Inception Date and as the same may be amended after the Inception Date but only to the extent such amendments have retroactive effect.

(c)    "Contest" means a dispute with a Taxing Authority over an adjustment in any Insured's liability for its Taxes as it relates to the Insured Tax Event for which the Insurer may be required to indemnify any Insured hereunder.

(d)    "Contest Expenses" means the reasonable and necessary legal, accounting or appraisal expenses of outside legal and accounting advisors and appraisers (i.e. advisors and appraisers that are not employees of the Insured) conducting that part of a Contest which directly relates to the Insured Tax Event, following the Named Insured having given notice under Clause 6 of this Policy.

(e)    "Final Determination" means (i) a decision, judgement, decree, or other order by a court of competent jurisdiction, or (ii) a closing agreement, accepted offer in compromise or other final settlement with a Taxing Authority.

EXHIBIT _B_, PAGE _13_

(f)     "Gross-Up" means the amount by which a payment under this Policy must be increased to take into account any federal or state income taxes which will be imposed on any Insured in respect of such payment and any Gross-Up payment.

(g)     "Inception Date" means the first date listed in Item 3 of the Declarations.

(h)     "Interest" means interest on an underpayment of Taxes assessed by a Taxing Authority.

(i)     "Insureds" means the Named Insured listed in Item 1(a) of the Declarations and the Additional Insureds listed in Item 1(b) of the Declarations. .

(j)     "Insured Tax Loss" means any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy.

(k)     "Issuance Date" means the earlier of the issuance of a binder, if any, or the issuance of this Policy.

(l)     "Loss" means 90% of Insured Tax Loss and, to the extent directly related to any Insured Tax Loss, 90% of any Contest Expenses and 90% of any Gross-Ups.

(m)     "Offsetting Benefit" means (i) any amount realized by any Insured, with respect to any year, of any saving of any Taxes that would not have been realized but for an Insured Tax Loss and (ii) any amount of Taxes that would have been imposed on an Insured, with respect to any relevant year for which there is an Insured Tax Loss, as a result of the status of such Insured as a shareholder of the Named Insured, but for the Named Insured's loss of S corporation status.

(n)     "Opinions" means the opinions attached hereto as <u>Exhibit A</u> and deemed a part of this Policy.

(o)     "Permitted Assignee" means a person or entity to which this Policy may be assigned by the Named Insured or an Additional Insured with the consent of the Insurer or in compliance with Clause 14 of this policy.

(p)     "Policy" means this Fiscal Event Insurance Policy agreed to and underwritten by the Insurer for the benefit of the Insureds.

(q)     "Policy Period" means the period of time shown in Item 3 of the Declarations, as the same may be extended pursuant to the terms and conditions hereof.

(r)     "Representation Letter" means the letter attached as <u>Exhibit B</u> to this Policy, executed by an authorized officer of the Named Insured and delivered to the Insurer in connection with the underwriting of this Policy, which letter is deemed part of the application for this Policy.

EXHIBIT __B__, PAGE __14__

(s)     "Taxes" mean (i) any federal or California income taxes imposed by the Code or comparable provisions of applicable California law, (ii) any federal gift taxes imposed by the Code, and (iii) the income taxes of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy.

(t)     "Taxing Authority" means (i) the Internal Revenue Service, (ii) the comparable authority of the State of California, and (iii) the comparable authority of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy.

(u)     "Tax Return" means a return required to be filed under the Code or comparable provisions of California law or the comparable provisions of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy.

3.      **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:

(a)     arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud), or any knowing and intentional violation of any law, rule, regulation or statute; provided, however, that effecting the transactions described in the Opinions and the filing of Tax Returns with any Taxing Authority by the Insureds consistent with the transactions described in the Opinions shall not be the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud) or a knowing and intentional violation of law, rule, regulation or statute for purposes of this Clause 3(a);

(b)     arising out of, based upon or attributable to any material inaccuracy in the facts set forth or referenced in the Representation Letter;

(c)     to the extent that such Loss arises out of, is based upon, or is attributable to a change in the Code, comparable state statute or corresponding regulations after the Inception Date unless such change is given retroactive effect;

(d)     arising out of the failure of any Insured to follow proper tax procedures relating to the filing of its tax returns to the extent that such failure has an adverse effect on Insurer, provided that such exclusion shall extend only to the portion of the Loss that is attributable to the failure to have followed proper tax procedures;

3

EXHIBIT __B__, PAGE _15_

(e)    any compromise of any Insured Tax Loss without the Insurer's prior written consent (which consent shall not be unreasonably withheld);

(f)    to the extent such Loss arises out of, is based upon or is attributable to the relevant status of any shareholder of the Named Insured, including but not limited to (i) the Austin Firefighters Relief and Retirement Fund never having been or ceasing to be an organization described in Section 401(a) of the Code and exempt from taxation under Section 501(a) of the Code, (ii) Mr. Richard McWilliam never having been or ceasing to be a U.S. citizen, (iii) the MPR Trust never having been or ceasing to be a trust described in Section 1361(c)(2)(A)(i) of the Code, (iv) any other person becoming a shareholder of the Named Insured (A) who, if an individual, is not or ceases to be a U.S. citizen, (B) which, if a trust, is not or ceases to be a domestic trust described in Section 1361(c)(2) of the Code, or (C) which, if an organization, is not or ceases to be an organization described in Section 1361(c)(6) of the Code; (v) any shareholder, other than (A) Mr. Richard McWilliam, (B) the MPR Trust or (C) the Austin Firefighters Relief and Retirement Fund, whose ownership of stock of the Named Insured would, by operation of law, terminate the Named Insured's S corporation status or (vi) the total number of shareholders of the Named Insured exceeds 75;

(g)    to the extent such Loss arises out of, is based upon or is attributable to an assertion by a Taxing Authority that a charitable contribution deduction should be disallowed or reduced because the fair market value of the shares of non-voting stock of the Named Insured is different from the value claimed by the shareholder of such entity;

(h)    to the extent such Loss arises out of, is based upon, or is attributable to an amendment to the Shareholders Agreement or the Warrant Agreement attached hereto as <u>Exhibits C and D</u>, respectively, without the Insurer's prior written consent (which shall not be unreasonably withheld by Insurer);

(i)    to the extent such Loss is caused by the issuance of any new security of the Named Insured;

(j)    to the extent such Loss arises out of, is based upon, or is attributable to the failure of the MPR Trust or Richard McWilliam to receive a tax benefit from the deductions for charitable contributions described in the definition of Insured Tax Event below, notwithstanding the allowance of such deductions by a relevant Taxing Authority; or

(k)    arising out of, based upon, or attributable to the Named Insured ceasing to be a domestic corporation within the meaning of Section 7701 of the Code, or becoming an "ineligible corporation" within the meaning of Section 1361(b)(2) of the Code.

EXHIBIT _B_, PAGE _16_

4.   **LIMIT OF LIABILITY  (FOR ALL LOSS - INCLUDING CONTEST EXPENSES)**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss arising out of all Claims first made against the Insureds during the Policy Period.  Further, in the event that the Policy Period is extended by endorsement as set forth in the last paragraph of Clause 8, a Claim for Loss which is made during an extension of the Policy Period shall also be subject to the one aggregate Limit of Liability stated in Item 4 of the Declarations.

Contest Expenses are not payable by the Insurer in addition to the Limit of Liability.  Contest Expenses are part of Loss and as such are subject to the Limit of Liability for Loss.

5.   **RETENTION**

The Insurer shall only be liable for the amount of Loss which is in excess of the retention amount stated in Item 5 of the Declarations (the "Retention").  This Retention shall be carried by the Insureds at their own risk and remain uninsured.  A single Retention shall apply to all Loss arising from all Claims relating to the Insured Tax Event.

6.   **NOTICE PROVISIONS**

(a)   The Named Insured shall give written notice to the Insurer as soon as practicable during the Policy Period of any Claim made against any Insured.  It is agreed that a Claim shall not be considered to have been made by a Taxing Authority until such time as Mr. Richard McWilliam, the General Counsel of the Named Insured or the Chief Financial Officer of the Named Insured receives written notice thereof from that Taxing Authority.

(b)   The Named Insured shall give written notice to the Insurer as soon as practicable during the Policy Period after the Named Insured or Mr. Richard McWilliam obtains actual knowledge of any communication (whether oral or written) by or with any Taxing Authority, regarding potential liability of any Insured arising out of the Insured Tax Event, but in all events as soon as practicable after Mr. Richard McWilliam, the General Counsel of the Named Insured or the Chief Financial Officer of the Named Insured obtains actual knowledge of such communication.

(c)   Notice to the Insurer.  Any notice or other communication to be given to the Insurer shall be made in writing and delivered to the Insurer at the following address:

American International Specialty Lines Insurance Company
c/o AIG Technical Services, Inc.

EXHIBIT _B_, PAGE _17_

P.O. Box 1000
New York, NY 10268

with a copy to:
American International Companies●
Mergers & Acquisitions Division
175 Water Street, 10th Floor
New York, NY 10038

Any notice or other communication to the Insurer shall be only effective upon
receipt.

(d)     Notice to the Insureds.  Any notice or other communication to be given to any
Insured shall be made in writing and delivered to the Named Insured at its mailing
address set forth in Item 1(a) of the Declarations and shall be effective only upon
its receipt.

(e)     Limitation on Notice Obligations.  Provided that any and all Claims relating to an
Insured Tax Loss are reported to the Insurer during the Policy Period, the failure
by the Named Insured to comply the other requirements of this Clause 6 will not
relieve the Insurer of any of its obligations under this policy, except to the extent
the failure to so comply with this Clause 6 adversely affects the Insurer.

7.      CONTEST EXPENSES, SETTLEMENTS, AND JUDGMENTS (INCLUDING
THE ADVANCEMENT OF CONTEST EXPENSES)

The Insurer shall advance excess of the Retention, at the written request of the Named
Insured, Contest Expenses every 90 days prior to the Final Determination of a Contest.
Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds in the
event and to the extent that the Insureds shall not be entitled under the terms and
conditions of this Policy to payment of such Loss.

