# SHAREHOLDERS AGREEMENT

This SHAREHOLDERS AGREEMENT (the "Agreement") is made and entered into this 31st day of March, 2001, by and among THE UPPER DECK COMPANY, California Company (the "Company") and its sole shareholders: the MPR TRUST, an inter vivos revocable trust of which Richard P. McWilliam is the sole trustee ("MPR"), and AUSTIN FIREFIGHTERS RELIEF AND RETIREMENT FUND (the "Donee"). MPR and the Donee shall sometimes be referred to collectively as the "Shareholders" and individually as a "Shareholder").

## R E C I T A L S

A.     Donee is a qualified pension trust within the meaning of Section 401(a) of the Internal Revenue Code of 1986, as amended (the "IRC"), and is exempt from tax under Section 501(a) of the IRC.

B.     Concurrently herewith MPR is contributing, without consideration, to Donee a total of $280,000 shares of the Company's Non-Voting Common Stock, no par value (the "Nonvoting Shares" or the "Donee Shares"), which are currently owned by MPR. Upon the contribution to Donee of such Nonvoting Shares, the sole shareholders of the Company shall be (i) MPR, which is the record owner of all of the outstanding shares of the Company's Voting Common Stock (the "Voting Shares"), and (ii) the Donee, which shall be the record owner of the Nonvoting Shares. (The Voting Shares and Nonvoting Shares shall sometimes be referred to herein generically or collectively as the "Shares".) MPR also is the holder of stock purchase warrants entitling it to purchase shares of Nonvoting Common Stock (the "Warrant Shares") which it is retaining.

C.     Donee desires to have the opportunity at a future date to liquidate the Donee Shares and the Company is willing to grant to Donee a "put" option and right with respect to such Shares on the terms and conditions set forth in Section 5 hereof, provided that Donee enters into this Agreement and grants to the Company and MPR certain rights as set forth hereinafter in this Agreement, in order, among other things, to protect the status of the Company as an S Company under the IRC and to maintain the stability of ownership of the Company.

D.     Donee is willing to grant such rights to the Company and MPR in exchange for the grant to it of the Put Option by the Company, all as set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the respective promises and covenants of each party to the others set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **RESTRICTIONS AGAINST TRANSFER.**

Except for sales, transfers or dispositions of Donee Shares made pursuant to and in conformity with the provisions of Section 2, Section 3 or Section 5 of this Agreement, or as otherwise expressly provided in this Agreement, Donee agrees that it will not transfer, assign, pledge or in any way alienate any of its Nonvoting Shares, or any right or interest therein, whether voluntarily or by operation of law, or otherwise, without the prior written consent of the Company and the other Shareholder(s) of the Company. Any purported transfer, assignment, pledge or other alienation of Nonvoting Shares by Donee, or of any right or interest therein, in violation of any provision of this Agreement shall be void and ineffectual, shall not operate to transfer any interest or title to the purported transferee and shall give the

EXHIBIT _B_, PAGE _56_

Company and the other Shareholder(s) an option to purchase, in the manner and on the terms and conditions provided for hereinafter, the Nonvoting Shares of Donee purported to be sold, transferred or otherwise alienated by it. In addition, in no event and under no circumstances shall the Company be obligated, and the Company may in all events refuse, to recognize or record on its books, any purported transfer, assignment or pledge of any Donee Shares, or any right or interest therein, made in violation of any provision of this Agreement.

## 2.   RIGHT OF FIRST REFUSAL UPON SALE TO BONA FIDE PURCHASER.

2.1     Company's Right of First Refusal.  In the event that Donee desires to transfer any or all of its Nonvoting Shares, or any right or interest therein, to a bona fide, good faith purchaser, Donee shall give written notice of such proposed transfer to the Secretary of the Company.  The notice (the "Offer Notice") shall state the name and address of the proposed transferee, specify the number of the Donee's Shares proposed to be sold (the "Offered Shares"), the consideration per Offered Share, and the terms of payment if other than for all cash, and shall state that the offer or proposal is bona fide and that the Donee proposes to sell such number of Offered Shares pursuant thereto.  For thirty (30) days following the receipt of an Offer Notice by the Secretary, the Company shall have the right to elect to purchase such Offered Shares for the consideration and according to the terms of payment stated in the notice.  Such right shall be exercised by delivering to the Donee a written election to purchase said Offered Shares; and may not be exercised as to less than all of such Offered Shares, unless the holder or holders of the Voting Shares of the Company exercise their rights (as provided below) to purchase any of such Offered Shares not purchased by the Company so that between the Company and such other Shareholder(s), all of such Offered Shares will be purchased.

2.2     Limitation on Corporate Redemption.  The authority of the Company to exercise such right and to purchase the Offered Shares is subject to the restrictions governing the right of a Company to purchase its own stock contained in the California General Corporation Law (the "CGCL"), and such other pertinent governmental restrictions as are now or may hereafter become effective and binding on the Company.

2.3     Shareholder's Right of First Refusal.  If said right of first refusal pursuant to Section 2.1 above is not exercised by the Company as to all of the Offered Shares within the thirty (30) day period prescribed above, notice of the contemplated transfer shall be given forthwith by registered or certified mail to all of the then record holders of Voting Shares of the Company who shall have the right to purchase any Offered Shares which the Company has not elected to purchase (the "Available Offered Shares"), for the consideration and according to the terms of payment upon which the Company was entitled to purchase the Offered Shares under the foregoing provisions.  Within twenty (20) days after the mailing of such notice, any such record holder of Voting Shares desiring to acquire any part or all of said Available Offered Shares shall deliver to the Secretary a written election (an "Election Notice") to purchase such Available Offered Shares, or a specified number thereof.  If the total number of Available Offered Shares specified in the Election Notices received from those holders of Voting Shares who have elected to purchase any such Available Offered Shares (the "Electing Holders") exceeds the number of Available Offered Shares to be transferred, each such Electing Holder shall have priority, up to the number of shares specified in his or its Election Notice, to purchase such proportion of the Available Offered Shares as the number of Company's Voting Shares which such Electing Holder holds bears to the total number of Company's Voting Shares held by all of the Electing Holders.  In the event that there are Available Offered Shares remaining after the application of the above formula, the remaining Available Offered Shares shall be distributed among the Electing Holders, if any, who have not received the number of Available Offered Shares specified in their respective Election Notices, in the proportion that the number of shares specified in each such Holders Election Notice, less the number of Available Offered Shares allocated to that Electing Holder under the above formula, bears to the total number of Available

EXHIBIT  B , PAGE 57

Offered Shares in all such Elections Notices less all shares allocated to all of the Electing Shareholders under the above formula.

2.4     Consideration Other Than Cash and Notes. If the Company and/or the Electing Holders elect to purchase all of the Offered Shares mentioned in the Offer Notice, the Company and such Electing Holders (if any) shall have the right to purchase the Offered Shares for cash consideration whether or not part or all of the consideration specified in the Offer Notice is other than cash. If part or all of the consideration to be paid for the Offered Shares as stated in the Offer Notice is other than cash and unsecured promissory notes, the price stated in such Notice shall be deemed to be the sum of the cash consideration, if any, specified in such Notice plus the fair market value of the non-cash consideration that is other than one or more unsecured promissory notes. The fair market value of such non-cash consideration shall be determined within ten (10) days after the Offer Notice is received by the Company, by mutual agreement of the Company and the Donee; provided that if they cannot reach such an agreement within such 10-day period, such determination shall be made by an independent appraiser, experienced in determining the value of shares of closely held corporations engaged in businesses similar to the business of the Company, to be selected by the Company and the Donee (or if they cannot agree on such an appraiser within an additional 10 days, the appraiser shall be selected by the Company's outside independent accountants). The determination of such appraiser shall be binding and non-appealable by the parties. In the event that such appraisal is required to be obtained, the periods of time for exercising the right of first refusal pursuant to Sections 2.1 and 2.3 hereof shall be extended for a period of time equal to the period that elapses from the date of the Offer Notice to a date ending 10 days after the final determination is made of the fair market value of the non-cash consideration.

2.5     Closing. If the Company and/or the Electing Holders have agreed to purchase all of the Offered Shares set forth in the Offer Notice, the closing of the purchase and sale of such Offered Shares shall occur at the offices of the Company at 10:00 A.M. on the thirtieth (30th) day following the date that the Company has given notice of its intent to purchase all of the Offered Shares pursuant to Section 2.1 or, if it has not elected to purchase all of the Offered Shares, then thirty (30) days following the final allocation of the Offered Shares pursuant to Section 2.3 hereof, or at such other time and place as may be mutually agreed to in writing by the Company and/or Electing Holders and the Donee (the "Closing"). At the Closing, the Donee shall deliver to the Company and/or the Electing Holders, as the case may be, a certificate or certificates representing the Offered Shares duly endorsed for transfer, and the Company and/or the Electing Holders, as the case may be, shall deliver to the Donee cash (or a certified or cashier's check) for the amount of the cash consideration and any other consideration to be paid by the Company and/or the Electing Holders in accordance with this Agreement. The Donee and the Company and/or the Electing Holders, as the case may be, shall each execute and deliver such other documents as may reasonably be requested by any of the parties mentioned above in connection with the transactions contemplated in this Section 2.

2.6     Failure to Exercise Right of First Refusal. In the event the Company and the holders of Voting Shares do not elect to purchase all of the Offered Shares set forth in a Offer Notice delivered hereunder by Donee within the applicable time periods specified above or the Company and/or the Electing Holders shall fail to tender the required consideration at the Closing, then none of the Offered Shares shall be purchased by the Company or the Electing Holders and all of the Offered Shares may be transferred by the Donee to the person and for the consideration and upon the terms and conditions specified in such notice; provided that (i) the transferee is not engaged in and does not have an ownership or other financial interest in any competitor of the Company, and (ii) such transfer is completed within thirty (30) days after the expiration of the applicable time periods for exercising the right of purchase (in the case where the Company and the holders of Voting Shares have failed to elect to purchase all of the Offered Shares) or within thirty (30) days from the date of the failed Closing (in the case in which the Company and/or the Electing Holders have elected to purchase such Offered Shares but fail to tender the

EXHIBIT _B_, PAGE_ 58_

consideration therefor at the Closing); and provided further that the transferee named in the Offer Notice executes a counterpart of this Agreement concurrently with the purchase of such Offered Shares. Any transfer of the Offered Shares after the end of whichever of such thirty (30) day periods is applicable, or any change in the price at which the Offered Shares are to be sold or in the other material terms of the sale that are more favorable from the standpoint of the prospective third party purchaser from the price or terms set forth in the original Offer Notice shall require a new Offer Notice to be delivered to the Company's Secretary and shall give rise anew to the rights provided in the preceding Subsections of this Section 2.

3.      DISPOSITION OF NONVOTING SHARES UPON SPECIFIED EVENTS.

        3.1     Option to Purchase. Upon the occurrence of any of the following events (each referred to hereinafter as a "Disposition Event") affecting the Donee. the Company and/or the holders of the Voting Shares of the Company shall have the option to purchase any or all of the Nonvoting Shares of the Donee for the price and upon the terms set forth hereinafter in this Section 3

                (a)     The maintenance of any proceeding initiated by or against Donee under any bankruptcy or debtors' relief laws of the United States or of any other jurisdiction, which proceeding is not terminated within sixty (60) days after its commencement:

                (b)     A general assignment for the benefit of the creditors of Donee:

                (c)     A levy upon any of the Donee Shares pursuant to a writ of execution or subject to the authority of any court or governmental entity. which levy is not removed within thirty (30) days and only to extent of the Nonvoting Shares subject to such levy: or

                (d)     If at any time hereafter the Donee become an ineligible holder of stock of a subchapter S corporation, due to the loss of its status under Section 401(a) of the IRC, any change in applicable law (a "law change") or otherwise, or should there be a law change whereby an excise tax will be or is imposed on the Company or on MPR or any other holder of Voting Shares of the Company due to Donee's ownership of shares in a subchapter S corporation.

        3.2     Notice of the Occurrence of a Disposition Event. Donee or its legal representative shall give written notice to the Chief Executive Officer of the Company and the holder(s) of its Voting Stock immediately upon the occurrence of a Disposition Event, but in no event more than ten (10) days after the occurrence either thereof or the appointment of a legal representative for such Affected Shareholder, whichever shall first occur. If the Disposition Event is one of those set forth in Paragraphs 3.1(a), (b) or (c) above. such notice shall specify the person or entity to which the Donee Shares are to be transferred or could be transferred as a result of the Disposition Event. For a period of ninety (90) days following the date on which the Company received written notice of the Disposition Event, or the date the Company otherwise learns of such Event, if later (the "Option Commencement Date"), the Company shall have a first option to purchase all or any portion of the Donee Shares, provided that the Company's right to exercise this option shall be subject to the laws of California governing the right of a Company to purchase its own shares. In the event that the Company does not elect to purchase all of the Donee Shares within said 90 day period, the Company shall forthwith notify each of the holders of Voting Stock of the Company of the election not to purchase all of the Donee Shares and each such Shareholder shall then have the right and option, during a period of sixty (60) days from the mailing of such notice, to elect to purchase up to such proportion of the Donee Shares available to be purchased as the number of the Company's Voting Shares which such holder owns bears to the total number of the Company's Voting Shares held by all of the remaining holders of Voting Shares of the Company. The election to make such purchase shall be made by written notice, specifying the number of such Donee

EXHIBIT __3__, PAGE __59__

Shares which such holders of Voting Shares is electing to purchase, delivered to the Chief Executive Officer of the Company by no later than the end of such 60-day period. In the event that there are Donee Shares remaining after the application of the above formula, the remaining holders of Voting Shares who elected to purchase their proportionate allocation of the Donee Shares available for purchase hereunder shall be notified in writing that there are additional Donee Shares available for purchase (the "Additional Donee Shares") and the number thereof and such remaining holders of Voting Shares shall be entitled to elect, by a further written notice delivered to the Chief Executive Officer of the Company within twenty (20) days of their receipt of the notice regarding the availability of the Additional Donee Shares, to purchase up to a number of such Additional Donee Shares that bears the same proportion to the total of such Additional Donee Shares as the number of Voting Shares owned by such holders of Voting Shares bears to the total number of Voting Shares owned by all of the holders thereof that elected to purchase their proportionate allocation of the Donee Shares. This procedure shall be repeated one additional time among those of such holders of Voting Shares who elected to purchase their respective proportionate allotments of the Additional Donee Shares, if elections to purchase all of the Additional Donee Shares were not received in response to the first notice from the Company of the availability thereof, with each such holder of Voting Shares having ten (10) days to make his or her election to purchase any of the then remaining Additional Donee Shares.

3.3     Notice of Exercise of Option.  If the Company and/or any or all of the holders of Voting Shares elect to purchase any or all of the Donee Shares pursuant to this Section 3, the Company shall give written notice of such election, setting forth the number of Donee Shares to be purchased by each party, to the Donee and, if applicable, his receiver or trustee in bankruptcy, the creditor who secured a levy upon the Donee Shares, or any other transferee (as the case may be). Such notice shall be given within one hundred twenty (120) days after the Option Commencement Date in the event the Company elects to purchase all of the Donee Shares (or the number of such Shares required to obtain a discharge of the levy or attachment and a release of such Shares therefrom), or within ninety (90) days after the Company has mailed notice to the other holders of Voting Shares of its election not to purchase all of such Donee Shares.

3.4     Timing of Purchase.  The purchase under this Section 3 of the Donee Shares by the Company and/or any or all of the holders of Voting Shares shall be deemed to have occurred immediately prior to the transfer of any Donee Shares by reason of the Disposition Event triggering such purchase and no other person or entity shall acquire or be deemed to have acquired any right to or interest in the Donee Shares by reason of the occurrence of a Disposition Event unless and until (i) the option granted to the Company and the holders of Voting Shares of the Company pursuant to this Section 3 expires unexercised, (ii) the Donee, its legal representative or the proposed transferee(s), as a condition precedent to the transfer of such Donee Shares to it, shall have delivered to the Company an opinion of counsel, reasonably acceptable to the Company, that the transfer of the Donee Shares and the ownership of such Shares by such transferee(s) will not invalidate or result in termination of the Company's status as an "S" corporation for Federal or state income tax purposes, and will not violate applicable federal or state securities laws and also shall comply with all of the provisions of this Section 3 and (iii) the proposed transferee(s) shall have agreed in writing to be bound by this Agreement.

3.5     Purchase Price Payable for Donee Shares.  The purchase price payable for Donee's Shares that are being purchased by the Company or any of the holders of Voting Shares pursuant to this Section 3 (the "Purchase Price") shall be the fair market value of such Shares on the date of the notice of the occurrence of the Disposition Event giving rise to the purchase right and option under this Section 3. Such fair market value shall be determined by FMV Opinions, Inc., or, at the Company's option, by another appraiser regularly engaged in valuing businesses and qualified to make appraisals of businesses engaged in enterprises similar to the Company's business. In making such determination FMV

Opinions, Inc. or such other appraiser (as the case may be) shall take into account the following considerations:

    (a)    The Donee Shares constitute nonvoting stock and constitute a minority and non-controlling interest in the Company;

    (b)    There is a lack of marketability for the Donee Shares;

    (c)    The number of additional Nonvoting Shares or Voting Shares of the Company which other Shareholders are entitled to acquire pursuant to outstanding options or warrants issued by the Company; and

    (d)    The Company is not obligated to pay dividends and its Board of Directors has adopted a policy to retain earnings and not to pay dividends.

    3.6    Binding Effect. The value determined pursuant to Section 3.5 shall be binding upon and nonappealable by the parties to this Agreement, their legal representatives, and their successors in interest for the purposes of purchases and sales made pursuant to this Section 3. Once a determination of the value of the Donee Shares has been made, any of the parties who have given notice of their election to purchase any of such Shares shall have ten (10) days after being notified of such value within which to withdraw its or his election to purchase. In the event of such withdrawal, notice thereof shall be given to the Company and the other holders of Voting Shares, and if they do not elect within the next succeeding thirty (30) days to purchase the Nonvoting Shares to which such withdrawal is applicable, then, subject to the restrictions in Subsections 3.4 and 4.1, the option and right under this Section 3 to purchase such Shares shall terminate.

    3.7    Closing and Payment of the Purchase Price of the Donee Shares. The purchase of the Donee Shares which the Company, and/or if applicable, the holders of Voting Shares have elected to purchase pursuant to this Section 3 (the "Purchasing Shareholder(s)") (the "Closing"), shall take place at the offices of the Company at 10:00 A.M. on a date which shall be 60 days after the later of (i) the giving of notice pursuant to Subsection 3.3 containing the election of the Company and/or the Purchasing Shareholder(s) to purchase any of the Donee Shares under this Section 3; or (ii) if applicable, the determination of the value of the Donee Shares made pursuant to Section 3.5; provided, however that the Company and Purchasing Shareholders may elect to effectuate the Closing on a day prior to such 60th day by giving at least five (5) business days prior written notice thereof to the Donee (the "Closing Date"). At the Closing, each of whichever of the Company and/or the Purchasing Shareholders that has elected to purchase Donee Shares pursuant to this Section 3 (a "Purchasing Party"), shall pay the purchase price thereof to the Donee as follows:

    (a)    Cash Payment. By delivery to Donee of a check in an amount equal to twenty-five percent (25%) of the purchase price of the Donee Shares being purchased by such Purchasing Party; and :

    (b)    Note. By the execution and delivery to Donee by such Purchasing Party of a negotiable promissory note (the "Note(s)") representing the balance of the purchase price of the Donee Shares being purchased by such Purchasing Party which shall contain the payment terms set forth in Section 3.8 hereof.

