# EXHIBIT F

 

# Internal Revenue Service IRS.gov

**DEPARTMENT OF THE TREASURY**

Internal Revenue Bulletin: 2004-17
April 26, 2004

Notice 2004-30

*S Corporation Tax Shelter*

**Table of Contents**

- FACTS
- DISCUSSION

The Internal Revenue Service and the Treasury Department are aware of a type of transaction, described below, in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by purportedly donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock. This notice alerts taxpayers and their representatives that these transactions are tax avoidance transactions and identifies these transactions, and substantially similar transactions, as listed transactions for purposes of § 1.6011-4(b)(2) of the Income Tax Regulations and §§ 301.6111-2(b)(2) and 301.6112-1(b)(2) of the Procedure and Administration Regulations. This notice also alerts parties involved with these transactions to certain responsibilities that may arise from their involvement with these transactions.

## FACTS

In a typical transaction, an S corporation, its shareholders, and an organization exempt from tax under § 501(a) and described in either § 501(c)(3) or § 401(a) of the Internal Revenue Code (such as a tax-qualified retirement plan maintained by a state or local government) (the exempt party) undertake the following steps. An S corporation issues, *pro rata* to each of its shareholders (the original shareholders), nonvoting stock and warrants that are exercisable into nonvoting stock. For example, the S corporation issues nonvoting stock in a ratio of 9 shares for every share of voting stock and warrants in a ratio of 10 warrants for every share of nonvoting stock. Thus, if the S corporation has 1,000 shares of voting stock outstanding, the S corporation would issue 9,000 shares of nonvoting stock and warrants exercisable into 90,000 shares of nonvoting stock to the original shareholders. The warrants may be exercised at any time over a period of years. The strike price on the warrants is set at a price that is at least equal to 90 percent of the purported fair market value of the newly issued nonvoting stock on the date the warrants are granted. For this purpose, the fair market value of the nonvoting stock is claimed to be substantially reduced because of the existence of the warrants.

Shortly after the issuance of the nonvoting stock and the warrants, the original shareholders donate the nonvoting stock to the exempt party. The parties to the transaction claim that, after the donation of the nonvoting stock, the exempt party owns 90 percent of the stock of the S corporation. The parties further claim that any taxable income allocated on the nonvoting stock to the exempt party is not subject to tax on unrelated business income (UBIT) under §§ 511 through 514 (or the exempt party has offsetting UBIT net operating losses). The original shareholders might also

EXHIBIT _F_, PAGE _115_

claim a charitable contribution deduction under § 170 for the donation of the nonvoting stock to the exempt party. In some variations of this transaction, the S corporation may issue nonvoting stock directly to the exempt party.

Pursuant to one or more agreements (typically redemption agreements, rights of first refusal, put agreements, or pledge agreements) entered into as part of the transaction, the exempt party can require the S corporation or the original shareholders to purchase the exempt party's nonvoting stock for an amount equal to the fair market value of the stock as of the date the shares are presented for repurchase. In some cases, the S corporation or the original shareholders guarantee that the exempt party will receive the fair market value of the nonvoting stock as of the date the stock was given to the exempt party if that amount is greater than the fair market value on the repurchase date.

Because they own 100 percent of the voting stock of the S corporation, the original shareholders have the power to determine the amount and timing of any distributions made with respect to the voting and nonvoting stock. The original shareholders exercise that power to cause the S corporation to limit or suspend distributions to its shareholders while the exempt party purportedly owns the nonvoting stock. For tax purposes, however, during that period, 90 percent of the S corporation's income is allocated to the exempt party and 10 percent of the S corporation's income is allocated to the original shareholders. The transaction is structured for the original shareholders to exercise the warrants and dilute the shares of nonvoting stock held by the exempt party, or for the S corporation or the original shareholders to purchase the nonvoting stock from the exempt party at a value that is substantially reduced by reason of the existence of the warrants. In either event, the exempt party will receive a share of the total economic benefit of stock ownership that is substantially lower than the share of the S corporation income allocated to the exempt party.

## DISCUSSION

The transaction described in this notice is designed to artificially shift the incidence of taxation on S corporation income away from taxable shareholders to the exempt party. In this manner, the original shareholders attempt to avoid paying income tax on most of the S corporation's income over a period of time.

The Service intends to challenge the purported tax benefits from this transaction based on the application of various theories, including judicial doctrines such as substance over form. Under appropriate facts and circumstances, the Service also may argue that the existence of the warrants results in a violation of the single class of stock requirement of § 1361(b)(1)(D), thus terminating the corporation's status as an S corporation. See, e.g., §§ 1.1361-1(l)(4)(ii) and (iii).

Transactions that are the same as, or substantially similar to, the transaction described in this notice are identified as "listed transactions" for purposes of §§ 1.6011-4(b)(2), 301.6111-2(b)(2), and 301.6112-1(b)(2) effective April 1, 2004, the date this notice was released to the public. Independent of their classification as listed transactions, transactions that are the same as, or substantially similar to, the transaction described in this notice may already be subject to the disclosure requirements of § 6011 (§ 1.6011-4), the tax shelter registration requirements of § 6111 (§ 301.6111-1T and § 301.6111-2), or the list maintenance requirements of § 6112 (§ 301.6112-1). Under the authority of §1.6011-4(c)(3)(i)(A), the exempt party in the listed transaction described in this notice will also be treated as a participant in the transaction (whether or not otherwise a participant). The exempt party will be treated as participating in the transaction for the taxable year of the purported donation, the taxable year of the reacquisition, and all intervening taxable years. Pending further review and possible additional guidance, this notice does not apply to any investment in employer securities, as defined in § 409(l), by an employee stock ownership plan subject to the requirements of § 409(p).

Persons who are required to register these tax shelters under § 6111 but have failed to do so may be subject to the penalty under § 6707(a). Persons who are required to maintain lists of investors under § 6112 but have failed to do so (or who fail to provide

EXHIBIT _F_, PAGE _116_

those lists when requested by the Service) may be subject to the penalty under
§ 6708(a). In addition, the Service may impose penalties on parties involved in these
transactions or substantially similar transactions, including the accuracy-related
penalty under § 6662.

The Service and the Treasury Department recognize that some taxpayers may have
filed tax returns taking the position that they were entitled to the purported tax
benefits of the type of transaction described in this notice. These taxpayers should
take appropriate corrective action and ensure that their transactions are disclosed
properly.

The principal author of this notice is Tara P. Volungis of the Office of Associate Chief
Counsel (Passthroughs & Special Industries). For further information regarding this
notice, contact Ms. Volungis at (202) 622-3070 (not a toll-free call).

Prev                              Up                              Next
                                 Home

EXHIBIT _F_, PAGE _117_

# EXHIBIT G

Primary Source Material Document
  Friday November 12, 2004
  TaxCore® - IRS Documents
  Coordinated Issue Papers

  Coordinated Issue Papers
  IRS Coordinated Issue Paper for All Industries on S Corporation Tax
  Shelters (Notice 2004-30)


IRC Section 1
Document Date: November 8, 2004

Effective Date: November 8, 2004
COORDINATED ISSUE ALL INDUSTRIES
S CORPORATION TAX SHELTER NOTICE 2004-30 UIL: 9300.36-00

INTRODUCTION
On April 1, 2004, the Internal Revenue Service issued Notice 2004-30, 2004-17
I.R.B. 828, announcing that the Service will challenge transactions in which S
corporation shareholders attempt to transfer the incidence of taxation on S
corporation income by purportedly donating S corporation nonvoting stock to a n
exempt organization while retaining the economic benefits associated with that
stock. The purpose of this coordinated issue paper is to discuss the grounds for
taxing the proper taxpayers on the income from the corporation's business and
disallowing deductions the taxpayers improperly claim as a result of
participating in Notice 2004-30 transactions. Examiners should challenge these
transactions on the basis of two alternative legal theories, both of which
should be asserted. These positions will result in notices of deficiency to both
the S corporation shareholders and to the C corporation as a result of the
proposed termination of its status under Subchapter S. There are various
statutory and judicial bases that may be used to challenge the taxpayer's
position, but these arguments must be tailored to the specific facts of the
case. Because many of the legal arguments are document sensitive, extensive
factual development is necessary for each transaction in order to establish and
evaluate the appropriate legal positions.
GROUNDS FOR REATTRIBUTION AND DISALLOWANCE
1. The transfer of the S corporation stock to the exempt party will be
disregarded for Federal tax purposes under judicial doctrines. Consequently, the
S corporation and original shareholders entering into transactions that are the
same as or substantially similar to those described in Notice 2004-30 shall be
treated as if there had been no transfer to the exempt party.
2. Alternatively, the capital structure created in the Notice 2004-30
transaction violates the single class of stock requirement of §1361(b)(1)(D) of
the Internal Revenue Code and §1.1361-1(l) of the Income Tax Regulations. The S
corporation election will terminate on the date the second class of stock is

AI 0009880

issued and the corporation will be treated as a C corporation. Thus, the income will not be allocated to the shareholders and the income will be taxable to the C corporation.

3. The transfer of nonvoting stock to the exempt party does not qualify as a deductible charitable contribution pursuant to §170 and should be disallowed.

4. The transaction costs incurred in connection with the Notice 2004-30 transactions, including promoter's fees, accounting fees, legal fees, and redemption payments recharacterized as accommodation fees, are not deductible under §162, §165, or §212.

5. Generally, the accuracy-related penalty under §6662 for negligence or disregard of rules or regulations and/or a substantial understatement of income tax should be developed and considered for taxpayers who engaged in Notice 2004-30 transactions. For LMSB taxpayers, assertion or nonassertion of penalties must be approved by the Director of Field Operations.

FACTS

A typical transaction involves an S corporation, its shareholders, and a tax-exempt organization (the exempt party). The exempt party is exempt from tax under §501(a) and is described in either §501(c)(3) or §401(a) (such as a tax-qualified retirement plan maintained by a state or local government), and is an organization eligible to receive charitable contributions as defined by §170(c). The parties undertake the following steps. An S corporation issues, pro rata to each of its shareholders (the original shareholders), nonvoting stock and warrants that are exercisable into nonvoting stock. For example, the S corporation issues nonvoting stock in a ratio of 9 shares for every share of voting stock and warrants in a ratio of 10 warrants for every share of nonvoting stock. Thus, if the S corporation has 1,000 shares of voting stock outstanding, the S corporation would issue 9,000 shares of nonvoting stock and warrants exercisable into 90,000 shares of nonvoting stock to the original shareholders. The warrants may be exercised at any time over a period of years. The strike price on the warrants is set at a price that is at least equal to 90 percent of the purported fair market value of the newly issued nonvoting stock on the date the warrants are granted. For this purpose, the fair market value of the nonvoting stock is claimed to be substantially reduced because of the existence of the warrants.

Shortly after the issuance of the nonvoting stock and the warrants, the original shareholders transfer the nonvoting stock to the exempt party. The S corporation and its shareholders contend that, after the transfer of the nonvoting stock, the exempt party owns 90 percent of the stock of the S corporation. Any taxable income allocated to the exempt party shareholder is claimed not to be subject to tax on unrelated business income under §§511 through 514 (or the exempt party has offsetting unrelated business net operating losses). The original shareholders claim a charitable contribution deduction under §170 for the transfer of the nonvoting stock to the exempt party. In some variations of this transaction, the S corporation may issue the nonvoting stock directly to the exempt party and the charitable contribution would flow through to the shareholders.

