# EXHIBIT J

1  Richard K. Howell (State Bar No. 144241)
   Duke F. Wahlquist (State Bar No. 117722)
2  Bradley A. Chapin (State Bar No. 232885)
   RUTAN & TUCKER, LLP
3  611 Anton Boulevard, Fourteenth Floor
   Costa Mesa, California 92626-1931
4  Telephone: 714-641-5100
   Facsimile: 714-546-9035
5  Email: rhowell@rutan.com

6  Attorneys for Respondents and Counterclaimants
   The Upper Deck Company and Richard P.
7  McWilliam, individually and as Trustee for the
   MPR Trust

8

9                  AMERICAN ARBITRATION ASSOCIATION

10

11 AMERICAN INTERNATIONAL
   SPECIALTY LINES INSURANCE
12 COMPANY and DOES 1 through 10,           RESPONDENTS THE UPPER DECK
   inclusive,                               COMPANY'S AND RICHARD P.
13                                          MCWILLIAM'S, INDIVIDUALLY
             Claimant,                      AND AS TRUSTEE FOR THE MPR
14                                          TRUST, ANSWER TO THE
        v.                                  ARBITRATION COMPLAINT OF
15                                          AMERICAN INTERNATIONAL
   THE UPPER DECK COMPANY, a                SPECIALTY LINES INSURANCE
16 California corporation, and              COMPANY; DEMAND FOR THREE
   RICHARD P. MCWILLIAM,                    ARBITRATORS
17 individually, and as Trustee for the MPR
   Trust,
18
             Respondents.
19

20        The Upper Deck Company, a California corporation, and Richard P.

21 McWilliam, individually and as trustee of the MPR Trust, answer the

22 "ARBITRATION COMPLAINT" ("Complaint") attached to the November 14,

23 2005 Demand for Arbitration by American International Specialty Lines Insurance

24 Company ("AISLIC") by first declining to waive the requirement for three

25 arbitrators at this time and responding further as follows:

26                    **Response to Specific Allegations**

27        1.    In answer to the allegations of paragraph 1 of AISLIC's Complaint,

28 Respondents

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05                        -1-        EXHIBIT _J_, PAGE _156_

1     • admit AISLIC is now, and at all times relevant hereto was, an Alaska

2       corporation authorized to underwrite insurance in the State of California as

3       a surplus lines insurer with its principal place of business in New York,

4       New York.  However, Respondents are informed and believe and based

5       thereon

6     • answer further that AISLIC is not authorized to conduct the business of

7       insurance in the State of New York and is not subject to the supervision of

8       insurance regulators in the State of New York..

9     2.     In answer to the allegations of paragraph 2 of AISLIC's Complaint,

10    Respondents admit Upper Deck is a California corporation with its principal place

11    of business at 5909 Sea Otter Place, Carlsbad, California.

12    3.     In answer to the allegations of paragraph 3 of AISLIC's Complaint,

13    Respondents deny that Richard P. McWilliam is the chief executive officer of Upper

14    Deck at this time.

15    4.     In answer to the allegations of paragraph 4 of AISLIC's Complaint,

16    Respondents admit the MPR revocable trust ("MPR Trust") is an inter vivos

17    revocable trust of which Richard P. McWilliam is the sole trustee.

18    5.     In answer to the allegations of paragraph 5 of the Complaint,

19    Respondents

20    • admit that AISLIC issued its policy no. 405-88-33 ("Policy") having The

21      Upper Deck Company as a "named insured" and the MPR Trust and Mr.

22      Richard P. McWilliam as "additional insureds"; however, Respondents

23    • answer further that AISLIC previously bound itself to issue the Policy in a

24      written binder dated August 29, 2001 and that while the Policy specifies its

25      period commenced August 29, 2001, the Policy was not actually

26      forwarded to The Upper Deck Company until on or about February 8,

27      2002.

28    • Admit one of the attachments to the Policy, Exhibit B, which is identified

1    in the Policy as the "Representation Letter" and in AISLIC's Complaint as

2    the "Representation and Warranty Letter," is dated September 4, 2001.

3    • deny that "AISLIC was entitled to rely . . . on . . . a Representation and

4    Warranty Letter signed by Upper Deck and McWilliams [sic]" in the form

5    of the Representation Letter appended to the Policy except insofar as that

6    Representation Letter warranted existing facts into which AISLIC had not

7    conducted AISLIC's own investigation.

8    • deny that AISLIC did in fact rely on the Representation Letter.

9    • deny that AISLIC relied on the "KPMG opinions . . . in deciding to

10   provide coverage" and further

11   • answer that the "KPMG opinions" were not matters upon which AISLIC

12   "relied in deciding to provide coverage" and

13   • answer further that Upper Deck specifically sought to insure against the

14   risk the "KPMG Opinions" would prove to be incorrect and AISLIC

15   specifically insured against accepted the risk that the "KPMG Opinions"

16   would prove to be incorrect.

17   • deny that "the transaction described in the documents presented to AISLIC

18   by Upper Deck was materially different from the transaction actually

19   carried out by Upper Deck" and

20   • answer further that the transactions, which are the subject of the Policy,

21   were not different in any respect from transactions described in any

22   documents presented to AISLIC by Upper Deck or anybody else.

23   • answering AISLIC's allegation "the transaction that was actually carried

24   out was an obvious tax sham for which AISLIC would never have

25   provided coverage," Respondents answer that whatever was "obvious" to

26   AISLIC, the transactions Respondents carried out were not obviously tax

27   shams to Respondents and further

28   • answer that AISLIC underwrote the Policy with full knowledge of the

1   transactions in which Respondents engaged and with the complete

2   expectation AISLIC assumed the risks attendant thereto.

3       6.      In answer to the allegations of paragraph 6 of AISLIC's Complaint,

4   Respondents

5   • admit that Upper Deck has made demand that AISLIC contribute its full

6       policy limits of $50,000,000 toward payment of taxes assessed or to be

7       assessed by the Internal Revenue Service consistent with three written

8       proposals to each of Respondents from the IRS each dated April 7, 2005.

9   • answer that each of Respondents executed their respective written

10      proposals dated April 7, 2005 from the IRS with the full knowledge and

11      consent of AISLIC

12  • answer that the terms of those three April 7, 2005 written proposals speak

13      for themselves.

14  • deny the allegations of paragraph 6 of the Complaint, except as

15      specifically admitted herein.

16      7.      In answer to the allegations of paragraph 7 of AISLIC's Complaint,

17  Respondents

18  • admit the Policy and its exhibits are appended to the Complaint as

19      Exhibit 1 and further

20  • answer that the written terms and conditions of the Policy attached as

21      Exhibit 1 to the Complaint speak for themselves.

22  • deny the allegations of paragraph 7 except as specifically admitted herein.

23      8.      In answer to the allegations of paragraph 8 of AISLIC's Complaint,

24  Respondents

25  • deny that Exhibit B to the Policy (a letter addressed to American

26      International Specialty Lines Insurance Company and dated September 4,

27      2001) which is referred to in the Policy as the "Representation Letter" and

28      which is referred to in the Complaint as "the Representation and Warranty

1    Letter" was submitted in any "negotiations . . . during the late spring of

2    2001 through August 2001."

3    • answer that AISLIC contractually bound itself to issue the Policy in a

4    written binder dated August 29, 2001.

5    • admit Upper Deck was involved in negotiations with AISLIC to obtain the

6    Policy prior to AISLIC's binding coverage and issuing the Policy.

7    • deny the allegations of paragraph 8 of the Complaint Except as specifically

8    admitted herein..

9    9.    In answer to the allegations of paragraph 9 of AISLIC's Complaint,

10   Respondents admit the "KPMG opinions" are attached to the Policy appended to the

11   Complaint as Exhibit 1 in Exhibit A thereto and further answer that the "KPMG

12   opinions" speak for themselves.  Except as specifically admitted herein,

13   Respondents deny the allegations of paragraph 9 of the Complaint.

14   10.    In answer to the allegations of paragraph 10 of AISLIC's Complaint,

15   Respondents

16   • admit that Richard P. McWilliam, as trustee of the MPR Trust, received a

17   written warrant (the "Warrant") from The Upper Deck Company on March

18   29, 2001 and further

19   • answer that the terms of the written Warrant speak for themselves.

20   • answer that the "KPMG opinions" appended in Exhibit A to the Policy

21   which is appended to Exhibit 1 to the Complaint speak for themselves.

22   • deny the allegations of paragraph 10 of the Complaint, except as

23   specifically admitted herein.

24   11.    In answer to the allegations of paragraph 11 of AISLIC's Complaint,

25   Respondents

26   • admit that as of the 31st day of March 2001 each of The Upper Deck

27   Company, the MPR Trust and the Austin Firefighters Relief and

28   Retirement Fund entered into an agreement denominated "Shareholders

1   Agreement," a copy of which is attached as Exhibit C to the Policy which

2   is appended to the Complaint as Exhibit 1.

3   • object to and deny the Complaint's characterization of the "Shareholders

4   Agreement" as a "redemption agreement."

5   • answer that the "Shareholders Agreement" speaks for itself.

6   • and deny that the characterizations of paragraph 11 of the Complaint

7   adequately describe the nature of the "Shareholders Agreement."

8   12.   In answer to the allegations of paragraph 12 of AISLIC's Complaint,

9   Respondents

10   • admit that on September 4, 2001 Richard P. McWilliam, as trustee of the

11   MPR Trust (and not individually) and The Upper Deck Company executed

12   Exhibit B to the Policy appended to the Complaint as Exhibit 1, which the

13   Policy denominates as the "Representation Letter" and which the

14   Complaint characterizes as the "Representation and Warranty Letter."

15   • admit that the "Representation Letter" states, in part, that "the

16   undersigned" (The Upper Deck Company and Richard P. McWilliam, as

17   trustee of the MPR Trust (and not individually)) "represent[ed] and

18   warrant[ed]"" as follows: ". . . the facts, assumptions of fact, and

19   understandings of facts set forth in the opinions of KPMG LLP attached as

20   Exhibit A to the [P]olicy were true and correct on the date of such

21   opinions [May 2, 2001] and continue to be true and correct on the date

22   hereof," September 4, 2001.

23   • deny the allegations of paragraph 12 of the Complaint except as

24   specifically admitted herein.

25   13.   In answer to the allegations of paragraph 13 of AISLIC's Complaint,

26   Respondents

27   • deny that Richard P. McWilliam individually "warranted [anything] to

28   AISLIC" in the Representation Letter appended as Exhibit B to the Policy

1  which is attached to the Complaint as Exhibit 1 and which the Complaint

2  characterizes as the "Representation and Warranty Letter,"

3  • deny that either The Upper Deck Company or Richard P. McWilliam, as

4  trustee of the MPR Trust, "warranted to AISLIC that neither Upper Deck

5  nor McWilliam could compel Firefighters to redeem its stock, 'except

6  pursuant to the exercise of the right of first refusal contained in the

7  Shareholders Agreement,'"[1] and

8  • deny the allegation that "the KPMG opinions made the same

9  representation that neither Upper Deck nor McWilliam had the power to

10  compel Firefighters to present the stock it owned for redemption."[2]

11  • Regardless of how the "Representation Letter" or the "KPMG opinions"

12  may have characterized the agreement denominated Shareholders

13  Agreement entered into as of March 31, 2001, that 'Shareholders

14  Agreement' was disclosed in its entirety to AISLIC and is in fact attached

15  as Exhibit C to the Policy which is attached to AISLIC's Complaint as

16  Exhibit 1." Respondents answer that paragraph 1 of the "Shareholders

17  _____

18  [1]   While the Representation Letter states, in part "[t]he municipal plan is neither legally bound to offer for redemption any of the non-voting shares of Upper Deck,

19  nor can Upper Deck or any of its shareholders compel such a redemption, except pursuant to the exercise of the right of first refusal contained in the Shareholder

20  Agreement, a copy of which is attached as Exhibit C to the policy ('Shareholder Agreement')", Section 3 of the Shareholders Agreement, captioned "Disposition of

21  Nonvoting Shares Upon Specified Events" sets forth other "Specified Events" called "Disposition Events" which would permit Upper Deck or its then shareholder(s) to acquire the non-voting shares of Upper Deck.

22  [2]   The May 2, 2001 letter appended as part of Exhibit A to the Policy attached to the Complaint as Exhibit 1 regarding "Charitable Contribution to the Firefighters

23  Relief and Retirement Fund" stated in part:  "As part of the Shareholders Agreement Upper Deck and Municipal Plan entered into a redemption agreement. Under the

24  redemption agreement, Municipal Plan may present the non-voting common stock it owns for redemptions by Upper Deck, beginning April 1, 2003. The redemption

25  amount is the fair market value of the stock on the date that Municipal Plan presents the stock for redemption. Neither Upper Deck nor the shareholder have the power

26  to compel Municipal Plan to present the stock it owns for redemption." However, Section 3 of the Shareholders Agreement, captioned "Disposition of Nonvoting

27  Shares Upon Specified Events" sets forth other "Specified Events" called "Disposition Events" which would permit Upper Deck or its then shareholder(s) to

28  acquire the non-voting shares of Upper Deck.

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

EXHIBIT __J__, PAGE _162_

1    Agreement" captioned "Restrictions Against Transfer" specifically permits

2    and authorizes "sales, transfers or dispositions of Donee Shares[3] which

3    were **not** "in conformity with provisions Section 2, Section 3 or Section 5

4    of th[e] Agreement, or as otherwise expressly provided in th[e]

5    Agreement" with "the prior written consent of the Company and the other

6    Shareholder[s] of the Company." AISLIC therefore acted at all time with

7    knowledge that Upper Deck, the MPR Trust and the Austin Firefighters

8    Relief and Retirement Fund could mutually agree to a transfer of the non-

9    voting stock at any time and at any price.

10        14.    In answer to the allegations of paragraph 14 of AISLIC's Complaint,

11   Respondents

12   • admit that as of March 31, 2001 The Upper Deck Company, the MPR

13       Trust and the Austin Firefighters Relief and Retirement Fund entered into

14       the "Shareholders Agreement" appended as Exhibit C to the Policy

15       attached to the Complaint as Exhibit 1 and

16   • admit the authenticity of the "KPMG opinions" attached as Exhibit A to

17       the Policy attached to the Complaint as Exhibit 1.

18   • answer that the "KPMG opinions" and the "Shareholders Agreement"

19       speak for themselves.

20   • deny that the allegations of paragraph 14 adequately or accurately

21       characterize or summarize the terms of either the "KPMG opinions" or the

22       "Shareholders Agreement."

