# EXHIBIT L

## ·AMERICAN ARBITRATION ASSOCIATION

AMERCIAN INTERNATIONAL
SPECIALTY LINES
INSURANCE COMPANY
                Claimant,

    - v.-

THE UPPER DECK COMPANY, RICHARD
P. McWILLIAM, and the MPR
REVOCABLE TRUST
                Respondents.

13 195 02486 05

John F. Byrne, Esq.
Stephen D. Kramer, Esq.
Charles J. Moxley Jr., Esq.

**RESPONSE TO
COUNTERCLAIM**

American International Specialty Lines Insurance Company ("AISLIC" or

"Claimant") responds as follows to the counterclaim of The Upper Deck Company ("Upper

Deck"), MPR Trust and Richard P. McWilliam ("McWilliam"), individually and as Trustee

for the MPR Trust (collectively "Respondents").  The paragraph numbers of the responses

below correspond to the paragraphs in the counterclaim to which they respond.

    1.    Admits that Upper Deck is a California corporation with its principal

place of business in Carlsbad, California.  Denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 1.

    2.    Admits upon information and belief the allegations in paragraph 2.

    3.    Admits upon information and belief that McWilliam is an individual

who has resided in Nevada, but further answers, upon information and belief, that

EXHIBIT ∠ PAGE 217

McWilliam, in 2004, purchased an 11-room apartment at 50 Central Park South in New York City.

      4.      Admits upon information and belief the allegations in paragraph 4.

      5.      Admits that AISLIC is an Alaska corporation with a principal place of business in New York and that AISLIC is authorized to underwrite insurance in California as a surplus lines insurer.  Answers that AISLIC maintains its principal place of business in New York City, and is authorized, pursuant to New York State statute, to maintain offices in New York and issue policies in New York through New York licensed excess insurance brokers. Denies that AISLIC is not subject to the supervision of insurance regulators in the State of New York. Denies the allegations of paragraph 5 not specifically admitted to herein.

      6.      Admits that AISLIC issued the Policy and further admits that the Policy provided for the payment of $3,250,000 in premiums by the Insureds.  Answers that the Policy speaks for itself as to the risks it is intended to insure. Denies the allegations of paragraph 6 not specifically admitted to herein.

      7.      Answers that the terms of the Policy's "Insuring Agreement" speak for themselves and adds that the "Insuring Agreement" is immediately preceded by the following:

> "In consideration of the payment of the premium, and in reliance upon the representations made and documents provided to [AISLIC] (the "Insurer"), the Insurer agrees as follows:"

Further adds that, pursuant to Section 2(n) of the Policy, the KPMG opinions, attached as Exhibit A to the Policy, are deemed a part of the Policy and that, pursuant to Section 2(r) of the policy, the Representation letter, attached as Exhibit B to the Policy, was

EXHIBIT _L_, PAGE _218_

"delivered to the Insurer [AISLIC] in connection with the underwriting of this Policy, which letter is deemed part of the application for this Policy."    Denies the allegations of paragraph 7 not specifically admitted to herein.

8.    Answers that the terms of Section 8 of the Policy regarding "Procedure For Time Of Payment" speak for themselves.  Denies the allegations of paragraph 8 not specifically admitted to herein and refers to the Order of Honorable Irma E. Gonzalez dated January 30, 2006, in the action between Upper Deck and AISLIC in the United States District Court, Southern District of California (the "January 30, 2006 Order"), which found at page 8:  "New York's interest in the relationship between its domiciled insurers and their customer matches California's interest in the relationship between its domiciled insured corporations and their insurers."

9.    Answers that the definitions of Loss, Insured Tax Loss, Contest Expenses and Gross-Ups, in Sections 2(l), (j), (d) and (f) speak for themselves and notes that the Policy provides that "Insured Tax Loss," pursuant to its definition in Section 2(j) of the Policy, is expressly "subject to all of the terms, conditions and exclusions of the Policy." Denies the allegations of paragraph 9 not specifically admitted to herein.

10.    Answers that the definition of Insured Tax Event in Endorsement No. 1 of the Policy speaks for itself and notes that the Policy provides that "Insured Tax Loss," pursuant to its definition in Section 2(j) of the Policy, is expressly "subject to all of the terms, conditions and exclusions of the Policy." Denies the allegations of paragraph 10 not specifically admitted to herein.

11.    Admits that on April 16, 2002, AISLIC was informed by KPMG that it was served with one or more summonses requesting various disclosures about certain tax

EXHIBIT _L_, PAGE _219_

strategies.  Further admits that on April 17, 2002, KPMG informed AISLIC that as a result of

such summons, KPMG determined that it was required to disclose the identities of certain

clients such as Upper Deck.  Denies the allegations of paragraph 11 not specifically admitted

to herein.

12.    Admits that on April 26, 2004, during the policy period,  the IRS

published Internal Revenue Bulletin 2004-17 on the "S Corporation Tax Shelter" and refers

to same for a complete and accurate description of its contents.  Denies the allegations of

paragraph 12 not specifically admitted to herein.

13.    Admits that the IRS issued, with an effective date of November 8,

2004, during the policy period, a Coordinated Issue Paper on S Corporation Tax Shelter

Notice 2004-30.  Answers that the Coordinated Issue Paper speaks for itself and notes that,

on page one, the Coordinated Issue Paper states:

> "extensive factual development is necessary for each transaction
> in order to establish and evaluate the appropriate legal
> positions."

Denies the allegations of paragraph 13 not specifically admitted to

herein.

14.    Answers that the Policy's definition of "Insured Tax Event" and the

IRS's Notice 2004-30 speak for themselves and notes that the Policy's definition of "Insured

Tax Loss" is expressly "subject to all of the terms, conditions and exclusions of the Policy,"

including the representations set forth in the KPMG Opinions and the Representation Letter,

which are expressly deemed part of the Policy.  Denies the allegations of paragraph 14 not

specifically admitted to herein.

EXHIBIT ___L___, PAGE __220__

15.    Answers that the Coordinated Issue Paper speaks for itself.  Further notes that, on page nine, the Coordinated Issue Paper refers to the importance of redemption agreements providing for fair market value to avoid violating the single class of stock requirement. Denies the allegations of paragraph 15 not specifically admitted to herein.

16.    Answers that Notice 2004-30 speaks for itself and notes that Coordinated Issue Paper on Notice 2004-30 states, on page one,  that "extensive factual development is necessary for each transaction in order to establish and evaluate the appropriate legal positions." Denies the allegations of paragraph 16 not specifically admitted to herein.

17.    Answers that the August 2004 IDRs speak for themselves.  Denies the allegations of paragraph 17 not specifically admitted to herein.

18.    Answers that the August 2004 IDR No. S608B2 and August 6, 2004 letter speak for themselves.  Denies the allegations of paragraph 18 not specifically admitted to herein.

19.    Denies the allegations of paragraph 19.

20.    Answers that the Policy's definition of "Insured Tax Event" and IRS's Notice 2004-30 and the Coordinated Issue Paper speak for themselves and notes that the Policy's definition of "Insured Tax Loss" is expressly "subject to all of the terms, conditions and exclusions of the Policy," including the representations set forth in the KPMG Opinions and the Representation Letter, which are expressly deemed part of the Policy.  Denies the allegations of paragraph 20 not specifically admitted to herein.

21.    Denies the allegations of paragraph 21.

5

EXHIBIT __L__, PAGE __221__

22.     Answers that the April 7, 2005 correspondence speaks for itself. Denies the allegations of paragraph 22 not specifically admitted to herein.

23.     Answers that the Policy's definition of "Insured Tax Event" and IRS's Notice 2004-30 and the Coordinated Issue Paper speak for themselves and notes that the Policy's definition of "Insured Tax Loss" is expressly "subject to all of the terms, conditions and exclusions of the Policy," including the representations set forth in the KPMG Opinions and the Representation Letter, which are expressly deemed part of the Policy.  Further notes that, on page 6 of the Coordinated Issue Paper, the IRS indicated that the "exempt party would be treated as a shareholder ... to the extent of the actual economic benefits it realizes from holding the stock."  Answers that Respondents denied Firefighters the economic benefits of redemption, by coercing Firefighters to sell its non-voting stock at a fraction of its fair market value.  Denies the allegations of paragraph 23 not specifically admitted to herein.

24.     Answers that the August 6, 2004 correspondence speaks for itself. Notes that the Policy's definition of "Insured Tax Loss" is expressly "subject to all of the terms, conditions and exclusions of the Policy," including the representations set forth in the KPMG Opinions and the Representation Letter, which are expressly deemed part of the Policy.  Denies the allegations of paragraph 24 not specifically admitted to herein.

25.     Answers that the August 7, 2005 correspondence speaks for itself. Denies the allegations of paragraph 25 not specifically admitted to herein.

