# EXHIBIT N

1  Richard K. Howell (State Bar No. 144241)
   Duke F. Wahlquist (State Bar No. 117722)
2  Bradley A. Chapin (State Bar No. 232885)
   RUTAN & TUCKER, LLP
3  611 Anton Boulevard, Fourteenth Floor
   Costa Mesa, California 92626-1931
4  Telephone:  714-641-5100
   Facsimile:  714-546-9035
5  Email:  rhowell@rutan.com

6  Attorneys for Respondents and Counterclaimants
   The Upper Deck Company and Richard P. McWilliam,
7  individually and as Trustee for the
   MPR Trust

8

9                    AMERICAN ARBITRATION ASSOCIATION

10

11  AMERICAN INTERNATIONAL          CASE NO. 13 195 02486 05
    SPECIALTY LINES INSURANCE
12  COMPANY and DOES 1 through 10,  John F. Byrne, Esq.
    inclusive,                      Stephen D. Kramer, Esq.
13                                  Charles J. Morley, Jr., Esq.
            Claimant,
14
        v.
15                                  RESPONDENTS' AND COUNTER-
                                    CLAIMANTS' OPENING BRIEF
16  THE UPPER DECK COMPANY, a
    California corporation, and
17  RICHARD P. MCWILLIAM, individually,
    and as Trustee for the MPR Trust,
18
            Respondents.            Dates:     October 10-13, 2006
19                                             October 30-Nov 2,2006
                                    Time:      10:00 a.m.
20  THE UPPER DECK COMPANY, a       Location:  Amer Arbitration Assn
    California corporation, MPR TRUST, a          1633 Broadway, 10th Floor
21  revocable trust, and RICHARD P.             New York, New York
    MCWILLIAM, individually, and as Trustee
22  for the MPR Trust,

23          Counter-Claimant,

24      v.

25  AMERICAN INTERNATIONAL
    SPECIALTY LINES INSURANCE
26  COMPANY and ROES 1 through 10,
    inclusive,
27
            Counter-Respondents.
28

EXHIBIT _N_, PAGE 261

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND ARGUMENT SUMMARY. ...........................................1

II.   RELEVANT FACTUAL BACKGROUND.................................................................5

    A.    SC2: The Tax Strategy Covered By The Policy...........................................6

        1.    The Typical SC2 Transaction. .........................................................9

        2.    Upper Deck And SC2. ...................................................................11

    B.    The Insureds' Tax Benefit Resulting From SC2. .......................................16

    C.    The Policy. ................................................................................................17

    D.    The IRS and California FTB Attack The Validity Of SC2. .......................18

    E.    With AIG's Consent, The Insureds Agree To Settle With The IRS And The FTB. ........................................................................21

        1.    Settlement With The IRS. ..............................................................22

        2.    Settlement With The FTB. .............................................................23

III.  THE INSUREDS' $50 MILLION POLICY PROVIDES COVERAGE FOR THE LOSSES SUSTAINED AS A RESULT OF THE IRS' AND FTB'S ASSERTIONS THAT THE INSUREDS IMPROPERLY REPORTED THEIR TAX LIABILITY BASED ON SC2..........................................................................................................24

    A.    The Policy's Insuring And Coverage Language.........................................24

    B.    A "Claim" Exists Under The Policy. .........................................................24

    C.    At Least Three Insured Tax Events Have Occurred. ..................................26

        1.    The IRS' Has Asserted That Upper Deck Has More Than One Class Of Stock -- An "Insured Tax Event" Under Paragraph (a) of Endorsement No. 1 of the Policy. ...........................27

        2.    The IRS Has Asserted That Upper Deck's Post-Gift Allocation Of Income To The Austin Firefighters Was Improper -- An "Insured Tax Event" Under Paragraph (d) of Endorsement No. 1 of the Policy. ...........................29

        3.    The IRS Has Asserted That A Shareholder Of Upper Deck Improperly Assigned Income To The Austin Firefighters -- An "Insured Tax Event" Under Paragraph (e) of Endorsement No. 1 of the Policy. ...........................31

    D.    The Insureds' Tax Loss..............................................................................32

EXHIBIT _N_ PAGE 262

|  |  |  |  | **Page** |
|---|---|---|---|---|
| IV. | | AIG'S DENIAL OF COVERAGE AND ITS STATED REASONS FOR DOING SO FIND NO SUPPORT IN THE POLICY OR APPLICABLE LAW. | | 33 |
| | A. | AIG Has Raised A Variety Of Specious Coverage Defenses Over the Past Few Years, Many Of Which It Has Dropped. | | 33 |
| | | 1. | AIG's Refusal To Acknowledge The Existence Of A Claim. | 33 |
| | | 2. | AIG's Contention That It Was Somehow Misled About Upper Deck's Potential For Growth. | 34 |
| | B. | AIG's Assertion That The Insureds' Breached a Warranty Is Without Merit. | | 38 |
| | | 1. | To Defeat Coverage, An Insured's Breach Of Warranty Must Materially Increase The Risk Of Loss. | 38 |
| | | 2. | The Insureds Neither Breached Any Warranties Given To AIG Nor Did Any Alleged Breach Materially Increase The Insureds' Risk Of Loss. | 39 |
| | C. | None Of The Exclusions Cited By AIG Are Applicable. | | 43 |
| | | 1. | The 2002 Share Purchase Agreement Does Not Provide The Basis For Denying Coverage Under Exclusion 3(h). | 45 |
| | | 2. | The Insureds' Alleged Conduct In Connection With The Acquisition of Austin Firefighter's Shares Does Not Bring Their Loss Within Exclusion (a) Of The Policy. | 47 |
| | | 3. | The Insureds Cannot Bring The Loss Within Exclusion (b) of The Policy. | 50 |
| | D. | Section 10 Of The Policy's Provisions Regarding Subrogation Are No Bar To The Insureds' Recovery. | | 50 |
| | E. | Mr. McWilliam Was Not Obligated To Take A Charitable Deduction For Gifting The Non-Voting Stock To Austin Firefighters In Order For The Insureds To Recover Under The Policy. | | 52 |
| V. | | NO OFFSETTING BENEFITS HAVE OCCURRED AND TO ARGUE THAT ONE *MIGHT* OCCUR IN THE FUTURE IS MERE SPECULATION AND CONJECTURE. | | 54 |
| VI. | | AIG'S BAD FAITH DENIAL OF THE INSUREDS' CLAIM UNDER THE POLICY. | | 56 |
| | A. | Bad Faith Damages Are Recoverable. | | 57 |
| | | 1. | The Choice Of Law Provision Governs Contract Based Claims Only. | 57 |

| | | | Page |
|---|---|---|---|
| | | 2. The Insureds' Tort Claims Are Governed By California Law. | 60 |
| | B. | An Insurer Violates Its Covenant of Good Faith And Fair Dealing When It Unreasonably Withholds Benefits Under The Policy. | 63 |
| | C. | An Insured's Unreasonable Delay In Making A Coverage Determination Constitutes Actionable Bad Faith. | 63 |
| | D. | An Insured's Assertion Of Specious Coverage Defenses Constitutes Actionable Bad Faith. | 64 |
| | E. | AIG Has Acted In Bad Faith. | 65 |
| | | 1. AIG Has Acted In Bad Faith By Denying Coverage Based On Unreasonable Interpretations Of The Policy Exclusions And Warranties. | 66 |
| | | 2. AIG Has Unreasonably Delayed Processing Of The Claim, Which Delay Has Now Resulted In A Bad Faith Denial Of Coverage. | 68 |
| | F. | The Insureds Are Entitled To Both Compensatory Damages, Including Attorneys' Fees, And Punitive Damages. | 71 |
| VII. | CONCLUSION | | 72 |

EXHIBIT _N_, PAGE _264_

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Amadeo v. Principal Mutual Life Insurance Co.,*
290 F.3d 1152 (9th Cir. 2002) ....................................................................63, 64, 65

*Banque Arabe Et Internationale D'Investissement v. Maryland National Bank,*
57 F.3d 146 (2d Cir. 1995) ...................................................................................35

*Finance One Public Co. Ltd. v. Lehman Brothers Special Financing, Inc.,*
414 F.3d 325 (2d Cir. N.Y. 2005) .......................................57, 58, 59, 60, 61

*Harris v. Provident Life & Accident Insurance Co.,*
310 F.3d 73 (2d Cir. 2002) ..........................................................................60, 63

*Hartford Fire Insurance Co. v. Mitlo,f*
208 F. Supp. 2d 407 (S.D.N.Y. 2002) ..................................................................44

*Int'l Multifoods Corp. v. Committee Union Insurance Co.,*
98 F. Supp. 2d 498 (S.D.N.Y. 2000) ...................................................................61

*Kimmins Industrial Serv. Corp. v. Reliance Insurance Co.,*
19 F.3d 78 (2d Cir. 1994) ...........................................................................44, 45

*Klaxon Co. v. Stentor Electric Manufacturing Co.,*
313 U.S. 487 (1941) ...........................................................................................60

*Krock v. Lipsay,*
97 F.3d 640 (2d Cir. 1996) ..................................................................................57

*Mass. Casualty Insurance Co. v. Morgan,*
886 F. Supp. 1002 (E.D.N.Y. 1995) ..............................................................61, 62

*McCormick & Co. v. Empire Insurance Group,*
878 F.2d 27 (2d Cir. 1988) ..................................................................................44

*Norlin Corp. v. Rooney, Pace Inc.,*
744 F.2d 255 (2d Cir. 1984) ................................................................................60

*Olin Corp. v. Insurance Co. of North America,*
743 F. Supp. 1044 (S.D.N.Y.1990) ......................................................................61

*Phildelphia Parking Authority v Federal Insurance Co.,*
385 F. Supp. 2d 280 (S.D.N.Y. 2005) ..................................................................61

*United States Fire Insurance Co. v. Pkfinans International Corp.,*
904 F.2d 169 (2d Cir. 1990) ................................................................................39

*Valley Juice Ltd. v. Evian Waters of France, Inc.,*
87 F.3d 604 (2d Cir. 1996) ..................................................................................58

EXHIBIT _N_, PAGE _265_

**Page(s)**

**STATE CASES**

*Acquista v. N. Y. Life Ins. Co.,*
   285 A.D.2d 73 (2001) ...................................................................71

*Album Realty Corp. v. American Home Assurance Co.,*
   176 A.D.2d 513 (N.Y.App.Div, 1st Dept. 1991) ........................45

*Brandt v. Superior Court (Standard Ins. Co.),*
   37 Cal. 3d 813 (1985) ..................................................................72

*Delgado v. Heritage Life Insurance Co.,*
   157 Cal. App. 3d 262 (1984) .......................................................72

*Egan v. Mutual of Omaha Insurance Co.,*
   24 Cal. 3d 809 (1979) ..................................................................72

*First Federal Savings and Loan Association v. Nichols,*
   306 N.Y.S.2d 542 (4th Dept. 1970) .............................................39

*Fleming v. Safeco Insurance Co.,*
   160 Cal. App. 3d 31 (1984) ....................................................64, 65

*Gruenberg v. Aetna Insurance Co.,*
   9 Cal. 3d 566 (1973) ..............................................................63, 71

*Gurfein Brothers v. Hanover Insurance Co.,*
   248 A.D.2d 227 (N.Y.App.Div., 1st Dept. 1998) ........................44

*Irv-Bob Formal Wear, Inc. v. Public Service Mutual Insurance Co.,*
   366 N.Y.S.2d 596 (N.Y.Civ.Ct. 1975) ........................................38

*Kransco v. American Empire Surplus Lines Insurance Co.,*
   23 Cal. 4th 390 (2000) .................................................................52

*Mighty Midgets, Inc. v. Centennial Insurance Co.,*
   47 N.Y.2d 12 (1979) ....................................................................72

*Munzer v. St. Paul Fire & Marine Insurance Co.,*
   203 A.D.2d 770, 610 N.Y.S.2d 389 (N.Y.App.Div., 3d Dept. 1994) ..........................62

*Neuss, Hesslein & Co. v. 380 Canal St. Realty Corp.,*
   168 N.Y.S.2d 579 (1957) .............................................................51

*Pacific-Southern Mortgage Trust Co. v. Insurance Co. of N. Am.,*
   166 Cal. App. 3d 703 (1985) .......................................................72

*Schultz v. Boy Scouts of America, Inc.,*
   65 N.Y.2d 189 (N.Y. 1985)..........................................................61

*Sukup v. State,*
   19 N.Y.2d 519 (1967)...................................................................72

EXHIBIT _N_, PAGE _266_

**Page(s)**

*Throgs Neck Bagels, Inc. v. GA Insurance Co.,*
    241 A.D.2d 66 (1st Dept. 1998) ...................................................................4, 44, 45

*Twinlab Corp. v. Paulson,*
    283 A.D.2d 570 (N.Y.App.Div., 2d Dep't 2001) ....................................................58, 59

## FEDERAL STATUTES

Internal Revenue Code
    Section 1.1361-1(l).........................................................................................28
    Section 1.1361(l)(4)(iii)..................................................................................15
    Section 1.1361-1(l)(4)(ii).................................................................................27
    Section 1.1361-1(l)(4)(iii)................................................................................27
    Section 1.1361-1(l)(4)(iii)(A)...........................................................................28
    Section 1.601104(b)(2)....................................................................................20
    Section 170...................................................................................................52
    Section 1361........................................................................................26, 27, 28
    Section 1361(b)(1)(D)................................................................................27, 28
    Section 1367(a)..............................................................................................55

## STATE STATUTES

California Civil Code
    Section 3333.................................................................................................71

California Corporations Code
    Section 25402...............................................................................................49

California Revenue & Tax Code
    Section 18622...............................................................................................23
    Section 19059...............................................................................................23
    Section 19060...............................................................................................23

New York Insurance Law
    Section 3106................................................................................................53
    Section 3106(b) .....................................................................................38, 53

EXHIBIT _N_, PAGE _267_

I.      **INTRODUCTION AND ARGUMENT SUMMARY.**

This action arises out of Claimant/Counter-Respondent American International Specialty Lines Insurance Company's, a wholly-owned subsidiary of American International Group, Inc., (hereinafter referred to as "AIG") breach of its obligation to pay policy benefits to its insured, Respondent/Counter-Claimants The Upper Deck Company, MPR Trust, and Richard P. McWilliam (collectively the "Insureds" or separately the "Insured"). On August 29, 2001, AIG issued its "Fiscal Event Insurance Policy" (the "Policy") to the Insureds, insuring the anticipated benefits of their participation in a tax strategy known as the S Corporation Charitable Contribution Strategy ("SC2") in an amount up to $50 million in exchange for the significant premium of $3.25 million. Earlier in 2001, the Insureds had paid $575,000 to purchase the SC2 strategy from KPMG, LLP. The Policy was purchased for the express purpose of insuring against the "assertion" by any taxing authority that the tax strategy did not provide the tax benefits promised by KPMG.

The SC2 strategy and other similar ill-fated tax strategies sold by KPMG have resulted in Congressional hearings, KPMG acknowledging its fraud, numerous criminal indictments, and KPMG's agreement to pay approximately $456 million in fines to the United States Government. Even AIG's retained tax experts in this action -- after outlining the most favorable case law they could find in favor of AIG's position -- can say nothing more than that if the SC2 strategy has been implemented and maintained precisely in the manner AIG now asserts it should have been, the tax strategy "would have had a reasonable prospect of success" if the Insureds litigated with the IRS. (Expert Report of Robert D. Burke, p. 9.) The Insureds, however -- faced with the prospect of paying upwards of $150 million dollars in additional taxes and penalties if they litigated and lost with the IRS -- have now agreed to settle the claims asserted by the IRS for a payment of more than $80 million (approximately $66 million in back taxes and $14.5 million in estimated interest). The additional taxes and interest paid to the California Franchise Tax Board ("FTB") total approximately $17 million. The IRS settlement being entered into by

EXHIBIT _N_, PAGE _268_

1  the Insureds was not only consented to by AIG, it is on the identical terms offered by the

2  IRS to each and every one of the other 58 different persons/entities who utilized the SC2

3  tax strategy.

4      Incredibly, despite the fact that <u>every</u> -- including some 58 participants -- SC2

5  strategy ever implemented has been attacked by the IRS, despite the fact that the Insureds

6  are entering into the identical settlement structure being offered and accepted by the other

7  "generic" SC2 participants, and despite the fact that AIG issued a policy that expressly

8  provided coverage based on <u>any</u> "assertion" by a taxing authority that the SC2 strategy was

9  not legitimate, AIG has somehow denied coverage under the Policy. AIG's position is not

10 only absurdly self-serving, its denial of coverage is in bad faith.

