1  **V.    NO OFFSETTING BENEFITS HAVE OCCURRED AND TO ARGUE THAT**

2  **ONE *MIGHT* OCCUR IN THE FUTURE IS MERE SPECULATION AND**

3  **CONJECTURE.**

4      AIG's document requests in discovery were justified by an assertion that they

5  would or could reveal potential or actual "Offsetting Benefit(s)" resulting from Upper

6  Deck's potential loss of its S corporation status.  Section 11 of the Policy only allows for

7  the Insurer to receive a "Refund" or "Reimbursement" of an "Offsetting Benefit" when the

8  Insured "realizes an Offsetting Benefit in respect of a payment made by the Insurer

9  hereunder."

10     Paragraph 2(m) of the Policy defines Offsetting Benefit as follows:

11         (i) any amount realized by any Insured with respect to any
           year, of any saving of any Taxes that would not have been
12         realized but for an Insured Tax Loss and (ii) any amount of
           Taxes that would have been imposed on an Insured, with
13         respect to any relevant year for which there is an Insured Tax
           Loss, as a result of the status of such Insured as a shareholder
14         of the Named Insured, but for the Named Insured's loss of S
           corporation status.

15

16  (Exhibit 1, ¶ 2(M).)

17     Based on this definition, there are two general categories of Offsetting Benefits.

18  The first category is a tax that would have been saved if Upper Deck lost its S corporation

19  status.  This category of Offsetting Benefit can be easily eliminated because as a result of

20  the Insureds accepting the IRS' proposed settlement, Upper Deck will not forfeit its S

21  corporation status.  Therefore, there can be no taxes saved as a result of the loss of S

22  corporation status.

23     The second category of potential "Offsetting Benefit" is less well-defined.  It

24  includes any other taxes saved as a result of the IRS disallowance of the SC2 transaction.

25  While the universe of potential savings referenced in this part of the Offsetting Benefits is

26  less well defined, what is indisputable is that the Insureds have in fact realized no tax

27  savings to date as a result of the IRS disallowance of the SC2 transaction.  No refunds or

28  tax benefits have yet been received due to the IRS disallowance of the SC2 transaction.

1       The theoretical *possibility* does exist for future Offsetting Benefits to be realized by

2   the Insureds.  The most obvious situation would be benefits resulting from an adjustment

3   to the basis of the MPR Trust's shares in Upper Deck.  The disallowance of the SC2

4   transaction has the effect of reallocating the income that had previously been allocated to

5   the Austin Firefighters back to the MPR Trust.  Pursuant to I.R.C. §1367(a), when an S

6   corporation shareholder reports a distributive share of S corporation income, that

7   shareholder receives an upward adjustment in the basis of the shareholder's shares.  If

8   those shares are subsequently sold, for example, the increased basis would cause the

9   shareholder to recognize a smaller capital gain from that sale transaction than would have

10   occurred without the increased basis.  Since the MPR Trust has not sold or transferred any

11   shares in any transaction other than the SC2 transaction, no such tax savings could have

12   occurred to date.  Similarly, there is no event that has otherwise caused an actual tax

13   savings that results from the IRS disallowance of the SC2 transaction.

14       The determination that  some potential future Offsetting Benefit will in fact occur is

15   nothing more that conjecture, speculation and the Policy only allows for recovery of an

16   Offsetting Benefit once an Insured "realizes" such benefit.  However, there is no

17   discernible or justifiable Offsetting Benefit that has occurred to date for the Insureds and

18   any potential Offsetting Benefit resulting from the increase in the MPR Trust's basis in the

19   Austin Firefighters' non-voting common shares would require a precipitating event --

20   which has not occurred -- to cause that basis to become relevant.  The most likely event

21   could be the sale of shares by the MPR Trust.  A second circumstance in which potential

22   benefit could be realized from the increased basis is if Upper Deck made distributions to

23   the MPR Trust in excess of what would have been the MPR Trust's basis in the shares

24   absent the reallocation of the income previously recognized by the Austin Firefighters.

25   This in fact would be a more likely short-term source of a potential Offsetting Benefit.

26       It is probable, however, that none of the events giving rise to an Offsetting Benefit

27   will ever occur.  For example, if neither a sale nor a distribution in excess of basis occurs

28   prior to McWilliam's death, under current law, the MPR Trust would receive increased

EXHIBIT _N_, PAGE 321

1  basis on the date of McWilliam's death as a result of the inclusion of the value of the

2  shares in McWilliam's taxable estate. The increased basis resulting from this event occurs

3  without any income tax cost and could effectively eliminate any Offsetting Benefit that

4  could otherwise occur. This illustrates the speculative nature of any potential future

5  Offsetting Benefit.

6      It simply is impossible to predict whether future events will unfold to cause an

7  Offsetting Benefit to occur. In addition, the large excess of the Insured Tax Loss over the

8  policy limit makes it extremely speculative as to whether any Offsetting Benefit of a

9  sufficient amount will occur at any point in the future.

10 **VI.   AIG'S BAD FAITH DENIAL OF THE INSUREDS' CLAIM UNDER THE**

11     **POLICY.**

12     From the first sign -- in April 2002 -- that the Insureds were certain to face a

13 challenge from the IRS and the FTB over the validity of the tax benefits claimed based on

14 the SC2 transaction, AIG conducted itself in a bad faith manner, repeatedly refusing to

15 even recognize the existence of a "Claim" under the Policy, then unabashedly grasping at

16 any and all conceivable defenses to coverage, and then somehow making the determination

17 that it had no coverage obligations under the Policy. In the end, it took AIG over two

18 years to reveal its coverage determination -- a determination (through its agents and

19 otherwise) that defies reason in that AIG chose to deny coverage outright despite its own

20 recognition that SC2 is a flawed tax strategy) and despite previously providing written

21 consent to the Insureds to settle with both the IRS and the California FTB. (Exhibit 31.)

22     As detailed below, based on the law of the state of California -- the governing law

23 of tort claims in this case -- the Insureds are entitled to recovery of punitive damages and

24 attorneys' fees for AIG's reprehensible conduct in connection with its delay in making a

25 coverage determination and its bad faith denial of coverage of the Insureds' claim under

26 the Policy.

27 / / /

28 / / /

EXHIBIT _N_, PAGE 322

1    **A.    Bad Faith Damages Are Recoverable.**

2         **1.    The Choice Of Law Provision Governs Contract Based Claims**

3              **Only.**

4         Under New York choice of law principles, the Policy's choice of law provision only

5    applies to contract-based claims and therefore does not apply to the Insureds' tort-based

6    claims for bad faith.  See *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing,*

7    *Inc.,* 414 F.3d 325, 335 (2d Cir. N.Y. 2005) (hereinafter *"Finance One"*); *Krock v. Lipsay*

8    97 F.3d 640, 645 (2d Cir. 1996).  The scope of a contractual choice-of-law clause is

9    determined not under the law specified in the clause, but under the relevant forum's

10   choice-of-law rules governing the effectiveness of such clauses.  *Finance One ,* 414 F.3d at

11   333-334.  Section 16 of the Insureds' Policy includes the following choice of law clause:

12        The construction validity and performance of this Policy **shall**
          **be governed by the laws of the State of New York** . . .

13

14   (Exhibit 1 [Emphasis added].)  Under New York law, a choice-of-law provision indicating

15   a contract will be governed by a certain body of law "does not dispositively determine that

16   law which will govern" a tort based claim.  *Krock,* 97 F.3d at 645.  New York courts are

17   reluctant to "construe contractual choice-of-law clauses broadly to encompass extra-

18   contractual causes of action."  *Finance One,* 414 F.3d at 334.  In fact, "tort claims are

19   outside the scope of contractual choice-of-law provisions that specify what law governs

20   construction of the terms of the contract, even when the contract also includes a broader

21   forum-selection clause."  *Id.* at 335.  "[I]n order for a choice-of-law provision to apply to

22   claims for tort arising incident to the contract, the express language of the provision must

23   be 'sufficiently broad' as to encompass the entire relationship between the contracting

24   parties."  *Krock,* 97 F.3d at 645.

25        Second Circuit courts construe language providing that an agreement "will be

26   governed by," or "construed in accordance with," a particular state's law, as applying only

27   to disputes concerning the agreement itself and its interpretation, and not to all disputes

28   arising from the parties' relationship.  See *Krock,* 97 F.3d at 645 (language that a mortgage

1   "shall *be governed by and construed in accordance with* the laws of the Commonwealth of

2   Massachusetts" is not broad enough to apply to fraudulent misrepresentation claims.);

3   *Valley Juice Ltd. v. Evian Waters of France, Inc.* (2d Cir. 1996) 87 F.3d 604, 611

4   (language that the "Agreement is to *be governed by* the laws of …New York"

5   insufficiently broad to govern a tort claim); *Twinlab Corp. v. Paulson*, 283 A.D.2d 570,

6   571 (N.Y.App.Div., 2d Dep't 2001) (language that the "'validity, interpretation,

7   construction and performance' of the agreement would be governed by and construed in

8   accordance with New York law" insufficiently broad to govern plaintiff's RICO claim).

9   The language in the Insureds' Policy that the Policy "shall be *governed by* the laws of the

10  State of New York" is therefore insufficiently broad under New York law to govern the

11  Insureds' tort based claims.

12        The Policy's broader forum selection clause -- pertaining to disputes "arising under

13  or in connection with" the Policy -- does not broaden the scope of the Policy's choice of

14  law clause.[20]  See *Finance One*, 414 F.3d at 335.  In *Finance One*, a contract dispute arose

15  between a Thai company, Finance One, and a Delaware corporation, Lehman Brothers

16  Special Financing.  *Id.* at 327.  Both parties appealed the district court judgment upholding

17  a Special Master's finding on the breach of contract claim.  *Id.* at 336.  Lehman Brothers

18  argued that pursuant to the Special Master's findings, it had a right to extra-contractual set

19  off under Thai law, and Finance One argued no such right exists under New York law,

20  which governed the contract.  *Id.* at 336.

21        In that case, the contract contained a choice of law provision stating "[t]his

22  Agreement *will be governed by and construed in accordance* with the law specified in the

23  _____

24  [20]Pursuant to the Policy's arbitration clause in Section 16 of the Policy, the relevant forum is New York:

25        all disputes or differences which may **arise under or in
      connection with** this Policy, whether arising before or after

26        termination, including any determination of the amount of
      Loss, **shall be submitted to the American Arbitration**

27        **Association in New York, New York** under and in accordance
      with its commercial arbitration rules then in effect.

28  (Emphasis added.)

EXHIBIT _*N*_, PAGE _324_

1    Schedule," New York law, and a forum selection clause stating "[w]ith respect to any suit,

2    action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:

> 3    (i) submits . . , to the non-exclusive jurisdiction of the
>      courts of the State of New York and the United States District
> 4    Court located in the Borough of Manhattan in New York City,
>      if this Agreement is expressed to be governed by the laws of
> 5    the State of New York.

6    *Finance One*, 414 F.3d at 332 (emphasis added).  Defendant Lehman Brothers argued "that

7    the choice-of-law clause [in its agreement with Finance One], in light of the forum-

8    selection clause, [was] sufficiently broad to require that New York law be applied" to the

9    extra-contractual set-off claim.  *Id.*

10          On appeal, the Second Circuit explained that the trend in New York courts indicated

11   a reluctance to "construe contractual choice-of-law clauses broadly to encompass extra-

12   contractual causes of action."  *Finance One*, 414 F3d. at 334.  As an example, the Court

13   cited *Twinlab Corp. v. Paulson*, 283 A.D.2d 570 (App. Div. 2d Dep't 2001), in which the

14   Second Department Appellate Division of the Supreme Court of New York held that a

15   choice of law provision providing that the "*validity, interpretation, construction and*

16   *performance of the agreement would be governed by and construed in accordance with*

17   *New York law*" was not made applicable to the plaintiff's RICO claim, despite a broader

18   forum selection clause for "any actions 'relating directly or indirectly' to the consultant

19   agreement."  *Id.* at 334-335.

