# EXHIBIT P

1   Richard K. Howell (State Bar No. 144241)
    Duke F. Wahlquist (State Bar No. 117722)
2   Bradley A. Chapin (State Bar No. 232885)
    RUTAN & TUCKER, LLP
3   611 Anton Boulevard, Fourteenth Floor
    Costa Mesa, California 92626-1931
4   Telephone: 714-641-5100
    Facsimile: 714-546-9035
5   Email: rhowell@rutan.com

6   Attorneys for Respondents and Counterclaimants
    The Upper Deck Company and Richard P. McWilliam,
7   individually and as Trustee for the
    MPR Trust

8

9                  AMERICAN ARBITRATION ASSOCIATION

10

11  AMERICAN INTERNATIONAL                 CASE NO. 13 195 02486 05
    SPECIALTY LINES INSURANCE
12  COMPANY and DOES 1 through 10,         John F. Byrne, Esq.
    inclusive,                             Stephen D. Kramer, Esq.
13                                         Charles J. Morley, Jr., Esq.
                Claimant,
14
          v.
15                                         RESPONDENTS' AND COUNTER-
    THE UPPER DECK COMPANY, a              CLAIMANTS' REPLY BRIEF
16  California corporation, and
    RICHARD P. MCWILLIAM, individually,
17  and as Trustee for the MPR Trust,

18              Respondents.               Dates:    October 10-13, 2006
                                                     October 30-Nov 2, 2006
19                                         Time:     10:00 a.m.
                                           Location: Amer Conf Center
20  THE UPPER DECK COMPANY, a                        780 Third Avenue, Level C2
    California corporation, MPR TRUST, a             New York, NY 10017
21  revocable trust, and RICHARD P.
    MCWILLIAM, individually, and as Trustee
22  for the MPR Trust,

23              Counter-Claimant,

24        v.

25  AMERICAN INTERNATIONAL
    SPECIALTY LINES INSURANCE
26  COMPANY and ROES 1 through 10,
    inclusive,

27              Counter-Respondents.

28

EXHIBIT _P_, PAGE_373_

## TABLE OF CONTENTS

Page

I.      INTRODUCTION AND ARGUMENT SUMMARY. ...........................................1

II.     AIG WAIVED ITS NEW DEFENSE THEORY RELIANT ON
        PARAGRAPH 3 OF THE REPRESENTATION LETTER. ...................................7

III.    THE INSUREDS' LOSS COMES WITHIN THE SCOPE OF THE
        INSURING CLAUSE, CLAUSE NO. 1, OF THE POLICY. ...............................8

IV.     AIG'S REMAINING COVERAGE DEFENSES ARE
        INAPPLICABLE AND DO NOT SUPPORT AIG'S ASSERTION
        THAT THE INSUREDS ARE NOT ENTITLED TO THE FULL
        POLICY BENEFITS. ........................................................................................10

        A.      No Policy Exclusions Apply.......................................................................10

                1.      Exclusion (a) Is Not Triggered Under The Policy And
                        Exclusion (a) Does Not Exclude Coverage In Any
                        Event. .......................................................................................11

                2.      Exclusion (h) Does Not Act To Exclude Coverage Of
                        The Insureds' Loss. ....................................................................13

        B.      AIG Cannot Establish Its Breach Of Warranty Defenses...........................15

                1.      The Insureds' Did Not Warrant That Fair Market Value
                        Would Be Paid To The Austin Firefighters, And The
                        Insureds' Nevertheless Did Not Fail In That Regard. .....................16

                2.      The Insureds Did Not Compel The Austin Firefighters
                        To Sell Their Stock Back To Upper Deck, Nor Did The
                        Repurchase Materially Increase The Insureds' Risk Of
                        Loss. ........................................................................................18

                3.      The Insureds Did Not Warrant The Truth Of KPMG's
                        Opinions; The Opinions Were The Very Substance Of
                        The Risk Insured Under The Policy. ..............................................20

        C.      AIG's Condition Precedent Argument Fails On Its Face, And
                Was Waived When AIG Failed To Raise The Defense In Its
                July 29, 2005 Coverage Denial Letter. .......................................................21

V.      AIG'S SUBROGATION ARGUMENT IS UNTIMELY AND FAILS
        TO DEFEAT COVERAGE IN ANY EVENT. ...................................................23

VI.     THE APPLICABLE LAW SUPPORTS A CAUSE OF ACTION FOR
        BAD FAITH AGAINST AIG. ..........................................................................24

VII.    CONCLUSION. ..............................................................................................27

EXHIBIT _P_, PAGE _374_

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Butvin v. DoubleClick, Inc.,*
   2001 U.S. Dist. LEXIS 2318 (S.D.N.Y. 2001) ..................................................26, 27

*Finance One Public Co. Ltd. v. Lehman Brothers Special Financing, Inc.,*
   414 F.3d 325 (2d Cir. 2005) ..................................................26

*Frazer Exton Development, LP v. Kemper Environmental, Ltd.,*
   2004 U.S. Dist. LEXIS 14602 (S.D.N.Y. 2004), *aff'd.,* 153 Fed. Appx. 31
   (2d Cir. 2005) ..................................................24, 25, 26, 27

*Mass. Casualty Insurance Co. v. Morgan,*
   886 F. Supp. 1002 (E.D.N.Y. 1995) ..................................................26

*New York v. Amro Realty Corp.,*
   936 F.2d 1420 (2d Cir. 1991) ..................................................2, 4, 6, 7,
                                                                   8, 18, 21, 23

*Philadelphia Parking Authority v. Federal Insurance Co.,*
   385 F. Supp. 2d 280 (S.D.N.Y. 2005) ..................................................26

*Yankee Caithness Joint Venture, L.P. v. Planet Insurance Co.,*
   1996 U.S. Dist. LEXIS 10747 (S.D.N.Y. 1996) ..................................................26, 27

## STATE CASES

*Albert J. Schiff Associate, Inc. v. Flack,*
   51 N.Y.2d 692 (1980)..................................................8, 18, 21

*First Federal Savings and Loan Associate v. Nichols,*
   306 N.Y.S.2d 542 (1970) ..................................................16, 18, 20

*Neuss, Hesslein & Co. v. 380 Canal St. Realty Corp.,*
   168 N.Y.S.2d 579 (1957) ..................................................24

*Schultz v. Boy Scouts of America, Inc.,*
   65 N.Y.2d 189 (N.Y. 1985)..................................................26

*Throgs Neck Bagels, Inc. v. GA Insurance Co.,*
   241 A.D.2d 66 (1st Dept. 1998) ..................................................10

EXHIBIT _P_  PAGE 375

I.     **INTRODUCTION AND ARGUMENT SUMMARY.**

With two minor exceptions, AIG's Opening Pre-hearing Brief (cited "AIG") now bases AIG's defense to the Insureds' claim for Policy benefits entirely on Upper Deck's December 2002 purchase of the shares in Upper Deck then held by the Austin Firefighters (the "Repurchase"). With respect to the December 2002 Repurchase, AIG now makes six assertions, none of which have any merit:

First, AIG asserts the "Claim for which Respondents seek coverage . . . resulted from a forced [R]epurchase of the shares [owned by Austin Firefighters ("Austin Firefighters Shares")] that bore no resemblance to the Tax Plan as contained in the Exhibits to the Policy." (AIG pp. 11-14, esp. 13.) AIG appears to base this ill-defined statement on the notion that the loss arising from the "Claim" does not come within the scope of the Insuring Agreement set forth in Clause 1 of the Policy. (AIG p. 13.) AIG is wrong, not only because the Repurchase was not "forced," but also -- and more importantly -- because the Claim or Claims actually made by the IRS and FTB come expressly and precisely within the insuring clause of the Policy. Put simply, the assertion that the Insureds' losses are not covered by the insuring clause of the Policy is absurd.

Second, AIG asserts the Insureds' tax losses arose out of, were based upon, or were attributable to an "amendment" to -- specifically a termination of -- the March 31, 3001 Shareholders' Agreement. AIG contends that because section 5.3 of the December 10, 2002 Share Purchase Agreement says that the Shareholders' Agreement will terminate upon the completion of the Repurchase, the Insureds losses are not recoverable under the Policy because this termination violated clause 3(h) of the Policy which excluded all losses attributable to an unapproved amendment to the Shareholders' Agreement. (AIG pp. 14-15.) AIG is wrong. This follows not only because the Repurchase did not effect an "amendment" to the Shareholders' Agreement which terminated by its own express terms as set forth in Section 8.3 of the Shareholders' Agreement [termination automatic upon existence of only one remaining shareholder in Upper Deck], but also because no aspect of the Repurchase had any causal connection with the Insureds' tax losses.

EXHIBIT  *P*  PAGE 376

1    Third, AIG asserts the Insureds' Loss was in connection with a Claim that was

2    attributable to criminal or deliberate fraud or knowing and intentional violations of law in

3    connection with the Repurchase and, hence, excluded from coverage under Clause 3(a).

4    (AIG pp. 21-24.)  While the Insureds dispute any criminal or fraudulent conduct and deny

5    any violation of law in connection with the Repurchase, intentional or otherwise, AIG's

6    assertion is a red herring.  AIG's arguments fail because the IRS's and the FTB's Claims

7    against the Insureds did not arise from the Repurchase as the Repurchase does not appear

8    to have anything to do with any Claim ever asserted by any Taxing Authority against the

9    Insureds. (see, the IRS's April 26, 2004 Notice 2004-30 [Ex. 12][1], the related November

10   12, 2004 Coordinated Issue Paper [Ex. 15], and the IRS's April 7, 2005 Offer of

11   Settlement [Ex. 17]).  Likewise, nor did the Repurchase have any causal relationship with

12   the Insureds' Loss arising from those Claims.  Indeed, the IRS and the Senate were already

13   investigating and tracking down all SC2 transactions and participants long before the

14   Repurchase was ever contemplated.

15    Fourth, AIG asserts that Upper Deck and the MPR Trust breached a warranty,

16   allegedly both factual and promissory, given in their September 4, 2001 Representation

17   Letter to the effect that the Austin Firefighters would be paid fair market value in

18   accordance with an appraisal whenever and however they sold or transferred their shares.

19   (AIG pp. 16-18.)  AIG's contention that a promissory rather than a factual warranty was

20   given in this regard is newly raised in AIG's Opening Pre-Hearing Brief.  (*compare,* AIG

21   pp. 18-20 with AIG's Comp. ¶¶ 54-55 and July 29, 2005 Denial Letter  pp. 3-4, ¶¶ 4&5

22   [Ex. 31].)  Thus, AIG waived any potential promissory warranty as a defense by failing to

23   assert it in AIG's July 29, 2005 denial of coverage and again in its Complaint and Answer

24   to the Insureds' Counter-Claim in this matter. *See, New York v. Amro Realty Corp.,* 936

25   F.2d 1420, 1431-1432 (2d Cir. 1991) (and July 29, 2005 Denial Letter  pp. 3-4, ¶¶  4-6

26   [Ex. 31]).  Moreover, AIG is wrong, most fundamentally, because the Representation

27

28    [1]Exhibit references in this Reply Brief are to the exhibits attached to and filed with the
     Insureds' initial Opening Brief.

EXHIBIT _*P*_, PAGE _311_

1   Letter gave no such warranties. The entire issue of fair market value is grossly overstated

2   by AIG; nowhere did the Insureds make any sort of warranty stating that all repurchases or

3   transfers of the Austin Firefighters' Shares would be at fair market value and/or would be

4   accompanied by an appraisal. To the contrary, the concept of fair market value and an

5   appraisal relates only to the express procedures which accompany the Put/Option

6   Redemption set forth Section 5.3 of the Shareholders' Agreement. The Put/Option

7   Redemption procedure had a limited life span of 180 days. Every other potential transfer

8   of the Austin Firefighters' stock outside of this 180-day window would be a transfer where

9   the Put/Option Redemption procedures involving an appraisal and fair market value did

10  not apply. Put simply, though AIG now appears to argue that the Insureds represented that

11  every transfer of the Austin Firefighters' Shares would be accompanied by an appraisal

12  and would be at fair market value, the Representation Letter contains no such

13  representation. If AIG truly thought such a representation was important from a coverage

14  standpoint, it should have included such wide-sweeping language in the Policy. The fact

15  that it did not is beyond dispute.

16      Fifth, AIG asserts that through the December 2002 Repurchase, Upper Deck did

17  "compel Austin [Firefighters] to redeem its shares" thereby breaching yet another alleged

18  promissory warranty by Upper Deck and the MPR Trust that Upper Deck could not

19  compel a redemption of the Austin Firefighters' Shares. AIG, however, again seeks to

20  ignore and grossly contort the actual representation made by the Insureds. What the

21  Insureds actually represented in the September 4, 2001 Representation Letter was that as of

22  that time the Austin Firefighters were "neither legally bound to offer for redemption any of

23  the non-voting shares of Upper Deck, nor can Upper Deck or any of its shareholders

24  compel such a redemption . . ."[2] It is obvious from the face of the underlying documents

25  such as the Shareholders' Agreement that there was no mechanism for the Insureds to

26  ────────────────

27  [2]This contention is based on paragraph 3 of the Representation Letter, which as pointed out above, has never been cited to by AIG as the basis of a breach of warranty defense to coverage. Thus, AIG has waived its right to assert this defense. Nevertheless, as

28  explained here, the Insureds never provided the broad-sweeping representation that AIG's new defense is premised upon.

1   compel a redemption.  The only mechanism for anyone to compel or force a redemption

2   was under the Put/Option Redemption procedure, a right which rested unilaterally with the

3   Austin Firefighters.  Again, the Insureds only represented that they could not compel the

4   Austin Firefighters to redeem their shares.  This was and remains precisely correct.

5   Nevertheless, AIG somehow attempts to twist the language quoted above into a

6   promissory warranty by the Insureds that all subsequent transfers -- be it a repurchase, a

7   redemption or some other transfer -- would not include any misrepresentations, omissions

8   or any other allegedly improper conduct.  No such representation or promissory warranty

9   was made by the Insureds anywhere in connection with the Policy.  Moreover, even if one

10  were to somehow accept that the Insureds somewhere made a promissory warranty that

11  they would never do anything improper -- be it an affirmative misrepresentation or a

12  material omission -- to induce the Austin Firefighters into selling at a reduced price, any

13  such warranty would not equate with a right to compel or force the Austin Firefighters to

14  redeem their shares.  To the contrary, the Austin Firefighters always had the ability to

15  decline to redeem their shares.  Finally, and perhaps most significantly, any alleged

16  transgressions by the Insureds in connection with the Repurchase had no effect on the risks

17  covered by the Policy.  It is beyond dispute that the IRS, FTB and the Senate have and

18  continue to pursue all SC2 participants irrespective of whether a repurchase or other

19  transfer ever took place.

20        Sixth, AIG asserts that the December 2002 Repurchase impaired AIG's rights

21  under Clause 10 ["Subrogation"] of the Policy to subrogate to the Insureds' rights against

22  KPMG and alleged rights against the "Government."  AIG is wrong for many reasons, not

23  the least of which is the complete absence of any impact of the Repurchase on any

24  perceived rights of any Insured against either KPMG or the "Government."  Moreover,

25  AIG waived any impairment-of-subrogation defense by failing to assert that defense in

26  AIG's July 29, 2005 denial of coverage letter [Ex. 30] . *See, Amro Realty Corp., supra*,

27  936 F.2d at 1431-1432.  In this regard, AIG's complaint and answer in this matter speak to

28  alleged subrogation against "the Government" (Comp. ¶ 80, p. 12) and never against

1  KPMG.  And, any such rights against "the Government" are the subject of a separate

2  Clause 11 ["Refunds and Reimbursements"] in the Policy, not Clause 10 as argued by

3  AIG.

4      Unrelated to the December 2002 Repurchase, AIG also now asserts two other

5  defenses:

6      First, AIG asserts that "As A Result Of KPMG's Mass-Marketing Campaign" an

7  alleged "Warranty to AI[G] of the Truth of the KPMG Opinions Proved False." (AIG pp.

8  20-21.)  AIG is wrong because the Insureds' Representation Letter did not warrant the

9  correctness of KPMG's Opinions to AIG.  Rather, AIG insured against the risk that

10  KPMG's Opinions would be challenged by a Taxing Authority.  Again, AIG simply seeks

11  to concoct representations by the Insureds which were not made.  Moreover, it bears

12  mentioning that AIG was a willing participant in, and the Insureds' were victims of

13  "KPMG's Mass-Marketing Campaign."  Not even AIG has come up with an argument that

14  the Insureds -- unlike AIG -- had knowledge of or participated in KPMG's marketing

15  campaign.

16      Second, AIG asserts that a "condition precedent" to the Insureds' rights to

17  indemnity from AIG under the Policy -- the Clause at 9(b) providing that "the Insureds

18  shall have prepared and filed all applicable Tax Returns in a manner materially consistent

19  with that anticipated by [KPMG's] Opinions and/or the [Representation Letter]" -- has not

20  been met. (AIG pp. 24-26.)  AIG is wrong, first and foremost, because Mr. McWilliam's

21  lack of a charitable deduction for the value of his March 21, 2001 contribution of the

22  Austin Firefighters' Shares was materially consistent with KPMG's Opinions and the

23  Representation Letter.  AIG is also wrong because Mr. McWilliam's lack of a charitable

24  deduction in 2001 -- a year for which the tax liability on Mr. McWilliam's initial tax return

25  was already zero -- was consistent with the conditions of Clause 9(a) that Mr. McWilliam

26  "act[] in relation to a Taxing Authority at all times substantially as if uninsured." Mr.

27  McWilliam could still have claimed a charitable deduction in a later year in which it might

28  have actually benefited him.  And not claiming the deduction in 2001 lessened Mr.

1   McWilliam's audit risk for tax year 2001.  Most importantly, the fact that Mr. McWilliam

2   did not claim a tax deduction in 2001 would not have lowered his taxes, had no causal

3   relationship with the Claims against the Insureds or with the Loss incurred by the Insureds

4   and it did not increase the risk of such a Claim or Loss.  Finally, AIG also waived this

5   defense by failing to raise it in its letter of July 29, 2005 [Ex. 30].  *See, Amro Realty Corp.,*

6   *supra,* 936 F.2d at 1431-1432.

