# EXHIBIT R

1   Richard K. Howell (State Bar No. 144241)
    Duke F. Wahlquist (State Bar No. 117722)
2   Bradley A. Chapin (State Bar No. 232885)
    RUTAN & TUCKER, LLP
3   611 Anton Boulevard, Fourteenth Floor
    Costa Mesa, California 92626-1931
4   Telephone:  714-641-5100
    Facsimile:  714-546-9035
5   Email:  rhowell@rutan.com

6   Attorneys for Respondents and Counterclaimants
    The Upper Deck Company and Richard P. McWilliam,
7   individually and as Trustee for the MPR Trust

8                   AMERICAN ARBITRATION ASSOCIATION

9

10  AMERICAN INTERNATIONAL                   CASE NO. 13 195 02486 05
11  SPECIALTY LINES INSURANCE
    COMPANY and DOES 1 through 10,           John F. Byrne, Esq.
12  inclusive,                               Stephen D. Kramer, Esq.
                                             Charles J. Moxley, Jr., Esq.
13                  Claimant,

14          v.

15  THE UPPER DECK COMPANY, a                THE UPPER DECK COMPANY'S
    California corporation, and              AND RICHARD MCWILLIAM'S
16  RICHARD P. MCWILLIAM, individually,      POST-HEARING BRIEF
    and as Trustee for the MPR Trust,
17
                    Respondents.
18

19  THE UPPER DECK COMPANY, a
    California corporation, MPR TRUST, a
20  revocable trust, and RICHARD P.
    MCWILLIAM, individually, and as Trustee
21  for the MPR Trust,

22                  Counter-Claimant,

23          v.

24  AMERICAN INTERNATIONAL
    SPECIALTY LINES INSURANCE
25  COMPANY and ROES 1 through 10,
    inclusive,
26
                    Counter-Respondents.
27

28                                    EXHIBIT  _R_, PAGE _448_

Rutan & Tucker LLP
attorneys at law

373/017994-0028
767556.01 a12/01/06        UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION AND SUMMARY. ...................................................... i

II.  THE INSUREDS PROVED A LOSS WITHIN THE POLICY'S
     CLAUSE 1. INSURING AGREEMENT. .................................................5

     A.   Application Of The Language Of The Insuring Agreement To
          The Evidence Establishes An Insured Loss....................................5

     B.   AIG Now Seeks To Re-Underwrite The Policy Post-Claim By
          Imposing Implied Terms Contrary To The Express Written
          Terms Of The Policy. .............................................................11

          1.   A Summary Of AIG's Post-Claim Underwriting Of The
               Policy's Clause 1 Insuring Agreement. ...........................11

          2.   AIG's Imagined Reading Of The Policy's Clause 1
               Insuring Agreement Has No Basis In The Policy's
               Language.................................................................12

          3.   The Policy's Recitations Cannot Alter The Policy's
               Express Terms In Clause 1. Insuring Agreement. ..............14

III. THE DECEMBER 10, 2002 SHARE PURCHASE AGREEMENT
     RESULTED IN MORE THAN A FAIR MARKET VALUE
     PURCHASE PRICE – THE NON-VOTING SHARES HAD NO
     FAIR MARKET VALUE. ...............................................................18

IV.  TO AVOID LIABILITY AIG MUST PROVE A COVERAGE
     DEFENSE STATED IN ITS JULY 29, 2005 COVERAGE DENIAL
     LETTER. ...................................................................................23

V.   AIG HAS NOT AND CANNOT PROVE THE LOSS IS WITHIN
     EITHER OF CLAUSE 3. EXCLUSIONS ¶ (a) or ¶ (h). .......................24

     A.   Case Law Requires That AIG Prove The "Claim" Or "Loss"
          Was Proximately Caused By The Perils Identified In Clause 3.
          ¶ (a), Fraud, Or Clause 3. ¶ (h), Amendment of the Shareholder
          Agreement, Respectively................................................25

     B.   Clause 3 ¶ (a) Requires That AIG Prove The "Claim" Arose
          From "Fraud" While Clause 3(h) Requires That AIG Prove
          The "Loss" Arose From The Amendment Of The Shareholders
          Agreement. .............................................................29

     C.   The "Claim" By the IRS Did Not Arise From "The
          Committing In Fact Of Any Criminal Or Deliberate Fraudulent
          Act (Including Without Limitation Deliberate Civil Fraud), Or
          Any Knowing And Intentional Violation Of Any Law, Rule,
          Regulation Or Statute."...............................................30

     D.   The Insureds' "Loss" Did Not Arise From An Alleged Fraud In
          Connection With The Repurchase. ..................................33

EXHIBIT *R*, PAGE *449*

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

|  |  |  | Page |
|---|---|---|---|
|  | 1. | There Was No Fraud Within The Scope of the Policy's Exclusion in Clause 3. ¶ (a) | 34 |
|  | 2. | Robert Burke's Own Testimony Reveals There Is No Causal Nexus Between Alleged Fraud In Connection With The December 10, 2002 Share Purchase Agreement Transaction And Any Loss. | 39 |
|  | 3. | The Insureds SC2 Transaction Would Not Have Survived Judicial Scrutiny Regardless Of The Repurchase. | 42 |
| E. | | The Insureds' "Loss" Did Not Arise From Any Aspect Of The Repurchase Involving An Alleged Amendment To The Shareholders Agreement (Clause 3. EXCLUSIONS ¶ (h)) | 49 |
|  | 1. | Section 5.3 of the December 10, 2002 Share Purchase Agreement Did Not Amend the Shareholders Agreement. | 50 |
|  | 2. | AIG's Own Expert Witness, Robert Burke, Conceded The "Early" Redemption In December 2002 Before The Put/Option Matured In April 2003 And The Resulting Termination Of The Shareholders Agreement Did Not Affect The Viability Of SC2, And Hence Had No Causal Relationship With Any Aspect Of The Loss. | 50 |
| VI. | | AIG'S ASSERTION THAT THE INSUREDS BREACHED A WARRANTY AND THEREBY INCREASED THE RISK OF INSURED LOSS IS WITHOUT MERIT | 51 |
| VII. | | AIG IS LIABLE FOR ITS BAD FAITH HANDLING OF THE INSUREDS' CLAIM. | 56 |
| A. | | New York Law Does Not Apply To The Insureds' Tort Claims. | 56 |
| B. | | California Bad Faith Law. | 58 |
| C. | | AIG's Refusal To Acknowledge The Existence Of A "Claim" And Outright Denial Of Coverage In The Face Of The Insureds' Indisputable Right To Policy Benefits Constitutes Bad Faith. | 60 |
|  | 1. | AIG's Refusal To Even Acknowledge The Existence Of A Claim And A Contest | 60 |
|  | 2. | AIG Made An Unreasonable and Dishonest Determination That The Insureds' Loss Was Not Covered By The Policy | 64 |
| D. | | "AIG's Duty Of Good Faith And Faith Dealing Is Absolute And Unrelated To The Insureds' Contractual Duties. | 65 |

EXHIBIT _e_ PAGE _450_

1
                                                            **Page**

2      E.    Based On AIG's Bad Faith Breach Of Its Duty Of Good Faith
             And Fair Dealing, The Insureds Are Entitled To Attorneys'
3          Fees And Punitive Damages. .......................................................................67

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT *R*, PAGE 451

373/017994-0028
767556.01 a12/01/06    UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

# **TABLE OF AUTHORITIES**

**Page(s)**

## **FEDERAL CASES**

*Abraham Zion Corp. v. Lebow Clothes, Inc.,*
761 F.2d 93 (2d. Cir. 1985) .................................................................. 15

*Amadeo v. Principal Mutual Life Insurance Co.,*
290 F.3d 1152 (9th Cir. 2002) ......................................... 58, 59, 62, 64

*Aramony v. United Way of America,*
254 F.3d 403 (2d Cir. 2001) .................................................................. 15

*Butvin v. DoubleClick, Inc.,*
2001 U.S. Dist. LEXIS 2318 (S.D.N.Y. 2001) .................................... 58

*Encyclopaedia Britannica v. SS Hong Kong Producer,*
422 F.2d 7 (2d Cir. 1969) ...................................................................... 17

*Finance One Public Co. Ltd. v. Lehman Brothers Special Financing, Inc.,*
414 F.3d 325 (2d Cir. 2005) .................................................................. 56

*Frazer Exton Development, LP,*
2004 U.S. Dist. LEXIS at 34-35 ...................................................... 57, 58

*Frazer Exton Development, LP v. Kemper Environmental, Ltd.,*
2004 U.S. Dist. LEXIS 14602 (S.D.N.Y. 2004),
*aff'd.*, 153 Fed. Appx. 31 (2d Cir. 2005) ..................................... 56, 57, 58

*Genovese Drug Stores, Inc. v. Connecticut Packing Company, Inc.,*
732 F.2d 286 (2d Cir. 1984) .................................................................. 15

*Kimmins Industrial Service Corporation v. Reliance Insurance Co.,*
19 F.3d 78 (2d Cir. 1994) .................................................. 16, 25, 26, 27

*Mass. Casualty Insurance Co. v. Morgan,*
886 F. Supp. 1002 (E.D.N.Y. 1995) .................................................... 56

*National Union Fire Insurance Co. of Pittsburgh, PA v. The Travelers
Indemnity Co.,*
210 F. Supp. 2d 479 (S.D.N.Y. 2002) .................................................. 24

*New York v. Amro Realty Corp.,*
936 F.2d 1420 (2d Cir. 1991) ................................................................ 24

*Philadelphia Parking Authority v. Federal Insurance Co.,*
385 F. Supp. 2d 280 (S.D.N.Y. 2005) .................................................. 56

*Saba Partnership v. Commissioner,*
T.C. Memo 1999-359 (1999) ................................................................ 47

*Sheldon v. Commissioner,*
94 T.C. 738 (1990) ......................................................................... 46, 47

EXHIBIT _R_, PAGE _452_

**Page(s)**

## FEDERAL CASES
### (continued)

*Yankee Caithness Joint Venture, L.P. v. Planet Insurance Co.,*
    1996 U.S. Dist. LEXIS 10747 (S.D.N.Y. 1996) ..................................................58

## STATE CASES

*Acquista v. N. Y. Life Insurance Co.,*
    285 A.D.2d 73 (2001)..................................................................................67

*Aetna Casualty & Surety Co. v. Liberty Mutual Insurance Co.,*
    91 A.D.2d 317, 459 N.Y.S.2d 158 (4th Dep't 1983)........................................26, 27

*Album Realty Corp. v. American Home Assurance Co.,*
    574 N.Y.S.2d 704, 176 A.D.2d 513 (N.Y.App.Div, 1st Dept. 1991) ........................25

*Board of Managers of Yardarm Condominium II v. Federal Insurance Co.,*
    247 A.D.2d 499, 669 N.Y.S.2d 332 (1998) ......................................................25

*Brandt v. Superior Court (Standard Insurance Co.),*
    37 Cal. 3d 813 (1985)..............................................................................67, 68

*Central General Hospital v. Chubb Group Insurance Cos.,*
    90 N.Y.2d 195 (1997)................................................................................24

*Chase Manhattan Bank v. New Hampshire Insurance Company,*
    193 Misc. 2d 580, 749 N.Y.S.2d 632, 2002 N.Y. Misc. LEXIS 1297........................15

*Cresthill Industries, Inc. v. Providence Washington Insurance Co. (1976) 385*
    N.Y.S.2d 797, 53 A.D.2d 488 .....................................................................25

*Delgado v. Heritage Life Insurance Co.,*
    157 Cal. App. 3d 262 (1984)........................................................................68

*Fleming v. Safeco Ins. Co.,*
    160 Cal. App. 3d 31 (1984)..........................................................................63

*Ginsburg v. New York Property Insurance Underwriting Associate,*
    210 A.D.2d 130 (1994)...............................................................................25

*Gruenberg v. Aetna Insurance Co.,*
    9 Cal. 3d 566 (1973).....................................................................58, 59, 65, 67

*Irv-Bob Formal Wear, Inc. v. Public Service Mutual Insurance Co.,*
    383 N.Y.S.2d 832 ....................................................................................52

*Irv-Bob Formal Wear, Inc. v. Public Service Mutual Insurance Co.,*
    366 N.Y.S.2d 596 (N.Y.Civ.Ct. 1975) ...........................................................52

*Kransco v. International Insurance Co.,*
    23 Cal. 4th 390 ........................................................................................66

-v-

EXHIBIT _B_, PAGE _453_

**Page(s)**

**STATE CASES**
**(continued)**

*Lumbermen's Mutual Casualty Co. v. Logan,*
  88 A.D.2d 971, 451 N.Y.S.2d 804 (2d Dep't 1982).......................27

*Maroney v. New York Central Mutual Fire Ins. Co.,*
  5 N.Y.3d 467 (2005)...............................................................27, 28

*Mighty Midgets, Inc. v. Centennial Insurance Co.,*
  47 N.Y.2d 12 (1979)...............................................................68

*Mount Vernon Fire Insurance Company v. Creative Housing Ltd.,*
  88 N.Y.2d 347 (1996)..............................................................25, 26

*Nelson Dairies, Inc. v. Royal,*
  6 Pa. D. & C. 2d 371 (Pa. C.P. 1955)......................................15

*New Hampshire Insurance Co. v Jefferson Insurance Co.,*
  213 A.D.2d 325 (1995).............................................................29

*Parry v. Maryland Casualty Co.,*
  238 N.Y.S. 613 (1929)..............................................................17

*Schultz v. Boy Scouts of America, Inc.,*
  65 N.Y.2d 189 (N.Y. 1985).......................................................56

*Servidone Construction Corp. v. Security Insurance Co.,*
  64 N.Y.2d 419, 477 N.E.2d 441, 488 N.Y.S.2d 139..................23

*Sukup v. State,*
  19 N.Y.2d 519 (1967)...............................................................68

*Throgs Neck Bagels,Inc. dba A-Whole Lot of Bagels v. GA Insurance Co. of N.Y.,*
  241 A.D.2d 66 (lst Dept. 1998).................................................25

*United Services Automobile Association v. Aetna Casualty & Surety Co.,*
  75 A.D.2d 1022, 429 N.Y.S.2d 508 (4th Dep't 1980)................27

*United States Fire Insurance Co. v. New York Marine and General Insurance Co.,*
  268 A.D.2d 19, 706 N.Y.S.2d 377 (2000) ................................27, 29

*Waters v. United Services Automobile Association,*
  41 Cal. App. 4th 1063 (1996)...................................................59

*Zivitz v. Maryland Casualty Co.,*
  182 N.Y.S. 321 (1920) .............................................................18

**DOCKETED CASES**

*Austin Firefighters Relief and Retirement Fund v. Brown Bottling Group, Inc.,*
  *W.D. Tex.,*
  No. A-06-327.............................................................................36

"EXIT R PAGE 454"

-vi-

**Page(s)**

## FEDERAL STATUTES AND REGULATIONS

Internal Revenue Code
    Section 1361  ...............................................................................6, 21, 49

Revenue Ruling 70-615, 1970-2 C.B. 169...............................................................45

## STATE STATUTES

California Civil Code
    Section 3294(a).......................................................................................68
    Section 3333 ...........................................................................................67

California Code of Civil Procedure
    Section 1021 ...........................................................................................67

New York C.L.S. U.C.C.
    Section 1-102 (2006) ....................................................................14, 17, 49

New York Insurance Law
    Section 3106(b) .......................................................................................52

## MISCELLANEOUS

5 Corbin on Contracts (2006 Rev. Supp.)
    Section 24.27B ........................................................................................17

Russ, Lee R. and Thomas F. Segalla, 2 Couch on Insurance (3d ed. 2005)
    Section 22.19 ...........................................................................................17
    Section 22.35 ...........................................................................................18

EXHIBIT R, PAGE 455

373/017994-0028
767556.01 a12/01/06

I.    **INTRODUCTION AND SUMMARY**.

AIG has done everything to avoid honoring its Policy obligations.  While AIG has presented a moving target of misrepresentation charges ranging from Tiger Woods to Yu-Gi-Oh!, AIG's policy defenses now appear limited to the events surrounding the December 10, 2002 Share Purchase Agreement (nominally, the "Repurchase.").  In essence, AIG argues that it should be handed a $50 million insurance coverage windfall because the Insureds allegedly did several things in violation of the **purported** requirements of the Policy.  Specifically, AIG appears to assert that Upper Deck violated the terms of the Policy and its related documents by:  (1) reacquiring the shares from the Austin Firefighters ("Firefighters' Fund") without informing AIG ahead of time and without obtaining AIG's prior consent to the transaction; and (2) repurchasing the shares without a formal fair market value appraisal and then purchasing the stock back at less than its alleged fair market value.

As the hearings made apparent, the Insureds dispute all of AIG's assertions.  Not only do the Policy exclusions and warranties not contain the Policy requirements and terms that AIG now seeks to impose, neither do any of the related Policy documents such as the KPMG opinions or the Shareholders' Agreement.  AIG seeks to disavow the product of extensive negotiations between the parties over the language of the Policy and related documents, and re-underwrite the Policy by adding or implying prohibitions which simply are not set forth **anywhere** in the Policy documents.  As these issues are being considered in the context of this final post-hearing brief, the Insureds believe it would be helpful to the Panel if they consider the following questions and issues in assessing whether the Repurchase can somehow be utilized by AIG to deprive the Insureds of $50 million of insurance coverage benefits they expressly bargained and paid for some five years ago:

- Were **all** 58 SC2 strategies under attack by the IRS, the Senate and the Press well before the Insureds first considered the Repurchase in approximately October or November of 2002?

- If the SC2 strategy had been a viable and defensible tax strategy as of December 2002, would not the Insureds have been far better off keeping the Firefighters' Fund as a shareholder for as long as possible in order to secure the huge and

EXHIBIT ___R___ PAGE _456_

disproportionate tax benefits associated with allocating income to the charity well into 2003?

- Has the IRS offered the **identical** settlement terms to **all** the SC2 participants who made the voluntary disclosure irrespective of the existence of a repurchase?

- Do the Insureds find themselves dealing with the same settlement terms they would have been presented in the absence of the Repurchase?

- Would there have been any realistic possibility of obtaining a more favorable settlement than the one entered with the IRS in the absence of the Repurchase?

- Is AIG paying full policy benefits to other insureds who supposedly implemented and followed the generic SC2 strategy?

- Through the production of a summary of the other AIG insured SC2 transactions, have we now learned that AIG has paid full policy limits (Spencer Forrest) and accepted coverage (Award Homes) despite the fact that both of these insureds negotiated to buy back their stock at a price below the appraised fair market value of the stock?

- With respect to the one other Policy where AIG has not paid full policy benefits, is that tax participant – Award Homes – an entity who did not voluntarily disclose its participation of the SC2 strategy to the IRS and, hence, cannot obtain a settlement on terms as favorable as those obtained by the Insureds?

- Assuming the Repurchase never took place, would AIG truly have insisted on litigating the Insureds' SC2 strategy even though any such insistence would have exposed AIG to excess limits exposure of at least $100 million and up to approximately $150 million if Upper Deck were to lose its S Corp. status?

