1 opinion and one of them at least is a matter of legal opinion. The second reason AIG is

2 wrong is that the Representation Letter cannot be read to include any such warranties from

3 the Insureds. The third reason is that the notion is nonsensical: Is AIG actually suggesting

4 that the Insureds somehow made a factual warranty that their SC2 transaction would not

5 result in a loss under the Policy. That would defeat the very purpose of the Policy.

6 **VII. AIG IS LIABLE FOR ITS BAD FAITH HANDLING OF THE INSUREDS'**

7 **CLAIM.**

8     **A. New York Law Does Not Apply To The Insureds' Tort Claims.**

9     The language in the Policy's choice of law provision – "The construction and

10 validity and performance of this Policy shall be governed by the laws of the State of New

11 York"[186] – is insufficiently broad under to encompass tort-based claims.

12     This is evidenced by, among other decisions, *Finance One Public Co. Ltd. v.*

13 *Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 333-334 (2d Cir. 2005) in which the

14 Second Circuit held tort-based claims were beyond the scope of a similar "will be

15 governed by" choice of law clause, and recognized New York courts' reluctance to

16 "construe contractual choice-of-law clauses broadly to encompass extra-contractual causes

17 of action." Other cases are similar: See *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d

18 189, 197 (N.Y. 1985); *Philadelphia Parking Authority v. Fed. Ins. Co.*, 385 F. Supp. 2d

19 280, 285 (S.D.N.Y. 2005); *Mass. Casualty Ins. Co. v. Morgan*, 886 F. Supp. 1002, 1005

20 (E.D.N.Y. 1995).[CC]

21     Similarly, in *Frazer Exton Development, LP v. Kemper Environmental, Ltd.*, 2004

22 U.S. Dist. LEXIS 14602, *33 (S.D.N.Y. 2004), *aff'd.*, 153 Fed. Appx. 31 (2d Cir. 2005)

23

---

24 [CC] Upper Deck is a California corporation, with its principal place of business in Carlsbad, California. The Insured initiated its purchase of the Policy from its office in Carlsbad,

25 California, on suggestion of its accountants, KPMG, located in Costa Mesa, California. The subject matter of the policy – financial representations made in opinion letters issued

26 by KPMG – were made by a partner of KPMG's Los Angeles, California office. Moreover, the Insured was represented in the Policy negotiations by their broker, Marsh,

27 based in San Francisco, California. Finally, as a result of the SC2 transaction, the Insureds incurred additional tax liabilities with the federal and California tax authorities. Therefore,

28 the location of the insured risk (i.e. the event that triggered liability under the Policy) also occurred in California.

**EXHIBIT** *R* **PAGE** *511*

1   the insured Frazer Exton Development, LP ("FED") brought actions for declaratory relief

2   and bad faith denial of claims pursuant to Pennsylvania's bad faith statute against

3   defendant insurer Kemper Environmental, Ltd. ("Kemper"), after Kemper refused to pay a

4   claim for clean up costs under an environmental policy related to a "Superfund Site"

5   facility. *Id.* at *2, *32-33. The choice of law provision at issue in *Frazer Exton*

6   *Development, LP* stated that:

7           In the event that the INSURED and the Company dispute the
            meaning, interpretation or operation of any term, condition,
8           definition or provision of this Policy, or the fulfillment by the
            INSURED or the Company of any other obligations with
9           respect to the Policy, resulting in litigation, arbitration or other
            form of dispute resolution, the INSURED and the Company
10          agree that the law of the State of New York shall apply
            notwithstanding the State of New York's choice of law rules.

11

12  *Id.* at *33 (emphasis added).

13          On appeal from the lower court's denial of the parties' summary judgment motions,

14  FED argued that the choice of law provision did not apply to tort claims such as the

15  Pennsylvania bad faith claim that are "separate and distinct from the Policy." *Id.* at *33.

16  The Southern District Court of New York agreed. *Id.* at *34-35. The Court explained that

17  under New York law, "'a contractual choice of law provision . . . does not bind the parties

18  with respect to non-contractual causes of action.'" *Id.* at *34. Therefore, "'[f]or a choice

19  of law provision to apply to claims for tort arising incident to the contract such as the

20  Pennsylvania Bad Faith claim, the express language of the provision must be 'sufficiently

21  broad' as to encompass the entire relationship between the parties.'" *Id.* (internal

22  parentheses omitted).

23          To achieve broad coverage, an insurer must use choice of law provisions employing

24  "expansive language" such as "'arising out of or relating to' the contract" or "'arising

25  directly or indirectly from the Agreement.'" *Frazer Exton Development, LP*, 2004 U.S.

26  Dist. LEXIS at *34-35. The Southern District Court found that the language in FED's

27  policy's choice of law provision fell short of the mark, and therefore did not determine

28  which law applied to FED's tort claim against Kemper. *Id.* at *35. Based on the

EXHIBIT _R_, PAGE _512_

-57-

1  "interests" used to determine the law governing tort claims, the Court held that because the

2  facility was located in Pennsylvania, the policy was negotiated in Pennsylvania, sent to

3  both Marsh and FED in Pennsylvania, and Kemper failed to allege that New York or any

4  other state has a closer nexus to the tort, Pennsylvania law applied to FED's bad faith

5  claim. *Id.* at *36-37.

6      Significantly, both of the cases cited by AIG for the proposition that the Insured's

7  bad faith claim falls within the scope of the choice of law provision are Southern District

8  Court opinions decided before *Frazer Exton Development, LP*, in which, as explained

9  above, the Southern District Court expressly held that bad faith actions are not

10 encompassed by a choice of law provision governing contractually based claims.

11      Moreover, AIG's cases are factually distinguishable. *Butvin v. DoubleClick, Inc.*,

12 2001 U.S. Dist. LEXIS 2318 (S.D.N.Y. 2001) addressed a stock option provision in an

13 employment agreement, not a choice of law provision in an insurance policy like the one

14 addressed in *Frazer Exton Development, LP*. And in *Yankee Caithness Joint Venture, L.P.*

15 *v. Planet Ins. Co.*, 1996 U.S. Dist. LEXIS 10747 (S.D.N.Y. 1996), the Court specifically

16 declined to address whether a tort claim would be encompassed by the parties' choice of

17 law provision. *Yankee Caithness Joint Venture, L.P.*, at *9, n2.

18      In sum, the Southern District Court has made clear since *Butvin* and *Yankee*

19 *Caithness Joint Venture, L.P.*, that bad faith claims for denial of coverage under an

20 insurance policy are not governed by a parties' choice of law provision limited to contract

21 based claims, but rather are subject to the law of the jurisdiction with the greatest interest

22 in the action, which in this case is California.

23      **B.    California Bad Faith Law.**

24      AIG's conduct in handling the Insureds' claim constitutes bad faith under California

25 law. California law analysis begins with the premise that every insurance policy includes

26 an implied covenant of good faith and fair dealing. *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d

27 566, 575 (1973); see *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1158 (9th Cir.

28 / / /

EXHIBIT ___R___, PAGE _513_

1   2002). An insurer's duty to deal fairly and in good faith with its insureds is a legal duty

2   imposed by law, not one arising out of the contract itself. *Gruenberg,* 9 Cal. 3d at 575;

3   *Amadeo,* 290 F.3d at 1158. Thus, an action for bad faith against an insurer sounds in tort.

4   *Gruenberg,* at 574. "Bad faith" is found where the evidence establishes that the insurer

5   breached the covenant of good faith and fair dealing. An insurer's duty to deal fairly and

6   in good faith with its insureds is a legal duty imposed by law, not one arising out of the

7   contract itself. *Gruenberg,* 9 Cal. 3d at 575; *Amadeo,* 290 F.3d at 1158. Thus, an action

8   for bad faith against an insurer sounds in tort. *Gruenberg,* at 574. The key to a bad faith

9   claim is whether or not the insurer's denial of coverage or withholding of payment is

10  unreasonable. *Amadeo,* 290 F.3d at 1161; *Gruenberg,* at 575. The question of what

11  constitutes "reasonable" handling of an insured's claim is a question of fact for the

12  arbitrators to resolve. *Id.*

13       An insurer breaches its implied covenant of good faith and fair dealing by pursuing

14  an "arbitrary or unreasonable" interpretation of its policy. *Amadeo,* 290 F.3d at 1161

15  (insurer's interpretation of 'occupation' to include 'unemployment' in a disability policy

16  was unreasonable where the out of work insured had been previously employed for 20

17  years in the securities industry). An insurer will also be liable for bad faith where it

18  wrongfully accuses its insured of an illegal act in order to invoke a policy exclusion.

19  *Gruenberg,* 9 Cal.3d at 575 (valid tortious bad faith claim properly stated where insurer

20  alleged to have wrongfully accused insured of arson to avoid paying benefits under a fire

21  insurance policy).

22       Thus, in California, an insurer's "refusal, without proper cause, to compensate the

23  insured for a loss covered by the policy . . . or by unreasonably delaying payments due

24  under the policy" is a tortious act of bad faith. *Waters v. United Services Auto. Ass'n.,* 41

25  Cal. App. 4th 1063, 1069-1070 (1996) .

26

27

28

EXHIBIT *R*, PAGE *514*

373/017994-0028
767556.01 a12/01/06 UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

**C.  AIG's Refusal To Acknowledge The Existence Of A "Claim" And Outright Denial Of Coverage In The Face Of The Insureds' Indisputable Right To Policy Benefits Constitutes Bad Faith.**

As early as August 28, 2001 – the day before the Policy incepted – AIG was evidencing an intent not to act in good faith.  In an email dated August 28, 2001, one of AIG's underwriters revealed that the long-term strategy of AIG was not to honor its Policy obligations and treat the Insureds in good faith, but rather, was to begin preparing the file for a defense to coverage in the event a covered risk materialized even before the Policy had been incepted:

> I know that you still have some issues w/ CFO departure but if something did happen and we can trace it back to him, it gives our claims department a good position to make some arguments.[187]

(Emphasis added).

True to form, AIG has consistently made every attempt to avoid making a coverage determination that would result in any Policy benefits being paid out to the Insureds.  This has always been, and continues to be AIG's *modus operandi*, despite taking a hefty $3.25 million in premiums from the Insureds in exchange for issuing the Policy.  Not one dollar in policy benefits has been paid!

