# EXHIBIT T

**EXPERT REPORT OF**

**STEVEN R. MATHER**

**REGARDING TAX RISKS OF**
**THE UPPER DECK COMPANY, RICHARD P. McWILLIAM**
**AND THE MPR REVOCABLE TRUST**
**IN THE $SC^2$ TRANSACTION**

KAJAN MATHER AND BARISH
9777 WILSHIRE BOULEVARD, SUITE 805
BEVERLY HILLS, CALIFORNIA 90212
Tel. No. (310) 278-6080
FAX (310) 278-4805
Email: srm@taxdisputes.com

EXHIBIT _T_, PAGE 561

# TABLE OF CONTENTS

Page

I.  QUALIFICATIONS ................................................... 3

II. RELEVANT FACTS .................................................. 4

III. OPINIONS........................................................ 11

A.  The SC$^2$ Transactions Would Not Withstand IRS Attack as
Structured.......................................................... 11

   1.  The Transfer of Stock to the Charity Would Not Be
   Recognized Under Established Judicial Doctrines............ 12

   2.  A Substantial Risk of Losing S Corporation Status
   Exists.......................................................... 18

B.  The Failure to Claim a Charitable Contribution Deduction
Did Not Materially Alter the Tax Risks Associated with the SC$^2$
Transaction......................................................... 20

   1.  McWilliam could still Claim the Deduction as a
   Charitable Contribution Carryover Even If It Was Not Claimed
   on the Original Return..................................... 20

   2.  The Charitable Contribution Was Not an Integral Part of
   the SC$^2$ Transaction......................................... 21
    a.  The IRS does not consider the contribution deduction
    to be an integral part of the transaction. .............. 22

    b.  The primary relevance relates to a potential doubt as
    to the validity of the transfer. ........................ 22

C.  The Circumstances of the Redemption of the Charity's Stock
by Upper Deck Did Not Materially Alter the Tax Risk Associated
with the SC$^2$ Transaction....................................... 23
   1.  The SC$^2$ Transaction as Structured Always Allowed Upper
   Deck to Cash Out the Charity's Interest................... 24

   2.  The Tax Risk Inherent in the Charity's Interest Made the
   Shares Difficult to Sell to an Independent Third Party..... 25

1

EXHIBIT _T_, PAGE 562

D.   Under No Circumstances Did Any Deviations by Upper Deck from the $SC^2$ Transaction Structure Cause a Change in the IRS Settlement Offer to Upper Deck............................26

   1.   The IRS Requires Consistency in Tax Shelter Settlement Offers...................................................26

   2.   The IRS Apparently Does Not Care about Upper Deck's Alleged Deviations.......................................28

E.   The Existence of Any Recovered Payments or Offsetting Benefits is Only Speculative.............................28

   1.   There Will Not Be Any Significant Recovered Payments..29

   2.   No Offsetting Benefits Have Occurred to Date.........30

   3.   The Possible Offsetting Benefits Depend on Events that May or May Not Occur......................................31

IV. CONCLUSION ...............................................32

2

EXHIBIT __7__ PAGE __563__

# I.  QUALIFICATIONS

I am a member in good standing of the State Bar of California. I am also an inactive member of the Iowa State Bar and received my certificate as a Certified Public Accountant in Iowa in 1979, although I am not licensed to practice as a CPA. My legal career has been spent almost exclusively practicing the tax controversy area. A copy of my curriculum vitae is attached to this opinion as Exhibit A.

My first job after law school was as a trial attorney for the Office of Chief Counsel, Internal Revenue Service ("IRS"). I started in January 1983 in the San Francisco IRS District Counsel Office, where I was responsible for the second tax shelter promoter penalty case under Internal Revenue Code ("I.R.C.") §6700 in that office. After approximately one year, I transferred to the Los Angeles District Counsel Office. I arrived in the Los Angeles District Counsel Office at the peak of the IRS' tax shelter activities. Near the end of 1984, I was named Tax Shelter Coordinator for the Los Angeles District Counsel Office. This put me in the position of organizing the efforts of the Los Angeles District Counsel Office with respect to the existing tax shelter cases. At that time, the Los Angeles office was the largest District Counsel Office in the country and had a greater volume of tax shelter cases than any other office.

In 1984, I was also named as the District Counsel representative to the "ACE" Committee consisting of representatives from IRS Appeals, IRS Counsel and the IRS Examination Division. The purpose of the ACE Committee was to review information gathered concerning current tax shelter promotions and evaluate the IRS' response. The ACE Committee reviewed literally dozens of tax shelter promotions and made recommendations and assigned staff to perform further investigation.

In addition to my role in coordinating tax shelter activities on behalf of the Los Angeles District Counsel Office, I was also assigned to several major tax shelters as the principal trial attorney. At one time I had more than 3,500 tax shelter cases pending in the United States Tax Court for which I was the principal attorney.

3

EXHIBIT 7 PAGE 564

In all of my activities in the tax shelter area, I had involvement in the formulation of tax shelter settlements. While these settlements were often coordinated on a national basis, if the tax shelter was one that was investigated by the Los Angeles office, the Los Angeles office had principal responsibility for developing the settlement proposal that was made to the tax shelter investors. I became extremely familiar with the IRS methods and policies for settling tax shelter cases.

A final substantial responsibility in the tax shelter area that I held with the IRS was the position of "TEFRA Coordinator" for the Los Angeles District Counsel Office. In 1982, Congress passed the Tax Equity and Fiscal Responsibility Act ("TEFRA"). A major portion of TEFRA involved the implementation of new procedures governing audits and litigation for partnerships and S corporations. See I.R.C. §6221 et seq. Many of these rules were effective for 1982 tax years on which determinations had to be made by early 1986. The IRS was disorganized in its initial implementation of these complicated procedures. Because of the enormous number of tax shelter partnerships and S corporations, the Los Angeles District Counsel Office was receiving numerous requests for opinions on the implementation of the TEFRA procedures. I was the only attorney in the Los Angeles District Counsel Office who was assigned to make these responses. My responses made me a national expert within the IRS on the TEFRA procedures.

After I left the Office, my practice has continued to be almost exclusively tax controversy matters. My first position with Rosen, Wachtel & Gilbert involved a number of tax controversy cases. I also authored or co-authored some of the most prominent treatises in the country on TEFRA audit procedures and federal tax collection. After I joined Kajan and Gross in July 1990, my practice changed to become exclusively tax controversy matters. Even though the original wave of tax shelters dwindled after the passage of the 1986 tax act, the resolution of those cases continued for years. In 1999 and 2000, I was the principal trial attorney for the taxpayers in the United States Tax Court trials of the "AMCOR Partnerships." This was one of the largest tax shelter trials in the history of the Tax Court.

## II. RELEVANT FACTS

The nature of the tax shelters that came to prevalence in the late 1990s differed from the 1980s tax shelter cases. In

4

EXHIBIT _T_, PAGE 565

general, the 1980s tax shelters involved the acquisition by the tax shelter entity of an asset or contract for services that was overvalued. These assets or services were acquired in leveraged transactions with a debt component for which there was typically some form of arrangement to protect the tax shelter investors from liability. The IRS settlements were usually designed to eliminate the claimed tax benefits but allow the taxpayers a deduction for their actual cash invested.

The 1990s tax shelters were more typically based on a chain of colorable interpretations of the Internal Revenue Code which, when applied to various aspects of a transaction, led to an illogical or unintended result. Some early litigation successes seemed to fuel this tax shelter boom. See, Gitlitz v. Commissioner, 531 U.S. 206 (2001) (aff'g and rev'g several earlier cases). As a result, internationally prominent accounting, investment and law firms developed technical interpretations of law that supported the tax shelter structures. Typically these involved literal or technical interpretations of specific statutory or regulatory provisions that in isolation were defensible under literal readings of the applicable authorities. One or more of these technical interpretations was strung together in a pre-packaged transaction which led to an outcome in the transaction that few would argue was an intended result. As with the 1980s tax shelters, the IRS was initially slow to recognize the tax shelter transactions. Once the IRS saw the full effect of the 1990s tax shelters, however, the IRS responded forcefully with broad-based examinations and settlements. While the makeup of the 1990s shelters was different than the 1980s shelters, the IRS response, examination and settlement initiatives were performed in a very similar manner.

The tax shelter transaction at issue in the instant case is a typical product of the 1990s tax shelter industry. The tax shelter, commonly referred to as SC[2], was developed and promoted by international accounting firm KPMG[1] with the assistance and

---

[1] See, e.g., *The Role of Professional Firms in the U.S. Tax Shelter Industry*, a Report Prepared by the Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs (February 8, 2005) (hereinafter "Subcommittee Report") and *U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals, Four KPMB Case Studies: FLIP, OPIS, FLIPS, and SC[2]*, a Report Prepared by the Minority Staff of the Permanent

cooperation of major international law firms, financial institutions and, in this case, American International Specialty Lines Insurance Company, a subsidiary of AIG Insurance (hereinafter collectively "AIG").[2] The $SC^2$ transaction was investigated by the Committee on Governmental Affairs of the United States Senate. The $SC^2$ transaction was described in Appendix B to the Minority Report. A copy of the narrative portion of Appendix B of this Minority Report is attached hereto as Exhibit B.

The transaction ultimately implemented by KMPG for Upper Deck was substantially similar to the transaction outlined in Exhibit B. Specifically, as of March 28, 2001, Upper Deck had 920,000 shares of voting common stock outstanding, all of which were owned by the MPR Revocable Trust (the "MPR Trust"), a revocable trust established by Upper Deck's CEO, Richard McWilliam ("McWilliam"). On March 28, 2001, Upper Deck amended its Articles of Incorporation to allow for non-voting common stock, which was identical to the voting stock except it lacked voting rights. Also on March 28, 2001, Upper Deck declared a dividend to the MPR Trust of 82,800,000 warrants to purchase non-voting common stock at an exercise price of $0.148 per share. The dividend was issued to the MPR Trust on March 29, 2001.[3]

On March 29, 2001, Upper Deck also distributed 8,280,000 shares of non-voting common stock to the MPR Trust. On March 31, 2001, the MPR Trust donated all of this non-voting common stock to the Austin Firefighters Relief and Retirement Fund (the "Austin Firefighters"). Accordingly, after the contribution to the Austin Firefighters, there was a total of 9,200,000 shares of common stock outstanding. Of these shares, all of the 920,000 shares of voting stock (10%) were held by the MPR Trust, and all of the 8,280,000 shares of non-voting common stock (90%) were

---

Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate (2003) (hereinafter "Minority Report").

[2] Minority Report, p. 9; Subcommittee Report, p. 48.

[3] The Warrant Agreement is attached to the AIG policy as Exhibit D.

6

held by the Austin Firefighters. However, if the MPR Trust exercised the warrants, the stock ownership would be as follows:

| SHAREHOLDER | SHARES | PERCENT |
|---|---|---|
| MPR Trust (Voting) | 920,000 | 1% |
| MPR Trust (Non-Voting) | 82,800,000 | 90% |
| Austin Firefighters (Non-Voting) | 8,280,000 | 9% |

As is more fully discussed below, MPR retained control of Upper Deck by continuing to hold all of the voting common stock. In addition, the ability to dilute the Austin Firefighters' interests through the exercise of the warrants gave the MPR Trust the ability to effectively cash out the Austin Firefighters' shares if the need arose.

As part of the transaction regarding the transfer of the shares to the Austin Firefighters, on March 31, 2001, the Austin Firefighters and Upper Deck entered into a Shareholders Agreement.[4] Among other things, the Shareholders Agreement gave the Austin Firefighters the right, beginning on April 1, 2003, to "put" the non-voting common stock to Upper Deck at a price equal to the fair market value of the shares on the put date. The Shareholders Agreement also gave Upper Deck a right of first refusal in the event the Austin Firefighters attempted to sell the stock.

The contribution of the 8,280,000 shares to the Austin Firefighters arguably qualified as a charitable contribution. The MPR Trust engaged FMV Opinions, Inc. to determine the fair market value of the shares contributed.[5] FMV Opinions determined the value of the shares contributed as follows:

| | |
|---|---|
| 1.  Determine value of company as a whole. FMV Opinions used four methodologies, the guideline public companies method, the discounted cash flow method, the prior stock transactions method, and the alternative investment method to determine the value of Upper Deck on the valuation date. | $27,800,000 |
| 2.  Add Warrant Exercise Proceeds. This was added based on the assumption that the warrants would be exercised. | 1,900,000 |

[4] The Shareholders Agreement is attached to the AIG policy as Exhibit C.
[5] FMV Opinions' April 30, 2001 valuation report is attached to the AIG policy as Exhibit E.

EXHIBIT _I_, PAGE 568

| | |
|---|---|
| 3.  Equals Controlling Interest in 100% of Upper Deck. | 29,700,000 |
| 4.  Reduce by Minority Interest Discount. A discount of 23% was determined based on the converse of the average control premium of 30% determined in two separate studies. | ( 6,800,000) |
| 5.  Reduce by Marketability and Lack of Voting Rights Discount. A 25% marketability discount was determined from various studies, and an additional 9% lack of voting discount was determined from a public stock analysis. | ( 5,700,000) <br> ( 2,100,000) |
| 6.  Equals Non-Voting, Non-Marketable Minority Interest Value. | 15,100,000 |
| 7.  Determine Value of Stock Contributed to Austin Firefighters. Value in Step 6 ($15,100,000) divided by 92,000,000 common stock equivalents = $.164 per share times 8,280,000 shares. | $ 1,357,920 |

Based on the foregoing, the FMV Opinions valuation of the stock contributed to the Austin Firefighters was $1,357,920. This is the amount of the charitable contribution that could have been allowable to the MPR Trust. Since the MPR Trust was a grantor trust, the activities of the MPR Trust were reported on McWilliam's individual return. Due at least in part to the fact that McWilliam had no taxable income as a result of other transactions, no charitable contribution deduction was claimed on McWilliam's 2001 federal income tax return.

As was contemplated in the $SC^2$ transaction, Upper Deck made little or no distributions to shareholders during 2001 and 2002.

8

During this time, the outstanding share ownership of Upper Deck was 10% for the MPR Trust and 90% for the Austin Firefighters. For 2001, Upper Deck reported S corporation earnings of $39,538,412. Based on the outstanding ownership of shares, after adjustments to account for differing share ownership during the year, $3,511,897 of this income was deemed distributed to the MPR Trust and $36,026,515 was deemed distributed to the Austin Firefighters. Because of the Austin Firefighters' tax-exempt status, no part of the deemed distribution of Upper Deck's earnings caused the Austin Firefighters to pay any tax.

As part of the SC[2] transaction, KMPG issued several opinions to Upper Deck, the MPR Trust and McWilliam (collectively the "Upper Deck Parties"). These opinions concluded that: (1) it was more likely than not that the MPR Trust would be entitled to a charitable contribution deduction for the fair market value of the stock transferred to the Austin Firefighters;[7] (2) the distribution of warrants by Upper Deck to the MPR Trust was not a taxable event;[8] and (3) the allocation of 90% of Upper Deck's

---

[7] KMPG's May 2, 2001 letter "Re: Charitable contribution to Austin Firefighters Relief and Retirement Fund" expressed KPMG's "view" that: "It is more likely than not that the Shareholder [MPR Trust] will be entitled to a charitable deduction for the fair market value of the stock the Shareholder donated." (see pp. 4-5, 9-11). The AIG policy insured against "Loss" from the risk the IRS would assert "at any time during the Policy Period [9/29/01 to no later than 11/30/2010] . . . that with respect to the tax years 2001 through 2005, . . . (c) deductions for charitable contributions are not allowable to the pre-gift shareholder of Upper Deck in the year of gift in an amount equal to the fair market value . . . of such shareholder's gift of non-voting stock to the Municipal Plan" (AIG policy, Endorsement No. 1 ¶1).

