REBUTTAL TO


EXPERT REPORT OF

STEVEN R. MATHER


REGARDING TAX RISKS OF THE UPPER DECK COMPANY,
RICHARD P. MCWILLIAM AND THE MPR REVOCABLE TRUST IN THE SC2
TRANSACTION


PREPARED BY

LINDA BEERBOWER BURKE
5023 FREW ST.
PITTSBURGH, PA 15213
412-688-8411
Email: tfb5650@aol.com

September 14, 2006

*Linda Beerbower Burke*

# Table of Contents

|   |   | Page |
|---|---|---|
| I. | Introduction | 3 |
| II. | Rebuttal to - The Transfer of the Stock to the Charity Would Not be Recognized Under Established Judicial Doctrines | 4 |
| | A.   Assignment of Income Argument | 4 |
| | B.   Transaction as Structured Argument v. Value Reference | 5 |
| | C.   Listing of Elements Regarding "Economic Benefit" | 5 |
| | D.   Arguments Regarding Marketability of Non-Voting Shares | 6 |
| | E.   Allusion to Short Form Merger Statute | 6 |
| | F.   Clarification of Allusion to Staggering Tax Burden | 7 |
| III. | Rebuttal to – The Circumstances of the Redemption of the Charity's Stock by Upper Deck Did Not Materially Alter the Tax Risk Associated With the SC2 Transaction | 7 |
| | A.   Shareholders Agreement Requirement of Appraisal | 7 |
| | B.   Short Form Merger Argument Not on Point | 8 |
| | C.   Appraisal and Timing | 8 |
| IV: | Rebuttal to –Under No Circumstances Did Any Deviation by Upper Deck from the SC2 Transaction Cause a Change in the IRS Settlement Offer to Upper Deck | 8 |

EXHIBIT _U_, PAGE 638



I.    Introduction:

As a result of the exchange of Expert Reports in the matter of Upper Deck and AISLIC

with regard to Upper Deck's (Company), the MPR Trust's (Trust) and Richard P.

McWilliam's undertaking of the so-called SC2 transaction, this Rebuttal will deal with

some of the issues addressed in the report of Steven R. Mather, an expert for the

Company.  The issues addressed in this Rebuttal will be taken in the order in which they

appear in Mr. Mather's Expert Report.  Those issues, as framed by Mr. Mather, are as

follows:

1.    "The transfer of the stock to the Charity would not be recognized under

      established judicial doctrines."


2.    "The circumstances of the Redemption of the Charity's stock by Upper Deck

      did not materially alter the tax risk associated with the SC2 transaction.  The

      SC2 transaction as structured always allowed Upper Deck to cash out the

      Charity's interest."


3.    "Under no circumstances did any deviations by Upper Deck from the SC2

      transaction structure cause a change in the IRS settlement offer to Upper

      Deck."



3

Since the determination of economic substance is the fundamental issue to be addressed in this case from a tax standpoint, the interpretation of the facts will be most important. The factual issue interpretations are also dealt with somewhat in this rebuttal.

II.  Rebuttal to - The Transfer of the Stock to the Charity would not be recognized under established judicial doctrines:

While admitting that the SC2 transaction does not run afoul of any technical provisions of the Internal Revenue Code (Code), Mr. Mather describes a number of judicial doctrines that all seem to boil down to whether or not the transaction has sufficient "economic substance." The facts of the case will determine whether economic substance exists and will be addressed below.

Mr. Mather raises one novel judicial argument in relation to these facts, and that is the old doctrine of "assignment of income" articulated in the textbook case of Lucas v. Earl, 281 U.S. 111 (1930) (Mather Report, p. 14-15). This doctrine generally pertains to a situation where one person earns income but assigns that income to another for tax purposes. Generally, the doctrine is stated as: one cannot separate the "fruit from the tree." That doctrine's applicability to the facts of this case is problematic because part of the "tree" itself was given to the Charity in the form of non-voting stock, so that the "earnings" relate to shares owned by the Charity and not to shares (the part of the "tree") owned by the Trust (McWilliam). This analysis sends us back to the economic substance issue: Was a gift of economic value made to the Charity?

On page 15 of his report, Mr. Mather maintains that the transaction fails as structured. Yet he bases his starting point of the analysis on the fact that the Charity received only a piece of paper labeled as stock for which the Charity received a cash payment of $2 million. The transaction "as structured" would have produced far more than $2 million for the Charity. A later appraisal by Empire Valuation Consultants (August 2006), using standard methodology, valued the stock as of December 2002, at $11.3 million. The difference between $2 million and $11.3 million demonstrates a significant economic difference between the transaction as structured and as actually carried out.

Mr. Mather proceeds to illustrate through a listing on page 16 of various elements of the ownership of nonvoting shares that he asserts have no "economic benefit." Most of this listing is irrelevant for two reasons. First, whether or not a benefit exists for the other party in such a transaction is not controlling. The standard is whether the economic situation of the parties is affected or changes as a result of the transaction. (Frank Lyon Company v. United States, 435 U.S. 561 (1978). Second, most of the seven items on this list are issues that affect the value of the gift, not the *bona fides* of the gift *per se*. These elements were recognized as items discounting value in the FMV Opinions, Inc. appraisal, explained at length in Mr. Mather's report, pages 7-8.

Many of the items on Mr. Mather's list pertain to elements that would make the shares not marketable. He asserts that the only mode the Charity had of getting value from the shares was "putting" them to the Company. It is at least curious that Upper Deck's attorney reviewing the transaction in an exchange of emails dated December 13 and 14,

2000, was deeply concerned about the force of the right of first refusal. (Email from Ben Frydman to Andrew Atkin, dated December 13, 2000.)

Furthermore, in examining the rights of the non-voting stock, that same email states that

> under California law, the holders of non-voting common stock have a right to vote on certain fundamental changes in the Company's corporate structure (e.g., mergers or sales of substantially all of corporation's assets, dissolutions, Articles of Incorporation amendments and changes adversely affecting their rights and privileges).

This language undercuts Mr. Mather's analysis that the short form merger provisions would enable to the Company to cash out the Charity at any time. The California Code seems to allow all outstanding shares, not just voting shares, to vote on the matter of a merger or other change in corporate form. California Corporate Code 1201(d). Therefore, to undertake the short form merger with any success, the warrants would first have had to be exercised, a very expensive proposition for the Trust (McWilliam.)

However, even if valid, Mr. Mather's short form merger analysis has little effect on the determination of economic substance. Dissenters' rights under merger statutes give the dissenters the right to be paid an amount equivalent to the fair market value of their shares. That value is generally established, in the case of closely held corporations, by an independent appraisal. The results of such an appraisal in this case would have yielded significant economic benefit to the Charity. Under the California Corporate Code, if the parties do not agree on fair market value, such determination becomes a matter to be



decided by the courts, a cumbersome, time consuming and expensive proposition for all the parties. (California Code Section 1304)

Mr. Mather's seventh item on page 16 of his report states that "[t]he shares carried with them a staggering tax burden." He makes this statement in support of the lack of marketability of the non-voting shares. As a matter of clarification, the shares have no carryover tax burden. The burden a purchaser would assume is only that accruing from the earnings of the Corporation while that purchaser owns the shares.

III.     Rebuttal to - The circumstances of the redemption of the Charity's stock by Upper Deck did not materially alter the tax risk associated with the SC2 transaction:

Mr. Mather's report fails to mention the requirement of the Shareholders Agreement of March 31, 2001, that the fair market value of the shares be established through the use of an outside appraiser at the time the shares are "put" to the Company. A fundamental difference from a tax standpoint between the transaction as structured and the transaction as actually executed is that no appraisal was used to set the $2 million figure paid to the Charity at the time of redemption. There would appear to be no other means, short of a court decision, of establishing fair market value. If fair market value were not paid, it would be fair to say that the *bona fides* of the transaction would be badly affected. In fact, fair market value was not paid. A later appraisal by Empire Valuation Consultants, August 2006, placed the value of the shares at the time of the redemption at $11.3 million, a substantially higher value than the $2 million actually paid.



Mr. Mather's suggestion that the short-form merger provisions negate the differences between the transaction as structured and the transaction as executed is not on point. A short form merger would have required that minority shareholders of 10% or less be compensated at fair market value for their shares. It is unclear what that value would have been had the warrants been exercised; but, with an appraisal, it is safe to say that the resulting payment for the shares would have had economic substance. It is also clear that the exercise of the warrants and the payment for the non-voting shares would have substantially affected the economic status and relationships of the parties, lending support to the economic substance of the transaction <u>as structured</u>.

The fundamental point making the difference between the transaction as structured and as executed is the protection afforded the Charity by the requirement of a fair market value <u>appraisal</u> to determine the value of the shares.

IV.     <u>Rebuttal to - Under no circumstances did any deviations by Upper Deck from the SC2 transaction structure cause a change in the IRS settlement offer to Upper Deck.</u>

Mr. Mather's point about the non-negotiable nature of the IRS settlement offer is true. However, the concern we always had in the Office of Chief Counsel in offering such settlements was that the cases with the bad facts would accept the settlement offers, and the cases with the good facts would be litigated. It appears to me that the Company was forced to take the settlement offer because the early redemption at less than fair market value put the transaction as executed in the "bad facts" category. Had the transaction been executed as structured, it had a good chance of winning in litigation, because



economic substance is fundamentally a factual case to make, and the facts would have

been good.

This is the full Rebuttal prepared by me to the Expert Report of Steven R. Mather
regarding the risks of the Upper Deck Company, Richard P. McWilliam and the MPR
Revocable Trust in the SC2 Transaction.

