# EXHIBIT W



COPY

1   AMERICAN ARBITRATION ASSOCIATION

2   ----------------------------------------X

3   AMERICAN INTERNATIONAL SPECIALTY

4   LINES INSURANCE COMPANY,

5             Claimant-

6             Counter Respondent,

7        - against -

8   THE UPPER DECK COMPANY, RICHARD P.

9   McWILLIAM, and the MPR REVOCABLE TRUST,

10           Respondents-

11           Counter Claimants.

12   ----------------------------------------X

13             780 Third Avenue

14             New York, New York

15             October 10, 2006
                10:05 a.m.

16   B E F O R E:

17      JOHN F. BYRNE, Chairman

18      STEPHEN D. KRAMER, Arbitrator

19      CHARLES J. MOXLEY, JR., Arbitrator

20

21      MELISSA GILMORE, Reporter

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
24         New York, New York 10022
            212-750-6434
25          REF: 81150

EXHIBIT _W_ PAGE 675

1  Benjamin - Cross
2  remember, that's fine.  This isn't a
3  memory test.  Thank God, it's never a
4  memory test.  If you are not sure, say so.
5  If you have got a question, ask it.  Okay?
6  THE WITNESS:  Um-hum.
7  CHAIRMAN BYRNE:  Cell phone turned
8  off?
9  THE WITNESS:  Didn't bring it with
10  me.
11  CHAIRMAN BYRNE:  You are back in my
12  will.  Swear the witness, Ms. Gilmore.
13  P E T E R   K.   L A T H R O P,   called as a
14  witness, having been duly sworn by a Notary
15  Public, was examined and testified as
16  follows:
17  CHAIRMAN BYRNE:  May we have your
18  full name for the record, please?
19  THE WITNESS:  Peter K. Lathrop,
20  L-A-T-H-R-O-P.
21  CHAIRMAN BYRNE:  I need from you a
22  business and home address.
23  THE WITNESS:  Business address, 70
24  Pine Street, Eighth Floor, New York, New
25  York 10270.  Home address, 1255 Meadowlark

155

1  Lathrop - Direct
2  A.   To prepare and file AIG's state and
3  federal income tax returns, and there were like
4  3,000 state returns, for example.  We handled
5  audits of those returns performed by the IRS
6  and state income tax authorities, and we
7  responded to tax questions raised by the profit
8  centers, tax issues involved in acquisitions of
9  companies, acquisition of assets, disposition,
10  any kind of income tax plan.
11  Q.   When were you admitted to practice?
12  A.   1969.
13  Q.   And are you a member of any
14  professional organizations?
15  A.   I'm a member of the American Bar
16  Association and the New York State Bar
17  Association.
18  Q.   Any sections or committees in those
19  organizations?
20  A.   I'm a member of the tax section of
21  both associations.
22  Q.   Can you give a brief summary of your
23  legal experience before you came to AIG?
24  A.   I was with the small law firm of
25  Everett, Johnson & Breckenridge in lower

157

1  Benjamin - Cross
2  Lane, Scotch Plains, New Jersey 07076.
3  MR. KUSHNER:  Let me just hand
4  Mr. Lathrop the policy.
5  DIRECT EXAMINATION
6  BY MR. KUSHNER:
7  Q.   Mr. Lathrop, by whom are you
8  employed?
9  A.   AIG.
10  Q.   And how long have you been employed
11  by AIG?
12  A.   Almost ten years.
13  Q.   You are an attorney?
14  A.   Yes, I am.
15  Q.   Where are you admitted?
16  A.   In the state of New York.
17  Q.   And what position did you hold at
18  AIG in May of 2001?
19  A.   Vice president and director of
20  taxes.
21  Q.   What were your responsibilities as
22  vice president and director of taxes?
23  A.   I managed the tax department, which
24  I had basically three roles at that time.
25  Q.   And what were they?

156

1  Lathrop - Direct
2  Manhattan.  They were located at 20 Exchange
3  Place from 1967 through 1994, August of '94.
4  Q.   Were you a partner or an associate
5  at that firm?
6  A.   I was an associate at the beginning,
7  and I became a partner, I believe July --
8  January 1, 1973.
9  Q.   And between your time at that firm,
10  and the time that you started at AIG, were you
11  employed?
12  A.   Yes, I was.
13  Q.   Where?
14  A.   I left Everett, Johnson &
15  Breckenridge to join Alexander & Alexander
16  Services, as its vice president and director of
17  taxes.
18  Q.   What years were those?
19  A.   Nineteen -- August '94 to
20  November '96.
21  Q.   Sir, are you going to be retiring
22  from AIG?
23  A.   I am.
24  Q.   And effective when?
25  A.   July 1, 2007.

158

Lathrop - Direct

1
2    Q.   Did you have anything to do with the
3    policy at issue in this proceeding before it
4    was bound?
5    A.   Yes, I did.
6    Q.   And what?
7    A.   I reviewed the tax consequences.
8    Q.   And I put the policy before you.  Do
9    you remember which parts of the policy --
10   A.   Primarily, the KPMG opinions.
11   Q.   Any other parts?
12   A.   I'm sure we read the policy itself.
13       CHAIRMAN BYRNE:  You just used that
14   lawyers "we" again.  It's a bad habit we
15   all have, but if -- did you review it
16   yourself or others on your staff?
17       THE WITNESS:  I meant to include
18   Stanton Young, senior tax counsel at AIG.
19   It was not the royal "we."
20   Q.   But the "we" does include you?
21   A.   It does include me.
22   Q.   Did you reach any conclusions based
23   on your review?
24   A.   Yes.
25   Q.   And what were they?

159

Lathrop - Direct

1
2       MR. WAHLQUIST:  Objection, Your
3    Honor, if he is going to give --
4    Honors/arbitrators -- if he is going to
5    give legal opinions or conclusions with
6    respect to the policy, we have a big
7    problem because all of the privilege
8    materials have been withheld, and it is
9    our view if he is going to give those
10   opinions, they have to certainly disclose
11   the opinions of all the tax lawyers they
12   consulted on this, or not just this one.
13   They don't get to pick and choose.
14       MR. KUSHNER:  I'm sorry, I didn't
15   mean to interrupt.
16       CHAIRMAN BYRNE:  It is very well
17   taken, and it's a good caution, and you
18   did it at the right time.  I assume he
19   reached conclusions.  It was the next
20   question that could or couldn't get us
21   into trouble, so I appreciate it.  Where
22   are we going here?
23       MR. KUSHNER:  I'm not asking for his
24   communications or advice to others.  I'm
25   asking for his own conclusions.

160

Lathrop - Direct

1
2       CHAIRMAN BYRNE:  Well --
3       MR. WAHLQUIST:  Nor was he
4    designated as an expert witness.
5       MR. KUSHNER:  No, he is a fact
6    witness, very much so.
7       CHAIRMAN BYRNE:  One second.  You
8    know what?  You are big boys and girls.
9    Let's go slow.  Let me hear the question.
10   Thank you for the position.  Let's see how
11   far we go on it.
12   BY MR. KUSHNER:
13   Q.   I will ask a follow-up question, and
14   that is, did you reach any conclusion as to
15   whether the transaction worked from a tax
16   standpoint?
17   A.   Yes.
18       MR. WAHLQUIST:  Objection, that's --
19       CHAIRMAN BYRNE:  Was that conclusion
20   based upon your own review of the policy,
21   the four corners of the policy, and the
22   opinion?
23       THE WITNESS:  Yes.
24       CHAIRMAN BYRNE:  Did it involve in
25   any way anyone giving you underlying

161

Lathrop - Direct

1
2    materials, legal or otherwise?
3       THE WITNESS:  No, I performed my own
4    research.
5       CHAIRMAN BYRNE:  What research did
6    you perform?
7       THE WITNESS:  Studied the Internal
8    Revenue Code, the regulations, the
9    rulings.
10       CHAIRMAN BYRNE:  How did you convey
11   your conclusion?
12       THE WITNESS:  I'm sorry.  May I hear
13   -- rehear the question?
14       CHAIRMAN BYRNE:  How did you
15   convey -- what was the manner in which you
16   conveyed your conclusion?
17       THE WITNESS:  My recollection is it
18   was done by e-mail and telephone
19   conversation.
20       CHAIRMAN BYRNE:  To whom?
21       THE WITNESS:  It would be
22   conversations to Stan Young, a lawyer in
23   the tax department, and I recollect with
24   Brian Benjamin, and possibly some of his
25   subordinates.

162

Lathrop - Direct

1    Lathrop - Direct
2        CHAIRMAN BYRNE:  Any e-mails to
3    them?
4        THE WITNESS:  I expect there were.
5        CHAIRMAN BYRNE:  They have been
6    produced?
7        MR. KUSHNER:  I believe that they
8    were in our privilege log.  So the answer
9    is they have not been produced.
10       CHAIRMAN BYRNE:  Are his e-mails
11   here per my prior order?
12       MR. KUSHNER:  I'm sorry.  The prior
13   order pertained to Rob Jones.
14       CHAIRMAN BYRNE:  Sorry.  Are the
15   e-mails here?
16       MR. STROILI:  I think they are here.
17       CHAIRMAN BYRNE:  Okay.  Here is the
18   deal.  I will let him testify as to what
19   he told someone provided that if he told
20   them that in writing, or conveyed
21   something in writing to them, also, the
22   writing be produced.  That's the deal.
23   Can you live with the deal?
24       MR. WAHLQUIST:  When, can I ask?
25       CHAIRMAN BYRNE:  One thing at a

163

1    Lathrop - Direct
2        CHAIRMAN BYRNE:  Here is the full
3    deal.  Since Mr. Wahlquist accused me of
4    jamming the deal down his throat, I'm
5    going to sweeten the deal I'm going to jam
6    down his throat.  We are going to finish
7    the direct of Mr. Lathrop between now and
8    4:30.
9        Those, I am told, are all the
10   e-mails in question.  I am going to give
11   you overnight to review them, and
12   Mr. Lathrop will be here tomorrow morning
13   at 10:00.  You can do whatever cross of
14   him you wish to, but tomorrow morning at
15   10:00, that will be the first thing we do.
16   All right?
17       MR. WAHLQUIST:  I can live with
18   that.
19       CHAIRMAN BYRNE:  Understood.
20       MR. KUSHNER:  Sure.
21       CHAIRMAN BYRNE:  And don't think
22   that just because you have got more time
23   to prepare your cross, that you have to
24   fill it all in.
25       MR. WAHLQUIST:  It gets shorter.

165

1    Lathrop - Direct
2    time.
3        MR. WAHLQUIST:  I get the sense I'm
4    going to have to live with the deal, but I
5    do want the deal to be fair, okay?  If
6    they are going to have this witness
7    testify and talk about what he told them
8    legally, and then I need to see all of it,
9    not just part of it.
10       CHAIRMAN BYRNE:  I understand and if
11   you have to call somebody, you call
12   somebody, but I want them here.  If you
13   don't have them here presently, I want
14   them here first thing tomorrow morning.
15       MR. STROILI:  Let me find out if we
16   have them.
17       CHAIRMAN BYRNE:  And we are
18   finishing this witness -- we will not
19   finish this witness, and he will be
20   subject to recall at such time as those
21   documents are produced.  Okay.  Go take a
22   look.
23       MR. STROILI:  Sure.
24       CHAIRMAN BYRNE:  Off the record.
25       (Discussion off the record.)

164

1    Lathrop - Direct
2        CHAIRMAN BYRNE:  Thank you very
3    much.
4    BY MR. KUSHNER:
5        Q.   Mr. Lathrop, before the recess, I
6    asked you if you had reached any conclusion as
7    to whether the transaction worked from a tax
8    standpoint.  Had you reached a conclusion?
9        A.   Yes, I had.
10       Q.   And this was prior to the policy
11   being bound?
12       A.   That's correct.
13       Q.   And what was your conclusion?
14       A.   That the transaction, if carried out
15   as outlined by KPMG, worked from a tax
16   standpoint.
17       Q.   What were the reasons for your
18   conclusion?
19       A.   The key to this is that you have to
20   have a valid charitable contribution.  The
21   shareholder, the donee, has to have the
22   beneficial ownership, meaning that it has a
23   risk of upside and downside in the stock.  And
24   the way the transaction was structured, the
25   Austin Firefighters had that.

166

Lathrop - Direct

```
 2    They weren't guaranteed a price of
 3  redemption. They had, you know, their
 4  obligations of first refusal under the
 5  shareholders agreement, but they also had the
 6  put option, which their stock would be
 7  evaluated by an independent appraiser, and they
 8  would get fair market value whatever it was at
 9  that time.
10    And there is a well established line
11  of authority that indicates like that. It's a
12  good charitable contribution. The other
13  consequences of this transaction, which
14  benefited Mr. McWilliam and Upper Deck, were
15  independent of the charitable contribution.
16    For many years, organizations like
17  the Austin Firefighters, have not been subject
18  to the Unrelated Business Tax under 511. And
19  for many years, the only eligible shareholders
20  of Subchapter S corporations were individuals,
21  and a limited number at that.
22    I think when I started practicing
23  law, which dates me, it was ten. Congress has
24  been expanding it over the years. In 1996,
25  Congress said we will increase the number of
```

167

Lathrop - Direct

```
 2  eligible shareholders to 75, and by the way,
 3  tax exempt organizations can be shareholders.
 4    And in that act, they also
 5  contemplated that people would be making gifts
 6  of shareholder stock to charitable
 7  organizations in Subchapter S stock and they
 8  changed 170E to say that in the case of gifts
 9  of Subchapter S stock to charitable
10  organizations, the amount of the deductible
11  donation had to be reduced by what are known as
12  751 items, receivables and sharply appreciated
13  inventory, the sort of things that, if sold,
14  would produce ordinary income.
15    That is the same rule for
16  partnerships. The Code and the Regs have very
17  specific rules on allocating the income of
18  Subchapter S corporations. You look only to
19  the issued stock. There are very specific
20  rules on second class of stock. Warrants are
21  not treated as a second class of stock unless
22  they are substantially certain to be exercised,
23  and they were not exercised here, and nor -- I
24  don't think they were in any of these other
25  deals that KPMG did.
```

168

Lathrop - Direct

```
 2    MR. WAHLQUIST:  I move to strike the
 3  latter testimony as not responsive to the
 4  question. We are going way beyond the
 5  underwriting process in order to
 6  complicate it.
 7    CHAIRMAN BYRNE:  It's not quite.
 8  The motion to strike is overruled, but
 9  give us some credit. Okay?
10    A.  Well, let's see. The warrants were
11  not a second class of stock because the
12  regulations were very specific. They won't be
13  treated as a second class of stock unless two
14  tests are met, one of which the warrants have
15  to be substantially likely to be exercised. So
16  they -- that wouldn't be a second class of
17  stock.
18    Second class of stock would be
19  fatal, but the Code itself says, if you have
20  voting and nonvoting stock and they are, you
21  know, identical as to liquidation and
22  distribution rights, they should be treated as
23  a single class of stock. That's in the Code
24  itself.
25    So the only risk here, as I saw it,
```

169

Lathrop - Direct

```
 2  was if the shares were not redeemed at market
 3  value, and unfortunately, that's what happened.
 4    CHAIRMAN BYRNE:  Did you tell
 5  anybody -- did you communicate to anyone
 6  what you viewed as the risk here?
 7    THE WITNESS:  No, because the --
 8    CHAIRMAN BYRNE:  No?
 9    THE WITNESS:  No.
10    CHAIRMAN BYRNE:  You are here to
11  tell us what you did in this transaction,
12  not to offer an opinion with respect to
13  any other transactions, or similar
14  transactions. That's why I stopped you,
15  okay?
16    THE WITNESS:  Okay.
17  BY MR. KUSHNER:
18    Q.  Did you know at the time, that is,
19  before the policy was bound, whether KPMG had
20  done any other SC2 transactions?
21    A.  Yes, I did.
22    Q.  And do you recall which ones you
23  knew about?
24    A.  There were at least three prior to
25  this one, Award Homes/Santa Clara, Seeno,
```

170

Lathrop - Direct

1
2  S-E-E-N-O, and I think Clement Pappas was
3  the -- the third one, or it could have been one
4  of the other ones, I don't know.  But there
5  were three prior to Upper Deck.
6      Q.   And were these transactions ones
7  which had been presented to AIG for insurance?
8      A.   Yes.
9      Q.   And what was the outcome?
10     A.   Two of them were insured.  Seeno was
11 not.
12     Q.   Why wasn't Seeno insured?
13     A.   Because the shareholder agreement --
14     MR. WAHLQUIST:  Your Honor, I
15 object. this is the second time I have
16 gone down this road.  We went down it the
17 first time, and we didn't say anything.
18 But we specifically asked for underwriting
19 files for the other SC square transactions
20 in discovery in this case.  There were
21 specific objections made to those, which
22 were sustained by the panel, and now, we
23 are up to our neck in this.
24     CHAIRMAN BYRNE:  Well, you are not
25 quite up to your neck, but you are getting

171

Lathrop - Direct

1
2  your feet wet, and I'm not being
3  facetious.  There is a difference between
4  asking for information and a difference --
5  and asking for the whole damn underwriting
6  file and whether it's relevant or not.
7  Tomorrow.
8      MR. WAHLQUIST:  Tomorrow, I get the
9  underwriting file?
10     CHAIRMAN BYRNE:  No, tomorrow -- you
11 may never get the underwriting file, but
12 tomorrow, I invite you to address to the
13 panel what it is about the other
14 transactions that you do or don't want to
15 know about, information about the
16 transactions.
17     Get away from the discovery file
18 thing, and we will figure out what's
19 there, and see if we need any of it.  And
20 there should be -- and give us, address to
21 us a reason for why you think you want
22 this particular information.  It seems to
23 me off the top of my head that some of the
24 information may be relevant, the
25 information may be relevant.

172

Lathrop - Direct

1
2      I'm still not convinced the
3  underwriting file is relevant, and there
4  is really -- there is a difference, as
5  opposed to a mere distinction.  And let's
6  see how you are going to get that
7  information or not.  It may be from a
8  witness, but if the question is I don't
9  know if this witness is telling the truth
10 about the transaction, there is another
11 way of dealing with that, aside from
12 saying I want the underwriting file.
13 Trust me for a couple of minutes, all
14 right, or for half a day.
15     MR. WAHLQUIST:  I have to.
16     CHAIRMAN BYRNE:  It's not the worst
17 thing in the world you can do,
18 Mr. Wahlquist, it's really not.
19     MR. WAHLQUIST:  We have to trust in
20 all three of you at this point.
21     CHAIRMAN BYRNE:  Thank you very
22 much.  All right.  There were three
23 transactions that you looked at while you
24 were at AIG -- four, including Upper Deck.
25     THE WITNESS:  Up to that point.

173

Lathrop - Direct

1
2  There was another one after that as well.
3      CHAIRMAN BYRNE:  Up to that point.
4  Okay, up to that point.  Two of them, you
5  insured.  With respect to the two you
6  insured, were they structured similarly to
7  the Upper Deck structure?
8      THE WITNESS:  Yes.
9      CHAIRMAN BYRNE:  Shareholders
10 agreement -- were they both KPMG?
11     THE WITNESS:  Yes, all three were
12 KPMG.
13     CHAIRMAN BYRNE:  All right.  With
14 respect to the one that was not insured --
15 that was not ultimately insured, what,
16 from a tax point of view, did you see was
17 problematic?
18     THE WITNESS:  The shareholders
19 agreement had a redemption provision,
20 which included one of its options, not
21 only fair market value, but a fixed dollar
22 price.
23     CHAIRMAN BYRNE:  It gave a fixed
24 price as a ceiling?
25     THE WITNESS:  Yes.  Well, as one of

174

EXHIBIT W  PAGE 680

Lathrop - Direct

1  the alternatives you get.  Now, you
2  weren't going to get less than the fair
3  market value of the stock on the date of
4  gift, and that's not a deal that all the
5  shareholders are going to get.  So the
6  danger is that that special provision
7  creates a second class of stock.
8      CHAIRMAN BYRNE:  All right.
9      THE WITNESS:  Which is obviously
10 fatal to Subchapter S.
11     CHAIRMAN BYRNE:  Well, it would seem
12 to be fatal.  Is that the only difference?
13     THE WITNESS:  It's the only one I
14 recall, yes, sir.
15     CHAIRMAN BYRNE:  Was it in a
16 shareholders agreement?
17     THE WITNESS:  It was in the
18 shareholders agreement.
19     CHAIRMAN BYRNE:  As best you can
20 recall, the shareholder agreement called
21 for what, with respect to redemption or
22 repurchase of shares?
23     THE WITNESS:  My recollection is
24 that under the shareholders agreement, the

175

Lathrop - Direct

1  A.  My recollection is that it was.
2      Q.  What was the change?
3      A.  It was the same problem in the
4  shareholders agreement.  We insisted that it be
5  changed so that the redeeming shareholder got
6  fair market value in all circumstances.
7      CHAIRMAN BYRNE:  And the shareholder
8  agreement was --
9      THE WITNESS:  Corrected before the
10 transaction, before the gift was made.
11     CHAIRMAN BYRNE:  Okay.  Did you make
12 the same demand of the one that was
13 ultimately not insured?
14     THE WITNESS:  No.  At that point,
15 the gift had already been made.  My
16 recollection is the gift had already been
17 made, and they said, "Well, we will change
18 the agreement now," and we just felt that
19 was unsatisfactory.
20     CHAIRMAN BYRNE:  Okay.
21 BY MR. KUSHNER:
22     Q.  Do you remember information you
23 received in May of 2001, that KPMG had done
24 about 20 other SC2 transactions?

