# EXHIBIT Y

568

COPY

1

2   AMERICAN ARBITRATION ASSOCIATION

3   ----------------------------------------X

4   AMERICAN INTERNATIONAL SPECIALTY

5   LINES INSURANCE COMPANY,

6                    Claimant-

7                    Counter Respondent,

8            - against -

9   THE UPPER DECK COMPANY, RICHARD P.

10  McWILLIAM, and the MPR REVOCABLE TRUST,

11                   Respondents-

12                   Counter Claimants.

13  ----------------------------------------X

14                   780 Third Avenue
                     New York, New York
15
                     October 13, 2006
16                   10:05 a.m.

17  B E F O R E:

18      JOHN F. BYRNE, Chairman

19      STEPHEN D. KRAMER, Arbitrator

20      CHARLES J. MOXLEY, JR., Arbitrator

21

22              MELISSA GILMORE, Reporter

23  ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
24          New York, New York 10022
                212-750-6434
25              REF: 82080

EXHIBIT __Y__ PAGE 727

Oct 13 arb hearing  10/13/2006  10:05:00 AM

1
2      CHAIRMAN BYRNE:  Good morning,
3   everyone.  Thank you again for being so
4   prompt.  It is my understanding that what
5   we are going to try to do today is adjourn
6   at 3:00, or as close thereto as we
7   possibly can.  That means we are -- we are
8   scheduling -- we have scheduled about two
9   hours or so with you in the morning, a
10  lunch break, and we have got another
11  victim coming in a little bit later.
12     Mr. Burke, thank you.  You can
13  assume that we have read the report.  As a
14  colleague, I will not swear you in as a
15  witness.
16     Keep in mind that we have read your
17  report.  Your opinion is your opinion.  It
18  is not accepted -- it is not being
19  accepted under the Federal Rules of
20  Evidence standard, such that we must view
21  it, as in some instances, dispositive as a
22  scientific fact or something like that.
23  Every lawyer has an opinion.
24     In this kind of situation, it is the
25  panel's position, based on the dispute,

572

1
2      CHAIRMAN BYRNE:  You can proceed.
3   EXAMINATION
4   BY MR. KUSHNER:
5      Q.  Mr. Burke, on page 11 of your
6   report, Footnote 16 states, "It is my
7   understanding that taxpayers, who engaged in at
8   least eight to ten SC2 transactions, is
9   currently anticipating litigating the matter
10  with the IRS."  What's the source of your
11  information for that footnote?
12     A.  That is discussions with Charles
13  Rettig, who is counsel who represents 30 some
14  odd of the -- initially represented 30 some odd
15  of the SC squared participants, and it's based
16  on conversations I had with him just about the
17  time I was preparing this report.  So -- and
18  you know, that is just his client base.  So
19  there are another 20 some odd taxpayers out
20  there that don't know exactly where they stand.
21  So just on the 34 or so I think that he
22  represented, that he is indicating that eight
23  to ten of them are likely to go to litigation.
24     Q.  Mr. Burke, do you have an opinion
25  concerning whether, under existing case law and

574

1
2   that really is most important.  And what
3   we are looking to you, as we have to
4   another expert, is the persuasiveness of
5   your opinion or your analysis and as a
6   guide for us in terms of going through the
7   analysis.
8      That said, don't feel you have to
9   defend the report or what you have done.
10  I'm basically going to limit much of the
11  questioning to what's it based on, what
12  did you do, what did you review because
13  there are some questions -- peripheral
14  questions that are out there.  And explain
15  to us, respond to questions if we flip
16  some hypotheticals or whatever, that's
17  what we are about today.  That said, you
18  are going to begin the questioning, Mr.
19  Kushner?
20     MR. KUSHNER:  Yes, I will be brief.
21     CHAIRMAN BYRNE:  You have been
22  threatening that now for four days, and
23  you have succeeded every time.  Proceed,
24  Mr. Kushner.
25     MR. KUSHNER:  I can only hope.

573

1      Burke
2   the statutes and regulations, the SC2
3   transaction structured -- as structured in this
4   case, originally structured in this case, would
5   have succeeded?
6      A.  Yes, I think, as spelled out by
7   KPMG, when I refer to them in my report as the
8   "generic SC squared transaction," done as
9   anticipated as a technical matter, I think the
10  case was very likely to be upheld if litigated.
11     CHAIRMAN BYRNE:  You have to keep
12  your voice up a little.
13     THE WITNESS:  Okay.
14     CHAIRMAN BYRNE:  Thank you.
15     Q.  And if a nontax lawyer were to
16  approach you and say, "It seems too good to be
17  true," what would your response be?
18     A.  My response is that's not the tax
19  test, and a lot of people believe it is the tax
20  test.  You know -- and the report goes in --
21  and everybody's report, all the experts'
22  reports, go into the economic substance which
23  is, to some extent, looks at whether things are
24  too good to be true, but that's not what they
25  ultimately look at.

575

Burke

1  Burke
2      There are lots of circumstances in
3  the tax law where things are too good to be
4  true.  A couple of examples, short sales
5  against the box, which you people probably
6  heard of, may not understand exactly what they
7  are, that's now been repealed by Congress, but
8  if you wanted to sell your stock and you didn't
9  want to pay tax this year.  You want to --
10      MR. WAHLQUIST:  I object.  This is
11  nowhere in any of the report.
12      CHAIRMAN BYRNE:  He is giving it as
13  an example of things being too good to be
14  true.  You can proceed.
15      THE WITNESS:  You know, you borrow
16  someone else's security.  You sell it.
17  You don't pay gain when you sell it.  You
18  have all the proceeds.  You pay a gain the
19  next year when you close the transaction
20  by giving your shares back to the person
21  you borrowed it from.
22      If there is ever a circumstance
23  where you get a tax result that is too
24  good to be true, that would be one, but it
25  was one the IRS, not only, you know,

576

1  Burke
2  tax exempt, would never -- wouldn't be
3  taxed until when the people retired, they
4  could take out their the earnings from the
5  Employee Stock Ownership Plan.
6      Congress, after noting this, went
7  "Oops, we have gone too far."  It was
8  clearly too good to be true.  That's what
9  the statute said, and the fix to it was,
10  Congress went back and changed the
11  statute.  So I mean there are -- I could
12  list enumerable circumstances.
13      CHAIRMAN BYRNE:  That's enough.  The
14  one follow-up is in an instance where
15  Congress goes back to close the loophole,
16  and I don't mean this in a technical
17  sense.  Are the taxpayers who took
18  advantage of the loophole, nonetheless,
19  safe harbor in the sense that their
20  transactions that occurred within the
21  loophole --
22      THE WITNESS:  Um-hum.
23      CHAIRMAN BYRNE:  -- are nonetheless
24  good?  May be challenged but they are
25  nonetheless good, notwithstanding that the

578

1  Burke
2  agreed with, they actually had regulations
3  that described what the parties' tax
4  consequences were.
5      Another -- and I don't want to go
6  through unless someone wants me to, a lot
7  of examples, but a very key example close
8  to this transaction is prior to, you know,
9  the late 1990s, the only people who could
10  be shareholders of S corporations were
11  individuals.
12      Congress changed the law to allow
13  tax exempts to be shareholders as well,
14  and it was that change in law that allowed
15  the SC squared transaction to go forward.
16  But Congress, when they did that, they
17  opened the flood gates too widely.
18      And in particular, there were
19  circumstances where people could set up
20  things called ESOPs, Employee Stock
21  Ownership Plans to own the shares of their
22  S corporation where they could sell their
23  shares, reinvest in public securities.
24      All of the income from the companies
25  would flow through to the ESOP, which was

577

1  Burke
2  loophole has been closed?
3      THE WITNESS:  I'm not sure I could
4  give a generic answer.
5      CHAIRMAN BYRNE:  Or does the IRS and
6  the courts view the closing of the
7  loophole as evidence that it wasn't
8  intended in the first place?  That's the
9  distinction.
10      THE WITNESS:  Yes, right, and like I
11  said, I'm not sure there is a -- one
12  answer that fits all circumstances.  And
13  the one I cited about the Employee Stock
14  Ownership Plan, that one was -- you know,
15  was intended not to say anything about
16  whether it worked previously.  To my
17  knowledge, the IRS has not tried to
18  challenge circumstances where people did
19  it as a result of the legislation.  People
20  had to undo their transactions so they had
21  to get out of it, but sometimes -- and
22  Congress will say in the legislative
23  history specifically whether they intend
24  to have any implications as to whether the
25  transaction, you know, worked prior to the

579

EXHIBIT __Y__, PAGE 729

Burke

```
 1              Burke
 2   change in the law.
 3       So it -- sometimes, people are save
 4   harbored or grandfathered.  Sometimes,
 5   they are not.  It depends on exactly what
 6   it is.  That particular example, I
 7   believe, they were practically safe
 8   harbored.
 9       ARBITRATOR MOXLEY:  Let me back up
10   for a second.  Mr. Burke, I want to make
11   sure I understand something.  When
12   Mr. Kushner asked you what your opinion
13   is, you indicated that the SC squared
14   transaction as structured, as spelled out
15   by KPMG, as a technical matter, was likely
16   to be upheld.
17       And I want to make sure I understand
18   what you mean and what one means in this
19   area when one says "as a technical
20   matter."  I have gotten the impression,
21   and I'm not sure this is right, that
22   sometimes, "as a technical matter" means
23   based on looking at specific code and reg
24   provisions, as opposed to application of
25   fairness doctrines.  But I don't know if
```

```
 1              Burke
 2   that's what you mean, so I'm asking.
 3       THE WITNESS:  What I mean is, if a
 4   taxpayer came in to me as a tax advisor
 5   and said, "Here is the transaction we
 6   dreamt up.  We did this, or we are going
 7   to do this.  Do you think it would work?
 8   Do you think it would be upheld by a
 9   court?"  All right.
10       To that, I would say in the SC
11   squared transaction, yes.  Under the
12   statute and the case law, as it exists
13   then, as it exists now, I think it would
14   be upheld.
15       And what I pointed out in my report
16   just to be aware of, you know, there is a
17   flavor as a result of this being a
18   promoted transaction, which introduces a
19   wild card that I don't know how to assess.
20   A one op transaction, one taxpayer did
21   this on its own initiative without
22   somebody bringing the case to them, you
23   know, I think the IRS would be exceedingly
24   hard challenged to prevail if they fought
25   it.
```

```
 1              Burke
 2       In the context of a promoted
 3   transaction, it obviously introduces a
 4   degree of risk to the taxpayer that I
 5   don't know how you assess it, but it
 6   certainly lowers their prospects of
 7   success.
 8       CHAIRMAN BYRNE:  Now, in 2006 for
 9   example, or next year, 2000 -- no, I will
10   leave it in 2006, now that I have at my
11   disposal the alleged expertise of KPMG and
12   others that have strategized with respect
13   to the SC squared transaction and I chose
14   to do the same transaction now, using the
15   eminent firm of Moxley and Kramer, is
16   there anything that prohibits Byrne to do
17   the same thing with respect to his S corp.
18   as outlined in the generic SC squared
19   transaction?
20       THE WITNESS:  That prohibits it, no,
21   I don't think so.
22       CHAIRMAN BYRNE:  Now, take the next
23   step.  Is it likely that my transaction
24   gets tarred with the same brush as the
25   KPMG marketed product, even though it
```

```
 1              Burke
 2   wasn't?
 3       THE WITNESS:  At this point, yes.
 4       CHAIRMAN BYRNE:  Would you say then
 5   that the likelihood of my success, if
 6   contested, if I took it through is better
 7   or worse than a transaction before it hit
 8   the fan?  It's hit the fan.  I did the
 9   transaction.
10       THE WITNESS:  I can't give you the
11   transaction.  Your prospects at this
12   point, I think, are worse than they would
13   have been had the KPMG transactions not
14   come to light, and you know ultimately,
15   been resolved.
16       ARBITRATOR MOXLEY:  Because it's
17   listed now, right?
18       CHAIRMAN BYRNE:  Okay.  That's what
19   I'm --
20       THE WITNESS:  I mean listed is
21   sounds horrible.
22       CHAIRMAN BYRNE:  But it's --
23       THE WITNESS:  Well, it's -- in my
24   view anyway, it's designed.  It's a
25   technique used by the IRS for in terrorem
```

