# EXHIBIT Z

734

COPY



1   AMERICAN ARBITRATION ASSOCIATION

2   ---------------------------------------X

3   AMERICAN INTERNATIONAL SPECIALTY

4   LINES INSURANCE COMPANY,

5                   Claimant-

6                   Counter Respondent,

7               - against -

8   THE UPPER DECK COMPANY, RICHARD P.

9   McWILLIAM, and the MPR REVOCABLE TRUST,

10                  Respondents-

11                  Counter Claimants.

12  ---------------------------------------X

13                    780 Third Avenue
                      New York, New York
14
                      October 30, 2006
15                    10:25 a.m.

16  B E F O R E :

17      JOHN F. BYRNE, Chairman

18      STEPHEN D. KRAMER, Arbitrator

19      CHARLES J. MOXLEY, JR., Arbitrator

20

21                  MELISSA GILMORE, Reporter

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                REF: 82081

EXHIBIT  2  PAGE 754

TELEPHONE: (212) 750-6434 • Fax: (212) 750-1097

Ellen Grauer
COURT REPORTING

**Proceedings**

1                Proceedings
2  I don't want to know what you didn't do,
3  or what you are going to do, or what you
4  tried to do, or whatever.  Hearing
5  nothing, we will do our duty.  Okay?
6        Let's take no more than ten minutes,
7  let's find out where the boxes are, let's
8  get where we have to get set up, and then
9  let's go with Mr. Mather.  Okay?  Thank
10  you.
11        (Recess taken.)
12        CHAIRMAN BYRNE:  Back on the record,
13  everyone.  There are a few other -- I will
14  call them procedural matters that we need
15  to discuss with the parties -- that I need
16  to discuss with the parties.  And there
17  are a few issues that Mr. Wahlquist raised
18  with me off the record, but let's talk
19  about them on the record after we have
20  finished our testimony with this witness.
21        You have been patient enough to wait
22  for us to get our act together, although,
23  you were scheduled earlier.  That is the
24  Chair's fault.  Monday is not a good day
25  for me under normal circumstances, and I

742

**Proceedings**

1                Proceedings
2  apologize, Mr. Mather.
3        THE WITNESS:  I'm at your disposal.
4        CHAIRMAN BYRNE:  I'm John Byrne, the
5  chair of the panel.  On my right is
6  Mr. Steven Kramer.  On my left is
7  Mr. Charles Moxley.  I want you to keep in
8  mind that you are testifying to, and on
9  behalf of, the three of us, the panel of
10  arbitrators.
11        I also want to remind you before you
12  start your testimony, that we have heard
13  and been basically brought up to speed
14  with respect to any number of tax issues
15  that you may be testifying to.
16        We are interested in your view, and
17  your insight, and your knowledge.  We are
18  going to have you sworn in, in a moment as
19  a witness, but I preface the swearing in
20  by reminding you or assuring you that you
21  are not being sworn in with respect to
22  your opinion.
23        I assume it's yours and not somebody
24  else's, but you are going to be sworn to
25  tell the truth with respect to what you

743

**Proceedings**

1                Proceedings
2  have done, what you didn't do, what you
3  looked at, what you didn't look at, what
4  you considered, what you didn't consider.
5        In other words, no one swears or
6  affirms to the truth of their opinion, and
7  you shouldn't sit there thinking that you
8  have to defend it in any way.  And we
9  assume the accuracy of your opinion when
10  we swear you in.
11        I'm also going to remind you to
12  listen to the question, take a breath, see
13  if there is an objection, and let us rule
14  before you answer.  So pay attention to
15  the proceedings and not just to the
16  question that you are being asked.  As you
17  are formulating the answer, that's the
18  only breath that you need to take.
19        The best witnesses, expert or
20  otherwise, are direct and to the point.
21  As best you can, answer succinctly.  "Yes"
22  and "No" is fine.  "I don't know" is just
23  as accurate, if you don't.
24        I have -- in other instances, I may
25  have -- and I apologize if I repeated

744

**Proceedings**

1                Proceedings
2  myself to this group -- the road to hell
3  is paved with good intentions.  The road
4  to hell is also paved with the carcasses
5  of those who tried to volunteer.
6        So just answer the question.  "I
7  don't know" is fine, not "I'm not sure,
8  but I can find out for you."  You will be
9  one of those carcasses on the road to
10  hell, I assure you.  Okay?
11        THE WITNESS:  Okay.
12        CHAIRMAN BYRNE:  With that said,
13  Madam Reporter, would you be good enough
14  to swear in the witness?
15  S T E V E N   R A Y   M A T H E R,   called
16  as a witness, having been duly sworn by a
17  Notary Public, was examined and testified
18  as follows:
19        CHAIRMAN BYRNE:  Thank you.  We need
20  your full name for the record, a business
21  address, and a home address.
22        THE WITNESS:  Okay.  It's Steven,
23  S-T-E-V-E-N, Ray, R-A-Y, Mather,
24  M-A-T-H-E-R.  The business address is 9777
25  Wilshire, W-I-L-S-H-I-R-E, Boulevard,

745

upper deck-aig arb

EXHIBIT _2_, PAGE _755_

Oct 30 arb hearing  10/30/2006  10:25:00 AM

```
 1            Proceedings
 2    Suite 805, in Beverly Hills, California,
 3    90212.  And the home address is 132 Via,
 4    V-I-A, Undine, U-N-D-I-N-E, in Newport
 5    Beach, California 92663.
 6        CHAIRMAN BYRNE:  Are you an
 7    attorney?
 8        THE WITNESS:  Yes.
 9        CHAIRMAN BYRNE:  So say we all, and
10    keep that in mind, okay?
11        THE WITNESS:  Okay.
12        CHAIRMAN BYRNE:  Mr. Wahlquist?
13    DIRECT EXAMINATION
14    BY MR. WAHLQUIST:
15    Q.   Are you ready to proceed?
16    A.   Yes.
17    Q.   You are an attorney.  Do you also
18    have any accounting background?
19    A.   Yes.  I was an accounting major at
20    the University of Iowa, and I passed the CPA
21    exam, which entitled me to have a certificate
22    as a CPA in Iowa, but I have never been
23    licensed to practice as a CPA.
24    Q.   You went straight to law school from
25    college?
```

746

```
 1            Mather - Direct
 2    A.   Pretty straight.  I worked for a
 3    while for Coopers -- at what was Coopers &
 4    Lybrand at the time in between college and law
 5    school, but that was only a period of about
 6    eight months.
 7    Q.   All right.  And when you graduated
 8    from law school, did you then become employed
 9    by the IRS?
10    A.   Yes.
11    Q.   Describe your employment history
12    with the IRS for us.
13    A.   I was an attorney with the IRS, then
14    District Counsel Office, first in San Francisco
15    for a year, and then in Los Angeles.  And my
16    responsibilities were principally threefold, I
17    guess.  I handled tax court litigation where I
18    was the representative of the government myself
19    and tried the cases.  I advised revenue
20    officers and US attorneys on tax collection
21    matters.
22        And I also spent a significant
23    amount of my time, particularly in the Los
24    Angeles office, doing duties associated with me
25    being the tax shelter coordinator for that
```

747

```
 1            Mather - Direct
 2    office, which meant a variety of different
 3    things.
 4        But most prominently was, I was the
 5    one member from the counsel office on what they
 6    called the ACE committee of appeals counsel and
 7    exam.  And what we did at that time, and this
 8    is the mid '80s, we received information on tax
 9    shelters that were being promoted currently,
10    and made determinations as to what type of
11    investigation would be done, and what possible
12    actions would be taken against the promoters of
13    the tax shelter.
14        Because in 1982, Congress passed a
15    law that for the first time allowed the
16    government to kind of go after the promoters,
17    as opposed to just waiting to audit the
18    investors, and that was -- the ACE was the
19    committee that basically was responsible for
20    implementing those, what we called at the time
21    front end investigations that were designed to
22    penalize or shut down people promoting tax
23    shelters.
24    Q.   So a large part of your employment
25    with the IRS, in fact, dealt with what you
```

748

```
 1            Mather - Direct
 2    refer to as a "tax shelter"?
 3    A.   Yes, because most of the cases that
 4    I handled as a trial attorney were also tax
 5    shelter cases.
 6    Q.   And you tried cases for the
 7    government in the tax court?
 8    A.   Yes.
 9    Q.   You tried cases for taxpayers as
10    well, since you have gone in private practice?
11    A.   I have.
12    Q.   How many tax cases have you tried?
13    A.   I would guess all told that it would
14    be in the neighborhood of 50, not all of which
15    were reported cases.  Some -- at least when I
16    was with the government, there were a number of
17    cases that were what we would call a small tax
18    case.
19    Q.   Did you try tax shelter cases?
20    A.   Yes, I have.
21    Q.   In the tax court?
22    A.   Yes.
23    Q.   Do you have any professional
24    publications?
25    A.   I have principally three
```

749

Mather - Direct

1
2  publications.  I have published articles and
3  materials for seminars.  But over and above
4  that, I have three, what I would call
5  treatises, that I've published.  One is -- or
6  two of them are BNA Tax Management Portfolios
7  which -- they are -- it's a series of several
8  hundred volumes.
9      And I have published one volume that
10 is essentially the audit procedures for
11 pass-through entities, partnerships, and S
12 corporations, which I have become an expert at
13 with the district counsel.  And then when I
14 moved to private practice, I authored that
15 publication.
16     Q.  That was by virtue of the tax
17 shelter work that you became an expert on --
18     A.  Essentially, because in the '80s,
19 most of the tax shelters were in partnership
20 form, and they also, in the 1982 Act in TEFRA,
21 they implemented a whole new set of audit
22 procedures for partnerships, primarily to
23 respond to the explosion of tax shelter
24 partnerships at that time.
25     And I was also the -- what they

750

Mather - Direct

1  called the TEFRA coordinator.  They refer to
2  these as the TEFRA procedures, and so I was
3  fielding all the questions on those procedures
4  and giving opinions, which made me intimately
5  familiar with --
6      Q.  I interrupted you.  That was one of
7  your publications?
8      A.  Yes.
9      Q.  What were the others?
10     A.  The other one was the Federal Tax
11 Collection Procedure which, as of two weeks
12 ago, just was republished just as a two volume
13 set in that same BNA Tax Management Portfolio
14 and series.
15     And then I also have that, I guess
16 they refer to as a chapter, on TEFRA
17 partnership procedures in the BNA Tax Practice
18 series, which is a different series, and that's
19 widely circulated.
20     Q.  Have you also handled tax cases at
21 the appellate levels?
22     A.  Yes, I have handled appeals to the
23 Ninth Circuit.
24     Q.  I want to talk with you briefly

751

Mather - Direct

1
2  about the nature of the tax court.
3      How many judges are on the tax
4  court?
5      A.  There are currently -- I think there
6  is 18.  There are 19 full-time positions, and
7  then there is a number of positions for what
8  they call small -- small trial judges.
9      Q.  Where do those judges have their
10 principal chambers?
11     A.  Everyone is in Washington, DC.
12     Q.  So they -- where do they try cases?
13     A.  Predominantly remote locations.
14 They ride circuit.
15     Q.  And so you are familiar with the
16 Upper Deck transaction and Mr. McWilliam's
17 transaction that is in issue?
18     A.  Yes.
19     Q.  If SC squared were to be challenged
20 in court -- in tax court, where would that
21 trial have taken place?
22     A.  Well --
23     Q.  Or where could it have taken place?
24 Let me put it that way.
25     A.  It could literally take -- you mean

752

Mather - Direct

1  for Upper Deck's specific case?
2      Q.  Yes.
3      A.  It would take place wherever Upper
4  Deck asked for the place of trial to be, which
5  presumably would be in San Diego.
6      Q.  And if there was an appeal from the
7  result in the tax court, where would that
8  appeal lie?
9      A.  The appeal -- the venue for appeal
10 is based on the residence of the taxpayer when
11 the petition in the tax court is filed.  So if
12 he didn't -- if Mr. McWilliam didn't move, it
13 would be the Ninth Circuit.
14     Q.  How many -- how many tax court
15 judges try a case in tax court?
16     A.  Only one.
17     Q.  Now, there is -- Ms. Linda Burke
18 testified that you might get one or two or
19 three tax judges.  Have you ever seen a case
20 that had more than one tax court judge try a
21 case?
22     A.  There would conceivably be a
23 different judge assigned at a different point,
24 but there has never -- I don't think in the

753

EXHIBIT _2_, PAGE _757_

Oct 30 arb hearing   10/30/2006  10:25:00 AM

Mather - Direct

1  
2  history of the tax court -- been a trial where  
3  there was more than one judge sitting as the  
4  trial judge in the case.  
5  Q.   What happens after a tax court judge  
6  formulates a proposed decision in connection  
7  with the case?  
8  A.   The trial judge receives all the  
9  evidence.  There are post-trial briefs filed  
10  typically, and then usually a year or more  
11  after the trial is over, the judge issues an  
12  opinion.  
13  And that opinion is then circulated  
14  among the other 19 full-time judges of the tax  
15  court, and they have an opportunity to file an  
16  objection to the opinion being issued in the  
17  form that the trial judge has authored it.  
18  Q.   And what happens -- if somebody  
19  files an objection, what happens?  
20  A.   Then the chief judge makes a  
21  determination as to whether the case will go  
22  to, what they call court conference, which is  
23  essentially, the judges get together in a big  
24  room like this, and they are all sitting around  
25  a big table, and they vote on the opinion in  

754

Mather - Direct

1  
2  Q.   How have you heard tax court judges  
3  describe their role in the tax court?  
4  A.   Well, they certainly have described  
5  their roles as being the trier of fact, but  
6  they also noticeably and somewhat  
7  disconcertingly now, describe their roles as  
8  being, in effect, the protector of the Fisk in  
9  the sense that I believe the tax court, as a  
10  body, views itself as having a gatekeeper  
11  function, and that they are there as a backstop  
12  to make sure that things that aren't supposed  
13  to happen, don't happen in the tax world.  
14  CHAIRMAN BYRNE:  Why do you say  
15  sometimes disconcertingly?  
16  THE WITNESS:  Well, it's generally  
17  not favorable to my current position of  
18  representing taxpayers.  
19  BY MR. WAHLQUIST:  
20  Q.   Is it tougher to win a case in tax  
21  court for you now that you are in private  
22  practice than it was when you were with the  
23  government?  
24  A.   I probably tried 20 to 25 cases, in  
25  the government and out of the government, and  

756

Mather - Direct

1  
2  essence.  
3  And if the judge that tried the case  
4  isn't in the majority, then he doesn't author  
5  the opinion, and they select somebody else to  
6  author the majority opinion, if you will, and  
7  then the judge that tried the case that wanted  
8  to decide it differently would file a  
9  dissenting opinion.  
10  Q.   Now, have you had occasion to hear  
11  tax court judges speak to professional  
12  organizations about their own view of their  
13  role?  
14  A.   Yes, many times.  
15  Q.   Can you describe the kind of  
16  circumstances where you have heard them speak  
17  about that?  
18  A.   The most frequent times certainly is  
19  that when the judges come to Los Angeles, which  
20  is usually six to eight times a year, a group  
21  of tax controversy attorneys invites them to  
22  dinner the first night that they are in town,  
23  and they make some remarks typically there to  
24  the assembled group, which includes government  
25  attorneys, so that would be the --  

755

Mather - Direct

1  
2  the win/loss percent is the same.  Although in  
3  the government, I won 95 percent of the cases.  
4  And now, I lose 95 percent of the cases.  So  
5  something happened there when I switched sides.  
6  CHAIRMAN BYRNE:  And you are  
7  testifying under oath that it was not the  
8  diminution of skill in any way?  
9  THE WITNESS:  I question that from  
10  time to time, but --  
11  BY MR. WAHLQUIST:  
12  Q.   Have you reviewed something called  
13  Notice 2004-30?  
14  A.   Yes, I have.  
15  Q.   And that is something that the IRS  
16  published in approximately April of 2004  
17  regarding the SC squared transaction, right?  
18  A.   That's correct.  
19  Q.   What is the purpose of a notice like  
20  that?  
21  A.   The typical purpose is to put the  
22  world on notice, if you will, that the IRS has  
23  determined what their position will be with  
24  respect to this transaction, and that they  
25  intend to attack the transaction for anybody  

757

Mather - Direct

1
2  that chooses to claim the tax benefits
3  associated with that.
4      And then it also, probably equally
5  importantly, kicks in or causes the transaction
6  to be a listed transaction, which automatically
7  kicks in some disclosure requirements for
8  people affiliated with the transactions.
9   Q.   What does it mean to be a "listed
10  transaction"?
11   A.   It means that the IRS put you on the
12  list.
13   Q.   And if, for example, you're KPMG,
14  what do you have to do when this is put on the
15  list?
16   A.   You have recordkeeping and
17  disclosure obligations with respect to the
18  transactions that you have sold to taxpayers
19  that you have been involved with, and you also
20  have to register the shelter with the IRS, if
21  you have not already done so, which the
22  registration is an IRS form that discloses
23  certain information about the particulars of
24  the deal.
25   Q.   Now, by notice 2004-30, the IRS had

758

Mather - Direct

1
2  already summoned the identity of the SC squared
3  participants from KPMG, though, right?
4   A.   Yes.
5   Q.   That was -- and you have reviewed --
6  well, you are aware that happened some time in
7  2002, correct?
8   A.   Yes, early 2002.
9   Q.   And you are aware that shortly after
10  that, Mr. McWilliam and some other SC squared
11  participants identified themselves to the
12  government in an amnesty program, right?
13   A.   Yes, a disclosure initiative.  I
14  wouldn't necessarily call it an amnesty
15  program.
16   Q.   Yeah.
17   A.   But it did function like an amnesty
18  program.
19   Q.   Describe for us this disclosure
20  program that Mr. McWilliam participated in?
21   A.   Well, if you -- the IRS, I believe
22  recognizing that they might not have the
23  resources to readily determine who was the --
24  who were the investors in some of these tax
25  shelter transactions that they became