The Insurer does not, however, under this Policy, assume any duty to defend.  The
Insureds shall defend and contest (taking all actions reasonable and necessary in
connection therewith), any Claim, action, notice, audit, investigation, examination
or review made or brought against it including, but not limited to, any proposed or
final adjustment, including all appeals thereof (to the most senior court of
competent jurisdiction) until there has been a Final Determination with respect to
which either no further appeal is available or the Insurer declines to request the
Insureds to pursue an appeal, unless the Insureds' counsel provides a written
opinion without qualification that there is no reasonable basis to pursue further
action or appeal in connection therewith.  The Insurer shall have the right to
consent to the Insureds' choice of defense counsel, which consent shall not be
unreasonably withheld.  No Insured shall admit or assume any liability, enter into
any settlement agreement, stipulate to any judgment, or incur any Contest

6

EXHIBIT  B  PAGE  18

Expenses, without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Contest Expenses which have been consented to by the Insurer shall be recoverable as Loss under the terms of this Policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense (including defense strategy) and the negotiation of any settlement of any Claim, action, notice, audit, investigation, examination, review or Contest of any Claim that involves or appears reasonably likely to involve the Insurer.

The Insurer shall have the right to effectively associate with all Insureds in the defense of any Claim or potential Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

The Insurer may make any settlement of any Claim it deems expedient with respect to any Insured subject to the Named Insured's written consent. If any such settlement provides that none of the Insureds shall have any liability in excess of the Retention and the Named Insured withholds consent to such settlement, the Insurer's liability for all Loss on account of such Claim shall not exceed the amount for which the Insurer could have settled such Claim plus Contest Expenses incurred as of the date such settlement was proposed in writing by the Insurer.

8.     **PROCEDURE FOR TIME OF PAYMENT**

Payment of Loss required hereunder shall be made to the Named Insured at the address set forth in Item 1(a) of the Declarations not more than 30 days after the receipt by the Insurer of a copy of a Final Determination of an Insured Tax Loss, but not later than the time any Insured is required by a Taxing Authority to make such payment. If the Insurer fails to reimburse the Named Insured within the time period set forth in this clause, such amounts shall be paid to the Named Insured by the Insurer with interest thereon, accruing from the latest date such payment could have been made by the Insurer under this clause, at the rate announced by Citibank, N.A. in New York, New York as its prime rate, as in effect from time to time. Notwithstanding the foregoing provisions of this clause, if the defense of a Contest requires a payment in connection with a Claim prior to the Final Determination with respect to such Claim, the Insurer shall make such payment at that time, subject to the Insurer's rights under Clauses 7 and 11 herein.

If, prior to the expiration of the Policy Period, the Insurer receives notice that any Insured has agreed to a Taxing Authority's request for an extension of time in which to assess additional taxes pertaining to the Insured Tax Event this Policy shall be endorsed, at no additional cost to the Insureds, to extend the Policy Period to correspond with the date which is 30 days beyond the extension of time agreed upon.

9.     **CONDITIONS PRECEDENT**

7

EXHIBIT __B__, PAGE __19__

It is a condition precedent to the right of the Insureds to be indemnified hereunder that the Insureds comply with the terms and conditions of sub-clauses (a) and (b) below:

(a)    <u>Mitigation</u>.  Except as otherwise provided in this Policy, the Insureds shall have acted in relation to a Taxing Authority at all times substantially as if uninsured and shall have undertaken all reasonable actions to mitigate any Insured Tax Loss and to contest all Insured Tax Loss.  Any failure by the Named Insured to comply with this Clause 9 will not relieve the Insurer of any of its obligations under this Policy, except to the extent the failure to so comply adversely affects the Insurer.

(b)    <u>Tax Returns, etc</u>.  The Insureds shall have prepared and filed all applicable Tax Returns in a manner materially consistent with that anticipated by the Opinions and/or the Representation Letter.

10.    SUBROGATION

If the Insurer makes any payment under this Policy in respect of Loss, the Insurer shall be subrogated, to the extent of such payment, to all the rights and remedies of the Insureds in respect of such Loss, and the Insurer shall be entitled at its own expense to sue in the name of the Insureds; provided, however, that such right of subrogation shall in no event be exercisable against any of the Insureds.  All Insureds shall take all reasonable action requested in writing by the Insurer to secure the rights and remedies of the Insurer in subrogation.

11.    REFUNDS AND REIMBURSEMENTS

(a)    If any Insured:

(i)    recovers from any Taxing Authority all or any part of any payment made by the Insurer hereunder (a "Recovered Payment");

(ii)    receives any indemnity payment (an "Indemnity Payment") from another party or insurer in respect of a Loss for which any Insured has received a payment hereunder; or

(iii)    realizes an Offsetting Benefit in respect of a payment made by the Insurer hereunder,

the Named Insured shall promptly notify the Insurer of such payment or benefit and shall, unless already credited as provided in Clause 11(b), and subject to Clause 11(c), pay or refund such amount, together with any interest received thereon, to the Insurer within 30 days of any Insured's receipt of such Recovered

8

EXHIBIT  B  PAGE  20

Payment or Indemnity Payment or realization of such Offsetting Benefit, as the case may be.

(b)   If any Insured receives any Indemnity Payment or realizes any Offsetting Benefit:

  (i)   prior to notifying the Insurer of a Claim in accordance with Clause 6, the Named Insured shall include in such notice a statement describing the Indemnity Payment received or the Offsetting Benefit realized, as the case may be, and the amount payable by the Insurer to the Named Insured hereunder shall, subject to Clause 11(c), be reduced by the amount of such Indemnity Payment or Offsetting Benefit;

  (ii)   subsequent to notifying the Insurer of a Claim in accordance with Clause 6, but prior to receiving any payment hereunder in respect of such Claim, the Named Insured shall promptly provide notice to the Insurer describing the Indemnity Payment received or the Offsetting Benefit realized, as the case may be, and the amount payable by the Insurer to the Named Insured hereunder shall, subject to Clause 11(c), be reduced by the amount of such Indemnity Payment or Offsetting Benefit.  If, notwithstanding the foregoing, the amount paid by the Insurer to the Named Insured is for any reason not so reduced, the Insureds shall, subject to Clause 11(c), pay to the Insurer the amount of such Indemnity Payment or Offsetting Benefit, as the case may be, within 30 days after receipt by the Named Insured of the payment from the Insurer.

(c)   Notwithstanding the foregoing, any amount otherwise payable by the Named Insured or any other Insured to the Insurer under this Clause 11, or the amount of any reduction (a "Reduction") otherwise determined in accordance with Clause 11(b) of the amount payable by the Insurer to the Named Insured or any other Insured under this Policy shall be reduced:

  (i)   if all or any part of the related Recovered Payment, Indemnity Payment or Offsetting Benefit, as the case may be, is included in Insured's income for Tax purposes, by the amount of the Taxes attributable to such income inclusion; and

  (ii)   to the extent necessary to ensure that such payment or Reduction does not put any Insured in a worse position than it would have been in had it not received the related Recovered Payment or Indemnity Payment or realized the related Offsetting Benefit, as the case may be.

(d)   For the purposes of this Policy, an Insured shall be considered to have realized an Offsetting Benefit defined in Clause 2(m)(i) of this Policy at the time that:

  (i)   such Insured receives a cash payment equal to the amount of such benefit from a Taxing Authority;

9

EXHIBIT _6_, PAGE _31_

(ii)    a Taxing Authority notifies such Insured that the Taxing Authority has taken into account the amount giving rise to such benefit in computing the income, loss or taxable income of such Insured for any taxation year and, as a result, has reduced by the amount of such benefit the amount of Taxes owing, at the time of such notification, by such Insured to such Taxing Authority; or

(iii)    a Taxing Authority notifies such Insured that the Taxing Authority has offset the amount of such benefit against Taxes owing, at the time of such notification, by such Insured to such Taxing Authority.

(e)    For purposes of this Policy, an Insured shall be considered to have realized an Offsetting Benefit defined in Clause 2(m)(ii) of this Policy for the relevant year at the time that a Loss payment is due under this Policy related to such relevant year.

(f)    If any Insured fails to reimburse the Insurer within the applicable time period set forth in this clause, such amounts shall be paid to the Insurer by such Insured with interest thereon, accruing from the latest date such payment could have been made by such Insured under this clause, at the rate announced by Citibank, N.A. in New York, New York as its prime rate, as in effect from time to time.

(g)    For purposes of computing a Loss under this Policy, if an Offsetting Benefit is realized prior to payment by the Insurer under this Policy, the Offsetting Benefit shall be subtracted from the relevant Insured Tax Loss, Contest Expenses and/or Gross-Up, as the case may be, prior to the application of the 10% co-insurance rate. Further, if an Offsetting Benefit is realized by an Insured after payment by the Insurer in respect of a Loss under this Policy, then the Insured shall pay 90% of such realized Offsetting Benefit to the Insurer, as otherwise in accordance with the remainder of Clause 11.

## 12.   PREMIUM EARNED PRO RATA; CANCELLATION; ACCELERATION

(a)    The payment of the full premium no later than seven days after the date of the binder executed in connection with this Policy is a condition to the effectiveness of this Policy. The premium shall be fully earned pro rata over the twelve-month period commencing on the Issuance Date (the "Cancellation Period").

(b)    The Named Insured (or any premium finance company to which it has issued a power of attorney) shall be entitled to cancel this Policy at any time during the Cancellation Period upon prior written notice of 5 business days. The Insurer shall not be permitted to cancel this Policy. In the event of cancellation by the Named Insured (or any premium finance company) pursuant to the first sentence hereof, the unearned premium due the Named Insured shall be calculated as the pro rata unearned premium assuming a policy period of twelve months.

EXHIBIT _B_, PAGE _22_

(c)    In the event any Insured makes a claim under this Policy at any time during the Cancellation Period, the Insurer shall notify the premium finance company who shall prepare and send to the Named Insured a notice (the "Payoff Notice") detailing the amount of aggregate premium remaining unpaid less unearned finance charges (the "Payoff Amount"). Within 10 business days of the Named Insured's receipt of the Payoff Notice, the Named Insured shall pay the Payoff Amount to the premium finance company. If the Insurer elects or is required to make a payment for Loss prior to the premium finance company's receipt of the Payoff Amount from the Named Insured, the Insurer shall be entitled to deduct the Payoff Amount from any such payment for Loss and remit the Payoff Amount to the premium finance company or retain any amount of premium that the Insurer has refunded to the premium finance company, such amount not to exceed the Payoff Amount.

13.    **WAIVER**

Notice to any agent or knowledge possessed by any agent or any other person shall not effect a waiver or a change in any part of this Policy or prevent the Insurer from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed except pursuant to a written endorsement.