On receipt of the Cash Payment and Note from a Purchasing Party, Donee shall deliver to such Purchasing Party the certificate or certificates evidencing the Donee Shares being purchased by it, together with such instruments of assignment and other documents or instruments as may reasonably be

DOCSOC:783235v6\17022.0047

EXHIBIT _B_ , PAGE_61_

requested by such Purchasing Party, including, without limitation, written representations and warranties from Donee that it is the beneficial and record owner of all of such Shares, that it has not sold or otherwise disposed of or hypothecated any of such Shares or any interests or rights therein, and that it is selling, transferring and conveying all of such Shares to that Purchasing Party free and clear of any liens, claims, pledges, options, security interests, encumbrances or adverse interests or any kind or nature whatsoever (other than the restrictions imposed by this Agreement), and that Donee is not in breach of this Agreement in any respect.

3.8    Terms of Note(s).  The Note(s) shall be fully amortized over a period of eighty-four (84) months.  Each Note shall bear interest from the date of delivery at (i) 10% per annum, or (ii) the minimum applicable rate necessary to avoid the imputation of additional interest for federal income tax purposes, whichever is less.  Interest and principal on the Note(s) shall be payable in equal monthly installments commencing not later than thirty (30) days after the date specified by Section 3.7 for payment of the Initial Payment, provided that the Note(s) shall be subject to prepayment, in whole or in part, at the option of the obligor thereunder, without penalty or premium, at any time.

3.9    Failure to Pay Purchase Price.  If any of Purchasing Party fails to tender the consideration due from it or him on the Closing Date, the Purchasing Parties that have tendered the consideration due by them may postpone the Closing for fourteen (14) days.  If the full consideration for all of the Donee Shares being purchased is not tendered on the date to which the Closing had been so postponed, or the original Closing Date if the Closing is not so postponed, then (x) sales of Donee Shares to any of the Purchasing Parties who have failed, at such Closing, to tender consideration for those of the Donee Shares being purchased by it or them shall be cancelled, without liability to any party, (y) the Purchasing Parties who have tendered their consideration and so desire shall be entitled to purchase, in addition to the number of Donee Shares which they had originally elected to purchase, as set forth in the notice of exercise delivered pursuant to Section 3.3 above, plus any number of the Donee Shares that any of the other Purchasing Parties failed to purchase, by tendering the consideration therefor at the Closing, and (z) the right and option to purchase those of the Donee Shares which are not paid for at the date to which the Closing was postponed shall terminate; provided, however, that no transfer of such Donee Shares shall be permitted to any third party by reason of a Disposition Event unless all of the requirements of Section 3.4 and Section 4.1 hereof have been satisfied.

4.    **SUBCHAPTER "S" ELECTION.**

4.1    Transfers Affecting "S" Company Status.  The Company is an electing small business corporation (an "S" Corporation) under Subchapter "S" of the IRC.  No transfer of the Shares of any Shareholder of the Company, or of any interest therein, whether such transfer is voluntary, involuntary or the result of the occurrence of any one of the Disposition Events set forth in Subsection 5.1 above, shall be effective, unless (i) neither the transfer to the proposed transferee of any Shares of this Company or any interest therein, nor the ownership by the proposed transferee, would invalidate or cause a termination of the Company's status as an "S" corporation, (ii) the transferee Shareholder covenants in writing to comply with any rules and regulations of the Internal Revenue Service then in effect relating to the Company's Subchapter "S" election and to take no action which will jeopardize such election and (iii) the transferee Shareholder covenants in writing to be bound by and comply with all of the terms and provisions of this Agreement.  Further, each Shareholder agrees that he or it (as the case may be) shall not transfer or attempt to transfer his or its Shares or any right or interest therein, to any proposed transferee whose ownership of any Shares would invalidate or cause a termination the Company's status as an "S" corporation.  Any such attempted sale or transfer shall be void and ineffectual.  Notwithstanding the foregoing, the restrictions contained in this Subsection 4.1 and any other restrictions on transferability of the Donee Shares contained elsewhere in this Agreement may be waived in connection with (i) any proposed transfer of Shares by a Shareholder pursuant to Section 2 or Section 3, but only if the holders of

DOCSOC:796235v4 17022.0047

EXHIBIT   _B_ . PAGE _62_

eighty percent (80%) or more of the aggregate number of Voting Shares held by the non-transferring Shareholders specifically and expressly consent, in writing, to such waiver and such written consents specifically identify (A) the Shares to be transferred; (B) the proposed transferee to whom such Shares may be transferred; (C) the time period within which such transfer must be consummated; and (D) any other terms and conditions with which such transfer or the proposed transferee must comply; and (ii) a sale or other transfer of all of the Shares to a third party (as contemplated by Section 6 hereof) or a merger or other business combination in which the outstanding Shares are converted or exchanged into shares of stock or other securities, or cash or other property, of another person or entity. Any attempted transfer pursuant to such a written consent contemplated by subdivision (i) of this Section 4.1 that does not comply with the terms and conditions contained therein, involves a transfer of more than the number of Shares specified in the consent or to any Person other than the proposed transferee named therein, or is not completed within the time period specified in such consent, shall be void and ineffectual and will not transfer any rights or interests in or to the Shares purported to be transferred.

   4.2    Will Provisions.  Within sixty (60) days of the date hereof each Shareholder that is a natural person shall prepare or cause to be prepared and shall execute a will, or a codicil to his or her existing will, which shall contain the following provision:

   "If at the time of my death, I own any stock of The Upper Deck Company, a California Company, or any Company which has succeeded to the assets and business of said Company (the "Company"), and such Company has in force a valid election (an "S" election) under Subchapter "S" (§ § 1362 - 1379) of the Internal Revenue Code of 1986 (the "IRC"), or the then corresponding provisions thereof, it is my desire that such "S" election continue following my death. Therefore, I direct that my executor take whatever steps are necessary consistent with this Will to distribute such stock in such a manner as not to cause a termination of the "S" election."

Failure of any Shareholder to comply with this provision shall not affect the validity or enforceability of this Agreement, including, but not limited to, the provisions of Subsection 4.1 hereinabove.

   4.3    Trust Provisions.  If a Shareholder, other than Donee, is a trust, the trustee thereof shall cause the trust agreement for such trust to be amended within thirty (30) days of the date hereof to include, or if any Shareholder hereafter transfers his or her Shares to a trust, other than Donee, such Shareholder shall cause the trust agreement for such trust to include the following provision:

   "If at the time of my death, the trust owns any shares of The Upper Deck Company, a California Company, or any Company which has succeeded to the assets and business of said Company (the "Company"), and such Company has in force a valid election (an "S" election") under Subchapter "S" (§ § 1361 - 1379) of the Internal Revenue Code of 1986 (the "IRC"), or the then corresponding provisions thereof, it is my desire that such "S" election continue following my death. Therefore, I direct that the trustee or successor trustee take whatever steps as may be appropriate to continue the "S" election, including, but not limited to, (i) transferring the shares to a successor trust which shall qualify as an eligible shareholder under Section 1361(c)(2) of the IRC, (ii) not transferring the shares to a number of persons or to any person or trust or trusts which could cause a termination or invalidation of the Company's "S" election, (iii) making any

EXHIBIT _B_, PAGE _63_

election to have this trust or any trust to which such Shares are to be transferred on my death treated as a qualified Subchapter "S" trust pursuant to Section 1361(d) of the IRC, or (iv) distributing the stock within the time necessary to prevent termination of the "S" election as provided in Section 1361(c)(2)(A)(ii) of the IRC."

Failure of any Shareholder to comply with this provision shall not affect the validity or enforceability and binding nature of this Agreement.

    4.4   <u>Restrictions on Certificates</u>. Each Shareholder agrees that all certificates representing any Shares which at any time are subject to the provisions of this Agreement shall have endorsed upon them the following legend or a legend substantially similar thereto:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS AGAINST TRANSFER UNDER THE TERMS OF A SHAREHOLDERS AGREEMENT ENTERED INTO BY THE ISSUER AND CERTAIN OF ITS SHAREHOLDERS. A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THIS COMPANY. SUCH RESTRICTIONS CREATE RIGHTS OF FIRST REFUSAL ON ANY ATTEMPTED SALE OR OTHER TRANSFER OF CERTAIN SHARES OF THE ISSUER AND PRECLUDE, AND MAKE INEFFECTIVE, ANY TRANSFER, ASSIGNMENT, PLEDGE OR OTHER DISPOSITION, WHETHER VOLUNTARY, INVOLUNTARY OR BY OPERATION OF LAW, WHICH WOULD CAUSE A TERMINATION OF THE ISSUER'S STATUS AS, OR ELIGIBILITY TO REMAIN, AN ELECTING SMALL BUSINESS COMPANY UNDER SUBCHAPTER "S" OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR ANY SUCCESSOR STATUTE THERETO OR WHICH WOULD VIOLATE ANY APPLICABLE SECURITIES LAWS."

Under no circumstances shall any sale or other transfer or disposition of any of the Shares subject hereto be valid unless and until the conditions set forth in this Agreement for a transfer of Shares to be effective, including, but not limited to, those contained in this Section 4, have been satisfied and the proposed transferee(s) thereof shall have executed and become a party to this Agreement and thereby shall have become subject to all of the provisions of this Agreement, unless the requirements of same are waived by written consent of the shareholders as provided in Subsection 4.1 above or such transfer is one that is described in subdivision (ii) of Section 4.1. Each Shareholder shall deliver to the Secretary of the Company all of the certificates evidencing his or her Shares upon execution of this Agreement to permit the Company either to endorse the foregoing legend on such certificates or to issue a new stock certificate with such legend endorsed thereon in substitution for the Shareholder's existing certificate(s), with any such newly issued certificate(s) to be of like tenor to, and for the same number of Shares as the number of Shares evidenced by, the existing certificates being surrendered for exchange pursuant hereto.

    4.5   <u>Allocation of Income</u>. Upon the transfer or the repurchase (as provided in Section 5 below) of any Donee Shares or any termination of the Company's S election, the Donee agrees that, upon the request of the Company and to the extent allowed by the IRC and the regulations thereunder, Donee shall consent to determine the Donee's share of any item for federal income tax purposes as if the taxable year of the Company consisted of two taxable years, as permitted under IRC Section 1362(e) and 1377(a) of the IRC, and Treasury Regulation 1.1368-1(g) as amended.

EXHIBIT __B__, PAGE __64__

5.      **PUT OPTION AND RIGHT.**

5.1      Purchase and Sale.  During the Put Option Exercise Period (as hereinafter defined) the Donee shall have the right and option, exercisable on not less than ten (10) days prior written notice to the Company (an "Exercise Notice"), to require the Company to purchase all, but not less than all, of the Donee's Nonvoting Shares on the terms and conditions set forth hereinafter (the "Put Option"). The "Put Option Exercise Period" shall be a period of one hundred eighty (180) days commencing on (but in no event earlier than) one (1) day following the second (2nd) anniversary of the date of this Agreement (the "Commencement Date").  If the Donee exercises this Put Option, by delivering an Exercise Notice to the Company no later than 5:00 P.M. Pacific Time on the last day of the 180-day Exercise Period, the closing of the purchase and sale of such Nonvoting Shares (the "Put Shares") shall take place at the offices of the Company at 10:00 A.M. on the thirtieth (30th) following the determination of the Put Price (as hereinafter defined), or at such other place or at such other time or date as the parties may agree in writing (the "Closing").  At the Closing, the Donee shall deliver to the Company the certificate or certificates evidencing the Put Shares, together with such instruments of assignment and other documents or instruments as may reasonably be requested by the Company, including, without limitation, written representations and warranties from Donee that it is the beneficial and record owner of all of the Put Shares, that it has not sold or otherwise disposed of or hypothecated any of the Put Shares or any interests or rights therein, and that it is selling, transferring and conveying all of the Put Shares to the Company free and clear of any liens, claims, pledges, options, security interests, encumbrances or adverse interests or any kind or nature whatsoever (other than the restrictions imposed by this Agreement), and that Donee is not in breach of this Agreement in any respect.  In exchange therefor, the Company shall pay the Put Price to the Donee in the manner provided in Section 5.3 below.  If not theretofore exercised, the Put Option granted under this Section 5 shall automatically terminate at, and shall not be exercisable at any time after, 5:00 P.M. Pacific Time on the 180th day of the Put Option Exercise Period.

5.2      Put Price.  The purchase price payable for Donee's Put Shares being purchased pursuant to Section 5.1 above shall be the fair market value of such Shares on the date of the notice of exercise of Donee's Put Right (the "Put Price").  Such fair market value shall be determined by FMV Opinions, Inc., or, at the Company's option, by another appraiser regularly engaged in valuing businesses and qualified to make appraisals of businesses engaged in enterprises similar to the Company's business.  In making such determination, FMV Opinions, Inc. or such other appraiser (as the case may be) shall take into account the following considerations:

(a)      The Put Shares constitute nonvoting stock and constitute a minority and non-controlling interest in the Company;

(b)      There is a lack of marketability for the Put Shares;

(c)      The number of additional Nonvoting Shares or Voting Shares of the Company which other Shareholders are entitled to acquire pursuant to outstanding options or warrants issued by the Company; and

(d)      The Company is not obligated to pay dividends and its Board of Directors has adopted a policy to retain earnings and not to pay dividends.

5.3      Manner of Payment.  The Put Price payable by the Company to Donee for the Put Shares shall be paid as follows:

(a)      Closing Cash Payment.  The Company shall pay twenty five percent (25%) of the Put Price to the Donee in cash or other mutually agreed upon consideration at the Closing.

EXHIBIT _B_, PAGE _65_

(b)     Remaining Payment. The Company shall pay the remaining balance of the Put Price to the Donee in cash or other mutually agreed upon consideration within forty-five (45) days after the Closing. No interest or other charges shall accrue on such remaining balance if paid on or before such forty-fifth (45th) day. If not paid within such 45 days, then the remaining unpaid balance shall bear interest at the lesser of (i) 10% per annum, or (ii) the minimum applicable rate necessary to avoid the imputation of additional interest for federal income tax purposes.

5.4     Compliance with Chapter 5 of CGCL. The authority and obligation of the Company to purchase the Put Shares pursuant to Section 5.1 hereof are subject to the restrictions governing the right of a corporation to purchase its own stock contained in the CGCL, and such other pertinent governmental restrictions as are now or may hereafter become effective and binding on the Company. The Company shall have no liability to Donee or otherwise if it is prevented from effectuating a purchase of Donee's Shares by reason of the restrictions or prohibitions contained in the CGCL.

5.5     Transferability of Put Obligation. The Company shall be entitled (but shall have no obligation) to transfer and delegate its obligation to purchase the Put Shares pursuant to Section 5.1 to MPR, so long as MPR remains a holder of Voting Stock of the Company, provided that in the event of any such transfer and delegation, MPR shall be the owner of the Put Shares acquired pursuant to this Section 5.

6.      DRAG-ALONG RIGHTS.

6.1     General. If at any time after the execution of this Agreement the holders of Voting Shares of the Company, by the affirmative vote or written consent of the holders of a majority of the Voting Shares then outstanding (the "Consenting Holders"), approve a sale of the Company (an "Approved Sale"), then, subject to the rights of the Donee under Section 5 above, if then exercisable:

(a)     the Donee and all other Shareholders of the Company who have not already voted or consented in writing to approve such Approved Sale (the "Non-Consenting Shareholders") shall approve and consent to, and raise no objections against, the Approved Sale;

(b)     if the Approved Sale is structured in whole or part as a merger or consolidation, or a sale of all or substantially all assets, each Shareholder, including Donee, shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale;

(c)     if the Approved Sale is structured in whole or part as a sale of Company Shares, the Shareholders, including Donee, agree to sell their Shares on the terms and conditions approved by the Consenting Holders; and

(d)     each Shareholder, including Donee, shall take all necessary and desirable actions approved by the Consenting Holders in connection with the consummation of the Approved Sale, including the execution of such agreements and such instruments and other actions reasonably necessary to provide the representations, warranties, indemnities, covenants, conditions, non-competition agreements, escrow agreements and other provisions and agreements relating to such Approved Sale, and effectuate the allocation and distribution of the aggregate consideration upon the Approved Sale such that each holder of Shares receives the same consideration per Share as each other Shareholder, irrespective of whether or not such Shares are Voting Shares or Non-Voting Shares. The Donee shall be permitted to sell its Shares pursuant to an Approved Sale without complying with the provisions of Section 2 of this Agreement.

EXHIBIT _B_ PAGE _66_

6.2     Conditions.  The obligations of the Shareholders pursuant to this Section 6 are subject to the satisfaction of the following conditions:

(a)     Upon the consummation of the Approved Sale, all of the Shareholders, shall receive the same proportion of the aggregate consideration from such Approved Sale that such holder would have received if such aggregate consideration had been distributed by the Company in complete liquidation of the Company immediately prior to such Approved Sale;

(b)     If any Shareholder is given an option as to the form and amount of consideration to be received, all Shareholders will be given the same option;

(c)     No Shareholder shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Approved Sale (excluding modest expenditures for its own postage, copies, etc., and the fees and expenses of its own counsel retained by it), and no Shareholder shall be obligated to pay more than its, his or her pro rata share (based upon the amount of consideration received for or with respect to its Shares) of reasonable expenses incurred in connection with such Approved Sale to the extent such costs are incurred for the benefit of all Shareholders and are not otherwise paid by the Company or the acquiring party (costs incurred by or on behalf of a Shareholder for its, his or her sole benefit will not be considered costs of the Approved Sale hereunder); and

(d)     In the event that the Shareholders are required to provide (i) any representations or warranties in connection with the Approved Sale, each Shareholder shall only be required to represent and warrant as to its or his title to its, his or her Shares being transferred, and such Shareholder's authority, power, and right to enter into and consummate such purchase or merger agreement without violating any other agreement or legal requirement, or (ii) any indemnities in connection with the Approved Sale, then each Shareholder shall not be liable for more than its pro rata share (based upon the amount of consideration received for or with respect to its Shares) of any liability for indemnity and such liability shall not exceed the total purchase price received by such Shareholder for its Shares, provided, however, that in the case of a Shareholder that owns only Non-Voting Shares, its liabilities under any such indemnities also shall be limited to breaches of the representations and warranties it has made regarding the matters set forth in clause (i) of this Section 6.2(d).

6.3     Accredited Investor/Purchaser Representative.  If the Company or any of the holders of Voting Shares enters into any negotiation or transaction for which Rule 506 under the Securities Act of 1933 (or any similar rule then in effect) may be available (including a merger, consolidation or other reorganization), each Shareholder that is not an accredited investor (as such term is defined in Rule 501 under the Securities Act) will, at the request of the Company or any of the Consenting Holders, appoint a purchaser representative (as such term is defined in Rule 501 under the Securities Act) reasonably acceptable to the party making such request.

7.     **REPRESENTATIONS AND WARRANTIES OF THE PARTIES.**

7.1     Company Representations.  The Company hereby makes the following representations and warranties to MPR and Donee as of the date hereof:

(a)     Organization and Good Standing.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California, and has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement.

(b).     Authorization and Binding Obligation.  The execution, delivery and performance of this Agreement and the Company's performance of its obligations hereunder, have been

EXHIBIT _B_ PAGE _67_

duly authorized by all necessary corporate action on the part of the Company. This Agreement has been duly executed and delivered by the Company and is a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar law, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability and (whether or not the issue of enforceability is decided by a court of law or in equity).

(c)   No Violation. The execution, delivery and performance by the Company of this Agreement do not violate (i) the charter or bylaws of the Company, (ii) to the knowledge of the Company, any material law, rule, regulation or ordinance applicable to the Company, or (iii) any order, ruling, judgment or decree of any court or other governmental agency binding on the Company.