AI 0009881

Pursuant to one or more agreements (typically redemption agreements, rights of first refusal, put agreements, or pledge agreements) entered into as part of the transaction, the exempt party can require the S corporation or the original shareholders to purchase the exempt party's nonvoting stock for an amount equal to the fair market value of the stock as of the date the shares are presented for repurchase. In some cases, the S corporation or the original shareholders pledge that the exempt party will receive the fair market value of the nonvoting stock as of either the transfer date or the repurchase date, whichever amount is greater.

Because the original shareholders own 100 percent of the voting stock of the S corporation, those shareholders have the power to determine the amount and timing of any distributions made with respect to the voting and nonvoting stock. The original shareholders exercise that power to limit or suspend distributions , while the exempt party purportedly owns the nonvoting stock. For tax purposes, however, during that period, 90 percent of the S corporation's income is allocated to the exempt party and 10 percent of the S corporation's income is allocated to the original shareholders. The exempt parties serve as accommodation parties to facilitate these tax avoidance transactions .

The transaction is structured either for the original shareholders to exercise the warrants and dilute the shares of nonvoting stock held by the exempt party, or for the S corporation or the original shareholders to purchase the nonvoting stock from the exempt party at a value that is substantially reduced by reason of the existence of the warrants. In either event, the exempt party will receive a n economic benefit that is a mere fraction of the income allocated to it. Development of the cases has uncovered very few facts that are materially different from those described above. As previously noted, in some instances, the transfer of nonvoting stock was made by the S corporation instead of the shareholders. Some of the pledge agreements may have been executed by the S corporation instead of the shareholders. In at least one case, the assets of the S corporation were sold while the exempt party held the nonvoting stock. Ninety percent of the gain from the sale was allocated to the exempt party.

Generally, the exempt parties took no steps to record the transfer of the stock or any aspect of the transaction on their books and did not list the nonvoting shares as assets in their financial reports. The exempt parties only recorded the transactions when they received cash payments under the redemption agreements or other purchase agreements. A number of the S corporations did not send Schedules K-1, "Shareholder's Shares of Income, Credits, Deductions, etc.," to the exempt party.

The S corporation and the original shareholders involved in a Notice 2004-30 transaction typically incur transaction costs, including promoter's fees, accounting fees, and legal fees. There may also be additional "out of pocket" costs for entering into the transaction.

DISCUSSION

1.The transfer of the S corporation stock to the exempt party will be disregarded for Federal tax purposes under judicial doctrines.

The essence of this transaction was not a donative contribution of stock to an

exempt party. The primary purpose of the transaction was to reduce S corporation pass-through income to the original shareholders' personal tax returns by approximately 90 percent while leaving that income in the S corporation so the economic benefits of owning the stock would be enjoyed at a later date by the original shareholders. Various judicial doctrines may be applicable to Notice 2004-30 transactions. The arguments have been classified under the general doctrines of substance over form and economic substance. Note that some courts may categorize the doctrines in a different manner.

A. Substance Over Form Doctrines

It is axiomatic that the substance rather than the form of a transaction governs the federal income tax treatment of the transaction. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Gregory v. Helvering , 293 U.S. 465 (1935). Substance over form and related judicial doctrines all require "a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened." Harris v. Commissioner, 61 T.C. 770, 783 (1974). The issue of whether any of those doctrines should be applied involves an intensely factual inquiry. See Gordon v. Commissioner, 85 T.C. 309 (1985).

Transactions that literally comply with the language of the Code but produce results other than what the Code and regulations intend are not given effect. In Gregory v. Helvering, 293 U.S. 465, 470 (1935), the Supreme Court found that even though the transaction did comply with the Code, "the transaction upon its face lies outside the plain intent of the statute ." Therefore, the Court found that to give the transaction effect would be to "exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." Id. In Knetsch v. United States, 364 U.S. 361 (1960), the Supreme Court once again found a transaction abusive, even though the transaction met every literal requirement of the Code. The Court stated that "there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction." Id. at 366.

Even if it is found that the Notice 2004-30 transaction literally complies with the Code and regulations, this abusive transaction produces results other than what the Code and regulations intended. It was never intended that S corporation income could be allocated to an exempt party to avoid income tax while the original shareholders retained the economic benefit of the income. While the form of this transaction suggests that the exempt party is a shareholder of the S corporation, the exempt party does not bear a risk, commensurate with its purported stock ownership, that the stock may decline in value, nor does the exempt party enjoy a benefit, commensurate with its purported stock ownership, if the stock increases in value . There is nothing of substance to be realized in this abusive transaction aside from substantial tax savings at the original shareholder level.

A transaction that is entered into solely for the purpose of tax reduction and that has no economic or commercial objective to support the transaction is a

EXHIBIT 6 , PAGE 121

AI 0009883

sham and is without effect for federal income tax purposes. Estate of Franklin v. Commissioner, 64 T.C. 752 (1975); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985); Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Nicole Rose Corp. v. Commissioner, 117 T.C. 328 (2001). When a transaction is treated as a sham, the form of the transaction is disregarded and the proper tax treatment of the transaction must be determined.

Other than the allocation of income, the parties did not treat the exempt party as owning 90 percent of the S corporation. For example, in most of the Notice 2004-30 transactions, the exempt party failed to record the nonvoting stock as an asset of the plan. A number of the S corporations did not send Schedules K-1 to the exempt party. Because the Notice 2004-30 transaction is a sham, the form of the transaction should be disregarded and the original shareholders generally should be treated as owning all of the S corporation stock.

Rev. Rul. 70-615, 1970-2 C.B. 169, provides that a taxpayer who is the record holder of a small business corporation's stock, but who has no beneficial interest in it, is not considered the shareholder. See also Pacific Coast Music Jobbers v. Commissioner, 55 T.C. 866 (1971), aff'd 457 F.2d 1165 (5th Cir. 1972) (in determining whether a sale had occurred, the Court considered not only when the bare legal title passed but also when the benefits and burdens of the property, or the incidents of ownership, were acquired or disposed of).

In this instance, the transferor merely parked the stock with the exempt party during the holding period. The abusive aspects of the transaction allow the original shareholders to allocate 90 percent of the S corporation's income to the exempt party while preventing the exempt party from participating in the benefits and burdens of stock ownership to the degree commensurate with the exempt party's purported stock ownership. Because the exempt party appears to be simply a facilitator without beneficial ownership of the S corporation stock, the exempt party generally should not be treated as a shareholder for purposes of the allocation of income. Further, any amount received by the exempt party upon exercise of its put right under the redemption agreement should be viewed as a payment for the performance of services as an accommodation party. However, if the exempt party were considered to be a shareholder rather than a mere facilitator or accommodation party, the exempt party would be treated as a shareholder only to the extent of the actual economic benefits it realizes from holding the stock.

B. Economic Substance Doctrines

A transaction must have economic substance separate and distinct from the economic benefit achieved solely from tax reduction. If a taxpayer seeks to claim tax benefits that were not intended by Congress, by means of transactions that serve no economic purpose other than tax savings, the doctrine of economic substance is applicable. United States v. Wexler, 31 F.3d 117, 122, 124 (3d Cir. 1994); Yosha v. Commissioner, 861 F.2d 494, 498-99 (7th Cir. 1988), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986); Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), aff'g 44 T.C. 284 (1965); ACM Partnership v. Commissioner, T.C.

EXHIBIT 6 , PAGE 122        AI 0009884

Memo. 1997-115, aff'd in part and rev'd in part, 157 F.3d 231 (3d Cir. 1998). Whether a transaction has economic substance is a factual determination. United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950). The determination turns on whether the transaction is rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and useful in light of the taxpayer's economic situation and intentions. The utility of the stated nontax purpose and the rationality of the means chosen to effectuate that purpose must be evaluated in accordance with relevant practices. Cherin v. Commissioner, 89 T.C. 986, 993-94 (1987); ACM Partnership, 157 F.3d at 248-49. A rational relationship between purpose and means ordinarily will not be found unless there was a reasonable expectation that the nontax benefits would be at least commensurate with the transaction costs. Yosha, at 502; ACM Partnership, at 249-50.

The Notice 2004-30 transaction had no economic substance outside of the tax savings to the original shareholders and serves no nontax purpose of either the S corporation or the original shareholders. The restructuring of the S corporation and the issuance and purported transfer of the nonvoting stock has no nontax purpose. The result of the transaction is that the original shareholders park the S corporation stock with the exempt party for a period of time while the S corporation makes little or no distributions . The transaction costs far outweigh any possible nontax purpose. The overall effect of these transactions achieves a result that is clearly inconsistent with Congressional intent for Subchapter S. The exempt party does not possess meaningful benefits and burdens of stock ownership, because the exempt party is not impacted by increases or decreases in the value of the stock commensurate with its purported ownership interest in the S corporation. The exempt party does not treat the transaction as a transfer of the nonvoting S corporation stock on its books and does not list the shares as assets. The original shareholders are the true owners. The exempt party takes on the appearance of an S corporation shareholder during the period it holds the nonvoting stock, only to have the interest revert to the original shareholders upon subsequent planned actions. Even if the exempt party were considered a shareholder rather than merely taking on the appearance of a shareholder, at most it would be treated as a shareholder to the extent of the actual economic benefits it realizes from holding the stock. The only economic substance of the transaction is the tax savings to the original shareholders. Even if the transaction complies with the literal language of the Code, it has no economic substance separate from the tax benefits and should not be respected.

Other judicial doctrines, such as economic compulsion, step transaction or business purpose may apply to Notice 2004-30 transactions. If you have questions concerning the application of these doctrines please contact your S Corporation Technical Advisor.

2. Alternatively, the capital structure created in the Notice 2004-30 transaction violates the single class of stock requirement of §1361(b)(1)(D) and §1.1361-1(l).

Section 1361 defines "small business corporation" and sets forth limitations on

the capital structure of an S corporation. The capital structure of an S corporation is limited to one class of stock pursuant to §1361(b)(1)(D). When an S corporation ceases to meet the limitations set forth in §1361(b), its status as an S corporation is immediately terminated. Based on the facts and circumstances of the individual cases, the arguments described below should be made.

Except as provided in §1.1361-1(l)(4), a corporation is treated as having only one class of stock if all of its outstanding shares confer identical rights to distributions and liquidation proceeds. §1.1361-1(l)(1). Section 1.1361-1(l)(4)(iii)(A) provides, in part, that a call option, warrant or similar instrument issued by a corporation is treated as a second class of stock of the corporation if, taking into account all of the facts and circumstances, the instrument is substantially certain to be exercised by the holder and has a strike price substantially below the fair market value of the underlying stock on the date that the instrument is issued. Section 1.1361-1(l)(4)(iii)(C) provides that warrants will not be treated as a second class of stock if they have a strike price that is at least 90 percent of the fair market value of the underlying stock on the dates they are issued. For this purpose, a good faith determination of fair market value by the corporation will be respected unless it can be shown that the value was substantially in error, and the determination of the value was not performed with reasonable diligence to obtain a fair value.

The warrants in these transactions are a second class of stock. The warrants have an exercise price that is substantially below the fair market value of the underlying stock, which is the nonvoting stock that would be issued if the warrants were exercised (the warrant stock). The parties often set the exercise price of the warrants as a percentage of the purported value of the stock held by the exempt party, rather than by reference to the value of the warrant stock. For this purpose, the parties determine the value of the exempt party's stock by treating the warrants as exercised, and by applying additional discounts to the value of the nonvoting stock for minority interest and lack of marketability and control. The value of the warrant stock is greater than the value of the stock held by the exempt party, because the factors that depress the value of the exempt party's stock are not equally applicable to the warrant stock. Thus, the Service may argue that whether or not the exercise price of the warrants is at least 90 percent of the fair market value of the stock held by the exempt party, the exercise price of the warrants is substantially below the fair market value (on the date that the warrants are issued) of the warrant stock.