23   • deny that the "Shareholders Agreement represented that the purchase price

24       to be paid by Upper Deck was to be 'the fair market value of the stock on

25       the date that [Firefighters] presents the stock for redemption'"

26

27   [3]  Recital B of the "Shareholders Agreement" identifies the "Donee Shares" as "a total of 8,280,000 shares of the company's non-voting common stock . . . [then]

28   owned by MPR" which were 'concurrently . . . contribut[ed] . . . to Donee,' the Austin Firefighters Relief and Retirement Fund."

Rutan & Tucker LLP
attorneys at law

1       • answer that only Section 5 of the "Shareholders Agreement" captioned

2       "Put Option and Right," which granted the "Donee" a "put option" (which

3       option was never exercised) and Section 3 captioned "Disposition of Non-

4       voting Shares Upon Specified Events" (which events never occurred)

5       speak to a "fair market value" or to a "put price."

6       • answer that Section 2 of the "Shareholders Agreement" captioned "Right

7       of First Refusal Upon Sale to Bona Fide purchaser" speaks to a right of

8       The Upper Deck Company to purchase shares from the "Donee" for a

9       price calculated without regard to "fair market value"

10      • answer that Section 1 of the "Shareholders Agreement" captioned

11      "Restrictions Against Transfer" permits "sales, transfers or dispositions of

12      Donee Shares" without any restriction whatsoever on a price of purchase

13      by The Upper Deck Company "with [] the prior written consent of the

14      Company and the other shareholders of the Company" (which written

15      consent was obtained in December 2002).

16        15.    In answer to the allegations of paragraph 15 of AISLIC's Complaint,

17 Respondents

18      • again admit the authenticity of the "KPMG opinions" attached as

19      Exhibit A to the Policy appended to AISLIC's Complaint as Exhibit 1 and

20      further

21      • answer that the "KPMG opinions" speak for themselves.

22      • deny the allegations of paragraph 15 of the Complaint except as

23      specifically admitted herein.

24        16.    In answer to the allegations of paragraph 16 of AISLIC's Complaint,

25 Respondents

26      • again admit the authenticity of the "KPMG opinions" attached as

27      Exhibit A to the Policy appended to AISLIC's Complaint as Exhibit 1, and

28      further

1   • answer that the "KPMG opinions" speak for themselves.

2   • deny that any of the "KPMG opinions" "advise[d] that if the non-voting

3      stock were redeemed at a purchase price substantially above or below the

4      fair market value of the stock, it could lead the IRS to conclude that there

5      was a second class of stock and thus invalidate the tax shelter"; **no such**

6      **statement and no similar statement appear in the "KMPG opinions."**

7      17.   In answer to the allegations of paragraph 17 of AISLIC's Complaint,

8   Respondents admit AISLIC issued the Policy to The Upper Deck Company as the

9   "named insured" and to the MPR Trust and Mr. Richard McWilliam as "additional

10  insureds" and admit that the Policy had a policy period incepting August 29, 2001.

11  Except as specifically admitted herein, Respondents deny the allegations of

12  paragraph 17 and Respondents specifically deny that "AISLIC issued the [P]olicy . .

13  . based on . . . documents presented to it by Respondents, including the

14  Representation and Warranty Letter" (which the Policy refers to as the

15  "Representation Letter") and answer further that AISLIC underwrote the Policy

16  based on its own independent investigation and not based on any representation or

17  warranty by any of Respondents.

18      18.   In answer to the allegations of paragraph 18 of AISLIC's Complaint,

19  Respondents admit that on April 9, 2002 the IRS summoned KPMG to reveal the

20  identity of its clients, including Respondents, using tax strategies which had been

21  promoted by KPMG, including the tax strategy sometimes referred to as "$SC^2$."

22  Respondents further admit that KPMG notified Upper Deck of this on April 9 or 10,

23  2003, and that Upper Deck in turn promptly notified AISLIC no later than April 10,

24  2003.  Except as specifically admitted herein, Respondents deny the allegations of

25  paragraph 18 of AISLIC's Complaint.

26      19.   In answer to the allegations of paragraph 19 of AISLIC's Complaint,

27  Respondents admit to execution of a "Voluntary Disclosure Under Announcement

28  2002-2" and further answer that the written terms of that "Voluntary Disclosure

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05                    -10-    EXHIBIT _J_, PAGE _165_

1  Under Announcement 2002-2" speak for themselves.  Except as specifically

2  admitted herein, Respondents deny the allegations of paragraph 19 of AISLIC's

3  Complaint.

4      20.    In answer to the allegations of paragraph 20 of AISLIC's Complaint,

5  Respondents admit to the execution of a written agreement dated as of December

6  10, 2002 and entitled "Share Purchase Agreement" by The Upper Deck Company,

7  by Richard P. McWilliam as Trustee of the MPR Trust and by the Austin

8  Firefighters Relief and Retirement Fund, and answer further that the written terms

9  and conditions of that "Share Purchase Agreement" speak for themselves except

10  insofar as the "Share Purchaser Agreement" alludes to or mentions other written

11  documents which written documents also speak for themselves.  Except as

12  specifically admitted herein, Respondents deny the allegations of paragraph 20 of

13  AISLIC's Complaint.

14      21.    In answer to the allegations of paragraph 21 of AISLIC's Complaint,

15  Respondents admit to the execution of a written agreement entitled "Share Purchase

16  agreement" by The Upper Deck Company, Richard P. McWilliam as Trustee of the

17  MPR Trust and the Austin Firefighters Relief and Retirement Fund dated as of

18  December 10, 2002, and answer that the written terms and conditions of that "Share

19  Purchase Agreement" speak for themselves except insofar as the "Share Purchaser

20  Agreement" alludes to or mentions other written documents which written

21  documents also speak for themselves.  Except as specifically admitted herein,

22  Respondents deny the allegations of paragraph 21 of AISLIC's Complaint.

23      22.    In answer to the allegations of paragraph 22 of AISLIC's Complaint,

24  Respondents

25      •  deny that "[T]he Share Purchase Agreement effectively terminated the

26          Shareholders Agreement."  In support of this denial, Respondents

27      •  answer that the "Shareholders Agreement" entered into as of March 31,

28          2001 attached as Exhibit C to the Policy which is attached to the

1    Complaint as Exhibit 1 specifically provides in paragraph 8 captioned

2    "Termination of Agreement," that "this Agreemen[t] shall terminate . . . on

3    the occurrence of any of the following events . . . at such time as only one

4    (1) Shareholder of the Company remain[ed]" and that because of this

5    provision the "Share Purchase Agreement" provides "that Austin[]

6    [Firefighters Relief and Retirement Fund's] rights and obligations under

7    the Shareholders Agreement shall terminate effective as of the closing of

8    the transactions contemplated [t]hereby" -- after which "only one (1)

9    shareholder of the Company " remain[ed]."

10    • answer that the "Share Purchase Agreement" speaks for itself except

11    insofar as the "Share Purchaser Agreement" alludes to or mentions other

12    written documents which written documents also speak for themselves

13    • deny that the allegations of paragraph 22 adequately characterize the terms

14    and conditions of the "Share Purchase Agreement."

15    23.    In answer to the allegations of paragraph 23 of AISLIC's Complaint,

16 Respondents

17    • answer that the "Share Purchase Agreement" provides that that

18    "Agreement *contains the entire understanding* and all of the agreements of

19    the parties with respect to the subject matter hereof *and supercedes* all

20    prior agreements, oral or written, and *all other communication* between the

21    parties, relating in any way to any sale or purchase of the Non-Voting

22    Shares owned by Austin" Firefighters' Relief and Retirement Fund (¶ 6.4;

23    italics added) including but not limited to any negotiations between the

24    parties thereto and any information allegedly requested by or provided to

25    Austin Firefighters' Relief and Retirement Fund.

26    • answer that as reflected in the minutes of the Board of Firefighters Relief

27    and Retirement Fund Trustees' regular meeting conducted December 10,

28    2002 the Board of Firefighters Relief and Retirement Fund Trustees

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05                    -12-   EXHIBIT __J__, PAGE __167__

1    "noted that the Fund had no direct investment in the donated stock

2    certificates, and the $2,000,000.00 net redemption offer would be in the

3    form of cash to the pension fund", considered the advice of the Fund's

4    legal counsel and auditors and approved the transaction contemplated by

5    the "Share Purchase Agreement."

6    • deny the allegations of paragraph 23 of AISLIC's Complaint except as

7    specifically admitted herein.

8    24.    In answer to the allegations of paragraph 24 of AISLIC's Complaint,

9    Respondents

10   • admit the authenticity of the December 9, 2002 memorandum to Bill

11   Stefka from Reg Bendheim (BEND 003-006) and the December 9, 2002

12   facsimile to Bill Stefka from Reg Bendheim (BEND 007-012) attached to

13   AISLIC's Complaint as Exhibit 2.

14   • deny the allegations of paragraph 24 of AISLIC's Complaint except as

15   specifically admitted herein.

16   • deny that the allegations of ¶¶ a-d of paragraph no. 24 adequately or

17   accurately characterize the written terms of Exhibit 2 to AISLIC's

18   Complaint.

19   • answer that the "Share Purchase Agreement" provides that that

20   "Agreement *contains the entire understanding* and all of the agreements of

21   the parties with respect to the subject matter hereof *and supercedes* all

22   prior agreements, oral or written, and *all other communication* between the

23   parties, relating in any way to any sale or purchase of the Non-Voting

24   Shares owned by Austin" Firefighters' Relief and Retirement Fund (¶ 6.4;

25   italics added) including but not limited to any negotiations between the

26   parties thereto and any information allegedly requested by or provided to

27   Austin Firefighters' Relief and Retirement Fund.

28   • answer that as reflected in the minutes of the Board of Firefighters Relief

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

-13-  EXHIBIT __J__, PAGE _168_

1    and Retirement Fund Trustees' regular meeting conducted December 10,

2    2002 the Board of Firefighters Relief and Retirement Fund Trustees

3    "noted that the Fund had no direct investment in the donated stock

4    certificates, and the $2,000,000.00 net redemption offer would be in the

5    form of cash to the pension fund", considered the advice of the Fund's

6    legal counsel and auditors and approved the transaction contemplated by

7    the "Share Purchase Agreement."

8       • deny the allegations of paragraph 24 of AISLIC's Complaint except as

9       specifically admitted herein.

10     25.    In answer to the allegations of paragraph 25 of AISLIC's Complaint,

11  Respondents

12       • deny that "the $2,000,000 purchase price was purportedly based upon"

13       annualized net income of Upper Deck for 2002 and deny that the

14       statements in Exhibit 2 to the Complaint were materially false or

15       misleading in any manner.

16       • answer that the "Share Purchase Agreement" provides that that

17       "Agreement *contains the entire understanding* and all of the agreements of

18       the parties with respect to the subject matter hereof *and supercedes* all

19       prior agreements, oral or written, and *all other communication* between the

20       parties, relating in any way to any sale or purchase of the Non-Voting

21       Shares owned by Austin" Firefighters' Relief and Retirement Fund (¶ 6.4;

22       italics added) including but not limited to any negotiations between the

23       parties thereto and any information allegedly requested by or provided to

24       Austin Firefighters' Relief and Retirement Fund.

25       • answer that as reflected in the minutes of the Board of Firefighters Relief

26       and Retirement Fund Trustees' regular meeting conducted December 10,

27       2002 the Board of Firefighters Relief and Retirement Fund Trustees

28       "noted that the Fund had no direct investment in the donated stock

1   certificates, and the $2,000,000.00 net redemption offer would be in the

2   form of cash to the pension fund", considered the advice of the Fund's

3   legal counsel and auditors and approved the transaction contemplated by

4   the "Share Purchase Agreement."

5   • deny the allegations of paragraph 25 of AISLIC's Complaint except as

6   specifically admitted herein.

7   26.   In answer to the allegations of paragraph 26 of AISLIC's Complaint,

8   Respondents

9   • again admit the authenticity of KPMG's written statements contained in

10   Exhibit 2 to AISLIC's Complaint and further

11   • answer that Exhibit B to AISLIC's Complaint speaks for itself.

12   • answer that the "Share Purchase Agreement" provides that that

13   "Agreement *contains the entire understanding* and all of the agreements of

14   the parties with respect to the subject matter hereof *and supercedes* all

15   prior agreements, oral or written, and *all other communication* between the

16   parties, relating in any way to any sale or purchase of the Non-Voting

17   Shares owned by Austin" Firefighters' Relief and Retirement Fund (¶ 6.4;

18   italics added) including but not limited to any negotiations between the

19   parties thereto and any information allegedly requested by or provided to

20   Austin Firefighters' Relief and Retirement Fund.

21   • answer that as reflected in the minutes of the Board of Firefighters Relief

22   and Retirement Fund Trustees' regular meeting conducted December 10,

23   2002 the Board of Firefighters Relief and Retirement Fund Trustees

24   "noted that the Fund had no direct investment in the donated stock

25   certificates, and the $2,000,000.00 net redemption offer would be in the

26   form of cash to the pension fund", considered the advice of the Fund's

27   legal counsel and auditors and approved the transaction contemplated by

28   the "Share Purchase Agreement."

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

EXHIBIT _J_, PAGE_170_

1     •  deny the allegations of paragraph 26 of AISLIC's Complaint except as
2        specifically admitted herein.

3     27.    In answer to the allegations of paragraph 27 of AISLIC's Complaint,
4 Respondents admit the execution and consummation of the "Share Purchase
5 Agreement" made and entered into as of the December 10, 2002 by and between
6 The Upper Deck Company, Richard P. McWilliam, as trustee of the MPR Trust and
7 the Austin Firefighters Relief and Retirement Fund. Except as specifically admitted
8 herein, Respondents deny the allegations of paragraph 27 of AISLIC's Complaint.
9 Finally, Respondents

10     •  specifically deny that the allegations of paragraph 27 of AISLIC's
11        Complaint have any bearing on any action by the Internal Revenue Service
12        in connection with any of Respondents,

13     •  deny that the allegations of paragraph 27 of AISLIC's Complaint have any
14        bearing on the existence of insurance coverage under AISLIC's Policy of
15        insurance, and answer that

16     •  AISLIC has made the allegations in paragraphs 23-27 of AISLIC's
17        Complaint in a deliberate attempt to mislead the arbitration panel with
18        allegations not germane to the outcome of this proceeding.