26.     Answers that the Policy's definition of "Insured Tax Event" and IRS's Notice 2004-30 and the Coordinated Issue Paper speak for themselves and notes that the Policy's definition of "Insured Tax Loss" is expressly "subject to all of the terms, conditions and exclusions of the Policy," including the representations set forth in the KPMG Opinions

#230956v1                                    EXHIBIT __L__, PAGE 222

and the Representation Letter, which are expressly deemed part of the Policy.  Further notes

that, at page 6 of the Coordinated Issue Paper, the IRS indicated that the "exempt party

would be treated as a shareholder ... to the extent of the actual economic benefits it realizes

from holding the stock." Answers that Respondents denied Firefighters the economic

benefits of redemption, by coercing Firefighters to sell its non-voting stock at a fraction of its

fair market value.  Denies the allegations of paragraph 26 not specifically admitted to herein.

   27. Answers that the August 7, 2005 correspondence speaks for itself.

Denies the allegations of paragraph 27 not specifically admitted to herein.

   28. Answers that the Policy's definition of Claim speaks for itself.  Denies

the allegations of paragraph 28 not specifically admitted to herein.

   29. Admits upon information and belief that, on or about April 7, 2005,

after reviewing the documents produced by Upper Deck, including the documents regarding

the purchase of Firefighters' non-voting common stock pursuant to the Share Purchase

Agreement in December 2002, the IRS gave written notice "alleging any insured may be

liable for taxes."  Denies the allegations of paragraph 29 not specifically admitted to herein.

   30. Admits that under law there is a mutual duty of good faith and fair

dealing between Insured and Insurer in carrying out the terms of the insurance contract, but

denies that there is any Implied Contract that is different from or which overrides the terms

of the insurance contract. Denies the allegations of paragraph 30 not specifically admitted to

herein.

   31. Answers that the April 7, 2005 Correspondence speaks for itself.

Denies that there is an Insured Tax Loss "subject to all of the terms, conditions and

EXHIBIT ___L___, PAGE _223_

exclusions of the Policy" and denies the allegations of paragraph 31 not specifically admitted to herein.

32.     Admits that, after failing to respond to repeated requests for documents and information demands from AISLIC's coverage counsel, Respondents communicated to AISLIC the IRS's April 7, 2005 proposal and demanded that AISLIC contribute its policy limits to the proposed settlement.  Denies the allegations of paragraph 32 not specifically admitted to herein.

33.     Admits that AISLIC consented to the IRS settlement proposal subject to reserving its rights under the policy.  Answers that AISLIC, as it indicated in letters dated April 26, 2005 and May 6, 2005, was not in a position to determine whether to fund the settlement with the IRS, since it had not received responses from Respondent to the repeated requests for documents and information demands from AISLIC's coverage counsel. Denies the allegations of paragraph 33 not specifically admitted to herein.

34.     Answers that the July 29, 2005 letter from Peabody & Arnold speaks for itself.  Denies the allegations of paragraph 34 not specifically admitted to herein.

35.     Denies the allegations of paragraph 35.

36.     Admits that AISLIC moved to compel the instant arbitration in the Southern District of California action initiated by Respondents.  Answers that in her January 30, 2006 Order, Judge Irma E. Gonzalez granted AISLIC's motion to compel arbitration. Denies the allegations of paragraph 36 not specifically admitted to herein.

37.     With respect to the allegations in paragraph 37, AISLIC realleges its responses to paragraphs 1 through 36 as if fully set forth herein.

38.     Denies the allegations of paragraph 38.

8

EXHIBIT __L__, PAGE 224

39.     Denies the allegations of paragraph 39.

40.     With respect to the allegations in paragraph 40, AISLIC realleges its responses to paragraphs 1 through 39 as if fully set forth herein.

41.     Denies the allegations of paragraph 41.

42.     Denies the allegations of paragraph 42.

43.     Denies the allegations of paragraph 43.

44.     Denies the allegations of paragraph 44.


### FIRST, SECOND, THIRD, FOURTH, FIFTH, SIXTH AND SEVENTH SEPARATE DEFENSES

45.     Claimant incorporates by reference, as if fully set forth at this point, Counts I, II, III, IV, V, VI and VII (i.e., paragraphs 47 through 84) of Claimant's arbitration complaint.


Dated: New York, New York
       March 3, 2006

                           Respectfully submitted,

                           D'AMATO & LYNCH

By:      _Robert E. Kushner_

                           Robert E. Kushner
                           Peter A. Stroili
                           Attorneys for Claimant AISLIC
                           70 Pine Street
                           New York, New York  10270
                           (212) 269-0927

#230956v1

EXHIBIT  L , PAGE 225

# EXHIBIT M

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY<br>Claimant – Counter Respondent<br><br>- v.-<br><br>THE UPPER DECK COMPANY, RICHARD P. McWILLIAM, and the MPR REVOCABLE TRUST<br>Respondents – Counterclaimants. | Case No.<br>13 195 02486 05<br><br>John F. Byrne, Esq.<br>Stephen D. Kramer, Esq.<br>Charles J. Moxley Jr., Esq |

## CLAIMANT'S PREHEARING BRIEF

D'AMATO & LYNCH
70 Pine Street
New York, New York 10270
(212) 269-0927

EXHIBIT _M_, PAGE _226_

# <u>TABLE OF CONTENTS</u>

<u>Page</u>(s)

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

ARGUMENT ...................................................................................................... 11

POINT I
  THERE IS NO INSURED TAX LOSS, SINCE RESPONDENTS' CLAIM
  DOES NOT ARISE FROM THE TAX PLAN SET FORTH IN THE
  DOCUMENTS ANNEXED TO AND DEEMED PART OF THE POLICY ....11

POINT II
  EXCLUSION 3(h) BARS COVERAGE DUE TO RESPONDENTS'
  TERMINATION OF THE SHAREHOLDERS AGREEMENT WITHOUT
  AISLIC'S CONSENT ................................................................................ 14

POINT III
  RESPONDENTS' BREACHES OF WARRANTIES PRECLUDE
  COVERAGE ............................................................................................ 16

  A.   Respondents Breached their Promissory Warranty With Respect To
       The Critical Assumption That Fair Market Value Would Be Paid
       For Austin's Shares ........................................................................ 17

  B.   Respondents Breached their Promissory Warranty That They Could
       Not Compel Austin To Redeem Its Shares ........................................ 18

  C.   Respondents' Warranty to AISLIC of the Truth Of The KPMG
       Opinions Proved False As A Result of KPMG's Mass-Marketing
       Campaign ....................................................................................... 20

POINT IV
  EXCLUSION 3(a) BARS COVERAGE FOR RESPONDENTS'
  FRAUDULENT INDUCEMENT OF THE REPURCHASE OF
  AUSTIN'S SHARES ............................................................................... 21

EXHIBIT __M__, PAGE __227__

POINT V
  RESPONDENTS' FAILURE TO COMPLY WITH AN EXPRESS
  CONDITION PRECEDENT TO COVERAGE VITIATES COVERAGE .... 24

POINT VI
  RESPONDENTS IMPAIRED AISLIC'S RIGHT TO SUBROGATION ...... 26

POINT VII
  RESPONDENTS' COUNTERCLAIM FOR ALLEGED BREACH OF
  IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING IS LEGALLY
  AND FACTUALLY DEFICIENT ................................................................. 27

CONCLUSION ................................................................................................ 30

#247186v1

EXHIBIT _M_, PAGE 228

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Commercial Union Insurance Co. v. Flagship Marine Services, Inc.*,
190 F.3d 26 (2d Cir. 1999)..................................................................... 16

*Hartford Fire Insurance Co. v. Mitlof*,
208 F. Supp. 2d 407 (2d Cir. 2002) ........................................................ 16

*Sacks v. Commissioner*,
69 F.3d 982 (9th Cir. 1995)............................................................... 14, 15

## STATE CASES

*Aetna Casualty & Surety Co. v. Longo Prod., Inc.*,
247 A.D.2d 497, 669 N.Y.S.2d 336 (2d Dep't), *lv. to appeal denied*,
92 N.Y.2d 802 (1998) ............................................................................ 27

*Albert J. Schiff Associates, Inc. v. Flack*,
51 N.Y.692, 435 N.Y.S.2d 972 (1980) ................................................... 13

*Bowden v. Robinson*,
67 Cal. App. 3d 705 (Cal. Ct. App. 1977) ............................................. 24

*Butvin v. Doubleclick, Inc.*,
2001 WL. 228121 (S.D.N.Y. 2001),
*aff'd*, 22 Fed. Appx. 57 (2d Cir. 2001).............................................. 27, 28

*Chase Manhattan Bank v. New Hampshire Insurance Co.*,
4 Misc.3d 1026 (A), 2004 WL. 2169394 (Sup. Ct., N.Y. Co. 2004) ........... 25