11     The SC2 transaction was designed, marketed and sold by KPMG to 58 KPMG

12 clients. The tax strategy -- identical to numerous other similar and admittedly illicit

13 strategies marketed by KPMG -- was designed to allow owners of an S corporation such as

14 The Upper Deck Company ("Upper Deck") to lower their tax liability by 90% over the

15 course of a specified period of time. As designed by KPMG, SC2 called for the S

16 corporation's shareholder to gift 90% of its stock to a charitable organization for a

17 designated period of time, shifting income to the charitable organization thereby avoiding

18 taxes on up to 90% of its income during the period in which the charitable organization

19 remained a shareholder. The S corporation's pre-gift shareholder could take a tax

20 deduction for the gifted stock, and would eventually repurchase the stock from the

21 charitable organization in order to regain control of the corporation and only then resume

22 making distributions to the shareholders (distributions that by design were limited or non-

23 existent during the period in which the charitable organization was a shareholder). The

24 intended end result was a deferred distribution to the original shareholders which would be

25 immune from taxation because of the charitable organization's prior ownership of the

26 stock during the period of time when the profit was actually earned by the S Corporation.

27     Among many of the shrewd marketing tactics utilized by KPMG to push the sale of

28 SC2 was the relationship it established with AIG. KPMG targeted AIG's services to

EXHIBIT _N_, PAGE 269

1  provide an insurance option for its SC2 clients, one that would provide coverage for any

2  taxing authority's assertion that the SC2 strategy was improper.  AIG in fact formulated its

3  Fiscal Event Insurance Policy to provide this precise and unique coverage for KPMG's

4  SC2 clients.  In all, AIG insured at least $92.6 million of SC2 risk under its Fiscal Event

5  Insurance Policies.  It is the biggest of these policies ($50 million) that the Insureds

6  purchased from AIG in August 2001 and that is at issue in this case.

7        At its core, the Policy provides insurance to the Insureds for $50 million for any

8  action taken by a "Taxing Authority" (i.e., the IRS or the FTB) which alleged any tax,

9  interest, or penalty is owing from the Insureds based on that taxing authority's

10 disallowance of tax benefits promised by KPMG in a series of professional tax opinions

11 issued by KPMG to its SC2 clients.  These assertions of potential taxes, interest, and

12 penalties have not only transpired with respect to the Insureds, but have also transpired

13 with respect to every SC2 transaction ever implemented by anyone.  Despite these

14 undeniable realities, AIG somehow now asserts that the SC2 levies against the Insureds are

15 attributable -- not to the problems inherent with the SC2 strategy in general -- but to the

16 manner in which the Insureds implemented the strategy.  The fact that no taxing authority

17 has ever made this assertion against the Insureds is of no apparent consequence to AIG as

18 it continues to pursue any conceivable angle to avoid honoring its coverage obligations.

19 Likewise, the fact that both the IRS and the FTB have treated the Insureds in prosecution

20 and settlement of these SC2 matters in the identical manner as every other SC2 participant

21 has done nothing to dissuade AIG from its assertion that the Insureds' SC2 tax losses are

22 attributable to the manner in which the Insureds implemented the strategy.  Moreover,

23 despite all of these underlying realities and despite the fact that AIG's own tax experts

24 acknowledged that a perfectly implemented "generic" SC2 tax strategy had no better than

25 a "reasonable prospect of success" if attacked by the IRS, AIG now somehow attempts to

26 deny coverage on the basis that the dominant cause of the loss was attributable to the

27 manner in which the Insureds implemented the SC2 strategy.  Suffice to say, the Insureds

28 are of the view that AIG can come nowhere close to meeting burden of establishing that

1   the "dominant cause" of the loss was attributable to the Insured's implementation of the

2   SC2 strategy. *Throgs Neck Bagels, Inc. v. GA Ins. Co.*, 241 A.D.2d 66, 71 (1st Dept.

3   1998). To the contrary, even AIG's own experts appear to concede that the dominant and

4   efficient cause of the loss was inherent within the generic SC2 strategy.

5        Notwithstanding the endless maneuverings of AIG, there is no disputing that both

6   the IRS and the FTB have asserted and determined that the relevant tax returns of the

7   Insureds and every other SC2 participant need to be amended in order to "unwind" the

8   SC2 transaction because the generic SC2 transaction is an "abusive tax shelter" not in

9   compliance with the Internal Revenue Code. The actions taken by the IRS and the FTB

10  are "Insured Tax Events" as defined in the Policy. Moreover, despite the undeniable

11  existence of a "Claim" under the Policy [written notice from a Taxing Authority that an

12  Insured "may be" liable for taxes related to an Insured Tax Event], signs of which began

13  appearing as early as April 2002, AIG has even refused to recognize the existence of a

14  "Claim."

15       After more than two years of delay, AIG finally made a coverage determination on

16  July 29, 2005, in a letter to the Insureds in which AIG denied the existence of any

17  coverage under the Policy. (*See*, Exhibit 31.) The denial came only after AIG spent two

18  years delaying a coverage determination, and in the process, asserting countless spurious

19  coverage defense theories in letters, emails, telephone conferences, and in-person meeting

20  with its Insureds. Regardless, it bears emphasizing that most of AIG's spurious coverage

21  defense theories appear to have now been abandoned as even AIG could not proceed with

22  these arguments with a straight face. Nevertheless, there is no disputing that AIG has

23  attempted to conjure up and concoct one specious argument after another to avoid

24  honoring its obvious coverage obligations.

25       AIG's denial of coverage under the Policy, and the reasons AIG has expressed for

26  refusing to pay the Policy benefits to the Insureds, flies in the face of the plain language in

27  the Policy. Simply put, the Policy provides coverage for the <u>exact scenario</u> that has played

28  out with the IRS and the FTB, yet AIG has taken the unsupportable position that there has

EXHIBIT *N*, PAGE 271

1  in fact been no "claim" and no "Insured Tax Event" triggering coverage under the Policy.

2  Beyond these assertions, AIG then goes on to somehow attempt to establish that the

3  dominant and efficient cause of the loss is attributable to something other than problems

4  inherent within the generic SC2 Strategy.  AIG's argument cannot be supported by the

5  facts of this case, and as set forth below, the panel should find that AIG is liable, not only

6  for the full $50 million Policy amount, but also for the damages resulting from its failure to

7  timely pay the Policy benefits and for punitive damages for AIG's exceedingly bad faith

8  denial of coverage.

9  **II.     RELEVANT FACTUAL BACKGROUND.**

10         Respondent and Counter-Claimant The Upper Deck Company ("Upper Deck") is a

11  California S corporation headquartered in Carlsbad, California.  Respondent and Counter-

12  Claimant Richard P. McWilliam is the founder and Chief Executive Officer of Upper

13  Deck.  Mr. McWilliam is now and previously was the sole shareholder of Upper Deck and

14  holds 100% of his shares through Respondent and Counter-Claimant the MPR Trust, for

15  which Mr. McWilliam is the trustee.

16         In February 2001, the Insureds purchased the SC2 tax strategy from KPMG for

17  $575,000.  In conjunction with their purchase of the SC2 tax strategy, the Insureds

18  purchased the Policy from AIG to protect against a scenario wherein the IRS or state

19  taxing authority disallowed the tax benefits of implementing the SC2 transaction.  The

20  Insureds paid AIG a premium of $3.25 million for the Policy that provides $50 million in

21  insurance coverage of certain enumerated "Insured Tax Events" as defined in Endorsement

22  No. 1 of the Policy.  (*See,* Exhibit 1[1] [Policy w/exhibits].)  Put simply, the Policy serves to

23  protect against financial liability arising from a taxing authority (i.e., the IRS or FTB)

24  disallowing tax benefits resulting from the Insureds implementation of the SC2 transaction,

25  as well as protecting against any increased tax liability of the Insureds resulting from the

26  IRS revoking Upper Deck's S Corporation status due to its participation in the tax strategy.

27  _____

[1]The exhibits attached to this Opening Brief are numbered separately from the exhibits
28  being used at the Hearing.  The exhibits provided herewith are for the convenience of the
Panel for reference while reviewing this brief.

EXHIBIT _N_, PAGE 272

1  (Exhibit 1 [Policy], at Endorsement No. 1: "Definition of Insured Tax Event".)  The Policy

2  provides specific coverage for any loss sustained by the Insureds based on "an assertion"

3  by a "Taxing Authority" that the income allocation under SC2 is improper and/or that

4  some action taken before August 29, 2001 in the Insureds' implementation of SC2

5  somehow resulted in the creation of an unauthorized second class of stock, an assertion

6  that would result in Upper Deck being stripped of its S corporation status.

7      As it turned out, the IRS has repeatedly made each of these assertions establishing

8  coverage under the Policy, not only to Upper Deck , but also as to each and every one of

9  the estimated 58 SC2 participants.  Yet, despite the occurrence of these events, AIG still

10  refuses to pay or even acknowledge the Policy benefits it so clearly owes to the Insureds.

11      **A.    SC2: The Tax Strategy Covered By The Policy.**

12      The SC2 transaction was created and sold by KPMG.  By the time KPMG had

13  developed the SC2 transaction, KPMG had created and sold numerous other mass-

14  produced generic tax avoidance strategies through a complex national infrastructure it had

15  established for the sole purpose of peddling these generic tax strategies to its clients.  The

16  details of KPMG's intricate infrastructure are set forth in two United States Senate

17  Subcommittee reports issued in late 2003 and early 2004, both of which include substantial

18  discussion of KPMG's practices with respect to generating generic tax products,[2]

19  _____

20  [2]In early 2002, under the chairmanship of Senator Carl Levin, the United States Senate
    Permanent Subcommittee on Investigations of the Committee on Governmental Affairs
21  (hereinafter the "Levin Committee") began investigating abusive tax shelters developed,
    marketed, and implemented by professional organizations such as accounting firms, banks,
22  investment advisors, and law firms.  During the course of the Levin committee's
    investigation, the Levin committee issued no less than 25 summonses seeking information
23  relating to numerous tax strategies with which KPMG was involved.  The subpoenas and
    document requests produced over 235 boxes of documents for the Levin committee's
24  review.  The Levin committee also conducted lengthy interviews of representatives from
    major organizations involved in the tax shelter industry.  The Levin committee's
25  investigation culminated in the issuance of a 130-page report entitled "U.S. Tax Shelter
    Industry: The Role of Accountants, Lawyers, and Financial Professionals – Four KPMG
26  Case Studies: FLIP, OPIS, BLIPS, and SC2" (hereinafter the "Levin Report").  A true and
    correct photocopy of the Levin Report (w/o exhibits) is attached hereto as Exhibit 2.
27      Subsequently, on April 13, 2005, the Permanent Subcommittee of the Committee On
    Homeland Security and Governmental Affairs of the United States Senate (hereinafter the
28  "Homeland committee"), following its own investigation into KPMG, published a further
    report entitled "The Role of Professional Firms In The U.S. Tax Shelter Industry"
    (hereinafter the "Homeland Report").  The Homeland Report is based on the testimony of

EXHIBIT _N_, PAGE _273_

1  including SC2.  Suffice it to say, KPMG established and utilized several of its national

2  practice groups in the United States to create and develop generic, mass-marketable tax

3  strategies (KPMG's Tax Innovation Center) to: (1) conduct tax-law compliance review of

4  any viable potential tax shelter products (KPMG's Washington National Tax Practice); (2)

5  ensure compliance with tax shelter regulations (KPMG's Tax Controversy Services

6  group); (3) and ensure compliance with KPMG's standards for "risk management and

7  professional practice" (KPMG's Department of Practice and Professionalism."  (Exhibit 3

8  [Homeland Report], pp. 13-15.)

9         After a proposed tax strategy successfully made its way through KPMG's

10  infrastructure, KPMG would compile a variety of documents to implement and market the

11  tax strategy including:  an abstract summarizing the product; an electronic PowerPoint

12  presentation to introduce the product to other KPMG tax professionals; and a "whitepaper"

13  summarizing the technical tax issues associated with the transaction and their resolution

14  (the "Initial Promotional Documents").  (Exhibit 3, p. 15.)

15         One of the specific findings of the Homeland Committee, one of two Senate

16  Subcommittees to investigate KPMG, was that KPMG used aggressive marketing tactics to

17  sell generic tax products by, among other things, using confidential client tax data to find

18

19  _____

more than twenty witnesses over the course of the two-day hearings held by the Levin

20  committee in November 2003, over 250 boxes of documents and electronic disks, three
depositions, numerous interviews, and additional post-hearing information gathered by the

21  Homeland committee.  A true and correct photocopy of the Homeland Report (w/o
exhibits) is attached hereto as Exhibit 3.

22         The Levin and Homeland Reports provide a wealth of information relevant to the
discussion herein related to the development, marketing, sale, and implementation of SC2.

23  Thus, these reports are cited throughout the following discussion.

       Ultimately, several of KPMG's most prominent tax partners were indicted by a federal

24  grand jury and charged with conspiracy to commit fraud in connection with several KPMG
abusive tax shelters.  In August 2005, KPMG entered into a Deferred Prosecution

25  Agreement ("DPA") in which it admitted that it unlawfully assisted United States
taxpayers with avoiding income taxes on billions of dollars in capital gain and ordinary

26  income by "developing, promoting and implementing unregistered and fraudulent tax
shelters."  As part of the DPA, KPMG agreed to pay $456 million to the United States and

27  to cease operating its private client tax practice, to cease its compensation and benefits
practice, to cease developing, marketing, selling, or implementing an pre-packaged tax

28  products, cease charging or accepting flat fees for providing tax services.  A true and
correct photocopy of the DPA and exhibits thereto is attached hereto as Exhibit 4.

EXHIBIT  *N*,  PAGE 274

1  prospective customers to whom KPMG could market, and using tax opinion letters[3] and

2  insurance policies as marketing tools. (Exhibit 3, p. 6.) In some cases, KPMG informed

3  reluctant prospective purchasers that insurance companies (including AIG) were willing to

4  issue a tax insurance policy protecting against the disallowance of the tax benefits

5  associated with a particular tax strategy. (Exhibit 3, pp. 6, 41, 46.) Advice of the

6  availability of these insurance policies was used as necessary further assurances to

7  reluctant clients that the tax strategy was sufficiently sound that reputable insurance

8  companies were willing to issue policies to insure against an IRS challenge. (Exhibit 2,

9  [Levin Report], p. 57.)

10      SC2 was the last of the abusive tax shelters sold and implemented by KPMG. It

11  was also one of KPMG's most successful -- as measured by KPMG's revenues -- tax

12  strategy products. In fact, SC2 was one of KPMG's top ten revenue producers in 2000 and

13  2001, generating in excess of $26 million in revenues in an 18-month stretch of time.

14  Designed specifically for S corporations, SC2 called for the sole shareholder of the S

15  corporation to donate 90% of S corporation shares (in the form of non-voting shares) to a

16  non-profit charitable organization for a period of time, during which only 10% of the S

17  corporation's income would be allocated to the original sole shareholder while the

18  remaining 90% would be allocated to the charitable organization, who of course would be

19  exempt from paying tax on the income that is allocated to the charitable organization.

20  However, under the SC2 strategy, little, if any, of the allocated income is actually

21  distributed during the time in which the charitable organization is a shareholder. At some

22  future date before the accumulated earnings are distributed to the shareholders, the shares

23  are purchased back from the charitable organization, providing in some cases for

24  significant purchase monies to the charitable organization and potentially saving the

25  remaining, non-exempt, shareholders a significant amount of money in federal and state

26

27  [3]As defined by KPMG, a "tax opinion" is a written instrument that explains the "tax consequences of a particular issue, transaction or series of transactions of the client and

28  that is furnished to the client or another party in a letter, a whitepaper, a memorandum, an electronic or facsimile communication, or other form." (Exhibit 3, p. 16.)

EXHIBIT _N_, PAGE _275_

1  tax "savings."

2       Given the basic structure of an SC2 transaction, KPMG targeted wealthy

3  individuals who owned 100% of an S corporation earning substantial net income (i.e. in

4  the millions).  (Exhibit 3, p. 10.)  As the Homeland Report found, KPMG mass-marketed

5  SC2 to "persons who appeared to have little interest in them or did not understand what

6  they were being sold, and likely would not have used them to reduce their taxes without

7  being approached by KPMG" (Exhibit 3, p. 33) – people like Mr. McWilliam.  KPMG

8  informed potential purchasers that it would walk them through the SC2 deal, assisting in

9  the preparation of all of the deal documents, monitoring the passage of corporate

10  resolutions, the issuance of shares, and the donation of shares to a charitable organization -

11  - whose participation had already been solicited and arranged by KPMG.  (Exhibit 3, p.