20          The Second Circuit held that "tort claims are outside the scope of contractual

21   choice-of-law provisions that specify what law governs construction of the terms of the

22   contract, even when the contract also includes a broader forum-selection clause."  *Id.* at

23   335.  Therefore, although the forum-selection clause in the Agreement between Finance

24   One and Lehman Brother's was "admittedly broader" than the choice-of-law clause, the

25   "forum-selection and choice-of-law clauses use[d] different language, there [was] no

26   reason to think they have the same scope."  *Id.* at 335.

27          Here, the Policy's choice of law provision contains nearly identical language-that

28   "*the construction, validity and performance of this Policy shall be governed by* the laws of

EXHIBIT  *N*, PAGE 325

1 the State of New York" to the language quoted by the Second Circuit in *Finance One* as an

2 example of language which is insufficient to encompass tort based claims. Moreover, as in

3 *Finance One*, the Policy's forum-selection clause uses entirely different language --

4 "disputes or differences which may arise under or in connection with" -- indicating that

5 AIG intended the provisions to have different scopes.

6      These circumstances, combined with the previously discussed rule that ambiguities

7 in an exclusionary clause are to be construed in favor of the insured, establish that the

8 Insureds' tort-based bad faith claims are outside the scope of the Policy's choice of law

9 provision governing contract based claims. Therefore, under Second Circuit law, AIG's

10 choice of law clause is limited to contractually based actions.

11      **2.    The Insureds' Tort Claims Are Governed By California Law.**

12      When determining what law to apply, federal courts must follow the choice of law

13 rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.* 313 U.S. 487, 494 (1941).

14 Therefore, New York's choice of law rules apply in the instant action. *Id.* at 497; *Norlin*

15 *Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984). Under New York law,

16 "[t]he first step in any choice of law inquiry is to determine whether there is an 'actual

17 conflict' between the laws invoked by the parties." *Harris v. Provident Life & Accident*

18 *Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). "If there is such a conflict, the court must then

19 classify the conflicting laws by subject matter with reference to New York law." *Id.*

20      New York law "does not recognize a separate cause of action for breach of the

21 implied covenant of good faith and fair dealing when a breach of contract claim, based

22 upon the same facts, is also pled." *Harris,* 310 F.3d at 81. "However, in California, unlike

23 in New York, 'in insurance cases there is a well-developed history recognizing a tort

24 remedy for a breach of the implied covenant' where the insurer has acted 'unreasonably or

25 without proper cause.'" *Id.* Thus, there is an actual conflict between the law of New York

26 and the law of California regarding the actionable nature of a bad faith claim based on an

27 insurance policy. Accordingly, a choice of law analysis is appropriate under the

28 circumstances.

EXHIBIT _N_, PAGE 326

1   For tort-based claims, a New York court will apply the state law of the jurisdiction

2   having the greatest interest in the litigation. *Schultz v. Boy Scouts of America, Inc.*, 65

3   N.Y.2d 189, 197 (N.Y. 1985). "[T]he only facts or contacts which obtain significance in

4   defining State interests are those which relate to the purpose of the particular law in

5   conflict." *Id.* The "contacts of the parties and occurrences with each jurisdiction are thus

6   factors to be considered in applying interest analysis, together with the policies underlying

7   each jurisdiction's rules, the strength of the governmental interests embodied in these

8   policies, and the extent to which these interests are implicated by the contacts." *Finance*

9   *One*, 414 F.3d at 337.

10   "In cases involving insurance contracts, New York courts have looked principally to

11   the following factors: the location of the insured risk; the insured's principal place of

12   business; where the policy was issued and delivered; the location of the broker or agent

13   placing the policy; where the premiums were paid; and the insurer's place of business."

14   *Olin Corp. v. Ins. Co. of North America*, 743 F. Supp. 1044, 1049 (S.D.N.Y.1990), *aff'd*,

15   929 F.2d 62 (2d Cir.1991); see *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 98

16   F.Supp.2d 498, 502 (S.D.N.Y. 2000); *Mass. Casualty Ins. Co. v. Morgan*, 886 F.Supp.

17   1002, 1005 (E.D.N.Y. 1995).

18   For example, in *Phila Parking Authority v Fed. Ins. Co.*, 385 F.Supp.2d 280, 285

19   (S.D.N.Y. 2005), plaintiff Parking Authority, an insured, sued defendant insurer for beach

20   of contract and bad faith conduct in processing his its property insurance claim.  The

21   Southern District Court explained:

22        it is clear to the Court that Pennsylvania has the 'most
23        significant interest in, or relationship to, the dispute.'  Indeed,
     Plaintiff, a Pennsylvania agency, initiated the purchase of the
     Insurance Policy from its offices in Pennsylvania.  Plaintiff's
24        insurance broker, with whom Plaintiff negotiated the Policy, is
     located in Pennsylvania, and the subject matter of the Policy,
25        Plaintiff's garages, is also in Pennsylvania.  Therefore,
     Pennsylvania law applies.

26   *Id.*

27   A similar result occurred in *Mass. Casualty Ins. Co.*  In that case, defendant applied

28   and then reapplied for disability insurance from plaintiff after testing positive for HIV, but

EXHIBIT _N_, PAGE 327

1    failed to disclose his HIV status to the insurer. *Mass. Casualty Ins.,* 886 F. Supp. at 1003.

2    After defendant submitted a claim for, and received, benefits under the policy, plaintiff

3    insurer sued to rescind the contract. *Id.* at 1004.  The Eastern District Court held that

4    because the insured was a New York resident, the policy was delivered in New York, and

5    the only non-New York contact was the location of the insurer, New York law applied. *Id.*

6    at 1005.

7         Upper Deck is a California corporation, with its principal place of business in

8    Carlsbad, California.  The Insured initiated its purchase of the Policy from its office in

9    Carlsbad, California, on suggestion of its accountants, KPMG, located in Costa Mesa,

10   California.  The subject matter of the policy -- financial representations made in opinion

11   letters issued by KPMG -- were made by a partner of KPMG's Los Angeles, California

12   office.  Moreover, the Insured was represented in the Policy negotiations by their broker,

13   Marsh, based in San Francisco, California.  Finally, as a result of the SC2 transaction, the

14   Insureds incurred additional tax liabilities with the federal and California tax authorities.

15   Therefore, the location of the insured risk (i.e. the event that triggered liability under the

16   Policy) also occurred in California.

17        Significantly, the Insureds' only contact with New York was its purchase of a

18   Policy from a New York-based insurance company.  Under New York law, the mere

19   issuance of an insurance policy in a particular state by a broker or agent in that state does

20   not create significant enough contacts to justify application of that state's law.  See *Munzer*

21   *v. St. Paul Fire & Marine Ins. Co.*, 203 A.D.2d 770, 772, 610 N.Y.S.2d 389, 391

22   (N.Y.App.Div., 3d Dept. 1994) (holding that Vermont rather than New York law should

23   govern an insurance policy issued to a Vermont-based business despite the fact that the

24   policy was procured through a New York insurance broker from an insurance company's

25   New York office); *Mass. Casualty Ins. Co.*, 886 F. Supp. at 1005.

26        Thus, based on the overwhelming interests California has in this litigation,

27   California law should be applied to the Insureds' tort-based claims.  Under California law,

28   the Insureds may bring a claim for breach of the implied covenant of good faith and fair

1   dealing against AIG. *Harris*, 310 F.3d at 81.

2       **B.    An Insurer Violates Its Covenant of Good Faith And Fair Dealing When**
3             **It Unreasonably Withholds Benefits Under The Policy.**

4           Under California law, every insurance policy includes an implied by law covenant
5   of good faith and fair dealing. *Gruenberg v. Aetna Ins. Co.,* 9 Cal. 3d 566, 575 (1973); see
6   *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir. 2002). The
7   covenant of good faith and fair dealing has "particular application" to insurers such as AIG
8   because they are "invested with a discretionary power affecting the rights of another, and
9   the insurance business is 'affected with a public interest and offers services of a quasi-
10  public nature.'" *Amadeo*, 290 F.3d at 1161 (internal citations omitted). The implied
11  obligation "requires an insurer to deal in good faith and fairly with its insured in handling
12  an insured's claim against it." *Gruenberg*, 9 Cal. 3d at 575.

13          The duty to deal fairly and in good faith with the insureds of an insurance contract
14  is a legal duty imposed by law, not one arising out of the contract itself. *Gruenberg*, 9 Cal.
15  3d at 575; *Amadeo*, 290 F.3d at 1158. The key to a bad faith claim is whether or not the
16  insurer's denial of coverage or withholding of payment is unreasonable. *Amadeo*, 290
17  F.3d at 1161; *Gruenberg*, 9 Cal. 3d at 575. The question of what constitutes "reasonable"
18  handling of an insured's claim is ordinarily a question of fact. *Id.*

19      **C.    An Insured's Unreasonable Delay In Making A Coverage Determination**
20            **Constitutes Actionable Bad Faith.**

21          An insurer breaches its implied covenant of good faith and fair dealing by pursuing
22  an "arbitrary or unreasonable" interpretation of its policy. *Amadeo*, 290 F.3d at 1161 . In
23  *Amadeo*, Joan Amadeo brought a claims of tortious bad faith and breach of contract after
24  defendant Principal Mutual Life Insurance Company ("Principal") denied her benefits
25  under her disability income insurance policy. *Id.* at 1156. Amadeo's policy "stated that
26  she was entitled to benefits if, due to disability, she was 'unable to perform the substantial
27  and material duties of [her ] regular occupation in which [she was] engaged just prior to
28  the disability" and was "not working in any other occupation.'" *Id.* at 1162. Principal

1  denied Amadeo's claim on the basis that "she became disabled in 1996 while unemployed

2  and could perform the 'substantial duties' of unemployment which it defined as the

3  activities of daily living." *Id.* Thus, "[r]ather than considering Amadeo's 'regular

4  occupation' to have been her 20-year career in the securities industry, Principal insisted

5  that if Amadeo became disabled during a period of unemployment, then the word

6  'occupation' meant 'unemployment.'" *Id.*

7        On appeal from the lower court's finding in the insurer's favor, the Ninth Circuit

8  Court of Appeals explained that "[a]s insurers are well aware, the major motivation for

9  obtaining disability insurance is to provide . . . peace of mind and security in the event the

10 insured is unable to work,'" and "Principal does not dispute that Amadeo was unable to

11 work in 1996." *Amadeo*, 290 F.3d at 1163. Moreover, "[t]he fact that Principal put

12 forward this interpretation only after [Ms. Amadeo's doctor] expressed the initial opinion

13 that Amadeo was 'unable to work' is evidence from which a jury could conclude that the

14 interpretation was adopted as a mere pretext for avoiding payment of the claim." *Id.*

15 Therefore, the Court held that "Principal's interpretation of its contract was not within

16 Amadeo's objectively reasonable expectations under California law." *Id.*

17     **D.**     **An Insured's Assertion Of Specious Coverage Defenses Constitutes**

18                  **Actionable Bad Faith.**

19       Unreasonable delay in the processing of a claim or the payment of benefits by itself

20 is also evidence of "bad faith" by an insurer. *Fleming v. Safeco Ins. Co.*, 160 Cal. App. 3d

21 31, 37 (1984). Thus, by failing to pursue adjustment of the claim with reasonable

22 diligence, AIG may tortiously breach its implied covenant of good faith and fair dealing

23 with the insured. *Id.*

24       In *Fleming*, plaintiff insured suffered injuries from an automobile accident.

25 *Fleming,* 160 Cal. App. 3d at 35. The insurer made a settlement offer of $10,000, and the

26 matter was eventually resolved by an arbitration award in the sum of $15,000- the policy

27 limits- approximately eighteen months after the accident. *Id.* at 36. Plaintiff brought suit

28 against defendant on the ground that Safeco, the insurer, had been guilty of bad faith in

1 part due to its delay in settling the claim which clearly and unequivocally justified the

2 payment of the policy limits of $15,000. *Id.*

3      Upholding the jury's finding of bad faith, the Second Appellate District Court found

4 that plaintiff presented evidence which could be reasonably interpreted to indicate that

5 Safeco was not pursuing the adjustment of this claim with any degree of diligence. *Id.* at

6 37. For example, "requests by Safeco for information from plaintiff's counsel seem to

7 have been spaced out over a much longer period than was reasonable under the

8 circumstances," and "[t]here was evidence indicating that some seven months elapsed from

9 the date of the accident before Safeco even concluded from its investigation that the

10 vehicles involved were uninsured." *Id.* During these months, "the investigation was

11 passed from Safeco adjuster to adjuster, some of whom did not even have the authority to

12 pay the policy limits of $ 15,000." *Id.*

13      **E.      AIG Has Acted In Bad Faith.**

14      AIG's handling of the claim has been a clear example of bad faith for which

15 liability should imposed. AIG pursued an "arbitrary or unreasonable" interpretation of the

16 Policy in taking absurd position after absurd position in its effort to first, delay making a

17 coverage determination, and then, to deny coverage outright based on wholly specious

18 coverage defenses. *See, Fleming,* 160 Cal. App. 3d at 37; *Amadeo,* 290 F.3d at 1161.