7        Further evidencing AIG's improper treatment of the Insureds in connection with

8   their claim under the Policy, AIG seemingly has abandoned numerous coverage defenses it

9   has been attempting to articulate over the last several years.  In particular, and perhaps

10  most glaring, is the fact that AIG no longer appears to contend that coverage should be

11  denied under the Policy based on the assertion that the Insureds misled AIG as to Upper

12  Deck's potential for income growth.  While AIG does include a discussion in the

13  "Statement of Facts" portion of its Opening Pre-Hearing Brief about Tiger Woods and the

14  alleged timing of certain alleged Yu-Gi-Oh sales projections, nowhere in its Brief does

15  AIG base or analyze <u>any</u> coverage defenses (whether based on exclusion or warranty, or

16  otherwise) on these specious economic growth allegations.  It appears that AIG only

17  continues to discuss these matters for mud slinging, not coverage, purposes.

18       Along with the conspicuous abandonment of previously articulated defenses, AIG

19  introduces in its Opening Pre-Hearing Brief an entirely new coverage defense.  AIG raises,

20  paragraph 3 appearing on page no. 1 of the Insureds' Representation Letter as a potential

21  coverage defense.  (AIG pp. 18-20.)  Never before (not in any of AIG's pre-arbitration

22  communications including its denial letter of July 29, 2005 [Ex. 30] and not in AIG's

23  pleadings in this case) has AIG ever even mentioned paragraph 3 of the Representation

24  Letter, which provides a "warranty" of a legal conclusion that neither Upper Deck nor any

25  of its shareholders can compel the Austin Firefighters to redeem the Austin Firefighters'

26  Shares.  Prior to now, AIG's only citation to the Representation Letter pertained to

27  paragraph 1, which warrants with "[t]he facts, assumptions of fact, and understandings of

28  fact set forth in the opinions of KPMG LLP attached as Exhibit A to the Policy" -- not

EXHIBIT __P__, PAGE _381_

1   legal conclusions about compelling redemption of Austin Firefighters' Shares. (see, AIG's

2   July 29, 2005 denial of coverage letter pp. 3-4, ¶¶ 4-6 [Ex. 30].)  Thus, AIG waived this

3   untimely and  newly fashioned coverage defense when AIG failed to raise the matter in

4   AIG's July 29, 2005 coverage denial letter (or in its Complaint or Answer to the Insureds'

5   Counter-Claim in this action).  *See, Amro Realty Corp., supra*, 936 F.2d at 1431-1432.

6   Regardless, the Insureds have done nothing in violation of paragraph 3 of the

7   Representation Letter.

8        AIG's campaign to concoct new frivolous coverage defenses as quickly as AIG

9   abandons old ones might garner AIG points if this were part of some imaginary law-school

10   game titled: "How Many Coverage Defenses Can You Name?"  But it is not.  In this

11   context, AIG's campaign to stonewall and otherwise frustrate the Insureds should be

12   recognized for the "bad faith" tort that it is.  AIG gladly accepted $3.25 million in

13   premium from the Insureds, and now AIG must be held responsible for the $50 million that

14   AIG promised to pay on the Insureds' behalf.  The risks at the very heart of the coverage

15   insured by AIG's policy have materialized for the Insureds and everyone else who

16   participated in an SC2 transaction.

17   **II.    AIG WAIVED ITS NEW DEFENSE THEORY RELIANT ON PARAGRAPH**

18   **3 OF THE REPRESENTATION LETTER.**

19        For some time, AIG has asserted that the Insureds breached a warranty provided for

20   in the September 4, 2001 Representation Letter.  However, AIG has always contended that

21   the Insureds' alleged breach of warranty was based on paragraph 1 of the Representation

22   Letter, which warranted "facts, assumptions of fact, and understandings of fact set forth in

23   the Opinions of KPMG LLP attached as Exhibit A to the Policy."  Now, for the first time,

24   AIG contends that the Insureds also breached paragraph 3 of the Representation Letter,

25   which warrants the legal -- not factual -- conclusion as of May 2, 2001 and as of

26   September 4, 2001 neither Upper Deck nor any of its shareholders "can compel a . . .

27   redemption" of the Austin Firefighters' Shares.  While the Insureds maintain that the

28   Austin Firefighters were not compelled to participate in the Repurchase, it bears

EXHIBIT _P_, PAGE _382_

1   mentioning that a defense under paragraph 3 of the Representation Letter was waived by

2   AIG when it failed to ever raise this defense in any of its coverage letters or the pleadings

3   in this case. *Amro Realty Corp.*, *supra*, 936 F.2d at 1431-1432 ("[T]he act by an insurer of

4   disclaiming on certain grounds but not others is deemed *conclusive* evidence of the

5   insurer's intent to waive the unasserted grounds."). Thus, because AIG failed to raise this

6   particular breach of warranty defense in its July 29, 2005 coverage denial letter, while

7   asserting other numerous defenses, it waived its right to ever assert a defense to the

8   Insureds' claim under the Policy based on paragraph 3 of the Representation Letter.

9       While New York's doctrine of waiver in the insurance context is inapplicable to

10  defenses raised by an insurer "where the issue is the existence or nonexistence of

11  coverage" (*Albert J. Schiff Assoc., Inc. v. Flack*, 51 N.Y.2d 692, 698 (1980)), New York

12  courts have defined the scope of "existence or nonexistence of coverage" as limited to the

13  policy's "insuring clause and exclusions." *Id.* at 697-698. Thus, because AIG's newly

14  raised defense theory is based on an alleged breach of warranty in the Representation

15  Letter -- as opposed to the Policy's insuring clause or exclusions -- the defense is untimely

16  and was waived by AIG over a year ago on July 29, 2005 when AIG stated its substantive

17  reasons for denying coverage. (Ex. 31.)

18  **III.   THE INSUREDS' LOSS COMES WITHIN THE SCOPE OF THE**

19      **INSURING CLAUSE, CLAUSE NO. 1, OF THE POLICY.**

20      AIG's Policy provides, in Clause No. 1, that AIG "shall pay . . . the Loss of the

21  Insureds arising from a Claim first made against any Insured during the Policy Period[3] and

22  reported to" AIG. A "Claim" is "any written notice from any Taxing Authority alleging

23  any insured may be liable for Taxes, but only if such Taxes are directly related in whole or

24  in part the Insured Tax Event." (Policy, Clause 2(a).) "'Insured Tax Event' means: an

25  assertion, at any time during the Policy Period, by a Taxing Authority that with respect to

26

27      [3]The "Policy Period" commenced August 29, 2001, and ends the later of (1) November
28  30, 2006, or (2) the "expiration of the applicable statute of limitations with respect to tax
    items described in the Insured Tax Event relating to the transactions described in the
    KPMG LLP opinions," but no later than November 30, 2010.

EXHIBIT __*P*__, PAGE_383

1  the tax years 2001 through 2005, (a) as a result of any action taken by the Named Insured

2  or the Additional Insureds prior to the Inception Date [August 29, 2001], The Upper Deck

3  Company . . . has more than one class of stock for purposes of Section 1361 of the Code;

4  . . . (d) the post-gift allocations of Upper Deck's taxable income to the Municipal Plan

5  [Austin Firefighters] are not correct or proper; . . . (e) as a result of the gift of the Upper

6  Deck non-voting common stock to the Municipal Plan by the pre-gift shareholder, any

7  Upper Deck shareholder or Upper Deck, itself, assigned income to the Municipal Plan."

8  (Policy, End. No. 1.)

9      The IRS's April 26, 2004 Notice 2004-30 asserted that SC2 "transaction[s] [were]

10  designed to artificially shift the incidence of taxation on S corporation income away from

11  taxable shareholders to the exempt party."  (Ex. 12.)  The IRS explained in its November

12  12, 2004 Coordinated Issue Paper that "the Service will challenge transactions in which S

13  corporation shareholders attempt to transfer the incidence of taxation on S corporation

14  income by purportedly donating S corporation nonvoting stock to an exempt organization .

15  . ." (Ex. 15.)  Quite obviously, this is the very Insured Tax Event described in the Policy's

16  Endt. No. 1, ¶¶ (d)&(e).

17      The IRS's Notice 2004-30 also stated the IRS "may argue that the existence of the

18  warrants [issued to MPR Trust on March 29, 2001] results in a violation of the single class

19  of stock requirement of § 1361(b)(1)(D), thus terminating the corporation's [Upper

20  Deck's] status as an S corporation."  (Ex. 12.)  The IRS's Coordinated Issue Paper

21  elaborated the warrants in an SC2 transaction would be treated under Section 1361 of the

22  Code as a second class of stock.  (Ex. 15.)  This is the very Insured Tax Event described in

23  the Policy's Endt. No. 1, ¶ (a).

24      On August 5 & 6, 2005 the IRS notified the Insureds in writing that their tax returns

25  were being examined in connection with the March 2001 SC2 transaction with Austin

26  Firefighters and that "the Service will challenge transactions in which S corporation

27  shareholders attempt to transfer the incidence of taxation on S corporation income by

28  purportedly donating the S corporation nonvoting stock to an exempt entity . . ." (Exs. 13

EXHIBIT _P_, PAGE _384_

1 & 14.) This is the very Insured Tax Event covered by the Policy's Endt. No. 1, ¶¶ (d)&(e).

2   On April 7, 2005 the IRS notified the Insureds that it proposed to resolve the matter

3 by "not consider[ing] the S corporation election terminated on the date of the transfer of

4 stock to the exempt party" (the risk insured against in Endt. No. 1 ¶ (a)) but that "the

5 transfer of the S corporate stock to the exempt party [would be] disregarded for Federal tax

6 purposes.  S corporation income will be allocated as if there had been no transfer of stock

7 to the exempt party" (Ex. 17), the very risk insured against in the Policy's Endt. No. 1

8 ¶¶ (d)&(e).  With AIG's consent, the Insureds accepted this proposal and Mr. McWilliam

9 will consequently have to pay over $66 million in back taxes to the IRS, plus interest, as

10 well as relinquish any claim to $17 million in back taxes paid to the FTB.  That is a $83

11 million loss, plus interest as a direct result of the risk insured against under Clause No. 1 of

12 the Policy and Endt. No. 1, (d) & (e) thereto.

13   Even if AIG's factual assertions were true -- and they most certainly are not --

14 AIG's assertions that this "Claim for which Respondents seek coverage, . . . resulted from

15 a <u>forced [R]epurchase</u> of the" Austin Firefighters' Shares in December of 2002 (AIG pp.

16 11-14, esp. 13) is obviously incorrect.  The IRS has repeatedly asserted Claims

17 demonstrating that the Loss is within the scope of Clause No. 1.

18 **IV.**  **AIG'S REMAINING COVERAGE DEFENSES ARE INAPPLICABLE AND**

19   **DO NOT SUPPORT AIG'S ASSERTION THAT THE INSUREDS ARE NOT**

20   **ENTITLED TO THE FULL POLICY BENEFITS.**

21   **A.**  **No Policy Exclusions Apply.**

22   AIG argues that both Policy exclusions (a) and (h) are applicable to exclude the

23 Insureds' loss from coverage under the Policy.  AIG fails to acknowledge the hefty burden

24 of proof that an insurer faces in seeking to exclude coverage of a policy claim based on the

25 application of a policy exclusion.  The well-settled burden is that an insurer must show that

26 the excluded event or activity was the "dominant and efficient" cause of the Insureds' loss.

27 *Throgs Neck Bagels, Inc. v. GA Ins. Co.*, 241 A.D.2d 66, 71 (1st Dept. 1998).

28   AIG fails to mention even once in its Opening Pre-Hearing Brief that its exclusion

1    defenses are subject to this burden of proof.  None of AIG's exclusion coverage defenses

2    can support the assertion that the alleged excluded activities -- the December 2002

3    Repurchase -- were the "dominant and efficient" cause of the Insureds' loss.  Indeed,

4    AIG's own experts appear to concede that AIG cannot meet this heavy burden.

5    Consequently, AIG's exclusion defenses must fail as a matter of law.

6              **1.    Exclusion (a) Is Not Triggered Under The Policy And Exclusion**

7                        **(a) Does Not Exclude Coverage In Any Event.**

8              The first provision that AIG contends acts to exclude coverage of the Insureds' loss

9    is exclusions (a) of Clause 3 of the Policy.  The exclusion reads as follows:

10                  The Insurer shall not be liable to make any payment for Loss in
                    connection with a Claim made against any Insured:
11
                    (a)      arising out of, based upon or attributable to the
12                  committing in fact of any criminal or deliberate fraudulent act
                    (including without limitation deliberate civil fraud), or any
13                  knowing and intentional violation of any law, rule, regulation
                    or statute; provided, however, that effecting the transactions
14                  described in the Opinions and the filing of Tax Returns with
                    any Taxing Authority by the Insureds consistent with the
15                  transactions described in the Opinions shall not be the
                    committing in fact of any criminal or deliberate fraudulent act
16                  (Including without limitation deliberage civil fraud) or a
                    knowing and intentional violation of law, rule, regulation or
17                  statute for purposes of this Clause 3(a). . . .

18             Thus, by the very terms of the Policy, in order for exclusion (a) to apply, the

19    excluded activity (i.e., the Insureds' alleged fraud in connection with the Repurchase) must

20    have resulted in a "Claim" being made by a Taxing Authority.  This simply did not

21    happen.  (*See*, e.g., the IRS's April 26, 2004 Notice 2004-30 [Ex. 12], the related

22    November 12, 2004 Coordinated Issue Paper [Ex. 15], the IRS's April 7, 2005 Offer of

23    Settlement [Ex. 17].)

24             While AIG quotes the language of exclusion (a), AIG conflates the question of

25    whether or not the "Loss" in connection with the "Claims" of the IRS and FTB arose from

26    the alleged fraud (which AIG contends is the case) with the separate and distinct question

27    of whether or not the "Claim" with which the "Loss" is "connect[ed]" arose from the

28

EXHIBIT _P_, PAGE _386_

1  alleged fraud. ( *Compare* AIG p. 24[4] and p. 21[5].) AIG asserts that exclusion (a) applies

2  because "the <u>Loss</u> claimed by Respondents <u>arose out of</u> the fraudulent inducement of the

3  sale of Austin's stock." (AIG p. 24; emphasis added)  That's not what the clear and

4  unambiguous language exclusion (a) of the Policy requires!  The language of Clause 3(a)

5  requires that the Loss be <u>connected</u> "with a <u>Claim</u> . . . <u>arising out of</u> . . . any criminal or

6  deliberate fraudulent act."[6]  No Taxing Authority has ever asserted in a Claim or elsewhere

7  that the Insureds are being audited based on or arising out of their alleged criminal or

8  fraudulent conduct.  Because no such Claim has ever been asserted, exclusion (a) cannot

9  apply.

10       For example, the IRS's Claims set forth in Notice 2004-30 (Ex. 12) and explained

11  in the Coordinated Issue Paper (Ex. 15) and reiterated in the IRS's April 7, 2005 offers to

12  settle the Claims (Ex. 17) are exactly the same Claims asserted against each and every one

13  of the other 58 SC2 participants regardless of when, and how, and even if the S corporation

14  in those transactions acquired the exempt party's shares in the S corporation.  AIG cannot

15  contend to the contrary.

16       Instead, AIG incorrectly contends that the December 2002 Repurchase

17  "significantly diminished the prospects that the tax benefits associated with the SC2

18  transaction would be upheld by a court if litigated" (AIG p. 24).  While the Insureds

19  _____

20  [4]"[T]he Loss claimed by Respondents arose out of their fraudulent inducement of the sale of Austin's stock . . . since . . . .' The manner in which the Upper Deck Parties repurchased its shares in December 2002 significantly diminished the prospects that tax

21  benefits associated with the SC2 transaction would be upheld by a court if litigated."
   [5]Quoting the language of the exclusion itself:  "the Insurer shall not be liable to make

22  any payment for Loss in connection with a Claim made against any Insured arising out of . . . any criminal or deliberate fraudulent act."

23  [6]In this regard, the language of the exclusion in Clause 3, ¶ (a) stands in stark contrast to the language Clause 3, ¶¶ (c) [excluding "Loss in connection with a Claim . . . to the

24  extent that such **Loss arises out of**"] (d) [excluding "Loss in connection with (identified) Claim(s) . . . provided that such exclusion shall extend **only to the portion of the Loss**

25  **that is attributable to** (those identifying characteristics)"] (f) [excluding "Loss in connection with a Claim . . . . **to the extent such Loss arises out of**"] (g) [excluding "Loss

26  in connection with a Claim . . . **to the extent such Loss arises out of**"] (h) [excluding "Loss in connection with a Claim . . . **to the extent such Loss arises out of**"] (i)

27  ["excluding "Loss in connection with a Claim . . . **to the extent such Loss is caused by**"] (j) [excluding "Loss in connection with a Claim . . . **to the extent such Loss arises out**

28  **of**"].  Other exclusions in Clause 3, like that appearing in ¶ (a), require that the "Claim" rather than the "Loss" "arise out of" specified perils: e.g., ¶¶ (b), (e), (k).

1    dispute that contention, if the Policy's Clause (a) is given its plain meaning -- as it must --

2    the contention does not matter.  What matters is that the "Claims" giving rise to the

3    litigation did not arise out of the alleged fraud in the December 2002 Repurchase; not even

4    AIG has the temerity to urge that any aspect of the December 2002 Repurchase gave rise

5    to the Claims, AIG only argues that the Repurchase "substantially decreased the possibility

6    that the Upper Deck Parties would prevail in any litigation of the issues" raised by the

7    Claims.  (RB p. 1.)  This contention in and of itself -- even if somehow accepted as true --

8    does not undermine AIG's obligation under the Policy to pay for the Insureds' tax Loss.

9         All evidence indicates the IRS and FTB simply did not care one way or the other

10   about the Insureds' decision to negotiate a repurchase of the non-voting shares from the

11   Austin Firefighters and that the existence of the Repurchase had no bearing on the IRS or

12   FTB making a Claim.  The fact is the IRS published identical notifications (Notice 2004-

13   30[Ex. 12]), published identical statements of its rationale for that notice (Coordinated

14   Issue Paper [Ex. 14]), and published identical settlement offers to all 58 S corporations and

15   their shareholders who implemented SC2 (Ex. 17) regardless of when and how and if those

16   SC2 participants redeemed or repurchased the participating charity's S corporation stock.

17   Neither AIG nor its expert witnesses have ever even attempted to meet AIG's burden of

18   proof in connection with Clause 3(a) through identification of any evidentiary support.