- To the extent that AIG asserts that it regarded the concepts of fair market value and/or a formal appraisal as being the most "critical" elements to the success of the SC2 strategy, **where** in the Policy documents did AIG express its fundamental understanding that **all** buybacks had to be accompanied by an appraisal and at fair market value?

- Based on AIG's assertions in these proceedings that it regarded fair market value as the most "**critical aspect**" of the SC2 transaction, is there any doubt that if AIG had the opportunity to rewrite the Policy that it would now include specific and definitive language in either the Policy exclusions or warranties addressing the issues of appraisal, fair market value and consent?

- Do the Policy documents **anywhere** state that the Insureds cannot buy back the Firefighters' Fund non-voting shares in advance of the six month Put/Option period set forth in section 5 of the Shareholders' Agreement?

- Do the Policy documents **anywhere** state that the Put/Option procedures were mandatory or had to be utilized by the parties?

- To the extent the Put/Option procedures were not mandatory, **where** do the Policy documents set forth any requirements such as appraisal or fair market value requirements that must be followed in a repurchase transaction that takes place outside of the context of the 180-day Put/Option?

*EXHIBIT R, PAGE 457*

- Do the Policy documents **anywhere** state or suggest that the Insureds must inform AIG of a reacquisition of the Firefighters' Fund stock?

- Do the Policy documents **anywhere** state or suggest that the Insureds must obtain AIG's consent before reacquiring the Firefighters' Fund stock?

- Does section 1 of the Shareholders' Agreement expressly state whose consent is required to be obtained in connection with any transfers of Upper Deck's stock?

- Is AIG identified in section 1 of the Shareholders' Agreement or in any document as a party from whom consent must be obtained before the Firefighters' Fund may transfer its stock?

- With respect to the Insureds potential reacquisition of the Firefighters' Fund stock under section 2 (reacquisition through their rights of first refusal), section 3 (reacquisition in response to a "Disposition Event") or section 5 (reacquisition through the Put/Option procedures) of the Shareholders' Agreement, were the Insureds able to reacquire the stock under all of these procedures without informing AIG of the contemplated transaction and without obtaining AIG's consent to the transaction?

- If the Insureds reacquired the Firefighters' Fund stock pursuant to sections 2, 3 or 5 of the Shareholders' Agreement, wouldn't all such reacquisitions result in the automatic termination of the Shareholders' Agreement in accordance with section 8 of the Shareholders' Agreement?

- Would an automatic termination of the Shareholders' Agreement following a section 2, 3 or 5 reacquisition be deemed an "amendment" of the Shareholders' Agreement in violation of the Policy documents?

- If the Shareholders' Agreement permits the Insureds to repurchase the Firefighters' Fund stock under sections 2, 3 and 5 without informing AIG ahead of time and without obtaining AIG's consent, how would the Insureds be expected to know that a voluntary buyback of the shares would **require** them to inform AIG of the transaction and/or to obtain AIG's consent to the transaction?

- If a third party offer was made in December 2002 to buy the Firefighters' Fund stock for $2 million and the Insureds then reacquired the stock in accordance with its Section 2 first refusal rights without obtaining an appraisal, without informing AIG and without AIG's consent, is AIG really saying that such a buyback would **not** violate the Policy but that a direct buyback by the Insureds on identical terms somehow results in a forfeiture of $50 million in Policy benefits?

- Based on the public policies applicable to the construction and interpretation of insurance contracts and the fact that the Policy documents do not contain **any** such express requirements, can the Insureds really be said to have waived or forfeited $50 million in coverage benefits based on what AIG says was an implied "assumption" that **all** repurchases would be accompanied by a formal appraisal and/or be at fair market value?

- Based on the public policies applicable to the construction and interpretation of insurance contracts and the fact that the Policy documents do not state a requirement that AIG be informed of or consent to **any** repurchases from the Firefighters' Fund, can the Insureds really be said to have waived or forfeited $50 million in Policy benefits based upon an implied "assumption" that they would inform AIG and obtain its consent to **any** repurchases from the Firefighters' Fund?

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

- To the extent that AIG asserts that it only insured a "Tax Plan," where in the Policy documents does AIG define this "Tax Plan" and where does AIG limit its coverage obligations to this "Tax Plan"?

- To the extent that AIG is somehow deemed to have only insured a particular "Tax Plan," where in the Policy documents does it state that a voluntary repurchase from the Firefighters' Fund would violate the requirements of this "Tax Plan"?

- To the extent that the concept of paying fair market value in **all** repurchase transactions was regarded by AIG as the most "**critical aspect**" of the "Tax Plan," is there any doubt that the Repurchase would have been handled differently by the Insureds if the Policy documents contained clear and definitive language setting forth requirements of either a formal appraisal or the payment of fair market value?

- Can the Insureds be deemed to have waived or forfeited $50 million in Policy benefits based on language AIG now seeks to rewrite or imply in the Policy documents notwithstanding the fact that the Repurchase did not alter or affect the ultimate resolution reached with the IRS?

At the end of the day, there is no denying that the precise risk which the Insureds sought to insure against not only manifested, but that it manifested long before the implementation of the Repurchase. Additionally, the attacks made by the IRS and the FTB are the exact risks which AIG agreed to provide $50 million in insurance benefits in exchange for a Policy premium of $3.25 million. However, as soon as this expressly contemplated risk materialized, AIG set out to concoct one coverage defense after another in order to avoid honoring its Policy obligations. Indeed, far from supporting its Insureds, AIG steadfastly refused to even acknowledge the existence of a "Claim," and the entire record in this action is devoid of any assurances by AIG that it was supporting its Insureds. To the contrary, all of the communications from AIG support the notion that AIG was keeping its Insureds at "arm's length" as it continued to look for any and every basis to defeat coverage. Regardless, though AIG has now abandoned many of the defense theories that it previously investigated and espoused, it now seeks to rely upon the Repurchase in order to obtain a windfall result in this action. The parties, however, extensively negotiated and agreed upon very detailed and specific Policy terms and requirements. Nevertheless, through implication, assumption and a flat out attempted rewrite of the numerous Policy provisions, AIG now seeks to re-underwrite the Policy in order to avoid paying Policy benefits.

EXHIBIT _R_ PAGE 459

1   The Insureds and AIG bargained for and entered an agreement back in 2001 in

2   which AIG (and its reinsurer) agreed to bear the risk that the taxing authorities would

3   challenge, among other things, the income allocations made to the Firefighters' Fund in

4   2001 and 2002.  The Insureds paid AIG $3.25 million to bear the risk.  With the benefit of

5   hindsight, it is now evident that AIG made critical underwriting mistakes in deciding to

6   issue $50 million in insurance coverage in exchange for a premium of $3.25 million.

7   Indeed, even AIG's expert tax witnesses in these proceedings put the chances of the

8   generic SC2 strategy succeeding in the tax or district courts at somewhere in the range of a

9   flip a coin.  It does not take a great deal of insight to now recognize that AIG made a

10  fundamental underwriting error when it issued this Policy as well as the other SC2

11  policies.  This risk of such error must be borne by AIG and this Panel cannot allow AIG to

12  escape the risk it agreed to bear by imposing phantom or implied requirements upon the

13  Insureds.  The foundational issue in this case is not whether the Repurchase -- though it

14  certainly did not -- dramatically increased the risk that the SC2 strategy would fail.  To the

15  contrary, one does not need to even address this issue because the Repurchase did not

16  violate or run afoul of any provision in the Policy or its related documents.  Put simply, the

17  Insureds acted reasonably and in accordance with terms of the Policy and they did nothing

18  which could be construed as a waiver or forfeiture of $50 million of agreed upon insurance

19  protection from AIG and its reinsurer.

20  **II.   THE INSUREDS PROVED A LOSS WITHIN THE POLICY'S CLAUSE 1.**

21  **INSURING AGREEMENT.**

22      **A.     Application Of The Language Of The Insuring Agreement To The**

23      **Evidence Establishes An Insured Loss.**

24  Evaluation of the evidence should begin with a determination of whether or not

25  there has been a Loss within the Policy's Clause 1. INSURING AGREEMENT:

26      The Insurer [AIG] shall pay, subject to the applicable
    Retention (as defined herein) [$500,000.00] and other terms

27      and conditions of this Policy: the Loss of the Insureds arising
    from a Claim first made against any Insured during the Policy

28      Period and reported to the Insurer pursuant to the terms of this
    Policy.

**EXHIBIT ___R___, PAGE _460_**

-5-

1   (Ex. 104, pg. 3.[A]) This INSURING AGREEMENT uses the following terms defined in the

2   Policy's Clause 2. DEFINITIONS:

3           'Loss' is "90% of Insured Tax Loss and, to the extent directly
        related to any Insured Tax Loss, 90% of any Contest Expenses

4           and 90% of any Gross-Ups.[1]

5           'Insured Tax Loss' means any Taxes, Interest, fines or
        penalties owed by any Insured to a Taxing Authority directly

6           related to the Insured Tax Event, subject to all of the terms,
        conditions and exclusions of the Policy.[2]

7

8           'Contest Expenses' means the reasonable and necessary legal,
        accounting or appraisal expenses of outside legal and
        accounting advisors and appraisers (i.e. advisors and appraisers

9           that are not employees of the Insured) conducting that part of a
        Contest[B] which directly relates to the Insured Tax Event,

10          following the Named Insured having given notice under Clause
        6 of this Policy.[3]

11

12          'Claim' means any written notice from any Taxing Authority
        alleging any Insured may be liable for Taxes, but only if such
        Taxes are directly related in whole or in part to the Insured Tax

13          Event.[4]

14  Each of these definitions make use of the expression "Insured Tax Event" which is defined

15  in relevant part in the Policy's Endorsement No. 1 as:

16          [A]n assertion, at any time during the Policy Period, by a Taxing
        Authority that with respect to the tax years 2001 through 2005,

17

18          (a) as a result of any action taken by the Named Insured or the
        Additional Insureds prior to the Inception Date [August 29,
        2001], The Upper Deck Company, a California corporation

19          ("Upper Deck") has more than one class of stock for purposes of
        Section 1361 of the Code, . . .

20          (d) the post-gift allocations of Upper Deck's taxable income to

21          the Municipal Plan are not correct or proper . . . .[5]

22  Thus, the Policy does not define the existence of an Insured Tax Event by, e.g., reference

23  to an IRS challenge to a defined Tax Plan or scheme; but, rather the Policy defines an

24  Insured Tax Event as any assertion that the Insured "has more than one class of stock" or

25  / / /

---

26  [A]  Evidentiary cites in the text after this initial one will be endnotes.

27  [B]  "'Contest' means a dispute with a Taxing Authority over an adjustment in any
Insured's liability for its Taxes as it relates to the Insured Tax Event for which the Insurer

28  may be required to indemnify any Insured hereunder."  (Ex. 104, pg. 3, ¶ (c).)  Notably, a
"Contest" does not require the existence of a "Claim."

EXHIBIT _R_, PAGE _461_

373/017994-0028
767556.01 a12/01/06     UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1  "the post gift allocations . . . of taxable income to the Municipal Plan are not correct or

2  proper."

3      The language of the definition of "Insured Tax Event" was so heavily negotiated in

4  the underwriting of the Policy that parts of the language threatened to be a "deal killer."[6]

5  The arbitrators should be loathe to search for or find implied terms relating to these terms

6  when the parties have both carefully negotiated the express contractual terms.  If anything

7  was omitted from this definition of "Insured Tax Event," its omission was intended.

8      The most important written evidence of a "Claim" begins with the IRS's publication

9  on April 26, 2004 of Notice 2004-30 regarding SC2 transactions in Internal Revenue

10 Bulletin 2004-17.[7]  Notice 2004-30 is the most important "Claim" because it is the

11 "Claim" which the Insureds ultimately settled with the IRS and which, by itself, gave rise

12 to an "Insured Tax Loss" well in excess of the Policy's limit of $50 million.[8]

13     AIG received Notice 2004-30 from the Insureds, but, AIG's Claims Director Robert

14 Jones testified that AIG did not recognize Notice 2004-30 as a "Claim" because Notice

15 2004-30, according to Mr. Jones:  "does not seek any payment.  It merely notifies

16 taxpayers that they should consider tax filings they had done in the past."[9]  Mr. Jones'

17 assertion is both wrong and disingenuous.  Not only does Mr. Jones misstate the Policy

18 language's requirement for a "Claim" – "notice . . . alleging any Insured **may** be liable for

19 Taxes" is sufficient – but Mr. Jones also misstates the nature and terms of Notice 2004-30.

20     Linda Burke testified that Notice 2004-30's "role is to put taxpayers on notice that

21 the IRS will challenge this type of transaction [SC2]."[10]  That testimony was corroborated

22 by Mr. Mather.[11]  Robert Burke testified that Notice 2004-30 "put taxpayers on notice that

23 if they continued to claim the tax benefits associated with the transaction, they would be

24 subject to the accuracy related penalties under Section 6662."[12]  That penalty is a

25 percentage of the understatement of taxes on the taxpayer's return.  Obviously, no penalty

26 computed as a percentage of taxes due to understatement of taxes on a return could be

27 imposed on an Insured unless the "Insured may be liable for [the understated] Taxes."

28 Presumably, Mr. Burke told Mr. Jones and Mr. Cotter the same thing when Mr. Jones was

**EXHIBIT _R_, PAGE _462_**

-7-

1  evaluating whether or not Notice 2004-30 was a "Claim."[13]  Mr. Sax at the Orrick firm

2  explained it to each of Messrs. Cotter, Jones and Burke.[14]  Mr. Jones had to know that

3  Notice 2004-30 was a "Claim," but AIG still continued to deny the existence of a Claim

4  until the IRS first offered to **settle** the matter in April 2005.

5      A comparison of the language of Notice 2004-30 with the definition of "Insured

6  Tax Event" in the Policy's Endorsement No. 1 ¶ (d) is more important than the testimony

7  of any witness.  An "Insured Tax Event" is "an assertion, at any time during the Policy

8  Period, by a Taxing Authority that with respect to the tax years 2001 through 2005 . . . (d)

9  the post-gift allocations of Upper Deck's taxable income to the Municipal Plan are not

10  correct or proper"[15]  Describing SC2, Notice 2004-30 also asserts:  "The parties to the

11  transaction claim that, after the donation of the nonvoting stock, the exempt party owns 90

12  percent of the stock of the S corporation"[16]; the "transaction . . . is designed to artificially

13  shift the incidence of taxation on S corporation income away from taxable shareholders to

14  the exempt party.  In this manner, the original shareholders attempt to avoid paying income

15  tax on most of the S corporation's income over a period of time."[17]  Notice 2004-30 then

16  provides that "the Service intends to challenge the[se] purported tax benefits from this

17  transaction."[18]  Elaborating on this, the IRS's Coordinated Issue Paper states:  "The

18  transfer of the S corporation stock to the exempt party will be disregarded for Federal tax

19  purposes . . . .  Consequently, the S corporation and original shareholders . . . shall be

20  treated as if there had been no transfer to the exempt party."[19]  The Coordinated Issue

21  Paper also states:  "Th[i]s position will result in notices of deficiency to both the S

22  corporation shareholders . . . ."[20]  Because Notice 2004-30 and the Coordinated Issue

23  Paper notified taxpayers like MPR Trust and Mr. McWilliam (and the Firefighters' Fund)

24  that the IRS "intend[ed] to challenge the purported tax benefits of this transaction," Notice

25  2004-30 was not just an "Insured Tax Event;" it was also a "Claim":  a "written notice

26  from a[] Taxing Authority alleging any Insured may be liable for Taxes."[21]

27      Similarly, compare the language of Notice 2004-30 with the definition of "Insured

28  Tax Event" in the Policy's Endorsement No. 1 ¶ (a).  An "Insured Tax Event" is "an

EXHIBIT  _R_, PAGE  _463_

1   assertion, at any time during the Policy Period, by a Taxing Authority that with respect to

2   the tax years 2001 through 2005, (a) as a result of any action taken by the Named Insured

3   or the Additional Insureds prior to the Inception Date [August 29, 2001], The Upper Deck

4   Company . . . has more than one class of stock for purposes of Section 1361 of the

5   Code."[22]  Notice 2004-30 asserts:  "the Service also may argue that the existence of the

6   warrants [issued by Upper Deck in March 2001] results in a violation of the single class of

7   stock requirement of § 1361(b)(1)(D), thus terminating the corporation's status as an S

8   corporation.  *See, e.g.,* §§ 1.1361-1(l)(4)(ii) and (iii)."[23]  And, the IRS's Coordinated Issue

9   Paper elaborates "the capital structure created in the Notice 2004-30 transaction violates

10  the single class of stock requirement of § 1361(b)(1)(D) of the Internal Revenue Code and

11  § 1.1361-1(l) of the Income tax Regulations"[24] because "the warrants . . . are a second

12  class of stock."[25]  The Coordinated Issue Paper elaborates:  "Th[i]s position[] will result in

13  notices of deficiency to . . . the C corporation as a result of the proposed termination of its

14  status under Subchapter S."[26]  Because the IRS asserted "the S corporation election will

15  terminate on the date the second class of stock is issued and the corporation will be treated

16  as a C corporation . . . [and] the income will be taxable to the C corporation,"[27] this was

17  not just an "Insured Tax Event," but also a "Claim" because the IRS alleged Upper Deck

18  "may be liable for Taxes."[28]

19          Not until after the IRS's April 7, 2005 settlement proposal to resolve the issues

20  "Present in Notice 2004-30" on specified terms offered to all SC2 participants did AIG

21  finally and silently retreat from its prior stone-walled assertion that there had been no

22  "Claim."[29]  Thus, while AIG has tried to portray itself as the cooperative insurer, AIG's

23  repeated and ridiculous denial of even the existence of a "Claim" or "Insured Tax Event"

24  effectively left the Insureds on their own to deal with the mounting attacks from both the

25  IRS and the FTB.  In any event, while the IRS's April 7, 2005 settlement proposal

26  provided, "[¶] 1. The Service will not consider the S corporation election terminated on

27  the date of the transfer of stock to the exempt party," that proposal also provided "[¶] 2.