**1.  AIG's Refusal To Even Acknowledge The Existence Of A Claim And A Contest.**

Regardless of whether AIG ultimately determined that there was no coverage for the Insureds' loss, it was obligated to recognize the existence of a "Claim" and to step in and protect its insureds.  As Mr. Cotkin testified, "ordinarily, an expansive approach is taken to the question of what is it that constitutes a claim, so as to at least trigger the process of an insurer addressing that which has been asserted against the insured." [188]  Not only did AIG fail to take an expansive approach as is customary in the insurance industry, AIG bent over backwards to deny the existence of that which was blatantly obvious -- even to AIG -- that a "Claim" (i.e., a written assertion by a Taxing Authority) in fact existed

EXHIBIT _R_, PAGE _515_

1    very early on in this dispute.

2      A brief look at the timeline of events regarding the IRS' assertions establishes that

3 AIG's steadfast refusal to acknowledge the existence of a Claim was nothing short of

4 unreasonable. At first, AIG gave the Insureds the impression it was going to handle the

5 claim appropriately and take a proactive approach. On April 18, 2002, AIG advised the

6 Insureds that "it is reasonable to expect that the IRS will open an examination of your tax

7 return and scrutinize the transaction with respect to which [AIG] issued" the Policy.[189]

8 AIG was anticipating a Claim involving an Insured Tax Event and Contest Expenses; or, at

9 a minimum, AIG was expecting an immediate Contest, "a dispute with a Taxing Authority

10 over an adjustment in any Insured's liability for its taxes." To lessen the risk of "penalties

11 owed by any Insured" to the IRS and a corollary larger Insured Tax Loss, AIG reminded

12 the Insureds of their obligation "to mitigate loss and to cooperate with the insurer" and

13 recommended voluntary disclosure of the Insureds' March 2001 SC2 transaction to the

14 IRS under the IRS's Announcement 2002-2, a "Disclosure Initiative for Certain

15 Transactions Resulting in Waiver of Certain Penalties Under § 6662 of the Internal

16 Revenue Code."[190] The Insureds subsequently made the voluntary disclosure under

17 Announcement 2002-2 to the IRS on April 22, 2002 – the next to the last day possible –

18 ("Voluntary Disclosure")[191] and notified AIG that same day.[192] It took nearly two months

19 for AIG to acknowledge receipt of the Voluntary Disclosure, but AIG "express[ed]

20 appreciation that disclosure [had] been made," advised that AIG wanted to learn "if any

21 communication [was] received from the IRS and . . .to be involved in formulating a

22 response," and reserved its rights under the Policy.[193] AIG expected that these events

23 would "no doubt trigger defense costs."[194]

24      However, the Insureds' Voluntary Disclosure at AIG's recommendation

25 temporarily forestalled the anticipated Claim by the IRS regarding an Insured Tax Event

26 (i.e., AIG's anticipated "examination of [the Insureds'] tax return and scrutiniz[ation] [of]

27 the [SC2] transaction "[195]) and the Insureds heard nothing further from the IRS until the

28 summer of 2003. In the meantime, the IRS summoned documents relating to the Insureds'

EXHIBIT *R*, PAGE *516*

1  SC2 transaction from KPMG, who advised the Insureds of this on March 31, 2003 and

2  April 10, 2003.[196]  Seemingly by coincidence (but probably not), AIG wrote the Insureds

3  on April 9, 2003 asking for an "update as to the current status of this claim as well as

4  copies of any correspondence with the IRS and/or any accounting firm pertaining to the

5  matters at issue."[197]  Notwithstanding AIG's knowledge that the "Put Option Exercise

6  Period" under Section 5 the Shareholders Agreement had already incepted,[198] AIG made

7  no inquiry whatsoever about the status of any redemption of the Firefighters' Fund non-

8  voting stock.[199]  The Insureds' counsel promptly responded to AIG's April 9, 2003

9  inquiries the very next day, April 10, 2003,[200] and Upper Deck responded on April 11,

10  2003.[201]

11       On June 23, 2003, the IRS issued Information Document Requests or IDRs

12  requesting that Upper Deck and Mr. McWilliam provide the IRS with transactional

13  documents for the March 2001 SC2 transaction (but not documents pertaining to the

14  December 10, 2002 Share Purchase Agreement[202]).[203]  The Insureds notified AIG of the

15  June 23, 2003 IDRs on July 2, 2003.[204]  On July 25, 2003 the Insureds again notified AIG

16  of the IDRs, provided AIG with proposed responses to the IDRs, asked for AIG's

17  concurrence in the proposed responses, asked for AIG's consent to Orrick Herrington as

18  defense counsel and asked for AIG's confirmation of coverage.[205]  While AIG internally

19  recognized these IDRs as part of an "audit" pertaining to SC2,[206] AIG responded to the

20  Insureds on August 11, 2003 approving the proposed responses to the IDRs and consenting

21  to Orrick's retention but asserting that there was not yet a "Claim" and that "neither the

22  Contest Expenses nor indemnity provisions of the policy have been implicated."[207]

23       While the Insureds believe the events described above either evidenced a "Claim"

24  or AIG's waiver of a Claim requirement, at the very least, the IRS' April 26, 2004 Notice

25  2004-30, describing the SC2 transaction in detail, unquestionably qualified as a Claim

26  under the Policy.  Yet, despite contemporaneously receiving a copy of the Notice 2004-30,

27  AIG's claim director Robert Jones testified that AIG did not recognize Notice 2004-30 as a

28  Claim.[208]  There simply is no reasonable interpretation of the Policy that supports AIG's

EXHIBIT _R_, PAGE _517_

373/017994-0028
767556.01 a12/01/06  UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1     contention that Notice 2004-30 somehow did not constitute a Claim under the Policy.

2     Such an unreasonable interpretation of the Policy without question constitutes bad faith

3     under California law. *See, e.g., Amadeo*, 290 F.3d at 1161. Neither the Coordinated Issue

4     Paper issued in November 2004 nor even the IRS' settlement offer that was sent out to all

5     SC2 participants in April 2005 brought AIG to acknowledge the existence of a Claim. In

6     fact, it wasn't until the July 29, 2005 denial letter that AIG tacitly acknowledged (by

7     ceasing to opening deny its existence) that a Claim in fact existed under the Policy; but of

8     course at that point, AIG flatly denied coverage (accusing its Insureds of fraud – which

9     nobody else had done before and which nobody else has done since).

10         Thus, throughout the entire three year process of disclosures to the IRS, multiple

11     IDR requests and responses, Notice 2004-30, the Coordinated Issue Paper, until the

12     settlement proposal in April 2005, AIG continued to take the position that no Claim had

13     been asserted triggering a coverage obligation of any kind. AIG effectively left the

14     Insureds to fend for themselves through the entire three-year process nothwithstanding the

15     fact that the Policy was purchased for precisely the purpose of having insurance protection

16     in the event the IRS moved to set aside the allocations of income made to the Firefighters'

17     Fund.

18         Based on AIG's refusal to acknowledge the existence of a Claim, AIG refused to

19     advance the Contest Expenses above and beyond the $500,000 retention provided for in

20     the Policy's Clause 1 "INSURING AGREEMENT." Clause 1 specifically provides that a

21     Loss (which included "Contest Expenses") over and above the $500,000 retention, "shall"

22     be paid by AIG. As Mr. McWilliam testified on October 31 the Insureds paid Orrick alone

23     approximately $800,000[209] in "Contest Expenses" incurred in responding to the IRS' and

24     California FTB's examination of the SC2 tax strategy. As far as the Insureds were

25     concerned, despite the Policy explicitly providing coverage for the exact scenario that was

26     playing out, they were out there on their own incurring a mountain of legal fees and facing

27     not only a legal battle with the IRS, but also one with the very insurer who was supposed

28     to be looking out for their interests.

**EXHIBIT _R_, PAGE _518_**

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1    **2.     AIG Made An Unreasonable And Dishonest Determination That**
2    **The Insureds' Loss Was Not Covered By The Policy.**

3    AIG's handling of the Insureds' claim exemplifies the type of tortious bad faith for

4    which extra-contractual liability is imposed under California law.  AIG pursued an

5    "arbitrary or unreasonable" interpretation of the Policy in taking absurd position after

6    absurd position in its effort to first, delay making a coverage determination, and then, deny

7    coverage outright based on wholly specious coverage defenses.  *See, Fleming v. Safeco*

8    *Ins. Co.,* 160 Cal. App. 3d 31, at 37 (1984); *Amadeo*, 290 F.3d at 1161.  Indeed, AIG has

9    denied coverage in all respects despite the fact the Policy was specifically tailored and

10   issued to cover the precise event which has transpired:  An attack by the IRS and the FTB

11   regarding the legitimacy of the SC2 strategy.  AIG has denied all aspects of coverage even

12   though the Policy does not even remotely support the interpretation AIG seeks to impress

13   despite the fact that its own partisan experts put the chances of success for the generic SC2

14   strategy on par with a coin toss.  When one considers all of the realities in the further

15   context of the uniformity in which all SC2 transactions have been attacked – not to

16   mention KPMG's indictments, fines and the "death penalty" imposed by the Justice

17   Department on KPMG's tax unit which generated and marketed the SC2 strategy and its

18   ilk – AIG's across the board denial of coverage is difficult to fathom, particularly in view

19   of the way AIG has handled the other SC2 policies at issue.

20   AIG's wholly unreasonable interpretation of its Policy contravenes the objectively

21   reasonable expectations of the Insureds that they would have additional peace of mind and

22   security in the event the Taxing Authorities asserted that SC2 was an improper tax

23   strategy.  Moreover, AIG unreasonably delayed in making a coverage determination, a

24   determination ultimately resulting in AIG's arbitrary and capricious denial of coverage.

25   The exclusions under which AIG is attempting to avoid payment are based on

26   issues unrelated to the Insureds' tax liabilities stemming from the SC2 transaction.  After

27   raising and abandoning numerous specious coverage defenses, AIG eventually denied

28   coverage based on arguments that (1) the Insureds' implementation of the SC2 strategy

EXHIBIT _R_ PAGE _519_

-64-

deviated materially from the form of the transaction, (2) the Insureds breached warranties given to AIG when the Policy was issued, and (3) the Insureds acted fraudulently in repurchasing the Firefighters' Fund shares. Each of these defenses are entirely baseless and for AIG to deny all aspects of coverage based upon any one of them is entirely unreasonable.

Furthermore, AIG's attempt to avoid paying benefits to the Insureds by affirmatively accusing the Insureds of fraud when no other party – including the alleged victims of the fraud (see testimony of Mr. Stefka) – has ever even accused or even alluded to the presence of untoward conduct by the Insureds in connection with the Repurchase is unreasonable. This is the precise type of behavior that was alleged to have occurred in *Gruenberg*, *supra*, where the court held that accusations of a fire insurance carrier wrongfully accusing its insured of arson in order to invoke an exclusion was sufficient to constitute bad faith under California law. *Gruenberg*, 9 Cal.3d at 575. Moreover, AIG concedes that it never conducted an investigation into its allegations of fraud, never speaking to anyone at the Firefighters' Fund or anyone at KPMG regarding the alleged fraud.