[8] KPMG's May 2, 2001 letter "Re: Warrant distribution by Upper Deck Company" expressed KPMG's "view" that: (1) it was "more likely than not" that MPR Trust and Upper Deck would prevail if challenged by the IRS regarding the non-taxable nature of the distribution of the warrants; and, (2) MPR Trust and Upper Deck "should prevail" if challenged by the IRS regarding whether the distribution of the warrants created a second class of stock" (pp. 2-3). The AIG policy insured against "Loss" from the risk the IRS would assert "at any time during the Policy Period [9/29/01 to no later than 11/30/2010] . . . that with respect to the tax years 2001 through 2005, (a) as a result of any action taken by the Named Insured [Upper Deck] or the Additional

9

EXHIBIT _I_, PAGE _570_

income to the Austin Firefighters after the transfer of the shares was appropriate.[9] In April 2002, KMPG informed Upper Deck that KPMG had disclosed Upper Deck's identity to the Internal Revenue Service ("IRS") and that an examination of Upper Deck's tax returns would likely ensue. As a result, the Upper Deck Parties made a voluntary disclosure of the transaction to the IRS on April 22, 2002. This allowed the Upper Deck Parties to avoid any penalties associated with any future tax deficiencies to be assessed by the IRS.

Even though the put in the Shareholders Agreement did not take effect until April 1, 2003, in November 2002, the Upper Deck Parties decided to reacquire the Austin Firefighters' shares. Negotiations ensued which resulted in a Share Purchase Agreement dated December 10, 2002. The MPR Trust purchased all of the Austin Firefighters' shares as of December 30, 2002. For 2002, Upper Deck reported S corporation earnings of $151,407,745. Based on the share ownership throughout the year, $15,140,775 of this income was deemed distributed to the MPR Trust and $136,266,970 was deemed distributed to the Austin Firefighters.

---

Insureds [MPR Trust and Richard McWilliam] prior to the Inception Date [August 29, 2001], The Upper Deck Company, a California corporation ('Upper Deck') has more than one class of stock for purposes of Section 1361 of the Code" (AIG policy, Endorsement No. 1.)

[9] KMPG's May 2, 2001 letter "Re: Taxable income allocation of Upper Deck Company" expressed KMPG's "view" that: "it is more likely than not that for Federal and California income tax purposes, the post-March 31, 2001 items of income, gain, loss, deduction, or credit of Upper Deck will be allocated" 10% to the holders of the voting common stock and 90% to the holders of the non-voting common stock (p. 2). The AIG policy insured against "Loss" from the risk the IRS would assert "at any time during the Policy Period [9/29/01 to no later than 11/30/2010] . . . that with respect to the tax years 2001 through 2005, . . . (d) the post-gift [March 31, 2001] allocations of Upper Deck's taxable income to the Municpal Plan and are not correct or proper. . . (e) as a result of the gift of the Upper Deck non-voting common stock to the Municipal Plan by the pre-gift shareholder, any Upper Deck shareholder or Upper Deck, itself, assigned income to the Municipal Plan. . ."(AIG policy, Endorsement No. 1.)

EXHIBIT I PAGE 571

In June 2003, the IRS commenced the audit of the Upper Deck Parties for various issues, including the $SC^2$ transaction. In April 2004, the IRS issued Notice 2004-30 which advised that the IRS considered the $SC^2$ transaction to be an abusive tax shelter. The IRS also issued a Coordinated Issue Paper on November 8, 2004, outlining the reasons the IRS believed the $SC^2$ transactions were not entitled to be respected for tax purposes. By letter dated April 7, 2005, the IRS offered a settlement to the Upper Deck Parties which effectively unwound the $SC^2$ transaction and taxed the MPR Trust as if it was always the sole shareholder of Upper Deck. On May 6, 2005, the Upper Deck Parties notified the IRS that they accepted the IRS settlement proposal. On June 7, 2006, the IRS issued Closing Agreements reflecting the resolution of the dispute pursuant to the settlement elected by the Upper Deck Parties. After clarification of one issue, the Upper Deck Parties intend to submit the signed Closing Agreement to the IRS.

The IRS has computed the tax due as a result of the settlement to be $66,777,434 plus interest. This amount greatly exceeds the limits on the AIG policy. A dispute has now arisen whether the Upper Deck Parties are entitled to coverage under the AIG policy in the circumstances of this case. The purpose of this report is to analyze the tax risks associated with the $SC^2$ transaction and to opine as to whether any deviations from the pro forma $SC^2$ transactions which may have been implemented by the Upper Deck Parties in fact changed the tax risks of the transaction. This report is not intended to interpret any aspect of the AIG policy.

### III. OPINIONS

Opinions on the following issues have been requested and are set forth below.

### A. The $SC^2$ Transactions Would Not Withstand IRS Attack as Structured.

There were two significant tax risks that existed from the $SC^2$ transactions as structured. First, notwithstanding the KPMG opinions to the contrary, the structure of the transaction itself was fundamentally flawed and the likelihood of the transaction being sustained by the courts was small. The denial of the tax benefits of the $SC^2$ transaction would essentially place the taxpayer back in the position the taxpayer would have been in if the transaction had never been attempted, with no

11

EXHIBIT 7 PAGE 572

additional cost other than transaction costs and some interest and penalties.

The second tax risk from the $SC^2$ transaction was potentially even more troubling. In addition to losing the tax benefits, the structure of the $SC^2$ transaction could actually have much more dramatically negative consequences. If the IRS determined (as it has) that the issuance of the non-voting common stock and transfer to the charity created a second class of stock, the corporation would then lose its status as a Subchapter S corporation. This could create a substantial additional tax liability that would not have existed had the $SC^2$ transaction never been attempted. For both of these reasons, the Upper Deck Parties were left with no alternative but to accept any reasonable settlement the IRS offered.

## 1. The Transfer of Stock to the Charity Would Not Be Recognized Under Established Judicial Doctrines.

As was true with most 1990s "technical" tax shelters, the $SC^2$ transaction probably does not run afoul of any statutes or regulations. The $SC^2$ transaction was tailored to fit precisely within the literal language of the statutes and regulations.

Statutory and regulatory compliance does not end the inquiry, however. Almost since the beginning of the income tax itself, the courts have developed judicial doctrines to reinforce the concept that the tax consequences of transactions should only apply to transactions with substance and not be based on actions which have no economic consequence. These judicial doctrines have taken on different names depending on the specific circumstances in which they apply. Some of the more popular names are the substance over form doctrine, the economic substance requirement, the sham transaction doctrine, the assignment of income doctrine, the benefits and burdens of ownership analysis and the step transaction doctrine.

The Supreme Court case of Gregory v. Helvering, 293 U.S. 465 (1935), is generally considered the landmark case in the substance over form area. In Gregory, the Supreme Court set aside a transaction which literally complied with the terms of the Internal Revenue Code when a taxpayer created a new corporation to receive a distribution from the taxpayer's wholly-owned corporation solely to avoid a tax on dividends. Similarly, in Commissioner v. Court Holding Co., 324 U.S. 331 (1945), the Supreme Court disregarded a claimed dividend when a

12

EXHIBIT 7 PAGE 523

corporation entered into an agreement to sell assets but then distributed the assets to the corporation's two shareholders for the transaction to be consummated. Again, the transaction was disregarded because there was no purpose for the transaction other than the savings of tax. Finally, in Knetsch v. United States, 364 U.S. 361 (1960), the Supreme Court pierced through a complicated façade of apparent transactions and disallowed all the tax benefits because "there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction."

As indicated above, many permutations of the basic judicial doctrine have been recognized by the courts. One of the more popular judicial doctrines applied by the IRS to combat the 1980s tax shelters was the sham transaction doctrine. Sham transactions were further divided into two categories, "factual shams" and "economic shams."

The key to the distinction between the two related but separate sham doctrines is whether or not the underlying transactions actually occurred. A factual sham is "one in which the alleged transaction never took place." Krumhorn v. Commissioner, 103 T.C. 29, 38 (1994), citing, Lerman v. Commissioner, 939 F.2d 44, 48 n.6 (3d Cir. 1991), aff'g. Fox v. Commissioner, T.C. Memo. 1988-570. As an alternative to the "factual sham" label, the Courts sometimes simply refer to this inquiry as to determining whether the transactions are "fictitious" or non-existent. See Sheldon v. Commissioner, 94 T.C. 738, 752 n.8 (1990). In Upper Deck's case, it is unlikely that the IRS would argue that the transaction (i.e., the stock transfer) did not occur. Therefore, the factual sham theories should not apply.

This factual sham test is distinguished from the "economic sham" inquiry in that economic shams are "transactions that have actually taken place, but which have no economic significance beyond expected tax benefits. Krumhorn, supra at 46, citing, Sheldon, supra at 759. In the Ninth Circuit, whose law would govern any Tax Court deficiency action or district court refund suit in Upper Deck's case, the current incarnation of the test is not a rigid "two-step analysis" but "typically focuses on the subjective aspect of whether the taxpayer intended to do anything other than acquire tax deductions, and the objective aspect of whether the transaction had any economic substance other than the creation of tax benefits." Sacks v. Commissioner, 69 F.3d 982, 987 (9th Cir. 1995). This is all part

13

EXHIBIT _T_, PAGE _574_

of the general analysis as to whether the transactions at issue had any practical economic effect other than the creation of income tax losses. Id. In stating this general two-step rule, the Ninth Circuit relied on its precedent in Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543 (9th Cir. 1987); Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988); Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); and Cook v. Commissioner, 941 F.2d 734 (9th Cir. 1991).

While a transaction entered into solely to generate tax benefits with no other economic or commercial objective is considered a sham, it is appropriate to consider the tax consequences of the transaction in determining the overall motive and purpose of the transaction. "The fact that favorable tax consequences were taken into account by [the taxpayer] on entering into the transaction is no reason for disallowing those consequences. [footnote omitted] We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978) (citing Commissioner v. Brown, 380 U.S. 563, 579-580 (1965) (Harlan, J., concurring)); See also, Coggin Automotive Corp. v. Commissioner, 115 T.C. 349, 360 (2000), rev'd on other grounds, 292 F.3d (11th Cir. 2002).

The acknowledgment that tax benefits are an important and appropriate part of a transaction's economic return was reinforced in the Ninth Circuit in Sacks v. Commissioner, 69 F.2d 982, 991 (9th Cir. 1995):

> "[The taxpayer's] investment did not become a sham just because its profitability was based on after-tax instead of pretax projections. Where a transaction has economic substance, it does not become a sham merely because it is likely to be unprofitable on a pretax basis."

As is set forth more fully below, the SC[2] transaction appears to be extremely vulnerable to an IRS attack on an economic sham or economic substance theory.

Another corollary of the judicial substance requirement is the assignment of income doctrine. This doctrine precludes a taxpayer from assigning income that is earned by the taxpayer to another party to avoid the tax consequence. See, Lucas v. Earl, 281 U.S. 111 (1930). The doctrine also requires

14

EXHIBIT 7 PAGE 575

the income from property to be reported by the party that beneficially owns the property. Blair v. Commissioner, 300 U.S. 5 (1937). As is discussed more fully below, there is a substantial likelihood that the claimed tax benefits of the SC$^2$ would be disallowed under the assignment of income doctrine.

Another variation of the judicial substance requirement is the so-called benefits and burdens of ownership analysis. When this doctrine is applied to an alleged transfer of property, the courts will examine whether the transaction genuinely transferred the economic benefits of the property or the purported transferor retained the true economic ownership of the asset. See, Giffen v. Commissioner, 190 F.2d 188 (9th Cir. 1951), cert. denied 342 U.S. 918 (1952); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981).

The SC$^2$ transaction is subject to attack on virtually every one of the judicial doctrines mentioned above. This vulnerability is based on the transaction as structured.

The starting point for analyzing the substance of the SC$^2$ transaction is to analyze what in substance the Austin Firefighters received. Reduced to its essence, the Austin Firefighters received a piece of paper labeled as 8,280,000 shares of non-voting Upper Deck common stock in 2001. Then, at the end of 2002, the Austin Firefighters received a cash payment of $2,000,000.

Under these circumstances, the judicial substance doctrines would analyze the Austin Firefighters' shares of non-voting common stock to determine whether that stock constituted any asset of substance. If the stock was not an asset of any economic consequence, the IRS would argue that the Austin Firefighters received nothing other than a promise to receive an unspecified payment at a future date. In this respect, if the stock is disregarded, we are left with nothing other than an unsecured promise or pledge to make a future contribution to the Austin Firefighters.

Since the substance of the Austin Firefighters' non-voting stock is the critical issue, it is important to examine what economic benefits inured to the Austin Firefighters as a result of its ownership of the shares. This inquiry yields the following analysis:

15

EXHIBIT $\underline{7}$ PAGE $\underline{576}$

1.    The shares had no participation in control of Upper Deck. The shares were non-voting with no opportunity to become anything else.

2.    The shares had no ability to compel distributions. Since the Austin Firefighters had no voting rights and, therefore, no say in the governance of the corporation, there was no ability to encourage or compel a distribution of the Upper Deck profits.

3.    There was no ability to compel liquidation of Upper Deck. Since there was no ability to force a current dividend, the only way the Austin Firefighters could receive benefit from their shares was in liquidation. Since they lacked voting rights, there was no ability to force this liquidation.

4.    The shares could not be freely sold. Pursuant to the Shareholders Agreement, the shares were subject to a right of first refusal allowing purchase by the Upper Deck Parties before the shares could be sold to any outside party.

5.    As set forth more fully below, by utilizing the short-form merger rules, the controlling shareholders could cash out the Austin Firefighters' shares at any time.

6.    The only realistic source for the sale of shares was by exercising the put or otherwise selling the shares to the Upper Deck Parties. The put constituted a promise by Upper Deck to pay money to the Austin Firefighters in the future at the request of the Austin Firefighters. This was little more than a legally enforceable pledge. In addition, since the shares were stripped of virtually all economic benefit, there was no other likely party that would be interested in purchasing the shares.

7.    The shares carried with them a potentially staggering tax burden. Since Upper Deck was an S corporation, the 90% interest represented by the Austin Firefighters' shares came with the ostensible obligation to report 90% of Upper Deck's net income each year. The income actually deemed distributed to the Austin Firefighters was $36,026,515 for 2001 and $136,266,970 for 2002. There was, however, no voting right or other ability to cause Upper Deck to make any distribution to pay the corresponding tax liability. Therefore, except for an entity exempt from tax such as the Austin Firefighters, any purchaser of the shares faced the possibility of having to

16

EXHIBIT ___1___, PAGE 577

report millions of dollars of taxable income without receiving any funds with which to pay the resulting tax obligation.

Based on the foregoing analysis, Austin Firefighters' non-voting common shares appear to be pieces of paper with no economic consequence whatsoever. The Austin Firefighters do not expect to receive any current income, cannot force the liquidation of Upper Deck, as a practical matter can only sell to Upper Deck, can be forced to cash out at any time and have a potential tax liability of a staggering magnitude. The $SC^2$ transaction <u>as designed</u> effectively stripped all economic benefit from the non-voting common stock contributed to the charity. Under these circumstances, there is no significant likelihood that any court would sustain the tax benefit claimed in the $SC^2$ transaction.