_Trish Barbara Burke_  9/7/06



9

# EXHIBIT V

# Tax Considerations Pertaining to Participation in SC$^2$ Transactions By The Upper Deck Company

Robert D. Burke
Senior Partner
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

August 16, 2006

EXHIBIT __V__, PAGE 646

# Table of Contents

                                                                                                    Page

I.    Introduction......................................................................................................................1

II.   Overview of Relevant Provisions of Subchapter S of the Code. .....................................2
      A.    Pass-Through Treatment .........................................................................................2
      B.    S Corporation Distributions ...................................................................................2
      C.    S Corporation Qualifications ..................................................................................4

III.  Transactions Per KPMG Opinions....................................................................................4
      A.    Facts ........................................................................................................................4
      B.    Conclusions of KPMG Opinions ............................................................................6
      C.    Consequences If KPMG Opinions Are Correct......................................................6

IV.   IRS Procedural Actions.......................................................................................................8
      A.    Announcement 2002-2 .............................................................................................8
      B.    IRS Commissioner Testimony Before the Senate Committee on Tax Shelters.......8
      C.    Speech of George Yin .............................................................................................8
      D.    Notice 2004-30..........................................................................................................9
      E.    IRS Settlement Proposal ..........................................................................................9
      F.    Coordinated Issue Paper ...........................................................................................9

V.    Taxpayers Had Reasonable Prospect of Success if SC2 Strategy Litigated.......................9
      A.    General .....................................................................................................................9
      B.    IRS's Position .........................................................................................................10
      C.    Reallocation Argument ...........................................................................................10
      D.    Second-Class-of-Stock Argument ..........................................................................19

VI.   Impact of Repurchase of Austin Plan Shares.....................................................................22

VII.  Offsetting Benefit................................................................................................................24

VIII. Definitions...........................................................................................................................26

US1DOCS 5762376v3

EXHIBIT __√__, PAGE 647

# Tax Considerations Pertaining to Participation in SC$^2$ Transactions
## By The Upper Deck Company

I.      Introduction.

In March 2001, (i) The Upper Deck Company ("Upper Deck" or the "Company"),
(ii) Upper Deck's sole shareholder, the MPR Trust, and (iii) the grantor of the MPR
Trust, Mr. Richard McWilliam ("McWilliam"), engaged in a series of transactions
designed to implement a tax strategy promoted by KPMG LLP ("KPMG") known as the
"S corporation charitable contribution strategy" or "SC$^2$." In connection with these
transactions, KPMG issued three separate opinions dated May 2, 2001 (the "KPMG
Opinions") regarding the material federal income tax consequences attributable to the
transactions. Upper Deck, the MPR Trust and McWilliam (collectively, the "Upper Deck
Parties") obtained Insurance Policy No. 405-88-33 (the "Policy") from American
International Specialty Lines Insurance Company (the "Insurance Company") effective
August 29, 2001, insuring (subject to the terms and conditions of the Policy) certain of
the tax consequences of the SC$^2$ transaction up to a maximum amount of $50 million.

This report summarizes my conclusions regarding various tax-related matters pertaining
to the participation by the Upper Deck Parties in the SC$^2$ transactions. The report first
summarizes the provisions of Subchapter S of the Internal Revenue Code of 1986, as
amended (the "Code") relevant to the SC$^2$ transactions and then explains the transactions
undertaken by the Upper Deck Parties in implementing the SC$^2$ strategy based upon the
KPMG Opinions. It goes on to describe the general tax benefits that were expected to be
derived from the SC$^2$ transactions as well as the positions taken by the Internal Revenue
Service (the "IRS") regarding why those tax benefits should not be realized.

Section V of the report analyzes the IRS's positions in light of applicable authority in the
Court of Appeals for the 9th Circuit (the "9th Circuit") and the Court of Appeals for the
Federal Circuit (the "Federal Circuit"), the two circuits whose authority would control
(depending upon whether the Upper Deck Parties chose to litigate in the Tax Court, a
federal district court or the Court of Federal Claims). That section concludes that,
provided that the Upper Deck Parties had a genuine intent to benefit the Austin
Firefighters Relief and Retirement Fund (the "Austin Plan") and did not have a
prearranged plan or agreement with the Austin Plan to reacquire the donated shares, the
taxpayers would have a reasonable prospect of success if they litigated the issues raised
by the IRS. Section VI of the report, however, goes on to analyze the impact that the
repurchase of the Austin Plan's shares in December 2002 by the MPR Trust has on the
prospects of success in litigation. As described in more detail in such section, the manner
in which the repurchase was undertaken likely would substantially undercut the ability of
the Upper Deck Parties to convince a court that they had the requisite intent to benefit the
Austin Plan or that the repurchase of its shares was not part of a plan or arrangement that
existed at the time the Plan first received the shares. Accordingly, the December 2002
repurchase substantially decreased the possibility that the Upper Deck Parties would
prevail in any litigation of the issues.

Finally, Section VII of the report discusses the possible tax benefits that the Upper Deck Parties may realize if they enter into a closing agreement with the IRS on the basis of the IRS's proposed settlement. Under the Policy, such tax benefits would be considered "Offsetting Benefits" entitling the Insurance Company to a reduction in the amount payable under the Policy.

II.     Overview of Relevant Provisions of Subchapter S of the Code.

To understand the $SC^2$ transaction, it is first necessary to understand certain of the basic rules of Subchapter S of the Code ("Subchapter S"). This section of the report will summarize the basic aspects of Subchapter S relevant to the $SC^2$ transactions. A more detailed analysis of certain of the provisions of Subchapter S applicable to the $SC^2$ transaction that are the subject of dispute with the IRS is contained in Section V.D, below.

A.     Pass-Through Treatment. With limited exceptions not relevant to the $SC^2$ transaction, corporations that elect to be "S corporations" under Subchapter S are not themselves subject to federal taxation on their income.[1] Instead, the corporations' income and loss pass through to their shareholders in proportion to the number of shares of stock held by them and are included in the computation of the shareholders' taxable income and loss.[2] Accordingly, it is the shareholders who are liable for the tax on income generated by S corporations, and it is the shareholders who recognize the tax savings attributable to losses generated by the corporations. Such pass-through treatment of income and loss applies regardless of whether amounts are currently (or ever) distributed by the S corporations to their shareholders.

B.     S Corporation Distributions. In general, the rules of Subchapter S are intended to mirror the tax rules applicable to partnerships in that the amount and nature of the corporation's income and loss are passed through to the shareholders and included in the computation of the shareholders' taxable income as if they had been realized directly by the shareholders. Thus, the general goals of Subchapter S are (i) to have all tax consequences occur at the shareholder level and (ii) to ensure that all income is taxed only once and all losses are deducted only once. To accomplish these goals, Section 1368[3] establishes a series of rules relating to distributions by S corporations to their shareholders. Generally, under these rules, distributions to the shareholders are not taxable to them.[4] Because income generated by an S corporation gets passed through and included in the taxable income of the shareholders, a subsequent distribution of the cash that gave rise to the taxable income should not again be subject to tax. Accordingly, the provisions of Sections 1368 and 1367 were designed to accomplish the following: (i) income previously passed through and included in the shareholder's taxable income should not be taxable when distributed to the shareholder or when

---

[1] Section 1363 of the Code.
[2] Section 1366 of the Code.
[3] Unless otherwise specified, all references to Sections shall be to sections of the Code.
[4] Section 1368(b)(1).

USIDOCS 5762376v3

EXHIBIT  V , PAGE 6 49

economically realized upon a sale or other disposition of the shareholder's shares; (ii) all distributions that represent a return of the shareholder's investment in the shares in the corporation also should not be taxable; and (iii) to the extent shareholders have had losses of the corporation passed through to them, the shareholders should not be entitled to a duplicate loss with respect to any sale or any disposition of their shares in the S corporation.

To understand the technical workings of Sections 1367 and 1368, it is first important to understand the central role that a shareholder's "basis" in his stock plays under Subchapter S. For most assets, such as the stock of a non-S corporation (a "C corporation"), a taxpayer's basis is the amount of his investment in the asset. Upon sale or other disposition of the asset, the taxpayer realizes gain (loss) to the extent the taxpayer receives consideration that is more (less) than his basis in the asset. Such an approach, however, would be exceedingly distortive in the context of an S corporation as demonstrated by the following example:

> Example 1. Shareholder A establishes an S corporation and invests $100 for all of the shares of the corporation. The corporation invests the $100 and realizes $50 of income from the investment that is passed through and taxed to the shareholder under the normal rules of Subchapter S. All of the income is retained by the corporation. If the shareholder then sold his stock, he would presumably be paid $150 reflecting the value of the corporation's assets. If his basis in his shares in the corporation remained at $100, he would recognize $50 of gain on the sale. As a result, even though Shareholder A ultimately only realized $50 of economic profit on his original investment, he would be subject to tax on $100 of income (*i.e.*, $50 passed through to him from the corporation and $50 from the gain on sale).

To avoid the double taxation demonstrated by the example (and similar double deduction of losses), Section 1367 provides that a shareholder's basis in S corporations' shares generally is increased by the amount of income allocated to the shareholder from the corporation and is decreased by the amount of any losses allocated to the shareholder from the corporation.[5] The adjustment to the shareholder's basis in his shares eliminates the potential double taxation of income or double deduction of losses demonstrated in the example by effectively eliminating the second recognition of gain or loss on disposition of the shares.

In the context of distributions from an S corporation, the adjustment to the shareholder's basis mandated by Section 1367 also eliminates double taxation of earnings when they are distributed. As previously mentioned, Section 1368 generally provides that distributions from an S corporation are not taxable. Section 1368(b)(2), however, provides an exception to the extent distributions

---

[5] The shareholder is prohibited from taking losses in excess of the basis in his shares.

USIDOCS 5762376v3

EXHIBIT __V__, PAGE 650

exceed the shareholder's basis in his shares.[6]  Because the shareholder's basis will always be increased by his share of the corporation's income, the basis-adjustment rules of Section 1367 typically result in the taxpayer having sufficient basis in his shares to be distributed his share of the company's earnings previously passed through to him, thereby eliminating the potential double taxation of the same economic profit.