177

Lathrop - Direct

1  charity was promised either X dollars,
2  which was the value at the date of gift,
3  or fair market value, whichever was
4  greater, so it established a floor.
5      CHAIRMAN BYRNE:  Okay.  Thank you.
6  Under all circumstances or under a
7  particular --
8      THE WITNESS:  My recollection is all
9  circumstances.
10
11 BY MR. KUSHNER:
12     Q.  Of the other two transactions, I
13 think you mentioned Award Homes and Clement
14 Pappas, did one of those transactions undergo
15 some alteration as to its structure?
16     CHAIRMAN BYRNE:  I'm sorry.  Wait a
17 second.  I'm sorry, Counsel.  Before or
18 after it was insured?
19     MR. KUSHNER:  Before it was insured.
20     A.  My recollection is that it did.
21     Q.  And which, if you remember, was that
22 transaction?
23     A.  I don't remember which one it was.
24     Q.  It was either one of those two or?

176

Lathrop - Direct

1  A.  Yes, I do.
2      Q.  And what was your opinion as to
3  whether that soured the tax aspects of the
4  Upper Deck proposed transaction?
5      A.  My view was that it didn't affect
6  the technical merits, but that the explosion of
7  these transactions, just the very multiplicity
8  of them, if the service became aware of them,
9  you got people trying to take them down just
10 because they were mass marketed, and that's
11 pretty much what happened.
12     Q.  Were you ever informed that KPMG was
13 mass marketing these transactions?
14     A.  No, I was not, not until the
15 hearings.
16     Q.  What hearings are we talking about?
17     A.  The Senate Subcommittee on
18 Investigations.
19     MR. KUSHNER:  May I have just a
20 moment, please?
21     CHAIRMAN BYRNE:  Sure.
22     (Discussion off the record.)
23 BY MR. KUSHNER:
24     Q.  I'd just like one or two other

178

Oct 10 arb hearing  10/10/2006  10:05:00 AM

Lathrop - Direct

1  Lathrop - Direct
2  questions, Mr. Lathrop.  Did the right of the
3  charity in the Upper Deck transaction to have
4  its stock redeemed at fair market value, as
5  determined by an independent outside appraiser,
6  play any part in your conclusion that the
7  transaction worked from a tax standpoint?
8  A.   Yes.
9  Q.   And what part did it play?
10  A.   It was critical.
11  Q.   Why was it critical?
12  A.   You wanted to make sure that the
13  charity was treated as an owner, and if you
14  take them out for just a small amount of money,
15  you get the problem that you are accused of
16  parking the stock, not really transferring it
17  to the charity as an owner.  And in that case
18  then, no gift ever occurred and ownership never
19  passed to the charity.
20       The second risk is that if you don't
21  pay fair market value, you have this nonvoting
22  stock that's getting one price, and the common
23  -- the voting common is obviously entitled to
24  everything else, and that creates a danger of
25  the second class of stock classification.  So

179

1  Lathrop - Direct
2  there is two problems.
3       CHAIRMAN BYRNE:  Okay.  I'm
4  confused.
5       MR. KUSHNER:  When you said --
6       CHAIRMAN BYRNE:  I'm sorry, Counsel.
7       You mentioned an appraisal was
8  critical.  There are, however, other ways
9  of arriving at fair market value, in an
10  arm's-length transaction and a right of
11  first refusal.
12       THE WITNESS:  Well, with the right
13  of first refusal you get a third party who
14  is performing the valuation.  When it's
15  between the controlling shareholder and a
16  minority shareholder, there are different
17  considerations that apply --
18       CHAIRMAN BYRNE:  All right.  I just
19  want --
20       THE WITNESS:  that's the difference
21  in my view.
22       CHAIRMAN BYRNE:  I didn't want
23  critical to become only -- I didn't want
24  critical to translate into only.  Thank
25  you.

180

1  Lathrop - Direct
2       MR. KUSHNER:  I have completed by
3  direct.
4       CHAIRMAN BYRNE:  Unlike lawyers --
5  unlike advocates, I don't have to worry
6  about not knowing the answer to my
7  questions beforehand.
8       Did you have any -- but I think it's
9  important to know whether or not you had
10  any role whatsoever in the claims process,
11  i.e., did you have any role whatsoever in
12  determining whether the alleged tax loss
13  was insured and would be paid?
14       THE WITNESS:  I was copied on some
15  of the e-mails, but I didn't take any role
16  in the process.
17       CHAIRMAN BYRNE:  I'm going to push
18  it.  Were you a participant in any of the
19  meetings concerning the same?
20       THE WITNESS:  I might have been a
21  participant in one or two.
22       CHAIRMAN BYRNE:  Asked or offer your
23  opinion, take a vote?  Were you asked for
24  a vote?
25       THE WITNESS:  I don't recall that I

181

1  Lathrop - Direct
2  was.
3       CHAIRMAN BYRNE:  Do you recall
4  voicing an opinion?
5       THE WITNESS:  No, I don't.
6       CHAIRMAN BYRNE:  Did you commit any
7  of your opinions with respect to the
8  payment process, claim process in writing?
9       THE WITNESS:  I really doubt that I
10  did.  Again, the reason I say that if I
11  can continue, is that by then, I had
12  really phased out of any oversight over
13  the tax insurance policies.
14       CHAIRMAN BYRNE:  Okay.  Unless I'm
15  wrong, Counsel, you would rather take a
16  look at what you have got and first thing
17  in the morning --
18       MR. WAHLQUIST:  I would.
19       CHAIRMAN BYRNE:  We will be
20  cognizant of Mr. Lathrop's time, and we
21  could have finished him today and yadda,
22  yadda, yadda, we will go very quickly with
23  you tomorrow.  Thank you very much.
24       MR. KUSHNER:  May I just ask one
25  question?

182

Oct 10 arb hearing  10/10/2006  10:05:00 AM

```
1        Lathrop - Direct
2        CHAIRMAN BYRNE:  Sure.
3   BY MR. KUSHNER:
4        Q.   Do you know who Bill Cotter is?
5        A.   Yes.
6        Q.   Did you meet with Mr. Cotter?
7        A.   Yes, I'm sure I did.
8        Q.   Do you remember whether Mr. Cotter
9   was representing AISLIC when you met with him?
10       A.   I'm sure he was.
11       Q.   And did you discuss the entire Upper
12   Deck situation with him?
13       A.   We may well have.
14       MR. KUSHNER:  Okay, thank you.
15       A.   I mean I just don't know.  I
16   remember I met Bill Cotter.
17       MR. KUSHNER:  Okay.  I thank you.
18       CHAIRMAN BYRNE:  Mr. Lathrop, you
19   are excused for the day.  I want counsel
20   and the parties to remain for a few
21   moments after the witness leaves.  Thank
22   you very much for your time.
23       (Witness leaves the room at this
24   time.)
25       CHAIRMAN BYRNE:  I'm going to put
```

183

192

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK          )

4                                :ss

5    COUNTY OF RICHMOND          )

6

7            I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify that the within is a true and accurate

10   transcript of the proceedings taken on

11   October 10, 2006.

12           I further certify that I am not

13   related to any of the parties to this action by

14   blood or marriage; and that I am in no way

15   interested in the outcome of this matter.

16           IN WITNESS WHEREOF, I have hereunto

17   set my hand this 11th day of October, 2006.

18

19           _____

20                   MELISSA GILMORE

21

22

23

24

25

EXHIBIT _W_, PAGE 684.

193

COPY

TELEPHONE: (212) 750-6434 • FAX: (212) 750-1097

1

2   AMERICAN ARBITRATION ASSOCIATION

3   ----------------------------------------X

4   AMERICAN INTERNATIONAL SPECIALTY

5   LINES INSURANCE COMPANY,

6                    Claimant-

7                    Counter Respondent,

8            - against -

9   THE UPPER DECK COMPANY, RICHARD P.

10  McWILLIAM, and the MPR REVOCABLE TRUST,

11                   Respondents-

12                   Counter Claimants.

13  ----------------------------------------X

14                    780 Third Avenue
                      New York, New York
15
                      October 11, 2006
16                    10:02 a.m.

17  B E F O R E :

18      JOHN F. BYRNE, Chairman

19      STEPHEN D. KRAMER, Arbitrator

20      CHARLES J. MOXLEY, JR., Arbitrator

21

22            MELISSA GILMORE, Reporter

23      ELLEN GRAUER COURT REPORTING CO. LLC
          126 EAST 56TH STREET, FIFTH FLOOR
24            New York, New York 10022
                    (212) 750-6434
25              REF:  82078

1               Proceedings
2     Mr. Lathrop.  Good morning, sir.
3       THE WITNESS:  Good morning.
4       CHAIRMAN BYRNE:  You are still under
5   oath.  You are not under oath with respect
6   to any opinions you may have given to
7   anyone because they are just that, they
8   are opinions.  You are under oath with
9   respect to facts and circumstances
10   involving you directly, all right,
11   understood?
12       THE WITNESS:  Yes.
13       CHAIRMAN BYRNE:  Okay.  God forbid,
14   I ever put a lawyer under oath with
15   respect to their opinions, including
16   myself.  So with that in mind, let's go.
17 EXAMINATION
18 BY MR. WAHLQUIST:
19     Q.  Good morning, Mr. Lathrop.
20     A.  Morning.
21     Q.  Have you ever used the expression
22   "template deal" to describe the SC squared
23   transaction?
24     A.  Have I, personally?
25     Q.  Yes, sir.

1               Lathrop
2     A.  I don't remember.  It's certainly
3 possible.
4     Q.  Why don't you take a minute and look
5 at Exhibit 388, which is what I handed you
6 before we went on the record, and tell me if
7 you can identify that document for us?
8     A.  I can.
9     Q.  What is it, sir?
10     A.  It's a chain of e-mails, the top
11 most of which is an e-mail from me to Steve
12 Goldman, with copies to Brian Benjamin and Stan
13 Young.
14     Q.  And does that refresh your
15 recollection as to whether or not you have ever
16 described SC squared as a template deal?
17     A.  Yes, it does.
18     Q.  What does that expression mean to
19 you?
20     A.  A transaction that has the same
21 characteristics.
22     Q.  All the SC squared transactions look
23 pretty much the same, is that what you meant?
24     A.  Yes.
25     Q.  Okay.  And you were questioned

1               Lathrop
2 yesterday about something at the bottom of
3 Exhibit 388.  I think it's an e-mail dated
4 May 16, 2001 from Kate Rego to Mr. Goldman,
5 advising that KPMG had done 20 S Corp.
6 transactions to date.  Do you remember that
7 testimony?
8     A.  Yes.
9     Q.  And I want to make sure I understand
10 your testimony from yesterday.  Under direct by
11 Mr. Kushner, you had a concern that the
12 multiplicity of those transactions would
13 potentially cause the IRS to take SC squared
14 down, correct?
15     A.  Certainly challenge it, I believe,
16 and I continued to express confidence on the
17 merits of the transaction.  It was just the
18 multiplicity of deals and the possible adverse
19 publicity would create a problem.  Yes, you
20 could wind up with an adverse decision, but not
21 because the deal did not have technical merit.
22     Q.  Did you ever say that in writing?
23     A.  I don't recall saying that
24 explicitly in writing.
25     Q.  Did you ever say anything in writing

1               Lathrop
2 about the technical merits of the SC squared
3 transaction, other than what's in Exhibit 388
4 in front of you today?
5     A.  I don't recall.  I may have on the
6 prior two deals.
7     Q.  There is a reference on Exhibit 388.
8 It says, "File tax" something.  You see the
9 handwritten writing on it?
10     A.  Yes.
11     Q.  Is that your writing?
12     A.  No, it's not.
13     Q.  Whose writing is that?
14     A.  Stan Young's.
15     Q.  Can you read that, that language?
16     A.  I believe it says "File tax
17 liability insure," which is short, I guess, for
18 tax liability insurance file.
19     Q.  Did AIG review that file for any
20 written advice that you gave in connection with
21 the SC squared deal?
22     A.  I have no idea.
23     Q.  Do you keep a separate file?
24     A.  No, I do not.
25     Q.  Did the tax department keep a file

EXHIBIT  _W_ , PAGE _686_

Lathrop

1
2  pertaining to the SC squared transaction?
3     A.   This refers to a tax department
4  file.
5     Q.   Okay.  So this isn't a --
6  Mr. Young's file, is it?
7     A.   No, it's not.
8     Q.   It's a tax department file.  And
9  there was a tax department file pertaining to
10  the SC squared transaction, correct?
11     A.   I believe there were a number of
12  files.
13     Q.   And that's what I'm trying to
14  understand.  Is there one file for each of the
15  policies, or is there a file that pertains to
16  this whole line of business on SC squared?
17     A.   I believe there are files just on
18  each transaction.
19     Q.   Okay.  Did I understand you
20  correctly yesterday to say that you believed
21  the IRS tried to take SC squared down because
22  it was mass marketed?
23     A.   Yes.
24     Q.   And did I understand you correctly
25  yesterday to testify that you were never

204

Lathrop

1
2  informed that KPMG was mass marketing SC
3  squared?
4     A.   That's correct.
5     Q.   Did you ever inform anybody of that?
6  The contrary, you said nobody every told you
7  that.  Did you tell anybody that SC squared was
8  being mass marketed by KPMG?
9     A.   If I didn't know it, how could I
10  tell somebody else?
11     Q.   Well, did you tell your clients that
12  you had concerns with the 20 transactions that
13  had already been underwritten?
14     A.   This is the extent of my comment.  I
15  commented to the people who were writing this
16  insurance.
17     Q.   And did you tell them you had
18  concerns with the number of S Corp.
19  transactions that were already underwritten?
20     A.   Not other than expressed here.
21     Q.   So you told them that on
22  Exhibit 388?
23     A.   Yes.
24        CHAIRMAN BYRNE:  How did you know --
25  and if it's privileged information, I

205

Lathrop

1
2  clearly don't want you to answer -- but
3  how did you learn in May 2001 that the IRS
4  had 20 opportunities to audit the KPMG
5  structure?
6        THE WITNESS:  Because of the bottom
7  e-mail in this chain.  Kate Rego, the
8  broker, is advising our people.  I don't
9  know where she got that information from.
10        CHAIRMAN BYRNE:  Thank you.  But you
11  got it from -- Rego is from Marsh?
12        THE WITNESS:  Marsh.
13        CHAIRMAN BYRNE:  Thank you.
14  BY MR. WAHLQUIST:
15     Q.   And when you got that information,
16  you told your client that KPMG would continue
17  to market this strategy, correct?
18     A.   That was my expectation, yes.
19     Q.   And you expressed concerns that if
20  AIG continued to underwrite insurance for the
21  transaction, that would particularly encourage
22  KPMG to continue writing it; is that correct?
23     A.   That's what it says.
24        CHAIRMAN BYRNE:  Was that then a
25  business decision going forward, as

206

Lathrop

1
2  opposed to a legal decision going forward?
3        THE WITNESS:  This wasn't legal.  I
4  wasn't saying it here that there was
5  anything wrong with the structure or the
6  legal merits.  It was just that, you know,
7  too many of these deals could be
8  problematic, regardless of merits.
9        CHAIRMAN BYRNE:  Yeah, you put a
10  question mark, "is this something that M
11  and A wants to insure going forward."  My
12  question is geared at, you are pointing
13  this out to the business people if they
14  didn't know it already.  And as far as you
15  were concerned, it was then a business
16  decision based on information that
17  everyone should have; is that fair?
18        THE WITNESS:  I would say that's
19  fair.
20        CHAIRMAN BYRNE:  Thank you.
21  BY MR. WAHLQUIST:
22     Q.   And you did have a question about
23  the wisdom of that business decision; is that
24  correct, sir?
25     A.   In light of this knowledge?  Yes, I

207

EXHIBIT  W  PAGE 687

Lathrop

1         Lathrop
2  had questions as to whether you should keep
3  writing these transactions.  Not that they, in
4  and of themselves, were risky.  But they became
5  risky because of the possible impact of having
6  many, many deals and the Service regarding, as
7  it ultimately did, as a mass marketed, shabby
8  kind of transaction.
9      Q.    And in your view, is that why the
10  Service took the position that it did with SC
11  squared?
12      A.    Yes.
13      Q.    Now, yesterday, we saw that -- this
14  is May 17, 2001.  When is the first time you
15  ever heard of Upper Deck?  Your e-mail is
16  May 17th.
17      A.    It was earlier that month, I
18  believe.
19      Q.    We heard testimony from your
20  colleague that AIG got an inquiry from Kate
21  Rego on May 14 or 15 of 2001.  Did you hear
22  anything about Upper Deck before that date?
23      A.    No.
24      Q.    So when you heard about it, was
25  there anything you said in writing about this

Lathrop

1         Lathrop
2  transaction before this e-mail which does raise
3  a question about whether or not you should be
4  in this business?
5      A.    No.
6      Q.    Do you recall a May 29, 2001
7  conference call involving you, Stanton Young,
8  Steve Farno, the then CFO of Upper Deck, and
9  Ms. Rego regarding valuation issues of Upper
10  Deck stock?
11      A.    I'm sorry.  I have no recollection
12  of that call.
13      Q.    Do you recall having -- had direct
14  access to Tom Kuccia on a phone call at some
15  time, Mr. Kuccia being an employee of FMV
16  Valuations, the firm that did the valuation of
17  the Upper Deck stock?
18      A.    The name doesn't even ring a bell.
19  I'm sorry.
20      Q.    Did you have direct access to KPMG
21  at any time with respect to the SC squared
22  transaction?
23      A.    I don't recall any direct access.
24      Q.    Did you -- maybe I can refresh your
25  recollection.  Do you remember a June 7

Lathrop

1         Lathrop
2  conference call involving you, Mr. Benjamin,
3  Mr. Farno, and Andrew Atkin from KPMG?
4      A.    I don't recall it.
5      Q.    Did you have contact with any
6  outside accounting firms or law firms at all
7  regarding SC squared trans -- the SC squared
8  transaction in this summer 2001 time period?
9      CHAIRMAN BYRNE:  Did he personally?
10      MR. WAHLQUIST:  Yes.
11      A.    To the best of my recollection,
12  none.
13      Q.    Are you aware of any by KPMG --
14  excuse me, by AIG?
15      A.    No, I'm not.
16      ARBITRATOR MOXLEY:  By KPMG or by
17  AIG?
18      MR. WAHLQUIST:  I meant by AIG.
19      If I didn't say by AIG -- did you
20  understand my question?
21      A.    I did.
22      Q.    Yeah, okay.  Yesterday, Mr. Kushner
23  asked you if the right of the charity to have
24  its stock redeemed at its fair market value as
25  determined by an independent outside appraiser

Lathrop

1         Lathrop
2  played a critical part, you characterized it,
3  in your analysis of the tax merits.  Do you
4  recall that testimony?
5      A.    Yes, I do.
6      Q.    What did you do to make sure that
7  that critical aspect of the transaction was
8  reflected in the deal documents?
9      A.    I would say probably review of the
10  shareholders agreement and the policy.
11      Q.    Did you review the shareholders
12  agreement?
13      A.    Yes, I did.
14      Q.    And let me pull the shareholders
15  agreement up then.  That is Exhibit C to the
16  policy.
17      CHAIRMAN BYRNE:  Well, you can give
18  the witness a copy of the policy if he
19  wants it.
20      MR. HOWELL:  Exhibit 104.
21      CHAIRMAN BYRNE:  We are all on
22  Exhibit C to the policy.
23  BY MR. WAHLQUIST:
24      Q.    Let me know when you have found
25  that, Mr. Lathrop.

EXHIBIT _w_, PAGE _688_

Lathrop

1
2  A.  I have it.
3  Q.  Would you turn to Section 5.2 of the
4  shareholders agreement?  And Section 5.2 speaks
5  to a sales price.  Just verify this for me, if
6  you will, you look at it, and I'm going to
7  read it because it's two lines.
8      CHAIRMAN BYRNE:  Don't worry about
9  it.  If he is focused right on it, don't
10  worry about reading it.
11  Q.  It refers to a valuation determined
12  by FMV Opinions or another appraiser selected
13  by Upper Deck.  Do you see that?
14  A.  Um-hum.
15  Q.  Is that what you meant yesterday
16  when you talked about an independent outside
17  appraiser?
18      MR. KUSHNER:  I'm sure Mr. Wahlquist
19  did not mean to omit the sentence prior to
20  the one he paraphrased.
21      CHAIRMAN BYRNE:  He didn't.  He was
22  probably listening to the chair saying
23  "Please don't read it.  Just focus the
24  witness' attention to the section and let
25  him read it."