EXHIBIT ___Y___, PAGE _730_

Burke

1
2  effect, rather than auditing everybody.
3  If they just say you do this, you are
4  going to be in big trouble, it stops a lot
5  of people from doing it.
6      An interesting thing about the SC
7  squared transaction is the standard listed
8  transaction, the IRS finds out about it.
9  They put out the listed transaction as
10  soon as they possibly can because they
11  want to stop it. SC squared, you know, we
12  know the IRS knew about it. You know,
13  certainly with the amnesty program, it
14  took them two years basically before they
15  listed the transaction.
16      This is a transaction which, within
17  the IRS, has been treated significantly
18  differently than the other tax structured
19  transactions out there. Two years, maybe
20  longer, to list it. If you look at the
21  KPMG deferred prosecution agreement, it's
22  not one of the transactions that's the
23  subject of that.
24      You have, you know, the head of
25  staff of the joint committee on taxation

Burke

1
2  There was no -- I mean we think of this as
3  a universal settlement proposal. We don't
4  know that. What people got were
5  individual letters. It said, "Here is
6  your settlement proposal."
7      The only reason we think it's
8  universal is because we happened to know
9  most of the taxpayers involved in it, and
10  we know they all got this letter. But it
11  was not done through a public
12  announcement. It was done separately so
13  that people who took the settlement, you
14  know, there were no announced statistics
15  about it like there were in the blip
16  transactions. This is the IRS responding
17  in a much different manner than they have
18  in the past.
19      CHAIRMAN BYRNE: I guess that goes
20  back to a question that Mr. Kushner asked,
21  also. Do we know -- do you know -- do we
22  know, whether the eight to ten
23  transactions that are being litigated,
24  whether they all are consummated generic
25  SC squared transactions, or do they have

Burke

1
2  saying "We don't know whether the IRS has
3  the weapons to challenge it." This is --
4  and I don't know how much people have seen
5  of the other listed transactions, they
6  are, you put your money in over here. It
7  kind of goes through a bunch of
8  transactions, usually with some, you know,
9  fancy financial derivatives and out pops a
10  loss, you know, 60 days later.
11      That's clearly not what was going on
12  here. You know there were real
13  consequences to these transactions. It
14  wasn't just a, you know, paper transaction
15  with financial derivatives that unwind at
16  the end of a short period of time. So
17  this a transaction, in my view, that the
18  IRS has thought long and hard about and
19  wondered whether they, you know can in
20  fact, attack it. Even the settlement
21  proposal is different, as opposed --
22      CHAIRMAN BYRNE: In what sense?
23      THE WITNESS: Other settlements, the
24  IRS would announce a proposal, all right?
25  It was published. Everybody knew it.

Burke

1
2  too many wrinkles to it for us to say?
3      THE WITNESS: I don't know for sure.
4  I know some of them are done exactly by
5  the letter of the opinions, but I don't
6  know any of the details of those cases.
7      ARBITRATOR MOXLEY: I'm sorry. Let
8  me just follow up on one piece of this.
9      CHAIRMAN BYRNE: Oh, sure.
10      ARBITRATOR MOXLEY: Mr. Burke, you
11  referred to the KPMG deferred prosecution
12  trans -- I guess it's an agreement, or
13  stip, or tolling agreement. Could you
14  elaborate on that as to what is known as
15  to governmental action of any kind against
16  KPMG related to SC squared?
17      THE WITNESS: I'm not aware of any
18  governmental action. Other than the IRS
19  attacks on the substance of the
20  transactions, but I'm not aware of
21  anything that the government has alleged
22  against KPMG or any of its principals.
23      It is also not one of the
24  substantive cases that the 17 KPMG
25  partners and affiliates that are subject

upper deck-aig arb

EXHIBIT __Y__, PAGE _731_

Burke

1       Burke
2  to prosecution.  It is not one of the
3  underlying transactions there either.
4       ARBITRATOR MOXLEY:  And those are
5  specific?
6       THE WITNESS:  They are specific.
7       ARBITRATOR MOXLEY:  There is a list
8  that's out there.
9       THE WITNESS:  Yes.
10       ARBITRATOR MOXLEY:  And the deferred
11  prosecution, I mean what is a deferred
12  prosecution?  It's a stipulation, or a
13  tolling agreement, or what?
14       THE WITNESS:  I mean it is -- others
15  may have a better idea than I, but it
16  is -- if the KPMG basically desists from
17  promoting these things and doing other
18  actions that relate to them for a
19  stipulated period of time, basically the
20  threat of prosecution goes away.
21       If they persist in promoting them,
22  or I don't remember all the prohibitions
23  on exactly what they could and couldn't
24  do, but it relates to specific
25  transactions they were involved in, and SC

588

1       Burke
2  what it was KPMG was prohibited from
3  doing, or what they agreed to do in return
4  for, in essence, their prosecution on the
5  prior acts, I'm not sure what the laundry
6  list of everything they can't do.
7       All I was focusing on is the things
8  that they are immune from prosecution on
9  do not include the SC squared.  It's not
10  one of the listed things that they were --
11  you know, that says if you do these right
12  things, we will not pursue our prosecution
13  on these half dozen list of transactions.
14       ARBITRATOR MOXLEY:  Do you know
15  whether or not the SC squared transactions
16  were part of the basis for the services
17  obtaining or seeking, and I guess
18  obtaining, the agreement by KPMG to
19  disband that branch?
20       THE WITNESS:  I don't, no.
21       ARBITRATOR MOXLEY:  Okay.  Thank
22  you.
23  BY MR. KUSHNER:
24     Q.  Mr. Burke, do you have any opinion
25  concerning whether the SC2 transaction, as

590

1       Burke
2  squared was not one of them.  So it's --
3  you know it is, it's in essence probation,
4  so to speak.  And as long as they don't do
5  the things the government wants -- you
6  know, wants to keep them away from, then
7  the government will not prosecute them for
8  their behavior for these particular
9  transactions, and the particular
10  transactions do not include SC squared.
11       ARBITRATOR MOXLEY:  I thought I read
12  someplace -- maybe I have this wrong --
13  that the group within KPMG that was
14  promoting shelters of this type was put
15  out of business by the IRS or one group or
16  another within the government.
17       THE WITNESS:  Yes.
18       ARBITRATOR MOXLEY:  What was the --
19  are the facts in that respect?
20       THE WITNESS:  Well, I'm not
21  intimately familiar with all the facts
22  going on there, but I mean part of what
23  KPMG agreed to was to disband their branch
24  of tax advice that did these types of
25  transactions.  So you know again, exactly

589

1       Burke
2  actually carried out in this case, would have
3  succeeded?
4     A.  I think it quite unlikely that it
5  would succeed.  You know -- and as my report
6  goes through in detail, the economic substance
7  transaction -- or Economic Substance Doctrine
8  tries to look at two different things and
9  exactly how the things are weighted by courts
10  varies.  But one is, is there a change in the
11  economic position of the parties?  And I think
12  on that front, the SC squared transaction
13  clearly has a change in the economic position
14  of the parties.
15       The other aspect of it is the tax
16  avoidance motive, and what your motivation is.
17  And the two courts of appeals where the SC
18  squared transaction would likely be appealed,
19  the Ninth Circuit and Court of Federal Claims,
20  both seem to say that if you have economic
21  substance, you are generally okay as long as
22  your sole motivation is not tax avoidance.
23       So you need something else, even if
24  you have a change in economic position of the
25  parties, that you -- that's generally okay, but

591

Burke

1
2  you can't be completely motivated by tax
3  avoidance. And the concern -- the way the
4  transaction was implemented, the repurchase in
5  particular in 2002, is that in my view, it
6  significantly undercuts the other motivation,
7  which is to benefit the Austin Firefighters.
8      This, unlike the other economic
9  substance cases, all of which look for profit
10  motive, I mean there is obviously no ability to
11  have a profit motive when you are making a
12  donation to a tax exempt entity. So you are
13  looking for some other motivation other than
14  pure tax avoidance.
15      And the likely one that I think the
16  courts would weigh would be your intention to
17  benefit the donee, the Austin Firefighters, and
18  in a situation wherein the 2002 repurchase, you
19  know the exchange of e-mails and correspondence
20  between the parties, you know in essence,
21  indicates that Upper Deck was not trying to
22  benefit the Austin Firefighters.
23      In fact, it was trying to do
24  everything it could to get the best possible
25  price, you know, before the Austin Firefighters

592

Burke

1
2  great many years doing transactions. Most
3  people dealing in purchase and sales, you know
4  when you ask for information, the other side
5  basically says we are not giving you what you
6  ask for.
7      You don't just agree to delete the
8  provision in the agreement and go on with the
9  purchase price. I mean, you get suspicious,
10  and you ask for more information. You try to
11  get into the -- you know, the facts to
12  understand if you are, in fact, getting a below
13  market price.
14      So I think both the approach taken
15  by Upper Deck in trying to minimize the price
16  and kind of the nonarm's length behavior of the
17  Firefighters raises a significant suspicion in
18  my mind. Certainly, I think in the IRS's mind,
19  that this wasn't kind of, you know, kind of
20  parties dealing at arm's length. That there
21  may well have been kind of a -- at least at
22  worst, a prearranged understanding that the
23  Firefighters would sell back -- you know at
24  the whim of Upper Deck.
25      So I think that -- I think it again

594

Burke

1
2  found out kind of what the spike in earnings
3  were for the end of 2002. So that, I think
4  substantially undercuts the donative intent, if
5  you will, as the nontax motive.
6      The other thing that it -- I think
7  factors into this that a court might also grasp
8  onto is you, know, the key to the whole
9  arrangement is the -- that there is not a
10  prearranged plan or some other manner where the
11  taxpayer enters into these transactions, can
12  get the stock back in all circumstances, or can
13  compel the Firefighters to sell it back.
14      And a transaction in which the
15  Firefighters don't seemingly act -- it's in an
16  arm's length fashion where they object to a
17  provision in the stock purchase agreement. It
18  says they have come to their own conclusions
19  about fair market value, and they have looked
20  at the financials and everything else.
21      They object to it. They ask for the
22  financials. The response is basically to, you
23  know, give them financials through September,
24  not showing the spike in income and deleting
25  the provision from the agreement. I spent a