759

Mather - Direct

1
2  interested in, adopted the disclosure
3  initiative, which essentially caused -- or the
4  deal was that the IRS would waive the penalties
5  associated with these transactions if the
6  people came forward and disclosed their
7  identity.
8      So that was -- there was a lot of
9  noncompliance with the tax shelter registration
10  rules, and so this was a way for them to get
11  the kind of information that they would have
12  hoped to have gotten through the registration
13  requirements.
14   Q.   Can you explain to us what those
15  penalties are?
16   A.   Well, the principal penalty
17  applicable to tax shelters is the
18  accuracy-related penalty, which is normally
19  20 percent of the tax deficiency amount.  And
20  it can, in instances, be 40 percent if the tax
21  benefit ultimately disallowed results from a
22  substantial overvaluation of an asset involved
23  in the transaction.
24   Q.   Now, what -- based on your
25  experience, what would happen to an SC squared

760

Mather - Direct

1
2  participant who did not take advantage of the
3  disclosure initiative?  What would the IRS's
4  position be with that taxpayer now?
5   A.   Well, certainly, they would not be
6  conceding the penalty now.  The settlement --
7  there was a standard settlement proposal made
8  to the SC squared participants, and they
9  acknowledged that if you disclosed, there was
10  no penalty.
11      But then they did impose a penalty
12  in the event you did not disclose.  So you got
13  a worse settlement if you didn't disclose under
14  their settlement initiative.
15      And if you still didn't want to
16  settle under that settlement initiative, then
17  you would end up in litigation.
18   Q.   Okay.  Mr. Kushner has provided the
19  panel, I believe, and me with a chart that
20  identifies four insured SC squared
21  participants.  That chart indicates that three
22  of the four SC squared participants
23  participated in the disclosure initiative, and
24  that one did not.
25      And it further indicates that the

761

EXHIBIT _2_, PAGE _759_

Oct 30 arb hearing  10/30/2006  10:25:00 AM

Mather - Direct

1  Mather - Direct
2  one that did not participate in the disclosure
3  initiative is the one that appears not to have
4  settled with the IRS?
5  A.  Yes, I saw that on the table.
6  Q.  And can you tell us, based on your
7  experience, what your expectations are -- would
8  be going on with that SC squared participant,
9  the one that did not participate in a
10  disclosure initiative?
11  A.  I would guess that the focus of the
12  litigation is probably on the taxpayer's
13  efforts to obtain relief from the penalty.
14  Q.  There is no litigation yet.
15  MR. KUSHNER:  I have to object to
16  the "guess."  You're --
17  CHAIRMAN BYRNE:  The objection is
18  well taken.  Choose your words a little
19  bit more carefully.
20  THE WITNESS:  Okay.
21  CHAIRMAN BYRNE:  Like, in my
22  experience, that would mean that.
23  MR. KUSHNER:  If Mr. Mathers has
24  seen the papers, that would be fine.
25  That's why I don't think he is right in

762

1  Mather - Direct
2  and the speed and timeliness where you
3  were able to turn around my ruling into
4  disclosures forwarding the documents that
5  I released to Mr. Wahlquist and on behalf
6  of the panel, I want to thank you.  And I
7  also want to thank you, Mr. Wahlquist, for
8  getting that list to Mr. Kushner timely in
9  the first place so we could get the ball
10  rolling.  It was very well done by the
11  parties and counsel.  Thank you.  Sorry
12  for the interruption, but it was, I think
13  appropriate, in light of the demonstrative
14  exhibit.
15  Why don't we go back, and perhaps,
16  Mr. Wahlquist, you can rephrase your
17  question more directly.
18  MR. WAHLQUIST:  Sure.
19  BY MR. WAHLQUIST:
20  Q.  Based on your experience, would you
21  expect that the IRS would pursue a penalty with
22  an SC squared participant who had not
23  participated in the disclosure program?
24  A.  I think it's virtually certain that
25  they would.

764

1  Mather - Direct
2  his guess.
3  CHAIRMAN BYRNE:  Mr. Kushner, your
4  objection is sustained.  I want to -- we
5  are at a point where I think it's
6  appropriate for me, on behalf of the
7  panel, to thank Mr. Kushner for providing
8  the demonstrative exhibit we were just
9  talking about in such a timely manner.
10  I apologize that it was so timely at
11  my direction that it is now being referred
12  to by a witness, but I'm saying that
13  facetiously, but I want to thank you very
14  much.
15  I also want to thank on the record
16  you and Ms. Thompson presumably, as well
17  as Mr. Stroili, who was so efficient in
18  providing me with documents pursuant to my
19  direction, all of which I will say on the
20  record that I was provided, appeared to me
21  to be overinclusive in compliance with my
22  directive on the record, which was
23  appreciated.
24  And the speed that you did it -- in
25  which it was done was also appreciated,

763

1  Mather - Direct
2  Q.  Now, you indicated you've reviewed
3  the Notice 2004-30; is that correct?
4  A.  Correct.
5  Q.  And you have reviewed certain IDRs
6  and transmitting letters directed to Upper Deck
7  and Mr. McWilliam that came in the August 2004
8  timeframe asking for documents pertaining to
9  the SC squared transaction; is that right?
10  A.  That's correct.
11  Q.  And have you reviewed the IRS's
12  coordinated issue paper --
13  A.  Yes, I have.
14  Q.  -- regarding Notice 2004?
15  With that as background, do you have
16  an opinion as to whether or not the SC squared
17  transaction that was implemented by Upper Deck
18  in 2001 differed in any material way in the
19  transaction identified -- general transactions
20  identified in Notice 2004-30?
21  A.  Is the question --
22  Q.  Let me rephrase it.  What I'm trying
23  to find out is, did what Upper Deck and
24  Mr. McWilliam did in 2001 differ in any way
25  materially from the transactions identified in

765

upper deck-aig arb           EXHIBIT  2, PAGE 760          Page  762 - 765

Mather - Direct

1
2  2004-30?
3  A.  No.
4  Q.  And you are aware that in December
5  of 2002, there was a share repurchase agreement
6  where the Austin Firefighter shares were
7  purchased by Upper Deck?
8  A.  Yes.
9  Q.  And you reviewed that agreement?
10  A.  I did.
11  Q.  Does that, in your understanding,
12  differ from the SC squared transaction
13  identified in Notice 2004-30?
14  A.  Not in any material respect.
15  Q.  Now, the shareholders agreement that
16  Upper Deck -- excuse me, that the MPR Trust and
17  the firefighters entered into in 2001, you are
18  familiar with that document?
19  A.  Yes.
20  Q.  And the Put provision in Section 5
21  of the document?
22  A.  Yes.
23  Q.  Does the Put -- the existence of the
24  Put affect the viability of the SC squared
25  transaction in any way?

766

Mather - Direct

1  you have, in my view in this case, when you
2
3  look at the way the transaction was designed to
4  occur, the concept of a fair market value for
5  these shares is essentially meaningless in my
6  view because you have this situation where
7  essentially, the deal -- if I were to put my
8  IRS hat on and say what's the deal here, is the
9  deal is that we have a piece of paper that we
10  call a share certificate here, that we are
11  going to give to the firefighters, and the
12  firefighters are going to absorb 90 percent of
13  the tax consequence of owning that -- of
14  holding that piece of paper for whatever term
15  they hold it.
16  And by the formula, which was
17  exhibited in the FMV opinions appraisal and
18  basically copied with minor variations in the
19  one done by Empire, I believe it was for AIG,
20  is that basically, you end up with a valuation
21  formula where 5 percent of the economic benefit
22  associated with that goes to the charity.
23  So you essentially have a piece of
24  paper, and whoever takes that piece of paper
25  gets to pay tax on 90 percent of the increase

768

Mather - Direct

1
2  A.  You could look at it in either of
3  two ways.  The Put is an opportunity for the
4  firefighters to realize cash from the shares of
5  stock.  It's designed, according to the
6  agreement, to occur two years out.  It could be
7  viewed negatively with respect to the bona
8  fides of the transactions because it's, in
9  essence, an opportunity for the shares to be
10  pulled back if you want to look at it that way.
11  Or it could be viewed as a positive
12  feature because it essentially establishes a
13  formula for determining a price for an asset
14  that otherwise has no market.
15  Q.  Can you elaborate on that second
16  comment?  The formula for the price.
17  A.  Well, it's -- within the Put itself,
18  it specifies certain elements that are supposed
19  to be taken into account in any valuation of
20  the price at which the Put is to be exercised.
21  And those are all fairly standard valuation
22  techniques when you look at a normal
23  closely-held corporation.
24  You look at discounts of the type
25  that are referenced in that paragraph, but what

767

Mather - Direct

1  in value of the company, if you will, in the
2
3  form of earnings, while receiving 5 percent of
4  the economic benefit.
5  And I would submit that there is no
6  market for those shares with that -- in that
7  understanding, and that's how the transaction
8  was designed.
9  CHAIRMAN BYRNE:  What I hear you --
10  part of what I -- oversimplification, but
11  what I hear you saying is, you are
12  paying -- anyone who engages in an SC
13  squared transaction is paying the charity,
14  the tax exempt, a price negotiated,
15  appraised, whatever, for having sheltered
16  90 percent of the earnings of the company
17  that is paying a price for that privilege?
18  THE WITNESS:  Reduced to its
19  essence, that's it.
20  CHAIRMAN BYRNE:  For all intents and
21  purposes, if the share -- what I hear you
22  saying is if the share is worth 2 million,
23  5 million, 11 million, 15 million, the IRS
24  would not stop there.  The IRS would see
25  how much -- what that price bought in

769

EXHIBIT 2, PAGE 761

Mather - Direct

1  terms of how much earnings were sheltered
2  during the period the entity held the
3  share?
4      THE WITNESS: Absolutely. I think
5  that's front and center of the
6  government's position in this case. And
7  if we could -- I mean we can even quantify
8  it a little bit in the context of how the
9  Upper Deck transaction was supposed to
10  work. We -- I mean -- or actually, let's
11  not talk about the Upper Deck transaction.
12     Let's just talk about the numbers
13  because if you look at -- both of the
14  valuation approaches by FMV and by Empire
15  essentially start with the value of the
16  entity, and then reach, at the end of the
17  day, a value for the interest that goes to
18  the charity.
19     And in both of those cases with
20  rounding errors really only, the value of
21  the entity, or the reduction from the
22  value of the entity to the value to the
23  charity, is a 95 percent reduction. So
24  that only 5 percent of the value of the

770

Mather - Direct

1  entity is determined to be the appraised
2  value of the firefighters' shares.
3      And so what you have is, you have --
4  and then if you add in the other layer and
5  go back to the purely generic transaction
6  that I think some people have referenced,
7  is what you expected to have happen, at
8  least prospectively, is that the earnings
9  would stay relatively constant.
10     But by not distributing dividends,
11  which was the other central feature of the
12  program, was that the value of the cap
13  would build essentially from the retained
14  endings and so -- and those retained
15  earnings are the income that somebody had
16  to report on their tax return.
17     So the deal was -- is that 90
18  percent of that increment would be taxed
19  to the charity, but then whoever appraised
20  it using this formula would appraise it
21  for 5 percent of the increase in value.
22     So if you had $10 million of
23  earnings that arguably -- were all
24  retained and arguably would increase the

771

Mather - Direct

1  entity value because now, you have
2  $10 million in cash that you didn't have
3  before, well, somebody -- 9 million, I
4  guess of that 10 million was allocated for
5  tax purposes to the firefighters.
6      But when you do the appraisal, that
7  10 million translates only to an extra
8  $500,000 of real money for the charity and
9  you present -- if the government presents
10  that argument in that manner to any court,
11  they win.
12     CHAIRMAN BYRNE: Are you suggesting
13  then that a determination with respect to
14  the validity of an SC squared transaction
15  is -- can't be done in a vacuum? It has
16  to be done in terms of what, in fact,
17  happens or happened because you wouldn't
18  have that problem if, in the 18-month
19  period, the earnings went down, or if you
20  had a share in a company that took a hit
21  and decreased in value.
22     So you are not talking about
23  retained earnings, you are not talking
24  about a situation -- you know, best

772

Mather - Direct

1  intentions in the world, again
2  notwithstanding, you are sheltering
3  losses, and I don't mean to put it that
4  way, but it happens.
5      I mean it can happen in the economic
6  reality of any -- IRS would, in
7  effect, take a look at that and say well,
8  the disparity is not there in terms of
9  earnings versus price for the shares. We
10  will let it go. We won't penalize you for
11  trying.
12     THE WITNESS: Well, the IRS
13  certainly likes to have it both ways. If
14  your hypothetical was that taxpayers went
15  into expecting to have earnings for the
16  next few years, and in fact had losses,
17  and then went back to the IRS, and said
18  well, we shouldn't be stuck just getting
19  10 percent of the losses. This was a
20  sham. We should have 100 percent of the
21  losses.
22     The IRS will say well, I'm sorry it
23  may be a sham, but it's your sham, and you
24  are stuck with the form of the transaction

773

**Page 774**

Mather - Direct

that you chose. And there is a number of
cases that would stand for that, not
because in substance anything was really
any different, but because the taxpayer
doesn't really get to argue that the way
he put a deal together is a sham.
    CHAIRMAN BYRNE: Yeah, no, no, no.
I understand what you are saying.
    ARBITRATOR MOXLEY: Let me ask a
follow-up question. Have you,
Mr. Mathers, had the opportunity to read
the reports of Mr. Burke and Ms. Burke?
    THE WITNESS: Yes, I have.
    ARBITRATOR MOXLEY: If I have
understood the way they have put all this
together, and the way you have just put it
all together, the two of you are, in
effect, giving us a different view of what
the cases say because what I understood
them to say was well, ultimately, the test
is, is there some substance to what the
charity got?
    And the issues seem to flow a little
bit between well, you know, does it make

**Page 775**

Mather - Direct

any difference whether it's 2 million, or
11.3 million, or the like? And as I
understand the argument that was made, it
was well, certainly, if you had -- if the
transaction had been consummated in what's
been described, as you say, by some as the
generic SC squared, and if the charity had
gotten 11.2 based on a valuation, that
would have been so much substance that a
tax court would have said well, we are
going to let it go. So it's a different
standard, I guess. So maybe you could
comment on that?
    THE WITNESS: Well, I certainly take
a number of exceptions to Linda Burke's
conclusions. One of her conclusions --
and I'm not sure if this was in the report
or her testimony because I did read her
testimony as well -- is she seemed to
suggest that if we had another piece of
paper, which was some type of evaluation
report done at the time the shares were
bought back, that that made the deal
viable.

**Page 776**

Mather - Direct

    ARBITRATOR MOXLEY: If you'd paid
fair market value?
    THE WITNESS: Well, if you actually
had somebody telling you. That's how I
understood her testimony is that if you
had that extra piece of paper that said
that was fair market value, then you could
win. And that's, in my view, a ludicrous
conclusion, to be perfectly honest,
because the litigation in tax shelters is
typically done on the basis of what really
happened here.
    It's not done on the basis of what
the Federal Circuit defines economic
substance as or what, you know, some other
court would say well, is it a subjective
factor or objective factors, or one, or
both?
    Those are nice arguments to put in a
brief, but the reality having been
there -- the reality of how these
transactions work is the court looks at
what happened. And when you are able to
present the case here based on the facts,

**Page 777**

Mather - Direct

you can't -- you can't come to the
conclusions that they have come to based
on the history of tax shelter litigation.
    And I think what Linda Burke is
focusing on is, she seems to be
excessively devoted to the form of the
transaction, which is, if you adopt a form
and you follow the form, and you have all
of your pieces of paper in a row, then you
win, or you have a chance -- a 60 or
70 percent chance, I believe she said, of
winning.
    That just isn't the way it works.
The pieces of paper in these cases, while
certainly, they are submitted as part of
the record of the case, is not how the
courts analyze these transactions.
    So whether -- you can call it
economic substance. I would prefer in
this case, a substance over form argument,
but she was excessively, in my view,
caught up into the formalities of the
transactions. So she was buying KPMG's
position way too much.