14.    **ASSIGNMENT OF POLICY**

This Policy is not assignable by any Insured without the written consent of the Insurer, which shall not be unreasonably withheld; provided, however, that notwithstanding the foregoing this Policy shall be assignable, effective on ten (10) days prior written notice to, but without the necessity of obtaining the consent of, the Insurer as follows: (i) if a successor trustee is appointed for any trustee who is an Additional Insured hereunder, the successor trustee shall be deemed an Additional Insured under the Policy, (ii) if any Insured is a trustee of a revocable trust or is a revocable trust and the trust is revoked, then the Policy may be assigned to the grantor, (iii) if the Insured is a trustee of a trust or is a trust and an event occurs that results or results in a distribution of the assets of the trust to the beneficiaries of the trust, then the Policy may be assigned to those beneficiaries; (iv) if any Insured is a corporation or other entity, and that Insured merges or consolidates with another corporation or entity or sells or otherwise transfers substantially all of its assets in a single or series of related transactions, to another corporation or entity, or the Insured is liquidated and its assets are distributed to its shareholders or owners, then the Policy may be assigned to the surviving corporation or entity in such merger or consolidation or the parent corporation thereof, or to the transferee to which the assets of such Insured are sold or transferred or, in the case of a liquidation of the Insured, to the shareholders or owners of the Insured, and (v) if an Insured is a natural person, to such person's estate and heirs. Notwithstanding anything to the contrary, prior to any assignment described in this Clause 14, any potential assignee must submit a representation letter to the Insurer confirming that such assignment or the ownership of shares of stock of the Named Insured by such assignee

EXHIBIT _B_, PAGE _23_

should not have the effect of causing termination of the Named Insured's status as an S corporation, and the form of such representation letter must be reasonably satisfactory to the Insurer. The representation letter referred to in the previous sentence shall be deemed part of the Representation Letter, as of the date made, for all purposes of this Policy. In the event of any assignment under this Clause 14, any new Insured shall be subject to all of the terms, conditions and exclusions of the Policy. The Insurer may assign this Policy to another member company of American International Group, Inc. ("AIG") without the consent of any Insured provided such other insurer's claims paying ability rating (Best's) and financial strength rating (Standard & Poor's) are equal to or better than that of the Insurer.

15.   OTHER INSURANCE

Such insurance as is provided by this Policy shall apply only as excess over any other valid and collectible insurance. Further, in the event such other insurance is provided by the Insurer or any member company of AIG (or would be provided but for the application of the Retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the maximum aggregate Limit of Liability for all Loss combined covered by virtue of this Policy as respects any such Claim shall be reduced by the limit of liability (as set forth on the declarations page) of the other AIG insurance.

16.   ARBITRATION AND CHOICE OF LAW

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this Policy, whether arising before or after termination, including any determination of the amount of Loss, shall be submitted to the American Arbitration Association in New York, New York under and in accordance with its commercial arbitration rules then in effect. On any specific dispute or claim, the parties shall agree on whether there shall be one or three arbitrators. If the parties cannot agree on the number of arbitrators, there shall be three arbitrators. The arbitrator(s) shall be disinterested, shall have knowledge of the legal, tax, and insurance issues relevant to the matters in dispute or the claim, and shall otherwise be chosen in the manner provided in such rules. The arbitration shall be subject to the Federal Arbitration Act and, to the extent such Act is not applicable, the laws of the State of New York. The construction, validity and performance of this Policy shall be governed by the laws of the State of New York, provided, however, that the Policy shall be construed in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the Policy, without regard to the authorship of the language and without any presumption in favor of either party. No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable Limit of Liability set forth in this Policy. The Insurer shall have no obligation to pay or reimburse any Insured's legal expenses incurred in mediating or arbitrating a claim or dispute under this Policy, except to the extent specified in the arbitrator(s) award, in which event such legal expenses will be included in the Loss payable by the Insurer in accordance with, and

12

subject to the Retention, Limit of Liability and other terms, conditions and exclusions of this Policy.

17.   **ACTION AGAINST INSURER**

Except as provided in Clause 16 of the Policy, no action by an Insured shall lie against the Insurer unless any Insured failed to substantially comply with its obligations under this Policy and such failure materially and adversely affected Insurer, or until the amount of the Insureds' obligation to pay shall have been the subject of a Final Determination; provided, however, that nothing in this Clause 17 shall require an Insured to wait until a Final Determination to be reimbursed hereunder for the Contest Expenses it incurs.

18.   **HEADINGS**

The descriptions in the headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

19.   **SERVICE OF SUIT**

Subject to any clause in this Policy requiring arbitration or other alternative dispute resolution, in the event of failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer, at the request of any Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon General Counsel, American International Specialty Lines Insurance Company, 70 Pine Street, New York, NY 10270, or his representative, and that in any suit instituted against the Insurer upon this contract, the Insurer will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Insurer hereby designates the Superintendent, Commissioner, or Director of Insurance, other officer specified for that purpose in the statute, or his or her successor or successors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of any Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

EXHIBIT __B__, PAGE __25__

## 20.   NOTICE AND AUTHORITY

It is agreed that the Named Insured shall act on behalf of the Additional Insureds with respect to any action required to be taken by any Insured under the terms of this policy, including, without limiting the generality of the foregoing, the giving and receipt of any notices to be delivered or received by or on behalf of any or all of the Insureds, the right to waive, modify or amend any of the terms of this policy, and the right to settle or stipulate to any judgment of or in connection with any Claim, and agrees to be bound by any and all actions taken by such Named Insured on its behalf.  The Insurer shall be entitled to rely exclusively upon any written notice given by the Named Insured and the Insurer shall not be liable in any manner for any action taken or not taken in reliance upon the actions taken or not taken or written notice made by the Named Insured, as the case may be.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and signed on the Declarations Page by a duly authorized representative of the Insurer or countersigned in states where applicable.

_Elizabeth M. Thal_
**SECRETARY**

_L. H. Kelley_
**PRESIDENT**

14

EXHIBIT _B_, PAGE _26_

## ATTACHMENTS

Endorsement No. 1:  "Insured Tax Event"

Endorsement No. 2:  Additional Insureds; "Taxes", "Taxing Authority" and "Tax Return"

Exhibit A:  Opinions

Exhibit B:  Representation Letter

Exhibit C:  Shareholders Agreement

Exhibit D:  Warrant Agreement

Exhibit E:  FMV Opinions, Inc. Valuation

## ENDORSEMENT NO. 1

This endorsement, effective 12:01 A.M. Standard Time August 29, 2001, forms a part of Policy No. 405-88-33 issued to The Upper Deck Company by American International Specialty Lines Insurance Company.

## FISCAL EVENT INSURANCE POLICY

The Policy is amended as follows:

Clause 2. DEFINITIONS is amended to include the following additional definition:

"Insured Tax Event" means:

an assertion, at any time during the Policy Period, by a Taxing Authority that with respect to the tax years 2001 through 2005, (a) as a result of any action taken by the Named Insured or the Additional Insureds prior to the Inception Date, The Upper Deck Company, a California corporation ("Upper Deck") has more than one class of stock for purposes of Section 1361 of the Code, (b) the Austin Firefighters Relief and Retirement Fund (the "Municipal Plan"), although an organization described in Section 401(a) of the Code and exempt from taxation under Section 501(a) of the Code, is not an eligible shareholder of Upper Deck for Subchapter S purposes, (c) deductions for charitable contributions are not allowable to the pre-gift shareholder of Upper Deck in the year of gift in an amount equal to the fair market value, reduced by any adjustments pursuant to Section 170(e)(1) of the Code, of such shareholder's gift of non-voting stock to the Municipal Plan, (d) the post-gift allocations of Upper Deck's taxable income to the Municipal Plan are not correct or proper; however, it is a condition precedent to coverage for this sub-clause (d) that during the time period or periods relevant to such an assertion by the Taxing Authority the percentage of the total number of shares of Upper Deck voting and non-voting common stock outstanding that were owned by the Municipal Plan and the percentage of the total post-gift allocations of Upper Deck's taxable income that were made to the Municipal Plan during such time period or periods were equal, (e) as a result of the gift of the Upper Deck non-voting common stock to the Municipal Plan by the pre-gift shareholder, any Upper Deck shareholder or Upper Deck, itself, assigned income to the Municipal Plan, or (f) as a result of the redemption of the Upper Deck non-voting common stock, the pre-gift shareholder or Upper Deck are taxed on any redemption proceeds received by the Municipal Plan. For purposes of this definition, the term "pre-gift shareholder" shall mean the MPR Trust; the term "gift" shall mean the gift of 8,280,000 shares of non-voting stock of Upper Deck made by the pre-gift

shareholder to the Municipal Plan on March 31, 2001; and the total number of shares of Upper Deck voting and non-voting common stock outstanding shall not include shares of stock of Upper Deck that may be acquired pursuant to the Warrant Agreement attached as Exhibit D to this Policy ("Warrant Shares") unless and until any such Warrant Shares are purchased and paid for pursuant to such Warrant Agreement.

With respect to distributions of cash or other property by Upper Deck to any of the Insureds occurring after the redemption of the Upper Deck non-voting common stock, this Policy shall, in each tax year covered under the Policy, only cover an Insured Tax Loss directly related to a distribution of such cash or other property in an amount up to a maximum of 50% of the taxable income of Upper Deck for the year of such distribution ("Distribution Limit"). For the avoidance of doubt, the Distribution Limit shall reset to zero at the beginning of each covered tax year and there shall be no aggregation, carryover or carryback of unused amounts under the Distribution Limit to future or prior years, as the case may be.

All other terms, definitions, conditions and exclusions of the Policy remain unchanged.

Authorized Representative or Countersignature
(in states where applicable)

17

EXHIBIT __B__, PAGE __29__

## ENDORSEMENT NO. 2

This endorsement, effective 12:01 A.M. Standard Time August 29, 2001, forms a part of Policy No. 405-88-33 issued to The Upper Deck Company by American International Specialty Lines Insurance Company.