(d)   Warrant Shares. The Company has previously issued to MPR stock purchase warrants (the "Warrants") that entitle MPR to purchase shares of Nonvoting Common Stock of the Company pursuant to a Warrant Agreement dated as of March 29, 2001 (the "Warrant Agreement"). Among other things, the Warrant Agreement contains provisions for the adjustment of the exercise price of the Warrants and the securities receivable on exercise thereof on the happening of certain events, including, without limitation, the declaration or payment of dividends payable in shares of stock or securities exercisable or convertible into shares of stock of the Company, reclassifications or recapitalizations of the outstanding shares of stock of the Company and reorganizations, mergers consolidations or other business combinations involving the Company (the "Adjustment Provisions"). The Company covenants that, without the consent of Donee, the Company will not agree to reduce the exercise price or change other economic terms of the Warrants in a manner that would reasonably be expected to affect adversely the fair market value of Donee's Nonvoting Shares; it being understood and agreed, however, that the Adjustment Provisions are intended to maintain, rather than reduce or increase, the fair market value of the Donee Shares and price reductions or other changes made pursuant to the Adjustment Provisions shall not constitute a breach of the provisions of this Section 7.2(d). The Company further covenants that, without the consent of Donee, the Company will not agree to change the Adjustment Provisions contained in the Warrant Agreement, which consent shall not be unreasonably withheld.

7.2   MPR Representations. MPR hereby makes the following representations and warranties to the Donee and the Company as of the date hereof:

(a)   Authorization. Richard P. McWilliam is the trustee of MPR and, in that capacity, he has the full right, power and authority under the MPR Trust Agreement to execute, deliver and to cause the Trust to perform its obligations under this Agreement.

(b)   Due Execution and Delivery; Binding Obligations. This Agreement has been duly executed and delivered by MPR and is a legal, valid and binding obligation of MPR enforceable against MPR in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, fraudulent transfer or conveyance or similar law, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether or not the issue of enforceability is decided by a court of law or in equity).

(c)   No Violation. The execution, delivery and performance by MPR of this Agreement, and the performance of its obligations hereunder do not violate (i) the MPR Trust Agreement or (ii) to the knowledge of MPR, any material law, rule, regulation or ordinance applicable to MPR, or (iii) any order, ruling, judgment or decree of any court or other governmental agency binding on MPR.

DOCSOC\788335v6\17022.0047

EXHIBIT _B_ PAGE _66_

(d)     Contribution of Donee Shares. In determining the value of the Nonvoting Shares that it has contributed to Donee, MPR has taken into account the factors set forth in Section 3.5 of this Agreement.

7.3     Donee Representations. Donee hereby makes the following representations and warranties to the Company and to MPR as of the date hereof:

(a)     Organization and Good Standing. The Donee is a tax-exempt trust, duly organized and validly existing under the laws of the State of Texas and has all requisite trust power and authority to enter into and to perform its obligations under this Agreement.

(b)     Authorization. The execution, delivery and performance of this Agreement by Donee have been duly authorized by all necessary action on the part of the Donee and its Board of Trustees.

(c)     Due Execution and Delivery; Binding Obligations. This Agreement has been duly executed and delivered by the Donee and is a legal, valid and binding obligation of Donee enforceable against Donee in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether or not the issue of enforceability is decided by a court of law or in equity).

(d)     No Violation. The execution, delivery and performance by Donee of this Agreement do not violate (i) the statutes under which the Donee is organized or which govern its existence or operations, (ii) to the knowledge of Donee, any law, rule, regulation or ordinance applicable to the Donee, or (iii) any order, ruling, judgment or decree of any court or other governmental agency binding on the Donee.

(e)     Qualified Trust Status. The Donee is an organization described as a qualified trust under Section 401(a) of the IRC that is exempt from tax under Section 501(a) of the IRC.

(f)     No Representation as to Tax Consequences. Donee acknowledges that neither the Company nor the MPR is making any representation or warranty as to the tax consequences to Donee of acquiring the Nonvoting Shares being contributed to it by MPR, and further acknowledges that it has had an opportunity to seek independent counsel and advisors with respect to tax and other matters relating thereto and with respect to this Agreement.

(g)     Acknowledgement of Dilutive Issuances. Donee acknowledges that the Company has issued the Warrants (as defined above) to MPR as a tax-free dividend on its outstanding Voting Shares. If the Warrants are exercised, the exercise will have the effect of diluting the percentage ownership interest in the Company represented by the Nonvoting Shares contributed to Donee. However, Donee has been informed that, in determining the value of the Nonvoting Shares being contributed by MPR to Donee, FMV Opinions, Inc. did take account of the prior issuance of the Warrants.

(h)     Investment Representations. Donee is acquiring the Nonvoting Shares from MPR for its own account, not as nominee or agent, for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act"). Donee further acknowledges and agrees that (i) the Nonvoting Shares are "restricted securities" under federal and state securities laws inasmuch as they have not been registered under the Securities Act or qualified under the California Corporate Securities Act of 1968, as amended (the "California Act"), by reason of a specific exemption therefrom, and therefore, Donee must bear the economic risk of such investment indefinitely and cannot sell, transfer or dispose of

EXHIBIT _B_ PAGE _67_

such Nonvoting Shares, unless a subsequent disposition thereof is registered or qualified or is exempt from such registration or qualification; (ii) neither the Company nor MPR has any obligation to register the Shares under the Securities Act or qualify them under the California Act at any time; (iii) each certificate representing any Nonvoting Shares will be endorsed with the following legend:

> "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION OR QUALIFICATION COVERING SUCH SECURITIES OR IF THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM ALL OF SUCH REGISTRATION AND QUALIFICATION REQUIREMENTS."

> (i)    The Donee. Donee is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act, as presently in effect and is a "qualified purchaser" with the meaning of Section 25102(n)(2)(D) of the California Corporate Securities Act. Donee's is organized under the laws of and its principal executive offices are located in the State of Texas.

> (j)    Governmental Consents. The execution and delivery by the Donee of and the performance of its obligations under this Agreement do not and will not require any authorization, registration or filing with, or consent or approval of, any federal, state or other governmental authority or regulatory body.

> 7.4    Survival. Each party's representations and warranties contained herein shall survive the execution and delivery of this Agreement and the consummation of any of the transactions contemplated hereby.

## 8.    TERMINATION OF AGREEMENT.

This Agreement shall terminate and the certificates representing the Shares shall be released from the terms of this Agreement on the occurrence of any of the following events:

> 8.1    Cessation of the business of the Company;

> 8.2    Bankruptcy, receivership or dissolution of the Company;

> 8.3    At such time as only one (1) Shareholder of the Company remains; and

> 8.4    Consummation of a public offering of any shares of capital stock of the Company, effectuated pursuant to a registration statement that has been filed and declared effective under Section 5 of the Securities Act.

Upon the termination of this Agreement for any of the above reasons, the certificates evidencing the Shares held by each Shareholder shall be surrendered to the Company and the Company shall issue new certificates for the same number of Shares but without the endorsement required by Subsection 4.4 of this Agreement.

EXHIBIT _B_ PAGE _68_

## 9.   MISCELLANEOUS.

9.1     Limited Engagement of Stradling Yocca Carlson & Rauth.  Each party hereto confirms its understanding that Stradling Yocca Carlson & Rauth has been engaged only to prepare this Agreement based on legal forms provided by other professional advisors to the Company, and not to identify the risks of the transactions contemplated hereby to any of the parties hereto or to analyze or render any opinion as to the advisability, fairness, or the tax or financial or other consequences, of (i) this Agreement, (ii) any other agreement, instrument or document that it may have prepared or may prepare or may have reviewed or may review for any of the parties in connection with the transactions contemplated hereby or described herein, or (iii) any of such transactions, including but not limited to the contribution by MPR of the Nonvoting Shares to Donee, or as to whether this Agreement, such other agreements, instruments or documents or such transactions will achieve the goals and objectives of the parties hereto.

9.2     Assignment; Binding Nature of Agreement.  Except as may otherwise be expressly provided to the contrary elsewhere in this Agreement, neither MPR nor Donee may assign this Agreement, or such party's rights, nor delegate such party's duties hereunder, except to a person or entity to which the Shares owned by such party are permitted to be sold or otherwise transferred pursuant to other provisions of this Agreement and then only if such sale or transfer has been made to such transferee in strict compliance with the provisions of this Agreement, including the provisions of Section 3.4 and 4.4 hereof.  The Company may assign its rights and delegate it duties hereunder to any entity into which it is merged or consolidated or to which all or substantially all of its business and assets may be sold.  Subject to the foregoing limitations on assignment, this Agreement shall be binding on and inure to the benefit of each of the parties and their respective representatives, successors and permitted assigns.

9.3     Parties in Interest.  Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns.  Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement.  No provision of this Agreement shall give any third person any right of subrogation or action over or against any party to this Agreement.

9.4     Severability.  If any of the terms or provisions of this Agreement or the application thereof to any person or circumstance shall be adjudged to any extent invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, such provision shall be construed as narrowly as is necessary to prevent such a finding of invalidity or unenforceability, and all of the remaining terms and provisions of this Agreement or their application to other persons or circumstances shall not be affected thereby and shall be valid and enforceable to the fullest extent permitted by applicable law.

9.5     Entire Agreement; Amendment.  This Agreement constitutes the entire agreement of the parties with respect to, and supersedes all prior agreements and understandings relating to, the subject matter of this Agreement or the transactions which are required to be consummated pursuant to this Agreement.  This Agreement may not be modified or amended except by a written instrument specifically referring to this Agreement signed by all of the parties hereto.

9.6     Waiver.  No waiver by any party of another party's obligations, or of any breach or default hereunder by any other party, shall be valid or effective, unless such waiver is set forth in writing and is signed by the party giving such waiver; and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature or any other breach or default by such other party of any other obligation hereunder.

EXHIBIT _B_, PAGE_69_

9.7    Notices.  All notices, requests, demands or other communications hereunder (collectively "notices") shall be in writing and shall be deemed to have been duly given, (i) on the date of delivery if delivered in person; (ii) on the business day immediately after the date on which it is sent by fax, provided that the successful transmission of the fax has been confirmed through a confirmation function sheet provided by the fax machine used for such transmission and a true and correct copy of the notice is sent by first class mail to the party to which the fax was sent within two (2) business days thereafter; or (iii) on the fourth business day following the deposit thereof in the United States Mails, provided it is mailed by certified or registered mail, return-receipt requested and postage prepaid and properly addressed, as set forth on the signature page of this Agreement.  Any party hereto may from time to time, by written notice to the other party, designate a different address, which shall be substituted for the one specified on the signature page of this Agreement effective on the tenth (10th) day following receipt of such change of address notice.  The addresses of the parties for purposes hereof are as follows:

If to the Company:      The Upper Deck Company
                        5909 Sea Otter Place
                        Carlsbad, CA 92008-6621
                        Attention: Richard P. McWilliam, CEO
                        Telecopy: (760) 929-6545

If to MPR:              Richard P. McWilliam, Trustee
                        The MPR Trust
                        5909 Sea Otter Place
                        Carlsbad, CA 92008-6621
                        Telecopy: (706) 929 6545

If to the Donee:        Austin Fire Fighters Relief and Retirement Fund
                        3301 Northland Drive, Suite 215
                        Austin, Texas 78731
                        Attention: Bill Stefka
                        Telecopy: (512) 453-7197

9.8    Interpretation; Headings.  This Agreement is the result of arms'-length negotiations and bargaining between the parties hereto and no provision hereof, because of any ambiguity found to be contained therein or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision.  The section, subsection and any paragraph headings contained herein are for the purpose of convenience only and are not intended to define or limit or affect, and shall not be considered in connection with, the interpretation of any of the terms or provisions of this Agreement.  Unless otherwise indicated elsewhere in this Agreement, (a) the term "or" shall not be exclusive, (b) the term "including" shall mean "including, but not limited to," and (c) the Recitals to this Agreement are fully incorporated into and are an integral part of this Agreement.

9.9    Representation by Legal Counsel.  Each of the parties hereby stipulates that is has been represented by counsel of its own choosing with respect to the negotiation, preparation and documentation of this Agreement and the other agreements being entered into pursuant hereto, and that said counsel has advised the party of all its rights, duties and obligations contained therein.

9.10    Dispute Resolution and Governing Law.

(a)    Arbitration of Disputes.  Subject to the exception hereinafter set forth in Section 9.11 hereto, the parties hereto agree that any dispute, controversy or claim arising out of or relating to this Agreement, the interpretation or the application of any of its provisions, or with respect to

17

DOCSOC:788325v4\17022.0047

EXHIBIT  B , PAGE  70

any actual or alleged breach, or the termination or claim of invalidity hereof, shall be resolved exclusively by binding arbitration before a panel of three arbitrators. Any such arbitration shall be conducted before the American Arbitration Association (the "AAA") in accordance with its rules in a jurisdiction, other than California and Texas, that is approved by mutual agreement of the parties. The parties may exercise discovery rights in connection with any such arbitration only with the consent or approval of a majority of the arbitrators, provided that discovery by means of interrogatories or requests for admission shall not be permitted. The determination of a majority of the three arbitrators shall be binding on the parties and shall be enforceable by any court having jurisdiction. NO PARTY HERETO SHALL CHALLENGE OR CONTEST THE RIGHT OF THE OTHER PARTY TO HAVE ANY DISPUTES RELATING TO THIS AGREEMENT TO BE RESOLVED BY BINDING ARBITRATION IN ACCORDANCE WITH THE PROVISIONS HEREOF AND NO PARTY SHALL CHALLENGE OR CONTEST THE PERSONAL JURISDICTION OR THE VENUE OF THE AAA TO CONDUCT SUCH ARBITRATION IN THE JURISDICTION SELECTED BY MUTUAL AGREEMENT OF THE PARTIES. EACH PARTY AGREES TO ACCEPT AND NOT TO CONTEST THE ADEQUACY OF SERVICE BY REGISTERED OR CERTIFIED MAIL. IT IS FURTHER EXPRESSLY AGREED THAT NO PARTY SHALL BE ENTITLED TO BRING AN ACTION IN ANY COURT OR SEEK RESOLUTION OF ANY DISPUTE OTHER THAN BY ARBITRATION EVEN IF THE PARTIES ARE UNABLE TO AGREE ON THE JURISDICTION WHERE THE ARBITRATION SHALL BE CONDUCTED. In the event that any party seeks to bring an action or proceeding in a court of law in violation of the provisions of this Section 9.10, this Agreement may be submitted to such court to evidence such party's agreement and obligation to have the matter resolved solely by binding arbitration as provided herein.

(b)   Waiver of Jury Trial. EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES THAT BY REASON OF THE ARBITRATION PROVISION CONTAINED HEREIN, SUCH PARTY IS WAIVING ITS RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY DISPUTE RELATING IN ANY WAY TO OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE PERFORMANCE OR (ACTUAL OR ALLEGED) NON-PERFORMANCE BY A PARTY HERETO AND EACH PARTY REPRESENTS AND WARRANTS THAT SUCH WAIVER IS VOLUNTARY ON ITS PART AND HAS BEEN GIVEN ONLY AFTER OBTAINING THE ADVICE WITH RESPECT THERETO OF ITS LEGAL COUNSEL. This Agreement may be submitted in any proceeding or action to evidence the foregoing waiver.

(c)   Costs and Expenses of Proceedings. In the event that any party initiates an arbitration proceeding pursuant to this Section 9.10, the prevailing party in such proceeding shall be entitled to recover the reasonable fees and disbursements of its attorneys, accountants and experts in connection with such proceeding from the non-prevailing party.

(d)   Governing Law. This Agreement shall be governed by, construed in accordance with and enforced under the laws of the State of California (without giving effect to principles of conflict of law thereof).

9.11   Injunctive Relief. Each party acknowledges and agrees that the material obligations and restrictions placed on each party hereto by this Agreement are reasonable and necessary to protect the legitimate interests of the Company, MPR and Donee and that any breach of any of those obligations or restrictions by any party hereto would result in irreparable injury to one or both of the other parties hereto that would not compensable by payment of monetary damages. Accordingly, each party acknowledges and agrees that in the event of a breach, or threatened breach, by it of any of its material obligations or covenants contained in this Agreement, then, notwithstanding the provisions of Section 9.10, each of the other parties, either individually or jointly, shall be entitled to obtain temporary, preliminary and permanent injunctive relief to obtain a halt to such breach or to prevent any such

EXHIBIT __B__, PAGE __71__

threatened breach by bringing a proceeding for such relief in a court having the jurisdiction and power to issue such relief against the breaching party; provided, however, that, in no event shall any party seeking such relief be entitled to seek or obtain any monetary or other remedies against the breaching party in such court action or proceeding and if a party desires to obtain damages or other types of relief, including declaratory relief, it must do so by arbitration pursuant to the provisions of Section 9.10. Each party agrees that neither of the other parties shall be required either (i) to join the other non-breaching party to any action brought to enforce this Agreement and to obtain such equitable relief or other remedies hereunder, or (ii) to post a bond or cash or other security as a condition to the granting of any such injunctive or other equitable relief. In addition, and notwithstanding the prohibition against seeking or obtaining monetary damages in any such equitable proceeding, the prevailing party in any such proceeding shall be entitled to recover the reasonable fees and disbursements of its attorneys, accountants and experts in connection with such proceeding from the non-prevailing party.

9.12    Counterparts. This Agreement, and any amendments hereto, may be executed in separate counterparts. Each separate counterpart of this Agreement or any such amendment shall be deemed an original, but all such counterparts of this Agreement or any such amendment, together, shall constitute one and the same instrument. A facsimile copy of any such signed counterpart shall be treated and shall have the same force and effect as an originally signed counterpart.

*(Remainder of page intentionally left blank.
Signatures of parties follow on next page.)*

EXHIBIT _B_, PAGE _72_

IN WITNESS WHEREOF, the parties to this Agreement have duly executed it on the day and year first above written.

"COMPANY"

THE UPPER DECK COMPANY, a California Company

By: _____
Richard P. McWilliam, CEO

"MPR"

MPR Trust

By: _____
Richard P. McWilliam, Trustee

"DONEE"

AUSTIN FIREFIGHTERS RELIEF AND RETIREMENT FUND

By: _____
WILLIAM E. STEFKA, ADMINISTRATOR

DOCSOC\733335v6\17022.0047

20

EXHIBIT _B_, PAGE _73_

# WARRANT AGREEMENT

THIS WARRANT AGREEMENT (the "Agreement"), dated as of March 29, 2001, is made and entered into by and between THE UPPER DECK COMPANY, a California corporation (the "Company"), and MPR TRUST, an inter vivos trust of which Richard P. McWilliam is the sole trustee (Warrantholder"), with reference to the following facts and circumstances:

A.      Warrantholder owns and holds of record 920,000 shares of the Company's no par value Common Stock, which constitute all of the Company's currently outstanding shares and which are designated in the Company's Articles of Incorporation as the Company's Voting Common Stock (the "Voting Common Stock").

B.      Until 1998, the outstanding shares of the Company were owned by several persons, who had disparate views of, and differing levels of commitment to the further development, of its business. As a result, the Company failed to fully achieve its strategic objectives.  In 1998, MPR succeeded in acquiring all of the shares of Common Stock of the Company owned by the other shareholders and the Board of Directors believes that an important contributing factor in the Company's success during the past two years has been that control of the Company has been vested in a single shareholder who has a keen understanding of the Company's business and the opportunities available to it and a commitment to supporting the Company's management to maintain a leadership position in its industry.  At the same time, the Board of Directors is aware that the Company may need capital for its business in the future.  As a result, in order to enable MPR to maintain control of the Company and at the same time provide a "currency" for raising additional capital when the need arises, the Company's Articles of Incorporation have recently been amended to authorize the Company's Board of Directors to sell or issue shares of the Company's Nonvoting Common Stock, which is identical to the Company's Voting Common Stock, except with respect to voting rights.  No shares of the Company's Nonvoting Common Stock have, as yet, been issued and none are outstanding.