In addition, for purposes of §1.1361-1(l)(4)(iii)(A), the warrants will be treated as substantially certain to be exercised. The effect of the warrants and other agreements is to maintain the original shareholders' equity ownership. As a result of the warrants and the other agreements, the original shareholders maintain their S corporation equity ownership at either 100 percent (if the stock of the exempt party is redeemed) or nearly 100 percent (if the warrants are actually exercised). Because the holders of the warrants would be economically compelled to exercise the warrants if the exempt party's stock is

AI 0009886

not redeemed, it is substantially certain that the original shareholders will enjoy the economic effect of exercising the warrants. Thus, the warrants will be treated as substantially certain to be exercised.

The safe harbor in §1.1361-1(l)(4)(iii)(C) does not apply to the warrants. The taxpayers did not seek or receive a valuation of the shares underlying the warrants (i.e., the warrant stock). In some cases, the appraisals may significantly understate the value of the corporation's business or may understate the value of the nonvoting stock held by the exempt party. Whether or not the appraisal in a particular case has these flaws, the exercise price of the warrants is substantially less than 90 percent of the fair market value of that stock. The appraisals are substantially in error and were not performed with reasonable diligence, because the appraisals valued the stock held by the exempt party rather than the stock that would be issued if the warrants were exercised. Finally, if the facts of a particular case indicate that an appraiser knew or had reason to know that the appraisals were being made in order to facilitate the improper avoidance of tax on the income from the corporation's business, the appraisal does not qualify as a good faith determination of fair market value.

Additionally, §1.1361-1(l)(2)(iii) provides that redemption agreements are disregarded in determining whether a corporation's outstanding shares of stock confer identical distribution and liquidation rights unless

1) a principal purpose of the agreement is to circumvent the one class of stock requirement, and

2) the agreement establishes a purchase price that, at the time the agreement is entered into, is significantly in excess of or below the fair market value of the stock.

In Notice 2004-30 transactions, the effect of the redemption agreements and various other instruments is to assure that the exempt party, to which 90 percent of the income is allocated, will never receive distribution or liquidation proceeds commensurate with its purported stock ownership, thereby circumventing the single class of stock requirement. Moreover, the structure of the transaction results in the manipulation of the purchase price of the shares upon redemption to ensure that the purchase price, while purportedly at fair market value, reflects a price substantially below that to be expected for shares reflecting 90 percent ownership of the S corporation.

Section 1.1361-1(l)(4)(ii)(A) provides that any instrument issued by a corporation is treated as a second class of stock if the instrument constitutes equity or otherwise results in the holder being treated as the owner of stock under general principles of Federal tax law and a principal purpose of issuing the instrument is to circumvent the rights to distribution or liquidation proceeds conferred by the outstanding shares of stock. In some Notice 2004-30 transactions, the facts may show that the warrants constitute equity or otherwise result in the holder being treated as the owner of stock under general principles of Federal tax law. If you have questions regarding whether the warrants constitute equity or otherwise result in the holder being treated as the owner of stock, please contact your S Corporation Technical Advisor.

AI 0009887

3.The transfer of nonvoting stock to the exempt party does not qualify as a deductible charitable contribution pursuant to §170 and should be disallowed. Section 170(a)(1) allows as a deduction, subject to certain limitations and restrictions, any charitable contribution (as defined in §170(c)) that is made within the taxable year.

## A. Charitable Intent

To be deductible as a charitable contribution under §170, a transfer to a charitable organization must be a gift. A gift to a charitable organization is a transfer of money or property without receipt of adequate consideration, made with charitable intent. See U.S. v. American Bar Endowment, 477 U.S. 105, 117-118 (1986) (citing Rev. Rul. 67-246, 1967-2 C.B. 104, with approval); Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); §1.170A-1(h)(1) & (2). A transfer to a charitable organization is not made with charitable intent if the transferor expects a return commensurate with the amount of the transfer. Hernandez at 690; see also American Bar Endowment at 116.

In a Notice 2004-30 transaction, the nonvoting stock was not transferred to the exempt party with charitable intent. The original shareholders transferred the nonvoting stock to the exempt party in order to allocate the S corporation's income to the exempt party, and thereby avoid paying tax on S corporation income. The parties to the transaction entered into the transaction to generate a tax benefit for the original shareholders, not to benefit the exempt party. Further, the original shareholders expected a return from the transfer of the nonvoting stock to the exempt party, in the form of income sheltering, that is at least commensurate with any amount ultimately transferred to the exempt party. Therefore, a charitable contribution deduction taken on the transfer of the nonvoting stock to the exempt party should be disallowed.

In addition, the original shareholders may argue that they transferred an amount of stock equal to the economic benefits realized by the exempt party, or that they expected to transfer cash to the exempt party upon redemption of the nonvoting stock..However, under either argument the amount received by the exempt party was an accommodation fee, not a charitable gift, and it is therefore not deductible under §170.

## B. Conditional Gift

Section 1.170A-1(e) states that if, on the date of the gift, an interest in property would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which does not appear to be so remote as to be negligible, a charitable contribution deduction is not allowed. See also §1.170A-7(a)(3).

As explained above, as a result of the warrants, the redemption agreements, and the other agreements, the original shareholders maintained their S corporation equity ownership at either 100 percent (if the stock of the exempt party is redeemed) or nearly 100 percent (if the warrants are actually exercised).

AI 0009888

Therefore, at the time of the purported gift of a 90 percent ownership interest in the S corporation by transfer of the nonvoting stock, the possibility that the exempt party's ownership interest in the S corporation will be defeated is not "so remote as to be negligible." Therefore, a charitable contribution deduction taken on the transfer of the nonvoting stock to the exempt party should be disallowed.

If the exempt party is considered to be a shareholder to the extent of the actual economic benefit it realized, this argument would not be available.

## C. Substantiation

A charitable contribution deduction is allowable only if substantiated in accordance with regulations prescribed by the Secretary. §170(a)(1) and (f)(8); see Addis v. Commissioner, 374 F.3d 881 (9th Cir. 2004) (charitable contribution deduction denied because contemporaneous written acknowledgment required by §170(f)(8) inadequate). Under §170(f)(8), a taxpayer must substantiate its contribution of $250 or more by obtaining from the donee a contemporaneous written acknowledgment that includes a statement as to whether goods or services were received (or are expected) by the donor from the donee, and a good faith estimate of the value of such goods or services. §1.170A-13(f)(6). Under §170(f)(8)(C), a written acknowledgment is contemporaneous if it is received by the donor on or before the earlier of the filing of the return on which the charitable contribution deduction is taken, or the due date of the return (including extensions). In addition to the contemporaneous written acknowledgment, a donor taking a charitable contribution deduction of more than $5,000 for the contribution of property must obtain a qualified appraisal and file with the return an appraisal summary on Form 8283. §1.170A-13(c)(2)(i). Section 1.170A-13(c)(3) of the regulations contains numerous detailed requirements on what constitutes a qualified appraisal.

An examination of a charitable contribution deduction should include an examination of whether the substantiation requirements were met. If they were not, the charitable contribution deduction may be challenged.

4. The transaction costs incurred in connection with the Notice 2004-30 transactions, including promoter's fees, accounting fees, legal fees, and redemption payments recharacterized as accommodation fees, are not deductible under §162, §165, or §212.

Section 162 provides generally for the deduction of ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. However, transaction costs incurred in connection with a transaction designed solely to provide tax benefits for participants are not deductible under §162. See Brown v. Commissioner, 85 T.C. 968, 1000 (1985), aff'd sub nom. Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988); see also Leslie v. Commissioner, 146 F.3d 643, 650 (9th Cir. 1998) (deduction disallowed for fees paid to purchase deductions in tax-motivated transaction, citing Brown); Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 294 (1999) (administrative fees disallowed as the product of a sham), aff'd, 254 F.3d 1313

(11th Cir. 2001); Price v. Commissioner, 88 T.C. 860, 886 (1987), aff'd without published opinion, 1990 U.S. App LEXIS 20422 (10th Cir. Oct. 26, 1990) (deduction for fees paid to acquire tax losses disallowed because neither a cost of doing business nor incurred with an intent to make a profit independent of tax consequences, citing Brown).

The transaction costs incurred by the original shareholders or by the S corporation in conjunction with the Notice 2004-30 transaction, including promoter's fees, accounting fees, legal fees, and payments made to exempt parties recharacterized as payment for services as accommodation parties, are paid for participation in the transaction. The Notice 2004-30 transaction is crafted to shelter income otherwise taxable to the original shareholders and serves no business purpose of either the original shareholders or the S corporation. The fees incurred constitute payments to purchase tax benefits for the original shareholders and, as such, are not deductible under §162 by either the S corporation or original shareholders.

Section 212 generally provides for the deduction by an individual of ordinary and necessary expenses paid or incurred during the taxable year (1) for the production or collection of income, (2) for the management, conservation, or maintenance of property held for the production of income, or (3) in connection with the determination, collection, or refund of any tax. Only §212(3) is possibly relevant to the instant case. Deductions under §212(3), however, cannot be taken for costs incurred in obtaining tax advice in furtherance of a sham transaction. See Dooley v. Commissioner, 332 F.2d 463, 468 (7th Cir. 1964); see also Brown v. Commissioner, 85 T.C. at 1000. Accordingly, the original shareholders may not take a deduction under §212 for the cost of tax advice obtained in furtherance of a Notice 2004-30 transaction.

Section 165(a) and (c)(3) generally allow a taxpayer to deduct losses arising from the theft of property. However, courts have disallowed a §165 "theft loss" deduction for the out-of-pocket costs of participating in sham transactions, because the taxpayers received what they expected from the transactions . Marine v. Commissioner, 92 T.C. 958, 974-980 (1989); aff'd without published opinion, 921 F.2d 280 (9th Cir. 1991); Viehweg v. Commissioner, 90 T.C. 1248, 1255 (1988). Accordingly, as with claims for deductions under §§162 and 212, deductions for theft losses claimed by participants in Notice 2004-30 transactions should be disallowed.

5. Generally, the accuracy-related penalty under §6662 for negligence or disregard of rules or regulations and/or a substantial understatement of income tax should be developed and considered for taxpayers who engaged in Notice 2004-30 transactions .

Whether penalties apply to underpayments generated by a Notice 2004-30 transaction must be determined on a case-by-case basis, depending on the specific facts and circumstances of each case. The application of a penalty must be based on a comparison of the facts developed with the legal standard for the application of the penalty. Accordingly, examination teams should ensure that the scope of factual development encompasses those matters relevant to penalties. A separate report should be prepared for the penalty issue.

AI 0009890

The extent of the taxpayer's disclosure must be considered in connection with the application of the accuracy-related penalties. A determination must be made as to whether the disclosure was timely and adequate. Regardless of whether a decision is made to apply penalties, a separate report must be prepared for the penalty issue addressing disclosure or the lack thereof.