19     28.    In answer to the allegations of paragraph 28 of AISLIC's Complaint,
20 Respondents

21     •  deny that Upper Deck's 2002 U.S. Income Tax Return for an S
22        Corporation (Form 1120S) "reflect[s] net income" in the amount stated
23        (this figure does not match the amount stated in Schedule M-1, Line 1).
24     •  admit that Schedule K-1 (Form 1120S), Shareholder's Share of Income,
25        Credits, Deductions, etc. pertaining to the Austin Fire Fighters Relief and
26        Retirement Fund's interest in the Upper Deck Company during 2002
27        reflects an allocation of "ordinary income" in the amount of $136,266,970.
28     •  admit that Schedule K-1 (Form 1120S), Shareholder's Share of Income,

1    Credits, Deductions, etc. pertaining to the MPR Revocable Trust's interest

2    in the Upper Deck Company reflects an allocation of "ordinary income" in

3    the amount of $15,140,775.

4    • deny those allegations not expressly admitted herein.

5    29.    In answer to the allegations of paragraph 29 of AISLIC's Complaint,

6    Respondents

7    • deny any initial recognition on the part of Respondents "that the

8    transaction, as they carried it out [or otherwise], did not confer beneficial

9    ownership of the donated non-voting stock on Austin Firefighters Relief

10    and Retirement Fund.

11    • admit that Respondent Richard P. McWilliam did not take a deduction for

12    his charitable contribution of the non-voting stock to the Austin

13    Firefighters' Relief and Retirement Fund but further answer that there

14    were no tax consequences as a result of Mr. McWilliam's failure to take

15    such a deduction.

16    30.    In answer to the allegations of paragraph 30 of AISLIC's Complaint,

17    Respondents admit to the publication of a report entitled "The Role of Professional

18    Firms in the U.S. Tax Shelter Industry" by a United States Senate Committee and

19    further answer that the written terms and conditions of that report speak for

20    themselves.  Except as specifically admitted herein, Respondents deny the

21    allegations of paragraph 30 of AISLIC's Complaint.

22    31.    In answer to the allegations of paragraph 31 of AISLIC's Complaint,

23    Respondents admit to the publication of a report entitled "The Role of Professional

24    Firms in the U.S. Tax Shelter Industry" by a United States Senate Committee and

25    further answer that the written terms and conditions of that report speak for

26    themselves.  Except as specifically admitted herein, Respondents deny the

27    allegations of paragraph 31 of AISLIC's Complaint.

28    32.    In answer to the allegations of paragraph 32 of AISLIC's Complaint,

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

-17- EXHIBIT J, PAGE 172

1   Respondents admit to the publication of a report entitled "The Role of Professional

2   Firms in the U.S. Tax Shelter Industry" by a United States Senate Committee and

3   further answer that the written terms and conditions of that report speak for

4   themselves.  Except as specifically admitted herein, Respondents deny the

5   allegations of paragraph 32 of AISLIC's Complaint.

6        33.     In answer to the allegations of paragraph 33 of AISLIC's Complaint,

7   Respondents admit to the publication of a report entitled "The Role of Professional

8   Firms in the U.S. Tax Shelter Industry" by a United States Senate Committee and

9   further answer that the written terms and conditions of that report speak for

10  themselves.  Except as specifically admitted herein, Respondents deny the

11  allegations of paragraph 33 of AISLIC's Complaint.

12       34.     In answer to the allegations of paragraph 34 of AISLIC's Complaint,

13  Respondents admit to the publication of a report entitled "The Role of Professional

14  Firms in the U.S. Tax Shelter Industry" by a United States Senate Committee and

15  further answer that the written terms and conditions of that report speak for

16  themselves.  Except as specifically admitted herein, Respondents deny the

17  allegations of paragraph 34 of AISLIC's Complaint.

18       35.     In answer to the allegations of paragraph 35 of AISLIC's Complaint,

19  Respondents admit to the publication of a report entitled "The Role of Professional

20  Firms in the U.S. Tax Shelter Industry" by a United States Senate Committee and

21  further answer that the written terms and conditions of that report speak for

22  themselves.  Except as specifically admitted herein, Respondents deny the

23  allegations of paragraph 35 of AISLIC's Complaint.

24       36.     In answer to the allegations of paragraph 36 of AISLIC's Complaint,

25  Respondents admit that the Internal Revenue Service published its Notice 2004-30

26  as Internal Revenue Bulletin 2004-17 on April 26, 2004 and further answer that

27  Notice 2004-30 is the subject of a coordinated issue paper issued by the IRS on

28  November 8, 2004 "discuss[ing] the grounds for taxing the proper taxpayers on the

1  income from the corporation's business and disallowing deductions the taxpayers

2  improperly claim as a result of participating in Notice 2004-30 transactions."

3  Respondents deny the allegations of paragraph 36 of AISLIC's Complaint are

4  adequate to accurately and completely characterize the contents of Notice 2004-30.

5  Respondents also deny that the "Share Purchase Agreement" had any causal

6  relationship with the IRS's issuance of Notice 2004-30.

7    37.    In answer to the allegations of paragraph 37 of AISLIC's Complaint,

8  Respondents admit that each of them supplied all notices of the publication of

9  Notice 2004-30 to AISLIC that may have been required under the Policy.  Except as

10  specifically admitted herein, Respondents deny the allegations of paragraph 37 of

11  AISLIC's Complaint.

12    38.    In answer to the allegations of paragraph 38 of AISLIC's Complaint,

13  Respondents admit to the receipt of letter(s) dated April 7, 2005 from the IRS, the

14  written terms and conditions of which letters speak for themselves.  Except as

15  specifically admitted herein, Respondents deny the allegations of paragraph 38 of

16  AISLIC's Complaint.

17    39.    In answer to the allegations of paragraph 39 of AISLIC's Complaint,

18  Respondents admit to the execution and return to the IRS of the April 7, 2005 letters

19  identified in their response to paragraph 37 above.  Except as specifically admitted

20  herein, Respondents deny the allegations of paragraph 39 of AISLIC's Complaint.

21    40.    In answer to the allegations of paragraph 40 of AISLIC's Complaint,

22  Respondents admit AISLIC consented to Respondents' execution and return of the

23  IRS' April 7, 2005 letters identified in paragraph 38 above.  Respondents deny that

24  AISLIC's consent was properly subject to any reservation of rights with respect

25  thereto under the Policy of insurance.

26    41.    In answer to the allegations of paragraph 41 of AISLIC's Complaint,

27  Respondents admit to having demanded AISLIC pay its Policy limit; however,

28  except insofar as specifically admitted herein, Respondents deny the allegations of

1  paragraph 41 of AISLIC's Complaint.

2      42.    In answer to the allegations of paragraph 42 of AISLIC's Complaint,

3  Respondents answer that the written terms and conditions of the Policy appended as

4  Exhibit 1 to AISLIC's Complaint speak for themselves and, except as specifically

5  admitted herein, Respondents deny the allegations of paragraph 42 of AISLIC's

6  Complaint.

7      43.    In answer to the allegations of paragraph 43 of AISLIC's Complaint,

8  Respondents again answer that the written terms and conditions of the Policy of

9  insurance attached as Exhibit 1 to AISLIC's Complaint speak for themselves and

10  further answer that on October 13, 2005 Respondents did file a complaint against

11  AISLIC in the United States District Court for the Southern District of California, a

12  photocopy of which is attached to AISLIC's Complaint as Exhibit 3, the terms and

13  conditions of which speak for themselves.  Except as specifically admitted herein,

14  Respondents deny the allegations of paragraph 43 of AISLIC's Complaint.

15      44.    In answer to the allegations of paragraph 44 of AISLIC's Complaint,

16  Respondents answer that the written terms and conditions of the "California

17  Complaint" attached as Exhibit 3 to AISLIC's Complaint speak for themselves and

18  except insofar as specifically admitted herein, Respondents deny the allegations of

19  paragraph 44 of AISLIC's Complaint.

20      45.    In answer to the allegations of paragraph 45 of AISLIC's Complaint,

21  Respondents answer that the written terms and conditions of the "California

22  Complaint" attached as Exhibit 3 to AISLIC's Complaint speak for themselves and

23  except insofar as specifically admitted herein, deny the allegations of paragraph 45

24  of AISLIC's Complaint.

25      46.    In answer to the allegations of paragraph 46 of AISLIC's Complaint,

26  Respondents answer that the written terms and conditions of the "California

27  Complaint" attached as Exhibit 3 to AISLIC's Complaint speak for themselves and

28  except insofar as specifically admitted herein, deny the allegations of paragraph 46

Rutan & Tucker LLP
attorneys at law

EXHIBIT _J_, PAGE _175_

1 | of AISLIC's Complaint.

2 |      47.    In answer to the allegations of paragraph 47 of AISLIC's Complaint,

3 | Respondents incorporate and reallege their answers to the allegations of

4 | paragraphs 1 through 46 of AISLIC's Complaint as set forth above.

5 |      48.    In answer to the allegations of paragraph 48 of AISLIC's Complaint,

6 | Respondents

7 |    • specifically deny that "pursuant to the shareholders agreement, Upper

8 |      Deck could only reacquire the non-voting shares if a third-party set the

9 |      price in a *bona fide* offer or if the Firefighters exercised its put right to

10 |      require Upper Deck to purchase the shares at then fair market value as

11 |      determined by appraisal." In support of this denial, Respondents

12 |    • answer that the "Shareholders Agreement" attached as Exhibit C to the

13 |      Policy of insurance appended to AISLIC's Complaint as Exhibit 1,

14 |      specifically Section 1 of the "Shareholders Agreement," captioned

15 |      "Restrictions Against Transfer" unambiguously permits "sales, transfers or

16 |      dispositions of" what paragraph 48 of AISLIC's Complaint characterizes

17 |      as "the non-voting shares" without "conformity with the provisions of

18 |      Section 2 (providing for a right of first refusal prior to transfer "to a bona

19 |      fide, good faith purchase"), Section 3 (captioned "Disposition of Non-

20 |      Voting Shares Upon Specified Events") or Section 5 (captioned "Put

21 |      Option and Right") of th[e] Agreement, or as otherwise expressly provided

22 |      in th[e] Agreement" whenever "Firefighters obtain the prior written

23 |      consent of the Company (Upper Deck) and the other Shareholder(s) of the

24 |      Company" (Richard P. McWilliam, as Trustee of the MPR Trust).

25 |    • Answer that the "Shareholders Agreement" does not speak at all to the

26 |      price to be paid for the non-voting shares acquired with "the prior written

27 |      consent of the Company and the other Shareholder(s)" as specifically

28 |      permitted by Section 1 of the "Shareholders Agreement."

Rutan & Tucker LLP
attorneys at law

EXHIBIT __J__, PAGE _176_

1    • answer that in the "Share Purchase Agreement" entered into as of
2       December 10, 2002 both Upper Deck and Richard P. McWilliam, as
3       Trustee of the MPR Trust "expressly waive[] the application of" the
4       Shareholder Agreement, including the "Restrictions Against Transfer" set
5       forth in Section 1 thereby consenting to Upper Deck's acquisition of the
6       non-voting shares from Austin Firefighters' Relief and Retirement Fund.

7    49.    In answer to the allegations of paragraph 49 of AISLIC's Complaint,
8  Respondents specifically deny "compel[ing] Firefighters to redeem its non-voting
9  common stock"

10   • either with the "assistance of KPMG" or otherwise
11   • or "at a price substantially below fair market value" or otherwise
12   • or "by misrepresenting that the $2 million purchase price was based on fair
13      market value" or otherwise
14   • or "by telling the Firefighters that 'th[e] real fair market value is what The
15      Upper Deck Company is willing to pay for it'" or otherwise
16   • or by "threatening that 'any delay or attempt to adjust the purchase price
17      may put the Austin Firefighters at significant risk'" or otherwise.

18   50.    In answer to the allegations of paragraph 50 of AISLIC's Complaint,
19  Respondents

20   • deny "compel[ing] a redemption of Firefighter stock," and
21   • deny "violat[ing] [any of] the requirements set forth in the Shareholders
22      Agreement" whether such "requirements set forth in the Shareholders
23      Agreement" were "referenced in the KPMG opinions" or not.

24   51.    In answer to the allegations of paragraph 51 of AISLIC's Complaint,
25  Respondents state they find the allegations to be vague, ambiguous and barely
26  comprehensible, if comprehensible at all; however, to the extent Respondents are
27  able to ascribe meaning to the allegations of paragraph 51 of AISLIC's Complaint,
28  Respondents deny each and every allegation of paragraph 51 in its entirety.

1       52.    In answer to the allegations of paragraph 52 of AISLIC's Complaint,

2   Respondents deny each and every allegation set forth therein in its entirety.

3       53.    In answer to the allegations of paragraph 53 of AISLIC's Complaint,

4   Respondents re-answer, re-allege and re-aver as set forth in paragraphs 1 through 52

5   above.

6       54.    In answer to the allegations of paragraph 54 of AISLIC's Complaint,

7   Respondents re-answer, re-allege and re-aver in the same manner they answered,

8   alleged and averred to the allegations of paragraphs 12 of the Complaint as set forth

9   in paragraph 12 above.

10      55.    In answer to the allegations of paragraph 55 of AISLIC's Complaint,

11  Respondents deny each and every allegation set forth therein and in support of such

12  denial

13      •   answer that the complete terms and conditions of the "Shareholders

14          Agreement" were set forth in Exhibit C to the Policy appended to

15          AISLIC's Complaint as Exhibit 1

16      •   answer that AISLIC in no way relied upon any characterizations of that

17          "Shareholders Agreement" by any of the "KPMG opinions" or the

18          Representation Letter; rather, AISLIC reviewed the "Shareholders

19          Agreement" for itself

20      •   answer that AISLIC could not reasonably rely upon characterizations of

21          the "Shareholders Agreement" by either the KPMG opinions or the

22          Representation Letter because AISLIC had the actual "Shareholder

23          Agreement" and AISLIC appended the "Shareholder Agreement" to the

24          Policy.

25      •   answer that the provisions of subparagraph (3) of paragraph 55 of

26          AISLIC's Complaint ("the transaction set forth in the opinions was a

27          lawful strategy that 'should' survive IRS scrutiny") was not a "fact,

28          assumption[] of fact, . . . [or] understanding[] of fact set forth in the

1  opinions of KPMG," but rather set forth the stated "opinion[] of KPMG,"

2  the risk of the incorrectness of which was willfully and deliberately

3  assumed by AISLIC and against which AISLIC indemnified Respondents.