*Core-Mark International Corp. v. Commonwealth Insurance Co.*,
2005 WL 1676704 (S.D.N.Y. 2005)........................................................ 29

*Foothill Capital Corp. v. Grant Thornton, LLP*,
276 A.D.2d 437, 715 N.Y.S.2d 389 (1st Dep't 2000).................................. 23

*J.A.O. Acquisition Corp. v. Stavitsky*,
192 Misc. 2d 7, 745 N.Y.S.2d 634 (Sup. Ct., N.Y. Co. 2001) ..................... 23

iii

EXHIBIT __M__, PAGE __229__

*Kidalso Gas Corp. v. Lancer Insurance Co.*,
21 A.D.3d 779, 802 N.Y.S.2d 9 (1st Dep't 2005).................................................. 13

*Maroney v. New York Central Mutual Fire Insurance Co.*,
5 N.Y.3d 467, 805 N.Y.S.2d 533 (2005) ............................................................. 15

*Murray Walter, Inc. v. Sarkisian Brothers, Inc.*,
183 A.D.2d 140, 589 N.Y.S.2d 613 (3d Dep't 1992).................................... 19

*Network Enterprises, Inc. v. APBA Offshore Products, Inc.*,
2004 WL 1837349 (S.D.N.Y. 2004)............................................................... 28, 29

*New York University v. Continental Insurance Co.*,
87 N.Y.2d 308, 639 N.Y.S.2d 283 (1995) .......................................................... 29

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y.2d 685, 636 N.Y.S.2d 734 (1995) ...................................................... 24, 25

*Rocanova v. Equitable Life Assur. Soc.*,
83 N.Y.2d 603, 612 N.Y.S.2d 339 (1994) .......................................................... 29

*Star City Sportswear, Inc. v. Yasuda Fire & Marine*
*Insurance Co. of America*,
1 A.D.3d 58, 765 N.Y.S.2d 854 (1st Dep't 2003),
*aff'd*, 2 N.Y.3d 789, 781 N.Y.S.2d 255 (2004) ............................................... 16

*Sulner v. G.A., Insurance Co. of New York*,
224 A.D.2d 205, 637 N.Y.S.2d 144 (1st Dep't) ............................................... 25

*Trustco Bank New York v. M.M.E. Power Enterprises, Inc.*,
223 A.D.587, 636 N.Y.S.2d 831 (2d Dep't 1996)........................................... 19

*Weinberg v. Transamerica Insurance Co.*,
62 N.Y.2d 379, 477 N.Y.S.2d 99 (1984) .......................................................... 27

*Yankee Caithness Joint Venture, LP v. Planet Insurance Co.*,
1996 WL. 426359 (S.D.N.Y. 1996)............................................................... 28, 29

iv

EXHIBIT M, PAGE 230

# STATUTES

Cal. Corp. Code §25401 .......................................................................... 23, 24

McKinney's N.Y. Ins. Law §3106 ................................................................. 16

#247186v1

EXHIBIT __M__, PAGE __23/__

AMERICAN ARBITRATION ASSOCIATION

AMERICAN INTERNATIONAL
SPECIALTY LINES
INSURANCE COMPANY
    Claimant -- Counter Respondent

- v.-

THE UPPER DECK COMPANY, RICHARD
P. McWILLIAM, and the MPR
REVOCABLE TRUST
    Respondents -- Counterclaimants.

Case No.
13 195 02486 05

John F. Byrne, Esq.
Stephen D. Kramer, Esq.
Charles J. Moxley Jr., Esq.

## CLAIMANT'S PREHEARING BRIEF

### PRELIMINARY STATEMENT

    In December 2002, without ever notifying much less asking for AISLIC's

consent, Respondents abolished the tax plan which AISLIC had agreed to insure. The tax

plan eradicated by Respondents had been carefully crafted a year and a half earlier in a

Shareholders Agreement, Warrant Agreement and three separate opinions by KPMG (the

"KPMG Opinions"), each of which was annexed to and deemed part of the Policy.  The

above documents described a transaction in which Respondents were motivated, at least in

part, by their warranted desire to support Austin Firefighters Relief Fund ("Austin") by

donating to Austin a gift of Upper Deck Non-Voting Common Stock.  The Shareholders

Agreement thus provided Austin with the right, after a two year period, to redeem its shares

for fair market value as determined by a qualified appraiser.

EXHIBIT _M_, PAGE _232_

The payment of fair market value for Austin's shares, as evidenced by an appraisal, was critical to the tax plan's validity both in terms of showing that a valid gift of shares had been made and in terms of coming within certain safe harbor rules for avoiding a determination that Austin's shares constituted a second class of stock, which determination would invalidate Upper Deck's Subchapter S status. AISLIC would not have agreed to insure the tax plan without the underpinnings of requiring payment of fair market value to Austin for its shares and a qualified appraisal evidencing the payment of fair market value.

In the latter part of 2002, after experiencing a tremendous surge in income due to sales of Yu-Gi-Oh!, Respondents, eschewing their prior representation of charitable intent, set out to acquire Austin's shares early for considerably less than their fair market value. Without notifying AISLIC or asking for its consent, Respondents terminated the Shareholders Agreement and replaced it with a Share Purchase Agreement, in which the purchase price was based solely on what Upper Deck was willing to pay, without any provision for an appraisal.

By eliminating the requirements of fair market value and a qualified appraisal, Respondents greatly enhanced, if not assured, the chance of success of any challenge by the IRS. Respondents departed from the tax plan in another critical respect: McWilliam's admitted failure to take a charitable deduction on his 2001 tax return, only months after representing to the IRS that he would in a Voluntary Disclosure Statement.

Respondents now ask AISLIC to pay for a settlement with the IRS which, as a result of Respondents' unilateral abandonment of the tax plan, was their only viable option. Respondents' actions vitiated coverage under the Policy on several independent grounds. First, by radically departing from the terms and conditions of the tax plan set forth in

2

EXHIBIT _M_, PAGE _233_

documents which were annexed to and deemed part of the Policy itself, Respondents cannot show, as they must, that they have incurred a covered Insured Tax Loss.  Moreover, by failing to take a charitable deduction for the donation of Austin's shares, McWilliam violated an express condition precedent in Section 9(b) of the Policy, which, under New York law, precludes coverage even in the absence of causation.

In addition, as a result of Respondents' unilateral abandonment of the tax plan, several limitations on coverage apply. Under Exclusion 3(h), coverage is clearly barred as a result of Respondents' termination of the Shareholders Agreement without AISLIC's prior written consent.  Under Exclusions 3(a) and 3(b)of the Policy, and pursuant to Respondents' breach of their promissory warranties in the Representation Letter, coverage is also barred by Respondents' failure to pay fair market value for Austin's shares or to obtain an appraisal, and by their use of threats and false statements to obtain Austin's shares.

In sum, Respondents are not entitled to coverage for a tax plan they chose not to follow, without ever telling AISLIC, in blatant violation of the Policy.

## STATEMENT OF FACTS

In May 2001, Upper Deck's insurance broker Marsh Risk and Insurance Services Inc. ("Marsh"), solicited AISLIC's interest in providing insurance to Upper Deck in connection with a tax plan devised by KPMG.  The tax plan was designed to save McWilliam federal and state income taxes by taking advantage of the pass-through nature of Upper Deck as a Subchapter S corporation, by allocating 90% of its income to Austin, a tax-exempt charitable organization. In accord with the tax plan, on March 28, 2001, Upper Deck had issued 8,280,000 shares of Upper Deck Non-Voting Common Stock to the MPR Trust, of

#247186v1

EXHIBIT _M_, PAGE_234_

which McWilliam was the sole beneficiary. Then, on March 31, 2001, the MPR Trust

donated the 8,280,000 shares ("Austin's shares") to Austin.[1]

The Shareholders Agreement, entered into between Respondents and Austin

on March 31, 2001, provided for a put option, by which Austin had the right, during a 180-

day period commencing April 1, 2003, to require Upper Deck to redeem its shares for fair

market value as determined by an independent appraisal firm. The Shareholders Agreement

required Upper Deck to pay 25 % of the purchase price at the redemption closing and the

remainder within 45 days of the Closing. (Section 5.3). The Shareholders Agreement also

provided for a right of first refusal, pursuant to which Upper Deck had the right to purchase

Austin's shares for the amount of any bona fide offer received by Austin. (Section 2.1).