12  30.)

13       **1.**    **The Typical SC2 Transaction.**

14       Appendix B of the Levin Report sets forth the following basic conceptual summary

15  of a typical SC2 transaction:

16  
17          1) **The Income**. Individual owns 100% of S-corporation which
        earns net income (e.g., $3 million annually).

18          2) **The Sales Pitch**. Individual is approached by KPMG with a
        "charitable donation strategy" to shelter a significant portion
19          (often 90%) of the S-corporation's income from taxation by
        "allocating," with little or no distribution, the income to a
20          charitable organization.  Individual is told that, for a fee,
        KPMG will arrange a temporary "donation" of corporate non-
21          voting stock to the charity and will provide an opinion letter
        stating it is "more likely than not" that nonpayment of tax on
22          the income "allocated" to the charity while it "owns" the stock
        will withstand an IRS challenge, even if the allocated income is
23          not actually distributed to the charity and the individual regains
        control of the income.  The individual is told he can also take a
24          personal tax deduction for the "donation."

25          3) **Setting Up The Transaction**.  The S-corporation issues
        non-voting shares of stock that, typically, equal 9 times the
26          total number of outstanding shares (e.g., corporation with 100
        voting shares issues 900 non-voting shares).  Corporation gives
27          the non-voting shares to the existing individual-shareholder.
        Corporation also issues to the individual-shareholder warrants
28          to purchase a substantial number of company shares (e.g.,
        7,000 warrants).  Corporation issues a resolution limiting or

EXHIBIT ___*N*___, PAGE _276_

1   suspending income distributions to all shareholders for a
    specified period of time (e.g., generally the period of time in
2   which the charity is intended to be a shareholder, typically 2 or
    3 years).  Prior to issuing this resolution, corporation may
3   distribute cash to the existing individual-shareholder.

4   4) **The Charity**. A "qualifying" charity (one which is exempt
    from federal tax on unrelated business income) agrees to accept
5   S-corporation stock donation. KPMG actively seeks out
    qualified charities and identifies them for the individual.

6
    5) **The "Donation."**  S-corporation employs an independent
7   valuation firm to analyze and provide a valuation of its non-
    voting shares.  Due to the non-voting character of the shares
8   and the existence of a large number of warrants, the non-voting
    shares have a very low fair market value (e.g., $100,000).
9   Individual "donates" non-voting shares to the selected charity,
    making the charity the temporary owner of 90% of the
10  corporation's shares.  Individual claims a charitable deduction
    for this "donation."  At the same time, the corporation and
11  charity enter into a redemption agreement allowing the charity,
    after a specified period of time (generally 2 or 3 years), to
12  require the corporation to buy back the shares at fair market
    value.  The individual also pledges to donate an additional
13  amount to the charity to ensure it obtains the shares' original
    fair market value in the event that the shares' value decreases.
14  The charity does not receive any cash payment at this time.

15  6) **The "Allocation."**  During the period in which the charity
    owns the non-voting shares, the S-corporation "allocates" its
16  annual net income to the charity and original individual-
    shareholder in proportion to the percentage of overall shares
17  each holds (e.g., 90:10 ratio).  However, pursuant to the
    corporate resolution adopted before the non-voting shares were
18  issued and donated to the charity, little or no income
    "allocated" to the charity is actually distributed.  The
19  corporation retains or reinvests the non-distributed in-come.

20  7)      **The Redemption**.  After the specified period in the
    redemption agreement, the charity sells back the non-voting
21  shares to the S-corporation for fair market value (e.g.,
    $100,000).  The charity obtains a cash payment from the
22  corporation for the shares at this time.  Should the charity not
    resell the stock, the individual-shareholder can exercise the
23  warrants, obtain additional corporate shares, and substantially
    dilute the value of the charity's shares.  Once the non-voting
24  shares are repurchased by the corporation, the corporation
    distributes to the individual-shareholder, who now owns 100%
25  of the corporation's outstanding shares, all of the undistributed
    cash from previously earned income.

26
    8) **Taxpayer's Claim**. Due to its tax exempt status, the charity
27  pays no tax on the corporate income "allocated" or distributed
    to it.  According to the KPMG opinion letter, for tax purposes,
28  the individual can claim a charitable deduction for the
    "donated" shares in the year in which the "donation" took

EXHIBIT _*N*_, PAGE_277_

1   place.  During the years in which the charity "owned" most of
    the corporate shares, individual will pay taxes on only that
2   portion of the corporate income that was "allocated" to him or
    her.  KPMG also advised that all in-come "allocated" to the
3   charity is then treated as previously taxed, even after the
    corporation buys back the non-voting stock and the individual
4   regains control of the corporation.  KPMG also advised the
    individual that, when the previously "allocated" income was
5   later distributed to the individual, the individual could treat
    some or all as long-term capital gains rather than ordinary
6   income, tax-able at the lower capital gains rate.  The end result
    is that the individual owner of the S-corporation was told by
7   KPMG that he or she could defer and reduce the rate of the
    taxes paid on income earned by the S-corporation.

8

9   (Exhibit 2, Appendix B.)

10          **2.     Upper Deck And SC2.**

11          Utilizing the same tax strategy development infrastructure and sales force

12   established to market its previous and likewise ill fated tax products, KPMG began

13   marketing the generic SC2 strategy in April 2000.  Shortly thereafter, in the summer of

14   2000, KPMG approached Mr. McWilliam and Upper Deck in an attempt to solicit their

15   business as an SC2 participant.

16          Dating back to the early 1990s, KPMG provided various and extensive accounting

17   services for McWilliam, Upper Deck, and the MPR Trust.  The services provided ranged

18   from providing tax advice, to preparing and reviewing tax returns, to performing auditing

19   services.  Thus, by the time KPMG approached McWilliam and Upper Deck in 2000 with

20   the SC2 transaction, KPMG was intimately familiar with Upper Deck's corporate

21   structure, and with McWilliam and the MPR Trust.  Based on this information, the

22   accountant in Southern California who had been Upper Deck's primary contact at KPMG,

23   Redge Benheim, began aggressively pursuing McWilliam and Upper Deck as a potential

24   SC2 client.

25          A meeting attended by Mr. Bendheim, Lawrence Manth (KPMG partner), Mr.

26   McWilliam, and Steve Farno (then CFO of Upper Deck) took place in the summer of 2000

27   at Upper Deck's Carlsbad, California headquarters in which KPMG began the hard sell of

28   SC2 to Mr. McWilliam.  During the meeting, Mr. Bendheim and Mr. Manth explained that

EXHIBIT __N__, PAGE _278_

1  SC2 was specifically developed by KPMG to benefit shareholders of S corporations like

2  Upper Deck.  He explained that the transaction could be implemented to save Mr.

3  McWilliam money on his taxes while allowing him to make a generous donation to a non-

4  profit charitable organization.  He also told McWilliam the strategy had been reviewed by

5  senior KPMG professionals, was determined by those professionals to be in compliance

6  with all applicable tax laws, and that KPMG's national office in Washington D.C. had

7  approved the SC2 transaction.  During the meeting, Mr. Manth also told Mr. McWilliam

8  that KPMG would issue opinion letters backing the legitimacy of the transaction.

9       Following this initial meeting, Mr. McWilliam was very hesitant and declined to

10  utilize the SC2 strategy.  However, over the following several months, KPMG began

11  implementing its pressure marketing tactics.  As described above, and as mentioned in

12  both Levin and Homeland Reports[4], one of the commonly used pressure sales tactics[5] used

13  by KPMG was to inform a prospective purchaser that there were at least two major

14  insurance carriers who were willing to issue a tax insurance policy to insure the benefits

15  associated with SC2.  This representation was in fact made to McWilliam and Upper Deck

16  during the period in which KPMG was hard selling Mr. McWilliam's participation in the

17  SC2 transaction.  Based in significant part on the availability and protection of insurance

18  aimed expressly at providing coverage in the event of "an assertion" by a taxing authority

19  that the SC2 strategy was improper, Mr. McWilliam decided to purchase the SC2

20  transaction from KPMG.  Thus, on or about February 8, 2001, Upper Deck purchased the

21  SC2 transaction from KPMG for the price of $575,000.  (Exhibit 5, [KPMG Engagement

22  letter].)  Likewise, the Insureds purchased the Policy from AIG in exchange for a $3.25

23  million insurance premium.

24       The February 8, 2001 engagement letter, memorializing the agreement with KPMG,

25  identifies the scope of services KPMG would perform in connection with the

26

27  [4]The Levin Committee found that KPMG possessed sample insurance policies that it would share with potential SC2 clients.  (*See*, Exhibit 2, p. 57.)

28  [5]KPMG utilized other strong-arm sales tactics with Mr. McWilliam and Upper Deck including misrepresenting that sales of SC2 would be limited and time was of the essence before KPMG would halt sales of the transaction.

EXHIBIT  N , PAGE  279

1   implementation of SC2.  (*See*, Exhibit 6.)  The scope of services KPMG agreed to provide

2   included tasks necessary to the implementation of SC2 such as assisting in locating and

3   contacting an appropriate tax exempt organization to receive the stock gift, providing

4   analysis of the projected income and gift tax consequences as a result of implementing

5   SC2, and representing Mr. McWilliam and Upper Deck through IRS appellate conference

6   with respect to any challenge by the IRS with regard to the tax services provided pursuant

7   to the engagement letter agreement.

8        Because McWilliam was the sole shareholder of Upper Deck, and because he held

9   those shares through the MPR Trust, KPMG advised that the following steps would be

10  necessary to implement SC2 for Upper Deck:

11       • Passing Board Resolutions approving the transaction, the issuance of

12            warrants to the MPR Trust, and the issuance of the non-voting stock;

13       • Amending Upper Deck's Articles of Incorporation to allow for the issuance

14            of warrants to the MPR Trust, and to permit the issuance of the non-voting

15            stock;

16       • Obtaining a formal valuation of Upper Deck's stock;

17       • Executing a shareholder agreement between Upper Deck, the MPR Trust,

18            and the chosen tax exempt organization; and

19       • Executing a warrant agreement issuing warrants to the MPR Trust.

20       As of March 28, 2001, Upper Deck had 920,000 shares of stock outstanding, all of

21  which were owned by the MPR Trust, an inter vivos revocable trust with Mr. McWilliam

22  as its sole beneficiary.  On the advice of KPMG, Upper Deck amended its Articles of

23  Incorporation on March 28, 2001 to permit the issuance of 8,280,000 shares of Non-Voting

24  Common Stock in Upper Deck.  Also on March 28, 2001, and also on the advice of

25  KPMG, Upper Deck declared a dividend of 82,800,000 warrants to purchase Non-Voting

26  Common Stock of Upper Deck to the MPR Trust in proportion to the MPR Trusts'

27  ownership of the Voting Common Stock.

28       On March 29, 2001, the above-described dividend was issued to the MPR Trust.

EXHIBIT _N_, PAGE _280_

1  Also, on March 29, 2001, Upper Deck distributed the 8,280,000 shares of Non-Voting

2  Stock to the MPR Trust. Two days later, on March 31, 2001, the MPR Trust donated all of

3  the Non-Voting Common Stock to the Austin Firefighters Relief and Retirement Fund (the

4  "Austin Firefighters"), a tax-exempt charitable organization who had been selected by

5  KPMG to participate in the SC2 transaction with Upper Deck and with at least four other

6  SC2 participants. (Exhibit 2 [Levin Report], p. 89.) Except as to voting rights, the only

7  difference between the Voting Common Stock and the Non-Voting Common Stock was

8  that the latter was subject to a contractual right of first refusal, in which Upper Deck had

9  the right to purchase outstanding Non-Voting Common Stock for the amount of any bona

10  fide offer received by any holder of the Non-Voting Common Stock. If Upper Deck did

11  not exercise the first right of refusal, such right would then become available to the then

12  owner of the Voting Common Stock.[6]

13  Also, on March 31, 2001, the MPR Trust entered into a shareholders agreement

14  with the Austin Firefighters providing that all Non-Voting Common Stock would be

15  subject to the first right of refusal. As part of the Shareholders' Agreement, Upper Deck

16  and the Austin Firefighters entered into what is generally referred to as a "redemption

17  agreement." Under the redemption agreement, the Austin Firefighters was permitted to

18  present the Non-Voting Common Stock for redemption by Upper Deck, beginning April 1,

19  2003. The redemption agreement was executed in order to guarantee an assured manner

20  for the Austin Firefighters Fund to sell its stock.

21  In conjunction with carrying out the necessary steps to implement SC2, Fair Market

22  Value, Inc. ("FMV") undertook to determine the value of shares in Upper Deck. In doing

23  so, FMV collected substantial information from Upper Deck, including past and present

24  financial records, performance records, and projections for future performance of the

25

26  [6]As the single class of stock issue was critical to Upper Deck's S corporation status, the
limited differences between the Voting Common Stock and Non-Voting Common Stock
27  was very important. As explained in one of KPMG's three opinion letters to McWilliam
and Upper Deck, under the Internal Revenue Code, buy-sell agreements (such as the first
28  right of refusal) are generally ignored in determining whether there is more than one class
of stock.

EXHIBIT *N*, PAGE *281*

1   company.  With respect to the warrants issued to the MPR Trust on March 29, 2001, FMV

2   determined that the exercise price of each warrant ($0.148 per share) was equal to at least

3   ninety percent of the fair market value of the underlying stock as of March 29, 2001.[7]  In

4   connection with this determination, FMV issued a document dated March 31, 2001,

5   entitled "The Upper Deck Company: Valuation of Voting Common Stock and Non-Voting

6   Common Stock As of March 31, 2001" which was attached to the Policy as Exhibit E.

7          Thus, by March 31, 2001, Mr. McWilliam and Upper Deck had completed all the

8   necessary steps to implement SC2.[8]  However, within approximately one year, in April

9   2002, the IRS was already moving quickly to set aside the SC2 transactions through the

10  issuance of summonses and document requests to investigate KPMG's abusive tax shelter

11  practices and requiring KPMG to reveal the identity of all of its clients using a variety of

12  tax strategies, including all SC2 participants.  The IRS then specifically sought out each

13  SC2 participant's cooperation in the investigation into SC2 through its Announcement

14  2002-2, a voluntary disclosure initiative released in April 2002.  Thus, by this time, the

15  IRS was clearly focusing in on SC2 and taking strides towards an eventual determination

16  that the tax strategy was in fact an abusive tax shelter.  In fact, several of KPMG's tax

17  strategies were undergoing rigorous IRS scrutiny at this time as the Levin committee was

18  launching a comprehensive investigation into the fraudulent tax shelters, including SC2,

19  which KPMG had been marketing in the preceding 2 years.  (*See, generally*, Exhibit 2.)

20         Against the backdrop of this ongoing IRS and Senate investigation into SC2, Upper

21  Deck offered in November 2002 to reacquire the Austin Firefighters' shares.  This buyback

22  transaction was initiated only after the IRS had began moving against SC2 participants.

23  There was nothing improper with the sale as Section 1 of the Shareholder's Agreement

24  ────────────────────

25  [7]The significance of this determination was to ensure Upper Deck's compliance with
    Internal Revenue Code, section 1.1361(l)(4)(iii), which states that warrants will not be
26  classified as a second class of stock if the strike price of the warrants is at least 90% of the
    fair market value of the underlying stock on the date they are issued.

27  [8]Each of the relevant documents reflecting the actions taken by Upper Deck and the
    MPR Trust over the three-day period at the end of March 2001 (including the warrant
    agreement, the Shareholders' Agreement, and FMV's valuation of the Non-Voting
28  Common Stock) to implement SC2 are attached to the Policy as Exhibits C, D & E.  (*See*,
    Exhibit 1.)

EXHIBIT _N_ PAGE 282

1   specifically permitted the Austin Firefighter's to "transfer, assign, pledge or . . . alienate"

2   the shares without conforming with Sections 2, 3 or 5 of the Shareholder's Agreement

3   with "the prior written consent of the Company [Upper Deck] and the other Shareholder(s)

4   of the Company [the MPR Trust]." (Exhibit 1 [Policy, Ex. C].)  The buyback was thus

5   consummated and resulted in a Share Purchase Agreement dated December 10, 2002 by

6   which Upper Deck purchased all of Austin Firefighters' shares for the purchase price of

7   $2,000,000 with the consent of the MPR Trust. (*See*, Exhibit 6.)