19 Indeed, AIG has denied coverage in all respects despite the fact the Policy was specifically

20 tailored and issued to cover the precise event which has transpired: An attack by the IRS

21 and the FTB regarding the legitimacy of the SC2 strategy. When one considers this reality

22 in the further context of the uniformity in which all SC2 transactions have been attacked- -

23 not to mention KPMG's indictments, fines and the "death penalty" imposed by the Justice

24 Department on KPMG against the very tax unit which generated and marketed the SC2

25 strategy and its ilk - -AIG's across the board denial of coverage is difficult to fathom.

26      Like the defendant insurer in *Amadeo,* AIG simply attempts to adopt a wholly

27 unreasonable interpretation of its Policy, which contravenes the objectively reasonable

28 expectations of the insured that it would have additional peace of mind and security in the

1   event the Taxing Authorities found that SC2 was an improper taxing strategy.  Moreover,

2   AIG unreasonably delayed in making a coverage determination, a determination ultimately

3   resulting in AIG's arbitrary and capricious denial of coverage.

**1.      AIG Has Acted In Bad Faith By Denying Coverage Based On**
**Unreasonable Interpretations Of The Policy Exclusions And**
**Warranties.**

7        Upper Deck clearly bought this specialized Policy for the very purpose for which it

8   is being used- to protect against losses arising out of a Taxing Authority's determination

9   that Upper Deck owed additional taxes as a result of the SC2 Transaction.  AIG now

10  unreasonably attempts to avoid payment by bringing Upper Deck's claim within a Policy

11  exclusion.

12       As discussed in greater detail above, the exclusions under which AIG is attempting

13  to avoid payment are based on issues unrelated to Upper Deck's tax liabilities stemming

14  from the SC2 transaction.  AIG argues coverage is excluded because (1) the Insureds'

15  implementation of the SC2 strategy deviated materially from the form of the transaction,

16  (2) the Insureds breached warranties given to AIG when the Policy was issued, and (3) the

17  Insureds acted fraudulently in repurchasing its shares.

18       As an example, AIG argues the claim comes within the Policy's exclusion of any

19  "Claim made against any Insured: (a) arising out of, based upon or attributable to" the

20  committing of a fraudulent act. Here, even assuming for the state of argument Upper Deck

21  somehow acted fraudulently with respect to its buy back of shares from Austin

22  Firefighter's- which it did not- the IRS has never asserted a "Claim" based upon or

23  attributable to any purportedly fraudulent act of the Insureds.  In fact, as previously

24  discussed, the IRS brought "claims" against *all subchapter S corporation participants* in

25  the SC2 transaction, regardless of the details of the manner in which the transaction

26  occurred.  These "Claims" were initiated well before the December 2002 transaction  was

27  even contemplated in November 2002.  It is preposterous to deny coverage on the basis

28  that Upper Deck would not owe the IRS the taxes that would otherwise have been avoided

1  under the SC2 Transaction had Upper Deck paid a different amount for its shares or it had

2  acquired Austin Firefighters' shares in some different fashion.

3      AIG's current position that the Insureds are entitled to no Policy benefits

4  whatsoever is consistent, AIG's reputation, but also with the manner in which AIG's prior

5  conduct with respect to KPMG's foray into the abusive tax shelter industry.

6      It has come to light through the extensive investigation and prosecution of KPMG

7  and its partners that KPMG internally cultivated an environment in which risky tax

8  strategies were hastily approved in the face of serious and valid concerns that the

9  transactions ran afoul of applicable tax laws:  In fact, the Levin and Homeland Reports

10  indicate that with respect to SC2, certain KPMG partners had expressed grave concerns

11  that the IRS would in fact successfully challenge the transaction should they ever learn of

12  its existence.  Of course none of the internal concerns expressed by KPMG tax

13  professionals were ever revealed to the purchasing clients who were left to rely on

14  KPMG's tax opinion letters, which KPMG used as a marketing tool to sell the validity of

15  the transactions to its customer base.

16      As early as 1996, KPMG began designing, marketing, and selling illegal tax

17  shelters defrauding the IRS.  The U.S. Department of Justice initiated an investigation and

18  eventually charged KPMG and nine other defendants with conspiring to defraud the IRS

19  with at least four illegal tax shelters called FLIP, OPIS, BLIPS, and SOS.  According to an

20  August 29, 2005 press release from the Department of Justice, KPMG and its co-

21  conspirators were charged with concocting "tax shelter transactions-together with false and

22  fraudulent factual scenarios to support them-targeted them to wealthy individuals who

23  needed a minimum of $10 or $20 million in tax losses so that they would pay fees that

24  were a percentage of the desired tax loss to KPMG, certain law firms, and others instead of

25  paying billions of dollars in taxes owed to the government."  The proceedings culminated

26  in the structuring of a settlement that involved KPMG paying $456 million in fines to the

27  government.  The settlement also permanently restricted KPMG's tax practice, including

28  the termination of two practice areas and bans KPMG's involvement with any pre-

1   packaged tax products.

2   What is notable about the Department of Justice inquiry and prosecution into

3   KPMG's activities is the parallels that exist between KPMG's development and marketing

4   of the four tax strategies involved in that case and SC2.  As the Department of Justice put

5   it, KPMG conspired with other professional organizations to peddle illegal tax shelters to

6   its clients.  Similarly, KPMG conspired with AIG to package a deal regarding SC2 wherein

7   AIG would provide insurance coverage to further bolster the illusion of validity associated

8   with the pre-packaged SC2 product.  This is evidenced by the fact that KPMG actually

9   possessed sample insurance policies to use as a marketing device in selling the tax

10  strategies to potential clients.  (*See*, Levin Report, p. 57.)

11  The development, marketing and sale of SC2 is inescapably linked to the shrouded

12  and dubious environment that spawned the other fallible pre-packaged tax products KPMG

13  was investigated and prosecuted for by the Department of Justice.  And AIG is inextricably

14  linked to the plot that resulted in the Insureds purchasing a doomed tax strategy with the

15  false sense of security that in the event KPMG's tax opinions failed to hold up the $50

16  million Policy purchased from AIG would cover their potential losses.  As it turns out,

17  however, the Insureds spent $575,000 to purchase the tax strategy from KPMG, and spent

18  $3.25 million to obtain coverage for the strategy, only to be shunned by AIG when the

19  taxing authorities predictably and inevitably challenged the validity of the transaction.

20  **2.    AIG Has Unreasonably Delayed Processing Of The Claim, Which**

21  **Delay Has Now Resulted In A Bad Faith Denial Of Coverage.**

22  Not only is AIG's interpretation of the Policy wholly unreasonable, but AIG has

23  failed to timely process Upper Deck's claim.  As explained earlier, AIG was on notice as

24  early as April 2002 that KPMG was being investigated by the IRS, and that that

25  investigation was focused on the sale and use of tax strategies, including the SC2

26  transaction.  Moreover, as early as July 2003, the Insureds began notifying AIG that the

27  relevant tax authorities (IRS and California FTB) considered the SC2 transaction to be

28  improper and had made assertions that any tax payer who utilized the strategy would be

1 investigated and would be encouraged to file amended tax returns to effectively unwind
2 the deal. Also in July 2003, the Insureds requested that AIG consent to the retention of
3 legal counsel to assist in responding to the IRS' inquiry into the SC2 transaction. Along
4 with the request for consent, the Insureds sought confirmation that AIG would fund the
5 costs and fees associated with the IRS' investigation of the Insureds once the retention
6 under the Policy was met. On August 27, 2003, while somehow continuing to maintain
7 that no "claim" yet existed under the Policy, AIG did commit to paying for the legal fees
8 and costs associated with the IRS inquiry once the expenses had exceeded the $500,000
9 retention.[21]

10      Throughout the next two years, AIG was kept informed of communications between
11 the Insureds and the IRS, and in fact actively participated in strategy sessions and what
12 positions to take with the IRS. During that time, however, AIG somehow continued to
13 take the position in writing and verbally that no "Claim" existed under the Policy, and
14 further began making numerous assertions that it was misled by the Insureds during the
15 underwriting process, e.g., (see various discussions re Tiger Woods and Yu-Gi-Oh) that it
16 did not have sufficient information to make a coverage determination, and that the Insureds
17 had implemented SC2 in such a way to take any potential tax loss they might sustain out of
18 the Policy's scope of coverage.

19      AIG took a two-pronged approach in its response to the Insureds' claim: (1) delay at
20 all costs to make any coverage determination; and (2) raise spurious coverage defense after
21 spurious coverage defense to deflect the focus from AIG's intentional refusal to make a
22 coverage determination. The correspondence exchanged between the parties over the
23 course of 2003 through 2005 evidence AIG's systematic refusal to meet its obligations
24 under the Policy and to make a timely coverage determination and to accept coverage.
25 Below are just some of the highlights of the positions asserted by AIG during the time in
26 which the Insureds sought a timely coverage determination:

27 ─────────────────

28 [21]This was confirmed in a July 9, 2004 letter from AIG new counsel, William Cotter, to Upper Deck. AIG has never actually made any payments to cover the Insureds costs and fees incurred in connection with the IRS' investigation.

- **August 27, 2003:** In a letter from AIG's counsel, AIG asserted that no "claim" or "contest" existed at the time, despite the IRS' subpena of SC2 participants identities from KPMG which AIG internally recognized as early as April 2002 would soon cause defense costs to be payable, the fact that as of that time, the IRS was already investigating the Insureds' SC2 transaction in the Senate was deep into its investigation of SC2 and KPMG's other illicit and similar tax strategies. (Exhibit 29.)

- **January 29, 2004:** In a letter from AIG's counsel, AIG contended that it was somehow misled by the Insureds during the underwriting process because the actual tax exposure of the Insureds turned out to be well in excess of $50 million. In other words, AIG asserted it never intended to insure against a loss that might conceivably materialize.(Exhibit 25.)

- **May 11, 2004**: In a letter from AIG's counsel, AIG raised the issue (apparently for the first time) that it suspected something untoward with the Insureds conduct in connection with Upper Deck's December 2002 purchase of Austin Firefighters shares. (Exhibit 27.)

- **July 6, 2004:** Counsel for the Insureds spoke with AIG's newly substituted counsel, who indicated that AIG was critical of the Upper Deck's apparent failure to have an appraisal done in connection with the December 2002 stock transaction. AIG's new counsel (William Cotter) indicated he was then preparing a reservation of rights letter dealing with whether there was yet a "claim" under the Policy.