19        **2.    Exclusion (h) Does Not Act To Exclude Coverage Of The**

20             **Insureds' Loss.**

21   The Policy's Clause No. 3.  EXCLUSIONS ¶ (h) provides:

22        The Insurer shall not be liable to make any payment for Loss in
         connection with a Claim made against any Insured: . . .to the
23        extent such Loss arises out of, is based upon or is attributable
         to an amendment to the Shareholders Agreement or the
24        Warrant Agreement attached hereto as <u>Exhibits C and D</u>,
         respectively, without the Insurer's prior written consent (which
25        consent shall not be unreasonably withheld by the Insurer).

26   AIG's Opening Pre-Hearing Brief reiterates AIG's allegations that Clause 5.3 of the

27   2002 Share Purchase Agreement "provides that the Shareholders' Agreement is terminated

28   with the consummation of the Share Purchase Agreement on December 31, 2002" and AIG

1  argues this "[wa]s an amendment thereof which pursuant to Exclusion (h) operates to

2  exclude coverage, since AIG's consent was not obtained." (AIG pp. 14-15.)

3     Remarkably, AIG makes this assertion without ever once examining the March 31,

4  2002 Shareholders' Agreement between MPR Trust and Austin Firefighters to see if the

5  recited termination of that Shareholders' Agreement in Clause 5.3 of the Share Purchase

6  Agreement of December 31, 2002 in fact amended the March 31, 2002 Shareholders'

7  Agreement.  It did not.

8     Section 8 of the March 31, 2002 Shareholders' Agreement captioned "Termination

9  Of Agreement" provides that [t]he Agreement shall terminate" by its own terms "on the

10  occurrence of any of the following events: . . . [¶ ]8.3 at such time as only one (1)

11  Shareholder with the Company remains."  Upon Upper Deck's acquisition of Austin

12  Firefighters' shares, there was "only one (1) Shareholder of the Company remain[ing]" and

13  the "Shareholder Agreement" terminated by its own terms (2002 Share Purchase

14  Agreement ¶ 8.3, p. 15).  This "termination of the Shareholders' Agreement" by its own

15  terms took place regardless of inclusion of Clause 5.3 in the 2002 Share Purchase

16  Agreement.  No part of Clause 5.3 effected "an amendment" of the Shareholders

17  Agreement.  Again, while AIG did include language in the Policy related to an amendment

18  to the Shareholders' Agreement, there was no representation by the Insureds to the effect

19  that the Austin Firefighters Shares could not be transferred without AIG's consent.  In fact,

20  all the language in the Policy and underlying documents contemplated share transfers by

21  the Austin Firefighters without AIG's consent, with any such share transfer back to Upper

22  Deck resulting -- on the face of the Shareholders' Agreement -- in an automatic

23  termination of the Shareholders' Agreement.

24     Moreover, AIG could never have reasonably withheld its consent to termination of

25  the Shareholder Agreement contemporaneous with or after the December 2002

26  Repurchase.  More importantly, termination of the Shareholder Agreement is a red herring

27  as AIG fails entirely to connect any termination of the Shareholders' Agreement to any

28  Loss sustained by the Insureds -- let alone to establish termination of the Shareholders'

1   Agreement was the "dominant and efficient" cause of that Loss.  AIG again fails to

2   acknowledge or even address the "dominant and efficient" cause element of proof that

3   AIG must establish in order to succeed with this exclusion (h) argument.  AIG cannot

4   make such a showing as there is no evidence at all that the IRS or FTB ever cared about

5   the Repurchase, let alone the termination of the Shareholders' Agreement incident thereto.

6        In its Opening Pre-Hearing Brief, AIG also attempts to mesh together the

7   "amendment to the Shareholders' Agreement" argument with the Insureds' alleged failure

8   to pay fair market value to the Austin Firefighters in connection with the Repurchase.

9   (AIG pp. 14-15.)  AIG then argues that because fair market value was not paid, the

10  Insureds effectively ridded themselves of some reasonable prospect of successfully

11  litigating with the IRS.  AIG draws no logical connection whatsoever between the

12  termination of the Shareholders' Agreement and Upper Deck's alleged failure to pay the

13  Austin Firefighters fair market value for the Austin Firefighters' Shares.  Yet, AIG

14  confusingly argues that the termination of the Shareholders' Agreement <u>caused</u> the

15  Insureds' Loss.  AIG apparently anticipates that this sort of muddy-the-water defense to

16  coverage approach will provide the requisite basis to apply Policy exclusions even when

17  AIG is unable to intelligently articulate how and why a particular exclusion applies to deny

18  the Insureds' their right to Policy benefits.  Again, despite the never ending arguments

19  made by AIG to the contrary, there simply is no language in the Policy which excludes

20  coverage in the event the Austin Firefighters transfer their shares at less than fair market

21  value and that such transfer results in a termination of the Shareholders' Agreement

22       Without a showing of "dominant and efficient" causation between the termination

23  of the Shareholders' Agreement or the alleged fraud in Upper Deck's Repurchase of the

24  Austin Firefighters' Shares and the Insureds' Loss under the Policy, AIG's exclusion

25  defenses fail as a matter of law.

26  **B.      AIG Cannot Establish Its Breach Of Warranty Defenses.**

27       Equally deficient are AIG's breach of warranty arguments, which AIG asserts

28  without any reference to or discussion of the burden an insurer faces when attempting to

1    defeat policy coverage through a breach of warranty defense.  The law is clear that in order

2    for a breach of warranty defense to defeat coverage, an insurer must prove that the alleged

3    breach of warranty "materially increased" the risk of loss insured by the policy.  *First*

4    *Federal Savings and Loan Assoc. v. Nichols*, 306 N.Y.S.2d 542, 546 (1970).  Thus, while

5    the Insureds emphatically deny making the alleged warranties AIG now bases its breaches

6    of warranty defenses on, and further deny that any alleged breach of any warranty actually

7    given ever occurred, AIG cannot satisfy its burden of proof that the alleged breaches of the

8    asserted warranties "materially increased" the Insureds' risk of loss (or that those breaches,

9    properly viewed in the context of Clause 3(b) were the dominant and efficient cause of the

10   loss).

11          1.      **The Insureds' Did Not Warrant That Fair Market Value Would**

12                  **Be Paid To The Austin Firefighters, And The Insureds'**

13                  **Nevertheless Did Not Fail In That Regard.**

14          AIG's obsession with totally mischaracterizing the substance of the warranties that

15   the Insureds actually gave to AIG in the September 4, 2001 Representation Letter has

16   emerged as the consistent theme with each of AIG's breach of warranty arguments.  This is

17   certainly true for AIG's argument that the Insureds' warranted that the Austin Firefighters

18   would be paid fair market value for the Austin Firefighters' Shares -- no matter when and

19   how those shares were reacquired by the Insureds.

20          What the Representation Letter actually says is that the Insureds warrant that the

21   "facts, assumptions of fact, and understandings of fact" in the KPMG opinions were true

22   and correct as of the date the opinions were given (May 2, 2001).  (Representation Letter,

23   ¶ 1.)  And the relevant KPMG opinion states that "under the redemption agreement

24   [Section 5 of the Shareholders' Agreement "Put Option and Right"] the purchase price for

25   any redemption is the fair market value measured at the time of redemption."  (Ex. A to the

26   Policy, May 2, 2001 KPMG Opinion "Re: Charitable contribution to Austin Firefighters

27   Relief and Retirement Fund," p. 7 [Ex. 1].)  Thus, what AIG characterizes as a promise to

28   pay fair market value no matter when and how the Insureds reacquired the Austin

1   Firefighters' stock, was in fact only a warranty that Section 5 of the Shareholders'

2   Agreement required fair market value to be paid if the Austin Firefighters unilaterally

3   optioned their put during the limited 180-day window under Section 5 of the Shareholders'

4   Agreement.  This is not what transpired in December 2002 as the Austin Firefighters did

5   not "put" their stock to Upper Deck under Section 5 of the Shareholders' Agreement.

6   Indeed, no such "put" right even existed in December 2002 as the 180-day option period

7   had yet to commence.  The Repurchase was in fact an entirely distinct transaction from the

8   one contemplated by Section 5 of the Shareholders' Agreement -- but nonetheless

9   permitted by the Shareholders' Agreement.[7]  Thus, even if Upper Deck failed to pay fair

10   market value to the Austin Firefighters, such failure would not constitute a breach of any

11   warranty given in the Representation Letter as contended by AIG.

12       Furthermore, AIG is seemingly confused over whether this alleged warranty was a

13   factual warranty or a promissory warranty.  (*See*, AIG pp. 17-18.)  The only paragraph of

14   the Representation Letter that could even conceivably (though not plausibly) support the

15   existence of this fair market value warranty is paragraph 1 that warrants that the facts

16   underlying the KPMG opinions are accurate.  Nowhere do the KPMG opinions state that

17   all future transfers would be at fair market value.  Put simply, Paragraph 1 only provides

18   factual warranties as of the time the KPMG opinions were issued; there simply is no

19   promissory warranty which obligated the Insureds to purchase the Austin Firefighters'

20   Shares at fair market value.  Thus, the Insureds did not give AIG a promissory warranty

21   that in any subsequent purchase of the Austin Firefighters' stock that fair market value

22   would be paid.  Moreover, to the extent AIG contends now that the Insureds somehow did

23   provide a promissory warranty not to pay less than fair market value for the Austin

24   Firefighters shares, such defense was waived by AIG as it has previously never presented a

25

---

26   [7]Section 1 of the Shareholders' Agreement permits "sales, transfers or dispositions of
    [Austin Firefighters'] Shares" "with [] the prior written consent of the Company [Upper
27   Deck] and the other shareholders of the Company [MPR Trust]."  (Policy Ex. C, § 1, p. 1.)
    In executing the 2002 Share Purchase Agreement, Upper Deck and the MPR Trust
28   consented to Upper Deck's acquisition of Austin Firefighters' Shares (22002 Share
    Purchase Agreement ¶ 5.3, p. 5.)

1   promissory warranty defense -- not in any of its coverage letters or its pleadings in this

2   case. *See, Amro Realty Corp., supra*, 936 F.2d at 1431-1432.

3        Furthermore, even assuming arguendo that AIG is correct in stating that the

4   Insureds warranted that they would pay fair market value to the Austin Firefighters no

5   matter how the stock was reacquired, and even assuming the Insureds breached that

6   warranty, AIG has done nothing to show that the alleged breached warranty had any

7   impact on the Insureds' susceptibility of sustaining a loss under the Policy.

8   Notwithstanding all of the other dispositive deficiencies in AIG's defense, it also fails as a

9   matter of law because AIG cannot show that the alleged breach of warranty materially

10  increased the risk of loss under the Policy. *See, First Federal Savings, supra*, 306

11  N.Y.S.2d at 546.

12  **2.   The Insureds Did Not Compel The Austin Firefighters To Sell**

13  **Their Stock Back To Upper Deck, Nor Did The Repurchase**

14  **Materially Increase The Insureds' Risk Of Loss.**

15       AIG next contends that the Insureds breached a promissory warranty that they could

16  not compel the Austin Firefighters to redeem its shares.  (AIG pp. 18-19.)  AIG asserts that

17  the Insureds thus breached paragraph 3 of the Representation Letter which provides that

18  neither Upper Deck nor any of its shareholders could compel the Austin Firefighters to

19  redeem its stock.  Again, as addressed above, previous to the filing of its Opening Pre-

20  Hearing Brief, AIG had never before raised paragraph 3 of the Representation Letter or the

21  concept of a breach of a promissory warranty by the Insureds.  By failing to identify

22  paragraph 3 of the Representation Letter as a coverage defense, which defense is not

23  related to the "existence or nonexistence of coverage," AIG waived its right to now assert

24  this defense. *See, Amro Realty Corp, supra*, 936 F.2d at 1431-1432; *see also, Albert J.*

25  *Schiff Assoc., supra*, 51 N.Y.2d at 697-698.

26       Moreover, AIG makes the bald assertion that the Insureds breached this <u>alleged</u>

27  promissory warranty by compelling the Austin Firefighters to redeem its stock in

28  December 2002.  Again, there is no promissory warranty in the Representation Letter

1  which asserts or even remotely suggests that all future transactions related to any purchase

2  of the Austin Firefighters' Shares will be fair, will be free of misrepresentations and will

3  not include any omissions of fact or law.  In fact, the language in the Representation Letter

4  is far narrower and simply asserts that it was a legally correct statement that as of

5  September 4, 2001, that the "Municipal Plain is neither legally bound to offer for

6  redemption and of the non-voting shares of Upper Deck, nor can Upper Deck or any of its

7  shareholders compel such a redemption . . ."  Indeed, the Repurchase was not a

8  "redemption" pursuant to Section 5 of the Shareholders' Agreement as AIG repeatedly

9  attempts to convey in its brief.  The Repurchase was a separate transaction from that

10  described as the "Put Option and Right" (or the "redemption") in Section 5 of the

11  Shareholders' Agreement.

12       AIG also fails entirely to explain how it comes to the conclusion that the Insureds

13  *compelled* the Austin Firefighters to participate in the Repurchase.  The reality is that the

14  Austin Firefighters had independent counsel representing them in the negotiation of the

15  Repurchase, which counsel communicated with the Insureds' counsel on numerous

16  occasions, made revisions to the 2002 Share Purchase Agreement, and ultimately blessed

17  the transaction as counsel for the Austin Firefighters.

18       AIG further fails to acknowledge that under Section 5 of the Shareholders'

19  Agreement the Austin Firefighters had every right to simply refuse to participate in the

20  Repurchase and to exercise their option to put the stock back to Upper Deck at appraised

21  fair market value -- a right that would not commence until April 1, 2003.

22       Finally, even assuming arguendo that the Insureds did make a promissory warranty

23  to not compel a redemption of the Austin Firefighters' shares, and even assuming that the

24  Insureds did compel such a redemption, AIG has done nothing to show that any such

25  alleged breach had any impact on the Insureds' susceptibility of sustaining a Loss under

26  the Policy either by increasing the prospects that a Claim would be asserted or that such a

27  Claim would be successful.  As set forth in detail in the Insureds' Opening Brief, the IRS

28  and Senate investigations and inquiries into SC2 commenced long before the Insureds and

EXHIBIT _P_, PAGE _394_

1   the Austin Firefighters ever began to contemplate or discuss the Repurchase.

2   Notwithstanding all of the other deficiencies in AIG's argument, AIG's inability to

3   establish that the Repurchase materially increased the risk of loss is yet another reason why

4   AIG's position is without merit.  *See, First Federal Savings, supra*, 306 N.Y.S.2d at 546.

5         **3.**     **The Insureds Did Not Warrant The Truth Of KPMG's Opinions;**

6                      **The Opinions Were The Very Substance Of The Risk Insured**

7                      **Under The Policy.**

8         Yet another creative defense raised by AIG is its assertion that the Insureds

9   somehow warranted the truth of KPMG's opinions regarding the likelihood that SC2

10   would be upheld if challenged by a Taxing Authority.  AIG is contending that the Insureds

11   warranted that no Insured Tax Event would give rise to a Loss under the Policy.  This

12   preposterous position is made further ridiculous by AIG's contention that the Insureds

13   were somehow aware of KPMG's devious acts prior executing the September 4, 2001

14   Representation Letter, which by the way, says NOTHING about the "truth" of the KPMG

15   opinions.  Looking to the very Senate Committee report that AIG cites in its Opening Pre-

16   Hearing Brief, the panel can see for itself that KPMG's clients were the ones in the dark

17   about KPMG's seedy conduct, and it was AIG who not only knew about KPMG's conduct,

18   but directly assisted in the marketing scheme by making available insurance for the

19   strategy -- insurance which was a key component to KPMG's marketing strategy.

20   Specifically, the panel is guided to look at page 57 of the Levin Committee Report, which

21   identifies AIG by name as a contributing insurance provider who offered insurance to

22   KPMG clients who purchased the SC2 transaction.  The report further states that KPMG

23   marketed the SC2 strategy armed with a sample insurance policy like the Policy that AIG

24   issued to the Insureds.  AIG's audacity in asserting that it was in the dark about the full

25   nature of KPMG's activities and that the Insureds knew the truth and hid it from AIG goes

26   beyond the pale.

27   / / /

28   / / /

        -20-    EXHIBIT ___P___, PAGE _394_

**C.    AIG's Condition Precedent Argument Fails On Its Face, And Was Waived When AIG Failed To Raise The Defense In Its July 29, 2005 Coverage Denial Letter.**

Yet another coverage defense that AIG omitted from its July 29, 2005 coverage denial letter, but now attempts to raise in this case is the assertion that a condition precedent to the Insureds' right to indemnification set forth in Clause 9(b) of the Policy has not been met. Clause 9(b) requires the Insureds to "prepare[] and file[] all applicable Tax Returns in a manner materially consistent with that anticipated by [KPMG's] Opinions and/or the [Representation Letter]." (AIG pp. 24-26.) Once again, AIG's failure to articulate this defense theory in the July 29, 2005 letter resulted in AIG waiving the defense as the defense is not based on either the insuring clause or an exclusions under the Policy. *See*, *Amro Realty Corp*, *supra*, 936 F.2d at 1431-1432; *see also*, *Albert J. Schiff Assoc.*, *supra*, 51 N.Y.2d at 697-698.

Aside from being fatally untimely, AIG's defense suffers from two additional fatal flaws on the merits. First, AIG grossly misconstrues the condition set forth in Clause 9(b) by taking the position that in order for the Insureds to file tax returns materially consistent with KPMG's opinions, Mr. McWilliam was required to take a charitable deduction for the value of his March 21, 2001 contribution of the Austin Firefighters Shares in the 2001 tax year. AIG contends this requirement existed despite the fact that Mr. McWilliam's tax liability of 2001 was already zero, rendering any possible claim of charitable deduction in 2001 pointless and possibly unnecessarily provocative. There is simply nothing inconsistent with Mr. McWilliam opting not to take a charitable deduction and the condition set forth in Clause 9(b). This is clear when looking to the portion of the KPMG opinion that AIG relies upon in making its argument. AIG cites to pages 4, 9-11 of KPMG's "Charitable Contribution" opinion, which provides that if Mr. McWilliam were to take a charitable deduction, he would "more likely than not . . . be entitled to a charitable deduction for the fair market value of the stock [] donated." Thus, KPMG opined that a charitable deduction would be appropriate under the circumstances, but it did

1   not state in any way that Mr. McWilliam was required to take a deduction in order for the

2   SC2 strategy to succeed.  AIG's contention that the Insureds failed to file their tax returns

3   in a manner consistent with the KPMG opinions is simply wrong.