28  The transfer of the S Corporate stock to the exempt party is disregarded for Federal tax

EXHIBIT *R*, PAGE 464

373/017994-0028
767556.01 a12/01/06   UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1   purposes.  S corporation income will be allocated as if there had been no transfer of stock
2   to the exempt party."[30]  The IRS's proposal also specified that the "taxpayer and the
3   Service must execute a specific matters closing agreement, Form 906, resolving the issues
4   for all taxable years."[31]

5        The IRS made this identical settlement proposal to all SC2 participants; the only
6   differences in the proposal's treatment of any participants depended on whether or not the
7   taxpayer disclosed the SC2 transaction under Announcement 2002-2 (as the Insureds did)
8   in which case no penalty would apply.[32]  Taxpayers who did not disclose under
9   Announcement 2002-2 (like Award Homes, AIG's only SC2 insured who has not settled
10  on these same terms with the IRS) had to agree to pay a 10% accuracy related penalty.[33]

11       The IRS's Form 906 "closing Agreement[s] on Final Determination Covering
12  Specific Matters" prepared by the IRS to finalize the April 7, 2005 proposal recites the
13  Insureds' engagement in "an S corporation Charitable Contribution Strategy . . . that is the
14  same or similar to the transaction described in Notice 2004-30" and reallocates a total of
15  $169,293,486 in income for the tax years 2001 and 2002 from Firefighters' Fund to Mr.
16  McWilliam.[34]  This unquestionably is "an assertion, . . . by a Taxing Authority [the IRS]
17  that with respect to the tax years 2001 through 2005 . . . the post-gift allocations of Upper
18  Deck's taxable income that were made to the Municipal Plan [we]re not correct proper" –
19  i.e., an "Insured Tax Event."  The Form 906s are also an allegation by the IRS that the
20  Insureds were "liable for Taxes . . . directly related in whole or in part to [an] Insured Tax
21  Event" – i.e., a "Claim."  This reallocation of $169,293,486 in income resulted in an
22  additional federal tax liability of approximately $66 million plus another approximately
23  $22 million in interest[35] for an "Insured Tax Loss" with the IRS alone of approximately
24  $80 million (90% of $88 million) – more than enough to completely exhaust the $50
25  million aggregate limit of the Policy even after satisfaction of the $500,000 retention.
26  / / /
27  / / /
28  / / /

EXHIBIT _R_, PAGE _465_

B.    **AIG Now Seeks To Re-Underwrite The Policy Post-Claim By Imposing Implied Terms Contrary To The Express Written Terms Of The Policy.**

1.    **A Summary Of AIG's Post-Claim Underwriting Of The Policy's Clause 1 Insuring Agreement.**

AIG attempts to obfuscate the clear terms of the Policy, asserting that there is and was no "Insured Tax Event."[36] AIG argues that it insured a "Tax Plan" and that the Insureds failed to follow the strict requirements of the "Tax Plan" when they, like numerous other SC2 participants[37] (including some of AIG's insureds under other policies [Spencer Forrest and Award Homes]), bought the shares back from the charitable organization without going through a Put/Option redemption. Though the term "Tax Plan" is not used or referenced anywhere in the Policy or the documents attached thereto, AIG now makes this concept of a required "Tax Plan" the cornerstone of its defense.

AIG's misguided analysis begins with the irrelevant observation that the Policy's Clause 1. INSURING AGREEMENT is preceded by the recitation that AIG's agreement thereto was "in consideration of the payment of the premium, and in reliance upon the representations made and documents provided to" AIG.[38] From this, AIG contends that Exhibits A, B, C, D and E (KPMG's Opinions, the Representation Letter, the Shareholders Agreement, the Warrant Agreement, and FMV's Valuation) comprise a "Tax Plan" which was annexed to and made part of the Policy.[39]

While "Tax Plan" is a term never defined or used in the Policy at all, let alone in Clause 1. INSURING AGREEMENT or in any of the defined expressions used therein, AIG argues that Clause 1. INSURING AGREEMENT and the definition of Insured Tax Loss "premised coverage on the terms and conditions of the Tax Plan as contained in the Exhibits to the Policy, especially the Shareholders Agreement."[40] Nowhere does the Policy say such a thing.

AIG then purports to impose a "critical element" into its vaguely defined Tax Plan: that **any** redemption of Firefighters' Fund shares must be at appraised fair market value.[41] AIG asserts the Insureds must show they "followed the Tax Plan" by "compl[ying]

EXHIBIT _R_, PAGE _46C_

-11-

1  with . . . the . . . critical elements of . . . fair market value and an independent and

2  competent appraisal."[42]  With this argument AIG would have the Panel re-underwrite the

3  Policy, imposing or implying terms and conditions for which AIG never bargained, to

4  which the Insureds never agreed, and which are no where found in the express written

5  terms of the Policy.

6        **2.**     **AIG's Imagined Reading Of The Policy's Clause 1 Insuring**

7                **Agreement Has No Basis In The Policy's Language.**

8        No portion of the Policy states that the Insureds must follow AIG's imagined "Tax

9  Plan."  What the Policy does say in Clause 9. CONDITIONS PRECEDENT, ¶ (b) is that

10  "[i]t is a condition precedent to the right of the Insureds to be indemnified hereunder

11  that . . . [t]he Insureds shall have prepared and filed all applicable Tax Returns in a manner

12  materially consistent with that anticipated by the Opinions and/or the Representation

13  Letter."[43] C  Had it been the parties' intention, the Policy could easily have stated AIG's

14  imagined condition that the Insureds follow the ill defined "Tax Plan" as a condition of

15  coverage;  but, the Policy states no such condition.

16        As part of what seemed to the Insureds like "AIG's insistence on technical wording

17  in the policy that could give [AIG] a basis for rejecting its liability for any claims under the

18  policy" and the Insureds' "having to get the wording changed to avoid such a result,"[44]

19  AIG repeatedly attempted, unsuccessfully, to expand the scope of the condition stated in

20  Clause 9 ¶(b).[45] Clause 9 reads as it does and does not state a "condition" that the Insureds

21  follow a "Tax Plan" identified in KPMG's Opinions or elsewhere because the parties never

22  agreed to such a condition.  Rather, the parties agreed to the explicitly stated conditions,

23  warranties and covenants.

24  ------

C  AIG belatedly contends the Insureds failed to meet this condition; but, AIG premises
25  this contention only on Mr. McWilliam's not taking a charitable deduction for the
   appraised value of the non-voting shares donated to the Austin Firefighters in 2001.
26  (AIG's Complaint, Count VII, ¶¶ 81-84; AIG's Pre-Hearing Brief, pp. 25-26.)  AIG
   waived this defense by not asserting it in its July 29, 2005 denial of coverage for any
27  aspect of the insureds claim (Ex. 303).  See Section IV, *supra*.  Moreover, the assertion is
   meritless.  Mr. McWilliam did not claim a deduction in 2001 because doing so would not
28  have afforded a tax benefit (TR 817:13-818:14; Ex. 330, p. 20) and he still had the right (if
   SC2 worked) to claim a deduction in later years.  (TR 818:15-819:2).

**EXHIBIT** _R_, **PAGE** _467_

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1      Presumably in support of AIG's post-claim underwriting "Tax Plan" theory, AIG

2 offered evidence that AIG's Vice-President and Director of Taxes, Peter Lathrop,

3 "reviewed the tax consequences" of the Insureds' SC2 transaction in AIG's underwriting

4 of the Policy.[46] "[T]he **only risk** . . . as [Mr. Lathrop] saw it, was if the shares were not

5 redeemed at market value."[47] Despite Mr. Lathrop's professed belief before the Policy

6 was issued a "right of the charity in the Upper Deck transaction to have its stock redeemed

7 at fair market value" was "critical" to the "conclusion that the transaction worked from a

8 tax standpoint," Mr. Lathrop freely admits he did not tell anybody or communicate to

9 anyone that this was the "only risk," or even that it was a risk at all.[48] [D]  Indeed, if this was

10 "the only risk" identified by AIG to the successful implementation of the strategy, one

11 would expect to see a carefully crafted Policy exclusion or Policy representations or

12 warranty aimed at <u>specifically</u> identifying this solitary and critical risk.  It is, however,

13 beyond dispute that the Policy exclusions and representations and warranties do not

14 include any language that even remotely reflects a concern over the "critical" fair market

15 value "risk" expressed by Mr. Lathrop.  Likewise, this fundamental and "critical" risk

16 / / /

---

17 [D]  The only risk Mr. Lathrop actually identified for AIG was in fact quite different and
18 speaks to a concern over the merits of the generic SC2 strategy. (Ex. 388; TR 200:21-
203:6.) Mr. Lathrop's May 17, 2001 e-mail (written only six days after Marsh first
19 contacted AIG about underwriting the Policy (Exs. 33 & 34; TR 206:15-23)) to Mr.
Goldman admonished: "The risk of insuring a template deal is that the IRS gets a lot of
20 chances to examine the transaction and decide that it does not work.  The IRS now has 20
opportunities to audit the KPMG structure.  The number is going to go up, because KPMG
21 is going to keep doing these transactions, particularly if someone is willing to provide tax
insurance for them.  Is this something that M&A wants to insure going forward?" (Ex.
22 388.) Mr. Lathrop's closing question to Mr. Goldman evidenced Mr. Lathrop's concern
about the wisdom of any business decision to underwrite the Policy.  (TR 206:24-208:8.)
23 Mr. Lathrop expected KPMG to keep on marketing SC2 (TR 206:15-23) and he was right.
KPMG marketed SC2 to over 3,100 S Corporations.  "SC2 sales produced fees exceeding
24 $26 million for KPMG, making SC2 one of the KPMG's top 10 revenue producers in 2000
and 2001." (Ex. 199, p. 89.)  And, the availability of Insurance spurred KPMG's efforts
25 on. (Ex. 199, pp. 56-57.)  Mr. Lathrop testified this aspect of the risk was responsible for
the IRS challenging SC2.  (TR:208:9-12.)  Apparently AIG decided after the Upper Deck
26 Policy issued that the SC2 risk was not something that AIG wanted to insure going
forward.  Due to "a breakdown in the communication between KPMG and Marsh" and
27 Marsh "dropp[ing] the ball" coverage was not bound before Upper Deck's SC2 deal closed
in March 2001 leading to Marsh's "embarrassment"; AIG was asked to "save . . .
28 credibility" and "save face" for Marsh (Exs. 32, 34, 78), one of AIG's biggest producers.
But, this was the last policy AIG wrote for SC2 (Ex. 127; TR 170:20-171:8).

1  testified to by Mr. Lathrop is not mentioned anywhere in the documents in AIG's

2  underwriting file.

3       Mr. Lathrop further testified that he "probably review[ed] the [S]hareholders

4  [A]greement and the [P]olicy" to make sure this "critical aspect of the transaction was

5  reflected in the deal documents."[49]  But, examining those deal documents, Mr. Lathrop

6  himself admits that Section 1 of the Shareholders Agreement permits a sale of Firefighters'

7  Fund non-voting shares with nothing more than the written consent of Upper Deck and Mr.

8  McWilliam and that Section 1 **doesn't say anything** about fair market value."[50]  And,

9  Mr. Lathrop admits "he did **nothing** with respect to linking [his] critical concern over fair

10 market value and the provisions of Section 1" of the Shareholders Agreement.[51]  Nor did

11 Mr. Lathrop or AIG do **anything** "to link the critical aspect of the deal . . . fair market

12 value, with the representations given [by the Insureds] in Exhibit B to the policy [the

13 Representation Letter]."[52]

14       **3.    The Policy's Recitations Cannot Alter The Policy's Express**

15            **Terms In Clause 1. Insuring Agreement.**

16       AIG is thus reduced to trying to manufacture some requirement in the Policy's

17 INSURING AGREEMENT that the Insureds follow a "Tax Plan" which was not identified

18 in that clause (or anywhere else) and that such Tax Plan purported to impose an all-

19 encompassing requirement of a redemption at fair market value with an appraisal, which

20 simply is not stated in the Policy's INSURING AGREEMENT (or anywhere else).  AIG

21 tries to construct these requirements from the vague and boilerplate recitation preceding

22 Clause 1 which simply states that AIG's agreement to the Policy was "in consideration of

23 the payment of the premium, and in reliance upon the representations made and documents

24 provided to" AIG.[53]

25       AIG was free to rely on whatever it chose in underwriting the Policy – even Mr.

26 Lathrop's "view" that Section 1 of the Shareholders Agreement was merely "a standard

27 provision" that somehow expressed AIG's alleged belief that a fair market value

28 redemption of Firefighters' Fund stock under all circumstances was "critical" to SC2's

EXHIBIT _R_, PAGE _469_

1   success.[54][E]  But AIG's reliance on vague and non-specific Policy recitations simply does

2   not change the plain written terms of the Policy's Clause 1. INSURING AGREEMENT

3   (nor does AIG's professed reliance on something mean the Insureds warranted anything

4   other than what is stated in the Representation Letter).  Indeed, to the extent AIG truly

5   regarded these all encompassing appraisal and fair market value concepts as "critical" to

6   the SC2 strategy and the Policy itself, they obviously should have been specifically

7   addressed in a Policy exclusion or the Policy representations or warranties.  Had the Policy

8   contained such express language, it no doubt would have impacted the handling of the

9   Repurchase.  Suffice to say, an insured should not have to interpret vague, non-specific

10  Policy recitations in order to somehow divine the insurer's most "critical aspect of the

11  transaction."[55]

12          It also bears mentioning that while recitations preceding contractual agreements

13  "may be useful as an aid in construing the rights and obligations created by the

14  agreement," those recitations "cannot create any right beyond those arising from the

15  operative terms of the document."  *Genovese Drug Stores, Inc. v. Connecticut Packing*

16  *Company, Inc.,* 732 F.2d 286, 291 (2d Cir. 1984); *Abraham Zion Corp. v. Lebow Clothes,*

17  *Inc.* 761 F.2d 93, 103-104 (2d. Cir. 1985); *Aramony v. United Way of America,* 254 F.3d

18  403, 413 (2d Cir. 2001).  Rather, it is the "general rule that 'recitals in a contract will not

19  control the operative clauses thereof unless the  latter are ambiguous . . . In other words,

20  recitals . . . cannot control the clearly expressed stipulations of the parties . . . ."  *Abraham*

21  *Zion Corp. v. Lebow Clothes, Inc.,* 761 F.2d 93, 103-104 (2d. Cir. 1985) citing *Nelson*

22  *Dairies, Inc. v. Royal,* 6 Pa. D. & C. 2d 371, 373 (Pa. C.P. 1955).[F]

23

24  [E]   The Insureds' rights under the Policy cannot be avoided if AIG's own agents failed to
    protect AIG's interests by specifically addressing what AIG believed to be the "critical"

25  aspects of the risk in the Policy language.  *Chase Manhattan Bank v. New Hampshire
    Insurance Company* 193 Misc. 2d 580, 591 749 N.Y.S.2d 632, 2002 N.Y. Misc LEXIS

26  1297.
    [F]   That is not to say that the attachments referenced in the Policy recitals have no purpose

27  or meaning.  But the attachments referenced in the recitals have relevance only in the
    Policy's express use of those documents to state terms of the Policy; those documents are

28  not relevant to finding some implied terms about a "Tax Plan" that is never expressly
    spoken of and the terms of which were never expressly stated.  Use of the attachments in

EXHIBIT ___K__, PAGE _470_

1    AIG's attempt to graft implied terms into the policy also needs to be judged against

2  the general rules of insurance policy construction.  These were summarized by the Second

3  Circuit in *Kimmins Industrial Service Corporation v. Reliance Insurance Company* 19

4  F.3d 78, 81 (2d Cir. 1994):

5    "As a fundamental matter, the objective of contract interpretation is to
give effect to the expressed intention of the parties. See, e.g., Hartford

6    Accident & Indemnity Co. v. Wesolowski, 33 N.Y.2d 169, 171-72,
350 N.Y.S.2d 895, 898, 305 N.E.2d 907 (1973); Morlee Sales Corp.

7    v. Manufacturers Trust Co., 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 518,
172 N.E.2d 280 (1961); 4 S. Williston, Williston on Contracts § 600,

8    at 280 (3d ed. 1961). The basic principle that guides a Court in its
interpretation of the terms contained in an insurance contract 'is the

9    reasonable expectation and purpose of the ordinary business man
when making an ordinary business contract . . . .' Album Realty Corp.

10   v. American Home Assurance Co., 176 A.D.2d 513, 515, 574
N.Y.S.2d 704, 706 (1st Dep't 1991) (mem.) (quoting Bird v. St. Paul

11   Fire & Marine Insurance Co., 224 N.Y. 47, 51, 120 N.E. 86 (1918)).

12  _____

     the Policy language is discussed below just to demonstrate that the attachments do have
13  meaning – just not the meaning that AIG would ascribe.
     KPMG's three opinions dated May 2, 2001 attached to the Policy as Exhibit A and
14  identified in Clause 2(n) as the "'Opinions' . . . and deemed a part of the [P]olicy" are:
     expressly used in the Policy's Declarations to set the "Policy Period" ( Ex. 104:2 [ending
15  on "the expiration of the applicable statute of limitations with respect to the tax items
     described in the Insured Tax Event relating to the transactions described in the KPMG LLP
16  opinions"]; 104:4 Clause 2(q)); expressly used in Clause 9. CONDITIONS PRECEDENT
     to state limited conditions on the Insureds' recovery ["The INSUREDS shall have prepared
17  and filed all applicable Tax Returns in a manner materially consistent with that anticipated
     by the Opinions and/or the Representation Letter"] (Ex. 104:10); expressly used in ¶ (1) of
18  the Representation Letter attached as Exhibit B to the Policy to warrant as of May 2, 2001
     and September 4, 2001 "the facts, assumptions of fact, and understandings of fact" in the
19  Opinions (each of which has sections captioned "FACTS", none of which states AIG's
     imagined condition that the non-voting stock in all circumstances be redeemed at fair
20  market value with an appraisal).
     The "Representation Letter" attached to the Policy as Exhibit B and identified in
21  Clause 2.(r) and "deemed part of the application for this policy" has relevance both with
     respect to Clause c. EXCLUSIONS ¶ (b) excluding "Loss in connection with a Claim
22  made against any Insured arising out of, based upon, or attributable to any material
     inaccuracy in the facts set forth or referenced in the Representation Letter" and also for
23  Clause 9. CONDITIONS PRECEDENT ¶ (b):  "The Insureds shall have prepared and filed
     all applicable Tax Returns in a manner materially consistent with that anticipated by the
24  Opinions and/or the Representation Letter."
     The "Shareholders Agreement" attached as Exhibit C and the Warrant Agreement
25  attached as Exhibit D have relevance to Clause 3. EXCLUSIONS ¶ (h) for "Loss in
     connection with a Claim made against any Insured . . . to the extent such Loss arises out of,
26  is based upon or is attributable to an amendment to the Shareholder Agreement or the
     Warrant Agreement . . . without the Insurer's prior written consent."
27   The FMV Opinions, Inc. Valuation attached to the Policy as Exhibit E is relevant to the
     representations and warranties given in ¶ (4) of the Representation Letter, e.g., "we believe
28  the appraised value of Upper Deck . . . is substantially correct", etc.

373/017994-0028
767556.01 a12/01/06
UPPER DECK'S AND RICHARD McWILLIAM'S POST-HEARING BRIEF

Insurance contracts are normally construed strictly against the insurer. See, e.g., United States Fidelity & Guaranty Co. v. Annunziata, 67 N.Y.2d 229, 232, 501 N.Y.S.2d 790, 791, 492 N.E.2d 1206 (1986); Miller v. Continental Insurance Co., 40 N.Y.2d 675, 678, 389 N.Y.S.2d 565, 567, 358 N.E.2d 258 (1976). Thus, 'where the meaning of a policy of insurance is in doubt or is subject to more than one reasonable interpretation, all ambiguity must be resolved in favor of the policy holder and against the company which issued the policy.' Little v. Blue Cross of Western New York, 72 A.D.2d 200, 203, 424 N.Y.S.2d 553, 555 (4th Dep't 1980); see Miller v. Continental Insurance Co., 40 N.Y.2d at 678, 389 N.Y.S.2d at 567.