In the words of Mr. Cotkin: "[I] recognize it [AIG's behavior] as a basically a stonewall pattern to stretch things out and avoid making a decision until hopefully coverage could be denied" and "it's rather astounding that they[AIG] haven't paid particularly given the circumstances. Just the tremendous exposure to the insured, the type of policy, the risk to the insured, I think it's incredible."[210]

### D. "AIG's Duty Of Good Faith And Faith Dealing Is Absolute And Unrelated To The Insureds' Contractual Duties.

AIG's Complaint accused the Insureds of "bad faith" in dealing with AIG, but not in the claims process.[211] Then, AIG's Pre-Hearing Brief abandoned any suggestion that of "bad faith" by the Insureds; but, then in AIG's Pre-Hearing Reply Brief AIG again accused the Insureds of bad faith, this time in the claims process.[212] In particular, AIG accused the Insureds of telling AIG of the December 2002 Repurchase for the very first time at a

EXHIBIT _R_ PAGE _520_

-65-

1   meeting on April 8, 2004.[213]  Then, at hearing, Mr. Jones' testified that AIG learned of the

2   Repurchase for the very first time before April 8, 2004:  on March 25, 2004 in an e-mail

3   from the Insureds' counsel, Exhibit 226.[214]

4       That March 25, 2004 e-mail was written in response to the an e-mail from AIG's

5   counsel dated March 19, 2004, Ex. 216 inquiring: "while we have many questions, we

6   particularly (sic) interested in learning what you intend to do to unwind the deal.

7   Specifically, will the charity be paid the current value of the shares in the proposed

8   redemption, or are you planning only to pay the value at the time the shares were

9   transferred to the charity?"[215]  And, this appears to be the first time AIG asked about the

10  redemption.

11      Recall AIG's contention it insured a "Tax Plan" that it contends contemplated

12  redemption at appraised fair market value pursuant to a put option between April and

13  September of 2003.  Together with the March 19, 2004 e-mail that is very telling in a

14  number of respects.  First, it reveals AIG's whole "Tax Plan" theory is an after the fact

15  concoction to justify a desired result.  AIG waited six to nine months after the

16  contemplated redemption and nearly two years into the claims process to even inquire

17  about it.

18      Second, it reveals AIG paid no attention to what it was told in the claims process.

19  Exhibit 207, a March 2, 2004 letter to AIG's counsel detailed the Insureds' potential

20  "Insured Tax Loss" at AIG's request and that letter's calculations clearly assume and

21  reveal that Firefighters' Fund ceased to be a shareholder at the end of 2002.

22      Third, it reveals that AIG cannot keep its story straight about the facts of the claims

23  process (did AIG learn about the Repurchase on April 4, 2004, March 25, 2004, March 2,

24  2004 [Upper Deck's counsel obviously thought AIG's counsel knew of the redemption

25  when Upper Deck's counsel wrote the March 2, 2004 letter or sooner]).  AIG is neither

26  reliable nor credible about what happened in the claims process.

27      The Insureds have generally chosen to demur to AIG's assertions when those

28  assertions do not matter at a substantive level rather than engage in he said/she said

373/017994-0028
767556.01 a12/01/06
UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1    dialogue; and these assertions by AIG do not, for legal reasons that will be re-explained

2    below. But, the Insureds feel compelled to say that, fairly construed, the record in this case

3    demonstrates that the Insureds generally went above and beyond anything that was

4    required of them to meet their obligations to AIG in the claims process.[216].

5        More importantly, AIG's allegations are simply a diversion: An insurer's duty of

6    good faith and fair dealing is absolute. *Kransco v. International Ins. Co.*, 23 Cal.4th 390,

7    402-405 (an insured's conduct, even if bad faith, is not a defense to insurer bad faith); see

8    also *Gruenberg*, 9 Cal. 3d at 578. Simply put, an insurer is not excused from its duty,

9    implied by law, of good faith and fair dealing even where an insured has failed to perform

10   its obligations under the policy. "In other words, the insurer's duty is unconditional and

11   independent of [the insured's] contractual obligations." *Gruenberg*, at 578.

12       It is neither accurate nor relevant for AIG to assert that the Insureds improperly

13   delayed in informing AIG of the Repurchase.

14   **E.    Based On AIG's Bad Faith Breach Of Its Duty Of Good Faith And Fair**

15          **Dealing, The Insureds Are Entitled To Attorneys' Fees And Punitive**

16          **Damages.**

17       Because AIG acted in bad faith by unreasonably withholding Policy benefits, the

18   Insureds are entitled to compensatory damages, including attorneys' fees, as well as

19   punitive damages. The general rule of damages in tort is that the injured party may

20   recover for "the amount which will compensate for all the detriment proximately caused

21   thereby, whether it could have been anticipated or not." Cal. Civ. Code, § 3333[DD]; see

22   *Gruenberg,* 9 Cal. 3d at 579.[EE]

23       When an insurer tortiously withholds policy benefits, attorneys' fees reasonably

24

25   [DD] California Civil Code, § 3333 states: "For the breach of an obligation not arising from
     contract, the measure of damages, except where otherwise expressly provided by this code,
26   is the amount which will compensate for all the detriment proximately caused thereby,
     whether it could have been anticipated or not."

27   [EE] Bad faith conduct on the part of the insurer in breaching its insurance policy, may also
     "be employed to interpose a claim for consequential damages beyond the limits of the
28   policy for the claimed breach of contract" under New York law. *Acquista v. N. Y. Life Ins.
     Co.* 285 A.D.2d 73, 82 (2001).

EXHIBIT __R__ PAGE __522__

incurred to compel payment of the policy benefits are recoverable as an element of damages resulting from the insurer's tortious conduct. *Brandt v. Superior Court (Standard Ins. Co.)*, 37 Cal. 3d 813, 815, 817 (1985) (and further holding that California Code of Civil Procedure section 1021 does not preclude an award of attorneys' fees under these circumstances). This is the case because "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense." *Brandt*, at 817. "The attorney's fees are an economic loss – damages – proximately caused by the tort." *Id.*

An insured may also recover attorneys' fees under New York law where he has been "cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations," or where the insurer exercised "such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it." *Mighty Midgets, Inc. v. Centennial Ins. Co.* 47 N.Y.2d 12, 21 (1979); *Sukup v. State,* 19 N.Y.2d 519, 522 (1967).

Accordingly, based on AIG's breach of its obligation of good faith and fair dealing (under California law) and further based on AIG's litigation strategy placing the Insureds' in a defensive posture (under New York law), the Insureds are entitled to recover all attorneys' fees incurred in connection with obtaining the policy benefits wrongfully withheld by AIG. In the declaration of Duke. F. Wahlquist filed concurrently herewith, there is an explanation of all of the attorneys' fees incurred by the Insureds in pursuit of the Policy benefits wrongfully withheld by AIG. The total amount of recoverable fees incurred to date are $1,214,151.76. (Wahlquist Decl., at ¶ 2.)

Furthermore, punitive damages are appropriate where, as in this case, the insurer, beyond a bad faith breach of the contract, "acted 'with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights.'" See *Delgado v. Heritage Life Ins. Co.*, 157 Cal. App. 3d 262 (1984) (restrictive policy interpretation coupled with repeated failure to investigate and awareness of insurer of the harsh consequences on the insured,

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1    sufficient to infer conscious disregard).  California Civil Code, section 3294(a) provides:

2                In an action for the breach of an obligation not arising from
             contract, where it is proven by clear and convincing evidence
3            that the defendant has been guilty of oppression, fraud, or
             malice, the plaintiff, in addition to actual damages may recover
4            damages for the sake of example and by way of punishing the
             defendant.
5

6    "Malice" is defined is section 3294(c) as "despicable conduct which is carried on by the

7    defendant with a willful and conscious disregard of the rights or safety of others."

8                AIG certainly took disingenuous position after disingenuous position in shunning

9    the Insureds' claim for Policy benefits.  For instance, AIG knew a "Claim" existed for

10   months if not for years, acknowledging as much internally, yet continued to maintain in

11   writing to its Insureds that no Claim had been triggered under the Policy and thus no Loss

12   in the form of Contest Expenses had been incurred.  A further example of AIG's conscious

13   disregard for its Insureds' rights is exhibited by AIG's bald assertions that Exclusion 3(a)

14   (fraud) applies despite the plain language of the Policy requiring a Taxing Authority's

15   *Claim* to "arise out of" the alleged criminal conduct in order for the exclusion to apply.

16   Not even AIG has ever made the assertion that the IRS or FTB made a Claim as a result of

17   some ill-alleged fraudulent conduct on the Insureds' part.

18               In the final analysis, the nearly $100 million loss sustained by the Insureds was the

19   exact risk for which AIG agreed to provide $50 million in insurance benefits in exchange

20   for a Policy premium of $3.25 million.  Yet, as soon as the precise covered risk

21   materialized, AIG concocted one spurious coverage defense after another in order to avoid

22   honoring its Policy obligations.  Throughout the handling of the Insureds' claim for Policy

23   benefits, AIG has desperately tried time and again to distance itself from the very

24   obligation it was paid $3.25 million to honor.  It has refused in bad faith to honor its

25   obligation and it is now time for it to be penalized for doing so.  Thus, in addition to the

26   full Policy benefits and the Insureds' attorneys' fees, AIG should be forced to pay

27   additional punitive damages sufficient to penalize it for its despicable conduct in

28   connection with the handling of the Insureds' claim.

EXHIBIT _R_, PAGE _524_

373/017994-0028
767556.01 a12/01/06    UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

1     AIG is a massive conglomerate, taking in premiums in the billions of dollars

2 annually. According to AIG's 10K for the year ending 2005, AIG had annual revenues of

3 nearly $109 billion and a total operating income in 2005 of $15.2 billion. Thus, a punitive

4 damage award must be truly significant in order to send the appropriate message to AIG

5 and to ensure AIG discontinues its abusive pattern of mistreating its insureds. This panel

6 is empowered to send that message and should do so in this case based on AIG's

7 shameless and abusive treatment of the Insureds.