Even if the taxpayers were to prevail on the issue of whether the charity's shares had any economic substance, the $SC^2$ transaction would appear to be subject to a successful attack by the IRS under the assignment of income doctrine. Under this attack, the IRS would argue that the taxpayer nominally "parked" the share ownership in the hands of a "friendly" charity to create an argument that the charity must report the income even though no distributions of the profits would be made to the charity and the taxpayer could preempt any transfer to a third party and effectively cash out the shares at any time. In a sense, the $SC^2$ transaction is even more abusive than a typical transaction subject to attack on the assignment of income theory. Typically under the assignment of income theory, the benefit of the income actually inures to the transferee. In the $SC^2$ transaction, the contribution of the non-voting common stock is merely an assignment of the tax consequence. The economic benefit associated with the income is held by the corporation <u>by design</u> until the shares are returned. It is hard to envision a circumstance under which a court would allow such a meaningless transfer to be recognized for tax purposes.

Based on the foregoing analysis, there appears to be only a negligible chance that the $SC^2$ transaction would be sustained by a court based on the transactions <u>as structured</u>. It follows, therefore, that the tax loss resulting to the Upper Deck Parties was substantially likely in all events unless the IRS failed to conduct an audit. It also follows that any deviations that the Upper Deck Parties may have implemented from the standard transaction as structured are essentially

17

meaningless since there was virtually no chance of prevailing based on the transaction <u>as structured</u>.

## 2. A Substantial Risk of Losing S Corporation Status Exists.

As mentioned above, in most tax shelter transactions the taxpayers' risk is limited to the loss of the tax benefits claimed and of any investment made in the shelter vehicle. In the $SC^2$ transaction, however, there was a greater risk, the loss of S corporation status. In general, an S corporation does not pay any tax at the corporate level but instead the corporate net income is taxed at the shareholder level in proportion to the share ownership. This is contrasted with a "C corporation" which pays a corporate-level tax on the corporate income and then any dividend distributions to the shareholders are subject to a second tax.

In our case, Upper Deck reported income for 2001 of approximately $39,538,412. Pursuant to the $SC^2$ transaction, this was allocated 10% to the MPR Trust and 90% to the Austin Firefighters. If the earnings were distributed to the shareholders, there would be no additional tax imposed on the distribution. If the S corporation status was lost, however, this income would have been subject to a corporate level tax of approximately $14,000,000. If the accumulated earnings were then distributed to the shareholders, the shareholders would then be subject to a second tax on the dividend distribution.

Based on this circumstance, it was critical that Upper Deck retain its S corporation status. Historically, however, S corporation status has only been allowed to corporations with a relatively small number of shareholders, each of whom enjoy the economic benefits of share ownership on a basis roughly equal to the other shareholders. The hallmark of this requirement is that an S corporation cannot have two classes of stock. Fortunately for S corporation shareholders, the Treasury Regulations that establish the rules for determining when a second class of stock exists are quite liberal. For example, Treas. Reg. §1.1361-1(1)(1) provides the general rule that a single class of stock will be deemed to exist so long as all outstanding shares of stock

> "confer identical rights to distribution and
> liquidation proceeds. Differences in voting
> rights among shares of stock of a

18

corporation are disregarded in determining whether a corporation has more than one class of stock."

The SC$^2$ transaction capitalizes on this generous rule to create the argument that the non-voting common stock contributed to the Austin Firefighters is not a second class of stock because it has identical rights to distribution and liquidation and the lack of voting rights is disregarded pursuant to the Regulations.

In spite of the liberal definition of a single class of stock in the Regulations, the IRS took the position in their November 2004 Coordinated Issue Paper that the single class of stock requirement was violated in the SC$^2$ transaction by the warrants issued to the taxpayer and the non-voting common stock which ultimately was transferred to the charity. The IRS opined that the warrants violated the second class of stock requirement because they had an exercise price less than 90% of the fair market value of the underlying stock on the date the warrants were issued. This violated Treasury Regulation §1.1361-1(1)(4)(iii)(C). In addition, the IRS suggested that the warrants were substantially certain to be exercised since the taxpayer would be compelled to exercise the warrants in the event the charity did not put the shares back to the corporation. This violated the safe harbor in Treas. Reg. §1.1361-1(1)(4)(iii)(A). With respect to the charity's non-voting common shares, the IRS suggested that the terms of the redemption agreement effectively made those shares a second class of stock because the principal purpose of the agreement was to circumvent the one class of stock requirement and that the agreement established a purchase price for the shares that is significantly different than the fair market value of the stock. In this respect, this violated the safe harbor set forth in Treas. Reg. §1.1361-1(1)(2)(iii).

It is not clear that the IRS position on this issue has substantial merit. The Regulations establish specific safe harbors. The purpose of a safe harbor is to ensure predictability in transactions. The SC$^2$ transactions were designed to fit within the safe harbor provisions. That being said, it is likely that the safe harbor provisions did not contemplate transactions so wholly without economic substance. While the taxpayers may have the better of the argument, there is a significant likelihood that a court that finds the transactions lack economic substance would also find the safe

19

harbor provisions do not apply. This would lead to the disastrous consequence of double taxation. That is a cost that is over and above any cost associated with the loss of the tax benefits.

This chance of a catastrophic tax consequence alters the risk assessment. Any chance of this adverse ruling forces a rational taxpayer to accept a settlement to avoid that risk. Since the risk of losing S corporation status is real, that additional risk virtually compelled the Upper Deck Parties to accept any reasonable settlement proposal received from the IRS.

**B.   The Failure to Claim a Charitable Contribution Deduction Did Not Materially Alter the Tax Risks Associated with the SC$^2$ Transaction.**

AIG has taken the position that the failure by McWilliam to claim the charitable contribution deduction for the appraised value of the non-voting common stock contributed to the Austin Firefighters materially changed the SC$^2$ transaction as structured and, therefore, constitutes a grounds to deny coverage under the AIG policy. This contention lacks merit. McWilliam did not claim a charitable contribution at least in part because it did not provide any tax benefit on McWilliam's 2001 tax return. McWilliam still could claim that charitable contribution (if it was allowed by the IRS) as part of a carryover to future years. Even more importantly, AIG's theory is flawed because claiming the charitable contribution deduction was not an integral part of the SC$^2$ transaction.

**1.   McWilliam could still Claim the Deduction as a Charitable Contribution Carryover Even If It Was Not Claimed on the Original Return.**

While it is true that McWilliam did not claim a charitable contribution deduction on his 2001 federal income tax return for the value of the stock contributed to the Austin Firefighters, this a fact of no consequence even with respect to McWilliam's individual tax situation. In general, pursuant to I.R.C. §170(b), a taxpayer may only claim a charitable contribution deduction to the extent of 50% of the taxpayer's adjusted gross income. McWilliam's tax counsel has advised me that McWilliam's 2001 adjusted gross income was negative. Accordingly, while McWilliam could have noted the charitable contribution on his 2001 return, it would have had absolutely no tax consequence. No portion of the deduction could be claimed as

20

a reduction of McWilliam's adjusted gross income. Therefore, the failure to list the charitable contribution deduction is essentially a meaningless fact as far as McWilliam's 2001 return is concerned.

The amount of a charitable contribution that cannot be deducted in a particular year is not lost forever. Pursuant to I.R.C. §170(d), the portion of a charitable contribution deduction that is not allowed in a particular year because of the limitation based on adjusted gross income is available to be carried forward for up to five years. There was no obligation for McWilliam to claim the deduction on the 2001 return to make that deduction eligible for inclusion in the charitable contribution carryover. See e.g., Jennings v. Commissioner, T.C. Memo. 2000-366, aff'd without published opinion, 2001-2 U.S.T.C. ¶50,651 (6th Cir. 2001) (previously undeducted charitable contributions considered but disallowed as unsubstantiated). Therefore, McWilliam is free to recompute his charitable contribution carryover and add in the charitable contribution deduction for the value of the stock donated to the Austin Firefighters in subsequent years through 2006. The period of limitations for filing a refund claim for McWilliam's 2002 return has not yet expired. Obviously, since the Upper Deck Parties have now accepted the IRS settlement offer with respect to the SC$^2$ transaction, an amended return claiming the charitable contribution deduction would be inappropriate. The critical point, however, is that at no time in this process was McWilliam precluded from claiming the charitable contribution deduction. It follows, therefore, that any failure by McWilliam to claim the charitable contribution deduction was of no consequence with respect to McWilliam's personal income tax situation.

## 2. The Charitable Contribution Was Not an Integral Part of the SC$^2$ Transaction.

The SC$^2$ transaction was premised on the transfer of the non-voting common stock to the charity. The principal reason that the charity had to be the transferee was so the allocation of 90% of the corporation's net income would go to an entity which would not suffer any tax consequence as a result. The secondary issue may have been that the application of the economic substance doctrine to a charitable contribution is somewhat uncertain. In any event, these were not critical considerations for the viability of the transaction.

21

**a. The IRS does not consider the contribution deduction to be an integral part of the transaction.**

As is set forth above, the role of the charitable contribution in the $SC^2$ transactions is a means to the end. The goal of the $SC^2$ transaction is not to generate a charitable contribution deduction. The goal of the transaction is to allocate 90% of the corporation's net income to a non-taxpaying entity. The charitable contribution is merely the vehicle to accomplish this result.

Consistent with this diminished importance, IRS Notice 2004-30 describes this aspect of the transaction as follows:

> "The original shareholders <u>might</u> also claim a charitable contribution deduction under §170 for the donation of the nonvoting stock to the exempt party. In some variations of this transaction, the S corporation may issue nonvoting stock directly to the exempt party." [emphasis added]

Accordingly, at least two variations of the transaction which do not contemplate a charitable contribution deduction are identified by the IRS. First, the corporation could issue the stock directly to the charity. Second, the shareholder "might" make the transfer and claim no charitable contribution deduction.

Since there are at least two permutations of the $SC^2$ transaction which the IRS believes do not involve any claimed charitable contribution deduction, it follows that this is not a critical element of the transaction in the IRS' eyes. Accordingly, McWilliam's alleged failure to claim the charitable contribution deduction cannot be a critical deviation from the $SC^2$ transaction as structured.

**b. The primary relevance relates to a potential doubt as to the validity of the transfer.**

As is set forth in detail above, the IRS attack on the $SC^2$ transaction involves, in some form, a claim that the transfer of the shares in substance conferred no economic benefit on the charity. In this respect, the IRS often examines whether the parties to the transaction did not even observe the

22

EXHIBIT 7 PAGE 583

formalities attendant with the transfer of the shares. The suggestion by AIG appears to be that McWilliam's failure to claim the charitable contribution deduction adds an additional element to the IRS argument that the parties did not respect the transaction as structured.

Any impact of McWilliam's failure to claim the charitable contribution is negligible at best. It is quite clear that the non-voting common shares were issued to the MPR Trust and transferred to the Austin Firefighters. On Upper Deck's 2001 and 2002 returns, the Austin Firefighters' share ownership was acknowledged and the allocation of income was based on that share ownership. The IRS states in IRS Notice 2004-30, and in the Coordinated Issue Paper, that the parties implemented the transfer of shares. Based on this, it seems clear that the IRS' position is that the relevant formal steps to the transaction were observed but that the substance of the transaction simply did not confer any economic benefit on the charity. McWilliam's alleged failure to claim the charitable deduction, even if such a failure occurred, is only relevant on the issue of whether the shares were transferred in form. Based on the IRS' apparent position based on economic substance, this issue of form is of little or no consequence.

Based on the foregoing, McWilliam's failure to claim the charitable deduction on his 2001 federal income tax return was of no consequence to him personally because, if the deduction was allowable, it could still readily be claimed. In addition, the failure to claim the contribution deduction is of no consequence to the bona fides of the $SC^2$ transaction because it is not a major component of the structure in the view of the IRS and because the IRS appears to be accepting that the formalities of the transaction were observed but that the transaction simply lacked substance. McWilliam's failure to claim the charitable contribution deduction has nothing to do with the substance of the transaction. For these reasons, AIG's argument that McWilliam's failure to claim the charitable contribution deduction is a material deviation from the $SC^2$ transaction is simply unavailing.

**C. The Circumstances of the Redemption of the Charity's Stock by Upper Deck Did Not Materially Alter the Tax Risk Associated with the $SC^2$ Transaction.**

AIG also posits the theory that the Upper Deck Parties' reacquisition of the Austin Firefighters' non-voting common

23

EXHIBIT _I_ PAGE _584_

shares prior to the inception of the put option constitutes a material breach changing the tax risks of the transaction. As with AIG's theory on the charitable contribution deduction, there is no merit to this contention whatsoever.

## 1. The SC$^2$ Transaction as Structured Always Allowed Upper Deck to Cash Out the Charity's Interest.

As is cited in Notice 2004-30, and as occurred in the facts in Upper Deck's case, the SC$^2$ transaction as structured always gave the original shareholder/taxpayer the opportunity to hold at least 90% of the each class (i.e., voting and non-voting) of outstanding shares of the corporation's stock. The vehicle to ensure this level of ownership was the issuance of the warrants. The exercise of the warrants would leave the taxpayer with at least 90% of each class of stock in the corporation.

Pursuant to California Corporations Code §1110, the holder of an interest that is at least 90% of each class of stock in a corporation has the ability to effectively cash out the minority shareholder. This is implemented by means of the "short-form merger." Pursuant to the short-form merger provision, if a corporation merges into another corporation, the holders of a minority interest representing 10% or less of the interests in a class of stock in the corporation have no legal right to retain their equity interest in the surviving corporation. Instead, these minority shareholders are subject to being cashed out and have dissenters' rights to determine the fair market value to be paid for their interests. California Corporations Code §1300 et. seq.

AIG's argument, therefore, appears to be that the Upper Deck Parties caused a material deviation from the SC$^2$ transaction because they reacquired shares by agreement instead of by exercising their statutory short-form merger right that the SC$^2$ transaction was designed to provide. Since the Upper Deck Parties did what the transaction allowed them to do, there cannot be a material deviation from the transaction structure unless the timing or manner of the Upper Deck Parties' transaction is somehow critical. The Upper Deck Parties consummated the reacquisition slightly more than one and a half years after the stock was donated to the Austin Firefighters. By design, the SC$^2$ transaction gave the Austin Firefighters a put two years after the donation. There is no statutory or regulatory significance in this six month difference. Similarly,

24

EXHIBIT _I_, PAGE _585_

there is no relevant distinction for tax purposes between a reacquisition of shares by agreement and a cash out by exercising statutory rights. This appears to be a red herring on AIG's part.

## 2. The Tax Risk Inherent in the Charity's Interest Made the Shares Difficult to Sell to an Independent Third Party.

In addition to the shareholders' ability at any time to cash out the charity's interest through the short-form merger statute, the $SC^2$ transaction provided at least two other factors which virtually ensured that no third party would be interested in purchasing the charity's shares. First, the Shareholders Agreement provided a right of first refusal. That right virtually eliminates any bargain element of a third-party's purchase. If the third party tenders a price below the genuine fair market value, the party holding the right of first refusal is sure to exercise the right to buy the shares. Therefore, the existence of the right of first refusal ensures that a sale of the shares can only be made to an independent third party who is willing to overpay for the stock.