C.   S Corporation Qualifications.  Not all corporations can elect to be S corporations. Section 1361(b) sets forth a list of qualifications that must be met before an election can be made.  Although the listed qualifications are fairly diverse, the general theme for all of them is simplicity.  Thus, the corporation must have a relatively simple capital structure and the shareholders must have relatively simple tax attributes.  For the SC[2] transactions, the relevant qualification is contained in Section 1361(b)(1)(D) and provides that the corporation must not have more than one class of stock (except that Section 1361(c)(4) allows for multiple classes of stock that differ solely with respect to voting rights).

III.   Transactions Per KPMG Opinions.

A.   Facts.  In connection with the SC[2] transaction undertaken by the Upper Deck Parties, KPMG issued the KPMG Opinions.  The KPMG Opinions were based upon the following facts as summarized in the opinions:

1.   Upper Deck had been an S corporation for federal income tax purposes commencing January 1, 1989.

2.   As of March 28, 2001, Upper Deck had 920,000 shares of voting common stock outstanding (the "UD Voting Common Stock"[7]), all of which were owned by the MPR Trust, an inter vivos revocable trust with McWilliam as its sole beneficiary.

3.   On March 28, 2001, Upper Deck amended its Articles of Incorporation to authorize the issuance of non-voting common stock.  This non-voting common stock (the "UD Non-Voting Common Stock"[8]) was identical in all respects to the UD Voting Common Stock, except that it had no voting rights.

4.   On March 28, 2001, Upper Deck declared a dividend of 82,800,000 warrants to purchase UD Non-Voting Common Stock from Upper Deck (the "UD Warrants"[9]).  The UD Warrant dividend was distributed to the

---

[6] Distributions in excess of the basis of the shares give rise to taxable gain that is considered to be gain attributable to a sale or exchange of the shares (typically, capital gain).  Section 1368(b)(2).

[7] Similar stock in other corporations that engaged in the SC[2] transactions will be referred to as "Voting Common Stock."

[8] Similar stock issued by other corporations that engaged in the SC[2] transactions will be referred to as "Non-Voting Common Stock."

[9] Similar warrants issued by other corporations that engaged in the SC[2] transactions will be referred to as "Warrants."

USIDOCS 5762376v3

EXHIBIT  V , PAGE 651

MPR Trust on March 29, 2001. The UD Warrants had an exercise price of $0.148 per share and had a term of 35 years.

5.  On March 29, 2001, Upper Deck issued 8,280,000 shares of UD Non-Voting Common Stock to the MPR Trust as a stock dividend.

6.  On March 31, 2001, the MPR Trust donated all of the UD Non-Voting Common Stock received from Upper Deck to the Austin Plan.

7.  Also on March 31, 2001, the MPR Trust and the Austin Plan entered into a Shareholders Agreement (the "UD Shareholders Agreement"[10]).

    a)  The UD Shareholders Agreement provided that all UD Non-Voting Common Stock would be subject to a right of first refusal pursuant to which Upper Deck had the right to purchase the stock for the amount of any bona fide offer received by the Austin Plan. In addition, if Upper Deck was unwilling or unable to exercise the right of first refusal, the holders of the UD Voting Common Stock were entitled to the right of first refusal.

    b)  The UD Shareholders Agreement also provided a put option (the "UD Put Option"[11]) to the Austin Plan with respect to its UD Non-Voting Common Stock. Pursuant to the UD Put Option, the Austin Plan had the right to require Upper Deck to redeem all of the Plan's shares upon 10 days' notice during the period that commenced on April 1, 2003 and ended 180 days thereafter.

        (1)  The purchase price payable to the Austin Plan upon exercise of its UD Put Option was the fair market value of its UD Non-Voting Common Stock as determined by FMV Opinions, Inc. ("FMV Opinions"), or, at Upper Deck's option, by another appraiser regularly engaged in valuing businesses similar to Upper Deck's business. In conducting the appraisal, the appraiser was required to take into account:

            (a)  that the UD Non-Voting Common Stock held by the Austin Plan was non-voting stock that constituted a minority and non-controlling interest of Upper Deck;

            (b)  there was a lack of marketability for the shares;

            (c)  the shares were subject to dilution as a result of the outstanding UD Warrants; and

---

[10] Similar shareholder agreements entered into in connection with other SC[2] transactions will be referred to as "Shareholder Agreements."
[11] Similar put options issued in connection with other SC[2] transactions will be referred to as "Put Options."

USIDOCS 5762376v3

EXHIBIT _√_, PAGE_652_

(d)   Upper Deck was not obligated to pay dividends (and the Board of Directors had adopted a policy to retain earnings and not to pay dividends).

(2)   The closing of the purchase of the Austin Plan shares upon exercise of the UD Put Option was to occur on the 30th day following determination of the put price. At the closing, 25% of the put price was paid in cash with the balance payable within 45 days of the closing, provided that if the balance was not paid within 45 days, interest would accrue at the lesser of 10% per annum or the minimum applicable rate necessary to avoid the imputation of interest for federal income tax purposes.

B.   Conclusions of KPMG Opinions. The KPMG Opinions reached the following conclusions regarding certain of the material tax consequences of the foregoing transactions:

1.   The issuance of the UD Non-Voting Common Stock to the MPR Trust and the issuance of the UD Warrants were not taxable events to any of the Upper Deck Parties.

2.   Income and loss of Upper Deck for periods following March 31, 2001 would be allocated in proportion to share ownership. Accordingly, assuming no changes in share ownership, 10% of the income and loss would be allocated to the holders of the UD Voting Common Stock (the MPR Trust) and 90% would be allocated to the holders of the outstanding UD Non-Voting Common Stock (the Austin Plan).

3.   The distribution of the UD Warrants should not create a second class of stock for Upper Deck.

4.   The right of first refusal and UD Put Option contained in the UD Shareholders Agreement should not create a second class of stock for Upper Deck.

5.   The MPR Trust and McWilliam would not be taxed on any redemption proceeds that were received by the Austin Plan pursuant to any exercise of the right of first refusal under the UD Shareholders Agreement or the UD Put Option.

6.   It was more likely than not that the MPR Trust (or McWilliam) would be entitled to a charitable deduction for the fair market value of the UD Non-Voting Common Stock donated to the Austin Plan.

C.   Consequences If KPMG Opinions Are Correct. The key to understanding the anticipated tax benefits associated with entering into the $SC^2$ transactions is to understand the central role that appraisals played in the strategy. In general, appraisals were important at two points. First, the exercise price of the

US1DOCS 5762376v3

EXHIBIT __V__, PAGE 653

UD Warrants was set at an amount intended to slightly exceed 90% of the fair market value of the UD Non-Voting Common Stock as determined by appraisal. Second, the purchase price under the UD Put Option was to equal the fair market value of the UD Non-Voting Common Stock held by the Austin Plan also as determined by appraisal at the time of exercise. The methodology employed in the appraisal performed by FMV Opinions in connection with the donation of the UD Non-Voting Common Stock to the Austin Plan as well as the methodology required (pursuant to the terms of the UD Shareholders Agreement) to be employed in the UD Put Option appraisal applied a series of discounts and downward adjustments to determine the fair market value of the UD Non-Voting Common Stock. The result in the appraisal by FMV Opinions was a value for the UD Non-Voting Common Stock that represented only approximately 4.9% of the value of the Company even though the stock constituted 90% of the outstanding stock. A similar result presumably would have occurred in the UD Put Option appraisal.

The appraisal by FMV Opinions applied discounts for the fact that the stock was non-voting and that it represented a minority non-controlling interest in Upper Deck. More importantly, the appraisal determined the value of the UD Non-Voting Common Stock after reflecting the dilutive effect of the UD Warrants. The impact of the dilution caused by the outstanding UD Warrants was particularly dramatic. The appraisal essentially treated the UD Warrants as if they were outstanding shares of the UD Non-Voting Common Stock.[12] As a result, the shares held by the Austin Plan were treated as only representing 9% of the Company's equity ownership although they constituted 90% of the Company's outstanding shares of stock.

If the KPMG Opinions were correct, Upper Deck's participation in the SC[2] strategy would have resulted in 90% of the Company's taxable income being allocated to the Austin Plan during the period that the Plan held the UD Non-Voting Common Stock. If the Austin Plan exercised the UD Put Option, Upper Deck could be expected to repurchase the shares at a deeply discounted value that almost certainly would be greatly below the tax savings realized by the shareholders as a result of the allocation of the income to the Austin Plan during the period it held the UD Non-Voting Common Stock. Alternatively, if the Austin Plan did not choose to exercise the UD Put Option, the MPR Trust could exercise the UD Warrants and dilute the Austin Plan's shares to 9% of the total capitalization of the Company.

Because of the restrictions imposed on the Austin Plan's ability to sell its UD Non-Voting Common Stock and the prospect of having its share ownership diluted by the exercise of the UD Warrants, the UD Put Option may well have been expected to be exercised.[13] If the Company repurchased the shares upon exercise of the UD Put Option (or otherwise), the MPR Trust would once again

---

[12] A relatively minor offsetting adjustment was made to reflect the exercise price of the Warrants.
[13] *But see* Section V.C hereof for an analysis of the economic consequences of exercising the UD Warrants.