212

Lathrop

1
2  Q.  It does not talk about an appraisal,
3  right?
4  A.  No, it does not.  It does talk about
5  a bona fide offer from a third party.
6      CHAIRMAN BYRNE:  The answer to the
7  question, therefore, is no.
8      THE WITNESS:  No.
9      CHAIRMAN BYRNE:  It does not.
10  BY MR. WAHLQUIST:
11  Q.  And Section 1 talks about a sale of
12  the stock with the consent -- written consent
13  of Upper Deck, right?
14  A.  I think that's a standard provision.
15  That's what it says.
16  Q.  And it doesn't say anything about
17  fair market value, does it?
18  A.  Section 1 does not.
19  Q.  Did that concern you?
20  A.  I viewed that as a standard
21  provision.
22      CHAIRMAN BYRNE:  So the answer is
23  no?
24      THE WITNESS:  No.
25

214

Lathrop

1
2  Q.  Is that the section you had in mind
3  when you talked about an independent appraisal
4  by an outside appraisal service yesterday?
5  A.  Yes.
6  Q.  Any other provision of the agreement
7  that you were referring to when you spoke about
8  that?
9  A.  Well, there are other provisions in
10  the agreement.  I mean, there are certain
11  triggering events, which would cause the stock
12  to be required to be submitted for redemption,
13  and again, it was fair market value.
14  Q.  Well, let's talk about that in
15  there.
16  A.  Is it Section 3?
17  Q.  Section 3 does talk about what are
18  referred to as "disposition events," correct?
19  A.  Yes.
20  Q.  And it does talk about an appraisal,
21  correct?
22  A.  3.5.
23  Q.  Section 2 talks about a first right
24  of refusal; is that right?
25  A.  Right.

213

Lathrop

1
2  BY MR. WAHLQUIST
3  Q.  Nor does Section 1 say anything
4  about obtaining AIG's consent to a sale of the
5  stock or an amendment of the shareholders
6  agreement?
7  A.  No, it does not.
8  Q.  Did you advise your client --
9      CHAIRMAN BYRNE:  Careful.
10  Q.  -- that steps --
11      MR. KUSHNER:  Objection.
12  Q.  -- had to be taken to put that
13  critical requirement in your mind of fair
14  market value into Section 1 of the shareholders
15  agreement?
16      CHAIRMAN BYRNE:  Sustained.  Did you
17  advise your client?  That's one of the
18  reasons why it was sustained.  We are
19  getting -- the second reason is we are
20  getting into argument.  Part of your basic
21  position -- one of your positions is
22  that -- is the legitimacy of the share
23  purchase agreement to the extent that it
24  would not have, did not, use a verb,
25  impact the validity of the SC squared

215

EXHIBIT _W_, PAGE _689_

Lathrop

1  transaction as counter to you didn't do
2  the exact template deal, and therefore, we
3  are not paying.  Is that -- it's a
4  simplification.
5      MR. WAHLQUIST:  I'm not sure I
6  totally understand what you are saying as
7  my point.  But what I'm trying to inquire
8  about is Mr. Lathrop has told us that the
9  fair market value requirement, as
10  perceived by him, was critical to his view
11  that this transaction worked.
12      CHAIRMAN BYRNE:  Right.
13      MR. WAHLQUIST:  And Section 1 of the
14  agreement clearly contemplates a sale with
15  the written consent of Upper Deck.
16      CHAIRMAN BYRNE:  Got it.
17      MR. WAHLQUIST:  I'm trying to find
18  out what, if anything, he did to make sure
19  this critical aspect of the deal was
20  required in that context.
21      CHAIRMAN BYRNE:  Did you do anything
22  to express your -- did you do anything to
23  express concern, your concern, over the
24  provisions of Section 1 of the

216

Lathrop

1  shareholders agreement?
2      THE WITNESS:  No.
3      MR. KUSHNER:  It assumes a fact he
4  hasn't testified to.  Okay.
5      CHAIRMAN BYRNE:  You are correct.
6  Having said this is all he did, I kind of
7  figured I was going to get a no, as long
8  as I stayed away from things like advice.
9  So the answer to your question is, he did
10  nothing with respect to linking critical
11  concern over fair market value and the
12  provisions of Section 1; fair
13      THE WITNESS:  Yep.
14  BY MR. WAHLQUIST:
15      Q.  Did you do anything to link this
16  critical concern that you had over fair market
17  value with the terms of the representation
18  letter appended to the policy as Exhibit B?
19      CHAIRMAN BYRNE:  Take a look at the
20  letter.  Tell me first if you reviewed it,
21  and then answer counsel's question.
22      Off the record.
23      (Discussion off the record.)
24      A.  I'm sure I reviewed it, but I don't

217

Lathrop

1  know when I saw it.
2      Q.  Did you see it before the
3  transaction was underwritten by AIG?
4      A.  I don't know.  I don't recall.
5      Q.  So in answer to my question then,
6  you certainly don't recall doing anything to
7  link the critical aspect of the deal, in your
8  mind fair market value, with the
9  representations given in Exhibit B to the
10  policy?
11      A.  That's correct.
12      Q.  Now, this concern that you had over
13  fair market value, was that driven by a
14  regulation published by the Internal Revenue
15  Service?
16      A.  In part.
17      Q.  And what else was it driven by?
18      A.  The case law dealing with charitable
19  contributions.
20      Q.  Anything else?
21      A.  That's basically it, rulings, the
22  78, 197.
23      Q.  That pertaining to the charitable
24  contribution aspect?

218

Lathrop

1      A.  Yes.
2      Q.  You did review the KPMG opinions,
3  themselves, appended to the policy as Exhibit
4  A, right?
5      A.  That's correct.
6      Q.  Okay.  I would like you to turn to
7  the May 2 KPMG opinion appended as Exhibit 1
8  that is captioned "Re: Charitable contribution
9  to the Austin Firefighters Relief and
10  Retirement Fund."
11      CHAIRMAN BYRNE:  AI625.
12      Q.  And turn to page -- I'm sorry, I
13  have got the wrong -- turn to page 6.
14      Do you find a discussion of
15  Regulation Section 1.1361-1L2(iii)?
16      A.  Yes.
17      Q.  Is that the regulation that
18  concerned you -- caused you to be concerned
19  about fair market value?
20      A.  Yes.
21      Q.  And can you identify for us what
22  part of that regulation caused you to be
23  concerned with fair market value?
24      A.  It's just the general importance of

219

EXHIBIT  W , PAGE 690

Lathrop

1  treating all shareholders the same.  So that's
2  the problem, for example, with warrants.  If
3  they are underpriced and they are actually
4  issued, they have different price.  So that
5  therefore, you wind up with a second class of
6  stock.
7      Q.   Well, and the warrants are the
8  subject of a different regulation?
9      A.   Yes, they are.  Yes -- well, it's
10 a -- further down than this one.
11     Q.   But this is the part of that
12 regulation that addresses fair market value,
13 right?
14     A.   That's correct.
15     Q.   And in particular, Subpart 2
16 addresses fair market value, correct?
17     A.   Fair market value, yes.
18     Q.   Is that the portion of the
19 regulation that caused you to be concerned with
20 fair market value?
21     A.   Yes.
22     Q.   Do you understand that regulation to
23 prohibit a non fair market value price that has
24 not been decided on at the time of entering

Lathrop

1      Q.   And in particular with respect to
2  fair market value, that regulation speaks to
3  the establishment of a purchase price at the
4  time the agreement is entered into that is
5  in -- significantly in excess of or below the
6  fair market value of the stock; isn't that
7  right?
8      A.   Yes.
9      Q.   In your view, does the shareholders
10 agreement do that?
11     A.   Would you please rephrase that
12 question?
13         CHAIRMAN BYRNE:  Does the
14 shareholders agreement, itself, in your
15 opinion, run afoul of that provision?
16         THE WITNESS:  In my opinion, it does
17 not.
18 BY MR. WAHLQUIST:
19     Q.   Thank you.
20         Are you aware of the existence of
21 any agreement as of the summer or spring of
22 2001 between the shareholders of Upper Deck
23 that did run afoul of that provision?
24     A.   I don't recall anything like that.

Lathrop

1  into the shareholders agreement?
2      A.   In all cases?
3      Q.   Correct.
4      A.   I think in this context, I do.
5      Q.   Can you explain that?
6      A.   This transaction offered tremendous
7  advantages to the corporation and its
8  shareholder.  It didn't invalidate the
9  charitable gift or anything like that, but to
10 make sure you didn't get a second class of
11 stock you want to, you know, dot all your Is
12 and cross all your Ts, in my opinion.
13     Q.   Well -- and I want to see if I'm
14 reading the KPMG opinions the same way you are.
15 KPMG addresses two ways that you can run afoul
16 of the second class of stock requirement.  One
17 is by issuing the warrants, and the other is in
18 a buy/sell agreement between the shareholders;
19 is that right?
20     A.   Yes.
21     Q.   The regulation on the page we are
22 talking about, page 6, speaks to the buy/sell
23 agreements, right?
24     A.   Yes, it does.

Lathrop

1      Q.   Are you aware of something called
2  the Economic Substance Doctrine?
3      A.   I am.
4      Q.   I knew the answer to that, but do
5  you see an analysis of the Economic Substance
6  Doctrine in the KPMG opinions?
7      A.   No.
8      Q.   Did you research the economic
9  substances -- excuse me.
10         Did you research the Economic
11 Substance Doctrine's application to the SC
12 squared transaction at any time before the
13 Upper Deck policy was bound?
14     A.   It's a very difficult question to
15 answer.
16         CHAIRMAN BYRNE:  Did you -- Counsel,
17 I think one of the reasons it's difficult
18 is did he ever research the Economic
19 Substance Doctrine?  And the answer is
20 probably yes, because he knows what it is.
21         MR. WAHLQUIST:  Well, let me
22 rephrase.
23         CHAIRMAN BYRNE:  In connection with
24 an SC squared?

EXHIBIT _W_, PAGE_691_

Lathrop

1
2    MR. WAHLQUIST:  Correct.  Before
3 this policy was bound.
4    CHAIRMAN BYRNE:  Did you research it
5 in connection with an SC squared
6 transaction prior to the issuance of the
7 Upper Deck policy?
8    THE WITNESS:  The problem is that
9 economic substance means different things
10 in different contexts.  Did I look at
11 economic substance in the terms of the
12 transaction that went afoul for Merrill
13 Lynch and Colgate, where you have to have
14 a business purpose, and usually, a pretax
15 profit and some profit other than tax
16 motive?  No, I did not.
17 BY MR. WAHLQUIST:
18    Q.   Well, yesterday, you told us you did
19 research with respect to this transaction?
20    A.   Yes.
21    Q.   And it was your own independent
22 research?
23    A.   That's correct.
24    Q.   And my question is, did you research
25 the applicability of the Economic Substance

224

Lathrop

1
2    A.   No.  On business transactions, yes,
3 but this is a different transaction.  I don't
4 view this as in the noneconomic loss category
5 at all.  This is a totally different
6 transaction in my view.
7    Q.   I'm sorry.  What do you mean
8 "noneconomic loss"?
9    A.   Noneconomic loss, where one party
10 contributes an asset to a company, and it gets
11 back preferred stock.  And you put some cash in
12 and then you assume a debt, and it's all
13 prearranged, precooked.  And all of a sudden,
14 there is foreign currency of $10 million, and
15 you claim you have got a basis of 110, you sell
16 it and claim a $100 million loss, and you have
17 no economic loss at all.
18    Q.   Did you participate in the decision
19 to deny coverage for this claim?
20    A.   Rob asked me yesterday about being
21 in meetings, and I probably was, but I don't
22 have any recollection of it.
23    Q.   Did you make a recommendation?
24    A.   I'm sure I expressed -- if I said
25 anything, I would have expressed confidence in

226

Lathrop

1
2 Doctrine to the SC squared transaction at all?
3    A.   As I believe I described yesterday,
4 what I looked at was whether this was a good
5 charitable contribution, and whether the
6 charity would be regarded as the owner of the
7 stock.  And from that, if the charity was the
8 owner of the stock, the other consequences
9 flowed.
10    It's not like these amorphous
11 transactions, like blips or some of these
12 others, where you need a business purpose and
13 you need a pretax profit, and you have to have
14 some reason for going into the transaction
15 other than taxes.
16    At the end of the day, your economic
17 position hasn't really changed.  Here, with a
18 charitable contribution, your economic position
19 is going to change.
20    Q.   Whose perspective did you analyze
21 from, the charity's or the donating
22 shareholder's?
23    A.   The charity's.
24    Q.   Doesn't all the case law analyze it
25 from the perspective of the taxpayer?

225

Lathrop

1
2 the merits of the position if, you know,
3 carried out as planned.
4    Q.   Of the, what we will call, generic
5 SC squared transaction?
6    A.   Generic SC squared.
7    Q.   Do you know who made the decision to
8 deny this claim?
9    A.   No, I do not.
10    Q.   Do you have an expectation, based on
11 your familiarity with AIG, who made that
12 decision?
13    A.   I had -- you know, if I had any
14 contact with claims, it would have been the
15 only contact I had with claims.  You know, it
16 just wasn't an area of the company that I had
17 involvement.
18    Q.   Did you have contact with Mr. Robert
19 Burke regarding this claim?
20    A.   That's a familiar name, but I can't
21 recall the substance of our conversations.
22    MR. WAHLQUIST:  Give me just a
23 minute.
24    (Discussion off the record.)
25    Q.   I want to come back to Exhibit 388,

227

EXHIBIT _W_, PAGE 692   Page 224 - 227

Lathrop
1
2 which is the May 17 e-mail to Mr. Goldman, with
3 copies to Mr. Benjamin and Stanton Young that
4 we began with this morning. Do you have that
5 in front of you?
6     A.   Yes, I do.
7     Q.   Is that the closest thing you have
8 in writing to expressing confidence in the SC
9 squared transaction?
10     A.   I don't recall if I wrote anything
11 on the two prior ones.
12     Q.   So certainly, not with respect to
13 this transaction?
14     A.   No, you have all the e-mail I wrote.
15 There weren't many.
16     MR. WAHLQUIST: I have no further
17 questions at this time.
18     CHAIRMAN BYRNE: Thank you.
19     MR. KUSHNER: Just a couple of
20 questions.
21 EXAMINATION
22 BY MR. KUSHNER:
23     Q.   Mr. Wahlquist asked you about the
24 KPMG opinion on charitable contributions.
25 Please take a look at, in particular, pages 3,

228

Lathrop
1
2 page 6 and also in the paragraph 2 on page 7,
3 fair market value.
4     MR. KUSHNER: I have no further
5 questions.
6     CHAIRMAN BYRNE: Thank you.
7 EXAMINATION
8 BY MR. WAHLQUIST:
9     Q.   Where, in the KPMG opinion letters,
10 does it say there cannot be a redemption
11 outside of Section 5 and Section 3?
12     CHAIRMAN BYRNE: It says what it
13 says. Argument.
14     Mr. Moxley?
15     (Discussion off the record.)
16     ARBITRATOR MOXLEY: Mr. Lathrop, you
17 have testified, if I have understood you
18 correctly, to the importance -- to the
19 view you had at the time in reviewing this
20 transaction, that the element of fair
21 market value was central to this deal
22 passing muster under the tax law. Is that
23 basically --
24     THE WITNESS: Yes.
25     ARBITRATOR MOXLEY: And then you

230

Lathrop
1
2 6 and 7 of that opinion, and tell me whether
3 that gave you comfort with regard to the
4 element of fair market value based on an
5 appraisal?
6     MR. WAHLQUIST: I'm sorry. I hate
7 to be obtuse. I want to make sure I'm on
8 the right letter.
9     MR. KUSHNER: Oh, well, you asked
10 about -- didn't --
11     MR. WAHLQUIST: The charitable
12 contribution letter.
13     MR. KUSHNER: Okay. 3, 6 and 7.
14 I'm trying my best not to quote.
15     ARBITRATOR MOXLEY: And what page is
16 that in the letter because I'm looking at
17 the version that doesn't have the Bates
18 stamps.
19     MR. KUSHNER: So am I. Pages 3, 6
20 and 7.
21     ARBITRATOR MOXLEY: Oh, 3, 6 --
22 okay. 3, 6 and 7.
23     A.   Page 3 states as a fact that the
24 redemption amount is the fair market value, and
25 that's echoed in the third full paragraph on

229

Lathrop
1
2 have been asked questions about other
3 sections of the shareholders agreement,
4 including Section 1. Do you recall those
5 questions?
6     THE WITNESS: Yes.
7     ARBITRATOR MOXLEY: And do you
8 recall Upper Deck's counsel asking you
9 under Section 1, about the language that
10 refers to, other than certain sections,
11 there shouldn't be a sale unless you have
12 Upper Deck's consent?
13     THE WITNESS: Yes.
14     ARBITRATOR MOXLEY: Do you recall
15 that area of testimony?
16     THE WITNESS: I recall those
17 questions, yes.
18     ARBITRATOR MOXLEY: Did you have --
19 did you make an evaluation at the time
20 when you were looking at this transaction,
21 as to whether fair market value, or how
22 fair market value would come in if you had
23 an event that was under Section 1 and not
24 under Section 5 or Section 3?
25     THE WITNESS: I think, you know, all

231

EXHIBIT _W_, PAGE _693_

Lathrop

1  
2    of our expectations were that all of the
3    transfers would occur under 2, 3 or 5, and
4    that one just restricted the Austin
5    Firefighters from, say, giving it to Tops
6    Baseball Cards or something.
7        ARBITRATOR MOXLEY:  Can you explain
8    what your basis was for that at the
9    time -- for that sense of it at the time?
10       THE WITNESS:  I just seemed like a
11   generic prohibition on transfers outside
12   of the other provisions.  In other words,
13   Section 2 was a bona fide offer from some
14   third party, and Upper Deck was a bona
15   fide offer.  Upper Deck got the chance to
16   match it to keep it out of unfriendly
17   hands, and 3 and 5 dealt with redemptions
18   between Upper Deck and the Firefighters
19   Fund.  And in that situation, a third
20   party, the appraiser would be brought in
21   to validate the price.
22       ARBITRATOR MOXLEY:  That was your
23   sense of it at the time?
24       THE WITNESS:  That was our sense of
25   it -- my sense -- it's my sense, my

232

Lathrop

1  
2    personal sense.
3        CHAIRMAN BYRNE:  Okay.
4        MR. WAHLQUIST:  May I have one
5    follow-up to that?
6        CHAIRMAN BYRNE:  Go ahead.
7    BY MR. WAHLQUIST:
8        Q.  What, then in your mind, would
9    happen if the Firefighters didn't exercise the
10   put?  Would it be prohibited for there to be a
11   redemption after that point in time to do a
12   voluntary transaction?
13       A.  I have no idea what happened because
14   I think, had the thing run its course, the
15   Firefighters would have submitted their stock
16   for redemption.
17       CHAIRMAN BYRNE:  So you don't know
18   what would have happened, period.
19       THE WITNESS:  I do not.
20       CHAIRMAN BYRNE:  Thank you.
21   Mr. Lathrop, thank you very much for your
22   time, and for coming back today.  Let's
23   take ten minutes.  I would like counsel to
24   chat to see where we are in terms of your
25   request, Mr. Wahlquist.

233

EXHIBIT  W , PAGE 694 .

382

1              McWilliam

2

3          C E R T I F I C A T E

4

5    STATE OF NEW YORK        )

6    COUNTY OF RICHMOND       ):ss
                              )

7

8         I, MELISSA GILMORE, a Notary Public

9    within and for the State of New York, do hereby

10   certify that the within is a true and accurate

11   transcript of the proceedings taken on

12   October 11, 2006.

13        I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage; and that I am in no way

16   interested in the outcome of this matter.

17        IN WITNESS WHEREOF, I have hereunto

18   set my hand this 12th day of October, 2006.

19

20   _Melissa Gilmore_

21        MELISSA GILMORE

22

23

24

25

# EXHIBIT X

385

COPY

1

2   AMERICAN ARBITRATION ASSOCIATION

3   ----------------------------------------X

4   AMERICAN INTERNATIONAL SPECIALTY

5   LINES INSURANCE COMPANY,

6                       Claimant-

7                       Counter Respondent,

8           - against -

9   THE UPPER DECK COMPANY, RICHARD P.

10  McWILLIAM, and the MPR REVOCABLE TRUST,

11                      Respondents-

12                      Counter Claimants.

13  ----------------------------------------X

14                      780 Third Avenue
                        New York, New York
15
                        October 12, 2006
16                      11:00 a.m.