593

Burke

1
2  colors the whole transaction as to whether
3  these parties were really dealing at arms
4  length and whether the Firefighters really had
5  the economic upside from the ownership of these
6  shares during the year or two that they were
7  supposed to own them.
8      ARBITRATOR MOXLEY: Let me ask
9  Mr. Burke. On the issue of donative
10  intent, what, if any difference, does it
11  make in this area whether the taxpayer
12  cared about this particular charity, had
13  had an admiration for it. It had a
14  personal interest in it, went to their
15  events. You know, followed them, talked
16  to them, whether it was his charity really
17  or whether it was something that was
18  arranged as a charity that he never heard
19  of and never talked to?
20      THE WITNESS: I think it is. It is
21  something that would be significant in
22  contest. I think the -- the more involved
23  someone was in the charity, the stronger
24  their case would be. So certainly, if
25  their son was on the Firefighters, and as

595

Burke

1
2  you say, went to all the events and that
3  they had a long-standing history, I think
4  the case would be, you know, almost
5  unwinble from the IRS.  They would have
6  virtually no shot in that circumstance
7  where there was a long-term pre-existing
8  relationship.
9      ARBITRATOR MOXLEY:  What about at
10  the other extreme?
11      THE WITNESS:  The other end of the
12  extreme, I don't think -- you know, the
13  fact that there wasn't the long-term
14  relationship would cause the case to be
15  lost.
16      It would make it less strong, but
17  you know, I mean there is the fact that
18  they didn't know a particular charity.  If
19  they, especially in the context of, you
20  know, this past decade and the prominence
21  of Firefighters and everything else, I
22  think it's perfectly understandable
23  someone wants to make a donation to
24  Firefighters.
25      So I don't think that would -- the

596

Burke

1
2  was a real number that could be -- had
3  been determined to be fair market value
4  for those shares at the time, and the
5  factors that the Austin Fund considered in
6  taking the offer.
7      How does that change the analysis?
8  In other words, look at the transaction,
9  itself, as it went down.
10      THE WITNESS:  Um-hum.
11      CHAIRMAN BYRNE:  And I'm taking out
12  the factors.
13      THE WITNESS:  Right.  What you are
14  saying is, if they got together and
15  negotiated at arm's length in a sensible
16  fashion, they came out to a $2 million
17  purchase price, how would I think that
18  impacts the --
19      CHAIRMAN BYRNE:  It was fair.  It
20  was relatively arms length.
21      THE WITNESS:  So the fact that they
22  didn't wait until the following April and
23  exercised the Put, I think if they really
24  dealt at arm's length and negotiated like
25  arm's-length parties would negotiate, I

598

Burke

1
2  fact that they didn't have a long-term
3  relationship and involvement with the
4  charity, I don't think would cause them to
5  lose the case with the IRS or in a court.
6      CHAIRMAN BYRNE:  If the -- there
7  were a few things in your prior answer,
8  some of the factors seem to boil down to
9  on its face -- I'm not quoting you, but
10  I'm going to paraphrase, on its face, it
11  looked bad.
12      Let's flip it a little bit.
13  Firefighters Fund has an independent board
14  they are a State-run pension fund in
15  effect, regulated up the wazoo, a Gaelic
16  term, and there are -- there is evidence
17  that they acted independently such that it
18  was not, in fact, a prearranged
19  transaction.  There was, in fact, no undue
20  pressure.  It was a decision legitimately
21  made by them to accept the 2 million, not
22  bad from their point of view.
23      Assume then that there was donative
24  intent, perhaps overshadowed by the tax
25  benefit, but the 2 million was real.  It

597

Burke

1
2  don't think the fact that they bought the
3  stock in December of '02 would adversely
4  impact the chances of success on the tax
5  side.
6      I don't think you had to wait till
7  April to exercise the Put if you, for
8  whatever reasons, the parties got together
9  and negotiated at arm's length, came out
10  with, you know, the appropriate price like
11  parties at dealing at arms length would,
12  an early purchase outside of the Put
13  arrangement, I don't think, changes the
14  analysis.
15      CHAIRMAN BYRNE:  Is there a
16  difference between the manner in which the
17  price was arrived at, arm's length,
18  negotiated, truly third party, and the
19  ultimate fair market value?  No matter how
20  they got there, 2 million was, in fact,
21  fair market value at the time?
22      THE WITNESS:  If it was 2 million --
23  was truly the fair market value?
24      CHAIRMAN BYRNE:  Um-hum.
25      THE WITNESS:  I think if they bought

599

EXHIBIT __Y__, PAGE _734_

Burke

1  
2  at fair market value, whether it was  
3  2 million or 11 million or whatever it  
4  was, you know, I think that would not  
5  adversely impact the chances of success if  
6  they fought with the IRS over it.  
7  ARBITRATOR MOXLEY: Regardless of  
8  whether they had a written fairness  
9  opinion, fair market value valuation?  
10  THE WITNESS: I think that's  
11  correct.  
12  ARBITRATOR MOXLEY: Because if you  
13  assume they are negotiating at arms  
14  length, then you don't need an opinion.  
15  THE WITNESS: Right. I mean if you  
16  saw that the Firefighters had all the  
17  financials, and they had someone who had  
18  some financial competence, an accountant  
19  or maybe someone on their board or  
20  something, and really analyzed it and  
21  everybody, with full disclosure, and acted  
22  like parties in a negotiated deal would  
23  act, if they came to the conclusion that  
24  $2 million was the purchase price, I would  
25  think that would not adversely impact the  

600

Burke

1  
2  prospects of success in a tax dispute.  
3  ARBITRATOR MOXLEY: Would you think  
4  that when Austin was looking at it, if  
5  they had known of the disclosures that had  
6  come out about the IRS challenging this  
7  kind of transaction, that that would have  
8  affected, or that that would likely have  
9  affected the way a charity would look at  
10  it because you would say "Well, you know  
11  if it's not a legitimate shelter, what  
12  does that mean to us?  
13  THE WITNESS: It cuts both ways. I  
14  mean another way they could have looked at  
15  it is this was that the -- the whole thing  
16  with KPMG bringing these transactions,  
17  that was the ghost that -- goose that laid  
18  the golden egg. And as long as there was  
19  still a prospect of more transactions  
20  coming, they weren't going to put up too  
21  big a stink or negotiate too hard about  
22  the repurchase price because they wanted  
23  to make sure the next yield came along and  
24  they got the -- you know, the value.  
25  And if, because of the fact that the  

601

Burke

1  
2  IRS had now stumbled across this  
3  transaction, and it was exposed -- it  
4  wasn't at that point a listed transaction,  
5  but you know it may well have been that  
6  the charity may have known that the IRS  
7  knew about this, the spigot of deals had  
8  been turned off. I mean another reaction  
9  the charity might well have had is like,  
10  we don't care about being nice to KPMG  
11  and -- you know, because we are not going  
12  to get any more of these transactions.  
13  This is our last opportunity, and we want  
14  the last nickle we can get. So...  
15  ARBITRATOR MOXLEY: What would a tax  
16  court -- how would a tax court look at the  
17  question of whether a situation like this  
18  was arm's length negotiations if the view  
19  of the charity were that this is found  
20  money. We don't have any basis in it. We  
21  don't know we have it until we have it  
22  anyhow. So if we can close it out, and  
23  now, we know we have 2 million bucks, what  
24  does that do to -- as to whether this  
25  process is one that involved fair market  

602

Burke

1  
2  value?  
3  THE WITNESS: You know, as a fact.  
4  You are looking at a position where the  
5  charity three months later basically had  
6  the right to get fair market value per an  
7  appraisal process. So it's -- to say they  
8  gave it to us, it was worth a 1.3 million  
9  and $2 million is probably a significant  
10  amount of money for, you know, a city fire  
11  pension fund.  
12  But notwithstanding that, they still  
13  had the possibility three months later to  
14  get the full fair market value. And I  
15  would think that parties dealing in arms  
16  length, who knew in a very short period of  
17  time they had the right to find out fair  
18  market value, would want to make sure that  
19  when someone offered them $2 million, that  
20  that at least had some, you know,  
21  approximation of the fair market value at  
22  that point. And they wouldn't just kind  
23  of go 2 million is a big number. Let's  
24  take it because 2 million is a big number,  
25  11 million, you know, or 20 million,  

603

EXHIBIT  Y  PAGE 735

Burke

1  whatever the value might have been is
2  possibly a bigger number.  So the whole
3  thing about people taking the price
4  without fully kicking the tires, I think,
5  is the problematic side from the
6  Firefighters' point of view.
7      ARBITRATOR MOXLEY:  If you were in
8  the District Court and looking at the tax
9  issues and also looking at the issues of
10  the implication to the charity if it were
11  determined that the tax strategy didn't
12  work, and it wasn't a bona fide gift, how
13  would that play out in terms of the impact
14  on the right of the charity to get fair
15  market value under its Put provisions of
16  the shareholder agreement?
17      THE WITNESS:  In civil litigation,
18  you mean?
19      ARBITRATOR MOXLEY:  Right.
20      THE WITNESS:  When they are pursuing
21  it with the taxpayer?
22      ARBITRATOR MOXLEY:  Right.
23      THE WITNESS:  I'm not sure I have
24  any expertise on that.

Burke

1      ARBITRATOR MOXLEY:  Thank you.
2      CHAIRMAN BYRNE:  Do you know whether
3  or not, in your review of these matters,
4  whether or not there were adverse tax
5  consequences laid at the doorstep of the
6  Austin Firefighters Fund?
7      THE WITNESS:  I don't know.
8      CHAIRMAN BYRNE:  I'm more than --
9  it's as much curiosity as anything else,
10  but they received $2 million?
11      THE WITNESS:  Right.
12      CHAIRMAN BYRNE:  Did it affect their
13  tax status or the taxability of the
14  2 million if you know?
15      THE WITNESS:  Well, I know the tax
16  law in the area.  So I can give you my
17  best estimate of what was going on there.
18  The fact that the Austin Firefighters were
19  tax exempt was not sufficient.  Most -- if
20  you went to the United Way and said would
21  you do this?  The United Way would
22  probably say no because they had the
23  prospect that the money they could be
24  paid, you know, could be taxable -- most

Burke

1  importantly is the income that flows
2  through from the S corporation would be
3  something that was called Unrelated
4  Business Taxable Income, and it would be
5  subject to tax.
6      The magic of the Austin Firefighters
7  is being a government affiliated entity,
8  that they are arguably exempt from the
9  UBTI rules.  I say arguably only because
10  in the early 1970s, there was a dispute
11  about whether government entities were
12  subject to these rules.
13      The IRS came out with a notice that
14  said we don't know whether there are
15  exempt or not.  We are studying it, and we
16  will let you know.  Now, 35 years later,
17  they haven't let us know, so -- and they
18  basically said until we let you know,
19  assume you are exempt.
20      So state affiliated entities are
21  generally exempt from UBTI until we hear
22  to the contrary.  So I don't think in that
23  context, the Austin Firefighters were
24  concerned that they were going to be