EXHIBIT 2 PAGE 763

Mather - Direct

1
2    Robert Burke's testimony and report
3    I think was a little -- a little harder to
4    judge what it really was because he kept
5    talking about the generic transaction and
6    the way that it was originally structured.
7    I think really attempting to put the case
8    into a vacuum, if you will.
9        And what -- the problem with that
10   is, in my view, you could really separate
11   it into three kinds of transactions, I
12   guess.  You have the generic -- generic
13   transaction where the income stays pretty
14   steady and everything happens the way
15   maybe everybody grew the plan, and that
16   seemed to be what he was talking about.
17       Then you have what you could call a
18   generic Upper Deck transaction, I suppose,
19   where they had gone through the Put
20   process instead of doing the buyback
21   early.
22       And then you have the actual Upper
23   Deck transaction.  Well, the thing that
24   changed from the transaction in a vacuum
25   to the transaction -- the generic Upper

778

Mather - Direct

1
2    Deck transaction is that Upper Deck made
3    buckets full of money.  And so then you
4    have to go into court, even assuming that
5    they had exercised the Put.  Let's say
6    it's worth 11 million.  I think that the
7    appraisal is probably high, but let's say
8    that it's 11 million.
9        Upper Deck saved 66 million of taxes
10   in exchange for that 11 million to the
11   charity.  And when you present the case in
12   that fashion, you would like to believe
13   that the court might be bogged down in
14   some technical analysis or be looking at
15   the pretty pieces of paper.
16       That's not what happens because no
17   one would intend a transaction -- if you
18   are saying that there is a purpose in the
19   tax code to benefit charities here.  So
20   you are going to give $11 million to the
21   charity, which maybe should be deductible,
22   and you save $4 million in taxes.
23       But instead, they save $66 million
24   in taxes.  You got a benefit to the
25   taxpayer at least six times as much as the

779

Mather - Direct

1
2    benefit to the charity?  Well, I mean you
3    don't have to be a tax expert to
4    understand that's not really how the thing
5    is supposed to work.
6        And when you combine that with the
7    fact that this piece of paper was stripped
8    back and pared back, and all the rights
9    that would normally go to a shareholder
10   were essentially taken away before the
11   piece of paper was even given to them, and
12   because of the tax consequence associated
13   with that piece of paper, you would be --
14   any buyer of that paper, any real buyer,
15   would be looking at reporting that kind of
16   taxable income without getting any money.
17       You are basically looking at a pure
18   paper transaction that benefits the
19   charity $11 million and the taxpayers
20   $66 million.
21       And you know, that's -- that's where
22   they would have to ignore the numbers, the
23   facts, the argument -- the issues in the
24   cases and say well, you know, but if I
25   look at these 15 cases, you know, you can

780

Mather - Direct

1
2    cite a proposition that if you have
3    donative intent, you win, but you can't do
4    that.
5        ARBITRATOR MOXLEY:  But is there a
6    point at which the amount that goes to the
7    charity is big enough that that alone
8    causes there to be substance, or is it
9    always in your view in terms of how the
10   tax court applies the case law?  The
11   situation that you have to look at what
12   the balance is between the amount received
13   by the charity and the tax benefit
14   received by the taxpayer and associated
15   persons?
16       THE WITNESS:  Well, if the charity
17   was getting $150 million, I think you then
18   have essentially where you should be
19   because the government has agreed to
20   basically bear 40 percent of the burden of
21   a charitable contribution.  And if it's
22   $150 million going to the charity and
23   Mr. McWilliam gets the $60 million
24   benefit, then, you know, that works.
25       But we are not talking -- I mean

781

Mather - Direct

1  Mather - Direct
2  that's the kind of frustrating part of
3  looking at this, is that we are not
4  anywhere in the ballpark of where there is
5  enough money going to the charity, whether
6  it's 2 million, or 5 million, or
7  11 million, that any court would look at
8  this as being a transaction that possessed
9  the requisite substance to be recognized
10  for tax purposes.
11      ARBITRATOR MOXLEY:  So as long as
12  there is a disparity, your testimony is
13  the tax court is not going to recognize --
14  transaction?
15      THE WITNESS:  Certainly, if there is
16  $100 million that went to the charity and
17  $66 million savings, then you are in the
18  game, but not when you are talking 11.
19      CHAIRMAN BYRNE:  You seem to be also
20  saying, I believe, that, again bad
21  terminology, but the disparity between 11
22  and 66 is bad enough.  Did Mr. McWilliam's
23  Upper Deck make it even worse by making it
24  $2 million?
25      THE WITNESS:  Well, when you have no

782

1  Mather - Direct
2  chance at 11, how much worse could it be?
3  And that's essentially my conclusion.
4      CHAIRMAN BYRNE:  All right.  All
5  right.  So if nothing else, he saved
6  himself 9 million in cash going to the
7  charity, maybe wound up giving it to the
8  IRS, or supposed to give it to the IRS,
9  but at least since cash is fungible, you
10  get rid of the IRS with that 9 million
11  instead of giving it to the charity, get
12  the deduction, and still have to pay a
13  gajillion dollars based on the earnings.
14      THE WITNESS:  Right.  And there's --
15  if I might explain one other aspect of the
16  transaction that's troubling is assuming
17  nothing had changed in Upper Deck's
18  earnings, and the valuation of 1.3 million
19  at the start essentially held true and
20  maybe went up a little bit, what was
21  really envisioned in this transaction was
22  a benefit of around 1.3 to 2 or $3 million
23  to the charity.
24      But one of the other factors that
25  the court looks at, and one of the issues

783

1  Mather - Direct
2  that's cited in the coordinated issue
3  paper is you look at the transaction cost
4  as well, because we have got a policy
5  premium here that's over $3 million and a
6  payment to KPMG over 500,000 and by the
7  time you add up all of those transactions
8  costs, you probably have a payment of
9  close to $4 million, let's say, to give
10  the charity 2 million or 1 million and a
11  half.
12      That would also be a factor that
13  would, I think, make the taxpayer's
14  position unattainable in any attempt to
15  litigate those cases.
16      CHAIRMAN BYRNE:  And also in terms
17  of a technical point, when Upper Deck paid
18  the 2 million and filed the return for it
19  was '01 or '02?
20      THE WITNESS:  '02.
21      CHAIRMAN BYRNE:  The 2 million was
22  paid in '02.  At the time when the return
23  was filed some time in '03, all things
24  being equal, did the payment of the
25  2 million and the undoing of the original

784

1  Mather - Direct
2  deal nonetheless make it a tax shelter?
3      THE WITNESS:  No.
4      CHAIRMAN BYRNE:  I guess that's what
5  I'm getting at, and maybe I misunderstand
6  everything that's going on, but in the
7  return then by having undone the tax
8  shelter, what is the IRS's problem?  You
9  know hey, I made a mistake.  I didn't go
10  through it.  You know, I'm showing the
11  income.
12      All that's happened here is I wound
13  up giving a $2 million charitable
14  contribution to the Austin Firefighters
15  Fund, for which I will or will not get a
16  deduction.  What's the IRS's problem?
17      THE WITNESS:  Well, the IRS's
18  problem is that in 2001 and 2002 on the
19  McWilliam Upper Deck returns, that
20  90 percent of that in was, in fact, not
21  reported on McWilliam's return.  And when
22  I talk about $66 million --
23      CHAIRMAN BYRNE:  Well, presume that
24  it would be reported on the 2000 return
25  because I ended the tax shelter, that's

785

Oct 30 arb hearing  10/30/2006  10:25:00 AM

Mather - Direct

1      Mather - Direct
2    what I'm saying.  When I filed my return
3    for 2000 -- I asked you did I, in fact, in
4    '02 -- let's say it's my return.  I undid
5    the tax shelter.  I terminated it.  I'm
6    out of there.  You also then have to -- I
7    would presume that I had to show income.
8         If I really wanted to get out, I
9    would have had to amend my '01 return,
10   which I still could have done, and filed a
11   correct '02 return, and the '02 would
12   simply -- would show any and all earnings
13   for '02, would show a $2 million tax
14   deduction to the Austin Firefighters Fund,
15   and my amended '01 presumably would pick
16   up whatever income that flowed through in
17   '01 and '02.
18        If I had done that, notwithstanding
19   that I got a notice, notwithstanding that
20   things were disclosed, you know, I
21   disclosed.  I got caught up in the whole
22   KPMG thing, in your opinion, would the IRS
23   have a problem with it?
24        THE WITNESS:  I don't think so.
25   That's basically what they are doing.

786

1      Mather - Direct
2         ARBITRATOR KRAMER:  I have a couple
3    of questions, too.
4         CHAIRMAN BYRNE:  We understand you
5    are not finished.
6         MR. WAHLQUIST:  I understand.
7         CHAIRMAN BYRNE:  You started it.
8         ARBITRATOR KRAMER:  In New York,
9    those of us who represent employers
10   basically know that when you go to human
11   rights on an employment discrimination
12   case, you are going to lose.
13        So we advise our clients to prepare
14   their files for the appeal.  It sounds to
15   me the way you are testifying, that that's
16   basically the way most people who take a
17   difficult tax position consider the tax
18   court.  They play to the appeal.  If
19   that's so, my -- does the Circuit Court do
20   a technical analysis?
21        THE WITNESS:  Well, they certainly
22   take the record that's given to them.  And
23   the problem that we would have in this
24   case is that this case is going to sink or
25   swim on a factual analysis.  So if you

788

1      Mather - Direct
2    They are putting Mr. McWilliam in that
3    position with their adjustments.  I think
4    the only difference between what they are
5    actually doing and what would have been
6    done in your scenario is, they are not
7    allowing a $2 million charitable
8    contribution.
9         CHAIRMAN BYRNE:  For '02?
10        THE WITNESS:  For '02,
11   notwithstanding the fact that it was
12   really paid, their position was that it
13   was essentially the payment of a fee for
14   the firefighters to agree to enter into
15   this deal.
16        CHAIRMAN BYRNE:  And they are not
17   allowing the deduction for the half a
18   million or whatever it was to KPMG?
19        THE WITNESS:  I don't recall that.
20        CHAIRMAN BYRNE:  Okay.
21        THE WITNESS:  I think they might
22   allow a part of it.
23        MR. McWILLIAM:  They are allowing
24   half of it.
25        CHAIRMAN BYRNE:  Okay.  Thank you.

787

1      Mather - Direct
2    appeal, wherever you appeal, you are going
3    to be subject to review on a clear error
4    standard, and that's certainly an uphill
5    battle.
6         ARBITRATOR KRAMER:  Is there a
7    difference in the factual analysis in your
8    view if -- that the Circuit Court would
9    make in trying to couch things in a
10   technical term possibly?  Is there a
11   difference in the factual analysis if
12   there was a $2 million unnegotiated
13   redemption, as compared to a fair market
14   value $11 million redemption in accordance
15   with the Put?
16        THE WITNESS:  I don't believe there
17   is a difference.
18   BY MR. WAHLQUIST:
19        Q.  I want to follow up on this actually
20   because it is clearly one of the differences
21   between you and Mr. Burke.
22        Mr. Burke says what the IRS is
23   really upset about is the disproportionate or
24   uncommensurate, I think, is his term,
25   difference between what the firefighters got

789

upper deck-aig arb          EXHIBIT  Z    PAGE  766          Page  786 - 789

Mather - Direct

1  Mather - Direct
2  and the tax benefits to the taxpayer as I
3  understand it.  Did you read his report?
4      A.  Yes.
5      Q.  Okay.  And I guess I want to take a
6  look at that.  You disagree with his assertion
7  that that's not going to matter in the final
8  analysis; is that correct?
9      A.  Yes, I do.
10     Q.  And you have personal experience
11  litigating that sort of issue?
12     A.  I do.  Two of the cases -- well --
13     Q.  Well, before we get to the cases,
14  I -- I will ask you about the cases in a
15  minute.  Let me make sure I understand the
16  concept first.
17     Mr. McWilliam, let's suppose he had
18  given the firefighters a dollar in 2001
19  charitable deduction.  His tax bracket -- he
20  would get a 40-cent benefit because marginal
21  taxes are roughly 40 cents?
22     A.  Right.
23     Q.  So firefighters get a dollar,
24  Mr. McWilliam gets 40 cents of tax benefit, and
25  you are saying that the way the situation was

790

1  Mather - Direct
2  designed by KPMG is that Mr. McWilliam would
3  get -- let's say -- let's make it $100, okay?
4  He is going to have $100 worth of income, 90
5  per -- or would have, but 90 percent of it is
6  going to get shifted to the firefighters,
7  right?
8      A.  Correct.
9      Q.  So he would otherwise pay 40 percent
10  of that 90?
11     A.  $36.
12     Q.  He'd pay $36 of tax on the $90 that
13  got allocated to the charity.  And the charity,
14  under the scenario you are positing, based on
15  the FMV analysis and the Empire analysis,
16  really got how much benefit?
17     A.  $5.
18     Q.  So Mr. McWilliam gets, under the
19  scenario that we are positing for the situation
20  the way it's designed, roughly seven times the
21  tax benefits of the amount that he gave to the
22  charity?
23     A.  Correct.
24     Q.  Whereas, if he had given them a
25  straight dollar cash, he would have got less

791

1  Mather - Direct
2  than a dollar-for-dollar basis of tax benefits,
3  right?  40 cents on the dollar?
4      A.  Yes, so it would be a $2 benefit, if
5  he gave them $5 in cash.
6      Q.  Okay.  That's uncommensurate, right?
7  I mean the benefit to Mr. McWilliam is
8  uncommensurate with the benefit to the
9  firefighters with the charitable donation?
10     A.  Absolutely.
11     Q.  And Mr. Burke says that doesn't
12  matter.  You say it does matter; is that right?
13     A.  I do.
14     Q.  Okay.  And the way this transaction
15  worked out, though, because Upper Deck made
16  more money than people expected, have you done
17  a similar calculation or can you do a similar
18  calculation -- you said $66 million in tax
19  benefits, right?
20     A.  That's the amount that the IRS
21  asserted as additional tax liability to
22  Mr. McWilliam for 2001 and 2002 combined.
23     Q.  And the -- if you look at the
24  $1.3 million donation to the firefighters,
25  that's 40 times?

792

1  Mather - Direct
2     CHAIRMAN BYRNE:  We can do the math.
3      A.  Yeah.
4      Q.  Okay.  It's big?
5      A.  Big.
6      Q.  And all of that is before we start
7  looking at what happens at the state level,
8  right?
9      A.  Correct.
10     Q.  Okay.  Now, you say you have had
11  personal experience litigating cases where
12  there is an uncommensurate relationship between
13  certain issues, right?  I cut you off a minute
14  ago when you were going to talk to me about a
15  case?
16     A.  One of the cases that's cited in the
17  coordinated issue paper was a case that I tried
18  on behalf of the taxpayers and lost, called the
19  Leslie case, and there very clearly in that
20  case was measurement of the benefit -- the tax
21  benefit versus the economic benefit in the
22  transaction.
23     It wasn't a case involving a
24  charity.  So you weren't looking at the benefit
25  to the charity.  You were looking at the profit

793

Mather - Direct

1
2  potential.  And in that case, the court very
3  meticulously went through the analysis of the
4  potential economic profit versus the tax
5  savings.
6       And also in that case, looked
7  specifically at the manner -- the transaction
8  costs related to the manner that the
9  transactions were done.  So that was certainly
10  one case in my personal experience that got --
11  in which that was done.
12    Q.   And that's a little different
13  because you are looking at a profit potential
14  versus charitable giving, right?
15    A.   Yes, absolutely.
16    Q.   But Mr. Burke, in his report, is the
17  one who made that substitution because he
18  couldn't find anything comparable to business
19  purpose or profit potential in this
20  transaction, right?
21    A.   Right, right.
22    Q.   Okay.  Now, are you aware of other
23  cases that have addressed the sort of disparity
24  that you are talking about, whether or not that
25  can be a basis to attack a transaction?

794

Mather - Direct

1
2    A.   Right.  Well, certainly, one of the
3  cases -- and I can't remember if this was cited
4  in the coordinated issue paper -- Sheldon vs.
5  Commissioner, very clearly establishes the
6  notion that if the real economics of the deal,
7  whether in that case again, a profit motivated
8  transaction involving trading securities, if
9  the economic potential is small in relation to
10  the claimed tax benefit, that that's absolutely
11  a factor that is taken into account, and can
12  serve as the basis for disallowing the
13  transaction as structured.
14       And that case, the Sheldon case, has
15  been cited on several occasions subsequently
16  for that proposition in cases dealing with tax
17  shelters that are maybe more typical or more
18  comparable to the one that we have here.  Not
19  again, a charity case, but other cases
20  involving business transactions.
21    CHAIRMAN BYRNE:  In effect, part of
22  what I'm hearing -- I probably just don't
23  understand it, but one of the problems
24  with the basic transaction was that it's
25  going -- it's 90 percent of the earnings,

795

Mather - Direct

1
2  90 percent of the profits, 90 percent of
3  the increase of profits are going to an
4  entity that's tax exempt.
5    THE WITNESS:  Yes.
6    CHAIRMAN BYRNE:  So by definition,
7  it's going to be benefit versus zero or
8  tax versus zero as set up.  10 percent.
9    THE WITNESS:  Yes.
10    CHAIRMAN BYRNE:  Tax on 10 percent
11  versus zero?
12    THE WITNESS:  That's absolutely a
13  feature of the transaction.
14    CHAIRMAN BYRNE:  All right.  Are you
15  then suggesting that -- when you talk
16  about tax shelters, they are -- not all
17  tax shelters, as you point out, deal with
18  charitable entities or tax exempts.  There
19  are other ways to do it.
20       Is that an inherent problem when you
21  use a tax exempt or a charity because the
22  disparity is always going to be there?
23    THE WITNESS:  Well, in terms of
24  having the issue of substance, I guess it
25  becomes -- it becomes a problem, if you

796

Mather - Direct

1
2  will, in maintaining the substance because
3  you don't really have two parties at
4  arms-length because one has to pay tax and
5  the other one doesn't.
6    CHAIRMAN BYRNE:  You don't have two
7  equal taxpayers.
8    THE WITNESS:  Yeah.
9    CHAIRMAN BYRNE:  They are at
10  arms-length, but you have two different
11  systems.
12    THE WITNESS:  So that causes greater
13  scrutiny of the transaction.  And then
14  where the tax shelter aspect of this comes
15  in, is in the way the transaction was
16  designed and structured so that the
17  economic benefit associated with that
18  income doesn't go to the charity.  That's
19  the tax shelter.
20    CHAIRMAN BYRNE:  Okay.  Thank you.
21    ARBITRATOR KRAMER:  I don't have the
22  record before me, but both Burke experts
23  had addressed the question of the
24  disparity, and they both said that there
25  were situations under the Code that --