### FISCAL EVENT INSURANCE POLICY

The Policy is amended as follows:

For purposes of this Policy coverage shall be extended, as an Additional Insured, for any person that becomes a shareholder of the Named Insured during the Policy Period, conditioned upon the Insurer's receipt, review and acceptance of a representation letter from such new shareholder confirming that the addition of such new shareholder should not have the effect of causing a termination of the Named Insured's S corporation status, and the form of such representation letter must be reasonably satisfactory to the Insurer. Such representation letter shall be deemed part of the Representation Letter as of the date made for all purposes of this Policy.

For purposes of this Policy, the Insurer shall add to the definitions of "Taxes", "Taxing Authority" and "Tax Return" additional states upon request by the Named Insured, subject to (i) demonstration by the Named Insured, reasonably satisfactory to the Insurer, as to the need to add such state and (ii) Insurer's receipt, review and acceptance (which shall not be unreasonably withheld by the Insurer) of a tax opinion from KPMG LLP (or another nationally recognized accounting firm reasonably acceptable to the Named Insured and the Insurer) opining on the treatment of the various components of the Insured Tax Event under the laws of the additionally requested state. For purposes hereof, the addition of a new shareholder (whether due to the issuance of shares thereto by the Named Insured or a transfer of outstanding shares by an existing shareholder) at any time during the Policy Period shall satisfy the condition set forth in sub-clause (i) of this Paragraph, where such new shareholder has a taxable nexus to the additional state being requested.

All other terms, definitions, conditions and exclusions of the Policy remain unchanged.


_____
Authorized Representative or Countersignature
(in states where applicable)

18

EXHIBIT ___6___, PAGE _30_

**EXHIBIT A**



355 South Grand Avenue
Suite 2000
Los Angeles, CA 90071-1568

Telephone 213 972 4000
Fax 213 622 1217

May 2, 2001

Mr. Richard McWilliam
c/o The Upper Deck Company
5909 Sea Otter Place
Carlsbad, California 92008-6621

The Upper Deck Company
5909 Sea Otter Place
Carlsbad, California 92008-6621

Re: Warrant distribution by Upper Deck Company

Gentlemen,

You have requested the opinion of KPMG LLP ("KPMG") as to certain Federal and California State income tax consequences to you and The Upper Deck Company ("Upper Deck") with respect to the warrant distribution by Upper Deck described below. We have included below the facts upon which we will rely in the issuance of our opinion. We ask that you contact us immediately if any fact is not entirely complete or accurate, as the incompleteness or inaccuracy could cause us to change our opinion. We will not independently verify the completeness and accuracy of any of the following facts

In rendering our opinion, we are relying upon the Internal Revenue Code of 1986 and Treasury Department regulations thereunder, as amended and in effect on the date hereof, and Revenue Rulings, Revenue Procedures, the California Revenue & Taxation Code, as amended, and reported judicial decisions as they existed on the date of this opinion letter. Each of the foregoing is subject to change or modification by subsequent legislation, or regulatory, administrative or judicial decisions. Any such change could also have an effect on the validity of the conclusions set forth herein retroactively or prospectively. Further, the opinion which is rendered should be considered together with various risks set forth in the Discussion and Caveat sections of this letter. Unless requested otherwise, we undertake no responsibility to update our opinion in the event of any subsequent change in the foregoing.

Our opinion is limited solely to the Federal and California State income tax consequences of the warrant distribution discussed herein to the parties described above. No opinion is rendered, expressed or implied with respect to the tax consequences of the warrant distribution to any other party. Furthermore, no opinion is expressed with respect to issues not specifically discussed herein, any other Federal, State or local tax, or any legal issue.



KPMG LLP KPMG LLP, LLP, a limited liability partnership, m

EXHIBIT _B_ PAGE _32_

Page 2
May 2, 2001
Upper Deck Company

## FACTS

Upper Deck is a California corporation that was incorporated on March 21, 1988. The effective date of its election to become a subchapter S corporation was January 1, 1989.

As of March 28, 2001, Upper Deck had 920,000 shares of stock outstanding. All of these shares were Voting Common Stock and all of these shares were owned by MPR Trust, an inter vivos revocable trust with Mr. Richard McWilliam as its sole beneficiary (herein referred to as the "Shareholder").

The Shareholder is a citizen of the United States and is a permissible owner of subchapter S corporation stock under the Internal Revenue Code of 1986.

On March 28, 2001, Upper Deck declared a dividend of 82,800,000 warrants to purchase Non-Voting Common Stock of Upper Deck to the Shareholder in proportion to his ownership of the Voting Common Stock. The dividend was actually issued to the Shareholder on March 29, 2001. The exercise price is $0.148 per share. The warrants have a term of 35 years.

Fair Market Value, Inc. ("FMV"), an unrelated nationally-recognized valuation firm highly experienced in appraising the value of stock of closely-held corporations, has determined that the exercise price of each warrant is equal to at least ninety percent (90%) of the fair market value of the underlying stock as of March 29, 2001. In making this determination, FMV applied a valuation methodology that is consistent with the objective standards of the valuation industry.

## CONCLUSION

Based on the facts set forth above, it is our view that the Shareholder and Upper Deck should prevail with respect to conclusion number two (Single class of stock requirement) if challenged by the IRS, and that with respect to all other conclusions discussed below, it is more likely than not that the Shareholder and Upper Deck will prevail if challenged by the IRS:[1]

1. <u>Taxability of distribution of warrants</u>. Section 305(a)[2] provides that gross income does not include a corporation's distribution of stock or stock rights to its

---

[1] In various sections of this opinion letter, language may be used (e.g., use of the word "will" or "should") that might indicate an opinion at a different standard of likelihood of success than listed above. Notwithstanding the use of this language, we intend our conclusions to be confined to a standard of "should" with respect to conclusion number two and "more likely than not" with respect to all other conclusions.

[2] All references to Sections herein are to the Internal Revenue Code of 1986, unless otherwise stated.

EXHIBIT ___B___ PAGE _33_

Page 3
May 2, 2001
Upper Deck Company

shareholders. Therefore, the distribution of the warrants by Upper Deck to the
Shareholder should be a tax-free distribution, without the Shareholder being taxed on
the distribution. Likewise, Upper Deck should not be taxed on the distribution of the
warrants under Section 311(a).

2. <u>Single class of stock requirement.</u> The distribution of the warrants should not create a
second class of stock under the safe harbor provision of Regulation Section 1.1361-
1(l)(4)(iii)(C), which provides that if the strike price of the warrants is at least 90% of
the fair market value of the underlying stock on the date they are issued, the warrants
should not be considered a second class of stock.

## DISCUSSION

1. <u>Taxability of distribution of warrants.</u> Under Section 305(a), shareholders of a
corporation are not taxed on the amount of any distribution by the corporation, so long as
the property that was distributed was stock in the corporation. Under Regulation Section
1.305-1(d) the term "stock" is defined to include warrants to acquire stock. Therefore,
the Shareholder should not be taxed on the distribution of warrants received from Upper
Deck. In addition, Upper Deck should not be taxed on the distribution; under Section
311, no gain is recognized by a corporation due to the distribution of its own stock or
stock rights to the shareholders of the corporation. Sections 305(a) and 311 are also
applicable under California law.[3]

2. <u>Single class of stock requirement.</u> Under Section 1361(b)(1)(D), an S corporation may
not have more than one class of stock. An S corporation has one class of stock if all
outstanding shares confer identical rights to distribution and liquidation proceeds.[4] In
making this determination, differences in rights that occur under the corporate charter,
articles or bylaws, by operation of State law, or under binding agreements relating to
distribution and liquidation proceeds must be taken into account in making this
determination.[5] As long as there is identity in liquidating and distribution rights provided
in these so-called "governing provisions," no second class of stock is created. In
addition, differences in voting rights are disregarded.[6]

In determining whether a corporation has more than one class of stock, only stock which
is outstanding is considered.[7] Warrants do not constitute outstanding stock because they
do not entitle the holder to any of the attributes of stock ownership such as the right to

---

[3] *See* Ca. Rev. & Tax. Code Sec. 17321.
[4] Reg. Sec. 1.1361-1(l)(1).
[5] I.R.C. Sec. 1362(d)(2).
[6] I.R.C. Sec. 1361(c)(4) and Reg. Sec. 1.1361-1(l)(1)
[7] Reg. Sec. 1.1361-1(l)(1).

EXHIBIT _B_, PAGE _34_

Page 4
May 2, 2001
Upper Deck Company

vote or receive dividends.[8]  Therefore, the issuance and distribution of the warrants should not trigger a second class of stock, provided that their strike price can be shown to be not substantially below the fair market value of the stock on the date the options are issued or on any date that they may be materially modified.[9]

However, the IRS will treat the warrants as a second class of stock if the warrants are substantially certain to be exercised by the holder or a potential transferee and the warrants have a strike price substantially below the fair market value of the underlying stock.[10]  There is a safe harbor provision though, which provides that if the strike price of the warrants is at least 90% of the fair market value of the underlying stock on the date they are issued, the warrants are not considered a second class of stock.  The regulation further provides that, for this purpose, a good faith determination of the fair market value by the corporation will be respected unless it can be shown that the value was substantially in error and the determination of value was not performed with reasonable diligence to obtain a fair value.  Finally, the regulation states that the failure of an option (or warrant) to meet the safe harbor will not necessarily result in the option (or warrant) being treated as a second class of stock.[11]  Here, the warrants issued by Upper Deck have an exercise price at least equal to 90% of the fair market value of underlying stock on March 29, 2001.  The value of the warrants has been determined by an unrelated nationally-recognized valuation firm highly experienced in appraising the value of stock of closely-held corporations, applying a valuation methodology that is consistent with the objective standards of the valuation industry.  Therefore, the safe harbor is met and the distribution of the warrants should not create a second class of stock.

## CAVEAT

No opinions are provided with respect to issues not specifically set forth in this letter.  No inference should be drawn regarding any matter not specifically opined upon.  Our opinion does not cover any foreign or local tax consequences including but not limited to, franchise, sales, use, excise or transfer taxes.

This opinion sets forth our views based on the completeness and accuracy of the above stated facts.  If any of the foregoing is not entirely complete or accurate, it is imperative that we be informed immediately, as the inaccuracy or incompleteness could have a material effect on our conclusions.  In rendering our opinion, we are relying upon the relevant provisions of the Internal Revenue Code of 1986, the California Revenue &

---

[8] *See Hume v. Commissioner*, T.C. Memo 1988-485 (an option to acquire S stock held by an ineligible shareholder did not disqualify the S election because the option was not exercised).
[9] Reg. Sec. 1.1361-1(I)(4)(iii)(A).
[10] Reg. Sec. 1.1361-1(I)(4)(iii).
[11] Reg. Sec. 1.1361-1(I)(4)(iii)(C).  This provision applies to call options, which are defined in Reg. Sec. 1.1361-1(I)(4)(iii)(A) to include warrants.