C.      Pursuant to its authority under the Company's Articles of Incorporation and the California General Corporation Law (the "CGCL"), and in furtherance of the above objectives, the Board of Directors of the Company has declared a dividend on its Voting Common Stock that is payable in warrants to purchase, on the terms and conditions set forth in this Warrant Agreement, a total of ninety (90) shares of the Company's Nonvoting Common Stock (the "Warrants"), for each share of Voting Common Stock owned by the holders thereof as of March 28, 2001, the record date established for the dividend of such Warrants.  The Warrants will be evidenced by one or more warrant certificates substantially in the form of <u>Exhibit A</u> to this Agreement (the "Warrant Certificates").

D.      In order to effectuate the dividend of the Warrants and to evidence the Warrants being issued by the Company to the Warrantholder, the Company is executing, and delivering to the Warrantholder on this date this Agreement and a Warrant Certificate, numbered W-1, evidencing the right of Warrantholder to purchase, on the following terms and conditions, the number of Warrant Shares (as hereinafter defined) set forth in Section 2.1 below.

Now therefore, in consideration of the foregoing and for the purpose of defining the terms and provisions of the Warrants, it is agreed as follows:

Section 1.      Definitions.

"Common Stock" shall mean shares of both the Voting Common Stock and Nonvoting Common Stock of the Company and any other series or class of stock or other securities of the Company resulting from successive changes or reclassifications of the Common Stock.

DOCSOC:738309v4:17022.0047

EXHIBIT _B_, PAGE _74_

"Current Price" shall mean the fair market value of a Warrant Share as is determined from time to time in good faith by the Board of Directors of the Company.

"Nonvoting Common Stock" shall mean (i) the class of stock designated in the Company's Articles of Incorporation as the "Nonvoting Common Stock, without par value," of the Company at the date of this Agreement, or (ii) any other class of stock or other securities resulting from successive changes or reclassifications of such Nonvoting Common Stock.

"Permitted Transfer" and "Permitted Transferee" shall have the respective meanings given to those terms in Section 5 hereof.

"Person" means any natural person and any corporation, limited liability company, partnership, trust or other entity or any group of two or more Persons acting in concert.

"Securities Act" shall mean the Securities Act of 1933, as amended or any successor statute thereto.

"Warrants" shall have the meaning set forth in the Recitals to this Agreement.

"Warrant Certificate" shall have the meaning set forth in the Recitals to this Agreement.

"Warrant Exercise Price" shall have the meaning set forth in Section 2.2 of this Agreement.

"Warrantholder" shall mean MPR and any Permitted Transferee thereof or any Permitted Transferee of a prior Permitted Transferee.

"Warrant Shares" shall mean the fully paid and nonassessable shares of the Company's Nonvoting Common Stock or any other securities or property which the Warrantholder is entitled to purchase pursuant to the terms of this Warrant Agreement at the time or times that it exercises the Warrants either in whole or in part.

**Section 2.      Issuance of Warrants; Transferability and Form of Warrants.**

2.1      *Issuance of the Warrants.*  The Company agrees that it shall issue to the Warrantholder, concurrently herewith, a Warrant Certificate, No. W-1, evidencing Warrants to purchase a total of Eighty Two Million Eight Hundred Thousand (82,800,000) Warrant Shares at the Warrant Exercise Price set forth in Section 2.2 below and otherwise on the terms and conditions set forth in this Warrant Agreement. The number of Warrants issued hereunder, the number and kind of Warrant Shares that may be purchased hereafter on exercise thereof and the Warrant Exercise Price shall be subject to adjustment as provided in the definition of the term "Nonvoting Common Stock" and as required by Section 4 hereof).

2.2      *Warrant Exercise Price.*  The price at which the Warrant Shares shall be purchasable upon the exercise of the Warrants shall be fourteen and eight-tenths cents ($0.148) per Warrant Share, as the same may be adjusted pursuant to Section 4 hereof (the "Warrant Exercise Price"). The Warrant Exercise Price has been determined by an independent valuation firm (applying a valuation methodology that is consistent with the objective standards of the valuation industry), to be at least 90% of the fair market value of the Current Price, as measured on the date the Warrants were issued.

2

EXHIBIT _B_, PAGE_ 75_

2.3    *Form of Warrants.* The Warrants being issued to the Warrantholder pursuant to this Agreement shall be evidenced by a Warrant Certificate that shall be numbered and registered on the books of the Company when issued. The Warrant Certificate shall be executed on behalf of the Company by its Chief Executive Officer or Chief Financial Officer and a Warrant Certificate bearing the signature of an individual who was at the time of signature the proper officer of the Company shall bind the Company, notwithstanding that such individual shall have ceased to hold such office prior to the delivery of such Warrant or did not hold such office on the date of this Agreement. Each Warrant Certificate shall be dated as of the date of signature thereof by the Company either upon initial issuance or upon division, exchange, substitution or transfer. Each Warrant Certificate and certificate for Warrant Shares initially issued upon exercise of the Warrants shall bear the following legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, EXCHANGED, HYPOTHECATED OR TRANSFERRED IN ANY MANNER EXCEPT PURSUANT TO AN EXEMPTION FROM REGISTRATION AND THEN ONLY IN STRICT COMPLIANCE WITH SECTION 5 OF THE WARRANT AGREEMENT PURSUANT TO WHICH THEY WERE ISSUED.  A COPY OF THAT AGREEMENT IS ON FILE WITH THE SECRETARY OF THE ISSUER."

Any Warrant Certificate issued at any time in exchange or substitution for any Warrant Certificate bearing such legend shall also bear the above legend unless the Company has received an opinion of counsel reasonably acceptable to it that the securities represented thereby need no longer be subject to the restrictions set forth the legend and those set forth in Section 5 of this Agreement.

2.4    *Exchange of Warrant Certificate.* Any Warrant Certificate may be exchanged for another certificate or certificates entitling the Warrantholder to purchase a like aggregate number of Warrant Shares as the Warrant Certificate or Certificates surrendered then entitled such Warrantholder to purchase. Any Warrantholder desiring to exchange a Warrant Certificate shall make such request in writing delivered to the Company, and shall surrender, properly endorsed and, if required by the Company, with signatures guaranteed, the Warrant Certificate evidencing the Warrants to be so exchanged. Thereupon, the Company shall execute and deliver to the person or persons entitled thereto a new Warrant Certificate or Warrant Certificates as so requested.

Section 3.        Term of Warrants; Exercise of Warrants.

3.1    *Term of Warrants.* Subject to the terms of this Agreement, the Warrantholder shall have the right, at any time during the period commencing at 9:00 a.m. Pacific Time, on March 29, 2001 and ending at 5:00 p.m., Pacific Time, on March 29, 2036 (the "Termination Date"), to purchase from the Company up to the number of Warrant Shares to which the Warrantholder may be at the time be entitled to purchase pursuant to this Agreement, upon surrender to the Company, at its principal office, of the Warrant Certificate evidencing the Warrants to be exercised, together with the purchase form on the reverse thereof duly completed and signed (and, if requested by the Company, with signatures guaranteed), and upon payment to the Company of the Warrant Exercise Price (as defined in and determined in accordance with the provisions of Section 2.2 and Section 4 hereof), for the number of Warrant Shares in respect of which such Warrants are then exercised.

3.2    *Exercise of Warrants.* In the event Warrantholder desires to exercise any of the Warrants and thereby purchase some or all of the Warrant Shares purchasable on exercise thereof, then, as a condition precedent to the Company's obligations to issue such Warrant Shares and the Warrantholder's rights to acquire such Warrant Shares, the Warrantholder shall:

EXHIBIT _B_, PAGE _76_

(a)    surrender the Warrant Certificate(s) evidencing the Warrantholder's right to purchase such Warrant Shares to the Company for cancellation or, in the case of a partial exercise, for exchange for a new Warrant Certificate as provided below in this Section 3.2; and

(b)    pay to the Company the aggregate Warrant Exercise Price for the Warrant Shares being purchased on such exercise, in cash or by check or, with the consent of the Board of Directors, by cancellation of indebtedness that may be owed by the Company to the Warrantholder or such other consideration approved by the Board of Directors as is lawful consideration under applicable law or the purchase of the Warrant Shares being exercised, or any combination thereof.

(c)    Upon such surrender of the Warrant Certificate or Certificates evidencing the Warrants being exercised and the payment of such Warrant Exercise Price as aforesaid, the Company shall issue and cause to be delivered with reasonable promptness to, or upon the written order of the Warrantholder and, subject to Section 5 hereof, in such name or names as the Warrantholder may designate, a certificate or certificates for the number of full Warrant Shares so purchased upon the exercise of the Warrants, together with cash, as provided in Section 6 hereof, in respect of any fractional Warrant Share otherwise issuable upon such surrender. Such Warrant Share certificate or certificates shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares as of the date of surrender of the Warrant Certificate(s) evidencing the right to purchase the Warrant Shares being purchased on such exercise and the payment of the Warrant Exercise Price, as aforesaid, notwithstanding that the certificate or certificates representing such Warrant Shares shall not actually have been delivered or that the stock transfer books of the Company shall then be closed. The Warrants shall be exercisable, at the election of each Warrantholder, either in full or from time to time in part and, in the event that a Warrant certificate is exercised in respect of less than all of the Warrant Shares specified therein at any time prior to the expiration or earlier termination of the Warrants, a new Warrant Certificate evidencing the remaining unexercised portion of the Warrants evidenced by the surrender Warrant Certificate shall be issued by the Company to such Warrantholder.

3.3    *Reservation of Warrant Shares.*    There has been reserved, out of the Company's authorized capital stock, such number of shares of Nonvoting Common Stock, without par value, as shall be subject to purchase under the Warrants, and the Company shall at all times keep reserved, for so long as any of the Warrants remain outstanding, such shares of Nonvoting Common Stock that from time to time are, and such additional Warrant Shares or other securities that, pursuant to Section 4 hereof, become issuable on exercise of the Warrants.

3.4    *Payment of Taxes on Exercise of Warrants.*    The Company will pay all documentary stamp taxes, if any, attributable to the initial issuance of the Warrants or the Warrant Shares; provided, however, the Warrantholder, and not the Company, shall be required to pay any tax which may be payable in respect of any secondary transfer of the Warrants or the securities comprising the Warrant Shares.

3.5    *Mutilated or Missing Warrants.*    In case the certificate or certificates evidencing the Warrants shall be mutilated, lost, stolen or destroyed, the Company shall, at the request of the Warrantholder, issue and deliver in exchange and substitution for and upon cancellation of the mutilated certificate or certificates, or in lieu of and substitution for the certificate or certificates lost, stolen or destroyed, a new Warrant Certificate or certificates of like tenor and representing an equivalent right or interest, but only upon receipt of (i) evidence reasonably satisfactory to the Company of such loss, theft or destruction of such Warrant, (ii) payment of the reasonable out-of-pocket expenses incurred by the

4

EXHIBIT _B_, PAGE_77_

Company in issuing a replacement Warrant Certificate and (iii) if requested in the sole and absolute discretion of the Company, a surety bond or other collateral in an amount that the Company deems in its sole discretion to be adequate by the Company to protect against any claims and causes of action and against any liabilities, damages or losses and all costs and expenses, including attorneys fees, that the Company or any of its Shareholders may incur by reason of the presentation, for transfer or exercise, of the purportedly lost, stolen or destroyed Warrant Certificate or Certificates by a third party or from any issuance or refusal to issue a new Warrant Certificate or Certificates or Warrant Shares on any such presentation.

**Section 4.**        Adjustment of Number of Warrant Shares.

The number and kind of securities purchasable upon the exercise of the Warrants and the Warrant Exercise Price shall be subject to adjustment from time to time upon the happening of certain events, as follows:

4.1    *Adjustments.*    The number of Warrant Shares purchasable upon the exercise of the Warrants shall be subject to adjustment as follows:

(a)    In case the Company shall hereafter (i) pay a dividend or make a distribution on any of its shares of Common Stock (whether Voting Common Stock or Nonvoting Common Stock or both) in or of additional shares of Voting Common Stock or Nonvoting Common Stock (other than and excluding the dividend payable in Nonvoting Common Stock to the holders of the Voting Common Stock of the Company on March 29, 2001 pursuant to action taken by the Company's Board of Directors on March 28, 2001), (ii) subdivide its outstanding Common Stock in to a greater number of shares, (iii) combine its outstanding Common Stock into a smaller number of shares of Common Stock, or (iv) issue, by reclassification of its Nonvoting Common Stock or Voting Common Stock, other securities of the Company, without the receipt in any such case of any consideration for such shares of Common Stock or other securities or property, as the case may be, then, upon exercise of the Warrants, the Warrantholder shall be entitled to receive, in addition to the number of Warrant Shares purchasable upon exercise of the Warrants immediately prior to such dividend, distribution, subdivision, combination or classification, the kind and number of Warrant Shares or other securities or property of the Company which it would have owned or would have been entitled to receive immediately after the happening of any of the events described above, had the Warrants been exercised immediately prior to the happening of such event or any record date with respect thereto. Any adjustment made pursuant to this subsection 4.1(a) shall become effective immediately after the effective date of such event, retroactive to the record date, if any, for such event.

(b)    In case the Company shall (i) pay a dividend or make a distribution on any of its shares of Common Stock (whether Voting Common Stock or Nonvoting Common Stock or both) in or of securities of the Company that are other than additional shares of Common Stock or in or of assets of the Company other than cash, or (ii) issue or grant options, rights or warrants entitling the recipients to purchase any shares of its Common Stock, whether Voting or Nonvoting (other than the Warrants granted as a dividend on the Company's Voting Common Stock as described in the Recitals hereto and any options or rights to purchase any shares of Common Stock under any Employee Stock Option or Employee Stock Purchase Plan that the Company may adopt for its officers, directors, employees or independent contractors), without the receipt in any such case of any consideration for such other securities or property or such options, rights or warrants (as the case may be), then, on exercise of the Warrants, the Warrantholder shall be entitled to receive, in addition to the Warrant Shares that it is otherwise entitled to receive on exercise thereof, the kind and number of other securities or assets of the Company or the kind and number of options, rights

5

EXHIBIT __B__, PAGE __78__

or warrants of the Company which it would have owned or would have been entitled to receive immediately after the happening of any of the events described above in this Paragraph 4.1(b), had the Warrants been exercised immediately prior to the happening of such event or any record date with respect thereto. Any adjustment made pursuant to this subsection 4.1(b) shall become effective immediately after the effective date of such event, retroactive to the record date, if any, for such event. Notwithstanding the foregoing, if any of the options, rights or warrants so issued that give rise to an adjustment under this Paragraph 4.1(b) terminate or expire without being exercised prior to the exercise of any of the Warrants, then such terminated or expired options, rights or warrants shall, in the event of any subsequent exercise of the Warrants, be treated as if they had never been issued or granted when determining the number and nature of the options, rights or warrants that the Warrantholder shall be entitled to receive on such subsequent exercise of the Warrants.

(c)     Whenever the number of Warrant Shares purchasable upon the exercise of the Warrant is adjusted pursuant to clauses (i), (ii) or (iii) of Paragraph 4.1(a) hereof, the Warrant Exercise Price payable upon exercise of the Warrant shall be adjusted by multiplying such Warrant Exercise Price immediately prior to such adjustment by a fraction, of which (i) the numerator shall be the number of Warrant Shares purchasable upon the exercise of the Warrant immediately prior to such adjustment, and (ii) the denominator shall be the number of Warrant Shares so purchasable immediately thereafter.

(d)     Whenever any event requiring an adjustment pursuant to this Section 4.1 occurs, the Company shall cause to be promptly mailed to the Warrantholder by first class mail, postage prepaid, notice of such adjustment and a certificate of the chief financial officer of the Company setting forth the number of Warrant Shares purchasable upon the exercise of the Warrants and the Warrant Exercise Price after such adjustment, the securities or other property issuable, in addition to or in place of the Warrant Shares on exercise of this Warrant and a brief statement of the transaction or transactions that required such adjustment and the computation by which such adjustment was made.

(e)     In the event that at any time an adjustment is required to the Warrant Exercise Price or to the securities receivable on exercise of this Warrant as a result of an event described in this Section 4.1, then the Company's Board of Directors shall, in good faith, determine whether any other or different adjustment to the Warrant Exercise is required by reason thereof, whether based on the value of any other securities issued that give rise to an adjustment hereunder, and thereafter the number of such other securities so purchasable upon exercise of the Warrants shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to the Warrant Shares contained in this Section 4.

(f)     The Company shall be entitled, but shall not be obligated, to retain a firm of independent public accountants of recognized national standing (which may be any such firm regularly employed by the Company) to make any computation required under this Section 4, and a certificate signed by such firm shall be conclusive evidence of the correctness of any computation made under this Section 4.

4.2     *No Adjustment for Cash Dividends.*  No adjustment shall be made in the number of Warrants or Warrant Shares or in the Warrant Exercise Price of the Warrants by reason of any cash dividends or distributions or dividends or distributions other than those specifically set forth in Section 4.1 hereof.

EXHIBIT _B_ , PAGE _79_

4.3     *No Adjustment for Future Sales of Shares.*  Except as specifically provided to the contrary in Section 4.1, no adjustment shall be made in the number of Warrants or Warrant Shares or in the Warrant Exercise Price by reason of any sale or issuance of shares of Common Stock or other equity securities or options, rights or warrants to purchase shares of Common Stock or other equity securities of the Company, including any securities convertible into or exchangeable for Nonvoting Common Stock or other equity securities of the Company, whether at a price above or below the then Warrant Exercise Price of the Warrants, provided that the Board of Directors has determined that the shares or other securities are being sold for cash or other property at their then fair market value.

4.4     *Effect of Consolidation, Merger or Sale of Company.*  In case of any consolidation of the Company or merger of the Company with or into another corporation or in case of any sale or conveyance to another corporation of the property, assets and business of the Company as an entirety or substantially as an entirety (a "Business Combination Transaction"), in which the shareholders of the Company will receive shares of voting stock or other securities, or securities convertible or exercisable into voting or other stock or securities, of the surviving corporation or purchasing corporation, as the case may be, or of the parent corporation thereof, if any ("Surviving Corporation Securities"), the Company or such surviving or purchasing corporation, or the parent thereof, if any, as the case may be, shall execute with the Warrantholder an agreement that the Warrantholder shall have the right thereafter, exercisable at any time or from time to time during the remaining term of the Warrant, upon payment of the Warrant Exercise Price in effect immediately prior to the consummation of such Business Combination Transaction (as the same may be adjusted thereafter pursuant to the adjustment provisions referenced below in this Section 4.4), to purchase the kind and number or amount of shares and other securities which the Warrantholder would have owned or have been entitled to receive immediately after the happening of such consolidation, merger, sale or conveyance had the Warrants been exercised immediately prior to such Business Combination Transaction.  Any such agreement referred to above this subsection 4.4 shall provide for further adjustments to such shares or other securities, which shall be as nearly equivalent as may be practicable to the adjustments provided for in Section 4 hereof.  In the event of a Business Combination Transaction involving a merger of the Company with another corporation, in which the persons that owned the outstanding shares of Common Stock of the Company immediately prior thereto, will continue to own a majority of the Common Stock of the Company immediately after the effectiveness of such merger, the Warrants shall remain outstanding and unaffected or changed thereby, except that if there is any reclassification or change in the outstanding shares of Common Stock of the Company by reason of such merger or other Business Combination Transaction, the Warrantholders shall become entitled to receive on exercise of their Warrants the kind and number of shares or other securities they would have received on consummation of such merger or other Business Combination Transaction had they exercised their Warrants immediately prior to the effectiveness of such merger or other Business Combination Transaction.  In the event of a Business Combination Transaction in which no provision is made for the assumption of the Warrants or their exchange for new warrants of the successor or purchasing corporation or any parent thereof, as provided above in this subsection 4.4, then, the right to purchase Warrant Shares under any Warrants not exercised immediately prior to the effective date of such Business Combination Transaction shall terminate as of the effective date of such Business Combination Transaction and thereupon the Warrants shall become null and void and, as a result, to realize any value that may then be represented by this Warrant, the Warrantholder shall be obligated to exercise this Warrant prior to the effective date of such Business Combination Transaction.  Accordingly, the Company shall provide to the Warrantholder notice of any proposed Business Combination Transaction no later than the date on which the holders of shares of Common Stock of the Company first receive notice thereof, provided that the failure to or any delay in providing such notice shall not affect the validity or the effectiveness of any such Business Combination Transaction or be a basis for delaying the effectiveness thereof.  The provisions of this subsection 4.4 shall similarly apply to successive Business Combination Transactions.