The extent of the taxpayer's due diligence in investigating the Notice 2004-30 transaction is an important factor to consider in connection with the accuracy-related penalty, as well as the reasonable cause exception. Facts need to be fully developed to determine when and how the taxpayer found out about the Notice 2004-30 transaction; details of meetings and correspondence with promoter personnel; the identity of advisors to the taxpayer and the type of advice provided; details of internal memorandums, notes, and meetings; the identity of taxpayer personnel that investigated the transaction and/or made the decision to participate; and actions that were taken by taxpayer personnel when the transaction was being considered.

The following factors affecting the consideration of penalties have been present in many of the cases involved in Notice 2004-30 transactions: the promotional materials generally emphasize the tax benefits; taxpayers have been unable to provide a valid non-tax business purpose for the transactions; the transactions are proposed and accepted within a very short time frame, often just prior to the end of the tax year; the taxpayer is unable to provide any evidence that due diligence was completed prior to entering into the transaction; and the taxpayer relied solely upon information provided by the promoter, without doing any independent investigation of the purported tax benefits. These factors are not all statutorily required for the penalty. Some of the factors go to the issue of reasonable cause and good faith. Others go to the issue of whether or not the transaction is a tax shelter.

A. The Accuracy-Related Penalty

Section 6662 imposes an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment1 attributable to, among other things: (1) negligence or disregard of rules or regulations and (2) any substantial understatement of income tax. Section 1.6662-2(c) provides that there is no stacking of the accuracy-related penalty components. Thus, the maximum accuracy-related penalty imposed on any portion of an underpayment is 20 percent (40 percent in the case of a gross valuation misstatement), even if that portion of the underpayment is attributable to more than one type of misconduct (e.g., negligence and substantial understatement). See DHL Corp. v. Commissioner, T.C. Memo. 1998-461, where the IRS alternatively determined that either the 40 percent accuracy-related penalty attributable to a gross valuation misstatement under §6662(h) or the 20 percent accuracy-related penalty attributable to negligence was applicable. The accuracy-related penalty provided by §6662 does not apply to any portion of an underpayment on which a penalty is imposed for fraud under §6663. §6662(b).

## 1. Negligence

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code or to exercise ordinary and reasonable care in the preparation of a tax return. See §6662(c) and §1.6662-3(b)(1). Negligence also includes the failure to do what a reasonable and ordinarily prudent person would do under the same circumstances. See Marcello v. Commissioner, 380 F.2d 499 (5th Cir. 1967), aff'g 43 T.C. 168 (1964). Section 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. The accuracy-related penalty attributable to negligence may be applicable if the taxpayer failed to make a reasonable attempt to evaluate the Notice 2004-30 transaction properly.

## 2. Substantial Understatement

A substantial understatement of income tax exists for a taxable year if the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporations other than S corporations or personal holding companies). §6662(d)(1). Understatements are generally reduced by the portion of the understatement attributable to: (1) the tax treatment of items for which there was substantial authority for the treatment, and (2) any item if the relevant facts affecting the item's tax treatment were adequately disclosed in the return or an attached statement and there is a reasonable basis for the taxpayer's tax treatment of the item. §6662(d)(2)(B).

In the case of items of taxpayers, other than corporations, attributable to tax shelters, exception (2) above does not apply and exception (1) applies only if the taxpayer also reasonably believed that the tax treatment of the item was more likely than not the proper treatment. §6662(d)(2)(C)(i). In the case of items of corporate taxpayers attributable to tax shelters, neither exception (1) nor (2) above applies. §6662(d)(2)(C)(ii). Therefore, if a corporate taxpayer has a substantial understatement that is attributable to a tax shelter item, the accuracy-related penalty applies to the underpayment attributable to the understatement unless the reasonable cause exception applies. See §1.6664-4(e) for special rules relating to the definition of reasonable cause in the case of a tax shelter item of a corporation.

In this case, the transaction fits within the definition of a tax shelter.2 Thus, no reduction in the understatement will be available for the shareholder unless there was substantial authority for the tax treatment of the item and the taxpayer reasonably believed that it was more likely than not the proper treatment.

There is substantial authority for the tax treatment of an item only if the weight of authorities supporting the treatment is substantial in relation to the

AI 0009892

weight of authorities supporting contrary treatment. All authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists. §1.6662-4(d)(3). For a discussion of how to analyze whether there is substantial authority see §1.6662-4(d)(3)(ii).

A taxpayer is considered to have reasonably believed that the tax treatment of an item is more likely than not the proper tax treatment if the taxpayer analyzes the pertinent facts and authorities and, based on his or her independent analysis, reasonably concludes in good faith, that there is a greater than 50 percent chance that the tax treatment of the item will be upheld if challenged by the Service. The taxpayer may also reasonably rely, in good faith, on the opinion of a professional tax advisor. The opinion must clearly state that, based on the advisor's analysis of the facts and authorities, the advisor concludes that there is a greater than 50 percent chance that the tax treatment will be upheld if the Service challenged the position. §1.6662-4(g)(4)(A) and (B).

B. The Reasonable Cause Exception

The accuracy-related penalty does not apply with respect to any portion of an underpayment with respect to which it is shown that there was reasonable cause and that the taxpayer acted in good faith. §6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. §1.6664-4(b)(1). All relevant facts, including the nature of the tax investment, the complexity of the tax issues, issues of independence of a tax advisor, the competence of a tax advisor, and the sophistication of the taxpayer must be developed to determine whether there was reasonable and good faith. Generally, the most important factor is the extent of the taxpayer's effort to assess their proper tax liability. Id. See also Larson v. Commissioner, T.C. Memo. 2002-95.

Reliance on the advice of a professional tax advisor does not necessarily demonstrate reasonable cause and good faith. Reliance on professional advice constitutes reasonable cause and good faith only if, under all the circumstances, the reliance was reasonable and the taxpayer acted in good faith. Id. In determining whether a taxpayer has reasonably relied on professional tax advice as to the tax treatment of an item, all facts and circumstances must be taken into account. §1.6664-4(b)(1).

The advice must be based upon how the law relates to the pertinent facts and circumstances. For example, the advice must take into account the taxpayer's purpose (and the relative weight of those purposes) for entering into a transaction and for structuring a transaction in a particular manner. A taxpayer will not be considered to have reasonably relied in good faith on professional tax advice if the taxpayer fails to disclose a fact it knows, or should know, to be relevant to the proper tax treatment of an item. §1.6664-4(c)(1)(i). The same facts relevant to the substantive issues will bear on the penalty, including the

EXHIBIT 6 , PAGE 131

AI 0009893

taxpayer's reasons for entering into the Notice 2004-30 transaction.
The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption that the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction or for structuring a transaction in a particular manner. §1.6664-4(c)(1)(i). Accordingly, examiners should evaluate the accuracy of critical assumptions contained in any opinion letter.

In any tax shelter transaction, the taxpayer has a duty to fully investigate all aspects of the transaction before proceeding. The taxpayer cannot simply rely on statements by another person, such as a promoter. See Novinger v. Commissioner, T.C. Memo. 1991-289. Moreover, if the tax advisor is not versed in the details of the transaction, mere reliance on the tax advisor does not suffice. See Addington v. United States, 205 F.3d 54 (2d Cir. 2000); Freytag v. Commissioner, 89 T.C. 849 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990); Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994); and Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988).

Reliance on tax advice may not be reasonable or in good faith if the taxpayer knew, or should have known, that the advisor lacked knowledge in the relevant aspects of the federal tax law. §1.6664-4(c)(1). For a taxpayer's reliance on advice to be sufficiently reasonable so as possibly to negate a §6662(a) accuracy-related penalty, the Tax Court stated that the taxpayer has to satisfy the following three-prong test: (1) the advisor was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer gave to the advisor the necessary and accurate information, and (3) the taxpayer actually relied in good faith on the advisor's judgment. Neonatalogy Associates P.A. v. Commissioner, 115 T.C. 43 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Generally, if a taxpayer is unwilling to produce a copy of its opinion letter, the taxpayer should not be relieved from penalty consideration. Moreover, an opinion letter prepared by a promoter should not be accorded significant weight. Neonatology Associates, 115 T.C. 43 (2000) (While good faith reliance on professional advice may establish reasonable cause, "reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about."). If a taxpayer did not obtain a legal opinion from anyone other than the promoter in connection with its Notice 2004-30 transaction, the taxpayer's reliance on the legal opinion may not have been reasonable. In many of the Notice 2004-30 transactions, the taxpayers relied entirely upon a legal opinion from the promoter. In addition, if the taxpayer did not receive the opinion letter until after the return was filed, he/she could not have reasonably relied on the opinion and thus, should not be relieved from penalties.

Special Rule for Tax Shelter Items of Corporations

AI 0009894

With respect to reasonable cause for the substantial understatement penalty attributable to tax shelter items of a corporation, special rules apply. A corporation's legal justification may be taken into account, as appropriate, in establishing that the corporation acted with reasonable cause and in good faith in its treatment of a tax shelter item, but only if there is substantial authority within the meaning of §1.6662-4(d) for the treatment of the item and the corporation reasonably believed, when the return was filed, that the treatment was more likely than not the proper treatment. 3 §1.6664-4(f)(2)(i); §§1.6664-4(f)(2)(i)(B)(1) & (2). Because many corporations rely on the opinion of a tax professional, the opinion should be obtained to determine whether these requirements are met.

Although satisfaction of the "substantial authority" and "belief" requirements is necessary to a reasonable cause finding, this may not be sufficient. For example, reasonable cause may still not exist if the ta xpayer's participation in the tax shelter lacked significant business purpose, if the taxpayer claimed benefits that were unreasonable in comparison to the initial investment in the tax shelter, or if the taxpayer agreed with the shelter promoter that the taxpayer would protect the confidentiality of the tax aspects of the structure of the tax shelter. §1.6664-4(f)(3).

C. Disclosure Initiative under Announcement 2002-2

Accuracy-related penalties will generally be waived for taxpayers that properly disclosed the Notice 2004-30 transactions as part of the Announcement 2002-2 disclosure initiative. As explained in Announcement 2002-2, however, the penalty waiver is not available in situations where the disclosed item had been raised as an examination issue prior to the time when the taxpayer made the disclosure. In addition, the penalty waiver is not available for certain transactions that did not actually occur, transactions that involve fraudulent concealments, and transactions that involve deductions of personal, household, or living expenses.

ENDNOTES

1 For purposes of §6662, the term "underpayment" is generally the amount by which the taxpayer's correct tax is greater than the tax reported on the return. See §6664(a).

2 The definition of tax shelter includes, among other things, any plan or arrangement a significant purpose of which is the avoidance or evasion of federal income tax. §6662(d)(2)(C)(iii).