4  • answer that the provisions set forth in subparagraph (1) of paragraph 55 of

5  AISLIC's Complaint inaccurately asserts that the "Shareholders

6  Agreement" set forth in Exhibit C to the Policy appended to AISLIC's

7  Complaint as Exhibit 1 required that the price paid by Upper Deck to

8  acquire the stock in Upper Deck previously owned by the Austin

9  Firefighers' Relief and Retirement Fund be "the fair market value of the

10  stock on the date . . [of] redemption" in all circumstances when in fact the

11  "Shareholders Agreement" attached as Exhibit C to the Policy of insurance

12  appended to AISLIC's Complaint as Exhibit 1, specifically Section 1 of

13  the "Shareholders Agreement," captioned "Restrictions Against Transfer"

14  unambiguously permits "sales, transfers or dispositions of" what paragraph

15  48 of AISLIC's Complaint characterizes as "the non-voting shares"

16  without "conformity with the provisions of Section 2 (providing for a right

17  of first refusal prior to transfer "to a bona fide, good faith purchase"),

18  Section 3 (captioned "Disposition of Non-Voting Shares Upon Specified

19  Events") or Section 5 (captioned "Put Option and Right") of th[e]

20  Agreement, or as otherwise expressly provided in th[e] Agreement"

21  whenever "Firefighters obtain the prior written consent of the Company

22  (Upper Deck) and the other Shareholder(s) of the Company" (Richard P.

23  McWilliam, as Trustee of the MPR Trust).  The "Shareholders

24  Agreement" does not speak at all to the price to be paid for the non-voting

25  shares acquired with "the prior written consent of the Company and the

26  other Shareholder(s)" as specifically permitted by Section 1 of the

27  "Shareholders Agreement."  And, in the "Share Purchase Agreement"

28  entered into as of December 10, 2002 both Upper Deck and Richard P.

1   McWilliam, as Trustee of the MPR Trust "expressly waive[] the

2   application of" the Shareholder Agreement, including the "Restrictions

3   Against Transfer" set forth in Section 1 thereby consenting to Upper

4   Deck's acquisition of the non-voting shares from Austin Firefighters'

5   Relief and Retirement Fund.

6   • answer that the provisions of subparagraph (2) ("neither Upper Deck nor

7      McWilliam had the power to compel Firefighters to present the stock it

8      owned for redemption") involve not a fact but rather a legal conclusion

9      pertaining to the effect of the written terms and conditions of the

10     "Shareholders Agreement" appended to the Policy as Exhibit C.

11   56.   In answer to the allegations of paragraph 56 of AISLIC's Complaint,

12   Respondents again admit that Upper Deck, the MPR Trust and the Austin

13   Firefighters' Relief and Retirement Fund entered into the written "Shareholders

14   Agreement" as of March 31, 2001 and further answer that the written terms and

15   conditions of the "Shareholders Agreement" speak for themselves.  Except as

16   specifically admitted herein Respondents deny each and every allegation set forth in

17   paragraph 56 of AISLIC's Complaint.  In particular, Respondents

18   • deny "eliminating the requirement of a fair market value put price,"

19   • deny the existence of a "fair market value put price" except in limited

20      circumstances which never occurred and which never became relevant and

21   • deny "breach[ing]" any "assumptions of fact contained in the KPMG

22      opinions", "key" or otherwise. Respondents further answer there is no

23      legal meaning in paragraph 56's use of the expression "breached key

24      assumptions of fact" nor does the Policy excuse AISLIC's performance of

25      its promises in the Policy in the event of any "breach[]" of any

26      "assumptions of fact contained in the KPMG opinions", "key" or

27      otherwise.  Rather, the Policy provides in Section 3. EXCLUSIONS that

28      AISLIC "shall not be liable to make any payment for Loss in connection

1   with a Claim made against any Insured: . . . [¶ ](b) arising out of, based

2   upon or attributable to any inaccuracy in the facts set forth or referenced in

3   the Representation Letter" dated September 4, 2001 attached to the Policy

4   as Exhibit B in which Upper Deck and the MPR Trust "represent[ed] and

5   warrant[ed] . . . [¶ ] 1.  [t]he facts, assumptions of fact, and understanding

6   of fact set forth in the opinions of KPMG attached as Exhibit A to the

7   Policy were true and correct on the date of such opinions [May 2, 2001]

8   and continue to be true and correct on the date hereof [September 4,

9   2001]."  There has been no "Loss . . . arising out of, based upon or

10   attributable to any inaccuracy in the facts set forth or referenced in the

11   Representation Letter."

12       57.     In answer to the allegations of paragraph 57 of AISLIC's Complaint,

13   Respondents

14   • deny ever "compel[ling] Firefighters to redeem its non-voting common

15     stock : . . in December of 2002" or at any other time,

16   • deny "compel[ling] Firefighters to redeem its non-voting common stock at

17     far below fair market value" or at any other value and

18   • deny "compel[ling] Firefighters to redeem its non-voting common stock"

19     in any other manner or at any time or at any price.

20   • admit the authenticity of the documents contained in Exhibit 2 of

21     AISLIC's Complaint and further answer that the written terms and

22     conditions of those documents speak for themselves.  And,

23   • except as specifically admitted herein, Respondents deny the allegations of

24     paragraph 57 of AISLIC's Complaint.

25       58.     In answer to the allegations of paragraph 58 of AISLIC's Complaint,

26   Respondents

27   • deny that the "Representation Letter" dated September 4, 2001 (executed

28     by The Upper Deck Company and Richard P. McWilliam as trustee of the

MPR Trust (but not individually)) attached as Exhibit B to the Policy appended as Exhibit 1 to AISLIC's Complaint omitted to disclose any "facts, assumptions of fact, and understandings of facts set forth in the opinions of KPMG" known to Respondents "on the date of such opinions [May 2, 2001]" or on September 1, 2001.

- deny that Respondents ever, by any act or omission, increased AISLIC's risk of Loss under the Policy beyond that risk which was knowingly and deliberately assumed by AISLIC upon issuance of the Policy.

- answer that if "(1) KPMG was engaged in a deceptive mass-marketing campaign to generate fees; [or] (2) KPMG did not act and had no intent to act as a truly independent professional in rendering its opinions [or] (3) KPMG had identified problems with the transaction which it failed to address or disclose in the KPMG opinions", then Respondents had no knowledge of (1), (2) and/or (3) and, Respondents are informed and believe and thereon allege, AISLIC did have knowledge of each of (1), (2) and (3) and AISLIC acted in complicity with KPMG.

59.    In answer to the allegations of paragraph 59 of AISLIC's Complaint, Respondents

- deny making any "misrepresentations" in what AISLIC characterizes as a "Representation and Warranty Letter" and what the Policy denominates the "Representation Letter" which "increased AISLIC's risk of loss under the Policy," materially or otherwise.

- deny or "omit[ing]" of facts known to Respondents from what AISLIC characterizes as a "Representation and Warranty Letter" and what the Policy denominates as the "Representation Letter" which facts "increased AISLIC's risk of loss under the Policy" either materially or otherwise.

- deny misleading AISLIC in any respect in connection with AISLIC's underwriting of the Policy.

1    • deny that any alleged "misrepresentations and omissions in the KPMG
2    opinions" by KPMG misled AISLIC in connection with AISLIC's
3    underwriting of the Policy and further answer that AISLIC underwrote the
4    Policy based on its own independent investigation of various taxing
5    authorities' anticipated treatment of the SC2 transactions.

6    60.    In answer to the allegations of paragraph 60 of AISLIC's Complaint,
7    Respondents

8    • deny breaching any warranty to AISLIC.
9    • deny that any breach of warranty by any Respondent to AISLIC could ever
10   suspend or excuse AISLIC's performance of its contractual obligations to
11   any Respondent under the Policy without AISLIC's affirmative proof that
12   a Loss otherwise insured under the Policy is excluded by application of
13   those provisions of Section 3. EXCLUSIONS which specify AISLIC
14   "shall not be liable to make any payment for Loss in Connection with a
15   Claim made against any Insured: . . . [¶ ](b) *arising out of, based upon or*
16   *attributable to* any material inaccuracy in the facts set forth or referenced
17   in the Representation Letter" (italics added).  To the extent the allegations
18   of COUNT II of AISLIC's Complaint (¶¶ 53-60), if proved, may ever
19   under any circumstances set forth a defense to a claim for Policy benefits
20   by any Respondent, COUNT II is redundant and extraneous surplus which
21   is unduly repetitious of COUNT III (¶¶ 61-63) pertaining to Exclusion (b).

22   61.    In answer to the allegations of paragraph 61 of AISLIC's Complaint,
23   Respondents re-answer, re-allege and re-aver in the same manner as they responded
24   to paragraphs 1 through 60 of AISLIC's Complaint in paragraphs 1 through 60
25   above.

26   62.    In answer to the allegations of paragraph 62 of AISLIC's Complaint,
27   Respondents admit the authenticity of the Policy of insurance attached to AISLIC's
28   Complaint as Exhibit 1 and further answer and affirmatively allege that the written

Rutan & Tucker LLP
attorneys at law

EXHIBIT J, PAGE 183

1 terms and conditions of the Policy, including exclusion (b) thereto, speak for

2 themselves.  Except as specifically admitted herein, Respondents deny the

3 allegations of paragraph 62 of AISLIC's Complaint.

4      63.    In answer to the allegations of paragraph 63 of the Complaint, which

5 purports to recount the matters "set forth above" in paragraphs 1 through 62 of

6 AISLIC's Complaint, Respondents again re-answer, re-allege and re-aver as set

7 forth in their responses to paragraphs 1 through 62 of AISLIC's Complaint as set

8 forth in paragraphs 1 through 62 above.  In further answer to the allegations of

9 paragraph 63 of AISLIC's Complaint, Respondents

10     • deny "compel[ling] Firefighters to redeem its non-voting common stock"

11       either "at far below fair market value" or otherwise.

12     • deny "materially . . . alter[ing] the transaction which had been represented

13       to AISLIC" either "materially" or otherwise.

14     • deny there had ever been a requirement of an "element of fair market

15       value" for the December 2002 transaction, either "critical" or otherwise..

16      64.    In answer to the allegations of paragraph 64 of AISLIC's Complaint,

17 Respondents re-answer, re-allege and re-aver to the allegations of paragraphs 1

18 through 63 of AISLIC's Complaint in the same manner as set forth in paragraphs 1

19 through 63 above.

20      65.    In answer to the allegations of paragraph 65 of AISLIC's Complaint,

21 Respondents admit the authenticity of the Policy of insurance attached to AISLIC's

22 Complaint as Exhibit 1 and further answer and affirmatively allege that the written

23 terms and conditions of the Policy, including exclusion (h) thereto speak for

24 themselves.  Except as specifically admitted herein, Respondents deny the

25 allegations of paragraph 65 of AISLIC's Complaint.

26      66.    In answer to the allegations of paragraph 66 of AISLIC's Complaint,

27 Respondents admit to Upper Decks', the MPR Trust's and Austin Firefighters'

28 Relief and Retirement Fund's execution of an agreement entitled "Shareholders

1    Agreement" dated as of December 10, 2002 and further answer that the written

2    terms and conditions of that "Shareholders Agreement", including clause 5.3

3    thereof, speak for themselves.

4        67.    In answer to the allegations of paragraph 67 of AISLIC's Complaint,

5    Respondents

6    • deny the allegation that the "termination of the Shareholders Agreement

7        [attached as Exhibit C to the Policy appended to AISLIC's Complaint as

8        Exhibit No. 1] is an amendment thereof" and further

9    • deny that any "termination of the Shareholders Agreement" attached as

10       Exhibit C to the Policy appended to AISLIC's Complaint as Exhibit No. 1

11       had any causal nexus with any Loss addressed by the Policy and further

12   • deny that "an[y] amendment" of the Shareholders Agreement attached as

13       Exhibit C to the Policy appended to AISLIC's Complaint as Exhibit No. 1

14       had any causal nexus with any loss addressed by the Policy and further

15   • answer that Section 8 of the "Shareholders Agreement" captioned

16       "Termination Of Agreement" provides that [t]he Agreement shall

17       terminate" by its **own terms** "on the occurrence of any of the following

18       events: . . . [¶ ]8.3 at such time as only one (1) Shareholder with the

19       Company remains."  Upon Upper Deck's acquisition of those shares in the

20       Upper Deck Company previously held by the Austin Firefighters Relief

21       and Retirement Fund in December of 2002 (with the "prior written consent

22       of the Company and the other Shareholder(s) of the Company"

23       contemplated by section 1 of the "Shareholders Agreement"), there was

24       "only one (1) Shareholder of the Company remain[ing]" and the

25       "Shareholder Agreement" terminated by its own terms.  This "termination

26       of the Shareholders Agreement" by its own terms was not "an amendment

27       thereof" and it did not and does not operate to exclude any Loss from

28       coverage under the Policy under exclusion (h) or otherwise.

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05          -30-     EXHIBIT  J , PAGE  185

1     68.   In answer to the allegations of paragraph 68 of AISLIC's Complaint,

2 Respondents re-answer, reallege and reaffirm their responses to the allegations of

3 paragraph 1 through 67 of AISLIC's Complaint as set forth in paragraphs 1 through

4 67 above.

5     69.   In answer to the allegations of paragraph 69 of AISLIC's Complaint,

6 Respondents again admit the authenticity of the Policy of insurance attached as

7 Exhibit 1 to AISLIC's Complaint and again further answer that the written terms

8 and conditions of the Policy of insurance including exclusion (a) thereof speak for

9 themselves.

10     70.   In answer to the allegations of paragraph 70 of AISLIC's Complaint,

11 Respondents

12    •  deny that "the transaction affected by Respondents in December 2002 was

13       not consistent with the transactions described in the KPMG opinions" and

14    •  answer that the transactions effectuated pursuant to the Share Purchase

15       Agreement dated December 10, 2002 were consistent in all material

16       respects with "the transaction described in the "KPMG opinion" and in

17       particular was perfectly consistent with the "Shareholder's Agreement"

18       attached as Exhibit C to the Policy appended to AISLIC Complaint as

19       Exhibit No. 1 and alluded to in the "KPMG opinions.

20    •  deny that "the exception to exclusion (a) [for 'effecting the transactions

21       described in the Opinions and the filing of Tax Returns with any Taxing

22       Authority by the Insureds consistent with the transactions described in the

23       Opinions'] does not apply" to any other Loss resulting from any

24       transactions which transpired in December 2002 and

25    •  deny that Loss (as that term is defined in the Policy) arose from, was based

26       upon or was attributable to any transaction transpiring in December of

27       2002.

28     71.   In answer to the allegations of paragraph 71 of AISLIC's Complaint

EXHIBIT _J_, PAGE 186

1    Respondents

2       • deny that "the taxes incurred by Respondents arose from the transaction in

3          December 2002."

4       • deny any causal connection whatsoever between any taxes incurred by any

5          Respondent and execution or consummation of the "Share Purchase

6          Agreement in December of 2002."

7       • answer that the three separate letters to Respondents from the IRS dated

8          April 7, 2005 reveal on their face that "[n]o adjustment will be made to the

9          S Corporation's [Upper Deck's] treatment of the redemption" of stock

10         from the Austin Firefighters' Relief and Retirement Fund which "are

11         capital expenditures and will not affect the shareholder's stock basis."