Fair market value was central to the success of the tax plan as described in the

KPMG opinions. In order to qualify as a Subchapter S corporation, Upper Deck could not

have more than one class of stock. Thus, KPMG opined both with respect to the issuance of

the warrants, and with respect to the redemption of Austin's shares, that they would not

trigger a "second class of stock, provided that their strike price can be shown to be not

substantially below the fair market value of the stock." (Opinion on Warrants, at 4; Opinion

on Charitable Contribution, at 7). Fair market value was also critical to show donative intent,

i.e., that the factual representation on page two of KPMG's Opinion on "Charitable

Contribution" of "the Shareholder's desire to support [Austin]" was true and correct, in that

---

[1] On March 28, 2001, Upper Deck declared a dividend to McWilliam, as sole beneficiary of the
MPR Trust, of 82,800,000 warrants to purchase Non-Voting Common Stock of Upper Deck. The
warrants had a dilutive effect on the appraised value of Austin's shares, which were valued at
$1,357,920 in a March 31, 2001 appraisal by FMV Opinion, Inc. (the "FMV appraisal").

EXHIBIT _M_, PAGE _235_

Austin would be entitled to the benefits of any appreciation in the fair market value of its shares.[2]

In order to determine its potential exposure under the Policy, AISLIC in the negotiations over coverage focused on obtaining reliable estimates of Upper Deck's projected income for the years for which it sought coverage. On or about June 14, 2001, before the Policy was issued, Upper Deck provided AISLIC with projections prepared by KPMG estimating a tax exposure of approximately $36 million based on projected income of approximately $45 million for 2001 and $34.1 million for 2002. These projections were much higher than the income projections in the FMV appraisal of projected Upper Deck income of $9.4 million for 2001 and $8.3 million for 2002. Upper Deck's broker, Marsh, represented to AISLIC that the higher projections were provided "to justify the higher insurance limit" and to take into account the "potential for growth with the potential signing of Tiger Woods."

Upper Deck failed to disclose, however, that it was also about to obtain exclusive rights to market and distribute in North America the immensely popular trading card game Yu-Gi-Oh!, which according to McWilliam, "is the No.1 game ever created in the history of games, bigger than Monopoly." As early as June 2001, Upper Deck had prepared projections forecasting tens of millions of dollars in sales from Yu-Gi-Oh!-related products.

On September 4, 2001, Upper Deck and McWilliam executed a Representation Letter expressly warranting the truth and correctness of the "facts, assumptions of fact, and

---

[2] Another assumption in the KPMG Opinions was that McWilliam, as Shareholder, would take a charitable deduction on his 2001 tax return. Thus, KPMG concluded: "It is more likely than not that the Shareholder will be entitled to a charitable deduction for the fair market of the stock the Shareholder donated." (Opinion on "Charitable Contribution, p.4) (underline in original).

5

EXHIBIT M, PAGE 234

understandings of fact set forth in the opinions of KPMG," as well as Upper Deck's and its

shareholders' inability to compel the redemption of Austin's shares, except pursuant to

Upper Deck's right of first refusal in the Shareholders Agreement.

On or about January 29, 2002, AISLIC issued the Policy to Upper Deck,

having previously issued a binder on August 29, 2001.[3]  The first sentence of the Policy

states that the agreement to provide coverage is "in reliance upon the representations made

and documents provided," i.e., the KPMG Opinions, the Shareholders Agreement, the

Representation Letter, the Warrant Agreement and the FMV appraisal, all of which were

annexed to and deemed part of the Policy.  AISLIC agreed to provide $50,000,000 in

aggregate coverage, subject to a $500,000 retention, for 90% of an Insured Tax Loss,

defined as "any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority

directly related to the Insured Tax Event, subject to all of the terms, conditions and

exclusions of the policy." (Policy, § 2 (j)).  Pursuant to Section 4 of the Policy, coverage is

excluded for Loss:

> (a)      arising out of, based upon or attributable to the
> committing in fact of any criminal or deliberate fraudulent act
> (including without limitation deliberate civil fraud), or any
> knowing and intentional violation of any law, rule, regulation or
> statute; provided, however, that effecting the transactions
> described in the Opinions and the filing of Tax Returns with any
> Taxing Authority by the Insureds consistent with the
> transactions described in the Opinions shall not be the
> committing in fact of any criminal or deliberate fraudulent act
> (including without limitation deliberate civil fraud) or a
> knowing and intentional violation of law, rule, regulation or
> statute for purposes of this Clause 3(a);

---

[3] Two weeks later, on February 12, 2002, Upper Deck announced that it had acquired exclusive rights to market and distribute Yu-Gi-Oh! in North America.

6

(b)    arising out of, based upon or attributable to any material
inaccuracy in the facts set forth or referenced in the
Representation Letter; [and] …

(h)    to the extent such Loss arises out of, is based upon, or is
attributable to an amendment to the Shareholders Agreement or
the Warrant Agreement attached as Exhibits C and D,
respectively, without the Insurer's prior written consent (which
consent shall not be unreasonably withheld by Insurer).

In addition, Section 9(b) of the Policy sets forth as an express "condition precedent to the

right of the Insureds to be indemnified hereunder, that … [t]he Insureds shall have prepared

and filed all applicable Tax Returns in a manner materially consistent with that anticipated

by the Opinions and/or the Representation Letter."

Section 16 of the Policy contains a broad arbitration clause requiring

arbitration of "all disputes or differences which may arise under or in connection with th[e]

Policy" and a choice of law provision which provides:

The arbitration shall be subject to the Federal Arbitration Act,
and to the extent such Act is not applicable, the laws of the State
of New York.  The construction, validity and performance of
this Policy shall be governed by the laws of the State of New
York ….

Section 16 further provides that no award shall exceed "the applicable Limit of Liability set

forth in this Policy."

In April 2002, Respondents were informed by KPMG that, in response to an

IRS summons, KPMG had disclosed Upper Deck's identity, "together with other information

regarding the transaction that is the subject of the Policy."  On April 22, 2002, Respondents

made a voluntary disclosure to the IRS, in which McWilliam stated, "I will claim a 2001

charitable contribution deduction as allowed for federal income tax purposes … with

respect to the contribution by me of [Austin's shares]."  McWilliam also told the IRS that,

7

EXHIBIT _M_, PAGE _237.1_

"at the time of contribution, the Donee and I and the Company entered into a Shareholders Agreement which provides the Donee with a put option," commencing April 1, 2003, which if exercised, "the price required to be paid for those Shares will be their fair market value on the date of exercise of the put option, as determined by an independent valuation firm."

However, in November 2002, Respondents, "for business reasons," sought to acquire Austin's shares before the end of Upper Deck's reporting year on December 31, 2002. Redge Bendheim ("Bendheim") of KPMG and Kevin Cahill ("Cahill") of Upper Deck exchanged drafts of a Share Purchase Agreement providing for Upper Deck's repurchase, without any appraisal, of Austin's shares for $2 million. The original draft contained a provision requiring Austin's "independent determination that the price being paid to it for the Non-Voting Shares is fair to it and has been negotiated at arms-length...."

On December 5, 2002, Austin's lawyer requested information from Upper Deck "that would enable the Fund to make the representation ... that the Fund has independently determined that the price is fair." Instead of providing the information, Bendheim and Cahill agreed to send Austin a new draft, eliminating any provision for Austin's independent determination of the fairness of the $2 million purchase price. Upper Deck only provided Austin with income statements for the nine month period ending September 30, 2002, which showed net income of $29,519,305. Then, in a December 9, 2002 letter, Bendheim told Austin: "If you annualize the September 30, 2002 income statement results, the annualized net income is approximately $39,359,073," and concluded that "the $2 million purchase price is very fair especially in light of today's economic conditions."

8

EXHIBIT  M , PAGE  238

At the time of Bendheim's statements, Upper Deck had experienced a tremendous surge in income due to the success of Yu-Gi-Oh!  Thus, in October 2002 alone, Upper Deck reaped monthly net income of $46,596,546, more than the $39,359,073 annualized income figure that Bendheim posited to Austin as Upper Deck's income for all of 2002.  Similarly, in November 2002, Upper Deck's monthly net income was $35,082,825.  Neither the October 2002 nor November 2002 monthly net income figures were disclosed by Respondents to Austin.

When Austin asked for additional financial information to assist its accountants in determining the fair market value of Austin's shares, Bendheim, in a fax sent the same day, December 9, 2002, told Austin that Austin's accountants' view of fair market value was of no account, that the "real fair market value is whatever the Upper Deck Company is willing to pay for it [Austin's shares]" and that Upper Deck was "not willing to pay one dollar more" than $2 million. As shown by Empire Valuation Consultants' appraisal of Austin's shares at $11.3 million, as of December 31, 2002, the $2 million purchase price was substantially below fair market value.  Compounding his misrepresentations regarding Upper Deck's annualized income, Bendheim further claimed that, under the Shareholders Agreement, "only 25 percent of the price is required to be paid at closing … The balance can be deferred it appears for an indefinite time," and concluded: "Any delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk."

Without ever notifying AISLIC or requesting its consent, Respondents executed the Share Purchase Agreement shortly before December 30, 2002.  The Share Purchase Agreement eliminated the requirements of fair market value and an independent

9

EXHIBIT _M_, PAGE _239_

appraisal from the tax plan insured by AISLIC and, pursuant to Section 5.3, terminated "Austin's rights and obligations under the Shareholders Agreement."