8       **B.     The Insureds' Tax Benefit Resulting From SC2.**

9           As indicated, the Insureds' implementation of the SC2 tax strategy commenced on

10   March 31, 2001 with the gifting of the non-voting stock to the Austin Firefighters.  The

11   transaction was in effect until December 31, 2002 when the Austin Firefighters sold all of

12   its stock back to the Insureds.  Thus, the Insureds' original tax returns (both state and

13   federal) for 2001 (March 31 through December 31 only) and 2002 reflected the Austin

14   Firefighters' ownership interest in Upper Deck and reported the Insureds' income and tax

15   liability consistent therewith.

16           In his original federal tax return, Mr. McWilliam, filing jointly with his wife,

17   reported only 10% of Upper Deck's income attributable to the MPR Trust and paid the

18   corresponding federal income taxes for the nine-month period from March 31, 2001

19   through December 31, 2001.  And for the year ending December 31, 2002, Mr.

20   McWilliam, this time married filing separately and again reporting only 10% of Upper

21   Deck's income, paid the corresponding federal income taxes owed.  Based on the IRS'

22   latest calculations, it has determined that if Upper Deck had not implemented the SC2 tax

23   strategy, Mr. McWilliam's federal tax liability would be increased by $14,085,520.00 for

24   the 2001 tax year, and an additional $52,691,914.00, totaling over $66 million dollars in

25   back-taxes owed by Mr. McWilliam.  (*See*, Exhibit 7 [Forms 870].)

26           Mr. McWilliam's 2001 and 2002 California state tax returns similarly reflected only

27   the MPR Trust's 10% interest in Upper Deck and accordingly Mr. McWilliam reported the

28   corresponding income allocation and paid the state taxes associated with the 2001 (March

EXHIBIT *N* , PAGE 283

1    31 through December 31) and 2002 respectively.  The California FTB later determined that

2    Mr. McWilliam had underpaid his taxes (based on SC2) by approximately $17 million.

3         Thus, in terms of tax liabilities alone, SC2 "saved" Mr. McWilliam over $83

4    million less transaction costs.

5    **C.    The Policy.**

6         In conjunction with purchasing SC2 from KPMG and based on KPMG's

7    recommendation and encouragement, the Insureds purchased AIG's Fiscal Event Insurance

8    Policy to protect against the potential tax liability that would arise in the event a "Taxing

9    Authority" made an assertion that SC2 is improper.  Effective August 29, 2001, AIG

10   issued to the Insureds a $50 million Policy insuring against the risk of a Loss resulting

11   from a Taxing Authority asserting that the tax treatment laid out in the opinions issued by

12   KPMG to the Insureds was incorrect.  For the $50 million in SC2 coverage, the Insureds

13   paid AIG a significant premium of $3,250,000.[9]  (*See*, Exhibit 1.)

14        The "Policy Period" commenced August 29, 2001, and ends the later of (1)

15   November 30, 2006, or (2) the "expiration of the applicable statute of limitations with

16   respect to tax items described in the Insured Tax Event relating to the transactions

17   described in the KPMG LLP opinions," but no later than November 30, 2010.  (*See,*

18   Exhibit 1 [Policy], Declaration Item 3.)  The Upper Deck Company, a California

19   corporation, is the "Named Insured" on the Policy; however, "Additional Insureds" include

20   the MPR Trust, Mr. Richard McWilliam, and any other person to which coverage was

21   extended pursuant to the terms of the Policy.  (Exhibit 1 [Policy], Declarations, Items 1(a)-

22   (b).)

23        Generally, and as will be discussed in detail below, the Policy provided for AIG to

24   _____

25   [9] The Policy also provides for a $500,000 "Retention."  An issue that will arise during
     the hearing but is not briefed extensively here is whether the attorneys' fees, costs, and
     other fees (which collectively are very large in amount) incurred in responding to the IRS'
26   inquiry into the validity of the Insureds' application of SC2 qualify as incurred "Contest
     Expenses" under the Policy in satisfying the $500,000 retention and otherwise qualify as
27   Loss under the Policy.  However, the magnitude of the Tax Loss with the federal
     government alone (not counting the extra dollars owed to the State of California) would
28   appear to make these additional "Contest Expenses" far from the significant for the
     purpose of calculating benefits due under the Policy.

**EXHIBIT  N , PAGE  294**

1   pay the Policy benefits to the Insureds in the event a Taxing Authority (i.e. the IRS or

2   California FTB) asserted positions contrary to those expressed in KPMG's tax opinions

3   provided to the Insureds, and those assertions resulted in the Insureds incurring additional

4   federal and/or state tax exposure, interests and/or penalties

5          **D.     The IRS and California FTB Attack The Validity Of SC2.**

6          As indicated, it didn't take long for the "Taxing Authorities" to launch their assault

7   on the validity of SC2.  As early as April 2002, the IRS compelled KPMG to reveal the

8   identity of <u>all</u> of its clients that it knew to be using a variety of tax strategies then under

9   IRS scrutiny, including all SC2 participants.  KPMG informed Upper Deck and AIG that

10  when KPMG disclosed Upper Deck's identity to the IRS an examination of Insureds tax

11  returns would likely ensue.  (Exhibit 8.)  This information was promptly passed on to AIG

12  by the Insureds (Exhibit 9) and also provided directly to AIG by KPMG.

13         At around the same time, the IRS issued Announcement 2002-2, a voluntary

14  disclosure initiative, seeking the voluntary cooperation and participation of each SC2

15  participant.  (Exhibit 10 [Announcement 2002-2.)  The initiative essentially provided SC2

16  participants a waiver of penalties in exchange for cooperating with the IRS' investigation

17  into the SC2 transaction.  Accordingly, after notifying AIG and with virtual urging by AIG

18  to do so, the Insureds made a voluntary disclosure of the transaction to the IRS on April

19  22, 2002.  (Exhibit 11 [Insureds' disclosure to the IRS].)  This allowed the Insureds and

20  AIG to avoid liability for any penalties associated with any future tax deficiencies to be

21  assessed by the IRS.

22         Concurrent with the IRS' investigation into SC2, the Levin Committee was

23  conducting its detailed investigation into KPMG's extensive tax shelter practice.  That

24  investigation resulted in many detailed and, quite frankly, shocking findings related to

25  KPMG's conduct and its apparent disregard for the fundamental flaws in the SC2 tax

26  strategy.  The Levin Report, published in November 2003, revealed that even KPMG tax

27  professionals considered SC2 a risky tax strategy, one that would attract a vigorous and "at

28

EXHIBIT _N_, PAGE 285

1  least partially successful" challenge if the IRS ever caught wind of it.  (Exhibit 2, p. 44.)[10]

2  And the Levin Report also identified AIG as one of the insurance companies associated

3  with KPMG and offering SC2 tax insurance policies to help market and sell the SC2

4  product to KPMG clients.  (Exhibit 2, p. 57.)  The Levin Report's findings included

5  determinations that KPMG aligned itself with other professional organizations (like AIG)

6  to promote, sell, and implement abusive and illegal tax shelters including SC2.  (*Id.* at p.

7  4.)

8       In April 2004, the IRS issued Notice 2004-30 which further confirmed that the IRS

9  considered all SC2 transactions to be "abusive tax shelter[s]."[11]  (Exhibit 12 [Notice 2004-

10  30].)  With respect to all of its assertions, Notice 2004-30 states the "Service and the

11  Treasury Department recognize that some taxpayers may have filed tax returns taking the

12  position they were entitled to the purported tax benefits of the type of transaction described

13  in this notice.  Those taxpayers should take appropriate corrective action and ensure that

14  their transactions are disclosed properly."  Notice 2004-30 also "alerts taxpayers and their

15  representatives that these transactions are tax avoidance transactions."  Notice 2004-30

16  further provides that the "Service intends to challenge the purported tax benefits from this

17  transaction."

18       Following publication of Notice 2004-30 on April 16, 2004, on August 5, 2004 the

19  IRS sent Upper Deck and its counsel "three IDR [Information Document Request] Forms

20  _____

21  [10]  This candid opinion by KPMG's knowledgeable professionals, which was never published to the Insureds or other SC2 participants, further evidences the truth of the Insureds designated tax expert Stephen Mather conclusion that "there was never a

22  substantial likelihood that the SC2 transaction as structured would withstand attack by the IRS." (Stephen R. Mather's Supplemental Report dated August 16, 2006.)  SC2

23  participants' (and AIG's) only hope to avoid liability to the IRS (or to an Insured) was to escape the attention of the IRS because if the SC2 strategy was challenged by the IRS the

24  IRS would be successful.  Only in the context of this proceeding do AIG's designated experts acknowledge that "courts could be expected to take a critical view of the

25  transaction" the participants would "still have a reasonable prospect of success notwithstanding the likelihood of such a negative bias by the courts." (Robert D. Burk

26  Report, August 16, 2006 p. 9.)
        [11]  While the term "abusive tax shelter" encompasses a wide variety of illegal or

27  potentially illegal tax evasion schemes, the General Accounting Office (GAO) has summarized the term to refer to "very complicated transactions promoted to corporations

28  and wealthy individuals to exploit tax loopholes and provide large, unintended tax benefits." (Exhibit 2 [Levin Report], p. 18.)

EXHIBIT _N_, PAGE _286_

1  4564, numbered S608B2, S608C, S701A" (the "August 2004 IDRs").  (Exhibit 13.)  One

2  of the August 2004 IDRs, request S608B2, specified that the "Internal Revenue Service

3  has identified certain transactions as 'listed transactions' for the purposes of

4  § 1.601104(b)(2) of the Income Tax Regulations.  The IRS considers transactions that are

5  the same as or substantially similar to listed transactions to be tax avoidance transactions."

6  Among the "listed transactions" identified in IDR No. S608B2 were those described in

7  "Notice 2004-30, 2004-17 I.R.B. -- S Corporation Tax Shelter," which are discussed

8  above.  (Exhibit 13.)  Request S608B2 identifies its purpose as "to determine whether The

9  Upper Deck Company has directly or indirectly participated in transactions that are the

10  same as or substantially similar to any listed transaction," including Notice 2004-30.

11  (Exhibit 13.)  Again, it is evident from these Notices and IDRs that the IRS was attacking

12  all SC2 and similar transactions.  Moreover, despite the passage of several years since the

13  IRS began investigating and attacking all SC2 and similar transactions, the IRS has never

14  asserted or suggested that the Insureds did anything unique in their implementation of the

15  SC2 strategy which prompted or impacted its investigation or analysis in any way.

16  Regardless, the Insureds, with the assent of AIG, provided responses to the IRS' August 5,

17  2004 IDRs over the course of several transmissions to the IRS in October, November, and

18  December 2004.

19        In correspondence dated August 6, 2004, addressed to counsel for Upper Deck,

20  stating it pertained to "examination of Upper Deck Co., Notice 2004-30 transactions," the

21  IRS advised that the it "ha[d] begun an examination of the tax returns indicated above

22  [returns of Upper Deck Co.] with respect to transactions described in Notice 2004-30[.] . . .

23  See Notice 2004-30 for the government's position.  The aforementioned examination is

24  proceeding and must still be concluded."  (Exhibit 14.)

25        Then, on November 8, 2004, the IRS issued a Coordinated Issue Paper outlining the

26  reasons the IRS believed that all SC2 transactions were not entitled to be respected for tax

27  purposes and instructing its agents on how to proceed with attacking each and every SC2

28  transaction as improper and illegal. (Exhibit 20 [CIP].)  The Coordinated Issue Paper

EXHIBIT _N_, PAGE _287_

1    began as follows:

2
3              On April 1, 2004, the Internal Revenue Service issued Notice
               2004-30, 2004-17 I.R.B. 828, announcing that the Service will
4              challenge transactions in which S corporation shareholders
               attempt to transfer the incidence of taxation on S corporation
5              income by purportedly donating S corporation nonvoting stock
               to an exempt organization while retaining the economic
6              benefits associated with that stock. The purpose of this
               coordinated issue paper is to discuss the grounds for taxing the
7              proper taxpayers on the income from the corporation's
               business and disallowing deduction the taxpayers improperly
8              claim as a result of participating in Notice 2004-30
               transactions.

9         Similar to the IRS' approach, the California FTB made an independent investigation

10   into SC2 and notified all of SC2 participants that they must amend their effected tax

11   returns to reflect allocation of all S corporation income to the pre-gift shareholder. In

12   March of 2004 the FTB offered a voluntary compliance initiative program ("VCI

13   Program") through which any California tax payer who implemented one of these tax

14   shelters could avoid certain penalties if they voluntarily came forward prior to April 15,

15   2004. The Insureds received two notices from the FTB regarding the availability of the

16   VCI program. (Exhibit 16.)

17   **E.      With AIG's Consent, The Insureds Agree To Settle With The IRS And**

18   **         The FTB.**

19        By the time the Insureds were faced with the decision of whether to settle or litigate

20   with the IRS over the suspect SC2 tax strategy, the climate surrounding the tax shelter

21   industry and SC2 in particular was ripe for an aggressive and successful attack on the

22   Insureds by the IRS. KPMG had already undergone extensive Congressional investigation

23   and had been sued at least once by the Justice Department (on behalf of the IRS) for

24   refusing to turn over tax shelter-related documents. The Levin and Homeland Reports had

25   been released, which reports lambasted KPMG for its development and promotion of SC2

26   and other abusive tax shelters.. The reports also unveiled several internal communications

27   at KPMG between tax professionals who were expressing grave concerns over the validity

28   of the SC2 transaction. Moreover, the Justice Department was investigating KPMG's tax

1   shelter practices, which would ultimately lead to KPMG narrowly avoiding an indictment -

2   - only because KPMG agreed to pay $456 million in restitution and fines to the United

3   States Government and to cease operating its tax shelter practice along with ceasing all

4   development and sale of all generic, pre-packaged tax products like SC2.  (Exhibit 4.)

5        Cognizant of the assault KPMG and its partners were undergoing at the hands of

6   federal prosecutors and Senate investigators, facing increasing investigation of its own

7   financials through an invasive IRS audit, and further apprised of the very real threat that

8   challenging the IRS and losing with respect to the validity of SC2 could result in a near

9   doubling of the Insureds' loss due to the potential loss of Upper Deck's S status, the

10  Insureds obtained AIG's  and agreed to participate in settlement offers with both the IRS

11  and the FTB.

12        **1.      Settlement With The IRS.**

13        The IRS has stated publicly that it regards the SC2 transaction as an abusive tax

14  shelter.  According to the IRS, 100% of the S corporation income should be allocated to

15  the pre-gift shareholder, rather than the 90% allocation of income to the charitable

16  organization under the SC2 transaction.  Moreover, the IRS has stated that it may

17  challenge a corporation's S status based on assertions that the SC2 transaction resulted in

18  an unauthorized second-class of stock, disqualifying the corporation from S status.

19  Revocation of S corporation status would result in double-taxation of all income reported

20  by the S corporation from the moment the IRS identifies that the second class of stock was

21  created.

22        By letter dated April 7, 2005, the IRS proposed a settlement to each and every SC2

23  participant which would effectively unwind the SC2 transaction and tax the S corporation

24  pre-gift shareholder as if it was always the sole shareholder of the S corporation.  (Exhibit

25  17.)  The IRS' use of a generic settlement procedure for all SC2 participants is

26  characteristic of the IRS' handling of taxpayers who use abusive tax shelters.  (*See*, Expert

27  Report of Steven R. Mather, pp. 26-28 [IRS standard practice is to offer identical

28  settlement proposals to all users of similar abusive tax shelters].)

1    On May 3, 2005, with AIG's written consent, the Insureds notified the IRS that they

2  had agreed to proceed with the IRS' generic settlement proposal. (Exhibit 18.)  To date,

3  no closing agreement finalizing the settlement has been executed between the Insureds and

4  the IRS.  However, as of September 1, 2006, final draft of the proposed Closing

5  Agreements were provided to the Insureds by the IRS. (Exhibit 19.)  Pursuant to the terms

6  of the Closing Agreements, the MPR Trust will be the sole owner of 100% of Upper Deck

7  for the entire taxable years 2001 and 2002.  In federal taxes alone (i.e. not including

8  interest on the deficiencies, which applies from the date of the return's original due date),

9  the Insureds will have to pay over $66 million in back-taxes for the 2001 and 2002 tax

10  years under the settlement with the IRS.  With interest, the settlement amount will likely

11  exceed $80 million.

12    Most significantly, the deal preserves Upper Deck's S Corporation status and spares

13  the Insureds the cost, inconvenience, intrusion, and potential loss of an additional $70 plus

14  million if the Insureds were to litigate and lose the IRS claims pertaining to the invalidity

15  of the SC2 strategy.