- **July 9, 2004:** In a letter from Mr. Cotter on behalf of AIG, Mr. Cotter recounts that this matter was submitted to AIG by letter dated April 22, 2002. Yet, not even this letter of over two years later provides a coverage determination. (It would be over another year, on July 29, 2005, when AIG would finally make its coverage determination.) In the "Coverage Analysis" portion of Mr. Cotter's July 9, 2004 letter, Mr. Cotter set forth AIG's

1   coverage position as follows: (1) reasserting that no claim had arisen under

2   the Policy at that point; (2) there existed no insured loss due to the facts and

3   circumstances surrounding the "unauthorized" December 2002 transaction;

4   (3) any potential loss may be excluded from coverage due to some alleged

5   fraud or criminal conduct by the Insureds in connection with the December

6   2002 transaction[22]; and (4) any potential loss is excluded from coverage

7   based on the Insureds bad faith deviations from the alleged prescribed

8   manner in which the stock was to be reacquired from Austin Firefighters.

9   (Exhibit 30.)

10   • **April 19, 2005:**  Email from Mr. Cotter reiterating AIG's coverage positions,

11   identifying possible defenses to coverage as (1) AIG was misled as to the

12   quantum of risk; (2) no claim yet existed; (3) Upper Deck's purchase of

13   Austin Firefighter's shares was "unauthorized"; and (4) the FMV valuation

14   was invalid due to its failure to reference the Tiger Woods deal[23].  (Exhibit

15   21.)

16   **F.**   **The Insureds Are Entitled To Both Compensatory Damages, Including**

17   **Attorneys' Fees, And Punitive Damages.**

18   Because AIG acted in bad faith by unreasonably withholding coverage, Upper Deck

19   is entitled to compensatory, including attorneys' fees, as well as punitive damages.  The

20   general rule of damages in tort is that the injured party may recover for "the amount which

21   will compensate for all the detriment proximately caused thereby, whether it could have

22   been anticipated or not."  Cal. Civ. Code, § 3333; see *Gruenberg,* 9 Cal. 3d at 579.[24]

23   _____

24   [22]Over two years into AIG's coverage analysis, with its new attorney on board, this was the first time anyone had ever alluded to the application of the fraud/criminal conduct exclusion under the Policy.

25   [23]Mr. Cotter's letter fails to acknowledge the fact that the prospective Tiger Woods deal and its potential impact on Upper Deck's future income was specifically addressed by

26   Marsh in the final stages of negotiations with AIG *before* the Policy was bound in August 2001.

27   [24]Bad faith conduct on the part of the insurer in breaching its insurance policy, may also "be employed to interpose a claim for consequential damages beyond the limits of the

28   policy for the claimed breach of contract" under New York law. *Acquista v. N. Y. Life Ins. Co.* 285 A.D.2d 73, 82 (2001).

1    In addition, when an insurer tortiously withholds benefits due under a policy,

2  attorney's fees reasonably incurred to compel payment of the benefits are recoverable as

3  an element of the damages resulting from the tortious conduct, and are not precluded by

4  Section 1021 of the California Code of Civil Procedure. *Brandt v. Superior Court*

5  *(Standard Ins. Co.)*, 37 Cal. 3d 813, 818-819 (1985); *Pacific-Southern Mortgage Trust Co.*

6  *v. Insurance Co. of N. Am.*, 166 Cal. App. 3d 703, 717 (1985). This is the case because

7  "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney

8  to obtain the benefits due under a policy, it follows that the insurer should be liable in a

9  tort action for that expense." *Brandt v. Superior Court*, 37 Cal. 3d at 817. "The attorney's

10  fees are an economic loss -- damages -- proximately caused by the tort." *Id.*[25]

11    Finally, because the relationship of insurer and insured is inherently unbalanced,

12  and the adhesive nature of insurance contracts places the insurer in a superior bargaining

13  position, punitive damages are available in recognition of insurers' underlying public

14  obligations and reflects an attempt to restore balance in the contractual relationship. *Egan*

15  *v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 820 (1979). Punitive damages are

16  appropriate where, as in this case, the insurer, beyond a bad faith breach of the contract,

17  "acted 'with the intent to vex, injure or annoy, or with a conscious disregard of the

18  plaintiff's rights.'" See *Delgado v. Heritage Life Ins. Co.*, 157 Cal. App. 3d 262 (1984)

19  (restrictive policy interpretation coupled with repeated failure to investigate and awareness

20  of insurer of the harsh consequences on the insured, sufficient to infer conscious

21  disregard).

22  **VII.   CONCLUSION**

23    AIG's denial of Policy benefits to the Insureds has been not just erroneous, but

24  unreasonable, without justification and quite simply outrageous. This is a case where the

25

---

26  [25]An insured may also recover attorneys' fees under New York law, so long as he has
been "cast in a defensive posture by the legal steps an insurer takes in an effort to free
27  itself from its policy obligations," or where the insurer exercised "such bad faith in
denying coverage that no reasonable carrier would, under the given facts, be expected to
28  assert it."  *Mighty Midgets, Inc. v. Centennial Ins. Co.* 47 N.Y.2d 12, 21 (1979); *Sukup v.
State*, 19 N.Y.2d 519, 522 (1967).

EXHIBIT _N_, PAGE_338_

1   narrow specific risk insured against materialized exactly as parties to the Policy conceived

2   that it might and AIG has simply refused to acknowledge its obligations to its Insureds.

3   Dated:  September 16, 2006                    RUTAN & TUCKER, LLP

4

5                                                By: _____

6                                                    Duke F. Wahlquist
                                                     Attorneys for Respondents and
7                                                    Counterclaimants, The Upper Deck Company
                                                     and Richard P. McWilliam, individually and
8                                                    as Trustee for the MPR Trust

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

382/017994-0028
746613.01 a09/16/06

EXHIBIT _N_, PAGE_339_

# EXHIBIT O

## AMERICAN ARBITRATION ASSOCIATION

AMERICAN INTERNATIONAL
SPECIALTY LINES
INSURANCE COMPANY
      Claimant – Counter Respondent

      - v.-

THE UPPER DECK COMPANY, RICHARD
P. McWILLIAM, and the MPR
REVOCABLE TRUST
      Respondents – Counterclaimants.

Case No.
13 195 02486 05

John F. Byrne, Esq.
Stephen D. Kramer, Esq.
Charles J. Moxley Jr., Esq

## **CLAIMANT'S PREHEARING REPLY BRIEF**

D'AMATO & LYNCH
70 Pine Street
New York, New York  10270
(212) 269-0927

EXHIBIT __O__, PAGE __340__

# <u>TABLE OF CONTENTS</u>

<u>Page</u>(s)

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT .............................................................................................. 4

POINT I
RESPONDENTS HAVE FAILED TO SATSIFY THEIR BURDEN OF
SHOWING AN INSURED TAX LOSS .......................................................... 4

POINT II
EXCLUSION 3(h) BARS COVERAGE DUE TO RESPONDENTS'
TERMINATION OF THE SHAREHOLDERS AGREEMENT WITHOUT
AISLIC'S CONSENT ................................................................................. 6

    A.  Respondents' Distorted Interpretation of the Shareholders Agreement
        Violates the Plain Meaning Rule .................................................... 6

    B.  The Policy's "Arising Out Of" Language, As Interpreted By New York
        Courts, Means The Exact Opposite Of a Rigid Causation
        Requirement ................................................................................... 7

POINT III
RESPONDENTS' BREACHES OF WARRANTIES PRECLUDE
COVERAGE ............................................................................................. 9

    A.  Respondents Breached their Promissory Warranty That Fair Market
        Value Would Be Paid For Austin's Shares ..................................... 9

    B.  Respondents Breached their Separate Promissory Warranty That They
        Could Not Compel Austin To Redeem Its Shares .......................... 11

    C.  Respondents and KPMG Conspired To Deceive AISLIC ............... 12

i

EXHIBIT __O__, PAGE_341

POINT IV
    EXCLUSION 3(a) BARS COVERAGE FOR RESPONDENTS'
    FRAUDULENT INDUCEMENT OF THE REPURCHASE OF
    AUSTIN'S SHARES ....................................................................... 13

POINT V
    RESPONDENTS' FAILURE TO COMPLY WITH AN EXPRESS
    CONDITION PRECEDENT TO COVERAGE VITIATES COVERAGE .... 15

POINT VI
    RESPONDENTS IMPAIRED AISLIC'S RIGHT TO SUBROGATION ...... 16

POINT VII
    RESPONDENTS' CONTINUED WITHOLDING OF INFORMATION
    CONCERNING YU-GI-OH! REVEALS A PATTERN OF DECEPTION ... 17

POINT VIII
    RESPONDENTS' COUNTERCLAIM FOR BAD FAITH IS LEGALLY
    AND FACTUALLY DEFICIENT................................................... 20

      A.  Under Governing New York Law, Missed By Respondents, They
          Cannot Maintain A Separate Claim For Implied Duty of Good Faith
          And Fair Dealing ............................................................... 20

      B.  AISLIC's Coverage Determinations Were Timely and Reasonable,
          Especially In View Of Respondents' Failure To Disclose Their
          Abandonment of The Tax Plan ............................................. 23

CONCLUSION ....................................................................... 27

EXHIBIT _O_, PAGE 342

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>Butvin v. Doubleclick, Inc.</u>, 2001 WL. 228121 (S.D.N.Y. 2001), *aff'd*,
22 Fed. Appx. 57 (2d Cir. 2001)...................................................................21

<u>Chicago Insurance Co. v. Kreitzer & Vogelman</u>,
265 F. Supp. 2d 335 (S.D.N.Y. 2003)........................................................ 20

<u>Commercial Union Insurance Co. v. Flagship Marine Services, Inc.</u>,
190 F.3d 26 (2d Cir. 1999)...................................................................... 10

<u>Continental Information Systs. Corp. v. Federal Insurance Co.</u>,
2003 WL. 145561 (S.D.N.Y. 2003)........................................................ 22

<u>Core-Mark International Corp. v. Commonwealth Insurance Co.</u>,
2005 WL. 1676704 (S.D.N.Y. 2005)...................................................... 22

<u>Employers Mutual Casualty Co. v. Key Pharmaceuticals</u>,
73 F.3d 815 (2d Cir. 1996)..................................................................... 23

<u>Hartford Fire Insurance Co. v. Mitlof</u>,
208 F. Supp. 2d 407 (2d Cir. 2002) ....................................................... 10

<u>Level 3 Communications, Inc. v. Federal Insurance Co.</u>,
272 F.3d 908 (9th Cir. 2001)................................................................. 15

<u>McGinniss v. Employers Reinsur. Corp.</u>,
648 F. Supp. 1263 (S.D.N.Y. 1986)............................................... 8, 13, 14

<u>Sacks v. Commissioner</u>,
69 F.3d 982 (9th Cir. 1995).................................................................. 10

<u>U.B. Vehicle Leasing Inc. v. Atlantic Mutual Insurance Co.</u>,
2004 WL. 503729 (S.D.N.Y. 2004)........................................................ 22

<u>Williams v. Deutsche Bank Securities, Inc.</u>,
2005 WL. 1414435 (S.D.N.Y. 2005)...................................................... 22

#248567v1

EXHIBIT __O__, PAGE __343__

Yankee Caithness Joint Venture, LP v. Planet Ins. Co., 1996 WL 426359
(S.D.N.Y. 1996)...................................................................21

## STATE CASES

Acquista v. N.Y. Life Insurance Co.,
285 A.D.2d 73, 730 N.Y.S.2d 272 (1st Dep't 2001) .............................. 23, n.4

Aetna Casualty & Surety Co. v. Liberty Mutual Insurance Co.,
91 A.D.2d 317 (4th Dep't 1983)........................................................ 8

Allianz Underwriters Insurance Co. v. Landmark Insurance Co.,
13 A.D.3d 172,175, 787 N.Y.S.2d 15 (1st Dep't 2002)................................. 16