4        Moreover, AIG's condition precedent argument seemingly conflicts with an actual

5   condition precedent in the Policy, iterated in Clause 9(a), which provides that the Insureds

6   shall mitigate their potential losses by taking "all reasonable actions to mitigate any

7   Insured Tax Loss."  Given that Mr. McWilliam's tax liability for 2001 was already zero,

8   there was no purpose for him to seek a deduction for his gift to the Austin Firefighters at

9   that time.  In fact, consistent with Clause 9(a), Mr. McWilliam's decision not to take a

10   deduction was in effect an act of mitigation given the fact that IRS has now taken the

11   position that the SC2 charitable deduction is disallowed and all taxpayers who claimed

12   such a deduction are now subject to back taxes and interest for the taxes previously

13   avoided by the taking of such a deduction.  (*See*, the IRS's April 7, 2005 Offer of

14   Settlement [Ex. 17].)  Had Mr. McWilliam taken the deduction AIG now says he was

15   required to take, AIG likely would now be asserting Clause 9(a) as a coverage defense

16   based on a theory that the Mr. William's failed to mitigate his exposure to loss by claiming

17   a charitable deduction when he stood to retain no benefit from taking a deduction as his tax

18   liability was already zero.

19        At the end of the day, AIG's condition precedent argument is just another red

20   herring in that even if one were to accept the irrational argument AIG is making, Mr.

21   McWilliam's not taking a charitable deduction had no impact whatsoever on the IRS' or

22   FTB's attack on the Insureds' use of SC2, nor did it impact the Insureds' incurrence of

23   over $83 million in back taxes and interest.  Despite this, AIG seeks to avoid its $50

24   million Policy obligation based on a absent charitable deduction, which would have been

25   meaningless to Mr. McWilliam, and was meaningless to the Taxing Authorities' respective

26   Claims under the Policy.

27   / / /

28   / / /

1  **V.    AIG'S SUBROGATION ARGUMENT IS UNTIMELY AND FAILS TO**

2  **DEFEAT COVERAGE IN ANY EVENT.**

3  AIG's Pre-Hearing Brief (at pp. 26-27) reiterates AIG's Complaint's Count VI's

4  assertion and AIG's Sixth Separate Defense to the Insureds' Cross-Complaint's assertion

5  that Clause 10 of the Policy which grants AIG a right of subrogation -- expressly

6  conditioned on AIG "mak[ing] . . . payment under [t]he [P]olicy in respect of [L]oss" --

7  claims that "Respondents . . . impaired [AIG's] rights of subrogation against the

8  Government." and prayers for a declaration "[t]here is no coverage due to . . .

9  Respondents' impairment of AISLIC's subrogation rights."  AIG never made such an

10  assertion when, on July 29, 2005, it denied coverage for the Insureds claims.  (Ex. 30.)  For

11  this reason, the defense cannot be raised now.  *Amro Realty Corp.*, *supra*, 936 F.2d at

12  1431-1432 ("[T]he act by an insurer of disclaiming on certain grounds but not others is

13  deemed *conclusive* evidence of the insurer's intent to waive the unasserted grounds.").

14  Compounding the already belated nature of this impairment-of-rights-of-

15  subrogation defense, AIG now, after close of discovery in this case, after the passing of

16  any opportunity to designate expert witnesses on this topic, after finalization of the witness

17  lists and exhibit lists in this matter, adds an assertion that not only were rights of

18  subrogation against "the Government" impaired, but rights of subrogation against KPMG

19  were also impaired.  (AIG pp. 26-27).  This defense insofar as it relates to subrogation to

20  the Insureds' rights against KPMG must be barred not only due to AIG's failure to raise it

21  when AIG denied the Insureds' claim, but also because it appears nowhere in AIG's

22  complaint or answer to Insureds' Counter-Claim.  The most basic notions of due process

23  and fair play require that result at this time.

24  The notion that the Insureds impaired rights of subrogation against "the

25  Government can further be dispensed with on the merits because AIG could never have

26  "rights of subrogation against the Government" under Section 10 of the Policy; AIG

27  insured against liability to "the Government."  Moreover, AIG did not satisfy the condition

28  that it "mak[e] . . . payment under [t]he [P]olicy in respect of [L]oss."

1    AIG's notion it could ever have rights of subrogation against "the Government" is

2 misguided. "[A]n insurer who pays claims against the insured for damages caused by the

3 default or wrongdoing of a third party is entitled to be subrogated to the rights which the

4 insured would have had against such third party for its default or wrongdoing." *Neuss,*

5 *Hesslein & Co. v. 380 Canal St. Realty Corp.,* 168 N.Y.S.2d 579, 582 (1957). The right

6 of subrogation "is based upon principles of equity and natural justice," because the courts

7 "recognize at once the fairness of the proposition that an insurer who has been compelled

8 by his contract to pay to or on behalf of the insured claims for damages ought to be

9 reimbursed by the party whose fault has caused such damages and the principle of

10 subrogation ought to be liberally applied for the protection of those who are its natural

11 beneficiaries." *Ibid.* These principles create no right in AIG to recover taxes paid on

12 behalf of the Insureds to "the Government" back from "the Government."

13    Any rights of AIG to "Recovered Payments" which the Insureds may pursue from

14 "the Government" are addressed not in Section 10 of the Policy, but instead under the

15 Policy's Section 11. REFUNDS AND REIMBURSEMENTS (See Section 11, esp.

16 ¶¶ (a)(i)&(iii).) Section 11 commits discretion to pursue and control over pursuit of any

17 "Recovered Payments" to the Insureds and not to AIG. Only if the Insureds obtain

18 "Recovered Payments" are the Insureds required to account for any "Recovered Payment

19    AIG's impairment-of-the-right-of-subrogation defense is frivolous.

20 **VI.   THE APPLICABLE LAW SUPPORTS A CAUSE OF ACTION FOR BAD**

21      **FAITH AGAINST AIG.**

22    Despite AIG's claims to the contrary, under <u>recent</u> New York law, choice of law

23 provisions limited to contract-based causes of action do not govern disputes over actions

24 for bad faith denial of coverage in insurance claims. *Frazer Exton Development, LP v.*

25 *Kemper Environmental, Ltd.,* 2004 U.S. Dist. LEXIS 14602, *33 (S.D.N.Y. 2004), *aff'd.,*

26 153 Fed. Appx. 31 (2d Cir. 2005). In *Frazer Exton Development, LP,* insured Frazer

27 Exton Development, LP ("FED") brought actions for declaratory relief and bad faith denial

28 of claims pursuant to Pennsylvania's bad faith statute against defendant insurer Kemper

1    Environmental, Ltd. ("Kemper"), after Kemper refused to pay a claim for clean up costs

2    under an environmental policy related to a "Superfund Site" facility. *Id.* at *2, *32-33.

3    The choice of law provision at issue in *Frazer Exton Development, LP* stated that:

4               In the event that the INSURED and the Company dispute the
                meaning, interpretation or operation of any term, condition,
5               definition or provision of this Policy, or the fulfillment by the
                INSURED or the Company of any other obligations with
6               respect to the Policy, resulting in litigation, arbitration or other
                form of dispute resolution, the INSURED and the Company
7               agree that the law of the State of New York shall apply
                notwithstanding the State of New York's choice of law rules.

8

9    *Id.* at *33 (emphasis added).

10          On appeal from the lower court's denial of the parties' summary judgment motions,

11   FED argued that the choice of law provision did not apply to tort claims such as the

12   Pennsylvania bad faith claim that are "separate and distinct from the Policy." *Id.* at *33.

13   The Southern District Court of New York agreed. *Id.* at *34-35. The Court explained that

14   under New York law, "'a contractual choice of law provision . . . does not bind the parties

15   with respect to non-contractual causes of action.'" *Id.* at *34. Therefore, "'**[f]or a choice**

16   **of law provision to apply to claims for tort arising incident to the contract such as the**

17   **Pennsylvania Bad Faith claim, the express language of the provision must be**

18   **'sufficiently broad' as to encompass the entire relationship between the parties**.'" *Id.*

19   (internal parentheses omitted, Emphasis Added).

20          To achieve broad coverage, an insurer must use choice of law provisions employing

21   "expansive language" such as "'arising out of or relating to' the contract" or "'arising

22   directly or indirectly from the Agreement.'" *Frazer Exton Development, LP,* 2004 U.S.

23   Dist. LEXIS at *34-35. The Southern District Court found that the language in FED's

24   policy's choice of law provision fell short of the mark, and therefore did not determine

25   which law applied to FED's tort claim against Kemper. *Id.* at *35. Based on the

26   "interests" used to determine the law governing tort claims, the Court held that because the

27   facility was located in Pennsylvania, the policy was negotiated in Pennsylvania, sent to

28   both Marsh and FED in Pennsylvania, and Kemper failed to allege that New York or any

EXHIBIT _P_, PAGE _399_

1    other state has a closer nexus to the tort, Pennsylvania law applied to FED's bad faith

2    claim. *Id.* at *36-37.

3         As set forth in detail in Insured's Opening Brief, the language in the Policy's choice

4    of law provision is insufficiently broad under *Finance One Public Co. Ltd. v. Lehman*

5    *Bros. Special Financing, Inc.*, 414 F.3d 325 (2d Cir. 2005) to encompass tort-based claims.

6    Opening Brief, at pp. 57-60, citing *Finance One Public Co. Ltd., supra,* 414 F.3d at 333-

7    334.  Therefore, as in *Frazer Exton Development, LP,* the law of the state having the

8    strongest interests in the action- California- must apply to Upper Deck's bad faith claim.

9    See *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197 (N.Y. 1985); *Philadelphia*

10   *Parking Authority v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 285 (S.D.N.Y. 2005); *Mass.*

11   *Casualty Ins. Co. v. Morgan*, 886 F. Supp. 1002, 1005 (E.D.N.Y. 1995).

12        Significantly, <u>both of the cases cited by AIG for the proposition that the Insured's</u>

13   <u>bad faith claim falls within the scope of the choice of law provision are Southern District</u>

14   <u>Court opinions decided **before** *Frazer Exton Development, LP*, in which, as explained</u>

15   <u>above, **the Southern District Court expressly held that bad faith actions are not**</u>

16   <u>**encompassed by a choice of law provision governing contractually based claims**</u>.

17        Moreover, AIG's cases are factually distinguishable.  Unlike *Butvin v. DoubleClick,*

18   *Inc.,* 2001 U.S. Dist. LEXIS 2318 (S.D.N.Y. 2001), in which the Southern District Court

19   addressed a stock option provision in an employment agreement, the agreement at issue in

20   this case is an insurance policy-- the type of agreement addressed in *Frazer Exton*

21   *Development, LP.*  And in *Yankee Caithness Joint Venture, L.P. v. Planet Ins. Co.*, 1996

22   U.S. Dist. LEXIS 10747 (S.D.N.Y. 1996), the Court specifically declined to address

23   whether a tort claim would be encompassed by the parties' choice of law provision.

24   *Yankee Caithness Joint Venture, L.P.,* at *9, n2.  Instead, the Court merely held that "New

25   York law shall apply to all contractual claims in this action," and then noted that although

26   some claims may be outside the choice of law provision, it was skeptical as to whether the

27   insured had pled any true non-contractual claims.  *Id.*  In fact, the exact language the

28   Southern District Court in *Yankee* held to be sufficiently broad to encompass the contract

EXHIBIT __*P*__, PAGE __400__

1  based breach of the covenant of good faith and fair dealing claim-- the "interpretation" of

2  the policy-- was found to be insufficiently broad to encompass a tort based claim for bad

3  faith by the same Court in *Frazer Exton Development, LP.*

4       In sum, the Southern District Court has made clear since *Butvin* and *Yankee*

5  *Caithness Joint Venture, L.P.*, that bad faith claims for denial of coverage under an

6  insurance policy are not governed by a parties' choice of law provision limited to contract

7  based claims, but rather are subject to the law of the jurisdiction with the greatest interest

8  in the action, which in this case is California, not New York.

9  **VII.   CONCLUSION.**

10       The losses sustained by the Insureds in this case are the <u>exact</u> losses which AIG

11  promised to insure in exchange for the Insureds' $3.25 million premium.  After years of

12  stonewalling and refusing to honor the obligations it has under the Policy, AIG's brazen

13  approach to this coverage dispute continues with the filing of its Opening Pre-Hearing

14  Brief, which drops many of the previously meritless defenses, and seeks to replace them

15  with new, and equally imaginative -- and equally meritless -- defenses.  The limited

16  defenses left in AIG's arsenal are based on AIG's wholly unreasonable reading of the

17  Policy and its intentional mischaracterization of the Insureds' obligations under the Policy.

18  And in the end, even if AIG could somehow support the factual assertion that, for instance,

19  a Policy exclusion applies or that the Insureds breached a warranty, AIG has not, and

20  simply cannot, establish the requisite applicable burdens to establish that the Insureds are

21  not entitled to the payment of full Policy benefits to compensate them for their losses

22  covered by the insuring clause of the Policy.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

EXHIBIT __P__, PAGE __401__

1    After all the Insureds have been put through in pursuing their coverage rights under

2   the Policy, it is time for this panel to once and for all order that AIG honor the plain terms

3   of the Policy and to pay the Insureds the full Policy limits, and to award the Insureds

4   punitive damages for AIG's blatant bad faith treatment and denial of the Insureds' claim.

5

6   Dated:  September 29, 2006                RUTAN & TUCKER, LLP

7

8                                            By: _____

9                                            Richard K. Howell
                                             Attorneys for Respondents and
                                             Counterclaimants, The Upper Deck Company
10                                           and Richard P. McWilliam, individually and
                                             as Trustee for the MPR Trust

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT Q

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| AMERICAN INTERNATIONAL<br>SPECIALTY LINES<br>INSURANCE COMPANY<br>    Claimant – Counter Respondent | Case No.<br>13 195 02486 05 |
| | John F. Byrne, Esq.<br>Stephen D. Kramer, Esq.<br>Charles J. Moxley Jr., Esq. |
|    - v.- | |
| THE UPPER DECK COMPANY, RICHARD<br>P. McWILLIAM, and the MPR<br>REVOCABLE TRUST<br>    Respondents – Counterclaimants. | |

## **CLAIMANT'S POST-HEARING MEMORANDUM**

D'AMATO & LYNCH
70 Pine Street
New York, New York  10270
(212) 269-0927

EXHIBIT __9__, PAGE __403__

# **TABLE OF CONTENTS**

**Page**(s)

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    A.   The Tax Plan Presented To AISLIC By Respondents for Coverage ...... 3

    B.   Respondents' Deviation From The Tax Plan Without AISLIC's
        Consent ......................................................................................... 6

    C.   Respondents' Continued Failure To Inform AISLIC ............................ 10

ARGUMENT ................................................................................................... 11

    POINT I
    RESPONDENTS HAVE FAILED TO SATISFY THEIR BURDEN OF
    SHOWING AN INSURED TAX LOSS ............................................................ 11

    POINT II
    EXCLUSION 3(h) BARS COVERAGE DUE TO RESPONDENTS'
    TERMINATION OF THE SHAREHOLDERS AGREEMENT WITHOUT
    AISLIC'S CONSENT ..................................................................................... 16

        A.   The Settlement Liability Necessarily Arises Out of Respondents'
            Deviation From the Shareholders Agreement ........................................ 16

        B.   The Termination of the Shareholders Agreement Materially Reduced
            The Prospect of Upholding the Tax Plan ............................................... 20

        C.   The Comparison of Benefits Approach Is Legally Baseless ................. 22

    POINT III
    RESPONDENTS' BREACHES OF WARRANTIES PRECLUDE
    COVERAGE .................................................................................................. 24

        A.   Respondents Breached their Promissory Warranty that Fair Market
            Value would be Paid for Austin's Shares .............................................. 24

i

EXHIBIT _6_, PAGE _404_

B. If Respondents are Right, then Their Separate Promissory Warranty that They Could Not Compel Austin to Redeem its Shares is False............ 27

POINT IV
RESPONDENTS' FAILURE TO COMPLY WITH AN EXPRESS CONDITION PRECEDENT TO COVERAGE VITIATES COVERAGE ......28

POINT V
EXCLUSION 3(a) BARS COVERAGE FOR RESPONDENTS' FRAUDULENT INDUCEMENT OF THE REPURCHASE OF AUSTIN'S SHARES ........................................................................................29

POINT VI
RESPONDENTS' COUNTERCLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH IS LEGALLY AND FACTUALLY DEFICIENT.............................................................................30

A. There Is No Such Claim Under Applicable New York Law ................ 30

B. Nor Is There Basis For Such A Claim Under California Law .............. 31

1. No Insured Tax Loss ........................................................ 32

2. What Contest Expenses? .................................................. 33

CONCLUSION ........................................................................... 35

#254673v1

EXHIBIT _Φ_, PAGE 405

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Americas Ins. Co. v. Stolt-Nielsen, Inc.*,
2004 WL. 2199497 (S.D.N.Y. 2004)............................................................. 13

*Bacchus Assocs. v. Hartford Ins. Co.*,
766 F. Supp. 104 (S.D.N.Y. 1991)............................................................. 12

*Butvin v. Doubleclick, Inc.*,
2001 WL 228121 (S.D.N.Y. 2001), *aff'd*,
22 Fed. Appx. 57 (2d Cir. 2001) ............................................................. 31

*Coltec Indus., Inc. v. United States*,
454 F.3d 1340 (Fed. Cir. 2006)............................................................. 23

*Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*,
190 F.3d 26 (2d Cir. 1999)............................................................. 27

*Employers Mut. Cas. Co. v. Key Pharmaceuticals*,
75 F.3d 815 (2d Cir. 1996)............................................................. 30

*Estate of Thomas v. Commissioner*,
84 T.C. 412 (1985) ............................................................. 23