Exclusions from insurance policy coverage are given strict construction. See, e.g., Seaboard Surety Co. v. Gillette Co., 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272 (1984); M.H. Lipiner & Son, Inc. v. Hanover Insurance Co., 869 F.2d 685, 687 (2d Cir. 1989) (applying New York law) ('exclusionary clauses are given the interpretation most beneficial to the insured'). In order to be enforced, 'exclusions or exceptions from policy coverage must be specific and clear"; they 'are not to be extended by interpretation or implication.' Seaboard Surety Co. v. Gillette Co., 64 N.Y.2d at 311, 486 N.Y.S.2d at 876; see also Miller v. Continental Insurance Co., 40 N.Y.2d at 678, 389 N.Y.S.2d at 567; General Accident Insurance Co. v. United States Fidelity & Guarantee Insurance Co., 193 A.D.2d 135, 137, 602 N.Y.S.2d 948, 950 (3d Dep't 1993); Album Realty Co. v. American Home Insurance Co., 176 A.D.2d at 515, 574 N.Y.S.2d at 705. 'Once the insured shows that a loss has occurred, the insurer shoulders the burden of demonstrating that the loss claimed is excluded expressly from coverage under the policy terms.' M.H. Lipiner & Son, Inc. v. Hanover Insurance Co., 869 F.2d at 687."[G]

[G] Arbitrator Moxley asked the parties to address the ramifications of the Policy's Clause 16. on these and similar legal principles. (TR 1272:3-20.) Briefly, the ramifications are not great because these rules are chiefly rules of public policy. 5 Corbin on Contracts § 24.27, p. 306 (1998); see also Encyclopaedia Britannica v. SS Hong Kong Producer, 422 F.2d 7, 15 (2d Cir. 1969), citing Corbin. As the Restatement (Second) of Contracts explains, "[i]t is in strictness a rule of legal effect, sometimes called construction, as well as interpretation: its operation depends on the positions of the parties as they appear in litigation, and sometimes the result is hard to distinguish from a denial of effect to an unconscionable clause." Rules such as these grounded in public policy may not be disclaimed. See 5 Corbin on Contracts § 24.27B, p. 105 (2006 Rev. Supp.); see e.g. N.Y. C.L.S. U.C.C. § 1-102 (2006).

Moreover, allowing an insurer to contract around strict construction against the insured, violates the policy behind the rule. As one treatise explains: "The soundest basis for the rule of construction against the insurer is that it comports with the standard requiring that policies be construed according to the object of the contract, that is, in light of the purpose of the contract to give protection." Russ, Lee R. and Thomas F. Segalla, 2 Couch on Insurance (3d ed. 2005) p. 22-49, § 22.19. Therefore,

[s]ince the parties have entered into a contract intended for the protection of the insured by the insurer, where an ambiguity presents a choice of interpretations which are equivalent in terms of favoring the insurer or the insured, the propriety of giving effect to the purpose of the contract to give protection to the insured tips the scales in his or her favor and calls for construction against the insurer , to provide the fullest

EXHIBIT _R_, PAGE _472_

373/017994-0028
767556.01 a12/01/06          UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1    Similarly:

2            "The well-settled rule of construction is that insurance policies
             prepared by insurance companies must not be so construed as
3            to work a forfeiture, unless by **clear and unambiguous**
             language, readily understandable, not by judicial officers or
4            trained and experienced lawyers, but by businessmen of
             average intelligence who have occasion to require insurance of
5            the kind in question, it appears that it was so intended."

6    Russ, Lee R. and Thomas F. Segalla, 2 Couch on Insurance (3d ed. 2005) p. 22-77,

7    § 22.35, citing *Zivitz v. Maryland Casualty Co.*, 182 N.Y.S. 321 (1920).

8            Judged against these general principles, AIG's attempt to graft implied terms into

9    the Policy based on recitations preceding the INSURING AGREEMENT must fail.

10   **III.    THE DECEMBER 10, 2002 SHARE PURCHASE AGREEMENT RESULTED**

11   **IN MORE THAN A FAIR MARKET VALUE PURCHASE PRICE – THE**

12   **NON-VOTING SHARES HAD NO FAIR MARKET VALUE.**

13           The issue of the valuation of the non-voting shares is relevant to a number of AIG's

14   coverage defenses which are discussed below.  In considering the valuation of the Shares,

15   the Arbitrators should not lose sight of who has the burden of proof on this issue:  AIG.

16           Because Chairman Byrne asked that the Insureds be brief in addressing the question

17   of value in their examination of AIG's key witness on that issue, Scott Nammacher, the

18   Insureds will be similarly brief here addressing only the most glaring deficiencies in Mr.

19   Nammacher's analysis.[56]

20           Mr. Nammacher acknowledged:

21       •   Upper Deck was an S corp. which is a pass-thru entity for income tax

22           purposes,[57]

23       •   "that that means that shareholders can have tax liabilities associated with

24           their ownership beyond the distributions that may be made to them," "so if

25           there aren't dividends or distributions that come out, somebody can have a

26           great big tax bill and no distributions to pay any part of it"[58] and

27           _____
             protection possible to the interests of the insured.

28   *Id.* at p. 22-49-2250, citing among other cases, *Parry v. Maryland Casualty Co.*, 238
     N.Y.S. 613 (1929).

                                    EXHIBIT   _R_, PAGE _473_

                                            -18-

1    • "that this company [Upper Deck] had announced . . . as of December 2002,

2        [a] no dividend policy."[59]

3    These acknowledgements lead inescapably to the conclusion that the only market for

4    Upper Deck's non-voting stock was with Upper Deck or Mr. McWilliam.

5        Mr. Nammacher was asked to " think about somebody who would have bought that

6    stock [Firefighters' Fund non-voting shares] in December of 2002. If the company's

7    income was $150 million, if they bought that stock, they would have been ratably allocated

8    90 percent of th[at] income" which Mr. Nammacher confirmed would be "$135 million in

9    taxable income for tax year 2003."[60] Mr. Nammacher confirmed that in his work he

10   "assumed a 40.75 percent effective tax rate" which would result in "$52 [closer to $54]

11   million in tax liability for 2003."[61] [H] Mr. Nammacher confirmed that his valuation

12   "posit[ed] that the buyer of this stock would pay $11.3 million for it. . . So by year end

13   2003, between taxes and their investment, the[] [hypothetical buyer would be] into this

14   [investment at least] $62.3 million in cash.."[62] Mr. Nammacher was therefore asked:

15   "Where is the market for such an investment?"[63] Mr. Nammacher responded: "I would

16   say no S corp. could ever be sold under a policy like that. So, you know, if you want to

17   take that approach, that's your approach."[64]

18       The approach leading to Mr. Nammacher's conclusion that "no S corp. could ever

19   be sold under a policy like that" is the only approach that fits the facts. Mr. Nammacher's

20   concession "no S Corp. could ever be sold under a policy like that" tells the arbitrators

21   virtually all that they need to know about the value of Upper Deck's non-voting common

22   stock in December 2002. You would probably have to pay somebody to accept such an

23   "investment."

24       No witnesses identified a market for Upper Deck's non-voting shares. Mr.

25   Nammacher could not identify one. Nor could Linda Burke. When Arbitrator Kramer

26   _____

[H] Mr. Nammacher was also asked to "talk about what actually happened in 2003. You
27   know what the number would have been on the K-1 in 2003? You looked at that
document." and he acknowledged "I think it was somewhere in the 130 or 150 something,
28   was in that range" and that "it would have been over $90 million in tax liabilities." (TR
351:4-12.)

EXHIBIT __R__, PAGE_474

-19-

1   asked, "Ms. Burke, realistically, do you -- could you imagine other viable candidates to

2   purchase this stock beyond Upper Deck or its affiliates?" Ms. Burke did no better in

3   identifying a market for the stock: "That's very difficult for me to say."[65]  Likewise, Steve

4   Mather testified: "any real buyer, would be looking at reporting that kind of taxable

5   income [$135 million in a year] without getting any money" from Upper Deck to pay taxes

6   in excess of $50 million in a year.[66]  There are no buyers like that.

7        Attempting to undermine the notion that there was no market for Upper Deck's

8   non-voting shares other than Upper Deck or Mr. McWilliam, AIG's counsel questioned

9   Mr. Mather attempting to suggest that "another charity that was tax exempt" would be a

10  market for the Austin Firefighter's non-voting shares.[67]  Mr. Mather testified that he did

11  not "believe any of those ever **purchased** shares" and questioned whether that would be

12  appropriate in "exercising their fiduciary obligations and investment responsibilities."[68]

13  Mr. Mather was correct to question whether such an investment would meet a tax exempt

14  charity's "fiduciary and investment responsibilities," because it would not.  This fact is

15  demonstrated by advice given to the Firefighters' Fund by its counsel and its auditors.

16       The Firefighters' Fund's counsel's, Kendall & Osborn's February 14, 2001 letter to

17  the Firefighters' Fund advised:

18       Board of Trustees would not be authorized . . . to invest in an S
    corporation:  The shares in such a corporation do not meet the
19       investment criteria . . .It therefore became necessary . . . to
    determine if the Fund could *hold* such an asset that it receives
20       as a gift even if it could not *invest* in that asset.  Were it not for
    the fact that the instruments making the gifts expressly grant
21       the Fund the right to require the corporation that issued the
    shares to purchase those shares from the Fund after a fixed
22       period of time, the answer would be that the Fund could not
    hold those shares . . .Since the Fund has that right, and intends
23       to exercise it with regard to each of the gifts, by necessary
    implication the Fund has the right to *hold* the shares until the
24       point in time when it can require that the shares be purchased
    by the corporation that issued them.[69]
25

26  On March 7, 2001 Fulbright & Jaworski advised the City of Austin that the Firefighters'

27  Fund:

28       may not invest in shares of common stock of the S
    Corporation.  [Kendall & Osborn] makes a distinction that the

EXHIBIT ___J___, PAGE 475

1    Fund will not be investing in the Stock but rather will merely
     be holding the stock.. ... it is uncertain whether the Fund may
2    [even] hold the Stock.[70]

3    The Firefighters' Fund's auditors, Davila Schaubhut & Co., advised that the Firefighters'

4    Fund:

5         may not invest in 'restricted securities' which have not been
          registered under the Securities Act of 1933 and as a result are
6         subject to restrictions on resale.[71]

7        Thus, "another charity that was tax exempt" was not a market for Upper Deck's

8    non-voting stock. The Firefighters' Fund could not even hold, let alone purchase, that

9    stock were it not for the existence of the Put/Option and there is no evidence that any

10   similar entity would be different.[I]

11       It also bears mentioning that under Mr. Nammacher's analysis, the Put/Option

12   would not follow the non-voting stock to a purchaser in December of 2002. Mr.

13   Nammacher was asked: "This prospective imaginary purchaser in December of 2002, the

14   valuation date . . . did you make an assumption about whether such a purchaser would also

15   acquire that put." Mr. Nammacher initially responded: "No."[72] Obviously, without the

16   Put, the prospective purchaser would have no guaranteed exit strategy to get out from

17   _____

[I]   These observations should disabuse anybody of the notion that the Put/Option provided
18   for in Section 5 of the Shareholders Agreement was there for any purpose other than to
     entice the tax exempt charity to participate in SC2. Austin Firefighters was told the
19   existence of the Put/Option was what permitted it to even hold the non-voting stock and
     that without the Put/Option it could not do so. Based on KPMG's advice, Mr.
20   McWilliam's "understanding was the put option was there to entice the Firemen's Fund . .
     it was there only for the benefit of the Firemen's Fund . . ." (TR 362:23-364:9, 374:2-
21   375:14.) KPMG's Opinions discuss the Put/Option only to examine whether or not its
     Put/Option came within the safe harbor provisions of Regulation Section 1.1361-
22   1(l)(2)(iii) which required that a principal purpose of the Shareholders Agreement not be
     circumvention of the one class of stock requirement of the Code's section 1.1361(b)(1)(D)
23   and that the Put/Option not "establish[] a purchase price that, at the time the agreement is
     entered into, is significantly in excess of or below the fair market value of the stock." The
24   Put/Option was necessary not to enhance the viability of the SC2 transaction under the tax
     laws, but because it was a necessary concession to permit and entice the tax exempt charity
25   to participate. Because of Regulation Section 1.1361-1(l)(2)(iii) the Put/Option created a
     danger that SC2 would not work under the tax laws; it weakened the viability of SC2, it
26   did not strengthen it. AIG's after the fact construction that the fair market value provisions
     required to keep the Put/Option from running afoul of the tax laws existed instead to add
27   some economic substance to the SC2 transaction is incorrect. If one were to conclude that
     the deal had absolutely no economic substance without the Put/Option, this conclusion
28   would invalidate all donations of privately held stock in instances where the stock is not
     accompanied by something akin to the Put/Option. In this regard, see also fn. Z, infra.

EXHIBIT *R*, PAGE 476

373/017994-0028
767556.01 a12/01/06    UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1   under a situation in which the purchaser suffered huge tax liabilities with no cash to pay

2   those liabilities. So Mr. Nammacher was asked "well, you understand that if they did not

3   acquire the Put, they have no exit strategy for this investment, right?" Evidencing how

4   well thought out his conclusions were, or were not, Mr. Nammacher then changed his

5   testimony: "We took a 35 percent lack of marketability in this case. So I would say we

6   valued it without a put in place. Part of the 35 percent that we applied assumes that is

7   there isn't an exit strategy."[73]

8        A 35% discount for lack of marketability for an investment in what could be

9   quickly diluted to a minority position in a closely held corporation with the potential

10  (which in this case was actually realized) to involve at least a $50 million federal income

11  tax liability for the purchaser in the purchaser's first year of ownership alone and with no

12  realistic prospect of cash distributed from the investment to pay that $50 million liability is

13  not realistic. Mr. Nammacher testified he arrived at that 35% number by selecting the

14  median discount rate from a number of studies that looked at restricted stock. But when

15  asked "of all those studies, did any involve an S corp.?" Mr. Nammacher acknowledged

16  "Probably not" and that he could not testify that even a single S-Corp. was involved in any

17  of the studies he relied on.[74] It is the S Corp.'s unique pass through structure which

18  allocates tax liabilities without regard to whether actual distributions are made that made

19  the S Corp. the subject of SC2 in the first place. Mr. Nammacher's predication of a 35%

20  marketability discount for the non-voting shares on the median discount rate revealed by

21  some studies that do not involve S-Corp.'s is fundamentally flawed. Even Mr.

22  Nammacher's own company's study observed discounts as high as 80% for stock in non S-

23  Corp entities. Non-controlling interests in S Corps. with announced no dividend policies

24  should obviously warrant the highest of marketability discounts.[75]

25        Mr. Nammacher's entire analysis also completely overlooks a large contingent

26  liability that Upper Deck faced in 2002 for income taxes arising from the potential loss of

27  S-Corp. status. In December 2002 the Insureds and the Firefighters' Fund knew of the IRS

28  subpoenas to KPMG in April of 2002 and of the potential the IRS could tax Upper Deck as

**EXHIBIT _R_, PAGE _477_**

1   a C-Corp. from March of 2001 and that if that happened Upper Deck could not apply for

2   S-Corp. status for another five years.  Again, Mr. Nammacher ignored this risk in forming

3   his 2002-2003 valuation opinions.

4        Given that the only market for the Firefighters' Fund's non-voting shares in Upper

5   Deck in December 2002 was Upper Deck, MPR Trust or Mr. McWilliam, Mr. Bendheim's

6   much decried (by AIG) statement to the Firefighters' Fund that "[t]he real fair market

7   value [of the non-voting shares] is what the Upper Deck Company is willing to pay for

8   those shares" and "the Upper Deck Company has offered to purchase the nonvoting stock

9   for $2 million" could not have been more accurate.[76]  Mr. McWilliam believed the non-

10  voting shares had a fair market value of $2 million in December of 2002.[77]  This was a

11  50% increase in the value of the stock over an 18-month period notwithstanding all of the

12  uncertainties associated with the Company's looming tax problems.  Nobody but Mr.

13  Nammacher contradicted the notion that $2 million was fair market value, and Mr.

14  Nammacher's testimony was not persuasive.

15  **IV.   TO AVOID LIABILITY AIG MUST PROVE A COVERAGE DEFENSE**

16       **STATED IN ITS JULY 29, 2005 COVERAGE DENIAL LETTER.  AIG**

17       **CANNOT RELY ON DEFENSES NOT STATED IN ITS COVERAGE**

18       **DENIAL LETTER.**

19       Because the Loss comes within the scope of Clause 1. INSURING AGREEMENT,

20  because AIG repudiated any obligations to the Insureds under the Policy[78] and because the

21  evidence establishes (and AIG concedes) that the settlement the Insureds reached with the

22  IRS was reasonable,[79] "the burden of proof . . . rest[s] with AIG to demonstrate that the

23  loss compromised by the [I]nsureds was not within the policy coverage." *Servidone*

24  *Construction Corp. v. Security Ins. Co.*, 64 N.Y.2d 419, 435, 477 N.E.2d 441, 445, 488

25  N.Y.S.2d 139, 143.  In that regard, AIG must be limited to proving matters expressly

26  stated in its coverage denial letter of July 29, 2005 (the "Coverage Denial Letter") because

27  "an insurer is deemed, as a matter of law, to waive a defense to coverage where other

28  defenses are asserted, and where the insurer possesses sufficient knowledge (actual or

EXHIBIT   R, PAGE 478

1   constructive) of the circumstances regarding the unasserted defense."[80J]  *New York v. Amro*

2   *Realty Corp.,* 936 F.2d 1420, 1431 (2d Cir. 1991) (holding that insurance company waived

3   a late notice defense when it failed to assert it along with several other grounds for

4   disclaiming coverage); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. The Travelers*

5   *Indemnity Co.,* 210 F.Supp.2d. 479, 485 (S.D.N.Y. 2002); *Cent. Gen. Hosp. v. Chubb*

6   *Group Ins. Cos.,* 90 N.Y.2d 195 (1997).  "[T]he act by an insurer of disclaiming on certain

7   grounds but not others is deemed *conclusive* evidence of the insurer's intent to waive the

8   unasserted grounds." *New York v. Amro Realty Corp.,* 936 F.2d at 1432.