8 Dated: December 1, 2006       RUTAN & TUCKER, LLP

9                       By: _____

10                       Richard K. Howell

11                       Attorneys for Respondents and
Counterclaimants, The Upper Deck Company
and Richard P. McWilliam, individually and

12                       as Trustee for the MPR Trust

13  [1]    Ex. 104, p. 4, ¶ (l) [AI0000600]

14  [2]    Ex. 104, p. 4, ¶ (j) [AI0000600]
 [3]    Ex. 104, p. 3, ¶ (d) [AI0000599]

15  [4]    Ex. 104, p. 3, ¶ (a). [AI0000599]
 [5]    Ex. 104, p. 18. [AI0000614]

16  [6]    Ex. 27, pp. 6, 9; 55
 [7]    Ex. 223

17  [8]    TR 792:18-22, 371:14-22
 [9]    Ex. 247, p. 2-3; TR. 681:7-682:3, 716:14-16

18  [10]   TR 480:21-481:23; Ex. 331, p. 16
 [11]   TR 757:12-758:8, 760:14-763:2, 765:22-767:2

19  [12]   Ex. 328, p. 9
 [13]   TR 716:17-718:2

20  [14]   Ex. 247
 [15]   Ex. 104, p. 18 [AI0000614]

21  [16]   Ex. 223, p. 1
 [17]   Ex. 223, p. 2

22  [18]   Ex. 223, p. 2
 [19]   Ex. 274, pp. 1, 3-4

23  [20]   Ex. 274 p. 1
 [21]   Ex. 104, p. 3 [AI0000599]

24  [22]   Ex. 104, p. 18 [AI0000614]
 [23]   Ex. 223, p. 2

25  [24]   Ex. 274, pp. 1, 6-7
 [25]   Ex. 274, p 7

26  [26]   Ex. 274 p. 1
 [27]   Ex. 274, pp. 1-2

27  [28]   Ex. 104:3, ¶ 2(a) [AI0000599]
 [29]   Ex. 288; TR 504:22-505:23, 557:6-10, 688:21-689:11; Ex. 303; AIG's Resp. to
Insureds' X-Comp., p. 7, ¶ 29

28  [30]   Ex. 288

EXHIBIT _R_, PAGE 525

31  Ex. 288
32  TR 504:22-505:23, 557:6-10; Ex. 288; TR 760:24-763:2
33  Ex. 390; TR 760:24-763:2; Exs. 288; 328, p. 9; 331, pp. 17-18; TR 760:24-763:2
34  Ex. A to Upper Deck Motion to Augment the Record
35  TR 792:18-22, 371:14-22
36  AIG's Comp., ¶¶ 47-52
37  Ex. 289 p. 130, 132
38  AIG's Ans. to X-Comp., ¶ 7; AIG's Opening Brief, pp. 5, 11
39  AIG's Opening Brief, pp. 11-12; AIG's Pre-hearing Reply Brief, pp. 1, 4-5
40  AIG's Opening Brief, p. 13
41  AIG's Comp., ¶¶ 50-52; AIG's Opening Brief, p. 12; AIG's Pre-Hearing Reply Brief, p. 5; TR 1081:7-14
42  AIG's Comp., ¶¶ 50-52; AIG's Pre-hearing Reply Brief, pp. 4-5
43  Ex. 104, p.12 [AI 0000606]
44  Exs. 27, p. 1; 87, p. 1
45  Exs. 27, pp. 9, 11; 52, p. 2; 68, p. 2; 73, pp. 1 & 2
46  TR 159:2-7
47  TR 169:25-170:3
48  TR 169:25-170:9, 230:16-24. TR 178:25-180:2, 210:22-211:5
49  TR 210:22-211:10
50  TR 214:11-18; emphasis added
51  TR 217:6-14; emphasis added
52  TR 217:16-218:12
53  AIG's Comp., ¶¶ 14-48; AIG's Pre-hearing Reply Brief pp. pp. 9-10 ["The Share Purchase Agreement eliminated the requirements of fair market value and an independent appraisal from the tax plan insured by" AIG"] and p. 12; AIG's Pre-hearing Reply Brief, pp. 1-2 [referring to the "Tax Plan's requirement of fair market value and an independent appraisal"] and pp. 4-5 [referring to the "critical elements of the Tax Plan set forth in the documents annexed to the Policy . . . namely: . . . fair market value and an independent and competent appraisal"]. AIG's Ans. to X-Comp., ¶ 7; AIG's Opening Brief, pp. 5, 11
54  TR 214:11-24
55  TR 210:22-211:10
56  TR 311:14-313:15, 320:13-321:8, 341:18-21, 343:21-22, 345:15-346:8
57  TR 346:14-20
58  TR 346:21-25, 347:2-6
59  TR 347:7-10, 348:22-24
60  TR. 347:19-348:3
61  TR 348:6-14
62  TR. 348:15-21
63  TR 349:10-11
64  TR. 349:12-15.  To be sure, after some hesitation, Mr. Nammacher added: "I don't know of any valuation person that would take that approach, but I would be willing to offer him, you know, a lot of money for a 90 percent interest." TR. 349:15-18.  But, when Mr. Nammacher was pressed by further questioning on the identities or attributes of anybody who could make such an investment, Chairman Byrne mercifully spared Mr. Nammacher, admonishing counsel: "Ask my first wife. We get it, Counsel. . . . We get it. It doesn't -- it's not about who would do it.  It's the valuation that he put on the company -- on the shares of the company using the methods he used.  Nothing personally." TR 349:19-350-8
65  TR 477:23-478:4
66  TR 780:14-16
67  TR 847:17-848:16
68  TR 848:3-14
69  Ex. 19, pp. 2-3
70  Ex. 21, pp. 1-2

EXHIBIT _R_, PAGE _526_

373/017994-0028
767556.01 a12/01/06

UPPER DECK'S AND RICHARD MCWILLIAM'S POST-HEARING BRIEF

[71] Ex. 31, p. 1
[72] TR 351:25-352:11
[73] TR 352:12-24
[74] TR. 353:10-15, 354:5-7.
[75] TR 354:11-21.
[76] Ex. 159, p. 2. [Bend 0004]
[77] TR 276:21-279:4, 283:23-284:6
[78] Ex. 303
[79] Ex. 330, pp. 11-18; 331, pp 20-21; Linda Burke's Supplemental Report, p. 8. This is further evidenced by AIG's consent to and agreement to fund the Clement Pappas and Spencer Forest settlements (Ex. C to Upper Deck's Motion to Augment the Report; TR 692:24-693:17) and AIG's consent to acceptance of the April 7, 2005 proposal to the Insureds (Exs. 293, 296, 298)
[80] Ex. 303
[81] Ex. 303, p. 2
[82] Ex. 303, p. 4
[83] TR 1107:15-1109:25; AIG's Pre-hearing Brief, p. 15; AIG's Pre-hearing Reply Brief, pp. 14-15
[84] TR 1107:15-1109:25; AIG's Pre-hearing Brief, p. 15; AIG's Pre-hearing Reply Brief, pp. 14-15
[85] AIG's Pre-hearing Reply Brief, pp. 7-8
[86] Mather Supp., pp. 7-9
[87] Ex. 137
[88] Exs. 138-141
[89] Ex. 124
[90] Ex. 328, p. 8
[91] Exs. 199, 289.
[92] AIG's Comp., p. 6, ¶ 33; Ex. 289, pp. 27-28
[93] Ex. 199, p. 89
[94] AIG's Comp., p. 6, ¶ 33; Ex. 289, pp 27-28
[95] TR 244:4-9
[96] Ex. 388; TR 200:21 –203:6
[97] Exs. 128, 132; TR 253:19-255:19
[98] Ex. 131; TR 253:19-255:19
[99] Exs. 183, p. 2; 185, p. 1
[100] Ex. 189
[101] Ex. 289, p. 182, fn. 578
[102] TR 884:4-887:3
[103] TR 204:19-23, 208:9-12, 202:9-21
[104] TR 562:21-563:6
[105] TR 490:11-493:25, 557:2-5, 556:7-23
[106] Ex. 328, pp. 9, 11, 15; TR 581:16-582:7
[107] Ex. 330, pp. 26-28; TR 815:2-13; 789:10-17
[108] Ex. 162
[109] AIG's Comp., ¶ 25, p. 5, Count V, ¶¶ 68-74, pp. 11-12; TR 717:1-17, 645:21-646:4
[110] TR 601:3-12
[111] TR 641:2-6
[112] TR 601:13-602:14
[113] Ex. 19, p. 2
[114] Ex. 21
[115] Ex. 28
[116] Ex. 31; TR 446:9-450:3
[117] Ex. 31; TR 446:9-450:3
[118] TR 419:3-24, 436:8-437:16
[119] TR 605:3-8

EXHIBIT _R_, PAGE _527_

373/017994-0028
767556.01 a12/01/06          UPPER DECK'S AND RICHARD McWILLIAM'S POST-HEARING BRIEF

| | |
|---|---|
| 120 | Ex. 286 p. 141 |
| 121 | Ex. 223, p. 2 |
| 122 | Ex. 274 p. 1 |
| 123 | TR. 604:8-17 |
| 124 | Ex. 604:18-25 |
| 125 | TR 438:11-439:11, 440:20-441:20 |
| 126 | TR 635:14-16 |
| 127 | TR 635:17-18 |
| 128 | TR 635:19-21 |
| 129 | TR 635:22-24 |
| 130 | TR. 411:7-415:15, 442:19-446:3 |
| 131 | TR. 414:11-415:8 |
| 132 | TR 415:16-416:9 |
| 133 | TR 276:13-20 |
| 134 | Exs. 150, 148 |
| 135 | Exs. 151, 154 |
| 136 | TR 270:13-20; 410:21-6 |
| 137 | Exs. 152, 155 |
| 138 | Exs. 156, 158; TR 405:2-24, 433:9-436:4 |
| 139 | Ex. 160, TR. 405:25-406:10 |
| 140 | Ex. 161 |
| 141 | Ex. 159, p. 3 |
| 142 | Ex. 159, p. 3 |
| 143 | Ex. 328, p. 23; TR. 591:15-593:5, 634:24-635:5, 636:14-25, 639:24-640:13. |
| 144 | Ex. 328, pp. 23-24; TR 593:6-595:7, 635:25-636:9, 640:14-25 |
| 145 | TR. 635:25-636:13 |
| 146 | TR. 636:10-637:5 |
| 147 | Ex. 19, p. 2 |
| 148 | TR 409:19-410:2 |
| 149 | TR 279:12-19 |
| 150 | TR 243:4-15 |
| 151 | Ex. 331, p. 10 |
| 152 | Ex. 331, p.11 |
| 153 | Ex. 331, p. 12 |
| 154 | Comp. ¶¶ 1-63, pp. 1-10; ¶ 15, p. 3, ¶ 55, p. 9; Resp. X-Comp. ¶ 45, p. 9 |
| 155 | Comp. ¶ 14, p. 3, ¶ 55, p. 9; Ex. 289, p. 28 |
| 156 | Ex. 289, Subcommittee, p. 26 |
| 157 | Ex. 289, Subcommittee, p. 32 |
| 158 | Ex. 289, Subcommittee, p. 27 |
| 159 | Ex. 289, Subcommittee, p. 27 |
| 160 | Ex. 274 p. 6; TR 783:14-784:15 |
| 161 | Ex. 274, p. 6 |
| 162 | TR 611:17-612:11; 768:16-769:8 |
| 163 | Ex. 328, p. 15 |
| 164 | TR 473:5-474:18 |
| 165 | TR 500:7-501:8 |
| 166 | TR 581:16-582:24 |
| 167 | TR 809:1-810:9 |
| 168 | Ex. 388 |
| 169 | AIG's Comp. ¶ 14, p. 3, ¶ 55, p. 9; Ex. 289, p. 28 |
| 170 | TR 494:11-495:15; 548:1-21 |
| 171 | TR 815:14-816:14. |
| 172 | Ex. 303 p. 3, ¶ 2 |
| 173 | AIG's Comp. p. 11, ¶¶ 66-67 |
| 174 | Exhibit 104 Ex. C, § 1, p. 1. [AI0000644] |