An even more pernicious aspect of the $SC^2$ transaction structure is the vulnerability of a third party purchaser to the enormous tax burden that accompanies the non-voting common stock. Assuming the allocation of the taxable income that is the intended feature of the $SC^2$ transaction is implemented, any third party purchasing the Austin Firefighters' shares must be willing to report 90% of Upper Deck's net taxable income. This 90% share flows through to the owner of the shares automatically whether or not any cash distribution is made. Accordingly, the shareholder could be faced with the obligation to report millions of dollars of taxable income and not have Upper Deck distribute a single cent to allow that to be paid. Since the Austin Firefighters' shares contain no ability to force any form of current distribution, this risk is an obligation that no prudent third party would undertake. This is a further element of the transaction as designed which ensured that no third party would acquire the Austin Firefighters' shares, leaving only Upper Deck, McWilliam or the MPR Trust as potential buyers. This was probably apparent to the Austin Firefighters, and was no doubt the reason they consummated the transaction to allow the MPR Trust to reacquire their shares. This is how the $SC^2$ transaction was designed and how the Upper Deck Parties implemented it. There was no deviation of any consequence.

25

EXHIBIT _T_, PAGE _586_

**D. Under No Circumstances Did Any Deviations by Upper Deck from the SC$^2$ Transaction Structure Cause a Change in the IRS Settlement Offer to Upper Deck.**

Consistent with standard IRS tax shelter settlement procedures, the IRS offered a uniform settlement offer to every participant in the SC$^2$ transaction. Accordingly, the Upper Deck Parties received the same settlement offer as every other taxpayer that participated in that transaction. AIG contends in this case that the Upper Deck Parties materially altered the transaction structure and, therefore, the AIG policy should not cover the transaction as implemented. It is therefore a relevant inquiry as to whether any of these alleged deviations changed the outcome.

It is perfectly clear that nothing that the Upper Deck Parties did in any way changed the settlement offer they received from the IRS. Since this is the only settlement offer that any participants in the SC$^2$ transactions are likely to receive, it follows that whatever deviations the Upper Deck Parties may have caused to occur simply had no effect whatsoever on the settlement offer that ultimately resolved the tax case.

**1. The IRS Requires Consistency in Tax Shelter Settlement Offers.**

Since the early 1980s, the IRS has gone to great lengths to ensure that "one size fits all" with respect to IRS settlement offers in tax shelter cases. As indicated in my qualifications above, I settled literally thousands of tax shelter cases. Other than occasional differences with respect to the application of penalties, the settlement offer for every taxpayer in a tax shelter project was exactly the same as the settlement offer to every other taxpayer. This is standard operating procedure for the IRS. Since there were no penalties imposed in Upper Deck's case, any variations that could possibly exist with respect to penalty liability are irrelevant.

There are at least two facets of the IRS tax shelter settlement implementation that shows the IRS' commitment to keeping all settlements identical. First, the IRS has elevated the uniformity of the settlement offers to the point where now the IRS will typically announce a settlement offer publicly. This uniformity is illustrated in the SC$^2$ transactions in the manner in which the IRS communicated the settlement offer. The settlement offer was communicated originally by the IRS by means

EXHIBIT *T*, PAGE *587*

of a letter dated April 7, 2005. The taxpayers were invited to notify the IRS of their acceptance of the settlement offer by written communications within 30 days. The IRS then developed pro forma closing agreements which memorialized the terms of the settlement. In every step and every aspect of this process, all indications are that every taxpayer that participated in the $SC^2$ transaction was treated exactly the same.

The second evidence of the longstanding nature of the IRS policy in uniform settlements is the implementation of the TEFRA procedures in 1982. These were enacted at the IRS' request at a time when the tax shelter industry consisted largely of multiple small investors participating in tax shelter transactions through partnership interests. The IRS was so concerned with the uniformity of treatment of taxpayers that it enacted several new sections of the Internal Revenue Code for the express purpose of achieving consistent audit results and settlement conclusions. This consistency requirement manifested itself in the rule that each partner must report partnership items consistently with the reporting of those items on the partnership return. I.R.C. §6222(a). After the consistency of the partners' treatment of the partnership items was established, the TEFRA procedures then imposed a statutory mandate that the IRS must offer consist partnership item settlements to all partners governed by the TEFRA procedures who request the same settlement. I.R.C. §6224(c)(2). Accordingly, the IRS went to the lengths of amending the Internal Revenue Code to ensure the maximum degree of consistency in the reporting and settlement of similar tax shelter issues.

Based on the foregoing, it is clear that there was virtually nothing that the Upper Deck Parties could have done to obtain a different settlement. They could not have negotiated a better settlement than the settlement that was given to the other $SC^2$ transaction participants. Similarly, none of the alleged deviations from the transaction structure caused them to have any worse settlement offer than the other participants. In terms of the settlement offer made to the Upper Deck Parties, any alleged deviations are absolutely irrelevant.

27

EXHIBIT _I_, PAGE _588_

## 2. The IRS Apparently Does Not Care about Upper Deck's Alleged Deviations.

The IRS settlement offer was issued on April 7, 2005. The examination of the Upper Deck Parties, however, commenced in June 2003. Voluminous documentation was produced to the IRS concerning all of the aspects of the transactions between Upper Deck and the Austin Firefighters. Presumably, this information was forwarded to the parties within the IRS who were coordinating the $SC^2$ transaction audits.

When the IRS issued the $SC^2$ settlement offer, no distinction was drawn between parties that caused a premature reacquisition of the shares and those that did not. There was similarly no distinction drawn between parties that claimed the charitable contribution and those that did not. The IRS made the same settlement offer to every party regardless of how these aspects of the transaction were treated. This was apparently done with the knowledge of these alleged deviations implemented by the Upper Deck Parties.

There were approximately 60 taxpayers who participated in the $SC^2$ transactions. According to standard IRS procedures, all of these 60 participants received the same settlement offer. Since no distinction in the settlement was recognized by the IRS in the pattern settlement offer, it follows that the IRS did not consider these to be significant events for purposes of formulating the settlement. As is set forth in more detail above, these alleged deviations in fact are of little or no consequence in terms of the operation of the transaction structure. The uniformity of the IRS settlement offer after apparently obtaining knowledge of the deviations confirms their irrelevance.

## E. The Existence of Any Recovered Payments or Offsetting Benefits is Only Speculative.

In the event it is determined that the tax loss of the Upper Deck Parties is covered by the AIG policy, a separate question arises as to whether there are any "Recovered Payments" or "Offsetting Benefits." More specifically, in the context of the Upper Deck case, the Upper Deck Parties' tax loss is in excess of $81,000,000 including interest computed through August 15, 2006. The "Limit of Liability" in the AIG policy is $50,000,000. Accordingly, the real question is whether there are Recovered Payments or Offsetting Benefits in excess of

28

$31,000,000 in this case. Any Recovered Payment or Offsetting Benefit of less than this amount would be irrelevant.

Paragraph 11 of the AIG policy identifies three potential reductions in the Upper Deck Parties' loss that could cause a lesser amount to be a covered loss. One of these three offsets is an "Indemnity Payment" from another party or insurer. This report does not address any such amounts. This provision also addresses a "Recovered Payment" received from a "Taxing Authority" or an "Offsetting Benefit" with respect to a payment made by the Upper Deck Parties. For the reasons set forth below, there have been no Recovered Payments or Offsetting Benefits to date.

### 1.   There Will Not Be Any Significant Recovered Payments.

Paragraph 11(a)(i) of the AIG policy states that a Recovered Payment occurs if one of the Upper Deck Parties "recovers from any Taxing Authority all or any part of any payment made by the Insured hereunder." Based on the manner of implementation of the settlement, the Upper Deck Parties will not receive any Recovered Payments unless the IRS makes a mistake.

The most likely scenario in which a Recovered Payment could arise would be if the Upper Deck Parties pay the tax or a portion of the tax and sue successfully for refund. The Upper Deck Parties, however, have appropriately chosen to resolve their involvement in the $SC^2$ transaction by means of settlement. As is typical of all IRS settlement offers, the Closing Agreement which binds the parties to the terms of the settlement precludes the Upper Deck Parties from seeking any type of refund pursuant to the settlement. Closing Agreements are specifically authorized by statute and are rigorously enforced by the IRS in the courts. I.R.C. §7121(b) states that a closing agreement:

> "shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—
>
> (1) The case will not be reopened as to the matters agreed upon or the agreement modified by any officer, employee or agent of the United States, and

(2) In any suit, action or proceeding, such agreement or any determination, assessment, collection, payment, abatement, refund or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded."

A closing agreement is the most definitive and final resolution of a tax matter that can be made. See, Whitney v. United States, 826 F.2d 896 (9th Cir. 1987) (only a closing agreement under §7121 is absolutely binding); Dubinsky v. Becker, 64 F.2d 601 (8th Cir. 1933) (subsequent change in law does not negate closing agreement). The closing agreement in our case expressly makes the settlement between the IRS and the Upper Deck Parties final. Accordingly, in the absence of a clerical error, there will be no Recovered Payments in this case.

## 2. No Offsetting Benefits Have Occurred to Date.

The final potential offset for the amount of the loss under the AIG policy is if the Upper Deck Parties realized an "Offsetting Benefit." Paragraph 2(m) of the AIG policy defines an Offsetting Benefit as:

"(i) any amount realized by any Insured with respect to any year, of any saving of any Taxes that would not have been realized but for an Insured Tax Loss and (ii) any amount of Taxes that would have been imposed on an Insured, with respect to any relevant year for which there is an Insured Tax Loss, as a result of the status of such Insured as a shareholder of the Named Insured, but for the Named Insured's loss of S corporation status."

Based on this definition, there are two general categories of Offsetting Benefits. The first category is a tax that would have been saved if Upper Deck lost its S corporation status. This category of Offsetting Benefit can be easily eliminated in our case. As a result of Upper Deck accepting the IRS settlement, Upper Deck did not lose S corporation status. Therefore, there can be no taxes saved as a result of the loss of S corporation status.

30

EXHIBIT _T_, PAGE 591

The second category is less well defined. This category generally covers any other taxes saved as a result of the IRS disallowance of the $SC^2$ transaction. While the universe of potential savings referenced in this part of the Offsetting Benefits may not be perfectly clear, it is clear that the Upper Deck Parties have in fact realized no tax savings to date as a result of the IRS disallowance of the $SC^2$ transaction. No refunds or tax benefits have yet been received due to the IRS disallowance of the $SC^2$ transaction.

The possibility does exist for future Offsetting Benefits. The most obvious situation would be benefits resulting from an adjustment to the basis of the MPR Trust's shares in Upper Deck. The disallowance of the $SC^2$ transaction has the effect of reallocating the income that had previously been allocated to the Austin Firefighters back to the MPR Trust. Pursuant to I.R.C. §1367(a), when an S corporation shareholder reports a distributive share of S corporation income, that shareholder receives an upward adjustment in the basis of the shareholder's shares. If those shares are subsequently sold, for example, the increased basis would cause the shareholder to recognize a smaller capital gain from that sale transaction than would have occurred without the increased basis. Since the MPR Trust has not sold or transferred any shares in any transaction other than the $SC^2$ transaction, no such tax savings could have occurred to date. Similarly, there is no event that has otherwise caused an actual tax savings that results from the IRS disallowance of the $SC^2$ transaction.

Based on the foregoing, there clearly will never be an Offsetting Benefit from the disallowance of Upper Deck's S corporation status, and no other type of Offsetting Benefit has occurred to date.

### 3. The Possible Offsetting Benefits Depend on Events that May or May Not Occur.

As is set forth in the preceding section, the most readily identifiable potential Offsetting Benefit would result from an increase to the basis of the MPR Trust's shares that result from the reallocation of the Austin Firefighters' share of income back to the MPR Trust. As is indicated in the preceding section, there is no discernible Offsetting Benefit that has occurred to date for the Upper Deck Parties. Any potential Offsetting Benefit resulting from the increase in the MPR Trust's basis in the Austin Firefighters' non-voting common

31

shares would require an event to cause that basis to become relevant. The most likely event could be the sale of shares by the MPR Trust. A second circumstance in which potential benefit could be realized from the increased basis is if Upper Deck made distributions to the MPR Trust in excess of what would have been the MPR Trust's basis in the shares absent the reallocation of the income previously recognized by the Austin Firefighters. This in fact would be a more likely short-term source of a potential Offsetting Benefit.

It is possible, however, that none of the events giving rise to an Offsetting Benefit may ever occur. For example, if neither a sale nor a distribution in excess of basis occurs prior to McWilliam's death, under current law, the MPR Trust would receive increased basis on the date of McWilliam's death as a result of the inclusion of the value of the shares in McWilliam's taxable estate. The increased basis resulting from this event occurs without any income tax cost and could effectively eliminate any Offsetting Benefit that could otherwise occur. This illustrates the speculative nature of any potential future Offsetting Benefit. It is impossible to predict whether future events will unfold to cause an Offsetting Benefit to occur. In addition, the large excess of the Insured Tax Loss over the policy limit makes it extremely speculative as to whether any Offsetting Benefit of a sufficient amount will occur at any point in the future.

## IV. CONCLUSION

Based on the foregoing, it is clear that any alleged deviations by the Upper Deck Parties in the implementation of the SC$^2$ transaction have no effect on the Insured Tax Loss under the Upper Deck policy. The SC$^2$ transaction was unlikely to succeed as structured. The failure to claim a charitable contribution deduction and the reacquisition of the Austin Firefighters' shares of stock earlier than contemplated had no effect on the likelihood of the Upper Deck Parties' SC$^2$ transactions being ultimately sustained. In any event, it is clear that these alleged deviations had no effect whatsoever on the IRS settlement proposal which the Upper Deck Parties acted appropriately in accepting. Finally, there will be no Recovered

EXHIBIT *T* PAGE *593*

Payments and there have been no Offsetting Benefits to date. The possibility of any future Offsetting Benefits is merely speculative.

DATED: August 17, 2006

Respectfully submitted,

STEVEN R. MATHER

33

**STEVEN RAY MATHER**
Kajan Mather and Barish
9777 Wilshire, Suite 805
Beverly Hills, CA 90212
(310) 278-6080

## WORK EXPERIENCE

**Attorney**, Kajan Mather and Barish, Beverly Hills, California. July 1990 to present. Partner handling tax controversies before state and federal agencies and courts.

**Lecturer**, Golden Gate University, Los Angeles, California. May 1989 to present. Instructor for Federal Tax Procedure class in Masters in Taxation program.

**Attorney**, Rosen, Wachtell & Gilbert, Los Angeles, California. December 1987 to July 1990. Senior associate in tax department. Actively involved in corporate, partnership, individual and estate tax planning and controversy matters.

**Senior Attorney**, Office of District Counsel, Internal Revenue Service. January 1983 to December 1987. Responsible for more that 3,000 United States Tax Court cases. Tried approximately 30 Tax Court cases, including civil fraud, real estate tax shelter, corporate accounting and estate tax issues. Advised revenue officers and U.S. Attorneys on tax collection and bankruptcy matters. Received an exceptional performance award in August 1987.

**Previous Employment**: **Corporate Controller**, ESP Digital Systems Corp., Des Moines, Iowa. **Law Clerk**, Wildman, Harrold, Allen & Dixon, Chicago, Illinois. **Internal Auditor**, Hawkeye Bancorporation, Des Moines, Iowa. **Staff Auditor**, Coopers & Lybrand, Des Moines, Iowa.