EXHIBIT __V__, PAGE 654

hold 100% of the outstanding stock of the Company. In addition, the Company would retain all of the earnings generated during the period that the Austin Plan held its stock reduced only by the amount paid to the Austin Plan to redeem its shares. The MPR Trust, however, would have only received an increase in the basis of its stock in Upper Deck reflecting the 10% share of income allocated to it during the period that the Austin Plan held the UD Non-Voting Common Stock. Thus, for example, if the MPR Trust had a zero basis in its shares at the time of its donation of the UD Non-Voting Common Stock to the Austin Plan, upon distribution of the earnings generated during the period that the Austin Plan held the stock, 90% of the earnings would give rise to a distribution in excess of the MPR Trust's basis in the shares and would be taxable as long-term capital gain.[14]

IV. IRS Procedural Actions.

A. Announcement 2002-2. On December 24, 2001, the IRS released Announcement 2002-2[15] in which it announced a "disclosure initiative." Under the disclosure initiative, the IRS agreed to waive all accuracy-related penalties under Section 6662(b) if taxpayers disclosed their participation in any transaction which the taxpayers believed could give rise to such a penalty. To qualify, a taxpayer was required to submit a statement that included, among other things, a description of the facts involved, a description of the taxpayer's tax treatment of the item on the taxpayer's tax return, the taxable years affected, the names and addresses of any parties who promoted the taxpayer's participation in the transaction and a statement agreeing to provide, if requested, copies of relevant transactional documents, internal documents or memoranda used by the taxpayer in the decision-making process and all opinions and memoranda that provided legal analysis of the transactions. Such disclosure was required to be submitted to the IRS on or before April 23, 2002.

1. By letter dated April 18, 2002, the Insurance Company notified McWilliam that KPMG intended to comply with an IRS summons requesting information regarding participation in the $SC^2$ transactions.

2. On April 22, 2002, Upper Deck disclosed its participation in the $SC^2$ transaction to the IRS in accordance with Announcement 2002-2.

B. IRS Commissioner Testimony Before the Senate Committee on Tax Shelters. On October 21, 2003, IRS Commissioner Mark Everson testified before the Senate Committee on Tax Shelters. Commissioner Everson testified that the $SC^2$ transaction was a prototype "tax shelter" that had no substantive basis.

C. Speech of George Yin. On January 31, 2004, in a speech given to the Tax Section of the American Bar Association, George Yin, the Chief of Staff of the Joint Committee on Taxation cited the $SC^2$ transaction as typical of the kinds of tax shelters being promoted by accounting firms and other professionals. In his

---

[14] Section 1368(b)(2).
[15] Announcement 2002-2, 2002-1 C.B. 304 (December 24, 2001).

EXHIBIT ___V___, PAGE 655

speech, Mr. Yin indicated that under current law, the IRS may be unable to successfully attack the SC$^2$ transaction.

D.    <u>Notice 2004-30</u>. On April 1, 2004, the IRS issued Notice 2004-30 pursuant to which it identified the SC$^2$ transaction as a "listed transaction." Identifying a transaction as a "listed transaction" had at least two consequences. First, it put taxpayers on notice that if they continued to claim the tax benefits associated with the transaction, they would be subject to accuracy-related penalties under Section 6662. Second, participants in listed transactions would be required to disclose their participation pursuant to regulations promulgated under Section 6011.

E.    <u>IRS Settlement Proposal</u>. By letters dated on or about April 7, 2004, the IRS notified participants in the SC$^2$ transactions of a universal settlement proposal. Under the proposal, the taxpayers were to concede that the income originally allocated to the tax-exempt entity that held the Non-Voting Common Stock (the Austin Plan in the Upper Deck transaction) was to be reallocated to the original shareholders, that no charitable contribution was allowed for any amounts contributed or paid to the tax-exempt entity and that 50% of all promoter fees paid by the taxpayers would not be deductible. In return, the IRS (i) would concede that the SC$^2$ transaction did not void the corporation's S election by creating a second class of stock, (ii) would allow the taxpayer to deduct the balance of its expenses in engaging in the transaction and (iii) would agree to impose a 10% rather than 20% negligence penalty under Section 6662(b).

F.    <u>Coordinated Issue Paper</u>. On November 8, 2004, the IRS issued a Coordinated Issue Paper addressing the tax consequences of an SC$^2$ transaction. The Coordinated Issue Paper was a statement by the Exam Division of the IRS setting forth its position on each aspect of a standard SC$^2$ strategy (hereinafter referred to as a "Generic SC$^2$ Transaction") and its legal analysis for each such position. The particular positions taken by the IRS are described in Section V.B, below.

V.    <u>Taxpayers Had Reasonable Prospect of Success if SC$^2$ Strategy Litigated</u>.

A.    <u>General</u>. If the Upper Deck Parties had implemented the SC$^2$ strategy as contemplated by the KPMG Opinions and had repurchased the UD Non-Voting Common Stock held by the Austin Plan pursuant to the exercise of the UD Put Option, they would have had a reasonable prospect that the desired tax consequences would be upheld by a court if litigated. As discussed in greater detail below, the taxpayers have strong legal arguments why the desired tax consequences should be upheld. Nevertheless, because the SC$^2$ strategy was a "marketed" strategy initiated by KPMG in a substantially prestructured format, courts could be expected to take a critical view of the transaction. The taxpayers' technical positions, however, are sufficiently strong that they still would have a reasonable prospect of success notwithstanding the likelihood of such a negative bias by the courts.

USIDOCS 5762376v3

EXHIBIT ___V___, PAGE_656

B.  IRS's Position. As set forth in a Coordinated Issue Paper dated November 8, 2004, the IRS disputed the results of the SC$^2$ strategy on four grounds:

1.  The transfer of the Non-Voting Common Stock to the tax-exempt entity should be disregarded under the judicial doctrines of "sham transaction" or "economic substance." As a result, all income of the S corporation during the period that the tax-exempt entity nominally held the shares would be allocated to the original shareholders.

2.  Alternatively, the issuance of the Non-Voting Common Stock coupled with the distribution of the Warrants and the existence of the Put Option created a second class of stock in the participating S corporation thereby disqualifying the participating corporation from being an S corporation. As a result, 100% of the income realized by the corporation during the period that the tax-exempt entity held the Non-Voting Common Stock (and for four taxable years after the taxable year in which the Non-Voting Common Stock was transferred to the tax-exempt entity) would be taxed to the corporation at regular corporate income tax rates.

3.  The transfer of the Non-Voting Common Stock to the tax-exempt entity did not qualify as a deductible charitable contribution because the donor expected tax benefits that exceeded the value of the stock contributed.

4.  The transaction costs incurred by the participants in connection with the SC$^2$ transactions were not deductible since they arose in connection with a transaction the sole purpose of which was tax avoidance.

Of the four IRS positions, two of them are not directly in dispute between the Upper Deck Parties and the Insurance Company: the non-deductibility of the charitable contribution and the non-deductibility of the transaction costs. The deductibility of the charitable contribution is generally not in dispute because neither the MPR Trust nor McWilliam claimed a charitable contribution on their federal income tax returns for the contribution of the UD Non-Voting Common Stock. The deductibility of the transaction costs is similarly not an issue since their deductibility was not included in the definition of an "Insured Tax Event" under the Policy. Accordingly, the balance of this section of the report will focus on the remaining two arguments of the IRS: that the tax-exempt entity's ownership of the Non-Voting Common Stock should be disregarded so that the income allocated to it with respect to such stock should be reallocated to the original shareholder (the "Reallocation Argument") and that the transactions caused the S corporation to effectively have a second class of stock (the "Second-Class-of-Stock Argument") thereby voiding its S election.

C.  Reallocation Argument. The IRS's primary position in Notice 2004-30 and the Coordinated Issue Paper is that the transfer of the shares to the tax-exempt entity should be disregarded pursuant to the judicial doctrines of "substance over form" and "economic substance." If the IRS's position were to prevail, the income from

USI DOCS 5762376v3

EXHIBIT _V_, PAGE 657

Upper Deck that was allocated to the Austin Plan would be reallocated to the MPR Trust and would be fully taxable to it (or McWilliam as the grantor of the Trust). As discussed in more detail below, the application of the "economic substance" and similar judicial doctrines to the facts of the $SC^2$ transactions is far from clear. These doctrines generally have not been applied to facts similar to those presented by the $SC^2$ transactions. However, a straight-forward application of these tests to the $SC^2$ transactions would not seem to support the IRS's Reallocation Argument in the case of a Generic $SC^2$ Transaction. Nevertheless, in the context of a transaction that had been pre-structured and marketed by KPMG to a large number of potential customers and which resulted in taxpayers donating property to a tax-exempt entity and receiving tax benefits significantly in excess of the value of the donated property, there is a distinct possibility that the courts would stretch the "economic substance" doctrine to cover the facts of the $SC^2$ transactions. Even so, in my opinion, taxpayers that engaged in a Generic $SC^2$ Transaction still would have a significant possibility of prevailing if they chose to litigate the IRS challenge.[16]

Courts have widely accepted the proposition that tax benefits arising from a transaction can be disallowed in circumstances where the transactions giving rise to the tax benefits had no economic substance other than reduction in income tax liability. This principle is based upon several Supreme Court cases. *See, e.g.,* *Gregory v. Helvering*, 293 U.S. 465 (1935) ("the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."); *Knetsch v. United States*, 364 U.S. 361, 366 (1960) (disregarding a transaction because "there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction"); *see also Frank Lyon v. United States*, 435 U.S. 561 (1978). Although the courts have used different names to describe the applicable concepts, including the "economic substance doctrine," the "sham transaction doctrine" and the "business purpose doctrine," the basic principle underlying all of these doctrines is the same. The Tax Court described this principle as follows:

> The tax law ... requires that the intended transaction have economic substance separate and distinct from the economic benefit achieved solely by tax reduction. The doctrine of economic substance becomes applicable, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings.

*ACM Partnership v. Commissioner*, 73 T.C.M. 2189 (1997) at 2215, *aff'd* 157 F.3d 231 (3rd Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999). For ease of reference, all of these various doctrines will be referred to as the "Economic Substance Doctrine."

---

[16] It is my understanding that taxpayers who engaged in at least 8 to 10 $SC^2$ transactions currently anticipate litigating the matter with the IRS.