17  B E F O R E:

18      JOHN F. BYRNE, Chairman

19      STEPHEN D. KRAMER, Arbitrator

20      CHARLES J. MOXLEY, JR., Arbitrator

21

22          MELISSA GILMORE, Reporter

23      ELLEN GRAUER COURT REPORTING CO. LLC
        126 EAST 56TH STREET, FIFTH FLOOR
24          NEW YORK, NEW YORK 10022
                212-750-6434
25               REF:82079

EXHIBIT  X  PAGE 696

Kendall

1          Kendall
2   AFTERNOON  SESSION
3       (Time noted:  2:06 p.m.)
4       CHAIRMAN BYRNE:  Good afternoon.
5   Thank you very much for being back
6   promptly.  Mr. Wahlquist, do you want us
7   to wait for your client or --
8       MR. WAHLQUIST:  No, I appreciate
9   that, but he asked that we proceed.
10       CHAIRMAN BYRNE:  I'm sorry?
11       MR. HOWELL:  He asked that we
12   proceed in his absence.
13       CHAIRMAN BYRNE:  We have with us
14   this afternoon, Linda Beerbower Burke, who
15   will be testifying as an expert.  Let me
16   repeat for the witness' benefit, but not
17   necessarily for counsels' benefit because
18   they have heard it before.  Your report
19   and your CV are in evidence.
20       In an arbitration proceeding, you
21   are not a FRE expert, a Federal Rules of
22   Evidence expert, as you would be called
23   under those circumstances.  We listen to
24   your opinion.  It may or may not be
25   persuasive.  We appreciate your joining us

454

1          Kendall
2   today.
3       I note that you are a member of the
4   Bar, and my practice -- the panel's
5   practice is that we do not swear in
6   colleagues.  We assume that you will give
7   us the information as being asked of you
8   to the best of your ability, and we
9   appreciate your time.
10       THE WITNESS:  I shall.
11       CHAIRMAN BYRNE:  However expert and
12   professor that you are, you may assume
13   that we have read your reports and most of
14   the material, that we are pretty well up
15   to speed.  Don't feel, because you are not
16   in a position where you have to defend
17   something you said or necessarily overly
18   explain something you have said just
19   because you have said it.
20       So while some think it rude,
21   particularly the counsel that I might cut
22   off, listen to see if there is an
23   objection.  Listen to see if there are
24   suggestions being interposed by the panel.
25       We are an impatient lot.  Sometimes,

455

1          Kendall
2   arbitration members wait until the end to
3   ask questions.  That not necessarily what
4   we do.  So some of our questions are
5   designed to get to it.  With all of that
6   in mind, and there is really not much in
7   mind, let me have, for the record, your
8   full name, please.  And I need a --
9   because you are a third party witness, I
10   need your residence and business address.
11       THE WITNESS:  My residence is 5023
12   Frew Street, F-R-E-W, Pittsburgh,
13   Pennsylvania 15213.
14       CHAIRMAN BYRNE:  Business address?
15       THE WITNESS:  That is also my
16   business address.
17       CHAIRMAN BYRNE:  Excellent, and it's
18   Burke, B-U-R-K-E?
19       THE WITNESS:  That is correct.
20       CHAIRMAN BYRNE:  Mr. Kushner, please
21   proceed.
22       MR. KUSHNER:  Thank you.
23   LINDA  BEERBOWER  BURKE,
24   called as a witness, was examined and
25   testified as follows:

456

1          Burke
2   EXAMINATION
3   BY MR. KUSHNER:
4   Q.   Ms. Burke, where are you admitted to
5   practice?
6   A.   I am admitted to the Bar of the
7   Commonwealth of Pennsylvania and to three
8   federal courts, the Western District of
9   Pennsylvania, the US Tax Court, and the US
10   Claims Court.
11   Q.   Can you give us a brief summary of
12   your education and legal experience?
13   A.   My undergraduate degree was from the
14   College of William and Mary in 1970.  My law
15   school, my J.D. was from the University of
16   Pittsburgh School of Law in 1973.  At 1973, I
17   began working for Alcoa, and I worked for Alcoa
18   until February 2000, and I worked for the
19   Internal Revenue Service from 2000 to 2003.
20   Q.   At Alcoa, what was the highest
21   position you held?
22   A.   I was the chief tax officer.
23   Q.   Your years at the IRS were what?
24   A.   You mean in time?
25   Q.   Until July 2003, did you say?

457

upper deck-aig arb

EXHIBIT   X , PAGE 697  Page 454 - 457

Burke

1
2    A.   July 2003 to -- July 2000 to
3    July 2003.
4    Q.   Three years?
5    A.   Three years.
6    Q.   Okay.  Thank you.
7         Are you a member of any professional
8    organizations?
9    A.   I am.
10   Q.   Of which?
11   A.   I am a member of the American Bar
12   Association, Tax Executives Institute, the
13   Pittsburgh Tax Club.
14   Q.   And what position or positions did
15   you hold at the IRS?
16   A.   I was the operating division counsel
17   for the large and mid size business division of
18   the IRS.
19   Q.   What were your responsibilities?
20   A.   In that position, my
21   responsibilities were to lead between 300 and
22   400 attorneys in that division to support that
23   sector of the IRS in ferreting out and
24   developing issues on examination, on advising
25   appeals with regard to issues of the large and

458

Burke

1
2    A.   No.
3    Q.   Did you give an expert report in any
4    other proceeding?
5    A.   No.
6    Q.   What material have you reviewed in
7    this matter?
8    A.   I have reviewed the government
9    publications, including Notice 2004-40, the
10   coordinated issue paper relative to this type
11   of transaction.  I have reviewed the insurance
12   policy and some of the exhibits thereto.  I
13   have reviewed the shareholders agreement, the
14   warrant agreement.  I have reviewed -- that is
15   the original one.
16        I have reviewed the shareholders
17   agreement pertinent to the 2002 redemption.  I
18   have reviewed correspondence pertinent to both
19   the original -- entering into the original
20   shareholders agreement and the correspondence
21   pertinent to entering into the 2000 --
22   December 2002 agreement.
23        I have reviewed appraisals.  I have
24   reviewed other expert reports, other tax
25   reports.  I have reviewed lots of cases

460

Burke

1
2    mid size business.  Litigating cases that
3    originated in that business sector in
4    developing guidance and procedures that
5    involved the taxpayers that -- for which that
6    business sector of the IRS was responsible, and
7    working with Treasury to develop policy and
8    guidance affecting those taxpayers.
9    Q.   How many attorneys were in your
10   immediate office at the IRS?
11   A.   In my headquarters office, there
12   were 15 attorneys.
13   Q.   Under your supervision?
14   A.   Under my supervision.
15   Q.   If I mutter, please tell me.  I have
16   a habit of muttering.
17        Did you have any contact with SC2
18   transactions?
19   A.   I did not.
20   Q.   And have you previously submitted
21   any expert reports in this proceeding -- to
22   this panel?
23   A.   Yes, I have.
24   Q.   Prior to this proceeding, did you
25   testify as an expert in any other proceeding?

459

Burke

1
2    associated with my research in this matter.
3    Q.   Do you have any opinion concerning
4    whether the SC2 transaction, as structured in
5    this case, would have succeeded?
6    A.   Yes.
7    Q.   And what is your opinion?
8    A.   My belief is that the transaction
9    would have succeeded --
10   Q.   What are the reasons --
11   A.   -- would likely have succeeded on
12   litigation.
13   Q.   -- what are the reasons for your
14   opinion?
15   A.   The reasons that I believe that this
16   particular transaction had a chance, a good
17   chance of succeeding, is that I think the facts
18   as were should have developed from the
19   transaction as structured were excellent.
20   Economic substance, which is the crux of the
21   issue in this case, is basically a factual
22   analysis.
23        And in this case, it would have been
24   very hard to argue that had the transaction
25   proceeded as structured, that there would not

461

EXHIBIT  X  PAGE 698

Burke

1
2  have been significant differences in the
3  economic relationships of the parties involved
4  in the transaction, and particularly, the
5  charity, which would have received a far larger
6  payment than it ultimately received.
7      Q.   I may have cut you off.  You said it
8  likely would have succeeded in litigation?
9      A.   In litigation.
10     Q.   Does that mean in court?
11     A.   Yes.
12     Q.   Who represents the IRS when it is
13 sued in the US District Court?
14     A.   The Department of Justice attorneys
15 in the trial division.
16     Q.   And who represents the IRS when it
17 is sued in the Court of Claims?
18     A.   The same, the justice department
19 attorneys in the civil trial division.
20     Q.   Who has settlement authority for the
21 IRS in those cases in US District Court and the
22 Court of Claims?
23     A.   The Department of Justice.
24     Q.   Now, do you have any opinion
25 concerning whether the transaction, as carried

462

Burke

1
2  fair market value was based on what?
3      THE WITNESS:  It was on the Empire
4  Appraisal that was done in 2006.
5      CHAIRMAN BYRNE:  Okay.  Would I,
6  slick litigator that I used to be, have an
7  opportunity to prove before a court of
8  competent jurisdiction that $2 million was
9  fair market value in connection with a
10 challenge that the SC2 transaction as
11 consummated was problematic, or disallowed
12 or whatever?
13     Would I have an opportunity to show
14 as the taxpayer, who is under challenge,
15 that 2 million was fair market value.
16 That the Empire report was meaningless
17 under the circumstances, and that the
18 price actually paid was fair market value
19 at the time it was paid?
20     THE WITNESS:  And your question --
21     CHAIRMAN BYRNE:  Would I have an
22 opportunity?
23     THE WITNESS:  In litigation?
24     CHAIRMAN BYRNE:  Um-hum.
25     THE WITNESS:  I believe you would.

464

Burke

1
2  out by Upper Deck, would have succeeded?
3      A.   Yes, I do.
4      Q.   And what is that opinion?
5      A.   I believe it could not have
6  succeeded.
7      Q.   What are the reasons for your
8  opinion?
9      A.   One of the hallmarks of determining
10 economic substance was whether the
11 transaction -- the payment for the shares in
12 the transaction occurred at fair market value.
13 And the transaction, as structured, assured
14 that there was a measure of fair market value
15 by providing for an appraisal.
16     The transaction is actually -- as
17 actually carried out, had no fair market value
18 determination that had any sense of
19 objectivity.  And for that reason, I believe
20 that that payment at what I believe was
21 considerably less than fair market value,
22 destroyed the bona fides of the transaction as
23 originally structured.
24     CHAIRMAN BYRNE:  The basis for your
25 belief that the $2 million was less than

463

Burke

1
2      CHAIRMAN BYRNE:  If, then, that
3  opportunity existed and succeeded, i.e., a
4  court of competent jurisdiction determines
5  that 2 million was fair market value, do
6  you have an opinion as to whether or not
7  the tax strategy, as consummated, would
8  succeed?
9      THE WITNESS:  I don't have an
10 opinion, but I'm trying to form one now.
11     CHAIRMAN BYRNE:  It's okay.
12     THE WITNESS:  And my belief is that
13 if it could have been proven through
14 objective standards that the price paid
15 for the shares was fair market value, that
16 it is likely the transaction could have
17 stood on its own.  Yes, it could have
18 succeeded.
19     CHAIRMAN BYRNE:  All right.  That's
20 all I'm -- I didn't mean to put you on the
21 spot.  I am --
22     THE WITNESS:  You didn't.
23     CHAIRMAN BYRNE:  -- what I was
24 trying to ascertain is, I did -- I guess,
25 did I have to prove or show at the time of

465

EXHIBIT __X__, PAGE 699

Burke

```
 1                    Burke
 2    the transaction, contemporaneously with
 3    the transaction, that 2 million was
 4    proper?
 5         THE WITNESS:  That is generally a
 6    requirement in determining fair market
 7    value in a transaction is that it be
 8    contemporaneous.
 9         CHAIRMAN BYRNE:  So there had to be
10    something existing, in this instance, at
11    the time, the end of 2002, that would lead
12    one to believe, or that would form a
13    reasonable basis for one to believe the
14    2 million was fair market value?
15         THE WITNESS:  There had to be
16    something existing at that time, yes.
17         CHAIRMAN BYRNE:  Okay.  Did you have
18    an opportunity to look at any of the
19    letters from KPMG to the Austin
20    Firefighters Fund?
21         THE WITNESS:  I did -- I don't know
22    that I looked at all of them.  I did, at
23    least one.
24         CHAIRMAN BYRNE:  All right.  Did you
25    look at the one where someone from KPMG
```

```
 1    is what Upper Deck is willing to pay.
 2         CHAIRMAN BYRNE:  Okay.  The letter
 3    says what it says, but I -- all right.
 4         THE WITNESS:  And it was viewed --
 5    in my experience at the Internal Revenue
 6    Service, that would not have been
 7    considered adequate to prove a valuation.
 8    Normally, you need something that is done
 9    by someone who is qualified to do it, and
10    there are certain methodologies that apply
11    to doing that type of evaluation, and none
12    of that occurred in the letter that I
13    recall.
14         CHAIRMAN BYRNE:  The key that you
15    are telling me, however, is that there had
16    to -- there should have been, or had to be
17    a contemporaneous valuation of 2 million,
18    contemporaneous legitimate valuation of
19    2 million in December of '02, for there to
20    be a likelihood that the transaction would
21    succeed?
22         THE WITNESS:  I believe that is the
23    case.
24         CHAIRMAN BYRNE:  Okay.  Surely,
25
```

Burke

```
 1                    Burke
 2    was telling -- not opining, but telling
 3    the Austin Firefighters Fund that, in
 4    words or substance, 2 million was fair
 5    market value -- fair value?
 6         THE WITNESS:  Yes, I do.
 7         CHAIRMAN BYRNE:  If -- I mean if you
 8    don't remember I --
 9         THE WITNESS:  I believe I saw that
10    letter, yes.
11         CHAIRMAN BYRNE:  Okay.  We are
12    talking speculation, so it's not a --
13    there are no hard and fast answers.  Would
14    a letter like that help in trying to
15    convince a court, a contemporaneous
16    2 million and then a slick litigator and
17    another expensive valuator saying "Yep,
18    2 million after the fact"?
19         THE WITNESS:  It is my opinion that
20    the letter to which you refer would not
21    have helped.
22         CHAIRMAN BYRNE:  Okay.  Why?
23         THE WITNESS:  If you -- if we are
24    talking about the same letter, I believe
25    that it also said that fair market value
```

```
 1    please.
 2         THE WITNESS:  I would like to
 3    qualify that the IRS can always challenge
 4    valuations and does.  And what they
 5    consider contemporaneous or sufficient
 6    might differ from a litigator's opinion on
 7    that.
 8         CHAIRMAN BYRNE:  And also what a
 9    court of competent jurisdiction might find
10    sufficient.
11         THE WITNESS:  Exactly.
12         CHAIRMAN BYRNE:  All right.  That's
13    what -- thank you for the --
14         MR. KUSHNER:  I thought Mr. Moxley
15    had a follow-up.
16         ARBITRATOR MOXLEY:  Yeah, I have a
17    follow-up.  Thank you.
18         MR. KUSHNER:  This doesn't count
19    against my time by the way.
20         ARBITRATOR MOXLEY:  I have a
21    follow-up on the chair's question.  And
22    the chair was making a distinction, and I
23    just want to make sure that you were
24    making the same distinction.
25
```

upper deck-aig arb

EXHIBIT   X   PAGE 700

Burke

1
2    You indicated, in response to
3    Mr. Byrne, that there should be a
4    contemporaneous document at the time the
5    buy back or transaction takes place that
6    substantiates fair market value, right?
7        THE WITNESS:  That is correct.
8        ARBITRATOR MOXLEY:  And you
9    indicated that something like the letter
10   wouldn't be enough.  You'd need more of a
11   valuation, correct?
12       THE WITNESS:  That is correct.
13       ARBITRATOR MOXLEY:  Just to be
14   clear, suppose you didn't have that
15   formalized, but you ended up in a disputed
16   proceeding in Tax Court or the District
17   Court, and the taxpayer was prepared to
18   present evidence that it was.
19       Would that potentially be sufficient
20   in terms of a court decision in your view,
21   or wouldn't it matter whether it was or
22   not fair market value, if you didn't have
23   it memorialized, you know, at the time the
24   buy back or redemption was actually done?
25       THE WITNESS:  If you are asking if

470

Burke

1
2    there were no contemporaneous
3    documentation, what would the court
4    consider?
5        ARBITRATOR MOXLEY:  Right.  If the
6    parties just said okay, shall we do a
7    redemption at such and such a number, and
8    it was done, and the Service challenges
9    it, and you end up in court, is the
10   absence of the development of paper of a
11   formal appraisal and so forth, is that
12   fatal or would the court be in a position
13   to evaluate and make a determination it
14   was or was not fair market value?
15       THE WITNESS:  It was not fatal,
16   however, it would be a negative inference
17   on the side of the party that didn't have
18   the paper.  Obviously, that's the whole
19   crux of, frankly, the issue, is this is a
20   factual matter, and what, in fact, was the
21   value.  That's part of what would go into
22   the economic substance determination.
23       ARBITRATOR MOXLEY:  When you talk
24   about substance -- well, maybe, I will
25   wait.  I have a question about substance,

471

Burke

1
2    but you are probably going to get
3    questions on it.  So why don't I -- I mean
4    if you are going to get into that, I will
5    defer and ask later.
6        MR. KUSHNER:  Anything that makes my
7    life easier, is welcomed.
8        CHAIRMAN BYRNE:  Go into it already.
9    Go ahead.
10       ARBITRATOR MOXLEY:  Okay.  Here is
11   my question.  Just from a non tax
12   practitioners point of view, $2 million is
13   real money.
14       THE WITNESS:  Um-hum.
15       ARBITRATOR MOXLEY:  I mean it's not
16   like it was defined as a peppercorn,
17   $11.4 million is a lot more money, but
18   $2 million is a real number, I would
19   think.
20       So my question is, I mean is that
21   basically the case?  But beyond that, is
22   the concept of economic substance -- to
23   what extent does that depend on whether
24   you have real money versus a peppercorn,
25   and to what extent do you evaluate

472

Burke

1
2    economic substance, not whether it's real
3    money and a change of position, and it's
4    putting something in somebody else's
5    pocket, but rather, to what extent do you
6    evaluate that based on the relative amount
7    of the number involved, in this case, the
8    buy back number vis-a-vis the tax benefit?
9    I mean is it all relative vis-a-vis the
10   tax benefit, or is it just, you know, did
11   they really put something in the charity's
12   pocket?
13       THE WITNESS:  There is -- to answer
14   your question, I'm going to have to say
15   yes to both, I think, and that is that
16   yes, real money obviously does make a
17   difference.  However, the relativity to
18   the tax benefit is significant.  Those are
19   all factors that go into determining
20   economic substance.
21       In this particular case, obviously,
22   there are regulations that govern the
23   concept of whether this is a single or
24   more than one class of stock, and those
25   regulations also require that the fair

473

EXHIBIT ___X___, PAGE _701    Page  470 - 473

Burke

1
2  market value be within a certain range of
3  what is determined to be fair market
4  value.
5      So it cannot be substantially above
6  or substantially below.  So generally -- I
7  guess I should stop there.
8      ARBITRATOR MOXLEY:  Right.  So
9  see -- but those are really separate
10  tests, right?  I mean economic substance
11  is one thing, and another is do you have
12  separate classes of stock or not?
13      THE WITNESS:  Actually, they are,
14  yes.
15      ARBITRATOR MOXLEY:  Okay.  You could
16  have separate classes of stock.  I mean
17  it -- without reference to economic
18  substance if they are just different in --
19      THE WITNESS:  That's a fair
20  question.  It's just that my feeling, my
21  belief is that in this case, because that
22  is one of the consequences that could
23  occur from failure to have adequate
24  economic substance, that they come
25  together.