Burke

1  taxed.  I can tell you because of some of
2  the heat that has been, or some of the
3  focus that has been put on these
4  transactions and the rolls of tax exempt
5  entities involved in them, that Congress
6  is considering whether they need to do
7  something to -- you know, to smack the
8  hands of the charities that are overly
9  accommodating, but as far as an immediate
10  tax is concerned, I think that was highly
11  unlikely.
12      ARBITRATOR KRAMER:  Excuse me,
13  Mr. Burke.  I'm troubled by the economic
14  substance argument regarding the generic
15  transaction.
16      THE WITNESS:  Um-hum.
17      ARBITRATOR KRAMER:  I don't -- I
18  think -- I mean I'm thinking of when I
19  told the University of Pennsylvania that I
20  left something to them in my will, and
21  they made me a member of the Harrison
22  Society, but it's not a charitable
23  deduction until it becomes quantifiable,
24  or someone enters into an agreement to

upper deck-aig arb

EXHIBIT  Y , PAGE 736

Burke
1
2  make a charitable contribution, and it's
3  not deductible until it's quantifiable.
4      THE WITNESS:  Um-hum.
5      ARBITRATOR KRAMER:  This generic
6  transaction seems to me to be designed to
7  eliminate any other economic substance
8  from the execution of the transaction.
9  You have a situation where I would
10  imagine -- I would imagine that in most of
11  these taxpayers' cases, there were not
12  going to be sudden spikes in the income
13  realized by the S corporation.
14      And in fact, the only thing that
15  changed from the tax consequences of an
16  intention to make a gift, where you would
17  be allowed an ordinary income deduction
18  once it was quantifiable, were that
19  90 percent of the income was deferred --
20  was allocated in a way where there was no
21  tax paid to an entity that had no control
22  over the company, no participation in the
23  company, and had a mere -- a small
24  fraction of the economic benefit of that
25  corporation, 9 percent in this particular

608

Burke
1
2  case, and probably in most cases from the
3  way I was reading the rulings.
4      I mean the notices and that
5  90 percent of the income was going to be
6  deflected back to a taxpayer, who would
7  then realize the benefit of 100 percent of
8  the income, only 90 percent of it at
9  capital gains instead of ordinary income
10  rates.
11      And that what happened here was this
12  was an accident where there would have
13  been economic substance if the Put Option
14  were permitted, and this possibly, to me,
15  in the way I'm looking at, in this
16  hypothetical analysis, the way I'm looking
17  at it, this would have been the one case
18  where it might have been sustainable, but
19  there was an accident.
20      Where do you see the economic
21  substance?  Where do you see the change in
22  the relationship of the taxpayers from a
23  deferred gift, other than this enormous
24  tax benefit that someone that was going to
25  get 100 percent of the income was going to

609

Burke
1
2  benefit from?
3      THE WITNESS:  Ultimately, I think
4  this goes to a question of who owned the
5  shares of stock during the -- in this
6  case, you know, a year and a half that the
7  charity at least had nominal title to it.
8  And there is very well established case
9  law in the tax world as to who is the
10  owner of property for tax purposes, and it
11  goes to who has the benefits and burdens,
12  of economic benefits and burdens
13  associated with the property.
14      And in that regard, you know, I
15  don't think there is much question that it
16  was the charity.  Now, you can -- the
17  problem with this case is, let's take
18  aside -- take out of it the subchapter S
19  piece.  Let's say, you did this with a C
20  corporation, where there is no flow
21  through of income, and for whatever
22  reason, the IRS wanted to say the charity
23  wasn't the owner of the preferred stock --
24  I'm sorry, the non-voting stock during
25  this two-year period.

610

Burke
1
2      I would say they had no shot.  They
3  would have absolutely no prospect of
4  succeeding on that issue because the
5  charity, to the extent there are changes
6  up in the value, if it goes up, it goes down
7  it's the charity who is the one who has
8  the economic consequences.
9      They have all the benefits and
10  burdens associated with that stock.  And
11  granted, that stock is, you know, stock in
12  a corporation that has a large overhang of
13  warrants out there, but the stock is the
14  stock.  Whatever the economic benefits of
15  that stock are, they were absolutely owned
16  by the charity.  Okay?
17      The complicating factor in this
18  circumstance isn't the charity didn't own
19  these shares.  The complicated factor is
20  they owned something which, if you look at
21  the appraisals, they say the non-voting
22  stock was worth about 5 percent of the
23  company.
24      Because of all the discounts and the
25  existence of the warrants and everything

611

Burke

1
2  else, you took something that was worth
3  5 percent of the company and was
4  allocating 90 percent of the income.
5      Now, the problem isn't that the
6  charity didn't own it.  The problem was
7  that the tax rule said whoever owns it,
8  gets this share of the income.  And you
9  know, should the rules say something else,
10  maybe they should, but you know they
11  don't.
12      The real substance here is that --
13  and you know, I should say there are lots
14  of circumstances out there in the tax
15  world where income and value are, you
16  know, separate.  You can look at things
17  called grantor trust beneficiaries
18  undoubtedly unquestionably have all the
19  economics, but the person who granted
20  the -- set up the trust because they have
21  some control over who the trustees are,
22  something like that.  They are taxed on
23  100 percent of the income.  Partnerships
24  that are 80 pages of regulations on how
25  allocate income among partners, you know,

612

Burke

1
2  which clearly, you can be getting all the
3  economics, you know, in the short term,
4  and I'm getting all the income.  So I mean
5  the disassociation of income and economic
6  benefit is not unique.  It's just extreme
7  in this case.
8      ARBITRATOR KRAMER: It doesn't
9  trouble you that this was -- that this was
10  engineered so that prior to the gift,
11  there was a resolution made that there
12  were going to be no distributions of the
13  income.  And in an S corporation, the
14  income is the chief economic benefit of
15  ownership, and that there -- and that the
16  distributions weren't reinstated until the
17  stock was sold?  Where is the economic
18  benefit of stock ownership?  I mean of
19  this particular kind of security, a
20  non-voting share.
21      THE WITNESS: Well, you know, during
22  this period, they accumulated whatever,
23  $200 million worth of income.  I mean if
24  you got to the Put, you went to an
25  appraisal, and they appraised the value of

613

Burke

1
2  this corporation, you know the thing is
3  now sitting on $200 million of profit it
4  didn't have before.
5      ARBITRATOR KRAMER:  That goes back
6  to my -- thought about the generic
7  case, where you would have normal,
8  run-of-the-mill income accumulating during
9  the period of stock ownership.  But that
10  here, there was an accident that happened.
11  They made a lot of money and it was
12  engineered so that the charity would not
13  possibly, or couldn't possibly benefit
14  from that unless that Put Option were
15  exercised at fair market value.  But the
16  generic transaction didn't have -- wasn't
17  engineered for stock -- for taxpayers who
18  were going to make a lot of money during
19  that period of donation.
20      THE WITNESS:  Even if you didn't
21  have unexpected surge in your earnings, I
22  mean obviously, you know taxpayers
23  wouldn't have gone into this if they
24  didn't expect to have significant income
25  during the period.  And otherwise, it

614

Burke

1
2  would have made no sense, right?  The only
3  benefit occurs if they generate income,
4  and you can allocate 90 percent of it to
5  the tax exempt.  So whether the -- I'm
6  sure they weren't expecting that type of
7  spike in income that the Upper Deck
8  Company realized.
9      But everyone was expecting income,
10  and that income, by and large, would
11  accumulate in the S corporation until, you
12  know, the exercise of the Put or some
13  other -- it could be sale of the company,
14  but some other way of realizing on the
15  fair market value of the stock.
16      And the fair market value of the
17  stock that the charity owned, you know,
18  reflects the fact that those earnings have
19  been retained.  So I mean they don't get a
20  direct benefit.  They are not getting the
21  dividend distributions, but you know, it's
22  not like they don't get any economic
23  benefit out of it.
24      ARBITRATOR KRAMER:  But you are
25  not -- I'm not satisfied with the answer

615

Burke

2  of where the economic substance is that's
3  different and other when you are talking
4  about a gift of an unmarketable security
5  and it is an unmarketable security, right,
6  by every -- in every sense of the word.
7      THE WITNESS:  Right.
8      ARBITRATOR KRAMER:  When you are
9  talking about a gift of an unmarketable
10  security, where is the difference in
11  economic substance between that and a
12  deferred gift, like my gift to the
13  University of Pennsylvania in my Will or
14  my agreement to make a gift at a later
15  date when I can figure out how much it's
16  worth?
17      THE WITNESS:  Well --
18      ARBITRATOR KRAMER:  And that, to me,
19  is where I'm having a real problem with
20  your opinion.
21      THE WITNESS:  Well, I don't think
22  there is any question, outside of an SC
23  squared transaction, if somebody donates
24  "unmarketable securities," nothing is
25  ultimately completely unmarketable.  There

616

Burke

2  some point in time.
3      And it's in that circumstance there
4  is, to my knowledge, never a question
5  about whether there was a completed gift
6  that people get.  You know, you have to go
7  get appraisals, and find out what the
8  value of the stock is, taking into account
9  lack of marketability discounts and
10  everything else.  But whatever that value
11  is on the date it's gifted, you know, is a
12  valid charitable deduction.
13      ARBITRATOR KRAMER:  But what is the
14  -- there is -- the charities' willingness
15  to accept the gift, I think, is completely
16  irrelevant.  What is the difference
17  between -- where is the economic substance
18  different between the gift you just
19  described and that would justify in the SC
20  squared generic case, tax treatment of
21  90 percent of the income in a way that is
22  a consequence that wouldn't happen if you
23  are given -- if you are just giving the
24  stock without strings attached?
25      THE WITNESS:  Yeah, I mean it's fact

618

Burke

2  are just -- interests in private companies
3  are donated to charities all the time.
4  Charities have a tendency not to want them
5  because they have to hold onto them, and
6  they are on the board, and someday, you
7  know, it's difficult to realize on the
8  value.  But certainly, charities take them
9  because it's better to take the stock and
10  hope someday, you will get to cash it in,
11  than it is to, you know, not take it at
12  all.
13      So I think charities do accept
14  interests in private companies on a
15  regular basis.  It is quite often the case
16  like this, that this is because of the
17  lack of marketability that the charity
18  does have the Put Option at some point in
19  time.
20      It has nothing to do with SC squared
21  or anything else.  It's just in order to
22  give the charity the marketability or the
23  ability to liquidate their ownership.
24  It's not unusual for the donor, if they
25  own the company, to give them a Put at

617

Burke

2  that the income follows the stock
3  ownership is the thing that's unique about
4  SC squared.  Outside of SC squared, the
5  only question is who has ownership for tax
6  purposes.
7      So once that's established, and
8  outside of SC squared, I don't think there
9  would be much question that the charity
10  had the stock ownership.  Even though it's
11  hard to value, and they might not be able
12  to liquidate it for a long period of time,
13  to the extent there are changes in values,
14  whatever economic consequences are
15  associated with that stock, it belongs to
16  the charity.  And therefore, they would be
17  treated as the tax owner.
18      The twist, and the thing that makes
19  everybody, you know, think maybe this is
20  too good to be true in SC squared, is
21  that, you know, along with that ownership
22  comes, shall we say, a disproportionate
23  amount of taxable income.
24      ARBITRATOR KRAMER:  And documents
25  that say you can't really exercise the

619

Burke

rights of that ownership?