797

Mather - Direct

1    where the disparity occurred, but it was
2    accepted.  The tax treatment was accepted
3    nonetheless, and I can look at the record
4    at some point.
5         THE WITNESS:  I did see that.
6         ARBITRATOR KRAMER:  Whether they are
7    historic credits and rehabilitation of
8    buildings, or whatever it happened to be.
9    How do you reconcile that with your
10   position that the disparity alone is
11   probably what will be looked at by the
12   courts?
13        THE WITNESS:  Well, I may have
14   overstated if I said the disparity alone
15   was the problem.  The disparity alone
16   dictates the outcome, if you will.  But
17   the basis of the case is that in essence
18   this -- these shares of stock that went to
19   the firefighters were unsaleable,
20   non-voting, didn't really have any
21   economic benefits associated with them at
22   all.  And that's -- that's the nub of the
23   problem there is that they were given
24   essentially a bald piece of paper.  And

798

Mather - Direct

1    structure of this transaction is that they
2    only get to participate in 5 percent of
3    that increase or decrease.  While they
4    purportedly are assigned 90 percent of the
5    tax burden, and if you analyze the
6    transaction that way, and you have to
7    because I don't think anybody argues that
8    it's anything different, then you end up
9    with such a large disparity between what
10   should happen, and what did happen, or
11   what was claimed that it just is -- it
12   just can't fly.
13        ARBITRATOR KRAMER:  So even with the
14   economic result of participation in the
15   increase or decrease in value, overall
16   value of the enterprise, the disparity
17   seems to be the determinative factor.
18        THE WITNESS:  Well, it's a critical
19   factor in this case.  There is no question
20   about that, and it's in part numbers.  And
21   the reason that the Upper Deck case is a
22   bad case if you are looking at it --
23   choosing one to try is the numbers got to
24   be really big, and you got $66 million,

800

Mather - Direct

1    from that plain piece of paper supposedly,
2    Mr. McWilliam saved $66 million.  And so
3    the result -- the courts are very much
4    result oriented in this area, and seeing
5    that result will cause the court to rule
6    against the taxpayer.
7         But they will rule based on an
8    analysis of factors that show that really,
9    there was no substance to this transaction
10   because even in the transactions that the
11   Burkes referenced, if you have a
12   transaction where there is no economic --
13   no economic substance to the way the deal
14   was structured, the result will not apply.
15        ARBITRATOR KRAMER:  And what if the
16   bald piece of paper, the way the
17   transaction was structured, permitted the
18   holder of those shares to participate in
19   the increase in value or decrease in value
20   of the corporation represented by the
21   stock?
22        THE WITNESS:  Well -- and you could
23   argue that it does in this case, but the
24   problem is -- the problem with the

799

Mather - Direct

1    and so it's offensive almost -- offensive
2    is probably too strong, but, you know,
3    it's problematic just because of the
4    numbers involved.
5         MR. WAHLQUIST:  Can I clarify the 66
6    because I think it's 88 that they owe the
7    federal government, isn't it?
8         THE WITNESS:  Well, 88 with
9    interest, 66 is the tax.  So you got, I
10   think, what some have referred to as the
11   accident, which is Upper Deck made all of
12   this income, and that wildly makes the
13   numbers even bigger, and the disparity on
14   a dollar basis even greater.
15        But the problem with the basic
16   structure in this case is that it's
17   designed to give 5 percent of the benefit
18   in exchange for taking 90 percent of the
19   tax.  That's the plan, and that's why it
20   fails.
21        CHAIRMAN BYRNE:  Assume everybody
22   knew that the earnings were going to
23   explode, what I hear you saying is --
24   nothing sure -- but if, at the time the

801

Mather - Direct

1
2  deal was -- if, at the time the -- I'm
3  going to call it the KPMG product -- was
4  entered into, anyone knew that the
5  earnings were going to explode, or whether
6  they knew the earnings were going to
7  explode or not, I almost hear you saying
8  that the KPMG product wouldn't work
9  because on any factual analysis of the
10  KPMG product, nobody goes into a tax
11  shelter if you think you are going to --
12  if you can't shelter a substantial amount
13  of your tax.  And if the disparity is
14  90 percent of earnings versus whatever it
15  is you give to the charity at the end of
16  18 months, your only hope is if you give
17  to the charity enough to offset the
18  disparity.
19      THE WITNESS:  I think that's right.
20  But in this case, you essentially have one
21  appraisal that says that number is
22  5 percent, and a provision in the contract
23  that says you are supposed to follow the
24  same methodology essentially.  So you are
25  going to get 5 percent again.

802

Mather - Direct

1
2  you attacking the 17 million on top of the
3  66 million in making your argument?
4      A.  No.
5      Q.  Why is that?
6      A.  I'm not -- I don't care --
7      CHAIRMAN BYRNE:  That's a different
8  government.
9      A.  It's a different government.  I
10  don't care if the taxpayer lives in California
11  or in Florida, where they have no state income
12  tax.  In this case, I don't need the state tax.
13      Q.  Fails in Nevada then, too?
14      A.  It fails in Nevada, too.
15      Q.  Where it's zero?
16      A.  Yeah, and I have not seen
17  typically -- and certainly in the cases that I
18  was involved in, we didn't do a state tax
19  analysis, also, but ...
20      CHAIRMAN BYRNE:  When you are in the
21  government, what is the attitude of the
22  taxpayer's argument?  "Hey, come on, guys.
23  The state is going to follow in lock step.
24  You can't hit me that hard because the
25  size of the welt is going to grow by

804

Mather - Direct

1
2      CHAIRMAN BYRNE:  Right.  So you're
3  walking into -- that's why I'm calling it
4  the KPMG product.
5      THE WITNESS:  Right.
6  BY MR. WAHLQUIST:
7      Q.  If we are looking at the benefits --
8  you have just been talking about the federal
9  benefit, right?
10      A.  That's right.
11      Q.  And there was a state -- there is
12  extra state taxes now owed because we moved the
13  income back from one taxpayer to the other,
14  right?
15      A.  Right.
16      Q.  How much is that?
17      A.  I haven't computed it, but typically
18  as a rule of thumb we use is that the state
19  benefit is a fourth of what the federal benefit
20  is in California, so an extra 15, 16,
21  17 million.
22      Q.  I thought it was 17.
23      A.  Okay, it could be.
24      Q.  So if you are going into court
25  representing the government in this case, are

803

Mather - Direct

1
2  15 percent.  You got to keep that in mind
3  or else you are going to put me out of
4  business."
5      THE WITNESS:  In my experience, the
6  response of the IRS is usually "Well, we
7  had better move quickly to get to you
8  before they do."
9      ARBITRATOR MOXLEY:  I'm sorry.  What
10  is the significance -- assuming that I
11  have -- my recollection is correct of the
12  fact that the Congress went back at some
13  point, and said "We are going to permit,
14  in the context of sub S corporations,
15  certain provisions as to charity that seem
16  to relate to, in one way or another, to
17  what has been done here.
18      THE WITNESS:  Right.  Well, I think
19  if you are looking at the Congressional
20  intent there, my view is that what they
21  had before is a restriction that
22  essentially prevented charities from
23  making this type of investment, and
24  Congress felt that was overly restrictive,
25  and that it would be appropriate for a

805

EXHIBIT  2 , PAGE  770

Mather - Direct

1  charity, in the right circumstances, to
2  actually invest in the stock of an entity
3  like this.
4      But I think as you can see from the
5  case here, and probably the testimony of
6  the firefighters, and you know, nobody was
7  looking at this as an investment.  This
8  was taking something on the fly.  They
9  would agree to except this pretty piece of
10 paper and maybe they would get some money
11 out of it down the road.
12     And you know that, in itself, I
13 think is a pretty telling statement of
14 what the substance of this transaction is.
15 If you are looking for substance over
16 form, and I believe that one of the panel
17 members was suggesting this in the first
18 half of the proceeding, is that how is
19 this any different than just some kind of
20 a pledge to give some money at some point
21 in the future?
22     Because that's really what happened
23 here in terms of economics is -- again to
24 harken back to my days at the IRS -- my

806

Mather - Direct

1  here?
2      And that would be, like I just
3  mentioned, what really happened here is we
4  promised to pay them some money at some point,
5  and we did.  So it involves more of a
6  determination of well, if it didn't happen the
7  way that we said that it happened, then what
8  did happen?
9      And so that's kind of the
10 distinction I would draw between substance over
11 form is there usually is involved a conclusion
12 of what did happen.  In economic substance,
13 they say okay, nothing of substance happened
14 the way you said it did.  We don't really care,
15 you know, I mean -- and there wasn't anything
16 else.  I mean this was a deal that was -- whose
17 only purpose was to create the tax benefits.
18     Q.   As I understand the IRS's argument
19 in Part A, substance over form, they are saying
20 well, if something did happen, you didn't give
21 them a charitable donation.  You paid them an
22 accommodation fee to facilitate tax avoidance;
23 is that correct?
24     A.   Right.  That's their position.

808

Mather - Direct

1  theory was always when I was evaluating
2  these deals and I looked at 30 or 40 of
3  them of similar kinds, is that you follow
4  the money if you want to know what the
5  economic substance is, and that's not
6  exactly a sophisticated argument, but it
7  usually works.
8  BY MR. WAHLQUIST:
9      Q.   The coordinated issue paper, you
10 indicated you had reviewed that?
11     A.   Yes.
12     Q.   The coordinated issue paper in
13 discussing the grounds for disallowing the
14 allocation of income issue identifies two
15 doctrines.  A Doctrine A, substance over form
16 doctrines, and Doctrine B, economic substance
17 doctrines.  Do you know that?
18     A.   Yes.
19     Q.   Is there a difference in your mind
20 between those two?
21     A.   There is a little difference.  In
22 substance over form, usually something
23 happened.  And so the challenge or the inquiry
24 is to determine well, what really happened

807

Mather - Direct

1      Q.   Did you see an analysis of that
2  position in either of the Burkes' reports?
3      A.   No.
4      Q.   And that was the IRS's Position A?
5      A.   Position A, yeah.
6      Q.   There have been different terms used
7  in these proceedings to point out the fact that
8  quite a number of SC squared transactions took
9  place.  I think "template deal" was used, and
10 Mr. Burke had his own reference to that.  But
11 the idea that there was 58 of these SC squared
12 transactions, and the number might affect how
13 these cases would come out?
14     A.   Yes.
15     Q.   Have you seen that reference?
16     A.   I have seen the reference.
17     Q.   Now, Mr. Burke says -- described
18 that in his testimony as a "wild card he wasn't
19 sure how to assess."
20     A.   Right.
21     Q.   How would you assess it if you
22 could?
23     A.   Well, I believe even Mr. Burke
24 acknowledged that it wasn't a good thing, which

809

upper deck-aig arb

EXHIBIT  2  PAGE  771

Page  806 - 809

Mather - Direct

1 Mather - Direct
2 I think obviously, you must. But particularly
3 if you are looking at potentially litigating in
4 the tax court, who acknowledges this kind of
5 gatekeeper function. The notion that there
6 would be a lot of these cases out there that
7 could be affected by the impact in one case
8 would be something that would be extremely
9 negative.
10    Q.   You have, in your testimony today,
11 talked about the prospects for success in court
12 on the SC squared transaction. And the way I
13 understood your testimony, I understood you to
14 be addressing the allocation of income issue?
15    A.   Correct.
16    Q.   Did I --
17    A.   Correct, so far.
18    Q.   -- okay. And would you look at some
19 of the issues differently than that?
20    A.   Oh, well, the second issue is the
21 second class of stock issue which the -- that
22 being that something in this transaction caused
23 there to be a second class of stock, and that
24 would disqualify Upper Deck's S corporation
25 election.

810

1 Mather - Direct
2    I have looked at that, and I believe
3 that there is a good likelihood in that case
4 that the taxpayer would prevail somewhere, I
5 would say, in the middle.
6    Q.   Would you expect that might be
7 affected by the template nature of the
8 transaction in any way?
9    A.   Well, again, the reality in these
10 cases is that they are very much end driven.
11 And so if you come in with the allocation
12 argument, and the court reacts in the manner
13 that I'm convinced they would react, then you
14 have the second issue of is that going to taint
15 or impact your chances on the second class of
16 stock issue?
17    And I think there is a good
18 likelihood that that could have a very negative
19 effect on that issue. And more specifically, I
20 think that what the government's ultimate
21 position in these cases is likely to be, is
22 that that share certificate had -- you know
23 that piece of paper was nothing more than a
24 piece of paper, and that the formula that was
25 implemented in the Put, which was essentially

811

1 Mather - Direct
2 appraising it in a vacuum without looking at
3 really what this -- what the benefits and
4 burdens of this piece of paper were -- ends up,
5 I think under the regulation, gives the
6 government a decent argument to prevail on
7 that.
8    Number one, it was primarily
9 intended to avoid the one class of stock or the
10 second class of stock issue. And number two,
11 that it establishes a value that's materially
12 different than the real fair market value.
13    CHAIRMAN BYRNE:  Isn't that -- what
14 I also hear you saying, however, is that
15 the second class of stock issue being an S
16 corp. shareholder's worse nightmare is the
17 IRS's biggest club to reach some
18 compromise on the first issue. It's like
19 we are all big boys and girls. If you
20 don't settle with me, I'm going to go with
21 you on two fronts, and your worst
22 nightmare is the second front, your status
23 as an S shareholder.
24    Is that being unreasonable from the
25 IRS's point of view?

812

1 Mather - Direct
2    THE WITNESS:  No, I think that's a
3 fair characterization of what they are
4 doing, number one. The point at which I
5 would differ from, at least Linda Burke --
6 and I can't remember specifically what
7 Robert Burke said on this -- is that
8 that's a genuine risk.
9    I think there is a chance the
10 government could prevail on that. They
11 wanted to dismiss the argument as being
12 totally specious, and I just don't think
13 that it is. I think there is a general
14 actual risk of losing that issue if you
15 don't settle the case.
16    CHAIRMAN BYRNE:  And that's the kind
17 of franchise -- excuse the expression --
18 but that's the kind of franchise issue
19 that is rare that someone wants to win or
20 lose.
21    THE WITNESS:  Right. It's quite
22 rare. I think I mentioned in my report,
23 it's very atypical of the typical tax
24 shelter situation because usually, all you
25 lose is your benefits.

813

EXHIBIT 2, PAGE 772

Mather - Direct

1
2      CHAIRMAN BYRNE:  That's what --
3   yeah.  That's right.
4      THE WITNESS:  But here, you could
5   have a bigger loss.  You could have the,
6   you know, the catastrophic event.  So in
7   terms of evaluating whether you settle or
8   not, you have to take that into account.
9      ARBITRATOR MOXLEY:  What is the
10   extent of that loss if you lose it?  If
11   you lose the status during the period
12   where a particular investment is relevant,
13   or all times going forward?
14      THE WITNESS:  You lose it for when
15   it happens, and the succeeding -- I
16   believe it's five years before you can
17   elect S status again.  So you have a
18   five-year period where you have got double
19   tax essentially.
20   BY MR. WAHLQUIST:
21      Q.  And that begins with the creation of
22   the second class of stock?
23      A.  Yes.
24      Q.  Which is the 2001 transaction?
25      A.  That would be the 2001 transaction.

814

Mather - Direct

1
2      Would you -- can you put a number on
3   that?
4      A.  I think the chance of success on the
5   Upper Deck transaction, assuming that the
6   December 2002 transaction had not occurred, is
7   substantially less than 10 percent.  I'm
8   personally of the view that there is no such
9   thing as a 100 percent case, but you get close
10   with this one in my view.
11      So I don't think there is a material
12   difference between that chance of success and
13   the chance of success when they did -- when
14   they did -- the way they actually did it.
15      Q.  Now, have you had occasion to deal
16   with appraisals and fair market issues in tax
17   market litigations?
18      A.  Many times.
19      Q.  I thought I heard you say that the
20   appraisal methodology and the fair market value
21   appraisal didn't come to fair market value.
22      Did I hear you say that earlier?
23      A.  That's my opinion, yes, in this
24   case.
25      Q.  Can you explain why?

816

Mather - Direct

1
2      Q.  In your opinion, would the IRS still
3   have challenged Upper Deck's and
4   Mr. McWilliam's SC squared transaction if they
5   had not -- if there had been no December 2002
6   repurchase?
7      A.  Absolutely.
8      Q.  And in your opinion, would the
9   settlement offer extended by the IRS in April
10   of 2005, have been the same, regardless of
11   whether or not the December 2002 transaction
12   took place?
13      A.  It would have been identical.
14      Q.  Can you comment on whether or not
15   the 2002 transaction affected the prospects for
16   the SC squared transaction in this case
17   standing up in litigation?
18      A.  I think I may have already mentioned
19   the chance of success was negligible, and it
20   can't have a material effect on a negligible
21   chance.  I guess if you have a 2 percent chance
22   of success, what does it go to, 1.5?
23      Q.  Well, I guess that's going to be my
24   next question.  I did it with Mr. and
25   Mrs. Burke.  So I will do it with you.