Page 5
May 2, 2001
Upper Deck Company

Taxation Code, as amended, the regulations thereunder, and judicial and administrative interpretations thereof, which are subject to change or modification by subsequent legislative, regulatory, administrative, or judicial decisions. Any such changes could also have an effect on the validity of our opinion. This opinion is not binding on the IRS, any other tax authority, or any court. No assurance is given that a position different than that expressed herein will not be asserted by a tax authority.

This opinion may only be provided to the IRS or any State taxing authority in connection with an examination of the underlying transaction.

Very truly yours,

KPMG LLP

Larry E. Manth
*Partner*

EXHIBIT   B   PAGE 36



355 South Grand Avenue
Suite 2000
Los Angeles, CA 90071-1568

Telephone 213 972 4000
Fax 213 622 1217

May 2, 2001

Mr. Richard McWilliam
c/o The Upper Deck Company
5909 Sea Otter Place
Carlsbad, California 92008-6621

The Upper Deck Company
5909 Sea Otter Place
Carlsbad, California 92008-6621

Re:  Charitable contribution to Austin Firefighters Relief and Retirement Fund

Gentlemen,

You have requested the opinion of KPMG LLP ("KPMG") as to certain Federal income, California State income and Federal gift tax consequences to you and The Upper Deck Company ("Upper Deck") with respect to the charitable contribution described below. We have included below the facts upon which we will rely in the issuance of our opinion. We ask that you contact us immediately if any fact is not entirely complete or accurate, as the incompleteness or inaccuracy could cause us to change our opinion. We will not independently verify the completeness and accuracy of any of the following facts.

In rendering our opinion, we are relying upon the Internal Revenue Code of 1986 and Treasury Department regulations thereunder, as amended and in effect on the date hereof, and Revenue Rulings, Revenue Procedures, the California Revenue & Taxation Code, as amended, and reported judicial decisions as they existed on the date of this opinion letter. Each of the foregoing is subject to change or modification by subsequent legislation, or regulatory, administrative or judicial decisions. Any such change could also have an effect on the validity of the conclusions set forth herein retroactively or prospectively. Further, the opinion which is rendered should be considered together with various risks set forth in the Discussion and Caveat sections of this letter. Unless requested otherwise, we undertake no responsibility to update our opinion in the event of any subsequent change in the foregoing.

Our opinion is limited solely to the Federal income, California State income and Federal gift tax consequences of the charitable contribution discussed herein to the parties described above. No opinion is rendered, expressed or implied with respect to the tax consequences of the consummated transaction to any other party. Furthermore, no opinion is expressed with respect to issues not specifically discussed herein, any other Federal, State or local tax, or the legal aspects of the charitable contribution.



EXHIBIT  B  PAGE  37

Re: Charitable contribution to Austin...

Page 2
May 2, 2001
Upper Deck Company

FACTS

Upper Deck is a California corporation that was incorporated on March 21, 1988. The effective date of its election to become a subchapter S corporation was January 1, 1989.

As of March 28, 2001, Upper Deck had 920,000 shares of stock outstanding. All of these shares were Voting Common Stock and all of these shares were owned by MPR Trust, an inter vivos revocable trust with Mr. Richard McWilliam as its sole beneficiary (herein referred to as the "Shareholder").

The Shareholder is a citizen of the United States and is a permissible owner of subchapter S corporation stock under the Internal Revenue Code of 1986.

On March 28, 2001, Upper Deck amended its Articles of Incorporation to allow for it to issue Non-Voting Common Stock in Upper Deck. This Non-Voting Common Stock and the Voting Common Stock are identical in all respects, except as to voting rights. However, the Non-Voting Common Stock is subject to a contractual right of first refusal described below.

On March 29, 2001, Upper Deck distributed 8,280,000 shares of Non-Voting Common Stock to the Shareholder.

The Austin Firefighters Relief and Retirement Fund ("Municipal Plan"), was established by an Act of the 45th Legislature of the State of Texas, which met in 1937. The purpose of Municipal Plan is to provide pension benefits for certain members of the Fire Department of the City of Austin. In addition, Municipal Plan provides benefits to injured members and also provides support to spouses and children of deceased members. The Shareholder desires to support Municipal Plan in its ability to supply these benefits.

In accordance with the Shareholder's desire to support Municipal Plan, on March 31, 2001, the Shareholder donated all of the Non-Voting Common Stock to Municipal Plan. On March 31, 2001, Municipal Plan accepted the Non-Voting Common Stock via hand delivery. Municipal Plan will credit the contribution for the use and benefit of Municipal Plan.

On March 31, 2001, the Shareholder and the Municipal Plan entered into a shareholders agreement ("Shareholders Agreement") providing that all Non-Voting Common Stock would be subject to the right of first refusal. Under the right of first refusal, Upper Deck has the right to purchase the outstanding Non-Voting Common Stock for the amount of any bona fide offer received by any holder of the Non-Voting Common Stock. In addition, if Upper Deck is unable or unwilling to exercise the right of first refusal, the holders of the Voting Common Stock are entitled to a right of first refusal.

EXHIBIT ___B___, PAGE ___38___

Page 3
May 2, 2001
Upper Deck Company

On August 22, 1985, the Internal Revenue Service (the "IRS") issued a favorable determination letter to Municipal Plan, finding that Municipal Plan satisfied the requirements of sections 401(a)(4) and 401(a)(26) of the Code.[1]  Municipal Plan has given a written representation to the Shareholder and Upper Deck, that it is an entity described in Sections 401(a) and 501(a).[2]

The Shareholder is not a beneficiary of Municipal Plan.  In addition, Municipal Plan did not transfer any cash or other property to the Shareholder in return for the contribution and Shareholder will receive no benefit from the contribution other than tax benefits.

As part of the Shareholders Agreement, Upper Deck and Municipal Plan entered into a redemption agreement.  Under the redemption agreement, Municipal Plan may present the Non-Voting Common Stock it owns for redemption by Upper Deck, beginning April 1, 2003.  The redemption amount is the fair market value of the stock on the date that Municipal Plan presents the stock for redemption.  Neither Upper Deck nor the Shareholder have the power to compel Municipal Plan to present the stock it owns for redemption.

## CONCLUSION

Based on the facts set forth above, it is our view that the Shareholder and Upper Deck should prevail with respect to conclusions number two and four (Single class of stock requirement and that Municipal Plan is an eligible holder of Upper Deck stock) if challenged by the IRS, and that with respect to all other issues discussed below, it is more likely than not that the Shareholder and Upper Deck would prevail if challenged by the IRS.[3]

1.  Distribution of Non-Voting Stock.  Section 305(a) provides that gross income does not include a corporation's distribution of stock or stock rights to its shareholder.  Therefore, the distribution of the Non-Voting Common Stock by Upper Deck to the Shareholder should be a tax-free distribution, without the Shareholder being taxed on the distribution.  Likewise, it is more likely than not that Upper Deck will not be taxed on the distribution of the Non-Voting Common Stock under Section 311(a).

[1] See IRS Determination Letter to City of Austin, dated Aug. 22, 1985.
[2] All references to Sections herein are to the Internal Revenue Code of 1986, as amended, unless otherwise stated.
[3] In various sections of this opinion letter, language may be used (e.g., use of the word "will" or "should") that might indicate an opinion at a different standard of likelihood of success than listed above.  Notwithstanding the use of this language, we intend our conclusions to be confined to a standard of "should" with respect to conclusion numbers two and four and "more likely than not" with respect to all other issues.

EXHIBIT  B  PAGE 39

Page 4
May 2, 2001
Upper Deck Company

2.  <u>Single class of stock requirement.</u>  The distribution of Non-Voting Common Stock should not create a second class of stock under Section 1361(c)(4) and Regulation Section 1.1361-1(l)(1), which provide that a corporation shall not be treated as having more than one class of stock solely because there are differences in voting rights among the shares of common stock.

In addition, the existence of the right of first refusal and the redemption agreement as part of the Shareholders Agreement should not create a second class of stock. Under Regulation Section 1.1361-1(l)(2)(iii), buy-sell agreements among shareholders are generally disregarded in determining whether there is more than one class of stock.

3.  <u>Taxation of redemption proceeds.</u>  The Shareholder should not be taxed on any potential redemption proceeds that may be received by Municipal Plan. The IRS held in Revenue Ruling 78-197, 1978-1 C.B. 83, that it will treat the proceeds of a redemption of donated stock as income to the donor only if the tax-exempt organization is legally bound, or can be compelled by the corporation, to surrender the shares. Since neither Upper Deck nor the Shareholder have the power to compel a redemption, it is more likely than not that the Shareholder will not be taxed on any potential redemption proceeds received by Municipal Plan.

4.  <u>Municipal Plan should be considered a permissible holder of subchapter S corporation stock.</u>  Under Section 1361(c)(6), an organization which is "described in section 401(a)" and that is "exempt from taxation under section 501(a)" may be a shareholder in a subchapter S corporation. Since Municipal Plan meets these requirements, it should be an eligible shareholder.

5.  <u>It is more likely than not that the Shareholder will be entitled to a charitable deduction for the fair market value of the stock the Shareholder donated.</u>  Under Section 170(a), the Shareholder should be entitled to a charitable contribution deduction in the 2001 tax year for the fair market value of the stock the Shareholder donated. However, under Section 170(e)(1), the amount of the deduction may be reduced. Specifically, "in the case of a charitable contribution of stock in an S corporation, rules similar to the rules of section 751 shall apply" to reduce the amount of the deduction by the amount of any ordinary income that would have been realized had the assets of the corporation been sold. The significant items that would give rise to ordinary income had there been a sale of the assets include unrealized receivables and Sections 1245 and 1250 recapture items for previously claimed depreciation. Thus, the charitable deduction should be reduced by the portion of the fair market value of the donated stock that is attributable to such ordinary income items.

EXHIBIT __B__, PAGE __40__

Page 5
May 2, 2001
Upper Deck Company

Under Section 170(b)(1)(C), the amount of the Shareholder's charitable deduction for the contribution of the stock should be limited to 30% of the Shareholder's adjusted gross income ("AGI"). In addition, under Section 170(b), the Shareholder's overall contributions for the year (including this stock contribution) may not exceed 50% of his AGI.