7

EXHIBIT _B_, PAGE_ 80_

4.5    *Statement on Warrant Certificates.* Irrespective of any adjustments in the number of Shares or other securities issuable upon exercise of Warrants, Warrant Certificates theretofore or thereafter issued may continue to express the same number of securities as are stated in the similar Warrant Certificates initially issuable pursuant to this Agreement. However, the Company may, at any time in its sole discretion (which shall be conclusive), make any change in the form of Warrant Certificate that it may deem appropriate and that does not affect the substance thereof; and any Warrant Certificate thereafter issued, whether upon registration of transfer of, or in exchange or substitution for, an outstanding Warrant Certificate, may be in the form so changed.

**Section 5.    Representations of Warrantholder; Restrictions on Transfer of Warrants and Warrant Shares.**

5.1    *Representations of Warrantholder.*

(a)    Warrantholder represents and warrants that the Warrants are being acquired by Warrantholder for its personal account, for investment purposes only, and not with a view to the distribution, resale or other disposition of the Warrants or the Warrant Shares. Warrantholder hereby consents to the placing of any legend or legends on the Warrant Certificates as the Company, or its counsel, may deem necessary or advisable in order to comply with exemptions from registration under the Securities Act and from qualification of the Warrants under applicable state securities laws.

(b)    Warrantholder acknowledges and agrees that the Company is issuing the Warrants and may issue Warrant Shares without registering the Warrants or the Warrant Shares under the Securities Act or qualifying the Warrants or the Warrant Shares under any applicable state securities laws, on the basis of certain exemptions from such registration and qualification requirements. Accordingly, Warrantholder agrees that its exercise of the Warrants, either in whole or in part, may be expressly conditioned on the Warrantholder's delivery to the Company of an investment certificate including such representations and undertakings as the Company may reasonably require in order to assure the availability of such exemptions, including a representation that Warrantholder is acquiring the Warrant Shares for investment and not with a present intention of selling or otherwise disposing thereof and an agreement by Warrantholder that the certificates that will evidence such Warrant Shares may bear a legend indicating such non-registration and non-qualification of the Warrant Shares under the Securities Act and applicable state securities laws and the resulting restrictions on transfer thereof. Warrantholder acknowledges and agrees that, because the Warrant Shares receivable on exercise of any of the Warrants shall be unregistered, Warrantholder may be required to hold the Warrant Shares indefinitely unless an exemption from registration and qualification is available.

5.2    *Limitations on Transfer of the Warrants.* The Warrants shall not be sold, transferred, assigned or hypothecated by the Warrantholder except as otherwise set forth hereinafter in this Section 5.2. The Warrants may nevertheless be transferred, in whole or in part, to any of the following Persons provided that the conditions set forth in this Section 5 hereof are first satisfied (each a "Permitted Transferee") (i) one or more persons, each of whom on the date of transfer is a trustor, trustee or beneficiary of MPR; (ii) a purchaser of all or substantially all of the assets of MPR or any Permitted Transferee thereof; (iii) any inter vivos trust established by a Permitted Transferee that is a natural Person for the benefit of himself or the members of his or her immediate family, provided that the Permitted Transferee is a trustee of such trust, or (iv) any Person receiving any of the Warrants pursuant to a will or trust or the laws of intestate succession due to the death of any natural Person that was a Permitted Transferee; *provided, however,* that no purported transfer to a Permitted Transferee of any of the Warrants pursuant to this subsection 5.2 (a "Permitted Transfer") shall be effective and the Company

8.

EXHIBIT  *B*  PAGE  81

shall not be required to register such transfer on its books unless and until the following conditions have been satisfied:

(a)     prior to attempting or making any disposition of the Warrants or the Warrant Shares, or of any rights or interests therein or thereto, the Warrantholder shall give written notice to the Company describing briefly the manner in which any such proposed disposition is to be made and the identity of and other information relating to the proposed Permitted Transferee as the Company may request;

(b)     the Company has received an opinion of counsel or other confirmation, reasonably acceptable to it, that neither the transfer to the proposed Permitted Transferee of any of the Warrants or Warrant Shares, or other securities of the Company that may be issuable on exercise of any of the Warrants, nor the ownership thereof by the proposed Permitted Transferee, would (i) invalidate or cause a termination of the Company's status as an "S" corporation for federal or state income tax purposes, or (ii) violate any applicable federal or state securities laws;

(c)     the proposed Permitted Transferee covenants in writing to comply with any rules and regulations of the Internal Revenue Service relating to the Company's Subchapter "S" election and status and to take no action which would jeopardize such election;

(d)     The Company has received confirmation, reasonably acceptable to it, that the proposed Permitted Transferee is not, and is not an owner or employee or service provider of, or otherwise affiliated or associated with any Person that the Board of Directors of the Company has determined, in good faith, is a competitor of the Company; and

(e)     The Company has received the Warrant Certificate evidencing the Warrants proposed to be transferred, duly endorsed by the Warrantholder or by its duly authorized attorney or representative, together with (i) proper evidence of assignment or authority to transfer, (ii) evidence, reasonably satisfactory to the Company, that the named transferee qualifies as a Permitted Transferee and that the conditions set forth above in this Section 5.2 have been satisfied, and (iii) executed copies of a new Warrant Agreement and of such other agreements, by the Permitted Transferee, as the Company may require in connection with such proposed transfer.

Warrantholder covenants and agrees that it shall not attempt to make and it shall not make a proposed transfer or assignment of any of the Warrants or Warrant Shares to a proposed Permitted Transferee that does not satisfy all of the conditions set forth in the foregoing Paragraphs of this Section 5.2 and any such attempted transfer or assignment shall be void and ineffectual.  Notwithstanding the foregoing, the restrictions contained in this Section 5.2 may be waived in connection with (i) any proposed transfer of the Warrants or Warrant Shares to a proposed Permitted Transferee, but only if the holders of eighty percent (80%) or more of the aggregate number of share of Voting Common Stock of the Company specifically and expressly consent, in writing, to such waiver and such written consents specifically identify (i) the Warrants or Warrant Shares to be transferred; (ii) the proposed transferee to whom such Warrants or Warrant Shares are proposed to be transferred, (iii) the time period within which such transfer must be consummated; and (iv) any other terms and conditions with which such transfer or the proposed transferee must comply.  Any attempted transfer of Warrants or Warrant Shares pursuant to such a written consent contemplated hereby that does not comply with the terms and conditions contained therein, involves a transfer of more than the number of Warrants or Warrant Shares specified in the consent or to any Person other than the proposed Permitted Transferee named therein, or is not completed within the time period specified in such consent, shall be void and ineffectual and will not transfer any rights or interests in or to any Warrants or Warrant Shares purported to be so transferred.

9

DOCSOC 788100v4 : 1922.0047

EXHIBIT   B , PAGE  82

5.3    *Evidence of Transfer*.  Subject to the foregoing, any Permitted Transfer of any Warrants or Warrant Shares, in whole or in part, that meets all of the requirements of and conditions contained in this Section 5 shall be effectuated by registration of such Permitted Transfer only on the books of the Company maintained at its principal executive offices.  Upon any such registration of a Permitted Transfer, the Company shall execute and deliver a new Warrant Certificate to the person or persons entitled thereto.  Unless the context indicates otherwise, the term "Warrantholder" shall include any Permitted Transferee or Permitted Transferees of the Warrants to which any of the Warrants or Warrant Shares have been transferred in strict compliance with the provisions of this Section 5, and the term "Warrants" shall include any and all Warrants outstanding pursuant to this Agreement, including those evidenced by a Warrant Certificate or Warrant Certificates issued upon division, exchange, substitution or transfer pursuant to this Agreement.

Section 6.    **Fractional Interests; Current Market Price.**

The Company shall not be required to issue fractional Warrant Shares on the exercise of any of the Warrants.  If any fraction of a Warrant Share would, except for the provisions of this Section 6, be issuable on the exercise of any of the Warrants, the Company shall pay to the Warrantholder, in lieu of the issuance of such fractional Warrant Share, an amount in cash equal to the then Current Price (as hereinabove defined) multiplied by such fraction.

Section 7.    **No Rights as Shareholder; Notices to Warrantholder.**

Nothing contained in this Agreement or in the Warrants shall be construed as conferring upon the Warrantholder or its Permitted Transferees any rights as a shareholder of the Company, including the right to vote, receive dividends, consent or receive notices as a shareholder in respect of any meeting of shareholders for the election of directors of the Company or any other matter, unless and until the Warrantholder or such Permitted Transferee (as the case may be) exercises the Warrants, in whole or in part, and pays the Warrant Exercise Price thereof to the Company and complies with the requirements for the issuance of the Warrant Shares as provided in Section 3 hereof and, in the case of a transferee, the provisions contained in Section 5.  Notwithstanding the foregoing, however, if at any time prior to the earlier of the expiration or termination of the Warrants or their exercise in full, any one or more of the following events shall occur:

(a)    any action which would require an adjustment to the number or kind of Warrant Shares or the Warrant Exercise Price pursuant to Section 4; or

(b)    any Business Combination Transaction, as defined in Section 4, which would result in a material change in the rights of the Warrantholder under this Agreement or pursuant to the Warrants or would result in termination of the Warrants, as contemplated in subsection 4.4 hereof;

(c)    a dissolution, liquidation or winding up of the Company (other than in connection with a consolidation, merger or sale of its property, assets and business as an entirety or substantially as an entirety) shall be proposed;

then, the Company shall give notice in writing of such event to the Warrantholder, in the manner provided in Section 8 hereof, at least 15 days prior to the date fixed as a record date or the date of closing the transfer books for the determination of the shareholders entitled to any relevant dividend, distribution, subscription rights or other rights or for the determination of shareholders entitled to vote on such proposed Business Combination Transaction or proposed dissolution, liquidation or winding up.  Such notice shall specify such record date or the date of closing of the transfer books, as the case may be.

10

EXHIBIT   *B*  PAGE  83

Notwithstanding the foregoing, the failure to provide such notice or any delay in giving such notice shall not affect or be a basis for delaying the effectiveness of any such action, Business Combination Transaction or dissolution, liquidation or winding up of the Company.

**Section 8.    Notices.**

Any notice pursuant to this Agreement by the Company or by a Warrantholder or a holder of Warrant Shares shall be in writing and shall be deemed to have been duly given on the date of delivery or refusal indicated on the return receipt if delivered or mailed by certified mail, return receipt requested:

8.1    *Warrantholder Address.*    If to the Warrantholder or a holder of Warrant Shares, addressed to MPR Trust, 5909 Sea Otter Place, Carlsbad, California 92008-6621; Attention: Richard P. McWilliam, Trustee.

8.2    *Company Address.*    If to the Company addressed to it at 5909 Sea Otter Place, Carlsbad, California 92008-6621; Attention: Chief Executive Officer.

Each party may from time to time change the address to which notices to it are to be delivered or mailed hereunder by notice in accordance herewith to the other party.

**Section 9.    Miscellaneous.**

9.1    *Applicable Law.*    This Agreement shall be deemed to be a contract made under the laws of the State of California and for all purposes shall be construed in accordance with the laws of said State, without regard to its choice of laws.

9.2    *Successors.*    Subject to the restrictions on the transferability of the Warrants and Warrant Shares contained elsewhere in this Warrant Agreement, all of the covenants and provisions of this Agreement by or for the benefit of the Company or the Warrantholder shall bind and inure to the benefit of their respective successors, assigns and Permitted Transferees (as the case may be) hereunder. Notwithstanding the foregoing, however, nothing in this Agreement shall be construed to give to any person or corporation other than the Company and its successors or assigns and the Warrantholder and its Permitted Transferees any legal or equitable right, remedy or claim under this Agreement.    This Agreement shall be for the sole and exclusive benefit of the Company and its successors or assigns and the Warrantholder and its Permitted Transferees.

9.3    *Amendments.*

(a)    Effective on not less than ten (10) days prior written notice to the Warrantholder(s), the Company shall be entitled to amend this Agreement and the Warrants, without the consent of the Warrantholder(s), solely for the following purposes and no others:

(i)    To add covenants or agreements of the Company for the protection or benefit of the Warrantholders;

(ii)    To cure any ambiguity or cure, correct or supplement any defective or inconsistent provisions contained herein or in any amendment hereto, provided, however, that except for adjustments under Section 4 of this Agreement, such cure, correction or supplement does not change the Warrant Exercise Price or the other economic terms of the Warrants in a manner adverse either to any Warrantholder or to any holder of voting or nonvoting stock of the Company; and

11

EXHIBIT _B_, PAGE _84_

(iii)    To evidence the succession of another corporation to the Company upon a merger, consolidation or other business combination in which the Company is not the surviving corporation (a "successor corporation") and the assumption by a successor corporation of the covenants, agreements and obligations of the Company under this Agreement.

(b)    Except as otherwise provided in Paragraph (a) of this Section 9.3, neither this Agreement nor any Warrant may be amended except by a written instrument executed by duly authorized representatives of the Company and the Warrantholder; provided, however, that except for adjustments under Section 4 of this Agreement, no reduction shall be made in the Warrant Exercise Price and no amendment, modification or other change shall be made in any of the economic terms of the Warrants that would reasonably be expected to adversely affect the holders of any outstanding shares of non-voting Common Stock of the Company unless such reduction or amendment, modification or other change in economic terms shall have been approved by vote or written consent of the holders of a majority of the outstanding shares of the nonvoting Common Stock of the Company.

9.4    *Severability.* In the event any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision, but only to the extent necessary to cure the infirmity that caused such provision to be held illegal, unenforceable or void.

9.5    *Interpretation.* No provision of this Warrant Agreement, because of any ambiguity found to be contained in any of the provisions hereof, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of those provisions. Unless otherwise indicated elsewhere in this Agreement, (i) the term "or" shall not be exclusive, (ii) the term "including" shall mean "including, but not limited to," and (iii) unless the context indicates otherwise the terms "herein," "hereof," "hereto," "hereunder" and other terms similar to such terms shall refer to this Agreement as a whole and not merely to the specific section, subsection, paragraph or clause where such terms may appear.

9.6    *Jurisdiction and Related Matters.* Warrantholder and the Company agree that the Superior Court in and for the County of San Diego, California (the "Court") shall have exclusive jurisdiction over any disputes between the parties relating in any manner to, including any action, suit or other proceeding brought to interpret or enforce, this Warrant Agreement or the Warrants, and each of the parties further agrees as follows: (i) such party shall accept and not contest the personal or subject matter jurisdiction of the Court; (ii) such party shall accept and not object to or challenge the venue of the Court or assert the doctrine of forum non conveniens with respect to such Court; (iii) such party shall accept and not contest the validity or effectiveness of service of process in any such action, suit or other proceeding by registered or certified first class mail. In addition, TO THE MAXIMUM EXTENT PERMITTED BY LAW, WARRANTHOLDER AND EACH OF THE PERMITTED TRANSFEREES OF ANY WARRANTHOLDER, AND THE COMPANY, WAIVES AND SHALL WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT WITH RESPECT TO THIS AGREEMENT OR THE WARRANTS OR THE ENFORCEMENT OR INTERPRETATION THEREOF. The Court shall award to the prevailing party, in addition to any other relief deemed appropriate, payment by the non-prevailing party of the prevailing party's attorneys' fees and costs of litigation, whether or not those are otherwise available to the prevailing party by statute.

12

9.7    *Headings*.  The captions or headings of the sections and subsections of this Agreement are for convenience of reference only and shall be disregarded in interpreting, construing or applying any of the provisions of this Agreement.

9.8    *Counterparts*.  This Agreement may be executed in separate counterparts, each of which shall be an original of and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed, all as of the day and year first above written.

THE UPPER DECK COMPANY,
a California corporation

By:  _____
     Stephen Farro, Chief Financial Officer

Accepted as of this 29th day of March 2001 by:

The MPR TRUST

By:  _____
     Richard P. McWilliam, Trustee

13

DOCSOC\788309v4\17022.0047

EXHIBIT _B_, PAGE _86_

Exhibit A

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, EXCHANGED, HYPOTHECATED OR TRANSFERRED IN ANY MANNER EXCEPT PURSUANT TO AN EXEMPTION FROM REGISTRATION AND IN COMPLIANCE WITH SECTION 5 OF THE WARRANT AGREEMENT PURSUANT TO WHICH THEY WERE ISSUED. ANY ATTEMPTED SALE, TRANSFER OR OTHER DISPOSITION OF THE SECURITIES EVIDENCE HEREBY, OR OF ANY INTEREST THEREIN, THAT DOES NOT COMPLY WITH THE REQUIREMENTS OF THE WARRANT AGREEMENT SHALL BE NULL AND VOID AND SHALL NOT CONVEY ANY RIGHT OR INTEREST TO THE PROPOSED TRANSFEREE.

Warrant Certificate No. W-1

## WARRANTS TO PURCHASE 82,800,000 SHARES OF NONVOTING COMMON STOCK

Void After 5:00 P.M. Pacific Time, on March 29, 2036

### THE UPPER DECK COMPANY

Incorporated under the laws of the state of California

This certifies that, for value received, MPR Trust, the registered holder hereof or assigns (the "Warrantholder"), is entitled to purchase from THE UPPER DECK COMPANY (the "Company"), at any time in whole, or from time to time in part, during the period commencing at 9:00 a.m., Pacific Time, on March 29, 2001 and before 5:00 p.m., Pacific Time, on March 29, 2036, at the purchase price per share of $0.148 (the "Warrant Exercise Price"), any or all of the number of Shares of Nonvoting Common Stock of the Company set forth above (the "Shares"). The number of Shares issuable upon exercise of the Warrants evidenced hereby and the Warrant Exercise Price shall be subject to adjustment from time to time as set forth in the Warrant Agreement referred to below.

The Warrants evidenced hereby may be exercised in whole or in part by presentation of this Warrant Certificate with the Purchase Form attached hereto duly executed (with a signature guarantee as provided thereon), and simultaneous payment of the Warrant Exercise Price, at the principal office of the Company. Payment of the Warrant Exercise Price shall be made in cash or by check.

The Warrants evidenced hereby represent the right to purchase an aggregate of up to Eighty Two Million Eight Hundred Thousand (82,800,000) Shares, subject to certain adjustments, and are issued under and in accordance with a Warrant Agreement, dated as of March 29, 2001 (the "Warrant Agreement"), between the Company and MPR Trust, and is subject to the terms and provisions contained in the Warrant Agreement, to all of which the Warrantholder by acceptance hereof consents.