3 For a discussion of the substantial authority and reasonable belief requirements, see section 5.A.2., supra.

Contact customer relations at: customercare@bna.com or 1-800-372-1033
ISSN 1532-5229
Copyright © 2004, The Bureau of National Affairs, Inc.
Copyright FAQs | Internet Privacy Policy | BNA Accessibility Statement | License

Reproduction or redistribution, in whole or in part, and in any form,
without express written permission, is prohibited except as permitted by the BNA
Copyright Policy,
http://www.bna.com/corp/index.html#V

EXHIBIT __61__, PAGE __134__          AI 0009896

# EXHIBIT H



STATE OF CALIFORNIA
FRANCHISE TAX BOARD
PO Box 1673
Sacramento CA 95812-1673
Telephone (916) 845-3232 Fax (916) 845-0415

## Abusive Tax Shelters: Need a Way Out?

March 2004

THE UPPER DECK CO
5909 SEA OTTER PLACE
CARLSBAD CA  92008

California obtained thousands of abusive tax shelter leads from the IRS, states, and other sources of information.  These leads identified taxpayers, promoters, and tax schemes involved in sheltering income. We have reason to believe that you may have participated in a potentially abusive tax shelter to avoid paying income tax.  Participating in abusive tax shelters exposes you to substantial risks of increased penalties and interest.  However, you can save money by taking advantage of the Voluntary Compliance Initiative (a one-time offer to avoid these penalties). To participate, you must complete three simple steps by **April 15, 2004:**

1. Complete an amended return and Voluntary Compliance Participation Agreement Form,
2. Pay the taxes and interest,
3. Mail the tax forms and payment (except for EFT payments) to: VCI, Franchise Tax Board, PO Box 1673, Sacramento, CA 95812-1673

New California law provides substantial penalties ranging from 20 percent to 75 percent of the underpayment and a penalty equal to 100 percent of the interest charged on any deficiency assessment. The law allows the Franchise Tax Board eight years (instead of only four years) to issue deficiency assessments on tax shelters.

You can participate in the Voluntary Compliance Initiative for tax years 2002 and prior. To obtain more information about this one-time offer, you can:

- Read the enclosed brochure.
- Visit our Voluntary Compliance Initiative Website at www.ftb.ca.gov.
- Email us at vci@ftb.ca.gov.
- Call our Voluntary Compliance Initiative hotline at (916) 845-3232, Monday – Friday, 9:00 a.m. to 4:00 p.m. (PST).

This letter constitutes formal notification of the Voluntary Compliance Initiative pursuant to California Revenue and Taxation Code Section 19751(e).  If you do not participate in this initiative, you cannot avoid the abusive tax shelter and transaction penalties by filing an amended return after April 15, 2004. If you believe you did not invest in an abusive tax transaction, please disregard this letter.

Winston Mah, Chief
Audit Division

Enc. VCI Brochure

**UDC03331**

AI 0003465

Option 2 allows you to voluntarily comply while maintaining your appeal rights, allowing you discretion to file a claim for refund for amounts paid under the VCI. In exchange, we waive all penalties that apply to the use of the abusive tax shelter or transaction except for the accuracy-related penalty.

Can I participate in the VCI if I do not have the ability to pay now?

Yes. The VCI requires you to fully pay the tax liabilities and interest for all years you participate in the VCI. However, if the Franchise Tax Board determines you are unable to pay now, based on full disclosure of all your assets and income sources, you may be able to pay the tax and interest in installments over time and qualify for penalty relief under the VCI.

Assistance for persons with disabilities:

We comply with the Americans with Disabilities Act. Persons with hearing or speech impairments, please call TTY/TDD (800) 822-6268.

FTB 919 (REV 12-2003)

What if I need forms or additional information about the VCI program?

Contact Information

Internet
www.ftb.ca.gov

Email
vci@ftb.ca.gov

Telephone
(916) 845-3232
Monday - Friday, 9:00 a.m. to 4:00 p.m.

VCI Participation Agreement Form
• Available online at www.ftb.ca.gov
• Call us at (916) 845-3232
Form FTB 622 for Individuals
Form FTB 621 for Business Entities

Remember, you must act by April 15, 2004.



State of California

Abusive Tax Shelters: Need a way out?

January 1, 2004 to April 15, 2004

VCI Voluntary Compliance Initiative It's the right choice!

www.ftb.ca.

UDC03332

EXHIBIT _H_ PAGE _136_

AI 0003466

## What is the Voluntary Compliance Initiative?

The Voluntary Compliance Initiative (VCI) allows a limited time for taxpayers, who used abusive tax shelters or transactions to underreport their income or tax liability, to amend their returns and obtain a waiver of various penalties. The VCI applies to tax year 2002 and prior tax years. The VCI begins January 1, 2004, and ends April 15, 2004.

## What is an abusive tax shelter or transaction?

Abusive tax shelters or transactions are plans or arrangements devised for the principal purpose of avoiding tax. They include, but are not limited to, listed transactions identified by the Internal Revenue Service (IRS) or the Franchise Tax Board.

## Can I participate in the VCI?

You can participate if you used an abusive tax shelter or transaction to underreport your income or tax liability. You cannot use the VCI if you were eligible to participate in the IRS Offshore Voluntary Compliance Initiative (Rev. Proc. 2003-11).

## How do I participate in the VCI?

To participate in the VCI, obtain a *Participation Agreement* form from our Website at www.ftb.ca.gov, or call (916) 845-3232 to order the form. Complete the form and attach it to your amended return. Your amended return must report all income and loss without regard to the abusive tax shelter or transaction. You must amend your return and pay all taxes and interest by April 15, 2004.

## Why should I participate in the VCI?

You can save a significant amount of money in penalties and avoid possible criminal prosecution. Potential penalties and interest can be substantial. The chart below highlights potential savings for those participating in the VCI:

### Payment due with VCI

| Tax | $100,000 |
|---|---|
| Interest | 30,585 |
| VCI | [illegible] |

### Payment due without VCI

| Tax | $100,000 |
|---|---|
| Interest | 30,585 |
| Penalties | 146,585 |

## What penalties can I avoid if I participate in the VCI?

The penalties you may avoid include:

| Noneconomic Substance Transaction Understatement Penalty | 20% or 40% of the underpayment |
|---|---|
| Accuracy-Related Penalty | 20% or 40% of the underpayment |
| Interest-Based Penalty | Additional 100% of the interest due on the deficiency. |
| Fraud Penalty | Equal to 75% of the underpayment |

## What are my options under the VCI?

You can choose one of two options under the VCI. Both options require you to amend your California income or franchise tax return to eliminate the abusive tax shelter or transaction and pay tax and interest due.

Option 1 allows you to voluntarily comply without appeal rights. We will waive all penalties that apply to the use of the abusive tax shelter or transaction. Under this option, you cannot file a claim for refund for amounts paid under the VCI related to the abusive tax shelter or transaction.

UDC03333

EXHIBIT _H_ , PAGE _137_

AI 0003467



STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO Box 1673
Sacramento CA 95812-1673
Telephone (916) 845-3232 Fax (916) 845-0415

## Abusive Tax Shelters: Need a Way Out?

March 2004

THE UPPER DECK COMPANY
5909 SEA OTTER PL
CARLSBAD CA 92008-6630

California obtained thousands of abusive tax shelter leads from the IRS, states, and other sources of information. These leads identified taxpayers, promoters, and tax schemes involved in sheltering income. We have reason to believe that you may have participated in a potentially abusive tax shelter to avoid paying income tax. Participating in abusive tax shelters exposes you to substantial risks of increased penalties and interest. However, you can save money by taking advantage of the Voluntary Compliance Initiative (a one-time offer to avoid these penalties). To participate, you must complete three simple steps by **April 15, 2004:**

1. Complete an amended return and Voluntary Compliance Participation Agreement Form,
2. Pay the taxes and interest,
3. Mail the tax forms and payment (except for EFT payments) to: VCI, Franchise Tax Board, PO Box 1673, Sacramento, CA 95812-1673

New California law provides substantial penalties ranging from 20 percent to 75 percent of the underpayment and a penalty equal to 100 percent of the interest charged on any deficiency assessment. The law allows the Franchise Tax Board eight years (instead of only four years) to issue deficiency assessments on tax shelters.

You can participate in the Voluntary Compliance Initiative for tax years 2002 and prior. To obtain more information about this one-time offer, you can:

- Read the enclosed brochure.
- Visit our Voluntary Compliance Initiative Website at www.ftb.ca.gov.
- Email us at vci@ftb.ca.gov.
- Call our Voluntary Compliance Initiative hotline at (916) 845-3232, Monday – Friday, 9:00 a.m. to 4:00 p.m. (PST).

This letter constitutes formal notification of the Voluntary Compliance Initiative pursuant to California Revenue and Taxation Code Section 19751(e). If you do not participate in this initiative, you cannot avoid the abusive tax shelter and transaction penalties by filing an amended return after April 15, 2004. If you believe you did not invest in an abusive tax transaction, please disregard this letter.

Winston Mah, Chief
Audit Division

Enc. VCI Brochure and Participation Agreement Form

**UDC03334**

EXHIBIT _H_, PAGE _138_

AI 0003468

# Voluntary Compliance Participation Agreement Form
### (Business Entities)

*Please refer to the instructions for more information. When completed and signed by an authorized representative of your organization, this form will serve as the official agreement with the Franchise Tax Board.*

Attach to the Amended Business Entity Tax Return

| For calendar year _____, or | |
|---|---|
| fiscal year beginning month _____ day _____ year_____, and ending month _____ day _____ year _____ | |
| Business entity name as shown on return and current address | California Business Entity Number: |
| | Key Corporation Number (If original return was included in an election to file a Unitary Taxpayers' Group return, include a copy of the Schedule R-7): |

Select one: Check one of the following Options and attach this form to <u>each</u> amended return. You must elect the same option for each year of participation.

**Option 1**
☐ On behalf of the above-named business entity, I elect to participate in the VCI under Option 1. I understand this option is irrevocable, and waive the entity's right to appeal or file a claim for refund for any amounts paid under this VCI.

**Option 2**
☐ On behalf of the above-named business entity, I elect to participate in the VCI under Option 2. I understand this option will not affect the entity's right to appeal or file a claim for refund for any amounts paid under this VCI option.

Please check if one of the following applies to this election.
   ☐ A. The business entity treats this election as a claim for refund. Specific grounds for the claim are described in an attachment.
   ☐ B. The business entity does <u>not</u> treat this election as a claim for refund. The business entity maintains its appeal rights.
   ☐ C. The business entity has a pending federal action and treats this election as a claim for refund. Specific grounds for the claim are described in an attachment.

   For more details, please see the instructions to this form under *Option 2 Appeal Process.*

**PLEASE SIGN BELOW**

Under penalty of perjury of the laws of the State of California, I declare that I examined this form, including any accompanying statements, and to the best of my knowledge and belief it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. I am properly authorized to execute this form.

Name of officer or general partner *(please print):* _____ Title: _____

Signature of officer or general partner: _____ Date: _____

Telephone number: _____

Note: A *Participation Agreement* signed by a representative or an attorney-in-fact must be accompanied by a completed power of attorney (Form FTB 3520) authorizing such signature. For taxpayers who elected to file a Unitary Taxpayers' Group return, see instructions under "How to Participate."

For Privacy Act Notice, get form FTB 1131.

FTB 621 (REV 3-2004) Page 1

**UDC03335**

AI 0003469

EXHIBIT _H_, PAGE _139_

## Instructions for form FTB 621

### Voluntary Compliance Initiative - Participation Agreement for Business Entity Taxpayers

These instructions are based on California Revenue and Taxation Code Sections 19751-19754

**A General Information**

The Franchise Tax Board (FTB) Voluntary Compliance Initiative (VCI) program is for taxpayers who underreported tax liabilities due to the use of abusive tax shelters and transactions. The VCI is available only from January 1, 2004, through April 15, 2004, and applies to 2002 and all prior taxable years. An abusive tax shelter and transaction is any plan or arrangement devised for the principal purpose of avoiding tax.