12      • deny any "deliberate acts of fraud" either of the nature alleged in

13         paragraph 71 of AISLIC's Complaint, or otherwise.

14        72.    In answer to the allegations of paragraph 72 of AISLIC's Complaint,

15   Respondents deny that exclusion (a) of the Policy or any other exclusions set forth

16   in the Policy apply to preclude coverage for losses sustained by any of Respondents.

17        73.    In answer to the allegations of paragraph 73 of AISLIC's Complaint,

18   Respondents admit that the Complaint appears to have accurately quoted one

19   provision of California Corporations Code  but demur that the provision cited and

20   quoted has no application to anything in dispute between AISLIC and any of the

21   Respondents, either in this arbitration proceeding or otherwise.

22        74.    In answer to the allegations of paragraph 74 of AISLIC's Complaint,

23   Respondents deny each and every allegation set forth therein and demur that the

24   allegations are irrelevant to AISLIC's obligations to Respondents under the Policy.

25        75.    In answer to the allegations of paragraph 75 of AISLIC's Complaint,

26   Respondents re-answer and reallege their response to paragraphs 1 through 74 of

27   AISLIC's Complaint as set forth in paragraphs 1 through 74 above.

28        76.    In answer to the allegations of paragraph 76 of AISLIC's Complaint,

Rubin & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

-32-    EXHIBIT  J  , PAGE  187

1  Respondents

2  • admit that the Policy imposes an obligation of good faith and fair dealing

3  on AISLIC but

4  • deny that any action by any Respondent altered any transaction presented

5  to AISLIC in the underwriting of the Policy either in a manner likely to

6  increase the likelihood of a tax authority challenging the transaction

7  • deny that any action by any Respondent after the inception date of the

8  Policy increased the likelihood of any a tax authority prevailing in the

9  event of its challenge of any transaction engaged in by Respondent and

10  relevant to AISLIC's obligations under the Policy

11  • deny any obligation under AISLIC's Policy (implied or express) to refrain

12  from taking any action actually  undertaken by any Respondent, including

13  the execution and consummation of the December 2002 "Share Purchase

14  Agreement."

15  77.    In answer to the allegations of paragraph 77 of AISLIC's Complaint,

16  Respondents

17  •  again admit the authenticity of the Policy attached to AISLIC's Complaint

18  as Exhibit No. 1 and answer that the written terms and conditions of the

19  Policy of insurance, including Article 10 thereof, speak for themselves.

20  • answer that any rights of subrogation may every be held by AISLIC under

21  the Policy of insurance by AISLIC are expressly conditioned on AISLIC

22  "mak[ing] . . . payment under [t]he [P]olicy in respect of [L]oss" and

23  answer further that AISLIC has made no such payment.

24  • deny that Respondents have in any manner impaired any conceivable right

25  of AISLIC to subrogation under the Policy.

26  78.    In answer to the allegations of paragraph 78 of AISLIC's Complaint,

27  Respondents

28  • deny in any manner "compelling firefighters to redeem its non-voting

1   stock" either by "entering into the 'Share Purchase Agreement'" or

2   otherwise, whether "at a price substantially below fair market value" or

3   otherwise.

4   • deny failing to observe any requirement actually set forth in any of the

5   KPMG opinions

6   • deny the existence of any requirement, whether set forth in the KPMG

7   opinions or otherwise, that the non-voting stock be redeemed at a purchase

8   price not substantially above or below fair market value of the stock.

9   • answer that the Share Purchase Agreement entered into on December 10,

10  2002 was consistent with the "Shareholder's Agreement" attached as

11  Exhibit C to the Policy of insurance appended to AISLIC's Complaint as

12  Exhibit C.

13  79.    In answer to the allegations of paragraph 79 of AISLIC's Complaint,

14  Respondents

15  • answer that "the transaction" spoken of in paragraph no. 79 is not

16  identified in a manner sufficient to allow Respondents to identify "the

17  transaction."  Because of Respondents inability to completely make sense

18  of the allegations of paragraph 79 of AISLIC's Complaint, Respondents

19  deny the allegations of paragraph 79 in their entirety.

20  • deny that any action by any Respondent after the inception date of the

21  Policy on August 29, 2001 increased the likelihood of any indemnifiable

22  Loss under the Policy in any manner.

23  80.    In answer to the allegations of paragraph 80 of AISLIC's Complaint,

24  Respondents deny each and every allegation set forth therein.

25  81.    In answer to the allegations of paragraph 81 of AISLIC's Complaint,

26  Respondents re-answer and reallege their responses to the allegation of paragraphs 1

27  through 80 of AISLIC's Complaint as set forth in paragraphs 1 through 80 above.

28  82.    In answer to the allegations of paragraph 82 of AISLIC's Complaint,

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

-34-

EXHIBIT __J__, PAGE _189_

1   Respondents

2        • admit the authenticity of the Policy of insurance attached to AISLIC's

3           Complaint as Exhibit No. 1.

4        • answer that the written terms and conditions of the Policy, including

5           section 9(b) thereof, speak for themselves.

6        • deny the allegations of paragraph 82 of AISLIC's Complaint except as

7           specifically admitted herein.

8        83.    In answer to the allegations of paragraph 83 of AISLIC's Complaint,

9   Respondents

10       • again admit the authenticity of the "KPMG opinions" attached as Exhibit

11          A to the Policy of insurance appended to AISLIC's Complaint as Exhibit

12          No. 1.

13       • again answer further that the written terms and conditions of "KPMG

14          opinions" speak for themselves.

15       • deny that any of the "KPMG opinions" state an "anticipat[ion] that 'the

16          Shareholder [McWilliam (sic)] will be entitled to a charitable deduction

17          for the fair market value of the stock the Shareholder donated" and in

18          support of this denial

19       • answer further that the May 2, 2001 "KPMG Opinion" regarding

20          "Charitable contribution to Austin Firefighters Relief and Retirement

21          Fund, after reciting "you have requested the opinion of KPMG LLP . . . as

22          to certain Federal income, California State income and Federal gift tax

23          consequences to you and The Upper Deck Company . . . with respect to

24          the charitable contribution" (p. 1) concludes:  **It is more likely than not**

25          **that** the Shareholder will be entitled to a charitable deduction for the fair

26          market value of the stock the Shareholder donated."  (p. 4, ¶ 5;

27          underscoring in original; emphasis added.)  This "KPMG Opinion"

28          elaborates on explicit limitations on the potential tax benefits of such a

1    deduction recognizing that in some circumstances there may be no tax

2    benefit.  These statements make the possibility that a prospective

3    charitable deduction may turn out to have no tax advantages for the

4    Shareholder.

5    •  answer that,  in contrast, the May 2, 2001 "KPMG Opinion" regarding

6    "Taxable income allocation of Upper Deck Company" recites "[y]ou have

7    requested the opinion of KPMG LLP . . . as to how the taxable income of

8    The Upper Deck Company . . . should be allocated to you for Federal and

9    California State income tax purposes" (p. 1), concludes "it is more likely

10    than not that for Federal and California State income tax purposes, the

11    post-March 31, 2001 items of income, gain, loss, deduction, or credit of

12    Upper Deck will be Allocated" 10% to the holders of voting common

13    stock and 90% to holders of non-voting common stock" (p. 2), and advised

14    that after 03/03`/01 "income should be allocated" 10% to Mr. Richard

15    McWilliam and 90% to the Municipal Plan (p. 5).

16    84.    In answer to the allegations of paragraph 84 of AISLIC's Complaint,

17 Respondents

18    •  deny that any condition precedent, whether explicit or implied, to

19    Respondents' right to indemnification under the Policy has not or cannot

20    be met.

21    •  deny that Respondent McWilliam's assertion of a right to a charitable

22    deduction for the shares of the non-voting common stock that he donated

23    to the Austin Firefighters' Relief and Retirement Fund was or is a

24    condition precedent to any Respondent's assertion of rights to

25    indemnification under the Policy of insurance.

26    •  admit that Mr. McWilliam did not claim a charitable deduction on his

27    2001 income tax return for the value of non-voting shares of stock donated

28    to Austin Firefighters' Relief and Retirement Fund in 2001 deny that this

Rutan & Tucker LLP
attorneys at law

1    circumstance was causally related in any way to any "Insured Tax Event",

2    to any "Insured Tax Loss", or to any "Loss" as those terms are defined in

3    the Policy.

4    • demur to the relevance of any of the matters alleged in paragraph 84.

5    85.    In answer to the allegations of paragraph 85 of AISLIC's Complaint,

6 Respondents re-answer and reallege their responses to allegations of paragraph 1

7 through 84 of AISLIC's Complaint as set forth in paragraphs 1 through 84 above.

8    86.    In answer to the allegations of paragraph 86 of AISLIC's Complaint,

9 Respondents

10    • again admit the authenticity of the Policy of insurance attached to

11       AISLIC's complaint as Exhibit 1 and

12    • again answer that the written terms and conditions of the Policy, including

13       section 16 thereof, speak for themselves.

14    • deny the allegations of paragraph 86 of AISLIC's complaint except as

15       specifically admitted herein.

16    87.    In answer to the allegations of paragraph 87 of AISLIC's Complaint,

17 Respondents

18    • again admit the authenticity of the Policy of insurance attached to

19       AISLIC's complaint as Exhibit 1 and

20    • again answer that the written terms and conditions of the Policy, including

21       section 16 thereof, speak for themselves.

22    • deny the allegations of paragraph 87 of AISLIC's complaint except as

23       specifically admitted herein.

24    88.    In answer to the allegations of paragraph 88 of AISLIC's Complaint,

25 Respondents

26    • again admit the authenticity of the policy of insurance appended to

27       AISLIC's Complaint as Exhibit 1 and again answer and allege that the

28       written terms and conditions of the Policy speak for themselves.

- deny the enforceability of any provisions that may be in the Policy restricting Respondents' ability to recover damages in excess of the Policy's limits of liability.

- except as specifically admitted herein, Respondents deny each and every allegation of paragraph 88 of AISLIC's Complaint.

## SEPARATE DEFENSES

### First Separate Defense

### (Failure to Comply with AAA Rule R-4,

### Initiation under an Arbitration Provision in a Contract)

89.    As a separate defense to AISLIC's Arbitration Complaint and Demand for Arbitration et al., Respondents answer that AISLIC's response of "N/A" to the Commercial Arbitration Rules Demand for Arbitration forms inquiry regarding "dollar amount of claim" was willfully false and that the amount of AISLIC's claim is in fact not less than Fifty Million Dollars ($50,000,000) and that AISLIC's representation that the amount of its filing fee is limited to $3,250 was willfully false.  As revealed in AISLIC's Complaint's annexation of Upper Deck's complaint in case of *Upper Deck Company et al v. American International Specialty Lines Insurance Company*, United States District Court for the Southern District of California Case No. 05 CV 1945 IEG (RBB) which is appended to AISLIC's Complaint As Exhibit 3 ("Upper Deck's Federal Court Complaint"), AISLIC's Complaint is a monetary claim in an amount in excess of $50,000,000.  AISLIC should not be permitted to proceed with its demand for arbitration unless and until, at a minimum, AISLIC has paid the case service fee of $6,000, the base fee of $12,500 and 0.01% of the amount of AISLIC's $50,000,000 claim in excess of $10,000,000.

### Second Separate Defense

### (Demand for Arbitration and Arbitration Complaint Barred by Exhibit 3 Thereto)

90.    As a separate defense to AISLIC's Demand for Arbitration and

1  Arbitration Complaint, Respondents assert and incorporate the allegations of their

2  complaint in case of *Upper Deck Company et al v. American International Specialty*

3  *Lines Insurance Company*, United States District Court for the Southern District of

4  California Case No. 05 CV 1945 IEG (RBB) which is appended to AISLIC's

5  Complaint As Exhibit 3 ("Upper Deck's Federal Court Complaint").

6       91.    Respondents further allege that AISLIC has filed and served a motion,

7  currently scheduled for hearing in the case of complaint in case of *Upper Deck*

8  *Company et al v. American International Specialty Insurance Company*,

9  United States District Court for the Southern District of California Case No. 05 CV

10  1945 IEG (RBB) on January 3, 2006 asking for an order compelling arbitration of

11  matters asserted in "Upper Deck's Federal Court Complaint." At a minimum, any

12  arbitration of this matter must await resolution of that motion.

13                    **Third Separate Defense**

14          **(Unconscionability of Arbitration Provisions)**

15       92.    As a separate defense to AISLIC's Demand for Arbitration and the

16  allegations of AISLIC's Arbitration Complaint, Respondents allege that AISLIC

17  contends the following portion of Section 16. ARBITRATION AND CHOICE OF

18  LAW of the Policy

19             "No award of the arbitrators or judgment of any court with respect to

20             any award, dispute or controversy shall be entered in an amount

21             exceeding the applicable Limit of Liability set forth in the Policy. The

22             Insurer shall have no obligation to pay or reimburse any Insured's legal

23             expenses incurred in mediating or arbitrating a claim or dispute under

24             this Policy, except to the extent specified in the arbitrator(s) award, in

25             which event such legal expenses will be included in the Loss payable

26             by the Insurer in accordance with, and subject to the Retention, Limit

27             of Liability and other terms, conditions and exclusions of, this Policy."

28  (the "Limitation Clause") operates either independently or in conjunction with that

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05                    -39-            EXHIBIT ___J___, PAGE _194_

1   portion of Section 16. ARBITRATION AND CHOICE OF LAW which provides:

2          "The arbitration shall be subject to the Federal Arbitration Act and, to

3          the extent such Act is not applicable, the laws of the State of New

4          York.  The construction validity and performance of this Policy shall

5          be governed by the laws of the State of New York, provided, however,

6          that the Policy shall be construed in the manner most consistent with

7          the relevant terms, conditions, provisions or exclusions of the Policy,

8          without regard to the authorship of the language and without any

9          presumption in favor of either party."

10  ("The "New York Law Clause") to effectively prohibit any arbitrators from

11  awarding punitive damages or other extra contractual damages to the Insureds in

12  this case if the Insureds' "Insured Tax Loss" already exceeds $50,000,000.  As so

13  interpreted by AISLIC, the Limitation Clause and the New York Law Clause are

14  both unconscionable and unenforceable and to the extent the Limitation Clause and

15  New York Law Clause are not severable from Section 16 of the Policy the entirety

16  of Section 16 of the Policy is unconscionable and unenforceable and this matter is

17  not subject to arbitration.