In April 2004, the IRS issued Notice 2004-30 listing the S Corporation Tax Shelter (the "SC$^2$ transaction") as a tax avoidance transaction, the tax benefits of which the IRS intended to challenge.  On November 8, 2004,  the IRS followed up with a Coordinated Issue Paper, setting forth arguments for challenging the taxpayer's position in the SC$^2$ transaction; but cautioning: "Because many of these legal arguments are document sensitive, extensive factual development is necessary in order to establish and evaluate the appropriate legal positions." (Coordinated Issue Paper, at 1).  While positing the "substance over form" doctrine as one of the bases to attack the SC$^2$ transaction, the IRS set forth the caveat, "if the exempt party were considered a shareholder rather than a mere facilitator or accommodation party, the exempt party would be treated as a shareholder … to the extent of the actual economic benefits it realizes from the stock." (Id., at 6).

On August 5, 2004, the IRS served Information Document Requests on Upper Deck, among which was a request for all documents regarding the redemption of Austin's shares  (Information Document Request S608C, Nos. 2, 30-37, 46).  On October 21, 2004 and December 9, 2004, Upper Deck provided documents to the IRS regarding Upper Deck's repurchase of Austin's shares in December 2002.

By letter dated April 7, 2005, the IRS offered a settlement, which, among other things, proposed to tax the MPR Revocable Trust and McWilliam as if the transaction never occurred. Respondents notified the IRS that they wished to accept the IRS settlement proposal subject to reaching an agreeable closing agreement.  AISLIC stated it would not object, subject to reserving its other rights under the Policy.

10

EXHIBIT _M_, PAGE_240_

Meanwhile, a report published on February 8, 2005 by the United States Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs (the "Senate Subcommittee"), titled "The Role Of Professional Firms In The U.S. Tax Shelter Industry"(the "Senate report"), revealed that KPMG aggressively marketed $SC^2$ through telemarketing and calls to "literally thousands of potential $SC^2$ clients," as part of a scheme to generate huge fees for KPMG. (Senate report, at 41).

Respondents have demanded that AISLIC contribute its full policy limit towards payment of the taxes to be assessed if the IRS settlement proposed is consummated. AISLIC submits that there is no insurance coverage available and requests from the Arbitration Panel a ruling of no coverage and/or exclusion.

## ARGUMENT

### POINT I

### THERE IS NO INSURED TAX LOSS, SINCE RESPONDENTS' CLAIM DOES NOT ARISE FROM THE TAX PLAN SET FORTH IN THE DOCUMENTS ANNEXED TO AND DEEMED PART OF THE POLICY

The very first sentence of the Policy premises coverage on "the representations made and documents provided to [AISLIC]," which included the KPMG Opinions, the Shareholders Agreement, the Representation Letter, the Warrant Agreement and the FMV appraisal (together, the "Tax Plan"). Each of these documents was annexed to and deemed part of the Policy itself (Policy, §§ 2(n), 2(r),3(h)), so that the terms and conditions of the Tax Plan became part of Policy itself. AIG agreed to pay 90% of an Insured Tax Loss, defined as "any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and

11

EXHIBIT __M__ PAGE 241

exclusions of the policy" (Policy, §2(j)) -- including the terms and conditions of the Tax Plan annexed to and deemed part of the Policy itself.

The most critical elements of the Tax Plan set forth in the exhibits to the Policy were the following:

- Donative intent:     Thus, on page two of its Opinion on "Charitable Contribution," KPMG states as a fact upon which it relied in issuing the Opinion: "In accordance with the Shareholder's [McWilliam's] desire to support Municipal Plan [Austin], on March 31, 2001, the Shareholder donated all of the Non-Voting Common Stock to Municipal Plan." Respondents' intent "to support" Austin was critical to show that the Tax Plan had a non-tax purpose, one of the elements for satisfying the Economic Substance Doctrine. (Expert Report of Robert D. Burke, at 14-15);

- Fair market value:     The FMV appraisal valued Austin's shares according to their fair market value at the time of donation.  Similarly, the Shareholders Agreement provided that Austin would be paid fair market value for its shares either pursuant to exercise of its put option (Section 5.3) or upon the occurrence of a disposition event (Section 3.5).  Providing for the valuation of Austin's shares at fair market value, both at the time of donation and at the time of redemption, was essential to show donative intent, i.e., that the benefits and risks of ownership of Austin's shares had truly been passed on to Austin. Fair market value was also critical to avoid a second class of stock determination. Thus, KPMG opined both with respect to the issuance of the warrants, and with respect to the redemption of Austin's shares, that they would not trigger a "second class of stock, provided that their strike price can be shown to be not substantially below the fair market value of the stock." (Opinion on Warrants, at 4; Opinion on Charitable Contribution, at 7); and

- Fair market value appraisal: In order to evidence the valuation of Austin's shares at fair market value and to take advantage of the safe harbor provision discussed at page 4 of KPMG's Opinion on "Warrant distribution by Upper Deck," the Tax Plan provided for an appraisal of Austin's shares by an outside, nationally recognized appraisal firm. (Shareholders Agreement, §§ 3.5 and 5.3).  An appraisal by an outside, qualified appraiser was so important that the FMV appraisal was annexed to the Policy, and Respondents, as part of their application for the Policy, had to represent and warrant that FMV was an

#247186v1

EXHIBIT __M__, PAGE 242

"independent" and "competent" appraiser and that the FMV appraisal was "substantially correct." (Representation Letter, ¶ 4).

The Claim for which Respondents seek coverage, i.e., the tax plan actually carried out by Respondents that would have had to be defended against any IRS challenge, resulted from a forced repurchase of shares that bore no resemblance to the Tax Plan as contained in the Exhibits to the Policy, especially the Shareholders Agreement. Respondents erased any notion of donative intent by eliminating the requirements of fair market value and an independent appraisal when they terminated the Shareholders Agreement and substituted the Share Purchase Agreement, providing for a purchase price based solely on what Upper Deck was willing to pay, without any requirement of fairness or an appraisal.

Under New York law, "[i]t is basic that it is the insured which has the burden of showing that the insurance contract covers the loss for which the claim is made." Kidalso Gas Corp. v. Lancer Ins. Co., 21 A.D.3d 779, 780-81, 802 N.Y.S.2d 9, 11 (1st Dep't 2005). "Thus, for the insured to extend its coverage to more than it originally bargained, it would have to enter into a supplemental contract expanding the insurance clause or contracting the exceptions." Albert J. Schiff Assocs., Inc. v. Flack, 51 N.Y.692, 698, 435 N.Y.S.2d 972, 974-75 (1980).

Here, the Policy's insurance clause and the definition of Insured Tax Loss premised coverage on the terms and conditions of the Tax Plan as contained in the Exhibits to the Policy, especially the Shareholders Agreement. Respondents cannot meet the burden of proving their Claim is in accord with the terms and conditions of the Exhibits to the Policy, since they cancelled the Shareholders Agreement and embarked on their own course

13

EXHIBIT _M_, PAGE _243_

without notifying, much less obtaining AISLIC's consent.  Accordingly, as a result of

Respondents' abandonment of the Tax Plan, there is no coverage under the Policy.

## POINT II

## EXCLUSION 3(h) BARS COVERAGE DUE TO RESPONDENTS' TERMINATION OF THE SHAREHOLDERS AGREEMENT WITHOUT AISLIC'S CONSENT

Exclusion 3(h) to the Policy provides that AISLIC, without its prior written

consent, shall not be liable to make any payment for Loss "to the extent such Loss arises out

of, is based upon, or is attributable to an amendment to the Shareholders Agreement."  The

Share Purchase Agreement, drafted and entered into by Upper Deck in December 2002,

expressly provides for the termination -- the most drastic form of amendment -- of the

Shareholders Agreement.  Section 5.3 of the Share Purchase Agreement provides:

> 5.3   Shareholders Agreement.   It is hereby agreed by the parties that Austin's rights and obligations under the Shareholders Agreement shall terminate effective as of the Closing of the transactions contemplated hereby....

Having expressly agreed to terminate "Austin's rights and obligations under the Shareholders

Agreement," Respondents cannot now argue that the Share Purchase Agreement and "the

transactions contemplated thereby" were not an amendment of the Shareholders Agreement.