16    **2.    Settlement With The FTB.**

17    Pursuant to the VCI program instituted by the FTB, the Insureds opted to file

18  amended tax returns restating the applicable allocation of Upper Deck income to reflect

19  100% allocation to the MPR Trust.  With AIG's written consent, the Insureds filed

20  amended returns for the tax years 2001 and 2002 and paid the resulting taxes and interest

21  under the VCI program.  For 2001, Mr. McWilliam paid back taxes and interest to the FTB

22  in the amount of $3,760,452.  For 2002, Mr. McWilliam paid back taxes and interest to the

23  FTB in the amount of $13,314,610.  Thus, in state taxes alone, Mr. McWilliam has already

24  paid over $17 million in taxes and interest due to the FTB's assertion that SC2 was

25  improper and the tax benefits received by the Insureds thereunder were void.

26    The Insureds participated in the VCI program under an option that preserved their appeal

27  rights.  Under California law, however, the FTB will follow final federal determinations.

28  California Revenue and Tax Code sections 18622, 19059 and 19060.  Therefore, final

-23-

EXHIBIT _N_, PAGE _289.1_

1  consummation of the settlement with the IRS will effectively terminate Insureds' appeal rights and

2  the Insureds will not be entitled to any refund of the amounts paid to the FTB.

3  **III.**  **THE INSUREDS' $50 MILLION POLICY PROVIDES COVERAGE FOR**

4  **THE LOSSES SUSTAINED AS A RESULT OF THE IRS' AND FTB'S**

5  **ASSERTIONS THAT THE INSUREDS IMPROPERLY REPORTED THEIR**

6  **TAX LIABILITY BASED ON SC2.**

7  **A.**  **The Policy's Insuring And Coverage Language.**

8  The Policy's insuring clause as set forth in Section 1 of the Policy ("INSURING

9  AGREEMENT") states the following:

10  The Insurer [AIG] shall pay, subject to the applicable

11  Retention (as defined herein) and other terms and conditions of
   this Policy; the Loss of the Insureds arising from a Claim first

12  made against any Insured during the Policy Period [August 29,
   2001 to at least November 30, 2006] and reported to the

13  Insurer pursuant to the terms of this Policy. The Insurer shall,
   in accordance with and subject to Clause 7 hereof, advance

14  Contest Expenses of such Claim excess of the Retention prior
   to its Final Determination."

15

16  **B.**  **A "Claim" Exists Under The Policy.**

17  According to the insuring clause of the Policy, the first triggering event for

18  coverage under the Policy is the occurrence of a "Claim," which the Policy defines as "any

19  written notice from any Taxing Authority alleging any Insured may be liable for Taxes, but

20  only if such Taxes are directly related in whole or in part to the Insured Tax Event."

21  (Exhibit 1 [Policy], Section 2 "Definitions," (a) [emphasis added].)  While it would not

22  acknowledge as much to the Insureds, internally AIG recognizes this was a foregone

23  conclusion after the IRS demanded the identities of SC2 participants from KPMG in April

24  of 2002.  An April 29, 2002 e-mail at AIG stated:

25  We'll likely need to create M & A claims files for each of the 4 insureds

26  since we know at least 2 have made voluntary disclosure to the IRS following

27  KPMG's response to the subpena.  That will no doubt trigger defense costs.

28  (Exhibit 32.)

1    While it does not appear that AIG is still disputing in this Arbitration the existence

2  of a "Claim," AIG has heretofore repeatedly taken the position that no "Claim" existed

3  despite the numerous instances in which the IRS put in writing that the Insureds were

4  going to be liable for taxes, interest, and possibly penalties for its use of the SC2

5  transaction.  Despite the fact that the absolute latest that a claim was made by the IRS was

6  April 26, 2004, when the IRS released its Notice 2004-30 indicating that the SC2

7  transactions would be challenged by the IRS, AIG continued to take the position in its

8  coverage letters and emails as late as May 4, 2005 that no claim even existed.  (Exhibit 21

9  [email from Cotter re AIG's coverage positions].)

10    The IRS' publication of Notice 2004-30 in Internal Revenue Bulletin 2004-17 is

11  without question a "Claim" within the meaning of the Policy.  As set forth in detail above,

12  Notice 2004-30 unequivocally denounced the validity of the SC2 tax strategy and alerted

13  all SC2 participants that SC2-styled transactions would be challenged by the IRS.  Notice

14  2004-30 further cautioned all SC2 users to take "correction action" to properly disclose

15  their use of the strategy.  The Notice clearly constitutes a "Claim" as defined by the Policy.

16    Furthermore, the IDRs that the IRS sent Upper Deck in August 2004 informed the

17  Insureds specifically that SC2 had been identified as a "listed transaction" and was

18  considered a tax avoidance transaction by the IRS.  (Exhibit 13.)  The IDRs sought

19  information from the Insureds regarding their implementation of the SC2 strategy.  On

20  August 6, 2004, the day after the IDRs were sent to the Insureds, the IRS sent a letter to the

21  Insureds regarding the "examination of Upper Deck Co., Notice 2004-30 transactions."

22  (Exhibit 14.)  In the letter, the IRS informed the Insureds that the IRS had begun an

23  examination of Upper Decks' tax returns due to the Insureds' participation in the SC2

24  transaction.  This again, is clearly a "Claim" under the Policy.  AIG, of course, was

25  continuing to maintain at the time that no "Claim" yet existed.

26    Next followed the Coordinated Issue Paper, which the IRS released and sent to all

27  SC2 participants in November 2004.  (Exhibit 20.)  The publication not only explained the

28  bases for the IRS' assertion that SC2 was an illegal tax shelter, it outlined the precise (and

EXHIBIT _N_, PAGE _291_

1   uniform) manner in which IRS agents were expected to challenge each and every use of

2   the SC2 strategy.  Even this lengthy written statement from the IRS was insufficient to

3   budge AIG from its position that no "Claim" yet existed under the Policy.

4       Then, on April 7, 2005, in a letter to Insureds' counsel regarding a proposal to

5   resolve the issues presented in Notice 2004-30, the IRS proposed a settlement with the

6   Insureds that would be based on terms including, among others:

7       "The transfer of the S Corporate Stock to the exempt party is disregarded for

8       Federal tax purposes.  S corporation income will be allocated as if there had been no

9       transfer of stock to the exempt party."

10

11   (Exhibit 17.)

12       Each of the foregoing communications and releases from the IRS unambiguously

13   qualify as a "Claim" under the Policy, defined as "any written notice from the Taxing

14   Authority alleging any Insured may be liable for taxes."  In fact, the IRS has determined

15   that the Insureds are liable for additional federal income taxes in excess of $66 million

16   based on its assertion that SC2 is an improper and abusive tax shelter.  (Exhibit 7.)

17       As will be detailed below, there is also no ambiguity that these taxes "are directly

18   related in whole or in part to [an] Insured Tax Event."

19      **C.**     **At Least Three Insured Tax Events Have Occurred.**

20       The Policy defines the term "Insured Tax Event" in the attached "Endorsement No.

21   1." Endorsement No. 1, in relevant part, defines "Insured Tax Event" as "[A]n assertion,

22   at any time during the Policy Period, by a Taxing Authority that with respect to the tax

23   years 2001 through 2005,

24

25       (a) as a result of any action taken by the Named Insured or the
      Additional Insureds prior to the Inception Date [August 29,
      2001], The Upper Deck Company, a California corporation

26       ("Upper Deck") has more than one class of stock for purposes of
      Section 1361 of the Code,[12] . . .

27

28    [12]This risk was the subject of KPMG's Opinion letters Nos. 1 & 2 attached to the
   Policy as Exhibit A.

EXHIBIT _N_, PAGE 292

1    (d) the post-gift allocations of Upper Deck's taxable income to the Municipal Plan are not correct or proper; however, it is a condition precedent to coverage for this sub-clause (d) that during the time period or periods relevant to such an assertion by the Taxing Authority the percentage of the total number of shares of Upper Deck voting and non-voting common stock outstanding that were owned by the Municipal Plan and the percentage of the total-post-gift allocations of Upper Deck's taxable income that were made to the Municipal Plan during such time period or periods were equal,

(e) as a result of the gift of the Upper Deck non-voting common stock to the Municipal Plan by the pre-gift shareholder, any Upper Deck shareholder or Upper Deck, itself, assigned income to the Municipal Plan, or[13] . . .

As will be detailed below, the IRS has made various assertions which constitute Insured Tax Events under subsections (a), (d), & (e) of Endorsement No. 1 to the Policy.

**1.    The IRS' Has Asserted That Upper Deck Has More Than One Class Of Stock -- An "Insured Tax Event" Under Paragraph (a) of Endorsement No. 1 of the Policy.**

Insured Tax Event (a) of Endorsement No. 1 to the Policy provides for coverage in the event a Taxing Authority makes an assertion that "(a) as a result of any action taken by the Named Insured or the Additional Insureds prior to the Inception Date [August 29, 2003], The Upper Deck Company, a California corporation ('Upper Deck') has <u>more than one class of stock</u> for purposes of Section 1361 of the Code.'" (Emphasis added.)

The IRS made this exact assertion in its Notice 2004-30, which stated that "the Service may also argue that the existence of the warrants [issued March 29, 2001 – before the Inception Date] results in a <u>violation of the single class of stock requirements</u> of § 1361(b)(1)(D), thus terminating the corporation's status as an S corporation. See, e.g., §§ 1.1361-1(l)(4)(ii) and (iii)." (Exhibit 12 [emphasis added].) The IRS published this assertion in I.R.B. 2004-17 on April 26, 2004, during the Policy Period. Again, these

---

[13]The risks in ¶¶ (d) & (e) were the subject of KPMG's Opinion letter No. 3 also attached to the Policy as Exhibit A.

EXHIBIT _N_, PAGE _293_

1    assertions in Notice 2004-30 were made to every SC2 participant.

2         Likewise, the IRS made assertions that the SC2 transaction violated the single class

3    of stock requirement of section 1361(b)(1)(D) of the Internal Revenue Code and section

4    1.1361-11(l) of the Income Tax Regulations IRS in its November 8, 2004 Coordinated

5    Issue Paper directed to all SC2 participants, which further explained the grounds for the

6    IRS' assertion:

> [T]he capital structure created in the Notice 2004-30
> transaction violates the single class of stock requirement of
> § 1361(b)(1)(D) of the Internal Revenue Code and § 1.1361-
> 1(l) of the Income Tax Regulations.  The S corporation election
> will terminate on the date the second class of stock is issued
> and the corporation will be treated as a C corporation.  Thus,
> the income will not be allocated to the shareholders and the
> income will be taxable to the C corporation.

12   (Exhibit 15, CIP pp. 1-2, 6.)  (Emphasis added.)

13        The Coordinated Issue Paper then goes on to state the IRS assertions about the

14   single class of stock issue, each of which pertains to every SC2 strategy ever implemented

15   by anyone:

- "[A] corporation is treated as having only one class of stock if all of its
  outstanding shares confer identical rights to distributions and liquidation
  proceeds § 1.1361-1(l)(1).  Section 1.1361-1(l)(4)(iii)(A) provides, in part,
  that a call option, warrant or similar instrument issued by a corporation is
  treated as a second class of stock of the corporation if, taking into account all
  of the facts and circumstances, the instrument is substantially certain to be
  exercised by the holder and has a strike price substantially below the fair
  market value of the underlying stock on the date that the instrument is
  issued."

- " The warrants in these transactions are a second class of stock."

22   (Exhibit 15 [CIP], p. 7 [Emphasis added].)

23        It is indisputable that the IRS' assertions in Notice 2004-30 and the Coordinated

24   Issue Paper regarding a second class of stock and Upper Deck's forfeiture of its S status

25   constitute "Insured Tax Events" under Endorsement No. 1, ¶ (a):  "[A]n assertion . . .that

26   with respect to the tax years 2001 through 2005 as a result of any action taken by the

27   Named Insured [Upper Deck] or the Additional Insureds prior to the Inception Date

28   [August 29, 2001], The Upper Deck company . . . has more than one class of stock for

EXHIBIT  *N* , PAGE 294

1   purposes of Section 1361 of the Code.". In this case, the "action taken . . . . prior to"

2   August 29, 2001 was Upper Deck's issuance of the warrants on March 29, 2001.

       **2.  The IRS Has Asserted That Upper Deck's Post-Gift Allocation Of**

          **Income To The Austin Firefighters Was Improper -- An "Insured**

          **Tax Event" Under Paragraph (d) of Endorsement No. 1 of the**

          **Policy.**

7        Insured Tax Event (d) of Endorsement No. 1 to the Policy provides for coverage in

8   the event a Taxing Authority makes an assertion that the post-gift allocation of 90% of

9   Upper Deck's income to the Austin Firefighters is not correct or proper.

10        The IRS has in fact made this exact assertion on at least four occasions.

11        First, Notice 2004-30, which the IRS released in April 2004, addresses and

12   describes the generic "S Corporation Tax Shelter" (otherwise known as SC2) and states

13   that these transactions are "designed to artificially shift the incidence of taxation on S

14   corporation income away from taxable shareholders to the exempt party" and that the IRS

15   "intends to challenge the purported tax benefits from this transaction." (Exhibit 12.)

16   Notice 2004-30 unequivocally asserts that the shifting of the income allocation to the

17   charitable organization from the individual pre-gift shareholder is improper and will be

18   challenged by the IRS. It is therefore indisputable that Notice 2004-30 constitutes an

19   "Insured Tax Event" under the Policy.

20        Second, Notice 2004-30 is the subject of the IRS' November 8, 2004 Coordinated

21   Issue Paper which "discuss[es] the grounds for taxing the proper taxpayers on the income

22   from the corporation's business.. . . in Notice 2004-30 transactions." (See, Exhibit 15.)

23   The Coordinated Issue Paper states that the participating charitable organization in each

24   and every SC2 transaction "should not be treated as a shareholder for purposes of the

25   allocation of income" and that "the transfer of the S corporation stock to the exempt party

26   will be disregarded for Federal tax purposes." (Exhibit 15, pp. 1, 5.) Once again, the

27   assertions made by the IRS in the Coordinated Issue Paper clearly constitute an "Insured

28   Tax Event" as defined by definition (d) of Endorsement No. 1 to the Policy.

EXHIBIT _N_, PAGE _295_

1    Third, in its August 2004 IDRs and the August 6, 2004 correspondence which

2  promptly followed the transmission of the IDRs the IRS reiterated these assertions.  The

3  August 6, 2004 correspondence, re: "examination of Upper Deck Co., Notice 2004-30

4  transactions," advised that the IRS:

5
> ha[d] begun an examination of the tax returns indicated above
6 > [returns of Upper Deck Co.] with respect to transactions
> described in Notice 2004-30[.] . . . Notice 2004-30 states that
7 > the Service will challenge transactions in which S corporation
> shareholders attempt to transfer the incidents of taxation on
8 > S corporation income by purportedly donating the
> S corporation non-voting stock to an exempt
9 > organization[.] . . . See Notice 2004-30 for the government's
> position.  The aforementioned examination is proceeding and
10 > must still be concluded.

11 This August 2004 assertion by the IRS again falls squarely within the definition of an

12 "Insured Tax Event" set forth in Endorsement No. 1, ¶ (d).

13    Fourth, in the August 7, 2005 "settlement correspondence," a form of which was

14 sent to all SC2 participants, the IRS informed all three Insureds that the IRS had

15 "evaluated the issues present in the transaction described in Notice 2004-30" and

16 "propose[d] to resolve issues related to the S corporation charitable contribution

17 transactions, including related penalties" in part by resolving that:

18
> 2.    The transfer of the S corporate stock to the exempt party
19 > is disregarded for federal tax purposes.  S corporation income
> will be allocated as if there had been no transfer of stock to the
20 > exempt party.

21

22 (Exhibit 17.)

23    This is yet another "Insured Tax Event" as defined by Endorsement No. 1, ¶ (d) of

24 the Policy.