Kidalso Gas Corp. v. Lancer Insurance Co.,
21 A.D.3d 779, 802 N.Y.S.2d 9 (1st Dep't 2005) ............................................ 4

Maroney v. New York Central Mutual Fire Insurance Co.,
5 N.Y.3d 467, 805 N.Y.S.2d 533 (2005) ................................................. 7, 8, 14

Mighty Midgets, Inc. v. Continental Insurance Co.,
47 N.Y.2d 12 (1979) ........................................................................ 23, 27

New York University v. Continental Insurance Co.,
87 N.Y.2d 308, 639 N.Y.S.2d 283 (1995) ..................................................... 22

Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,
86 N.Y.2d 685, 636 N.Y.S.2d 734 (1995) ..................................................... 15

Purdue Frederick Co. v. Steadfast Insurance Co.,
2005 WL. 1662028 (Sup. Ct., N.Y. Co. 2005) ............................................... 8

Rocanova v. Equitable Life Assur. Social,
83 N.Y.2d 603, 612 N.Y.S.2d 339 (1994) ................................................22-23

Throgs Neck Bagel Inc. v. GA Insurance Co. of New York,
241 A.D.2d 66, 671 N.Y.S.2d 66 (1st Dep't 1998)........................................... 8

iv

EXHIBIT __O__, PAGE 344

*United States Fire Insurance Co. v. New York Marine and General
Insurance Co.*,
  *268 A.D.2d 19, 706 N.Y.S.2d 377 (1st Dep't 2000)* ...................................... 8

*Weinberg v. Transamerica Insurance Co.*,
  62 N.Y.2d 379, 477 N.Y.S.2d 99 (1984) ...................................................... 17

## STATE STATUTES

McKinney's N.Y. Ins. Law §3105 ................................................................ 20

#248567v1

EXHIBIT __O__, PAGE _345_

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY<br>      Claimant – Counter Respondent<br><br>            – v.–<br><br>THE UPPER DECK COMPANY, RICHARD P. McWILLIAM, and the MPR REVOCABLE TRUST<br>      Respondents – Counterclaimants. | Case No.<br>13 195 02486 05<br><br>John F. Byrne, Esq.<br>Stephen D. Kramer, Esq.<br>Charles J. Moxley Jr., Esq. |

## CLAIMANT'S PREHEARING REPLY BRIEF

### PRELIMINARY STATEMENT

Respondents have completely failed to satisfy their burden of proving an Insured Tax Loss, subject to the terms and conditions of the Shareholders Agreement and the KPMG Opinions, for the simple reason that they chose not to follow the Tax Plan set forth in those documents. Rather, Respondents chose, in December 2002, to make Austin "a take it or leave it proposition" (Respondents' bf. at 42), having nothing to do with fairness, let alone fair market value. Nor, in seventy-three pages, do Respondents make any attempt to explain their failure, in plain violation of the Policy, to ask for AISLIC's consent to terminate the Shareholders Agreement.

Instead, Respondents distort the plain meaning of the Shareholders Agreement to argue that it somehow sanctioned their abrogating the Agreement and the Tax Plan's

#248567v1

EXHIBIT __O__, PAGE _346_

requirements of fair market value and an independent appraisal.  Respondents also invent a rigid causation requirement for the Policy's exclusions to apply, which is directly contrary to the broad interpretation that the New York Court of Appeals has given to the phrase "arising out of"-- a phrase completely ignored by Respondents -- in interpreting insurance policy exclusions.

With respect to the warranties Respondents made to AISLIC, Respondents fail to grasp that their warranty of KPMG's Opinions ran not merely to the factual existence of the documents mentioned in those Opinions, but expressly encompassed the "facts, assumptions of fact and understandings of fact" contained in those documents, most notably, as set forth in the KPMG Opinions: donative intent, fair market value and an independent appraisal.  Respondents argue for the first time that the Tax Plan was a "doomed tax strategy" from the onset, with fundamental flaws" not disclosed in the KPMG Opinions, without realizing that Respondents warranted the truth and accuracy of the "facts, assumptions of fact, and understandings of facts" contained in those Opinions.  Respondents forget altogether that they made a separate warranty to AISLIC promising that neither "Upper Deck [n]or any of its shareholders [could] compel … a redemption, except pursuant to the exercise of the Right of First Refusal contained in the Shareholders Agreement…."

To distract from the fact that the Policy, on multiple grounds, does not provide coverage for a "take it or leave it proposition" which it did not insure, Respondents resort to false claims and "guilt by association." Respondents point to the Justice Department's investigation of KPMG, _Respondents'_ longtime accountants, without ever mentioning that it had nothing to do with the $SC^2$ transaction.  Respondents cannot rewrite history. Respondents and their agent KPMG came to AISLIC, not _vice-versa_, seeking coverage long

2

#248567v1

EXHIBIT __O__, PAGE _347_

after they entered into their engagement letter, and months after they had already entered into the SC$^2$ transaction with Austin.  It was also Respondents and KPMG, who then later conspired, after the Policy was issued, to cheat Austin out of its shares, without so much as a word to AISLIC because they knew AISLIC would never consent.

          Respondents nevertheless pursue a bad faith claim, which besides being non-existent under New York law, like a boomerang, turns back to its owner.  Here too, Respondents fail to provide answers to questions, such as why they waited until January 2004 to disclose to AISLIC for the first time that the projections they provided to AISLIC in June 2001 grossly underestimated AISLIC's potential exposure.  Nor do Respondents explain why they waited until April 2004 to mention for the very first time that they had repurchased Austin's shares a year and a half earlier and that Yu-Gi-Oh! -- never previously mentioned to AISLIC -- was the reason for the repurchase.  The facts show that AISLIC raised appropriate coverage defenses, as soon as possible, as Respondents, ever so gradually, disclosed that they never followed the Tax Plan which they asked AISLIC to insure.  AISLIC had been prepared to cooperate fully in the vigorous defense of the Tax Plan, and thus agreed to advance defense costs from the onset of the IRS inquiry -- only to find out later that the Tax Plan had never been followed.

#248567v1

EXHIBIT ___O___, PAGE__348__

# ARGUMENT

## POINT I

### RESPONDENTS HAVE FAILED TO SATSIFY THEIR BURDEN OF SHOWING AN INSURED TAX LOSS

As set forth at page 13 of our moving brief, "[i]t is basic that it is the insured which has the burden of showing that the insurance contract covers the loss for which the claim is made." <u>Kidalso Gas Corp. v. Lancer Ins. Co.</u>, 21 A.D.3d 779, 780-81, 802 N.Y.S.2d 9, 11 (1st Dep't 2005). Respondents have not and cannot satisfy their burden of showing an Insured Tax Loss "subject to the terms, [and] conditions of" the Exhibits annexed to and deemed part of the Policy for the simple reason that they chose not to follow the Tax Plan covered by the Policy.

Not surprisingly, since it is fatal to their coverage claim, Respondents in their seventy-three page brief do not make a single reference to the first sentence of the Policy, immediately preceding the Insuring Clause, which premises coverage "upon the representations made and documents provided to [AISLIC]." Respondents thus fail to acknowledge that, apart from any exclusions to coverage, they have to show that they followed the terms and conditions of coverage contained in the documents, on which AISLIC expressly relied, which were annexed to and deemed part of the Policy (Policy, §§ 2(n), 2(r),3(h)).

While Respondents acknowledge that AISLIC "contends that in fact no Insured Tax Loss has occurred at all" (Respondents' bf. at 33), to Respondents "Insured Tax Loss" merely means the amount McWilliam must pay in taxes (<u>Id.</u> at 32), which he can simply pass off to AISLIC, without any need to show that he followed the Tax Plan the

4

#248567v1

EXHIBIT __O__, PAGE 349

Policy covered.  Nowhere do Respondents show, because they cannot, how their unauthorized repurchase of Austin's shares in December 2002 complied with any of the three critical elements of the Tax Plan set forth in the documents annexed to the Policy (outlined at page 12 of our main brief), namely: donative intent, fair market value and an independent and competent appraisal.

The reason is clear.  The misrepresentations and threats made by Respondents to Austin in the December 9, 2002 letters (Exs. 281 and 282) cannot possibly be reconciled with donative intent.  Similarly, Respondents nowhere attempt to show how the $2 million purchase price that Upper Deck paid for Austin's shares bore any resemblance to fair market value because, as they admit, the $2 million purchase price was "a take it or leave it proposition." (Respondents' bf. at 42).  Nor can Respondents ever manage to claim that they took the step, which they acknowledge at page 13 of their brief "would be necessary to implement SC2 for Upper Deck," of obtaining a formal valuation of Austin's shares.  No "independent" or "competent" appraiser could ever justify a purchase price of $2 million based on annual income exceeding $150 million in the year of the purchase.

In sum, Respondents did not mention to AISLC, let alone ask for its consent, to abolish the Tax Plan in late 2002, nor even attempt to explain their failure to do so now, because it is obvious, even to Respondents, that they did not follow the Tax Plan for which AISLIC provided coverage.

#248567v1

EXHIBIT ___O___, PAGE _356_

## POINT II

### EXCLUSION 3(h) BARS COVERAGE DUE TO RESPONDENTS' TERMINATION OF THE SHAREHOLDERS AGREEMENT WITHOUT AISLIC'S CONSENT

Exclusion 3(h)'s intent is evident: the Policy does not allow the insured to go around the insurer's back and change the Tax Plan by amending the Shareholders Agreement without AISLIC's consent.  In late 2002, Respondents did exactly what the exclusion was designed to prevent. Respondents, therefore, try to create confusion where there is none by distorting the plain meaning of the anti-assignment provision in the Shareholders Agreement. Respondents also erroneously assert that there is a "dominant and efficient" causation requirement, an assertion which is directly contrary to the New York Court of Appeals' broad interpretation of "arising out of" language in insurance policy exclusions.

**A.**   *Respondents' Distorted Interpretation of the Shareholders Agreement Violates the Plain Meaning Rule*

Respondents argue that Section 1 of the Shareholders Agreement, titled "RESTRICTIONS ON TRANSFER," contemplates Respondents doing whatever they want, with no restrictions or requirement of consent at all, with respect to the transfer of Austin's shares. Respondents' reading of Section 1 makes no sense.  Section 1 does not address at all the situation where Upper Deck is approaching Austin to circumvent the fair market value and independent appraisal requirements of Sections 3.5 and 5.2 of the Agreement.  As the very first sentence of Section 1 indicates, the permissible means of "sales, transfers or dispositions of Donee's [Austin's] shares" are specifically addressed in "the provisions of Section 2, Section 3 or Section 5 of this Agreement."  Rather, Section 1 is directed exclusively at what Austin may not do, namely: "transfer, assign, pledge or in any way

6

EXHIBIT ___O__, PAGE _351_

alienate any of its Nonvoting shares ... without the prior written consent of the Company and

the other Shareholders of the Company." The provisions of the Shareholders Agreement, as

part of the Policy itself, must be given their plain meaning.  Respondents' self-serving -- to

say the least -- interpretation of Section 1 of the Shareholders Agreement violates its plain

meaning.

   Respondents' other argument, that the "Shareholders Agreement terminated

quite naturally because there was only one shareholder of Upper Deck following [its]

purchase of Austin Firefighters' shares" (Respondents' bf. at 22), is equally untenable.

There was nothing natural about the termination of the Shareholders Agreement; it

terminated because Respondents set out to terminate it by causing Austin to enter into the

Share Purchase Agreement.  Regardless of whether the termination of the Shareholders

Agreement came about as a result of the provision in Section 5.3 of the December 2002

Share Purchase Agreement plainly so stating, or as a result of entering into the Share

Purchase Agreement, or both, the fact remains that the Shareholders Agreement was

terminated without AISLIC's consent.