*Feldman v. Allstate Ins. Co.*,
322 F.3d 660 (9th Cir. 2003)............................................................. 31

*Frazer Exton Dev., LP v. Kemper Envir., Ltd.*,
2004 WL. 1752580 (S.D.N.Y. 2004), *aff'd on other grounds*,
153 Fed. Appx. 31 (2d Cir. 2005) ............................................................. 31

*Great American Ins. Co. v. J. Aron & Co., Inc.*,
1995 WL. 495492 (S.D.N.Y. 1995)............................................................. 16

*Guebara v. Allstate Ins. Co.*,
237 F.3d 987 (9th Cir. 2001)............................................................. 32

#254673v1

EXHIBIT _Q_, PAGE _406_

*Hartford Fire Ins. Co. v. Mitlof,*
208 F. Supp. 2d 407 (2d Cir. 2002) ............................................... 27

*Johnson v. United States,* 11 Cl. Ct.17, 25 (Ct. of Claims 1986)..............23

*Leslie v. Commissioner,*
146 F.3d 643 (9th Cir. 1998)........................................................ 22

*Lowry & Co. Inc. v. SS. Le Moyne D'Iberville,*
253 F. Supp. 396 (S.D.N.Y. 1966), *app. dismissed,*
372 F.2d 123 (2d Cir. 1967)........................................................ 12

*Sacks v. Commissioner,*
69 F.3d 982 (9th Cir. 1995)...................................................... 22, 23

*Schering Corp. v. Home Ins. Co.,*
712 F.2d 4 (2d Cir. 1983)........................................................... 14

*Sedco, Inc. v. S.S. Strathewe,*
800 F.2d 27 (2d Cir. 1986)......................................................... 15

*Sheldon v. Commissioner,*
94 T.C. 738 (U.S. Tax Ct. 1990)................................................... 22

*Sirignano v. Chicago Ins. Co.,*
192 F. Supp.2d 199 (S.D.N.Y. 2002)............................................ 28

*St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of America,*
1994 WL. 167943 (S.D.N.Y. 1994).............................................. 13

*Williams v. Deutsche Bank Secs., Inc.,*
2005 WL. 1414435 (S.D.N.Y. 2005)............................................ 31

*Yankee Caithness Joint Venture, LP v. Planet Ins Co.,*
1996 WL. 426359 (S.D.N.Y. 1996)............................................. 31

## STATE CASES

*Aetna Cas. & Surety Co. v. Liberty Mut. Ins. Co.,* 91 A.D.2d 317, 320-21 (4th
Dep't 1983)...........................................................................17

#254673v1

EXHIBIT _Q_, PAGE_407_

*Chase Manhattan Bank v. New Hampshire Ins. Co.,*
4 Misc.3d 1026 (A), 2004 WL. 2169394 (Sup. Ct., N.Y. Co. 2004) ......28-29

*Chateau Chamberay Homeowners Assoc. v. Associated*
*Int'l Ins. Co.,* 90 Cal. App. 4th 335 (Cal. Ct. App. 2001)............................. 32

*J.A.O. Acquisition Corp. v. Stavitsky,*
192 Misc. 2d 7, 745 N.Y.S.2d 634 (Sup. Ct., N.Y. Co. 2001) ..................... 30

*Kidalso Gas Corp. v. Lancer Ins. Co.,*
21 A.D.3d 779, 802 N.Y.S.2d 9 (1st Dep't 2005).......................................... 12

*Star City Sportswear, Inc. v. Yasuda Fire & Marine Ins. Co.,*
1 A.D.3d 58, 765 N.Y.S.2d 854 (1st Dep't 2003),
*aff'd,* 2 N.Y.3d 789 (2004) ........................................................................ 25

*Maroney v. New York Central Mutual Fire Insurance Co.,*
5 N.Y.3d 467, 805 N.Y.S.2d 533 (2005) ...................................................... 17

*Matza v. Oshman, Helfenstein & Matza,*
823 N.Y.S.2d 47, 2006 Slip. Op. 07612 (1st Dep't Oct. 24, 2006) .............. 34

*Medill v. Westport Insurance Corp.,*
143 Cal. App. 4th 819, 49 Cal. Rptr. 570 (Cal. App. 2 Dist. 2006) ............. 18

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,*
86 N.Y.2d 685, 636 N.Y.S.2d 734 (1995) .................................................... 28

*Portofino Ristorante & Catering, Inc. Michigan Millers Mut. Ins. Co.,*
198 A.D.2d 869, 604 N.Y.S.2d 438 (4th Dep't 1993) .................................. 16

*Sulner v. G.A., Ins. Co. of New York,*
224 A.D.2d 205, 637 N.Y.S.2d 144 (1st Dep't), *lv. to app. denied,*
88 N.Y.2d 805 (1996) .................................................................................. 29

*Waller v. Truck Insurance Exchange, Inc.,*
11 Cal. 4th 1 (Cal. 1995) ............................................................................. 31

EXHIBIT _φ_, PAGE _408_

*Zappone v. Home Insurance Co.*,
55 N.Y.2d 131, 447 N.Y.S.2d 911 (1982) .................................................................... 15

EXHIBIT __Φ__, PAGE __409__

## AMERICAN ARBITRATION ASSOCIATION

AMERICAN INTERNATIONAL
SPECIALTY LINES
INSURANCE COMPANY
    Claimant – Counter Respondent

- v.-

THE UPPER DECK COMPANY, RICHARD
P. McWILLIAM, and the MPR
REVOCABLE TRUST
    Respondents – Counterclaimants.

Case No.
13 195 02486 05

John F. Byrne, Esq.
Stephen D. Kramer, Esq.
Charles J. Moxley Jr., Esq.

## **CLAIMANT'S POST-HEARING MEMORANDUM**

### **PRELIMINARY STATEMENT**

Under a Policy requiring the insurer and insured to cooperate and, if necessary, defend a tax plan, Respondents seek coverage after abandoning the tax plan long ago without telling AISLIC.  In May 2001, Respondents presented to AISLIC, as worthy of $50 million in insurance coverage, a specific tax plan already defined by Respondents and their advisors in documents to be annexed to and deemed part of the Policy.  The KPMG Opinions presented for coverage an S Corporation Charitable Donation ("SC$^2$") tax plan, based on what was opined to be a valid charitable donation by Respondents to the Austin Firefighters Relief and Retirement Fund ("Austin" or "the Fund").  Critical to the validity of the tax plan -- and to AISLIC's agreement to insure it -- was the payment of fair market value to the Fund both at the time of donation and at the time of redemption.  Respondents therefore

EXHIBIT ___ϕ___, PAGE _4/0_

represented to AISLIC in the KPMG Opinions that fair market value must be paid in "any" redemption or exercise of right of first refusal under the Shareholders Agreement.  In the event of redemption, the Shareholders Agreement provided for an independent appraisal, which KPMG opined provided a safe harbor from the second class of stock rule.

Sixteen months after AISLIC bound the Policy, Respondents exited the $SC^2$ strategy without a word to AISLIC.  They replaced fair market value with a $2 million accommodation fee that, as Mr. Bendheim testified, "was fair only from the standpoint that's what the company was willing to pay" (Tr. 1202, lines 3-8).  They replaced the Shareholders Agreement with a Share Purchase Agreement and treated Austin's shares as mere "pieces of paper" without any economic substance.  By extinguishing Austin's right to a put, the Share Purchase Agreement enabled Mr. McWilliam to receive a $75 million distribution, without having to pay 90% of it to Austin.

Respondents claim that they were free to pay whatever they wanted for Austin's shares, and use whatever means they chose to obtain them, without saying a word to AISLIC.  However, where what is insured is carefully laid out in documents drafted by the insured and its advisers and annexed to the policy, the insured cannot do whatever it wants.  Under the Policy's definition of Insured Tax Loss, there is no coverage for doing whatever Respondents wanted.  Rather, when Respondents exited from the tax plan without AISLIC's consent, the risk of loss was allocated back to Respondents.

Even if Respondents could somehow reconcile an "ad hoc willy-nilly" transaction accomplished by deception of the Fund with the definition of Insured Tax Loss, other provisions of the Policy would nevertheless preclude coverage.  Exclusion 3(h), which broadly links Respondents' unauthorized termination of the Shareholders Agreement to the

EXHIBIT  $\phi$,  PAGE  411

settlement loss, would apply since the "bad facts" (Tr. 506) associated with Respondents' cheating Austin out of $11 million in fair market value in order to pay Mr. McWilliam a $75 million distribution would become part of a transaction that could no longer be defended. There is a significant difference between defending before an appeals court what would have been a ten-fold increase in the value of Austin's shares and having to defend a transaction that was merely a prelude to a $75 million distribution to the taxpayer.

Respondents are also precluded from coverage by their breaches of warranted assumptions and understandings that were the "basis to underwrite the policy in the first place" (Tr. 111). The unrebutted testimony is that if the KPMG opinions had presented the Put as merely "an economic bone to the charity" (Tr. 1140), instead of as a vital element of the tax plan, AISLIC would never have agreed to insure the tax plan. Coverage is also precluded by Respondents' failure to observe an express condition precedent to coverage, by deciding to exit the tax plan, instead of following the tax plan and taking a charitable deduction. Finally, an insurer cannot be in bad faith where an insured fails to recognize even "some implicit obligation ... to act in good faith vis-à-vis the objectives of the strategy"(Tr. 1166) and doesn't "even think it an issue" to notify the insurer (Tr. 1248).

## STATEMENT OF FACTS

### A.    *The Tax Plan Presented To AISLIC By Respondents for Coverage*

In May 2001, Respondents presented to AISLIC for coverage "*a specific discrete transaction* "(Tr. 38, line 21), already defined in documents drafted and executed by Respondents and their advisors. (Tr. 31, lines 3-5; Tr. 38-39; *see, e.g.*, Exs. 10, 15). AISLIC was asked to insure a tax plan involving a transaction already closed (Ex. 15) in which KPMG opined that Respondents "should" prevail, i.e., that there was a 70% or greater

#254673v1

EXHIBIT _Q_, PAGE 4/2

probability of success, if challenged by the IRS on the second class of stock issue and was "more likely than not" to prevail, a greater than 50% probability of success, on other issues. (Ex. 6, at AI0003783; Ex. 34).

A critical component of the transaction, as explained by KPMG, was Austin's right to put the stock back to Upper Deck, with the "redemption price to be determined using the same methodology that was used by the donor to value the charitable contribution of the stock...." (Ex. 8). KPMG opined that fair market value must be paid in any redemption or exercise of right of first refusal under the Shareholders Agreement. (Ex. 104, at AI0000631; Tr. 111, lines 17-24, Benjamin: *"That was the underlying premise for the opinion and the conclusions that were drawn in the opinion."*; Tr. 229-30, Lathrop: *"Page 3 states as a fact that the redemption amount is the fair market value, and that's echoed in the third full paragraph on page 6 and also in paragraph 2 on page 7"*).[1]

The importance of fair market value, mentioned eighteen times in the KPMG opinions, is that in order to show a valid charitable contribution, i.e., that the charity was the beneficial owner of its shares, the charity had to have the benefit of any increase in the value of its shares and bear the risk of any decrease in the value of its shares. (Tr. 33, lines 3-10; Tr. 166, lines 14-25). Respondents chose Austin as the donee of Upper Deck Non-Voting Common Stock over two other funds because Austin did not require a "guarantee that the fair market value of the stock if and when the stock was 'put' to UDC would be equal to the fair market value of the stock upon contribution to the Pension Plan."(Ex. 281, p.7, ¶19).

---

[1] Unless in block quotes, hearing testimony and statements of counsel and panel members during the hearing will be distinguished by italics.

4

Similarly, prior to insuring Upper Deck, AISLIC turned down one $SC^2$ transaction because the shareholders agreement set a redemption floor price (Tr. 32, lines 1-16; Tr. 174, lines 18-22), and AISLIC approved another transaction only after the shareholders agreement was amended to provide for the payment of fair market value in all circumstances. (Tr. 177).

The Shareholders Agreement provided for a put, whereby Austin had the right, during a 180-day period commencing April 1, 2003, to require Upper Deck to redeem its shares for fair market value as determined by an independent appraisal firm. (Ex. C to Ex. 104, §5.3). As Mr. Lathrop testified, the put was critical because "*if you take them out for just a small amount of money, you get the problem that you are accused of parking the stock.*" (Tr. 179, lines 12-17). Obtaining a fair market appraisal, as KPMG opined (Ex. 104, at AI0000623), was also important to come within the safe harbor provision for avoiding a second class of stock determination.

Based primarily on its review of the KPMG Opinions presented to AISLIC for coverage (Tr. 159, lines 1-10), AISLIC's Tax Department determined "*[t]hat the transaction, if carried out as outlined by KPMG, worked from a tax standpoint.*" (Tr. 166, lines 13-16). AISLIC proceeded to underwrite the Policy based on the assumption in the KPMG opinions "*that the redemption would be at fair market value and an independent appraisal would be conducted.*" (Tr. 111-12). On September 4, 2001, Respondents executed a Representation Letter warranting the truth and correctness of the "facts, assumptions of fact, and understandings of fact set forth in the opinions of KPMG," as well as their inability to compel the redemption of Austin's shares. (Ex. B to Ex. 104). The Policy was bound in August 2001 and issued in January 2002. AISLIC agreed to provide $50,000,000 in coverage "in reliance upon the representations made and documents provided," subject to a

#254673v1

EXHIBIT  Ø , PAGE  44

$500,000 retention, for 90% of an Insured Tax Loss, defined as "any Taxes, Interest, fines or penalties owed by any Insured to a Taxing Authority directly related to the Insured Tax Event, subject to all of the terms, conditions and exclusions of the policy." (Ex. 104, § 2 (j)). Among the key provisions of the Policy, set forth at pages 6-7 of Claimant's prehearing brief, is Exclusion 3(h), which was designed to prevent any deviation from the tax plan by excluding coverage for Loss arising from any amendment to the Shareholders Agreement without AISLIC's consent.

**B.    *Respondents' Deviation From The Tax Plan Without AISLIC's Consent***

        In August 2002, Upper Deck started experiencing a surge in net sales in large part attributable to Yu-Gi-Oh! (Tr. 286-87; Ex. 382). The surge continued and spiked beginning in October 2002, with sales exceeding $80 million in each of the last three months of 2002. (Ex. 382). In late 2002, Mr. McWilliam decided to get out of the SC$^2$ transaction by year-end 2002. (Tr. 268, 359). He testified that he did so because the SC$^2$ was "*getting a lot of press*"(Tr. 268, lines 9-13)[2] and he was concerned with becoming "*locked in a freeze position*" that would prevent him from managing the company and engaging in activities such as making distributions for taxes. (Tr. 359, lines 9-14). In 2003, Mr. McWilliam did take a $75 million distribution from Upper Deck (Tr. 274, lines 21-24; Ex. 370), of which Austin would have been entitled to 90% if it had still been a shareholder. (Tr. 275-76).

        Mr. McWilliam testified that he arrived at a $2 million purchase price for Austin's shares by adding a 50% return to the $1.3 million at which Austin's shares were

---

[2] There is nothing in the record to suggest that SC$^2$ was getting a lot of press as early as 2002 and none of the articles in the record regarding IRS scrutiny of KPMG tax shelters came from Respondents' files.

EXHIBIT _Ø_, PAGE _445_

valued by FMV, Inc. in March 2001. (Tr. 271-72). The price was not subject to negotiation (Tr. 271, lines 17-21) and no appraisal was conducted (Tr. 276, lines 17-20). He testified that he wanted to complete the transaction by year-end because, as a former accountant, he was "*a little anal when it comes to doing transactions by year end.*" (Tr. 272, lines 6-13).

He testified that he vetted the transaction with Mr. Bendheim of KPMG (Tr. 268, lines 20-25; 375, lines 11-14). However, Mr. Bendheim testified that the only contact he had with Upper Deck regarding the purchase of the shares "*was the company coming to me, that they were going to repurchase the shares and that the price that they were willing to pay was $2 million and that was it.*" (Tr. 1221-22; Tr. 1220, lines 13-16). Mr. Bendheim testified that he had no knowledge as to whether the purchase needed to be at fair market value or not because he wasn't involved in drafting the KPMG opinions. (Tr. 1223, lines 10-15). Mr. Bendheim testified that he told Upper Deck that the shares needed to be repurchased by Mr. McWilliam and "*that they should also inform the insurance company so that they're aware of it, too.*" (Tr. 1222, lines 13-15). This testimony was not rebutted by Respondents. Mr. Bendheim further testified that the Company told him that it wanted to purchase Austin's shares by year-end because it "*was trying to expand operations into Europe.*" (Tr. 1206, lines 8-14).

When Austin was approached regarding the proposed early redemption of its shares, William Stefka, administrator of the Fund, requested a copy of the March 2001 FMV, Inc. appraisal "*to get an idea of what the fair market value of the shares were.*" (Ex. 145;

7

EXHIBIT _Q_, PAGE _416_

Tr. 401, lines 14-15).[3]  The original draft of the Share Purchase Agreement (Ex. 147), never

sent to Austin, contained a provision that "Austin has had an adequate opportunity to review

the financial books and records of the company and has been given the opportunity to ask

questions of the officers [of the Company]." (Id., § 3.5).  The provision was deleted from the

draft sent to Austin on December 3, 2002 (Ex. 151) and Austin "*did not talk to the officers of

the Company.*" (Tr. 1198, lines 22-24).  The draft agreement that was sent to Austin, on

December 3, 2002, did contain a provision whereby Austin warranted its "independent

determination that the price being paid to it for the Non-Voting Shares is fair to it and has

been negotiated at arms-length…." (Ex. 151, §3.5).  That provision was also deleted

(Tr. 403), after the attorney for Austin, Terrence Kendall, sent a December 5, 2002 letter,

which requested information from Upper Deck "that would enable the Fund to make the

representation … that the Fund has independently determined that the price is fair."

(Ex. 156).