9   **V.     AIG HAS NOT AND CANNOT PROVE THE LOSS IS WITHIN EITHER OF**

10          **CLAUSE 3. EXCLUSIONS ¶ (a) or ¶ (h).**

11          AIG's July 29, 2005 Coverage Denial Letter for any aspect of the IRS's or FTB's

12  claims against the Insureds raised two separate exclusions, Clause 3 EXCLUSIONS

13  ¶ (a)[81]:

14          The Insurer shall not be liable to make any payment for Loss in
            connection with a *Claim made against any Insured:*
15          *(a) arising out of, based upon or attributable to* the committing
            in fact of any criminal or deliberate fraudulent act (including
16          without limitation deliberate civil fraud), or any knowing and
            intentional violation of any law, rule, regulation or statute; . . .
17

18  and Clause 3 EXCLUSIONS ¶ (h):

19          The Insurer shall not be liable to make any payment for Loss in
            connection with a Claim made against any Insured: . . .to the
20          extent such *Loss arises out of, is based upon or is attributable*
            *to* an amendment to the Shareholders Agreement or the
21          Warrant Agreement attached hereto as <u>Exhibits C and D</u>,
            respectively, without the Insurer's prior written consent (which
22          consent shall not be unreasonably withheld by the Insurer).[82]

23  _____

    [J]   This eliminates: AIG's assertions that AIG was misled in the underwriting process
24  regarding Yu-Gi-Oh (AIG's Pre-hearing Reply Brief, pp. 17-20.)  AIG's allegations about
    impairment of AIG's alleged rights of subrogation (AIG's Complaint, Count VI, ¶¶ 75-80;
25  AIG's Pre-hearing Reply Brief, pp. 16-17; AIG 's Opening Brief, pp. 26-27; AIG's
    Complaint); AIG's assertion that the Insureds warranted that "the transaction set forth in
26  the opinions [of KPMG] was a lawful strategy that 'should' survive IRS scrutiny"(AIG's
    Complaint, ¶ 15 and Count II, ¶¶, 53-60); AIG's assertion Mr. McWilliam's lack of a
27  charitable deduction in 2001 for his contribution of the non-voting shares to Austin
    Firefighters excuses AIG's payment (AIG's Complaint, Count VII, ¶¶ 81-84); and AIG's
28  contentions that the Insureds breached paragraph 3 of the Representation Letter (AIG's
    Pre-hearing Reply Brief, p. 11).

EXHIBIT _B_, PAGE _479_

-24-

1       Comparing the language in Clause 3's ¶ (a) and ¶ (h) italicized above for emphasis

2   reveals important similarities and even more important differences between the language

3   and structure of the two exclusions.

4       **A.    Case Law Requires That AIG Prove The "Claim" Or "Loss" Was**

5                  **Proximately Caused By The Perils Identified In Clause 3. ¶ (a), Fraud,**

6                  **Or Clause 3. ¶ (h), Amendment of the Shareholder Agreement,**

7                  **Respectively.**

8       Both of the exclusions use similar language that may be summarized as "arising out

9   of" language.[K] AIG has argued that because the Policy exclusions use the "arising out of"

10  language AIG does not need to establish that the circumstances surrounding the

11  Repurchase actually **caused** the Insureds' loss. According to AIG, it only need establish

12  "some causal relationship to the Loss" and not that the Repurchase was either the

13  "dominant and efficient" or the "proximate cause" of the Loss. In making this argument,

14  AIG not only seeks to turn upside down the well-settled causation requirements relating to

15  insurance policy exclusions,[L] but AIG also appears to concede that it cannot establish that

16  the Repurchase was the "dominant and efficient" or "proximate cause" of the Insureds'

17  Loss or the IRS' Claim.[83]

18  ///

19

---

20  [K]   Clause 3 ¶ (a) uses the language "arising out of, based upon or attributable to" and Clause 3 ¶ (h) uses the virtually identical language "arises out of, is based upon or is

21  attributable to." There is no meaningful difference between "arising out of" and "arises out of" or between "attributable to" and "is attributable to." And, New York Law instructs that "[t]here is no significant difference between the meaning of the phrases 'based on'

22  [and, presumably, 'based upon'] and 'arising out of'" in the coverage or exclusion clauses of an insurance policy." *Mount Vernon Fire Insurance Company v. Creative Housing Ltd.*,

23  88 N.Y.2d 347, 352 (1996). Nor does inclusion of the language "*attributable to*" appear to alter the breadth of the language common to Clause 3. ¶¶ (a) & (h) in any way (*Board of*

24  *Managers of Yardarm Condominium II v. Federal Ins. Co.*, 247 A.D.2d 499, 669 N.Y.S.2d 332 (1998)).

25  [L]   The insurer must prove the excluded peril is the dominant and efficient cause of the

26  loss. *Throgs Neck Bagels, Inc. dba A-Whole Lot of Bagels v. GA Ins. Co. of N.Y.*, 241 A.D.2d 66, 71 (1st Dept. 1998); *Kimmins Indus. Serv. Corp.*, 19 F.3d 78, 81; *Album Realty*

27  *Corp. v. American Home Assurance Co.*, 574 N.Y.S.2d 704, 176 A.D.2d 513, 514 (N.Y.App.Div, 1st Dept. 1991); *Ginsburg v. New York Property Ins. Underwriting Assoc.*,

28  210 A.D.2d 130 (1994); *Cresthill Industries, Inc. v. Providence Washington Insurance Co.* (1976) 385 N.Y.S.2d 797, 53 A.D.2d 488, 493-494.

EXHIBIT _R_, PAGE_480_

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1    Contrary to AIG's suggestion that due to the use of the "arising out of" language the

2    "Claim" or "Loss" need not even have been "caused by" the perils identified in Clause 3.

3    ¶¶ (a)[M] &(h)[N] respectively, at a minimum, for either of Clause 3. ¶¶ (a) or (h) to apply there

4    must be a "but for" relationship between the "Claim" or "Loss" and the respective fraud

5    and amendment perils identified in those respective exclusions.[84]  *Mount Vernon Fire*

6    *Insurance Company v. Creative Housing Ltd.*, 88 N.Y.2d 347, 350 (1996).  In reality, as

7    expressed in footnote L, there must be more than a "but for" causal relationship; AIG bears

8    the burden of demonstrating that the Repurchase was the proximate cause of the Insureds'

9    Loss.

10    In *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78 (2d Cir. 1994), a

11    case decided under New York law, the Second Circuit considered application of an

12    exclusion in a general liability policy for "bodily injury . . . arising out of" any of a myriad

13    of asbestos related perils[O] to injuries suffered by two workmen who were in fact removing

14    asbestos on a tower when they were burned by a rising cloud of hot steam and then fell

15    from the tower.  The court made it clear that the use of "arising out of" language does not

16    change the requirement that the excluded peril must be the proximate cause of the loss for

17    an exclusion to apply, stating:

18         Although "the words 'arising out of' have 'broader
          significance than the words "caused by", and are ordinarily
19         understood to mean originating from, incident to, or having
          connection with,'" *Aetna Casualty & Surety Co. v. Liberty*
20         *Mutual Insurance Co.*, 91 A.D.2d 317, 320-21, 459 N.Y.S.2d
          158, 161 (4th Dep't 1983) (quoting 6B Appleman, Insurance
21         Law & Practice, § 4317), the **New York courts have not
          found injuries to "arise out of" a specified condition unless**
22         **there was some causal relationship between the condition**

---

23  [M]  "[T]he committing in fact of any criminal or deliberate fraudulent act (including
    without limitation deliberate civil fraud), or any knowing and intentional violation of any
24    law, rule, regulation or statute; . . . "

    [N]  "[A]n amendment to the Shareholders Agreement or the Warrant Agreement attached
25    hereto as Exhibits C and D, respectively, without the Insurer's prior written consent (which
    consent shall not be unreasonably withheld by the Insurer)."
26
    [O]  "[¶] 1) Inhaling, ingesting or prolonged physical exposure to asbestos or goods or
27    products containing asbestos; or [¶] 2) The use of asbestos in constructing or
    manufacturing any good, product, or structure; or [¶] 3) The removal of asbestos from any
28    good, product, or structure; or [¶] 4) The manufacture, transportation, storage or disposal
    of asbestos or goods or products containing asbestos."

EXHIBIT _A_, PAGE _481_

373/017994-0028
767556.01 a12/01/06        UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

**and the injury**.  Among the cases dealing with insurance policy clauses using the "arising out of" terminology, **two courts have stated expressly that an injury does not arise out of a specified set of conditions unless it is proximately caused by those conditions**.  See *Lumbermen's Mutual Casualty Co. v. Logan*, 88 A.D.2d 971, 451 N.Y.S.2d 804 (2d Dep't 1982) (mem.); *United Services Automobile Association v. Aetna Casualty & Surety Co.*, 75 A.D.2d 1022, 429 N.Y.S.2d 508 (4th Dep't 1980) (mem.). . . .

Though other courts dealing with "arising out of" clauses have not expressed their rulings in terms of proximate causation, a review of the fact patterns reveals that the **"arising out of" clause has been held applicable where the injury was proximately caused by the specified condition**, see, e.g., *Aetna Casualty & Surety Co. v. Liberty Mutual Insurance Co.*, 91 A.D.2d at 319, 459 N.Y.S.2d at 160, but not where there was no such proximate causation, see, e.g., *General Accident Insurance Co. v. United States Fidelity & Guarantee Insurance Co.*, 193 A.D.2d at 139, 602 N.Y.S.2d at 951.

19 F.3d 81-82; emphasis added.  The court then went on to reject the insurer's contention that the exclusion for injury "arising out of" asbestos removal applied "conclud[ing] that the injuries in question were not caused by asbestos, nor related to the intrinsic nature of asbestos, nor proximately caused by the removal of asbestos.  Hence, they cannot be said to have 'arisen out of' the removal of that substance."  19 F.3d 82.

AIG cites two cases decided after *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78 (2d Cir. 1994) for the proposition that "the words 'arising out' . . . 'have broader significance than the words caused by, and are ordinarily understood to mean originating from, incident to, or having connection with . . .'": *Maroney v. New York Central Mutual Fire Ins. Co.*, 5 N.Y.3d 467 (2005) and *United States Fire Ins. Co. v. New York Marine and General Ins. Co.*, 268 A.D.2d 19, 706 N.Y.S.2d 377 (2000).  But neither one of these cases changed the requirement that the peril identified after the words "arising out" of must be the proximate cause of a loss before an exclusion employing those words can eliminate coverage.

In relying on *Maroney* and *United States Fire Ins. Co.* and the earlier cases, AIG fails to distinguish between the scope of a peril described in an exclusionary clause, which is what these cases deal with, and the causal nexus required between the excluded peril and

EXHIBIT _R_, PAGE _482_

373/017994-0028
767556.01 a12/01/06
UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1  the loss before the exclusion can apply.  In *Maroney,* the court addressed "the meaning of

2  the words 'arising out of' in an 'uninsured premises' exclusion contained in a homeowners

3  insurance policy."  *Maroney v. New York Central Mutual Fire Ins. Co.*, 5 N.Y.3d 467 at

4  470 (2005).  In that case, plaintiff Maroney's son Mark was kicked in the head by a horse

5  being led by the insured, Deborah Morris, who owned stables built on property across the

6  road from the her residence.  *Id.* at 470-471.  New York Central Mutual Fire Insurance

7  Company (NYCM) wrote the Maroney's homeowners insurance policy based on their

8  residence, but the stable was insured by a different insurer.  *Id.*  NYCM policy's

9  "uninsured premises" exclusion provided in pertinent part that coverage for personal

10  liability did not apply "to bodily injury or property damage . . . arising out of a

11  premises . . . owned by an insured . . . that is not an insured location."  *Id.* at 472.  The

12  New York Supreme Court held that the exclusions did not apply; however, a divided

13  Appellate Division reversed, finding that the injury "arose out of" the uninsured premises

14  and the exclusion was applicable.  *Id.* at 471.

15       On appeal, plaintiff argued that the uninsured premises exclusion applied only to

16  injuries "causally connected to the physical condition of the premises."  *Maroney,* 5

17  N.Y.3d at 472.  Thus, the exclusion would be inapplicable because the insured's allegedly

18  tortious or negligent conduct, not the physical condition of the premises, caused plaintiff's

19  injuries.  *Id.*  However, the insurer argued that the term "arising out of" is broader, and

20  therefore "pertains to both the physical condition of the premises and conduct related to the

21  use of the uninsured premises that is causally connected to the injury."  *Id.*  The New York

22  Court of Appeals agreed with defendant and held that the "arising out of" language in the

23  policy included use of the premises, and was not limited to the physical condition of the

24  premises, as urged by the insured.  *Id.*

25       While AIG suggests *Maroney* stands for the proposition that application of a policy

26  exclusion containing "arising out of" language employs a causation standard requiring

27  only "some causal" relationship between the loss and the excluded activity,[85] that is <u>not</u>

28  what *Maroney* <u>holds</u>. As the court plainly stated:  "Here we <u>hold</u> that "arising out of"

EXHIBIT  *R* , PAGE *483*

-28-

1   includes use of the premises (as urged by the insurer), and is not limited to the physical

2   condition of the premises (as urged by the insured)" (emphasis added).  Thus, the court

3   clearly iterates its holding in terms of the scope of the excluded peril, not the causal

4   relationship between the insured's loss and the excluded peril.

5        *United States Fire Ins. Co.*, similarly addressed the scope of the excluded peril and

6   not the causal nexus between that peril and the excluded loss.  The court held that an

7   exclusion for damage "arising out of the ownership, maintenance, operation, use, loading

8   or unloading of any automobile" applied to "an accident in which one vehicle collides with

9   another vehicle that has been improperly left in the middle of a roadway" after use

10  regardless of the fact it was not in use at the time.  The Court relied on *New Hampshire*

11  *Ins. Co. v Jefferson Ins. Co.*, 213 A.D.2d 325, which involved application of an exclusion

12  for bodily injury "arising out of the ownership, maintenance, operation [or] use of any

13  vehicle owned or operated by" the insured to injuries suffered by an individual struck by a

14  vehicle owned by the insured driven by an employee of the insured.  The court stated:

15  "whatever theory of liability the resourceful attorney may fashion from the circumstances

16  of a client struck by an automobile, it remains that the immediate and efficient cause of the

17  injury is, in fact, the automobile."  *New Hampshire Ins. Co. v. Jefferson Ins. Co.,* 213

18  A.D.2d 325, 327 (1995).  Thus, contrary to the arguments made by AIG, *United States*

19  *Fire Ins. Co.* relied on the proposition that the excluded peril must be the "immediate and

20  efficient cause of the injury" before an exclusion can apply which eliminates insurance

21  coverage.

22  **B.     Clause 3 ¶ (a) Requires That AIG Prove The "Claim" Arose From**

23  **"Fraud" While Clause 3(h) Requires That AIG Prove The "Loss" Arose**

24  **From The Amendment Of The Shareholders Agreement.**

25      The two Policy exclusions relied on by AIG also differ in that Clause 3. ¶ (a), the

26  fraud exclusion, excludes "Loss in connection with a ***Claim** made against any Insured . . .*

27  *arising out of, based upon or attributable to*" specified perils while Clause 3. ¶ (h), the

28  amendment exclusion, excludes "Loss in connection with a Claim made against any

EXHIBIT _R_, PAGE _484_

1  Insured: . . . to the extent such ***Loss*** *arises out of, is based upon or is attributable to*"

2  specified perils.[P]  Consequentially,  for Clause 3. ¶ (a) to have application it is the "Claim"

3  which must be "arising from" the fraud perils addressed in ¶ (a); for Clause 3. ¶ (h) to have

4  application it is the "Loss" which must "arise out of" the amendment perils addressed in

5  ¶ (h).  This is significant because "Claim" and "Loss" are, after all, distinct and separately

6  defined terms under the Policy.[Q]

7        **C.**    **The "Claim" By The IRS Did Not Arise From "The Committing In Fact**

8                **Of Any Criminal Or Deliberate Fraudulent Act (Including Without**

9                **Limitation Deliberate Civil Fraud), Or Any Knowing And Intentional**

10                **Violation Of Any Law, Rule, Regulation Or Statute."**

11        The IRS's "Claim" had no causal connection whatsoever with any aspect of the

12  Repurchase, let alone with "the [alleged] committing in fact of any criminal or deliberate

13  fraudulent act (including without limitation deliberate civil fraud), or any knowing and

14  intentional violation of any law, rule, regulation or statute."  There is no causal nexus

15  between the Repurchase and any of Notice 2004-30, the IRS's Coordinated Issue Paper,

16  the IRS's April 7, 2005 settlement Proposal or the settlement Form 906s.  Put simply, the

17  IRS never asserted a Claim relating to the Repurchase or any allegedly fraudulent conduct

18  of the Insureds in the Repurchase.

19        The origin of the IRS Claim is best understood in the context of the regulatory

20  environment.  Between April of 2001 and December 2002, there was "a sea change in the

21  tax shelter environment."[86]  By the end of June 2002 the IRS had issued 132 summons in

22  2002 (compared to only 8 at that time in 2001) as part of its stepped up enforcement effort

23  actions against tax shelters.[87]  The Department of the Treasury was issuing multiple news

24  releases about its pursuit of KPMG's tax shelters.[88]  Early in 2002, the underwriters of the

25

---

26  [P]    Clause 3. ¶¶  (b), (d), (e) and (k) are structured like ¶ (a) while ¶¶ (c), (f), (g) and (j) are structured like ¶ (h) in their use of the word "Loss."

27  [Q]    "'Claim' means any written notice from any Taxing Authority alleging any Insured may be liable for Taxes . . ." while "'Loss' means 90% of Insured Tax Loss and, to the

28  extent directly related to any Insured Tax Loss, 90% of any Contest Expenses and 90% of any Gross-Ups."

**EXHIBIT _R_, PAGE _485_**

1   Policy at AIG were already tracking high profile news accounts comparing the IRS's

2   pursuit of KPMG and its clients to the Enron scandal.[89]   The Treasury Department's IRS

3   Commissioner would continue high profile public announcements of the IRS's aggressive

4   crackdown on tax shelters well into October of 2003, when he would testify before Senate

5   Committees that the "SC2 transaction was a prototype 'tax shelter' that had no substantive

6   basis."[90]   Other leading tax experts testified similarly before the Senate.[91]

7        Changes between April 2001 and December 2002 were not limited to the tax shelter

8   environment.  Changes also occurred in KPMG's marketing of SC2 which became

9   markedly more aggressive.  KPMG initially intended to market SC2 "to a relatively small

10  number of large S corps" because tax professionals at KPMG itself believed "there was

11  (and is) a strong risk of a successful IRS attack on SC2 if the IRS gets wind of it."[92]

12  KPMG had nevertheless marketed the SC2 strategy to over 3,100 S-Corps; "SC2 sales

13  produced fees exceeding $26 million for KPMG, making SC2 one of KPMG's top 10

14  revenue producers in 2000 and 2001."[93]   By December 20, 2001 tax professionals at

15  KPMG recognized this aggressive marketing presented a serious danger.[94]   KPMG

16  nevertheless told Mr. McWilliam that SC2 "was for a very defined client base, and it

17  would not be a strategy that would be mass marketed.  It was for a very defined client

18  base."[95]   Mr. Lathrop's testimony made clear that, unlike Mr. McWilliam, AIG knew

19  better and AIG recognized this risk when it underwrote the Policy and when AIG decided

20  at some point in 2001 not to write any more SC2 policies.[96]

21        In April of 2002, the IRS summoned the identities of SC2 participants from KPMG

22  causing AIG to conclude that "it [wa]s reasonable to expect that the IRS will open an

23  examination of [the Insureds'] . . .tax return[s] and scrutinize" the SC2 transaction.[97]   At

24  AIG's urging the Insureds' had, on April 22, 2002 already made "Voluntary Disclosure" of

25  their SC2 transaction to the IRS under the IRS's Announcement 2002-2, a "Disclosure

26  Initiative for Certain Transactions Resulting in Waiver of Certain Penalties Under § 6662

27  of the Internal Revenue Code."[98]   AIG was right about the IRS's intentions and in June of

28  / / /

EXHIBIT _R_, PAGE _486_

1  2003 the IRS issued IDRs to the Insureds respecting their Voluntary Disclosure of SC2.[99]

2  AIG recognized these IDRs as an audit of the Insureds in connection with SC2.[100] [R]

3      In August of 2002, on the heels of the IRS summons to KPMG, the KPMG partners

4  who had developed SC2 had departed KPMG and formed another professional firm.[101]

5      By December of 2002, the IRS's pursuit of the Insureds and other SC2 participants

6  was well underway.  Mr. Mather explained that given the IRS's identification of all SC2

7  transactions early in 2002 and that participants in all 58 of transactions were under audit,

8  the IRS's much later issuance of Notice 2004-30 could only have been "more of an

9  afterthought where they [the IRS] said well, you know, there could be copycats out there

10  or something"[102] – like the newly formed firm of prior KPMG partners.