EXHIBIT _R_, PAGE_528_

-73-

| | |
|---|---|
| 175 | TR 628:11-629:24, 630:3-8 |
| 176 | TR. 630:3-8 |
| 177 | TR 628:11-629:24 |
| 178 | TR 815:14-816:14. |
| 179 | Ex. 104, Ex. B. [AI0000617-0000618] |
| 180 | AIG's Comp. pp. 9-10, ¶¶ 54-55, 58; Ex. 303, pp. 3-4 |
| 181 | Ex. 303, p. 4, ¶ 5 |
| 182 | TR 815:14-816:14. |
| 183 | Ex. 303, p. 4, ¶ 6 |
| 184 | TR 628:11-629:24 |
| 185 | AIG's Prehearing Brief, pp. 17-19 |
| 186 | Ex. 104, § 16 [AI0000610-0000611] |
| 187 | Ex. 96 |
| 188 | TR 935:12-17 |
| 189 | Ex. 128; TR 253:19-255:19 |
| 190 | Exs. 128, 134, 331 pp. 14-15, 328 p. 8 |
| 191 | Ex. 131 |
| 192 | Ex. 130 |
| 193 | Ex. 135 |
| 194 | TR 702:11-703:2 |
| 195 | Ex. 132 |
| 196 | Exs. 173, 176 |
| 197 | Ex. 175 |
| 198 | Ex. 104, Ex. C [AI0000644-0000663] |
| 199 | Ex. 175 |
| 200 | Exs. 177, 178, 179 |
| 201 | Ex. 180 |
| 202 | Ex. 162 |
| 203 | Exs. 183:2, 185:1 |
| 204 | Ex. 186 |
| 205 | Exs. 186, 187, 188 |
| 206 | Ex. 189 |
| 207 | Ex. 190; cf Ex. 195 |
| 208 | Ex. 247, p. 2-3; TR. 681:7-682:3, 716:14-16 |
| 209 | TR 1052:9-13 |
| 210 | TR, pp. 1044-1050. |
| 211 | AIG's Comp. Count VII. |
| 212 | See AIG's Pre-Hearing Brief and AIG's Reply Brief p. 25. |
| 213 | AIG's Pre-Hearing Reply Brief p. 25. |
| 214 | TR 676:12-24; Ex. 226. |
| 215 | Ex. 216. |
| 216 | See, e.g., p. 1050. |

-74-

EXHIBIT _R_, PAGE_529_

# EXHIBIT S

EXPERT REPORT OF


RAPHAEL COTKIN




REGARDING INSURANCE CARRIER HANDLING OF
AND CONDUCT AS TO IRS CLAIMS AGAINST
UPPER DECK COMPANY, RICHARD P. MCWILLIAM
AND THE MPR REVOCABLE TRUST

COTKIN, COLLINS & GINSBURG
300 SOUTH GRAND AVENUE
SUITE 2400
LOS ANGELES, CALIFORNIA 90071
TEL. NO.  213-688-9350
FAX 213-688-9351
EMAIL: rxc@ccglaw.cc

2178-1.WPD

1

**EXPERT REPORT OF**

**RAPHAEL COTKIN**

My background, experience and credentials are set forth in
Exhibit A including my CV.

Simply to set the stage, I have been extensively and
intimately involved in various aspects of the insurance world
since 1963, have worked on behalf of hundreds of insurers on many
thousands of matters and interacted with hundreds of other
insurers on thousands of matters. (Amongst these various
aspects, I have participated in forming insurers, helping to
formulate their approach to claims handling, drafted portions of
claims manuals, provided training lectures to carrier adjusters,
spoken and interacted at adjusters associations, etc.)

However, the vast bulk of this work has involved dealing
with issues of carrier insurance coverage, carrier
responsibilities to insureds and others and whether carriers have
conducted themselves reasonably and appropriately, including
numerous matters analogous to this case.

To a unique extent, the latter has involved addressing those
issues vis-a-vis AIG. ("AIG" refers to and includes the numerous
subsidiaries of AIG.) In brief, during the first 15 years
beginning in 1963, I represented dozens of carriers and
encountered hundreds of carriers including AIG. A major aspect
of the practice was to ascertain the MO of carriers with an
obvious emphasis on the carrier's approach to addressing claims



EXHIBIT _S_, PAGE _531_

and their responsibilities to insureds. During those initial years the AIG approach to claims and protection of their policyholders was mainstream and generally better than average as far as protection of their policyholders.

During the latter part of the 1970's, it became strikingly apparent that the "modern" AIG had adopted an extraordinarily hard-line approach to its coverage responsibilities to its policyholders, particularly with regard to specialty or niche lines of insurance coverage such as directors and officers liability coverage.

Because of AIG's uniquely systematic hard-line resistance to issues of insurance coverage for its insureds, I have as a result been involved in hundreds of matters triggered in whole or in part by AIG's "unique" approach. To put it bluntly, AIG's systematically unreasonable approach to its responsibilities toward its policyholders has, in my experience, been unique amongst major property and casualty carriers and represents a pattern and practice which has been carried forward in this matter and which enhances the egregiousness of their unreasonable and inappropriate conduct herein.

The generally understood insurance industry standard is that when a carrier withholds from an insured policy benefits unreasonably and without proper cause, the carrier has failed to meet its obligation to act in good faith and to exercise fair dealing, i.e., the carrier has acted in bad faith. In this matter, AIG has refused to pay any amount or any type of policy benefits to any of its insureds. In doing so, AIG, in fact,

EXHIBIT __S__, PAGE 532

acted unreasonably, withheld all policy benefits without proper cause and did act in bad faith.

An aspect of the coverage resistance here which helps bring into focus the unreasonable AIG conduct as a continuation of their longstanding MO is with regard to their duty to protect this policyholder when this potentially extraordinarily grave matter surfaced.

Carriers as to all aspects of their relationship to their policyholder have a duty to act in good faith and exercise fair dealing.

Although this obligation in various forms exists in most contracts, it is particularly critical in insurance policies and somewhat uniquely creates tort exposure when the obligation is breached.

This obligation is particularly expansive and significant with regard to the carrier's duty to protect the insured against that which is being asserted against the insured. Although the duty to protect the insured with regard to settlements or judgments carries with it that implied covenant to act in good faith and fair dealing to the policyholder, it applies in spades to the initial obligation to participate in protecting the insured.

And that is true even though policies may articulate that duty using different phraseology, i.e., it may be a "duty to defend," it may be a duty to advance, or indemnify or reimburse

EXHIBIT _J_, PAGE _533_

the insured's expenditures during that protective phase or, as here, it may be a duty to protect the insured regarding the "Contest" of that being asserted or potentially asserted against the insured.

Although its probably unnecessary to point out the significance to an insured of the carrier providing support to the insured in addressing claims, demands and assertions, please note that the first page of the policy in bold face addresses the fact that "CONTEST EXPENSES" are covered by the policy and this coverage is in essence identified as being the equivalent of "LEGAL DEFENSE."

While explaining that it is not a duty to defend policy, the Insuring Agreement, Item 1 in the policy expressly provides AIG shall "...advance Contest Expenses of such Claim excess of the Retention prior to its Final Determination" and the Contest Expenses incurred serve to shrink the Retention accordingly and thus accelerate the monetary point at which AIG must indemnify as to settlement.

Although in some circumstances, it may take a while to determine the scope of the carrier's obligation to pay a settlement or judgment, the carrier obligation to protect the insured against the assertions of the claimant (here the IRS) are triggered almost instantly. If the affirmative assertions (here the "Claim") raise the mere potential that they may ultimately be covered, the carrier's obligation to protect the insured arises instantly. As a point of reference, its generally understood that an insurer should be able to indicate for the insured its

EXHIBIT S, PAGE 534

approach to this threshold issue within 40 days unless it can
articulate an acceptable game plan for requiring additional time
to take action; in any event, its totally unreasonable for this
threshold obligation to still be in limbo years later.

If the carrier legitimately can't immediately identify a
<u>potential</u> of coverage, it is obligated to instantly undertake a
comprehensive investigation for the purpose of determining
whether there is a basis for coverage.  In the present case,
given the uniquely specific and targeted nature of the coverage
provided, from the outset there was never any legitimate question
but that there was at least a "mere potential" that coverage
existed and that the insured should be promptly advised AIG would
fulfil its obligation to protect the insured vis-a-vis this
momentous exposure.  Under the clear-cut provisions of the
policy, mechanically that entailed AIG's unequivocal
acknowledgment that addressing the Claim would represent Contest
Expenses which were expressly covered.

A telling aspect of AIG's unreasonable stonewalling with
regard to this basic policy protection is evidenced by its
completely inappropriate refusal to acknowledge that, at the very
least, there had been an "Event" and a "Claim."  Even assuming
arguendo for the moment that an issue exists at some point
whether an insured Loss warranting carrier indemnification had
occurred, it takes monumental gall to deny that an Event or a
Claim arose triggering AIG's obligation to address Contest
Expenses under the low threshold applicable ("mere potential" of
there ultimately being coverage).