## PUBLICATIONS

**Audit Procedures for Pass-Through Entities**, B.N.A. Tax Management Portfolio 467-2d (1991), 624 (2002).

**Federal Tax Collection Procedure**, B.N.A. Tax Management Portfolio 404-2d (1990), 638-2d (2001) (co-author).

**Whipsaw Revisited**, 43 Tax Lawyer 343 (1990) (co-author).

**The Elusive Definition of a Tender Offer**, 7 The Journal of Corporation Law 503 (1982).

**TSN Liquidating Corporation, Inc. v. United States - Negotiation Focus in Substance Over Form**, 7 The Journal of Corporation Law 171 (1981).

Exhibit A

EXHIBIT __I__, PAGE 595

## PROFESSIONAL ACTIVITIES

Speaker, tax seminars sponsored by various organizations, including the California State Bar Tax Section, the California Society of Certified Public Accountants and the Los Angeles County Bar Tax Section.

Panelist, United States Tax Court Judicial Conference, Richmond, Virginia (November 1992).

Recipient, recognition as one of the top California tax litigators under 40 by the Los Angeles Daily Journal (September 1992).

Chair, Tax Section, Beverly Hills Bar Association (1996-1997).

Chair, Pro Bono Committee, Section of Taxation, Los Angeles County Bar Association (1993-present).

Chair, Tax Procedure and Litigation Committee, Section of Taxation, Los Angeles County Bar Association (1991-1992).

Co-Director, Tax Court Pro Se Program, Beverly Hills Bar Association/Los Angeles County Bar Association (1988 - Present).

Task Force Head, Los Angeles County Bar Association Tax Section project submitting proposals for legislative changes. Topic: Partnership audit procedures (1990).

## PROFESSIONAL CERTIFICATION

State Bar of California, December 1983.
Iowa State Bar, June 1982.
Certified Public Accountant, Iowa, July 1979.

## EDUCATION

The University of Iowa Law School, J.D., May 1982.
<u>Honors and Activities</u>: Graduation with Distinction.
Topics Editor, The Journal of Corporation Law.

The University of Iowa, B.B.A. in Accounting, December 1978.
<u>Honors and Activities</u>: Graduation with Highest Distinction.
Dean's List. Beta Alpha Psi. Beta Gamma Sigma. Phi Eta Sigma.

# APPENDIX B

## CASE STUDY OF S-CORPORATION CHARITABLE CONTRIBUTION STRATEGY (SC2)

KPMG approved the S-Corporation Charitable Contribution Strategy (SC2) for sale to multiple clients in 2000. KPMG marketed SC2 for about 18 months, from about March 2000 to about September 2001. KPMG sold SC2 to 58 S-corporations, in 58 transactions, and obtained more than $26 million in revenues, making SC2 one of KPMG's top ten revenue producers in 2000 and 2001. SC2 is not covered by a "listed transaction" issued by the IRS, but is currently under IRS review.

SC2 can be summarized as follows. A chart depicting a typical SC2 transaction is also provided.[389]

**1) The Income.** Individual owns 100% of S-corporation which earns net income (e.g., $3 million annually).

**2) The Sales Pitch.** Individual is approached by KPMG with a "charitable donation strategy" to shelter a significant portion (often 90%) of the S-corporation's income from taxation by "allocating," with little or no distribution, the income to a charitable organization. Individual is told that, for a fee, KPMG will arrange a temporary "donation" of corporate non-voting stock to the charity and will provide an opinion letter stating it is "more likely than not" that nonpayment of tax on the income "allocated" to the charity while it "owns" the stock will withstand an IRS challenge, even if the allocated income is not actually distributed to the charity and the individual regains control of the income. The individual is told he can also take a personal tax deduction for the "donation."

**3) Setting Up The Transaction.** The S-corporation issues non-voting shares of stock that, typically, equal 9 times the total number of outstanding shares (e.g., corporation with 100 voting shares issues 900 non-voting shares). Corporation gives the non-voting shares to the existing individual-shareholder. Corporation also issues to the individual-shareholder warrants to purchase a substantial number of company shares (e.g., 7,000 warrants). Corporation issues a resolution limiting or suspending income distributions to all shareholders for a specified period of time (e.g., generally the period of time in which the charity is intended to be a shareholder, typically 2 or 3 years). Prior to issuing this resolution, corporation may distribute cash to the existing individual-shareholder.

**4) The Charity.** A "qualifying" charity (one which is exempt from federal tax on unrelated business income) agrees to accept S-corporation stock donation. KPMG actively seeks out qualified charities and identifies them for the individual.

**5) The "Donation."** S-corporation employs an independent valuation firm to analyze and provide a valuation of its non-voting shares. Due to the non-voting character of the shares and the existence of a large number of warrants, the non-voting shares have a

---

[389] A detailed explanation of this chart is included in the opening statement of Senator Carl Levin at the hearing before the Senate Permanent Subcommittee on Investigations, "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals" (11/18/03).

**Exhibit B**

very low fair market value (e.g., $100,000). Individual "donates" non-voting shares to the selected charity, making the charity the temporary owner of 90% of the corporation's shares. Individual claims a charitable deduction for this "donation." At the same time, the corporation and charity enter into a redemption agreement allowing the charity, after a specified period of time (generally 2 or 3 years), to require the corporation to buy back the shares at fair market value. The individual also pledges to donate an additional amount to the charity to ensure it obtains the shares' original fair market value in the event that the shares' value decreases. The charity does not receive any cash payment at this time.

**6) The "Allocation."** During the period in which the charity owns the non-voting shares, the S-corporation "allocates" its annual net income to the charity and original individual-shareholder in proportion to the percentage of overall shares each holds (e.g., 90:10 ratio). However, pursuant to the corporate resolution adopted before the non-voting shares were issued and donated to the charity, little or no income "allocated" to the charity is actually distributed. The corporation retains or reinvests the non-distributed income.

**7) The Redemption.** After the specified period in the redemption agreement, the charity sells back the non-voting shares to the S-corporation for fair market value (e.g., $100,000). The charity obtains a cash payment from the corporation for the shares at this time. Should the charity not resell the stock, the individual-shareholder can exercise the warrants, obtain additional corporate shares, and substantially dilute the value of the charity's shares. Once the non-voting shares are repurchased by the corporation, the corporation distributes to the individual-shareholder, who now owns 100% of the corporation's outstanding shares, all of the undistributed cash from previously earned income.

**8) Taxpayer's Claim.** Due to its tax exempt status, the charity pays no tax on the corporate income "allocated" or distributed to it. According to the KPMG opinion letter, for tax purposes, the individual can claim a charitable deduction for the "donated" shares in the year in which the "donation" took place. During the years in which the charity "owned" most of the corporate shares, individual will pay taxes on only that portion of the corporate income that was "allocated" to him or her. KPMG also advised that all income "allocated" to the charity is then treated as previously taxed, even after the corporation buys back the non-voting stock and the individual regains control of the corporation. KPMG also advised the individual that, when the previously "allocated" income was later distributed to the individual, the individual could treat some or all as long-term capital gains rather than ordinary income, taxable at the lower capital gains rate. The end result is that the individual owner of the S-corporation was told by KPMG that he or she could defer and reduce the rate of the taxes paid on income earned by the S-corporation.

**9) IRS Action.** This transaction is under review by the IRS.

REBUTTAL EXPERT REPORT OF


STEVEN R. MATHER


TO


"TAX CONSIDERATIONS PERTAINING TO
PARTICIPATION IN SC$^2$ TRANSACTIONS BY
THE UPPER DECK COMPANY"
BY ROBERT D. BURKE
DATED AUGUST 16, 2006


AND


"EXPERT REPORT RE:
UPPER DECK SC$^2$ TRANSACTION"
BY LINDA BEERBOWER BURKE

KAJAN MATHER AND BARISH
9777 WILSHIRE BOULEVARD, SUITE 805
BEVERLY HILLS, CALIFORNIA 90212
Tel. No. (310) 278-6080
FAX (310) 278-4805
Email: srm@taxdisputes.com

EXHIBIT __T__, PAGE 599

# TABLE OF CONTENTS

I.  PURPOSE ................................................... 3

II.  RESPONSE TO GENERAL CONCLUSION ........................... 3

A.  The General Conclusion of Both Reports.................. 3

B.  Summary of Response to General Conclusion............... 4

C.  There Was Never a Substantial Likelihood that the $SC^2$
Transaction Would Survive an IRS Attack...................... 4

D.  Whatever Chance There Was that the Upper Deck Parties
Would Realize the Tax Benefits from the $SC^2$ Transaction Was
Gone Before the December 2002 Repurchase Occurred............ 5

    1.  Tax Shelter Environment Prior to April 2001........... 5

    2.  Relevant Developments Between April 2001 and December
2002....................................................... 7

III.  RESPONSE TO SPECIFIC CONCLUSIONS IN ROBERT BURKE REPORT.. 9

A.  The Robert Burke Report Ignores the Effect of the Short-
Form Merger Statute on the $SC^2$ Transaction as Structured.....10

B.  The Robert Burke Report Inadequately Analyzes the Benefits
and Burdens and Assignment of Income Theories................11

C.  The Robert Burke Report Incorrectly Analyzes the Issue
Concerning the Likelihood of the Exercise of the Warrants..11

D.  The Austin Firefighters Did Not Fail to Exercise Diligence
in Reselling the Shares to the Upper Deck Parties............12

E.  The Robert Burke Report Tacitly Acknowledges that there
Was No Chance of Prevailing in the Tax Court.................12

F.  No Offsetting Benefits Have Occurred....................13

IV. RESPONSE TO SPECIFIC CONCLUSIONS IN LINDA BURKE REPORT ....13

1

EXHIBIT 7, PAGE 600

A.   The Linda Burke Report Ignores the Effect of the Short-Form Merger Statute on the $SC^2$ Transaction as Structured. ....13

B.   The Linda Burke Report Inadequately Analyzes the Benefits and Burdens and Assignment of Income Theories................13

C.   The Linda Burke Report is Misleading Concerning the Use of Judicial Doctrines in Tax Shelter Cases......................14

D.   The Linda Burke Report's Analysis of the December 2002 Repurchase is Inconsistent with the Conclusion in the Robert Burke Report.................................................14

V. CONCLUSION .................................................15

EXHIBIT  7 , PAGE 601

## I.  PURPOSE

The purpose of this report is to rebut the reports entitled "Tax Considerations Pertaining to Participation in $SC^2$ Transactions by the Upper Deck Company," by Robert D. Burke dated August 16, 2006 (the "Robert Burke Report") and "Expert Report Re: Upper Deck $SC^2$ Transaction" by Linda Beerbower Burke (the "Linda Burke Report"). This rebuttal will be broken down into three parts: (1) a response to the common general conclusion in both the Robert Burke Report and the Linda Burke Report; (2) responses to the specific conclusions made in the Robert Burke Report; and (3) responses to the specific conclusions made in the Linda Burke Report.

## II.  RESPONSE TO GENERAL CONCLUSION

Both the Robert Burke Report and the Linda Burke Report appear to be offered to support one general conclusion. This section of the report will restate that conclusion, provide a summary of the response to the conclusion and then provide specific analysis of the grounds for this response.

## A.  The General Conclusion of Both Reports.

The general conclusion of the Robert Burke Report appears in the last sentence of page 1 of that Report. Robert Burke concludes that the "December 2002 repurchase substantially decreased the possibility that the Upper Deck Parties would prevail in any litigation of the issues." This general conclusion is based on Robert Burke's analysis that the December 2002 repurchase "substantially undercut the ability of the Upper Deck Parties to convince a court that they had the requisite intent to benefit the Austin Plan or that the repurchase of its shares was not part of a plan or arrangement that existed at the time the Plan first received the shares." These were considered by Robert Burke to be two critical elements to give the Upper Deck Parties any significant chance of success in the case.

The general conclusion of the Linda Burke Report appears in the last sentence of the Report. Linda Burke concludes that "in short, the changes made to the KPMG strategy by the Company's and the Trust's (McWilliams') actions to purchase the Fund's shares at a favorable price significantly undermined the <u>bona fides</u> of the Shareholders Agreement and gave the Company and the Trust no chance of prevailing on the original transaction." This

3

is substantially similar to the general conclusion in the Robert Burke Report.

**B.    Summary of Response to General Conclusion.**

There are at least two reasons that the general conclusion in both reports is unfounded. First, there was <u>never</u> a substantial likelihood that the $SC^2$ transaction as structured would withstand attack by the IRS. Second, the only significant chance that the Upper Deck Parties would realize the tax benefit in the $SC^2$ transaction was eliminated before the December 2002 repurchase occurred.

**C.    There Was Never a Substantial Likelihood that the $SC^2$ Transaction Would Survive an IRS Attack.**

Both reports contain extensive analysis of the general law of tax shelters and the law dealing with the specific issues presented by the $SC^2$ transaction. As is typical with the vast majority of tax shelter legal opinions issued, the legal analysis is substantially correct but simply has nothing to do with the economic reality of the transaction. The $SC^2$ transaction may possess the least economic substance of any transaction in the history of tax shelters. The reasons for this lack of economic substance are set forth in detail in the "Expert Report of Steven R. Mather Regarding Tax Risks of the Upper Deck Company, Richard P. McWilliam and the MPR Revocable Trust in the $SC^2$ transaction" dated August 17, 2006 (the "Mather Report"). The Mather Report is incorporated herein by reference.

As is acknowledged in both the Robert Burke Report and the Linda Burke Report, transactions without economic substance are never respected for tax purposes. The $SC^2$ transaction had no economic substance for the reasons set forth in the Mather Report. Without economic substance, there was no realistic likelihood that the $SC^2$ transaction could withstand an IRS attack. Since there was no realistic chance of success in the $SC^2$ transaction as structured, it follows that the December 2002 repurchase could have no material effect on the chance of success. Simply put, the repurchase had no effect on the chance of success because there was no chance of success in the first instance.

4

EXHIBIT __T__, PAGE 603

**D.  Whatever Chance There Was that the Upper Deck Parties Would Realize the Tax Benefits from the SC$^2$ Transaction Was Gone Before the December 2002 Repurchase Occurred.**

In the preceding section, the conclusion is asserted that the SC$^2$ transaction never had a chance of withstanding an IRS attack. That is not the same as saying there was never any chance that the Upper Deck Parties would realize the tax benefit contemplated by the SC$^2$ transaction. At the time the Upper Deck Parties entered into the SC$^2$ transaction in 2001, there existed a reasonable possibility that the tax benefits from the transactions would be realized simply because the IRS might not choose to audit Upper Deck prior to the expiration of the statute of limitations. As is discussed more fully below, however, this chance of "prevailing" was gone before the December 2002 repurchase occurred. This change occurred through no fault or action by the Upper Deck Parties. Once this chance of "prevailing" was gone, the December 2002 repurchase became a logical way to conclude the transaction and in no way impacted the likelihood that the tax benefit would not be realized in the end.

**1.    Tax Shelter Environment Prior to April 2001.**

To fully understand the risks confronting the Upper Deck Parties on entering into the SC$^2$ transaction (and in assessing the corresponding risk to AIG in issuing the AIG Policy), it is important to understand the general state of the IRS and the IRS' efforts in pursuing tax shelters at that time.

The general state of the IRS in April 2001 can only be understood by reviewing the recent history of Congressional oversight of the IRS. The Senate Finance Committee conducted hearings concerning the IRS in 1997 and 1998. These hearings led to enactment of the IRS Restructuring and Reform Act of 1998 (the "1998 Act"). The 1998 Act, and the selection of a Commissioner of Internal Revenue, Charles Rosatti, who lacked a tax background, sent the IRS into a prolonged period in which enforcement activities declined dramatically while the IRS focused on internal reorganization and review of the agency's purpose.