USI DOCS 5762376v3

EXHIBIT _V_, PAGE 658

Although the courts have widely accepted the Economic Substance Doctrine, there is wide disparity in how it is applied. In connection with a recent attempt (failed) to codify the Economic Substance Doctrine, the Conference Committee accompanying the *Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users*, P.L. 109-59, August 10, 2005, summarized the current state of the law as follows:

> There is a lack of uniformity regarding the proper application of the economic substance doctrine. Some courts apply a conjunctive test that requires a taxpayer to establish the presence of both economic substance (i.e., the objective component) and business purpose (i.e., the subjective component) in order for the transaction to survive judicial scrutiny. A narrower approach used by some courts is to conclude that either a business purpose or economic substance is sufficient to respect the transaction. A third approach regards the economic substance and business purpose as "simply more precise factors to consider" in determining whether a transaction has any practical economic effects other than the creation of tax benefits.

*Id.* at ¶187 (footnotes omitted).

Because of the disparity in the application of the Economic Substance Doctrine by courts, to assess the prospects of $SC^2$ participants prevailing in litigation with the IRS regarding the Reallocation Argument, applicable authority in the circuit courts to which appeal would lie is the most relevant. In that regard, since McWilliam was a Nevada resident during the periods in question, authority in the 9th Circuit (if he chose to litigate the dispute in a federal district court or the United States Tax Court) or the Federal Circuit (if he chose to litigate in the Court of Federal Claims) are the relevant jurisdictions.

The 9th Circuit, like many other courts, applies the Economic Substance Doctrine by evaluating whether the taxpayer had a non-tax business purpose and whether the transaction had economic substance beyond the generation of tax benefits. *See Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995); *Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990). However, it does not apply a "rigid two-step analysis" in which the two factors are applied either conjunctively (*i.e.*, taxpayer must prove both) as is the case in the 6th Circuit or disjunctively (*i.e.*, taxpayer must prove either) as is the case in the 4th and 8th Circuits. Instead, the Court has assessed the overall transaction as follows:

> [T]he consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses. ... We have

USIDOCS 5762376v3

EXHIBIT V , PAGE 659

repeatedly and carefully noted that this formulation cannot
be used as a "rigid two-step analysis."

*Sacks v. Commissioner*, 69 F.3d at 988 (citations omitted).

In fashioning its version of the Economic Substance Doctrine, the 9th Circuit has
placed particular reliance on the Supreme Court decision in *Frank Lyon Co. v.
United States*, 435 U.S. 561 (1978). *See Robertson v. Commissioner*, 87 AFTR2d
2001-1274 (9th Cir. 2001); *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995);
*Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir. 1990). *See also Bail Bonds
by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543 (9th Cir. 1987). In *Frank
Lyon Co.*, the Supreme Court stated the following principle:

> Where ... there is a genuine multiple-party transaction with
> economic substance which is compelled or encouraged by
> business or regulatory realities, is imbued with tax
> independent considerations, and is not shaped solely by tax
> avoidance features that have meaningless labels attached,
> the Government should honor the allocation of rights and
> duties effectuated by the parties.

*Id.* at 583-84.

In *Casebeer*, the 9th Circuit cited the above-quoted language from the *Frank Lyon
Co.* decision indicating that:

> This language was subsequently construed by this court to
> create a two-part test for determining whether a transaction
> is a sham:
>
> > 1) has the taxpayer shown that it had a business purpose
> > for engaging in the transaction other than tax
> > avoidance? 2) has the taxpayer shown that the
> > transaction had economic substance beyond the creation
> > of tax benefits?
>
> *Bail Bonds*, 820 F.2d at 1549. The application of the
> "business purpose" prong is a subjective test, whereas the
> application of the "economic substance" prong is an
> objective test. *Sochin*, 843 F2d at 354.

*Casebeer* at 1363.

The *Sacks* case is a leading case in the 9th Circuit. That case involved a situation
in which the taxpayer purchased solar water heaters and leased them back to the
seller who in turn subleased them to homeowners. The Tax Court had disallowed
Mr. Sacks' losses and tax credits associated with ownership of the units based on
an analysis that Mr. Sacks had little prospect of receiving a before-tax economic
profit on his investment. Although the 9th Circuit expressed skepticism regarding
the Tax Court's financial analysis of the arrangement, it chose not to hold that the

USI DOCS 5762376v3

EXHIBIT __V__, PAGE 660

Tax Court's factual findings were clearly erroneous. Instead, it applied the Economic Substance Doctrine and concluded that Mr. Sacks was entitled to the tax losses and credits. Its conclusion was based on a determination that Mr. Sacks' economic deal had "genuine economic effects and was not a sham" because (1) Mr. Sacks was personally obligated to pay the purchase price for the units; (2) his purchase price was at fair market value; (3) the tax benefits would have existed for someone so that the only issue was which taxpayer got to claim them; (4) the business of installing solar water heaters was genuine; and (5) the business consequences of a rise or fall in energy prices in solar energy devices were genuinely shifted to Mr. Sacks. Furthermore, the Court held that "where a transaction has economic substance, it does not become a sham merely because it is likely to be unprofitable on a pre-tax basis."

In reaching this conclusion, the *Sacks* court relied on the statement of the Supreme Court decision in *Frank Lyon Co.*: "The fact that favorable tax consequences were taken into account ... is no reason for disallowing those consequences." *Frank Lyon Co.*, 453 U.S. at 580. Importantly, the 9th Circuit's interpretation of the "economic substance" requirement of the Economic Substance Doctrine was different from that adopted by certain other courts of appeal. Specifically, it determined economic substance by determining whether the transactions affected the legal rights and obligations of the parties rather than the approach adopted in certain other courts of trying to determine whether the transaction had a reasonable prospect of making a profit. *See* Keyes & Light, *Developments in Economic Substance Doctrine*, 20 J. TAX'N OF INV. 284 (2003).

Applying the 9th Circuit's version of the Economic Substance Doctrine to the facts of a Generic SC$^2$ Transaction is difficult because of the significant disparity between the SC$^2$ transactions and the transactions that were the subject of the Court's opinions. Nevertheless, the analytical framework established by the 9th Circuit for applying the Economic Substance Doctrine is useful. The 9th Circuit does not apply a "rigid two-step analysis," but it does mandate inquiry into both (i) the non-tax business purpose and (ii) the economic substance of the transaction beyond tax benefits.

In the case of a Generic SC$^2$ Transaction, there obviously is no traditional business purpose or profit motive since the basic transaction involves a donation that necessarily has an economic cost to the donor. In *Skripak v. Commissioner*, 84 T.C. 285 (1985), the court was faced with a similar issue of how to apply the Economic Substance Doctrine to a case involving a charitable contribution and concluded that, "doctrines such as business purpose and objective economic profit are of little, if any, significance." *Skripak*, 84 T.C. at 315. Clearly, taxpayers in the SC$^2$ transactions had no "business" purpose for contributing the stock to the tax-exempt entity and even more clearly had no before-tax profit motive for doing so. However, it seems unlikely that the 9th Circuit's phraseology was intended to so limit the scope of the relevant motive of the taxpayer. Referencing "business purpose" likely is simply a byproduct of the fact that all of the cases in which the 9th Circuit has applied the Economic Substance Doctrine have involved

US1DOCS 5762376v3

EXHIBIT _V_, PAGE _661_

commercial transactions in which non-tax purposes would undoubtedly have been "business" purposes. *See, e.g., Casebeer, supra; Sacks, supra* and *Bail Bonds by Marvin Nelson, supra.* It is likely that the 9th Circuit intended to look at all non-tax purposes for the transaction not just the "business" purposes. As such, the intent of the shareholders in a Generic SC$^2$ Transaction to make a contribution to benefit the tax-exempt entity is a relevant non-tax purpose that serves to support the economic substance of the overall transaction. In this regard, the KPMG Opinion captioned "Charitable Contribution to Austin Firefighters Relief and Retirement Fund" states on page 2: "In accordance with the Shareholder's desire to support [the Austin] Plan, on March 31, 2001, the Shareholder donated all of the Non-Voting Common Stock to [the Austin] Plan." This purpose was then confirmed in the representation letter dated September 4, 2001 executed by Upper Deck and McWilliam as trustee of the MPR Trust in connection with the receipt of the Policy. Of course, in a situation such as presented by many of the SC$^2$ transactions where the tax benefits associated with a gift to a tax-exempt entity potentially exceeded the value of the gift, there would be a distinct possibility that a court would disregard the professed purpose of benefiting the tax-exempt entity and find that the shareholders were motivated solely by tax avoidance purposes.

The second inquiry mandated by the 9th Circuit in applying the Economic Substance Doctrine is an assessment of whether the transaction had economic substance beyond the generation of tax benefits. It is under this factor that the IRS makes most of its arguments in the Coordinated Issue Paper. In that regard, the Coordinated Issue Paper states:

> The exempt party does not possess meaningful benefits and burdens of stock ownership, because the exempt party is not impacted by increases or decreases in the value of the stock commensurate with its purported ownership interest in the S corporation. ... The original shareholders are the true owners. The exempt party takes on the appearance of an S corporation shareholder during the period it holds the non-voting stock, only to have the interest revert to the original shareholders upon subsequent planned actions. ... The only economic substance of the transaction is the tax savings to the original shareholders. Even if the transaction complies with the literal language of the Code, it has no economic substance separate from the tax benefits and should not be respected.

The IRS's analysis is strained. The IRS is correct in focusing on which parties had the economic benefits and burdens of ownership of the shares. However, its conclusion that the ownership by the tax-exempt entity should be disregarded because the economic benefits and burdens held by it are not "commensurate with its purported ownership interest in the S corporation" is unsupported by any relevant authority. The fact that the tax-exempt entity held stock that was allocated 90% of the income of the corporation does not imply that the stock had

-15-

EXHIBIT ___V___, PAGE 662

to be worth 90% of the value of the corporation. In addition, the IRS's conclusion that the shares held by the tax-exempt entity necessarily would revert to the original shareholders upon "subsequent planned actions" is without merit in a Generic SC$^2$ Transaction.