474

Burke

1
2      CHAIRMAN BYRNE:  I guess part of the
3  question -- and maybe this is where both
4  of us are going -- is economic substance
5  related -- if economic substance is
6  related to fair market value, what's the
7  relationship?
8      THE WITNESS:  What's the what?
9      CHAIRMAN BYRNE:  What's the
10  relationship?
11      THE WITNESS:  Between fair market --
12      CHAIRMAN BYRNE:  You can -- you can
13  be -- you can have economic substance, one
14  would think, without having fair market
15  value.
16      ARBITRATOR MOXLEY:  And vice versa?
17      CHAIRMAN BYRNE:  And vice versa.
18      THE WITNESS:  That might be the case
19  in anything except where a gift is
20  involved.  And a gift, when it is shares,
21  depends on what the fair market value is.
22  I mean that's part of determining whether
23  the gift has occurred.
24      CHAIRMAN BYRNE:  No, no.  That's all
25  right.  I hear you saying that if you are

475

Burke

1
2  talking about shares --
3      THE WITNESS:  Right.
4      CHAIRMAN BYRNE:  -- economic
5  substance is more likely than not measured
6  by fair market value?
7      THE WITNESS:  It is one of the
8  measures, yes.
9      CHAIRMAN BYRNE:  What, other than
10  fair market value, is considered in
11  determining whether a transaction has
12  economic substance?
13      THE WITNESS:  Okay.  The
14  relationship between the parties.  That
15  is, in this case, did the donor treat the
16  charity as a shareholder?  You also look
17  at how the relationship between the
18  parties -- how their economic
19  relationships changed, and it could be
20  evidenced by such things as obviously, the
21  payment for the shares at the time, but
22  also behaviors like, were there
23  distributions, and what were the rights of
24  the shareholders, and things of that type.
25      CHAIRMAN BYRNE:  All right.  Thank

476

Burke

1
2  you.
3      ARBITRATOR MOXLEY:  See, my
4  impression -- and I only say this so you
5  can disabuse me of this if you don't think
6  I don't have it right -- but my impression
7  would be that $2 million standing alone
8  would appear to be economic substance.
9  And so that whether you are talking
10  2 million, or you are talking
11  11.4 million, you have economic substance.
12      But the question would be, is it
13  also fair market value because, as I
14  understand what you have said, is that you
15  need fair market value to uphold the
16  equality -- not of two shares of stock.
17  Is that a fair summary or am I --
18      THE WITNESS:  I think it is.
19      ARBITRATOR MOXLEY:  -- missing it in
20  terms of what you're saying.  Okay.
21      ARBITRATOR KRAMER:  Do you mind?
22      MR. KUSHNER:  No, please.
23      ARBITRATOR KRAMER:  Ms. Burke,
24  realistically, do you -- could you imagine
25  other viable candidates to purchase this

477

EXHIBIT _X_ PAGE 702

Burke

1   Burke
2   stock beyond Upper Deck or its affiliates?
3      THE WITNESS:  That's very difficult
4   for me to say.
5      ARBITRATOR KRAMER:  If there were no
6   other viable purchasers so that the market
7   consisted of one, what would be the
8   importance of a fair market value
9   appraisal?
10      THE WITNESS:  That's generally when
11   it becomes most important for tax purposes
12   because when there are multiple buyers,
13   then there is generally viewed as a
14   willing buyer and a willing seller, and
15   that will set a marketplace.  It's
16   generally when there isn't a market that
17   having a fair market value appraisal
18   becomes very, very important.
19      ARBITRATOR KRAMER:  Looking at it
20   differently, and following up on
21   Mr. Moxley's questions, is there a
22   difference between a significant gift and
23   the economic substance of a gift of a
24   bundle of shareholder rights?
25      THE WITNESS:  I'm not sure I exactly

478

Burke

1   Burke
2   understand the question.
3      ARBITRATOR KRAMER:  $2 million is a
4   lot of cash.  So it's a significant gift
5   and it has substance.  But in this
6   particular transaction, what I imagine is
7   being given is not just a cash value.  We
8   don't know what the value is on the date
9   it's given.  It's a bundle of shareholder
10   rights.
11      If they are so carved away, have
12   they been given?  If they are so carved
13   away, as in the documentation that we have
14   got here, is that one of the things that's
15   examined in exploring the fair market
16   value of those rights or the viability of
17   the gift?
18      THE WITNESS:  Are you asking about
19   what a court would look at in determining
20   the value of the shares at the time they
21   were given to a charity versus what was
22   paid?  I'm not sure I'm getting the gist
23   of your question.
24      ARBITRATOR KRAMER:  I'm not looking
25   so much at valuation.  I'm looking at

479

Burke

1   Burke
2   economic substance in terms of the rights
3   that were given.
4      THE WITNESS:  Okay.
5      ARBITRATOR KRAMER:  Because, as I
6   understand it from reading your reports,
7   economic substance doesn't just depend on
8   the quantity of money.
9      THE WITNESS:  It doesn't depend on
10   what?  I'm sorry.
11      ARBITRATOR KRAMER:  On the quantity
12   of money, the sum of money.
13      THE WITNESS:  That's absolutely
14   correct.  Yes.  So your question is, would
15   the rights that were given also impact
16   economic substance?
17      ARBITRATOR KRAMER:  Yes.
18      THE WITNESS:  And the answer to that
19   is yes.
20      ARBITRATOR KRAMER:  Thank you.
21   BY MR. KUSHNER:
22      Q.   I think you mentioned before that
23   you have reviewed the IRS April 2004 notice
24   concerning SC2 transactions?  It's Exhibit 223.
25      A.   Yes, I have.

480

Burke

1   Burke
2      MR. KUSHNER:  Do you have a copy?
3   Oh, you do.  Okay.  Thank you.
4      MR. WAHLQUIST:  Um-hum.  I will take
5   yours.
6      MR. KUSHNER:  No, but that's mine.
7      MR. WAHLQUIST:  That's yours?  I can
8   pull it out.
9      MR. KUSHNER:  I will wait for you.
10   I'm sorry.
11      MR. WAHLQUIST:  I can pull it out.
12   203?
13      MR. KUSHNER:  223.
14   BY MR. KUSHNER:
15      Q.   What type or what role does a notice
16   of this type play usually?
17      A.   A notice of this type is called a
18   Listing Notice, and its role is to put
19   taxpayers on notice that the IRS will challenge
20   this type of transaction.  It also serves as
21   the point at which certain reports have to be
22   done by vendors, taxpayers, and advisors to the
23   IRS.
24      Q.   And is there some part of this
25   report that deals with the substance -- the

481

EXHIBIT  X  PAGE 703

Burke

1 reason for the listing?
2
3    A.    Let me make sure I understand.
4    Q.    Well, let me withdraw the question
5 and ask you on page 2 of the report under
6 "Discussion," second paragraph, the notice
7 refers to, "The Service intends to challenge
8 the purported tax benefits from this
9 transaction based on the application of various
10 theories, including judicial doctrines such as
11 substance over form." Is it unusual for a
12 notice of this type not to rely on IRS rules
13 and regulations?
14    A.    Well, my experience with notices of
15 this type is that -- first, notices of this
16 type are drafted in the office of chief
17 counsel, and while they are published by
18 Treasury, the Department of the Treasury, there
19 is always a negotiation about them. And
20 essentially, as members of the office of chief
21 counsel, we were always required to find a
22 technical basis for listing the transaction.
23 By "technical basis," I mean a basis found in
24 the code and the regulations, themselves.
25        It is a sign of weakness, in my

482

Burke

1 opinion, and obviously, this was issued after I
2 left under a different chief counsel than was
3 in position when I was there, but if you have
4 to resort to judicial doctrines, it generally
5 means that you have no other basis for
6 challenging the transaction.
7
8    Q.    So far as you know, did the
9 transaction, as structured in the Upper Deck
10 case -- as originally structured, violate any
11 IRS rule or regulation?
12    A.    The transaction as originally
13 structured in the IRS, advocate -- what was
14 your question?
15    Q.    Did it violate any IRS rule or
16 regulation?
17    A.    How would the IRS rule? Was that
18 your question?
19    CHAIRMAN BYRNE:  No, as originally
20 structured.
21    THE WITNESS:  Yes.  I just didn't
22 hear you.
23    CHAIRMAN BYRNE:  Did the SC squared
24 transaction violate any code, rules, or
25 technical provisions?

483

Burke

1
2    THE WITNESS:  No, it did not.
3    CHAIRMAN BYRNE:  Its success,
4 however, depended -- always depended upon
5 a successful interpretation of those
6 provisions and regulations as applicable
7 to the transaction.  It didn't mean they
8 weren't going to challenge it.  It just
9 didn't mean -- it just meant that on their
10 face, they didn't violate?
11    THE WITNESS:  Well, I believe your
12 question is would the challenge -- would a
13 successful challenge relate to the code
14 and regulations?
15    CHAIRMAN BYRNE:  Fair enough.
16    THE WITNESS:  I believe that the
17 Service could have attempted to challenge
18 this transaction on the two classes of
19 stock argument, but I do not think they
20 would have won that.  When you resort to
21 judicial doctrines, you are essentially
22 arguing the facts of the case as they
23 relate to principles, like was it a valid
24 gift made?  Was the charity treated as a
25 shareholder?  Was fair market value the

484

Burke

1 standard for the buy out?  In other words,
2 those are the things that the judicial
3 doctrines pertain to.
4
5 BY MR. KUSHNER:
6    Q.    I also think you mentioned that you
7 reviewed the IRS November 2004 coordinated
8 issue paper regarding SC2 transactions?
9    A.    I did.
10    Q.    This is Exhibit 274.  Do you have
11 that before you?
12    A.    I do.
13    Q.    What role does a paper of this kind
14 play?
15    A.    A coordinated issue paper's role is
16 to guide agents in how they develop issues.
17    Q.    And does it have any kind of
18 precedential value?
19    A.    No.
20    Q.    Again, is it fair to state that this
21 coordinated issue paper is based on the lack of
22 judicial -- the lack of economic substance?
23    A.    Parts of it are, yes.
24    Q.    And you have already said that that
25 kind of challenge requires intensive factual

485

EXHIBIT  X  PAGE 704  Page 482 - 485

Burke

1
2  determination?
3      A.   That's correct.
4      Q.   There was testimony yesterday by
5  Mr. McWilliam, that the IRS conducted
6  investigation for over three and a half years
7  into Upper Deck affairs and issued countless --
8  maybe he didn't count the number, but a number
9  of IDRs. Is that the kind of factual inquiry
10  the IRS would be conducting?
11      MR. WAHLQUIST: Objection. That
12  misstates the evidence with respect to the
13  SC squared transaction.
14      CHAIRMAN BYRNE: It does because he
15  never said that they were the kind of --
16  he never said that any of the requests for
17  documents related to the SC squared
18  transaction.
19      My understanding was he had the
20  IRS -- after he agreed to voluntary
21  disclosure, they were looking through
22  everything else.
23      MR. KUSHNER: Well, we can resolve
24  the --
25      CHAIRMAN BYRNE: Just you know, kind

486

Burke

1
2  of break it out a little better.
3      MR. KUSHNER: We can resolve the
4  question. We have the IDRs in evidence.
5  If you want to give me time, I will -- I
6  mean I make the representation that they
7  indeed did center on the SC2 transaction.
8      MR. WAHLQUIST: Not over three and a
9  half years, they didn't.
10      CHAIRMAN BYRNE: All right, look --
11      MR. KUSHNER: Maybe Mr. --
12      CHAIRMAN BYRNE: -- assuming they
13  all related to the SC squared transaction,
14  does that sound right?
15      THE WITNESS: What's the question?
16  I'm sorry. I've lost the train.
17  BY MR. KUSHNER:
18      Q.   Let me reframe the question.
19  Assuming that the various IRS IDRs
20  concerned, among other things, the SC2
21  transactions, is that the kind of factual
22  inquiry the IRS would be conducting?
23      A.   The answer to that is yes,
24  however -- yes.
25      Q.   You have reviewed the settlement

487

Burke

1
2  offer that the IRS made to Upper Deck in April
3  of 2005?
4      A.   I have.
5      Q.   In your opinion, was the settlement
6  offer the IRS offered in April 2005 the best
7  result that the transaction, as structured,
8  could have achieved?
9      A.   No.
10      Q.   And what's the reason for your
11  opinion?
12      A.   My opinion is that had the
13  transaction as structured proceeded, that the
14  facts that were developed would have been
15  excellent, and this would have been a good case
16  to litigate, and I think the odds of winning
17  the litigation would have been good.
18      Q.   Assuming that based on a fair market
19  value appraisal by an independent appraiser
20  supported a value of $11.4 million in April of
21  2003, and that the Austin Firefighters had
22  exercised its Put and had tendered its stock
23  and had received that amount, in your opinion,
24  would that have, in large measure, ensured the
25  success of the transaction as structured?

488

Burke

1
2      A.   I believe it would have.
3      Q.   Can you explain the reasons for your
4  opinion?
5      A.   I believe it would be very difficult
6  for any court to come to the conclusion that a
7  charity, who received $11.4 million from this
8  transaction, which was supported by fair market
9  value, would not have had economic substance.
10      Q.   Would you agree with the statement
11  "resort to judicial doctrine" by the IRS is a
12  last resort?
13      A.   I believe it is.
14      Q.   And as of the time you left the IRS
15  in July 2003, were you at all aware of SC2
16  transactions?
17      A.   I was not.
18      Q.   If that had been a matter for
19  consideration by the IRS, would that have
20  fallen within your office?
21      A.   My office would have been involved
22  in the analysis, yes.
23      MR. KUSHNER: I have no further
24  questions.
25      CHAIRMAN BYRNE: Ms. Burke, before

489

EXHIBIT  X , PAGE  705

Oct 12 arb hearing  10/12/2006  11:00:00 AM

Burke

1
2  you move over and we will take a break,
3  and we will move you over here, and have
4  counsel question, I want --
5      THE WITNESS:  What comprises taking
6  a break?
7      CHAIRMAN BYRNE:  Ten minutes or so.
8  Would you like to do it now?  Would you
9  like to take a ten-minute break now?
10     THE WITNESS:  I'm fine.
11     CHAIRMAN BYRNE:  We have been
12  looking at a transaction with a charity, a
13  particular stock given for a particular
14  period of time, pursuant to a generic, we
15  have been calling it SC squared
16  transaction.  We know because we have been
17  told or we have read, that there were 50
18  some odd of these out there all at the
19  same time.
20     Most, if not all of which, were
21  developed by KPMG designed specifically SC
22  squared, the S to a C and back again, we
23  got it.  It's only marketed to S
24  corporations or to or through a C corp.
25     The Senate Investigatory Committee

490

Burke

1
2  look around, and see 50 some odd of these
3  suckers on somebody's docket in various
4  district courts, being represented by
5  the -- all being challenged for different
6  reasons, do I have to put that out of my
7  mind and say no, I look at a single
8  transaction, or does what in reality was
9  going on at the time have anything to do
10  with the likelihood of success of any
11  given transaction?
12     THE WITNESS:  I believe your
13  question is, does the environment that
14  existed --
15     CHAIRMAN BYRNE:  More than just the
16  environment.  It was specific.
17     THE WITNESS:  -- have anything to do
18  with the success of an individual --
19  success or failure of an individual
20  transaction in court?
21     CHAIRMAN BYRNE:  Anywhere.
22     THE WITNESS:  Could I answer it in
23  about three different phases?
24     CHAIRMAN BYRNE:  Try seven because
25  that's what they are asking us to do.

492

Burke

1
2  was getting very cranky with Enron and
3  accounting firms and tax schemes and
4  overreaching, mass market products.  What
5  role, if any, do all those -- any or all
6  of those things I mentioned, play in
7  taking a look at a single transaction from
8  a single company with a single charity and
9  the likelihood of success?
10     THE WITNESS:  Are you asking at the
11  IRS?
12     CHAIRMAN BYRNE:  With respect to
13  that transaction anywhere.  Anywhere.  I
14  guess I'm asking you to be -- I guess I'm
15  asking you to put yourself up here and
16  help me because I need all the help I can
17  get -- decide how to weigh certain
18  factors.  I know you are telling me that
19  the single -- this transaction as
20  contemplated, would have a likelihood of
21  success.
22     Is that reasonable for me to do as a
23  fact finder, like a court would be
24  ultimately deciding this?  When I look
25  around, as presumably that court would

491

Burke

1
2      THE WITNESS:  Okay.  The first is
3  that I believe the environment has a
4  significant impact on what the IRS and
5  Treasury are forced to do.  I think that
6  it's probably critical to note that this
7  transaction was not listed until after the
8  hearings.
9      CHAIRMAN BYRNE:  Until after the
10  senate hearings?
11     THE WITNESS:  The minority report,
12  and I didn't know about it when I left,
13  which tells me now, I am speculating.  Am
14  I allowed to speculate?
15     CHAIRMAN BYRNE:  Don't ask them.
16  Ask me.  In this regard, you can.  Go
17  ahead.
18     THE WITNESS:  That it had not picked
19  up until the senate hearings is something
20  that was creating -- it clearly had no
21  technical issues.  It had a lot of factual
22  issues.  So yes, I think that the
23  environment had a lot to do with the fact
24  that the IRS would look at the
25  transaction.

493

upper deck-aig arb

EXHIBIT  X   PAGE: 706   Page  490 - 493

Burke

1  Burke
2  CHAIRMAN BYRNE:  Well, in August,
3  October of 2000, taxpayers started getting
4  the voluntary disclosure and KPMG --
5  THE WITNESS:  I actually drafted the
6  voluntary notice.  So I'm quite aware of
7  it, and the idea was to see whether we
8  could get a universe that we could look
9  at.  So yes, I think it had a great deal
10  to do with that.
11  However, when you look at each
12  individual case and the facts associated
13  with those cases, I think in court, it
14  would not and should not have an effect on
15  the legal answer.
16  CHAIRMAN BYRNE:  Therefore, does the
17  fact -- does a finding that a product was
18  "mass marketed -- quotes "mass marketed,
19  quotes -- have any impact on the success
20  on the merits of any particular product?
21  THE WITNESS:  My personal opinion is
22  that it does not.
23  CHAIRMAN BYRNE:  Or at least should
24  not.
25  THE WITNESS:  I'm sorry?

494

1  Burke
2  CHAIRMAN BYRNE:  Yes.
3  THE WITNESS:  Yes.
4  CHAIRMAN BYRNE:  Are there a lot of
5  taxpayers that turn down the opportunity?
6  THE WITNESS:  That turn down the
7  opportunity?  That's like proving a
8  negative.  I have no idea.
9  CHAIRMAN BYRNE:  Okay.  In your
10  ex- -- by that, I mean in your experience,
11  do many or most taxpayers take advantage
12  of that kind of opportunity if offered by
13  the IRS under any kind of circumstances?
14  ARBITRATOR MOXLEY:  And perhaps
15  assuming that there is a disclosure.
16  CHAIRMAN BYRNE:  Involved.  Thank
17  you.
18  THE WITNESS:  I'm sorry, but I don't
19  think I can answer that question because
20  it all depends on the facts the taxpayer
21  finds itself in.
22  CHAIRMAN BYRNE:  Fair enough.  Fair
23  enough, and in a sense that's a judg- -- I
24  tried to slip this one on you, but it's
25  partially a judgment we may have to make.

496

1  Burke
2  CHAIRMAN BYRNE:  Or at least should
3  not.
4  THE WITNESS:  And should not,
5  correct.
6  CHAIRMAN BYRNE:  Does the -- in your
7  opinion, should the fact that every
8  generic product being challenged was sold
9  by the same entity have any impact?
10  THE WITNESS:  On litigation?
11  CHAIRMAN BYRNE:  Um-hum, on the
12  likelihood of success.
13  THE WITNESS:  In litigation?
14  CHAIRMAN BYRNE:  In litigation.
15  THE WITNESS:  No, it should not.
16  CHAIRMAN BYRNE:  Last question from
17  me before the break.  No, two.
18  From your experience, do you have
19  any experience with taxpayers who are
20  requested to make voluntary disclosures
21  and to continue to do so, so they may
22  participate in an amnesty program in terms
23  of penalties, waiver of penalties?
24  THE WITNESS:  Your question is, do I
25  have any experience with that?

495

1  Burke
2  Last question for now.  And focus on
3  challenging an SC squared transaction of
4  the type we are talking about, either as
5  contemplated or as consummated.
6  Do you have a sense as to how long
7  it would take or how much it would cost if
8  represented by competent accountants and
9  lawyers, and I'm going to take on the IRS,
10  what you have to go through to do that?
11  THE WITNESS:  Are you talking in
12  terms of time?
13  CHAIRMAN BYRNE:  Time and cost.  You
14  were at Alcoa.  You probably took a look
15  at some of the bills and shook your head,
16  and said "I'm going to outside practice."
17  THE WITNESS:  In terms of time, it
18  would probably -- from the time the audit
19  begins?
20  CHAIRMAN BYRNE:  Right.
21  THE WITNESS:  Until there is a
22  decision from the court, and the variation
23  could be -- well, it could probably be
24  five or six years, maybe even more.  In
25  terms of money?