THE WITNESS: Well, you know, they had the economic -- they had the ability basically to realize on it from the exercise of the Put. I mean granted, they were a silent partner, but they were a partner that did not have -- didn't have voting rights. It had whatever state law rights they give to minority shareholders in the state of California.

You know it does -- it probably would have some rights if there were a merger or something to vote as a separate class. I'm not a corporate law expert, but these are kind of standard rights that you can't eliminate.

You know, so they had those, but from a tax point of view those aren't the key things. The key things are, you know, if value goes up, value goes down, who is impacted and there, it's the charity.

And you know, the Put is the arrangement that guarantees that the charity could realize on that value,

620

Burke

whether it's higher than the value at the time it was donated to them or lower, that impacted the ultimate economics to the charity.

So I think, you know, outside of some overarching tax principle that just kind of -- the tax benefit here is just so overwhelming that they are going to disregard stock ownership. I don't think there is much question that in a generic SC squared transaction, that the charity would be treated as the owner.

And I think that's one of the reasons people were so bullish on this particular strategy likely succeeding if litigated. It's because for the IRS to upset it, they would have to go against, you know, hundreds of cases that look at the economic benefits and burdens of ownership.

And the IRS would need to do something that kind of said forget all these cases that have been developed over the last 50 years. We have a new approach

621

Burke

here that kind of says economic ownership is not the key. You have to weigh it against the tax consequences, and that's not where the law is at the moment.

It may be sometime in the future, but by and large, the tax law now says if they are the economic owners, then they get the tax consequences associated with the ownership.

ARBITRATOR KRAMER: Thank you.

ARBITRATOR MOXLEY: Did you -- Mr. Burke, in the analysis you did -- did you review the shareholders agreement?

THE WITNESS: Yes.

ARBITRATOR MOXLEY: Did it concern you at all that no place in the agreement was there a clause that said in no instance may there be a buy back by Upper Deck from Austin unless the price is either determined pursuant to Section 5 in the context of the buy back where there would be a fair market opinion or in the context of, I think it's 3, is it 3?

In the context of this Section, it

622

Burke

says that well, there is a right of first refusal.

ARBITRATOR KRAMER: 2.

ARBITRATOR MOXLEY: 2 -- Section 2, there is a right of first refusal if there is a bona fide buyer out there?

THE WITNESS: Your concern is they didn't put it in a provision that prohibited --

ARBITRATOR MOXLEY: Correct. I mean it -- there are provisions in there that say okay, you know, if you have an opinion in the context of the redemption, you know that's one exit strategy for the charity. And secondly, if the charity gets a bona fide purchaser, however unlikely, you know, and then there is a right of first refusal, that's another exit strategy.

Those are the strategies there.

Those are the ones that, I take it have been relied on in some sense, as to the bona fides of what has been called the "generic transaction," right? I mean isn't that essentially the case?

623

Burke

1
2    THE WITNESS: Um-hum.
3    ARBITRATOR MOXLEY: But it's a fact
4    that there is no provision in that
5    agreement that says that there is no other
6    way to do it. I mean you -- it can't be
7    the case that you just have a buy back
8    where the taxpayer goes to the charity and
9    says, "Look, here is what we are going to
10   do." The agreement doesn't say that. So
11   does that -- does that affect --I mean
12   does that make any difference to your
13   analysis?
14   THE WITNESS: No. I mean I think
15   that provision, you know, I never would
16   have thought of -- of put in such a
17   provision. I mean you are talking about
18   the two parties to the agreement agreeing
19   that they are not going to, you know,
20   enter into a transaction, you know, in the
21   future? If they decided six months later,
22   well, let's buy the stock back, you have
23   the two parties to the agreement, the
24   repurchase in the agreement would, in
25   essence -- the repurchase of the stock

624

1    Burke
2    would, in essence, just be an amendment to
3    the shareholder agreement.
4    ARBITRATOR MOXLEY: But there's no
5    -- but the question in my mind is, well,
6    what's the significance of the fact that
7    the agreement didn't preclude that? Does
8    that not mean that when we talked about
9    the generic transaction, that the generic
10   transaction includes -- because the
11   agreement doesn't preclude it, includes
12   you know, just the possibility that they
13   get together outside the redemption
14   period.
15   Whether beforehand because somebody
16   wants to do it sooner, whether it could be
17   the taxpayer, it could be the charity, or
18   the Put period goes by and then they want
19   to do it.
20   So I mean there is no provision
21   either way as to what the terms of a
22   transaction should be if it's not pursuant
23   to, you know, either of these Section 5 or
24   Section 2. So ostensibly, that's open
25   because it's possible. It's open till

625

1    Burke
2    they do it however they want. So what
3    does that do to the tax liability of the
4    universe of what's permitted by the
5    shareholders agreement?
6    THE WITNESS: I don't think the
7    absence of such a provision impacts it at
8    all, and you know, as I said a new minutes
9    ago and I forgot who asked me the
10   question, but I don't actually even find
11   that the early purchase, as a concept,
12   impacts the tax viability.
13   I think the thing that impacts the
14   tax viability is the manner in which this
15   particular purchase was done. If it had
16   been in December of '02, if everybody got
17   together, they got their financial
18   experts. They sat down, and they
19   negotiated, and they came out with
20   whatever the price is they negotiated.
21   Based on the way parties act in
22   normal commercial transactions, and they
23   come up with a value of you know
24   $8 million or something, I don't think
25   that would impact the tax viability of the

626

1    Burke
2    structure.
3    ARBITRATOR MOXLEY: But how is the
4    tax viability of the structure affected,
5    if at all, by the fact that it appears to
6    be an open issue? And I'm not saying that
7    it does appear that, but if it appears to
8    be an open issue that the parties can just
9    get together and just do something on
10   whatever basis, even an accommodation
11   basis because, you know, it's a free
12   country.
13   People can -- you can have a gift.
14   You can have a reverse gift. You can have
15   a give back of part of the gift. If
16   that's, you know, not precluded by the
17   agreement and if that means that it is
18   permitted by the agreement, what does that
19   mean as to the tax viability as a general
20   proposition of the underlying arrangement
21   that permits that?
22   THE WITNESS: I don't think the lack
23   of that provision impacts the tax
24   viability at all. I think when you go to
25   the insurance policy, you know, and the

627

upper deck-aig arb

EXHIBIT ___Y___, PAGE 741

Page  624 - 627

Oct 13 arb hearing  10/13/2006  10:05:00 AM

Burke

1  representations that went with the
2  insurance policy about not having a
3  prearranged ability to compel anybody to
4  do anything and that they did this with
5  donative intent, then maybe that has some
6  impact on the insurance policy.  But as a
7  tax matter, I think the lack of that
8  provision in the agreement is completely
9  neutral.
10      ARBITRATOR MOXLEY:  But if you
11  have -- but if you interpret -- I mean we
12  have used the term "generic agreement,"
13  and I take it we meant, you know by that,
14  what's permitted by the underlying
15  documents.  If, and I'm not -- you know,
16  it's an issue here.
17      THE WITNESS:  Right.
18      ARBITRATOR MOXLEY:  But if the
19  underlying document permits a willy nilly,
20  ad hoc transaction without a requirement
21  of appraisal opinion or an arm's length
22  transaction, it could be anything.  It's
23  not regulated.  If that's part of the
24  generic deal, then that encompasses what

628

Burke

1  from that, you know standard commercial
2  transaction, that impacts it.  But the
3  ability to do a repurchase, other than
4  pursuant to the exercise of the Puts, that
5  theoretical possibility, I don't think is
6  something that cuts one way or the other
7  as far as the tax prospects are concerned.
8      ARBITRATOR MOXLEY:  But my question
9  does, and you have given an opinion as I
10  understand it, and you said that the
11  transaction is consummated, $2 million
12  transaction wouldn't win, right?  And you
13  said that the generic deal would win.  You
14  didn't say that.  You said you thought it
15  likely would.  I mean you hedged in
16  various ways, but you know, you thought it
17  had a fair prospect?
18      THE WITNESS:  Right.
19      ARBITRATOR MOXLEY:  But my question
20  changes the definition of the generic
21  deal.  My question says if the generic
22  deal is encompassed in all the papers if
23  -- and it's an issue here.  I don't know
24  the answer to it at this point, but if the

630

Burke

1  actually happened here.  And how does that
2  affect whether that broad nature of the
3  generic deal is, therefore, permitted
4  here.
5      THE WITNESS:  Again, the fact that
6  it wasn't precluded, I don't think changes
7  the tax analysis.  I think if people did
8  enter into this transaction prior to the
9  exercise of the Put because they were
10  allowed to under the agreement, or they
11  weren't prohibited anyway, then I think
12  the terms on which they did it does, in
13  fact, potentially impact the tax analysis.
14      But the mere fact that they could,
15  if they could do it and deal at arms
16  length, which I think would be the normal
17  presumption, do parties, you know absent
18  any evidence, would normally act in a
19  commercially reasonable fashion, deal at
20  arms length and come out with what they
21  believed was a fair price.  You know, that
22  transaction, I don't think impacts the tax
23  viability.
24      When they do something that departs

629

Burke

1  generic deal permitted the willy nilly, ad
2  hoc, not necessarily fair market value
3  transaction, would that change your view
4  as to whether the generic deal would pass
5  muster?
6      THE WITNESS:  The fact that it would
7  allow it?  I mean even if it had a
8  provision in the agreement that said, "and
9  the parties can negotiate, you know, a
10  deal outside of this contract," I don't
11  think that would impact the tax analysis.
12  How they did it would impact it, but the
13  fact that they just kind of says --
14      ARBITRATOR MOXLEY:  Okay.  I got it.
15  Thank you.
16      MR. KUSHNER:  I have no questions.
17      CHAIRMAN BYRNE:  Let's take our
18  break.  Mr. Burke, walk around for five
19  minutes.  Please come back.  Why don't you
20  come over here and counsel for respondents
21  have a few questions for you.
22      (Recess taken.)
23      CHAIRMAN BYRNE:  Mr. Howell
24  indicated that you may proceed.

631

upper deck-aig arb

EXHIBIT  Y , PAGE 742

Page  628 - 631

Burke

1
2  EXAMINATION
3  BY MR. WAHLQUIST:
4    Q.   Good morning again, Mr. Burke.
5    A.   Good morning.
6    Q.   Are you ready to proceed?
7    A.   I am.
8    Q.   I thought I heard you make a
9  distinction in your testimony earlier about
10 whether or not the transaction that took place
11 in December of 2002 affected the viability of
12 the SC squared transaction in tax court, or
13 whatever court it gets litigated in --
14   A.   Right.
15   Q.   -- and whether or not the
16 transaction violated a term or condition of the
17 policy.
18        Did I hear that distinction made in
19 your testimony?
20   A.   I'm not sure.  Could you maybe
21 elaborate?  I'm not sure I'm --
22   CHAIRMAN BYRNE:  Frankly -- frankly,
23   I did.  You were talking about the impact
24   on tax consequences, as opposed to without
25   regard to insurance coverage.