815

Mather - Direct

1
2      MR. KUSHNER:  I don't think this is
3   in the report, and I would like to be
4   enlightened.
5      CHAIRMAN BYRNE:  We don't have to go
6   into that for all intents and purposes.
7   This is not witness to question him on
8   that.
9      MR. WAHLQUIST:  I will withdraw the
10   question.
11      CHAIRMAN BYRNE:  Sustained.
12   BY MR. WAHLQUIST
13      Q.  Now, Mr. McWilliam did not claim a
14   charitable deduction on his 2002 tax return?
15      A.  That's correct.
16      Q.  Oh, excuse me, his 2001 tax return?
17      A.  That's correct.
18      Q.  Or his 2002?
19      A.  Or his 2002 tax return.
20      Q.  Could he have claimed it in 2002?
21      A.  He could have claimed it in -- the
22   benefit of it in 2002.
23      Q.  Could he have claimed it in any
24   other years?
25      A.  Well, the reason -- Mr. McWilliam's

817

EXHIBIT 2, PAGE 773

Oct 30 arb hearing  10/30/2006  10:25:00 AM

```
                Mather - Direct
 1
 2    2001 return, he had negative taxable income
 3    so -- negative adjusted gross income.  So any
 4    amount claimed as a charitable contribution in
 5    that year, he wouldn't have had a benefit from.
 6    But he gets to carry it forward, and so if
 7    there was a point at which his income became
 8    positive, and if that was today, then he would
 9    still be able to claim that.
10         Obviously, now that he settled, he
11    can't claim it.  But for the settlement, he
12    would be in a position to claim that whenever
13    his income crossed over -- his adjusted gross
14    income crossed over to the positive.
15         CHAIRMAN BYRNE:  So he would have
16    been able to claim, as a charitable
17    deduction, the then fair market value of
18    the piece of paper he gave to the Austin
19    Firefighters Fund?
20         THE WITNESS:  Right.  If you were --
21    except if the deal survived, and there was
22    really a charitable contribution there, it
23    would have occurred in 2001 when he handed
24    over the piece of paper, and he could
25    claim it whenever he could use it
```

818

```
                Mather - Direct
 1
 2    Upper Deck's prospects of succeeding in
 3    litigation in the tax court?
 4    A.   No.
 5    Q.   No?
 6    A.   No.
 7    Q.   You have reviewed the policy?
 8    A.   Yes.
 9    Q.   And have you reviewed the provisions
10    of the policy that address something called an
11    "offsetting benefit"?
12    A.   Yes.
13    Q.   And you have reviewed those portions
14    of Mr. Burke's report that address offsetting
15    benefit as well, right?
16    A.   Yes.
17    Q.   Okay.  In your opinion, have there
18    been any offsetting benefits?
19    A.   No, and I don't believe in
20    Mr. Burke's opinion, there have been any
21    offsetting opinions.
22    Q.   Can you elaborate on that?
23         CHAIRMAN BYRNE:  It's not an issue.
24    A.   An offsetting benefit --
25         CHAIRMAN BYRNE:  Burke didn't say
```

820

```
                Mather - Direct
 1
 2    essentially.
 3    BY MR. WAHLQUIST:
 4    Q.   You are alluding to the $1.3 roughly
 5    million figure --
 6    A.   Right.
 7    Q.   -- of the fair market value equal --
 8    assuming that's fair market value?
 9    A.   I will say FMV.
10    Q.   FMV.  Okay.
11    A.   Yes, the appraisal.  Just to
12    clarify, that's not to suggest that I agree
13    that 1.3 was really fair market value.
14    Q.   It's nominal -- I understand.
15         CHAIRMAN BYRNE:  Whatever it was.
16         THE WITNESS:  Whatever it was.
17    BY MR. WAHLQUIST:
18    Q.   Now, the -- in your opinion, did
19    Mr. McWilliam's not taking a charitable
20    deduction for the tax year 2001 for that
21    donation to the Austin Firefighters affect the
22    way he was treated by the IRS in any manner?
23    A.   Not in any manner.
24    Q.   In your opinion, does his not having
25    taken that deduction, did it diminish his or
```

819

```
                Mather - Direct
 1
 2    there was a -- both sides agree.  In their
 3    writing, both experts agree that there was
 4    no offsetting benefit.  That's what I
 5    read.  No?
 6         MR. KUSHNER:  In my understanding of
 7    Mr. Burke's report is that since he didn't
 8    know Mr. McWilliam's tax basis, he was
 9    unable to say whether there was an
10    offsetting benefit.
11         CHAIRMAN BYRNE:  Unable to say
12    whether there was an offsetting --
13         MR. KUSHNER:  Yes.
14         CHAIRMAN BYRNE:  -- okay.  I didn't
15    mean to overstate.
16         MR. KUSHNER:  That's okay.
17    BY MR. WAHLQUIST:
18    Q.   Can you elaborate on the likelihood
19    of there ever being an offsetting benefit?
20    A.   Well, there is a theoretical
21    possibility that at some day there could be an
22    offsetting benefit.  But in one of the memos
23    that Mr. Burke himself authored, that was
24    provided to me within the last week, he
25    suggests that it's more theoretical than real.
```

821

upper deck-aig arb                    EXHIBIT 2, PAGE 774                    Page  818 - 821

Mather - Direct

1
2  Q.   Those were his words?
3  A.   Close to it.  That's the substance
4  of it.
5      ARBITRATOR KRAMER:  Is that so, even
6  if he sells the company?
7      THE WITNESS:  If he sells the
8  company, that's an event where it could
9  matter.  But again, if he sells it before
10  he dies and he gets a basis step up -- I
11  mean there are so many events that could
12  cause that not to matter that it's really
13  speculative.
14      Mr. Burke's precise analysis was
15  that this is a potential issue that is
16  probably manageable by the company so that
17  it may never -- may never even occur.
18      MR. KUSHNER:  If Mr. Wahlquist wants
19  to offer that document in evidence, I
20  certainly have no objection.
21      MR. WAHLQUIST:  Let me just ask
22  this.
23  BY MR. WAHLQUIST:
24  Q.   As we sit here today, are you aware
25  of any offsetting benefit that has been

822

Mather - Direct

1
2  realized as a result --
3  A.   No.  No.
4      MR. WAHLQUIST:  I have nothing
5  further.
6      CHAIRMAN BYRNE:  Let's go off the
7  record for a moment.
8      (Discussion off the record.)
9      CHAIRMAN BYRNE:  We will take our
10  lunch break now.  It is now 12:35.  Please
11  be back here at 1:30.  We have a number of
12  things to do.  We are going to finish your
13  testimony.  We are then going to go
14  through a couple of other procedural
15  matters that have come to my attention,
16  including our scheduling.  Even though you
17  are technically on cross or about to go on
18  cross, no prohibition.  You can talk to
19  whomever you want.  Just don't talk about
20  your testimony.  See you in 55 minutes.
21      (Luncheon recess taken at
22  12:35 p.m.)
23
24
25

823

Mather - Direct

1
2      AFTERNOON SESSION
3      (Time noted:  1:35 p.m.)
4  STEVEN RAY MATHER, resumed
5      and testified as follows:
6  CROSS-EXAMINATION
7  BY MR. KUSHNER:
8  Q.   Mr. Mather, I'm going to read you
9  from page 12 of your report, and I'm going to
10  ask you if that is still your opinion.
11      "As was true with most 1990s
12  'technical' tax shelters, the SC squared
13  transaction probably does not run afoul of any
14  statutes or regulations.  The SC squared
15  transaction was tailored to fit precisely
16  within the literal language of the statutes and
17  regulations."
18      Is that still your opinion, sir?
19  A.   That's right.
20  Q.   And reading to you from your
21  rebuttal report, page 4:
22      "As is typical with the vast
23  majority of tax shelter legal opinions issued,
24  the legal analysis is substantially correct,
25  but simply has nothing to do with the economic

824

Mather - Cross

1
2  reality of the transaction.  The SC squared
3  transaction may possess the least economic
4  substance of any transaction in the history of
5  tax shelters."
6      Is that still your opinion, sir?
7  A.   That's right.
8  Q.   Now, let's turn to the economic
9  benefits or economic reality.  Is it fair to
10  state that the critical issue, as you see it,
11  is whether any "economic benefits inured to the
12  Austin Firefighters as a result of its
13  ownership of the shares"?  That's from page 15
14  of your report.
15  A.   Well, any?
16  Q.   Would you like the question reread,
17  sir?
18  A.   Yes.
19      CHAIRMAN BYRNE:  No.  You know what
20  would be more useful, respectfully?  Put
21  the two reports in front of him.
22      ARBITRATOR MOXLEY:  What's the
23  exhibit number of the rebuttal report?
24      MR. KUSHNER:  There was no exhibit
25  number.  We got them too late, both sides,

825

upper deck-aig arb

EXHIBIT Z  PAGE 775

Page 822 - 825

Mather - Cross

2  to mark them.
3      THE WITNESS:  Which page was it?
4      MR. KUSHNER:  Page 15, last
5  paragraph.  This is the main report.
6      ARBITRATOR MOXLEY:  Does anybody
7  have an extra copy of the rebuttal report,
8  by the way?
9      MR. WAHLQUIST:  I can probably print
10  one for you later today.
11      CHAIRMAN BYRNE:  Okay.  Go ahead.
12      A.  Okay.  I see that it says "It's
13  important to examine," is that what you are
14  referring to?
15      Q.  Yes.  Yes.  You also refer to the
16  substance of the Austin Firefighters non-voting
17  stock as the critical issue.  That's the same
18  paragraph, sir?
19      A.  Yes, yes.
20      Q.  And is it your opinion that this is
21  a very fact-intensive inquiry?
22      A.  Yes.
23      Q.  As a matter of fact, the coordinated
24  issue paper stated, didn't it, that you had
25  a -- I'm quoting, "You had to conduct a certain

826

Mather - Cross

2  analysis of the facts to see whether the true
3  substance of the transaction is different from
4  its form, or whether the form reflects what
5  actually happened"?
6      A.  Okay.
7      Q.  It sounds fair?
8      A.  That's fair.
9      Q.  And also, it involves an intensive
10  factual inquiry, doesn't it?
11      A.  That's true.
12      Q.  Now, would you agree that in this
13  case, the stockholders agreement conferred an
14  economic benefit on Austin if its stock
15  increased in value?
16      A.  You are referring to the original --
17  the March 2001 agreement?
18      Q.  Yes, sir.  I'm referring to --
19      CHAIRMAN BYRNE:  Take that as a
20  given.  Whether he agrees or not, it
21  conveyed an economic benefit to the Austin
22  Firefighters.
23      MR. KUSHNER:  It's part of
24  Exhibit 104, and I think it's in that
25  binder we put before you.

827

Mather - Cross

2      CHAIRMAN BYRNE:  Okay.  All right.
3  You know what?  I don't think it's
4  necessary.
5      MR. KUSHNER:  Well, I'm going to be
6  asking a lot of questions about this
7  stockholders agreement.
8      CHAIRMAN BYRNE:  I'm not sure I'm
9  going to let you because he is not -- put
10  it in front of him, if you want.  Let's
11  see how it goes.  Put it in front of him
12  because it says what it says.  It was
13  intended to do what it was intended to do.
14      And the answer to your first
15  question is -- did the share of stock --
16  was the share of stock intended, intended,
17  to convey an economic benefit to the
18  Austin Firefighters, which I believe was
19  your first question.
20      MR. KUSHNER:  I hate to disagree
21  with the Chairman.  My question was
22  whether this conferred an economic
23  benefit.
24      CHAIRMAN BYRNE:  And the answer to
25  either question is yes.

828

Mather - Cross

2      MR. KUSHNER:  Thank you.
3  BY MR. KUSHNER:
4      Q.  Now, is it also correct that that
5  benefit was conferred by the Put exercisable at
6  appraised fair market value, which commenced a
7  little over two years after the date of the
8  shareholders agreement?
9      A.  No.
10      Q.  Oh, really, sir.  Would you like to
11  look at Section 5?  You did look at Section 5,
12  didn't you?
13      CHAIRMAN BYRNE:  Mr. Kushner, it
14  says what it says.  Why did you say no?
15      THE WITNESS:  I understood his
16  question to be that the source of the
17  economic benefit was paragraph 5, and
18  that's not the source.
19  BY MR. KUSHNER:
20      Q.  Was it a source?
21      A.  It could have been a source, yes.
22      Q.  Were there other sources in this
23  shareholders agreement of possible economic
24  benefit to Austin?
25      A.  Well, there was a right of first

829

Mather - Cross

1   Mather - Cross
2   refusal, and that could confer economic benefit
3   if it was exercised.  On the premise that if it
4   were matched, then some benefit could go to the
5   charity from the purchase of the shares.
6      Q.   Were there any other sources of
7   possible economic benefit in this shareholders
8   agreement benefit to Austin?
9      A.   I don't recall.
10     Q.   Take a look at Exhibit 7, please,
11  which is -- did we put that binder in front of
12  you?  We didn't?
13     A.   Yeah, I think I have 7.
14     Q.   No, I had a thinner binder.  We
15  haven't distributed that?  I'm sorry.
16     MR. KUSHNER:  (Handing.)
17     CHAIRMAN BYRNE:  Okay.
18  BY MR. KUSHNER:
19     Q.   Would you agree with Mr. Frydman,
20  quoting from Exhibit 7, which is his e-mail of
21  December 13, 2000 to various persons, I'm going
22  down to Subitem B about half way down the first
23  page, "As a practical matter, the redemption or
24  'Put' right in favor of the tax exempt entity
25  shares increases the value of the non-voting

830

1   Mather - Cross
2   be refused at the time of the Put.  And at
3   the time of the Put, there is a high value
4   placed on the shares that are being bought
5   back, right?
6      THE WITNESS:  Right.
7      CHAIRMAN BYRNE:  Remember, economic
8   benefit to the charity.  How the value is
9   placed on those shares per the shareholder
10  agreement is by a fair market value
11  analysis/appraisal.  Okay?
12     THE WITNESS:  Okay.
13     CHAIRMAN BYRNE:  So we go back to
14  the question.  Per the shareholders
15  agreement, the economic value of the Put
16  is to be determined by a fair market
17  value/appraisal of the shares?
18     THE WITNESS:  Correct.
19     CHAIRMAN BYRNE:  Okay, let's go from
20  there.  The higher the price, the higher
21  the economic value.  Go.
22  BY MR. KUSHNER:
23     Q.   You do know, don't you, that
24  Mr. McWilliam considered that Put to have
25  substantial economic benefit?

832

1   Mather - Cross
2   shares, potentially by a very significant
3   amount."
4      Would you agree with that statement?
5   "Which in turn means that the value of the
6   charitable contribution by the contributing
7   shareholders will be greatly enhanced."
8      A.   So in concept, I would not agree.
9   But as a practical matter, what really happens,
10  I probably would agree because I think it sets
11  an artificial value.
12     CHAIRMAN BYRNE:  Let's keep using
13  the same terms.  One, again, Byrne's --
14  the panel does not sleep in the park
15  theory.  You have got a closed
16  corporation.  If there is value to the
17  Austin Firefighters, it comes from the Put
18  because the right of first refusal, I
19  would be shocked if the right of --
20  nonelectrically shocked -- if the right of
21  first refusal comes into play at any point
22  in time, all right?
23     So it's the Put that gives it value.
24  The Put has value to the charity.  If
25  there is an absolute right, the Put can't

1   Mather - Cross
2      MR. WAHLQUIST:  Lack of foundation.
3      CHAIRMAN BYRNE:  To the share -- to
4   the -- he would have to.  His intent would
5   have to be to provide an economic benefit
6   to the charity.
7      THE WITNESS:  But I don't know if
8   that was in his mind from the Put.
9      CHAIRMAN BYRNE:  Thank you.
10  BY MR. KUSHNER:
11     Q.   Have you looked at Exhibit 171 --
12  that's in -- everything I refer to, unless I
13  say otherwise, is in the binder I have put
14  before you.
15     CHAIRMAN BYRNE:  Okay.  It's the
16  resolution of the Board of Directors.
17  BY MR. KUSHNER
18     Q.   Have you seen this resolution
19  before?
20     A.   Yes, I have.
21     Q.   It was part of your review?
22     A.   Yes.
23     Q.   Isn't it clear from that resolution,
24  and from the share purchase agreement that
25  followed, that Mr. McWilliam wished to

833

EXHIBIT _2_, PAGE _777_

Mather - Cross

1   Mather - Cross
2   extinguish Austin's Put?
3       MR. WAHLQUIST: I object.
4       CHAIRMAN BYRNE: Sustained. It says
5   what it says. If the Put was extinguished
6   by virtue of that agreement, it calls for
7   a legal conclusion in any event. And with
8   all due respect to the legal expertise of
9   this witness, stay away from my territory.
10      MR. KUSHNER: I would just argue
11  that if the shareholder deemed this
12  material -- this Put provision, that is
13  some evidence that it was material.
14      CHAIRMAN BYRNE: Such is the
15  presumption. Accepted.
16  BY MR. KUSHNER:
17      Q. I would like to discuss with you
18  some other parts of the shareholders agreement,
19  which is part of Exhibit 104.
20      A. Is that in the small binder?
21      Q. It should be in the small binder.
22      ARBITRATOR KRAMER: It's in the
23  pocket.
24      CHAIRMAN BYRNE: In the pocket,
25  right up front.