6. Gift Tax. It is more likely than not that the Shareholder will be entitled to a gift tax deduction for the amount of the contribution. Under Section 2522(a)(1), gifts made to or for the use of "the United States, any State, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes" are deductible. Furthermore, it is more likely than not that the Shareholder will be exempt from filing a gift tax return under Section 6019(3).

## DISCUSSION

1. Taxability of distribution of Non-Voting stock. Under Section 305(a), shareholders of a corporation are not taxed on the amount of any distribution by the corporation, so long as the property that was distributed was stock in the corporation. Therefore, the Shareholder should not be taxed on the distribution of the Non-Voting Common Stock received from Upper Deck. In addition, Upper Deck should not be taxed on the distribution; under Section 311, no gain is recognized by a corporation due to the distribution of its own stock to the shareholders of the corporation. Sections 305(a) and 311 are also applicable under California law.[4]

2. Single class of stock requirement. Under Section 1361(b)(1)(D), an S corporation may not have more than one class of stock. In determining whether a corporation has more than one class of stock, only stock which is outstanding is considered.[5] An S corporation has one class of stock if all outstanding shares confer identical rights to distribution and liquidation proceeds.[6] In making this determination, differences in rights that occur under the corporate charter, articles or bylaws, by operation of State law, or under binding agreements relating to distribution and liquidation proceeds must be taken into account in making this determination.[7] As long as there is identity in liquidating and distribution rights provided in these so-called "governing provisions," no second class of stock is created. Moreover, in determining whether there is more than one class of stock, differences in voting rights are disregarded.[8]

---

[4] See Ca. Rev. & Tax. Code Sec. 17321.
[5] Reg. Sec. 1.1361-1(l)(1).
[6] Id.
[7] I.R.C. Sec. 1362(d)(2).
[8] I.R.C. Sec. 1361(c)(4) and Reg. Sec. 1.1361-1(l)(1)

EXHIBIT 6 PAGE 41

Page 6
May 2, 2001
Upper Deck Company

The issuance of the Non-Voting Common Stock should not create a second class of stock. The Non-Voting Common Stock contains identical rights to distribution and liquidation proceeds as the Voting Common Stock and is otherwise identical, except with respect to voting rights. Moreover, the right of first refusal, as discussed below, should not create a second class of stock. Therefore, the authorization, issuance and donation of the Non-Voting Common Stock should not create a second class of stock under Section 1361(b)(1)(D).

The fact that the Non-Voting Common Stock is subject to the right of first refusal and that Municipal Plan has a right to present its Non-Voting Common Stock for redemption should not alter the conclusion that there is no second class of stock. Under Regulation Section 1.1361-1(l)(2)(iii):

> [b]uy-sell agreements among shareholders, agreements restricting the transferability of stock and redemption agreements are disregarded in determining whether a corporation's outstanding shares of stock confer identical distribution and liquidation rights unless
>
> (1) A principal purpose of the agreement is to circumvent the one class of stock requirement of Section 1361(b)(1)(D) and this paragraph (1), and
>
> (2) The agreement establishes a purchase price that, at the time the agreement is entered into, is significantly in excess of or below the fair market value of the stock.

For the reasons discussed below, it does not appear that the right of first refusal or the redemption agreement were entered into to circumvent the one class of stock requirement. In addition, the purchase price under both the redemption agreement and the right of first refusal are at fair market value. Therefore, no second class of stock is created due to the right of first refusal or the redemption agreement.

    1) <u>Principal purpose test</u>. As explained above, there is more than one class of stock if there are different distribution rights or rights to liquidation proceeds among the shareholders. Therefore, in analyzing whether the purpose of the right of first refusal or the redemption agreement was to circumvent the one class of stock rule, the key issue is whether these agreements alter the right to distributions or the shareholders' respective share of liquidation proceeds.

Neither the right of first refusal nor the redemption agreement was created to alter any shareholder's right to distributions or liquidation proceeds. The right of first refusal was enacted to provide protection to the Shareholder that no objectionable person would be able to acquire an ownership interest in their closely held business. The redemption

EXHIBIT  B , PAGE  42

Page 7
May 2, 2001
Upper Deck Company

agreement was executed in order to give Municipal Plan a market to sell its stock. Therefore, the purpose of these agreements is not to circumvent the one class of stock requirement.

2) Fair market value test. Under the right of first refusal, Upper Deck and the holder of the Voting Common Stock must match the bona fide offer to exercise the right. In addition, under the redemption agreement the purchase price for any redemption is the fair market value measured at the time of redemption. Since fair market value must be paid under both agreements, the second test for avoiding a second class of stock should also be met.

California law follows the Federal law with respect to the S corporation single class of stock requirements.[9]

3. Taxation of redemption proceeds. In the past, the IRS has recharacterized certain stock contributions followed by a redemption. Specifically, where there was a prearranged plan to have the corporation redeem stock previously donated to a tax-exempt entity, the IRS treated the transaction as a redemption of the stock by the donor followed by a contribution of the redemption proceeds to the tax-exempt entity. Therefore, the donor would be taxed on the redemption proceeds less the shareholder's basis in the stock contributed. However, the IRS has subsequently stated in a Revenue Ruling that it will treat the proceeds of a redemption of donated stock as income to the donor only if the tax-exempt organization is legally bound, or can be compelled by the corporation, to surrender the shares.[10]

Under the Shareholder Agreement, neither Upper Deck nor the Shareholder have the power to compel Municipal Plan to surrender its shares. Municipal Plan will likely desire to present the stock it owns for redemption because it has no ready market in which to sell the stock. However, neither Upper Deck nor the Shareholder can compel a redemption. Rather, this fact simply makes it more desirable for Municipal Plan to want a redemption. Therefore, neither Upper Deck nor the Shareholder should be taxed on any potential redemption proceeds that may be received by Municipal Plan.

There is no California law directly on point on this issue. In the absence of any conflicting law, the Federal interpretation would presumably apply.[11]

_____

[9] See Ca. Rev. & Tax. Code Sec. 17087.5
[10] Rev. Rul. 78-197, 1978-1 C.B. 83.
[11] See Ca. Rev. & Taxation Code Sec. 23051.5

Page 8
May 2, 2001
Upper Deck Company

4. <u>Municipal Plan should be considered a permissible holder of subchapter S corporation stock.</u> Under Section 1361(c)(6), an organization "which is described in section 401(a)" and which is "exempt from taxation under section 501(a)" may be an owner of subchapter S corporation stock. Municipal Plan meets both of these criteria and should therefore be considered an eligible holder of subchapter S corporation stock.

1) <u>Municipal Plan should be considered an organization described in section 401(a).</u> Congress provided in Section 401(a) that, "a trust created or organized in the United States and forming part of a stock bonus, pension, or profit sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries" is a tax-qualified trust if it meets all of the requirements specified in that provision. State and Local governmental plans were permanently exempted from many of the requirements specified in the statute, effective August 5, 1997.[12] Municipal Plan has given a written representation that it meets these requirements. Therefore, Municipal Plan should be considered an organization described in Section 401(a).[13]

2) <u>Municipal Plan should be considered an organization which is exempt from taxation under Section 501(a).</u> Section 501(a) provides that, *inter alia*, an organization which is described in Section 401(a) is exempt from taxation. Since as discussed above, Municipal Plan is an organization described in Section 401(a), it should also be considered an organization exempt from taxation under Section 501(a). In addition, Municipal Plan has given a written representation that it is an organization described in Section 501(a).

Municipal Plan should also be considered an eligible S corporation shareholder under California law.[14]

---

[12] *See* Taxpayer Relief Act of 1997, P.L. 105-34, Sec. 1505.

[13] The organization described in 401(a) is technically the trust, not the plan itself. Commentators have noted that for many governmental plans, "there is no formal trust document." *See* Karen B. Kotner and Leslye G. Laderman, Defined Benefit Plans of Churches and State and Local Governments, 372 Tax Management. (BNA) (1990) at Sec. III(e). However, "the Section 401(a) trust requirement would apparently be satisfied if the statutory language imposes duties on the plan administrator equivalent to those imposed on a private sector trustee." *Id.* Municipal Plan is governed by Tex. Rev. City Stat. art. 6243e.1. Section 2.01 of Article 6243e.1 provides that: "Each fund established under this Act is a trust. The board of trustees is responsible for the administration of the fund . . ." and not the City of Austin. Therefore, it appears that the trust requirement is met. Moreover, the IRS apparently believes that Municipal Plan meets the trust requirement because it ruled that Municipal Plan met the requirements of Section 401(a)(26), which provides that a trust is not a qualified trust unless it benefits a statutory minimum number of beneficiaries. *See* Letter from the IRS to the City of Austin, dated August 22, 1985. Obviously, Municipal Plan could not meet this requirement unless it was considered to have a trust as part of the pension plan.

[14] *See* Cal. Rev. & Tax. Code Secs. 23800.5(c) and 17631.

EXHIBIT *B* PAGE 44

Page 9
May 2, 2001
Upper Deck Company

5.  <u>The Shareholder should be entitled to a charitable deduction for the fair market value of the stock the Shareholder donated.</u>   Section 170(a) provides that, "[t]here shall be allowed as a deduction any charitable contribution . . . payment of which is made within the taxable year."  The term "charitable contribution" is defined in Section 170(c)(1) to include:

> a contribution or gift to or for the use of a state, a possession of the United States, or any political subdivision of any of the foregoing or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.[15]

The IRS has given more specific guidance with respect to contributions to pension funds established for the benefit of municipal employees, municipal policemen or municipal firemen.  Specifically, the IRS held in Revenue Ruling 58-154, 1958-1 C.B. 125, that:

> contributions made by third parties to pension funds established under a state law for the benefit of municipal employees, municipal policemen, or municipal firemen, which are deposited by the administering pension board to the credit of the particular fund for the use and benefit of the respective pension system, are deductible by the donors in computing their taxable income in the manner and to the extent provided by section 170 of the Code.[16]

Although Municipal Plan was created by the City of Austin, under United States Supreme Court precedent the city charter provision creating Municipal Plan is considered a State law because the City of Austin obtained its power to create Municipal Plan from the State of Texas.[17]  Specifically, the Supreme Court has held that an ordinance adopted under a power granted by the State legislature is to be regarded as in effect a statute of the State.[18]  Therefore, Municipal Plan should be considered to be established under a State law and hence a qualifying municipal pension plan under Revenue Ruling 58-154.