Upon any partial exercise of the Warrant evidenced hereby, there shall be signed and issued to the Warrantholder a new Warrant Certificate in respect of the Shares of Nonvoting Common Stock as to which the Warrant evidenced hereby shall not have been exercised. This Warrant may be exchanged at the office of the Company by surrender of this Warrant Certificate properly endorsed for one or more new Warrants of the same aggregate number of Shares of Nonvoting Common Stock as evidenced by the Warrant exchanged. No fractional Shares of Nonvoting Common Stock will be issued upon the exercise of rights to purchase hereunder, but the Company shall pay the cash value of any fraction upon any exercise of the Warrant. This Warrant is not transferable except as and to the extent set forth in the Warrant Agreement.

This Warrant Certificate does not entitle any Warrantholder to any of the rights of a shareholder of the Company.

THE UPPER DECK COMPANY

By: _____

Dated: March 29, 2001

DOCSOC\788399v4\17022.0047

EXHIBIT _B_, PAGE _87_

THE UPPER DECK COMPANY
PURCHASE FORM

THE UPPER DECK COMPANY

_____

The undersigned hereby irrevocably elects to exercise the right of purchase represented by the within Warrant Certificate for, and to purchase thereunder, _____ shares of Nonvoting Common Stock (the "Shares") provided for therein, and requests that certificates for the Shares be issued in the name of:

Name (Print): _____

Address, including zip code: _____

Social Security or Tax ID No.: _____

And, if said number of Shares shall not be all the Shares purchasable hereunder, that a new Warrant Certificate for the balance of the Shares purchasable under the within Warrant Certificate be registered in the name of the undersigned Warrantholder or his Assignee as below indicated and delivered to the address stated below.

(PLEASE PRINT)

Name of Warrantholder or Permitted Transferee: _____

Address: _____

Signature: _____ Dated: _____

Note:  The above signature must correspond with the name as written upon the face of this Warrant Certificate in every particular, without alteration or enlargement or any change whatever, unless these Warrants have been assigned.

Signatures Guaranteed: _____

(Unless waived by the Company, signature must be guaranteed by a bank or trust company having an office or correspondent in the United States or by a member firm of a registered securities exchange or the National Association of Securities Dealers, Inc.)

ASSIGNMENT
(To be signed only upon assignment of Warrants to a Permitted Transferee)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto the assignee named below all of the rights of the undersigned represented by the attached Warrant with respect to the number of Shares covered by the Warrant set forth below:

(Name and Address of Assignee Must Be Printed or Typewritten)

| Name of Assignee | Social Security No. or Tax I.D. No. | Address | No. of Shares |
|---|---|---|---|
| | | | |
| | | | |

and does hereby irrevocably constitute and appoint _____ Attorney to transfer said Warrants on the books of the Company, with full power of substitution in the premises.

Dated: _____

_____
Signature of Registered Holder

Note:   The signature on this assignment must correspond with the name as it appears upon the face of the within Warrant Certificate in every particular, without alteration or enlargement or any change whatever.

Signature Guaranteed: _____

(Unless waived by the Company, signature must be guaranteed by a bank or trust company having an office or correspondent in the United States or by a member firm of a registered securities exchange or the National Association of Securities Dealers, Inc.)

DOCSOC\788309v4\17022.0047

EXHIBIT _B_ , PAGE _88_

# EXHIBIT C

## SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT (hereinafter "Agreement") is made and entered into as of this 10th day of December 2002, by and among THE UPPER DECK COMPANY, a California Company (the "Company"), the MPR TRUST, an inter vivos revocable trust of which Richard P. McWilliam is the sole trustee ("MPR"), and AUSTIN FIREFIGHTERS RELIEF AND RETIREMENT FUND ("Austin").

### RECITALS:

A.    Austin, which is a qualified pension trust within the meaning of Section 401(a) of the Internal Revenue Code of 1986, as amended (the "IRC"), is the record and beneficial owner of 8,280,000 shares of the Company's Non-Voting Common Stock, no par value (the "Non-Voting Shares"), which constitute all of the outstanding Non-Voting Shares of the Company.

B.    MPR is the owner of all of the outstanding shares of voting stock of the Company (the "Voting Shares").

C.    Austin desires to sell the Non-Voting Shares, and the Company is desirous of purchasing the Non-Voting Shares from Austin, on the terms and conditions hereinafter set forth in this Agreement

NOW, THEREFORE, the parties hereto agree as follows:

1.    Sale and Purchase of the Non-Voting Shares.

1.1    Sale to Company.  Subject to the terms and conditions hereinafter set forth, on the Closing Date (as hereinafter defined), Austin shall sell to the Company and the Company shall purchase from Austin all of the 8,280,000 Non-Voting Shares, at a total purchase price of Two Million Dollars ($2,000,000) (the "Purchase Price"), which shall be paid by the Company to Austin in the manner set forth in Subsection 1.2 below

1.2    Closing of Sale and Purchase of Non-Voting Shares.  The closing of the sale and purchase of the Non-Voting Shares (the "Closing"), shall take place at the offices of Redge Bendheim, Plaza Tower, 600 Anton Blvd., Suite 700, Costa Mesa, CA 92626, at 10:00 A.M., Pacific Time, on December 31st, 2002, or at such other place or at such other time or day as the parties may agree hereafter in writing.  At the closing:

(a)    Austin shall deliver to the Company the stock certificate evidencing its ownership of all 8,280,000 Non-Voting Shares being sold pursuant to this Agreement (the "Stock Certificate"), accompanied by a Stock Assignment separate from certificate duly endorsed in blank and irrevocably authorizing Kevin Cahill, as attorney in fact, with full power of substitution, to transfer or effect the cancellation of the Non-Voting Shares on the books of the Company as instructed by the Company.

(b)    Concurrently with the delivery of the Stock Certificate by Austin to the Company, accompanied by such Stock Assignment, the Company shall pay the Purchase Price to Austin by wire transfer of same day funds to a bank account that Austin has designated in writing to the Company at least two business days prior to the Closing Date.

DOCSOC\936445v1\17022.0047

UDC02490

EXHIBIT _C_, PAGE _89_

AI 0003437

(c)     At the Closing each party shall execute and deliver such additional documents and instruments as any other party to this Agreement may reasonably request, including certified copies of resolutions authorizing the transactions contemplated hereby, to better evidence or effectuate the transactions contemplated hereby, but not to enlarge or diminish any of the respective rights or obligations of any of the parties under this Agreement.

2.     <u>Representation and Warranties of the Company</u>.   The Company hereby makes the following representations and warranties to Austin and MPR:

2.1     <u>Organization and Good Standing</u>.   The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement.

2.2     <u>Authorization and Binding Obligation</u>.   The execution, delivery and performance of this Agreement by the Company and the Company's performance of its obligations hereunder, have been duly authorized by all necessary corporate action on the part of the Company. This Agreement has been duly executed and delivered by the Company and is a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar law, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether or not the issue of enforceability is decided by a court of law or in equity).

2.3     <u>No Violation</u>.   The execution, delivery and performance by the Company of this Agreement do not and will not (i) violate the Articles of Incorporation or bylaws of the Company, (ii) to the knowledge of the Company, violate any material law, rule, regulation or ordinance applicable to the Company, (iii) violate or constitute a default under or breach of any order, ruling, judgment or decree of any court or other governmental agency binding on the Company, (iv) require any authorization, registration or filing with, or consent or approval of, any federal, state or other governmental authority or regulatory body, or (v) violate or constitute or result in a breach of any contract, note or other instrument or agreement to which the Company is a party or to which any of its material assets is subject, except for any contract, note, instrument or agreement the violation or breach of which would not have a material adverse effect on the Company nor adversely affect, delay or interfere with its consummation of the transactions contemplated hereby.

3.     <u>Austin Representations</u>.   Austin hereby makes the following representations and warranties to the Company and to MPR:

3.1     <u>Organization and Good Standing</u>.   Austin is a qualified trust under Section 401(a) of the IRC that is exempt from tax under Section 501(a) of the IRC, is duly organized and validly existing under the laws of the State of Texas and has all requisite trust power and authority to enter into and to perform its obligations under this Agreement.

3.2     <u>Authorization</u>.   The execution, delivery and performance of this Agreement by Austin have been duly authorized by all necessary action on the part of Austin and its Board of Trustees and no other action on the part of Austin or any governing board or body of Austin is required or necessary therefor.

UDC02491

EXHIBIT  _C_ , PAGE _90_

AI 0003438

3.3     Due Execution and Delivery; Binding Obligations.  This Agreement has been duly executed and delivered by Austin and is a legal, valid and binding obligation of Austin enforceable against Austin in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether or not the issue of enforceability is decided by a court of law or in equity).

3.4     No Violation.  The execution, delivery and performance by Austin of this Agreement do not and will not (i) violate the statutes, laws or rules or regulations under which Austin is organized or which govern its existence or operations or, to the knowledge of Austin, any other law, rule, regulation or ordinance applicable to Austin, (ii) violate or constitute a default under or breach of any order, ruling, judgment or decree of any court or other governmental agency binding on Austin or (iii) result in the imposition of any lien, claim or encumbrance of any kind on any of the Non-Voting Shares being sold by it to the Company pursuant to this Agreement, (iv) require any authorization, registration or filing with, or consent or approval of, any federal, state or other governmental authority or regulatory body, or (v) violate or constitute or result in a breach of any contract, note or other instrument or agreement to which Austin is a party or to which any of its material assets is subject, except for any contract, note, instrument or agreement the violation or breach of which would not have a material adverse effect on Austin nor adversely affect, delay or interfere with its consummation of the transactions contemplated hereby.

3.5     Ownership and Title to Non-Voting Shares.  Austin hereby represents and warrants that Austin is the legal and beneficial owner of the Non-Voting Shares, and on consummation of the sale of the Non-Voting Shares to the Company pursuant to this Agreement, Austin will have sold, transferred and conveyed to the Company and the Company shall have received from Austin, good and marketable title to the Non-Voting Shares, free and clear of any and all liens, claims, security interests, pledges, options, encumbrances or adverse interests of any kind or nature whatsoever. Without limiting the generality of the foregoing, Austin further represents and warrants that, except for this Agreement and that certain Shareholders Agreement dated as of March 31, 2001 by and among the parties hereto (the "Shareholders Agreement"), Austin has not entered into and is not a party to and neither Austin nor the Non-Voting Shares are subject to, any purchase or sales agreement, option agreement, pledge or security agreement or any other agreement (whether written or oral) that (i) entitles or will or may entitle anyone to acquire any of the Non-Voting Shares either in whole or in part; or (ii) provides for or contemplates the sale, transfer, conveyance or pledge of or the grant of any security interest in or option on or the creation of any other lien or encumbrance on, any of the Non-Voting Shares.

4.     MPR Representations.  MPR hereby makes the following representations and warranties to Austin and the Company:

4.1     Authorization.  Richard P. McWilliam is the trustee of MPR and, in that capacity, he has the full right, power and authority under the MPR Trust Agreement to execute, deliver and to cause the Trust to perform its obligations under this Agreement.

4.2     Due Execution and Delivery; Binding Obligations.  This Agreement has been duly executed and delivered by MPR and is a legal, valid and binding obligation of MPR enforceable against MPR in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, fraudulent transfer or conveyance or similar law, relating to or limiting

UDC02492

EXHIBIT ___C. PAGE_9/

AI 0003439

creditors' rights generally or by equitable principles relating to enforceability (whether or not the issue of enforceability is decided by a court of law or in equity).

          4.3    No Violation. The execution, delivery and performance by MPR of this Agreement, and the performance of its obligations hereunder do not and will not (i) violate the MPR Trust Agreement, (ii) to the knowledge of MPR, violate any material law, rule, regulation or ordinance applicable to MPR, (iii) violate or constitute a default under or breach of any order, ruling, judgment or decree of any court or other governmental agency binding on MPR, (iv) require any authorization, registration or filing with, or consent or approval of, any federal, state or other governmental authority or regulatory body, or (v) violate or constitute or result in a breach of any contract, note, instrument or other agreement to which MPR is a party to or to which any of its material assets is subject, except for any contract, note, instrument or agreement the violation or breach of which would not have a material adverse effect on MPR nor adversely affect, delay or interfere with its consummation of the transactions contemplated hereby.

     5.    Certain Covenants.

          5.1    No Assignments or Transfers. Between the date hereof and the Closing, and except as provided for herein, Austin shall not sell, transfer, convey or assign, pledge or hypothecate or otherwise dispose of, any right, title or interest of any kind or nature whatsoever in the Non-Voting Shares and shall not enter into any agreement or understanding, written or oral, to do so or which would result in the imposition of any lien or encumbrance on any of the Non-Voting Shares or adversely affect, delay or interfere with the consummation of the transactions contemplated hereby.

          5.2    Confidentiality Obligations. For purposes hereof, (a) the term "Confidential Information" shall mean strategic business plans or prospects, marketing strategies, plans and programs, information concerning current or future products, including pricing information or strategies, trade secrets and know-how, financial statements, operating data and other financial information and financial forecasts, and the identities and other information concerning customers, employees and independent contractors and shall include the terms and provisions of this Agreement; and (b) the term "Representatives" shall mean Austin's trustees, administrators, officers, employees, agents and independent contractors. Austin covenants and agrees that it will keep, and that it will cause its Representatives to keep, all of the Confidential Information in strict confidence and shall not disclose any of the Confidential Information of or about the Company, however obtained (including any documents or information prepared by it or its Representatives that incorporate, reflect, analyzes or comment on any Confidential Information of or about the Company). Austin further covenants and agrees that it shall not make, and it will cause its Representatives to refrain from making, any use of any of the Confidential Information of or about the Company, whether for Austin's or their own benefit or for the benefit of any other person or entity. If Austin or any of its Representatives is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process), to disclose any of the Confidential Information, Austin or its Representatives requested or required to make the disclosure shall provide the Company with prompt notice of any such request or requirement and shall provide, at the Company's expense, such reasonable cooperation as the Company may request so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Section 5.2. If, in the absence of a protective order or other remedy or the receipt of a waiver from the Company, Austin or its Representatives that are requested or required to make the disclosure are nonetheless, in the written opinion of Austin's primary outside counsel, legally compelled to disclose the requested Confidential Information to any

UDC02493

EXHIBIT _C_, PAGE _92_

AI 0003440

tribunal or government agency, Austin or such Representatives may, without liability hereunder, disclose to such tribunal or government agency only that portion of the requested Confidential Information which such counsel advises is legally required to be disclosed. The obligations of Austin under this Section 6.2 shall survive the execution and delivery of this Agreement for a period of seven (7) years from the date hereof.

5.3   Shareholders Agreement. It is hereby agreed by the parties that Austin's rights and obligations under the Shareholders Agreement shall terminate effective as of the Closing of the transactions contemplated hereby and each of the parties hereto expressly waives the application of that Agreement to the transactions contemplated hereby.

6.   Miscellaneous.

6.1   Survival. Each party's representations and warranties contained herein shall survive the execution and delivery of this Agreement and the consummation of any of the transactions contemplated hereby. Each party's covenants also shall survive the execution and delivery of this Agreement and the consummation of any of the transactions contemplated hereby for so long as necessary to effect full compliance therewith or if a stated period of survival is made applicable thereto, then for such stated period.

6.2   Equitable Remedies. Austin acknowledges and agrees that any violation or breach of any of its covenants or agreements contained in this Agreement would result in substantial and irreparable injury to the Company and MPR for which an award of damages would not be sufficient, by itself, to compensate such parties. Accordingly, Austin agrees that, in the event of any actual or threatened violation by it or any of its Representatives of any such covenants or agreements, each of the Company and MPR shall have the right, severally and jointly, to obtain (in addition to any other remedies that may be available at law or in equity) temporary, preliminary and permanent injunctive relief to prevent or halt such violation or breach or threatened violation or breach, and an order of specific performance of such covenants or agreements being violated or breached or threatened to be violated or breached, and in any such equitable proceeding the parties shall stipulate that the party or parties seeking such equitable remedy or remedies will incur irreparable injury by reason of any such violation or breach, and no party hereto shall be required to post a bond or other security as a condition to the grant of such or any other equitable relief in any such proceeding.

6.3   Assignment. No party hereto may assign or otherwise transfer any of its rights, or delegate any of its duties or obligations, under this Agreement. Notwithstanding the foregoing, however, the Company may assign its rights or delegate its duties hereunder to MPR or to an affiliate thereof (a "Permitted Assignee"), effective on written notice to Austin, provided, however, that no such assignment or delegation by the Company shall operate to relieve the Company of any of its obligations hereunder to the extent they are not performed fully and faithfully by such Permitted Assignee. Subject to the foregoing, this Agreement shall inure to and shall be binding on the respective successors and assigns of the parties hereto.

6.4   Entire Agreement; Modification. This Agreement contains the entire understanding and all of the agreements of the parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the parties, relating in any way to any sale or purchase of any of the Non-Voting Shares owned by Austin. This Agreement may not be amended or modified except by a written agreement or instrument signed by all of the parties hereto.

-5-

DOCSOC\936445v1\17022.0047

UDC02494

AI 0003441

EXHIBIT _C_ PAGE_93_

6.5     Waiver.  No waiver by one party (the "Waiving Party") of an obligation under this Agreement of the other party or of any breach thereof shall be effective unless such waiver is set forth in a written document executed by the Waiving Party and no such written waiver shall constitute a waiver of performance previously or subsequently required or of any prior or subsequent breach of the same obligation or of any other obligation under this Agreement.

6.6     Severability.  Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, provided, however, that, if any provision of this Agreement shall be determined to be invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only, without invalidating or affecting the remainder of such provision or the remaining provisions of this Agreement.

6.7     Interpretation and Headings.  This Agreement is the result of arms'-length negotiations between the parties hereto and no provision of this Agreement, because of any ambiguity found to be contained herein, or otherwise, shall be construed against a party by reason of the fact that such party or its legal counsel was the draftsman of that provision.  Unless otherwise indicated elsewhere in this Agreement, (a) the term "or" shall not be exclusive, (b) the term "including" shall mean "including, but not limited to," and (c) the terms "herein," "hereof," "hereto," "hereunder," "hereinafter," and other terms similar thereto shall refer to this Agreement as a whole and not merely to the specific section, subsection, paragraph or clause where such terms may appear. The Section, subsection and paragraph headings in this Agreement are included for convenience of reference only and shall not be considered in interpreting, construing or giving effect to any of the provisions of this Agreement.

6.8     Further Assurances.  Each of the parties agrees that it shall promptly execute and deliver, at such times (before, at or after the Closing) as are necessary, such other documents and instruments that any of the other parties may reasonably request, to better evidence or effectuate the agreements of the parties contained herein and the transactions contemplated hereby.

6.9     Counterparts.  This Agreement may be executed in one or more counterparts, each of which signed counterparts, together with any photocopies or facsimile copies thereof, shall be deemed to be an original but all of which together will constitute one and the same instrument.

*(Remainder of page intentionally left blank.*
*Signatures of parties follow on next page)*

UDC02495

EXHIBIT   C   PAGE  94

AI 0003442

This Share Purchase Agreement is hereby executed by the parties as of the day and year first above written.