To participate in the VCI:

- You amend your California return by eliminating your abusive tax avoidance transactions and fully pay all taxes and interest due. If you are unable to pay, the FTB may enter into an installment payment agreement with you. To request an installment agreement, contact Office Collections at (916) 845-7033 or send your request to:

  Franchise Tax Board - Office Collections
  PO Box 942857
  Sacramento CA 94857-2021

- The FTB will waive all penalties (except those penalties finalized prior to December 31, 2003) applicable to abusive tax shelter and transactions for taxable years the taxpayer participates in the VCI Option 1. See VCI Option 2 below for exceptions.

- The FTB will not pursue criminal action for taxable years with respect to the VCI issues if a criminal complaint was not filed against you or you are not the subject of a criminal investigation in connection with an abusive tax shelter and transaction as of December 31, 2003.

**B Eligibility**

The VCI applies to any taxpayer that meets all of the following:

1) Previously filed a California franchise or income tax return using an abusive tax shelter and transaction to underreport tax liability.

2) Was not eligible to participate in the IRS Offshore Voluntary Compliance Initiative that ended April 15, 2003.

3) Was not party to a filed criminal complaint or under criminal investigation for an abusive tax shelter and transaction as of December 31, 2003.

**C Options**

If you are participating in more than one year, you must elect the same option for each year.

**Option 1 – Waive Appeal Rights**

You elect to comply by amending your California return reporting all income or loss without regard to an abusive tax shelter and transaction and close the issue with finality.

If you have a final federal determination (such as, revenue agent report, closing or settlement agreement) regarding the transaction, amend your California return based on the final federal determination and attach a copy to your amended return. Be sure to adjust for federal and state differences.

You must fully pay all taxes and interest due as reported on your amended return.

You waive your right to appeal the amounts paid under the VCI in exchange for being relieved of any applicable penalties and avoiding possible prosecution.

**Option 2 – Retain Appeal Rights**

You elect to comply by amending your California return reporting all income or loss without regard to an abusive tax shelter and transaction but wish to maintain your appeal rights.

If you have a final federal determination (such as, revenue agent report, closing or settlement agreement) regarding the transaction, amend your California return based on the final federal determination and attach a copy to your amended return. Be sure to adjust for federal and state differences.

You must fully pay all taxes and interest due as reported on your amended return.

You avoid possible prosecution, but remain subject to the 20% accuracy related penalty as provided in California Revenue & Taxation Code section 19164 (prior to amendments passed in October 2003).

If you elect this option, you can choose to:

A. Treat your amended return as your claim for refund, or
B. File a claim later within the statute of limitations.

In either case, you must clearly state the specific grounds of your claim and attach any necessary documents. Once you file a claim for refund under Option 2, the FTB will process and may examine your claim for refund, or may defer that action if there is a pending federal action, such as, an IRS examination.

The FTB will determine if the accuracy related penalty applies when it takes action on your claim. If there is a final federal determination regarding the transaction and the accuracy related penalty, the FTB will generally follow the federal determination.

UDC03336

EXHIBIT _H_, PAGE _140_

AI 0003470

**Option 2 – Appeal Process:**
You may file an appeal after either of the following:

1) The FTB takes action on the claim for refund, or
2) The later of either:
   (a) 180 days after the date of a final federal determination regarding an abusive tax avoidance transaction, or
   (b) 4 years after the date you filed the claim; or if later, 1 year after full payment of tax, penalty and interest.

If the FTB assesses the accuracy related penalty, you must pay the amount before proceeding with your appeal.

**D   How to Participate**
You must file an amended return and attach a completed *Participation Agreement*, Form FTB 621, (for corporations, LLCs, partnerships, estates, trusts, and fiduciaries), or Form FTB 622 (for individuals, partners and shareholders). You must file a separate participation agreement for each year you participate in the VCI. You must elect one of the two options. If you are participating in more than one year, you must elect the same option for each year.

Before attaching the VCI *Participation Agreement* (Form FTB 621 or 622) to the amended return, make sure you fill out the following entries:

- Calendar or fiscal year dates.
- Name.
- California identification number.
- Key corporation number and copy of Schedule R-7, if applicable.
- Clearly check only one option.
- Signature of authorized officer.

Note: For taxpayers who elected to file a Unitary Taxpayers' Group return: The individual signing this participation agreement

represents that he or she is an officer of the corporation on whose behalf this participation agreement is being filed and is an officer of all other entities that were members of this unitary business for the taxable year for which this participation agreement is being filed. He or she has authorization to execute this participation agreement on behalf of each and every member of the unitary business for the year for which this participation agreement is being filed.

A member of a Unitary Taxpayers' Group return may elect to enter the VCI program independent of the other members of the group. The affected taxpayer must include a notice of termination of the R-7 group election for the year with the Participation Agreement(s) and amended return(s).

Attach the completed VCI *Participation Agreement Form* (FTB 621 or 622) to the back of each amended return being filed. On the top of the amended return write "VCI" in red. Amended returns, and payment of the additional tax and interest, must be sent no later than April 15, 2004. Send your amended return(s) to:

Attn: VCI
Franchise Tax Board
PO Box 1673
Sacramento CA 95812-1673

To file the amended return use the following FTB form:

- Corporations – Form FTB 100X for taxpayers who previously filed a Form FTB 100, 100S, or 100W

- Partnerships – Form FTB 565
- LLC – Form FTB 568 for taxpayers filing as a partnership
- Individuals/Partners/ Shareholders – Form FTB 540X
- Estates/Trusts/ Fiduciaries – Form FTB 541

**E   Electronic Funds Transfer (EFT)**
Corporations that meet certain requirements must remit all of their payments through EFT. Payments made by other means may result in a penalty of 10 percent of the amount paid.

To obtain more information on the EFT requirements, please refer to Publication 3817, *Electronic Funds Transfer Information Guide*. If you would like assistance regarding EFT, please call the EFT Unit at (916) 845-4025 Monday through Friday 8 a.m. until 5 p.m. or visit our Website at:

www.ftb.ca.gov

**F   Additional Information**
For additional information concerning the Voluntary Compliance Initiative, please refer to one of the following:

- Visit our Voluntary Compliance Initiative Website at:

www.ftb.ca.gov

- Call the VCI Hotline at (916) 845-3232.
- E-mail us at vci@ftb.ca.gov

Assistance for persons with disabilities:
We comply with the Americans with Disabilities Act. Persons with hearing or speech impairments please call TTY/TDD (800) 822-6268.

UDC03337

EXHIBIT __H__, PAGE _141_

AI 0003471

# EXHIBIT I

# AMERICAN ARBITRATION ASSOCIATION

AMERCIAN INTERNATIONAL
SPECIALTY LINES
INSURANCE COMPANY
          Claimant,

    - v.-

THE UPPER DECK COMPANY, RICHARD
P. McWILLIAM, and the MPR
REVOCABLE TRUST
          Respondents.

**ARBITRATION
COMPLAINT**

PLEASE TAKE NOTICE that Claimant American International Specialty

Insurance Company ("AISLIC") hereby gives notice pursuant to Clause 16 of the Fiscal

Event Insurance Policy Number 405-88-33, of its intention to arbitrate the dispute between

AISLIC and Respondents, The Upper Deck Company ("Upper Deck"), Richard P.

McWilliam ("McWilliam") and the MPR Revocable Trust (hereafter collectively referred

to as the "Respondents") as more fully described below.

## THE PARTIES

1.      AISLIC is an insurance company and corporation organized under the laws of Alaska, with a principal place of business at 175 Water Street in New York, New York.

2.      Upper Deck is a California corporation with a principal place of business at 5909 Sea Otter Place in Carlsbad, California.

3. McWilliam is the Chief Executive Officer of Upper Deck and the person responsible for the taxes here in question.

4. The MPR Revocable Trust is an inter vivos revocable trust of which McWilliam is the sole trustee.

## NATURE OF THE DISPUTE

5. In this arbitration, AISLIC seeks a declaration of no coverage or exclusion under a Fiscal Event Insurance Policy Number 405-88-33 (the "Policy") that AISLIC issued to Upper Deck in reliance on documents, incorporated by and annexed to the Policy, which were presented by Upper Deck to AISLIC. AISLIC was entitled to rely and did rely on those documents in deciding to provide coverage. The documents included three opinion letters of KPMG (the "KPMG opinions") describing a tax shelter and a Representation and Warranty Letter signed by Upper Deck and McWilliams attesting to the accuracy of the facts, assumptions of facts and understandings of facts set forth in the KPMG opinions. The transaction described in the documents presented to AISLIC by Upper Deck was materially different from the transaction actually carried out by Upper Deck. The transaction that was actually carried out was an obvious tax sham for which AISLIC would never have provided coverage.

6. Upper Deck has made a demand that AISLIC contribute its full policy limit towards payment of taxes to be assessed by the Internal Revenue Service ("IRS") pursuant to a settlement proposal dated April 7, 2005. The settlement proposal seeks other things, to unwind the transaction (described more fully below) and tax the Respondents as if the transaction never occurred.

## THE POLICY

7. AISLIC issued the policy to Upper Deck with a Policy Period of August 29, 2001 to the later of (i) November 30, 2006 or (ii) the expiration of the applicable statute of limitations with respect to the tax items described in the Insured Tax Event relating to the transaction described in the KPMG opinions. The Policy has limits of liability of $50,000,000 in the aggregate, inclusive of defense costs, charges and expenses, subject to a $500,000 retention. The Policy further contained a 10% co-insurance clause. (The Policy and its exhibits are attached hereto as Exhibit 1).

## THE TRANSACTION PRESENTED TO AISLIC

8. During the late spring of 2001 through August 2001, Upper Deck was negotiating with AISLIC to obtain a Fiscal Event Insurance Policy. During negotiations, Upper Deck submitted to AISLIC the following: (i) the KPMG opinions; (ii) the Representation and Warranty Letter; (iv) a Shareholders Agreement; and (v) an Appraisal by Fair Market Value, Inc. of the valuation of Upper Deck voting common stock and non-voting common stock as of March 31, 2001. Copies of these documents are attached to the Policy as Exhibits A, B, C, and D.

9.   The KPMG opinions described a transaction -- which became known as the SC$^2$ transaction -- in which Upper Deck, a subchapter S corporation, distributed 8,280,000 shares of non-voting stock to McWilliam, who in turn donated all of the 8,280,000 shares of non-voting stock as a charitable donation to The Austin Firefighters Relief and Retirement Fund ("Firefighters"), a pension plan that provided pension benefits for certain members of the Fire Department of the City of Austin, Texas. McWilliam at all times retained all shares of voting common stock.

10.   Meanwhile, Upper Deck declared a dividend to McWilliam of warrants to purchase 82,800,000 additional shares of non-voting common stock at an exercise price of $0.148 per share, which the KPMG opinions represented to be at least 90% of the fair market value of the underlying stock as of March 29, 2001, as determined by an "unrelated nationally recognized valuation firm" experienced in valuing the stock of closely-held corporations.

11.   Firefighters and Respondents entered into a redemption agreement, as part of the Shareholders Agreement (annexed as Exhibit 1C), pursuant to which Firefighters had the right, beginning on April 1, 2003, to "put" back the donated non-voting common stock to Respondents.  However, pursuant to Section 5.2 of the agreement, the put price was required to be "the fair market value of such Shares on the date of" redemption.

## RESPONDENTS' WARRANTIES TO AISLIC

12.   Upper Deck and McWilliam executed the Representation and Warranty Letter on September 4, 2001.  The Representation and Warranty Letter warranted to AISLIC that "[t]he facts, assumptions of fact, and understandings of facts set forth in the opinions of KPMG LLP attached as Exhibit A to the Policy were true and correct on the date of such opinions and continue to be true and correct on the date hereof."