**Fourth Separate Defense**

**(Unclean Hands)**

20      93.   As a separate defense to AISLIC's Demand for Arbitration and

21  Arbitration Complaint, Respondents answer and allege that AISLIC's Demand for

22  Arbitration and AISLIC's Arbitration Complaint are barred by AISLIC's own

23  unclean hands in that, among other things, if the allegations in ¶¶ 30-36, 55(3) and

24  58 of AISLIC's Arbitration Complaint are in any manner correct, AISLIC was

25  complicity with KPMG and acted with unclean hands.

**Fifth Separate Defense**

**(Illegality of Arbitration Provisions)**

28      94.   As a separate defense to AISLIC's Demand for Arbitration and

EXHIBIT $\underline{J}$, PAGE $\underline{195}$

1  Arbitration Complaint, Respondents allege the Limitation Clause in Section 16 of

2  the Policy is illegal, and unenforceable, under both New York and California law

3  and that to the extent the Limitation Clause is not or cannot be severed from Section

4  16, Section 16 itself is illegal and unenforceable.  Respondents allege, on

5  information and belief, that AISLIC contends that the Limitation Clause is not an

6  cannot be severed from Section 16.  Consequently, Section 16 is illegal and

7  unenforceable and this matter is not subject to arbitration.

8

9  **RESERVATION OF RIGHT TO COUNTER CLAIM AGAINST CLAIMANT**

10  **AND COUNTERCLAIMANT RESPONDENT AMERICAN**

11  **INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY**

12  Consistent with Rules 4  and 6 of AAA's Commercial Arbitration Rules

13  (Initiation under an Arbitration Provision in a Contract and Changes of Claim) the

14  Upper Deck Company, a California corporation, and Richard P. McWilliam,

15  individually and as trustee of the MPR Trust reserve the right to assert a

16  counterclaim against AISLIC of the same nature and type as asserted in Upper

17  Deck's Federal Court Complaint.  Respondents reserve the right to assert such a

18  counterclaim unilaterally at any time prior to appointment of arbitrators in

19  connection with this matter and reserve the right to assert such a counterclaim, with

20  the consent of the arbitrators, at any time after appointment of the arbitrators and

21  reserve the right to assert a counterclaim at any other time permitted by law.

22  WHEREFORE, Insureds pray for an award and ultimately judgment in their

23  favor and against AISLIC, and each of them, as follows:

24  1.     For a declaration that AISLIC is not entitled to demand arbitration of

25  the matters set forth in its arbitration demand and arbitration complaint and for

26  dismissal of AISLIC's demand for arbitration.

27  2.     Alternatively, Respondents pray for an arbitration award in favor of

28  Respondents and against AISLIC declaring

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05

-41-

EXHIBIT  5 , PAGE 196

1        a.      Respondents are entitled to recover from AISLIC the amount of

2   compensatory damages, both special and general, proved by Respondents at hearing

3   or trial;

4        b.      Respondents are entitled to recover from AISLIC in the amount

5   of exemplary damages proved by Respondents at hearing or trial;

6        c.      Respondents are entitled to recover from AISLIC those

7   attorneys' fees and costs incurred by Respondents in this matter, if and to the extent

8   provided for by applicable law, ;

9        d.      Respondents are entitled to recover from AISLIC prejudgment

10  interest on all awards in favor of Respondents in the maximum amount allowed by

11  law from the date such damages became due; and

12      3.      And in any event, for such further relief as the arbitration panel in its

13  discretion deems just and appropriate.

14  Dated:  December 7, 2005              RUTAN & TUCKER, LLP

15                                       By: _____

16                                          Duke F. Wahlquist
                                            Attorneys for Insureds and Petitioners
17                                          The Upper Deck Company and Richard P.
                                            McWilliam

18

19

20

21

22

23

24

25

26

27

28

Rutan & Tucker LLP
attorneys at law

373/017994-0023
660976.03 a12/07/05                      -42-

EXHIBIT __J__, PAGE _197_

**PROOF OF SERVICE BY MAIL**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed by the law office of Rutan & Tucker, LLP in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 611 Anton Boulevard, Fourteenth Floor, Costa Mesa, California 92626-1931.

On December 7, 2005, I served on the interested parties in said action the within:

**RESPONDENTS THE UPPER DECK COMPANY'S AND RICHARD P. MCWILLIAM'S, INDIVIDUALLY AND AS TRUSTEE FOR THE MPR TRUST, ANSWER TO THE ARBITRATION COMPLAINT OF AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY; DEMAND FOR THREE ARBITRATORS**

by placing a true copy thereof in sealed envelope(s) addressed as stated below:

Robert E. Cushner, Esq.
Peter A. Stroili, Esq.
Dimato & Lynch
70 Pine Street
New York, NY 10270-0110

In the course of my employment with Rutan & Tucker, LLP, I have, through first-hand personal observation, become readily familiar with Rutan & Tucker, LLP's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice I deposited such envelope(s) in an out-box for collection by other personnel of Rutan & Tucker, LLP, and for ultimate posting and placement with the U.S. Postal Service on that same day in the ordinary course of business. If the customary business practices of Rutan & Tucker, LLP with regard to collection and processing of correspondence and mailing were followed, and I am confident that they were, such envelope(s) were posted and placed in the United States mail at Costa Mesa, California, that same date. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on December 7, 2005, at Costa Mesa, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| Michelle Mann | _Michelle Mann_ |
| :---: | :---: |
| (Type or print name) | (Signature) |

2171/017994-0023
665682.01 a12/07/05

EXHIBIT __J__, PAGE __198__

# EXHIBIT K

1 | Richard K. Howell (State Bar No. 144241)
Duke F. Wahlquist (State Bar No. 117722)
2 | Bradley A. Chapin (State Bar No. 232885)
RUTAN & TUCKER, LLP
3 | 611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
4 | Telephone: 714-641-5100
Facsimile: 714-546-9035
5 | Email: rhowell@rutan.com

6 | Attorneys for Respondents and Counterclaimants
The Upper Deck Company and Richard P.
7 | McWilliam, individually and as Trustee for the
MPR Trust

8

9 | AMERICAN ARBITRATION ASSOCIATION

10

11 | AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
12 | COMPANY and DOES 1 through 10,
inclusive,
13
| Claimant,
14
| v.
15
| THE UPPER DECK COMPANY, a
16 | California corporation, and
RICHARD P. MCWILLIAM,
17 | individually, and as Trustee for the MPR
Trust,
18
| Respondents.
19
| THE UPPER DECK COMPANY, a
20 | California corporation, MPR TRUST, a
revocable trust, and
21 | RICHARD P. MCWILLIAM,
individually, and as Trustee for the MPR
22 | Trust,
23
| Counter-Claimant,
24
| v.
25 | AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
26 | COMPANY and ROES 1 through 10,
inclusive,
27
| Counter-Respondents.
28

**THE UPPER DECK COMPANY'S, MPR TRUST'S, AND RICHARD P. MCWILLIAM'S, INDIVIDUALLY AND AS TRUSTEE FOR THE MPR TRUST, COUNTERCLAIM AGAINST AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY**

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
672453.02 a01/05/06

-1-

EXHIBIT __K__, PAGE __199__

1        The Upper Deck Company, a California corporation, MPR Trust, a revocable

2   trust, and Richard P. McWilliam, individually and as trustee of the MPR Trust, for

3   their counterclaim complaint against defendant American International Specialty

4   Lines Insurance Company allege and pray as follows:

5       1.    Counterclaim Plaintiff The Upper Deck Company ("Upper Deck") is a

6   California corporation duly organized and in good standing under the laws of the

7   State of California.  Upper Deck's principal place of business is now, and at all

8   times relevant hereto was, in the City of Carlsbad, California.

9       2.    As of the filing of this Counterclaim, the MPR Trust is the sole

10  shareholder of Upper Deck.

11      3.    Plaintiff Richard P. McWilliam is an individual residing in the State of

12  Nevada.

13      4.    Richard P. McWilliam also serves as trustee of plaintiff MPR Trust

14  ("Trustee").  Upper Deck, MPR Trust, and Richard P. McWilliam, individually and

15  as Trustee, are hereinafter referred to collectively as "Insureds."

16      5.    Insureds are informed and believe and based thereon allege that

17  defendant American International Specialty Lines Insurance Company ("AISLIC")

18  is now, and at all times relevant hereto was, an Alaska corporation authorized to

19  underwrite insurance in the State of California as a surplus lines insurer with its

20  principal place of business in New York, New York.  However, Insureds are

21  informed and believe and based thereon allege that AISLIC is not authorized to

22  conduct the business of insurance in the State of New York and is not subject to the

23  supervision of insurance regulators in the State of New York.

24      6.    In or about October 2001, for good and valuable consideration

25  including the payment of $3,250,000 in premiums by the Insureds (hereinafter

26  sometimes also referred to collectively as "Counterclaimants"), AISLIC issued its

27  Fiscal Event Insurance Policy no. 405-88-33 to the Insureds (the "Policy").  AISLIC

28  represented to Insureds and Insureds believed that AISLIC had designed the Policy

1   to insure against risks that federal and state taxing authorities would challenge the

2   tax benefits claimed by the Insureds to inure to the Insureds' benefit as the result of

3   the Insureds' implementation of a tax strategy designed by KPMG, LLP ("KPMG")

4   and referred to as "SC$^2$."  Insureds had implemented KPMG's SC$^2$ tax strategy in a

5   related series of transactions which had taken place earlier in the calendar year 2001.

6       7.      The Policy contains an insuring agreement which is set forth in Section

7   1, INSURING AGREEMENT.  The provisions of that insuring agreement are

8   quoted below; the quoted text has associated endnotes which include the Policy's

9   definition of selected terms used in the insuring agreement; this convention is used

10  hereinafter in other quotations of the Policy's language.  The insuring agreement

11  provides:

12          The Insurer [American International Specialty Lines
        Insurance Company] shall pay, subject to the applicable
13      Retention (as defined herein)[i] and other terms and
        conditions of this Policy[ii]; the Loss of the Insureds[iii]
14      arising from a Claim first made against any Insured during
        the Policy Period [August 29, 2001 to at least November
15      30, 2006][iv] and reported to the Insurer pursuant to the
        terms of this Policy.  The Insurer shall, in accordance with
16      and subject to Clause 7 hereof, advance Contest Expenses
        of such Claim excess of the Retention prior to its Final
17      Determination.

18      8.      In a portion of the Policy captioned Section 8. PROCEDURE FOR

19  TIME OF PAYMENT, AISLIC promised that:  "Payment of Loss required

20  hereunder  shall be made to the Named Insured [Upper Deck Company] at the

21  address set forth in Item 1(a) of the Declarations [5909 Sea Otter Place, Carlsbad,

22  CA 92008-6621]."  AISLIC was, therefore, to perform its obligations under the

23  Policy in this judicial district.

24      9.      The insured "Loss" defined in the Policy at Section 2. DEFINITIONS

25  ¶ (1)[v] is comprised of three constituent parts, each of which is also defined in

26  Section 2. DEFINITIONS ¶¶ (j), (d) & (f) of the Policy respectively as:  (1) "Insured

27  Tax Loss"[vi]; (2) "Contest Expenses"[vii]; and (3) "Gross-Ups."[viii]

28      10.     The Policy's definitions of two of the constituent parts of "Loss,"

1  "Insured Tax Loss" and "Contest Expenses," both make reference to an "Insured

2  Tax Event," the definition of which is set forth in Endorsement No. 1 of the Policy

3  and relevant portions of which are quoted below:

4           'Insured Tax Event' means an assertion, at any time
         during the Policy Period, by a Taxing Authority that with
5         respect to the tax years 2001 through 2005, (a) as a result
         of any action taken by the Named Insured or Additional
6         Insureds prior to the Inception Date [August 29, 2001],[ix]
         The Upper Deck Company, a California corporation
7         ("Upper Deck") has more than one class of stock for
         purposes of Section 1361 of the Code[x], . . . (c) deductions
8         for charitable contributions are not allowable to the pre-
         gift shareholder of Upper Deck in the year of gift in an
9         amount equal to the fair market value, reduced by any
         adjustments pursuant to Section 170(e)(1) of the Code, of
10        such shareholder's gift of non-voting stock to the
         Municipal Plan, (d) the post-gift allocations of Upper
11        Deck's taxable income to the Municipal Plan are not
         correct or proper; . . ., (e) as a result of the gift of the
12        Upper Deck non-voting common stock to the Municipal
         Plan by the pre-gift shareholder, any Upper Deck
13        shareholder or Upper Deck, itself, assigned income to the
         Municipal Plan, . . . . For purposes of this definition, the
14        term 'pre-gift shareholder' shall mean the MPR Trust; the
         term' gift' shall mean the gift of 8,280,000 shares of non-
15        voting stock of Upper Deck made by the pre-gift
         shareholder to the Municipal Plan on March 31, 2001; and
16        the total number of shares of Upper Deck voting and non-
         voting common stock outstanding shall not include shares
17        of stock of Upper Deck that may be acquired pursuant to
         the Warrant Agreement attached as Exhibit D to this
18        Policy ("Warrant Shares") unless and until any such
         Warrant Shares are purchased and paid for pursuant to
19        such Warrant Agreement. . . .

20        11.    On April 9, 2002, the IRS summoned KPMG to reveal the identity of

21  its clients, including the Insureds, utilizing various tax strategies which had been

22  promoted by KPMG, including the tax strategy referred to as "SC[2]."  KPMG

23  notified Upper Deck of this on April 9 or 10, 2003, and Upper Deck in turn

24  promptly notified AISLIC no later than April 10, 2003.

25        12.    Thereafter, the IRS published a list of those transactions it was going to

26  investigate -- Notice 2004-30 -- and Upper Deck and its voting shareholders

27  subsequently received various Information Document Requests from the IRS.  The

28  IRS (a "Taxing Authority"[xi] as defined in the Policy) published Notice 2004-30 as

1  Internal Revenue Bulletin 2004-17 on April 26, 2004 (during the "Policy Period").

2  Notice 2004-30 addresses and describes an "S Corporation Tax Shelter" which is the

3  $SC^2$ tax strategy.

4      13.    Notice 2004-30 is also the subject of a Coordinated Issue Paper ("CIP")

5  issued by the IRS on November 8, 2004 (during the "Policy Period") "discuss[ing]

6  the grounds for taxing the proper taxpayers on the income from the corporation's

7  business and disallowing deductions the taxpayers improperly claim as a result of

8  participating in Notice 2004-30 transactions."