Respondents not only did not ask for AISLIC's consent to terminate the

Shareholders Agreement, they concealed their termination of the Shareholders Agreement

from AISLIC.  AISLIC would never have consented to redemption of Austin's shares for

other than fair market value as evidenced by a qualified appraisal.  Absent fair market value

being paid for Austin's shares, the tax plan was vulnerable to a successful challenge by the

IRS under the "economic substance" doctrine (See Sacks v. Commissioner, 69 F.3d 982, 988

(9th Cir. 1995)), since Respondents would not be able to meet the IRS' argument in its

14

EXHIBIT _M_, PAGE _244_

Coordinated Issue Paper, that "the exempt party [does not] enjoy a benefit, commensurate with its purported stock ownership, if the stock increases in value." (Coordinated Issue Paper, at 4, 6). Moreover, without a fair market appraisal, Respondents were also subject to a successful claim by the IRS that Austin's shares constituted a second class of stock, since Respondents would not be able to take advantage of the safe harbor provision discussed at page 4 of KPMG's Opinion on "Warrant distribution by Upper Deck."

If, as noted in the expert report of former IRS Division Counsel Linda B. Burke, Austin had received the fair market value for its shares, which Empire Valuation Consultants has conservatively appraised at $11.3 million as of December 31, 2002, "it would have been very difficult for the government to win the economic substance argument. Donative intent was clear and the Fund would actually have obtained the benefit of good performance by the Company." (L. Burke report, at 14).

By instead paying Austin only $2 million for its shares, a miniscule amount relative to their fair market value, without any appraisal as provided for in the Shareholders Agreement, Respondents made it impossible to defend against an IRS challenge. Id. at 21. Accordingly, the Loss claimed by Respondents "arose out of, was based upon, or was attributable to" Respondents' termination of the Shareholders Agreement. Maroney v. New York Central Mut. Fire Ins. Co., 5 N.Y.3d 467, 805 N.Y.S.2d 533 (2005) (holding that the words "arising out of" in the context of insurance policy exclusions "have broader significance than the words 'caused by' and are ordinarily understood to mean originating from, incident to, or having connection with..."). Exclusion 3(h) should therefore apply to exclude coverage for Respondents' termination of the Shareholders Agreement without AISLIC's consent as required under the Policy.

15

EXHIBIT _M_, PAGE _245_

**POINT III**

**RESPONDENTS' BREACHES OF WARRANTIES PRECLUDE COVERAGE**

New York recognizes both a claim for "an express, promissory warranty under common-law principles" and a statutory warranty claim under New York Insurance Law §3106(a). Star City Sportswear, Inc. v. Yasuda Fire & Marine Ins. Co. of America, 1 A.D.3d 58, 61-62, 765 N.Y.S.2d 854, 857 (1st Dep't 2003), *aff'd*, 2 N.Y.3d 789, 781 N.Y.S.2d 255 (2004) ("Star City") ("Not only is endorsement No. 6 a warranty within the meaning of Insurance Law § 3106(a), it also constitutes an express, promissory warranty under common-law principles."). New York Insurance Law §3106(a) defines a "warranty" as:

> any provision of an insurance contract which has the effect of requiring, as a condition precedent of the taking effect of such contract or as a condition precedent of the insurer's liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract.

Whether under common law or by statute, a warranty is "a promise by the insured to do or not do something that the insurer considers significant to its risk of liability under an insurance contract." Hartford Fire Ins. Co. v. Mitlof, 208 F. Supp.2d 407, 411 (2d Cir. 2002); Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 31 (2d Cir. 1999) (warranty is "a promise 'by which the assured undertakes that some particular thing shall or shall not be done, or that some condition shall be fulfilled, or whereby he affirms or negatives the existence of a particular state of facts'").

In their Representation Letter, "delivered to [AISLIC] in connection with the underwriting of the Policy, which letter is deemed part of the application of th[e] Policy"

#247186v1

EXHIBIT _M_, PAGE _246_

(Policy, §2(r)), Respondents acknowledged that AISLIC would "rely upon [its] accuracy and truthfulness" and proceeded to expressly represent and warrant that:

> 1. The facts, assumptions of fact, and understandings of facts set forth in the opinions of KPMG LLP attached as Exhibit A to the Policy were true and correct on the date of such opinions and continue to be true and correct on the date hereof ....

> 3. The Municipal Plan is neither legally bound to offer for redemption any of the non-voting shares of Upper Deck, nor can Upper Deck or any of its shareholders compel such a redemption, except pursuant to the exercise of the Right of First Refusal contained in the Shareholders Agreement, a copy of which is attached as Exhibit C to the Policy.

**A.   *Respondents Breached their Promissory Warranty With Respect To The Critical Assumption That Fair Market Value Would Be Paid For Austin's Shares***

As set forth in Point I, one of the basic assumptions of fact on which the tax plan was based was the concept of fair market value. In its Opinion on Charitable Contribution, KPMG represented with respect to Austin's shares: "The redemption amount is the fair market value of the stock on the date that Municipal Plan [Austin] presents the stock for redemption." (Opinion on Charitable Contribution, p.3). As KPMG explained in its Opinion, paying Austin fair market value for its shares was critical to avoiding a determination that Austin's shares constituted a second class of stock, which would result if,

> [t]he agreement establishes a purchase price that, at the time the agreement is entered into, is significantly in excess of or below the fair market value of the stock. (Id., p.6).

KPMG concluded that since, under the Shareholders Agreement, Upper Deck was required to pay fair market value for Austin's shares, the test "for avoiding a second class of stock should also be met." (Id., p.7). As an assumption of fact critical to the tax plan's validity,

#247186v1

EXHIBIT __M__, PAGE __247__

the representation that, in accord with the Shareholders Agreement, Austin would be paid

fair market value for its shares, constituted a promissory warranty.

For the reasons discussed in Point II, Respondents' breach of the promissory

warranty that Austin would be paid fair market value for its shares materially increased the

risk of Loss.

**B.**    ***Respondents Breached their Promissory Warranty That They Could Not Compel Austin To Redeem Its Shares***

Respondents expressly warranted to AISLIC that neither Upper Deck nor its

shareholders could compel Austin to redeem its non-voting shares of Upper Deck stock,

except pursuant to the exercise of the Right of First Refusal contained in the Shareholders

Agreement.  However, in December 2002, Upper Deck did compel Austin to redeem its

shares for far less than their fair market value. In response to Austin's request for financial

information to assist its accountants in determining the fair market value of its shares,

Bendheim, in a December 9, 2002 letter sent on Respondents' behalf, told Austin

representative Bill Stefka that Upper Deck was "not willing to pay a dollar more" than $2

million and threatened that "any delay or attempt to adjust the purchase price may put the

Austin Firefighters at significant risk."

Bendheim backed up this threat by misrepresenting that Upper Deck could

withhold 75% of the purchase price indefinitely, stating, "only 25 percent of the price is

required to be paid at closing (i.e., September 30, 2003).  The balance can be deferred it

appears for an indefinite time."[4]  He further strongly implied that any appraisal would only

---

[4] Bendheim only enclosed page ten of the Shareholders Agreement, which referred to a 25%
payment at closing, but omitted the next page, which provided: "The Company shall pay the

#247186v1                                    EXHIBIT _M_, PAGE _248_

support Upper Deck's desired purchase price, since the appraisal firm would be "engaged and compensated by the Upper Deck Company to perform the valuation." In sum, Respondent threatened that if Austin did not agree to the early redemption of its shares at the forced $2 million purchase price, Austin's redemption right would be in serious jeopardy.

The very next day, on December 10, 2002, Austin approved the Share Purchase Agreement without ever obtaining the additional financial documents requested by its accountants. Respondents, in violation of their promissory warranty, had successfully compelled Austin to redeem its shares for a fraction of their worth. Trustco Bank New York v. M.M.E. Power Enterprises, Inc., 223 A.D.587, 589, 636 N.Y.S.2d 831, 832 (2d Dep't 1996) ("The existence of economic duress is demonstrated by proof that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand."); Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 144, 589 N.Y.S.2d 613, 615 (3d Dep't 1992) (finding evidence that defendants, through threats, exercised economic duress upon plaintiff "for a redemption of their [defendants'] shares at an inflated price"). Respondents' heavy-handedness materially increased the risk of a successful challenge by the IRS by "substantially diminish[ing] any argument that one of the principal motivations for entering into the $SC^2$ transaction was to provide an economic benefit to [Austin]." (R. Burke Report, at 23).

---

remaining balance of the Put Price to the Donee in cash or other mutually agreed upon consideration within forty-five (45) days after the Closing."