25

26

27

28

EXHIBIT  *N* , PAGE  296

1      **3.**     **The IRS Has Asserted That A Shareholder Of Upper Deck**

2              **Improperly Assigned Income To The Austin Firefighters -- An**

3              **"Insured Tax Event" Under Paragraph (e) of Endorsement No. 1**

4              **of the Policy.**

5         Insured Tax Event (e) of Endorsement No. 1 to the Policy provides for coverage in

6 the event a Taxing Authority makes an assertion "as a result of the gift of the Upper

7 Deck's non-voting common stock to the Municipal Plan by the pre-gift shareholder, any

8 Upper Deck shareholder of Upper Deck, itself, assigned income to the Municipal Plan."

9         Again, the IRS made this exact assertion in its Notice 2004-30, which attacked all

10 "transactions . . . in which S corporation shareholders attempt to transfer the incidents of

11 taxation on S corporation income." Notice 2004-30 "alerts taxpayers and their

12 representatives that these transactions are tax avoidance transactions" and are "designed to

13 artificially shift the incidents of taxation on S corporation income away from taxable

14 shareholders to the exempt party." Notice 2004-30 states "the Service intends to challenge

15 the purported tax benefits of this transaction based on the application of various theories,

16 including judicial doctrines such as substance over form." This assertion by the IRS (again

17 clarified by the IRS' Coordinated Issue Paper (at pp. 1, 3-6) was yet another "Insured Tax

18 Event."

19         In its August 7, 2005 settlement proposed correspondence, the IRS informed all

20 three Insureds that the IRS had "evaluated the issues present in the transaction described in

21 Notice 2004-30" and "propose[d] to resolve issues related to the S corporation charitable

22 contribution transactions, including related penalties" in part by resolving that:

23                    2.     The transfer of the S corporate stock to the exempt party

24                 is disregarded for federal tax purposes. S corporation income
                   will be allocated as if there had been no transfer of stock to the

25                 exempt party.

26 (Exhibit 17.)

27         This is yet another "Insured Tax Event" as defined by Endorsement No. 1, ¶ (d) of

28 the Policy.

EXHIBIT _N_, PAGE _297_

**D.    The Insureds' Tax Loss.**

The Policy defines "Insured Tax Loss" as "any Taxes, Interest, fines or penalties owed by the Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the Policy."  (Exhibit 1 [Policy], ¶ 2. DEFINITIONS, (j).)

In conjunction with the "Claim" and based on the "Insured Tax Events" (i.e. that SC2 was improper) the IRS has now determined that Mr. McWilliam must pay an additional $14,085,520.00 in federal income taxes for the 2001 tax year, and an additional $52,691,914.00 in federal income taxes for the 2002 tax year.  (*See*, Exhibit 7 [Forms 870].)  Moreover, the IRS has indicated that interest on the aforementioned deficiencies "will accrue from the due date of the return until paid."  (Exhibit 7, [Continuation Sheets attached to Forms 870].)  Accordingly, the $66 million in back-taxes to be paid by Mr. McWilliam will be in addition to the applicable interest rate on the $66 million from the respective dates of the original filing deadlines for Mr. McWilliam's 2001 and 2002 federal tax returns.  Thus, with interest, the Insureds' <u>federal</u> tax liability arising out of the failed SC2 tax strategy will be over $70 million -- well in excess of the $50 million Policy limit.  As of the filing of this brief, the Insureds are in the final stages of completing the settlement with the IRS, and expect the settlement payment to be made by the time of the Hearing on this matter.

The Insureds' tax loss is much more than the $70 million plus in federal back-taxes and interest; it also includes over $17 million in back-taxes Mr. McWilliam has already paid the California FTB under the VCI program.  As with the federal returns, Mr. McWilliam filed joint California state tax returns with his wife for the same two years (2001 and 2002) in which Upper Deck was participating in the SC2 tax strategy.  Under the VCI program, Mr. McWilliam paid back-taxes to the FTB in the amount of $3,760,452 for the 2001 tax year (only March 31 through December 31).  For 2002, Mr. McWilliam paid back-taxes to the FTB in the amount of $13,314,610.

Thus, in all, based on assertions made by Taxing Authorities that the SC2

EXHIBIT _N_, PAGE _298_

1  transaction improper as structured by KPMG, with specific assertions constituting Insured

2  Tax Events under the Policy, the Insureds have and will incur increased tax liabilities in

3  excess of approximately $90 million -- some $40 million over and above the Policy limits.

4  **IV.   AIG'S DENIAL OF COVERAGE AND ITS STATED REASONS FOR**

5      **DOING SO FIND NO SUPPORT IN THE POLICY OR APPLICABLE LAW.**

6      In the face of the foregoing evidence of the Insureds' covered Tax Loss well in

7  excess of the Policy limits, AIG contends that in fact no Insured Tax Loss has occurred at

8  all.  AIG's refusal to acknowledge the occurrence of a valid Insured Tax Loss covered by

9  the Policy is not surprising as it appears that AIG never really intended to honor its

10 coverage obligations under this Policy.  Indeed, in an email dated August 28, 2001 -- the

11 day before the Policy incepted -- one of AIG's underwriters evidenced that the long-term

12 strategy of AIG was not to honor its Policy obligations and treat the Insureds in good faith,

13 but rather, was to begin preparing the file for a defense to coverage in the event a covered

14 risk materialized even before the Policy had been incepted:

15

16     I know that you still have some issues w/ CFO departure but if
something did happen and we can trace it back to him, <u>it gives
our claims department a good position to make some
arguments</u>

17

18 (Exhibit 22.)

19     **A.   AIG Has Raised A Variety Of Specious Coverage Defenses Over the**

20     **Past Few Years, Many Of Which It Has Dropped.**

21     Consistent with the corporate culture and intent evidenced in this August 28, 2001

22 email, when it first became apparent that SC2 would fall victim to IRS and FTB scrutiny

23 and that the Insureds would sustain an Insured Tax Loss under the Policy, AIG began

24 "make some arguments" – without regard to their merit -- in an effort to escape or defer

25 any payment of Policy benefits to the Insureds.

26     **1.   AIG's Refusal To Acknowledge The Existence Of A Claim.**

27     First, beginning with correspondence dated August 27, 2003 and continuing at least

28 until April 19 , 2005, AIG repeatedly refused for over a year and half to even acknowledge

EXHIBIT _N_, PAGE _299_

1  that a "Claim" had been made by a Taxing Authority.  (Exhibits 23 and 24.)  AIG did so

2  even though as early as April 29, 2002 that recognized it "likely need[ed] to create . . .

3  claims files for each of the 4 insureds . . . [and that events of April 2002] will no doubt

4  trigger defense costs"  (Exhibit 32.)

5       .Recall that the Policy defines "Claim" as "any written notice from any Taxing

6  Authority alleging that any Insured may be liable for taxes . . . ."  (Exhibit 1, Definition (a)

7  [emphasis added].)  AIG continued to deny the existence of a "Claim" even after the IRS

8  subpoenaed the identities of SC2 participants from KPMG in April 2002, after the IRS

9  released Announcement 2002-2 (the disclosure initiative), released Notice 2004-30

10  (identifying SC2 as a listed transaction), after the IRS served the August 2004 IDRs on the

11  Insureds, after the IRS released its Coordinated Issue Paper in November 2004, and after

12  the IRS sent out the universal settlement offer to all SC2 participants in April 2005.

13  Internally, AIG recognized it would have to pay defense costs or "Contest Expenses" in

14  response to these claims with the first of these events in 2002, AIG remained steadfast in

15  its denial to the Insureds that even a "Claim" existed under the Policy or that "Contest

16  Expenses" were owing for at least three years thereafter.

17            **2.    AIG's Contention That It Was Somehow Misled About Upper**

18                 **Deck's Potential For Growth.**

19       Apparently subscribing to the theory that a good Policy coverage defense would

20  begin with offensive assertions about its Insureds, AIG began proffering the theory that it

21  was somehow misled by the Insureds during the underwriting process because the actual

22  tax exposure of the Insureds turned out to be well in excess of $50 million.  (*See, e.g.*,

23  Exhibit 25 [January 29, 2004 letter from AIG to Insureds]; Exhibit 26 [March 8, 2004

24  letter from AIG to Insureds]; Exhibit 27 [May 11, 2004 letter from AIG to Insureds].)  For

25  well over a year AIG suggested that it was misled by the Insureds about Upper Deck's

26  prospects for income growth and that AIG "would not have issued the policy on the same

27  basis if AIG had appreciated the insured would have significant above limits exposure that

28  AIG would be requested to consider in a claims situation."  (*Id.*)

1    Put bluntly, AIG asserted it would never have underwritten a $50 million policy if

2  AIG understood the Insureds might suffer a $50 million insured loss.  To this end, AIG

3  repeatedly suggested that it did not receive adequate information of Upper Deck's potential

4  relationship with Tiger Woods and Upper Deck's launch of its Yu-Gi-Oh product line.[14]

5    While AIG appears to have abandoned this misrepresentation line of defense as

6  AIG did not raise the defense in either its Arbitration pleadings or its July 29, 2005

7  correspondence denying coverage for the claim, if AIG attempts to resurrect this fraud in

8  the inducement defense to coverage it would have to prove by clear and convincing

9  evidence that the Insureds intentionally defrauded AIG by concealing and or affirmative

10  misrepresenting material facts regarding its potential for economic growth.  *Banque Arabe*

11  *Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.

12  1995) (questioned, criticized, on other grounds).  That is a burden AIG can never meet.

13    There simply is no evidence that the Insureds concealed or misrepresented any

14  information regarding its economic potential for growth.  In fact, despite its attempts to

15  paint a contrary picture, AIG was always in possession of the relevant information and had

16  been apprised from the outset -- before the Policy was issued -- as to the real economic

17  prospects for growth for Upper Deck.

18    Prior to the issuance of the Policy, as discussed in further detail below, Upper Deck

19  gave AIG access to Upper Deck's consolidated and audited financial statements, to

20  confidential information related to Upper Deck's negotiations for a deal with Tiger Woods,

21  to detailed income projections for Upper Deck's entire business, and to virtually any other

22  financial information AIG requested in connection with determining the risk and

23  appropriate scope of coverage to provide to the Insureds.

24    Moreover, with respect to the product line which ultimately drove Upper Deck's

25  income to unprecedented levels, Upper Deck did not even sign its first letter of intent to

26

27    [14]Due almost entirely to a sales explosion of its new Yu-Gi-Oh product line launched in
2002, Upper Deck experienced a dramatic increase in profits during the years in which the
28  Policy was in effect,  Much like the sales of "Pokemon" products in previous years, Yu-
Gi-Oh products emerged as a sales phenomenon in the industry.

EXHIBIT _N_, PAGE _301_

1  market the Yu-Gi-Oh products until April 2002, some 8 months <u>after</u> the issuance of the

2  Policy. Despite this undeniable reality, AIG continued to assert that the Insureds had

3  somehow misled AIG regarding the profits that would be realized from Yu-Gi-Oh sales

4  which started over a year after the Policy incepted. . (See, e.g., Exhibit 26 [March 8, 2004

5  letter from AIG to Insureds]; Exhibit 27 [May 11, 2004 letter from AIG to Insureds].)

6         AIG also received (and appended to the Policy as Exhibit E) the FMV valuation

7  report, dated March 31, 2001, which provided a detailed analysis of Upper Deck's

8  business, the history of the company from its inception, its economic outlook, and its

9  earning capacity. The FMV's valuation report discusses: (1) each of the markets in which

10  Upper Deck operated and the market share Upper Deck maintained at the time; (2) the

11  diversity of its product lines; (3) the significance of its brand and trademark; (4) the

12  relationship it enjoyed with its licensors; (5) its product development record; and (6) its

13  expansion strategy. (Exhibit 1 [Policy, Exhibit F].) Of particular importance is the FMV

14  report's discussion of "Collectible Card Games" like Yu-Gi-Oh as it would be this

15  entertainment segment of Upper Deck's business that would eventually experience

16  freakish and unpredictable growth during the Policy period. (Id. at 7-8.) FMV's valuation

17  report offered the following analysis regarding "Collectible Card Games":

18         The popularity of collectible card games ("CCG's") has
         increased enormously over the past few years. The wildly
19         successful Pokemon CCG has laid the foundation for what
         should be a very promising new line of products for Upper
20         Deck. Based on the acceptance of this product and the
         company's success in getting the appropriate licensing
21         approvals, Upper Deck plans to develop games in all four
         sports. Of course, given the company's recent success with
22         Digimon a well as the promising entertainment licenses in its
         arsenal, Upper Deck also intends to aggressively pursue
23         entertainment CCG opportunities. Upper Deck is highly
         optimistic about the growth prospects in the CCG market and
24         is poised to capture a sizable share of this new and exciting
         market.

25

26  (Exhibit 1 [Policy Ex. E, p. 7].)

27         FMV's valuation report also included an analysis of the relevant market and

28  projected prosperity of the entire industry in which Upper Deck operated. (see generally

1   *Id.*) In short, in receiving a copy of the FMV report (which became an exhibit to the

2   Policy) and having communication access to FMV itself, AIG was provided with an

3   extensive and thorough economic analysis of every aspect of Upper Deck's business and

4   its potential for growth over the years for which AIG was underwriting the Policy.

5       As indicated, AIG also raised the issue of whether the FMV valuation report was

6   reliable as it did not include any reference to a <u>potential</u> Tiger Woods deal that Upper Deck

7   would eventually finalize after the FMV valuation report was issued.  This too, was just

8   another example of AIG making absurd accusations to try and avoid its coverage

9   obligation.  The reality is that Tiger Woods was often discussed during the underwriting of

10   the Policy, and AIG had several discussions and written communications with Marsh, the

11   Insureds' broker, regarding the potential for a Tiger Woods deal before issuing the Policy.

12   AIG was also aware that the FMV report would not have been any different had the Tiger

13   Woods deal actually been entered into prior to the issuance of the FMV valuation report.

14   (*See*; *e.g.*, Exhibit 28 [August 28, 2001 letter from Marsh to AIG].)  The open

15   communication about Tiger Woods, for example, is exhibited in one of the final

16   communications from Marsh to AIG shortly before the Policy was issued, a letter in which

17   Marsh advised:

18         Given the potential for growth with the potential signing of
        Tiger, the projected numbers provided to AIG, at AIG's

19         request, to justify the higher insurance limit were provided
        showing the "best case scenario" income projections with the

20         new line and the addition of Tiger Woods.

21   (*Id.*)

22       AIG now appears to have abandoned these specious fraud in the inducement

23   arguments based on Tiger Woods and Yu-Gi-Oh as there is no mention of them in any of

24   AIG's Arbitration pleadings or AIG's July 29, 2005 coverage denial letter.  Nonetheless,

25   AIG's pursuit of these types of arguments to dissuade the Insureds from pursuing benefits

26   under the Policy evidence the scorched earth tactics employed by AIG to avoid honoring

27   its obvious contractual obligations to the Insureds under the Policy.

28

EXHIBIT __*N*__, PAGE __303__

**B.    AIG's Assertion That The Insureds' Breached a Warranty Is Without Merit.**

    **1.    To Defeat Coverage, An Insured's Breach Of Warranty Must Materially Increase The Risk Of Loss.**

A breach of warranty defense is governed by New York Insurance Law section 3106, which permits an insurer to avoid liability only if an insured's breach an express warranty or representation "materially increases the risk of loss, damage or injury within the coverage of the contract." N.Y. Ins. Law, § 3106(b). To establish this defense, the insurer must "show the existence of a warranty, its breach and that such breach 'materially increased the risk of loss.'" *Irv-Bob Formal Wear, Inc. v. Public Service Mutual Ins. Co.,* 366 N.Y.S.2d 596, 602 (N.Y.Civ.Ct. 1975) (aff'd by *Irv-Bob Formal Wear, Inc. v. Public Service Mut. Ins. Co.,* 383 N.Y.S.2d 832).

Significantly, a warranty "is clearly <u>not</u> a provision limiting coverage by excluding all but a stated risk (citation), but is 'an undertaking that some particular thing be done.'" *Irv-Bob Formal Wear, Inc.,* 366 N.Y.S.2d at 602 (emphasis added). Therefore the arbitrators should draw a clear distinction between AIG's assertions that warranties which are not the subject of a Policy exclusion have been breached and AIG's assertions that the loss at issue was caused by a peril excluded by the Policy.

Whether an insured's warranty has been breached is determined in light of the scope of the language of the warranty provided by the insured. See *Irv-Bob Formal Wear, Inc.,* 366 N.Y.S.2d 596. As with all language in an insurance policy, any ambiguities in the warranty must be construed against the insurer. *Id.* at 603. Therefore, the insurer may not enforce a warranty unless the language of the express representation made by an insured is unambiguous and clearly stated. *Id.* at 603 (finding that insured did not breach warranty requiring proper records be made and maintained where "[t]he policy did not specify what kind of records were to be kept" and "[i]f defendant wanted a particular kind of record to be kept, it presumably would have so stated in the policy").

Moreover, the burden is on an insurer to allege and prove that a material increase in

1  risk occurred due to the a breach of warranty attributable to a false representation made by

2  an insured. *First Federal Savings and Loan Asso. v. Nichols*, 306 N.Y.S.2d 542, 546 (4th

3  Dept. 1970). The mere allegation of an increased risk is insufficient. *Id.* The relevant

4  measure of the materiality of the breach is the risk of loss over the life of the policy.