**B.**  ***The Policy's "Arising Out Of" Language, As Interpreted By New York Courts,
Means The Exact Opposite Of a Rigid Causation Requirement***

   Respondents must be reading another policy.  They ignore the policy language

"arises out of, is based upon, or is attributable to" contained in Exclusions 3(a)(b) and (h) of

the Policy, which has been broadly interpreted by New York courts, most recently by the

Court of Appeals in <u>Maroney v. New York Central Mut. Fire Ins. Co.</u>, 5 N.Y.3d 467, 472,

805 N.Y.S.2d 533, 536 (2005)("<u>Maroney</u>"). Respondents instead cite a case having

EXHIBIT __6__, PAGE 352

absolutely nothing to do with interpreting "arising of" language in a policy exclusion to claim that AISLIC must show "dominant causation" for the exclusions to apply.[1]

New York courts have repeatedly held that the words "arising out" are clear and unambiguous and "have broader significance than the words caused by, and are ordinarily understood to mean originating from, incident to, or having connection with....'" United States Fire Ins. Co. v. New York Marine and General Ins. Co., 268 A.D.2d 19, 21-22, 706 N.Y.S.2d 377, 378-79 (1st Dep't 2000) (so holding with respect to meaning of "arising out of the use of" in automobile exclusion); Purdue Frederick Co. v. Steadfast Ins. Co., 2005 WL 1662028 at *5 (Sup. Ct., N.Y. Co. 2005) ("New York's interpretation of 'arising out of' in general liability insurance contracts is indeed broad."), quoting, Aetna Cas. & Surety Co. v. Liberty Mut. Ins. Co., 91 A.D.2d 317, 320-21 (4th Dep't 1983); McGinniss v. Employers Reinsur. Corp., 648 F. Supp. 1263, 1267 (S.D.N.Y. 1986) (holding that coverage for injury "arising out of" specified torts covered injury "originating from" or "having connection with" any of the specified torts).

Not only is there no requirement of "dominant and efficient" causation, but as the Court of Appeals recently reaffirmed, the phrase "arising out of" in the context of an exclusion "requires only that there be some causal relationship between the injury and the risk for which coverage is provided." Maroney, 5 N.Y.3d at 472, 805 N.Y.S.2d at 536 (Emphasis added) (holding that exclusion of injury "arising out of" use of premises barred coverage for injuries caused by a horse's kick on premises since the injury was related to the

---

[1] The exclusion in Throgs Neck Bagel Inc. v. GA Ins. Co. of New York, 241 AD.2d 66, 671 N.Y.S.2d 66 (1st Dep't 1998), cited at pp. 4, 44-45 of Respondents' bf., did not have "arising out of" language, but rather contained strictly causation language.

#248567v1

EXHIBIT O, PAGE 353

purposes for which the premises were used, i.e., boarding horses). The Court Of Appeals in

<u>Maroney</u> explained that New York's broad interpretation of "arising out" of language in an

exclusion "'allows an insurer to reasonably define the 'universe of possibilities to which it

can apply its risk analysis methods … and determine a premium.'" <u>Ibid.</u>, *quoting, 7 Couch*

*on Insurance* 3d § 101:40, a 101-127.

As set forth at page 15 of our main brief, the Loss "arises out of, is based

upon, or is attributable to an amendment to the Shareholders Agreement" (Policy, §3(h)), i.e.,

there was "some" causal relationship to Respondents being forced to settle with the IRS,

<u>Maroney</u>, 5 N.Y.3d at 472, 805 N.Y.S.2d at 536, since, as a result of Respondents'

termination of the Shareholders Agreement and its requirements of fair market value and an

independent appraisal, Respondents made it impossible to defend the abandoned tax plan.

**POINT III**

**<u>RESPONDENTS' BREACHES OF WARRANTIES PRECLUDE COVERAGE</u>**

*A.*    ***Respondents Breached their Promissory Warranty That Fair Market Value Would Be Paid For Austin's Shares***

As Respondents correctly point out (at page 38 of their brief), the three

elements for a successful breach of warranty claim are (1) the existence of a warranty; (2) a

breach of that warranty; and (3) a resulting material increase in the risk of loss.  Respondents

cannot argue that they paid Austin fair market value for its shares.  Therefore, if the

statements regarding the payment of fair market value in the KPMG Opinions constitute

warranted "facts, assumptions of fact, [or] understandings of facts," Respondents have

undeniably breached such a warranty. Nor can Respondents argue that the failure to pay

anything close to fair market value for Austin's shares did not materially increase the risk of

9

EXHIBIT __O__, PAGE 354

loss. The standard for determining whether a breach of warranty materially increases the risk of loss under a policy is whether the risk at issue is a primary risk as opposed to being something "collateral to the primary risk." Hartford Fire Ins. Co. v. Mitlof, 208 F. Supp.2d 407, 411 (2d Cir. 2002); Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 31 (2d Cir. 1999) ("In other words, if an insured breaches a warranty that is collateral to the risk that is the primary concern of the contract, the insured will not be precluded from recovery."). Not even Respondents claim that the failure to pay fair market value for Austin's shares was merely collateral to the primary risks of falling outside the safe harbors for avoiding a second class of stock determination and failing to show that Austin was the true owner of the stock entitled to the "benefit, commensurate with its purported stock ownership, if the stock increases in value." (Ex. 274: Coordinated Issue Paper, at 4, 6; Sacks v. Commissioner, 69 F.3d 982, 988 (9th Cir. 1995)).

Rather, Respondents merely assert, at page 40 of their brief, that the statements in the KPMG Opinions regarding the payment of fair market value at redemption, were "nothing more than legal conclusions," that the only "facts" warranted were the existence of the Shareholders Agreement and the redemption agreement it incorporated. (Respondents' bf. at 40).

The language of the warranty reveals, however, a much deeper understanding of the word "facts," expressly encompassing both "assumptions of facts" and "understanding of facts." KPMG's statement with respect to Austin's shares that the "redemption amount is the fair market value of the stock on the date that Municipal Plan [Austin] presents the stock for redemption"(Opinion on Charitable Contribution, at 3), was an assumed and critical fact, which formed the basis later in the same opinion for KPMG's legal conclusion that because

10

EXHIBIT ___O__, PAGE 355

the redemption agreement "establishes a purchase price that, at the time the agreement is entered into, is [not] significantly in excess of or below the fair market value of the stock," the test "for avoiding a second class of stock should also be met."(Id. at 6-7). Accordingly, Respondents' attempt to get reduce the scope of their warranty to the mere existence of documents attached to the Policy, rather than the "facts, assumptions of fact, and understandings of facts" within those documents, should fail.

## B.   Respondents Breached their Separate Promissory Warranty That They Could Not Compel Austin To Redeem Its Shares

Respondents similarly argue that the statement that Respondents could not compel Austin to redeem its shares was "simply a statement of the legal effect of the Shareholders' Agreement"(Respondents' bf. at 40-41).  However, this fails to take into account that Respondents separately warranted that "effect," i.e., promised result, in the Representation Letter, by warranting:

> 3. The Municipal Plan is neither legally bound to offer for redemption any of the non-voting shares of Upper Deck, nor can Upper Deck or any of its shareholders compel such a redemption, except pursuant to the exercise of the Right of First Refusal contained in the Shareholders Agreement, a copy of which is attached as Exhibit C to the Policy. (underline added).

Significantly, the word "legally" is dropped from the second clause we have underlined above, indicating that Upper Deck's promise that it could not compel Austin to redeem its shares was not limited to legal means of compulsion. Nowhere in Respondents' brief do they attempt to argue the legality -- under any state or federal securities law -- of the misrepresentation in Mr. Bendheim's December 9, 2002 letter that Upper Deck's income for 2002 would be "approximately $39,359,073" (Ex. 160).  As set forth in Exhibit 382, in the

11

#248567v1

EXHIBIT _O_, PAGE _356_

two preceding months, Upper Deck's income surpassed that amount in one month alone (in the case of Upper Deck's October 2002 monthly income of $46,596,546) and nearly surpassed that amount in one month alone (in the case of Upper Deck's November 2002 monthly income of $35,082,825). (Ex. 382).

Nor can Respondents argue that Upper Deck's misleading income statements for the nine month period ending September 30, 2002 were not provided for Austin's reliance or that Austin did not rely on the income statements in approving the Share Repurchase Agreement the very next day, December 10, 2002. (Ex. 161). Accordingly, Respondents breached their separate warranty to AISLIC regarding the promised result of the Shareholders Agreement.

## C.   *Respondents and KPMG Conspired To Deceive AISLIC*

Respondents have it backward. AISLIC did not come to Respondents with KPMG to solicit Respondents' interest in insurance coverage, as Respondents erroneously suggest. (Respondents' bf. at 5: claiming that "[i]n conjunction with their purchase of the $SC^2$ tax strategy, the Insureds purchased the Policy from AIG"). Rather, in May 2001, more than two months after entering into the $SC^2$ transaction with Austin, and more than five months after Respondents signed an engagement letter with KPMG (Ex. 6), Respondents came, with their longtime agent KPMG[2], to AISLIC, seeking insurance. (Ex. 33). Prior to that time, AISLIC had issued only two of the four $SC^2$ policies it ever issued (Ex. 34), out of what Respondents claim were a total of 58 $SC^2$ transactions carried out by KPMG.

---

[2] Respondents' bf. at 11: "Dating back to the early 1990s, KPMG provided various and extensive services for McWilliam, Upper Deck, and the MPR Trust."

#248567v1

EXHIBIT _O_, PAGE_357_

If the Tax Plan set forth in the KPMG Opinions was, as Respondents claim, a "doomed tax strategy" (Id. at 68) from the onset, with "fundamental flaws" (Id. at 18) not disclosed in the Opinions, then Respondents have breached their warranty as to the truth and accuracy of the "facts, assumptions of fact, and understandings of facts" contained in the Opinions.

In fact, the evidence appears to suggest a continuous conspiracy to deceive AISLIC engaged in by Respondents and KPMG. KPMG, as Respondents' agent, who provided the projections on which AISLIC relied in underwriting the Policy (See Point VII), presumably knew about projected Yu-Gi-Oh! sales. (See, e.g., Ex. 13: 1/22/01 Mutual Non Disclosure Agreement with maker of Yu-Gi-Oh!, Section 2(ii) of which prohibits disclosure of Confidential Information "other than to … accountants"). Then, a year and a half later, KPMG "in conjunction with" Respondents, conspired to abolish the Tax Plan by means of fraudulent misrepresentations to Austin without ever disclosing to AISLIC what they were up to, despite the fact that Respondents, and KPMG, who aggressively negotiated the policy on Respondents' behalf, knew that the Policy required AISLIC's consent to such a radical change.

## POINT IV

### EXCLUSION 3(a) BARS COVERAGE FOR RESPONDENTS' FRAUDULENT INDUCEMENT OF THE REPURCHASE OF AUSTIN'S SHARES

Interestingly, Respondents make no attempt to defend their misrepresentations to Austin, such as their misrepresentation to Austin, in Mr. Bendheim's December 9, 2002 letter, that Upper Deck's annualized net income in 2002 "would be approximately $39,359,073." (Ex. 160). The reason is because they cannot claim the statements made to

13

EXHIBIT _O_, PAGE 358

Austin were not material misrepresentations -- or clear violations of Section 25401 of California's Corporate Securities Law (*See* Claimant's bf. at 23-24), when Upper Deck's income for one month alone, October 2002, of $46,596,546, was more than what Respondents represented to Austin would be Upper Deck's income for the entire year.

Rather, Respondents' sole defense is causation. Again, the standard is not "dominant and efficient" causation, but rather whether there was "some causal relationship between the injury and the risk for which coverage is provided" (Maroney, 5 N.Y.3d at 472, 805 N.Y.S.2d at 536); McGinniss, 648 F. Supp. at 1267 (finding coverage for injury "arising out of" specified torts covered injury "originating from" or "having connection with" any of the specified torts in the policy).