      Mr. Stefka requested income statements from the Company "*to get an idea of

the value of the company, and to see if their business is growing from year to year.*" (Tr. 406,

lines 8-10).  Upper Deck provided Austin with income statements for the nine-month period

ending September 30, 2002, based on which Upper Deck's annualized income was

represented to be "approximately $39,359,073." (Ex. 160).  Upper Deck was aware at the

time of the huge spike in income largely attributable to Yu-Gi-Oh! sales (Tr. 286-87) since

it had the financial statements for October 2002 (Tr. 273, lines 11-13), not produced to

---

[3] Mr. McWilliam testified that Mr. Manth of KPMG made the offer to Austin for its shares
(Tr. 269, lines 1-7) because he "had a relationship with the Fund" (Tr. 279, lines 9-11).  Mr.
Stefka testified, however, that he did not know and never met Mr. Manth (Tr. 402, lines 8-10).

EXHIBIT _G_, PAGE _417_

Austin (Tr. 423, lines 10-11), showing net income in one month alone of $46,596,546. (Ex. 382).

Austin did not engage in any negotiation with Upper Deck regarding the $2 million purchase price. (Tr. 415, lines 9-12). In a December 9, 2002 letter, Austin was told that the "real fair market value is whatever the Upper Deck Company is willing to pay for it" and that Upper Deck was "not willing to pay one dollar more." (Ex. 159). Mr. Bendheim, who told Austin that, testified: "*It was fair only from the standpoint that's what the company was willing to pay*" (Tr. 1202, lines 3-8). Austin was also told by Mr. Bendheim in the same letter: "Any delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk." (Ex. 159).

Because it believed "*time was of the essence*"(Tr. 423-24), Austin approved the Share Purchase Agreement the next day, December 10, 2002. (Ex. 161). Instead of determining whether the $2 million purchase price was fair market value, Austin, in view of Upper Deck's wanting to do something by year-end, "*as a courtesy*," agreed to the $2 million purchase price (Tr. 445-46). Respondents executed the Share Purchase Agreement, dated as of December 10, 2002 (Ex. 162), which, pursuant to Section 5.3, terminated "Austin's rights and obligations under the Shareholders Agreement." Respondents never followed Mr. Bendheim's advice to inform AISLIC that they were going to enter into the agreement (Tr. 267), although Mr. McWilliam testified that he did ask Upper Deck's attorney whether the Share Purchase Agreement "*would have an impact on the insurance policy.*" (Tr. 283, lines 1-6).

The December 30, 2002 corporate resolution (Ex. 171), by which Upper Deck approved the Share Purchase Agreement, provided:

9

EXHIBIT 𝒟 , PAGE 418

> Whereas, Austin Firefighters Fund will have the right to require the
> Corporation to repurchase the Non-Voting Shares for fair market value
> thereof, also payable in a lump sum cash payment, during the six month period
> commencing on April 1, 2003 (the "Put Right") and it is anticipated that
> Austin Firefighters Fund would exercise such right as it has no other means of
> liquidating those Shares.

In 2003, Mr. McWilliam received a $75 million distribution from Upper Deck (Ex. 370;

Tr. 274, lines 21-24).

### C.   Respondents' Continued Failure To Inform AISLIC

AISLIC's *"intent was to seek to validate the strategy if it were ever tested."*

(Tr. 675, lines 2-4).  Respondents did not disclose to AISLIC, until March 25, 2004, that they

had already redeemed Austin's shares.  (Ex. 218; Tr. 676, lines 21-24).  At that point, both

Upper Deck and AISLIC were in agreement on trying to defend the transaction, with Upper

Deck's counsel communicating *"their desire to file [for a refund] in District Court."*

(Tr. 677-78).  AISLIC attempted to get more information about the redemption (Tr. 680,

lines 16-19; Tr. 682, lines 16-22), but except for the barest of details (Ex. 232 (p.2); Tr. 685),

received nothing. (Tr. 691, lines 21-25:  *"We had received nothing since the brief summary.*

*We wanted to understand, as we had asked previously, how the redemption took place so that*

*we could consider its impact on coverage... on ... how the IRS might view the strategy."*).

On May 11, 2004, AISLIC's counsel sent a reservation of rights letter

(Ex. 226; Tr. 682, lines 3-7).  Meanwhile, AISLIC had previously agreed, in August 2003, to

advance defense costs, even though based on consultation with coverage counsel (Tr. 716,

lines 20-21) it disputed the existence of a Claim under the Policy.  (Ex. 195; Tr. 723-24;

10

EXHIBIT __φ__, PAGE _419_

Tr. 683, lines 18-22, Mr. Jones: "*I thought that was a reasonable approach so we can understand and work with Orrick and Upper Deck to understand what it was they faced in any potential challenge to the strategy.*").

In December 2004, in response to Information Document Requests, Upper Deck provided documents to the IRS regarding Upper Deck's repurchase of Austin's shares in December 2002. (Ex. 243, pp. 15-16, item E: "Redemption or Stock Acquisition"; Ex. 270, pp. 7-8, item E; Ex. 281, p.9, item E, p.5 (last ¶), p.8 (1st ¶)). The IRS, after receiving the requested documents, on April 7, 2005, made an offer to settle <u>all</u> issues relating to the Upper Deck transaction. (Ex. 288). At a meeting held soon thereafter at the offices of Respondents' new coverage counsel in Los Angeles, Respondents informed AISLIC that they had "*changed their position and they wanted to settle with the IRS.*" (Tr. 690, lines 22-23). On July 29, 2005, after finally receiving access to documents explaining the circumstances of the redemption, AISLIC denied coverage. (Ex. 303; Tr. 692).

## ARGUMENT

### POINT I

### RESPONDENTS HAVE FAILED TO SATISFY THEIR <u>BURDEN OF SHOWING AN INSURED TAX LOSS</u>

In late 2002, Respondents decided to get out of the $SC^2$ tax plan. They made Austin a take it or leave it $2 million offer (Tr. 277, lines 4-6), amounting to nothing more than an accommodation fee. (Tr. 445-46). They proceeded to extinguish Austin's right to a put (Ex. 171), thus enabling Mr. McWilliam to receive a $75 million distribution without having to pay 90% of the distribution to Austin. (Tr. 275-76). Having thus embarked on an

EXHIBIT _Q_, PAGE _420_

"*ad hoc willy- nilly transaction*" nowhere contemplated by the KPMG opinions, Respondents cannot possibly satisfy their basic "burden of showing that the insurance contract covers the loss for which the claim is made." <u>Kidalso Gas Corp. v. Lancer Ins. Co.</u>, 21 A.D.3d 779, 780-81, 802 N.Y.S.2d 9, 11 (1st Dep't 2005).

    "Documents may be incorporated into insurance policies by explicit reference or by annexation or attachment to the policy." <u>Bacchus Assocs. v. Hartford Ins. Co.</u>, 766 F. Supp. 104, 108 (S.D.N.Y. 1991), *citing*, *Couch on Insurance 2d* at §4.46 (rev. ed.). "'A reference in a contract to another writing, sufficiently described, incorporates that writing.'" <u>Ibid.</u>; <u>Lowry & Co. Inc. v. SS. Le Moyne D'Iberville</u>, 253 F. Supp. 396, 398-99 (S.D.N.Y. 1966), *appeal dismissed*, 372 F.2d 123 (2d Cir. 1967) (holding that where bill of lading incorporated by reference "all conditions and exceptions as per charter party," strike and arbitration clauses in charter party were fully incorporated into bill of lading).

    The Policy incorporated the KPMG opinions by attaching them as Exhibit A to the Policy and expressly stating that they are "deemed a part of the Policy." (Policy, § 2(n)). The KPMG Opinions, along with the Shareholders Agreement, Warrant Agreement and FMV, Inc. appraisal, also attached to the Policy, set forth the insured transaction. (Ex. 34: "this is a tax transaction insuring a 'more likely than not' and a 'should' opinion from KPMG relating to a S Corp Charitable Contribution strategy").

    Where, as here, what is insured is specifically set forth in documents annexed to the Policy, the taxpayer cannot, as Respondents contend, "*do whatever it wanted.*" (Tr. 1243-44: stating Respondents' position that it could have paid Austin not "*a nickel more than $500,000 ... take it or leave it*"). "To recover on an insurance policy, the insured must show that a loss was suffered, and that the loss was covered by the policy. [citation omitted].

#254673v1

EXHIBIT  _ᗡ_ , PAGE _451_

An insurer is not liable for noncovered losses." Americas Ins. Co. v. Stolt-Nielsen, Inc.,

2004 WL 2199497 (S.D.N.Y. 2004) (holding there was no coverage where freight was

unearned because it was not delivered to its destination).  Thus, pursuant to the Policy's

definition of Insured Tax Loss, the Policy only covers taxes and interest "subject to all of the

terms, conditions and exclusions of the Policy"(Policy, §2(j)), including the terms and

conditions set forth in the KPMG opinions "deemed a part of the Policy."  (Tr. 1040: "*if*

*there were specific documents that were annexed ... to a policy, that purport to describe that*

*which is being insured, it becomes one in the same policy.  You've got to read the documents*

*and you've got to read the policy to understand what's being insured.*").

     Significantly, AISLIC did not draft the KPMG opinions or the other

documents annexed to the Policy.  Rather, in May 2001, Respondents presented to AISLIC

for coverage a transaction based on documents that had already been negotiated and drafted

by Upper Deck's attorneys and accountant KPMG. As Mr. Benjamin testified (Tr. 38):

> One of the things which is unique with the tax insurance product
> is that ... we underwrite to a specific discrete transaction... So
> the tax transaction that we are underwriting is really defined for
> us by our potential insured and their advisors in the form of a
> tax opinion.

Thus, the rule of *contra proferentem*, on which Respondents heavily rely to excuse their

actions (Tr. 1151), does not apply, especially given that Article 16 of the Policy provides:

"the Policy shall be construed in the manner most consistent with the relevant terms,

conditions, provisions or exclusions of the Policy, without regard to the authorship of the

language and without any presumption in favor of either party."  (Ex. 104, Art. 16).

St. Paul Fire & Marine Ins. Co. v. Royal Ins. Co. of America, 1994 WL 167943 at *2

(S.D.N.Y. 1994) ("Where the insured had contributed at least equally to the drafting of the

#254673v1

EXHIBIT _5_, PAGE _422_

policy, however, the application of *contra proferentem* is doubtful."); *see also* Schering
Corp. v. Home Insurance Co., 712 F.2d 4,10, n.2 (2d Cir. 1983) ("*contra proferentem* is used
only as a matter of last resort, after all aids to construction have been employed but have
failed to resolve the ambiguities in the written instrument").

The transaction presented by Respondents for coverage described an S
Corporation tax plan set forth in the KPMG opinions. That is what was insured.
(Tr. 1084-85: *"the intended KPMG SC squared transaction, the substance of which and the
workings of which were annexed to the policy"*). The first KPMG Opinion on the Warrants
(at page four) emphasized the importance of obtaining a fair market appraisal in order to
come within the safe harbor provision for avoiding a second class of stock determination.
(Ex. 104, at AI0000623). The second KPMG Opinion on Charitable Contribution (at pages
six and seven) provided that "the purchase price for *any* redemption is the fair market value
measured at the time of redemption." (Ex. 104, at AI0000631; emphasis added). The
importance of fair market value as central to upholding the tax plan, and the Shareholders
Agreement providing for fair market value, is stressed throughout the KPMG Opinions.
(Ex. 104, at AI0000627, AI0000630). Otherwise, as explained in the Opinion, the
redemption risked running afoul of the second class of stock rule by establishing a purchase
price "significantly in excess of or below the fair market value of the stock."
(Ex. 104, at AI0000631 ). Page two of the same Opinion set forth Mr. McWilliam's donative
intent, that "[i]n accordance with [his] desire to support Municipal Plan [Austin], on March
31, 2001, [he] donated all of the Non-Voting Common Stock to Municipal Plan."
Respondents' intent "to support" Austin was critical to show that the Tax Plan had a non-tax
purpose, one of the elements for satisfying the economic substance doctrine.

14

EXHIBIT _Ⓖ_, PAGE_423_

All of the elements of the S corporation strategy, together, were presented as vital to KPMG's opinion that the strategy "more likely than not" (or, in the case of the single class of stock requirement, "should") prevail if challenged by the IRS. (Ex. 104, at AI0000627; Tr.1146, lines 5-13: *"Everything leans on everything else... You have to have the put to avoid the parking arrangement and you have to have the fair market value to avoid the second class of stock. Otherwise, the whole thing doesn't work."*).

In December 2002, Respondents scuttled the tax plan (Tr. 1110) and replaced it with a non-negotiable $2 million accommodation fee (Tr. 271-72), with no appraisal (Tr. 276), and which was *"fair only from the standpoint that's what the company was willing to pay."* (Tr. 1202, lines 5-7; Tr. 445, lines 10-12, Mr. Stefka agreeing that Austin's approach was akin to saying, *"[s]o we are just going to take it without really considering whether it is or is not fair market value"*). Respondents' abandonment of the tax plan was deliberate, as was their ignoring Mr. Bendheim's advice to advise AIG of what they were doing (Tr. 1222, lines 13-15), and hiding from AISLIC for more than two years the facts and documents concerning the early redemption (Tr. 676, 691-92).

Where, as here, the insured materially deviates from the insured transaction, there is no coverage, or in the Policy's terms there is no "insured tax loss." <u>Sedco, Inc. v. S.S. Strathewe</u>, 800 F.2d 27, 31 (2d Cir. 1986) (in marine insurance, "the insurer was deemed to have accepted only that risk reasonably contemplated. Where the vessel, without excuse, voluntarily and unjustifiably departed from the usual, commercial or contractual route, the policy was voided"); <u>Zappone v. Home Ins. Co.</u>, 55 N.Y.2d 131,138, 447 N.Y.S.2d 911 (1982) (holding that to require insurer to indemnify for accident in a car other than that insured would "rewrite the policy to expose Home to a risk ... never contemplated");

#254673v1

EXHIBIT  Ø , PAGE 42 4

Portofino Ristorante & Catering, Inc. Michigan Millers Mut. Ins. Co., 198 A.D.2d 869, 869-70, 604 N.Y.S.2d 438 (4th Dep't 1993) (no coverage for fire to restaurant, where "contrary to the facts stated in application for insurance, there were major deficiencies in the premises that did not meet defendant's underwriting guidelines and that constituted a material change in the nature and extent of the risk of loss beyond that contemplated by the parties").

To put it another way, when a policy bases coverage on certain terms and conditions -- as did the Policy's definition of Insured Tax Loss and the very first sentence of the Policy premising coverage on "the representations made and documents provided" -- and those terms and conditions do not occur, the risk of coverage is allocated back to the insured. Great American Ins. Co. v. J. Aron & Co., Inc., 1995 WL 495492 at * 5 (S.D.N.Y. 1995) (where policy of buyer expressly contemplated the existence of other insurance "provided by the seller," the insurance policy of the insured buyer "allocated the risk of Sellers' failure to procure the insurance to J. Aron (the insured buyer) rather than to the Underwriters [the insurer]"). When, in December 2002, Respondents charted their own course, they steered their plan outside the parameters of the tax plan covered by the Policy. Accordingly, there is no coverage.

## POINT II

### EXCLUSION 3(h) BARS COVERAGE DUE TO RESPONDENTS' TERMINATION OF THE SHAREHOLDERS AGREEMENT WITHOUT AISLIC'S CONSENT

**A.    *The Settlement Liability Necessarily Arises Out of Respondents' Deviation From the Shareholders Agreement***

Exclusion 3(h) of the Policy provides that AISLIC, without its prior written consent, shall not be liable to make any payment for Loss "to the extent such Loss arises out of, is based upon, or is attributable to an amendment to the Shareholders Agreement." The

16

EXHIBIT ⊘, PAGE 425

New York Court of Appeals reaffirmed in <u>Maroney v. New York Central Mut. Fire Ins. Co.</u>,

5 N.Y.3d 467, 805 N.Y.S.2d 533 (2005), the "broader significance" of the words "arising out

of" in an insurance policy exclusion "to mean originating from, incident to, *or having*

*connection with.*" <u>Maroney</u>, 5 N.Y.3d at 472, *quoting*, <u>Aetna Cas. & Surety Co. v. Liberty</u>

<u>Mut. Ins. Co.</u>, 91 A.D.2d 317, 320-21 (4th Dep't 1983) ("The words 'arising out of' *have*

*broader significance than the words 'caused by'*…")(emphasis added).

      In negotiating the policy exclusions, the parties understood the distinction

between "arising out of" and "caused by" language, and therefore, Respondents negotiated

for stricter language with respect to Exclusion 3(i), after it was separated out of Exclusion

3(h), which Mr. Benjamin at first resisted:

> 2. Section 3(i) – We have separated this exclusion as requested.
> However, we were unable to use the "directly related to"
> language requested after discussions with counsel.  As we
> continue to be flexible and accommodating as possible, instead
> of "arises out of, is based upon, or is attributable to" we would
> use "related to" if you and your client would prefer. (Ex. 71,
> 7/17/01 email from Steven Goldman to Kate Rego, at bottom of
> page one to top of page two).

Respondents' attempt to rewrite the policy (Tr. 1229: *asserting a "dominant and efficient"*

*causation requirement*) is therefore not only at odds with the New York Court of Appeals'

holding in <u>Maroney</u>, but also with Respondents' own prior understanding in negotiating for

stricter language than "arising out of" language with respect to Exclusion 3(i).

      Exclusion 3(h) only requires "that there be *some* causal relationship between

the injury and the risk for which coverage is provided." <u>Maroney</u>, 5 N.Y.3d at 472, 805

N.Y.S.2d at 536 (emphasis added).  As the California appellate court held last month in

17

EXHIBIT _Q_, PAGE _426_

<u>Medill v. Westport Ins. Corp.</u>, 143 Cal. App.4[th] 819, 49 Cal. Rptr. 570, 578 (Cal. App. 2 Dist. 2006):

> It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship.

Here, the fact situation to which Exclusion 3(h) speaks is Respondents' termination of the Shareholders Agreement without so much as a word to AISLIC, because, according to Respondents, "*we did not think it important at the time*" (Tr., 1250, lines 23-24), and then hiding what they had done from AISLIC for two more years (Tr. 1093, lines 9-10: ("*you did the deal almost two years ago and now you're talking to us?*"). Respondents' taking it upon themselves to abandon the tax plan and hide that fact for two years from AISLIC is necessarily "connected to" the settlement liability incurred by Respondents. For one thing, it deprived AISLIC of what it bargained for under the Policy: the "*option of funding the contest costs and litigating the matter if it's the generic dea*l." (Tr. 1236 (lines 5-7); Tr. 565-566). The unrebutted testimony is that AISLIC would not have entered into the transaction in the first place (Tr. 1156, 1-6), if, at redemption, Respondents could do whatever they wanted without asking for AISLIC's consent.