11      All of this evidence buttresses AIG's own Director of Taxes, Mr. Peter Lathrop's

12  conclusion "the IRS tried to take SC squared down because it was mass marketed" – not

13  because of any aspect of the Repurchase, let alone because of some alleged fraud by the

14  Insureds in connection with the Share Purchase Agreement.[103]

15      AIG's expert witness Linda Burke testified that "if Upper Deck had not engaged in

16  the December 2002 transaction . . . the IRS . . . would . . . still have taken the same position

17  with Upper Deck and Mr. McWilliam that it did take."[104]  Ms. Burke also testified that the

18  environment created by the Senate hearings involving SC2 had a lot to do with the fact that

19  the IRS would look at the transaction, that "its tough for [her] to know . . . what the

20  / / /

21  _____

22  [R]   With regard to these facts and in response to inquiries by Arbitrator Kramer
(TR 1274:21-1275:9) following up on comments by Upper Deck's counsel and

23  suggestions by Chairman Byrne (TR 1249:17-1250:16) the Insureds point out that the
Voluntary Disclosure advised the IRS of the Austin Firefighters' put/option and of Austin

24  Firefighters' right to exercise that option at any time between April 1, 2003 and September
30, 2003.  (Exs. 128, 134, 331, pp. 14-15, 328, p. 8.)  The IRS' IDRs issued in June of

25  2003 in response to the Voluntary Disclosure and after the "Put" option had matured call
for all manner of documents regarding the March 2001 SC2 transaction disclosed in the

26  Voluntary Disclosure but do not call for any documents pertaining to the actual exercise of
the put, to the actual redemption of the shares or to acquisition of the shares by another

27  party.  (Exs. 183 & 185.)  The IRS would not request that sort of information until August
of 2004.  (Ex. 244, p. 15.)  The Insureds provided the information to the IRS on December

28  9, 2004 notwithstanding Mr. Burke's, AIG's counsel's, suggestion that "a defensible
reading is that it [the IDR] is only requesting documents from 2001" (Exs. 281, 282, 283.)

-32-   EXHIBIT _R_, PAGE _487_

1   IRS . . . was . . . saying was wrong with Upper Deck's transaction" in particular because

2   the IRS "probably did not look beyond establishing that the generic facts of the transaction

3   fit the Notice 2004-30."[105]  This evidence belies any notion that the IRS's "Claim" arose

4   from any aspect of the Repurchase, let alone from "the [alleged] committing in fact of any

5   criminal or deliberate fraudulent act (including without limitation deliberate civil fraud), or

6   any knowing and intentional violation of any law, rule, regulation or statute" in that

7   transaction.

8        Robert Burke testified that "because the SC2 strategy was a 'marketed' strategy

9   initiated by KPMG in a substantially pre-structured format, courts could be expected to

10  take a critical view of the transaction."[106] Mr. Burke never suggested that the Repurchase

11  had an impact on the IRS's motivation to bring the "Claim" against the Insureds.  Finally,

12  Mr. Mather likewise testified the Repurchase had no impact whatsoever on the IRS's

13  position on the Insureds' SC2 transaction.[107]

14       In short, there is absolutely no evidence whatsoever to suggest that any aspect of the

15  IRS's "Claim" (Notice 2004-30, the IRS's settlement proposal of April 7, 2005 or the final

16  Form 906 Closing Agreements) arose from, was based upon or was attributable to or had

17  any causal connection whatsoever with any aspect of the Repurchase.[108] Nor is there any

18  evidence that ". . . the committing in fact of any criminal or deliberate fraudulent act

19  (including without limitation deliberate civil fraud), or any knowing and intentional

20  violation of any law, rule, regulation or statute . . ." had a causal connection with IRS's

21  Claim.  Clause 3. ¶ (a) cannot be a basis for AIG's denial of Policy benefits to the

22  Insureds.

23       **D.   The Insureds' "Loss" Did Not Arise From An Alleged Fraud In**

24            **Connection With The Repurchase.**

25       AIG incorrectly contends that  Clause 3. EXCLUSIONS ¶ (a) speaks to Loss arising

26  from an alleged fraud rather than to a Claim arising from an alleged fraud.  AIG is wrong.

27  But, it does not matter because neither the IRS's Claim nor the Insureds' Loss arose from

28  an alleged fraud in connection with the Share Purchase Agreement.

EXHIBIT __R__, PAGE 488

-33-

1.    **There Was No Fraud Within The Scope of the Policy's Exclusion**
            **in Clause 3. ¶ (a)**

In AIG's eagerness to find some plausible basis to stonewall payment on this $50 million claim, AIG hastened to conclude that the Repurchase Agreement "was carried out by [Upper Deck's] deliberate acts of fraud" (specifically "misrepresenting to the Firefighters' Fund that Upper Deck's annual income for 2002 would be $39,359,073").[109] AIG and its principal advisor on the tax aspects of Upper Deck's SC2 transaction, Robert Burke, disregarded all aspects of the Share Purchase Agreement inconsistent with AIG's desired conclusion – no insurance coverage – and ignored all potential sources of information that would rebut the desired conclusion.

The evidence reveals no such deliberate acts of fraud and no reliance by the Firefighters' Fund on statements by Upper Deck or KPMG.  With regard to the Firefighters' Fund's motivations, the evidence discloses that the Firefighters' Fund was highly motivated to disentangle itself from SC2.

Arbitrator Moxley inquired of Mr. Robert Burke whether the IRS's investigation of SC2 which involved the issuance of subpoenas (to KPMG in to learn the identities of SC2 participants) in April of 2002 would have affected the way a charity like the Firefighters' Fund would look at its participation in SC2 and consequently how the Firefighters' Fund would look at Upper Deck's $2 million offer to repurchase the non-voting shares in December of 2002.[110]  While conceding "the Firefighters' Fund may have had reasons unrelated to the price of the stock for wanting to disentangle themselves from this circumstance,[111]" Mr. Burke's response to Arbitrator Moxley's inquiry[112] ignored the answer which the evidence, discussed below, makes obvious:  Yes, the Firefighters' Fund wanted out of SC2, and the subpoenas could only have further heightened that desire.

The Firefighters' Fund first sought and received advice from its counsel Kendall & Osborn on February 14, 2001 suggesting that the Firefighters' Fund would not be taxed on the income allocated to them as a result of their ownership of S-Corp. stock.[113]  The City

/ / /

373/017994-0028
767556.01 a12/01/06
UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1    of Austin then sought and received a second and contrary opinion from Fulbright &

2  Jaworski on March 7, 2001 which warned that "whether or not the income from the S

3  Corporation is distributed to the Fund, . . . the Fund could be liable for federal income

4  taxes on the unrelated business taxable income derived from the S Corporation."[114]  The

5  Firefighters' Fund then asked Kendall & Osborn to rethink the matter based on Fulbright

6  & Jaworski's opinion and Kendall & Osborn maintained their position on April 18,

7  2001.[115]  Apparently seeking a tie breaking opinion, the obviously nervous Firefighters'

8  Fund sought and received, on May 1, 2001, advice from its auditors Davila Schaubhut,

9  P.C. warning that "the service may rule on this type of investment in the future if they find

10  that the practice is widespread and potentially abusive" and advising that Davila Schaubhut

11  found ample ground for the IRS to find abuse and warned the Firefighters' Fund that the

12  IRS "could rule that the **taxes are** either **due by the pension fund** and/or the donor."[116]

13        The Firefighters' Fund obviously had concerns about their exposure for taxes on

14  income allocated to the Firefighters' Fund but not paid to the Firefighters' Fund.  The

15  Firefighters' Fund did not inquire about that issue four times in four months with three

16  different professional firms because the Firefighters' Fund were not worried about the

17  issue.  The last answer the Firefighters' Fund got from Davila Schaubhut, P.C. was

18  anything but reassuring.[117]  After seeking opinions from three different firms on four

19  separate occasions about whether or not the Firefighters' Fund might have to pay taxes on

20  the income that would be allocated to it, but not paid to it, and never getting the same

21  answer twice in a row, the Firefighters' Fund prudently declined participation in any new

22  SC2 transactions after the summer of 2001.[118]

23        Notwithstanding Mr. Burke's disclaiming knowledge of the answer to Chairman

24  Byrne's inquiry about "whether or not . . . adverse tax consequences . . . were . . . laid at

25  the doorstep of the Firefighters' Fund," Mr. Burke was obviously aware of the contents of

26  both Notice 2004-30 and the related Coordinated Issue Paper.[119]  An IRS release

27  accompanying Notice 2004-30 observed "it was 'the first time the IRS has exercised its

28  authority under the tax shelter regulations to specifically designate a tax exempt party as a

EXHIBIT _R_, PAGE _490_

-35-

1   participant in a tax avoidance transaction.'"[120]   Notice 2004-30 confirmed that "the exempt

2   party in the listed transaction . . . will also be treated as a participant in the transaction

3   (whether or not otherwise a participant).   The exempt party will be treated as participating

4   in the transaction for the taxable year of the purported donation, the taxable year of the

5   reacquisition, and all intervening taxable years."[121]   The IRS's Coordinated Issue Paper

6   respecting Notice 2004-30 stated:  "The[] positions [respecting Notice 2004-30] will result

7   in notices of deficiency to **both** the S corporation shareholders" including the Firefighters'

8   Fund and Mr. McWilliam.[122]   That, of course, is the direct answer to Chairman Byrne's

9   inquiry of Mr. Burke.  The IRS ultimately took the potentially calamitous position for the

10   Firefighters' Fund that both Fulbright & Jaworski and Davila Schaubhut, P.C. warned the

11   Firefighters' Fund that the IRS might take.

12         In a related vein, Arbitrator Moxley asked Mr. Burke what implications of the IRS's

13   challenges to SC2 would have with respect to "the right of the charity to get fair market

14   value under its put provisions of the shareholder agreement."[123]   Mr. Burke offered no

15   answer; but the Firefighters' Fund have had first-hand experience with the question and

16   they know the implications were not good.[124]   Messrs Stefka and Kendall each

17   acknowledged that the Firefighters' Fund was in litigation with one of the S Corps whose

18   stock the Firefighters' Fund received.[125]   That S Corp. is directly challenging the

19   Firefighters' Fund' ability to enforce the Put precisely because of the position the IRS

20   took.  See, *Austin Firefighters Relief and Retirement Fund v. Brown Bottling Group, Inc.*,

21   W.D. Tex., No. A-06-327 LY, 2006 U.S. Dist. LEXIS 70425.

22         Mr. Burke never interviewed anybody from the Firefighters' Fund,[126] never read

23   Mr. Stefka's testimony or Mr. Kendall's comments[127], never interviewed anybody with

24   Upper Deck[128] and never spoke to anybody with KPMG.[129]   Nor is there any evidence that

25   anybody else affiliated with AIG in any manner did so before AIG denied coverage for the

26   Loss in July of 2005.

27         Mr. Burke and AIG therefore conveniently ignore the clear evidence that the

28   Firefighters' Fund entered into the December 10, 2002 Share Purchase Agreement

EXHIBIT _R_, PAGE _491_

1  knowing that the non-voting shares "may be worth more [than $2 million and] could be

2  worthless (sic)" and the Firefighters' Fund's auditors specifically told the Firefighters'

3  Fund "the value could be more than 2 million."[130]  The Firefighters' Fund's auditors

4  specifically "said you would probably have to do another valuation, or . . . one on your

5  own and go through that expense" to find out what the non-voting shares were really worth

6  and questioned "do you really want to argue with" the $2 million offered. [131]  The

7  Firefighters' Fund Board "said, you know, well, do we really want to go through an

8  expense on this to pour over these numbers and get a second opinion, you might say, or

9  something like that.  And they felt like the offer that [Upper Deck] made was acceptable to

10 them."[132]

11       The inference, under the circumstances, is inescapable:  The Firefighters' Fund saw

12 its entanglement with the IRS and with the other participants in the SC2 transactions as a

13 serious potential problem and it wanted out.  Upper Deck offered $2 million.  The

14 Firefighters' Fund knew it did not have to accept the offer.[133]  The Firefighters' Fund could

15 have waited and exercised the Put/Option or obtained additional information another way;

16 but the Firefighters' Fund did not want to go to the expense to do so when a $2 million

17 offer was already on the table.  The Firefighters' Fund consent to the December 10, 2002

18 Share Purchase Agreement was not the product of any fraud.

19       There is likewise no evidence that Upper Deck ever did anything to withhold any

20 information from the Firefighters' Fund, only AIG's innuendo.  The last direct

21 communication on what information could be made available to the Firefighters' Fund to

22 come from Upper Deck was Upper Deck's general counsel's, Kevin Cahill's, e-mail of

23 December 2, 2002 asking that Mr. Bendheim forward the draft Share Purchase Agreement

24 which still contained representations and warranties by Firefighters' Fund that it "has

25 independently determined that the price being paid to it for the Non-Voting Shares is fair

26 to it [etc.]" to the Firefighters' Fund because "it most accurately reflects the facts."[134]  Mr.

27 Cahill stated:  **"Of course, we are more than willing to provide any information they**

28 **desire . . . ."**

1    Mr. Bendheim forwarded the purchase agreement to Mr. Kendall as Mr. Cahill

2  requested.[135]  (As they had always done in the past Mr. Stefka and the Firefighters' Fund

3  dealt exclusively with KPMG.[136])  Mr. Bendheim then received a statement on Thursday,

4  December 5, 2002 from Mr. Kendall indicating that Mr. Stefka would be requesting more

5  information from Upper Deck before the Firefighters' Fund could agree to the requested

6  recitations in the Share Purchase Agreement.[137]  Mr. Kendall also requested changes to the

7  form of the Shareholder Agreement in the event that information could not be provided.[138]

8  The documentary evidence suggests and Mr. Stefka acknowledges that by December 9,

9  2002 he had requested and received income statements for Upper Deck from Mr.

10  Bendheim for the period through the third quarter of 2002.[139]

11    The Firefighters' Fund's next regularly monthly board meeting was scheduled for

12  the morning of December 10, 2002 at 8:00 a.m. Texas time (two hours earlier than

13  California time where Upper Deck and Mr. Bendheim were located) and that would be the

14  last opportunity to approve a transaction with Upper Deck to close before the end of 2002

15  (the next scheduled board meeting was January 14, 2003).[140]  After receipt of Upper

16  Deck's financial statements thru September 2002 on December 9, 2002, Mr. Stefka

17  apparently spoke with Mr. Bendheim on the afternoon of December 9 requesting more

18  recent financial data.[141]  Mr. Bendheim "was unable to reach anyone at Upper Deck" at

19  that time as "they were at an off-site location."[142]

20    There is no evidence that Upper Deck ever withheld information from anyone, or

21  that Upper Deck was not, as represented by its general counsel's email to Mr. Bendheim,

22  "more than willing to provide any information they [Firefighters' Fund] desire." The

23  evidence is that Mr. Bendheim could not reach Upper Deck on less than one day's notice

24  to get that additional information prior to the Austin Firefighter's regularly scheduled

25  board meeting the next morning, December 10, 2002.

26    The Austin Firefighters' board approved the transaction – without the information

27  and with Section 3.5 removed from the Share Purchase Agreement – on December 10,

28  / / /

EXHIBIT __R__, PAGE 493

1    2002.  There was, apparently, no other opportunity for the Board to approve the transaction

2    on other terms before year end and the Firefighters' Fund was apparently happy to close

3    the deal for $2 million without the information.

4            **2.       Robert Burke's Own Testimony Reveals There Is No Causal**

5                       **Nexus Between Alleged Fraud In Connection With The December**

6                       **10, 2002 Share Purchase Agreement Transaction And Any Loss.**

7            Exclusion (a) cannot defeat coverage unless, at a minimum, AIG also demonstrates

8    that the alleged fraud in the Repurchase caused the Insureds' Tax Loss.  AIG has not met

9    its evidentiary burden.

10           For example, Robert Burke, similarly disregarded all aspects of the Repurchase

11   Agreement transaction that were inconsistent with his conclusions about the alleged

12   "fraud" perpetrated on the Firefighters' Fund.  Mr. Burke opined that the fraud was

13   causually linked to the tax loss because the "fraud" evidenced either a lack of sufficient

14   donative intent on Mr. McWilliam's part in donating the non-voting shares in March of

15   2001[143] or evidenced a "pre-existing plan or arrangement whereby the Upper Deck Parties

16   would repurchase the UD Non-Voting Common Stock from the Austin Plan at a price

17   greatly below the stock's fair market value."[144]  Mr. Burke testified these two failures were

18   the bases of his conclusion that the Repurchase **caused** the failure of the Insureds' SC2

19   transaction.

20           The evidence belies both AIG's contention and Mr. Burke's conclusions.  Mr.

21   Burke conceded, as he must, that if the Arbitrators "were to decide that evidence just

22   wouldn't warrant th[e] conclusion . . . that the facts of that December 2002 transaction . . .

23   will evidence or permit an inference of a pre-existing agreement . . . that would be contrary

24   to one of the assumptions of his opinion"[145] and that "if the arbitrators were to reject th[e]

25   supposition . . . that you could draw an inference from the fact that the price was $2

26   million, that there was no donative intent in 2001 . . . that would undermine [the other]

27   bas[i]s for his conclusion.[146]"  Both of these tortured paths Mr. Burke would use to link the

28   alleged fraud to something having some impact on the SC2 transaction in fact lead to

EXHIBIT ___B___, PAGE _494_

-39-

1    nothing but confusion.