EXHIBIT _S_, PAGE _535_

I will generally avoid subjecting the Arbitrators to reiteration of that which the parties undoubtedly will brief in great detail but this "Claim" issue represents a capsulized snapshot as to the AIG pattern and practice of denying reality to at least delay, if not totally avoid payment of policy benefits owing. As will undoubtedly be addressed in the litigants briefs, for numerous reasons the extensive developments were at least in part an "Insured Tax Event." With this in mind the definition is:

> "'Claim' means any written notice from the Taxing Authority alleging any Insured <u>may</u> be liable for Taxes, but only if such Taxes are directly related in whole or in part to the Insured Tax Event."
> (Emphasis added)

The Internal Revenue Service's April 26, 2004 publication of Notice 2004-30 in Internal Revenue Bulletin 2004-17 in conjunction with the Internal Revenue Service's August 5, 2004 correspondence transmitting "three IDR Forms 4564, numbered S608B2, S608C and S701A" followed the next day by the Internal Revenue Service's August 6, 2004 correspondence regarding "examination of Upper Deck Co. Notice 2004-30 transactions" and the same "Taxing Authority's" April 7, 2005 correspondence (all during the "Policy Period") leave no room for ambiguity about there being "written notice from the Taxing Authority alleging any Insured <u>may</u> be liable for taxes." (Emphasis added) As indicated above, there is also no ambiguity that "such Taxes are directly related in whole or in part to the Insured Tax Event."

EXHIBIT _S_, PAGE_534_

There has been a Claim by the IRS and AIG knew of that Claim for an extended period of time. To make this situation even more extreme, there was a similar "Claim" asserted by the Taxing Authorities of the State of California which in and of itself involved sums in the eight figures.

The indications are that within one day following initial notice of this situation, AIG was internally beginning its investigation to address its self interests. Nonetheless, years later AIG continued to deny that it could ascertain an Event or a Claim existed and to resist even its protective obligations as to Legal Defense, i.e., Contest Expenses. Apparently to this day AIG improperly denies that even this coverage obligation has been triggered. (It might be noted that this shabby treatment continues even though the insured purchased this targeted policy for seemingly just this very "Fiscal Event" for a stunning premium of $3,250,000.)

Ironically if it were to AIG's advantage to demonstrate that an early incident constituted a "claim" and this was to their best interests coverage-wise, they would turn heaven and earth to demonstrate such an early "claim." For example, if that placed the "claim" within an earlier policy, it had not been reported by the insured and thus coverage was lost within a claims made policy, AIG would proclaim that an early "claim" had occurred and coverage was barred.

I believe its fair to say that the understanding in the insurance industry and thus custom and practice is an appreciation that because of the low threshold triggering its

EXHIBIT _S_, PAGE_537_

required performance (i.e., "mere potential"), its extreme significance to the insured, etc., that failure to protect the insured (here "Contest Expenses") equates with bad faith per se if the insurer has gambled and lost in its reckless decision to stonewall. I can assure the panel that any insurance carrier coverage attorney worth his salt would so advise his carrier client.

AIG has long since been in a position to acknowledge its fundamental obligation to the insured to participate in responding to the IRS assertions (and has failed to respond appropriately). Moreover, AIG has long since been in a position to acknowledge its obligation to contribute its policy limit toward payment of the IRS settlement (to which AIG gave its blessing) and to therefore spare the insured having to advance the $50,000,000 for which AIG is obligated.

It should be emphasized that AIG's refusal to pay regarding this insured's exposure comes in the face of a specialized (and expensive) coverage extraordinarily targeted to the very risk which, in fact, eventuated. Thus, this is not a situation in which a carrier might legitimately question whether a newly evolving tort or unforeseen exposure cast doubt as to whether a generalized policy was intended to provide coverage, e.g., the initial uncertainty as to whether newly emerging torts such as wrongful termination or new legal doctrine such as implied indemnity represented covered risks under a general liability policy.

EXHIBIT $\underline{S}$, PAGE $\underline{538}$

In fact, this AIG policy represents a step beyond even other specialized, niche policies limited to one specific risk, e.g., a specialized policy covering nothing other than patent infringement liability. Here, the AIG policy was for all practical purposes sold as part of a package arrangement tied to the exotic tax planning prepared by KPMG. The very rationale - and the presentation - was such that as a practical matter the insured would not undertake the "Fiscal Event" risk without the "comfort" provided to the insured addressed to the very Event that has ultimately exposed the policyholder to a multi-million dollar exposure.

And even in a vacuum, given this context and laser shot purpose for this narrow coverage, AIG's refusal to acknowledge coverage for the IRS Claim would constitute unreasonable carrier conduct. However, the situation is aggravated in that it is apparent that the act by any taxpayer (and by any AIG insured) of utilizing this tax approach (SC squared) turned out to be that sort of failure which constituted the Fiscal Event covered by AIG.

After my having been through many thousands of coverage disputes on all sides of the fence, AIG's approach here is readily identifiable as a zealous quest to find reasons to avoid coverage. Obviously that is 180 degrees out of phase as far as the carrier obligation which is to conduct a prompt and thorough investigation to determine whether there is any basis upon which their policyholder is entitled to the benefits of the coverages which have been purchased. (Actually, in my opinion, under the

EXHIBIT _S_, PAGE_539_

applicable ground rules AIG should have been able to ascertain simply from the IRS assertions that, at the very least, it had to begin protecting the insured as to Contest Expenses and provide to the insured its support and expertise. To say the least, AIG has breached one of the cardinal rules governing carriers in that it has failed to show as much concern for its insureds best interests as for its own interests.)

The litigants undoubtedly will brief in exquisite detail the specific pros and cons of their coverage positions vis-a-vis each of the contested policy provisions, AIG's imaginative coverage defenses and the insured's rebuttal therein. I believe a valid overview, however, is that the best that can be said for AIG's approach is that it represents a complete loss of perspective as to what they sold, what the insured purchased and the appropriate approach to those issues.

Notwithstanding the thousands of coverage matters in which I have been involved, I am hard pressed to recall a circumstance in which the actual loss sustained (or, in the parlance of the AIG policy, the Fiscal Event) more closely tracks precisely that being covered than what we have here (which, of course, goes back to the laser-shot nature of the narrow but targeted coverage provided).

Thus for AIG to search out aspects of the manner in which this insured carried out the insured tax plan or the charitable entity was treated or the IRS specifically articulated its position is doomed to failure. It is particularly telling that apparently every subchapter S corporation insured under this SC



EXHIBIT _S_, PAGE _540_

squared program was, in fact, subjected to this "Fiscal Event" by the IRS.  It is almost as if the IRS was reading from the AIG policy as they challenged the insured and ultimately demanded its pound of flesh (a demand which AIG acknowledged the insured was entitled to accept).

The panel is undoubtedly aware of the basic insurance principles that this policy which has been provided for the purpose of protecting and indemnifying the policyholder (and is to be construed accordingly) specifically should be interpreted so that the grant of coverage is broadly construed to benefit the insured.

In particular, the policy is to be construed so that restrictions upon coverage and the policy's exclusions are to be narrowly construed so as not to improperly deprive the policyholder of coverage which would reasonably be expected.  Thus AIG's efforts to utilize specific exclusions or exclusionary concepts simply won't fly and is not even close to being reasonable within the standards of the insurance industry.

By way of example:  AIG insultingly contends that the insured concealed information from AIG during the process of acquiring the policy.  Putting aside for the moment the fact that to a unique degree this policy was "sold" (through the efforts of KPMG and the broker) rather than being "sought," it should be noted that improper utilization of the "concealment" defense appears to be a coverage defense du jour for AIG.

For example, during my representation of the State of California's coverage interests stemming from the high profile



EXHIBIT  S  , PAGE 541

Stringfellow Acid Pits episode, AIG amongst the dozens of
(dubious) affirmative coverage defenses asserted, focused on
allegations that the State had "concealed" information on the
Stringfellow site which was one of many thousands of sites owned
by the State. Ultimately, the AIG companies involved, decades
after the loss was sustained, finally abandoned their position
and paid the State $19,000,000. (And the "concealment" defense
was ultimately soundly rejected following trial by jury.)

Apparently this "concealment" coverage defense has now been
raised by AIG so as to stop making payment under a $100,000,000
policy covering the school district for environmental cleanup
costs. AIG contends "district officials failed to fully disclose
what they knew about polluted sites before buying the policy..."
I hasten to add I am not involved in that matter but, if asked by
the school district prior to purchasing the policy, I would have
advised the odds were high ultimately they would be hearing that
coverage defense from AIG (in the same way I would have advised
Mr. McWilliam to that effect if I had been asked prior to his
purchase of this $50,000,000 coverage).

In determining whether AIG has acted unreasonably and
inappropriately, even a cursory examination of AIG's conduct
within the context involved, reveals that they have acted
unreasonably. It would not take a rocket scientist to comprehend
that the circumstances presented an extraordinary risk to the
insured, monetarily and otherwise. The IRS was obviously on the
warpath with criminal prosecution of KPMG seemingly just over the

EXHIBIT _S_, PAGE _542_

horizon and with KPMG personnel targeted for individual prosecution.

However, instead of functioning as an ally to the insured who had paid handsomely for AIG's protection and assistance (i.e., their premium), AIG shotgunned with insinuations and unfounded allegations of improprieties by its own insured. Thus AIG contended that the insured had utilized an "unauthorized method" for reacquisition of the stock from the Austin firemen (which seemingly would have no impact upon AIG's coverage obligation - even if the accusation was correct).

AIG suggested application of exclusion (a) which pertains to "criminal or deliberate fraudulent act." The accusation appeared ill-founded and inflammatory and is particularly dubious within the context of the insured entering into the tax plan at the urging of its prestigious accountants who pointed out their expertise and strongly proclaimed the plan was legitimate. (The fact that KPMG and its personnel were seemingly targets for criminal prosecution and the insured was not should have turned the lightbulb on for AIG, a massive entity with unlimited resources to illuminate a situation if they considered it to be in their best interests.)

In its desperation to avoid this potentially massive payout, AIG (through counsel) during May 2004 archly invoked exclusion (b) pertaining to "material inaccuracies." At other points AIG in essence contended that the policyholder had misrepresented its income or potential income. The accusations were meritless, irrelevant, legitimately contested by the insured and were

obviously less than helpful to a policyholder in the midst of a high-stakes controversy with the IRS as to the propriety of its tax planning and potential obligations. Which leads to the paraphrase of the cliche, "With friends like AIG, who needs enemies?"