This introspective period had a startling effect on IRS enforcement activities. Statistics from the Transactional Records Access Clearinghouse at Syracuse University (available at www.trac.syr.edu/tracirs/trends) illustrate the drastic

EXHIBIT ___7___, PAGE 604

decline in enforcement activities. For example, IRS collection levies numbered 3,659,417 in 1997 but declined to 219,778 for 2000. Similarly, IRS collection seizures declined from 10,090 in 1997 to only 174 in 2000. Comparable, although less dramatic, declines occurred in IRS audit activities. The likelihood of an audit for high-income taxpayers (i.e., taxpayers with total income items in excess of $100,000) declined by more than two-thirds from 1997 to 2000. While the audit risk was never high, the national percentage of returns in this category that were audited by the IRS in 2000 was 0.47%.

These statistics establish that the IRS had been rendered almost wholly ineffective by the end of 2000. The collection action had ceased almost entirely. The likelihood of an audit for a high-income taxpayer was less than one in 200. In addition, while the IRS had identified certain tax shelter transactions as meriting further review, there was no indication that the IRS had the resources or the will to ramp up the broad based initiatives that were subsequently implemented. Accordingly, by any account, a very substantial likelihood existed that Upper Deck would realize the tax benefits from the SC$^2$ transaction simply because the claimed benefits would never be challenged by the IRS.

By April 2001, there was also further cause for optimism with respect to the chances of prevailing in the unlikely event that the IRS would attack the transaction. In January 2001, the United States Supreme Court issued its opinion in Gitlitz v. Commissioner, 531 U.S. 206 (2001). In Gitlitz, the Supreme Court upheld a tax benefit based on a literal interpretation of a statutory provision even though the resulting tax benefit seemed clearly unintended. There was nothing in the Gitlitz opinion that would have given the IRS cause for optimism in attacking tax shelter transactions that were similarly based on technical interpretations of statutory provisions with nonsensical results. As a result, the seemingly high likelihood that the transaction would not be challenged, combined with the Supreme Court's apparent willingness to allow nonsensical, technically correct interpretations of the Internal Revenue Code to be upheld, presented an environment in which the Upper Deck Parties could hope to realize their tax benefits and AIG could hope that no corresponding claim would be made on the AIG Policy.

EXHIBIT 7 PAGE 605

## 2. Relevant Developments Between April 2001 and December 2002.

A sea change occurred in the tax shelter environment between April 2001 and December 2002. The Upper Deck Parties had nothing to do with these forces of change. Nevertheless, as a result of these changes, by the time of the December 2002 repurchase, it was evident that the Upper Deck Parties' $SC^2$ transaction would be audited and there was virtually no chance of prevailing.

By the end of 2001, the long-dormant IRS gave indications that it was ramping up its tax shelter activity. On December 24, 2001, IRS Announcement 2002-2 was issued which set forth a "disclosure initiative." This disclosure initiative allowed taxpayers to come forward by April 23, 2002 and disclose substantial information concerning any tax shelters in which the taxpayer had invested. The incentive to make this disclosure was that the IRS would waive the accuracy-related penalty with respect to any disclosed transaction. This accuracy-related penalty (typically 20% of the tax deficiency) was perhaps the most material ultimate risk to the taxpayer. If the benefits of the tax shelter transaction were disallowed, the result was typically that the tax savings from the transaction would be reversed and statutory interest would be imposed. During this period, the IRS interest rate ranged from a high of 9% in early 2001 to 6% by the end of 2002. As a result, even if a taxpayer was uncertain if the tax savings would be sustained, the "downside" was only that the tax saved would have to be repaid with a relatively modest rate of interest. The existence of penalties dramatically altered this scenario. If the taxpayer owed a penalty equal to 20% of the tax (plus interest on the penalty) in addition to repayment of the tax saved (plus interest), the risk-reward matrix was significantly altered. Avoiding the risk of this penalty, therefore, was a significant consideration in favor of making the disclosure.

The alternative to making the disclosure was to sit back and hope that the statute of limitations would expire before the IRS would discover the taxpayer's involvement in the tax shelter transaction. On April 18, 2002, however, AIG informed the Upper Deck Parties that KPMG had been served with IRS summonses concerning the $SC^2$ transaction and would disclose the Upper Deck Parties' involvement in the $SC^2$ transaction. Based on this position taken by KPMG, it became apparent that the Upper Deck Parties could not avoid detection. Accordingly, the

7

EXHIBIT 7, PAGE 606

incentive to refuse the disclosure was gone. The Upper Deck Parties could gain penalty protection under the initiative, thereby eliminating the largest exposure for additional expenses that existed. This made the decision easy. Consequently, on April 22, 2002, the Upper Deck Parties disclosed their involvement in the $SC^2$ transaction.

From this point, the environment for tax shelter cases became increasingly hostile. In July 2002, the IRS sued KPMG for perceived uncooperativeness in responding to tax shelter related summonses. United States v. KPMG, LLP, (D. D.C. No. 1002 MS 00295, 7/9/02). By October 2002, the Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs had begun an investigation into activities surrounding the involvement of professional firms in so-called "abusive tax shelters." It was known then that KPMG was one of the focal points of this investigation. This led to further investigations that specifically included detailed review of the $SC^2$ transactions. These investigations subsequently resulted in the release of the report of the Minority Staff of the Permanent Committee on Investigations of the Committee on Governmental Affairs, entitled "U.S. Tax Shelter Industry: the Role of Accountants, Lawyers, and Financial Professionals, Four KPMG Studies: FLIP, OPUS, BLIPS AND $SC^2$ (the "Minority Report").

By October 2002, there was also speculation that, due to its central involvement in many targeted tax shelters, KMPG might be subjected to a criminal investigation and ultimate indictment. A fellow former Big 5 accounting firm, Arthur Andersen, had just been indicted in March 2002, which led to an almost immediate demise of the firm. Concern was expressed that KPMG might be facing a similar fate. In the end, however, in August 2005, KPMG was able to avoid indictment by entering into a deferred prosecution agreement by which KPMG took extraordinary steps to purge any vestiges of its tax shelter business, agreed to detailed (and possibly excessive) cooperation with government investigations, and paid the largest fine in IRS history. The IRS then proceeded to indict multiple former KPMG employees. Although the indictments ultimately did not center on the $SC^2$ transaction, the three other case studies in the Minority Report were included in the indictment. The investigation was far-ranging and undoubtedly at some point included the $SC^2$ transactions.

In October 2002, the IRS also began to roll out settlement initiatives for tax shelters which the IRS had

previously investigated. Settlement initiatives were issued for contingent basis tax shelters, basis shifting shelters, and corporate-owned life insurance. Rev. Proc. 2002-67, I.R.B. 2002-43, 733; IRS Announcement 2002-97, I.R.B. 2002-43, 757; IRS Announcement 2002-96, I.R.B. 2002-43, 756. These settlement initiatives were not generous. By essentially allowing none of the tax benefits associated with the transactions in these settlement initiatives, the IRS signaled that settlements which allowed a portion of the tax benefits in any tax shelter transactions would be exceedingly difficult to obtain.

A final change that occurred before December 2002 was the expiration of the term of IRS Commissioner Rosatti. By this time, it became clear that the IRS enforcement activities had fallen to an unacceptable level and a change was needed. In the end, Mark Everson was confirmed as the new IRS Commissioner and immediately assumed the agenda of beefing up IRS enforcement activities. Everson has proved to be one of the most enforcement-oriented IRS Commissioners in recent history.

All of these events had a material impact on the likelihood that the Upper Deck Parties would receive the tax benefits claimed in the $SC^2$ transaction. The greatest chance of success, the chance of not being audited, was now gone. The $SC^2$ transaction never had substantial merit. The Upper Deck Parties wanted to repurchase the shares from the Austin Firefighters and the chances of ultimately realizing the tax benefits from the $SC^2$ transaction were miniscule. Nothing that the Upper Deck Parties could have done in the December 2002 repurchase could have had a material impact since there was no realistic chance of prevailing at the time these transactions were implemented.

## III. RESPONSE TO SPECIFIC CONCLUSIONS IN ROBERT BURKE REPORT

In addition to the general conclusion of the Robert Burke Report, there are a number of subsidiary or specific conclusions for which a response is required. In general, as set forth above, the legal analysis on these issues is adequate. The problem, however, is that the legal analysis has little to do with the actual facts in the case due to assumptions or conclusions that are untenable.

EXHIBIT _T_, PAGE 608

## A. The Robert Burke Report Ignores the Effect of the Short-Form Merger Statute on the $SC^2$ Transaction as Structured.

Throughout the Robert Burke Report, the Report reinforces the critical importance of the absence of any prearranged plan or ability under the Shareholders Agreement to force the Austin Firefighters to sell their shares. As is set forth in the Mather Report, however, the $SC^2$ transaction as structured appears to be specifically tailored to put KPMG's taxpayer/donor in a position to cash out the charity by use of the short-form merger statute set forth in California Corporations Code §1110 or analogous statutes in other states. While it may be true that this is not a right that derives from the Shareholders Agreement and there was no prearranged agreement with the charity to sell the shares back, it seems quite clear that the $SC^2$ transaction as structured was <u>designed</u> to give the taxpayer/donor the opportunity to implement the short-form merger rules to cash out the charity in the event the charity did not voluntarily agree to resell the shares.

The Robert Burke Report fails to mention the effect of the short-form merger statute on the economic substance analysis. This appears to be a fundamental flaw in an opinion that relies so extensively on the supposed right of the charity to retain their shares. While the short-form merger rules do contemplate a procedure for the charity to realize a fair market value for its shares, this fair market value analysis is entirely speculative. As is set forth in the Mather Report, a substantial case can be made that there was no market for the charity's shares other than a sale back to the taxpayer/donor.

Judicial doctrines such as the economic substance doctrine are implemented specifically to cut through hypertechnical arguments to achieve appropriate results. To the extent that the Robert Burke Report relies expressly and exclusively on the Shareholders Agreement and the lack of an actual agreement at the time of the contribution for the charity to sell the stock back to the taxpayer/donor, the Report is incomplete and deficient. The rights conferred on the taxpayer/donor by the California short-form merger rules are a material factor that strips the $SC^2$ transaction as structured of virtually any vestige of economic substance.

10

EXHIBIT _I_ PAGE 609

**B. The Robert Burke Report Inadequately Analyzes the Benefits and Burdens and Assignment of Income Theories.**

It is certainly true that common threads exist in all of the judicial doctrines that historically have been applied to tax shelters. It is nevertheless important to separately state and analyze all of the judicial doctrines that may be applicable.

By stating the issue as whether the benefits and burdens of the ownership of the charity's shares were actually transferred, an appropriate focus can be brought on the economic realities of this transaction. As is set forth in detail in the Mather Report, the charity received virtually none of the economic benefit or control associated with the shares. There was no current economic benefit. The only economic benefit that could occur was from the repurchase of the shares by the taxpayer/donor. The $SC^2$ transaction was structured to virtually guarantee would this occur. It is certainly true that one important burden was transferred to the charity—the obligation to report the tax on the income associated with the shares. This is not the kind of transfer of burden that can withstand analysis under the judicial doctrine, however.

Similarly, the Robert Burke Report fails to analyze the $SC^2$ transaction under the assignment of income doctrine. As stated in the Mather Report, this is more egregious than a typical assignment of income case because the net effect of the transfer of the shares is the assignment of only the tax consequence without the income even following the tax. If a transaction is permitted to allow one party to retain the economic benefit of income while another party assumes the tax obligation for a modest fee because the other party does not care about the tax, the entire system of federal income taxation falls apart. The $SC^2$ transaction would appear to have virtually no chance of prevailing under an assignment-of-income-type argument. The Robert Burke Report fails to address this exposure at all.

**C. The Robert Burke Report Incorrectly Analyzes the Issue Concerning the Likelihood of the Exercise of the Warrants.**

The Robert Burke Report at p. 21 concludes there is no factual basis for the IRS conclusion that the warrants are substantially certain to be exercised because Burke is unaware that any exercise ever occurred. This completely misses the point. The $SC^2$ transaction was designed to ensure that the

11

EXHIBIT _I_, PAGE 610

charity would have only one likely buyer for the shares, the taxpayer/donor. It was clearly contemplated that the charity would resell the shares to the taxpayer/donor in all circumstances. The exercise of the warrants was only necessary in the event the charity balked and it became critical to dilute the charity's interest to invoke the short-form merger statute. Apparently, no charity balked. Therefore, the absence of exercise of warrants fails to establish that the warrants were not substantially certain to be exercised. All that is established is that the design of the $SC^2$ transaction worked in all cases and the charity sold the shares back to the taxpayer/donor.

**D.  The Austin Firefighters Did Not Fail to Exercise Diligence in Reselling the Shares to the Upper Deck Parties.**

The Robert Burke Report at p. 23 suggests that the Austin Firefighters failed to exercise much diligence in determining the price at which the shares should be resold to the Upper Deck Parties and, therefore, the repurchase was prearranged. There appears to be no factual basis for this whatsoever. Instead, the correspondence between the parties suggests a bona fide, albeit one-sided, negotiation. The Austin Firefighters understood, as the transaction was designed, that there was no other likely purchaser for the shares. As a result, the negotiation simply became a determination of what the Upper Deck Parties were willing to pay for the shares. The Austin Firefighters received a firm and final offer and had the choice to accept it or wait for the uncertain outcome of exercising the put. Nothing in the sequence of events suggests a prearranged plan. The purchase was for substantially more than the original appraised value and was determined in a separate independent negotiation. The factual conclusion of the Robert Burke Report on this issue is unfounded.

**E.  The Robert Burke Report Tacitly Acknowledges that there Was No Chance of Prevailing in the Tax Court.**

The Robert Burke Report at p. 19 suggests that the IRS assertion of the second class of stock argument is weak and is designed simply to make the stakes so high that the parties would be forced to litigate the issues in the United States Tax Court. While the premise is subject to question, the conclusion is telling. The United States Tax Court is the judicial body with the greatest degree of experience and expertise in addressing tax issues. Burke seems to be suggesting that the

EXHIBIT ___T___, PAGE _611_.

only chance of success for the SC$^2$ transactions is to place the issue before a judge who lacks the expertise and experience of a Tax Court judge. From this analysis, one must question whether the realistic prospect of success mentioned in the Robert Burke Report is based entirely on the Upper Deck Parties' ability to get the case heard by an unsophisticated judge who would not know any better.

## F.    No Offsetting Benefits Have Occurred.

The Robert Burke Report at p. 24-26 engages in an extensive hypothetical analysis of possible ways that an Offsetting Benefit could occur. All of that discussion is irrelevant. At no point in the Report is it asserted that an Offsetting Benefit has occurred. This is not an oversight. No Offsetting Benefit has occurred. This renders moot this portion of the Robert Burke Report.

## IV. RESPONSE TO SPECIFIC CONCLUSIONS IN LINDA BURKE REPORT

As with the Robert Burke Report, there are a number of subsidiary or specific conclusions in the Linda Burke Report for which a response is required. Several of these deficiencies in the Linda Burke Report are the same as the corresponding deficiencies in the Robert Burke Report.

## A.    The Linda Burke Report Ignores the Effect of the Short-Form Merger Statute on the SC$^2$ Transaction as Structured.