It is well settled that the ownership of property for federal income tax purposes is based upon the possession of the economic benefits and burdens of the property involved rather than mere legal title. *See Frank Lyon, supra; Rexnord, Inc. v. Unites States*, 940 F3d 1094 (7th Cir. 1991). In a Generic SC$^2$ Transaction, the question is which party possessed the economic benefits and burdens of the Non-Voting Common Stock while it was held by the tax-exempt entity. The fact that the Non-Voting Common Stock represented 90% of the outstanding common stock of the corporation but only a relatively minor percentage of the value of the corporation is not relevant to this inquiry. Ownership of the stock is based upon possession of the economic benefits and burdens of the stock whatever they may be.

Under applicable authority, there is little basis for concluding that the tax-exempt entity did not own the Non-Voting Common Stock in a Generic SC$^2$ Transaction. Although the value of the stock may have been small relative to the value of the Company, there was little doubt in the Generic SC$^2$ Transactions that any appreciation in the value of the stock would belong to the tax-exempt entity and any depreciation in the value of the stock would be borne by it. Importantly, this result would not be negated by an exercise of Warrants since the tax-exempt entity would continue to own 9% of the company's stock and the value of the company would be increased by the Warrant exercise price.

Furthermore, although many of the S corporations in the SC$^2$ transactions (including Upper Deck) evidently did not pay significant dividends during the period that the Non-Voting Common Stock was held by the tax-exempt entity, the tax-exempt entity could still benefit from the earnings generated by the company during this period. If the tax-exempt entity exercised the Put Option and sold its stock back to the corporation, the amount of earnings retained by the corporation during the period that the tax-exempt entity owned its stock would be reflected in the fair market value purchase price received by the tax-exempt entity. Alternatively, if the tax-exempt entity continued to own its stock indefinitely, the earnings could potentially be distributed at a later point in time or the tax-exempt entity could receive the economic benefit of the earnings upon a sale of the stock or a sale of the S corporation. Thus, the IRS's true objection is not that the tax-exempt entity did not have the economic benefits and burdens of ownership, but that the stock received a disproportionately large allocation of income from the corporation relative to its value. Such a circumstance should generally not be sufficient to allow the IRS or a court to disregard the ownership of the stock by the tax-exempt entity. In fact, it is a fairly common occurrence in other areas of federal tax law such as the taxation of partnerships, grantor trusts and charitable trusts that the allocation of taxable income does not follow the value of economic ownership.

-16-

EXHIBIT ___✓___, PAGE 663

The IRS's other assertion regarding the economic substance of the tax-exempt entity's ownership of the Non-Voting Common Stock was essentially that the ownership was transitory because the stock would "revert" to the original shareholders "upon subsequent planned actions." Such a position, however, is directly contrary to applicable authority. In *Palmer v. Commissioner*, 62 T.C. 684 (1974), *aff'd on another issue*, 523 F.2d 1308 (8th Cir. 1975), the taxpayer contributed shares of a closely-held corporation that he controlled to a private foundation of which he was the controlling trustee. The contribution was made on August 31, 1966. On September 1, 1966, the Board of Directors and the shareholders of the corporation (comprised of the taxpayer, the foundation and a trust controlled by the taxpayer) met and approved an agreement to redeem the shares that had been contributed to the foundation. The Tax Court held:

> Even though the donor anticipated or was aware that the redemption was imminent, the presence of an actual gift and the absence of an obligation to have the stock redeemed have been sufficient to give such gifts independent significance. ... There was no allegation or evidence that the foundation was a sham. In these circumstances, it appears clear that the foundation was not an alter ego of the petitioner, and in fact it had dominion and control over the shares of stock received by gift from the petitioner, notwithstanding the fact that the petitioner was the controlling trustee.

Accordingly, the Court held that the gift should be respected and the foundation should be treated as the owner of the shares such that the redemption was a redemption of its shares.

The *Palmer* decision was one of a series of similar cases that the IRS litigated and lost. *See also Grove v. Commissioner*, 490 F.2d 241 (2nd Cir. 1973); *Behrend v. United States*, No. 72-1153, 72-1156 (4th Cir. 1972); and *Carrington v. Commissioner*, 467 F.2d 704 (5th Cir. 1973). As a result, in 1978, the IRS issued Revenue Ruling 78-197, 1978-1 C.B. 83. In that Revenue Ruling, the IRS effectively conceded the issue addressed by the *Palmer* court. In so doing, the IRS stated: "The Service will treat the proceeds as income to the donor under facts similar to those in the *Palmer* decision only if the donee is legally bound, or can be compelled by the corporation, to surrender the shares for redemption." In all other circumstances, the IRS would treat the donee as the true owner of the shares at the time of their redemption.

It seems clear under the test enunciated in Revenue Ruling 78-197 that the tax-exempt entity in a Generic $SC^2$ Transaction would be treated as the owner of the shares. Although the tax-exempt entity had the Put Option, it was neither legally bound nor subject to being compelled to surrender its shares for redemption. Accordingly, even if there were an expectation that the shares would be repurchased, their ownership by the tax-exempt entity should be respected.

USI DOCS 5762376v3

EXHIBIT __V__, PAGE 66 4

The IRS also suggests in the Coordinated Issue Paper that the tax-exempt entity's ownership of the Non-Voting Common Stock should be disregarded as transitory, because either the tax-exempt entity would exercise the Put Option or the original shareholders would exercise the Warrants thereby increasing their equity ownership to "nearly 100%." Such analysis, however, is neither factually nor legally correct. The existence of the Put Option should not be sufficient to cause the ownership of the shares by the tax-exempt entity to be disregarded. Exercise of the Put Option was entirely in the discretion of the tax-exempt entity and the repurchase price was based on fair market value. Accordingly, in no way does the existence of the Put Option undercut the economic substance of the ownership of the shares by the tax-exempt entity even if a court were to conclude that it was likely that the tax-exempt entity would exercise the Put Option in order to reduce to cash the value of its interest in the S corporation. Additionally, the possibility that the Warrants could be exercised thereby diluting the tax-exempt entity's ownership position does not change this result. Because the exercise of the Warrants would require a large cash outlay by the original shareholder, and because the tax-exempt entity would continue to own 9% of the S corporation, the economic cost of exercising the Warrants and sharing 9% of all future profits with the tax-exempt entity in most circumstances would outweigh the expected tax savings associated with the transactions. Thus, although the Warrants acted as a backstop to ensure that the original shareholders could retain control of the majority of the economic value of the corporation, the price for doing so was great. Consequently, the "threat" of exercising the Warrants and diluting the equity position of the tax-exempt entity could not economically induce the tax-exempt entity to exercise its Put Option. The importance of the Warrants in the $SC^2$ transactions was to depress the value of the Non-Voting Common Stock held by the tax-exempt entity and was not to economically compel the tax-exempt entity to exercise the Put Option.

The approach of the Federal Circuit is somewhat different from that of the 9th Circuit. In *Coltec Industries, Inc. v. United States*, Fed. Cir., No. 05 5111, 7/12/06, the Court recently clarified its view of the Economic Substance Doctrine. In general, the Court concluded that the "economic substance of a transaction must be viewed objectively rather than subjectively." In reaching this conclusion, the Court stated:

> The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the economic substance doctrine. While the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose, all courts have looked to the objective reality of the transaction is assessing its economic substance. *See, e.g., Black & Decker*, 436 F.3d at 441–42 (noting that economic substance inquiry requires an "objective determination of whether a reasonable possibility of profit from the transaction existed") (*internal quotation marks omitted,*

USI DOCS 5762376v3

EXHIBIT _V__, PAGE_665_

*first two emphases added); Dow Chem. Co.*, 435 F.3d at
599; *In re CM Holdings, Inc.*, 301 F.3d at 103 (stating that
the objective economic substance inquiry is "whether the
transaction affected the taxpayer's financial position in any
way"); *United Parcel Serv. of Am., Inc.*, 254 F.3d at 1018;
*Rice's Toyota World, Inc. v. Comm'r of Internal Revenue*,
752 F.2d 89, 94 (4th Cir. 1985).

The *Coltec* court, however, did note in *dicta* (citing the above-quoted language
from *Frank Lyon Co.*) that although the test was generally an objective one, if the
sole motivation for a transaction was tax avoidance, the Economic Substance
Doctrine could still be applied to allow the Court to disregard a transaction even if
the transaction had identifiable economic consequences when viewed objectively.

As discussed above, a Generic $SC^2$ Transaction had objective economic substance
in that the economic benefits and burdens of ownership of the Non-Voting
Common Stock belonged to the tax-exempt entity. The fact that the taxpayers
may have had a tax avoidance motive in entering into the transaction would
largely be seen as irrelevant in the Federal Circuit unless the sole motivation was
tax avoidance, in which case the court's *dicta* could potentially apply. Thus, as
long as the original shareholders of the S corporation were at least partially
motivated to engage in the $SC^2$ transaction by the desire to benefit the tax-exempt
entity, the transaction would likely be sustained under the Federal Circuit's
interpretation.