497

upper deck-aig arb

Page  494 - 497

EXHIBIT  X , PAGE 707

Burke

1    Burke
2    CHAIRMAN BYRNE:  Law firm, plus
3    accounting firm, plus --
4    THE WITNESS:  I can't -- I'm not
5    going to give you a dollar figure.  All
6    I'm going to tell you is that factual
7    cases, cases that depend on the facts, as
8    opposed to a legal principle, cost a lot
9    more.
10    CHAIRMAN BYRNE:  Sure, okay.  Last
11    but not least, and I lied to you.  I said
12    two.  There are actually three.
13    From the Service's point of view or
14    reviewing court's point of view, should
15    insurance -- should potential insurance
16    with respect to a potential loss factor
17    into, in any way, to what the insurance --
18    what the IRS will or will not do or what a
19    reviewing court will or will not do?
20    THE WITNESS:  Now, you are asking
21    about the IRS's view?
22    CHAIRMAN BYRNE:  Either one, or
23    actually both.
24    THE WITNESS:  I think that the IRS's
25    view -- that is an agent looking at a

498

1    Burke
2    situation, would factor in the fact.
3    CHAIRMAN BYRNE:  How?
4    THE WITNESS:  I think that he would
5    believe that if a transaction were
6    insured, he would want to take a harder
7    look at it.
8    CHAIRMAN BYRNE:  Because somebody
9    knew it may be -- somebody may have
10    known -- it's a simplistic view, but not
11    necessarily a wrong one.  There is a
12    reason why it's insured.  Something could
13    go wrong.
14    THE WITNESS:  It would give him a
15    reason to look at it.
16    CHAIRMAN BYRNE:  How about from a
17    reviewing court's point of view?  Those of
18    us who are much more fair minded than IRS
19    agents.
20    THE WITNESS:  Of course.  I do not
21    think it should factor in.
22    CHAIRMAN BYRNE:  Okay.  Let's take
23    a -- oh, no, you got one?  Get it in.
24    Follow-up.  Follow up.  Whenever I take a
25    break and witnesses wander, I'm always

499

1    Burke
2    afraid that they may not come back.  So we
3    get our questions in as much as we can.
4    Mr. Kramer, please.
5    ARBITRATOR KRAMER:  Ms. Burke --
6    THE WITNESS:  Yes.
7    ARBITRATOR KRAMER:  -- I believe you
8    testified that a court would find that
9    there was economic substance had a charity
10    received so substantially gifted
11    $11.3 million.  Now, from our previous
12    discussion, my understanding was that the
13    bundle of rights would be viewed -- this
14    is in my interpretation, and I'm not an
15    expert -- the bundle of rights -- this is
16    my understanding of what you said -- the
17    bundle of rights would be viewed as having
18    shared in the earning potential of the
19    company.
20    Let me -- because the bundle of
21    rights is important.  The bundle of rights
22    that was transferred, you said, was
23    important to economic substance.  If the
24    corporation at the time the stock was
25    redeemed had been seeing hard times and

500

1    Burke
2    was in decline, or even a temporary dip,
3    and for that reason, a fair value of the
4    stock would be a half million dollars,
5    would you think that a court would find
6    that there was economic substance in that
7    gift?
8    THE WITNESS:  Yes, I do.
9    ARBITRATOR KRAMER:  So the amount of
10    money is not necessarily important then?
11    THE WITNESS:  I'm not sure that I
12    would agree with that statement because
13    the amount of money is one of the factors.
14    However, if a company had not performed
15    well, and the stock followed the
16    performance, which would normally be the
17    case with a closely held corporation, then
18    I believe, frankly, it adds economic
19    substance that the stock -- if, in fact,
20    it was in a dip, and if it were fairly
21    valued that the transaction was far less
22    than that, I'm assuming your facts were
23    assuming it would be for less than the 1.3
24    or whatever the original appraisal was.
25    ARBITRATOR KRAMER:  Yes.

501

EXHIBIT ___X___, PAGE 708

Burke

1
2      THE WITNESS: I believe that
3   properly documented, that's helpful. I
4   think had there been a floor, there would
5   have been less substance to the
6   transaction.
7      ARBITRATOR KRAMER: And you would
8   find that the court might consider that
9   there is economic substance,
10   notwithstanding that during the
11   intervening period, there may have been
12   $200 million of income allocated to the
13   tax exempt owner of the non-voting shares?
14      THE WITNESS: Yes.
15      ARBITRATOR KRAMER: Thank you.
16      ARBITRATOR MOXLEY: I had my
17   question, but your answer was so clear
18   that I want to make sure I understood it.
19   As I understand, what you just told
20   Mr. Kramer is that it wouldn't matter that
21   you had a very big -- and he gave an
22   example of $200 million if I understood
23   it -- of tax benefit that the S corp. is
24   getting as long as the non-voting shares
25   upon buy back, got fair market value even

502

Burke

1
2   front of you for you to correct it if I'm
3   wrong.
4      My impression is that after the IRS
5   puts out the kinds of statements of
6   position, and it lists the SC2, and it
7   takes this public position that Upper Deck
8   had no serious prospect of convincing the
9   Service to back off, upon showing the
10   Service what you have called very good
11   facts. If they showed, you know, real
12   economic value and the like, my sense is
13   the Service part of, you know, what could
14   or couldn't happen here, is pretty much
15   closed by the Service's opposition. And
16   what the panel here has to think about
17   potentially is what would a court have
18   done? You know, is that right, or is
19   there real room within the Service, even
20   after they take all these positions and so
21   forth?
22      THE WITNESS: There was wiggle room
23   in the Service until the settlement offer
24   was made.
25      ARBITRATOR MOXLEY: And then the

504

Burke

1
2   if, assuming that's a very small number,
3   that should be fine?
4      THE WITNESS: That's my opinion.
5      ARBITRATOR MOXLEY: It's a small
6   number, and it's very small compared to
7   the tax benefit that the company is
8   getting there, and that's fine.
9      THE WITNESS: That is my opinion.
10      ARBITRATOR MOXLEY: Okay.
11      THE WITNESS: Now, I will say that
12   I think a court would look at that -- a
13   court would look at that, but it is my
14   opinion that properly structured, because
15   it's unlikely that a corporation had a lot
16   of income is going to have a low market
17   value, but yes, properly structured with
18   an appropriate appraisal, I stand by that
19   answer.
20      ARBITRATOR MOXLEY: Okay. The
21   question I wanted to ask you, Mr. Byrne
22   had asked you a number of questions as to
23   what a court would do, or might do, in
24   various scenarios. I have the following
25   impression, and I will just put it in

503

Burke

1
2   settlements have to be uniform because
3   there is a statute on that?
4      THE WITNESS: Correct. So until the
5   settlement offer was made, there certainly
6   was room to negotiate or the facts known,
7   and hopefully in an objective way. But
8   once the settlement was made, there was no
9   room -- the settlement offer was made,
10   there was no room to move.
11      ARBITRATOR MOXLEY: And there's no
12   wiggle there. I mean I read this in one
13   of the other papers, that there is a
14   statute and so forth, and that really is
15   serious. It means what it says that the
16   Service doesn't go and cut separate deals
17   once the offer is out.
18      THE WITNESS: Yeah, that's correct.
19   In fact, they do not.
20      ARBITRATOR MOXLEY: They do not.
21      THE WITNESS: And my experience is
22   they do not cut separate deals after the
23   generic offer goes out.
24      MR. KUSHNER: I have just one or two
25   questions. I can wait if you want.

505

Burke

1  Burke
2  CHAIRMAN BYRNE: Go ahead before she
3  moves. Go ahead.
4  BY MR. KUSHNER:
5  Q.  Your report has some part of it
6  which talks about how, in your experience at
7  the IRS, the easy cases for the IRS were the
8  ones that were settled, and the hard cases went
9  to some other forum?
10  A.  Right.
11  Q.  My question really relates to the
12  length of time, or more properly, do you have
13  any opinion or experience as to what percentage
14  of the hard cases for the IRS that went to
15  litigation, settled before some final outcome?
16  A.  Are you suggesting in cases where
17  there were what I'm going to call generic
18  offers?
19  Q.  Well, this case had a generic offer,
20  didn't it, or did it?
21  A.  I'm trying to understand which cases
22  you are referring to.
23  Q.  I'm assuming that a case goes to
24  court?
25  A.  To court.

506

1  Burke
2  Q.  Whatever court it is, and the IRS is
3  the opposing party, and there is some kind of
4  ruling that's made, and it is being contested.
5  The question is -- for example, I could tell
6  you that in civil cases, probably 90 percent at
7  least settle before trial. Is there some
8  similar --
9  A.  After they are docketed.
10  Q.  Pardon?
11  A.  After they're docketed?
12  Q.  After they're filed, sure. Is there
13  some similar statistic for the IRS?
14  A.  I don't know it. I can guess, but
15  that's what it is. It's a guess. Do you want
16  me to guess?
17  Q.  Thank you. No, that's okay.
18  ARBITRATOR MOXLEY: I do have one
19  other follow-up. Mr. Byrne had asked you
20  a bunch of questions as to how a court
21  would look at it, and you talked about and
22  you answered in response to Mr. Kramer,
23  too, you know, various points as to what
24  is economic substance or not.
25  We have seen statements in various

507

1  Burke
2  of the paper submitted to us about
3  differences between the different courts.
4  The Ninth Circuit, there is another tax
5  court, another circuit. Are those
6  differences such that we need to consider
7  them, or do we know enough when we have
8  sort of the general description you have
9  given us of what is or is not economic
10  substance? I mean how much significance
11  do the verbal formulations have?
12  THE WITNESS: Okay. It's actually
13  an excellent question. You may be aware
14  that the Coltech case came down this
15  summer, and it is a Federal Circuit case.
16  Ad I'm sure you are aware that because in
17  the tax field, at least, where you have a
18  Federal Circuit decision, it is often
19  viewed as better authority than the other
20  circuits simply because that circuit is
21  available to all taxpayers.
22  So my feeling is that the results of
23  that case may change the playing field
24  with regard to differences that circuits
25  may have.

508

1  Burke
2  CHAIRMAN BYRNE: It's more
3  persuasive than others.
4  THE WITNESS: Exactly.
5  CHAIRMAN BYRNE: Like the Second
6  Circuit in commercial cases.
7  THE WITNESS: Second Circuit has
8  influence, but I'm not exactly sure that's
9  the case in an economic substance case
10  because it's so factually intensive.
11  ARBITRATOR MOXLEY: Thank you.
12  CHAIRMAN BYRNE: Okay, let's take --
13  let's reconvene at 3:30, please.
14  (Recess taken.)
15  CHAIRMAN BYRNE: Mr. Wahlquist,
16  please.
17  EXAMINATION
18  BY MR. WAHLQUIST:
19  Q.  Good afternoon, Ms. Burke.
20  A.  Good afternoon.
21  Q.  We met briefly before. I introduced
22  myself, but my name is Duke Wahlquist, and I
23  represent Upper Deck and Mr. McWilliam in these
24  proceedings. I want to make sure at the outset
25  of this that absolutely none of my questions

509

EXHIBIT __X__, PAGE _71D_

Burke

will mean you any disrespect. You've obviously had a long and successful career. So if in the heat of --

MR. KUSHNER: Excuse me, are you saying nothing personal, just business?

We will accept that.

BY MR. WAHLQUIST:

Q. And if, in the heat of the moment, it sounds like I do, I really don't. You have obviously had a successful career.

I want to talk first a little bit about this notion of economic substance in the context of the allocation of the income of Upper Deck to the Austin Firefighters as a 90 percent shareholder.

Now, in the tax year 2001, over $36 million of income was allocated to the Austin Firefighters, and in the tax year 2002, over $136 million of Upper Deck's taxable income was allocated to the Austin Firefighters. So over a 21-month period, that's about $172 million being allocated to the Austin Firefighters.

Is it your testimony then that the

510

Burke

difference between whether or not a -- that it makes a difference in whether or not a court will respect that, whether or not Upper Deck paid $2 million to redeem the stock, or whether it paid $11 million?

A. Yes.

Q. Is there any judicial authority you can cite us to support that proposition?

A. You are talking about the fact -- the authority that I would cite is that, especially in closely held situations, there needs to be an objective standard of fair market value. And it -- I'm speaking of the difference between 2 million and 11.4, and there was no objective standard of fair market value at the time of the early redemption.

Q. Are you suggesting that no purchase or sale of stock will be respected for tax purposes without a fair market appraisal before that purchase or sale?

A. In a closely held situation where there is a limited market, I can't say that as a fact, but I think that it's very often required.

511

Burke

Q. Can you cite us to a case or a regulation that says a court cannot uphold such a transaction in the absence of a precedent?

A. No, I can't.

Q. One of the -- on direct, one of the things you were asked about, I think, was regulations pertaining to fair market value. Do you remember some of that testimony?

A. In conjunction with Section 1361?

Q. Actually, in conjunction with 1361, yeah. Is that what you said?

A. (Nodding.)

Q. Okay. And I want to make sure -- you said you reviewed the insurance policy in question?

A. I reviewed it. I can't tell you that I read every section.

Q. Okay. There were -- did you read the three KPMG opinions, which were appended to the policy as Exhibit A?

A. Yes.

Q. And did you read the representation letter that was appended as Exhibit B?

A. I remember -- is that what you mean,

512

Burke

the engagement letter?

Q. No, it was a letter signed by Upper Deck and the MPR Trust that made certain representations to the insurance company in this case. Did you read that letter?

A. I probably did, but I can't tell you that I recollect it.

Q. How about Exhibit C, the actual shareholders agreement between Upper Deck and -- excuse me, between MPR Trust and the Austin Firefighters, did you review that document?

A. The initial one?

Q. Yeah.

A. Yes.

MR. KUSHNER: I think Upper Deck was a party to that.

MR. WAHLQUIST: It was.

MR. KUSHNER: I could be wrong, but I think so.

BY MR. WAHLQUIST:

Q. Now, would you agree with the statement that the best evidence or indication of the substance of the initial transaction is

513

upper deck-aig arb

EXHIBIT _X_, PAGE _711_

Burke

1  Burke
2  that shareholders agreement?
3      A.   I would have to qualify that.  I
4  would say yes, but it determined -- what was
5  determinative was how it was followed.
6      Q.   Are you suggesting that there was a
7  breach of that agreement?
8      A.   Am I?
9      Q.   Yeah.  Are you suggesting there was
10  a breach in the shareholders agreement in any
11  respect?
12      A.   The only thing I'm stating is the
13  transaction that actually occurred didn't
14  follow that agreement.
15      Q.   Can you tell us what provision of
16  the shareholders agreement was violated by the
17  transaction in December of 2002?
18      A.   Well, the primary provision that was
19  violated was that there was no opportunity for
20  the charity to Put the shares according to the
21  agreement, and therefore, there was no
22  appraisal to determine fair market value.
23      Q.   What do you mean?  You are saying
24  the charity could not have exercised their Put?
25      A.   Well, they didn't.

514

1  Burke
2      Q.   Does that make it a violation of the
3  agreement?
4      A.   Not --
5      MR. KUSHNER:  I haven't objected
6  till now to the legalese, but I object on
7  the ground that he's calling for legal
8  conclusions.
9      CHAIRMAN BYRNE:  She is doing great.
10  She's doing pretty good, Counsel.
11      MR. KUSHNER:  Fine.
12      CHAIRMAN BYRNE:  Don't worry.
13      MR. KUSHNER:  Okay.  I have to make
14  my money some way.
15      CHAIRMAN BYRNE:  She is an expert.
16  We have already asked her questions in
17  terms of her expertise in some other legal
18  matters.
19      MR. WAHLQUIST:  Do you have the
20  policy?
21      MR. KUSHNER:  Sure.  What would you
22  like her to see?
23      MR. WAHLQUIST:  I would like her to
24  see the shareholders agreement appended as
25  Exhibit C.

515

1  Burke
2      CHAIRMAN BYRNE:  Sure.
3  BY MR. WAHLQUIST:
4      Q.   Is that the shareholders agreement
5  you reviewed?
6      A.   Is that what again?
7      Q.   Is that the shareholders agreement
8  which you reviewed?
9      A.   I'm just looking at the date trying
10  to be sure.
11      Q.   I'm seldom accused of not being loud
12  enough.
13      A.   Yes.
14      Q.   Okay.  Can you identify for me by
15  section which provision of that agreement was
16  violated by the December 2002 stock
17  transaction?
18      A.   I guess what I would have to tell
19  you first is, I don't know what was violated.
20  I can tell you that they didn't follow this
21  agreement.
22      Q.   Well, let's talk about what they
23  followed.  Let's look at Section No. 1.
24      CHAIRMAN BYRNE:  Now, Counsel, no.
25  It's there.  Forget it.  Her opinion with

516

1  Burke
2  respect to -- one, we have been down this
3  path before, it's really argument.  It
4  says what it says.  When she said they
5  didn't follow the procedures, we know they
6  weren't doing it with respect to one.
7  They were talking about not waiting for a
8  Put, they are talking about violated --
9  not violated.  They are talking about not
10  contemplated by the original shareholders
11  agreement.
12      MR. WAHLQUIST:  Let me ask a
13  different question.
14      CHAIRMAN BYRNE:  Go a different way.
15  BY MR. WAHLQUIST:
16      Q.   What if that Austin Firefighters
17  simply elected, during the Put period, they
18  have a six-month period in which to exercise
19  the Put.  You recall that?
20      A.   From April 1, 2003.
21      Q.   What if they decided not to exercise
22  the Put, and they wanted to -- they wanted to
23  go for the ride.  Would that have altered the
24  viability of this transaction?
25      A.   I do not believe it would have.

517

EXHIBIT   X  , PAGE  712

1          Burke
2     Q.   And what is the difference for
3   your -- what is the basis for your distinction
4   between the outcome and the result in those two
5   circumstances?
6     A.   In terms of their following --
7     Q.   Whether or not this transaction
8   would survive scrutiny in a court of law?
9     A.   The shareholders agreement to which
10  you are referring, the initial shareholders
11  agreement, laid out a course of action that
12  would have resulted in the transaction's having
13  determined, objectively determined fair market
14  value, and it also left it to the charity, and
15  this is the person that will determine in a
16  way -- let me rephrase that.
17       I think what you are -- if the
18  charity chose not to Put the shares, then there
19  is no fair market value to be determined. And
20  I don't think that because the agreement
21  contemplated that, that that's any sign that
22  there was lack of economic substance.
23     Q.   Well, what if the charity chose not
24  to exercise its Put, and then five years later
25  after the Put period expired, the parties

518

---

1          Burke
2   take the shareholders agreement that we have
3   here and take out Section 5, take out the Put.
4   would that have survived IRS scrutiny or
5   scrutiny in a tax court?
6     A.   It's tough to say because you have
7   not given the charity a chance to cash it out,
8   and I believe that that would create some
9   negative issues for it.
10     Q.   Well, in fact -- well, can you
11  identify those issues?  What regulation?  What
12  provision of the tax code?  What case would
13  that run afoul of?
14     A.   Actually, there are several
15  provisions that you can look at in the
16  corporate area, including 311 and 301, that
17  could, aside from the 1361, which could impact
18  this in a way, that the shareholders could have
19  had dividends they didn't anticipate, but are
20  managed as disguised dividends --
21     Q.   I'm sorry, ma'am.
22     A.   Disguised dividends, and normally
23  the protection against that type of imputation
24  by the Service is that first, there is
25  substance of the transaction, and second, that

520

---

1          Burke
2   entered into a voluntary transaction without a
3   fair market value analysis being done by a
4   third party prior to that?  Would that
5   jeopardize this transaction in tax court?
6     A.   I believe it probably would.
7     Q.   So this transaction is at risk of
8   being set aside in a circumstance like that, in
9   your view, for time and eternity?
10     A.   So this transaction.
11     Q.   Yeah, the SC squared transaction
12  is -- are you suggesting that if the charity
13  fails to exercise the Put, there can never be a
14  voluntary sale and exchange of the
15  Firefighters' shares between Upper Deck and the
16  Firefighters at any time in the future without
17  a fair market value -- without a fair market
18  valuation appraisal being done that would not
19  result in the unravelling of this transaction
20  for tax purposes?
21     A.   I continue to say that I think it
22  would be problematic.
23     Q.   Okay.  Now, so in your view the --
24  let me ask a different question.  The
25  generic -- let's not phrase it that way.  Let's

519

---

1          Burke
2   there is fair market value.  So there actually
3   is authority that emanates from those sections
4   that does that.  You know, I didn't cover that
5   so I can't tell you today.
6     Q.   Well, let's talk about the one
7   section that has been identified.  The only
8   section that has been identified by any tax
9   lawyer or accountant that we have seen any
10  documents from or reports from in this case and
11  that is 1361, right?  Now, 1361 is quoted in
12  the opinions of KPMG, which are appended to the
13  policy as Exhibit A.  That's Exhibit 104 to
14  these proceedings, Exhibit A to that, and I
15  believe it's the second letter.  I have
16  projected it up on the screen in front of us.
17  Do you see regulation Section 1361 there?
18     A.   No, I can't see it, but I'm
19  relatively familiar with it.
20     Q.   Do you have it in front of you?
21       ARBITRATOR MOXLEY:  Page 6.
22       THE WITNESS:  Yes.
23     A.   I'm looking at a KPMG opinion.
24     Q.   Okay.  Now Section 1361, that's a
25  regulation published by which agency?