632

Burke

1
2    THE WITNESS:  Right.
3    A.   I did distinguish the two.  I offer
4  no expertise on the insurance policy.
5    Q.   And that's what I want to be clear
6  about is, I mean to do a simple analogy.  You
7  know, if I have a fire insurance, and I smoke
8  in bed, and my house burns down, I certainly
9  increased the risk, but it may or may not still
10 be covered under my policy, depending on
11 whether or not there is a prescription on my
12 smoking in bed, right?
13   A.   Um-hum.
14   Q.   And you are not going to tell us
15 whether or not the December 2002 transaction
16 violated a term or condition of the policy or
17 representation, right?
18   CHAIRMAN BYRNE:  He could try.
19   THE WITNESS:  Right.
20   MR. KUSHNER:  No, he is not here to
21   do that.
22   CHAIRMAN BYRNE:  But it is clear
23   that he is not here.
24   MR. WAHLQUIST:  Okay.
25 BY MR. WAHLQUIST:

633

Burke

1
2    Q.   When -- the donation in conjunction
3  with the shareholders agreement in 2001, when
4  do you measure the economic substance of that
5  transaction?
6    A.   I don't think you can measure the
7  economic substance of the entire transaction
8  until it's completed.  So it depends on when
9  the IRS audit would come up.  If the IRS
10 audited it in 2001 before any repurchase under
11 any circumstances occurred, that's when you
12 would have to look at it, but you know, you
13 would have an audit that occurs after the transaction
14 is complete, so you look at the complete
15 transaction.
16   Q.   Well -- and at the time we do the
17 audit, as of what time period do we judge the
18 economic substance of the transaction?  Is it
19 when the donation was made?
20   A.   It is when the donation is made, but
21 in trying to look at the substance, you look at
22 subsequent events to determine what light that
23 may shed on whether there was economic
24 substance when you started.
25   Q.   You are suggesting we might draw

634

Burke

1
2  inferences from what happened later about what
3  the substance was at the time?  Is that what
4  you are suggesting?
5    A.   Yes.
6    Q.   And you've talked about inferences
7  that the court might draw about whether or not
8  there was a prearranged agreement between the
9  Firefighters and the Upper Deck Company in
10 December of 2002.  What inferences a court
11 might draw from that transaction about what
12 happened in 2001, right?
13   A.   Yes.
14   Q.   Did you ever interview anybody from
15 the Firefighters?
16   A.   No.
17   Q.   Have you ever read their testimony?
18   A.   No.
19   Q.   Have you -- have you, personally,
20 interviewed anybody with Upper Deck?
21   A.   No.
22   Q.   About that trans- -- no.  Have you
23 ever talked to anybody at KPMG?
24   A.   No.
25   Q.   And what you are offering as an

635

Burke

1
2    opinion -- your opinion that the viability of
3    the SC squared strategy was affected by that
4    transaction is based in part on an assumption
5    that the facts of that December 2002
6    transaction, if examined, will evidence or
7    permit an inference of a pre-existing
8    agreement, correct?
9        A.   Agreement or arrangement, yes.
10        Q.   And if the arbitrators here were to
11    decide that evidence just wouldn't warrant that
12    conclusion, that would be contrary to one of
13    the assumptions of your opinion, right?
14        A.   Yes.  The other aspect of my opinion
15    that was the donative intent, so but --
16        Q.   Right.  And when do we measure
17    donative intent?
18        A.   Also measure that at the time of the
19    donation.
20        Q.   And your argument or conclusion is
21    essentially premised on the idea that -- that
22    you could draw an inference from the fact that
23    the price was $2 million, that there was no
24    donative intent in 2001, right?
25        A.   Um-hum.

636

Burke

1
2        Q.   And if the arbitrators were to
3    reject that supposition, that would undermine
4    one of the bases for your conclusion, correct?
5        A.   Correct.
6        Q.   I want to understand -- you have
7    used in your report, a variety of expressions
8    to describe the viability of the SC squared
9    transaction.  You have used "reasonable
10    prospect of success, significant possibility of
11    prevailing."  I'm trying to get a handle on
12    what you really mean by that.  Can you
13    elaborate?
14        A.   Well, I think as I explained
15    earlier, outside of the promoted transaction
16    arena, I think there was a high likelihood of
17    success.  I don't know what that percentage is,
18    but the taxpayer had, in my view, a
19    significantly stronger side of the argument.
20    The promoted transaction nature of this puts a
21    wild card in the analysis that I don't know how
22    you would go about trying to quantify.  But it
23    certainly diminishes the prospects of success
24    so it becomes a closer call.  As you know tax
25    is not a precise science.  So predicting what

637

Burke

1
2    the court would say is hard to come by.
3        Q.   Can you put a percentage on the
4    prospects of success?
5        A.   I can't put a percentage on it.
6        Q.   Are you aware that AIG has called
7    another expert on the same subject?
8        A.   I am.
9        Q.   Ms. Linda Burke?
10        A.   Yes.
11        Q.   Have you reviewed her testimony?
12        A.   I have reviewed her report, not her
13    testimony.
14        Q.   In her testimony, she suggested a
15    percentage of 60 to 70 percent prospects of
16    success.  Would you disagree with that
17    assessment?
18        MR. KUSHNER:  I object.  That was
19    only on one part.  On the other part, she
20    said 90 -- my memory is 90 to 100 percent,
21    so I object.
22        MR. WAHLQUIST:  I stand corrected.
23    I will rephrase the question.
24    BY MR. WAHLQUIST:
25        Q.   With respect to the out- -- what you

638

Burke

1
2    refer as the allocation of income argument, she
3    put a prospect of success at 60 to 70 percent.
4    Would you disagree with that?
5        A.   I'm not sure I would be at that high
6    a level.  I don't think her assessment is
7    unreasonable, but so -- but I probably not as
8    that high myself.
9        Q.   So you are over 50 percent but below
10    60 percent?
11        A.   I'm somewhere in that middle range,
12    yes.
13        Q.   One of the things that you state in
14    your report is that because of the
15    disproportionate nature of the tax
16    consequences, and the size of the gift, and
17    because of the mass marketed nature of SC
18    squared, there was a distinct possibility of
19    losing, even in the generic transaction?
20        A.   Correct.
21        Q.   And that would just be the flip side
22    of the possibility of winning, right?
23        A.   Yes.
24        Q.   Okay.  You suggest in your report
25    that the transaction in December of 2002

639

upper deck-aig arb                    EXHIBIT  Y, PAGE 744                    Page  636 - 639

Burke

1
2    substantially decreased the possibility that
3    Upper Deck Corporation would prevail?
4        A.    Yes.
5        Q.    Can you elaborate on that for me?
6        A.    Sure.  Again, it goes back to the
7    two aspects that I perceive, based on the
8    evidence I have seen and the correspondence,
9    that it's because you may well need a donative
10   intent for the transaction to be upheld.  The
11   manner in which that redemption took place or
12   repurchase took place, you know, undercuts
13   that it.
14            The other aspect of it is the
15   behavior of the Firefighters who were, from the
16   evidence I have seen, not acting in your
17   standard commercial reasonable fashion of a
18   situation where they could realize fair market
19   value three months later.  They accepted with
20   relatively little inquiry, you know, an offer
21   proffered to them.  I think that raises the
22   prospect that there was a prearranged agreement
23   or arrangement that, you know, reflected the
24   prospect of them selling back at some price
25   other than fair market value.

Burke

1
2    Q.    Of course, the Firefighters may have
3    had reasons unrelated to the price of the stock
4    for wanting to disentangle themselves from this
5    circumstance, right?
6        A.    Conceivably.
7        Q.    You alluded to the possibility that
8    they could be assessed taxes because of the
9    concept, I think you referred to it as UBIT,
10   Unrelated Business Income?
11       A.    Yes.
12       Q.    And that possibility existed, did it
13   not?
14       A.    I would consider that possibility
15   virtually insignificant.
16       Q.    How about from a legislative
17   perspective?  If Congress got wind of this
18   circumstance, that people who had this
19   exemption for unrelated business income were
20   engaging in activities like this, they would
21   have a legitimate concern that that might
22   affect that status for them?
23       A.    I'm not sure even if they did, why
24   that would inspire them to get out of the
25   transaction.  I mean they had already done the

Burke

1
2    evil that Congress might attempt to change.
3        Q.    You don't think they might have
4    wanted to disentangle themselves from this
5    circumstance?
6        A.    I -- I don't know.  I -- you know, I
7    think they are a very small player in a very
8    large tax shelter arena.  So I'm not sure that
9    they are thinking if we get out, that this
10   somehow going to change the legislative
11   prospects, but --
12       Q.    What does the IRS have to do to
13   revoke somebody's status as a charity?
14       A.    I'm sorry?
15       Q.    What does the IRS have to do to
16   revoke somebody's status as a charity?
17       A.    They basically would have to
18   indicate that they were not -- or their primary
19   activities were no longer consistent with their
20   charitable purpose.
21       Q.    What's the procedure to do that?
22       A.    To do that?  I'm not sure of the
23   ins-and-outs of the procedure.
24       Q.    Do you know anyone who is actually
25   litigating the viability of the SC squared

Burke

1
2    transaction?
3        A.    I don't know.  I know there are some
4    cases that have received the notice of
5    deficiency where you then have 90 days to
6    decide whether to go to tax court or pay and
7    either go about your business, or then file for
8    a refund.
9            So last reports I have from anyone
10   is they were up through the statute and the
11   notice of deficiency and don't know, where
12   they -- at the stage in the settlement process
13   with the IRS that those notices of deficiency
14   would just be coming out, so it's --
15       Q.    So the answer is no?
16       A.    The answer is no.
17       Q.    Now, if I understood you correctly
18   earlier, you said Mr. Rettig had 34 clients,
19   eight to ten of which were considering
20   litigating SC squared.  Did I hear that
21   correctly?
22       A.    I'm not sure whether the 34 was the
23   precise, somewhere in the 30s, and that eight
24   to ten was the number that he was anticipating
25   were going to litigation.