834

1   Mather - Cross
2       A. Okay. All right. I have it.
3       Q. Did you consider, in arriving at
4   your opinion, that what Austin got was a piece
5   of paper that in any sale of Upper Deck, that
6   sale would be subject to Austin's Put right if
7   it was then exercisable? I'm referring to
8   Section 6.1 captioned "General."
9       CHAIRMAN BYRNE: Section 6 was
10  designed to protect the Put. That's why
11  they call it a "drag-along right." Okay,
12  so if Austin Firefighters -- if someone
13  bought out Upper Deck, Austin Firefighters
14  still had an exercisable right against the
15  new owner. Is that the basis?
16      MR. KUSHNER: Yes, sir.
17      CHAIRMAN BYRNE: And therefore, the
18  Put or the share of stock nonetheless had,
19  or was intended to have, economic value to
20  the charity. Every one of the panel
21  agrees with it --
22      ARBITRATOR MOXLEY: Subject to
23  whether or not it's available after the
24  Put expired.
25      CHAIRMAN BYRNE: Subject to whether

835

1   Mather - Cross
2   or not it's available after the Put
3   expired.
4       MR. KUSHNER: I did qualify the
5   terms by using the language "if then
6   exercisable."
7       CHAIRMAN BYRNE: Yes, absolutely.
8   That was just to show that the other
9   members of the panel are a hell of a lot
10  more smarter than I am. Go ahead.
11  BY MR. KUSHNER:
12      Q. In arriving at your opinion that
13  what Austin received was a piece of paper, did
14  you consider the fact that if the voting
15  shareholder of Upper Deck agreed to sell the
16  company in whole or in part, then each
17  shareholder was entitled to receive the same
18  consideration per share as each other
19  shareholder, irrespective of whether or not
20  such shares were voting or non-voting shares?
21  I'm referring to Section 6.2(a) and (b). Did
22  you consider those provisions, sir?
23      A. Yes.
24      Q. And of course, they didn't influence
25  your opinion that this was a mere piece of

836

1   Mather - Cross
2   paper that Austin was getting?
3       MR. WAHLQUIST: Argumentative.
4       A. It didn't change my opinion.
5       Q. And if Mr. McWilliam exercised his
6   warrant to purchase Upper Deck voting common
7   shares while Austin was a shareholder, wasn't
8   that an economic benefit to Austin?
9       A. It was non-voting shares, I believe.
10      Q. That's correct, sir.
11      A. Could you repeat that question?
12      MR. KUSHNER: Shall I, or will
13  Ms. Gilmore repeat it?
14      CHAIRMAN BYRNE: The answer is yes.
15      MR. KUSHNER: Her voice is so much
16  more enchanting than mine.
17      CHAIRMAN BYRNE: Do we really have
18  to confer on that, or can we agree?
19      (Record read.)
20      MR. WAHLQUIST: Incomplete
21  hypothetical.
22      THE WITNESS: Obviously, it was
23  non-voting.
24      CHAIRMAN BYRNE: Yes. I'd be
25  willing to determine, I believe I think we

837

Mather - Cross

1
2  all would, that any time that Austin got
3  something of value would -- whether it be
4  a negotiable instrument, a transferrable
5  instrument, a saleable instrument, cash,
6  negotiated check, that Austin Firefighters
7  got something of value, and that it
8  conveyed -- "it" whatever "it" was, the
9  cash, the blah, blah, blah, blah, blah
10  conveyed an economic benefit to Austin
11  Firefighters.  So let's move on.
12      THE WITNESS:  But in this instance,
13  at least by design, the warrants were, I
14  believe, intended to be dilutive, and
15  therefore, may have been a negative
16  consequence to the firefighters.
17      CHAIRMAN BYRNE:  Listen to the
18  question.
19      THE WITNESS:  Okay.
20      CHAIRMAN BYRNE:  Benefit to Austin
21  Firefighters who put out nothing for this
22  transaction.
23      THE WITNESS:  Right.  But as I
24  understood the question, it was with the
25  exercise of the warrants, conferred

838

Mather - Cross

1
2  A.  Yes.
3      Q.  Would you also agree that if Austin
4  did not exercise its Put and held its stock,
5  then sooner or later, McWilliam would need a
6  distribution, and Austin would also be entitled
7  to a distribution?
8  A.  I don't know that.
9      Q.  Pardon me?
10  A.  I don't know that he would be ever
11  required to make a distribution.
12      Q.  The word wasn't "required."  The
13  word was "need" to make a distribution.
14  A.  I don't know that he would ever need
15  to make a distribution.
16      Q.  Are you aware of the fact that in
17  2003, Mr. McWilliam made a distribution to
18  himself from Upper Deck of about $75 million?
19  A.  I've read that, yes.
20      Q.  And that doesn't affect your
21  opinion?
22  A.  No.
23      Q.  Are you aware of any case authority
24  holding that a court will weigh the nontax
25  economic consequences of a transaction against

840

Mather - Cross

1
2  economic benefit on the firefighters.  And
3  I think specifically with respect to the
4  warrants, the answer was probably no
5  because they are diluted, even though
6  there is an enhancement of value of the
7  company, there is a dilution in their
8  interests of a greater -- once the
9  warrants are exercised.
10      CHAIRMAN BYRNE:  Fair enough.
11  BY MR. KUSHNER:
12      Q.  Well, you do know, don't you, that
13  Fair Market Value Inc. appraised the non-voting
14  shares as if the warrants, in fact, did dilute
15  those shares?
16  A.  Correct.  Correct.
17      Q.  Have you calculated the amount of
18  money McWilliam would have to pay Upper Deck in
19  order to exercise his 82,800,000 warrants at
20  .148 per share?
21  A.  I believe that was 12 and a quarter
22  million, give or take.
23      Q.  We agree on that at least.  And the
24  value of Austin shares would appreciate if the
25  additional money was put into Upper Deck?

839

Mather - Cross

1
2  the tax consequences, and will disregard the
3  transaction because the tax consequences are
4  greater than the nontax consequences?
5  A.  Certainly, there is a number of
6  cases that would hold that.
7      Q.  Are they cited in your report, in
8  your rebuttal report?
9  A.  I don't believe so.
10      Q.  Are you aware that there is indeed
11  authority in the form of court decisions, which
12  have rejected the approach of weighing the
13  nontax consequences against tax consequences?
14  A.  I believe there would be -- I don't
15  know one of those cases offhand, but I believe
16  there is probably a case out there that would
17  do that.
18      CHAIRMAN BYRNE:  Or two or three.
19      THE WITNESS:  Or two or three.
20  BY MR. KUSHNER:
21      Q.  In your report at page 16, you
22  contend that Austin shares were unable to
23  realize any economic benefits because they were
24  non-voting, had no ability to compel
25  distributions, had no ability to compel

841

EXHIBIT   2 , PAGE  779

Mather - Cross

1
2  liquidations, and could not be freely sold due
3  to a right of first refusal?  The question is
4  whether you still hold that opinion?
5      A.   I do.
6      Q.   And if your analysis is correct,
7  then would you agree that no holder having a
8  non-voting minority interest in a closely-held
9  corporation would be respected as the owner of
10  its shares for Federal Income Tax purposes?
11      A.   No, I don't.
12      Q.   And why don't you?
13      A.   Because in the normal situation, the
14  purpose of the transaction that was
15  implemented, does not carry with it the burden
16  of paying the tax without the economic benefit
17  that is commensurate with that tax.
18      Q.   And how do you determine that
19  purpose, sir?
20      A.   The purpose, as stated in this
21  transaction, was that nominal ownership of the
22  stock would be given to the firefighters,
23  justifying an allocation of 90 percent of the
24  income to the firefighters, when by design,
25  there was only a 5 percent economic benefit

842

Mather - Cross

1
2  associated with that ownership.
3      Q.   Are you aware of any court decisions
4  which refused to allocate income in accordance
5  with the percentage of stock ownership?
6      CHAIRMAN BYRNE:  That's awfully
7  broad.
8      A.   Off the top of my head, I'm not sure
9  if I do.
10      Q.   If Upper Deck had been a C
11  corporation rather than an S corporation, is it
12  your opinion that the transfer of the
13  non-voting common shares to Austin would have
14  had economic substance so as to be respected
15  for Federal Income Tax purposes?
16      A.   Yes.  There would be a valuation
17  issue, but yes.
18      Q.   And the difference between one and
19  the other is that one was an S corporation, is
20  that it?
21      A.   Essentially.
22      Q.   In your report but not your
23  testimony this morning, you spoke of an
24  assignment of income ground for challenging
25  this Subchapter SC2 transaction?

843

Mather - Cross

1
2      A.   Yes.
3      Q.   Do you still have that opinion?
4      A.   Yes.
5      Q.   And there is nowhere in the
6  April 2004 IRS listing notice, which refers to
7  that ground for challenging the transaction, is
8  there?
9      A.   I don't believe there is.
10      Q.   And there is nowhere in the
11  coordinated issue paper of November 2004 where
12  the IRS says it will challenge the SC2
13  transaction on the assignment of income ground,
14  is there?
15      A.   I don't believe there is.
16      Q.   Do you know of any court decisions
17  which will use that ground, the assignment
18  income ground, to pierce the ownership by a
19  company?  In other words, where the company
20  owns the asset, the court will nevertheless
21  hold that it's not -- it's not entitled to the
22  benefits of ownership?
23      A.   Yes, there are cases.
24      Q.   Are they cited in your report, sir?
25      A.   At least one of them is.

844

Mather - Cross

1
2      Q.   Which one is that, sir?
3      A.   Do you know which page the
4  assignment of income discussion is?
5      Q.   I'm searching for it, too.  I will
6  see if I can find it.
7      A.   Yes, it's on the top of page 15, the
8  Blaire case.
9      Q.   Well, that's interesting because you
10  cite Blaire for the proposition that the
11  doctrine; namely, assignment of income, also
12  requires the income from property to be
13  reported by the party that beneficially owns
14  the property?
15      A.   Correct.
16      Q.   And is it your opinion, and in this
17  case, Austin did not beneficially own the
18  non-voting shares?
19      A.   That's right.
20      Q.   And what do you base your opinion
21  on, sir?
22      A.   That all of the vestiges of
23  ownership, as I set forth in my report, were
24  essentially retained and not conveyed to Austin
25  with the piece of paper.

845

Mather - Cross

1           Mather - Cross
2    Q.   And the vestiges of ownership you
3  refer to are what?
4    A.   Voting rights, rights to participate
5  at distributions, right to participate in
6  liquidation, ability to have any -- realize any
7  economic benefit, other than potentially by the
8  implementation of the shareholders agreement or
9  a repurchase, whether it's under the
10  shareholders agreement or otherwise.
11    Q.   Under your analysis in the case of
12  any closely-held corporation, wouldn't
13  beneficial ownership of non-voting shares which
14  are nonmarketable be held by the majority or
15  controlling shareholder?
16    A.   No.
17    Q.   And why is that, sir?
18    A.   The difference in this case is that
19  to obtain any economic benefit from those
20  shares in theory -- let's say by sale, which is
21  one way, or the other -- the only way to
22  realize economic benefit on this, you have to
23  have a buyer.  And in the context of most
24  closely-held corporations, there is some price
25  at which a buyer would materialize and pay

846

1           Mather - Cross
2  listed, weren't there?
3    A.   That's correct.  I don't believe any
4  of those ever purchased shares.
5    CHAIRMAN BYRNE:  You were asked
6  whether or not a charity -- a potential
7  buyer that made any sense would be another
8  tax exempt entity.  The question then
9  becomes whether, and at what price, that
10  other tax exempt entity would buy a
11  shareholder of Austin Firefighters.
12    THE WITNESS:  Correct.  In
13  exercising their fiduciary obligations and
14  investment responsibilities.
15    CHAIRMAN BYRNE:  And what they would
16  be buying is that which Austin has.
17  BY MR. KUSHNER:
18    Q.   You testified this morning about a
19  second class of stock ground for challenging
20  the SC2 transaction.
21    A.   Yes.
22    Q.   And is it your opinion that the Fair
23  Market Value Inc. appraisal of the value of the
24  non-voting shares given to Austin was outside
25  of the Safe Harbor regs?

848

1           Mather - Cross
2  something.  So there is at least the
3  opportunity for economic benefit.
4    By design in this case, if you took
5  the piece of paper from the Austin
6  Firefighters, you ostensibly took with it the
7  obligation to report 90 percent of the taxable
8  income of Upper Deck.
9    And that was a number that was -- an
10  amount that was grossly in excess of any
11  economic benefit that there could have been
12  from ownership of the stock.  And so therefore,
13  there was no -- there was no purchaser.  There
14  was no way to sell and realize economic
15  benefit.
16    Q.   Let's stay with that for a while.
17  Was there anything to prevent Austin from
18  selling its shares, subject to the right of
19  first refusal, to another charity that was tax
20  exempt?
21    A.   No, it could have done that if
22  somebody would have wanted to pay for it.
23    Q.   As a matter of fact, in the schedule
24  you spoke about this morning in having had seen
25  it, there were two other tax exempt charities

847

1           Mather - Cross
2    A.   You need to be more specific.
3    Q.   Well, if you want to, I will refer
4  you to the KPMG opinion, which recites the Safe
5  Harbor regulations and the Fair Market Value
6  Inc. appraisal.  Would that help you any?
7    A.   Well, there is at least two
8  different issues relating to the appraisal for
9  Safe Harbor regulations.  There is the
10  warrants, the valuations of the warrants, and
11  then there is the valuation essentially -- it's
12  relevant essentially with respect to the Put,
13  and those are two different issues.
14    Q.   Your opinion -- I'm sorry.  I didn't
15  mean to interrupt you.
16    A.   No, no.  So I would need to know
17  which one you are talking about.
18    Q.   All right.  Let's talk about the
19  Fair Market Value Inc. opinion directed to the
20  value of the warrants.
21    A.   Okay.
22    Q.   Is it your opinion that that
23  appraisal was vulnerable?
24    A.   I don't believe it was vulnerable
25  with respect to the warrants.

849

Oct 30 arb hearing  10/30/2006  10:25:00 AM

**Page 850**

Mather - Cross

2  Q.   But it's your opinion that it was
3  vulnerable with respect to the non-voting
4  shares?
5  A.   That's correct.
6  Q.   And why is that?
7  A.   Because with respect to the
8  warrants, let's see if I -- I should probably
9  look at the provision.  But you only ran afoul
10  of the Safe Harbor provision for the warrants
11  if they established -- if the appraisal or the
12  formula established a value that was less than
13  the true fair market value.
14      With respect to the Put, it could
15  be -- it could run afoul of the Safe Harbor if
16  it was less or more.  And it's my belief that
17  the Fair -- the FMV report established a value
18  that was more than true fair market value.
19  Q.   In that respect, was a fair market
20  value appraisal an important safety measure in
21  coming within the Safe Harbor regulations?
22  A.   Yes, I think it was.
23  Q.   And the transaction, as actually
24  carried out in December 2002, lacked that
25  appraisal, didn't it?

**Page 852**

Mather - Cross

2  procedural grounds, we settled.  So there was
3  not an opinion ultimately on the economic
4  substance issue.
5  Q.   Is that the decision or series of
6  decisions where you were attacking the parallel
7  investigation or prosecution launched both by
8  the IRS and by the US Attorney's Office?
9  A.   That's correct.
10  Q.   And that's the issue you lost on?
11  A.   We lost on that issue, and a statute
12  of limitations issue, and I think another issue
13  before we settled.
14  Q.   Do you remember what year that
15  decision or decisions was in?
16  A.   I think the trial was at the end of
17  '99 and the beginning of 2000, and the opinions
18  probably came out in 2000 or 2001.
19  Q.   The April 2004 IRS notice, listing
20  notice, does cite Leslie as you pointed out on
21  page --
22      MR. KUSHNER:  May I have just a
23  moment, please?
24      CHAIRMAN BYRNE:  Sure.
25      MR. KUSHNER:  Thank you.

**Page 851**

Mather - Cross

2  A.   That's irrelevant.
3      CHAIRMAN BYRNE:  The answer is yes.
4  A.   It lacked the appraisal.  Yes, you
5  are correct.
6      CHAIRMAN BYRNE:  Other experts have
7  left this room bruised.  You do not
8  particularly want to be in that position.
9      THE WITNESS:  I apologize.
10      CHAIRMAN BYRNE:  That's quite all
11  right.
12  BY MR. KUSHNER:
13  Q.   Some clarifying questions.  You left
14  the IRS when?
15  A.   December 1987.
16  Q.   And after you left the IRS, have you
17  had any tax shelter cases which involved the
18  issue of economic substance?
19  A.   Yes.
20  Q.   What were those?
21  A.   The Leslie case that I mentioned
22  previously dealt with economic substance.  I
23  also tried a -- I had a four-month trial of a
24  tax shelter group called the Amcore
25  Partnerships that, after several losses on

**Page 853**

Mather - Cross

2  (Pause.)
3  BY MR. KUSHNER:
4  Q.   Mr. Stroili has corrected me.  The
5  coordinated issue paper, rather than the
6  April 2004 IRS notice, and that coordinated
7  issue paper is Exhibit 274, it cites Leslie on
8  the page Bates Stamped AI0009889 near the
9  bottom as a "See also" with a parenthesis
10  "Deduction disallowed for fees paid to purchase
11  deductions in tax-motivated transaction, citing
12  Brown."
13      That is the decision you referred
14  to, sir?
15  A.   That's correct.
16  Q.   And that went up to the Eleventh
17  Circuit, was it?
18  A.   Ninth.
19  Q.   Ninth Circuit, okay, thank you.
20      You did say that you had reviewed
21  the IRS offer of settlement with Mr. McWilliam?
22  A.   That's correct.
23  Q.   And is it fair to state that that
24  offer of settlement was virtually a complete
25  concession by the taxpayer, except for some

EXHIBIT 2, PAGE 782

Mather - Cross

1
2 small transaction costs?
3     A.   And the concession by the IRS of the
4 second class of stock issue.
5     Q.   You view that that concession by the
6 IRS on the second class of stock issue
7 indicated the weakness IRS had in that
8 position?
9     A.   No, they were alternative arguments,
10 and I think they were stronger on the
11 reallocation issue than on the second class
12 issue.
13     Q.   Would you agree that the decision of
14 a taxpayer whether or not to accept the IRS
15 offer was affected by the strength of the
16 particular taxpayer's case?
17     MR. WAHLQUIST:  Too general.
18     CHAIRMAN BYRNE:  Melissa, read that
19 back.
20     Q.   Well, you are a litigator.  You so
21 testified?
22     A.   Well, I don't understand the
23 question.
24     CHAIRMAN BYRNE:  Wait a second.
25     (Record read.)