---

[15] I.R.C. Sec. 170(c)(1).

[16] Rev. Rul. 58-154, 1958-1 C.B. 125.

[17] Article III Section 52 of the Texas Constitution provides that "a county, city, town, or other political corporation or subdivision of the state may invest its funds as authorized by law."

[18] *See New Orleans Waterworks Company v. Louisiana Sugar Refining Co.*, 125 U.S. 18, 31 (1888) ("So a by-law or ordinance of a municipal corporation may be such an exercise of legislative power delegated by the legislature to the corporation as a political subdivision of the State, having all the force of law within the limits of the municipality, that it may properly be considered as a law, within the meaning of this article of the Constitution of the United States."); *see also North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 313 (1908) ("In this case the ordinance in question is to be regarded as in effect a statute of the State, adopted under a power granted it by the state legislature, and hence it is an act of the State within the Fourteenth Amendment.").

EXHIBIT _6_, PAGE_45_

Page 10
May 2, 2001
Upper Deck Company

The donations should be considered as deductible gifts because Municipal Plan did not transfer any cash or other property to the Shareholder in return for his contribution. Although Shareholder will obtain tax benefits from the contribution, the contribution should still be considered a deductible gift. The United States Tax Court has held that, "[a] charitable contribution may be motivated by the basest and most selfish of purposes as long as the donor does not reasonably anticipate benefit from the donee in return."[19]

In that case, the Tax Court found that, while it was "not unmindful of the tax benefits petitioners received from the contribution, that is not pertinent to an analysis of donative intent."[20] Therefore, even though the Shareholder may receive tax benefits as a result of making the contributions, he should still be entitled to a charitable contribution deduction.

The Shareholder should be entitled to his deduction in the 2001 tax year. Under Regulation Section 1.170A-1(b), "a contribution is made at the time delivery is effected." With regard to stock certificates specifically:

> [i]f a taxpayer unconditionally delivers or mails a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery or, if such certificate is received in the ordinary course of the mails, on the date of mailing.[21]

Since the stock certificates were hand delivered to Municipal Plan on March 31, 2001, the Shareholder should be entitled to his deduction in the 2001 tax year.

The amount of the Shareholder's deduction should be the fair market value of the stock he contributed, measured on March 31, 2001.[22] Should the stock be redeemed later for an amount greater than the fair market value on March 31, 2001, the Shareholder will NOT be entitled to any additional deductions.

In addition, under Section 170(e)(1), the amount of the deductions may be less than the fair market value on March 31, 2001. Section 170(e)(1) provides that, "in the case of a charitable contribution of stock in an S corporation, rules similar to the rules of section 751 shall apply" to reduce the amount of the deduction by the amount of any ordinary income that would have been realized had the assets of the corporation been sold. The significant items that would give rise to ordinary income had there been a sale of the

---

[19] *Weitz v. Commissioner*, T.C. Memo. 1989-99.
[20] *Id.*
[21] Reg. Sec. 1.170A-1(b).
[22] Reg. Sec. 1.170A-1(c). For a charitable contribution of property valued in excess of $5,000 to be deductible, however, the appraisal and written acknowledgement requirements of Reg. Sacs. 1.170A-13(c) and (f) must also be satisfied.

EXHIBIT *B* PAGE 46

*KPMG*

Page 11
May 2, 2001
Upper Deck Company

assets include unrealized receivables and recapture items under Sections 1245 and 1250 (relating to previously claimed depreciation). Thus, the charitable deduction should be reduced by the portion of the fair market value of the donated stock that is attributable to such ordinary income items. KPMG will be analyzing whether the charitable deduction should be decreased under this provision and will provide you such an analysis prior to the filing of the applicable tax returns.

The amount of the charitable deductions that can be claimed in the 2001 tax year will be limited to 30% of the Shareholder's adjusted gross income (AGI).[23] In addition, the Shareholder's overall contributions for the year (including this stock contribution) may not exceed 50% of AGI.[24] If the deduction exceeds either of these amounts, it must be carried over to be used in subsequent tax years.

California law conforms to Federal law with respect to charitable contributions.[25]

6. **Gift tax.** In computing the amount of the Shareholder's taxable gifts for the year, the charitable contribution should be allowed as a deduction. Under Section 2522(a)(1), gifts made to or for the use of "the United States, any State, or any political subdivision thereof, or the District of Columbia, for exclusively public purposes" are deductible. Given that this language is identical to Section 170(c) as discussed above, the Shareholder should be entitled to a gift tax deduction for the contribution. In addition, it is more likely than not that the Shareholder will not be required to file gift tax returns for the charitable donations. Under Section 6019(3), an individual is not required to file a gift tax return for a gift which was allowed as a deduction under Section 2522, so long as the transfer was of the donor's entire interest in the property transferred and no other interest in such property is transferred for less than full consideration to a person for a use not described in Section 2522. Since the Shareholder donated his entire interest in the Non-Voting Common Stock, there should be no need to file a gift tax return.

**CAVEAT**

No opinions are provided with respect to issues not specifically set forth in this letter. No inference should be drawn regarding any matter not specifically opined upon. Our opinion does not cover any foreign or local tax consequences including but not limited to, sales, use, excise or transfer taxes.

---

[23] I.R.C. Sec. 170(b)(1)(C).
[24] I.R.C. Sec. 170(b).
[25] *See* Ca. Rev. & Tax. Code Sec. 17201. One exception is that I.R.C. Sec. 170(e)(5), relating to special rules for contributions of stock for which market quotations are available, does not apply. Ca. Rev. & Tax. Code Sec. 17251.5.

EXHIBIT _B_ PAGE _47_

**KPMG**

Page 12
May 2, 2001
Upper Deck Company

This opinion sets forth our views based on the completeness and accuracy of the above stated facts. If any of the foregoing is not entirely complete or accurate, it is imperative that we be informed immediately, as the inaccuracy or incompleteness could have a material effect on our conclusions. In rendering our opinion, we are relying upon the relevant provisions of the Internal Revenue Code of 1986, the California Revenue & Taxation Code, as amended, the regulations thereunder, and judicial and administrative interpretations thereof, which are subject to change or modification by subsequent legislative, regulatory, administrative, or judicial decisions. Any such changes could also have an effect on the validity of our opinion. This opinion is not binding on the IRS, any other tax authority, or any court. No assurance is given that a position different than that expressed herein will not be asserted by a tax authority.

This opinion may only be provided to the IRS or any State taxing authority in connection with an examination of the underlying transaction.

Very truly yours,

KPMG LLP

Larry E. Manth
*Partner*

EXHIBIT _B_, PAGE _48_



355 South Grand Avenue
Suite 2000
Los Angeles, CA 90071-1568

Telephone 213 972 4000
Fax 213 622 1217

May 2, 2001

Mr. Richard McWilliam
c/o The Upper Deck Company
5909 Sea Otter Place
Carlsbad, California 92008-6621

The Upper Deck Company
5909 Sea Otter Place
Carlsbad, California 92008-6621

Re:  Taxable income allocation of Upper Deck Company

Gentlemen,

You have requested the opinion of KPMG LLP ("KPMG") as to how the taxable income of The Upper Deck Company ("Upper Deck") should be allocated to you for Federal and California State income tax purposes. We have included below the facts upon which we will rely in the issuance of our opinion. We ask that you contact us immediately if any fact is not entirely complete or accurate, as the incompleteness or inaccuracy could cause us to change our opinion. We will not independently verify the completeness and accuracy of any of the following facts.

In rendering our opinion, we are relying upon the Internal Revenue Code of 1986 and Treasury Department regulations thereunder, as amended and in effect on the date hereof, and Revenue Rulings, Revenue Procedures, the California Revenue & Taxation Code, as amended, and reported judicial decisions as they existed on the date of this opinion letter. Each of the foregoing is subject to change or modification by subsequent legislation, or regulatory, administrative or judicial decisions. Any such change could also have an effect on the validity of the conclusions set forth herein retroactively or prospectively. Further, the opinion which is rendered should be considered together with various risks set forth in the Discussion and Caveat sections of this letter. Unless requested otherwise, we undertake no responsibility to update our opinion in the event of any subsequent change in the foregoing.

Our opinion is limited solely to how the taxable income of Upper Deck should be allocated to you for Federal and California State income tax purposes. No opinion is rendered, expressed or implied with respect to the taxable income allocation to any other party. Furthermore, no opinion is expressed with respect to issues not specifically discussed herein, any other Federal, State or local tax, or legal issue.



EXHIBIT ___ℬ___, PAGE __49__

KPMG

*Re: Taxable Income allocation . . .*

Page 2
May 2, 2001
Upper Deck Company

FACTS

Upper Deck is a California corporation that was incorporated on March 21, 1988. The effective date of its election to become a subchapter S corporation was January 1, 1989. The taxable year of Upper Deck is the calendar year.

As of March 31, 2001, Upper Deck had 9,200,000 shares of stock outstanding, consisting of 920,000 Voting Common Shares and 8,280,000 Non-Voting Common Shares. The Voting Common Shares and the Non-Voting Common Shares possess the same rights to dividends and liquidation rights and are otherwise identical in all respects.

As of April 1, 2001, the 9,200,000 outstanding shares were owned as follows:

| | |
|---|---|
| Mr. Richard McWilliam[1] | 920,000 Voting Common Shares |
| Austin Firefighters Relief and Retirement | |
| Fund | 8,280,000 Non-Voting Common Shares |
| Total | 9,200,000 |

Austin Firefighters Relief and Retirement Fund ("Municipal Plan") acquired all of its stock from a contribution made by Mr. Richard McWilliam (referred to hereinafter as the "Shareholder") on March 31, 2001. Prior to the contribution, the Shareholder owned all of the stock of Upper Deck.

The Shareholder and Municipal Plan have consented to treat the year 2001 taxable year of Upper Deck as if it consisted of two separate taxable years, with the first taxable year ending on March 31, 2001.