**"COMPANY"**                 THE UPPER DECK COMPANY,
                             a California Company

                             By: _____
                                 Richard P. McWilliam, CEO

**"MPR"**                     MPR Trust

                             By: _____
                                 Richard P. McWilliam, Trustee

**"AUSTIN.**                  AUSTIN FIREFIGHTERS RELIEF
                             AND RETIREMENT FUND

                             By: William Eg Stefhe
                                 WILLHAM E. STEFKA
                                 FUND ADMINISTRATOR

DOCSOC\936445v1\17022.0047                        -7-

UDC02496

EXHIBIT ___C___, PAGE __95__           AI 0003443

# EXHIBIT D

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110

[617] 951.2100  FAX [617] 951.2125

BOSTON, MA   PROVIDENCE, RI

WILLIAM A. COTTER PC
[617] 951.2063
wcotter@peabodyarnold.com

July 29, 2005

*VIA EMAIL and FACSIMILE ONLY*

Andrew M. Reidy, Esq.
Howrey Simon Arnold & White
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004-2402

|     | Re:     | Insureds: | The Upper Deck Company |
|-----|---------|-----------|------------------------|
|     |         |           | Richard P. McWilliam   |
|     |         |           | The MPR Trust          |
|     |         | Policy No.: | 405-88-33            |
|     |         | Claim No.:  | 640-00010            |

Dear Andrew:

At the close of our recent meeting in Los Angeles you orally requested AISLIC to make a prompt withdrawal of its reservation of rights and agree to fund the "settlement" with the IRS if finalized.  This was subsequently repeated in writing by letters dated April 26, 2005 and May 6, 2005.  AISLIC's response, in substance, was for Upper Deck and/or Mr. McWilliam to satisfy the document/information demands previously made by Cahill Gordon and this firm.  It would then review the matter and make a decision.  The response was, in substance, that the information/documents requested could be found within the mass of documents supplied to the IRS as a response to its several document/information requests.

While it would have greatly assisted AISLIC if Upper Deck had identified the specific documents within the IRS submissions, it recently finished its search.  The documents found and conclusions that can be drawn from such, as well as other available documents and materials, mandates AISLIC to conclude the policy provides no coverage to Upper Deck or Mr. McWilliam for the proposed IRS settlement or any other taxes, interest or penalties that might arise because of their entering into and carrying out a transaction described in IRS Notice 2004-50.

Fundamental to this determination is the fact that the transaction, as carried out in December of 2002, was not the transaction as presented to AISLIC in the summer of 2001, to insure and which was fully described in the policy and attached exhibits.  The key difference lay in the impact of the Share Purchase Agreement dated December 10, 2002, as well as the circumstances surrounding its negotiation as partially set forth in two letters to the Austin Firefighters dated December 9, 2002.

UDC-ARB 00089

EXHIBIT ___D___, PAGE __92__

PEABODY & ARNOLD ᴸᴸᴾ
Andrew M. Reidy, Esq.
July 29, 2005
Page 2

Until the Share Purchase Agreement, with reference to its non-voting stock, the Austin
Firefighters' rights were governed by the Shareholders Agreement of March 31, 2001. Under the
Shareholders Agreement, the Austin Firefighters had many rights, including, commencing in
April of 2003, it could in its sole discretion exercise the right to have Upper Deck repurchase
their non-voting stock at its then Fair Market Value ("FMV") to be determined by independent
appraisal (the "Put").

This Shareholders Agreement was presented to AISLIC as part of the foundation of the
transaction for which it was seeking insurance. This document, with particular reference to the
Put with its purchase price being the then Fair Market Value, were an essential part of KPMG
issuing its favorable tax opinion letters. It was further warranted to AISLIC by Upper Deck and
Mr. McWilliam by letter dated September 4, 2001 that:

> The facts, assumptions of fact, and understandings of fact set forth in the opinions
> of KPMG LLP attached as Exhibit A to the Policy were true and correct on the
> date of such opinions and continue to be true and correct on the date hereof.
>
> A key fact and assumption of fact was if the Austin Firefighters exercised the Put
> they would receive the then FMV of their stock to be determined by appraisal."

The importance of the Shareholder Agreement is attested to by the inclusion in the Policy
of Exclusion (h) which reads:

> (h)     to the extent such Loss arises out of, is based upon, or is attributable to an
> amendment to the Shareholders Agreement or the Warrant Agreement attached
> hereto as Exhibits C and D, respectively, without the Insurer's prior written
> consent (which shall not be unreasonably withheld by Insurer)

While Upper Deck for years prior to 2001 had earnings averaging less than $10 million
(except for 1999 when it was $12 million), for the full year 2001 the earnings were $34 million
(most coming in the last half). For the full year 2002 earnings were excess of $150 million of
which, by far the major part came in the last quarter after September 2002. From what we have
reviewed, Management in December 2002 had every reason to believe earnings of 2002 would
continue. None of the 2001 and 2002 earnings were distributed and as no taxes were paid
shareholder net worth as of December 31, 2002 was at least $184 million higher than when the
appraisal was done for April 2001.

Apparently for "business reasons" and contrary to the Shareholders Agreement, Upper
Deck decided sometime in late November/early December of 2002 to make an offer to purchase
the Austin Firefighters' stock effective December 31 2002 and that the price would be $2
million. Attempts by the Austin Firefighters to obtain information with which it could evaluate
this were met with two letters of KPMG, acting for Upper Deck, dated December 9, 2002 saying,
in substance, that FMV is what Upper Deck is willing to pay and, for 2002 they should anticipate

**PEABODY & ARNOLD** LLP
Andrew M. Reidy, Esq.
July 29, 2005
Page 3

full year figures of around $39 million by annualizing those of the first nine months. Both these statements are, to be kind, misleading, if not knowingly false. First, FMV is not what Upper Deck determines it to be. Secondly, telling the Austin Firefighters to utilize 2002 first nine months figures to project full year results when actual results through that date showed such a projection seriously understated actual earnings.

The Austin Firefighters having been supplied materially misleading information, having been told not to involve their accountants to determine FMV, that Upper Deck determines FMV and that such was $2 million, and, one could conclude, from the March 31, 2001, two December 9, 2002 KPMG letters, the Austin Firefighters had no choice but to accept. On December 10 they did accept and the Share Purchase Agreement was executed and consummated on December 31, 2002.

Although the Share Purchase Agreement provided that upon its consummation on December 31, 2002, the Shareholders Agreement of March 31, 2001 (Exhibit C of the policy) would be null and void, neither the negotiations for this document or its execution were called to the attention of AISLIC. AISLIC's consent to such was never sought nor obtained. The transaction as described in the Share Purchase Agreement was completed on December 31, 2002.

Accordingly, AISLIC maintains that any taxes, interest, penalties and imposed on Upper Deck and or its shareholders related to its participation in a transaction described in Revenue Notice 2004-30 and including the proposed offer of Settlement dated April 7, 2005 are not covered as:

1.      Such do not arise from an Insured Tax Event covered by the Policy as the procedures utilized in the Share Purchase Agreement deviated materially from the transaction insured utilizing the Shareholders Agreement procedures.

2.      The termination of the Shareholders Agreement by operation of ¶5.3 of the Share Purchase Agreement causes the transaction as carried out to be excluded per Exclusion (h) of the Policy.

3.      The substitution of what Upper Deck deemed fair as the purchase price in the Share Purchase Agreement, for the FMV purchase price determined by an appraisal requirement of the Shareholders Agreement was a material prejudicial change not consented to by AISLIC and excluded.

4.      The unauthorized execution of the Share Purchase Agreement and its Consummation breached warranties given AISLIC.

These include:

Exhibit 1.B. to the Policy provides, warrants to AISLIC in relevant part, that:

UDC-ARB 00091

EXHIBIT _D_, PAGE_ 98

PEABODY & ARNOLD LLP
Andrew M. Reidy, Esq.
July 29, 2005
Page 4

"The facts, assumptions of fact, and understandings of fact set forth in the
opinions of KPMG LLP attached as Exhibit A to the Policy were true and correct
on the date of such opinions and continue to be true and correct on the date
hereof."

5.     A key understanding of fact in the KPMG Opinions was that the Put exercise
price would be FMV. The elimination of such in the Share Purchase Agreement was a breach of
this warrant. The warranty contained in Paragraph 1 of the Representation Letter must be read in
conjunction with Exclusion (h) which prohibits amendments to the Shareholders Agreement
unless assented to by AISLIC. The Shareholders Agreement and its requirements that the
Firefighters be paid fair market value price upon exercise of its put rights was a key factual
component to the KPMG opinions. The execution of the Share Purchase Agreement and the
elimination of the requirement of a fair market value put price is a breach of a key fact warranted
to AISLIC by Upper Deck and Mr. McWilliam and takes the transaction as consummated
outside of the insurance coverage.

6.     The existence of the Shareholders Agreement and its requirement that the FMV
price for repurchase of non-voting shares would be determined by an independent appraisal was
a fact relied on by KPMG in its Opinions. This fact was warranted to AISLIC by Upper Deck
and Mr. McWilliam. The execution and carrying out of the Share Purchase Agreement without a
FMV appraisal is a breach of this warranty.

7.     Exclusion (a) of the Policy reads:

(a) arising out of, based upon or attributable to the committing in
fact of any criminal or deliberate fraudulent act (including without
limitation deliberate civil fraud), or any knowing and intentional
violation of any law, rule, regulation or statute; provided, however,
that effecting the transactions described in the Opinions and the
filing of Tax Returns with any Taxing Authority by the Insureds
consistent with the transactions described in the Opinions shall not
be the committing in fact of any criminal or deliberate fraudulent
act (including without limitation deliberate civil fraud) or a
knowing and intentional violation of law, rule, regulation or statute
for purposes of this Clause 3(a)[.] (emphasis in original)

Section 25402 of the California Corporate Code [Fraudulent and Prohibited Practices]
provides that:

It is unlawful for an issuer or any person who is an officer, director
or controlling person of an issuer or any other person whose
relationship to the issuer gives him access, directly or indirectly, to
material information about the issuer not generally available to the

UDC-ARB 00092

EXHIBIT  D, PAGE 99

**PEABODY & ARNOLD** LLP
Andrew M. Reidy, Esq.
July 29, 2005
Page 5

public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

At the time that KPMG, on behalf of Upper Deck, represented to the Firefighters that annualized net income of Upper Deck for 2002 would be approximately $39,359,073, Upper Deck knew or had reason to know that such would be materially misleading.

While on December 9, 2002, the exact 2002 12-month ending figure was not known, Upper Deck and its agents knew or should have known that it would be far in excess of the $39,359,073 represented. An accurate projection of anticipated net income for 2002 would have been of the utmost importance to the Firefighters in determining if the $2,000,000 purchase price was fair market value for the nonvoting stock.

Upper Deck violated California Corporate Code § 25402 and committed civil fraud by failing to provide the Firefighters with realistic net income figures for 2002 when such was known to Upper Deck and related to the price payable for stock of the issuer.

The Share Repurchase Agreement dated December 10, 2002 is not covered by the KPMG Opinions and, thus, the exception contained in Exclusion (a) does not apply.

8.      There is in every contract of insurance mutual implied obligations of both insureds and insurers to act in good faith.

In the case of Upper Deck, this obligation of acting in good faith, at a minimum, obligated Upper Deck to do nothing not permitted by the Policy that would:

(a)      increase the likelihood of the tax authority challenging the transaction;

(b)      increase the likelihood of the tax authority prevailing if such were challenged.

The unauthorized execution of the Share Purchase Agreement on December 10, 2002, which eliminated the requirement of payment of FMV upon Upper Deck's repurchase of shares, increased both the likelihood of an IRS attack and the likelihood of the IRS prevailing as resort to various safe harbor protections were eliminated.

When "negotiating" the Share Purchase Agreement, Upper Deck's failure to give the Firefighters accurate information as to 2002 income resulted in a purchase price not reflective of

UDC-ARB 00093

EXHIBIT _D_, PAGE _100_

**PEABODY & ARNOLD** LLP
Andrew M. Reidy, Esq.
July 29, 2005
Page 6

FMV. These actions substantially increased the vulnerability of the transaction if attacked and constitute breaches of Respondents duty of good faith and excuse AISLIC from performance.

     9.    It is against the Public Policy of California to obtain insurance to cover a default in paying that which an insured is obligated by law to pay where such default is known or should be known by the insured.

     Pursuant to the transaction as described in the Policy and its Exhibits there was a substantial likelihood that the insured would prevail in a contest with the tax authorities. Under the transaction as restructured and carried out pursuant to the Share Purchase Agreement such favorable treatment was no longer assured. By elimination of the requirement that FMV determined by appraisal be the price paid on repurchase, the transaction as restructured came outside various safe harbor provisions and thus subject to attack by the IRS or other tax authority. This was further exacerbated as, not only was the requirement that FMV be determined by appraisal eliminated, pressure was put on the Austin Firefighters, having been supplied misleading information, to accept a price arguably substantially below what an independent appraisal would have determine to be FMV.

     These actions breached the obligations of good faith owed AISLIC and operate to deny it the benefit of the Policy.

     The above position of AISLIC is dictated and based on the very limited information AISLIC has at hand. In the event Upper Deck and or Mr. McWilliam disagrees and contests the denial, AISLIC reserves the right to supplement the foregoing based on additional information that becomes available via discovery or otherwise.

     AISLIC has asked me to prepare a petition to seek confirmation of its position from an arbitration panel as provided by the Policy. If you wish to discuss this matter before such is commenced, please contact me before August 5, 2002.

     Lastly, I have been contacted by a Mr. Sanford Victor of Marsh requesting a chance to discuss this matter. While I am willing to meet with him, I am reluctant to do such without your consent. Please let me know your position on such a meeting.

Sincerely,

William A. Cotter PC

cc:   Robert D. Burke
      Robert J. Jones

619695_1
14768-90691

**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

30 ROWES WHARF, BOSTON, MA 02110
[617] 951.2100  FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI

WILLIAM A. COTTER P.C.
[617] 951.2063
wcotter@peabodyarnold.com

July 9, 2004

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Paul J. Sax, Esq.
Orrick, Herrington & Sutcliffe LLP
400 Sansome Street
San Francisco, CA 94111-3143

| Re: | Insured: | The Upper Deck Company |
|-----|----------|------------------------|
|     | Matter: | SC2 |
|     | AISLIC Policy No: | 405-88-33 |
|     | AISLIC Claim No.: | 640-000010 |
|     | Our File No.: | 14768-90691 |

Dear Mr. Sax:

Please be advised that this law firm has been retained as successor counsel by AIG
Technical Services, Inc. ("AIGTS"), on behalf of American International Specialty Lines
Insurance Company ("AISLIC"), with regard to the above-referenced matter under the Fiscal
Event Insurance Policy No. 405-88-33. We are sending this letter to you because it is our
understanding that your law firm has been retained by The Upper Deck Company ("Upper
Deck") and its stockholder[s]. If you are not authorized to receive coverage correspondence on
behalf of Upper Deck, please let us know immediately so that we may redirect our
correspondence to an authorized recipient.

This matter was submitted to AISLIC by letter dated April 22, 2002. The purpose of this
letter is to supplement AISLIC's prior coverage letters. Further, we have your letter of June 24
to Thom Rosenthal and will address the issues raised therein.

<u>Background</u>

As we understand, this matter arises out of a tax strategy ("SC2") designed by KPMG for
subchapter S corporations and their shareholders. The strategy involved the corporation

EXHIBIT ___D___, PAGE _102_                    AI 0009207

PEABODY & ARNOLD LLP
Paul J. Sax, Esq.
July 9, 2004
Page 2

recapitilizing and issuing to its stockholders non-voting shares[1] of common stock and warrants to purchase additional non-voting shares. These non-voting shares would comprise ninety percent (90%) of the outstanding shares of stock. The stockholders would give these non-voting shares to a qualified governmental entity exempt from tax retaining 10% in the form of voting shares. The taxable income of the corporation would be allocated for tax purposes ninety percent (90%) to the governmental entity, and ten percent (10%) to the holders of the voting shares. Consequently, instead of paying tax on one hundred percent (100%) of the income of the S corporation, the voting shareholders would pay tax on ten percent (10%) and the governmental entity would utilize its exempt status to avoid paying taxes on the ninety percent (90%) allocated to it. During the period that the non-voting shares were held by the governmental entity, the corporation would make no distributions of cash or property to any shareholders. Under a shareholders agreement, the governmental entity would have the right to "put" its non-voting stock to the company (or the holders of the voting shares) after a specified period of time (typically two years). The "put" price would be the value of the stock as determined by an independent appraiser appointed by the company using the same valuation methodology that was used to value the stock at the time of its donation to the governmental entity. The shareholders agreement also restricted the governmental entity's ability to transfer the non-voting shares in several ways including granting rights of first refusal to the company and the holders of the voting shares. The voting shareholders were also issued warrants, which, upon exercise, would dilute the non-voting shares held by the public entity down to a nine percent (9%) or lesser interest. The exercise price of the warrant was to be no less than 90% of the fair market value at the date of grant as determined by an independent appraiser. Once the "put" was exercised the voting shareholders would once again own one hundred percent (100%) of the company.

In Upper Deck's case, ten percent (10%) of the shares (in the form of voting stock) belonged to MPR Trust ("McWilliam"), while ninety percent (90%) (in the form of non-voting shares) were donated to the Austin Firefighters Relief and Retirement Fund ("Fireman's Plan"). The Fireman's Plan executed a Shareholders Agreement with Upper Deck. Among other provisions this gave the Fireman's Plan the right (*i.e.*, a "put") to require Upper Deck to repurchase these shares during the period March 2003 to September 2003 at their fair market value as determined by an independent appraiser. Towards the end of 2002, McWilliam approached the Fireman's Plan and negotiated a repurchase of the non-voting stock for $2,000,000. Your letter of June 24 provides us some of the details but more specifics will be needed. However, your letter makes it quite clear that there was no fair market value appraisal to determine the price. This was not a transaction contemplated by the Shareholder Agreement.

---

[1]These shares share equally with the voting shares in all attributes except voting.

PEABODY & ARNOLD LLP
Paul J. Sax, Esq.
July 9, 2004
Page 3

Our review reveals that some time in April of 2002 the IRS sought to compel KPMG to reveal the identity of its clients utilizing various tax strategies, including SC2. KPMG notified Upper Deck of this and it in turn notified AISLIC. Thereafter the IRS published a list of those transactions it was going to investigate (Notice 2004-30) and Upper Deck and its voting shareholders received Information Document Requests. It was also served with notice of intent by the California authorities and the opportunity to participate in one of its voluntary compliance programs.

While AISLIC, through Cahill Gordon, denied that the above was a Claim so as to activate coverage, it did agree that Upper Deck could participate in Option 2 of the California program with its own funds. Ninety percent (90%) of the fees of your firm, after the retention is satisfied, would be recognized as Loss.[2] AISLIC reserved its right to further review the coverage when it learned all the facts and circumstances.

## The Policy

AISLIC Policy No. 405-88-33 (the "Policy") is a Fiscal Event Insurance Policy, naming Upper Deck as the Named Insured. The Policy has Limits of Liability of $50,000,000 in the aggregate, inclusive of defense costs, charges and expenses, subject to a $500,000 retention. The Policy Period runs from August 29, 2001 to the later of (i) November 30, 2006 or (ii) the expiration of the applicable statute of limitations with respect to the tax items described in the Insured Tax Event relating to the transactions described in KPMG's opinions dated May 2, 2001 (Exhibit A) and the other documents attached to the Policy as Exhibits B through D.

## Coverage Analysis

1.    Definition of "Claim"

For coverage to be activated there first must be a Claim arising from a Insured Tax Event. Definition 2(a) of the Policy defines Claim to mean "any written notice from any Taxing Authority alleging any insured may be liable for Taxes, but only if such Taxes are directly related in whole or in part to the Insured Tax Event." As indicated in previous coverage letters, the Information Document Request issued by the IRS does not constitute a Claim. Indeed, this position is supported by Notice Provision 6(a), which reads in part, "It is agreed that a Claim shall not be considered to have been made by a Taxing Authority until such time as Mr. Richard McWilliam, the General Counsel of the Named Insured or the Chief Financial Officer of the Named Insured receives written notice thereof from that Taxing Authority." Our understanding is that no such written notice has ever been received; therefore no Claim has been made yet.