13.   The Representation and Warranty Letter also warranted to AISLIC that neither Upper Deck nor McWilliam could compel Firefighters to redeem its stock, "except pursuant to the exercise of the Right of First Refusal contained in the Shareholders Agreement."  The KPMG opinions made the same representation that neither Upper Deck nor McWilliam had the power to compel Firefighters to present the stock it owned for redemption.

14.   The KPMG opinions and the redemption agreement made part of the Shareholders Agreement represented that the redemption price was to be "the fair market value of the stock on the date that [Firefighters] presents the stock for redemption."

15.   The KPMG opinions also represented that the transaction set forth in the KPMG opinions was a lawful strategy that, in several respects, "should" be approved by the IRS, and, in all other respects, was "more likely than not" to be approved by the IRS. "Should" was KPMG's strongest level of opinion.

16.   The KPMG opinions did advise that if the non-voting stock were redeemed at a purchase price substantially above or below the fair market value of the stock, it could



lead the IRS to conclude that there was a second class of stock and thus invalidate the tax shelter.

17. Based on the documents presented to it by Respondents, including the Representation and Warranty Letter and the KPMG opinions, AISLIC issued the policy to Upper Deck effective August 29, 2001.

## RESPONDENTS AND KPMG CHANGE THE DEAL

18. In April 2002, Respondents were informed by KPMG that, in response to a summons served on it the IRS, KPMG had disclosed Upper Deck's identity, "together with other information regarding the transaction that is the subject of the Policy." Respondents were thus made aware of the likelihood that the IRS would open an examination of their tax returns and scrutinize the transaction with Firefighters.

19. On April 22, 2002, Respondents made a voluntary disclosure of the transaction to the IRS, including disclosure of the Donee's [Firefighters'] put option. In the voluntary disclosure, Respondents told the IRS that if the put option was exercised, the price of the put option would be fair market value as determined by an independent valuation. Respondents further stated that the "put option is wholly within the discretion of the Donee" and that Respondents did not "have the right or power to compel the Donee to exercise the option."

20. In or about November 2002, Respondents decided to reacquire the non-voting stock from the Firefighters as of December 2002, rather than wait until April 2003 to see if Firefighters would exercise its right to "put" back the stock to Respondents at fair market value.

21. From late November 2002 to early December 2002, Respondents and Firefighters negotiated a Share Purchase Agreement, which was executed on December 10, 2002. AISLIC was not made aware of either the negotiation or execution of the Share Purchase Agreement. Nor has AISLIC ever consented to any amendment to, or termination of, the Shareholders Agreement.

22. The Share Purchase Agreement effectively terminated the Shareholders Agreement. The Share Purchase Agreement set the purchase price for the non-voting stock at $2,000,000, with a closing date of December 31, 2002.

23. During the negotiations of the Share Purchase Agreement, Firefighters requested information from Upper Deck, for review by its accountants and attorneys, to assist in determination of the fair market value of the non-voting stock.

24. KPMG, on behalf of Upper Deck, responded with two letters dated December 9, 2002 (attached hereto as Exhibit 2), which represented:

      a.    Upper Deck's net income for 2001 was $34,108,856;

      b.    Upper Deck's net income for the period ending September 30, 2002 was $29,519,305;

     c.    If you annualize Upper Deck's September 30, 2002 income statement, the annualized net income of Upper Deck for 2002 would be approximately $39,359,073.

     d.    The $2,000,000 purchase price was very fair and could very well be much less in the future because of Iraq.

25. At the time Respondents negotiated the Share Purchase Agreement, they knew that the annualized net income of Upper Deck for 2002, on which the $2,000,000 purchase price was purportedly based, was materially false and misleading, in that Upper Deck's actual year-end net income for 2002 was $151,407,745, almost 400% greater than the $39,359,073 annualized net income figure presented to the Firefighters on December 9, 2002.

26. KPMG, on Respondents' behalf, responded to Firefighters' request for information, by telling Firefighters that any estimated value placed on the non-voting stock by the Firefighters' accountants was of no account. Rather, KPMG, on Respondents' behalf, told Firefighters that "[t]he real fair market value is what the Upper Deck Company is willing to pay for it." KPMG, on Respondents' behalf, further told Firefighters that the $2,000,000 purchase price was fair and all Upper Deck would pay and "any delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk."

27. The $2,000,000 offer for the Upper Deck non-voting stock was accepted and closed on December 31, 2002. The $2,000,000 purchase price did not represent the fair market value of the non-voting stock as of December 31, 2002. Nor did Respondents claim to the IRS that the $2,000,000 purchase price represented the stock's fair market value as of December 31, 2002.

28. Upper Deck filed Federal Income Tax Returns for 2002 reflecting net income of $151,407,745, of which 90% or $136,266,970 was allocated to the Firefighters who received no cash and $15,140,775 was allocated to the MPR Revocable Trust (McWilliam).

29. Further reflecting Respondents' recognition that the transaction, as they carried it out, did not confer beneficial ownership of the donated non-voting stock on the Firefighters, upon information and belief, none of the Respondents claimed a deduction for the charitable contribution of the stock to the Firefighters.

## THE IRS CHALLENGES THE SC² TRANSACTIONS

30. On February 8, 2005, a United States Senate Permanent Subcommittee published a report titled, "The Role Of Professional Firms In The U.S. Tax Shelter Industry" (the "report"). The report revealed that KPMG had aggressively marketed the SC2 transaction through telemarketing and other calls to "literally thousands of potential SC2 clients," as part of a scheme to generate huge fees for KPMG.

31. The report revealed that, in the spring of 2000, KPMG prepared and then circulated to its tax professionals as part of its mass-marketing campaign, a list of "Frequently Asked Questions and Sticking Points," which included the following question and response:

> Q1: What happens if the tax exempt ("TE") does not want to redeem the stock to the S-Corp?
>
> A1: First, the longer the TE owns the stock, the more benefit the company will receive .... Secondly, the TE would have no reason not to sell the stock back, since the company is really its only source of liquidity (nobody will want the stock). Third, the only reason for the TE to accept the stock is to get cash. Also, the TE knows the deal prior to accepting the stock. It signs a redemption agreement that discloses the warrants as well as the fact that no distributions are required to be made.
>
> However, if we assume the TE gets a new board, and the board wants to hold the company "hostage," the shareholders can exercise their warrants that can dilute the TE to less than 10%.

32. In short, according to KPMG, the Charity had no choice but to redeem its stock, since the S-Corp was "the only source of liquidity (nobody else will want the stock)," and, if the Charity tried to resist, the shareholders could exercise their warrants and dilute the Charity's shares to less than 10%.

33. The significance of KPMG's mass marketing campaign was commented on in an December 2001 email from a KPMG professional, who wrote:

> Going way back to Feb. 2000, when $SC^2$ first reared its head, my recollection is that $SC^2$ was intended to be limited to a relatively small number of large S corps. That plan made sense because, in my opinion, there was (and is) a strong risk of successful IRS attack on $SC^2$ if the IRS gets wind of it .... Call me paranoid, but I think that such a widespread marketing campaign is likely to bring KPMG and $SC^2$ unwelcome attention from the IRS. If so, I suspect a vigorous (and at least partially successful) challenge would result.

34. According to interviews of charities conducted by the Senate Subcommittee, KPMG, instead of acting as an independent professional in the $SC^2$ transactions, actively assisted the corporate donor to the disadvantage of the charity when the donor decided to retake possession of the non-voting common stock issued to the charity.

35. An April 13, 2005 report by the Senate Subcommittee also revealed that KPMG "had identified even more technical problems with $SC^2$," but failed to disclose these problems in the KPMG opinions. "For example," according to the report:

> KPMG tax professionals discussed problems with identifying a business purpose to explain the structure of the transaction – why a donor who wanted to make a cash donation to a charity would first donate stock to the charity and then buy it back, instead of simply providing a straightforward cash contribution. They also identified problems with establishing the charity's "beneficial ownership" of the donated stock, since the stock was provided on the clear understanding that the charity would sell the stock back to the donor within a specified period of time. [Beneficial ownership is "probably our weakest link in the chain on $SC2$."] KPMG professionals identified other technical problems, as well, involving assignment of income, reliance on tax indifferent parties and valuation issues.

36. On or about April 2004, the IRS issued Notice 2004-30 advising Respondents that the SC2 transaction was abusive.

37. Respondents submitted Notice 2004-30 to AISLIC under the Policy.

38. The IRS, by letter dated April 7, 2005, offered a settlement, which, among other things, proposed to unwind the transaction and to tax the MPR Revocable Trust and/or McWilliam as if the transaction never occurred.

39. Respondents have notified the IRS that they wish to accept the IRS settlement proposal subject to reaching an agreeable closing agreement.

40. AISLIC has consented, subject to reserving its rights under the Policy, to Respondents' notifying the IRS that they wish to accept the IRS settlement proposal.

41. Respondents have demanded that AISLIC contribute its full policy limit towards payment of the taxes to be assessed if the IRS settlement proposed is consummated. AISLIC submits that there is no insurance coverage available and requests from the Arbitration Panel a ruling of no coverage and/or exclusion.

## RESPONDENTS' ATTEMPT TO NULLIFY
## THE POLICY'S ARBITRATION CLAUSE

42. Section 16 of the policy, titled "ARBITRATION AND CHOICE OF LAW," contains a very broad arbitration clause, which provides for mandatory arbitration before the American Arbitration Association in New York, New York, of "all disputes, or differences which may arise under or in connection with this Policy, whether arising before or after termination, including any determination of the amount of Loss...."

43. Despite the fact that the arbitration clause plainly mandates arbitration of "all disputes ... in connection with this Policy," Respondents, on October 13, 2005, filed a complaint against AISLIC in the United States District Court, Southern District of California (the "California complaint," annexed as Exhibit 3), in which they contend that the scope of the arbitration clause only extends to the determination of Loss under the policy. (Exhibit 3, ¶ 45). Respondents seek to deprive the arbitration panel of the power to finally determine all other disputes, including but not limited to, the decision whether to award punitive damages or attorneys' fees. (Ibid.).

44. Respondents also seek in the California complaint (Exhibit 3, ¶ 47), to renege on their agreement to limit any arbitration award to the Limit of Liability set forth in the policy, pursuant to the arbitration clause in Section 16 of the policy, which provides: "No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable Limit of Liability set forth in this Policy."

45. Respondents further seek in the California complaint (Exhibit 3, ¶¶ 48-49) to circumscribe the arbitration panel's ability to apply and interpret the scope of the policy's New York choice of law provision in the arbitration clause, which provides that this "arbitration shall be subject to the Federal Arbitration Act and, to the extent such Act is not applicable, the laws of the State of New York. The construction, validity and performance of this Policy shall be governed by the laws of the State of New York...." (Exhibit 1, §16).

46. In addition to seeking declaratory relief to avoid the above-cited provisions of the policy's arbitration clause, Respondents, in the California complaint, assert a second cause of action for alleged breach of the insurance contract and a third cause of action for alleged breach of AISLIC's implied covenant of good faith, despite the fact that both causes of action are clearly encompassed by the policy's arbitration clause.

## CLAIMS FOR RELIEF

### COUNT I
### (THE TRANSACTION IS NOT AN INSURED TAX EVENT)

47. AISLIC realleges the allegations contained in paragraphs 1 through 46 as if fully set forth at this point.

48. Pursuant to the Shareholders Agreement, Upper Deck could only reacquire the non-voting shares if a third-party set the price in a *bona fide* offer or if the Firefighters exercised its put rights to require Upper Deck to purchase the shares at the then fair market value as determined by an appraisal.