9      14.    The Policy's definition of "Insured Tax Event" provides that an

10  "'Insured Tax Event' includes:  an assertion, at any time during the Policy Period,

11  by a Taxing Authority that with respect to the tax years 2001 through 2005, (a) as a

12  result of any action taken by the Named Insured or the Additional Insureds prior to

13  the Inception Date [August 29, 2003], The Upper Deck Company, a California

14  corporation ('Upper Deck') has <u>more than one class of stock</u> for purposes of

15  Section 1361 of the Code.'"  (Emphasis added.)  Such an assertion was made in

16  Notice 2004-30 which stated that "the Service may also argue that the existence of

17  . . . [certain] warrants [issued by Upper Deck on March 29, 2001 – before the

18  Inception Date] result[ed] in a <u>violation of the single class of stock requirements</u> of

19  § 1361(b)(1)(D), thus terminating the corporation's status as an S corporation. See,

20  e.g., §§ 1.1361-1(l)(4)(ii) and (iii)."  (Emphasis added.)  The IRS' assertion in this

21  regard was published in I.R.B. 2004-17 on April 26, 2004 during the Policy Period.

22      15.    The IRS' Coordinated Issue Paper, issued November 8, 2004, further

23  explains the grounds for the IRS' assertion:  "[T]he capital structure created in the

24  Notice 2004-30 transaction <u>violates the single class of stock requirement</u> of

25  § 1361(b)(1)(D) of the Internal Revenue Code and § 1.1361-1(l) of the Income Tax

26  Regulations.  The S corporation election will terminate on the <u>date the second class</u>

27  <u>of stock is issued</u> and the corporation will be treated as a C corporation.  Thus, the

28  income will not be allocated to the shareholders and the income will be taxable to

1  the C corporation." (CIP, pp. 1-2, 6.) (Emphasis added.)  The Coordinated Issue

2  Paper states several points in support of this conclusion:

> - [A] corporation is treated as having only <u>one class of</u>
>   <u>stock</u> if all of its outstanding shares confer identical
>   rights to distributions and liquidation proceeds
>   § 1.1361-1(l)(1). Section 1.1361-1(l)(4)(iii)(A)
>   provides, in part, that a call option, warrant or similar
>   instrument issued by a corporation is treated as a
>   <u>second class of stock</u> of the corporation if, taking into
>   account all of the facts and circumstances, the
>   instrument is substantially certain to be exercised by
>   the holder and has a strike price substantially below the
>   fair market value of the underlying stock on the date
>   that the instrument is issued.
>
> - The warrants in these transactions are a second class of
>   stock.

11  (CIP, p. 7.) (Emphasis added.)

12          16.    With respect to all of its assertions (others being discussed below),

13  Notice 2004-30 states the Internal Revenue "Service and the Treasury Department

14  recognize that some taxpayers may have filed tax returns taking the position they

15  were entitled to the purported tax benefits of the type of transaction described in this

16  notice.  Those taxpayers should take appropriate corrective action and ensure that

17  their transactions are disclosed properly."  Notice 2004-30 also "alerts taxpayers and

18  their representatives that these transactions are tax avoidance transactions."

19  Notice 2004-30 provides the "Service intends to challenge the purported tax benefits

20  from this transaction."

21          17.    Following publication of Notice 2004-30 on April 16, 2004, on

22  August 5, 2004 (again during the "Policy Period"), correspondence from the

23  Department of the Treasury, the Internal Revenue Service (a "Taxing Authority")

24  addressed to the Upper Deck Company and its counsel transmitted "three IDR

25  Forms 4564, numbered S608B2, S608C, S701A" (the "August 2004 IDRs").  One

26  of the August 2004 IDRs, request S608B2, specified that the "Internal Revenue

27  Service has identified certain transactions as 'listed transactions' for the purposes of

28  § 1.601104(b)(2) of the Income Tax Regulations.  The IRS considers transactions

1    that are the same as or substantially similar to listed transactions to be tax avoidance

2    transactions."

3        18.    Among the "listed transactions" identified in IDR No. S608B2 were

4    those described in "Notice 2004-30, 2004-17 I.R.B. -- S Corporation Tax Shelter"

5    which are discussed above. Request S608B2 identifies its purpose as "to determine

6    whether The Upper Deck Company has directly or indirectly participated in

7    transactions that are the same as or substantially similar to any listed transaction,"

8    including Notice 2004-30. In correspondence dated August 6, 2004, addressed to

9    counsel for The Upper Deck Company, stating it pertained to "examination of

10    Upper Deck Co., Notice 2004-30 transactions," the Department of the Treasury,

11    Internal Revenue Service advised that the IRS "ha[d] begun an examination of the

12    tax returns indicated above [returns of Upper Deck Co.] with respect to transactions

13    described in Notice 2004-30[.] . . . See Notice 2004-30 for the government's

14    position. The aforementioned examination is proceeding and must still be

15    concluded." This August 2004 assertion by the IRS matches the definition of an

16    "Insured Tax Event" set forth in Endorsement No. 1, ¶ (a).

17        19.    The IRS has therefore made multiple assertions that the warrants issued

18    by Upper Deck Company on March 29, 2001 were a second class of stock and these

19    assertions are an "Insured Tax Event."

20        20.    The Policy also provides "'Insured Tax Event' means: an assertion, at

21    any time during the Policy Period, by a Taxing Authority that with respect to the tax

22    years 2001 through 2005, . . . (c) deductions for charitable contributions are not

23    allowed to the pre-gift shareholder of Upper Deck in the year of gift in an amount

24    equal to the fair market value, reduced by any adjustments pursuant to

25    Section 170(e)(1) of the Code, of such shareholder's gift of non-voting stock to the

26    Municipal Plan." The IRS made such an assertion in Notice 2004-30 which

27    describes a transaction in which "the original shareholders donate the non-voting

28    stock to the exempt party . . . . The original shareholders might also claim a

1  charitable contribution deduction under Section 170 for the donation of the non-
2  voting stock to the exempt party." Notice 2004-30 further asserts: "The Service
3  intends to challenge the purported tax benefits from this transaction . . . ." The IRS'
4  Coordinated Issue Paper regarding Notice 2004-30 amplifies this assertion stating
5  "the transfer of nonvoting stock to the exempt party does not qualify as a deductible
6  charitable contribution pursuant to § 170 and should be disallowed." (CIP, p. 2.)
7  The IRS explained that "to be a charitable contribution under § 170, a transfer to a
8  charitable organization must be a gift. . . . In a Notice 2004-30 transaction, the
9  nonvoting stock was not transferred to the exempt party with charitable intent.
10 [Rather], [t]he parties to the transaction entered into the transaction to generate a tax
11 benefit to the original shareholders, not to benefit the exempt party. . . . [T]he
12 amount received by the exempt party was an accommodation fee, not a charitable
13 gift." (CIP, pp. 8-9.) A "charitable contribution deduction taken on the transfer of
14 the nonvoting stock to the exempt party should be disallowed." (CIP, p. 9.) The
15 Notice 2004-30's assertion by the IRS that there could be no valid charitable
16 contribution by Richard McWilliam was another "Insured Tax Event."[1]

17        21.    Similarly, the August 2004 IDRs reiterate the IRS Notice 2004-30's
18 assertions that deductions for the shareholder gift of Upper Deck stocks to the
19 Municipal Plan should be disallowed.

20        22.    Thereafter, in the April 7, 2005 correspondence ("April 7, 2005
21 Correspondence"), the Department of the Treasury, Internal Revenue Service (again,
22 a "Taxing Authority") informed all three Insureds that the IRS had "evaluated the
23 issues present in the transaction described in Notice 2004-30" and "propose[d] to
24 resolve issues related to the S corporation charitable contribution transactions,
25 including related penalties" by:

26                3.     The transfer of non-voting stock to the tax

27 ───────────────────────
   [1]  Mr. McWilliam never claimed such a charitable deduction on his 2001 tax return
28 because due to other factors associated with his return there would have been no tax
   benefit for his doing so.

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
672453.02 a01/05/06

-8-

EXHIBIT _K_, PAGE 206

> exempt party does not qualify as a charitable contribution under IRC section 170 and no charitable contribution deduction will be allowed.

This is another "Insured Tax Event" under Section 2. DEFINITIONS ¶ (c) of the Policy.

23.   The Policy's definition of "'Insured Tax Event' [also provides that that term] means:  an assertion, at any time during the Policy Period, by a Taxing Authority that with respect to the tax years 2001 through 2005, . . . (d) the post-gift allocations of Upper Deck's taxable income to the Municipal Plan are not correct or proper; . . . ."  Notice 2004-30 describes a transaction in which "the parties to the transaction claim that, after the donation of the non-voting stock, the exempt party owns 90 percent of the stock of the S corporation. . . . For tax purposes . . . during that period, 90 percent of the S corporation's income is allocated to the exempt party and 10 percent of the S corporation's income is allocated to the original shareholders."  Notice 2004-30 asserts such a "transaction . . . is designed to artificially shift the incidents of taxation on S corporation income away from taxable shareholders to the exempt party.  In this manner, the original shareholders attempt to avoid paying income tax on most of the S corporation's income over a period of time.  The Service intends to challenge the purported tax benefits from this transaction."  The IRS' Coordinated Issue Paper reiterates "the transfer of the S corporation stock to the exempt party will be disregarded for Federal tax purposes under judicial doctrines.  Consequently, the S corporation and original shareholders entering into transactions that are the same as or substantially similar to those described in Notice 2004-30 shall be treated as if there had been no transfer to the exempt party."  (CIP, pp. 1, 3-6.)  The IRS' assertion the "transaction . . . is designed to artificially shift the incidents of taxation on S corporation income away from taxable shareholders to the exempt party" is clearly an "Insured Tax Event."

24.   The IRS reiterated these assertions in its August 2004 IDRs and the

1  August 6 , 2004 correspondence which promptly followed the IDRs.  That

2  correspondence stated it pertained to "examination of Upper Deck Co., Notice 2004-

3  30 transactions," the Department of the Treasury, Internal Revenue Service advised

4  that the IRS "ha[d] begun an examination of the tax returns indicated above [returns

5  of Upper Deck Co.] with respect to transactions described in Notice 2004-30[.] . . .

6  Notice 2004-30 states that the Service will challenge transactions in which

7  S corporation shareholders attempt to transfer the incidents of taxation on

8  S corporation income by purportedly donating the S corporation non-voting stock to

9  an exempt organization[.] . . .  See Notice 2004-30 for the government's position.

10  The aforementioned examination is proceeding and must still be concluded."  This

11  August 2004 assertion by the IRS matches the definition of an "Insured Tax Event"

12  set forth in Endorsement No. 1, ¶ (d) ["post-gift allocations of Upper Deck's taxable

13  income to the Municipal Plan are not correct or proper"].

14        25.    In the August 7, 2005 Correspondence (again, during the "Policy

15  Period"), the Department of the Treasury, Internal Revenue Service (again, a

16  "Taxing Authority") informed all three Insureds that the IRS had "evaluated the

17  issues present in the transaction described in Notice 2004-30" and "propose[d] to

18  resolve issues related to the S corporation charitable contribution transactions,

19  including related penalties" by:

20              2.    The transfer of the S corporate stock to the
                exempt party is disregarded for federal tax purposes.
21              S corporation income will be allocated as if there had been
                no transfer of stock to the exempt party.
22

23  This is yet another "Insured Tax Event" under Section 2. DEFINITIONS ¶ (d) in the

24  Policy.

25        26.    The Policy's definition of "'Insured Tax Event' [also provides that that

26  term] means:  an assertion, at any time during the Policy Period, by a Taxing

27  Authority that with respect to the tax years 2001 through 2005, . . . (e) as a result of

28  the gift of the Upper Deck's non-voting common stock to the Municipal Plan by the

1  pre-gift shareholder, any Upper Deck shareholder of Upper Deck, itself, assigned

2  income to the Municipal Plan." Notice 2004-30 describes a "transaction . . . in

3  which S corporation shareholders attempt to transfer the incidents of taxation on

4  S corporation income." Notice 2004-30 "alerts taxpayers and their representatives

5  that these transactions are tax avoidance transactions" and are "designed to

6  artificially shift the incidents of taxation on S corporation income away from taxable

7  shareholders to the exempt party." Notice 2004-30 states "the Service intends to

8  challenge the purported tax benefits of this transaction based on the application of

9  various theories, including judicial doctrines such as substance over form." This

10  assertion by the IRS (again clarified by the IRS' Coordinated Issue Paper (pp. 1, 3-

11  6) was another "Insured Tax Event."

12        27.   In the August 7, 2005 Correspondence (again, during the "Policy

13  Period"), the Department of the Treasury, Internal Revenue Service (again, a

14  "Taxing Authority") informed all three Insureds that the IRS had "evaluated the

15  issues present in the transaction described in Notice 2004-30" and "propose[d] to

16  resolve issues related to the S corporation charitable contribution transactions,

17  including related penalties" by:

18               2.    The transfer of the S corporate stock to the
exempt party is disregarded for federal tax purposes.
19          S corporation income will be allocated as if there had been
no transfer of stock to the exempt party.

20

21  This is yet another "Insured Tax Event" under Section 2. DEFINITIONS ¶ (e) in the

22  Policy.

23        28.   The Policy provides, in Section 2. DEFINITIONS ¶ (A):

24              'Claim' means any written notice from the Taxing
Authority alleging any Insured may be liable for Taxes,
25          but only if such Taxes are directly related in whole or in
part to the Insured Tax Event.

26

27  (Emphasis added.)

28        29.   The Internal Revenue Service's April 26, 2004 publication of

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
672453.02 a01/05/06

-11-

EXHIBIT _K_, PAGE _209_

1   Notice 2004-30 in Internal Revenue Bulletin 2004-17 in conjunction with the

2   Internal Revenue Service's August 5, 2004 correspondence transmitting "three IDR

3   Forms 4564, numbered S608B2, S608C and S701A" followed the next day by the

4   Internal Revenue Service's August 6, 2004 correspondence regarding "examination

5   of Upper Deck Co. Notice 2004-30 transactions" and the same "Taxing Authority's"

6   April 7, 2005 Correspondence (all during the "Policy Period") leave no room for

7   ambiguity about there being "written notice from the Taxing Authority alleging any

8   Insured <u>may</u> be liable for taxes." (Emphasis added.) For reasons alleged above,

9   there is also no ambiguity that "such Taxes are directly related in whole or in part to

10   the Insured Tax Event."

11       30.    Implicit in the Policy is an implied Covenant of Good Faith and Fair

12   Dealing pursuant to which AISLIC impliedly promised not to unreasonably interfere

13   with Insureds' receipt of benefits under the Policy (the "Implied Covenant").