#247186v1                          EXHIBIT  _M_ , PAGE _249_

**C.**   ***Respondents' Warranty to AISLIC of the Truth Of The KPMG Opinions Proved False As A Result Of KPMG's Mass-Marketing Campaign***

The facts, assumptions of fact, and understandings of facts set forth in the KPMG opinions, the truth and correctness of which were warranted by Respondents, failed to disclose that KPMG had mass-marketed the $SC^2$ transaction as part of a scheme to generate huge fees. While Upper Deck's broker Marsh informed AISLIC that KPMG had implemented a number of $SC^2$ transactions, KPMG's mass-marketing campaign in the pursuit of millions of dollars in fees was not disclosed to AISLIC.  The significance of KPMG's mass marketing campaign was commented on in a  December 2001 internal email from a KPMG professional, who wrote:

> Going way back to Feb. 2000, when $SC^2$ first reared its head, my recollection is that $SC^2$ was intended to be limited to a relatively small number of large S corps.  That plan made sense because, in my opinion, there was (and is) a strong risk of successful IRS attack on $SC^2$ if the IRS gets wind of it …. Call me paranoid, but I think that such a widespread marketing campaign is likely to bring KPMG and $SC^2$ unwelcome attention from the IRS.  If so, I suspect a vigorous (and at least partially successful) challenge would result.

The KPMG professional's concern proved accurate in that the mass-marketing of the $SC^2$ transaction led to scrutiny from both the Senate Subcommittee, which, in November 2003, held hearings on the subject, and the IRS, which, in April 2004, issued Notice 2004-30 listing the "S Corporation Tax Shelter" as a tax avoidance transaction, the tax benefits of which the IRS intended to challenge.  The aggressive mass-marketing of the $SC^2$ transaction by KPMG, therefore, materially increased the risk of Loss under the policy.

20

EXHIBIT __M__, PAGE __256__

In sum, Respondents breached their warranties to AISLIC, materially increasing the risk of Loss under the Policy.  Accordingly, there is no coverage under the Policy.[5]

## POINT IV

## EXCLUSION 3(a) BARS COVERAGE FOR RESPONDENTS' FRAUDULENT INDUCEMENT OF THE REPURCHASE OF AUSTIN'S SHARES

Exclusion 3(a) of the Policy provides that the Insurer shall not be liable to make any payment for Loss in connection with a Claim made against any Insured:

> arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud), or any knowing and intentional violation of any law, rule, regulation or statute; provided, however, that effecting the transactions described in the Opinions and the filing of Tax Returns with any Taxing Authority by the Insureds consistent with the transactions described in the Opinions shall not be the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud) or a knowing and intentional violation of law, rule, regulation or statute for purposes of this Clause 3(a).

Here, Respondents induced Austin to sell its stock for a price that was far below its fair value by deliberately misrepresenting Upper Deck's annual income and withholding from Austin and its accountants financial information that would have revealed Upper Deck's tremendous surge of income in the latter part of 2002.  In a December 9, 2002 fax to Austin, KPMG, on Upper Deck's behalf, only provided Upper Deck's income statements through the first nine months of 2002, showing $29,519,305 of net income for the

---

[5] The same result is reached by Exclusion 3(b) of the policy, which provides that AISLIC shall not be liable for Loss in connection with a Claim "arising out of, based upon or attributable to any material inaccuracy in the facts set forth or referenced in the Representation Letter."

21

EXHIBIT _M_, PAGE _251_

period ending September 30, 2002. Bendheim then suggested: "If you [Austin] annualize the September 30, 2002 income statement results, the annualized net income is approximately $39,359,073." He concluded that "the $2 million purchase price is very fair especially in light of today's economic conditions."

At the time Bendheim made these representations on Respondents' behalf, Respondents knew that they were materially false and misleading. Whereas Upper Deck's monthly net income for September 2002 -- the last month of the period annualized by Mr. Bendheim -- was $7,398,839, Upper Deck's monthly net income for October 2002 was $46,596,546. Thus, in October 2002 alone, Upper Deck's monthly net income was greater than the $39,359,073 that Bendheim approximated as Upper Deck's net income for the entire year. Similarly, in November 2002, Upper Deck experienced net income of $35,082,825. Not surprisingly, Upper Deck's actual year-end net income for 2002 was $151,407,745, almost 400% times the $39,359,073 annualized net income figure presented to the Austin.

Bendheim, on Respondents' behalf, also misrepresented to Austin that under the Shareholders Agreement "the fair market value of the stock is essentially determined by Upper Deck"; that [t]he real market value is what the Upper Deck Company is willing to pay for it," i.e., $2 million and not "one dollar more"; and that under the Shareholders Agreement "only 25 percent of the price is required to be paid at closing (i.e. September 30, 2003). The balance can be deferred it appears for an indefinite time." Section 5.2 of the Shareholders Agreement actually provided that the put price "shall be the fair market value" as determined by a qualified appraiser. Moreover, under Section 5.3(b), the entire purchase price had to be paid "in cash or other mutually agreed upon consideration within forty-five (45) days after

22

EXHIBIT _M_, PAGE _252_

the Closing." Respondents therefore compounded their fraudulent misrepresentations regarding Upper Deck's annual income by misrepresenting the terms of the Shareholders Agreement in such a way as to make it seem that "[a]ny delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk."

Respondents have asserted that, pursuant to the Policy's choice of law clause, the Panel must determine whether under New York law the above misrepresentations and omissions constitute, in fact, a "criminal or deliberate fraud (including without limitation deliberate civil fraud)"or a "knowing and intentional violation of any law, rule regulation or statute." The answer is clearly yes. <u>J.A.O. Acquisition Corp. v. Stavitsky</u>, 192 Misc.2d 7, 13, 745 N.Y.S.2d 634 (Sup. Ct., N.Y. Co. 2001) (holding that defendants' alleged misrepresentations in connection with stock purchase agreement regarding company's inventory, accounts receivable and net worth of company constituted "appropriate fraud claim" separate and apart from claim for breach of warranties in stock purchase agreement); <u>Foothill Capital Corp. v. Grant Thornton, LLP</u>, 276 A.D.2d 437, 715 N.Y.S.2d 389 (1st Dep't 2000) (accounting firm's gross negligence and recklessness in overstating company's inventory, accounts payable and fixed assets held "sufficient to give rise to an inference of fraud").

Further, Respondents' fraudulent inducement of the early redemption of Austin's shares at a cheap price also constituted a violation of Section 25401 of California's Corporate Securities Law, applicable to Upper Deck's conduct at the time. This Section provides: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to

23

EXHIBIT _M_, PAGE_253_

make the statements made, in the light of the circumstances under which they were made, not misleading." Under Section 25401, "(1) proof of reliance is not required, (2) although the fact misrepresented or omitted must be 'material,' no proof of causation is required, and (3) plaintiff need not prove defendant's negligence." Bowden v. Robinson, 67 Cal.App.3d 705, 715 (Cal. Ct. App. 1977).

Nor does the exception in Exclusion 3(a) applicable to the "effecting [of] the transactions described in the Opinions" apply. Nowhere do the KPMG Opinions provide for redemption of Austin's shares for anything other than fair market value as verified by a qualified appraiser, or for the use of deception to force an early redemption of Austin's shares at a price based solely on what Respondents were willing to pay.

Finally, the Loss claimed by Respondents arose out of their fraudulent inducement of the sale of Austin's stock at a price far below fair market value, since, as set forth at page 23 of the expert report of Robert D. Burke: "The manner in which the Upper Deck Parties repurchased its shares in December 2002 significantly diminished the prospects that the tax benefits associated with the $SC^2$ transaction would be upheld by a court if litigated." (*See* note 5, *supra*).

**POINT V**

**RESPONDENTS' FAILURE TO COMPLY WITH AN EXPRESS CONDITION PRECEDENT TO COVERAGE VITIATES COVERAGE**

The New York Court of Appeals has defined a condition precedent as "an act or event … which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y. 2d 685, 690, 636 N.Y.S.2d 734 (1995) ("Oppenheimer") (*ellipses in original*);

24

EXHIBIT M , PAGE 254

<u>Chase Manhattan Bank v. New Hampshire Ins. Co.</u>, 4 Misc.3d 1026(A), 2004 WL 2169394

at *4 (Sup. Ct., N.Y. Co. 2004) ("<u>Chase</u>").  Express conditions, which are those conditions

precedent "agreed to and imposed by the parties themselves," <u>Oppenheimer</u>, 86 N.Y. 2d at

690, "must be 'literally performed,' and [are] not satisfied by substantial compliance."

<u>Chase</u>, 2004 WL 2169394 at *4 (in rejecting insured's claim that condition precedent under

Contingent Loss of Revenue Insurance Policy was a warranty under Insurance Law §3106,

Court held that express condition precedent required literal compliance with a "set of events,

the occurrence of which must precede coverage").