5  *United States Fire Ins. Co. v. Pkfinans Int'l Corp.*, 904 F.2d 169, 170 (2d Cir. 1990)

6  (creditor entitled to payment under loan insurance policy, despite fact that underlying

7  promissory note was amended without insurer's consent in violation of policy's terms,

8  where the amendment, although a breach of warranty by the insured, did not materially

9  increase insurer's risk of loss).

10     **2.**     **The Insureds Neither Breached Any Warranties Given To AIG**

11                 **Nor Did Any Alleged Breach Materially Increase The Insureds'**

12                 **Risk Of Loss.**

13     AIG's breach of warranty defense is based on the warranties and representations

14 provided by the Insureds in a September 4, 2001 Representation Letter, which is attached

15 as Exhibit B to the Policy. (Exhibit 1.) Other than the warranties set forth in the

16 Representation Letter, the Insureds did not make any other warranties in connection with

17 the Policy.

18     The Representation Letter simply "represents and warrants" that:

19         The <u>facts</u>, assumptions of <u>fact</u>, and understandings of <u>fact</u> set
   forth in the opinions of KPMG LLP attached as Exhibit A to

20         the Policy were true and correct on the date of such opinions
   and continue to be true and correct on the date hereof.

21

22 (Exhibit 1 [Policy, Exh. B], [emphasis added].)     AIG asserts that the Insureds made

23 breached three alleged factual warranties identified in Paragraph 55 of AIG's Complaint:

24         "The facts, assumptions of fact, and understandings of fact" set
   forth in the KPMG opinions were not "true and correct" in that

25         the KPMG opinions contained several material
   misrepresentations, including but not limited to, the

26         representations that: (1) the redemption price was to be "the
   fair market value of the stock on the date that [Firefighters]

27         presents the stock for redemption"; (2) neither Upper Deck nor
   McWilliam had the power to compel Firefighters to present the

28         stock it owned for redemption; and (3) the transaction set forth
   in the opinions was a lawful strategy that "should" survive IRS

1    scrutiny.

2        The only conceivable place in KPMG's opinion letters where AIG might dredge up

3    the first two of these alleged factual warranties is KPMG's opinion letter "Re:  Charitable

4    contribution to [Austin Firefighters] . . ." which includes the following language:

> On March 31, 2001, the Shareholder and the Municipal Plan
> [Austin Firefighters] entered into a shareholders agreement
> ('Shareholders' Agreement') . . .
>
> [a]s part of [specifically as section 5 of] the Shareholders
> Agreement [attached to the Policy as Exhibit C],  Upper Deck
> and Municipal Plan entered into a redemption agreement.
> Under the redemption agreement,[in section 5 of the
> Shareholder's Agreement] Municipal Plan may present the
> Non-Voting Common Stock it owns for redemption by Upper
> Deck, beginning April 1, 2003.  The redemption amount is the
> fair market value of the stock on the date that Municipal Plan
> presents the stock for redemption.  Neither Upper Deck nor the
> Shareholder [the MPR Trust] have the power to compel
> Municipal Plan to present the stock it owns for redemption.

13   (Exhibit 1 [Policy, Ex. A].)

14       As is apparent from the language quoted immediately above, the only "facts"

15   regarding the "redemption price and the Insured's ability to "compel . . .present[ation] [of]

16   the stock . . . for redemption" discussed in the relevant KPMG's relevant opinion letter are

17   that "the Shareholder and the Municipal Plan entered into a shareholders agreement," and

18   that part of the Shareholders' Agreement (specifically, section 5)  included a redemption

19   agreement.  Both of these factual assertions are indisputably correct.  The Insureds cannot

20   be found to have breached a warranty by virtue of misstating these facts.

21       The balance of the above-quoted language from the KPMG opinion letter "Re:

22   Charitable Contribution . . ." statements are nothing more than legal conclusions, which

23   AIG was free to evaluate by itself and undoubtedly did evaluate.  These statements were

24   not -- either on May 2, 2001, September 4, 2001 or at any other time – representations of

25   "facts, assumptions of fact, [or] understandings of fact."  For example, the statement that

26   neither Upper Deck nor the Shareholder have the power to compel the Austin Firefighters

27   to present the stock it owns for redemption under Section 5 of the Shareholder Agreement

28   is not a representation of fact, but simply a statement of the legal effect of the

1    Shareholders' Agreement.[15]  AIG could and undoubtedly did evaluate such legal realities

2    for itself.  Moreover, regardless of whether any of these additional statements are factual

3    statements or legal conclusions, there is nothing in these statements which is even remotely

4    inaccurate.

5         Notwithstanding the foregoing realities about the factual warranties given the

6    Representation Letter, AIG somehow maintains that the Insureds breached some

7    unidentified and unspecified warranty in the Representation Letter or KPMG opinion to

8    the effect that the redemption agreement/put option process set forth in Section 5 of the

9    Shareholder Agreement would be the <u>exclusive manner</u> in which the Austin Firefighters

10   stock could be transferred.  No such representation or warranty was ever given.

11        By way of background, recall that the SC2 transaction provided the participating

12   charitable organization with a 'put' option, which could be exercised within the sole

13   discretion of the charitable organization to cause the S corporation to redeem the non-

14   voting shares for fair market value within a limited time period in which the put could be

15   exercised.  With respect to the Insureds' SC2 transaction, the Austin Firefighters received

16   a put option in Section 5 of the Shareholders Agreement through which the Austin

17   Firefighters could compel Upper Deck to redeem the donated shares at fair market value

18   during, and limited to, a 180-day period commencing April 1, 2003.  While this right

19   provided the Austin Firefighters the beneficial and unilateral ability to compel Upper Deck

20   to liquidate its shares, this right only existed during a very limited time frame.  Again, this

21   right was unilateral, existed solely for the Austin Firefighters' beneficial right, and was

22   involuntary in that Upper Deck could be forced to redeem or liquidate the Austin

23   Firefighters' shares during the limited 180-day redemption period.

24        In November of 2002, several months before the commencement of the April 1,

25

26   [15]This also summarily dismisses AIG's third breach of warranty defense, which is
     based on the contention that Upper Deck and the MPR Trust breached a warranty given in
     the Representation Letter that "the transaction set forth in the [KPMG] opinions was a
27   lawful strategy that 'should' survive IRS scrutiny."  AIG unbelievably contends that the
     Insureds warranted that the very peril AIG was insuring would not materialize.  AIG's
28   attempt to dove-tail the risk that the SC2 strategy was unlawful into a Policy exclusion is
     simply one more example of AIG going to any length to avoid its coverage obligations.

1   2003 redemption period, Upper Deck and the Austin Firefighters began discussions about

2   a Austin Firefighter's voluntary sale of the shares to Upper Deck and Upper Deck's

3   voluntary acquisition of the shares from Austin Firefighters.  These discussions

4   commenced after the IRS subpoenaed SC2 participants identities from KPMG and after the

5   IRS and the Levin Committee had commenced their assault on SC2.  Against this

6   backdrop, Upper Deck offered Austin Firefighters $2 million to purchase the Austin

7   Firefighter's stock – roughly a 50% premium over the appraised value of the stock in

8   March of 2001.   In negotiating the deal, Upper Deck presented the offer to the Austin

9   Firefighters as a take it or leave it proposition which, if not accepted, would mean Austin

10  Firefighter's next opportunity to sell the stock would be when its put option materialized in

11  April of 2003.  Austin Firefighters, who were represented by counsel in the transaction,

12  eventually accepted Upper Deck's offer to purchase their stock and on December 31, 2002

13  the purchase was executed.

14          In contrast to the redemption/put option right set forth in Section 5 of the

15  Shareholders' Agreement, this purchase was mutual agreed after entry into the SC2

16  transaction in March of 2001, entirely voluntary and occurred well before the

17  commencement of the limited 180-day redemption period set forth in the Shareholders'

18  Agreement relating to the Austin Firefighters unilateral and involuntary redemption rights

19  under the put option in Section 5.  Upper Deck thus acquired the stock in December 2002

20  from the Austin Firefighters, which left the MPR Trust as the sole shareholder of Upper

21  Deck.

22          AIG now tries to confuse the involuntary and unilateral redemption right and

23  process provided for in Section 5 of the Shareholders Agreement and identified in the

24  KPMG opinion letter "Re:  Charitable contribution to [Austin Firefighters] . . ." with the

25  transaction that actually occurred in December of 2002.  Simply put, the put procedure

26  provided in Section 5 of the Shareholders Agreement was never warranted by the Insureds

27  as the exclusive means through which the shares could be reacquired from the Austin

28  Firefighters and the actual Shareholder's Agreement appended to the Policy clearly

1  evidenced that this was not the case.

2      Nowhere in the Representation Letter, the KPMG opinions, the Shareholders'

3  Agreement, or anywhere else does anybody assert or suggest the put mechanism of Section

4  5 of the Shareholder's Agreement was the only mechanism by which Upper Deck might

5  acquire the Austin Firefighter's shares.  To the contrary, the Shareholders' Agreement --

6  Exhibit C to the Policy -- expressly permits the parties to transfer the shares through any

7  variety of alternative means.  Section 1 of the Shareholders' Agreement specifically

8  permitted the Austin Firefighter's to "transfer, assign, pledge or . . . alienate" the shares

9  without conforming with Sections 5 ("Put Option And Right") of the Shareholder's

10  Agreement.  (Exhibit 1 [Policy, Ex. C].)

11      The third warranty identified by AIG, an asserted warranty that "the transaction set

12  forth in the opinions [of KPMG] was a lawful strategy that 'should' survive IRS scrutiny"

13  exists only in the fanciful imagination of AIG's corporate consciousness.  This was one of

14  the very risks that AIG insured against!  AIG would have the arbitrators believe the

15  insured warranted to the insurer that the risk insured would never materialize.  To even

16  read such a ludicrous position is to reject it.

17      **C.   None Of The Exclusions Cited By AIG Are Applicable.**

18      Much like its warranty arguments, all of AIG's exclusion defenses -- with one

19  exception to be discussed below -- are based on its characterization of the December 2002

20  purchase.  AIG contends that by purchasing Austin Firefighters' stock in December 2002

21  without AIG's consent and without having obtained a formal third-party fair market

22  valuation of the non-voting stock at the time of the Repurchase, Upper Deck materially

23  deviated from the as-structured SC2 strategy.  Based on these assertions, AIG contends

24  that several of the Policy's exclusions -- as distinct from the warranties in the

25  Representation Letter -- now bar the Insureds' from receiving Policy benefits they would

26  otherwise be entitled to.

27      The standards of law relating to coverage issues in the context of a policy exclusion

28  / / /

EXHIBIT _N_ PAGE 369

1    are – as previously noted -- different than the materiality standards discussed above

2    relating to express warranties given by an insured.  In the context of an exclusion "[o]nce a

3    loss has been established, the burden is on the insurer to prove that an exclusion in the

4    policy applies to the facts of this particular case." *Gurfein Bros. v. Hanover Ins. Co.*, 248

5    A.D.2d 227, 229 (N.Y.App.Div., 1st Dept. 1998), citing *Seabord Sur. Co. v. Gillette Co.*,

6    64 N.Y.2d 304, 311 (N.Y. 1984).  "To negate coverage by virtue of an exclusion, an

7    insurer must establish that the exclusion is stated in clear and unmistakable language, is

8    subject to no other reasonable interpretation and applies in the particular case." *Throgs*

9    *Neck Bagels, Inc., dba A-Whole Lot of Bagels v. GA Ins. Co. of N.Y.*,  241 A.D.2d 66, 71

10   (lst. Dept. 1998) at 71.  In other words "it is not sufficient for [insurers] to offer a

11   reasonable interpretation under which the loss is excluded; they must demonstrate that an

12   interpretation favoring them is the only reasonable reading of at least one of the relevant

13   terms of exclusion." *McCormick & Co. v. Empire Ins. Group*,  878 F.2d 27, 30 (2d Cir.

14   1988).

15         "The rule that insurance policies are to be construed in favor of the insured is

16   applied most strictly in construing the meaning of an exclusion from coverage." *Hartford*

17   *Fire Ins. Co. v. Mitlof*, 208 F. Supp. 2d 407, 412 (S.D.N.Y. 2002); see also *Kimmins Indus.*

18   *Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir. 1994).  Therefore, "'where the

19   meaning of a policy of insurance is in doubt or is subject to more than one reasonable

20   interpretation, all ambiguity must be resolved in favor of the policy holder and against the

21   company which issued the policy.'" *Kimmins Indus. Serv. Corp.*, 19 F.3d at 81;  see also

22   *McCormick & Co.*, 878 F.2d at 30 ("'well recognized is the general rule that ambiguities in

23   an insurance policy are to be construed against the insurer, particularly when found in an

24   exclusionary clause'").

25         Most importantly, AIG cannot escape paying Policy benefits to the Insureds based

26   on the application of any exclusion unless it can meet its burden of demonstrating that the

27   subject of the exclusion was the "dominant and efficient" cause of the Insureds' loss.

28   *Throgs Neck Bagels,Inc. dba A-Whole Lot of Bagels v. GA Ins. Co. of N.Y.*, 241 A.D.2d

1  66, 71 (1st Dept. 1998) at 71.  "In determining whether a particular loss was caused by an

2  event covered by an insurance policy where other, non-covered events operate more

3  closely in time or space in producing the loss, the question of whether the covered event

4  was sufficiently proximate to the loss to require that the insurer compensate the insured

5  will depend on whether it was the <u>dominant and efficient cause</u>".  *Id*. [emphasis added.]

6  Therefore, when "interpret[ing] an insurance policy excluding from coverage any injuries

7  'caused by' a certain class of conditions, 'the causation inquiry stops at the efficient

8  proximate cause of the loss.'"  *Kimmins Industrial Service Corp.*, 19 F.3d at 81, citing

9  *Album Realty Corp. v. American Home Assurance Co.*, 176 A.D.2d 513, 514

10  (N.Y.App.Div, 1st Dept. 1991).

11       Accordingly, in order for AIG to defeat coverage through the application of a policy

12  exclusion, it has the burden of establishing that some excluded event under the Policy was

13  the "dominant and efficient" cause of the Insureds loss.

14       AIG relies on three Policy exclusions to argue that the Insureds are not entitled to

15  Policy benefits they would otherwise be entitled to:  (1) Exclusion (h), which excludes

16  Policy benefits for any loss proximately and efficiently caused by an amendment to the

17  Shareholders' Agreement or Warrant Agreement without prior written approval from AIG;

18  (2) ; Exclusion (a), which excludes Policy benefits for any loss proximately and efficiently

19  caused by a criminal or fraudulent act on behalf of the Insureds; and (3) Exclusion (b),

20  which excludes Policy benefits for any loss proximately and efficiently caused by a

21  material misrepresentation made by the Insureds in the Representation Letter.  As detailed

22  below, none of the exclusions are applicable and none come even remotely close to rising

23  to the level of becoming the "dominant and efficient" cause of the Insureds' Loss.

24       **1.    The 2002 Share Purchase Agreement Does Not Provide The Basis**

25            **For Denying Coverage Under Exclusion 3(h).**

26       To memorialize their deal, Upper Deck and the Austin Firefighters entered into the

27  Share Purchase Agreement.  (Exhibit 6.)  AIG contends that because the Insureds did not

28  seek or obtain AIG's consent to execute the December 2002 Share Purchase Agreement,

1    the Insureds' loss is excluded under exclusion 3(h) of the Policy.  Specifically, AIG

2    contends that Clause 5.3 of the Share Purchase Agreement "amended" the Original

3    Shareholders' Agreement, bringing the Insureds' Loss within exclusion 3(h), which

4    provides:

> The Insurer shall not be liable to make any payment for Loss in
> connection with a Claim made against any Insured: . . .to the
> extent such Loss arises out of, is based upon or is attributable
> to an amendment to the Shareholders Agreement or the
> Warrant Agreement attached hereto as Exhibits C and D,
> respectively, without the Insurer's prior written consent (which
> consent shall not be unreasonably withheld by the Insurer).

9    AIG alleges that because Clause 5.3[16] of the Share Purchase Agreement "provides

10   that the Shareholders' Agreement is terminated with the consummation of the Share

11   Purchase Agreement on December 31, 2002," this "[wa]s an amendment thereof which

12   pursuant to Exclusion (h) operates to exclude coverage, since AIG's consent was not

13   obtained."  The Shareholders' Agreement terminated, quite naturally, because there was

14   only one shareholder of Upper Deck following Upper Deck's purchase of Austin

15   Firefighters' shares..  Nevertheless, AIG asserts that the termination of the Shareholders'

16   Agreement by its own terms incident to the December 2002 transaction was both an

17   amendment to the Shareholders' Agreement and thus this so-called amendment was the

18   "dominant and efficient" cause of the Insureds loss.