There clearly was "some causal" relation between Respondents' repudiation of their warranted intent to treat Austin as a true shareholder, and instead to treat Austin as merely an accommodation party, to the necessary resolution of IRS's claim that Upper Deck "may" be liable for taxes. Thus, the Coordinated Issue Paper which the IRS issued on November 8, 2004, which Respondents assert constituted a Claim under the Policy, stated: "Because many of these legal arguments are document sensitive, extensive factual development is necessary in order to establish and evaluate the appropriate legal positions." (Ex. 274, at 1). Specifically, with respect to the "substance over form" doctrine, which the experts on both sides agree was the IRS's strongest argument, the IRS conceded that, in the particular case, where "if the exempt party were considered a shareholder rather than a mere facilitator or accommodation party, the exempt party would be treated as a shareholder ... to the extent of the actual economic benefits it realizes from the stock." (Id., at 6). Respondents made the IRS's concession inapplicable to them by defrauding Austin.

14

EXHIBIT _O_, PAGE 359

To say that just because the IRS's settlement proposal came before any judicial determination of the IRS's Claim, Upper Deck's fraud did not have "some causal relationship" with how the Claim resulted in a Loss, i.e., settlement, is wrong.  The settlement proposal only came <u>after</u> Respondents provided the IRS with documents concerning Upper Deck's repurchase of Austin's shares in December 2002 in response to specific IRS document requests seeking the information as relevant to its determination. (Ex. 244, Request Nos. 2, 30-37, 46).  Moreover, as Judge Posner, in <u>Level 3 Communications, Inc. v. Federal Ins. Co.</u>, 272 F.3d 908, 811(9th Cir. 2001), held in rejecting a similar argument by an insured that "[a]s long as the case is settled before entry of judgment, the insured is covered:"

> It would mean Level 3, seeing the handwriting on the wall, had agreed to pay the plaintiffs in the fraud suit all they were asking for (a very large amount – almost $70 million), which they surely would not have done had there been no evidence of fraud….

In short, Respondents' indefensible conduct toward Austin made settlement the only option.

**POINT V**

**RESPONDENTS' FAILURE TO COMPLY WITH AN EXPRESS CONDITION
PRECEDENT TO COVERAGE VITIATES COVERAGE**

Respondents fail to address New York law, including the New York Court of Appeals decision in <u>Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.</u>, 86 N.Y. 2d 685, 690, 636 N.Y.S.2d 734 (1995), discussed at pages 24-25 of our main brief, holding that an express condition precedent in a Policy must be complied with for coverage to apply, and expressly rejecting Respondents' argument that an express condition precedent is a warranty under Insurance law §3106, and therefore, must enhance the risk of loss.

15

EXHIBIT ___O___, PAGE 360

Section 9(b) of the Policy sets forth as an express Condition Precedent that Respondents "shall have prepared and filed all applicable Tax Returns in a manner materially consistent with that anticipated by the Opinions and/or the Representation Letter." As Respondents concede at page 10 of their brief (item 5 "The Donation"), the Tax Plan provides: "Individual claims a charitable deduction for this 'donation.'" The fact that in other $SC^2$ transactions, the S corporation, instead, issued nonvoting stock directly to the Charity (Respondents' bf. at 52), is irrelevant.  Here, by the nonvoting stock had already been issued not by Upper Deck, but by McWilliam through his MPR Trust.  KPMG's Opinion on the "Charitable Contribution," therefore, anticipated that McWilliam would take a charitable deduction and concluded: "It is more likely than not that the Shareholder will be entitled to a charitable deduction for the fair market of the stock the Shareholder donated." (Opinion on "Charitable Contribution, p.4).  By admittedly failing to take the charitable deduction on his 2001 tax return, as anticipated in the KPMG Opinion, McWilliam has failed to fulfill an express Condition Precedent to coverage.

## POINT VI

## RESPONDENTS IMPAIRED AISLIC'S RIGHT TO SUBROGATION

Under New York law, "[c]ontingent claims by subrogees have been recognized, especially where it would further judicial economy." Allianz Underwriters Ins. Co. v. Landmark Ins. Co., 13 A.D.3d 172,175, 787 N.Y.S.2d 15, 18 (1st Dep't 2004) (rejecting contention that insurer could not bring subrogation claim since it had not yet paid anything on underlying judgment). Here, where both parties cast blame on KPMG, and KPMG is in "near privity" by virtue of its Opinions on which AISLIC was intended to rely, consideration of AISLIC's contingent right to subrogation against KPMG, and Respondents

EXHIBIT _O_, PAGE _361_

impairment of same, is appropriate. <u>Weinberg v. Transamerica Ins. Co.</u>, 62 N.Y.2d 379, 384-85, 477 N.Y.S.2d 99 (1984) (affirming summary judgment dismissal of claim seeking to recover benefits against insurer because insured failed to protect the subrogation rights of the insurer).

If Respondents had followed the Tax Plan set forth in the KPMG Opinions and paid Austin fair market value for its shares, the Tax Plan could have succeeded against a challenge under either the economic substance doctrine or the second class of stock rule. No Court has held that what Respondents call the "generic SC2 strategy" was an abusive tax shelter. Given that Respondents, if they had followed the Tax Plan, due to their huge increase in income, would have had to pay Austin, conservatively, at least $11 million for their shares, the chances for defending the Tax Plan outlined in the documents annexed to the Policy would have been considerably enhanced.  By not following the Tax Plan, Respondents deprived AILSIC of what they bargained for in providing coverage, the chance to defend the Tax Plan set forth in the documents annexed to the Policy.

### POINT VII

### RESPONDENTS' CONTINUED WITOLDING OF INFORMATION CONCERNING YU-GI-OH! REVEALS A PATTERN OF DECEPTION

The issue is not, as Respondents frame it at pages 34-37 of their brief, about the adequacy of information concerning Yu-Gi-Oh! provided by Respondents to AISLIC, but rather the total absence of information provided to AISLIC about Yu-Gi-Oh! prior to issuance of the Policy.

In underwriting the Policy, AISLIC sought to obtain a reliable estimate of its potential exposure and therefore requested Upper Deck's income projections for the years for

17

748567v1

EXHIBIT _O_, PAGE_362_

which it sought coverage.  Thus, in June 2001, when Upper Deck sought to extend the Policy period through 2007, AISLIC requested "projected pre-tax earnings for each year from 2001 forward as well as projected distributions." (Ex. 55).  On or about June 14, 2001, Upper Deck provided AISLIC with projections through 2003 prepared by KPMG and stated that it had no projections for 2004-2006. (Ex. 61).  The projections through 2003 estimated a tax exposure of approximately $36 million based on projected income of approximately $45 million for 2001 and $34.1 million for 2002. (Ex. 56).  Respondents represented that the projections were "aggressive," "best case scenario" projections, provided to AISLIC "to justify the higher insurance limit" and to take into account the "potential for growth with the potential signing of Tiger Woods." (Ex. 103).

Not until January 9, 2004, two and a half years later, did Respondents disclose to AISLIC that Upper Deck's income for 2002 exceeded $150 million (Ex. 204), more than three times the so-called "aggressive" "best case scenario" projections provided to AILSIC prior to issuance of the Policy.  Not until three months later, on April 8, 2004, at a meeting between the parties' representatives at the offices of Respondents' counsel in San Francisco, did Respondents disclose that the huge increase in income experienced by Upper Deck was caused by sales of Yu-Gi-Oh! products.  (Exs. 382-386; Ex. 226).  Respondents had never before mentioned anything about Yu-Gi-Oh! to AISLIC.[3]

AISLIC's coverage counsel, in his January 29, 2004 letter to Respondents' counsel (Ex. 204), explained the significance of the discrepancy between AISLIC's reported

---

[3] Contrary to Respondents' suggestion at page 36 of their brief, the FMV appraisal, which projected Upper Deck income of only $8.3 million for 2002, made no mention or hint that Upper Deck was about to obtain exclusive rights to sell and market Yu-Gi-Oh in North America. Thus, the quoted reference from page 7 of the FMV appraisal refers to sports games.

18

#248567v1

income and the income projections provided to AISLIC. AISLIC's concern was not, as misrepresented at page 35 of Respondents' brief, about issuing a policy on which it might have to someday pay out policy limits. Rather, AISLIC's concern -- as it turns out, well-founded -- was of "significant above-limits exposure ... such that the insured would be motivated to settle and would raise AIG's good faith in litigating the merits of the tax strategy." (Ibid.) (Emphasis added).

Not until more than two years later, on June 6, 2006, and only because they were required to by this Panel's April 29, 2006 Order, did Respondents produce Yu-Gi-Oh! sales projections. The meaning of the projections, which appear to reflect estimates of sales based on different sales volumes is difficult to decipher. (Ex. 319 at pages bate-stamped UDC-ARB 238-287). However, the projections appear to date back as early as June 18, 2001, the same time period when AISLIC, prior to issuance of the Policy, had requested projections. The Yu-Gi-Oh! sales projections indicate that they are based on briefs submitted by J. Bennington on 6/18/01 (Id. at 238), and 7/2/01, revised on 7/23/01. (Id. at 250). AISLIC requested copies of the Bennington briefs in a June 7, 2006 letter to Respondents' counsel and, in letters dated August 15, 2006 and September 12, 2006, requested Respondents to make Mr. Bennington available for examination during the hearing. AISLIC has not received a response. Nor has it received copies of the Bennington briefs (which Respondents claim cannot be found).

Now, only weeks before the hearing, Respondents selectively produced, for first time, documents indicating that Upper Deck was evaluating a deal concerning Yu-Gi-Oh! as early as May 24, 2000 (Exs. 2, 33, 4), a year before they sought coverage from AISLIC. "Under New York law, an insurance policy issued in reliance on material

19

EXHIBIT ___O___, PAGE _364_

misrepresentations is void from its inception." Chicago Ins. Co. v. Kreitzer & Vogelman, 265 F.Supp.2d 335, 342-43 (S.D.N.Y. 2003); McKinney's N.Y. Ins. Law §3105. Respondents' continuing failure to come clean on Yu-Gi-Oh! has concealed whether or not they made material misrepresentations concerning Upper Deck's projected income, and therefore concerning AISLIC's potential exposure, prior to issuance of the Policy. From the sales projections produced by Respondents and the handful of documents they have selectively produced only a few weeks before the start of the arbitration, it is still not clear what Respondents knew regarding Yu-Gi-Oh! and when they knew it. What is clear, however, from both Respondents' failure to disclose Yu-Gi-Oh! to AISLIC -- and their failure to disclose to AISLIC the Share Purchase Agreement abolishing the Tax Plan that AISLIC insured -- is Respondents' total lack of candor towards their insurer.

## POINT VIII

### RESPONDENTS' COUNTERCLAIM FOR BAD FAITH IS LEGALLY AND FACTUALLY DEFICIENT

A.   *Under Governing New York Law, Missed By Respondents, They Cannot Maintain A Separate Claim For Implied Duty of Good Faith And Fair Dealing*

Respondents concede that New York law does not recognize a separate cause of action for breach of the implied covenant of good faith (Resp. Bf. at 60), and therefore, argue for the application of California law. However, in their haste to avoid New York law, Respondents ignore both governing New York law (cited at pages 27-28 of Claimant's bf.) holding that a claim for breach of an implied covenant of good faith is contractual for the purposes of enforcing a choice of law provision, as well as the extremely broad choice of law provision in Section 16 of the Policy providing that "[t]he arbitration shall be subject to the

20

EXHIBIT __O__, PAGE _365_

Federal Arbitration Act and, to the extent such Act is not applicable, the laws of the State of New York."

Thus, while a contract's choice of law provision does not necessarily apply to a tort claim where -- unlike here -- the choice of law provision is narrowly based, "[s]ince 'the implied covenant of good faith … is a rule of interpretation rather than a separate obligation,' (citation omitted), a claim for breach of the covenant is a contractual cause of action." Butvin v. Doubleclick, Inc., 2001 WL 228121 (S.D.N.Y. 2001), aff'd, 22 Fed. Appx. 57 (2d Cir. 2001) (enforcing Delaware choice of law provision); Yankee Caithness Joint Venture, LP v. Planet Ins. Co., 1996 WL 426359 at *2 (S.D.N.Y. 1996)(in applying New York law where Court was faced with a conflict between New York's restrictive law on the recovery of punitive damages and Nevada law subjecting an insurer to a possible claim for "punitive damages for breach of the covenant of good faith," the Court held: "Any duty to defend and indemnify arises directly from the policy provisions respecting coverage.").