Moreover, as Respondents' expert conceded, the economic substance issue was "*the critical issue*" in determining the validity of the tax plan (Tr. 826, lines 15-19), and would involve "*a very fact-intensive inquiry*," including an "*analysis of the facts to see whether the true substance of the transaction is different from its form, or whether the form reflects what actually happened.*" (Tr. 826-27). The IRS Information Document Requests addressed the facts and circumstances of the redemption and Upper Deck produced the

#254673v1

EXHIBIT *Q*, PAGE 427

requested documents (Ex. 243, pp. 15-16, item E:  "Redemption or Stock Acquisition"; Ex.

270, pp. 7-8, item E; Ex. 281, p.9, item E, p.5 (last ¶), p.8 (1st ¶)).[4]  The IRS, after receiving

the requested documents, offered to settle all issues relating to the transaction (Ex. 288).

Most importantly, any court determination and appeal would necessarily have to look at the

tax plan as actually carried out.  The tax plan "*as actually carried out in December 2002,*

*lacked that appraisal*" (Tr. 850, lines 23-25) and any semblance of an arms length

transaction and was merely a vehicle for paying Mr. McWilliam a $75 million distribution.

As Linda Burke, former Chief Tax Counsel for the IRS put it, as a result of the December

2002 transaction, Upper Deck was placed in the "bad facts" category of cases forced to

accept the IRS settlement:

> However, the concern we always had in the Office of Chief
> Counsel in offering such settlements was that the cases with the
> bad facts would accept the settlement offers, and the cases with
> the good facts would be litigated.  It appears to me that the
> Company was forced to take the settlement offer because the
> early redemption at less than fair market value put the
> transaction as executed in the "bad facts" category.  Had the
> transaction been executed as structured, it had a good chance of
> winning in litigation, because economic substance is
> fundamentally a factual case to make, and the facts would have
> been good. (Linda Burke's rebuttal report, at 8-9; see also Tr.
> 506).[5]

---

[4]  Mr. Wahlquist, in closing argument (Tr. 1249), points to the first IRS IDR served in the summer of 2003 (Ex. 184).  However, the first IDR had nothing to do with the $SC^2$ transaction and was served well before the April 2004 IRS listing notice of $SC^2$.

[5]  At the Panel's request, AISLIC submitted a demonstrative chart concerning its four $SC^2$ policies (Ex. 390).  Each of the $SC^2$ transactions insured by AISLIC rests on its own particular facts and circumstances (Tr. 1121), which have contributed in each particular transaction to the taxpayer's position against the IRS, as well as AISLIC's coverage position.  As the chart indicates and as Mr. Jones testified (Tr. 692-94), AISLIC made payment in Spencer Forrest under a non-waiver agreement; in Award Homes/Santa Clara, the insureds are contesting the IRS and have not yet requested payment from AISLIC; and, finally, in Clement Pappas, the insured settled with the IRS and AISLIC paid the full policy limit.

#254673v1

EXHIBIT _Φ_, PAGE _428_

Under the courts' broad interpretation of "arising out of" language in policy exclusions, there's been a clear showing that the December 2002 share repurchase was linked to the settlement loss, since the "bad facts" associated with the December 2002 transaction became part of a transaction which could no longer be defended.

**B.**   ***The Termination of the Shareholders Agreement Materially Reduced The Prospect of Upholding the Tax Plan***

As even Respondents' expert was eventually forced to concede, the basis for a district court or appeals court determination concerning the validity of the Upper Deck tax plan would be the issue of economic substance. (Tr. 799, lines 8-9, Mr. Mather: "*But they will rule based on analysis of factors...*").  Prior to Respondents' termination of the Shareholders Agreement, any increase in the value of its shares belonged to Austin and any decrease in the value of its shares would have been borne by Austin. (Tr. 621, lines 1-4; Tr. 799, lines 23-24, Mather: "*you could argue that it does in this case*"; Tr. 621, lines 10-21: R. Burke: "*I don't think there is much question that ... the charity would be treated as the owner ... for the IRS to upset it they would have to go up against, you know, hundreds of cases that look at the economic benefits and burdens of ownership.*").  The right to exercise the Put pursuant to the Shareholders Agreement gave Austin a readily available mechanism for realizing a nearly ten-fold increase in the value of its stock from $1.3 million to more than $11 million.  (Tr. 831-32; Mr. Byrne: "*it's the Put that gives it value... And at the time of the Put, there is a high value placed on the shares that are being bought back...*"; Tr. 461-62, Ms. Burke: "*the facts ... developed from the transaction as structured were excellent*").  A fair market value appraisal was also "*an important safety measure in coming within the Safe Harbor regulations.*"  (Tr. 850, lines 19-22).

20

EXHIBIT _Q_, PAGE 429

It was only as a result of the termination of the Shareholders Agreement that Austin's shares were rendered what Respondents' expert described as mere "*pieces of paper*" with "*no economic consequences whatsoever*" (Tr. 776-77). Austin was deprived of the high economic value conferred by the Put (Tr. 832, lines 1-5; Tr. 614, lines 11-14), and could no longer take advantage of the Safe Harbor regulations. (Tr. 850-51; Tr. 535, line 7: "*Yes, that is a very large concern.*"). The prospects of defending the tax plan were thereby materially decreased both with respect to a challenge by the IRS under the economic substance doctrine set forth in <u>Sacks v. Commissioner</u>, 69 F.3d 982, 988 (9th Cir. 1995), and the second class of stock rule.

Finally, the manner in which Austin's shares were redeemed also materially decreased the prospect that an appeals court would have upheld the transaction as carried out. Upper Deck told Austin that $2 million was all it would pay and that "for business reasons" it had to be done by year-end (Tr. 421-22), i.e., "*before [Austin] found out ... what the spike in earnings were for the end of 2002.*" (Tr. 592-93). Austin's independent determination of fairness was carved out of the Share Repurchase Agreement (Tr. 403) and $2 million was paid as an accommodation fee. (Tr. 443-46; Tr. 603: "*And they wouldn't just kind of go 2 million is a big number*"). In sum, there is a substantial difference between defending a transaction in which the charity receives a nearly ten-fold increase in the value of its shares and defending a transaction which was merely a prelude to paying the shareholder a $75 million distribution.

#254673v1

EXHIBIT _Q_, PAGE 430

### C.    *The Comparison of Benefits Approach Is Legally Baseless*

Confronted with an appraised fair market value of Austin's shares more than

500% greater than what Austin was paid for its shares, Respondents manufacture a

comparison of benefits approach that is without legal authority and which founders against

Congress' undiminished intent to allow tax-exempt charities to own stock in Subchapter S

Corporations.  Mr. Mather opines that the numerical disparity between $66 million in tax

benefits to Mr. McWilliam compared with $11 million in economic benefit to Austin would

have been too great to withstand attack by the IRS.  No court of appeals or district court has

ever adopted such an approach,[6] which as Mr. Mather seems to acknowledge (Tr. 776, lines

14-19), is dismissive of the entire body of controlling caselaw on the economic substance

doctrine "*of what the Federal Circuit defines economic substance as or what, you know,*

*some other court would say well, is it a subjective factor or objective factor, or one, or*

*both*") (Tr. 621-22, Mr. Burke:  "*the IRS would need to [say] ... forget all these cases that*

*have been developed over the last 50 years...*").

Importantly, both the Ninth Circuit and the Federal Circuit have concluded

that the taxpayer's position should be upheld under the economic substance doctrine if the

transaction had <u>any</u> non-tax benefits.  Thus, the Ninth Circuit held in <u>Sacks v. Commissioner</u>,

69 F.3d 982 (9th Cir. 1995):

---

[6]  The only case Mr. Mather could point to, <u>Sheldon v. Commissioner</u>, 94 T.C. 738 (U.S. Tax Ct. 1990), merely noted in determining the subjective factor of profit motive -- not an issue in a charitable donation case -- that the profit potential was "infinitesimally nominal and vastly insignificant when considered in comparison with the claimed deductions." <u>Id.</u> at 768. Similarly, <u>Leslie v. Commissioner</u>, 146 F.3d 643 (9th Cir, 1998), did not deal with economic substance, but rather with a provision of the Deficit Reduction Act of 1984 allowing a deduction of tax loss incurred in a "transaction entered into for profit." <u>Id.</u> at 645-46.

22

EXHIBIT _Ǫ_ , PAGE _431_

> The proper test to apply to a sham question is not a "rigid two-step analysis," we typically focus on the subjective aspect of whether the taxpayer intended to do <u>anything</u> other than acquire tax deductions, and the objective aspect of whether the transaction had <u>any</u> economic substance other than creation of tax benefits.

<u>Id.</u> at 987 (emphasis added). Similarly, in <u>Coltec Industries, Inc. v. United States</u>, 454 F.3d 1340 (Fed. Cir. 2006), the Federal Circuit held that the economic substance doctrine disregards a transfer of stock that has "<u>no</u> business or corporate purpose" and performs "<u>no</u> function" other than to reduce taxes. <u>Id.</u> at 1355 (emphasis added). Other courts have held that a "mere modicum" of profit, <u>Johnson v. United States</u>, 11 Cl. Ct.17, 25 (Ct. of Claims 1986), or a potential for profit that is "more than de minimus," <u>Estate of Thomas v. Commissioner</u>, 84 T.C. 412, 440 (1985), was sufficient to sustain the taxpayer's position. If Austin had received the nearly ten-fold increase in the value of its shares to which it was entitled under the Shareholders Agreement, it would have received a significant financial benefit more than sufficient to satisfy the requirements of economic substance in any court, let alone the "any" economic substance test followed by the Ninth Circuit.

In addition to not being the law in any district or appellate court, Mr. Mather's comparison of benefits approach makes no sense since Congress clearly intended for charities to receive the economic benefits as owners of Subchapter S stock. (Tr. 167-68, Mr. Lathrop: *"In 1996, Congress said ... tax exempt charitable organizations can be shareholders."*) (Tr. 805, lines 11-17: Mr. Mathers agreed with Mr. Moxley's recollection that *"Congress went back at some point, and said 'We are going to permit, in the context of sub S corporations, certain provisions as to charity that seem to relate to, in one way or another, to what has been done here"*). Congress has since held hearings on the SC[2]

#254673v1

23

EXHIBIT _Ø_, PAGE 432

transaction and yet has not changed the law to "*say that's not what we meant*" (Tr. 878, lines 24-25) by allowing charities to own stock in Subchapter S corporations.

In sum, Respondents' comparison of benefits argument is a red-herring. The test that an appeals court would have used to determine the validity of the Upper Deck tax plan is the economic substance doctrine which requires an "*intensive factual inquiry*" (Tr. 827, lines 9-10). Ms. Burke's testimony as the former IRS Division Counsel who supervised "*in the neighborhood of 10,000*" cases (Tr. 564) in the very office that would have been involved in the IRS analysis of the $SC^2$ transaction (Tr. 489), is pertinent. As she opined, if Austin had received the nearly ten-fold increase in the value of its shares, "*it would have been very difficult for the government to win the economic substance argument. Donative intent was clear and the Fund would actually have obtained the benefit of good performance by the Company.*" (Ex. 331, at 14; Tr. 488-89, "*I think the odds of winning the litigation would have been good*"). Instead, as a result of Respondents' scuttling of the tax plan, an appeals court would have evaluated a transaction, as actually carried out in December 2002, which lacked an appraisal (Tr. 850-51), provided for a purchase price which bore no resemblance to fair market value, and was carried out in a manner which repudiated any donative intent. (Tr. 592-95).

## POINT III

### RESPONDENTS' BREACHES OF WARRANTIES PRECLUDE COVERAGE

A.   ***Respondents Breached their Promissory Warranty that Fair Market Value would be Paid for Austin's Shares***

In Respondents' world, they could "enter any kind of tax shelter" they wanted (Tr. 1154). The KPMG opinions that they presented to AISLIC for coverage, *after* they were

#254673v1

EXHIBIT _Ǫ_, PAGE _433_

already executed, were mere scribblings.  According to Respondents, AISLIC -- not

Respondents -- had "an enormous burden of clarity" (Tr. 1151, lines 6-7) with respect to

opinions which AISLIC did not draft and which were presented to AISLIC *by Respondents*

as something worthy of $50 million in coverage.  Respondents claim that the KPMG

opinions did not bind them at all, since they did not contain "*clear, specific and direct*"

prohibitions to the contrary (Id., lines 10-18).  In Respondents' world, their warranty as to

"facts, assumptions of fact, and understandings of facts" is reduced to just "facts"-- and facts

of the most mundane sort such as the existence of documents.  Because the KPMG opinions

meant so little to Respondents, the Put option was to them just an "*economic bone provided*

*to Austin*" (Tr. 1140) that they could take away not long after the ink was dry on the

Shareholders Agreement.  (Tr. 1158, lines 13-14: "*The underlying basic position is just*

*that.*").

Respondents thus create a world of illusion that they did not have the guts to

present to the IRS in their Voluntary Disclosure Statement. (Ex. 131; Tr. 266, lines 8-15:

noting that only option presented was that of paying Austin fair market value pursuant to an

independent appraisal).  However, the Representation Letter did not warrant express

prohibitions, which are the stuff of exclusions, not warranties. Nor did they just warrant the

"facts" set forth at the very beginning of the KPMG opinions.  Respondents warranted

"assumptions" and "understandings" of facts. (Ex. 41, at AI254, Subject to No.1: "*Included*

*in this representation letter, there shall be a representation that the facts, assumptions, and*

*understandings set forth in the opinions of KPMG...*"; Ex. B to Ex. 104).[7]

---

[7]   An express warranty of "assumptions of fact," by its very nature, also constitutes a promissory
warranty under common law which cannot be waived. (ftn. cont'd)

EXHIBIT  *Q* , PAGE 434

As Mr. Benjamin testified (Tr. 111, lines 17-24):

> one of the assumptions in the opinion was that redemption
> would be at fair market value and an independent appraisal
> would be conducted. That was an underlying premise for the
> opinion and the conclusions that were drawn in the opinion.
> That was the basis for us to underwrite the policy in the first
> place.

Fair market value, the critical component to show that a true gift was made, was mentioned

eighteen times in the KPMG opinions. Fair market value was not presented in the KPMG

opinions as some marketing ploy (Tr. 1145, lines 13-15), but rather as a critical assumption

underlying key conclusions in the KPMG opinions. Thus, at page seven of its opinion on

"Charitable contribution to Austin," KPMG set forth the "fair market value test":

> 2) <u>Fair market value test</u>. Under the right of first refusal, Upper
> Deck and the holder of the Voting Common Stock must match
> the bona fide offer to exercise the right. In addition, under the
> redemption agreement the purchase price for any redemption is
> the fair market value measured at the time of the redemption.
> Since the fair market value must be paid under both agreements,
> the second class of stock should also be met.

KPMG therefore opined, based on the assumption that fair market value must be paid in

"any" redemption or exercise of right of first refusal, that the transaction "should" prevail if

challenged on the second class of stock issue. (<u>Id.</u> at 3). In addition to risking running afoul

of the second class of stock rule, as Mr. Lathrop testified, without fair market value being

paid for Austin's shares, *"you get the problem that you are accused of parking the stock, not*

*really transferring it to the charity as an owner."* (Tr. 179, lines 15-17; Tr. 1146, lines 8-13:

---

(ftn. cont'd) <u>Star City Sportswear, Inc. v. Yasuda Fire & Marine Ins. Co. of America</u>, 1 A.D.3d
58, 61-62, 765 N.Y.S.2d 854, 857 (1st Dep't 2003), aff'd, 2 N.Y.3d 789, 781 N.Y.S.2d 255
(2004) ("Not only is endorsement No. 6 a warranty within the meaning of Insurance Law §
3106(a), it also constitutes an express, promissory warranty under common-law principles.").

EXHIBIT Q, PAGE 435

*"you have to have the put ... to avoid the parking arrangement and you have to have fair market value to avoid the second class of stock. Otherwise, the whole thing doesn't work"*).

Respondents proved false the assumptions of fair market value and an independent appraisal -- not to mention donative intent -- on which AISLIC relied in providing $50 million in coverage. As a result they breached warranties regarding assumptions that were material, not merely "collateral to the primary risk." <u>Hartford Fire Ins. Co. v. Mitlof</u>, 208 F. Supp.2d 407, 411 (2d Cir. 2002); <u>Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.</u>, 190 F.3d 26, 31 (2d Cir. 1999). Accordingly, Respondents should be precluded from coverage.

**B.    *If Respondents are Right, then Their Separate Promissory Warranty that They Could Not Compel Austin to Redeem its Shares is False***

Respondents claim that they were free to engage in any transaction they chose with respect to the redemption of Austin's shares. (Tr. 1158, lines 13-14: *"The underlying basic position is just that."*) (Tr. 1244, lines 6-9: Respondents' position that they could have given Austin *"$500,000 take it or leave it"*). While AISLIC strongly disputes Respondents' claim, if they are right, then the separate warranty made to AISLIC in paragraph three of the Representation Letter (Ex. B to Ex. 104), that they could not "compel such a redemption, except pursuant to the exercise of the Right of First Refusal contained in the Shareholders Agreement" was false. If Respondents are right, they could pay anything they wanted for Austin's shares and use any means -- including coercion -- to make Austin take it. In fact, one could argue that that is exactly what happened. Upper Deck made Austin a non-negotiable offer based on gross misrepresentations regarding annual income (Tr. 423, lines 10-11: *"I don't believe they made it a point to mention that to our board."*), and threatened

27

EXHIBIT _Q_, PAGE _436_

that "any delay or attempt to adjust the purchase price may put the Austin Firefighters at significant risk" (Ex. 160).