2        Turning first to Mr. Burke's conclusion that the evidence supports an "inference of

3    a pre-existing agreement", neither AIG nor Mr. Burke ever explains why, if there was a

4    pre-existing agreement between the Firefighters' Fund and Upper Deck, Upper Deck had

5    to, in AIG's view, commit fraud to get the Firefighters' Fund to enter into the Share

6    Purchase Agreement.  One need only think briefly about AIG's contention and Mr.

7    Burke's inference in that regard to come to the conclusion that they are aptly described as

8    bizarre and non-sequiter.

9        If there was an agreement in 2001 between the Firefighters' Fund and Upper Deck

10   to the effect that the Firefighters' Fund would sell the stock back in December of 2002 or

11   anytime Upper Deck wanted, then why did Upper Deck have to defraud the Firefighters'

12   Fund to induce the Firefighters' Fund to engage in the December 2002 Share Purchase

13   Agreement transaction?  The only reasonable inference from the AIG's and Mr. Burke's

14   assumed premise that the Share Purchase Agreement was the product of fraud on the

15   Firefighters' Fund is that Upper Deck had no prior agreement with the Firefighters' Fund –

16   the opposite of what Mr. Burke concludes.

17       Mr. Burke might instead have looked at direct evidence respecting the Firefighters'

18   Fund's intentions and an alleged pre-existing agreement between Upper Deck and the

19   Firefighters' Fund to engage in the transaction accomplished with the Repurchase.  While

20   AIG's agent, Mr. Burke, never bothered to contact the Firefighters' Fund, KPMG or Upper

21   Deck about how the transaction was accomplished, both AIG and Mr. Burke received

22   some of the direct evidence of the Firefighters' Fund's intentions.  AIG and Mr. Burke

23   disregarded that the Firefighters' Fund's intentions as of 2001 are quite straightforwardly

24   revealed in its own counsel's letter of February 14, 2002:  The Firefighters' Fund intended

25   to execute the Put that it had in all of its SC2 transactions, not to sell the stock "early."[147]

26   Consistent with that evidence, at hearing Mr. Stefka testified the Firefighters' Fund

27   "entered into this thinking that most of these transactions would be a two- or three-year

28   program."[148]

EXHIBIT  R, PAGE 495

1    Turning to Mr. Burke's next conclusion that "you could draw an inference from the

2   fact that the price was $2 million, that there was no donative intent in 2001," that inference

3   also simply does not follow.[S]   It is also belied by the direct evidence.  For example,

4   Richard McWilliam testified that he believed he was making a valid charitable gift in

5   March of 2001[149] and that SC2 was promoted to him as something that did have a

6   charitable component.[150]

7    Nevertheless, Mr. Burke still presses on with his opinion that the alleged fraud in

8   the Repurchase in December of 2002 is significant to the viability of Upper Deck's SC2

9   transaction because it demonstrates a lack of "donative intent" in March of 2001.  What

10  Mr. Burke fails to articulate is where in the tax authorities upon which he relies he finds

11  any requirement that the Insureds demonstrate a donative intent.  To the contrary, what Mr.

12  Burke does is simply assume that since this is a charitable contribution case and not a case

13  involving a purported business transaction, he can substitute the "business purpose"

14  requirement in the cases dealing with the Economic Substance doctrine with a "donative

15  intent" requirement.  Mr. Burke does this because he thinks a "business purpose" has no

16  application to a gift transaction in which there is not a business purpose but rather a

17  charitable purpose.  Again, Mr. Burke cites no legal authority supporting this substitution

18  of terms.

19    Regardless, and perhaps more importantly, Mr. Burke, also ignores what Ms. Burke

20  aptly points out about the requisite "donative intent" for a valid gift under the tax laws:

21  "Courts in the Ninth Circuit . . . determine whether the donor has received anything of

22  value from the recipient as a result of making the gift."[151]  That is a very thin requirement

23  of donative intent.  The nature of that requirement is further demonstrated by Ms. Burke's

24  citation of Tax Court authority for the proposition that: "A charitable contribution may be

25  / / /

26

27  _____

   [S]   It bears mentioning that the Policy documents say nothing about "donative intent."  The
28  Opinion Letter on charitable contributions only and simply recites that "i[n] accordance
   with the Shareholder's desire to support the Municipal Plan . . ."  (Ex. 104 MARSH 0258
   A1 0000626.)

EXHIBIT _R_, PAGE _496_

1  motivated by the basest and most selfish of purposes so long as the donor does not

2  reasonably anticipate benefit from the donee in return."[152] Ms. Burke, in apparent contrast

3  with Mr. Burke, therefore concluded "the Trust (McWilliam) had sufficient donative

4  intent."[153]  Can AIG really be adjudged to have met its burden of proof if its own expert

5  witnesses contradicted one another?

6       Under these donative intent standards presented by Ms. Burke, it is not possible for

7  Mr. Burke or AIG to support the contention that Mr. McWilliam lacked the requisite

8  donative intent and, more importantly, it is impossible to discern an alleged lack of the

9  minimal donative intent in 2001 out of an alleged fraud which transpired in December

10  2002.  This is particularly difficult given the fact that Mr. McWilliam ultimately wrote the

11  Firefighters' Fund a check for $2 million -- a 50% increase in value in approximately 18

12  months -- in the face of huge potential tax liabilities for Upper Deck.

13       **3.    The Insureds SC2 Transaction Would Not Have Survived Judicial**

14       **Scrutiny Regardless Of The Repurchase.**

15       AIG cannot prevail under Clause 3. EXCLUSIONS ¶ (a) if AIG does not prove that

16  Upper Deck's SC2 transaction would have survived in litigation without the Repurchase.

17  AIG must prove that the alleged fraud in inducing the Firefighters' Fund to enter the Share

18  Purchase Agreement proximately caused the transformation of the Insureds SC2

19  transaction from being a winner in the court room into being a loser in the court room.

20  AIG has not and cannot meet this burden of proof.[T]

21       Preliminarily, it bears stressing that AIG itself has repeatedly asserted that the

22  generic SC2 strategy does **not** work.  AIG's own Complaint and Answer to the Insureds'

23

24  [T]   In this regard, the chances of SC2 surviving declined markedly once the KPMG tax
     shelter climate changed and once the risk of audit became a certainty.  Moreover, it may be
25  important to note that even though Upper Deck's SC2 transaction has been characterized
     as a "dead duck" and "dead from the get go" (TR 858:13-860:12) that does not affect the
26  insurability of the risk in this circumstance.  The IRS's challenge of SC2 was fortuitous
     and insurable.  Moreover, a risk is deemed fortuitous even if it is only "assumed by the
27  parties to be to a substantial extent beyond the control of either party.  N.Y. Ins. Law
     § 1101(a)(2); see also *Chase Manhattan Bank v. New Hampshire Insurance Company* 193
28  Misc. 2d 580, 749 N.Y.S.2d 632, 2002 N.Y. Misc LEXIS 1297 and authorities cited
     therein.

EXHIBIT  R  PAGE 497

373/017994-0028
767556.01 a12/01/06
UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1   Cross-Complaint in this matter both allege that Upper Deck and the MPR Trust breached

2   an imagined warranty given in the Representation Letter that "the transaction set forth in

3   the [KPMG] opinions was a lawful strategy that 'should' survive IRS scrutiny."[154U]   Thus,

4   AIG has sued its Insureds based on the assertion that the Insureds falsely represented the

5   strategy was lawful and should survive IRS scrutiny. [V]

6          In further support of AIG's assertion that the transaction set forth in KPMG's

7   opinions was not lawful and would not survive IRS scrutiny, AIG then cites in its

8   Complaint statements by KPMG tax professionals which were exposed to the public as a

9   result of the Senate hearings, e.g., a December 20, 2001 e-mail expressing "concern about

10  the widespread marketing of SC2 because, if the IRS 'gets wind of it,' the agency would

11  likely mount a vigorous and 'at least partially successful' challenge to the product."[155]

12  Thus, in addition to the fact that AIG has made admissions in these proceedings that the

13  generic SC2 strategy does **not** work, the opinion of KPMG's own tax professionals back in

14  2001 that IRS challenges to the generic SC2 strategy would be "at least partially

15  successful" should also weigh heavily with the Panel in assessing whether the Repurchase

16  could somehow be deemed a waiver or forfeiture of Policy benefits by the Insureds.

17         In assessing the merits of the so-called generic SC2 strategy, it is also now apparent

18  that KPMG's candid internal assessments of SC2's technical merits were skeptical from

19  the beginning.  An April 11, 2000 e-mail to the tax professional practice partners at KPMG

20  announcing SC2's approval for sale stated: "This is a relatively high risk strategy" and

---

21  [U]   Recognizing the impossibility of reconciling this assertion with AIG's allegations that
22  the 2002 Share Purchase Agreement "created a new transaction . . . differing in material
    aspects from the transaction presented in" KPMG's Opinions (Comp. ¶¶ 50-51, p. 9, ¶¶ 66-
23  67, p. 11) and that all the Insureds' "Loss arises out of, is based upon or is attributable to"
    this change (Comp. ¶¶ 64-67, pp. 10-11) and that this "change[] [in] the transaction . . .
24  ma[d]e it virtually impossible to defend the transaction under the tax laws" (Comp. ¶ 79,
    p. 12),  AIG's Pre-hearing Brief rewrote this assertion to suggest only that "the aggressive
25  mass marketing of the SC2 transaction by KPMG . . . materially increased the risk of Loss
    under the policy" (AIG's Pre-hearing Brief, p. 20).
26  [V]   AIG's allegations lack merit as a coverage defense not because "the transaction set
    forth in the [KPMG] opinions was a lawful strategy" – it has turned out not to be – but
27  because no such warranty was given in the Representation Letter, these alleged
    representations are not representations of "facts," and because AIG waived any such
28  defense by not asserting it in AIG's July 29, 2005 correspondence disclaiming coverage
    (see Section VII, *supra*).

-43-

EXHIBIT _R_, PAGE _498_

1  that KPMG's "pre approved engagement letter stating the limitation of liability and

2  indemnification provisions are not to be waived."[156W]  The Permanent Subcommittee on

3  Investigations of the Committee on Homeland Security also concluded that the "SC2

4  evidence demonstrates that the KPMG development process led to approval of tax

5  products that senior KPMG tax professionals knew had significant technical flaws and

6  were potentially illegal tax shelters."[157]  Similarly, both that Subcommittee and its minority

7  staff concluded that "[i]nternally, KPMG tax professionals . . . identified . . . more

8  technical problems with SC2 than were discussed" with any KPMG clients.[158]

9          For example, KPMG tax professionals discussed problems
           with identifying a business purpose to explain the structure of
10         the transaction – why a donor who wanted to make a cash
           donation to a charity would first donate stock to the charity and
11         then buy it back instead of simply providing a straightforward
           cash contribution.  They also identified problems with
12         establishing the charity's 'beneficial ownership' of the donated
           stock, since the stock was provided on the clear understanding
13         that the charity would sell the stock back to the donor within a
           specified period of time.  KPMG tax professionals identified
14         other technical problems as well involving assignment of
           income, reliance on tax indifferent parties, and valuation
15         issues.[159]

16         The difficulty KPMG's own tax professionals saw in "explain[ing] why a donor

17  who wanted to make a donation to a charity would first donate stock to the charity and

18  then buy it back instead of simply providing a straight forward cash contribution"

19  illuminates some of the key problems with the transaction.  The IRS Coordinated Issue

20  Paper stated (and Mr. Mather testified similarly):

21         "The determination [whether a transaction has economic
           substance] is rationally related to a useful non-tax purpose that
22         is plausible in light of the taxpayer's conduct and useful in
           light of the taxpayers economic situation and intentions.  The
23         utility of the stated non-tax purpose and the rationality of the
           means chosen to effectuate that purpose must be evaluated in
24         accordance with relevant practices.  *Cherin v. Commissioner*,
           89 T.C. 986, 993-94; *ACM Partnership*, 157 F.3d at 248-49.  A
25         rational relationship between purpose and means ordinarily
           will not be found unless there was a reasonable expectation

26

27  [W]  These provisions limiting KPMG's "maximum liability to Client . . . to the fees paid for
    these services" and requiring that in "the event of a claim by a third party relating to
28  [KPMG's] services . . . Client will indemnify KPMG . . . ." may be found in KPMG's
    engagement letter, Exhibit 6, p. 6.

EXHIBIT  R  PAGE 499

-44-

1    that the non-tax benefits would be at least commensurate with

2    the transaction costs. *Yosha v. Commissioner*, 861 F.2d 494,
     502 (7th Cir. 1988)."[160]

3

4    Here "the transaction costs [approximately $4 million] far outweigh any possible

5    non tax purpose," a gift valued at approximately $1.4 million to the Firefighters' Fund.[161]

6    Notably, neither Robert Burke nor Linda Burke ever even acknowledged this problematic

7    aspect of the SC2 transaction; they simply ignored what they could not explain away.

8    Further comparisons between the Upper Deck SC2 transaction involving a donation

9    of stock with an appraised cash valued of $1.4 million and a cash contribution to the

10   Firefighters' Fund in an equal amount are illuminating. A cash contribution of $1 to the

11   Firefighters' Fund could have generated a $1 charitable deduction and, at a marginal tax

12   rate of 40%, approximately $0.40 in federal tax benefits – a ratio of federal tax benefits for

13   Mr. McWilliam to economic benefit to the Firefighters' Fund of 0.4/1.0 or 1.0/2.5 or 0.4.

14   Mr. Mather and Mr. Robert Burke explained that both FMV's and Empire's valuations of

15   the non-voting stock valued that asset at 5% of the value of Upper Deck notwithstanding

16   the fact that the Firefighters' Fund owned 90% of the outstanding stock and 90% of the

17   Company's income would be allocated to the Firefighters' Fund.[162X] Roughly speaking,

18   this 5% valuation resulted in an anticipated economic benefit of $1 to the Firefighters'

19   Fund for each $18 of income allocated to the Firefighters' Fund for tax purposes. At a

20   40% marginal tax rate each $18 in income allocated to the Firefighters' Fund resulted in an

21   $7.20 federal tax benefit to Mr. McWilliam. This results in a federal tax benefit to Mr.

22   McWilliam to economic benefit to the Firefighters' Fund ratio of 7.2/1.0 or 1.0/0.139 or

23   7.2, approximately 18 times higher than the 0.4 ratio that Congress contemplated when it

24

25   X    In this regard, Revenue Ruling 70-615, 1970-2 C.B. 169, provides in part:

26        For purposes of determining who is a shareholder under the provisions
         of Subchapter S of the Code, beneficial ownership of the stock rather
         than technical legal title is controlling. Accordingly, it is held that the

27        taxpayer who is the stockholder of record but does not own the
         beneficial interest in a share of stock of a small business corporation is

28        not a shareholder for the purposes of the provisions of Subchapter S of
         the Code. . . .

EXHIBIT R, PAGE 500

373/017994-0028
767556.01 a12/01/06    UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1  authorized a charitable deduction for a cash contribution.

2       The Tax Court simply would not accept such a result.  AIG's witness Robert Burke

3  acknowledges this distinct reality:

4               Of course, in a situation such as presented by many of
         the SC2 transactions where the tax benefits associated with a
5         gift to a tax-exempt entity potentially exceeded the value of the
         gift, there would be a distinct possibility that a court would
6         disregard the professed purpose of benefiting the tax-exempt
         entity and find that the shareholders were motivated solely by
7         tax avoidance purposes.[163]

8  Similarly, Linda Burke testified that to evaluate economic substance "you evaluate that

9  based on the relative amount of the number involved, in this case, the buy back number

10  vis-à-vis the tax benefit."[164] [Y]  But, when questioned about the viability of a transaction

11  whereby $200 million in taxable income was allocated to the Firefighters' Fund with a

12  corresponding increase in tax benefits to Mr. McWilliam of approximately $80 million

13  even that would not dissuade Ms. Burke from her conclusion that a court would uphold the

14  transaction.[165]  Though Ms. Burke obviously felt that these ratios of tax benefits to

15  economic benefit were important, it was not clear at what precise point Ms. Burke would

16  acknowledge that the ratio of tax benefit to economic benefit to a charity would finally

17  result in the invalidity of the generic SC2 strategy.  Regardless, judged against judicial

18  precedent and common sense, Ms. Burke's analysis was not credible.

19       In *Sheldon v. Commissioner*, 94 T.C. 738 (1990), the court held that a transaction

20  was a sham based in part on the fact that the potential profit (i.e., the non-tax purpose) to

21  be gained by the taxpayer's participation in the transaction was far outweighed by the tax

22  benefits claimed as a result of the transaction.  *Sheldon*, at 768.  The court held that

23  although there was a potential for an "investment" profit of $1 million (and in fact a real

24  gain in one year of $18,000), this potential profit was not commensurate with the more

25

---

26  [Y]   But, incongruously, Ms. Burke also insists that had the purchase price in the December
     2002 Share Purchase Agreement been $20 million the SC2 transaction would not have
27  survived scrutiny in court, because there would have been no economic substance.  (TR
     535:5-536:19.)  She insists this is the case despite the fact that $20 million would be "real
28  money" which makes a difference in determining whether or not there was economic
     substance.  (TR 472:20-473:17, 501:9-13.)

EXHIBIT _R_, PAGE _501_

-46-

1   than $5 million in interest deductions that were offset against the taxpayer's ordinary

2   income. *Id.* at 768-769. The court determined that where a transaction is **structured** to

3   result in such a drastic disparity between the non-tax purpose and the tax benefits, the

4   transaction is a sham clearly designed to artificially create tax benefits. *Id.* at 769.

5   Comparing the ratio of the taxpayer's tax benefit of $2 million (40% of $4,982,000

6   [approximately $5 million in interest deductions less the $18,000 gain]) to the taxpayers

7   investment of $1 million in *Sheldon* (2/1 or 2) to the ratio anticipated in Upper Deck's SC2

8   transaction (7.2/1 or 7.2) does not bode well for SC2 inasmuch as the anticipated SC2 ratio

9   was 360% higher than the ratio the court found offensive in *Sheldon*.

10       In *Saba Partnership v. Commissioner*, T.C. Memo 1999-359, at 161-162 (1999) the

11   court similarly invalidated a transaction using the economic substance doctrine. In the

12   relevant portion of the court's analysis, the court said that in the best case scenario, the

13   taxpayer would have profited $10.8 million on a 5 year investment, but that such profits

14   were "inconsequential when compared with the capital losses of approximately $170

15   million" (which would have produced tax benefits of approximately $40 million or a 4 to 1

16   ratio of economic benefit to tax benefit) that the transaction was **designed** to generate. The

17   court concluded that "We are convinced that no reasonable business person would have

18   participated in the [transactions], as they were designed and implemented in these cases,

19   except for a tax motive." (*Ibid.* at *163.) *Saba* was vacated and remanded, but the tax

20   court on remand stuck to its holding discussed above, stating: "even under the most

21   generous assumptions, any expected profits from the partnerships' investments paled in

22   comparison to the approximately $170 million in capital losses that the partnerships were

23   designed to generate." (T.C. Memo 2003-31, at *32.)