If AIG truly took seriously their insinuations of concealment, withholding material information, etc., they undoubtedly would have attempted to pursue complete rescission of the policy. From personal experience I can attest that they are not bashful about taking that step.

For example, I provided insurance coverage advice to MGM regarding a famous dispute re the origination of the James Bond films. During coverage discussions with MGM, AIG decided upon a preemptive first strike and filed a rescission action to eliminate the policy ab initio. (The effort at rescission ultimately failed.)


As indicated earlier, it is apparent that AIG's stalling, never-ending requests for additional information and ultimate denial of coverage are simply part of a pattern and practice systematically engaged in during the last 30 years rather than a good faith approach to this insured's undeniable loss.

AIG is a major force in the sale of specialty and niche products such as this but unfortunately for insureds such as Mr. McWilliam, these types of insurance are uniquely susceptible to AIG's inclination to demonize their insureds and to advocate that

EXHIBIT _S_, PAGE 544

while obtaining the coverage, the insured knew of information that should have been conveyed to AIG - even if not requested by AIG. The very nature of the circumstances insured frequently provide an opportunity to spin this purported coverage defense.

CONCLUSION

In my opinion, as set forth above, AIG has failed to act reasonably or appropriately in responding to these momentous claims against its policyholders even though to a unique extent the IRS claims represent precisely the Fiscal Event for which these insureds purchased this coverage.

AIG's stonewalling - refusal to pay any policy benefits to any of these insureds without proper cause - is part of a pattern and practice, all of which accentuates the fact that AIG's conduct is below the standard of care and constitutes bad faith.

DATED: August 18, 2006                    Respectfully submitted,

                                          /s/

                                          RAPHAEL COTKIN

EXHIBIT _S_, PAGE 545

RAPHAEL COTKIN
COTKIN, COLLINS & GINSBURG
300 South Grand Avenue, 24ᵗʰ Floor
Los Angeles, California  90071
(213) 688-9350
Facsimile (213) 688-9351

## QUALIFICATIONS

To supplement the background information provided at the
beginning of the expert's report to which this is an exhibit, I
attach my curriculum vitae which summarizes my background and
experience including a list of publications which I have
authored.

I have been retained by both carriers and policyholders on
numerous occasions as an expert witness and I have been qualified
and testified in various courts in California, in other states
and countries and in federal court.

I have been retained by both insurers and insureds to express
opinions regarding several areas, amongst them being the issue of
insurance, insurance coverage, the "production" of insurance
policies, the structure, interpretation and application of
insurance policies and insurance policy provisions.  And, on
numerous occasions, whether insurers have acted reasonably and in
good faith.  I have worked on numerous cases involving the
insurance/bad faith aspects of specialized and unusual insurance
policies.

The nature of my practice pertaining to insurance has been
national in scope and at one time or another I have addressed
insurance issues or had to utilize the insurance law of almost
all states in the union.

Since 1963, I have attended hundreds of educational programs
pertaining to all aspects of insurance.  For more than the last
quarter century I have, in turn, presented over 100 programs
pertaining to all aspects of insurance.

I have served as judge pro tem, Special Referee, Discovery
Master, arbitrator and mediator on various occasions, more often
than not with regard to issues of insurance coverage and the
reasonableness of carrier conduct.


2222-1.wpd

EXHIBIT _S_, PAGE_547_

# Raphael Cotkin

**COTKIN, COLLINS & GINSBURG**
300 South Grand Avenue, 24th Floor
Los Angeles, California 90071
(213) 688-9350
Facsimile (213) 688-9351

**Shareholder and Founder of COTKIN, COLLINS & GINSBURG, 1978 to Present**

1968-1978    Dryden, Harrington & Swartz; Partner and Associate

1963-1968    Bolton, Groff & Dunn, Los Angeles; Associate and Law Clerk

## EDUCATION

1960    Bachelor of Arts, University of California, Los Angeles
1964    Juris Doctor, University of Southern California

## LEGAL ASSOCIATIONS

Admitted to the State Bar of California and the United States District Court, Central, Southern and Northern Districts of California

Member of Los Angeles Superior Court Arbitration Panel, Judicial Arbitration of Civil Cases, 1978-82

Los Angeles County Bar Association (Member, Trial Lawyers Section)

American Bar Association (Member, Insurance, Negligence and Compensation Law Section)

Defense Research Institute

Association of Southern California Defense Counsel (Member, Board of Governors, 1976 to 1978; Chairman, Industry Liaison Committee, 1978)

Association of Business Trial Lawyers

International Association of Property Insurance Counsel, 1981-Present

7036-1.1



EXHIBIT _S_, PAGE _548_

Vice Chairman of the Insurance Coverage Litigation Section of the ABA's Tort and Insurance Practice Section, 1990-Present

Chairman of ABA's TIPS Inland Marine Subcommittee, 1992

Charter member of the Los Angeles branch of Insurance Dispute Resolution, Ltd., 1997

Evaluator for California State Bar Board of Legal Specialization (Legal Professional Liability)

State Bar of California, Group Insurance Committee - including presentations regarding accidental death and dismemberment, Errors and Omissions, property and casualty aspects of business office policies, automobile, health, life insurance and workers' compensation; Member 1976 - Present; Chairman, 1978-1979 and 2001-2002

Lawyers Professional Liability Bar Association, Member

## PUBLICATIONS AND SEMINARS

Author: "Arguments for A.B. 209 - Attorneys, Professional Responsibility Fund", State Bar of California Reports, July 1977

Author: "The Outlook for Availability of Attorneys Errors and Omissions Coverage", Report of the Seventeenth Annual Seminar, Association of Southern California Defense Counsel, 1978

Author: "Update: Legal Malpractice Insurance," Report of Eighteenth Annual Seminar, Association of Southern California Defense Counsel, 1979

Moderator: CEB Program on "Insurance Coverage Litigation"

Panelist: CEB Seminars: "Bad Faith Insurance Litigation" and "Insurance Coverage Problems in Motor Vehicle Cases"

Panelist: CEB Seminar: "Advanced Trial Practice Series"  "Insurance Coverage Programs in Motor Vehicle Cases" February 1983

Speaker: PLI Seminar: "Media Insurance: Protecting Against High Judgments, Punitive Damages, and Defense Costs" July 1983

Author: "Rules of Construction Applicable to Insurance Policies: Carriers Duty to Its Insured, General Rules of Policy Construction," PLI, July 1983

Panelist: SCDC Annual Seminar: "Sweaty Palms: Dealing With the Policy Limits Demands" January 1985

EXHIBIT _S_, PAGE _549_

Panelist: Business Trial Lawyers Seminar re: "Insurance Coverage and Business Litigation -- 'Where the Dollars Are and How to Get Them'" February 1985

Panelist: CEB Seminar: Second Annual Real Property Practice Institute: Construction Law "Liability Insurance for Defective Work and Property Damage" February 1985

Panelist: California Business Law Institute Seminar: "California Environmental Compliance Workshop" "Getting Your Insurance Carrier to Pay the Bills" May 1985

Speaker: PLI Seminar: Insurance, Excess & Reinsurance Coverage Issues: "Coverage for Punitive Damages Assessed Against an Insured" January 1986

Speaker: Southern California Adjusters Association Seminar: "Policy Limits Demands: How to Deal With Them From a Carrier's Standpoint" March 1986

Speaker: CPCU Society of Orange County: Panel discussion of <u>Cumis</u> April 1986

Speaker and Author: PLI Seminar on Professional Liability Insurance for Attorneys, Accountants, and Insurance Brokers: "Coverage Aspects of Claims Against Professional: Plaintiff's Perspective" June 1986

Panelist and Author: Association of Business Trial Lawyers: "The Deepest Pocket Strikes Back: Recent Developments in the Avoidance, Preparation, Settlement, and Trial of Bad Faith Insurance Lawsuits" June 1986

Speaker: Title Insurance Underwriters Section of the American Land Title Association Meeting: "Brave New World: Carriers Under a Microscope" September 1986

Panelist: ABA seminar: "Coping with the Latest Corporate Insurance Crisis: Are You Covered?" November 1986

Speaker: General Real Estate Law Subsection of the Real Property Section of the Los Angeles County Bar "Significant Insurance Developments" November 1986

Author: "CEB California Automobile Insurance Law Guide," annual Supplements 1982 through 1986

Panelist: CEB program on Bad Faith Litigation: "Recent Trends and Effective Tactics" March 1987

Speaker: Public Risk & Insurance Management Association 8th National Conference "Pollution Claims: Who Foots the Bill?" May 1987


EXHIBIT _S_ , PAGE_550_

Speaker and Author: California Business Law Institute, California Environmental Regulation Conference "Insurance Coverage for Spills - Recent Developments" October 1987

Speaker and Author: ABA Seminar: Going Bare: A Survival Course for Self-Insureds: "Digging Up Coverage Under Old Insurance Policies: Why, How and What Are the Pitfalls?" March 1987 and November 1987

Speaker and Author: Stanford Bar Institute Seminar: "Third Party Claims," March 1988

Author: Beverly Hills Bar Association Journal, Summer 1988: "Bad Faith Before Moradi-Shalal"

Author: Litigation, published by ABA, Summer 1988: "Litigating an Insurer's Bad Faith"

Panelist and Author: American Insurance Association - General Counsel's Symposium. "Brave New World: Today's Extracontractual Liability," June 1989

Panelist: CEB: "Bad Faith Litigation - Trends and Effective Tactics," September 1989

Panelist and Author: ABA - National Institute on Legal Malpractice Litigation. "Who Controls the Defense: A New    Dilemma for Insurers" (re the present status of the Cumis doctrine) November 1989

Author: ABA/TIPS: "Insurance: The Golden Goose for Intellectual Property Disputes?" Winter 1991

Co-author: "Identifying Sources of Coverage; Tendering Defense to Insurer," in the CEB Publication "California Liability Insurance Practice: Claims & Litigation" 1991

Panelist and Author: ABA Seminar: "Walking the Tightrope: Contesting Coverage During the Underlying Case." August 1991

Author: Institute for Corporate Counsel: "ABC's of ERISA" March 1992

"After the Los Angeles Riots" (Insurance Address to Legal Aid Foundation) May 1992

Panelist and Author: Lorman Education Services Seminar: "Recent Developments in Insurance Law," February 1993

Panelist and Author: ABA Seminar: "Fundamentals of Subrogation and Pursuing These Rights Notwithstanding Coverage Disputes," August 1993

Panelist and Author: ABA-TIPS Seminar: "Insurance Coverage for Unfair Competition," February 1994

EXHIBIT _S_ PAGE _551_

Panelist and Author: PLI Seminar: "Insurance, Excess and Reinsurance Coverage Disputes," March 1995

Moderator: ABA-TIPS Seminar: "Cutting the Gordian Knot: Mediating the Construction Coverage Dispute," February 1996

Program Organizer and Panel Chair: ABA Seminar: "Insurance Coverage for Defective Construction"; Co-Authored: "Joint Ventures: The Insurance Minefield" which was included in the seminar materials, September 1996

Speaker and Author: ABA Annual Meeting: "Entangling Alliances: Coverage Issues Stemming From Construction Relationships," July 1997

Panelist and Co-Author: Association of Southern California Defense Counsel Annual Seminar: "Dual, Multiple and Courtesy Representation", February 1998

Program Organizer and Moderator: ABA Seminar: "Insurance Coverage for Defective Construction II", June 1998

Panelist and Co-Author: Professional Liability Underwriting Society (PLUS) 1998 International Conference: "Between a Rock and a Hard Place: Coping With Diminishing Limits During Litigation."