The analysis on this issue is the same as the analysis in Section III.A. above with respect to the Robert Burke Report. Linda Burke concludes that the critical issue is whether an asset with real economic consequence was transferred to the charity or whether the stock was just "parked." Nevertheless, the Linda Burke Report seeks to limit the discussion to an analysis of the Shareholder Agreement and ignore the effect of the short-form merger statute. The ability of the taxpayer/donor to cash out the charity at any time is a factor that has to be considered in the analysis. The failure of the Linda Burke Report to consider this renders the Report deficient.

## B.    The Linda Burke Report Inadequately Analyzes the Benefits and Burdens and Assignment of Income Theories.

The Linda Burke Report suffers from the same deficiency in this regard as the Robert Burke Report. The Linda Burke Report

EXHIBIT _7_, PAGE 612

seems to rely exclusively on a new valuation report obtained by AIG to suggest that economic substance exists because a change in value should have inured to the Austin Firefighters. This is a largely theoretical valuation. As is set forth in detail in the Mather Report, the Austin Firefighters' stock essentially only had value to the Upper Deck Parties. Under these circumstances, traditional valuation techniques which assume a hypothetical willing buyer and willing seller are suspect. In reality, there was no hypothetical buyer that would acquire the Austin Firefighters' shares and, therefore, any appraisal is largely theoretical.

**C.   The Linda Burke Report is Misleading Concerning the Use of Judicial Doctrines in Tax Shelter Cases.**

The Linda Burke Report at p. 13 suggests that judicial doctrines such as economic substance are "of last resort" and further suggests that the IRS position in Notice 2004-30, 2004-17 I.R.B. 828 is "interesting" because only judicial doctrines are invoked to challenge the shelter. These suggestions completely ignore the primary use of judicial doctrines throughout the history of tax shelter litigation.

Tax shelters are typically structured by competent professionals who expend substantial time ensuring that the structure of the shelter does not violate any express provision of the Internal Revenue Code or Treasury Regulations. It is exceedingly rare to have even a single aspect of a tax shelter transaction violate the provisions of a Code or Regulation. That is precisely why the judicial doctrines were developed, to ensure that only transactions with economic substance reap the benefit that is technically available under a strict interpretation of the Code or Regulations. As a result, the judicial doctrines are almost always an avenue of <u>first</u> resort. Any suggestion to the contrary in the Linda Burke Report is directly contradicted by the entire history of litigation of tax shelter cases.

**D.   The Linda Burke Report's Analysis of the December 2002 Repurchase is Inconsistent with the Conclusion in the Robert Burke Report.**

The Linda Burke Report at p. 18-20 suggests that the abrupt and forceful manner by which the Upper Deck Parties proposed the December 2002 repurchase indicates that "the Trust did indeed 'park' the stock with the [Austin Firefighters]." The conclusion

14

does not follow from the premise. The Linda Burke Report suggests that the Austin Firefighters were unhappy with the amount of information received from Upper Deck and "properly" refused to make a representation that the Austin Firefighters accepted the fairness of the transaction and agreed with the purchase price. The Robert Burke Report found that these events suggested a prearranged agreement to repurchase the shares. The Linda Burke Report cites the same events to show an acrimonious negotiation. These two reports cite these events for opposite premises. Nevertheless, somehow these opposite characterizations lead to the same conclusion, i.e., the repurchase suggests a lack of substance.

In fact, the December 2002 repurchase reflects exactly the economic reality. The Upper Deck Parties presented a firm offer that was not subject to negotiation. It was grudgingly accepted by the Austin Firefighters. The reality was the Austin Firefighters had no other likely buyer for these shares. That is how the SC$^2$ transaction was designed to work. Rather than being a deviation from the SC$^2$ transaction as structured, this <u>bona fide</u> negotiation was a manifestation of that structure. While the form of the repurchase may have been different that in the Shareholders Agreement, the simple fact remained, the charity could only resell the stock to the taxpayer/donor.

## V. CONCLUSION

Based on the foregoing, the general conclusion of both reports that the December 2002 repurchase transaction had a material effect on the chances that the Upper Deck Parties could prevail in litigation is unfounded. There was never any significant likelihood that the SC$^2$ transactions could withstand an IRS attack. In addition, by the time the December 2002 repurchase was implemented, it became clear that the greatest chance of realizing the tax benefits (the failure of the IRS to conduct an audit) was already gone and that the flimsiness of the SC$^2$ transaction had been exposed to the IRS and to Congress. Finally, certain subsidiary conclusions in the Robert Burke Report and the Linda Burke Report do not take into account applicable statutory provisions or the economic reality of these transactions. This further undermines the conclusions in the Reports. Simply put, the SC$^2$ transaction, once discovered, had no

15

EXHIBIT _I_ PAGE 614

realistic chance of success and nothing the Upper Deck Parties did with respect to the December 2002 repurchase had any material effect on that miniscule chance of success.

DATED: September 15, 2006

Respectfully submitted,

STEVEN R. MATHER

EXHIBIT _I_, PAGE 615

# EXHIBIT U

Expert Report Re: Upper Deck SC2 Transaction

Linda Beerbower Burke

This is the full report on the captioned matter prepared by me on behalf of American
International Specialty Lines Insurance Company.

_Linda Beerbower Burke_
Linda Beerbower Burke

## Table of Contents

|  |  | Page |
|---|---|---|
| I. | Introduction | 3 |
| II. | Description of the KPMG proposed strategy and transactions | 4 |
| | A. Distribution of nonvoting shares | 4 |
| | B. Donation of nonvoting shares | 4 |
| | C. Shareholders Agreement | 4. |
| | D. Warrants | 5 |
| III. | Expected tax consequences of the KPMG proposed transactions | 5 |
| | A. Subchapter S description | 5 |
| | B. Eligible shareholder | 6 |
| | C. One class of stock | 6 |
| | D. Taxability of distribution of nonvoting stock | 7 |
| | E. Charitable Contribution | 7 |
| | F. Redemption | 8 |
| | G. Allocations | 8 |
| IV. | The KPMG implemented strategy had a good chance of succeeding | 9 |
| | A. Donative intent | 10 |
| | B. Conclusion | 12 |
| | C. Economic substance | 12 |
| | C. Conclusion | 14 |
| V. | US Treasury and IRS activities | 14 |
| | A.. Announcement 2002-2, Disclosure Initiative | 15 |
| | B. Information Document Requests | 15 |
| | C. Listing Transactions: Treasury Notice 2004-30 | 16 |
| | D. Coordinated Issue Paper | 17 |
| | E. Settlement Offer | 17 |
| VI. | The transaction as actually carried out would probably not prevail | 18 |
| | A. Change in the "put" and price | 18 |
| | B. Change from redemption to purchase | 20 |
| | C. One class of stock issues | 20 |
| | D. Conclusion | 21 |

EXHIBIT _U_, PAGE_617_

## I.    Introduction:

This report addresses a strategy undertaken by the Upper Deck Company, a Subchapter S corporation, (Company), and its sole shareholder MPR Trust (Trust), a grantor trust of Richard McWilliams (McWilliams).   The strategy was proposed to the Company, MPR and McWilliams by the national accounting firm of KPMG LLP (KPMG), who also largely assisted with implementation of the strategy.   The strategy used certain principles pertaining to Subchapter S corporations, among other results, to save the Trust and McWilliams large amounts of current federal and state income taxation on the Company's net taxable income.

The US Internal Revenue Service (IRS) has challenged various elements of the strategy because it does not believe that the income tax savings are a legitimate use of the Internal Revenue Code (Code) sections applicable to the strategy.   The US Treasury Department, in addressing a similar strategy, issued Notice 2004-30, 2004-17 IRB 828, stating that the IRS will challenge the "purported tax benefits from this [strategy] based on the application of various theories, including judicial doctrines such as substance over form." In November 2004, the IRS issued a Coordinated Issue Paper entitled *S Corporation Tax Shelter* instructing IRS Revenue Agents on how to raise issues attacking this type of strategy.

This report will be focused on two issues:  1. Would the strategy as documented and initially implemented have survived an IRS challenge? and 2. Did the actions of the

3

Company, the Trust and McWilliams, causing an early redemption of the Company shares, negatively affect chances for the strategy's success?

II.   Description of the KPMG proposed transactions:

Before the transactions implementing the strategy occurred, the Company had 920,000 shares of stock outstanding. All of the stock was owned by the Trust.   After undertaking necessary legal steps, the Company issued and distributed 8,280,000 shares of non-voting stock to the Trust on March 29, 2001. The ratio of the voting to the non-voting shares was therefore one to nine.

On March 31, 2001, the Trust donated all the non-voting stock to the Austin Firefighters Relief and Retirement Fund (Fund), established by the State of Texas to provide pension benefits, and certain other disability and survivor benefits, to eligible members of the Fire Department of the City of Austin.   The Fund accepted the donation on March 31, 2001. The Fund is a Code Section 401(a) plan with a determination letter from the IRS qualifying it as a valid Section 401(a) plan.

Also on March 31, 2001, the Trust and the Fund entered into a Shareholders Agreement (Shareholders Agreement) providing for a right of first refusal to the Company should another buyer make an offer for the stock. If the Company were unable or unwilling to exercise the first refusal right, the holder of the voting common stock, the Trust, could exercise the right. Further, the Shareholders Agreement provided that the Fund could put

4

the stock to the Company for redemption commencing April 1, 2003, for a period of 180 days, for the fair market value of the stock on the date that the Fund presents the stock for redemption. Neither the Company nor Trust had the power under the Shareholders Agreement to compel the Fund to present the shares for redemption.

As part of the strategy, the Company and the Trust also entered into a Warrant Agreement, dated as of March 29, 2001. Under the Warrant Agreement, the Company issued a total of 82,800,000 warrants to purchase non-voting shares to the Trust on March 28, 2001. The warrants were valued by an outside, nationally recognized appraiser to be at least 90% of fair market value at the time of issuance. The purpose of the warrants was to dilute the Fund's interest in the Company if the shares were not presented for redemption, or upon certain other occurrences, such as a payment of certain distributions.

III.    Expected tax consequences of the KPMG proposed transactions:

Subchapter S corporations are generally not subject to corporate level tax. Their tax items and attributes are largely passed through each year to their shareholders, whether or not there has been a distribution from the corporation. The shareholders report the items on their returns as if the items were derived by the shareholders directly. (Code Section 1363) There are many restrictions on the ability to make a Subchapter S election. The restrictions at issue in the KPMG proposed transactions include the eligibility of shareholders and the requirement that there be only one class of stock.

5

EXHIBIT _U_, PAGE 620

The Code itself is clear about who qualifies to be a shareholder of a Subchaper S corporation. Under Code Section 1361(c)(6)(A), certain exempt organizations are permitted as shareholders. They include "an organization which is described in Section 401 (a)." With a valid determination letter from the IRS, there is little doubt that the Fund qualifies as a valid Subchapter S corporation shareholder. The Coordinated Issue Paper, cited in Part I, does not raise the issue of whether the Fund is an eligible shareholder.

Code Section 1361(b)(1)(D) mandates that a Subchapter S corporation may not "have more than one class of stock." Rev. Rul. 85-161, 1985-2 C.B 191, is directly on point. That revenue ruling involves a Subchapter S corporation with two "classes" of shares, one voting and one non-voting. The revenue ruling facts even had a restriction on transfer of the non-voting shares. The holding was that a Subchapter S election was properly made because all the shares were equal with respect to rights to profits and rights to the assets of the corporation. Rev. Rul. 85-161 was obsoleted by Rev. Rul. 95-71, 1995-2 C.B. 323, as the issue is now addressed in Treas. Reg. Section 1.1361-1(l)(2)(iii). (The IRS' obsolescence policy is to obsolete revenue rulings when a Treasury Regulation is issued that addresses the subject in the same way, because the Treasury Regulation is the better authority. The regulation is to the same effect as the prior revenue ruling.) Therefore, the issuance of non-voting stock under the strategy will not create a second class of stock.

6

The above cited regulation (specifically Treas. Reg. 1-1361-1(l)(3)(iii)) also deals with warrants, disregarding them unless they are sure be exercised **and** the agreement establishes a purchase price significantly in excess or below fair market value. Since, here, the warrants were not exercised by the Company, and, therefore, were not sure to be exercised, there is no possibility that they create a second class of stock.

The distribution of the non-voting stock to the Trust is not taxable under Code Section 305(a), as a proportionate distribution of a corporation's stock to its shareholders does not create a taxable event. Code Section 311 makes it clear that the corporation will not be taxed on such a distribution. These issues also were not dealt with in the previously cited Coordinated Issue Paper.

McWilliams (as the Trust's grantor) apparently did not claim a charitable deduction for the donation of the non-voting stock to the Fund on his tax return. (Letter of Paul Sax responding to Information Document Requests, dated July 1, 2004. pp. 1-2.) A third party appraisal valued the non-voting shares at the time of their contribution to the Fund at $1,357,920. (Letter from FMV Valuation Services, dated April 30, 2001, page 3.) However, the issue of whether a valid donation/gift was made to the Fund is critical to determining the Subchapter S flow through tax consequences to the Trust. That issue will be dealt with in the next section of this report.

This report will not deal with the gift tax consequences as the issue has not been raised at any level by the government.

EXHIBIT _U_, PAGE 622

The redemption proceeds should not cause any tax to the Trust as a disguised dividend, becasue the Company under the Shareholders Agreement could not compel the redemption of the shares. In fact this issue may be moot as the Trust may have been the ultimate purchaser of the Fund's shares. The Company may not have been considered to have redeemed them. (Sax letter response to IRS Information Document Request dated December 9, 2004, page 9.)

If all the transactions described above in this section operate to result in a valid gift to the Fund, the flow through of tax items from the Company would be allocated 90% to the Fund and 10% to the Trust. Therefore, 90% of the Company's income would be untaxed, because that allocation is going to an entity that does not pay income tax. Only 10% of the allocation will be made to the Trust. There are some disadvantages to the Trust in this scenario. Any actual distribution of the income to the shareholders would also result in 90% of the distribution going to the Fund and only 10% of the distribution going to the Trust. The Trust is also not building basis in the shares (Allocations build basis, much like in partnerships.) The Trust (McWilliams) therefore may pay more tax when there is a later distribution. (The net income shown by financial statements of the Company increased in this period from $7,277,770 in 2000 to $149,398.316 in 2002. The Trust (McWilliams) therefore avoided a considerable amount of current income tax through this strategy.)

8

The Fund has received a gift that has value that will accrue to the Fund when it "puts" the shares to the Company. If the Company does well, the shares will be very valuable to the Fund. The Fund has the discretion, subsequent to April 1, 2003, for 180 days, of when to put the shares to the Company to receive the highest value. That value, according to the Shareholders Agreement, was to be determined by an outside appraiser named in the agreement or one of the Company's choosing.

The issues dealt with in this Section III should be resolved favorably to the Company, the Trust and McWilliams.

IV.    The KPMG implemented strategy had a good chance of succeeding:

The major issue critical to the success of the strategy is, "Was a valid charitable donation made?" It is my opinion that the likely answer is, "Yes."

Most of the major cases addressing purported "abusive transactions" hinge on "economic substance" and "business purpose" or "profit motive." *Coltec Industries, Inc. v. U.S.*, __F 3d__ (Fed. Cir. 2006); *Frank Lyon Company v. United States*, 435 US 561 (1978); *Compaq Computer Corporation v. Commissioner*, 277 F3d 778 (5th Cir. 2001.); *ACM Partnership v. Commissioner*, 157 F3d 231(3d Cir. 1998). Some cases require both elements to be lacking to void economic substance. Other cases require only one, generally the economic substance element.