D.  Second-Class-of-Stock Argument. In the Coordinated Issue Paper, the IRS argues
that each of the Warrants and the Put Option caused the corporations that engaged
in the $SC^2$ strategy to have a second class of stock that disqualified them as
S corporations. Both of these arguments are exceedingly weak and are contrary to
the applicable Treasury regulations. The IRS likely included these arguments as a
means of trying to force taxpayers to litigate their cases in the Tax Court rather
than the applicable federal district court or the Court of Federal Claims. In
general, the Tax Court has two distinguishing features. First, it is commonly
viewed by tax practitioners as a significantly more pro-government forum than
many U.S. federal district courts and the Court of Federal Claims. Second, of the
three venues in which taxpayers may litigate tax issues, the Tax Court is the only
one that grants jurisdiction to the taxpayer without first requiring the full payment
of the taxes involved. By raising the Second-Class-of-Stock Argument, the IRS
effectively positioned itself so that it could assert alternative deficiencies against
the shareholders (based on the Reallocation Argument) and the corporations
(based upon the Second-Class-of-Stock Argument). By asserting deficiencies
against both the shareholders and the corporations, the IRS could require
participants in $SC^2$ transactions to pay the alleged tax deficiency twice in order to
maintain jurisdiction over the entire matter in either a district court or the Court of
Federal Claims. Because of the large amounts involved for some of the
participants in the $SC^2$ transaction such as Upper Deck, a requirement to pay the
tax at both the corporate level and the shareholder level could economically

-19-

EXHIBIT __V__, PAGE 666

compel the parties to bring one or both of the disputes in the Tax Court, the forum favored by the IRS.

1.  *Warrants.* The IRS's primary position regarding the Second-Class-of-Stock Argument is that the Warrants created a second class of stock. However, Treasury Regulation Section 1.1361-1(l)(4)(iii) provides:

> A ... warrant, or similar instrument (collectively, call option) issued by a corporation is treated as a second class of stock of the corporation if, taking into account all the facts and circumstances, the call option is substantially certain to be exercised (by the holder or a potential transferee) and has a strike price substantially below the fair market value of the underlying stock on the date the call option is issued.

Such Regulation goes on to establish a safe harbor in Section 1.1361-1(l)(4)(iii)(*B*)(*3*) compliance with which precludes treatment of a warrant as a second class of stock. In relevant part, such Regulation provides:

> A call option is not treated as a second class of stock if, on the date the call option is issued, ... the strike price of the call option is at least 90% of the fair market value of the underlying stock on that date. For purposes of this paragraph (l)(4)(iii)(C), a good faith determination of the fair market value by the corporation will be respected unless it can be shown that the value is substantially in error and the determination of value was not performed with reasonable diligence to obtain a fair value.

In the case of Upper Deck, the strike price for the UD Warrants was set at an amount in excess of 90% of the fair market value of the UD Non-Voting Common Stock as determined by the valuation performed by FMV Opinions. In the Coordinated Issue Paper, the IRS concluded that the valuations undertaken in Generic SC$^2$ Transactions were substantially in error, with the result that the Warrants did not fall within the safe harbor. In addition, it concluded that for purposes of the general test of Treasury Regulation Section 1.1361-1(l)(4)(iii)(*A*), the Warrants were substantially certain to be exercised and had strike prices substantially below the stock's fair market value. Such conclusions, however, are largely unfounded.

Even if it is assumed that the valuation performed by FMV Opinions was "substantially in error," it does not follow that the safe harbor would not be available to the Upper Deck Parties. Unless the IRS could show that Upper Deck's determination of value (as opposed to FMV Opinions'

USIDOCS 5762376v3

EXHIBIT __V__, PAGE 667

determination of value) was not performed with reasonable diligence, the safe harbor would nevertheless be available. Notwithstanding any flaws that may have existed in the valuation performed by FMV Opinions, in choosing FMV Opinions to undertake the valuation, Upper Deck selected a highly-respected, well-known valuation firm, and there does not seem to be any basis for the IRS to assert that such selection was not performed with reasonable diligence or that there was any reason why the Upper Deck parties could not rely on the conclusions reached in FMV Opinions' valuation. In this regard, it is important to note that under the wording of the Regulation, the burden is on the IRS to show that Upper Deck's process for obtaining the fair market value of the UD Non-Voting Common Stock was not performed with reasonable diligence. Moreover, even if there are flaws in the methodology employed in the valuation, unless the IRS could show that Upper Deck acted unreasonably in accepting the valuation and should have substituted its non-professional judgment for that of a professional appraisal, the safe harbor would still be available.

If the safe harbor were not available, a court still would have to determine that the UD Warrants were "substantially certain to be exercised" before it could conclude that the UD Warrants gave rise to a second class of stock. In that regard, to my knowledge no Warrant in any $SC^2$ transaction has ever been exercised. Furthermore, as discussed in Section V.C, above, exercise of the UD Warrants would have had significant adverse economic consequences to the MPR Trust. Thus, although the UD Warrants unquestionably acted to depress the value of the UD Non-Voting Common Stock held by the Austin Plan and were an ultimate "fail safe" mechanism that would allow the MPR Trust to regain 90% economic ownership of the Company if the UD Non-Voting Common Stock were not repurchased, there is no analysis that would support the conclusion that they were substantially certain to be exercised. The IRS's naked assertion in the Coordinated Issue Paper that "because the holders of the warrants would be economically compelled to exercise the warrants if the exempt parties' stock is not redeemed, it is substantially certain that the original shareholders will enjoy the economic effect of exercising the warrants ... [such that] the warrants will be treated as substantially certain to be exercised" is both factually incorrect and unsupported as a matter of federal income tax law.

2.  *Put Option.* Similar analysis applies with respect to the UD Put Option. Treasury Regulation Section 1.1361-1(l)(2)(iii) provides that redemption agreements (including arrangements such as the UD Put Option) are disregarded in determining whether a corporation has a second class of stock unless:

USIDOCS 5762376v3

EXHIBIT ✓, PAGE 668

"(1)  A principal purpose of the agreement is to
circumvent the one-class-of-stock requirement ... ,
and

(2)  The agreement establishes a purchase price
that, at the time the agreement is entered into, is
significantly in excess of or below the fair market
value of the stock."

The Regulation goes on to state that: "A good faith determination of fair
market value will be respected unless it can be shown that the value is
substantially in error and the determination of the value is not performed
with reasonable diligence."

The purchase price under the UD Put Option was set at the fair market
value of the stock as determined by appraisal at the time of exercise. As
set forth above, the UD Shareholders Agreement specified certain factors
that needed to be taken into account in the appraisal setting the purchase
price. These factors were generally the same factors that were included in
the appraisal conducted by FMV Opinions in connection with the initial
contribution of shares to the Austin Plan. As discussed above in
connection with the determination of the exercise price of the
UD Warrants, there is no evidence that the Upper Deck parties acted
unreasonably in relying on the opinion and valuation methodology
employed by FMV Opinions. Moreover, the flaws that the IRS believes
existed in the valuation used to determine the exercise price of the
Warrants were not applicable in the case of the UD Put Option. Finally,
the IRS's argument contained in the Coordinated Issue Paper that the
purchase price determined for the Put Options "while purportedly at fair
market value, reflects a price substantially below that to be expected for
shares reflecting 90% ownership of the corporation" is meaningless. The
IRS effectively is refusing to acknowledge that what is being appraised is
the value of the outstanding shares of Non-Voting Common Stock held by
the tax-exempt entity in a company that has a large number of outstanding
Warrants that dilute the equity position of such shares. In addition, there
is no basis to conclude that establishing an exercise price for a put option
at an excessively low value is problematic from a tax perspective. If the
purchase price is too low, the tax-exempt entity simply would not exercise
the Put Option.

VI.  Impact of Repurchase of Austin Plan Shares.

In November 2002, Upper Deck approached the Austin Plan with an offer to repurchase
the shares of the UD Non-Voting Common Stock held by the Plan. This overture
resulted in the MPR Trust repurchasing the Austin Plan's shares on December 31, 2002
for $2 million. Had the Austin Plan not agreed to so sell its shares, commencing in April
2003, it would have been entitled under the UD Put Option to require Upper Deck to
redeem the shares.

-22-

US1DOCS 5762376v3

EXHIBIT __V__, PAGE 669

The MPR Trust's repurchase of the shares seems to have been done in an exceedingly non-arm's-length manner. Upper Deck provided the Austin Plan with incomplete financial data regarding the Company. Furthermore, it undoubtedly must have known that the incomplete financial data was misleading since it did not reflect the tremendous surge in revenues and net income that the Company experienced in the last quarter of 2002. In that regard, the Company seemingly deliberately withheld information from the Austin Plan by responding to the Plan's requests for additional information by essentially threatening the Austin Plan that if it did not accept the offered price, it might never receive anything for the shares held by it. The ultimate result was the repurchase of the shares for $2 million at a time when an appraisal conducted on behalf of the Insurance Company (in 2006) by Empire Valuation Consultants indicates the true fair market value of the shares at December 10, 2002 was closer to $11.3 million.

The manner in which the Upper Deck Parties repurchased its shares in December 2002 significantly diminished the prospects that the tax benefits associated with the $SC^2$ transaction would be upheld by a court if litigated. The seemingly heavy-handed method of negotiation and evident failure to disclose pertinent information to the Austin Plan substantially diminished any argument that one of the principal motivations for entering into the $SC^2$ transactions was to provide an economic benefit to the Austin Plan. Absent such a non-tax motivation for the transactions, the Economic Substance Doctrine as applied in both the 9th Circuit and the Federal Circuit could easily be found to apply to sustain the IRS's Reallocation Argument.[17] Furthermore, the fact that the Austin Plan accepted the $2 million purchase price without undertaking the type of financial due diligence that a party dealing at arm's length would prudently take suggests that the Austin Plan was not truly acting independently. The actions of the Austin Plan consequently would add significant strength to the IRS's argument that the UD Non-Voting Common Stock held by the Austin Plan was intended to revert to the benefit of the MPR Trust pursuant to a prearranged plan and that the parties to the transactions never truly expected the Austin Plan would enjoy the economic benefits associated with appreciation in the value of the UD Non-Voting Common Stock. Thus, the actions of the parties in connection with the repurchase of the shares substantially undercut the ability of the Upper Deck Parties to argue either that they had a significant non-tax motive for the transaction or that the transaction had economic substance as a result of the benefits and burdens of ownership being lodged with the Austin Plan. Consequently, the probability that the IRS could prevail in its Reallocation Argument was substantially enhanced.