521

---

```
                    Burke
 1
 2      A.   Actually, it isn't.  Section 1361 is
 3   the code section.  The regulation is 1-1361-1.
 4   Actually it's 023.
 5      Q.   And you are familiar with this
 6   regulation, right?
 7      A.   Yes.
 8      Q.   Doesn't this regulation simply
 9   address a potential problem in the put
10   agreement, which is a buy/sell agreement,
11   creating a second class of stock?
12      A.   The regulation doesn't address
13   anything in the agreement.  The regulation
14   addresses in generic terms when a sub S
15   corporation does or does not have a second
16   class of stock.
17      Q.   And the section or the subsection
18   that's quoted right here says that, "Buy/sell
19   agreements."  Would you agree with me that the
20   Put is a buy/sell agreement?
21      A.   The shareholders agreement?
22      Q.   Yeah, the Put is in the shareholders
23   agreement, but not all shareholders agreements
24   are buy/sell agreements, right?
25      A.   I'm not sure I can agree with that
```

522

```
                    Burke
 1
 2   because what essentially -- never mind.  I'm
 3   not sure.
 4        CHAIRMAN BYRNE:  Sharehold- -- not
 5   all shareholder agreements generically are
 6   buy/sell agreements.
 7        THE WITNESS:  That's correct.
 8        CHAIRMAN BYRNE:  With respect to the
 9   subS, for example.
10        THE WITNESS:  Well, yeah, but --
11   yeah.  I just can't agree that I think
12   this agreement was a buy/sell agreement.
13   BY MR. WAHLQUIST:
14      Q.   You don't think the Put was a
15   buy/sell agreement at all?
16      A.   The Put was a redemption.
17      Q.   And a redemption is -- well, there
18   is a redemption agreement, and this -- this
19   code or this regulation addresses redemption
20   agreements as well, right?
21      A.   It does.
22      Q.   So the -- would you agree that the
23   Put is a redemption agreement?  It's an
24   agreement pertaining --
25      A.   I would agree that Section -- what
```

523

```
                    Burke
 1
 2   is it 5 is --
 3      Q.   Section 5.
 4      A.   -- of the shareholders agreement
 5   deals with a Put, which a redemption.
 6      Q.   And at least in KPMG's analysis, the
 7   reason they looked at that was be- -- they were
 8   concerned that the put would run afoul of this
 9   provision, correct?
10      A.   Yes, I believe that is correct.
11      Q.   And one of the ways to run afoul of
12   this provision is to have an agreement
13   establishing a purchase price that, at the time
14   the agreement is entered into, is significantly
15   in excess of or below the fair market value of
16   the stock, correct?
17      A.   That's correct.
18      Q.   And isn't the agreement that's
19   spoken to there the redemption agreement?
20      A.   Actually, the agreement that's
21   spoken to here is -- well, the agreement that
22   was spoken to here was the price at the time
23   that the shares were given to the charity.  And
24   then the Put is what it refers to, and that is
25   why, specifically, a fair market value
```

524

```
                    Burke
 1
 2   appraisal was put into Section 5 of the
 3   agreement so that they would not run afoul of
 4   this provision.
 5      Q.   And isn't the concern that if they
 6   didn't put the fair market value provision in
 7   the redemption agreement?
 8      A.   Yes, that is a very large concern.
 9      Q.   Okay.  That the redemption
10   agreement, itself, might create a second class
11   of stock?
12      A.   Absolutely.
13      Q.   And did you see anything in the
14   redemption agreement that ran afoul of that?
15      A.   This agreement?  The?
16      Q.   The one right in front of you, yeah.
17   The shareholders agreement you just put your
18   finger on.
19      A.   As structured?
20      Q.   Correct.
21      A.   No.
22      Q.   And isn't that all the regulation
23   addresses?
24      A.   No.
25      Q.   Where, in this regulation, does it
```

525

upper deck-aig arb

EXHIBIT X  PAGE 714

Page  522 - 525

Burke

1
2  address a subsequent agreement?
3      A.  Because the subsequent agreement was
4  a buy/sell agreement.  So it's -- directly
5  addresses that agreement.
6      Q.  Can you cite an authority, any
7  authority, for the proposition that the
8  agreement referred to there is an -- a mutual
9  exchange of stock at a subsequent time?
10     A.  I'm not following you.
11     Q.  Well, I'm not --
12     CHAIRMAN BYRNE:  Are you asking us
13  to determine --
14     MR. WAHLQUIST:  Let me -- let me
15  rephrase the question.
16     CHAIRMAN BYRNE:  -- that a buy/ --
17  whether a buy/sell agreement, includes a
18  stock repurchase agreement?  Is that what
19  you want us to do?
20     MR. WAHLQUIST:  Whether or not the
21  redemption agreement in this provision
22  addresses.
23     CHAIRMAN BYRNE:  That's not what you
24  asked her.  That's not what you asked her.
25     MR. WAHLQUIST:  Okay.  And that's --

526

Burke

1
2  I'm trying to get there.
3      CHAIRMAN BYRNE:  I know.
4      MR. WAHLQUIST:  You are going to
5  have to be -- give me a little bit of
6  indulgence here.
7  BY MR. WAHLQUIST:
8      Q.  Ms. Burke, if a corporation -- if we
9  are talking about an agreement where the
10  corporation buys the shares back in this
11  particular circumstance, how could it ever
12  have created a second class of stock?
13     A.  How could it ever what?
14     Q.  How could that ever have created a
15  second class of stock?  There is only one
16  outstanding shareholder after the redemption,
17  right?
18     A.  Right.
19     Q.  Only one outstanding class of stock,
20  right?
21     A.  Right.
22     Q.  So it could never -- in this
23  context, a subsequent redemption agreement like
24  this could never run afoul of that provision,
25  right?

527

Burke

1
2      A.  That is not true.
3      Q.  Okay.  How -- postulate a
4  hypothetical for me where a redemption by the
5  shareholder would actually lead to outstanding
6  classes of stock?
7      A.  Well, first, a shareholder can't
8  redeem.
9      Q.  I'm sorry.
10     A.  Only a corporation can redeem.
11     Q.  And you corrected me, and that's as
12  you should have.  Where the corporation's
13  redemption of the stock would create a second
14  class of stock?
15     A.  In the second of the subS
16  corporation with all the limitations around
17  qualifying for subS, this specific regulation
18  would apply to any buy/sell agreement in that
19  situation.  So it definitely applies to the
20  second agreement.
21     Q.  So you are saying the -- let's talk
22  about the -- you are familiar with Section 3 of
23  the shareholders agreement as well?
24     A.  Can I check to see what it is?
25     Q.  Sure.  I believe that is the right

528

Burke

1
2  of first refusal.
3      A.  Which of these exhibits is the
4  shareholder agreement?  I have four?
5      Oh, no -- A, B, C.
6      Q.  It's C.
7      A.  C, okay.
8      Q.  Exhibit C.
9      MR. KUSHNER:  You might want to take
10  -- it's very small.  Do you want one with
11  larger print?  No, fine.
12     THE WITNESS:  No, it's fine.
13     Q.  And I actually want to look at
14  Section 2, which is on page 2 of that
15  shareholders agreement?
16     A.  Are you still in Section 3?
17     Q.  No, I'm on Section 2.
18     CHAIRMAN BYRNE:  Can we go off the
19  record for a second?
20     (Discussion off the record.)
21  BY MR. WAHLQUIST:
22     Q.  Ms. Burke, have you read Section 2
23  of the shareholders agreement?
24     A.  Yes.
25     Q.  It provides generally for a right of

529

Burke

1
2  first refusal for Upper Deck to purchase the
3  stock at any price at which the Firefighters
4  proposed to transfer it to another party,
5  correct?
6        MR. KUSHNER:  I object.  That's not
7  what it says.
8        CHAIRMAN BYRNE:  It says what it
9  says.
10       MR. KUSHNER:  Well, fine, but I mean
11 why mischaracterize it?
12       CHAIRMAN BYRNE:  Counsel, it wasn't
13 really mischaracterizing.  It was
14 capsulizing the general import of Section
15 -- Section 2 is known to the witness,
16 fair?
17       THE WITNESS:  I was just going to
18 wait until he finished his question.
19       CHAIRMAN BYRNE:  That's all right.
20 Fair?
21       THE WITNESS:  (Nodding.)
22 BY MR. WAHLQUIST:
23    Q.  What if somebody made a lowball
24 offer to Austin Firefighters, and they said for
25 whatever reason, we think we would rather have

530

Burke

1
2  the money than the stock at that point.  So
3  they go to Upper Deck and say, you have a right
4  of first refusal.  Otherwise, we are going to
5  sell it at what may well be way below fair
6  market value.  Upper Deck says okay, and buys
7  the shares?
8     A.  Upper Deck buys the shares?
9     Q.  Um-hum.  That transaction work in
10 court?
11    A.  I think it would.  It would hold up.
12    Q.  Even though it's not for fair market
13 value?
14    A.  It would hold up if the person --
15       CHAIRMAN BYRNE:  If it was a bona
16 fide offer.
17    A.  -- if the person who made the offer
18 was a third party not associated with the
19 shareholders of Upper Deck.
20    Q.  So if they had --
21    A.  If there is a bona fide third party.
22    Q.  So if somebody had come in in
23 December of 2002 and said, "Here is $2 million.
24 we will take the stock."  And the Firefighters
25 had gone to Upper Deck and said $2 million, and

531

Burke

1
2  Upper Deck said we will take it, the
3  transaction had proceeded that way.  Are you
4  suggesting the transaction would work in court?
5     A.  Yes, with the condition that it was
6  a completely third party transaction, the offer
7  was completely third party.
8     Q.  Even though it was not fair market
9  value?
10    A.  Actually, the definition of fair
11 market value is that between an independent
12 willing buyer and a willing seller, and when
13 that can't be established, or there is not
14 independence.  This would be the case with
15 McWilliam, the MPR Trust, and the Fund, then
16 you must resort to other methods to determine
17 fair market value, the primary of which is an
18 appraisal.
19    Q.  Well, by the supposition of the
20 valuation report for 11.4 million that you
21 reviewed?  It said the stock was worth, I
22 guess, 11.3 million in December?
23    A.  Yes.
24    Q.  There probably ought to be a lot of
25 buyers for the stock at $2 million, right?

532

Burke

1
2     A.  I'm sorry.  What are you asking me
3  to agree with?
4     Q.  If, in fact, the stock was worth
5  $11.3 million in December of 2002, there ought
6  to be a lot of people willing to pay 2 million
7  for it, right?
8     A.  Well, you asked me to assume that
9  the charity was willing to accept it.
10       CHAIRMAN BYRNE:  And the answer to
11 the question is yes.
12       THE WITNESS:  Okay.
13    A.  And what is your question again?
14 I'm sorry.
15 BY MR. WAHLQUIST:
16    Q.  Well, the question is, if it were a
17 $2 million transaction in December of 2002,
18 done pursuant to the right of first refusal,
19 your testimony then is that would survive
20 scrutiny in court; is that correct?
21    A.  If it were a bona fide third party
22 offer.
23    Q.  Even if it were not for fair market
24 value?
25    A.  It would not --

533

Burke

1
2  CHAIRMAN BYRNE:  No, because fair
3  market value is then determined, not by an
4  appraisal, fair market value was
5  determined by a bona fide purchase.
6  MR. WAHLQUIST:  A lot of purchases
7  are for below fair market value.
8  CHAIRMAN BYRNE:  The reg and
9  judicial interpretation of the reg, fair
10  market value as determined by a -- I think
11  it's A, bona fide purchase by a third
12  party in an arm's-length transaction, B
13  it's an art, not a science.  It doesn't
14  even say appraisal except as an example.
15  It says "A valuation determined under
16  reasonable circumstances," blah, blah,
17  blah, blah, blah, blah, blah, blah.  No,
18  no, no, no, no, no, no.  The definition of
19  fair market value, the reg that -- not
20  that reg, but the reg -- the section
21  and/or the reg that talks about fair
22  market value defines it as.  So don't
23  switch regs when you are asking her a
24  question.
25  MR. WAHLQUIST:  Okay, let's assume

Burke

1
2  that the reg says -- well, let me ask you
3  this then.
4  BY MR. WAHLQUIST:
5  Q.  What if Upper Deck had bought the
6  stock back for $20 million, would it survive
7  scrutiny in court?
8  A.  Who are you asking?
9  Q.  You.
10  CHAIRMAN BYRNE:  You.
11  A.  Oh.  I do not believe it would have.
12  Q.  And is that because there was no
13  economic substance to this transaction?
14  A.  It's because it was substantially
15  above fair market value.
16  Q.  And does that render the
17  transaction --
18  A.  And therefore, there was no economic
19  substance.
20  Q.  All right.  So you'd say there is no
21  economic substance to this transaction, even if
22  Upper Deck had paid $20 million for the stock;
23  is that right?
24  A.  If those are the only facts, yes.
25  CHAIRMAN BYRNE:  And when you

Burke

1
2  contested, therefore, you -- one would --
3  the taxpayer would say "IRS, you are out
4  of your mind. $20 million was more than
5  fair market value.  Here are a gagillion
6  valuations we have.  Here are our internal
7  reports.  You do it.  In fact, it was
8  worth at the time the 20 million was more
9  than fair market value, or the 15 million
10  was more than fair market value, or the
11  $2 million was fair market value if, at
12  the time, you can back it up?
13  THE WITNESS:  Correct.
14  CHAIRMAN BYRNE:  It ain't the
15  number.  It's what's behind it?
16  THE WITNESS:  That's correct.
17  CHAIRMAN BYRNE:  Thank you.
18  Counsel, that makes your point as well as
19  anything else.
20  BY MR. WAHLQUIST:
21  Q.  Let's talk a little bit about
22  courts.
23  A.  About what?
24  Q.  Courts.  How do you wind up in
25  District Court in tax litigation?

Burke

1
2  A.  How do you wind up in District
3  Court?
4  Q.  Yeah.
5  A.  In a tax case, to wind up in
6  District Court, a taxpayer must first pay the
7  amount of the assessment and then sue for a
8  refund.
9  Q.  So hypothetically, if the IRS had
10  said to Upper Deck, "You have a second class of
11  stock.  We are assessing you with income taxes,
12  the corporation, on that basis."  And Upper
13  Deck would have disagreed, they wanted to get
14  into District Court, they would have to pay the
15  taxes, and then sue the IRS to get it back?
16  A.  That's correct.
17  Q.  Similarly, if the IRS had said to
18  Mr. McWilliam, "We think the allocation of the
19  -- we, the IRS, think the allocation of the
20  income to the Firefighters is inappropriate.
21  We are going to assess it to you."
22  Mr. McWilliam wanted to contest
23  that.  He would have had to have paid the
24  income tax and gone -- before he could go to
25  District Court, right?

Oct 12 arb hearing  10/12/2006  11:00:00 AM

```
 1              Burke
 2     A.   That's correct.
 3     Q.   How do you wind up in tax court?
 4     A.   You simply appeal the deficiency.
 5   You docket the case.  You do not have to pay
 6   first.
 7     Q.   Now, have you done the analysis --
 8   if the IRS had done an assessment here, how
 9   much Upper Deck and Mr. McWilliam would have
10   had to have shelled out before they could
11   litigate in District Court?
12     A.   Would the IRS take that into
13   consideration?  Is that your --
14        CHAIRMAN BYRNE:  No, no. no.  Have
15   you, Ms. Burke, done any calculation in
16   connection with your review of the
17   documents, or the settlement agreement, or
18   whatever what Upper Deck or Mr. McWilliam
19   would have had to have shelled out?
20        THE WITNESS:  To get into tax court?
21        MR. WAHLQUIST:  No.
22        CHAIRMAN BYRNE:  To get into -- to
23   get into District Court.
24        THE WITNESS:  He would have had to
25   shell out the amount of the assessment.
```

538

```
 1              Burke
 2   BY MR. WAHLQUIST:
 3     Q.   Which would have been, assuming both
 4   those assessments I just identified, an
 5   assessment against Upper Deck and an assessment
 6   against him, he'd have had to shell out close
 7   to $140 million to litigate in District Court,
 8   right?
 9     A.   The answer to that's most likely.
10   Sometimes that could be negotiated so it's only
11   counted once.
12     Q.   Negotiated with whom?
13     A.   With the courts.  I mean you can
14   agree that the IRS will agree that there is
15   only one liability.
16     Q.   Okay.  Now, in Tax Court, do you get
17   a jury?
18     A.   Pardon me?
19     Q.   In Tax Court, do you get a jury?
20     A.   No.
21     Q.   Do you get a judge?
22     A.   Or two or three.
23     Q.   And is there -- in your experience,
24   do tax practitioners regard one of those forums
25   as more hospitable than the other?
```

539

```
 1              Burke
 2     A.   It would depend on the case.
 3        CHAIRMAN BYRNE:  Would it not also
 4   depend on the District Court or the
 5   Circuit you are in?
 6        THE WITNESS:  It would depend on the
 7   precedent, yes.
 8     Q.   Would you agree that in general, Tax
 9   Court is regarded as a less favorable forum for
10   the taxpayer than is District Court?
11     A.   I would agree that it is generally
12   viewed that way.  I would not agree that is
13   necessarily the case.
14     Q.   So in that regard, you would
15   disagree with the general view of tax
16   practitioners; is that correct?
17     A.   Are you asking me what the general
18   view of the tax practitioners are -- is?
19     Q.   Well, yeah.
20     A.   I think the general view of the tax
21   practitioners would be Tax Court is a less
22   favorable jurisdiction.
23     Q.   Okay.  And you disagree with that?
24     A.   Yes, I do.
25        CHAIRMAN BYRNE:  It's not that you
```

540

```
 1              Burke
 2   disagree with the general view.  You
 3   disagree that -- you simply disagree that
 4   Tax Court is generally less favorable to
 5   the taxpayer.
 6        THE WITNESS:  That's correct.
 7   BY MR. WAHLQUIST:
 8     Q.   Have you read the report of another
 9   expert in this case, Mr. Robert Burke?
10     A.   Yes, I have.
11     Q.   Is any relation to you?
12     A.   Pardon me?
13     Q.   Is any relation to you?
14     A.   No.
15     Q.   Now, Mr. Burke has --
16        CHAIRMAN BYRNE:  The way you said
17   that, and the way he speaks so highly of
18   you, I was very surprised.
19        THE WITNESS:  No, I have never known
20   Robert before, never seen him in the
21   flesh, don't know him.
22   BY MR. WAHLQUIST:
23     Q.   Okay.  Would you disagree with the
24   statement that it's commonly viewed by tax
25   practitioners -- as the Tax Court is commonly
```

541

EXHIBIT  X   PAGE 718

Burke

1
2  viewed as a significantly more pro government
3  forum than many United States Federal District
4  Courts or the Court of Claims?
5      A.   Would I disagree that is the
6  view of tax practitioners?  Without the word
7  "significant," I would agree with him.
8      Q.   But as phrased, you disagree with
9  it?
10     A.   Probably.
11     Q.   Okay.  Would you agree that because
12  the SC squared strategy was a marketed strategy
13  initiated by KPMG, in a substantially
14  prestructured formats, courts could be expected
15  to take a critical view of SC squared?
16     A.   No, I can't agree with that because
17  the cases are factual.  They can be different.
18     Q.   So you disagree?
19     A.   I disagree.
20     Q.   Would you disagree with the
21  proposition that with respect to the SC squared
22  transaction, there was a likelihood of a
23  negative bias by the courts?
24     A.   I guess I have to disagree with that
25  as well.

542

Burke

1
2  Q.   So if Mr. Burke said that, that
3  would be wrong?
4      CHAIRMAN BYRNE:  Sustained.
5      MR. KUSHNER:  I'm not objecting to
6  the fact that there are sentences
7  following that, which might put it more
8  fairly, but that's okay.
9      CHAIRMAN BYRNE:  So you don't mind
10  that I sustained the objection you didn't
11  make?  Is that okay?
12     MR. KUSHNER:  Yes.
13     CHAIRMAN BYRNE:  Are we good?
14     MR. KUSHNER:  Yes.
15     CHAIRMAN BYRNE:  Thank you.
16  BY MR. WAHLQUIST:
17     Q.   Would you agree or disagree with the
18  proposition that with respect to many SC
19  squared transactions, there would be a distinct
20  possibility that a court would disregard the
21  professed purpose of benefiting the tax exempt
22  entity and find that the shareholders were
23  motivated solely by a tax avoidance purposes
24  because the tax benefits associated with a gift
25  to a tax exempt entity, to the tax exempt

543

Burke

1
2  entity, potentially exceeded the value of the
3  gift?
4      A.   Would I agree with that statement?
5      Q.   Agree or disagree?
6      A.   The statement was -- read it to me
7  again, please.
8      CHAIRMAN BYRNE:  Well, can we show
9  it to her.  Can I grab -- tell me what
10  page, and I will get my copy for her.
11     MR. WAHLQUIST:  Page 15 of
12  Mr. Burke's report.
13     A.   (Perusing.)  Now, are you asking me
14  if I agree with that statement?
15     Q.   Yes.
16     A.   I can neither just agree or
17  disagree.  Basically, he -- because these are
18  factual cases, it would very much depend on the
19  facts.
20     Q.   And because they are factual cases,
21  the facts as found by the trial court are, in
22  all likelihood, going to be sustained on
23  appeal, correct?
24     A.   That is normally the way the rules
25  work, yes.