EXHIBIT  Y  PAGE 745

Burke

1
2   Q.   So of the 58 SC squared
3   transactions, your best information is that
4   only eight to ten of them are even considering
5   litigating with the IRS; is that correct?
6   A.   That's my best information, but I
7   don't know anything about 20 or so of them.
8   Q.   And presumably, these 58 individuals
9   involved were all high income individuals,
10  certainly able to hire competent tax counsel;
11  is that correct?
12  A.   That's correct, I assume.
13  MR. KUSHNER:  You hope.
14  THE WITNESS:  I hope.
15  Q.   Does that sort of strop whole that
16  maybe only eight to ten out of 58 would take
17  the IRS on in this circumstance cause you any
18  concern about your opinion about the viability
19  of the SC squared transaction?
20  A.   No, not really.  No, I have
21  represented a lot of taxpayers who were
22  involved in various shelters and the discovery
23  process, the IDRs that they put up with, the
24  legal fees they have incurred.  The -- you
25  know, it is a very daunting prospect to go into

644

Burke

1
2   litigation.  People may well decide not to
3   litigate, and I know many of my clients have
4   decided not to litigate cases because of -- not
5   because of the substance of the transaction,k
6   but because of the externalities, the other
7   costs associated with doing it.  So I'm not
8   sure eight to ten is probably a -- out of, you
9   know, it's roughly a third of what Rettig -- of
10  the sample I know about, roughly a third of
11  them going to litigation, I think is a very
12  high number compared to other structured
13  transactions.
14  Q.   Are you monitoring any of those
15  other cases?
16  A.   You know, how can I say this?  You
17  know in connection with my involvement with
18  AISLIC, I do have occasion to find out where
19  those cases stand, but have not really had
20  contact on them in several months now.
21  Q.   Are you monitoring other SC squared
22  transactions for AIG besides this one?
23  A.   Yes.
24  Q.   How many?
25  A.   I guess it depends on how you count,

645

Burke

1
2   but I would say four others.
3   Q.   So that would be all of them?
4   A.   Yes.
5   Q.   Has AIG paid to settle on behalf of
6   any policyholder?
7   A.   I don't know of my personal
8   knowledge.
9   Q.   Do you have any information that AIG
10  has paid to settle with the IRS on behalf of
11  any policyholder?
12  A.   I believe that they have.
13  Q.   How many?
14  A.   One, that I'm aware of.
15  Q.   And did AIG pay in that circumstance
16  before the Put was exercised?
17  A.   Before the Put was exercised?  I
18  don't believe so.
19  Q.   Did AID pay before the redemption?
20  A.   I don't think so.
21  Q.   Did AIG commit to pay before the
22  redemption in that case?
23  A.   I -- again, I don't think so.  I'm
24  not, at this point, recalling what the time
25  sequence was, and when the redemption in that

646

Burke

1
2   case occurred.
3   Q.   Who did you work with on that case?
4   A.   I'm sorry.  "Who" meaning?
5   Q.   What personnel with AIG did you work
6   with on that case?
7   A.   Rob Jones.
8   MR. KUSHNER:  A familiar name, I
9   assume?
10  MR. WAHLQUIST:  It is now.
11  MR. KUSHNER:  It was yesterday.
12  MR. WAHLQUIST:  Yeah, this week.
13  BY MR. WAHLQUIST:
14  Q.   How about William Cotter with
15  Peabody and Arnold?  Did you work with him on
16  that case?
17  A.   Yes.
18  Q.   Can you name that insured for us?
19  A.   The one that they paid on was, let
20  me think.  What it was -- it was Clement
21  Pappas.
22  Q.   Did they pay their policy limits?
23  A.   I don't know for sure, but I think
24  so.
25  Q.   Wasn't SC squared the last of the

647

EXHIBIT  X  ,  PAGE 746

Burke

1          Burke
2 tax strategies sold by KPMG to be investigated
3 by the Senate?
4     A.   I don't know what the sequence was.
5     Q.   Wasn't SC squared -- didn't it
6 involve the smallest number of taxpayers of all
7 the matters investigated by the senate?
8     A.   I think that's correct.
9     Q.   Some of the others, like Son of Boss
10 had approximately 3,500 taxpayers, right?
11     A.   Right.
12     Q.   And if I understand your testimony
13 from earlier today, so far as you know, the IRS
14 could still prosecute KPMG with respect to SC
15 squared, right?
16     A.   As far as I know, yes.
17     Q.   And is it true that the deferred
18 prosecution agreement essentially put KPMG out
19 of this business?
20     A.   I would think so, yes.
21     Q.   What is a tax shelter?
22     A.   I don't know.
23     Q.   When you used that term today, did
24 you have a meaning ascribed to that?
25     A.   It is a transaction that either

1          Burke
2 generates losses, or you know, reduces income.
3 So it has a pejorative, you know, connotation
4 these days that -- which is why I try to stay
5 away from the concept but -- and certainly,
6 there were the tax shelters of the early '80s
7 which, you know, were syndicated real estate
8 deals.
9      There were certainly ones -- there
10 were ones there that there was a sheltered a
11 lot of income, but there were no grounds for
12 the IRS to attack them.  Nowadays, it means
13 something that -- structured transactions,
14 which I think are the blips, and the sons of
15 bosses, and the other transactions that were
16 mass marketed, primarily by the accounting
17 firms.
18     Q.   Don't most tax shelters have some
19 technical merit?
20     A.   You know, some tax shelters are
21 airtight and absolutely work, and no one would
22 suggest otherwise.  Others have some pure
23 technical merit and I think if you look at
24 nothing except the individual steps taken, that
25 each one is governed by a statute, or

1          Burke
2 regulation, or something that said by itself,
3 it would work.  So if that's what you mean by
4 technical merit, they do.  Usually have you
5 know, without stepping back and looking at the
6 landscape, they usually do "work" under the
7 fine print of the tax rules.
8     Q.   That's what makes them a tax
9 shelter, right?
10     A.   I'm not sure I understand.
11     Q.   Otherwise, it would be tax fraud.
12 You would just be making something up?
13     A.   Yes.
14     Q.   Like a phony transaction?
15     A.   Right.  Yes, it is certainly what
16 saves it from being tax fraud.
17     Q.   You know, I mean a transaction that
18 never took place, that's tax fraud?
19     A.   That would be tax fraud.
20     Q.   Tax shelter is a transaction that
21 avoids or reduces taxes, and it has some
22 technical merit, right?
23     A.   Correct.
24     Q.   And some of those shelters still
25 lose, notwithstanding their technical merit,

1          Burke
2 right?
3     A.   That's correct.
4     Q.   When did you first become involved
5 in the administration of Upper Deck's and
6 Mr. McWilliam's claims for policy benefits in
7 connection with AIG's policy?
8      MR. KUSHNER:  I object to the
9 words --
10      CHAIRMAN BYRNE:  Take out -- what do
11 you mean by "administration"?
12      MR. WAHLQUIST:  He worked on this
13 claim.
14      CHAIRMAN BYRNE:  When did you become
15 involved and in what capacity with the
16 Upper Deck/AIG?
17      THE WITNESS:  I don't know exactly
18 when the involvement with Upper Deck.  I
19 was retained by AIG or AISLIC in
20 connection with all of their insureds in
21 early summer of 2004.  I think I may be
22 off by a little bit, but it was right
23 around there.
24 BY MR. WAHLQUIST:
25     Q.   And was there somebody that you

upper deck-aig arb         EXHIBIT ___Y___, PAGE _747_         Page  648 - 651

Burke

1
2  supplanted or replaced in that role?
3      A.   Well, as I understand it, AIG was
4  originally represented by Cahill Gordon in the
5  insurance claim area, who was supplanted by
6  Bill Cotter of Peabody & Arnold.
7          Peabody & Arnold did not have the
8  in-house tax expertise so to have someone who
9  could help them with the tax side, Bill
10  suggested and AISLIC ultimately retained me to,
11  in essence, assist Mr. Cotter in -- you know,
12  on the technical tax side.
13      Q.   And in that role, did you have
14  connection with Upper Deck's -- excuse me.  In
15  that role, did you have communications with
16  Upper Deck's tax counsel?
17      A.   Yes.
18      Q.   Who was that?
19      A.   Paul Sax originally at Orrick, and
20  then I think when they moved to -- the name
21  escapes me now.
22      Q.   DeCastro?
23      A.   DeCastro, yes, relatively little
24  involvement with DeCastro.  I had a great deal
25  of involvement with Paul Sax.

652

Burke

1
2      Q.   Are you aware of a single submission
3  made by Mr. Sax to the IRS without your prior
4  approve?
5      A.   After my involvement, I mean I do
6  think he submitted some things before I was
7  involved.  So that I can't speak to.  I vaguely
8  recall there may be something that he retained
9  claiming privilege.
10      Q.   That was submitted to the IRS?
11      A.   I believe so.
12      Q.   On the whole, did you -- well, I
13  mean --
14          MR. KUSHNER:  He hasn't completed
15  his answer perhaps.
16      Q.   -- I'm sorry.  I didn't mean to cut
17  you off?  Have you completed your answer?  I
18  thought you had.  The last thing in the world I
19  want to do is cut you off.
20      A.   I have completed my answer.
21      Q.   Did you find Mr. Sax to be
22  cooperative with you?
23      A.   Yes.
24      Q.   Did you, during the time you worked
25  on this claim, give AIG or its insurance

653

Burke

1
2  counsel, Mr. Cotter, opinions with respect to
3  the viability of the generic SC squared
4  transaction?
5      A.   Yes.
6      Q.   What did you tell them?
7          MR. KUSHNER:  Objection.  It's
8  attorney/client advice.
9          MR. WAHLQUIST:  It's a legitimate
10  inquiry.  He has come in here, and he has
11  already testified and given a legal
12  opinion.  And what they are trying to do
13  is sweep the candid advice --
14          CHAIRMAN BYRNE:  Ah, ah, ah.  He has
15  given a tax opinion.  He has given an
16  opinion with respect to the viability of
17  certain transactions vis-a-vis the tax
18  code, regs, and how courts would interpret
19  the regs, et cetera, vis-a-vis
20  particular -- this particular transaction
21  and the generic SC squared.
22          To the extent that he was retained
23  by a client to give a legal opinion with
24  respect to any claim, I would like to
25  identify the client, see if there was a

654

Burke

1
2  waiver, or otherwise, really have no
3  choice but to uphold the privilege,
4  certainly at this stage.
5          MR. KUSHNER:  May I make a
6  statement?
7          CHAIRMAN BYRNE:  If there is certain
8  information, i.e., nonprivileged
9  information that Mr. Burke or any other
10  witness has, go ahead.  But when you are
11  at the point of legal advice to a
12  particular client, the escape clause
13  narrows drastically.  You may still get
14  out from under it, but the inquiry has to
15  be very plaintive.  I'm just framing the
16  basis of the ruling -- wait one second.
17  Go ahead.
18          MR. KUSHNER:  Thank you.  Upper Deck
19  moved to compel AISLIC's production of all
20  documents in its privileged log which were
21  either addressed to, copied to, prepared
22  by --
23          CHAIRMAN BYRNE:  I know.  I ruled.
24          MR. KUSHNER:  -- Mr. Burke.  The
25  panel's ruling dated October 2 was --

655

upper deck-aig arb

Page 652 - 655

EXHIBIT  V, PAGE 748

Burke

1    Burke
2    CHAIRMAN BYRNE:  You can ask
3    Mr. Burke about particular documents that
4    you are interested in, and we will
5    determine whether or not those particular
6    documents specifically involved legal
7    advice to a client, and then we go through
8    the inquiry.
9    MR. WAHLQUIST:  Let me confer with
10    my colleague just a minute.
11    CHAIRMAN BYRNE:  Okay, you confer
12    with your colleagues, and we are going to
13    have a quick consultation outside, also.
14    (Recess taken.)
15    CHAIRMAN BYRNE:  You, Mr. Burke,
16    keep my rulings in mind whenever you
17    answer a question, okay?
18    THE WITNESS:  (Nodding.)
19    CHAIRMAN BYRNE:  Go ahead.
20    BY MR. WAHLQUIST:
21    Q.   Mr. Burke, did you give advice to
22    AIG respecting the Clement Pappas SC squared
23    transaction?
24    A.   Yes.
25    Q.   Was that tax advice?