854

Mather - Cross

1
2     Q.   Do you have any doubt that the IRS
3 review showed that Austin's Put was
4 extinguished by the share purchase agreement?
5     MR. WAHLQUIST:  Objection.
6     CHAIRMAN BYRNE:  Overruled.
7     THE WITNESS:  I'm sorry.  Read that
8 one again.
9     CHAIRMAN BYRNE:  Do you understand
10 that the share repurchase agreement
11 extinguished the Put?
12     THE WITNESS:  Do I understand, or do
13 I understand the IRS understands?
14     CHAIRMAN BYRNE:  Do you understand
15 that it did?
16     THE WITNESS:  Yes.
17     CHAIRMAN BYRNE:  Then it's
18 unanimous.
19 BY MR. KUSHNER:
20     Q.   Please take a look at Exhibit 281, a
21 copy of a letter dated December 9, 2004 from
22 Mr. Sax at the Orrick firm to Mr. Holfield,
23 H-O-L-F-I-E- L-D, at the IRS, and specifically,
24 at page 5 of that letter.
25     CHAIRMAN BYRNE:  What's the exhibit

856

Mather - Cross

1
2     A.   Yes, I would agree that would always
3 be true.
4     Q.   Did you review the information
5 document requests served by the IRS on Upper
6 Deck?
7     A.   I reviewed many of them at least.
8     Q.   And did you review the summons
9 served by the IRS on Austin?
10     A.   No.
11     Q.   Did you review the summons served by
12 the IRS on KPMG?
13     A.   Not the summons, no.
14     Q.   Did you determine that the IRS was
15 furnished with a share purchase agreement dated
16 December 31 -- dated as of December 10, 2002?
17     A.   I didn't confirm that they received
18 it.  I'm sure that they were provided a copy.
19     Q.   And are you also sure that the IRS
20 was provided with the December 2002
21 correspondence exchanged among Mr. Farno,
22 Mr. Bendheim, Mr. Stefka, and Mr. Kendall?
23     A.   I don't know.
24     Q.   Did you look at that correspondence?
25     A.   I don't recall.

855

Mather - Cross

1
2 again?
3     MR. KUSHNER:  It's Exhibit 281, page
4 5.
5     Q.   The third paragraph from the bottom.
6     A.   I see that.
7     Q.   Did you read that letter as part of
8 your review?
9     A.   Probably.
10     Q.   Well, Mr. Sax states in part "In
11 November and December of 2002, UDC, its
12 counsel, KPMG, and the pension plan exchanged
13 communications regarding UDC's repurchase of
14 shares and the documentation relating to that
15 repurchase.  Those documents are included with
16 this response."
17     The question is whether you reviewed
18 those documents?
19     A.   I don't have a specific recollection
20 one way or the other.
21     Q.   Referring to the documents in the
22 paragraph I just read, are you able to state
23 that those documents did not hurt Upper Deck's
24 SC2 case?
25     A.   Yes, they did not.

857

EXHIBIT _Z_, PAGE _793_

Mather - Cross

1       Mather - Cross
2       Q.  Well, you don't even remember
3    reviewing testimony, or am I misstating your
4    testimony?
5       A.  My testimony is essentially that any
6    issues relating to the repurchase didn't hurt
7    SE -- or didn't hurt Upper Deck's case.
8    Therefore, these didn't.
9       Q.  Even though you don't remember
10   reviewing those documents?
11      A.  Even though I don't remember
12   reviewing them.
13      CHAIRMAN BYRNE:  I understood you to
14   be saying that it made no difference --
15   that Upper Deck was a dead duck?
16      THE WITNESS:  That's correct.  They
17   were dead from the getgo.  So the
18   repurchase didn't matter.
19      CHAIRMAN BYRNE:  Well, no.  Here is
20   what I want to ask you.  Define "getgo."
21   Upper Deck was a dead duck from the time
22   they entered in the tax shelter -- from
23   the time they bought the product -- I'm
24   going to call it product -- from KPMG, or
25   they were a dead duck as soon as their

858

1       Mather - Cross
2    earnings went up?
3       THE WITNESS:  The increase in
4    earnings didn't make them a dead duck.
5    They were a dead duck before.
6       CHAIRMAN BYRNE:  So they were a dead
7    duck from the minute they bought the
8    product?
9       THE WITNESS:  They were.
10      CHAIRMAN BYRNE:  Because?
11      THE WITNESS:  Because the generic --
12   even the generic transaction, the totally
13   generic transaction will not succeed
14   because of the way that it was designed to
15   allocate 90 percent of the income for
16   5 percent of the value.
17      CHAIRMAN BYRNE:  And the only way it
18   could have survived from anyone who bought
19   the product is under a situation where
20   90 percent of the earnings -- there was a
21   loss, there was no earning --
22      THE WITNESS:  I could envision the
23   scenario like that.
24      CHAIRMAN BYRNE:  -- or there was a
25   balance between the buyout and earnings.

859

1       Mather - Cross
2       THE WITNESS:  Right.  But by design,
3    there wasn't, yes.
4       CHAIRMAN BYRNE:  Thank you.
5       THE WITNESS:  If I could elaborate
6    on that.  Upper Deck -- as the accident in
7    the Upper Deck transaction of the
8    increased earnings made the numbers
9    bigger, but didn't change the
10   relationships and the percentages.
11      CHAIRMAN BYRNE:  No, I understood
12   that.
13   BY MR. KUSHNER:
14      Q.  Mr. Stroili wants to know whether if
15   the Yu-Gi-Oh stream of income had continued,
16   and the fair market appraisal under the Put was
17   $50 million, would that affect your opinion?
18      A.  For that to happen, the value of the
19   company would have had to have been 20 times
20   $50 million.  And in that scenario, it wouldn't
21   change my opinion.
22      Q.  Now, would you agree that the test
23   of economic substance requires a court to
24   determine what actually happened in the
25   transaction?

860

1       Mather - Cross
2       A.  That's typical, yes.
3       Q.  And then those are the words of the
4    coordinated issues paper, aren't they?
5       A.  Could be.
6       Q.  Would you also agree to use Supreme
7    Court's holding in Frank Lyco vs. The United
8    States, that the court's test in determining
9    economic reality was to determine "what
10   actually occurred"?
11      A.  Yes.
12      Q.  In the present case, would you agree
13   that what actually happened is shown by the
14   December 2002 events concerning the termination
15   of Austin's Put?
16      A.  Yes, that's what happened.
17      Q.  The tax court, I think you said,
18   consisted of 23 judges?
19      A.  19.
20      Q.  Is it your testimony that all of
21   them are result oriented?
22      A.  It's my experience.
23      Q.  And there is no right to jury trial,
24   is there, in tax court?
25      A.  That's correct.

861

Mather - Cross

1
2  Q.  Are you aware that the Orrick
3  correspondence in this case indicates a plan to
4  seek a refund for the 2001 year and to file
5  suit in district court?
6      MR. WAHLQUIST:  I object.  You've
7  got to show him the document.
8      A.  I will accept it as a hypothetical.
9      Q.  Well, no, out of respect for
10  Mr. Wahlquist --
11      CHAIRMAN BYRNE:  Make a
12  representation.  Is that what it said or
13  not?  I'm looking at you, Mr. Wahlquist?
14      MR. WAHLQUIST:  I don't know whether
15  or not it said that.
16      CHAIRMAN BYRNE:  Okay, that's fair.
17      MR. KUSHNER:  (Handing.)
18      CHAIRMAN BYRNE:  Okay.  This is an
19  exhibit.  I will do it this way.  Take a
20  look at that letter.  Have you ever seen
21  that letter before?
22      THE WITNESS:  No.
23      CHAIRMAN BYRNE:  Mr. Kushner and
24  Mr. Wahlquist, are we confident that we
25  don't have a disclosure of confidential

862

Mather - Cross

1
2  asked them first, Mr. Kushner.  I thought
3  it was only fair.  I'm not worried about
4  the confidentiality in this case.  God
5  forbid, I'd be accused of being fair, but
6  we have no problem here.  So go ahead.
7  Take a look at it and ask your question.
8      MR. KUSHNER:  The question was he
9  didn't -- the question drew the answer he
10  hasn't seen it before.  I don't need to
11  ask any more about it.
12      CHAIRMAN BYRNE:  Okay.  Oh, what the
13  hell.  He read it.  Go ahead.  Ask him a
14  question.
15      MR. KUSHNER:  No, I won't.
16      CHAIRMAN BYRNE:  I have a question
17  in terms of some of the court cases,
18  decisions I have seen on appeals of tax
19  court decisions.
20      From your experience, both at the
21  IRS and in private practice on the West
22  Coast, was the Ninth Circuit the least
23  favorite place for the IRS to be appealed?
24      THE WITNESS:  No, certainly not.
25      CHAIRMAN BYRNE:  Most favorite, ran

864

Mather - Cross

1
2  information here?  God forbid, a
3  privileged question here?
4      MR. KUSHNER:  We do have a
5  confidentiality agreement in this
6  proceeding.
7      CHAIRMAN BYRNE:  I understand, but
8  this witness has not seen it before, which
9  doesn't bother me as much as you have got
10  lawsuits out there with this firm, and we
11  have got privilege claims, so put
12  confidentiality aside.  Do you still want
13  to show him?  Okay with you if we show him
14  this letter?
15      MR. WAHLQUIST:  Oh, this witness,
16  yeah.
17      MR. KUSHNER:  I might note I mean my
18  non-party witnesses were asked to sign
19  onto the confidentiality agreement so...
20      CHAIRMAN BYRNE:  It becomes a
21  privilege issue when they have a lawsuit,
22  and a different kind of confidentiality
23  issue when they have a lawsuit, as I
24  understand it, against this firm.  "They,"
25  pointing to respondent, and that's why I

863

Mather - Cross

1
2  the gamut?
3      THE WITNESS:  In the middle, I would
4  say in the middle.  The Fifth Circuit,
5  Texas, would be the most taxpayer friendly
6  I think by almost any reckoning.
7      CHAIRMAN BYRNE:  Thank you.  That's
8  what I was getting at.
9  BY MR. KUSHNER:
10      Q.  There is a right to jury trial in a
11  refund suit in district court, isn't there?
12      A.  That's correct.
13      Q.  I think this morning, you
14  characterized the $2 million treatment in the
15  settlement with the IRS as a payment of a fee?
16      A.  Yes, I believe I said that.
17      Q.  Would you care to agree that it was
18  not payment of a fee, but it was a payment used
19  to increase Mr. McWilliam's tax basis in the
20  stock he acquired, the non-voting shares?
21      A.  Certainly, that was the effect of
22  the closing agreement, yes.
23      Q.  Thank you.
24      CHAIRMAN BYRNE:  The bottom line was
25  it was not treated as a charitable

865

EXHIBIT  2 , PAGE 785

Mather - Cross

1
2 deduction?
3     THE WITNESS:  No deduction.
4     CHAIRMAN BYRNE:  Charitable
5 contribution?
6     THE WITNESS:  Right.
7 BY MR. KUSHNER:
8     Q.   In your report at page 11, the last
9 sentence of the first full paragraph, you state
10 that "After clarification of one issue, the
11 Upper Deck parties intend to submit the signed
12 closing agreement to the IRS."
13     A.   Yes.
14     Q.   What was that one issue?
15     A.   That was the issue that you
16 discussed, the treatment of the $2 million
17 payment.
18     Q.   Which I take it, Mr. McWilliam
19 wanted to use to increase his tax basis?
20     A.   That's correct.  They wanted to
21 clarify -- as I understood it, they wanted to
22 clarify in the agreement -- in the closing
23 agreement itself, that it was treated as a
24 purchase of the shares by the MPR Trust, not a
25 redemption by the corporation.

Mather - Cross

1
2 a charitable contribution and becomes an
3 improper way of sheltering excess income.
4     THE WITNESS:  I think that's fair.
5     CHAIRMAN BYRNE:  Is part of the way
6 I put it.
7 BY MR. KUSHNER:
8     Q.   Would you agree that Mr. McWilliam,
9 at the time that the stock -- the non-voting
10 stock was transferred to Austin, did not have
11 an intent to donate that stock, then the
12 transaction was doomed to fail?
13     A.   It was doomed to fail anyway, but
14 that -- a donative intent would be helpful.
15     CHAIRMAN BYRNE:  It's important but
16 not dispositive.  It's a factor.
17     THE WITNESS:  In my view, it is a
18 factor.  It is not a dispositive factor in
19 this case.
20 BY MR. KUSHNER:
21     Q.   To turn it around a bit, is it a
22 dispositive factor against the SC2 transaction
23 if the donative intent was lacking at the
24 beginning?
25     MR. WAHLQUIST:  Too general.

Mather - Cross

1
2     Q.   This morning, you referred to the
3 transaction involved here as a deal whose only
4 purpose was to generate tax benefits?
5     A.   I don't remember saying that, but if
6 you say I did.
7     Q.   Is that an opinion you have as you
8 sit here now?
9     MR. WAHLQUIST:  It's too general.
10     CHAIRMAN BYRNE:  It's kind of
11 general, but I think the way -- I will ask
12 it a little different way.
13     The SC squared transaction would
14 have little value other than to
15 successfully shelter 90 percent of the
16 earnings of the company?
17     THE WITNESS:  Right.  I would agree
18 with that.
19     CHAIRMAN BYRNE:  Meaning it's not
20 being done -- it might have -- it may
21 always have some value as a charitable
22 contribution?
23     THE WITNESS:  Yes.
24     CHAIRMAN BYRNE:  But only to the
25 extent that it doesn't lose its nature as

Mather - Cross

1
2     CHAIRMAN BYRNE:  It is general, but
3 wouldn't you say that if, from the getgo,
4 there was no intent to make a charitable
5 deduction of any kind -- a charitable
6 contribution of any size, of any amount,
7 the SC squared was doomed to failure if
8 the IRS determined that there was no
9 donative intent?
10     MR. WAHLQUIST:  I'm sorry.  With
11 respect to the charitable donation issue,
12 the allocation income issue?
13     CHAIRMAN BYRNE:  Donative intent
14 with respect to -- if you remember the
15 absence of any donative -- absence of any
16 donative intent was likely to doom an SC
17 squared transaction.
18     Ladies and gentlemen, this whole
19 thing depended -- depended upon sheltering
20 the income through a charitable
21 institution for value.  The value of the
22 donative intent was the first issue.  The
23 disparity between the benefit and --
24     THE WITNESS:  Okay.
25     CHAIRMAN BYRNE:  -- and the value is

Mather - Cross

1
2    different.
3        THE WITNESS:  Yeah.  Certainly, if
4    it were determined as a fact that the sole
5    purpose for the payment of the $2 million
6    was to get the tax benefit, then you would
7    lose.
8        MR. KUSHNER:  May I have just two
9    minutes?  I'm almost done.
10        CHAIRMAN BYRNE:  Certainly.
11        (Discussion off the record.)
12        MR. KUSHNER:  I have no further
13    questions.
14        MR. WAHLQUIST:  Can you give me five
15    minutes?
16        CHAIRMAN BYRNE:  Yes.
17        (Recess taken.)
18        CHAIRMAN BYRNE:  Any questions?
19        MR. WAHLQUIST:  Yes, two lines of
20    inquiry.
21    REDIRECT EXAMINATION
22    BY MR. WAHLQUIST:
23        Q.   You were asked about whether or not
24    you recalled reviewing certain documents that
25    were transmitted to the IRS and IDR responses

870

Mather - Redirect

1
2        Q.   In your opinion, does it matter
3    where this case is litigated as to the outcome?
4        A.   No, my opinion was not based on
5    exclusively tax court.  In my view, the chance
6    of success is essentially the same in any
7    court.
8        MR. WAHLQUIST:  No further
9    questions.
10        MR. KUSHNER:  I have no questions.
11        CHAIRMAN BYRNE:  A question that I'm
12    probably just not clear about.  As I
13    understand the focus of your differences
14    with the Burkes is, that the Burkes seemed
15    to stop at economic substance of the
16    contribution and how you arrived at it.
17        It had to be an appraisal of the
18    company, fair market value, valuing the
19    Put, or the repurchase, or the right of
20    first refusal "fairly" in quotes.  And if
21    you determine that the economic substance
22    of the transaction between the donee and
23    donor, it can stop there.  What I hear you
24    say -- you can basically stop there.
25        What I hear you saying is, for all

872

Mather - Redirect

1
2    pertaining to the December 2002 transaction.
3        Do you recall that testimony?
4        A.   Yes, I do.
5        Q.   Do you recall reviewing some
6    documents that pertain to that transaction?
7        A.   Yes, I reviewed some.
8        Q.   Just answer the question.
9        A.   Yes.
10        Q.   Did you review the testimony in this
11    proceeding of Mr. Stefka, Mr. Kendall, and
12    Mr. McWilliam pertaining to that transaction?
13        A.   Yes, I did.
14        Q.   Are you still of the opinion that
15    the December 2002 transaction does not impact
16    the outcome of any litigation pertaining to the
17    SC squared transaction involved here?
18        A.   I'm still of the opinion that it
19    does not change that outcome.
20        Q.   And the -- you were asked some
21    questions on cross by Mr. Kushner about
22    potential plans to litigate a refund claim in
23    district court.
24        Do you recall that?
25        A.   Yes.