CONCLUSION

Based on the facts set forth above, it is our view that so long as there are no changes in the number of shares outstanding, it is more likely than not that for Federal and California State income tax purposes, the post-March 31, 2001 items of income, gain, loss, deduction, or credit of Upper Deck will be allocated as follows:[2]

| | |
|---|---|
| Holders of Voting Common Stock | 10% |
| Holders of Non-Voting Common Stock | 90% |
| Total: | 100% |

---

[1] Mr. Richard McWilliam owned his stock through an inter vivos revocable trust of which he is the sole beneficiary.

[2] In various sections of this opinion letter, language may be used (e.g., use of the word "will" or "should") that might indicate an opinion at a different standard of likelihood of success than "more likely than not." Notwithstanding the use of this language, we intend our conclusions to be confined to a standard of "more likely than not."

EXHIBIT _6_, PAGE _50_

Page 3
May 2, 2001
Upper Deck Company

Any items attributable to the period ending March 31, 2001, would be allocable 100% to the Shareholder.

## DISCUSSION

Subchapter S corporations are pass-through entities for federal income tax purposes.[3] Thus, the S corporation must pass through items of income, gain, loss, deduction, or credit separately to its shareholders,[4] and generally, the corporation is not subject to any federal corporate level tax on those items,[5] so long as a valid S corporation election is in effect for the entire year.[6] Because subchapter S corporations are pass-through entities, shareholders are taxed on the income and gain of the corporation even if the corporation does not actually make distributions to the shareholders.[7]

Generally, the income of the subchapter S corporation is aggregated and the net amount passes through as so-called "nonseparately computed income or loss."[8] However, other items must pass through separately where such amounts could affect the shareholder's computation of tax liability.[9] This is similar to the treatment these items would receive in a partnership.[10]

Under Section 1366(a),[11] each shareholder's share of income, gain, loss, deduction, or credit of the corporation is determined on a *pro rata* basis. Specifically, each shareholder's share of a separately or nonseparately stated item for any taxable year is the sum of the amounts determined with respect to the shareholder on a per-share, per-day basis by: (i) assigning an equal portion of such item to each day of the taxable year; and (ii) by dividing that portion pro rata among the shares outstanding on that day.[12] The per-day, per-share rule is a mechanical method for allocating an S corporation's items of income, gain, loss, deduction, or credit among its shareholders.[13] It does not require tracing actual items to the day received or incurred; instead, year-end results are allocated back to each day during the year on a *pro rata* basis.[14]

---

[3] *See* I.R.C. Sec. 1366.
[4] *Id.*
[5] I.R.C. Sec. 1366(a). However, there are certain circumstances in which an S corporation may be required to pay tax at the corporate level but only with respect to certain items, and only if the S corporation was ever a C corporation. *See* I.R.C. Sec 1374 and 1375.
[6] I.R.C. Sec. 1362.
[7] *Knott v. Commissioner.*, T.C. Memo 1991-352.
[8] I.R.C. Sec. 1366(a)(1)(B).
[9] I.R.C. Sec. 1366(a)(1)(A). Charitable contributions are one such item that must be separately stated.
[10] *See* Reg. Sec. 1.702-1(a)(8)(i).
[11] All references herein to Sections are to the Internal Revenue Code of 1986, as amended, unless otherwise stated.
[12] I.R.C. Sec. 1377(a).
[13] *See Tax Planning for S Corporations*, §4.01 (Matthew Bender 1998).
[14] I.R.C. Sec. 1377(a).

EXHIBIT __6__, PAGE _51_

Page 4
May 2, 2001
Upper Deck Company

In determining the Shareholder's respective *pro rata* share, no distinction is made between Voting and Non-Voting Common Stock.[15] In addition, options, warrants and debentures do not constitute outstanding stock and therefore are not allocated any of the taxable income of the corporation provided that their strike price can be shown to be not substantially below the fair market value of the stock on the date the options are issued or on any date that they may be materially modified.[16]

Under Regulation Section 1.1368-1(g)(2), solely for allocation purposes, an S corporation may elect to treat a taxable year as if it consisted of two taxable years, if there is a "qualifying disposition." A "qualifying disposition" is defined as, "[a] disposition by a shareholder of 20 percent or more of the outstanding stock in one or more transactions during any thirty-day period during the corporation's taxable year."[17] Essentially, the S corporation may elect to close its books as of the qualifying disposition date. The shareholders of the corporation prior to the closing of the books are allocated the income of the company as of the closing date. The shareholders after the closing date are allocated the income of the second portion of the year.

The transfer by the Shareholder should constitute "qualifying disposition[s]" because the transfer represented more than twenty percent of the outstanding stock. Upper Deck therefore may elect to close the books as of March 31, 2001.[18]

Therefore, the Shareholder should be allocated all of the taxable income as of March 31, 2001.[19] Municipal Plan will own 90% of Upper Deck's outstanding stock as of April 1, 2001. After the closing of the books, 90% of Upper Deck's income which is accrued after the closing date should be allocated to Municipal Plan.

California law follows the federal law with respect to the allocation of S corporation taxable income.[20]

---

[15] *See* I.R.C. Sec. 1361(c)(4) and Reg. Sec. 1.1361-1(l)(1). Under these provisions, differences in voting rights are ignored and both voting and nonvoting stock are considered to be of the same class of stock so long as distribution and liquidation rights are the same.
[16] *See* Reg. Sec. 1.1361-1(l)(4)(iii)(A); *Hume v. Commissioner*, T.C. Memo 1988-485 (an option to acquire S stock held by an ineligible shareholder did not disqualify the S election because the option was not exercised).
[17] Reg. Sec. 1.1368-1(g)(2)(i)(A).
[18] The time and manner of making the election are specified in Reg. Sec. 1.1368-1(g)(2)(iii).
[19] Treas. Reg. Sec. 1.1377-1(a)(2)(ii) provides that a shareholder who disposes of stock in an S corporation is treated as the shareholder for the day of the disposition.
[20] *See* Ca. Rev. & Tax. Code Sec. 17087.5

EXHIBIT _B, PAGE 52_

Page 5
May 2, 2001
Upper Deck Company

Until there are any changes in ownership, income should be allocated as follows:

|  | Income as of 03/31/01 | Income after 03/31/01 |
|---|---|---|
| Mr. Richard McWilaim | 100% | 10% |
| Municipal Plan | 0% | 90% |
| Total: | 100% | 100% |

## CAVEAT

No opinions are provided with respect to issues not specifically set forth in this letter. No inference should be drawn regarding any matter not specifically opined upon. Our opinion does not cover any foreign or local tax consequences including but not limited to, income, franchise, sales, use, excise or transfer taxes.

This opinion sets forth our views based on the completeness and accuracy of the above stated facts. If any of the foregoing is not entirely complete or accurate, it is imperative that we be informed immediately, as the inaccuracy or incompleteness could have a material effect on our conclusions. In rendering our opinion, we are relying upon the relevant provisions of the Internal Revenue Code of 1986 and the California Revenue & Taxation Code, as amended, the regulations thereunder, and judicial and administrative interpretations thereof, which are subject to change or modification by subsequent legislative, regulatory, administrative, or judicial decisions. Any such changes could also have an effect on the validity of our opinion. This opinion is not binding on the IRS, any other tax authority, or any court. No assurance is given that a position different than that expressed herein will not be asserted by a tax authority.

This opinion may only be provided to the IRS or a state taxing authority in connection with an examination of the underlying issues.

Very truly yours,

KPMG LLP

Larry E. Manth
*Partner*

EXHIBIT ___B___ PAGE ___53___



September 4, 2001

American International Specialty Lines Insurance Company
70 Pine Street
New York, NY 10270

Re: Fiscal Event Insurance Policy No. 405-88-33 (the "Policy") issued by American International
Specialty Lines Insurance Company in favor of The Upper Deck Company, a California
corporation ("Upper Deck") and the Additional Insureds named in the Policy.

Ladies and Gentlemen:

In connection with our application to you for the Policy described above, the undersigned,
recognizing that you will rely upon the accuracy and truthfulness of this letter in connection with
your underwriting of the Policy, hereby represents and warrants as follows:

1.      The facts, assumptions of fact, and understandings of fact set forth in the opinions of KPMG
        LLP attached as Exhibit A to the Policy were true and correct on the date of such opinions
        and continue to be true and correct on the date hereof.

2.      To our knowledge, the Austin Firefighters Relief and Retirement Fund (the "Municipal
        Plan"), the recipient of the gift of the non-voting common stock of Upper Deck made to it on
        March 31, 2001, is an organization which is described in Section 401(a) of the Internal
        Revenue Code of 1986, as amended (the "Code"), and is exempt from taxation under Section
        501(a) of the Code.

3.      The Municipal Plan is neither legally bound to offer for redemption any of the non-voting
        shares of Upper Deck, nor can Upper Deck or any of its shareholders compel such a
        redemption, except pursuant to the exercise of the Right of First Refusal contained in the
        Shareholder Agreement, a copy of which is attached as Exhibit C to the Policy (the
        "Shareholder Agreement").

4.      FMV Opinions, Inc. ("FMV Opinions"), an independent and, to our knowledge and belief,
        competent appraiser, has made a determination that the value of the Upper Deck non-voting
        common stock, on the date of the issuance of the warrants to purchase Upper Deck non-
        voting common stock, is $0.164 per share. We believe that the appraised value of the Upper
        Deck non-voting common stock on the date of the issuance of the warrants, $0.164 per share,
        is substantially correct. To our knowledge and belief, this appraisal was made in good faith
        and was performed with reasonable diligence by FMV Opinions. Upper Deck provided FMV
        Opinions with all of the information requested by FMV Opinions in connection with the
        appraisal of Upper Deck. A copy of FMV Opinions' written appraisal is attached as Exhibit
        E to the Policy.

THE UPPER DECK COMPANY, LLC
5909 Sea Otter Place • Carlsbad • California • 92008-6621 • (760) 929-6500 • FAX (760) 929-6577

EXHIBIT  B  PAGE 54



5.    With respect to Upper Deck, FMV Opinions has made a determination that an exercise price of $0.148 per warrant, where 82,800,000 warrants are issued, is at least 90% of the fair market value per share of the underlying non-voting common stock of Upper Deck as of the date those warrants were issued.  To our knowledge and belief, this determination was made in good faith and was performed with reasonable diligence.

Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Policy.

THE UPPER DECK COMPANY

By: _____

Name:  Skip Richmond

Title:  CFO

_____
Richard P. McWilliam, as Trustee of the MPR Trust

2

.DOCSOC\1172894\17022.0047