---

[2] Once there is compliance with the earlier supplied AIG billing standards and budget requirements.

**PEABODY & ARNOLD LLP**
Paul J. Sax, Esq.
July 9, 2004
Page 4

Your firm's August 19, 2003 letter alleges that the Policy's defense obligations are triggered notwithstanding a lack of a Claim based on AISLIC's duty to advance Contest Expenses, which is defined to include a "dispute with a Taxing Authority." A dispute involves two parties. At this time, there is no "dispute" with any Taxing Authority. Indeed, there has only been an Information Document Request from the IRS.

Lastly, a Claim must arise from an Insured Tax Event as set forth in Endorsement I, that is, a transaction as described in the KPMG opinions and Exhibits B, C and D to the Policy. As the repurchase of the Fireman's Plan's non-voting stock as described in your June 24 letter was not a transaction contemplated by the Policy, the carrier must reserve its rights to deny, or limit, coverage if this is the cause or contributes to causing, an adverse tax result.

2.     In The Circumstances There May Not Be An Insured Loss

The Shareholder Agreement (Exhibit C to the Policy) provided three (3) ways the Fireman's Plan's non-voting shares could be reacquired: (a) a third party offer activating a right of first refusal, (b) the occurrence of a "Disposition Event" as described in Section 3.1 of the Shareholders Agreement; and (c) put rights of the Fireman's Plan requiring Upper Deck to repurchase at fair market value determined by an appraisal. Again, your June 24 letter reveals that the Fireman's Plan shares were repurchased without an appraisal to determine the shares then fair market value. Rather, there was an offer to repurchase for $2,000,000, which was accepted. This was not a fair market value appraisal, and was not a permitted method and any Loss for this reason would not be covered. Again, as your letter does not provide all the facts and circumstances surrounding the repurchase, AISLIC hopes such will be provided and it will make a final determination at such time. At your earliest convenience we anticipate being supplied full and complete details.

The unauthorized method by which Upper Deck reacquired the non-voting shares may likewise put the transaction outside the definition of Insured Event for a more than one class of stock finding under subsection (a) of Endorsement I. If the insured is determined to have more than one class of stock because of action after the inception date, this is not covered. The acts of Upper Deck and the Fireman's Plan in December 2002 in creating a fourth unauthorized method of repurchase is post inception date conduct.

3.     The Loss May Be Excluded From Coverage

The conduct of McWilliam, Upper Deck and the Fireman's Plan in creating this unauthorized additional method of reacquiring the Fireman's Plan stock can well be found to constitute an amendment (implied if not express) to the Shareholder Agreement (Exhibit C to the Policy). As the Insurer never consented to such Exclusion (h) excludes from coverage any Loss based upon, or attributable to, this event.

EXHIBIT _D_, PAGE _105_

AI 0009210

PEABODY & ARNOLD LLP
Paul J. Sax, Esq.
July 9, 2004
Page 5

Exclusion 3(a) of the Policy provides that the Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:

(a)     arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud), or any knowing and intentional violation of any law, rule, regulation or statute; provided, however, that effecting the transactions described in the Opinions and the filing of Tax Returns with any Taxing Authority by the Insureds consistent with the transactions described in the Opinions shall not be the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud) or a knowing and intentional violation of law, rule, regulation or statute for purposes of this Clause 3(a)[.] (emphasis in original).

Your June 24 letter indicates that toward the end of 2002, Upper Deck approached the Fireman's Plan and negotiated a repurchase of the non-voting stock for $2,000,000. The specifics of how the repurchase was accomplished are still unclear. To the extent that McWilliam caused the Fireman's Plan to tender the non-voting stock outside the parameters of the carefully drafted Stockholder Agreement, Exclusion 3(a) could apply to exclude coverage. The exception for transactions described in the "Opinions" would not apply as the repurchase, as done, was not a permitted transaction.

4.     Duty of Good Faith

Under New York law, Upper Deck and AISLIC have reciprocal duties of good faith towards each other. Consequently, Upper Deck had a duty to carry out the transaction in a way set forth in the KPMG Opinions and Exhibits. To the extent that Upper Deck, without informing the Carrier and obtaining its required consent, deviated from the terms of the agreed to requirements of the "put" it may have breached its duty of good faith under the Policy, AISLIC reserves the right the deny coverage under the Policy for this reason if such conduct is a cause of Loss.

5.     Duty to Cooperate

Cahill Gordon on behalf of AISLIC has made several requests for information and documents. On August 19, 2003 you responded in part, "the insureds have no obligation to share privileged or work product matters with AISLIC or your firm, especially absent an unqualified acceptance of coverage by AISLIC." Your June 24, 2004 letter as it relates to further requests for information states that, it will be limited to that, "which we believe, will adequately resolve any legitimate concerns you may have. However, an important pre-condition to our providing any such information, your firm and your client must expressly confirm and agree that it will

PEABODY & ARNOLD LLP
Paul J. Sax, Esq.
July 9, 2004
Page 6

.hold that information in confidence and not disclose it to any third party or use it for any purpose other than evaluating the present matter."

Addressing first the contention in your August 19, 2003 letter that basically asserts that Upper Deck has no obligation to provide privileged or work product until the carrier has accepted coverage without reservation. AISLIC rejects that position and asserts it is entitled to all relevant materials including attorney work product which may impact the defense of a Claim when and if made or a determination of the coverage afforded. Lastly, this duty cannot be limited to just those materials, "we believe will adequately resolve ...." Any information that is any way relevant must be provided. Whether or not you believe it is needed is not the test.

6.   Confidentially

As to your request for a confidentiality agreement this should not be a problem. Neither the carrier nor this firm has any desire, or plans, to use information you/your client supplies for any purpose other than determining the coverage available when a Claim is presented, if ever, and, if a Claim is made, seeing that all Policy obligations are fulfilled.

If you could submit a form of confidentiality agreement I would be pleased to review such.

AISLIC has also retained Robert Burke, a tax attorney at Wilmer Cutler Pickering Hale and Dorr, to assist it and myself. He has an extensive background in the area of the tax involved here. Once the two of us are thoroughly familiar with the issues we would like to arrange for a meeting with you. Could you give me a rough idea of your availability for later this month/early August? Among the items to be discussed would be your recommendations for Upper Deck's (and its shareholders) strategy for the future.

In connection with your firm's fees, I have been asked to remind you that you were requested to submit a budget of what you saw as anticipated work for the near future. This is required at AISLIC, as anticipated expenses must be on approved payments for time periods involved. These do not have to be exact. However, if for some reason they are going to be substantially exceeded in any time period, we should be told in advance.

Nothing in this letter is meant to be nor shall it be construed as a waiver on any of AISLIC's Policy rights or coverage defenses and the listing of the above concerns is not meant to be exclusive as such cannot be done until a Claim is made and the carrier possesses all relevant information. In the meantime, we anticipate we will be kept fully informed of all contacts with the tax authorities and provided with advance drafts of any proposed submissions.

California Insurance Regulations require that we inform you that if you believe your claim for insurance has been wrongly denied/rejected/limited in whole or in part, you have the

PEABODY & ARNOLD LLP
Paul J. Sax, Esq.
July 9, 2004
Page 7

right to have the matter reviewed by the California Department of Insurance.  Correspondence to
that Department should be directed to:

> California Department of Insurance
> Claims Service Bureau
> 300 South Spring Street
> Los Angeles, CA  90013
> 1-800-927-4357 (in state)
> 1-213-897-8921 (out of state)

If you have any questions regarding this letter or AISLIC's coverage position, please do
not hesitate to contact me.  I look forward to working with you.

Very truly yours,

William A. Cotter, P.C.

cc:    Robert Jones (AIGTS)
       Robert Burke, Esq.

591369_1
14768-90691

EXHIBIT _D_ PAGE _108_                    AI 0009213

# EXHIBIT E

**Voluntary Disclosure Under Announcement 2002-2**

Re:    Mr. Richard McWilliam, the MPR Revocable Trust and The Upper Deck
       Company, 5909 Sea Otter Place, Carlsbad, California 92008-6621

       Richard McWilliam: 547 -98-1315; MPR Revocable Trust FEIN: 33-6036405;
       The Upper Deck Company TIN: 33-0321692;

We are non-Coordinated Industry Case (CIC) taxpayers, not under examination as of December 21,
2001. Pursuant to the PROCEDURES FOR MAKING THE DISCLOSURE contained in the
Announcement, this statement is being submitted to the Office of Tax Shelter Analysis.

The following information is provided as required by the Announcement.

## INFORMATION REQUIRED TO MAKE DISCLOSURE

1.     STATEMENT DESCRIBING MATERIAL FACTS OF THE ITEM

       During calendar year 2001 The Upper Deck Company ("the Company"), a Subchapter S
corporation, engaged KPMG LLP to provide the Company and me, as a shareholder (through the
MPR Revocable Trust), income tax advisory services. These income tax advisory services included
S corporation planning, advice from KPMG with respect to a Company equity recapitalization and
the issuance of stock purchase warrants, as more fully described below, and the tax benefits to be
attained as a result of contributing S corporation stock to an entity I believed, on the basis of
representations from that entity and information provided to us by KPMG LLP, qualified as an
organization described in Internal Revenue Code ("IRC") Section 1361(c)(6) (referred to herein as
the "Donee").

       The Company was recapitalized in the following manner: (i) the Company's Articles of
Incorporation were amended to create a class of non-voting shares of common stock (the "Non-
Voting Shares"), which are identical in all respects to the shares of the existing class of voting
common stock, except that the holders of non-voting shares would not have voting rights, and (ii) on
March 29, 2001, the Company issued, to me, a total of 8,280,000 of the Non-Voting Shares and also
issued me warrants to purchase an additional 82,800,000 Non-Voting Shares (the "Warrants"). The
issuance of the Non-Voting Shares and the issuance of the Warrants were nontaxable to me under
IRC Section 305 and IRC Section 311. The Warrants are exercisable by me at any time during their
35 year term at an exercise price of $0.148. That exercise price was determined by an independent
valuation firm to be greater than 90% of the fair market value of the underlying shares, measured on
the date of issuance of the warrants.

       Subsequently, on March 31, 2001, I contributed the 8,280,000 Non-Voting Shares issued to
me by the Company to the Donee.

       In addition, at the time of the contribution, the Donee and I and the Company entered into a
Shareholders Agreement which provides the Donee with a put option that entitles it, at any time
during the 180 day period from April 1, 2003 to September 30, 2003, to require the Company to
repurchase the Non-Voting Shares contributed to it. If the Donee exercises this put option, the price
required to be paid for those Shares will be their fair market value on the date of exercise of the put
option, as determined by an independent valuation firm. The decision whether or not to exercise the

EXHIBIT  *E*, PAGE *109*                    AI 0009511

put option is wholly within the discretion of the Donee and neither the Company nor I have the right or power to compel the Donee to exercise the put option.

2.     STATEMENT DESCRIBING THE TAX TREATMENT

I will claim a 2001 charitable contribution deduction as allowed for federal income tax purposes under IRC Section 170 with respect to the contribution by me of the Non-Voting Shares in 2001 to the Donee.

The issuance of the Non-Voting Shares and the Warrants, the contribution of the Non-Voting Shares and the execution of the Shareholders Agreement did not create a second class of stock in the Company or in any other way terminate the Subchapter S status of Company.

In 2001, the Donee and I were allocated our respective proportionate share of the taxable income of the Company based on our respective percentage ownership of the outstanding stock of the Company. Similarly, in all subsequent years that the Donee remains a shareholder of the Company, it will be allocated its proportionate share of the taxable income of the Company based on its percentage ownership of the outstanding stock of the Company.

If the Donee exercises its put option under the Shareholders Agreement, I will not be taxed on any resulting proceeds that may be received by the Donee on the exercise of that put option, under Revenue Ruling 78-197, 1978-1 C.B. 83, and other authorities.

3.     TAXABLE YEARS AFFECTED BY THE ITEM

The tax years affected by this item are 2001 and all tax years in which the Donee continues to own stock in the Company.

4.     COORDINATED INDUSTRY CASE TAXPAYER

We are not Coordinated Industry Case taxpayers.

5.     NAMES AND ADDRESSES REQUIRED

KPMG LLP
355 South Grand Avenue
Suite 2000
Los Angeles, California 90071

KPMG advised me on the tax aspects of the transaction.

DOCSOC\893393v3\17022.0047

2

EXHIBIT  E  PAGE  110

AI 0009512

6.     STATEMENT AGREEING TO PROVIDE INFORMATION

To the extent required by the Announcement, I agree to provide if requested:

1.     All transactional documents, including agreements, contracts, instruments, schedules, and, if participation in the transaction was promoted, solicited or recommended by any other party, all material received from that party or that party's advisor.

2.     All internal documents or memoranda used by us in our decision-making process, including, if applicable, information presented to the Board of Directors.

3.     All opinions and memoranda that provide a legal analysis of the item, whether prepared by the taxpayer or a tax professional on our behalf.

As stated in Announcement 2002-2, neither the making of the disclosures contained herein, nor disclosures themselves, shall create any inference whatsoever that our treatment of the items disclosed herein was improper or that the accuracy-related penalty would apply if it was ultimately determined that an underpayment of tax occurred and we are not waiving any rights or positions whatsoever by reason of the making of these disclosures or the disclosures themselves.

### STATEMENT UNDER PENALTY OF PERJURY

Under penalties of perjury, I declare that I have examined the foregoing statement, and to the best of my knowledge and belief, this statement contains all the relevant facts relating to this disclosed item and such facts are true, correct, and complete.

Individually

As trustee of the MPR Revocable Trust

On behalf of The Upper Deck Company

April 22, 2002

DOCSOC\993393v3\17022.C047

3

EXHIBIT __E__, PAGE __III__

AI 0009513

Voluntary Disclosure Under Announcement 2002-2

Re:   Mr. Richard McWilliam, the MPR Revocable Trust and The Upper Deck
Company, 5909 Sea Otter Place, Carlsbad, California 92008-6621

Richard McWilliam: 547 -98-1315; MPR Revocable Trust FEIN: 33-6036405;
The Upper Deck Company TIN: 33-0321692;

We are non-Coordinated Industry Case (CIC) taxpayers, not under examination as of December 21,
2001. Pursuant to the PROCEDURES FOR MAKING THE DISCLOSURE contained in the
Announcement, this statement is being submitted to the Office of Tax Shelter Analysis.

The following information is provided as required by the Announcement.

### INFORMATION REQUIRED TO MAKE DISCLOSURE

1.   STATEMENT DESCRIBING MATERIAL FACTS OF THE ITEM

During calendar year 2001 The Upper Deck Company ("the Company"), a Subchapter S
corporation, engaged KPMG LLP to provide the Company and me, as a shareholder (through the
MPR Revocable Trust), income tax advisory services. These income tax advisory services included
S corporation planning, advice from KPMG with respect to a Company equity recapitalization and
the issuance of stock purchase warrants, as more fully described below, and the tax benefits to be
attained as a result of contributing S corporation stock to an entity I believed, on the basis of
representations from that entity and information provided to us by KPMG LLP, qualified as an
organization described in Internal Revenue Code ("IRC") Section 1361(c)(6) (referred to herein as
the "Donee").

The Company was recapitalized in the following manner: (i) the Company's Articles of
Incorporation were amended to create a class of non-voting shares of common stock (the "Non-
Voting Shares"), which are identical in all respects to the shares of the existing class of voting
common stock, except that the holders of non-voting shares would not have voting rights, and (ii) on
March 29, 2001, the Company issued, to me, a total of 8,280,000 of the Non-Voting Shares and also
issued me warrants to purchase an additional 82,800,000 Non-Voting Shares (the "Warrants"). The
issuance of the Non-Voting Shares and the issuance of the Warrants were nontaxable to me under
IRC Section 305 and IRC Section 311. The Warrants are exercisable by me at any time during their
35 year term at an exercise price of $0.148. That exercise price was determined by an independent
valuation firm to be greater than 90% of the fair market value of the underlying shares, measured on
the date of issuance of the warrants.

Subsequently, on March 31, 2001, I contributed the 8,280,000 Non-Voting Shares issued to
me by the Company to the Donee.

In addition, at the time of the contribution, the Donee and I and the Company entered into a
Shareholders Agreement which provides the Donee with a put option that entitles it, at any time
during the 180 day period from April 1, 2003 to September 30, 2003, to require the Company to
repurchase the Non-Voting Shares contributed to it. If the Donee exercises this put option, the price
required to be paid for those Shares will be their fair market value on the date of exercise of the put
option, as determined by an independent valuation firm. The decision whether or not to exercise the

DOCSOC\893393v3\47022.0047

**UDC02350**

AI 0003617

EXHIBIT ___E___ PAGE __112__

put option is wholly within the discretion of the Donee and neither the Company nor I have the right or power to compel the Donee to exercise the put option.

2.      STATEMENT DESCRIBING THE TAX TREATMENT

I will claim a 2001 charitable contribution deduction as allowed for federal income tax purposes under IRC Section 170 with respect to the contribution by me of the Non-Voting Shares in 2001 to the Donee.

The issuance of the Non-Voting Shares and the Warrants, the contribution of the Non-Voting Shares and the execution of the Shareholders Agreement did not create a second class of stock in the Company or in any other way terminate the Subchapter S status of Company.

In 2001, the Donee and I were allocated our respective proportionate share of the taxable income of the Company based on our respective percentage ownership of the outstanding stock of the Company. Similarly, in all subsequent years that the Donee remains a shareholder of the Company, it will be allocated its proportionate share of the taxable income of the Company based on its percentage ownership of the outstanding stock of the Company.

If the Donee exercises its put option under the Shareholders Agreement, I will not be taxed on any resulting proceeds that may be received by the Donee on the exercise of that put option, under Revenue Ruling 78-197, 1978-1 C.B. 83, and other authorities.

3.      TAXABLE YEARS AFFECTED BY THE ITEM

The tax years affected by this item are 2001 and all tax years in which the Donee continues to own stock in the Company.

4.      COORDINATED INDUSTRY CASE TAXPAYER

We are not Coordinated Industry Case taxpayers.

5.      NAMES AND ADDRESSES REQUIRED

KPMG LLP
355 South Grand Avenue
Suite 2000
Los Angeles, California 90071

KPMG advised me on the tax aspects of the transaction.

UDC02351

EXHIBIT ___E__, PAGE _113_                    AI 0003618

6.   STATEMENT AGREEING TO PROVIDE INFORMATION

To the extent required by the Announcement, I agree to provide if requested:

1.   All transactional documents, including agreements, contracts, instruments, schedules, and, if participation in the transaction was promoted, solicited or recommended by any other party, all material received from that party or that party's advisor.

2.   All internal documents or memoranda used by us in our decision-making process, including, if applicable, information presented to the Board of Directors.

3.   All opinions and memoranda that provide a legal analysis of the item, whether prepared by the taxpayer or a tax professional on our behalf.

As stated in Announcement 2002-2, neither the making of the disclosures contained herein, nor disclosures themselves, shall create any inference whatsoever that our treatment of the items disclosed herein was improper or that the accuracy-related penalty would apply if it was ultimately determined that an underpayment of tax occurred and we are not waiving any rights or positions whatsoever by reason of the making of these disclosures or the disclosures themselves.

STATEMENT UNDER PENALTY OF PERJURY

Under penalties of perjury, I declare that I have examined the foregoing statement, and to the best of my knowledge and belief, this statement contains all the relevant facts relating to this disclosed item and such facts are true, correct, and complete.

_[signature]_

Individually

_[signature]_

As Trustee of the MPR Revocable Trust

_[signature]_

On behalf of The Upper Deck Company

April 22, 2002

DOCSOC\893393:7\17022.0047

3

UDC02352

EXHIBIT _E_, PAGE _114_

AI 0003619