49. Upper Deck, with the assistance of KPMG, compelled Firefighters to redeem its non-voting common stock at a price substantially below fair market value by misrepresenting that the $2,000,000 purchase price was based on fair market value, and by telling the Firefighters that "[t]he real fair market value is what the Upper Deck

Company is willing to pay for it" and threatening that "any delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk."

50. The transaction thus carried out by Respondents in December 2002, by which they compelled a redemption of Firefighters' stock, violated the requirements set forth in the Shareholders Agreement and referenced in the KPMG opinions.

51. Respondents thereby created an entirely new transaction, without the requisite economic substance, differing in material aspects from the transaction represented in the documents provided to AISLIC and on which its coverage determination was based.

52. As a result, there is no coverage, since any resulting tax does not arise from an Insured Tax Event.

## COUNT II
## (BREACH OF WARRANTIES)

53. AISLIC realleges the allegations contained in paragraphs 1 through 52 as if fully set forth at this point.

54. The Representation and Warranty Letter (annexed as Exhibit 1B) provides, in relevant part, that:

> The facts, assumptions of fact, and understandings of fact set forth in the opinions of KPMG LLP attached as Exhibit A to the Policy were true and correct on the date of such opinions and continue to be true and correct on the date hereof.

55. "The facts, assumptions of fact, and understandings of fact" set forth in the KPMG opinions were not "true and correct" in that the KPMG opinions contained several material misrepresentations, including but not limited to, the representations that: (1) the redemption price was to be "the fair market value of the stock on the date that [Firefighters] presents the stock for redemption"; (2) neither Upper Deck nor McWilliam had the power to compel Firefighters to present the stock it owned for redemption; and (3) the transaction set forth in the opinions was a lawful strategy that "should" survive IRS scrutiny.

56. By entering into the Share Purchase Agreement and thereby eliminating the requirement of a fair market value put price, Upper Deck breached key assumptions of fact contained in the KPMG opinions.

57. Moreover, in December 2002, Upper Deck did compel Firefighters to redeem its non-voting common stock at far below fair market value. Thus, KPMG, on Respondents' behalf, told Firefighters that what Firefighters' accountants considered to be fair market value did not matter, that "[t]he real fair market value is what the Upper Deck Company is willing to pay for it." KPMG further told Firefighters that "any delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk," i.e., the shares would be diluted to less than 10%.

58. The KPMG opinions and Representation and Warranty letter also contained several material omissions which rendered the "facts, assumptions of fact, and understandings of fact" set forth in the KPMG opinions materially misleading, including but not limited to, the failure to disclose that: (1) KPMG was engaged in a deceptive mass-marketing campaign to generate fees; (2) KPMG did not act and had no intent to act as a truly independent professional in rendering its opinions; and (3) KPMG had identified problems with the transaction which it failed to address or disclose in the KPMG opinions.

59. The above misrepresentations and omissions in the KPMG opinions and Representation and Warranty letter materially increased AISLIC's risk of loss under the policy.

60. Due to Respondents' breaches of warranties, they are precluded from recovering under the policy.

## COUNT III
## (EXCLUSION B TO THE POLICY APPLIES TO PRECLUDE COVERAGE)

61. AISLIC realleges the allegations contained in paragraphs 1 through 60 as if fully set forth at this point.

62. Exclusion (b) to the policy provides that AISLIC shall not be liable for Loss in connection with a Claim "arising out of, based upon or attributable to any material inaccuracy in the facts set forth or referenced in the Representation [and Warranty] Letter."

63. As set forth above, the facts set forth in the Representation and Warranty Letter were materially inaccurate. For instance, the Representation and Warranty Letter stated that neither Upper Deck nor McWilliam could compel Firefighters to redeem its stock, "except pursuant to the exercise of the Right of First Refusal contained in the Shareholders Agreement." However, in December 2002, Respondents, without telling AISLIC, did compel Firefighters to redeem its non-voting common stock at far below fair market value. Respondents, without telling AISLIC, were thereby able to materially alter the transaction which had been represented to AISLIC by removing the critical element of fair market value from the transaction.

## COUNT IV
## (EXCLUSION H TO THE POLICY APPLIES TO PRECLUDE COVERAGE)

64. AISLIC realleges the allegations contained in paragraphs 1 through 63 as if fully set forth at this point.

65. Exclusion (h) to the Policy provides, in relevant part, that the Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured "to the extent such Loss arises out of, is based upon, or is attributable to an amendment to the Shareholders Agreement or the Warrant Agreement ..., without the Insurer's prior written consent ...."

EXHIBIT _I_, PAGE _151_

66. Clause 5.3 of the Share Purchase Agreement provides that the Shareholders Agreement is terminated with the consummation of the Share Purchase Agreement on December 31, 2002.

67. The termination of the Shareholders Agreement is an amendment thereof, which pursuant to Exclusion (h) operates to exclude coverage, since AISLIC's consent was not obtained.

## COUNT V
### (EXCLUSION A OF THE POLICY EXCLUDES COVERAGE)

68. AISLIC realleges the allegations contained in paragraphs 1 through 67 as if fully set forth at this point.

69. Exclusion (a) of the Policy provides that the Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:

> arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud), or any knowing and intentional violation of any law, rule, regulation or statute; provided, however, that effecting the transactions described in the Opinions and the filing of Tax Returns with any Taxing Authority by the Insureds consistent with the transactions described in the Opinions shall not be the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud) or a knowing and intentional violation of law, rule, regulation or statute for purposes of this Clause 3(a)[.] (emphasis in original)

70. As set forth above, the transaction effected by Respondents in December 2002 was not consistent with the transactions described in the KPMG opinions; therefore, the exception to exclusion (a) does not apply.

71. Rather, the taxes incurred by respondents arose from a transaction in December 2002 that was carried out by Respondents' deliberate acts of fraud, such as misrepresenting to Firefighters that Upper Deck's annual income for 2002 would be $39,359,073, when Respondents knew that Upper Deck's actual year-end net income would be approximately four times this amount, and misrepresenting that $2,000,000 was a fair purchase price for the donated shares.

72. Accordingly, exclusion (a) applies to preclude coverage.

73. Moreover, under Section 25402 of the California Corporate Code [Fraudulent and Prohibited Practices]:

> It is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about

the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

74. Respondents violated California Corporate Code § 25402 by failing to provide the Firefighters with true net income figures for 2002, when such were known to Respondents, resulting in a significantly lower value for Firefighters' shares than their fair market value.

## COUNT VI
### (RESPONDENTS BREACHED THEIR IMPLIED OBLIGATION OF GOOD FAITH AND IMPAIRED AISLIC'S RIGHT TO SUBROGATION)

75. AISLIC realleges the allegations contained in paragraphs 1 through 74 as if fully set forth at this point.

76. Respondents owed AISLIC an implied obligation to act in good faith, which, at a minimum, obligated Respondents not to alter the transaction presented to AISLIC in a manner that would increase the likelihood of the tax authority challenging the transaction; and increase the likelihood of the tax authority prevailing if such were challenged.

77. Moreover, pursuant to Article 10 of the Policy, AISLIC, in the event of payment under the policy, had the right to be subrogated "to all the rights and remedies of the Insureds in respect of such Loss..."

78. By entering into the Share Purchase Agreement and compelling Firefighters to redeem its non-voting common stock at a price substantially below fair market value, Respondents failed to observe the requirement set forth in the KPMG opinions that non-voting stock be redeemed at a purchase price not substantially above or below the fair market value of the stock.

79. Moreover, the changes in the transaction wrought by Respondents without AISLIC's consent make it virtually impossible to defend the transaction under the tax laws.

80. Respondents thereby violated their implied obligation of good faith to ASLIC and impaired its rights to subrogation against the Government.

## COUNT VII
### (FAILURE OF CONDITION PRECEDENT)

81. AISLIC realleges the allegations contained in paragraphs 1 through 80 as if fully set forth at this point.

82. Section 9(b) of the policy, requires that as "a condition precedent to the right of the Insureds to be indemnified ... [t]he Insureds shall have prepared and filed all

EXHIBIT _I_, PAGE _153_

applicable Tax Returns in a manner materially consistent with that anticipated by the Opinions and/or the Representation Letter."

83. The KPMG opinions anticipate that "the Shareholder [McWilliam] will be entitled to a charitable deduction for the fair market value of the stock the Shareholder donated" in the 2001 tax year. (underline in original).

84. Upon information and belief, in his tax return for 2001, McWilliam did not take a charitable deduction for the shares of non-voting common stock that he donated to Firefighters. Accordingly, a necessary condition precedent to Respondents' right to indemnification under the policy cannot be met.

## COUNT VIII
## (DECLARATION OF ARBITRABILITY)

85. AISLIC realleges the allegations contained in paragraphs 1 through 84 as if fully set forth at this point.

86. The policy's arbitration clause in Section 16 of the policy clearly provides for arbitration of "all disputes, or differences which may arise under or in connection with this Policy, whether arising before or after termination, including any determination of the amount of Loss,...."

87. The policy's arbitration clause also clearly provides that no award exceed "the applicable Limit of Liability set forth in this Policy," and further provides for the application of New York law to the "construction, validity and performance of this Policy."

88. AISLIC, therefore, seeks, in accord with the plain meaning of the policy's arbitration clause, a declaration that, all disputes in connection with the policy, including but not limited to any claim by Respondents for punitive damages and attorneys' fees, are subject to this arbitration and the provisions of the policy's arbitration clause, including the New York choice of law provision and the provision limiting any award to the policy's Limit of Liability.

## PRAYERS FOR RELIEF

WHEREFORE, AISLIC seeks a declaration that:

    A.    The transaction effected by Respondents in December 2002 was an entirely different transaction than that for which AISLIC provided coverage and the tax losses claimed by Respondents do not arise from an Insured Tax Event under the Policy;

    B.    Coverage is precluded due to Respondents' breaches of the warranties to AISLIC;

    C.    Exclusion (b) of the Policy applies to bar coverage;

D.   Exclusion (h) of the Policy applies to bar coverage;

E.   Exclusion (a) of the Policy applies to bar coverage;

F.   There is no coverage due to Respondents' breach of their implied obligation of good faith to AISLIC and Respondents' impairment of AISLIC's subrogation rights;

G.   There is no coverage due to the failure of the condition precedent to Respondents' right to indemnification set forth in Section 9(b) of the policy, that Respondents "shall have prepared and filed all applicable Tax Returns in a manner materially consistent with that anticipated by the Opinions and/or the Representation Letter."

H.   A declaration that all disputes in connection with the policy, including but not limited to any claim by Respondents for punitive damages and attorneys' fees, are subject to this arbitration and the provisions of the policy's arbitration clause, including the New York choice of law provision and the provision limiting any award to the policy's Limit of Liability;

I.   Such other and further relief as the Panel may deem just and proper.

<u>Hearing Locale</u>:   The Policy provides that all disputes or differences which may arise under or in connection with the Policy shall be submitted to the American Arbitration Association in New York, New York.

Dated: New York, New York
       November 14, 2005

Respectfully submitted,

D'AMATO & LYNCH

By: _Robert E. Kushner_

Robert E. Kushner
Peter A. Stroili
Attorneys for Claimant AISLIC
70 Pine Street
New York, New York  10270
(212) 269-0927