14       31.    The magnitude of the "Insured Tax Loss"[xii] portion of the insured Loss

15   arising from the Insureds' implementation of KPMG's SC$^2$ tax strategy due to the

16   "Claim" made against the Insureds by the IRS will exceed the $50 million limits of

17   the Policy by millions of dollars even before any "Contest "Expenses"[xiii]" or

18   "Gross-Ups"[xiv] are included in the potential Loss. In the April 7, 2005

19   Correspondence, the IRS proposed to resolve the IRS' Claim against the Insureds in

20   a manner that would still result in an "Insured Tax Loss" well in excess of the $50

21   million limits of the Policy but nevertheless result in a multi-million dollar savings

22   in the "Insured Tax Loss" might otherwise be if the Internal Revenue Service

23   aggressively pushed and prevailed on the issue that the Upper Deck Company had

24   more than one class of stock for purposes of Section 1362 of the Code; the proposal

25   in the April 7, 2005 Correspondence would resolve the amount of the "Insured Tax

26   Loss" as if Upper Deck Company did not have more than one class of stock.[2]

27   ───────────────────

28   [2]Because of the magnitude of the "Insured Tax Loss" resulting from the IRS's
     Claim, the Insureds have not alleged the details of a similar claim asserted by the
     Taxing Authorities of the State of California, the Franchise Tax Board, giving rise to

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
672453.02 a01/05/06

-12-

EXHIBIT  K , PAGE 210

32.     The Insureds communicated the proposals in the IRS' April 7, 2005
Correspondence to AISLIC, communicated the Insureds' willingness to fund the
millions of dollars over and above the $50 million limit of AISLIC's Policy's limits
required to resolve the IRS' Claim on the terms of the April 7, 2005
Correspondence, and urged that AISLIC contribute its $50 million Policy limits to
avoid the potential for additional millions of dollars in "Insured Tax Loss".  The
Insureds also communicated to AISLIC that AISLIC's $50 million Policy limits
would be needed to consummate the settlement proposed in the IRS's April 7, 2005
Correspondence.

33.     AISLIC communicated its consent to the Insureds' acceptance of the
proposals in the April 7, 2005 Correspondence, but AISLIC initially declined to
state if and when it would contribute its $50 million Policy limits, or any portion
thereof, to consummate the resolution of the IRS' Claim in accordance with the
April 7, 2005 Correspondence.

34.     By way of letter to Insureds' counsel from AISLIC'S counsel, Peabody
& Arnold, dated July 29, 2005, AISLIC denied that the Policy had any application
to the Claims asserted against the Insureds by the IRS or the Franchise Tax Board
and arising out of the Insureds' implementation of KPMG's $SC^2$ tax strategy and
further denied any responsibility to or obligation to the Insureds for the Losses
arising from those Claims.  AISLIC has thereby repudiated its obligations under the
Policy.

35.     No Policy exclusions apply to the insured Losses for the Claim asserted
by the IRS.[3]

36.     Notwithstanding the filing of this Counterclaim in this arbitral forum,
Counter-Claimants are in no way waiving their right to object to the arbitrability of

_____

an "Insured Tax Loss" of millions of dollars; however, the Insureds also allege the
existence of such a loss.

[3]Nor do any Policy exclusions apply to the insured Losses for the Claim asserted
by the Franchise Tax Board.

Rutan & Tucker LLP
attorneys at law

EXHIBIT  K , PAGE 211

1 this dispute.  To be sure, as of the filing of this Counterclaim, a federal district court

2 in the Southern District of California has taken under submission a motion to

3 compel the instant arbitration brought by AISLIC in response to a complaint filed in

4 that Court by Counter-Claimants (Case No. 05CV1945IEG (RBB)).  The allegations

5 in the federal case are substantially similar to those asserted herein.  Counter-

6 Claimants file this Counterclaim at this time in order to preserve its rights under the

7 rules applicable to this arbitral forum.

8 **FIRST CLAIM**

9 **(Against AISLIC, inclusive, for Breach of Insurance Contract)**

10          37.        Insureds reallege paragraphs 1 through 36 above and incorporate them

11 in this First Claim as though fully set forth herein.

12          38.        Insureds have performed each of their obligations under the Policy or

13 such performance has been waived, suspended or excused.  Moreover, all conditions

14 precedent to AISLIC's performance of their obligations under the Policy have

15 occurred or have been waived.

16          39.        AISLIC's repudiation of any obligation to provide any Policy benefits

17 to the Insureds is a material breach of the Policy which has or will damage Insureds

18 in an amount not less than the $50,000,000 Limit of Liability provided for in ITEM

19 4 in the DECLARATIONS for the Policy and which may consequentially damage

20 the Insureds in the amount of millions of dollars by disrupting resolution of the

21 IRS's Claim on the terms set forth in the April 7, 2005 Correspondence.

22 **SECOND CLAIM**

23 **(Against AISLIC for Tortious Breach of the Covenant**

24 **of Good Faith and Fair Dealing)**

25          40.        Insureds reallege paragraphs 1 through 39 above and incorporate them

26 in this Second Claim as though fully set forth herein.

27          41.        AISLIC's actions tortiously breached the Implied Covenant inherent in

28 the Policy as well as the explicit terms and conditions of the Policy.  As a proximate

Rutan & Tucker LLP
attorneys at law

2163/017994-0028
672453.02 a01/05/06

-14-

EXHIBIT  K , PAGE 212

1  and legal result of AISLIC's, inclusive, breach of the Implied Covenant inherent in

2  the Policy, Insureds have suffered damages which include not only deprivation of the

3  explicit benefits provided for in the Policy but also in the form of costs and attorneys'

4  fees which Insureds have been forced to incur in order to recover the contractual

5  benefits under the Policy to which Insureds are entitled.  In addition Insureds

6  anticipate suffering additional damages of millions of dollars as a result of AISLIC's

7  refusal to pay Policy benefits to resolve the IRS's claim consistent with the April 7,

8  2005 Correspondence which Insureds anticipate may disrupt such a resolution.

9       42.    AISLIC's, inclusive, actions have been fraudulent and malicious and

10  Insureds are entitled to recover exemplary damages.  Defendants' actions were

11  malicious in that defendants intended those actions to cause injury to Insureds and

12  those actions were despicable conduct carried on by the defendants with the willful

13  and conscious disregard for the rights of Insureds to receive benefits under the

14  Policy.  Defendants' actions were fraudulent in that defendants misrepresented to

15  Insureds that Insureds were not entitled to benefits under the Policy with the

16  intention on the part of the defendants of depriving Insureds of their legal rights

17  under the Policy and otherwise causing injury to Insureds.

18       43.    Furthermore, the officers, directors and managing agents of AISLIC,

19  inclusive, acting within the course and scope of their employment, have authorized

20  and ratified the wrongful acts and conduct alleged herein, and AISLIC has

21  themselves engaged in the wrongful acts and conduct alleged herein which

22  constitute oppression, fraud and malice.

23       44.    Insureds are entitled to recover punitive and exemplary damages from

24  AISLIC in amounts sufficient to punish and make an example of AISLIC.

25       WHEREFORE, Insureds pray for an award and ultimately judgment in their

26  favor and against AISLIC, and each of them, as follows:

27       1.    In the amount of compensatory damages, special, general and

28  consequential, proved at hearing or trial;

2.     In the amount of exemplary damages proved at hearing or trial;

3.     If and to the extent provided for by applicable law, for attorneys' fees and costs incurred in this action;

4.     For prejudgment interest in the maximum amount allowed by law from the date such damages became due; and

5.     For such further relief as the arbitration panel in its discretion deems just and appropriate.

Dated:  January 5, 2006

RUTAN & TUCKER, LLP

By: _____
Duke F. Wahlquist
Attorneys for Respondents and
Counterclaimants, The Upper Deck
Company and Richard P. McWilliam,
individually and as Trustee for the
MPR Trust

---

[i]Section 5 RETENTION provides: "The Insurer shall only be liable for the amount of Loss which is in excess of the retention amount stated in Item 5 of the Declarations (the 'Retention') [$500,000, in the aggregate]. This Retention shall be carried by the Insureds at their own risk and remain uninsured. A single Retention shall apply to all Loss arising from all Claims relating to the Insured Tax Event."

[ii]Section 2. DEFINITIONS ¶ (p) "'Policy' means this Fiscal Event Insurance Policy agreed to and underwritten by the Insurer for the benefit of the Insureds."

[iii]Section 2 DEFINITIONS ¶ (i) "'Insureds' means the Named Insured listed in Item 1(a) of the Declarations and the Additional Insureds listed in Item 1(b) of the Declarations." Item 1(a) of the Declarations identifies the NAMED INSURED as "the Upper Deck Company." Item 1(b) identifies the ADDITIONAL INSUREDS as including "the MPR Trust [and] Mr. Richard McWilliam."

[iv]Section 2 DEFINITIONS ¶ (p) "'Policy Period' means the period of time shown in Item 3 of the Declarations, as the same may be extended pursuant to the terms and conditions hereof." Item 3 of the Declarations identifies the POLICY PERIOD as "from August 29, 2001 to the later of (i) November 30, 2006 or (ii) the expiration of the applicable statute of limitations with respect to the tax items described in the Insured Tax Event relating to the transactions described in the KPMGLLP opinions; provided, however, that in no event shall a policy with Policy Period expire later than November 30, 2010."

[v]Section 2 DEFINITIONS ¶ (l) "'Loss' means 90% of Insured Tax Loss and, to the extent directly related to any Insured Tax Loss, 90% of any Contest Expenses and 90% of any Gross-Ups."

[vi]Section 2 DEFINITIONS ¶ (j) "'Insured Tax Loss' means any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy." Section 2 DEFINITIONS ¶ (s) "'Taxes' mean (i) any federal or California income taxes imposed by the Code or comparable provisions of

applicable California law. (ii) any federal gift taxes imposed by the Code, and (iii) the income taxes of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy." Section 2 DEFINITIONS ¶ (h) "'Interest' means interest on an underpayment of Taxes assessed by a Taxing Authority."]

[vii]Section 2 DEFINITIONS ¶ (d) "'Contest Expenses' means the reasonable and necessary legal, accounting or appraisal expenses of outside legal and accounting advisors and appraisers (i.e. advisors and appraisers that are not employees of the Insured) conducting that part of a Contest which directly relates to the Insured Tax Event, following the Named Insured having given notice under Clause 6 of this Policy." Section 2 DEFINITIONS ¶ (c) "'Contest' means a dispute with a Taxing Authority over an adjustment in any Insured's liability for its Taxes as it relates to an Insured Tax Event for which the Insurer may be required to indemnify the Insured hereunder."

[viii]Section 2 DEFINITIONS ¶ (f) "'Gross-Up' means the amount by which a payment under this Policy must be increased to take into account any federal or state income taxes which will be imposed on any Insured in respect of such payment and any Gross-Up payment."

[ix]Section 2 DEFINITIONS ¶ (g) "'Inception Date' means the first date listed in Item 3 of the Declarations [August 29, 2001]."

[x]Section 2.  DEFINITIONS: "'Code' means the Internal Revenue Code of 1986, as amended and in effect as of the Inception Date and as the same may be amended after the Inception Date but only to the extent such amendments have retroactive effect."

[xi]Section 2.  DEFINITIONS ¶ (t) provides "'Taxing Authority' means (i) the Internal Revenue Service, (ii) the comparable authority of the State of California and (iii) the comparable authority of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy."

[xii]Section 2 DEFINITIONS ¶ (j) "'Insured Tax Loss' means any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy." Section 2 DEFINITIONS ¶ (s) "'Taxes' mean (i) any federal or California income taxes imposed by the Code or comparable provisions of applicable California law. (ii) any federal gift taxes imposed by the Code, and (iii) the income taxes of any other state as to which the Insurer has extended coverage as provided in Endorsement No. 2 of this Policy." Section 2 DEFINITIONS ¶ (h) "'Interest' means interest on an underpayment of Taxes assessed by a Taxing Authority."]

[xiii]Section 2 DEFINITIONS ¶ (d) "'Contest Expenses' means the reasonable and necessary legal, accounting or appraisal expenses of outside legal and accounting advisors and appraisers (i.e. advisors and appraisers that are not employees of the Insured) conducting that part of a Contest which directly relates to the Insured Tax Event, following the Named Insured having given notice under Clause 6 of this Policy." Section 2 DEFINITIONS ¶ (c) "'Contest' means a dispute with a Taxing Authority over an adjustment in any Insured's liability for its Taxes as it relates to an Insured Tax Event for which the Insurer may be required to indemnify the Insured hereunder."

[xiv]Section 2 DEFINITIONS ¶ (f) "'Gross-Up' means the amount by which a payment under this Policy must be increased to take into account any federal or state income taxes which will be imposed on any Insured in respect of such payment and any Gross-Up payment."

EXHIBIT  K, PAGE 215

1

### PROOF OF SERVICE BY MAIL

2

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

3

4

    I am employed by the law office of Rutan & Tucker, LLP in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is

5

611 Anton Boulevard, Fourteenth Floor, Costa Mesa, California 92626-1931.

6

    On January 6, 2006, I served on the interested parties in said action the within:

7

**THE UPPER DECK COMPANY'S, MPR TRUST'S, AND RICHARD P. MCWILLIAM'S, INDIVIDUALLY AND AS TRUSTEE FOR THE MPR TRUST,**

8

**COUNTERCLAIM AGAINST AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY**

9

by placing a true copy thereof in sealed envelope(s) addressed as stated below:

10

11

    Robert E. Cushner, Esq.
    Peter A. Stroili, Esq.
    Dimato & Lynch

12

    70 Pine Street
    New York, NY 10270-0110

13

14

    In the course of my employment with Rutan & Tucker, LLP, I have, through first-hand personal observation, become readily familiar with Rutan & Tucker, LLP's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that

15

practice I deposited such envelope(s) in an out-box for collection by other personnel of Rutan & Tucker, LLP, and for ultimate posting and placement with the U.S. Postal Service on that same day

16

in the ordinary course of business. If the customary business practices of Rutan & Tucker, LLP with regard to collection and processing of correspondence and mailing were followed, and I am

17

confident that they were, such envelope(s) were posted and placed in the United States mail at Costa Mesa, California, that same date. I am aware that on motion of party served, service is

18

presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

19

    Executed on January 6, 2006, at Costa Mesa, California.

20

21

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

22

23

_____
    Michelle Mann
    (Type or print name)

*Michelle Mann*
    (Signature)

24

25

26

27

28

2171/017994-0023
665682.01 a01/05/06

**EXHIBIT** _K_, **PAGE** 214