   A failure of an express condition precedent vitiates coverage entirely and

there is no requirement that the failure of the condition caused or even contributed to the

claimed loss under the policy.  <u>Sulner v. G.A., Ins. Co. of New York</u>, 224 A.D.2d 205, 206,

637 N.Y.S.2d 144, 145 (1st Dep't), <i>lv. to appeal denied</i>, 88 N.Y.2d 805 (1996) ("<u>Sulner</u>").

In <u>Sulner</u>, involving a condition precedent in an insurance policy which provided that, when

open for business, the insured shop's valuable papers and records be kept in certain metal

cabinets, the Court held:

>    Since plaintiff has conceded that she failed to perform a
> condition precedent under the insurance policy, she is not
> entitled to collect for any loss to the valuable documents, and it
> is irrelevant whether the breach of the condition precedent was
> the cause of all or part of the water damage to the valuable
> documents or that the subject policy lacked a specific
> pronouncement that the lack of performance would result in a
> loss of coverage. (<u>Ibid.</u>)

   Here,  Section 9 of the Policy, captioned "Conditions Precedent," in

unmistakable terms sets forth as an express "condition precedent to the right of the Insureds

to be indemnified hereunder, that the Insureds comply with the terms and conditions" of sub-

25

EXHIBIT <u>M</u>, PAGE <u>255</u>

clause (b) which, in turn, requires: "The Insureds shall have prepared and filed all applicable Tax Returns in a manner materially consistent with that anticipated by the Opinions and/or the Representation Letter."

The KPMG opinion on "Charitable Contribution" to Austin clearly anticipates that McWilliam, as Shareholder, would take a charitable deduction on his 2001 tax return. One of KPMG's principal conclusions, Conclusion No. 5 of its Opinion on the "Charitable Contribution" to Austin is: "It is more likely than not that the Shareholder will be entitled to a charitable deduction for the fair market of the stock the Shareholder donated." (Opinion on "Charitable Contribution, p.4) (underline in original).   The opinion devotes several pages to the subject (Id., pp.5, 9-11 ), and concludes that the donation of Non-Voting Common Stock to Austin "should be considered as deductible gifts because Municipal Plan [Austin] did not transfer any cash or property to the Shareholder in return for his contribution." (Id. at 10).

Respondents admit "that Mr. McWilliam did not claim a charitable deduction on his 2001 income tax return" for the value of the non-voting shares donated to Austin. (Answer, ¶ 84).  Accordingly, Respondents have failed to satisfy an express condition precedent under the Policy, thereby vitiating coverage under the Policy.

## POINT VI

## RESPONDENTS IMPAIRED AISLIC'S RIGHT TO SUBROGATION

Pursuant to Article 10 of the Policy, AISLIC, in the event of payment under the Policy, had the right to be subrogated "to all the rights and remedies of the Insureds in respect of such Loss..."  Respondents, for a considerable fee, entered into an engagement with KPMG, whereby KPMG agreed to provide its Opinions based on the Tax Plan it had presented. However, as set forth in Point I, Respondents radically departed from the Tax Plan

26

#247186v1

EXHIBIT _M_, PAGE _254_

that KPMG had crafted.  Respondents repudiated their donative intent and the requirement

set forth in the KPMG opinions that Austin's shares be redeemed at a purchase price not

substantially above or below the fair market value of the stock.  Respondents thereby

impaired any claim against KPMG based on the KPMG Opinions. Similarly, as a result of

Respondents' termination of the Shareholders Agreement, any attempt to obtain a more

favorable settlement from the IRS was thwarted, since Respondents "substantially

undermine[d] the substance that the transaction would have had under the Shareholders

Agreement." (L. Burke report, at 20).

       Respondents thereby impaired AISLIC's rights to subrogation under the

Policy against both KPMG and the Government.  Accordingly, coverage should not lie under

the Policy.  Weinberg v. Transamerica Ins. Co., 62 N.Y.2d 379, 384-85, 477 N.Y.S.2d 99

(1984) (affirming summary judgment dismissal of claim seeking to recover benefits against

insurer because insured failed to protect the subrogation rights of the insurer); Aetna Cas. &

Surety Co. v. Longo Prod., Inc., 247 A.D.2d 497, 669 N.Y.S.2d 336 (2d Dep't), *lv. to appeal*

*denied*, 92 N.Y.2d 802 (1998) (same).

### POINT VII

### RESPONDENTS' COUNTERCLAIM FOR ALLEGED BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING IS LEGALLY AND FACTUALLY DEFICIENT

       Under New York law, a contractual choice of law provision applies with equal

force to a claim for breach of an implied duty of good faith. Thus, in Butvin v. Doubleclick,

Inc., 2001 WL 228121 (S.D.N.Y. 2001), *aff'd*, 22 Fed. Appx. 57 (2d Cir. 2001), the Court, in

applying a Delaware choice of law provision in an option agreement to a claim for breach of

an implied covenant of good faith held: "Since 'the implied covenant of good faith … is a

27

EXHIBIT __M__, PAGE _257_

rule of interpretation rather than a separate obligation,' (citation omitted), the Court holds
that a claim for breach of the covenant is a contractual cause of action and therefore
Delaware law applies to [plaintiff's] claim regarding the Option Agreement." Id. at *7;
Yankee Caithness Joint Venture, LP v. Planet Ins. Co., 1996 WL 426359 at *2 (S.D.N.Y.
1996) ("Yankee") (in rejecting an argument that a choice of law provision applying New
York law to any dispute regarding the "meaning, interpretation or operation of any term,
condition, definition or provision" of an insurance policy, did not apply to claims for punitive
damages and breach of the covenant of good faith, the Court held: "This argument has no
merit.  Any duty to defend and indemnify arises directly from the policy provisions
respecting coverage.").

     Here, the choice of law clause in Section 16 of the Policy is extremely broad,
providing that where the Federal Arbitration Act does not apply, New York law shall apply.
(Policy, §16: "The arbitration shall be subject to the Federal Arbitration Act and, to the
extent such Act is not applicable, the laws of the State of New York.").  In particular, the
choice of law clause singles out disputes regarding the "performance of this Policy," i.e.,
compliance with the parties' obligations under the Policy, as governed by New York law.

     Under New York law, "'breach of an implied covenant of good faith and fair
dealing is intrinsically tied to the damages allegedly resulting from a breach of contract.'"
Network Enterprises, Inc. v. APBA Offshore Prods., Inc., 2004 WL 1837349 at *4 (S.D.N.Y.
2004) ("Network Enterprises"), quoting, Canstar v. J.A. Jones Constr. Co., 622 N.Y.S.2d
730, 731 (1st Dep't 1995).  "As a result, most courts 'faced with a complaint brought under
New York law and alleging both breach of contract and breach of a covenant of good faith

EXHIBIT __M__, PAGE _25C_

and fair dealing [have] dismissed the latter claim as duplicative.'" <u>Network Enterprises</u>, 2004 WL 1837349 at *4.

The New York Court of Appeals thus held, in <u>New York University v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 319-20, 639 N.Y.S.2d 283, 290 (1995) ("<u>NYU</u>"), that plaintiff insured's claim that defendant insurer's actions, including its denial of coverage, were "'careless, negligent, reckless and vindictive" amounted "to nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing," which the Court held "should have been dismissed" as "duplicative of the first cause of action for breach of contract...." <u>NYU</u>, 87 N.Y.2d at 319-20, 639 N.Y.S.2d at 290; <u>Core-Mark Int'l Corp. v. Commonwealth Ins. Co.</u>, 2005 WL 1676704 at *3-4 (S.D.N.Y. 2005) ("New York does not recognize the tort of bad faith denial of insurance coverage.").

Respondents' Counterclaim's second cause of action against AISLIC for breach of the covenant of good fair and fair dealing should therefore, under controlling New York law, be dismissed as duplicative of their first cause of action for breach of contract.[6] Denial of Respondents' counterclaim should also result in denial of plaintiff's claim for punitive damages.  Under New York law, extra-contractual damages, such as punitive damages, are only recoverable if:  "(1) defendant's conduct [is] actionable as an independent tort; (2) the tortious conduct [is] of [an] egregious nature ...; (3) the egregious conduct [is] directed to the plaintiff; and (4) it [is] part of a pattern directed at the public generally." <u>NYU</u>, 87 N.Y.2d at 316, 639 N.Y.S.2d at 287; <u>Rocanova v. Equitable Life Assur. Soc.</u>, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339 (1994); <u>Yankee</u>, 1996 WL 426359 at *1

---

[6]  For the same reason, under New York law, AISLIC cannot pursue a separate claim for Respondents' breach of their implied covenant of good faith and fair dealing.

29

EXHIBIT __M__, PAGE __259__

(S.D.N.Y. 1996).  None of these required elements are met here.  Accordingly, Respondents'

counterclaim for breach of implied covenant of good faith and fair dealing and its claim for

extra-contractual damages should be dismissed.

## CONCLUSION

Based on the foregoing, Claimant respectfully requests that the Panel issue an

Order that there is no coverage under the Policy.

Dated:  New York, New York
          September 15, 2006

Respectfully submitted,

D'AMATO & LYNCH

By: _____

Robert E. Kushner
Peter A. Stroili
**Attorneys for Petitioners**
70 Pine Street
New York, New York  10270
(212) 269-0927

EXHIBIT __M__, PAGE _260_

#247186v1