19   Notwithstanding AIG's assertions, it is clear from a review of the Shareholders'

20   Agreement and the Share Purchase Agreement that AIG's interpretation is unreasonable

21   and that exclusion (h) is not applicable under these circumstances.  First, Section 1 of the

22   "Shareholders' Agreement" permits "sales, transfers or dispositions of [Austin

23   Firefighters'] Shares" "with [] the prior written consent of the Company and the other

24   shareholders of the Company [MPR Trust]."  The Shareholders' Agreement --which was

25   attached as Exhibit C to the Policy -- says nothing about obtaining AIG's prior consent to

26

27   _____
     [16]"It is hereby agreed by the parties that Austin's rights and obligations under the
     Shareholders' Agreement shall terminate effective as of the Closing of the transactions
28   contemplated hereby and each of the parties hereto expressly waives the application of that
     Agreement to the transactions contemplated hereby."

382/017994-0028
746613.01 a09/16/06                          -46-    EXHIBIT ___N___, PAGE 312

1   such transfer.  (Exhibit 1 [Policy, Ex. C, § 1, p. 1].)  Moreover, Section 8 of the

2   Shareholders' Agreement attached as Exhibit C to the Policy and captioned "Termination

3   Of Agreement" also provides that [t]he Agreement shall terminate" by its own terms "on

4   the occurrence of any of the following events:  . . . [¶ ]8.3 at such time as only one (1)

5   Shareholder with the Company remains."  Upon Upper Deck's acquisition of Austin

6   Firefighters' shares, there was "only one (1) Shareholder of the Company remain[ing]" and

7   the "Shareholder Agreement" terminated by its own terms.  (Exhibit 6, [Share Purchase

8   Agreement ¶ 8.3, p. 15].)  This "termination of the Shareholders' Agreement" by its own

9   terms took place regardless of inclusion of Clause 5.3 in the Share Purchase Agreement.

10  No part of Clause 5.3 effected "an amendment" of the Shareholders' Agreement, let along

11  an amendment that was the dominant and efficient cause of the Insureds Loss.

12              **2.        The Insureds' Alleged Conduct In Connection With The**

13                    **Acquisition of Austin Firefighter's Shares Does Not Bring Their**

14                    **Loss Within Exclusion (a) Of The Policy.**

15        AIG next asserts that the Insureds' loss is excluded by exclusion (a) of the Policy.

16  Exclusion (a) of the Policy provides:

17            The Insurer shall not be liable to make any payment for Loss in
            connection with a Claim made against any Insured: . . .arising
18            out of, based upon or attributable to the committing in fact of
            any criminal or deliberate fraudulent act (including without
19            limitation deliberate civil fraud), or any knowing and
            intentional violation of any law, rule, regulation or statute;
20            provided, however, that effecting the transactions described in
            the Opinions and the filing of Tax Returns with any Taxing
21            Authority by the Insureds consistent with the transactions
            described in the Opinions shall not be the committing in fact of
22            any criminal or deliberate fraudulent act (including without
            limitation deliberate civil fraud) or a knowing and intentional
23            violation of law, rule, regulation or statute for purposes of this
            Clause 3(a).

24

25        AIG contends that the Insureds committed fraud in connection with the December

26  2002 transaction by misleading the Austin Firefighters with respect to the estimated value

27  of the non-voting shares then held by the Austin Firefighters.  Apparently AIG believes

28  that because the Insureds purportedly duped the Austin Firefighters into selling back their

382/017994-0028
746613.01 a09/16/06                              -47-

EXHIBIT __N__, PAGE 313

1   stock at too low a price, this fraud allegedly perpetrated upon the Austin Firefighters -- not

2   AIG -- results in a $50 million Policy windfall to AIG.  In making this argument, AIG

3   contends that the factual circumstances underlying the December 2002 transaction were

4   the dominant and efficient cause of the Insureds Loss and therefore exclusion (a) in the

5   Policy is applicable.

6        Notwithstanding AIG's argument to the contrary, there is no evidence whatsoever

7   that the circumstances surrounding the December 2002 transaction had any causal nexus to

8   the Insureds' loss, let alone amounting to the dominant and efficient cause of the loss.  To

9   the contrary, all the evidence -- ranging from the fact that the IRS and Senate

10  investigations predated the December 2002 transaction and the fact that all 58 SC2

11  transactions have been attacked and treated uniformly -- demonstrates that the December

12  2002 transaction purchase has had nothing to do with either the IRS or FTB attacks on the

13  SC2 strategy.  Indeed, even in the setting of these proceedings, each of AIG's tax experts

14  acknowledge and opine that a generic and perfectly implemented SC2 tax strategy had a

15  significant chance for failure and had no better chance than a "reasonable prospect" of

16  success.  (Expert Report of Robert D. Burke, p. 9.)  Put simply, all of the experts retained

17  in this action appear to agree that even in the most generic SC2 transaction -- independent

18  of whether or not a sale of the charity's stock through a mechanism other than the exercise

19  of the charity's put option transpired -- had an inherent risk of failure under the applicable

20  tax rules, regulations and supporting legal authorities.  As previously noted, KPMG's

21  partners' own candid but unstated (to the Insureds) conclusion that if the IRS ever caught

22  wind of the SC2 strategy, the IRS's inevitable challenge to it would be "at least partially

23  successful."  (Exhibit 2, p. 44.)[17]  These inherent flaws are the dominant risks of the

24  Insured's Loss under the Policy, not some erroneously perceived flaw in the December

25  2002 transaction.

26       Moreover, aside from the fact that SC2 strategy fails irrespective of any actual

27  repurchase, the IRS has never even asserted that the circumstances surrounding the

28

---

[17]See footnote no. 10, supra.

EXHIBIT  N , PAGE 314

1   December 2002 transaction are even a contributing factor to the invalidation of the SC2

2   strategy.  Neither the IRS nor the FTB have ever made a "Claim" asserting that the

3   Insureds' SC2 strategy fails because of an alleged fraud in connection with the December

4   2002 transaction.  Nothing in the Notice 2004-30, in the IDRs and related correspondence,

5   or in the April 7, 2005 letters suggests anything improper with the December 2002

6   transaction or that the particulars of Upper Deck's acquisition of Austin Firefighter's

7   shares had anything to do with the IRS' actions.  For example, Notice 2004-30 describes

8   the targeted transaction as involving "one or more agreements (typically redemption

9   agreements, rights of first refusal, put agreements, or pledge agreements) entered into as

10  part of the transaction [whereby] the exempt party can require the S corporation or the

11  original stockholders to purchase the exempt party's non-voting stock for an amount equal

12  to the fair market value of the stock as of the date the shares are presented for repurchase."

13  (Exhibit 12.)  This is an exact description of the SC2 strategy AIG insured.  Notice 2004-

14  30 does not in any way suggest that it is somehow relates to the existence of a subsequent

15  purchase that was not required by one of the agreements entered into as part of the original

16  SC2 transaction.

17       Thus, because the Policy's fraudulent act exclusion requires a "Claim" made against

18  "any insured . . . attributable to the committing in fact of any criminal or deliberate

19  fraudulent act" and because no such "Claim" has ever been asserted by a Taxing Authority

20  in connection with the December 2002 transaction, the fraudulent act exclusion (a) under

21  the policy cannot bar coverage for the Insureds Loss.

22       AIG contrived and advanced its feckless fraud argument in connection with

23  Exclusion No. 3(a) and the December 2002 transaction simply to avoid or delay payment

24  under the Policy.[18]

25

26

_____

[18]It bears mentioning that AIG'S fraud argument is based upon Upper Deck's alleged

27  affirmative disclosure obligations under California Corporations Code, section 25402,
    governing insider trading and affirmative disclosure obligations.  However, as discussed

28  further below, the Policy exclusions are limited to violations of New York law.  Therefore,
    any alleged violation of California's blue sky laws is irrelevant.

1         **3.**      **The Insureds Cannot Bring The Loss Within Exclusion (b) of The**

2                   **Policy.**

3      AIG next attempts to bring the Loss within exclusion (b) of the Policy, which

4 provides that AIG:

5                shall not be liable to make any payment for Loss in connection
               with a Claim made against any Insured arising out of, based

6                upon or attributable to any **material inaccuracy in the facts**
               set forth or referenced in the Representation Letter[]

7

8      As discussed above in response to AIG's breach of warranty defense, the Insureds

9 did not make any materially inaccurate statements, factual or legal, in their Representation

10 Letter.  Nor has AIG ever suggested a mechanism by which the alleged inaccuracy of these

11 fanciful misstatements of fact served as the dominant cause of the Insureds Loss.  This

12 exclusion affords AIG no comfort.

13      **D.**     **Section 10 Of The Policy's Provisions Regarding Subrogation Are No**

14              **Bar To The Insureds' Recovery.**

15      AIG's next raises as a defense to coverage Section 10[19] of the Policy which grants

16 AIG a right of subrogation which is expressly conditioned on AIG "mak[ing] . . . payment

17 under [t]he [P]olicy in respect of [L]oss" and "an implied obligation to act in good faith,

18 which [allegedly], at a minimum, obligated [Insureds] not to alter the transaction to AIG in

19 a manner that would increase the likelihood of the tax authority challenging the transaction

20 and increase the likelihood of the tax authority prevailing if such were challenged."

21 (Comp. ¶ 76 p. 12.)

22      With regard to Section 10 of the Policy, Subrogation, AIG claims "Respondents . . .

23 impaired [AIG's] rights of subrogation against the Government" and prays for a

24 declaration "[t]here is no coverage due to . . . Respondents' impairment of AIG's

25 

26       [19]"If the Insurer makes any payment under this Policy in respect of Loss, the Insurer
shall be subrogated, to the extent of such payment, to all rights and remedies of the

27 Insureds in respect of such Loss, and the Insurer shall be entitled at its own expense to sue
in the name of the Insureds; provided, however, that such right of subrogation shall in no

28 event be exercisable against any of the Insureds.  All Insureds shall take all reasonable
action requested in writing by the Insurer to secure the rights and remedies of the Insurer in
subrogation."

1   subrogation rights." This argument, however, fails as AIG could never have "rights of

2   subrogation against the Government" under Section 10 of the Policy; AIG only insured

3   against liability owing to the Government. Moreover, AIG did not "mak[e] . . . payment

4   under [t]he [P]olicy in respect of [L]oss."

5       "[A]n insurer who pays claims against the insured for damages caused by the

6   default or wrongdoing of a third party is entitled to be subrogated to the rights which the

7   insured would have had against such third party for its default or wrongdoing." (*Neuss,*

8   *Hesslein & Co. v. 380 Canal St. Realty Corp.* (1957) 168 N.Y.S.2d 579, 582). The right of

9   subrogation "is based upon principles of equity and natural justice," because the courts

10  "recognize at once the fairness of the proposition that an insurer who has been compelled

11  by his contract to pay to or on behalf of the insured claims for damages ought to be

12  reimbursed by the party whose fault has caused such damages and the principle of

13  subrogation ought to be liberally applied for the protection of those who are its natural

14  beneficiaries." *Id.* These principles create no right in AIG to recover taxes paid on behalf

15  of the Insureds to "the Government" back from "the Government."

16      Any rights of AIG to "Recovered Payments" which the Insureds may pursue as

17  refunds from "the Government" are addressed not in Section 10 of the Policy, but instead

18  under the Policy's Section 11. REFUNDS AND REIMBURSEMENTS (See Section 11,

19  esp. ¶¶ (a)(i)&(iii).) Section 11 commits discretion to pursue and control over pursuit of

20  any "Recovered Payments" to the Insureds and not to AIG. Only if the Insureds obtain

21  "Recovered Payments" are the Insureds required to account for any "Recovered Payment."

22      With regard to the question of "good faith" AIG raises no issues not previously

23  raised and discussed above -- AIG simply reiterates its arguments that "[b]y entering into

24  the Share Purchase Agreement and compelling [Austin] Firefighters to redeem its non-

25  voting common stock at a price substantially below fair market value, Respondents failed

26  to observe . . . requirement[s] set forth in the KPMG opinions" and that "changes in the

27  transaction wrought by Respondents without AIG's consent make it virtually impossible to

28  defend the transaction under the tax laws." This argument, however, implies that SC2 is

1   otherwise defendable under the tax code.  But, SC2 is indefensible.

2       Moreover, an insured's breach of an implied covenant of good faith can never

3   constitute a defense to the insured's claim against the insurer.  See, e.g., *Kransco v.*

4   *American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390 (2000).

5       **E.**    **Mr. McWilliam Was Not Obligated To Take A Charitable Deduction**

6           **For Gifting The Non-Voting Stock To Austin Firefighters In Order For**

7           **The Insureds To Recover Under The Policy.**

8       AIG also contends that Mr. McWilliam's failure to take a charitable deduction in

9   2001 for the non-voting stock he gifted to the Austin Firefighters, amounts to the failure of

10   a condition precedent as set forth in Section 9(b) of the Policy.  Section 9(b) of the Policy

11   provides in pertinent part:

12           It is a condition precedent to the right of the Insureds to be
        indemnified hereunder that the Insureds comply with the terms

13           and conditions of sub-clause (a) and (b) below: . . .

14           (b) <u>Tax Returns, etc.</u>  The Insureds shall have prepared and
        field all applicable Tax Returns in a manner materially

15           consistent with that anticipated by the Opinions and/or the
        Representation Letter.

16

17       As pointed out in the Steven R. Mather's initial expert report, AIG's theory that Mr.

18   McWilliam's failure to take a charitable deduction has any bearing whatsoever on the risk

19   of loss or the ultimate sustaining of a covered loss under the Policy is misguided and

20   without merit.  (*See*, Expert Report of Steven R. Mather, p. 20.)  The charitable

21   contribution deduction was simply not an integral part of the SC2 transaction, and the IRS

22   has made it clear that this aspect of the SC2 strategy was not a critical element of the

23   transaction.  In Notice 2004-30, the IRS stated the following in its summary of the

24   transaction:

25           The original shareholders <u>might</u> also claim a charitable
        contribution deduction under § 170 for the donation of the

26           nonvoting stock to the exempt party.  In some variations of this
        transaction, the S corporation may issue nonvoting stock

27           directly to the exempt part.

28   (Exhibit 12, [emphasis added].)  Thus, in at least some of the 58 SC2 transactions carried

1   out in the United States, the stock was not gifted at all, but rather simply issued directly to

2   the participating charitable organization.  Yet, mindful of the fact that <u>all</u> 58 SC2

3   participants were treated uniformly by the IRS, it is clear that notwithstanding variations in

4   whether a charitable deduction was taken by an SC2 participant, the IRS simply did not

5   take that into consideration when deciding whether to attack the aspects of SC2

6   participants use of the strategy in other respects.  Specifically, whether or not a charitable

7   deduction was taken had nothing to do with the IRS position that the warrants created a

8   second class of stock threatening to render the S corporation and a C corporation and

9   nothing to do with whether or not the allocation of the corporation's income between the

10   shareholders was correct.  Those are the matters for which Mr. McWilliam now seeks

11   compensation under the Policy.

12        Along the same lines, applying the principles stated in New York's Insurance Law

13   section 3106, Mr. McWilliam's decision to not to seek a charitable deduction should have

14   no bearing on the issue of coverage under the Policy of the Insureds' tax loss.

15        New York Insurance Law, section 3106(b) provides that a

16            breach of warranty shall not . . . defeat recovery thereunder
             unless such breach materially increases the risk of loss, damage
17            or injury within the coverage of the contract.  If the insurance
             contract specifies two or more distinct kinds of loss, damage or
18            injury which are within its coverage, a breach of warranty shall
             not . . . defeat recovery thereunder with respect to any kind or
19            kinds of loss, damage or injury other than the kind or kinds to
             which such warranty relates and the risk of which is materially
20            increased by the breach of such warranty.

21        Mr. McWilliam's lack of a charitable deduction on his 2001 tax return for MPR's

22   contribution of Upper Deck stock to Firefighters did not "materially increase the risk of

23   [these kinds] of loss, damage or injury" and therefore is entirely immaterial to the

24   determination of whether the Insureds' loss is covered under the Policy.  (New York Ins.

25   Law, § 3106.)

26   / / /

27   / / /

28   / / /

EXHIBIT ___N___, PAGE __319__