Moreover, here, Section 16 of the Policy extends New York law not only to the "construction, validity and performance of the Policy," but also to any issue which may arise in the arbitration where the FAA does not supply an answer, i.e., any substantive issue and most procedural issues.  (Policy, §16: "The arbitration shall be subject to the Federal Arbitration Act and, to the extent such Act is not applicable, the laws of the State of New York.").  Thus, even if New York law holding that a contract's choice of law provision applies with equal force to a claim for breach of an implied covenant of good faith were otherwise, the Policy's choice of law provision is still "broad enough to reach related tort claims." Williams v. Deutsche Bank Secs., Inc., 2005 WL 1414435 at *4 (S.D.N.Y. 2005) (citing cases with similarly broad choice of law provisions encompassing related tort claims).

21

EXHIBIT ___O__, PAGE _366_

Finally, even if, in contravention of New York law and the Policy's broad choice of law provision, it was necessary to resort to choice of law analysis, New York law should still apply, since the Policy was issued in New York and the most significant contacts, in the form of AISLIC's coverage positions purportedly forming the basis of Respondents' claim for breach of implied covenant of good faith (Resp. Bf. at 70-71), were taken in New York. *See* <u>U.B. Vehicle Leasing Inc. v. Atlantic Mutual Ins. Co.</u>, 2004 WL 503729 at *5 (S.D.N.Y. 2004) (holding that New York law applied to bad faith claim, since the "most significant contacts are in New York" where the policies were issued and where the "alleged wrongful conduct -- Atlantic's [insurer's] assessment of the underlying case and its handling of the settlement of negotiations occurred").

As Respondents concede and the cases set forth at pages 28-29 of Claimant's bf. provide (*See also* <u>Continental Info. Systs. Corp. v. Federal Ins. Co.</u>, 2003 WL 145561 at *3 (S.D.N.Y. 2003) ("<u>Continental</u>")), New York does not recognize an independent cause of action for alleged bad faith denial of insurance coverage.  In the absence of an independent tort, Respondents cannot satisfy the first prong of the test enunciated by the New York Court of Appeals, set forth at page 29 of Claimant's bf., for asserting a claim for punitive damages. <u>New York University v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 319-20, 639 N.Y.S.2d 283, 290 (1995) ("<u>NYU</u>").  Nor can Respondents meet the further requirements of alleging egregious conduct, and conduct directed at the public generally by "alleging merely that the insurer engaged in a pattern of bad-faith conduct." <u>Ibid.</u>, *quoting*, <u>Rocanova v. Equitable Life Assur. Soc.</u>, 83 N.Y.2d 603, 615, 612 N.Y.S.2d 339 (1994).[4]  Similarly, "[u]nder New York

---

[4] Respondents, at n.24 at p.71 of their brief, rely on <u>Acquista v. N.Y. Life Ins. Co.</u>, 285 A.D.2d 73, 730 N.Y.S.2d 272 (1st Dep't 2001).  However, New York courts have rejected the holding in

#248567v1

EXHIBIT O, PAGE 367

law, it is 'well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy and is held responsible for the risk.'" Employers Mut. Cas. Co. v. Key Pharmaceuticals, 75 F.3d 815, 824 (2d Cir. 1996) ("Employers"). Thus, in Employers, the Court held that that the exception to the rule against recovery of attorneys fees set forth in Mighty Midgets, Inc. v. Continental Ins. Co., 47 N.Y.2d 12, 21 (1979), and referred to in footnote 25 at page 72 of Respondents' bf., does not apply where, as here, the dispute does not concern the insurer's duty to defend.

**B.    AISLIC's Coverage Determinations Were Timely and Reasonable, Especially In View Of Respondents' Failure To Disclose Their Abandonment of The Tax Plan**

The correspondence exchanged between AISLIC's coverage counsel and counsel for Respondents from 2003 to 2005, far from supporting a bad faith claim under any state's law, actually reveals that AISLIC's coverage determinations were consistent, well-grounded in the Policy and very prompt.  The correspondence reveals AISLIC's extensive efforts to cooperate with Respondents, including attending meetings scheduled across the country at the convenience of Respondents' counsel, and AISLIC's stated willingness from the onset of the IRS's inquiries to advance Respondents' defense costs and Respondents' refusal to provide their counsels' bills.[5]  Most notably,  the correspondence reveals Respondents' hiding as long as possible their betrayal of AISLIC in eradicating the Tax Plan

---

(fn. continued) Acquista as in conflict with the decisions of the New York Court of Appeals. *See, e.g.,* Continental, 2003 WL 145561 at *3; Core-Mark Int'l Corp. v. Commonwealth Ins. Co., 2005 WL 1676704 at *3-4 (S.D.N.Y. 2005).

[5] On August 27, 2003, and several times thereafter, AISLIC stated it was prepared to "advance reasonable fees and disbursements of" Respondents' counsel incurred in responding to the IRS inquiry.  However, Respondents never provided the detailed bills and budget repeatedly requested by AISLIC's coverage counsel.  (See, e.g., Exs. 197 and 285).

#248567v1

EXHIBIT __O__, PAGE 368

that AISLIC was prepared to vigorously defend, and the so-called "business reasons" for that eradication.

Any discussion of bad faith should begin with Respondents' admitted -- and, after a seventy-three page hearing brief, still unexplained -- failure to ever inform, let alone ask for AISLIC's consent to terminate the Shareholders Agreement and the Tax Plan it prescribed.  In a January 9, 2004 telephone conference, Respondents' coverage counsel provided the first inkling that something was amiss, by disclosing to AISLIC's coverage counsel that Upper Deck had experienced a huge increase in income, and then stating in a January 27, 2004 letter, that the resulting increase in exposure "need[ed] to be considered carefully in evaluating strategies regarding both the IRS and FTB." (Ex. 203).  In response, in a January 26, 2004 letter, coverage counsel for AISLIC asked for "clarifying information" and noted the huge discrepancy between Upper Deck's reported income and the income projections provided to AISLIC prior to issuance of the Policy. (Ex. 202).  Then, in a January 29, 2004 letter, AISLIC's counsel explained the significance, which Respondents fail to grasp at pages 34-37 and 69 of their brief, of the discrepancy between AISLIC's reported income and the income projections, namely that "AIG would not have issued the policy on the same basis if AIG had appreciated that the insured would have significant above-limits exposure ... such that the insured would be motivated to settle and would raise AIG's good faith in litigating the merits of the tax strategy." (Ex. 204, p.1).

In the same January 29, 2004 letter, coverage counsel for AISLIC, nevertheless noted that, in the absence of the information requested by AISLIC, "AIG continues to believe that the tax strategy is meritorious, [and] that the intended tax treatment should be defended if challenged…." Ibid.  However, Respondents had still not disclosed to

EXHIBIT __O__, PAGE _369_

AISLIC that they had entered into the Share Purchase Agreement with Austin.  Thus, in a March 19, 2004 email to Respondents' counsel, AISLIC's coverage counsel asked, "will the charity be paid current value of the shares in the proposed redemption?," because "in view of the apparent substantial appreciation in the value of the shares, we believe that the factual information is of great importance to the analysis of the available options and merits of the sustainability of the tax position." (Ex. 216).

Then, at an April 8, 2004 meeting held at the offices of Respondents' counsel in San Franciso between the parties' coverage counsel, Respondents' coverage counsel, for the first time, disclosed that Respondents had redeemed Austin's shares early, on December 31, 2002, for $2,000,000, and also for the first mentioned Yu-Gi-Oh!, in connection with explaining Yu-Gi-Oh! as the reason for the early redemption (Exs. 382-86) -- not, as Respondents' now claim, the Senate investigation of KPMG, which occurred later.

Only one month later, in a May 11, 2004 letter (Ex. 226),[6] coverage counsel for AISLIC clearly and promptly laid out the possible coverage ramifications of the early repurchase, stating:  "Pending a better understanding of the facts, it appears to us that the redemption transaction may have constituted an amendment to the Shareholder Agreement to delete the fair market value and appraisal requirements, to which amendment we did not consent." (Ex. 226. p.2).

---

[6]  Respondents characterize the May 11, 2004 letter, at page 70 of their brief, as the first time AISLIC raised the issue "it suspected something untoward with the Insureds['] conduct in connection with Upper Deck's December 2002 purchase of [Austin's] shares," without mentioning that the early redemption of Austin's shares for $2 million was only disclosed to AISLIC one month earlier, and even then Respondents refused to disclose the circumstances of the repurchase.

EXHIBIT ___O___, PAGE 370

Thereafter, despite repeated requests by AISLIC, Respondents failed to furnish documents and information explaining the circumstances of the early redemption of Austin's shares. Thus, in his July 9, 2004 letter (page 5), AISLIC's coverage counsel, stated: "Your [June 24, 2004] letter indicates that toward the end of 2002, Upper deck approached [Austin] and negotiated a repurchase of the non-voting stock for $2,000,000. The specifics of how the repurchase was accomplished are still unclear."(Ex. 236).[7]

Finally, in late April 2005, when faced with a deadline to respond to the IRS's April 7, 2005 settlement offer, Respondents' counsel indicated "that the information/documents requested could be found within the mass of documents supplied to the IRS as a response to its several document/information requests." (Ex. 303, p.1). Despite Respondents' failure to identify specific documents, AISLIC's counsel undertook a search of the mass of documents provided by Respondents to the IRS, and, as set forth in the July 29, 2005 denial of coverage letter, determined that "[t]he documents found and conclusions that can be drawn from such, as well as other available documents and materials, mandates AISLIC to conclude the policy provides no coverage to [Respondents] for the proposed IRS settlement...." Ibid.

In sum, AISLIC responded promptly to the concerns raised and information provided by Respondents and promptly raised applicable coverage defenses as Respondents, very gradually, disclosed the information and documents that provided the basis for those

---

[7] Respondents, in footnote 23 at page 71 of Respondents' brief, disingenuously point to the July 9, 2004 letter as the first time in "over two years into AIG's coverage analysis" that AISLIC "ever alluded to the application of the fraud/ criminal conduct exclusion." Respondents fail to note that, as of July 9, 2004, Respondents had still not provided any of the documents showing that they employed fraud to induce Austin to sell its shares.

#248567v1

EXHIBIT ___O___, PAGE _371_

coverage defenses.  Respondents' last ditch effort, without a shred of evidence and contrary to documented fact, to assert a bad faith claim through "guilt by association," by attempting to impute to AISLIC the conduct of KPMG, *Respondents'* long-time accountants and agents, is truly ironic, since as set forth in Point III(c)  Respondents conspired with KPMG to deceive AISLIC, not vice-versa.

Finally, Respondents have not challenged the Policy's liability limitation.  Nor can they, because Judge Gonzalez, in her Order compelling this arbitration, dated January 30, 2006, held that "the Policy's liability limitation is valid."  (Ex. 314, at.7).  Indeed, as Judge Gonzalez noted, Upper Deck conceded that "New York law would honor the Policy's $50,000,000 Limitation Clause…" (Id. at 6).

## CONCLUSION

Based on the foregoing, Claimant respectfully requests that the Panel issue an Order that there is no coverage under the Policy.

Dated:  New York, New York
          September 29, 2006

Respectfully submitted,

D'AMATO & LYNCH

By:  _Robert E. Kushner_
     Robert E. Kushner
     Peter A. Stroili
     **Attorneys for Petitioners**
     70 Pine Street
     New York, New York  10270
     (212) 269-0927

27

#248567v1

EXHIBIT ___O___, PAGE 372