The unrebutted testimony is that AISLIC would never have issued the Policy based on the understanding that Respondents could do whatever tax shelter they wanted. (Tr. 111, 179). Tellingly, Respondents never directly answered the question, "*if the company had had the right to say to the charity, we'll take this back whenever we want and we'll give you that, that would be a problem vis-à-vis the tax strategy?*" (Tr. 1155, lines 15-20), because the answer is obvious. Of course, it would have. If one accepts Respondents' argument, then they were gambling with AISLIC's money and "*$3 million was not a lot to pay if you were able to shelter a gagillion dollars...*" (Tr. 1266, lines 1-14). Nor could the warranty discussed here be waived, since Respondents' position that they could do whatever they wanted was only made clear at the hearing and waiver requires a "voluntary and intentional relinquishment of a known right ... and cannot be found unless there was 'full knowledge of the facts upon which the existence of the right depends.'" Sirignano v. Chicago Ins. Co., 192 F. Supp.2d 199, 207 (S.D.N.Y. 2002).

## POINT IV

### RESPONDENTS' FAILURE TO COMPLY WITH AN EXPRESS CONDITION PRECEDENT TO COVERAGE VITIATES COVERAGE

Respondents continue to foist the misconception that in order for an express condition precedent to apply it must contribute to the claimed loss. (Tr. 819, lines 18-23). Under New York law, it does not. Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 86 N.Y. 2d 685, 690, 636 N.Y.S.2d 734 (1995); Chase Manhattan Bank v. New Hampshire Ins. Co., 4 Misc.3d 1026(A), 2004 WL 2169394 at *4 (Sup. Ct., N.Y. Co. 2004);

#254673v1

EXHIBIT _Q_, PAGE _437_

Sulner v. G.A., Ins. Co. of New York, 224 A.D.2d 205, 206, 637 N.Y.S.2d 144, 145 (1st

Dep't), *lv. to appeal denied*, 88 N.Y.2d 805 (1996).

Section 9(b) of the Policy sets forth as an express condition precedent that

Respondents "shall have prepared and filed all applicable Tax Returns in a manner materially

consistent with that anticipated by the Opinions and/or the Representation Letter." KPMG's

Opinion "Charitable Contribution" anticipated that Mr. McWilliam would take a charitable

deduction and based on that assumption concluded:  "It is more likely than not that the

Shareholder will be entitled to a charitable deduction for the fair market of the stock the

Shareholder donated." (Opinion on Charitable Contribution, p.4; emphasis in original).  The

Opinion anticipated that Mr. McWilliam would take the deduction in 2001.  (Id., p.10).  In

fact, Mr. McWilliam told the IRS in the Voluntary Disclosure Statement (Ex. 131; *see* Tr.

257):  "I will claim a 2001 charitable contribution deduction … with respect to the

contribution by me of the Non-Voting Shares in 2001 to the Donee."  Instead of ever taking

the charitable donation, Mr. McWilliam decided to exit the tax plan without telling AISLIC.

(Tr. 818, lines 10-11:  *"Obviously now, that he settled, he can't claim it."*)  Accordingly, Mr.

McWilliam has failed to fulfill an express condition precedent to coverage.

## POINT V

## EXCLUSION 3(a) BARS COVERAGE FOR RESPONDENTS' FRAUDULENT INDUCEMENT OF THE REPURCHASE OF AUSTIN'S SHARES

There is no question that the repurchase of Austin's shares was accomplished

by material omissions and misrepresentations regarding Upper Deck's income.  Austin was

told that Upper Deck's annualized net income in 2002 "would be approximately

$39,359,073."(Ex. 160).  Upper Deck was aware at the time of the huge spike in income

EXHIBIT __Q__, PAGE __438__

attributable to Yu-Gi-Oh! sales (Tr. 286-87), since it had the financial statements for

October 2002 showing income in one month alone of $46,596,546. (Tr. 273).  However,

Upper Deck refused to provide Austin with the additional financial statements it requested,

which would have showed the spike in income.  (Tr. 423, lines 10-11).  Under New York

law, these documented and uncontestable facts constitute the basis for a fraud claim.  J.A.O.

Acquisition Corp. v. Stavitsky, 192 Misc.2d 7, 13, 745 N.Y.S.2d 634 (Sup. Ct., N.Y. Co.

2001).  The fact that the repurchase of shares was not only characterized by an absence of

negotiation (Tr. 415, lines 9-12), but also by outright fraud, made the defense against the IRS

challenge even more untenable.  Accordingly, while it should not be necessary for the Panel

to reach the fraud exclusion given Respondents' deviation from the covered tax plan set forth

in Points I-III, the facts and testimony support application of the fraud exclusion.

## POINT VI

## RESPONDENTS' COUNTERCLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH IS LEGALLY AND FACTUALLY DEFICIENT

### A.    There Is No Such Claim Under Applicable New York Law

As set forth in Point VII of our pre-hearing brief and Point VIII of our pre-

hearing reply brief, New York law -- which both sides agree does not recognize a separate

cause of action for breach of the implied covenant of good faith[8] -- applies.  Section 16 of the

Policy has an extremely broad choice of law provision, which provides: "The arbitration

shall be subject to the Federal Arbitration Act and, to the extent such Act is not applicable,

---

[8] Nor under New York law are attorneys' fees recoverable.  Employers Mut. Cas. Co. v. Key Pharmaceuticals, 75 F.3d 815, 824 (2d Cir. 1996) ("Under New York law, it is (ftn. cont'd)

#254673v1

EXHIBIT _Ф_, PAGE _439_

the laws of the State of New York." <u>Williams v. Deutsche Bank Secs., Inc.</u>, 2005 WL

1414435 at *4 (S.D.N.Y. 2005) (citing cases with similarly broad choice of law provisions

encompassing related tort claims).  In particular, the choice of law clause singles out disputes

regarding the "performance of this Policy," e.g., bad faith claims, as governed by New York

law. Moreover, for choice of law purposes, New York views a claim for breach of an implied

covenant of good faith as a contractual cause of action. <u>Butvin v. Doubleclick, Inc.</u>, 2001

WL 228121 (S.D.N.Y. 2001), <i>aff'd</i>, 22 Fed. Appx. 57 (2d Cir. 2001); <u>Yankee Caithness Joint</u>

<u>Venture, LP v. Planet Ins. Co.</u>, 1996 WL 426359 at *2 (S.D.N.Y. 1996).[9]

**B.**   ***Nor Is There Basis For Such A Claim Under California Law***

          "In order to establish a breach of the implied covenant of good faith and fair

dealing under California law, a plaintiff must show (1) benefits due under the policy were

withheld, and (2) the reason for withholding benefits was unreasonable or without proper

cause." <u>Feldman v. Allstate Ins. Co.</u>, 322 F.3d 660, 669 (9th Cir. 2003).  A bad faith claim

"cannot be maintained unless policy benefits are due under the contract." <u>Waller v. Truck</u>

<u>Ins. Exchange, Inc.</u>, 11 Cal. 4th 1, 35-36 (Cal. 1995) (Tr. 948-49) ("Absent that contractual

right ... the implied covenant has nothing upon which to act as a supplement...") (Tr. 948-

---

(ftn. 8 cont'd) 'well settled that) an insured cannot recover his legal expenses in a controversy
with a carrier over coverage, even though the carrier loses the controversy and is held
responsible for the risk.'").

[9]  <u>Frazer Exton Dev., LP v. Kemper Envir., Ltd.</u>, 2004 WL 1752580 (S.D.N.Y. 2004), <i>aff'd on</i>
<i>other grounds</i>, 153 Fed. Appx. 31 (2d Cir. 2005), did not involve an implied covenant of good
faith claim, but rather a Pennsylvania statute (Id. at *10), and therefore did not address New
York law holding that "the implied covenant of good faith ... is a rule of interpretation rather
than a separate obligation." <u>Butvin</u>, <i>supra</i>.  Nor did the choice of law provision (ftn. contd)

EXHIBIT ___, PAGE 440

49).  A breach of the covenant "implies unfair dealing rather than mistaken judgment."

Chateau Chamberay Homeowners Assoc. v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335,

345 (Cal. Ct. App. 2001). The insurer's actions must be "prompted not by an honest mistake,

bad judgment or negligence but rather by a conscious and deliberate act…." Id. at 346 (Tr.

949, Cotkin: *"was it just a mistake … or was it … something which was outrageous or*

*unreasonable"*).  California has adopted a "genuine dispute doctrine," whereby a bad faith

claim "should be dismissed on summary judgment if the defendant demonstrates there was 'a

genuine dispute as to coverage.'" Ibid. (holding there was a "genuine dispute" where insurer

denied claim based on fraud exclusion); Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th

Cir. 2001) (applying doctrine based on "the insurer's three experts and the insured's

inconsistent explanations").

## 1.    *No Insured Tax Loss*

AISLIC's coverage positions revolve around Respondents taking it upon

themselves to deviate from the tax plan in December 2002 without so much as a word to

AISLIC, and then hiding the facts and documents concerning the redemption from AISLIC

for two more years.  (Tr. 1093, lines 9-10: *"you did the deal almost two years ago and now*

*you're talking to us?"*).  A chronology of the relevant correspondence is annexed as

Appendix A.  Not until March 25, 2004, did Upper Deck's counsel disclose for the first time

"by the way" that Upper Deck had already redeemed Austin's shares. (Ex. 218; Tr. 676).

---

(ftn.cont'd) in Frazer apply, as here, to any issue not governed by the FAA or expressly single -
out claims regarding the "performance of this Policy," i.e., bad faith claims, as governed by New
York law.

EXHIBIT _Q_, PAGE _441_

AISLIC attempted to get more information about the redemption (Tr. 680, lines 16-19; Tr. 682, lines 16-22), but except for the barest of details (Ex. 232 (p.2); Tr. 685), received nothing. (Tr. 691, lines 21-25: *"We had received nothing since the summary. We wanted to understand, as we had asked previously, how the redemption took place so that we could consider its impact on coverage... on ... how the IRS might view the strategy.").*

AISLIC's coverage determinations were consistent, well-grounded in the Policy and very promptly made as information reluctantly and gradually was provided. (Ex. 226 (p.2): "Pending a better understanding of the facts, it appears to us that the redemption transaction may have constituted an amendment to the Shareholder Agreement to delete the fair market value and appraisal requirements, to which amendment we did not consent."). On July 29, 2005, AISLIC denied coverage. (Ex. 303 (p.1): "The documents found and conclusions that can be drawn from such, as well as other available documents and materials, mandates AISLIC to conclude the policy provides no coverage to [Respondents] for the proposed IRS settlement...."; Tr. 692). Where, as here, an insured fails to recognize even *"some implicit obligation ... to act in good faith vis-à-vis the objectives of the strategy"* (Tr. 1166), undertakes a transaction unrecognizable from the transaction defined by the insured for which it sought coverage (Tr. 38-39, 111), and doesn't *"even think it an issue"* to notify the insurer (Tr. 1248, lines 21-23), the *insurer's* bad faith should not even be a topic for discussion under any state's laws.

## 2.    What Contest Expenses?

Respondents were required by November 17th to make an application to submit documentary evidence supporting any claim for contest expenses. (Tr. 1267-68). Respondents have not done so.  There is not a shred of evidence to support Mr. McWilliam's

33

EXHIBIT *B*, PAGE *442*

claim that he ever paid the $500,000 deductible necessary to trigger any obligation to pay

contest expenses, i.e., *"90 percent of $57,000"* in excess of the $500,000 deductible

(Tr. 1017, lines 19-20; Ex. 277), let alone the $800,000 Mr. McWilliam claims he paid.

(Tr. 1052, lines 12-13). In fact, the evidence is to the contrary, as the Orrick firm has alleged

in paragraph fourteen of its July 7, 2006 cross-complaint against Upper Deck (Ex. 324), that

"Upper Deck has not paid any portion of the $576,282, which is due and owing to Orrick."

Nor in connection with Respondents' request for contest expenses did AIG

exhibit bad faith. As Mr. Cotkin testified, an insurer could, in good faith, challenge the

assertion of claim, but nonetheless agree to advance contest expenses subject to a reservation

of rights (Tr. 940), which is what AIG did until it denied coverage in July 2005. (Ex. 236;

Tr. 686). Moreover, AIG's position that there was no claim until the April 2005 IRS offer of

settlement was supported by Section 6 of the Policy, which provides that the insured agrees

that there is no claim until specifically identified persons at Upper Deck receive written

notice of a claim. (Tr. 1033, lines 16-17: Cotkin, *"No I don't think I'd actually seen item

six"*). Finally, as Mr. Cotkin also acknowledged, a carrier could reasonably refuse to pay a

legal bill where, as here, there is no evidence of payment (Tr. 1028, lines 10-15), and for an

insured to insist on a confidentiality agreement, as Respondents did, *"may be overkill."*

(Tr. 1021, line 23). Accordingly, there is no basis for a bad faith claim with respect to the

indemnification of contest expenses which, in any event, Respondents never paid.

Finally, AAA Rule R-43(d)(ii) only sanctions an award of attorneys' fees

where "all parties have requested an award or it is authorized by law or their arbitration

agreement." Claimant has not requested such an award (Tr. 902). Matza v. Oshman,

Helfenstein & Matza, 823 N.Y.S.2d 47, 48-49, 2006 Slip Op. 07612 (1st Dep't Oct. 24,

#254673v1

EXHIBIT ⊘ PAGE 443

2006) (holding attorneys' fees award was unauthorized "in light of the requirement for an 'unmistakably clear' expression of a party's intention to waive the rule that parties are responsible for their own attorneys' fees"). In all events, as Judge Gonzalez held in her Order compelling this arbitration, dated January 30, 2006, "the Policy's liability limitation is valid." (Ex. 314, at.7).

**CONCLUSION**

In late 2002, with Upper Deck sales of Yu-Gi-Oh! leading to a surge of net income that would amount to more than $150 million by year-end, Mr. McWilliam decided to keep for himself all of the benefits of his Company's success. He devised his own strategy having nothing to do with the tax plan he had asked AISLIC to insure. By withholding financial information and imposing a deadline, Mr. McWilliam was able to get the Fund to give up its shares for $2 million, exit the tax plan and extinguish Austin's right to a Put that would have entitled it to a nearly ten-fold increase in the original value of its shares, and 90% of cash distributions prior to redemption. As a result, he was able to take, free and clear, a seventy-five million dollar distribution the following year.

If and when the tax bill ever came due he could always shift the tax burden to his unsuspecting insurer, so he thought. However, Respondents' payment of some $3 million in premium did not entitle it to gamble with AISLIC's money. The Policy, for the reasons discussed herein, did not insure the secret plan carried out by Mr. McWilliam, as opposed to the tax plan that he cast aside when it was no longer convenient.

35

EXHIBIT _C_, PAGE _444_

Claimant, therefore, respectfully requests that the Panel issue an Order that there is no coverage under the Policy, and award AISLIC fees and expenses under AAA Rules R-49 and R-50.

Dated: New York, New York
        December 1, 2006

                                        Respectfully submitted,

                                        D'AMATO & LYNCH

                        By:     _Robert E. Kushner_____
                                        Robert E. Kushner
                                        Peter A. Stroili
                                        Attorneys for Claimant
                                        70 Pine Street
                                        New York, New York  10270
                                        (212) 269-0927

#254673v1

EXHIBIT _6_, PAGE _445_

Appendix A

Chronology of Correspondence re: Redemption

| Date | Exhibit No. | Author | Recipient | Substance |
|------|-------------|--------|-----------|-----------|
| 3/19/04 | 216 | Thorn Rosenthal (Cahill Gordon) | Paul Sax (Orrick) | AISLIC asks for factual information concerning the proposed redemption. AISLIC expresses its view that "this factual information is of great importance to the analysis of the available options and merits of the sustainability of the tax position." |
| 3/25/04 | 218 | Paul Sax | Thorn Rosenthal | Coverage counsel for Upper Deck states that the Austin FF Pension Plan stock of UDC was purchased by the company at year-end 2002. [This is the first time that AIG learned that the shares had been purchased back] |
| 4/5/04 | 219 | Paul Sax | Thorn Rosenthal | Coverage counsel for UD promises to forward the repurchase documents regarding the 2002 redemption of the charity's shares, including the determination of price. He states that the price was negotiated. |
| 5/11/04 | 226 | Thorn Rosenthal | Paul Sax | AISLIC expresses concern about the redemption process and price and requests further information: "pending a better understanding of the facts, it appears to us that the redemption transaction may have constituted an amendment to the Shareholders Agreement to delete the fair market value and appraisal requirements, to which amendment we did not consent." AISLIC declines UD request to fund the California proposed tax and interest payments. |
| 6/24/04 | 232 | Paul Sax | Thorn Rosenthal | UD coverage counsel states that the company redeemed Austin's stock in December 2002 for $2 million. He states that the company provided financial data to Austin in connection with the purchase offer and that Upper Deck undertook no formal appraisal of the stock at the time of redemption. |

1

#253150v1

EXHIBIT _6_ PAGE _446_

Appendix A

| 7/9/04 | 235 | William Cotter | Paul Sax | AISLIC asks: "Has Upper Deck made any cash or property distributions to its shareholder of 2001, 2002 or 2003 income? If so, how much and when?" |
| 7/9/04 | 236 | William Cotter (Peabody & Arnold) | Paul Sax | States that AISLIC will need more specifics regarding the redemption [to supplement information provided to AISLIC in 6/24/04 letter]. Notes that there was no fair market value appraisal to determine the price of the non-voting stock and that "this was not a transaction contemplated by the Shareholder agreement." Requests more facts and circumstances surrounding the repurchase. |
| 7/15/04 | 238 | George Yuhas | William Cotter | Response to July 9, 2004 letters of William Cotter. Says that "upon receipt of the executed Nondisclosure Agreement, we will be happy to provide additional financial and other information in response to your requests." |
| 8/10/04 | 247 | Paul Sax | William Cotter | Defends repurchase of shares (at p.3). |
| 8/11/04 | 248 | William Cotter | George Yuhas | States that "AISLIC is willing to try and accommodate the privacy concerns of Upper Deck. However, it is not willing to restrict/tie its hands in the legitimate use of materials to which it has entitlement under its Policy. It is essential that we get this resolved as we want to move forward in this matter which we cannot do until we have the requested materials." |
| 4/29/05 | 293 | William Cotter | Andrew Reidy | Requests specific materials relating to the purchase/redemption of the Austin Fund's non-voting stock, and notes that "requests have been made for the above materials for well over a year." |
| 7/29/05 | 303 | William Cotter | Andrew Reidy | Letter denying coverage. Notes that documents produced to IRS were produced recently en masse to AISLIC. |

2

EXHIBIT __G__, PAGE __447__