24       These cases and similar cases evidence that while a dollar for dollar comparison

25   may be unnecessary, where a transaction is designed to result in a relatively small non-tax

26   purpose (i.e., a charitable benefit $1.4 million or $2 million or $11 million) in the face of a

27   relatively large tax benefit (i.e., $66 million in federal tax savings alone), the transaction

28   already has limited chance of success. When the transaction fees (approaching $4 million

EXHIBIT _R_, PAGE _502_

1   in this case) are greater than the non-tax purpose (the planned benefit to the charity in this

2   case of $1.4 million at the time of the donation) the taxpayer's case becomes worse,

3   particularly in view of the KPMG tax shelter climate in which the Insureds' case would

4   have been litigated in Tax Court.

5        At the end of the day, Mr. Robert Burke put the Insureds' chances of success

6   litigating the viability of generic SC2 transaction in Tax Court without the December 10,

7   2002 Share Purchase Agreement at between 50% and 60%. But, Mr. Burke also conceded

8   that "there is a flavor as a result of being a promoted transaction, which introduces a wild

9   card that I don't know how to assess. . . . In the context of a promoted transaction, it

10  obviously introduces a degree of risk to the taxpayer that I don't know how you assess it,

11  but it certainly lowers their prospects of success."[166]

12       Mr. Mather, the only expert witness for whom the evidence discloses significant

13  trial experience, knew how to assess this "wild card": it "would be something that would

14  be extremely negative."[167]  AIG's Director of Taxes', Peter Lathrop', assessment of the

15  "wild card" made him question AIG's business judgment in underwriting insurance for

16  SC2.[168]  The "wild card" caused tax professionals at KPMG " "concern . . . because, if the

17  IRS 'gets wind of it,' the agency would likely mount a vigorous and 'at least partially

18  successful' challenge to the product"[169]  Linda Burke weakly suggested this "wild card"

19  and other factors "should not matter" to a court though she conceded that it might.[170]

20       Given Mr. Burke's acknowledgment that he does not know how to assess the "wild

21  card" and his estimate of the prospects of success for SC2 in court (without the Share

22  Repurchase Agreement) at between 50% and 60%, his opinion cannot be evidence

23  satisfying AIG's burden to prove Upper Deck's SC2 transaction would have survived in

24  court without the Repurchase.  Moreover, given the potentially devastating additional

25  losses associated with the potential loss of S Corporation status for a 5-year period the

26  Insureds could not been realistically expected to litigate the merits of a strategy that an

27  such a high risk of failure:  Mr. Mather characterized the prospects of successfully

28  litigating the generic SC2 transaction as " negligible" – something less than 2 percent.[171]

**E.     The Insureds' "Loss" Did Not Arise From Any Aspect Of The Repurchase Involving An Alleged Amendment To The Shareholders Agreement (Clause 3. EXCLUSIONS ¶ (h)).**

AIG has also argued that the Insureds should be denied coverage because the Repurchase was an amendment of the Shareholders Agreement and that this purported amendment violated Exclusion 3(h) and caused the Insureds Tax Loss, Thus, analysis of Clause 3. EXCLUSIONS ¶ (h) requires consideration of whether or not the Insureds' "Loss" arose from, was based upon or was attributable to ". . . an amendment to the Shareholders Agreement . . . attached [to the Policy] as <u>Exhibit[] C</u> . . . without the Insurer's prior written consent (which consent shall not be unreasonably withheld by the Insurer) . . ."[Z] AIG disclaimed coverage on July 29, 2005 asserting that "the termination of the Shareholders Agreement by operation of ¶ 5.3 of the Share Purchase Agreement [of December 10, 2002] causes the transaction as carried out to be excluded per Exclusion (h) of the Policy."[172] AIG's Complaint similarly asserts: "Clause 5.3 of the Share Purchase Agreement provides that the Shareholders Agreement is terminated with the consummation of the Share Purchase Agreement on December 31, 2002.  The termination of the Shareholders Agreement is an amendment thereof, which pursuant to Exclusion (h) operates to exclude coverage."[173]  AIG cannot prevail on this defense.

/ / /

/ / /

/ / /

---

[Z]   In the transactions involving AIG's other three SC2 insured S-Corps – Clement Pappas & Company, Inc., Award Homes, Inc., and Spencer Forrest, Inc. – the put and the redemption provided for in Section 5 of the Upper Deck Shareholders' Agreement was the subject of a separate agreement altogether called the "Redemption Agreement."  In each of the other three policies Clause 3. EXCLUSIONS ¶ (h) speaks to "amendment to the Redemption Agreement" rather than to the Shareholders Agreement.  This reveals that the underwriting concern addressed by Clause 3. EXCLUSIONS ¶ (h) was that the Insureds and the Charity might somehow modify the terms of Section 5 of the Shareholders Agreement (or the Redemption Agreements in the other cases) bringing the put outside the safe harbor provided for by Regulation Section 1.1361-1(l)(2)(iii) and possibly creating a second class of stock.  The underwriting concern was not that economic substance would be removed from the SC2 transaction.  In this regard see fn. I, *supra*.

**EXHIBIT _R_, PAGE _504_**

-49-

1      **1.      Section 5.3 of the December 10, 2002 Share Purchase Agreement**

2               **Did Not Amend the Shareholders Agreement.**

3      Section 1 of the Shareholders' Agreement permits "sales, transfers or dispositions

4      of [Firefighters' Fund] Shares" "with [] the prior written consent of the Company and the

5      other shareholders of the Company [MPR Trust]."[174]  The Shareholders' Agreement says

6      nothing about obtaining AIG's prior consent, written or otherwise, to such a transfer (or to

7      a transfer pursuant to Section 2 [the right of first refusal], Section 3 [Disposition Events

8      including acts of insolvency or the Firefighters' Fund becoming ineligible to be an S Corp.

9      shareholder] or Section 5 [the Put/Option]).  Section 8 of the Shareholders' Agreement

10     captioned "Termination Of Agreement" also provides that "[t]he Agreement shall

11     terminate" by its own terms "on the occurrence of any of the following events: . . . [¶ ]8.3

12     at such time as only one (1) Shareholder with the Company remains."  Upon Upper Deck's

13     acquisition of Firefighters' Fund shares, there was "only one (1) Shareholder of the

14     Company remain[ing]" and the "Shareholder Agreement" terminated by its own terms.

15     This "termination of the Shareholders' Agreement" by its own terms took place regardless

16     of inclusion of Clause 5.3 in the Share Purchase Agreement.  No part of Clause 5.3

17     effected "an amendment" of the Shareholders' Agreement.  The Shareholders' Agreement

18     would have automatically terminated on **any** repurchase of the Firefighters' Fund stock.

19     **2.      AIG's Own Expert Witness, Robert Burke, Conceded The**

20              **"Early" Redemption In December 2002 Before The Put/Option**

21              **Matured In April 2003 And The Resulting Termination Of The**

22              **Shareholders Agreement Did Not Affect The Viability Of SC2,**

23              **And Hence Had No Causal Relationship With Any Aspect Of The**

24              **Loss.**

25     When Robert Burke was questioned about the "generic" documents underlying

26     Upper Deck's SC2 transaction seemingly permitting, as stated by Arbitrator Moxley, "a

27     willy nilly, ad hoc transaction without a requirement of appraisal opinion or an arm's

28     length transaction, [which] could be anything . . . [i]t's not regulated," Mr. Burke testified

EXHIBIT _R_, PAGE _505_

-50-

1  that the "fact that it wasn't precluded, I don't think that changes the tax analysis."[175]

2  According to Mr. Burke: "[T]he ability to do a repurchase, other than pursuant to the

3  exercise of the Puts, that theoretical possibility, I don't think is something that cuts one

4  way or the other as far as the tax prospects are concerned."[176]  Mr. Burke stated: "The

5  mere fact that the[] [parties] could, if they could do it and deal at arms length . . and come

6  out with what they believed was a fair price.  You know, that transaction, I don't think

7  impacts the tax viability."[177]  That being the case, there can be no causal connection

8  between the Loss from the SC2 transaction and simple early termination of the

9  Shareholders Agreement – which AIG says "amended" the Shareholders Agreement.  If

10  the Repurchase somehow affords AIG a defense then that defense must be based on a

11  Policy provision other than Clause 3. ¶ (h).

12     And, of course, Mr. Mather characterized the prospects of successfully litigating the

13  generic SC2 transaction, before any alleged amendment to the Shareholders Agreement, as

14  " negligible" – something less than 2 percent.[178]

15  **VI.   AIG'S ASSERTION THAT THE INSUREDS BREACHED A WARRANTY**

16  **AND THEREBY INCREASED THE RISK OF INSURED LOSS IS**

17  **WITHOUT MERIT.**

18     Trying to address AIG's breach of warranty defense has, for the Insureds, been an

19  exercise in shooting at a moving target.  AIG's theories never stay the same from one

20  written statement of position to the next.

21     AIG began with assertions it had been misled in the underwriting process by

22  information about Upper Deck's financial prospects focusing first on Tiger Woods and

23  then on Yu-Gi-Oh!  While AIG resurrects these assertions from time to time, AIG does not

24  pursue them with sufficient earnest to warrant lengthy analysis here.

25     AIG's positions then morphed into those stated in its July 29, 2005 Disclaimer

26  Letter which abandoned the Tiger Woods/Yu-Gi-Oh innuendo, morphed again in

27  November of 2005 to those stated in AIG's Complaint and then changed again with the

28  introduction of an entirely new warranty in AIG's Pre-Hearing Brief.  Doubtless AIG's

1   post-hearing brief will resurrect some seemingly abandoned theory, distort a recently

2   asserted theory or concoct a completely new one.  The arbitrators should limit AIG to

3   attempting to prove those warranties identified in its July 29, 2005 Coverage Denial Letter;

4   to do otherwise is inconsistent with New York law (Section IV. supra) and with any notion

5   of Due Process or fundamental fairness.

6          The law applicable to interpretation of policy warranties has already been

7   previously briefed but is again summarized in a footnote below.[AA]  Any consideration of

8   AIG's breach of warranty defense has to begin with determining what warranties were

9   actually provided by the Insureds.  There are no warranties that were not stated in Upper

10  Deck's and MPR Trust's September 4, 2001 Representation Letter attached as Exhibit B to

11  the Policy.[179]  Any breach of warranty defense by AIG must be rooted in that letter.

12         AIG's Coverage Denial Letter of July 29, 2005 and AIG's Complaint both rely on

13  paragraph No. 1 of the Representation Letter which "represents and warrants" that:

14             The facts, assumptions of fact, and understandings of fact set
               forth in the opinions of KPMG LLP attached as Exhibit A to
15             the Policy were true and correct on the date of such opinions
               and continue to be true and correct on the date hereof.[180]

16

17         AIG 's Complaint asserts, in paragraph No. 55, that the Insureds breached this

18  warranty because "the KPMG opinions [not the Representation Letter] . . . material[ly]

19  misrepresent[ed] . . . the redemption price was to be 'the fair market value of the stock on

20  the date that [Firefighters] presents the stock for redemption'" and that the $2 million

21  purchase price provided for by the Share Purchase Agreement allegedly was not fair

---

22  [AA]  AIG must "show the existence of a warranty, its breach and that such breach
23  'materially increased the risk of loss.'"  N.Y. Ins. Law, § 3106(b); *Irv-Bob Formal Wear,
    Inc. v. Public Service Mutual Ins. Co.*, 366 N.Y.S.2d 596, 602 (N.Y.Civ.Ct. 1975) (aff'd
24  by *Irv-Bob Formal Wear, Inc. v. Public Service Mut. Ins. Co.*, 383 N.Y.S.2d 832).
        Whether an insured's warranty has been breached is determined in light of the scope of
25  the language of the warranty provided by the insured.  See *Irv-Bob Formal Wear, Inc.*, 366
    N.Y.S.2d 596.  As with all language in an insurance policy, any ambiguities in the
26  warranty must be construed against the insurer.  *Id.* at 603.  Therefore, the insurer may not
    enforce a warranty unless the language of the express representation made by an insured is
27  unambiguous and clearly stated.  *Id.* at 603 (finding that insured did not breach warranty
    requiring proper records be made and maintained where "[t]he policy did not specify what
28  kind of records were to be kept" and "[i]f defendant wanted a particular kind of record to
    be kept, it presumably would have so stated in the policy").

-52-   **EXHIBIT** R, **PAGE** 507

1   market value.

2        AIG's July 29, 2005 Coverage Denial Letter is significantly different than

3   paragraph No. 55 of the Complaint.  AIG's Coverage Denial Letter provides that:

4        "A key understanding of fact in the KPMG Opinions was that
         the Put exercise price would be FMV.  The elimination of such
5        in the Share Purchase Agreement was a breach of this warranty
         . . . The Shareholders Agreement and its requirement that the
6        Firefighters be paid fair market value price upon its exercise of
         put rights was a key factual component to the KPMG opinions.
7        The execution of the Share Purchase Agreement and the
         elimination of the requirement of a fair market value put price
8        is a breach of a key fact warranted to AISLIC by Upper Deck
         and Mr. McWilliam . . ."[181]

9

10  The above quoted allegation in the Complaint and the Coverage Denial Letter differ

11  significantly in that the Coverage Denial Letter speaks narrowly to a warranty about the

12  purchase price in the event of an exercise of the Put/Option while AIG's Complaint ¶ 55

13  broadens that alleged warranty to include **any** redemption of the non-voting stock.

14       The narrow warranty about the purchase price in the event of the exercise of the

15  Put/Option described in the Coverage Denial Letter, if given, certainly could not have been

16  breached by execution of the Share Purchase Agreement because the Share Purchase

17  Agreement was not executed in a Put/Option transaction .  The broader warranty

18  subsequently alleged in AIG's Complaint that **all** redemptions or repurchases would be at

19  fair market value was never given and, even if given, AIG has not proved it was breached.

20       Consider what warranty actually was given.  Looking first at the "facts, assumptions

21  of fact, and understandings of fact set forth in the opinions of KPMG LLP attached as

22  Exhibit A to the Policy," KPMG's opinion letter "Re:  Charitable contribution to [the

23  Firefighters' Fund] . . ." does contain the following language which might be characterized

24  as factual:

25       On March 31, 2001, the Shareholder and the Municipal Plan
         entered into a shareholders agreement ('Shareholders'
26       Agreement') . . .

27       [a]s part of the Shareholders Agreement, Upper Deck and

28

EXHIBIT _R_, PAGE 508

-53-

1        Municipal Plan entered into a redemption agreement.[BB]  Under
the redemption agreement, Municipal Plan may present the
2        Non-Voting Common Stock it owns for redemption by Upper
Deck, beginning April 1, 2003.  The redemption amount is the
3        fair market value of the stock on the date that Municipal Plan
presents the stock for redemption.  Neither Upper Deck nor the
4        Shareholder have the power to compel Municipal Plan to
present the stock it owns for redemption.

5

6        As is apparent from the language quoted immediately above, the only "facts"

7 regarding the "redemption price and the Insured's ability to compel presentation of the

8 stock for redemption as discussed in KPMG's relevant opinion letter are that "the

9 Shareholder and the Municipal Plan entered into a shareholders agreement," and that part

10 of the Shareholders' Agreement (specifically, section 5) included a redemption agreement

11 which did provide that a redemption pursuant to section 5 would be at fair market value in

12 accordance with an appraisal.  Both of these factual assertions are indisputably correct.

13 The Insureds cannot be found to have breached a warranty by virtue of misstating these

14 facts.

15        Even if the arbitrators accepted AIG's erroneous suggestion that Upper Deck

16 warranted that even outside the context of the Put/Option in section 5 of the Shareholders

17 Agreement Upper Deck would not acquire the non-voting stock except at appraised fair

18 market value, AIG's theory would fail because AIG has not proved that the fair market

19 value of those shares was different than the $2 million which was paid.  (See Section III,

20 *supra*.)  The valuation issue is something on which AIG bears the burden of proof.

21 Moreover, given the overwhelming problems with the generic SC2 strategy from the

22 beginning, breach of such a warranty would not matter anyway.  Mr. Mather characterized

23 the prospects of successfully litigating the generic SC2 transaction as " negligible" –

24 something less than 2 percent.[182]

25        Both AIG's Complaint and AIG's Pre-Hearing brief omit any discussion of the

26      [BB] As previously noted, in the transactions involving AIG's other three SC2 insured S-

27 Corps – Clement Pappas & Company, Inc., Award Homes, Inc., and Spencer Forrest, Inc.
– the put and the redemption provided for in Section 5 of the Upper Deck Shareholders'

28 Agreement was the subject of a separate agreement altogether called the "Redemption
Agreement."

EXHIBIT _R_, PAGE _509_

373/017994-0028
767556.01 a12/01/06    UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1  assertion in AIG's July 29, 2005 Coverage Denial Letter to the effect that the Repurchase

2  Agreement breached a warranty that **any** repurchase of the non-voting shares would only

3  be at a value "determined by an independent appraisal"[183]  AIG seems to have abandoned

4  this theory – for good reasons.  First, no such warranty appears in the Representation

5  Letter or anywhere else.  Second, AIG's own expert witness, Robert Burke, testified that

6  the absence of an independent appraisal did not affect the viability of SC2.[184]  And, of

7  course, Mr. Mather testified that SC2 would have failed irrespective of what happened in

8  December of 2002.

9        There are no other warranties raised in AIG's July 9, 2005 Coverage Denial Letter

10  and the Arbitrators should therefore consider no other breach of warranty theories.  (See

11  Section III., *supra*.)  But, the other theories are discussed below for completeness.

12        AIG's Pre-Hearing Brief raises for the first time ¶ 3 of the Representation Letter

13  which provides:

14            "The municipal plan is neither legally bound to offer for
redemption any of the non-voting shares of Upper Deck, nor

15            can Upper Deck or any of its shareholders compel such a right
of redemption, except pursuant to the exercise of the Right of

16            First Refusal contained in the Shareholders Agreement, a copy
of which is attached as Exhibit C to the Policy."[185]

17

18  Establishing the truthfulness of the warranty in ¶ 3 of the Representation Letter requires

19  nothing more than a reading of the Shareholders Agreement.  There was no mechanism as

20  of the date of the Representation Letter for the Insureds to compel the Firefighters' Fund to

21  redeem their shares.  Moreover, AIG has produced no evidence whatsoever that Upper

22  Deck, MPR Trust or Mr. McWilliam compelled the Firefighters' Fund to offer its non-

23  voting shares for redemption.  Certainly Mr. Stefka and Mr. Kendall never testified to such

24  a thing.  The Firefighters' Fund were free to reject Upper Deck's offer.

25        Paragraph 55 of AIG's Complaint also alleges that the Insureds warranted as a

26  factual matter that the transaction set forth in KPMG's opinions was a "lawful strategy that

27  should survive IRS scrutiny."  AIG is wrong first because the lawfulness of SC2 and its

28  likelihood of surviving IRS scrutiny are not and were not factual.  They are a matter of

**EXHIBIT _R_, PAGE _510_**

-55-