Speaker: Insurance Brokers Society of Orange County: "Latest Developments in the Insurance Field" with particular emphasis on issues affecting agents and brokers, February 2001

Participant: As Chairman of California State Bar Group Insurance Committee, presentations to California State Bar Board of Governors and Board Subcommittees regarding numerous insurance subjects including life, disability, long term care, workers compensation, errors and omissions, property and casualty aspects of business office policies and workers compensation insurance, 2001-Present.

Panelist: ABA Seminar: "Coverage for Media and Entertainment Disputes - Issues Raised by Media/Entertainment Disputes Under CGL Policies", September 2003.

Panelist: Association of Southern California Defense Counsel Annual Seminar: "Recent Developments in Case Law Affecting the Representation of Insurers", November 2003.

Panelist: ABA-TIPS Seminar: "Tool Box Lunch - Hot Topics: Media/Entertainment Liability Coverage", February 2004

Panelist: Southern California Mediation Association Seminar: "Successfully Mediating Bad Faith and ERISA Claims", November 2005

EXHIBIT _S_, PAGE 552

Mr. Cotkin conducts all aspects of alternative dispute resolution including mediation, arbitration, referee/special master for discovery and law and motion issues, and serves as a judge pro tem.

Mr. Cotkin has in the past - and was again in 2006 - selected as one of "California's Super Lawyers." His customary fields of practice include insurance coverage law, toxic substances litigation, professional liability litigation and coverage (including legal and medical), insurance defense, reinsurance and excess insurance, general civil litigation, mediation and arbitration.

'7036-1.1

EXHIBIT _S_, PAGE _553_

SUPPLEMENTAL EXPERT REPORT OF


RAPHAEL COTKIN




REGARDING INSURANCE CARRIER HANDLING OF
AND CONDUCT AS TO IRS CLAIMS AGAINST
UPPER DECK COMPANY, RICHARD P. MCWILLIAM
AND THE MPR REVOCABLE TRUST

COTKIN, COLLINS & GINSBURG
300 SOUTH GRAND AVENUE
24TH FLOOR
LOS ANGELES, CALIFORNIA 90071
TEL. NO.  213-688-9350
FAX 213-688-9351
EMAIL: RXC@ccglaw.cc



.wpd

EXHIBIT _S_, PAGE_554_

## SUPPLEMENTAL EXPERT REPORT OF

## RAPHAEL COTKIN

I submit this supplemental report in response to the August 16, 2006 expert report of Richard D. Burke, which was submitted by AISLIC ("AIG"), and which I have reviewed. I have also reviewed the expert report of Steven R. Mather submitted by the Upper Deck Parties.

### A. Burke's report confirms that there is no basis for AIG to invoke the fraud exclusion to deny coverage.

Remarkably, Mr. Burke's report confirms that AISLC has no valid basis for denying coverage based on the section 3(a) fraud exclusion. As discussed in my original report (at p. 14), one of the arguments advanced by AIG for denying coverage is the exclusion contained in section 3(a) of the policy. Section 3(a) operates to exclude coverage for any claim "arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act (including without limitation deliberate civil fraud), or any knowing and intentional violation of any law, rule, regulation, or statute."

While Mr. Burke contends in his report (at p. 23) that "[t]he manner in which the Upper Deck Parties repurchased its shares in December 2002 **significantly diminished** the prospects that the tax benefits associated with the Generic SC$^2$ transaction

.wpd

-2-

would be upheld by a court if litigated" (emphasis added),
nowhere does he even begin to suggest that the Upper Deck
Parties' actions in repurchasing the non-voting shares from the
Austin Firefighters Relief and Retirement Fund ("Austin
Firefighters") constituted fraud.  Perhaps, more importantly,
nowhere does Mr. Burke indicate that any taxing authorities
claims against any of the Upper Deck Parties arise from any
fraud, real or imagined.

The expert report of Steven R. Mather directly contradicts
Mr. Burke's conclusions regarding the significance of the
December 2002 share repurchase by the Upper Deck Parties.  Mr.
Mather states that the December 2002 share repurchase did not
materially alter the tax risks associated with the Generic SC$^2$
transaction, and in no way affected the IRS settlement offer to
Upper Deck.  Whatever the case, it is clear from Mr. Burke's own
report that the tax claims do not arise from even purported fraud
by AIG's policyholders.

**First**, Mr. Burke opines that had the Upper Deck Parties
implemented the Generic SC$^2$ transaction as contemplated in the
KPMG opinion letters, the arrangement would have a reasonable
prospect of surviving judicial scrutiny.  Assuming, *arguendo*,
that Mr. Burke is correct on this point, then AIG has no basis
to deny coverage on the ground that the Generic SC$^2$ transaction,
**as structured by KPMG**, involved fraud (even putting aside that a


.wpd

-3-

EXHIBIT _S_, PAGE _556_

policyholder tracking the KPMG approach comes within an exception
to the purported exclusion).

**Second,** Mr. Burke opines (at p. 23) that the December 2002
share repurchase by the Upper Deck Parties "significantly
diminished" its likelihood of surviving judicial scrutiny.
Again, even assuming that Mr. Burke is correct, this would not
provide AIG any ground to deny coverage based on the section 3(a)
fraud exclusion.

Mr. Burke's own words are that the share repurchase
"significantly diminished" the Generic $SC^2$ transaction's
prospects for success; nowhere does Mr. Burke definitively
conclude that the December 2002 repurchase derailed an ironclad,
winning tax strategy, thereby bringing about the tax liability
AIG has been called upon to cover. To the contrary, Mr. Burke,
at best, gives the Generic plan a reasonable prospect for
success - whatever that might mean. And nowhere does he suggest
that the share repurchase involved any kind of fraud.

For his part, Mr. Mather contends that, contrary to Mr.
Burke's argument, the share repurchase in no way materially
altered the tax risks associated with the $SC^2$ transaction.
Whether Mr. Burke or Mr. Mather is correct as a matter of federal
income tax law, the fact remains that, from an insurance coverage
standpoint, the December 2002 share repurchase does not furnish
AIG any ground to deny coverage based on the section 3(a) fraud

wpd

-4-



exclusion.

**B.    The fraud exclusion cannot apply because there has been
no factual determination, as required by the policy,
that Upper Deck's claim arose out of any fraud or
intentional wrongdoing; indeed the IRS settlement
confirms the <u>absence</u> of any fraud whatsoever.**

A parallel can be drawn between the section 3(a) exclusion

here, and a typical "dishonesty exclusion" contained in a

Directors and Officers ("D&O") liability policy—something with

which AIG should be infinitely familiar as it is one of the

largest D&O insurers in the country.  A dishonesty exclusion bars

coverage for claims brought about or contributed by the

fraudulent, dishonest, and/or criminal acts of the insureds.

These policies typically limit the dishonesty exclusion to cases

where a "judgment or other final adjudication" established

intentionally dishonest or fraudulent acts by the insured

officers and directors.

Here, the section 3(a) exclusion operates only where the

"Claim" is based upon  "the committing **in fact** of any criminal or

deliberate fraudulent act (including without limitation

deliberate civil fraud), or any knowing and intentional violation

of any law, rule, regulation, or statute."  (Emphasis added).

There has never been any finding that the Upper Deck Parties **in**

**fact** committed fraud or intentionally violated any law.  Indeed,

.wpd


EXHIBIT _S_, PAGE _558_

the IRS did not institute criminal proceedings against the Upper Deck Parties (or any parties) with respect to the SC² transaction, Generic or otherwise. Rather the IRS issued administrative releases indicating that they would challenge the legal validity of the Generic SC² transaction. The IRS offered to settle with the Upper Deck Parties, and the proposed settlement was agreed to. Consequently, there has been no determination, either by judgment or final adjudication or otherwise, that the claim here arose out of any fraud or intentional wrongdoing.

**C.    AIG has ignored its clear obligation to advance Contest Expenses.**

Another deficiency in AIG's claims handling here is its blatant disregard of its obligation under the policy to advance Contest Expenses to its insured. The Contest Expenses provision, section 7 of the policy, provides that "The Insurer shall advance excess of the Retention, at the written request of the Named Insured, Contest Expenses every 90 days prior to the Final Determination of a Contest." The policy expressly defines "Contest" as "a dispute with a Taxing Authority over an adjustment in any Insured's liability for its Taxes as it relates to the Insured Tax Event for which the Insurer may be required to indemnify any Insured hereunder."

Notwithstanding Upper Deck's requests, AIG simply ignored



-6-

EXHIBIT _S_, PAGE _559_

its clear policy obligations to advance such Contest Expenses during its dispute with the IRS. As I stated in my opening report, I cannot recall a circumstance in which the actual loss sustained tracks more precisely the event being covered. There simply is no reasonable basis for contending that AIG was not obligated under section 7 of the policy to advance Contest Expenses to Upper Deck during Upper Deck's dispute with the IRS.

I address the carrier's generalized obligation to protect its insured with regard to "contest expenses" beginning at page 4 of my initial report. I return to the issue here because AIG's stonewalling is particularly galling given the industry practice in circumstances where a carrier suspects or is even convinced there may have been fraud perpetrated by the insured but an in fact determination is required. It is universally understood that, nonetheless, the carrier cannot abandon its besieged insured but must at the very least provide protection (whether it be by "advance" or reimbursement, etc.) until there has been an actual judicial determination "in fact" that fraud which eliminates coverage has occurred. AIG's failure to acknowledge this fundamental obligation emphasizes their bad faith conduct.

DATED: September 15, 2006

Respectfully submitted,

RAPHAEL COTKIN

-7-

EXHIBIT S, PAGE 560