9

We also need to look at donative intent. The cases cited below generally agree that a donation, contribution or gift all mean the same thing and the meaning is the same for all purposes of the Code. All cases require a careful analysis of the facts in making the determination regarding these elements. How does this authority impact the KPMG strategy?

The KPMG strategy does not fit the analytic mold of the "business purpose" and "profit motive" cases because the Trust admittedly had no business purpose or profit motive for the transactions, aside from the tax consequences. The transactions were focused on a charitable gift.

The seminal case on the definition of a gift for purposes of the Code is *Commissioner v. Duberstein*, 363 U.S. 278 (1960). It held that a gift "must proceed from a detached and disinterested generosity." (*Id.* at 285) Courts in the Ninth Circuit (most pertinent in this matter as the Company, the Trust and McWilliams all reside in states covered by the 9th Circuit) have questioned the sweep of *Duberstein*, electing instead to determine whether the donor has received anything of value from the recipient as a result of making the gift. *United State of America v. Transamerica Corporation*, 392 F2d 522 (9th Cir. 1968); *Robert C Stubbs and Mary Ann Stubbs v. United States of America*, 428 F2d 885 (9th Cir. 1970); *William Stephen Allen and Jane E. Allen v. United States of America*, 541 F2d 786 (9th Cir. 1976); *Rainer Companies, Inc. v. Commissioner*, 36 TCM 1404 (1977), on

10

remand from the U.S. Court of Appeals for the Ninth Circuit for calculation of the charitable deduction.

The Tax Court, a jurisdiction available to any federal taxpayer, has separated the consideration of donative intent from tax benefits received. In *Max Weitz and Sylvia Weitz v. Commissioner*, 56 TCM 1422 (1989), the Tax Court held that a valid charitable contribution had been made in a factual situation very similar to the KPMG recommended transactions. Taxpayers, on the advice of their accountant, worked with an agent to contribute equipment to a hospital. The taxpayers contributed a pool of funds; hospital employees picked out the equipment at a bankruptcy auction; the agent bid on the equipment and paid for it from the pool of funds; the equipment was delivered to the hospital's warehouse, where it sat unused for a year and a day; the equipment was then delivered to the hospital, which accepted the equipment; the taxpayers received a tax deduction for the contribution with capital gain treatment for any difference between basis and fair market value. The Tax Court, in holding that a valid charitable contribution had been made, even though the taxpayers were motivated by a tax deduction, stated,

> Most of respondent's argument that petitioners lacked generous and altruistic intent is irrelevant and ill conceived. A charitable contribution may be motivated by the basest and most selfish of purposes as long as the donor does not reasonably anticipate benefit *from the donee* in return.... Although we are not unmindful of the tax benefits petitioners received from the contribution, that is not pertinent to an analysis of donative intent. *Id.* at 16-17. (Emphasis added).

11

Based on the forgoing authority, the following questions should be asked and answered to determine donative intent: 1. Did the donor intend to make a gift? 2. Did the donor deliver the gift? 3. Did the recipient accept the gift? and 4. Did the donor receive anything of value directly or indirectly from the recipient as a result of the gift? If the first three questions can be answered "Yes" and the last one "No," then, objectively, donative intent should be found.

The answers to those questions in the transactions contemplated by the Shareholders Agreement are as follows: The Trust (McWilliams) intended to part with the non-voting stock by giving it to the Fund. The donation was delivered to the Fund. The Fund accepted the donation. (See Section II, second paragraph for description and dates.) Neither the Trust nor McWilliams received any direct or indirect benefit from the Fund. The Trust (McWilliams) did receive tax benefits resulting from the transactions, but the tax benefits were unrelated to the Fund or any benefit it could provide. Therefore, the Trust (McWilliams) had sufficient donative intent.

Code Section 1361 clearly contemplates tax exempt owners of Subchapter S corporations, so allocating income and loss to tax exempt parties is not an unintended result of the Code.

What we need to ascertain is whether a true gift was made. We therefore turn to whether the donation to the Fund had sufficient economic substance. In this case, the appropriate questions to ask are did the Trust part with all rights and ownership to the non-voting

12

common stock, or did it just "park" the stock in the care of the Fund, as argued by the Coordinated Issue Paper cited in Section I? And did the Fund receive anything of value and assume the risks of ownership? Economic substance is generally an argument of last resort and is a very factually intensive theory to prove or disprove. The *Coltec* case, *supra*, and other recent cases cited above look to determine economic substance objectively, rather than subjectively. "Where a transaction objectively affects the Taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations." *ACM Partnership, supra,* at 248, n. 31. It is especially interesting that the only basis mentioned for challenging this type of transaction in Notice 2004-30, 2004-17 IRB 828 (2004) is "the application of various theories, including judicial doctrines, such as substance over form."

The best way to judge the reality of the donation made by the Trust to the Fund is to look at the Shareholders Agreement  The Shareholders Agreement between and among the Company, the Trust (McWilliams) and the Fund provides that the Fund will have the "right and option...to require the Company to purchase all of the Donee's [Fund's] shares at a price to be determined by FMV Opinions, Inc., or another outside appraiser chosen by the Company." (Section 5 of the Shareholders Agreement.) The Fund is not required to exercise the put option. These provisions ensure that the Fund will get the benefit of increases in the value of the stock, or suffer decreases in the value, as does any other shareholder. The Company cannot even require that the put option be exercised. The Trust does have the ability to exercise warrants to dilute the Fund's ownership, but since

13

the put is likely in this case to be attractive to the Fund, the warrants will not come into play.

The Company did extraordinarily well in the two years following the Fund's becoming a shareholder, so well, in fact, that had the transactions occurred in accordance with the KPMG recommendations, and the executed documents, the Fund would have received $11.4 million had it exercised the put on the first eligible date. (Report of Empire Valuation Consultants, LLC, August 2006). It would be very difficult on these facts to determine that the gift to the Fund had no economic substance. The initial value of $1,357,920 increased over a period of two years to $11.4 million based on the performance of the Company, whose net income in the period jumped over 400%. Had the Company paid the Fund $11.4 million in accordance with the Shareholders Agreement, it is my opinion it would have been difficult for the government to win the economic substance argument. Donative intent was clear and the Fund would actually have obtained the benefit of good performance by the Company.

V.    US Treasury and IRS activities:

During the time span of the transactions covered by this opinion, the US Treasury Department (Treasury) and the IRS were devising their own strategies to cope with the increasing use by taxpayers of tax products devised by firms to circumvent payment of taxes in ways that the IRS and Treasury considered to be abusive. Code Sections dealing with reporting of transactions and client lists were not being enforced and summons powers were not being invoked to obtain needed information about such transactions.

14

In an effort to obtain such information and to put a chilling effect on the marketing and use of such products, the Large and Mid-Size Business Division of the IRS (LMSB), in conjunction with the Office of Chief Counsel (Chief Counsel), initiated a Disclosure Initiative, published as Treasury Announcement 2002-2, 2002-1 C.B. 304, late in December 2001. The gist of the Announcement was to invite taxpayers to disclose the use of such products, by providing information, including the seller of the product, sales documents and correspondence, and legal opinions associated with the product, to the IRS by April 23, 2002. In exchange, the taxpayers would incur no penalty if the transactions were judged to be abusive. It soon became apparent to the accounting firms and others marketing such products that one disclosure by a taxpayer of a strategy would give the IRS enough information to summon customer lists and be able to audit all taxpayers involved in such products. Many firms advised their clients to make the voluntary disclosures so as to avoid any possible penalties. As a result of this Disclosure Initiative, LMSB received thousands of disclosures. Among those disclosing was the Trust (McWilliams).

The IRS had much administrative work to do in addressing the disclosures. Each one had to be analyzed in the Office of Tax Shelter Analysis, a part of LMSB, and then information was turned over to Chief Counsel for legal review. Transactions were classified, and after legal review, each type of transaction was assigned a Technical Advisor, who would be the resource person for agents in the field who audited such transactions. The Technical Advisor also drafted pattern Information Document

15

Requests (IDRs) for each type of transaction to elicit necessary facts. Cases involving the disclosures were slowly assigned to agents, as workload permitted. LMSB also initiated the use of a "Mandatory IDR." The "Mandatory IDR" was used in every audit. It included all listed transactions to date and asked the taxpayer whether it had engaged in any of the described transactions or in similar transactions. The "Mandatory IDR" was updated as additional transactions were "listed." That "Mandatory IDR" was first given to the Company and the Trust (McWilliams) in June 2004. The pattern IDR for the transactions similar to the KPMG strategy was apparently issued to them in August 2004.

At the same time, LMSB and Chief Counsel were working with Treasury's Office of Tax Policy to "list" transactions that appeared to be abusive. The purpose of such "listing" through a Treasury Notice was to put taxpayers on notice that the IRS would challenge such transactions and to inform taxpayers of the likely basis of the challenge, in broad terms. Generally, Chief Counsel and Treasury preferred that the basis be found in Code Sections and Treasury Regulations themselves. A "listing" notice also required certain types of reporting to the IRS for taxpayers, advisors, and others involved in such transactions. The process of listing transactions was slow and deliberative and generally resulted in "listing" well after the transaction was known. The transaction containing the elements similar to the KPMG recommended strategy was "listed" in April 2004 as Treasury Notice 2004-30, 2004-17 IRB 828. Curiously, that Notice gave as the basis for challenge, "various theories, including judicial doctrines, such as substance over form." Resorting to judicial doctrines as the basis for the challenge indicates that the analysis would have to be very factually intensive, which uses a large amount of government

16

resources. Such basis also indicates that the legal ground for the challenge was not as strong as the government might have wished.

A Coordinated Issue Paper was issued with analyses of the 2004-30 transaction in November 2004. Coordinated Issue Papers are drafted by Technical Advisors in LMSB and reviewed by Chief Counsel. While Chief Counsel makes recommendations that are generally accepted, such recommendations do have to be accepted by the Technical Advisor. The purpose of a Coordinated Issue Paper is to guide agents in the field on how to raise issues on a given topic.

Generally, the IRS and Chief Counsel, along with the Appeals Division of the IRS (Appeals), also try to find a basis for settling cases comprising the group involved in any given listed transaction. Since Appeals is mandated by the Legislature to be independent, Appeals generally had the final say on developing common settlement proposals for given families of transactions. The IRS had to be sure that a taxpayer could not get a better settlement in Appeals than would be offered in the general settlement proposal. It was necessary for the IRS and Chief Counsel to undertake the settlement initiatives because they did not have the resources to litigate all of these cases. The cases would not generally be susceptible to Motions for Summary Judgment, as they were very factually oriented cases, requiring enormous work in developing and arguing all the facts. Fortunately for the IRS, many taxpayers accepted the standard settlement initiatives, as they generally offered some amount of relief from the overturned tax consequences, such as allowing transaction costs. Furthermore, the only recourse of refusing the settlement

17

initiative was to litigate the case. No further action was available in Appeals. The Company and the Trust (McWilliams) accepted what appears to be the standard settlement offer for the Notice 2004-30 types of cases.

VI.  The transactions as actually carried out would probably not prevail:

During my tenure with Chief Counsel, our jobs in addressing potentially abusive tax transactions were generally made easier, because most taxpayers failed to follow the form and documentation of the transactions or failed to execute properly the paper work for the transactions. That is apparently the situation involving these taxpayers.

For whatever reasons, perhaps including that the IRS knew that the Trust (McWilliams) had undertaken the KPMG recommended strategy or that the Company had performed so extraordinarily well that the payment for shares "put" by the Fund would be very large ($11.4 million), McWilliams, the Trust and the Company decided to buy out the shares held by the Fund early. The "put" period would have commenced in April 2003 and been open for 180 days. McWilliams, the Trust and the Company wanted to buy the shares back before the end of the calendar year 2002. And the Company offered only $2 million for the shares.

The Fund reviewed the proposed agreement sent by the Company's representatives and asked for information regarding the profitability of the Company so that it could make a judgment at to whether the $2 million figure was a fair value. The Company apparently

18

refused to provide proper financial statements but did give the Fund an income number for the first nine months and suggested that the Fund annualize that figure. When the Fund protested that it did not have enough information to make a fair assessment of the offer, it received a fax from the Company's KPMG representative, Redge Bendheim, dated December 9, 2002. The fax stated in part the following:

> the estimated value placed on the nonvoting stock by your accountants has no impact on the ultimate valuation of the nonvoting stock.
>
> The real fair market value is what the Upper Deck Company is willing to pay for it. As I mentioned in our discussion, the Upper Deck Company has offered to purchase the nonvoting stock for $2 million. The Company believes that this is a fair price (again this represents an almost 50 percent increase of the original valuation) and it is not willing to pay one dollar more.

The Fund was so disturbed by the forced nature of the negotiation that it properly refused to sign an agreement that had language indicating that it had reviewed the transaction for fairness and agreed with the purchase price number. (Letter from Terrence Kendall to Redge Bendheim, dated December 5, 2002.) The Fund finally accepted the $2 million amount and closed on the transaction December 31, 2002. In fact, a later appraisal determined that the stock was conservatively worth $11.3 million on December 31, 2002 (Empire Valuation Consultants, LLC Report, August 2006.)

Immediately after the Company paid the Fund, the Company assigned its right to purchase the shares to the Trust, which on December 31, 2002, reimbursed the Company $2 million for the non-voting stock. (Sax letter of December 9, 2004, responding to an IDR, p. 10.) Therefore, another departure from the Shareholders Agreement is that the

19

Trust purchased the stock, rather than the Company's redeeming it. Furthermore, the Company did not cash McWilliams' check until a distribution was made on February 2, 2003. This change was probably an effort by McWilliams to get the basis in the shares against any future distributions.

It is doubtful that the Company and the Trust (McWilliams) could have prevailed against an IRS challenge. The whole exchange indicates that they did not view the Fund as a real shareholder. The $2 million that the Company paid the Fund, compared to the likely fair market value, was miniscule. There, of course, was no appraisal, as provided for in the Shareholders Agreement. The early purchase transaction at a favorable price to the Company significantly undermines the substance that the transaction would have had under the Shareholders Agreement. The whole nature of the December 10, 2002, agreement makes it look as if the Trust did indeed "park" the stock with Fund. The $2 million could be viewed as more akin to a fee for facilitating the transaction, versus the Fund's having a real shareholder interest.

Furthermore, the depressed price for the Fund's shares could invoke the Treas. Reg. 1-1361-1(l)(2)(iii) and lead to a determination that there are two classes of stock in the Company, because the price of the shares under the December 10, 2002, agreement is "significantly...below the fair market value of the stock." Such a determination would lead to the revocation of the Company's Subchapter S status. Fortunately, that is not the settlement proposal the Company faces, but it would have been a real possibility.

EXHIBIT _U_, PAGE 635

In short, the changes made to the KPMG strategy by the Company's and the Trust's (McWilliams') actions to purchase the Fund's shares at a favorable price significantly undermined the *bona fides* of the Shareholders Agreement and gave the Company and the Trust no chance of prevailing on the original transaction.

This is the full report on the captioned matter prepared by me on behalf of American International Specialty Lines Insurance Company. I am being paid $450 per hour for my services. Further, I have no publications in the last ten years, nor have I testified as an expert witness in any case in the last four years.

_____

Linda Beerbower Burke

EXHIBIT U , PAGE 636