The terms of the repurchase of UD Non-Voting Common Stock could also breathe life into the IRS's argument that the overall arrangement among the parties created a second class of stock that disqualified Upper Deck from being an S corporation. The IRS could well be able to convince a court that the non-arm's-length behavior of both the Upper Deck Parties and the Austin Plan in connection with the share repurchase evidenced a pre-existing plan or arrangement whereby the Upper Deck Parties would repurchase the UD Non-Voting Common Stock from the Austin Plan at a price greatly below the stock's

---

[17] In addition, the lack of an intention to benefit the Austin Plan would be inconsistent with the representations made by Upper Deck and the MPR Trust in the representation letter dated September 4, 2001 to the Insurance Company thereby presumably defeating coverage under Section 3(b) of the Policy.

EXHIBIT ____√____, PAGE 670

fair market value. Assuming the court did not use the existence of such a preexisting arrangement to completely disregard the ownership of the stock by the Austin Fund (thereby holding for the IRS under the Reallocation Argument), it could conclude that the arrangement created a second class of stock because it resulted in the shares held by the Austin Fund having different economic attributes than the UD Voting Common Stock held by the MPR Trust. Such an arrangement would not be protected from causing a second class of stock under Treasury Regulation Section 1.1361-1(l) because the purchase price presumably was not established at the time the UD Non-Voting Common Stock was transferred to the Austin Fund and the repurchase was certain to occur.

VII.    Offsetting Benefit.

As discussed above in Section I, Section 11 of the Policy requires any insured party to refund to the Insurance Company the amount of any Offsetting Benefit realized by the insured party. The term "Offsetting Benefit" is defined in part to mean "(i) any amount realized by any Insured, with respect to any year, of any savings of any Taxes that would not have been realized but for an Insured Tax Loss." If the Upper Deck Parties enter a closing agreement with the IRS based upon the IRS settlement proposal, all of the income previously reported as allocable to the Austin Plan during 2001 and 2002 would be reallocated to the MPR Trust. As a result of this reallocation, the basis that the MPR Trust had in its shares in Upper Deck would be increased by the amount of income so reallocated. As discussed in Section II.B hereof, such an increase in basis would allow the MPR Trust (i) to receive a corresponding additional amount of distributions from Upper Deck without realizing gain, (ii) to be able to deduct a corresponding additional amount of losses (if any) allocated to it from Upper Deck and (iii) to recognize a smaller amount of gain (or a greater amount of loss) on any sale of the stock of Upper Deck held by it. The tax savings associated with any of these three circumstances would be Offsetting Benefits under the Policy.

An Offsetting Benefit in the form of reduced gain (or increased loss) upon a sale or other disposition of shares is relatively easy to identify and quantify. In contrast, Offsetting Benefits attributable to the ability of the MPR Trust to deduct increased losses or realize less gain upon the receipt of distributions from Upper Deck can only be determined if the Trust's basis in its shares of stock in the Company is known. Despite the Insurance Company's requests for information regarding the basis of the Trust's shares of stock, insufficient information has been received from the Upper Deck Parties to allow determination of the Trust's basis.

Although the basis of the MPR Trust in its shares of Upper Deck is unknown, the tax returns for Upper Deck for 2002, 2003 and 2004 reflect significant taxable income. Accordingly, assuming those returns to be correct, no Offsetting Benefit attributable to an increased use of losses was realized through the end of 2004. Considerable less certainty, however exists with regard to potential Offsetting Benefits attributable to the ability of the MPR Trust to receive additional distributions from Upper Deck without realizing taxable gain. The additional uncertainty exists not only because the basis in the shares is unknown, but also because the amount of post-2002 distributions that may have occurred is unclear.

-24-

EXHIBIT ✓, PAGE 671

There exists a substantial amount of court authority in the context of closely-held corporations in which transactions undertaken by the corporations and their shareholders (or their affiliates) have been treated as deemed distributions for federal income tax purposes. For example, the sale of assets by a corporation to its shareholders at a below-market price would be characterized as a deemed distribution in the amount of the "discount" given the purchaser. Similarly, purchases by corporations of assets from their shareholders at above-market prices also could be characterized as a deemed distribution in the amount of the premium. Other possible transactions that could give rise to deemed distributions include loans made by a corporation to its shareholders that are never repaid, purchases of personal assets (*e.g.*, cars, houses, boats) by the corporation that are used by the shareholders, and excessive amounts of compensation paid to the shareholders or their affiliates.

Financial information provided by the Upper Deck Parties reveals a variety of transactions and circumstances that could potentially be characterized as constructive distributions by the Company to its shareholder. However, because the information regarding these circumstances and transactions is incomplete, no conclusion can be reached as to whether they would properly be characterized for federal income tax purposes as deemed distributions or, if so characterized, whether they would produce an Offsetting Benefit. The following transactions have been identified as ones that could potentially give rise to an Offsetting Benefit:

1. Footnote 1 to the audited financial statements of Upper Deck Company LLC (the "LLC") for the year ended December 31, 2004 as set forth in Report of McGladrey and Pullen (the "2004 Financials"), indicates that on September 15, 2004, the LLC acquired 100% of the units of Central South Investors LLC from an entity "under common control" for cash in the amount of $22 million. If the amount paid for the units exceeded their fair market value, for federal income tax purposes, a deemed distribution from Upper Deck to the MPR Trust could result.

2. Footnote 1 to the 2004 Financials also indicates that two of the LLC's subsidiaries, Upper Deck Authenticated Ltd. and Upper Deck International, had minority interests of 44.6% and 50%, respectively, held by "minority owners ... ultimately owned by the same member as the [LLC]." Such minority interests create the potential for transactions that would be deemed to be distributions from Upper Deck to its shareholder. The types of transactions that could give rise to deemed distribution include (i) "disproportionate" distributions by the subsidiaries to their minority owners; (ii) inappropriate intercompany charges for goods and services between the subsidiaries and the LLC and/or its wholly owned subsidiaries; and (iii) disproportionately large capital contributions by the LLC or its wholly owned subsidiaries to the subsidiaries that have minority interests.

3. Footnote 2 to the 2004 Financials indicates that the LLC ceased both sales and distributions operations and sold, at cost, certain raw material, work-

-25-

in-process and finished goods inventory to an affiliate for approximately $9.7 million. The sale of a seemingly major portion of the LLC's business to an affiliate for $9.7 million during a year in which the LLC had net income of approximately $82.7 million could evidence a below-market sale properly characterized in part as a distribution from Upper Deck to the MPR Trust (or McWilliam).

4.  Footnote 9 to the 2004 Financials indicates outstanding notes and advances receivable from affiliates totaling approximately $95.6 million as of December 31, 2004. Depending upon (i) the history of repayment of these loans, (ii) the terms of the loans, (iii) the payment or accrual of interest on the loans and (iv) other dealings between the parties to the loans, some or all of these loans and advances could be treated as constructive distributions to the MPR Trust by Upper Deck. Despite requests for information regarding related party loans, Upper Deck did not provide sufficient background information relating to these (or other) loans to determine whether they should properly be characterized as loans or disguised distributions under applicable federal income tax principles.

5.  Footnote 9 to the 2004 Financials also indicates that the LLC entered into certain guaranties of indebtedness incurred by an affiliate, Jet Source, Inc. Once again, if the economic arrangement between the LLC and Jet Source, Inc. was not documented in an arm's-length fashion or the conduct of the parties otherwise reflects non-arm's-length treatment of the LLC, the guaranty could be treated as a constructive distribution by the Upper Deck Company to the MPR Trust.

6.  Footnote 11 to the 2004 Financials indicates that the LLC exchanged, at cost, certain prepaid signature royalties and minimum guarantee royalties with an affiliate. To the extent such exchange was undertaken in a non-arm's-length manner such that the affiliate received disproportionate economic benefits, the transaction could be recharacterized in whole or in part as a constructive distribution by Upper Deck to the MPR Trust.

VIII.  Definitions.

| | |
|---|---|
| 2004 Financials | Section VII.1 |
| 9th Circuit | Section I |
| Austin Plan | Section I |
| Code | Section I |
| Company | Section I |
| Economic Substance Doctrine | Section V.C |
| Federal Circuit | Section I |

-26-

EXHIBIT __V__, PAGE 673

| | |
|---|---|
| FMV Opinions | Section III.A.7(b)(1) |
| Generic SC$^2$ Transaction | Section IV.F |
| Insurance Company | Section I |
| IRS | Section IV.A |
| KPMG | Section I |
| KPMG Opinions | Section I |
| LLC | Section VII.1 |
| McWilliam | Section I |
| Offsetting Benefits | Section I |
| Policy | Section I |
| Reallocation Argument | Section V.B |
| SC$^2$ | Section I |
| Second-Class-of-Stock Argument | Section V.B |
| Subchapter S | Section II |
| UD Non-Voting Common Stock | Section III.A.3 |
| UD Put Option | Section III.A.7(b) |
| UD Shareholders Agreement | Section III.A.7 |
| UD Voting Common Stock | Section III.A.2 |
| UD Warrants | Section III.A.4 |
| Upper Deck | Section I |
| Upper Deck Parties | Section I |

This is the full report on the captioned matter prepared by me on behalf of American International Specialty Lines Insurance Company. Wilmer Cutler Pickering Hale and Dorr LLP is being paid $650 per hour for my services. Speaking engagements and publications during the last ten years are set forth in my résumé which was previously submitted. I have not testified as an expert witness in any case in the last four years.

_Robert D. Burke_  8/16/06

Robert D. Burke

US1DOCS 5762376v3

EXHIBIT ✓, PAGE 674