544

Burke

1
2      CHAIRMAN BYRNE:  And don't ever
3  forget it.
4      MR. WAHLQUIST:  I can't.
5  BY MR. WAHLQUIST:
6      Q.   So if the trial court is, in fact,
7  inhospitable and it turns on the facts of the
8  case, would you agree that makes it a less
9  advantageous forum for the taxpayer?
10     A.   Could you leave your hand away?
11     Q.   I'm sorry.  It's better if you can
12  see me.  If, in fact, the Tax Court is a less
13  advantageous forum for the taxpayer, and if, in
14  fact, the case is going to turn on the facts of
15  the case rather than the law, which can be
16  reviewed on appeal with a greater degree of
17  scrutiny by an appellate court, you can --
18  would you agree that that would make the Tax
19  Court likely the final determiner with respect
20  to this case?
21     A.   Well, I have a problem because I
22  don't agree with your premise.
23     Q.   But I'm allowed to ask hypothetical
24  questions.
25     A.   So your question is, if the Tax

545

EXHIBIT  X , PAGE 719

Burke

1
2  Court -- what was your final question?
3      Q.   The final question is, isn't it
4  likely if Mr. McWilliam and Upper Deck had gone
5  to Tax Court, and the Tax Court had found the
6  facts disadvantageously to him, that he would
7  have had a tough road on appeal?
8      A.   If the Tax Court found the facts
9  disadvantageous to the taxpayer?
10     Q.   If they found against him.  If they
11 found, for example, Mr. McWilliam had no
12 donative intent?
13     A.   Okay.  Then what's your question?
14     Q.   Wouldn't you agree that if a Tax
15 Court found that, that would be very difficult
16 to attack on appeal in this case?
17     A.   Yes.
18     Q.   Have you ever tried a case in Tax
19 Court?
20     A.   No.
21     Q.   Have you ever tried a case in
22 District Court?
23     A.   In what?
24     Q.   District court?
25     A.   No.

546

Burke

1
2      A.   Yes, I'm sorry.
3      Q.   If I understood the gist of your
4  testimony, and I may be wrong because I want to
5  make sure I understand it, aspirationally, we
6  would all agree that the rule of law should be
7  supreme, and it doesn't matter who the parties
8  are, what they look like.  The law should be
9  applied evenly, right, outside, divorced from
10 the context of the political furor that might
11 be surrounding it; is that right?
12     A.   Yes.
13     Q.   And while that may be an
14 aspirational goal, is it your opinion that it
15 always happens?
16         CHAIRMAN BYRNE:  You better say no.
17     A.   No.
18     Q.   And so you would agree that the
19 climate in which the litigants find themselves
20 in court can affect the outcome of the case?
21     A.   I would agree that it can, yes.
22     Q.   You spent 27 years at Alcoa?
23     A.   Correct.
24     Q.   Did you ever work with an
25 S corporation there?

548

Burke

1
2      Q.   Have you ever tried a case in a
3  Court of Claims?
4      A.   Yes.
5      Q.   Have you ever tried a tax case in
6  the Court of Claims?
7      A.   Yes.
8      Q.   How many?
9      A.   Pardon me?
10     Q.   How many?
11     A.   One.
12     Q.   Have you ever argued an appeal
13 before the Ninth Circuit Court of Appeals?
14     A.   Have I ever what?
15     Q.   Ever argued an appeal before the
16 Ninth Circuit Court of Appeals?
17     A.   No.
18     Q.   Have you ever argued an appeal
19 before the Federal Circuit Court?
20     A.   No.
21     Q.   There was some discussion on
22 redirect about what I will call the climate,
23 and whether or not it affects an outcome in a
24 court.  Do you remember that discussion?  Is
25 that a "Yes"?

547

Burke

1
2      A.   As a matter of fact, I did, yes.
3      Q.   On how many occasions?
4      A.   Pardon me?
5      Q.   On how many occasions?
6      A.   The S Corp -- probably about ten.
7      Q.   Did you work with S corporations --
8  well, strike that.
9          You reviewed the KPMG opinions.
10 They make use of language like "taxpayer should
11 prevail."  Do you know that language?
12     A.   Yes.
13     Q.   KPMG apparently suggested to the
14 Senate in their investigations by that
15 expression, they meant 70 percent chance of
16 prevailing.  Is that generally the way you
17 understand that expression?
18     A.   It generally means there is a good
19 chance of prevailing, yes.
20     Q.   They also use the expression "more
21 likely than not, "right?
22     A.   Yes.
23     Q.   And that that's a commonly used
24 expression in a tax opinion, "more likely than
25 not"?

549

1                     Burke
2      A.  Yes.
3      Q.  As is "should prevail," right?
4      A.  Yes.
5      Q.  And there are other commonly used
6   expressions that go with certain degrees of
7   confidence in a tax opinion, correct?
8      A.  In the tax accounting field, yes.
9      Q.  Are you familiar with the
10  expression, "reasonable basis"?
11     A.  Yes.
12     Q.  Do you know what that means?
13     A.  Yes.
14     Q.  What does it mean?
15     A.  It means that there is a basis for
16  the claim.
17     Q.  Doesn't it generally mean one chance
18  in three, at least one chance in three?
19     A.  No, I've actually never heard that.
20     Q.  Pardon me?
21     A.  I have never heard that, no.  I was
22  just thought -- no, I haven't heard that.
23     Q.  You, in your report, use the
24  expression "good chance"?
25     A.  Um-hum.

                                        550

1                     Burke
2      Q.  What does that mean?
3      A.  I think it means they could prevail.
4         CHAIRMAN BYRNE:  More than -- better
5   than 50/50?
6         THE WITNESS:  Pardon me?
7         CHAIRMAN BYRNE:  Better than 50/50?
8         THE WITNESS:  Yes.
9   BY MR. WAHLQUIST:
10     Q.  How much better?
11     A.  Do you have to be better than 50 --
12  more than 50?
13        CHAIRMAN BYRNE:  Well, sometimes, it
14  -- in fairness to counsel, and to you,
15  Ms. Burke.
16        THE WITNESS:  I actually
17  deliberately use that term because I don't
18  like the tax accounting terms.  I don't
19  think they have any basis in a legal
20  analysis.
21  BY MR. WAHLQUIST:
22     Q.  Well -- and you've made that clear
23  to me, but what I want to address is your
24  assessment of the likelihood of prevailing in
25  litigation.  You said it's good, and I want to

                                        551

1                     Burke
2   get an assessment of how good.  Does that mean
3   51 percent?
4      A.  On the facts of this case if it --
5      Q.  And no, I want to talk about a
6   generic transaction first, okay?
7         MR. KUSHNER:  He has changed the
8   question.
9      A.  I can't answer that question.
10        MR. KUSHNER:  She didn't address
11  generic.  She addressed this claim.
12        CHAIRMAN BYRNE:  Counsel, sustained.
13  BY MR. WAHLQUIST:
14     Q.  Wait a minute.  In your report, you
15  say that the tax transaction entered -- excuse
16  me, that the transaction entered into in 2001
17  had a good chance of surviving scrutiny in the
18  Tax Court, right?
19     A.  Yes.
20     Q.  How good?
21     A.  I think in the case of this
22  particular factual situation, had it proceeded
23  to be implemented as structured, I would have
24  made the -- I would probably have taken the
25  chances up to 60 or 70 percent, 60 or 70.

                                        552

1                     Burke
2      Q.  So there would have been a 30 or
3   40 percent chance of losing, right?
4      A.  That would be the case with any
5   factual case, is it not?
6      Q.  And is your assessment in that
7   regard the same for both the allocation of
8   income issue and the second class of stock
9   issue?
10     A.  Could I address the second class of
11  stock issue first?  I think that was like 100
12  percent.
13     Q.  I understood from your report you
14  thought they were maybe different, but that's
15  -- that's what I want to be clear on?
16     A.  Okay.
17     Q.  So you are telling us that on the
18  allocation issue, you think there was, in the
19  original transaction 60, 70 percent chance of
20  prevailing, and you thought it was a virtual
21  certainty they would prevail on the second
22  class of stock issue?
23     A.  But that all goes hand-in-hand, but
24  I really think the second class of stock was a
25  nonissue.

                                        553

ᵀᵁᴴIBIT  X  , PAGE 721

Burke

1  Burke
2  Q.  Can you explain what you mean by
3  "hand-in-hand" to me?
4  A.  I'm sorry?
5  Q.  Can you explain what you mean by
6  "hand-in-hand" to me?
7  A.  Had there -- had there been a second
8  class of stock, they would have absolutely
9  failed on the allocation issue. It's only
10 because there was no second class of stock that
11 you even address the allocation issue.
12 Q.  And you indicated that after the
13 transaction in December of 2002, you thought
14 that the taxpayer would lose in court?
15 A.  That's correct.
16 Q.  Can you tell us what degree of
17 confidence you have in that conclusion?
18 A.  In the conclusion that he would
19 lose?
20 Q.  Yeah.
21 A.  Probably 90 to 100 percent.
22 Q.  Okay. And that's the percentage you
23 would put on it?
24 A.  (Nodding.)
25    CHAIRMAN BYRNE: I must tell you I'm

554

1  Burke
2  up.
3    CHAIRMAN BYRNE: Okay. And that the
4  IRS's determination that it was -- in this
5  case, keep in mind my form over substance
6  comment.
7    What was the IRS saying was wrong
8  with this transaction? This transaction,
9  Upper Deck's transaction.
10   THE WITNESS: Okay. What was the
11 IRS saying was wrong with the shareholders
12 agreement?
13   ARBITRATOR MOXLEY: The generic.
14   CHAIRMAN BYRNE: With anything that
15 Upper Deck did.
16   THE WITNESS: Oh, with the SC --
17   CHAIRMAN BYRNE: With anything that
18 Upper Deck did.
19   THE WITNESS: Because anything that
20 Upper --
21   CHAIRMAN BYRNE: Upper Deck did.
22   THE WITNESS: It's tough for me to
23 know.
24   CHAIRMAN BYRNE: Thank you.
25 BY MR. WAHLQUIST:

556

1  Burke
2  having difficulty with what -- with what
3  I'm going to call form over substance.
4  And I'm going to go back to some of the
5  other questions counsel asked you.
6    MR. HOWELL: May I just interrupt to
7  get my binder back? I wrote some notes
8  that I want to look at.
9    CHAIRMAN BYRNE: Oh, I'm sorry.
10 Sure. And I won't do -- I won't engage in
11 the hypothetical, but if I contest -- if
12 the taxpayer contested the IRS's position
13 that the repurchase of shares in December
14 of 2002 vitiated an otherwise valid SC
15 squared transaction, what would be the
16 impact, if any, on that determination of a
17 finding or a establishment that, in fact
18 and in law, the $2 million paid to redeem
19 the shares in December of 2002 were fair
20 market -- was fair market value?
21   THE WITNESS: And you're asking me
22 what effect that would have? If the court
23 found that that was fair market value,
24 then I think the transaction would hold
25 up -- I think the transaction would hold

555

1  Burke
2  Q.  And why is it tough for you to know?
3  A.  Because they probably did not look
4  beyond establishing that the generic facts of
5  the transaction fit the Notice 2004-30.
6  Q.  Thank you. Are you aware of any SC
7  squared taxpayer who was not offered an
8  identical settlement proposal to that received
9  by Upper Deck and Mr. McWilliam?
10 A.  No.
11 Q.  Now, in your direct, you suggested
12 that prior to the issuance of those settlement
13 offers, those generic settlement offers that
14 went to all SC squared participants, there
15 would have been some prospect of negotiating a
16 separate settlement if I heard you correctly.
17 Did I hear that correctly?
18 A.  You heard me correctly.
19 Q.  And you know if you look at Notice
20 2004 in the coordinated issue paper, it says in
21 some of these cases for example, they didn't
22 even issue a share certificate to the charity.
23 That's a bad case, right?
24 A.  That's correct.
25 Q.  So -- or they didn't send them K-1s.

557

upper deck-aig arb

EXHIBIT __X__, PAGE 722

Page 554 - 557

Burke

1
2  That's another bad case, right?
3      A.  Correct.
4      Q.  In your view, would it have been
5  possible to negotiate a settlement prior to the
6  issuance of that generic settlement proposal
7  more advantageous than the one that was
8  negotiated?
9      A.  Would it be possible for me to
10  answer your question by talking a little bit
11  about the procedure that normally pertains?
12      Q.  Well, you can tell me all about the
13  procedure, but I would like a direct answer to
14  my question.
15      A.  Your question was, prior to the
16  issuance of the generic settlement offer for
17  the SC2 type of transaction, would it have been
18  possible to negotiate a settlement?
19      Q.  Correct.
20      A.  The answer to that is yes, but it
21  would have had to be in appeals.
22      Q.  Are you aware of anybody negotiating
23  such a settlement?
24      A.  No.
25      Q.  And you think the prospects of

558

Burke

1
2  anybody negotiating such a separate settlement
3  were strong, anybody?
4      A.  I have to be honest with you and
5  tell you I cannot answer that question as to
6  this transaction.
7      Q.  Would you turn to page 13 of your
8  own report, please?
9      A.  Page 13 of what?
10      Q.  Your own report if you have it.
11      MR. KUSHNER:  Let's see if I can dig
12  it out.
13      A.  Page 13 of my report?  It's more
14  than halfway through it, I know that much.
15      MR. KUSHNER:  Here we are (handing).
16      THE WITNESS:  Thank you.
17      CHAIRMAN BYRNE:  What are we looking
18  at?
19      Q.  The first sentence of the first
20  paragraph.
21      A.  The one that starts, "The best way"?
22      Q.  Yes.  My question is, do you still
23  believe that?
24      A.  Okay.
25      Q.  Do you still believe that?

559

Burke

1
2      A.  Yes.
3      Q.  "The best way to judge the reality
4  of the donation made by the Trust to the Fund
5  is to look at the shareholders agreement"?
6      A.  Yes.
7      Q.  Would that be the most compelling
8  evidence in court of whether or not there was
9  an actual donation made to the Fund?
10      CHAIRMAN BYRNE:  If you can answer
11  that, God bless you.
12      THE WITNESS:  Thank you.  There are
13  obviously many other factors that play
14  into what is a valid donation.
15  BY MR. WAHLQUIST:
16      Q.  Would that be --
17      A.  I'm sorry?
18      Q.  Would that be the best evidence or
19  factor?
20      A.  Well, the shareholders agreement is
21  the best evidence of what took place in the
22  transaction.
23      Q.  The coordinated issue paper?
24      A.  Pardon me?
25      Q.  The coordinated issue paper issued

560

Burke

1
2  by the IRS in connection with the Notice 2004
3  draws a distinction between the Economic
4  Substance Doctrine and the Form Over Substance
5  Doctrine.  Do you recall that?
6      A.  Not really.
7      Q.  Do you draw a distinction between
8  those two doctrines?
9      A.  Not really.
10      Q.  The way the coordinated issue paper
11  generally describes the application of the Form
12  Over Substance Doctrine is that the substance
13  of this was an accommodation fee paid to the
14  charity to accommodate the taxpayer's reduction
15  of their taxes.
16      Have you done an analysis of that
17  doctrine?
18      A.  Of the Substance Over Form?
19      Q.  Correct?
20      A.  Well, the Substance Over Form in
21  that case is the same as Economic Substance.
22  What you are looking at -- I guess the answer
23  is yes.
24      Q.  Okay.  Well, isn't the difference
25  between those two doctrines, one doctrine says

561

EXHIBIT X, PAGE 723

Burke

1
2  there is no substance.  The other doctrine says
3  there is substance, but the substance is not
4  the same as the label you have put on it.  It's
5  something different than what you have called
6  it?
7      A.  No, I wouldn't agree with that.
8      Q.  You would disagree with that.  And
9  would you disagree with that reading of the
10  coordinated issue paper?
11      MR. KUSHNER:  Reading by whom?
12      CHAIRMAN BYRNE:  His.
13      MR. WAHLQUIST:  Mine, the one I just
14  stated.
15      A.  Yes, I guess I do disagree with
16  that.
17      MR. WAHLQUIST:  Okay.
18      CHAIRMAN BYRNE:  I think you kind of
19  have it, Counsel, or damned close to doing
20  it.
21      MR. WAHLQUIST:  One last question.
22  BY MR. WAHLQUIST:
23      Q.  If the -- if Upper Deck hadn't
24  engaged in the December 2002 transaction?
25      A.  If Upper Deck had not?

562

Burke

1
2      Q.  Have you got some estimate of how
3  many tax cases -- Tax Court cases there were
4  belonging to lawyers whom you supervised?
5      A.  It was in the neighborhood of
6  10,000.
7      Q.  Just one last question.  You were
8  asked -- you mentioned various factors.  If I'm
9  wrong you will correct me, that you would use
10  in evaluating the economic substance of a
11  transaction.  Can you just mention those
12  factors, please?
13      A.  Well, basically, you look to see was
14  a gift really made?  Did the company and the
15  fund have a shareholder relationship?  Was fair
16  market value the standard used on the
17  redemption?  And how was fair market value
18  determined?  And were there other economic
19  relationships or standings that changed with
20  either party because of entering into the
21  transaction?
22      CHAIRMAN BYRNE:  What was the last
23  part?  Anything that --
24      THE WITNESS:  Were there economic
25  relationships that changed for either

564

Burke

1
2      Q.  If Upper Deck had not engaged in the
3  December 2002 transaction, would the IRS still
4  have taken the same position with Upper Deck
5  and Mr. McWilliam that it did take?
6      A.  Yes.
7      MR. WAHLQUIST:  Thank you.
8      MR. KUSHNER:  May I?
9      CHAIRMAN BYRNE:  Quickly.
10  EXAMINATION
11  BY MR. KUSHNER:
12      Q.  When you were in the Internal
13  Revenue Service, did you supervise lawyers who
14  tried cases in the Court of Claims?
15      A.  No, I did not.
16      Q.  And what did you have to do with the
17  300 or 400 lawyers you mentioned in your direct
18  testimony?
19      A.  Well, I did supervise lawyers who
20  litigated in the Tax Court.
21      Q.  How about the District Court?
22      A.  No.
23      Q.  That would be because the Department
24  of Justice had those lawyers; is that right?
25      A.  That's correct.

563

Burke

1
2  party because of entering into the
3  transaction?
4      CHAIRMAN BYRNE:  Thank you.
5  BY MR. KUSHNER:
6      Q.  Do you have an opinion as to whether
7  the transaction effected in December 2002
8  deprived the taxpayer of a chance to
9  litigate -- a realistic chance to litigate or
10  settle the IRS ruling?
11      MR. WAHLQUIST:  Compound, and asked
12  and answered.
13      CHAIRMAN BYRNE:  Do you understand
14  the question?
15      THE WITNESS:  Yes, I believe I do,
16  but if I could rephrase it?
17      CHAIRMAN BYRNE:  Please.  Yes.
18      THE WITNESS:  The question was, do I
19  have an opinion?
20      CHAIRMAN BYRNE:  Better you.  If I
21  said that -- go ahead.
22      THE WITNESS:  Do I have an opinion
23  as to whether the transaction actually
24  implemented as a result of the 2002
25  agreement affected the ability to litigate

565

EXHIBIT  X , PAGE 724

Oct 12 arb hearing  10/12/2006  11:00:00 AM

```
 1          Burke
 2   the case successfully?
 3   Q.   Yes.  I will accept it.
 4   A.   Was that your question?
 5   Q.   Yes.
 6   A.   Yes, I have an opinion.
 7   Q.   And what is it?
 8   A.   It is that it did.
 9        MR. KUSHNER:  Okay.  I have no other
10   questions.
11        CHAIRMAN BYRNE:  Thank you very,
12   very much, Ms. Burke.  Thank you for your
13   time, and your opinions, and your help.
14   As you can tell, we do not have the
15   easiest job.
16        We are adjourned until 10:00
17   tomorrow, when we will start with
18   Mr. Robert Burke, and I will not describe
19   for him the expression that Mrs. Linda
20   Burke gave when his name was mentioned.
21        (Time noted:  5:00 p.m.)
22
23
24
25
```

566

```
 1          Burke
 2        C E R T I F I C A T E
 3
 4   STATE OF NEW YORK    )
                          :ss
 5   COUNTY OF RICHMOND   )
 6
 7        I, MELISSA GILMORE, a Notary Public
 8   within and for the State of New York, do hereby
 9   certify that the within is a true and accurate
10   transcript of the proceedings taken on
11   October 12, 2006.
12        I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage; and that I am in no way
15   interested in the outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto
17   set my hand this 13th day of October, 2006.
18
19        _____
20             MELISSA GILMORE
21
22
23
24
25
```

567

EXHIBIT  X , PAGE 725

567

1                        Burke

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :ss
5    COUNTY OF RICHMOND       )

6

7         I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify that the within is a true and accurate

10   transcript of the proceedings taken on

11   October 12, 2006.

12        I further certify that I am not

13   related to any of the parties to this action by

14   blood or marriage; and that I am in no way

15   interested in the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto

17   set my hand this 13th day of October, 2006.

18

19                    *Melissa Gilmore*

20                    MELISSA GILMORE

21

22

23

24

25

EXHIBIT __X__, PAGE 726