656

Burke

1    Burke
2    MR. KUSHNER:  I'm going to object on
3    attorney/client grounds.
4    CHAIRMAN BYRNE:  I am going to
5    overrule that objection.  It calls for a
6    "Yes" or "No" answer.
7    A.   Could you repeat the question?
8    (Record read.)
9    A.   No.
10    BY MR. WAHLQUIST:
11    Q.   Was your advice with respect to any
12    of the SC squared transactions regarding the
13    viability of the generic SC squared transaction
14    consistent with what you have stated as your
15    opinion in these proceedings?
16    MR. KUSHNER:  Objection on
17    attorney/client grounds.
18    CHAIRMAN BYRNE:  Overruled, calls
19    for a "Yes" or "No" answer.
20    A.   My advice was consistent with what I
21    had in my report and said today.
22    Q.   Have you -- with respect to any of
23    the five SC squared claims that you have been
24    involved in, ever rendered an opinion that the
25    generic SC squared transaction would likely not

658

Burke

1    Burke
2    A.   Yes.
3    Q.   Did it pertain to the viability of
4    the generic SC squared transaction?
5    A.   Yes.
6    Q.   Was the Clement Pappas transaction a
7    generic SC squared transaction?
8    A.   As far as I know, yes.
9    Q.   Did AIG pay its limits to settle the
10    Clement Pappas claim?
11    A.   I don't know for sure.
12    Q.   Did AIG pay to settle the Clement
13    Pappas claim?
14    A.   I believe they did, but you know, my
15    job was to render tax advice.  I didn't get
16    involved in all the --
17    CHAIRMAN BYRNE:  Stop there.  Is Rob
18    Jones -- would Rob Jones know the answer
19    to this?
20    MR. KUSHNER:  Oh, yes, he will.
21    CHAIRMAN BYRNE:  Fine.
22    BY MR. WAHLQUIST:
23    Q.   Was your advice with respect to the
24    Clement Pappas transaction contrary to that,
25    that you have given in this proceeding?

657

Burke

1    Burke
2    survive judicial scrutiny?
3    MR. KUSHNER:  Objection.
4    Attorney/client grounds.
5    CHAIRMAN BYRNE:  You can answer.  It
6    calls for a "Yes" or "No."
7    A.   No.
8    MR. WAHLQUIST:  I only have one copy
9    of this, but we can make copies at the
10    break.  I'm marking as Exhibit 389, an
11    abstract of AIG's privilege logs, which
12    identify the documents that have Mr. Burke
13    designated as a recipient or as the
14    author, and I would like to hand that to
15    Mr. Burke if I may?
16    (Respondent AIG Exhibit 389, AIG
17    Privilege Logs, marked for
18    identification.)
19    CHAIRMAN BYRNE:  All right.  You are
20    not going to go through the whole list,
21    right?
22    MR. WAHLQUIST:  No, I promise you I
23    will not do that.
24    CHAIRMAN BYRNE:  Okay.  What --
25    where are we?  What do you want to ask

659

EXHIBIT ___V___ PAGE 749

Burke

1   him?
2   MR. WAHLQUIST:  I want to know if he
3   reviewed any of that in the course of
4   coming to the opinions that he expressed
5   here?
6   CHAIRMAN BYRNE:  Okay.
7   THE WITNESS:  I did not review them
8   in connection with my report.  I mean I
9   obviously saw them when I got them.  So I
10  can't pretend like I never seen them, but
11  we went over these, you know, a week ago
12  to see whether there was anything in them
13  that I had relied upon in giving my
14  testimony or in my report, and what I was
15  anticipating in my testimony, and there
16  was nothing I relied on in them.
17  BY MR. WAHLQUIST:
18  Q.   Is there anything in any of those
19  writings pertaining to the tax viability of any
20  SC squared transaction?
21  A.   Yes.
22  Q.   Can you identify any of those for
23  us?
24  A.   I can't from the list.

660

Burke

1   transactions?
2   A.   My analysis was based on my
3   analysis.
4   CHAIRMAN BYRNE:  So it's not a
5   question of accepting someone else's
6   analysis and making it your own?  Is that
7   the distinction you are trying to --
8   THE WITNESS:  Correct.
9   CHAIRMAN BYRNE:  If someone else's
10  analysis was consistent with your own, so
11  be it?
12  THE WITNESS:  Correct.
13  BY MR. WAHLQUIST:
14  Q.   Did you see an analysis inconsistent
15  with your analysis?
16  A.   Sometimes, yes.
17  Q.   From whom?
18  MR. KUSHNER:  I object.
19  CHAIRMAN BYRNE:  That one is
20  problematic because I don't know where it
21  came from, don't know if the author was a
22  lawyer, don't know if he got a copy under
23  a joint defense privilege, all of which
24  they have to go into.  You want to do

662

Burke

1   Q.   The material that is in writing
2   pertaining to the viability of an SC squared
3   transaction, was that written by you?
4   A.   Substantially, no.
5   Q.   Why do you qualify your answer?
6   A.   There were certain correspondence
7   here where people were suggesting tax analysis,
8   where I would respond to it, but that was not
9   many of these transactions -- not many of these
10  documents, and so there was mostly my -- you
11  know my advice was limited substantially to
12  responses to other peoples' inquiries.
13  Q.   Did you consider that suggested tax
14  analysis in coming to your conclusions about
15  the viability of the SC squared transaction?
16  A.   Did I consider it, yes.
17  Q.   Did you disregard it in coming to
18  your conclusions?
19  A.   I believe so.
20  Q.   Was it all wrong?
21  A.   A fair amount of it, yes.
22  Q.   So did you accept part of the
23  suggested analysis in coming to your
24  conclusions with respect to the SC squared

661

Burke

1   generically did it come from lawyers or
2   crack pots, which isn't going to get you
3   too far.  Did it come from tax advisors
4   from -- did it come from tax advisors
5   retained by and with respect to the five
6   transactions, that, he can answer "Yes" or
7   "No."  Yes or no, and we can go from there
8   by eliminating the other ones.
9   MR. WAHLQUIST:  Well, let me try to
10  ask that then.
11  CHAIRMAN BYRNE:  Okay.
12  BY MR. WAHLQUIST:
13  Q.   Mr. Burke, did the analysis that you
14  reviewed that appears somewhere in the
15  documents identified on Exhibit 389, did any of
16  it come from tax advisors pertaining to any of
17  the participants in the five SC squared
18  transactions in which you were involved?
19  A.   I do not believe so.
20  Q.   Did it come from your client?
21  A.   Some of it, yes.
22  Q.   Did some of it not come from your
23  client?
24  A.   Yes.

663

Burke

1
2  Q.  From whom did it come?
3     CHAIRMAN BYRNE:  You can answer that
4  one if you are excluding your client.  If
5  you are excluding counsel for someone
6  else's client in a joint defense posture,
7  I think we have done most of the
8  exclusions.  You can answer that question
9  "Yes" or "No."
10    A.  I'm not sure which way the question
11  was phrased.  Does it exhibit --
12    CHAIRMAN BYRNE:  Okay.  Yes, you --
13  my understanding is you said yes, you
14  received -- I will rephrase it.
15    Did you receive communications
16  concerning tax advice from other than your
17  client, attorneys representing your
18  client, attorneys representing any client
19  involved in the SC squared transactions
20  that may have a joint defense privilege
21  with your client?
22    THE WITNESS:  The answer to that is
23  no.
24    CHAIRMAN BYRNE:  What class did I
25  not exclude that that came fro -- that the

664

Burke

1
2     I don't care what's asked for.  If
3  it doesn't have to do with tax advice
4  related to SC squared generic or SC
5  squared transactions -- and by that, I
6  mean your tax advice, Mr. Burke, I don't
7  mean anybody else's tax advice.  Okay?
8     THE WITNESS:  Um-hum.
9     CHAIRMAN BYRNE:  That is what I
10  expect to see in those documents
11  unredacted.  Are we clear?  If you are not
12  clear, take a look at the transcript when
13  you get it on Monday because that's about
14  as clear as I'm going to make it.
15    MR. WAHLQUIST:  Could I ask for just
16  one more clarity, and that is when exactly
17  do you want designations?  You said over
18  the break and not the lunch break?
19    CHAIRMAN BYRNE:  You have got a long
20  flight.
21    MR. WAHLQUIST:  Okay.  That's -- not
22  today.  That's what I meant.
23    CHAIRMAN BYRNE:  I regret you are
24  likely going to have to sit next to your
25  partner on the way home, but you can --

666

Burke

1
2  other communications came from?  And I
3  don't mean your or my law school class.
4     THE WITNESS:  I'm not sure there is
5  anyone who wasn't included in that class
6  that I gave tax advice in these documents.
7     CHAIRMAN BYRNE:  All right.  Hang on
8  for a second.  We need to take a minute.
9     (Recess taken.)
10    CHAIRMAN BYRNE:  Over my strenuous
11  objection over the break -- and I don't
12  mean the lunch break, you are to designate
13  those items on the privilege list that you
14  really are hot to trot to see, and I don't
15  want to hear all 12 pages of which because
16  I have looked at them, and a lot of them
17  is duplicative.  Okay?
18    Next week -- by the end of next
19  week, I want overnighted to me those
20  documents with proposed redactions.  In
21  other words, don't redact them, what you
22  want to redact will be marked in yellow so
23  that when you copy it, it comes out black
24  and is redacted, but I will approve the
25  redactions and what is being given.

665

Burke

1
2     MR. WAHLQUIST:  He gets the middle
3  seat.
4     MR. HOWELL:  I'm not in coach.  I'm
5  up front, don't worry.
6     CHAIRMAN BYRNE:  You can begin the
7  process then, and it will behoove you to
8  get it by e-mail or whatever Monday.
9  E-mail a copy to him.  E-mail a copy to
10  me, even if it's just the same privilege
11  list, a .PDF with marks.  I mean I don't
12  care how you do it.  Okay.  You guys have
13  four days or so to do what you got to do.
14  Okay?
15    I will make my rulings, give what
16  directives I have to give from wherever
17  I'm going to be the Monday or Tuesday of
18  the following week, and then I expect them
19  out in time for our next session at the
20  end of the month.
21    I am not -- I am reserving the right
22  to require that any follow-up questions
23  you may have, Mr. Burke may do -- may
24  answer by much other than live testimony.
25  I will think about telephone call.  I'm

667

EXHIBIT ___Y___, PAGE _751_

1          Burke

2     more likely to permit him to give a letter

3     or an affirmation in response to follow-up

4     questions from you, okay?

5          MR. WAHLQUIST:  Okay.

6          CHAIRMAN BYRNE:  Anything else?

7          MR. WAHLQUIST:  I don't think so.

8          MR. KUSHNER:  I have no questions.

9          CHAIRMAN BYRNE:  We are adjourned

10    for lunch.  Mr. Burke, thank you very

11    much.

12         (Luncheon recess taken at

13    12:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

668

upper deck-aig arb                    EXHIBIT  Y  PAGE 752                    Page  668

733

1                              Jones

2

3                     C E R T I F I C A T E

4

5     STATE OF NEW YORK          )
                                  :ss
6     COUNTY OF RICHMOND         )

7

8              I, MELISSA GILMORE, a Notary Public

9     within and for the State of New York, do hereby

10    certify that the within is a true and accurate

11    transcript of the proceedings taken on

12    October 13, 2006.

13             I further certify that I am not

14    related to any of the parties to this action by

15    blood or marriage; and that I am in no way

16    interested in the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto

18    set my hand this 16th day of October, 2006.

19

20             _____
                       MELISSA GILMORE
21

22

23

24

25

EXHIBIT __Y__, PAGE 753