871

Mather - Redirect

1
2    intents and purposes, you can never stop
3    there.  When it comes to a tax shelter
4    situation, whether it's SC squared or it's
5    any tax shelter, the old real estate tax
6    shelters, the doctor's best friend, the
7    building in the Bronx, whatever it might
8    be, you can never stop at the economic
9    substance argument.  You must always go to
10    the tax benefit, for want of a better
11    word, of the donor.
12        As in this case, you would always
13    have to look at what tax benefit did the
14    donor get by sheltering 90 percent of the
15    income, by getting rid of an asset while
16    it was appreciating in value, whatever the
17    case may be.  You never stop at the
18    economic substance or the donative intent
19    of what was received by, or what was
20    intended to be given to the donee?
21        THE WITNESS:  I think that's a fair
22    characterization.  You can't look at just
23    what the firefighters got, and somehow is
24    focusing on that alone, you say okay,
25    there was substance in this transaction.

873

EXHIBIT 2, PAGE 787

Mather - Redirect

1
2    CHAIRMAN BYRNE:  Or how they got it.
3    THE WITNESS:  Right.  I think
4  that's -- I think that the Burkes kind of
5  get at their conclusions from different
6  perspectives, but I think that's a fair
7  characterization of our difference in at
8  least one respect, yes.
9    CHAIRMAN BYRNE:  I'm not saying
10  that's the only one.
11    THE WITNESS:  Right.  All right.
12  Thank you.
13    CHAIRMAN BYRNE:  No, no, go ahead.
14    THE WITNESS:  Well, I mean clearly,
15  there was an economic --
16    CHAIRMAN BYRNE:  When I open the
17  door, you can.
18    THE WITNESS:  Okay.  There was an
19  economic change of position here if you
20  want to reduce it to its essence.  I mean
21  $2 million changed hands, and $2 million
22  is real money.  So...
23    CHAIRMAN BYRNE:  And $11 million is.
24    THE WITNESS:  More money.
25    CHAIRMAN BYRNE:  Could have

874

Mather - Redirect

1
2  market value.  If, after whatever the fair
3  market value was 15 million, whatever, in
4  '02.
5    THE WITNESS:  Okay.
6    CHAIRMAN BYRNE:  That, as designed
7  and implemented with that result, while it
8  may have had the intended result of
9  sheltering for a while earnings,
10  90 percent of the earnings, if scrutinized
11  singularly or in a pack, the Upper Deck
12  transaction would not pass muster.  I kind
13  of hear you saying that.
14    THE WITNESS:  That's absolutely
15  correct is that if everything was perfect,
16  they still lose.  They still lose.  It was
17  designed, in my view, without economic
18  substance, designed without economic
19  substance.
20    CHAIRMAN BYRNE:  Because it was
21  designed for maximum tax benefit, and
22  that's the way it was sold.
23    THE WITNESS:  It was designed to
24  confer 90 percent tax benefit in exchange
25  for 5 percent economic benefit, and that

876

Mather - Redirect

1
2  exchanged hands, and it was more money
3  or --
4    THE WITNESS:  Right.
5    CHAIRMAN BYRNE:  -- or $25 million,
6  whatever it was that changed hands, you
7  still have to take a look at -- I don't
8  want to say the purpose of the
9  transaction, but what also happened during
10  that tax benefit.
11    THE WITNESS:  To look at claims tax
12  benefit, you have to look at the claims
13  tax benefit because if you were arguing
14  that the deduction was $800,000 and should
15  have been $600,000, that's a lot different
16  than saying the tax benefit was
17  $66 million for that.
18    CHAIRMAN BYRNE:  Because -- again, I
19  will try and do it this way.  What I hear
20  you saying is that you would not put much
21  faith in a successful defense contest of
22  the KPMG product, even if it worked --
23  even it was carried out in the manner in
24  which it was intended to be carried out.
25  If, after 18 months, there was a fair

875

Mather - Redirect

1
2  will never prevail anywhere.
3    CHAIRMAN BYRNE:  Okay.  I kind of
4  heard that.
5    ARBITRATOR MOXLEY:  Mr. Kramer
6  earlier had made the point, I think, that
7  one or the other of the Burke witnesses
8  had given some examples of areas where
9  they said that things had seemed
10  counterintuitive, that having the
11  potential to work, end up working.
12    And their point was, you know, it
13  may not seem right that you could have
14  this big disparity here between the
15  benefit that the taxpayers or someone
16  associated with them ostensibly could get
17  and the amount of the charity -- the
18  amount that the charity gets.
19    That there's all kinds of areas, and
20  I just went through my notes, and I just
21  have sort of references to them.  I don't
22  have enough that I can really address the
23  areas, but maybe you can.  The examples
24  that I see references to were short sales
25  against the box.  There were references to

877

EXHIBIT  2 , PAGE  798

Mather - Redirect

1  a number of partnership transactions where
2  you have a disparity between ownership and
3  allocation, and there is a reference to
4  ESOPs, employee plans.
5      THE WITNESS:  Right.
6      ARBITRATOR MOXLEY:  I don't know if
7  these -- just naming these, what I think
8  were examples, gives you enough to respond
9  because I think it will be helpful for us
10  to hear your side of this.
11      But first of all as a general
12  proposition, is the point fair that there
13  are in the law a number of instances where
14  you have a kind of disparity, and it
15  appears to be generally withheld -- upheld
16  or not yet knocked down.
17      THE WITNESS:  Well, there have been
18  instances where you could argue there is a
19  gap in the law, and a favorable result can
20  be obtained in an individual case.  And
21  then often what happens is, if that result
22  is upheld on appeal, Congress comes in and
23  changes the law, says that's not what we
24  meant.

878

Mather - Redirect

1      There would be instances like that.
2  One of them I cited in my own report in
3  the Gitlitz case, which involved
4  essentially the creation of basis as a
5  result of a cancellation of indebtedness
6  situation for an S corporation.  It was
7  kind of a complicated case.  It went all
8  the way up to the Supreme Court.  The
9  Supreme Court blessed it, and Congress
10  immediately changed the law and said
11  that's not what we meant.
12      So instances, you know, like that
13  have occurred.  I mean lightening can
14  strike in a particular place.  This is not
15  a situation in which that is a viable
16  alternative -- a viable outcome because
17  this can easily be addressed under the
18  long-standing judicial doctrines, like
19  economic substance and substance over
20  form, and just say there is nothing here.
21      I mean usually, those cases rely on
22  very technical interpretations of kind of
23  borderline aspects of statutes, and that's
24  really not so much the case here.

879

Mather - Redirect

1      The case here is that they designed
2  a transaction where they took this piece
3  of paper that was a share of stock, and
4  peeled off everything they could that made
5  it real shares of stock, and said "Oh,
6  well, we get all of these extraordinary
7  benefits, notwithstanding all we have is
8  this transparent piece of paper."
9      And that is -- that's as old as time
10  in terms of the tax shelter areas.  There
11  is nothing new, nothing gray area, about
12  that.  Those are the kinds of cases really
13  more so than even kind of the technical
14  '90s tax shelters.
15      That's more like the kind of
16  shelters that I was fighting when I was at
17  the IRS in the '80s where there is just
18  nothing happening in this realm of
19  90 percent ownership of the partner that
20  makes any economic sense here.
21      ARBITRATOR MOXLEY:  I mean you have
22  the 2 million or the 11 million, but you
23  are saying that's not enough because you
24  need the balance.

880

Mather - Redirect

1      THE WITNESS:  Absolutely.  I mean,
2  you know, we are not dealing with a
3  technical gray area here.  We are dealing
4  with a situation in which there is a
5  transaction that is remarkably baldfaced
6  in its design to remove all of the benefit
7  from the firefighters, and leave them with
8  this piece of paper they can do nothing
9  with, other than give it back later, and
10  then you will figure out what you are
11  going to pay him.
12      CHAIRMAN BYRNE:  Is the situation
13  made worse by -- in your opinion, by
14  virtue of the fact that it was generically
15  designed?  That it was not designed for a
16  particular company with particular
17  earnings or particular potential or blah,
18  blah, blah, blah, blah?  It's like here is
19  the product.  Here is what the product is
20  going to do.  Implement the product and
21  that puts 57 of them out there, as opposed
22  to one.
23      THE WITNESS:  It's -- that's not --
24  it is worse because of that, but it's a

881

1   Mather - Redirect
2   loser for one.
3       ARBITRATOR MOXLEY:  Is there a
4   potential, if you get into a bunch of
5   cases being litigated in tax court and
6   district court, notwithstanding what we
7   have heard that the Service tries to
8   settle.  Indeed, there is a statute for
9   settling cases on equal basis.
10      But when you get into litigation,
11  does that take over?  And so if you have a
12  set of facts that has elements that are
13  favorable to the taxpayer, that there is a
14  potential to litigate -- or for settlement
15  along the way, get into it?
16      THE WITNESS:  No.  And here, it
17  would matter because if this were one deal
18  and one alone, then there would be a
19  possibility for getting a better deal down
20  the road.
21      But -- because it's a listed
22  transaction, it has been identified by the
23  IRS, and there were the 58 total
24  transactions, the IRS policy which is
25  virtually inviolate, in my experience,

882

1   Mather - Redirect
2   which is when we make an offer, that's the
3   best offer you get.
4       And if you want to take it further,
5   they only get worse from here on, and that
6   is sacrosanct to the IRS.  It's more
7   important than the outcome of an
8   individual case.
9       Now, the only exception to that
10  would be on an issue that really isn't
11  relevant to us here, would be the
12  penalties because they will always
13  recognize differences on penalties.  If
14  you went to your own attorney and have him
15  look at this deal, and he blessed it, then
16  you have a much better case on the
17  penalties than you do for the guy that
18  just took the KPMG opinion, you know, the
19  guy that you were -- who was chasing after
20  you to get into this deal.
21      So that matters on penalties and
22  there aren't really any hard and fast
23  rules on the penalties with the respect to
24  the underlying tax itself.
25      ARBITRATOR MOXLEY:  They really

883

1   Mather - Redirect
2   stick with it?
3       THE WITNESS:  They stick with it.
4       ARBITRATOR KRAMER:  I have a
5   question.
6       Much was made by the Burkes of the
7   fact that between the first announcement
8   from IRS regarding the SC2 transaction, to
9   the time of the position paper was three
10  years or so.  It was inordinately long.
11      Do you have an explanation for why
12  it took so long if this is as old as time
13  and no gray area?
14      THE WITNESS:  Well, I think --
15      ARBITRATOR KRAMER:  Two years,
16  whatever.
17      THE WITNESS:  I think, yeah, to
18  state it the way I remember is they were
19  aware of the transaction at the time of
20  the disclosure, and that it was a couple
21  years later before the notice was issued.
22  And I think that's largely attributable to
23  the fact that there were 58.
24      They knew at the time of the
25  disclosure, or at least at the time that

884

1   Mather - Redirect
2   KPMG responded to the summons, presumably,
3   they knew all the 58 people.  Why they
4   issued the notice in that instance, I'm
5   not even sure because why do you issue a
6   public notice when you already have the
7   whole universe identified and under audit?
8       It's not typically what the function
9   of the notice is.  And so I think maybe
10  the only -- the purpose of the notice is
11  more of an afterthought where they said
12  well, you know, there could be copycats
13  out there or something but...
14      CHAIRMAN BYRNE:  In terrorem effect
15  or for future?
16      THE WITNESS:  Maybe, maybe, and
17  for -- because it's always these deals and
18  anything substantially similar.
19      So, you know, there certainly could
20  have been instances when KPMG didn't do
21  the deal, but some -- you know, they
22  pitched the deal to some guy, and he took
23  it to his own accountant, and then that
24  accountant put it together for him, or
25  something like that.

885

EXHIBIT  2 , PAGE 790

Oct 30 arb hearing  10/30/2006  10:25:00 AM

Mather - Redirect

1 
2 So those aren't going to be
3 significant in number, but I think that
4 could be a reason that they published the
5 notice at all.  I'm not surprised that it
6 was a delay in time at all because I am
7 more surprised that they even thought it
8 was necessary to issue the notice.
9 And secondly, if they also -- I
10 think Robert Burke made a point that there
11 was a difference in the normal pattern in
12 that they communicated -- they didn't
13 publish the terms of the settlement as
14 well because that's a typical aspect of
15 these, too.
16 But again, I think that's the same
17 answers.  When you know your universe, why
18 do you publish to the world what the
19 settlement is when you can write 58
20 letters, and that accomplishes the task
21 because many of these other deals had
22 hundreds and sometimes thousands of
23 participants, and they had little hope of
24 identifying them all.  So they were hoping
25 to scare them straight, if you will, that

886

Mather - Redirect

1 
2 in terrorem effect from the notice,
3 itself.
4 ARBITRATOR MOXLEY:  You gave a
5 characterization that the IRS wins
6 essentially 95 percent of the time in tax
7 court.  Then you said well, your opinions,
8 though, are not keyed to -- are not
9 limited by tax court.
10 Do you have a basis to give a
11 characterization as to the extent to which
12 the taxpayers win or lose versus the
13 Service in district court?
14 THE WITNESS:  It is more frequently
15 that taxpayers win in district court.  It
16 certainly is more frequent.  I don't know
17 if it's the same cases.
18 CHAIRMAN BYRNE:  Damn dumb federal
19 judges.
20 THE WITNESS:  Yeah, I mean I -- if
21 your argument is our program is very
22 meritorious because we can somehow avoid
23 the tax court and get to somebody, I don't
24 know if that's --
25 ARBITRATOR MOXLEY:  What about the

887

Mather - Redirect

1 
2 appellate courts?
3 THE WITNESS:  Appellate courts are,
4 by and large, not that favorable.
5 ARBITRATOR MOXLEY:  To whom?
6 THE WITNESS:  To the taxpayer.
7 There are instances in which they have
8 reversed the tax court.  One of the -- one
9 of the instances of one of the cases here
10 is the ACM Partnership case, I think it's
11 called.
12 And there was an appeal of that, and
13 it was reversed in part and remanded, but
14 it essentially said you didn't go far
15 enough.
16 And then there is the Coltech case
17 that I think everybody has cited recently
18 where in the Federal Claims -- in the
19 Court of Federal Claims, there was victory
20 for the taxpayer, and it was appealed in
21 the Federal Circuit, and they slammed it
22 and reversed it.
23 And the conventional wisdom at the
24 time is that if you have a shot, in most
25 cases, the Court of Federal Claims is the

888

Mather - Redirect

1 
2 place to go and then after this Coltech
3 case, everybody says oh, now, it's the
4 district court.  Oh, cross that one out.
5 We knew it wasn't the tax court.  Let's
6 cross out of the Court of Federal Claims.
7 Maybe we can find a district court
8 someplace.  But you know, it's become an
9 almost frantic search to find somebody who
10 isn't going to see what's going on here.
11 MR. KUSHNER:  I have a couple of
12 questions.
13 CHAIRMAN BYRNE:  Sure, go ahead.
14 RECROSS-EXAMINATION
15 BY MR. KUSHNER:
16 Q.  Haven't most of your cases after you
17 left the IRS been in the district courts?
18 A.  No, most in tax court.
19 Q.  Most in tax court?
20 A.  Yes.
21 Q.  Have any been in district court?
22 A.  Some.
23 Q.  Can you give an estimate
24 percentagewise?
25 A.  Of actual trials or cases that I

889

upper deck-aig arb

EXHIBIT ___2___ PAGE _791_

Page  886 - 889

1        Mather - Recross

2    filed?

3        Q.   No, no, cases commenced.

4        A.   Cases commenced, I would say

5    80 percent tax court, 20 percent district.

6        Q.   And the 20 percent in district

7    court, have any of those been settled?

8        A.   Most of them have been settled.

9        Q.   Now, one other question, which I'm

10   led to ask because you referred to the Gitletz

11   decision, the Supreme Court decision, page 5 of

12   your report.  You state "The 1990 tax shelters

13   were more typically based on a chain of

14   colorable interpretations of the Internal

15   Revenue Code, which when applied to various

16   aspects of the transaction, led to an illogical

17   or unintended result.  Some early litigation

18   successes seem to fuel this tax shelter boom."

19   There, you cite Gitletz v. Commissioner, 531

20   U.S. 206, affirming and reversing several

21   earlier cases.

22        I take it that what you are really

23   saying is that the Supreme Court thought it was

24   bound to apply the Internal Revenue Code and

25   regulations as they stood on the books?

890

1        Mather - Recross

2        A.   There was a literal interpretation

3    of the statute that the Supreme Court applied

4    in a case in which the result would seem

5    unintended, yes.

6        CHAIRMAN BYRNE:  And soon

7    thereafter, Congress came in.

8        THE WITNESS:  Yes, immediately

9    changed the law.

10       MR. KUSHNER:  No other questions.

11       CHAIRMAN BYRNE:  Thank you very

12   much.  I realize it was a long day for

13   you, but it was a very productive day for

14   us.  Why don't you see your witness out,

15   and then we will stay here, and we will

16   conclude and finish up for the day.

17       (Pause.)

18       CHAIRMAN BYRNE:  Let me tell you

19   that I truly commend counsel for the

20   quality and forthrightness, and in some

21   instances, limitations of your respective

22   tax witnesses -- experts.

23       I confess that we have a better

24   understanding of the basic principles --

25   without regard to their opinion, everyone

891

906

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK          )

4                               :ss

5    COUNTY OF RICHMOND         )

6

7              I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify that the within is a true and accurate

10   transcript of the proceedings taken on

11   October 30, 2006.

12             I further certify that I am not

13   related to any of the parties to this action by

14   blood or marriage; and that I am in no way

15   interested in the outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto

17   set my hand this 31st day of October, 2006.

18

19   _____
                   MELISSA GILMORE

20

21

22

23

24

25

EXHIBIT _2_, PAGE _793_