# EXHIBIT AA



COPY

1

2   AMERICAN ARBITRATION ASSOCIATION

3   ----------------------------------------X

4   AMERICAN INTERNATIONAL SPECIALTY

5   LINES INSURANCE COMPANY,

6                Claimant-Counter Respondent,

7        - against -

8   THE UPPER DECK COMPANY, RICHARD P.

9   McWILLIAM and the MPR REVOCABLE TRUST,

10               Respondents-Counter Claimants.

11   ----------------------------------------X

12               780 Third Avenue
              New York, New York
13
              November 2, 2006
14            10:04 a.m.

15   B E F O R E:

16      JOHN F. BYRNE, Chairman

17      STEPHEN D. KRAMER, Arbitrator

18      CHARLES J. MOXLEY, JR., Arbitrator

19

20

21           STACEY E. RAIKES, CSR   Reporter

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24             New York, New York
               212-750-6434
25             Ref: 82084

EXHIBIT AA, PAGE 794

TELEPHONE: (212) 750-6434 ● FAX: (212) 750-1097

Ellen Grauer
COURT REPORTING

**Page 1068**

```
 1
 2    AMERICAN ARBITRATION ASSOCIATION
 3    -------------------------------------X
 4    AMERICAN INTERNATIONAL SPECIALTY
 5    LINES INSURANCE COMPANY,
 6             Claimant-Counter Respondent,
 7       - against -
 8    THE UPPER DECK COMPANY, RICHARD P.
 9    McWILLIAM and the MPR REVOCABLE TRUST,
10             Respondents-Counter Claimants.
11    -------------------------------------X
12             780 Third Avenue
              New York, New York
13
              November 2, 2006
14            10:04 a.m.
15    B E F O R E :
16    JOHN F. BYRNE, Chairman
17    STEPHEN D. KRAMER, Arbitrator
18    CHARLES J. MOXLEY, JR., Arbitrator
19
20
21        STACEY E. RAIKES, CSR  Reporter
22
23    ELLEN GRAUER COURT REPORTING CO. LLC
      126 East 56th Street, Fifth Floor
24    New York, New York
      212-750-6434
25    Ref: 82084
```

**Page 1069**

```
 1
 2    A P P E A R A N C E S :
 3    D'AMATO & LYNCH
 4    Attorneys for Claimant-Counter Respondent
 5       70 Pine Street
 6       New York, New York 10270
 7    BY:  PETER STROILI, ESQ.
 8       - and -
 9       ROBERT KUSHNER, ESQ.
10       PHONE  212-909-2065
11       FAX  212-269-3559
12       E-MAIL  pstroili@damato-lynch.com
13
14
15    RUTAN & TUCKER, LLP
16    Attorneys for Respondents-Counter Claimants
17       611 Anton Boulevard, Suite 1400
18       Costa Mesa, California 92626
19    BY:  RICHARD K. HOWELL, ESQ.
20       - and -
21       DUKE F. WAHLQUIST, ESQ.
22       PHONE  714-641-5100
23       FAX  714-546-9035
24       E-MAIL  rhowell@rutan.com
25
```

**Page 1070**

```
 1
 2    A P P E A R A N C E S :  (Cont'd)
 3    ALSO PRESENT:
 4       NELSON KWONG, Infographics
 5       SARAH THOMPSON, Paralegal
 6       RAYMOND F. HAMPEL, AIG
 7       RICHARD McWILLIAM, Upper Deck
 8       ROBERT JONES
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 1071**

```
 1
 2    ---------------- I N D E X ----------------
 3    WITNESS     DIRECT CROSS REDIRECT RECROSS
 4    REDGE BENDHEIM    1189
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PROCEEDINGS

1   CHAIRMAN BYRNE:  Good morning,
2   everyone.
3       What we would like to do this
4   morning or today just let me give some
5   guidelines.  My best guess is, and you
6   don't have to use it, you may go a couple
7   minutes longer or a couple minutes
8   shorter, but I would like to devote an
9   hour to claimant's side of the case.  Take
10  our morning break.  Devote about an hour
11  to respondent's side of the case.  That
12  should bring us somewhere between 12:15
13  and 12:30, but by 12:30, I want to take
14  our lunch break, reconvene by 2 o'clock,
15  at which time we'll establish the
16  connection, et cetera, take the testimony
17  of Mr. Bendheim, which the more I thought
18  about it at least if it takes more than an
19  hour and 15 minutes, an hour-and-a-half, I
20  think both sides we're doing something
21  wrong.  Fifteen minutes thereafter, to
22  make sure we've dotted the Is and crossed
23  the Ts, and we adjourn subject to the
24  submission schedule.

1072

PROCEEDINGS

1       When we were off the record and
2   after we had adjourned on Tuesday, I asked
3   Ms. Thompson to be responsible for the
4   exhibits and she foolishly agreed.  And
5   what she is going to do is take the
6   arbitrator's exhibits, make sure all of
7   the exhibits are in the binders, whether
8   we had them loose leaf or we have extra
9   copies or whatever, but that all of the
10  exhibits that we dealt with or didn't deal
11  with, but that were introduced into
12  evidence are in the binders, and as I
13  recall, we only had two additions, two
14  evidentiary additions.  Maybe three.  And
15  then have them sent to the panel -- what
16  date did I set?
17      MS. THOMPSON:  You set Friday.
18      CHAIRMAN BYRNE:  Friday of next
19  week.
20      MS. THOMPSON:  Right.
21      CHAIRMAN BYRNE:  Okay.  That's still
22  doable.
23      MS. THOMPSON:  Uh-huh.
24      CHAIRMAN BYRNE:  Okay, so they will

1073

PROCEEDINGS

1   be sent to us, not necessarily by
2   delivery, but they will be sent to us by
3   November 10.  All right, I wanted you to
4   be aware of that.
5       Is there anything else, any other
6   housekeeping that we need to discuss
7   before we go forward with some argument or
8   give and take?  Gentlemen?  No, yes?
9       MR. KUSHNER:  No.
10      MR. WAHLQUIST:  I don't think so.
11      CHAIRMAN BYRNE:  No, all right.
12      I am going to state on the record
13  that the panel has not conferred prior to
14  this morning how this morning would go and
15  Mr. Moxley and Mr. Kramer, however, know
16  my style and my style is feel free.  And
17  if there are any questions whatsoever for
18  any member of the panel that you have at
19  any time, I warn the parties that I
20  encourage Mr. Moxley and Mr. Kramer that
21  we're past the procedural side.  It's
22  substance.  Ask away, all right?  And I
23  mean that, so counsel.
24      MR. KUSHNER:  Mr. Stroili and I are

1074

PROCEEDINGS

1   going to divide up our argument.  He'll
2   handle the insured tax loss issue and the
3   breach of warranty issue.  I'll handle the
4   exclusions 3H and 3A issues.  He'll come
5   back with the charitable -- well, the
6   condition precedent argument and the bad
7   faith argument, and if there's time, I'll
8   go into subrogation which, frankly, I
9   would prefer to delay until we get
10  Mr. Bendheim's testimony.
11      CHAIRMAN BYRNE:  Sure.
12      MR. KUSHNER:  But if necessary, I'll
13  go into it.
14      CHAIRMAN BYRNE:  Surely.
15      MR. STROILI:  I'd like to begin,
16  lest I forget to do so later on, to thank
17  the panel for your questions.  I think
18  they were very good questions throughout
19  the arbitration.  I'm reminded of a scene
20  from the movie about the Holy Grail with
21  Indiana Jones where the old knight played
22  by -- I think it's Lawrence Olivier tells
23  Harrison Ford when he chooses the
24  carpenter's chalice, you chose wisely, I

1075

EXHIBIT _AA_, PAGE _796_

PROCEEDINGS

1  believe both sides can honestly say that
2  we chose wisely.
3      CHAIRMAN BYRNE:  I appreciate that
4  and I assume you were not referring to age
5  of the "old knight".
6      MR. STROILI:  No, no, not for a
7  23-year old, no.
8      Given my annoying habit, however, of
9  always looking -- keeping one eye to the
10  worst case scenario and have to take that
11  last nice statement I made and say that
12  subject to my right later on to totally
13  withdraw it, but --
14     CHAIRMAN BYRNE:  Fair enough.
15     MR. STROILI:  I'm just kidding.
16     I also want to thank the other side
17  in this matter.  After reviewing their bad
18  faith expert's opinion, I was a bit afraid
19  that it could get nasty and that they
20  would come at us with cleavers, but they
21  proved to be gentlemen and very
22  professional and my only subject thereto
23  is Mr. Howell's closing, which I don't
24  know what it's going to be, and to --

1076

PROCEEDINGS

1  Appraisal, although that is certainly key,
2  as I believe the Chairman pointed out on
3  Tuesday, it's also from our side, a
4  question of economic substance and what
5  the exhibits to the policy did not
6  contain.
7      If you look at Exhibits 159 -- and I
8  won't dwell on them -- and Exhibit 160, it
9  is certainly our contention that we did
10  not insure that.  Any coverage lawyer or
11  claims person worth his or her salt, when
12  they see these two letters would raise
13  coverage arguments.  That's my opinion
14  based on my experience.
15     CHAIRMAN BYRNE:  In terms of -- I
16  understand the thrust.  I think I
17  understand the thrust of what AISLIC did
18  not cover.  And I think I understand that
19  the argument is there are a number of
20  exclusions, issues, procedures that are
21  directed at what actually happened, and
22  coming to the conclusion you're asking us
23  to come to, okay, AISLIC did not cover
24  what happened.

1078

PROCEEDINGS

1  MR. HOWELL:  Softballs.
2      MR. STROILI:  And to the fact that
3  but for Mr. Howell, I probably wouldn't
4  have to give a closing argument, but other
5  than that, it's been great.
6      What is the crux of the matter
7  regarding coverage?  At least for us.  If
8  you put up Exhibit 135, which I believe is
9  a June 12, 2002 letter in which counsel
10  for AIG is simply asking after we've had
11  this voluntary disclosure statement in
12  February of 2002, tell us what's going on.
13  Then if you would just put up Exhibit 175.
14  And this is a letter, I think in April of
15  2003, again, basically asking tell us
16  what's going on.  Sandwiched in between
17  these two letters is Exhibit 162, which is
18  the share purchase agreement, which is
19  entered into without notifying much less
20  asking for AIG's consent.
21     It is our contention and in point
22  one of our brief that we did not insure
23  that and it's not just the fact that it
24  doesn't provide for fair market value.

1077

PROCEEDINGS

1  The argument should be raised then
2  what did AISLIC cover at least for
3  comparative informational purposes, and if
4  it's you who can address that, fine, or
5  Mr. Kushner, that's fine, too, but I
6  personally am getting so bogged down as to
7  what didn't cover that I'm afraid I'm
8  losing site of what was the coverage.
9      MR. STROILI:  Okay, I think I can
10  touch upon it.
11     CHAIRMAN BYRNE:  Appreciate it.
12     MR. STROILI:  And I'll put in it
13  terms of the issues you presented to us, I
14  think it was the first week, which is what
15  was covered, whether what was covered
16  happened and why was the claim denied?
17  For us it's on this issue at least, point
18  one, the insured tax loss issue, you don't
19  get past number one.  This was not
20  covered, and in that regard, much
21  attention has been paid in this
22  arbitration to the shareholder's
23  agreement, but I would -- and this is how
24  I answer your question:  At least as

1079

EXHIBIT *AA*, PAGE 797

PROCEEDINGS

1  important and perhaps more important
2  because if you look at the definition of
3  opinions in the policy, the KPMG opinions
4  are defined as deemed part of the policy,
5  which those words mean something.  They
6  mean the provisions of a KPMG opinion are
7  the provisions of the policy.  And if we
8  look at, I think, KPMG opinions are
9  Exhibit A to the policy, what is key for
10 me in terms of the answer to your question
11 is the charitable contribution opinion
12 which is the second opinion which starts
13 about five pages in.  Next page.
14     Then on page seven, I'm sorry, page
15 seven of that opinion, if you could circle
16 the second paragraph, fair market value
17 test, thank you, what draws my attention
18 to the KPMG opinions is this paragraph here
19 because what it says is that the purchase
20 price for any redemption, any redemption,
21 is fair market value measured at the time
22 of redemption.
23     Now, KPMG opinions also talk about
24 the right of first refusal, which is fine

1080

PROCEEDINGS

1  by AIG, because in that case, you have a
2  willing buyer and a willing seller and the
3  willing buyer is a third party, and in
4  that case, you get to the very definition
5  of fair market value.  That's not a
6  problem.  But in our view, both under the
7  insured tax loss argument and breach of
8  warranty argument, critical assumption and
9  foundation of the policies that there be,
10 if there is a redemption, that there be
11 fair market value.  No other means of
12 redemption is contemplated in the KPMG
13 opinion.  An ad hoc, willy nilly
14 transaction is certainly not contemplated
15 because if you go to the very next
16 sentence there, it tells us there are very
17 serious consequences if fair market value
18 is not paid upon redemption.  Namely, the
19 dreaded second class of stock rule which
20 could result in loss of subchapter S
21 status, which both sides were afraid of.
22 And if you look at Exhibit 131, which is
23 the voluntary disclosure statement signed
24 by Mr. McWilliam in February 2002, the

1081

PROCEEDINGS

1  only option set forth in the voluntary
2  disclosure statement regarding transfers,
3  sales, et cetera is if you go to the
4  bottom of the page, I think, is the option
5  of the put option, which is basically
6  redeem the shares at fair market value
7  subject to an independent valuation firm
8  conducting an appraisal, which is that
9  objective piece of paper that Mrs. Burke
10 testified to.
11     Also, in the KPMG opinions, and I
12 believe it's in the first opinion on the
13 breach of warranty, page four, appraisal
14 is key because without an appraisal, you
15 have a real problem coming within the safe
16 harbor protection on the second class of
17 stock rule, and I think the words in the
18 KPMG opinion are you need a valuation that
19 is not substantially in error, performed
20 with reasonable diligence and I believe
21 even Mr. Mathers conceded that you would
22 want an appraisal to get within that safe
23 harbor rule.
24     CHAIRMAN BYRNE:  What are we

1082

PROCEEDINGS

1  supposed to do with Mr. Mathers' opinion
2  that even if you did -- I'll call it the
3  KPMG deal -- it wouldn't fly, and I'm
4  oversimplifying it in a way, but does it
5  remain your position that if Upper Deck
6  did the KPMG opinion, basically, I mean,
7  at its core, what was insured was the KPMG
8  deal not flying so that Mr. Mathers'
9  testimony may be accurate that the KPMG
10 wouldn't fly, but that's what was insured,
11 the KPMG deal.
12     Now think about it.  I don't mean to
13 put you on the spot, but I think that I
14 would like you to address that in your
15 written -- even if you don't care to
16 address it now, it's fine with me.
17     MR. STROILI:  And I think it depends
18 on which point in our brief you're talking
19 about because there are different
20 standards, and without trying to infringe
21 too much on Mr. Kushner's argument.
22     CHAIRMAN BYRNE:  Assume you get past
23 the conditions precedent.  Assume you get
24 past the exclusions.  Assume you get past

1083

EXHIBIT _AA_, PAGE _798_

PROCEEDINGS

2 the bad faith or assume that we don't buy
3 them, okay? You're now looking at the
4 core coverage component of this policy,
5 with all conditions precedent being met.
6 It does back to my original question:
7 What was covered the KPMG deal? If the
8 KPMG were and there was no tax loss, God
9 bless. But if the KPMG deal didn't fly,
10 ie, the KPMG deal not working is what
11 AISLIC insured.
12     MR. STROILI: What the policy
13 covered is -- I don't know if you want to
14 call it the KPMG, but what it covered is
15 the transactions set forth in the exhibits
16 to the policy and which basically is the
17 transactions set forth in the KPMG
18 opinions as implemented by the
19 shareholder's agreement.
20     CHAIRMAN BYRNE: When I say the KPMG
21 deal, I don't mean KPMG saying don't worry
22 about it, it's the same for the $2 million
23 dollars. I'm not talking about that as
24 the KPMG deal. I'm talking about the
25 intended KPMG SC squared transaction, the

1084

PROCEEDINGS

2 substance of which and the workings of
3 which were annexed to the policy.
4     MR. STROILI: I would certainly
5 agree that that is what was insured with
6 the caveat that you don't insure a generic
7 transaction, you insure a transaction as
8 actually carried out, so you've got to
9 look at the fundamental principles.
10     CHAIRMAN BYRNE: You are very --
11 you're a very careful lawyer and I truly
12 appreciate the reservations. But you also
13 have to keep in mind that -- and this goes
14 to everybody -- somebody's going to be
15 unhappy with our decision. We understand
16 all your reservations. I trust us before
17 I trust a federal judge sitting on a
18 motion to vacate or to confirm. So, I
19 mean, sometimes we are all going to ask
20 you bottom line questions. We know all
21 the reservations.
22     MR. STROILI: Yeah, and I understand
23 what you're saying, and as I remember the
24 question, you have to assume that the
25 exclusions don't apply, so we're not

1085

PROCEEDINGS

2 dealing with arising out of language. I
3 take it you're also assuming that we're
4 not talking about breach of warranties,
5 which you have a little different
6 standard.
7     CHAIRMAN BYRNE: Right. Right.
8     MR. STROILI: Okay. Well then
9 really the heart of the matter for us in
10 the policy is two places, definition of
11 insured tax loss. There's an insured tax
12 event, which we contend has to be a
13 notice, specific notice, to Upper Deck as
14 provided in section 6A of the policy, but
15 assuming you have an insured tax event,
16 you don't have an insured tax loss unless
17 you could prove it is as subject to the
18 terms conditions and exclusions.
19     Now we're not just talking
20 exclusions, we're talking terms and
21 conditions, and when you make the KPMG
22 policies deemed part of the policy, those
23 conditions of fair market value,
24 appraisal, donative intent all become
25 conditions of the policy, and that's the

1086

PROCEEDINGS

2 heart of point one of our argument.
3     CHAIRMAN BYRNE: And I'm not trying
4 to turn either counsel into a expert nor
5 am I eliciting expert opinion or not even
6 practice opinion. Here's the scenario to
7 chew on. In August, September, October,
8 November, December 2002, Upper Deck goes
9 to you or somebody on your behalf, your
10 meaning AISLIC's behalf, I got to get out
11 of this and I gotta know -- I'm going to
12 get killed here. I don't know if it
13 happened to you, AISLIC, but as far as I'm
14 concerned, I got sold a bill of goods by
15 KPMG or whatever and I am now in the
16 middle of a mess. What am I supposed to
17 do? Would that have made any difference
18 to AISLIC and how, if at all, would that
19 have kicked in or not kicked in, you know,
20 conditions precedent, exclusions,
21 whatever? I mean you guys have been
22 dealing with insurance companies for a
23 long time. What would it make a
24 difference legally, do you think?
25     MR. STROILI: Well, it would have

1087

PROCEEDINGS

1 made all the difference to AIG if instead
2 of consulting Mr. Friedman on whether the
3 transaction would affect the insurance
4 policy, Mr. McWilliam had picked up the
5 phone and consulted AIG.  At that point,
6 we would have become true partners in
7 either defending the tax plan in tax court
8 or looking at a possible settlement, but
9 at that point, we would have been on the
10 same page.  A lot of our coverage
11 arguments would have fallen because you
12 would have fulfilled your duty under the
13 contract.
14      When they did the deal as they did,
15 without consulting us, by us that means
16 the collective we.
17      CHAIRMAN BYRNE:  I, in fact, have a
18 take home, so I can say we, but you guys
19 can use the collective we.
20      MR. STROILI:  That's where the
21 problem is because while, frankly, while
22 AIG insured the bats, the balls and a lot
23 of new fangled products that other
24 insurers won't, we do not insure ad hoc,

1088

PROCEEDINGS

1 willy nilly transactions.  And if you had
2 come to us and asked us our consent to
3 that transaction as it was structured, we
4 would have given you some different advice
5 as to how you can make it foolproof, gets
6 an appraisal.  I mean, your company's
7 doing so well.  How much is an appraisal
8 going to cost?  It's much safer to do the
9 appraisal, for instance.  So it would have
10 made all the difference to us.  Of course,
11 the transaction, if we both agreed that
12 the best course of action is to defend it
13 in tax court, we are defending the
14 transaction that's set forth in the policy
15 and I understand the point of your
16 question well Mr. Mather would say you're
17 in a losing battle.
18      CHAIRMAN BYRNE:  It's a waste of
19 time.
20      MR. STROILI:  Exactly.  And I
21 understand that argument and you have the
22 arguments of the Burkes in contrast to
23 that and Mr. Kushner will handle that
24 aspect.  But I would like to point out one

1089

PROCEEDINGS

1 thing there and that is under the economic
2 substance doctrine, you look at the facts
3 and I think even the IRS coordination
4 papers says you have to do that and I know
5 Mr. Kushner will touch on this, but
6 arising out of language, as my
7 understanding of the case, is all that
8 means that it doesn't mean any specific
9 causation test and it's not proximate
10 causation.  It's simply there has to be
11 some link between the matters set forth in
12 the exclusion and the injury.  And if
13 you're talking about economic substance,
14 there has to be a link because it looks
15 like the facts, and I think as Mr. Mather
16 admitted on cross, one of the key facts
17 the IRS would have had to look at and the
18 tax court or the district court would have
19 had to look at is the December 2002
20 transaction.  Having said that --
21      CHAIRMAN BYRNE:  Well, I mean, just
22 following the same line in terms of
23 becoming partners and without regard to
24 the actual outcome, and I know this is

1090

PROCEEDINGS

1 clearly subjective, but I got the sense
2 from your argument and some of your
3 witnesses that getting information was
4 like pulling teeth, that process, the
5 pulling teeth process, was making it
6 worse.  With all due respect to former
7 President Clinton, I'm not going to get
8 into what it was, but things were getting
9 worse.  Am I getting the right feel of the
10 testimony in that regard?  I'm not saying
11 there was a consequence to it, but the
12 hairs on the back of -- the collective
13 hairs on the back of AISLIC's head were
14 tingling away.  What's going on here?
15      MR. STROILI:  I definitely think in
16 terms of the reaction of the insurer, if
17 you wait -- I mean, the initial failure to
18 disclose is bad enough, but if you wait
19 until April, I think it was March 25, 2004
20 in response to a simple question, what's
21 going on with the redemption of shares and
22 then not until that point do you tell us,
23 and by the way, we already redeemed these
24 shares almost two years ago, that makes it

1091

PROCEEDINGS

2 worse and I'm more talking about not how
3 coverage is determined under the policy,
4 but really what you call the dance.
5   CHAIRMAN BYRNE:  That's what I was
6 getting at.
7   MR. STROILI:  It does affect the
8 dance.  And I think there's evidence of
9 that because until that happened in March
10 of 2004, Orrick and AIG were pretty much
11 on the same page.  They had both exchanged
12 IDRs and responses and they were working
13 to try and defend this thing as best both
14 parties could in district court and that
15 was the plan at the time.
16   And then they had that meeting out
17 in San Francisco in, I think it was
18 April 8 of 2004, and at that point, you
19 know, we're still trying to work together,
20 defend the thing in tax court, but then we
21 find out, you know, about Yugio for the
22 first time and for the first time we find
23 out that, you know, the projections you
24 sent us were way out of whack and our
25 interests are not going to be aligned and

1092

PROCEEDINGS

2 that creates an interest on your behalf to
3 ultimately sue us for bad faith, which is
4 what happened, so it does make a
5 difference.
6   CHAIRMAN BYRNE:  All right.  You
7 threw in Yugio.  I think my uneducated in
8 non-insurance law reaction is oh, yeah,
9 you did the deal almost two years ago and
10 now you're talking to us?  That the event,
11 the event was the insured taking it upon
12 itself to do something, to do it and then
13 work backwards.  Try to defend what was
14 done.  I guess, you know, at least my
15 reaction to the projections is a little
16 bit of ambivalence.  They were what they
17 were.  I understand the argument.  I
18 understand the representation argument.
19 But that gets me back to the deal,
20 Mr. Stroili, Mr. Kushner.  It's like, hey,
21 if Mather is right, and I'm not saying he
22 is, but if Mather is right, the deal you
23 "insured" didn't have a chance in hell if
24 the disparity between the contribution and
25 the sheltering of income was too great.

1093

PROCEEDINGS

2 Whether it was -- if it were $2 million,
3 it's 33 times too much, round numbers, and
4 if it's $11 million, it's six times too
5 much.  Too much.  When does it become too
6 much?  Did AISLIC insure a product?  Did
7 AISLIC insure a transaction, the KPMG
8 transaction as contemplated?  That could
9 only work if the projections didn't go up.
10 Forget Yugio.  The Kushner trading card
11 series was signed on December 15 and went
12 into production in '03 before the put had
13 to be put, 90 percent of the income would
14 still be, at least up until that point,
15 it's still going to be attributed to the
16 tax payer, not Austin Firefighters Fund.
17 I mean, did AISLIC insure a deal that
18 would only work under certain
19 circumstances?  Or are you prepared to
20 say, for all intents and purposes, Byrne,
21 it doesn't make any difference.  We
22 insured what we insured.  We were willing
23 to let the chips fall where they may.  And
24 if it triggered coverage, it triggered
25 coverage.  Do you see where I'm going?

1094

PROCEEDINGS

2   MR. STROILI:  I think so.  And I
3 think that last statement is pretty
4 accurate.  If I can try and use an
5 analogy, regardless of whether the tax
6 plan would have worked, wouldn't have
7 worked, whether KPMG sold us both a lousy
8 good, we insured a specific transaction
9 with certain parameters.  It's like where
10 you insure a specific, well-defined
11 property, and without knowing home
12 insurance policies, I'm going to take the
13 risk.  Okay, you insured a home which has
14 gone through rigorous safety inspection,
15 which would have appreciated 500 percent
16 in value except for the fact that in the
17 intervening two years, the insured tore
18 down the house, replaced it with a shack
19 built in ad hoc, willy nilly fashion.
20 It's our contention that it's no longer
21 the house insured.
22   CHAIRMAN BYRNE:  Sounds like my
23 second wife, but that's okay.
24   MR. STROILI:  And that's where you
25 point to in the policy other than insured

1095

PROCEEDINGS

1. 
2. tax loss definition, which incorporates
3. the KPMG opinion, it's that first sentence
4. of the policy, and reliance upon the
5. documents and representations made, we are
6. providing to you this very unique, I
7. guess, Mr. Cotkin calls it a niche form of
8. insurance, which is not only laser shot
9. with respect to the risks, which is what
10. they understandably focus on because under
11. their argument, if you have an insured tax
12. event, bingo, that's the end of the story.
13. We say wait, got to go to the insured tax
14. loss. And the insured tax loss, in turn,
15. you got to go to the KPMG opinions. And
16. if you can tell us, matching them up side
17. by side, that this share purchase
18. agreement is somehow contained in that
19. KPMG opinion, all power to you. I don't
20. see it. It's not what we insured.
21. CHAIRMAN BYRNE: All right.
22. MR. MOXLEY: Let me pick up on that
23. line of discussion. I understand that in
24. a sense, in a broad, conceptual sense, the
25. first issue is how one interprets the

1096

PROCEEDINGS

1. 
2. to say okay, if the panel finds in your
3. favor in terms of interpreting the
4. documents and says, you know, the document
5. specifies a so-called generic deal and
6. that provides for fair market value,
7. that's implicit in the transaction and the
8. KPMG opinions that are incorporated in the
9. policy and so forth. If we say that, then
10. one way of looking at it is we then ask,
11. and I'll put it this way so you could tell
12. me what I'm missing. I think this line of
13. analysis misses a bunch of policy
14. arguments that you're making, but one way
15. to look at it would say, okay, if the
16. policy required fair market value and the
17. like, then you have to say, okay, would
18. the generic transaction, you know, the
19. what we would have determined was covered
20. by the policy, would that have worked or
21. not? And Mr. Mathers said well, it
22. wouldn't have worked. It wouldn't have
23. worked, so even if they had done it
24. exactly in the -- exactly with an
25. appraisal or right of first refusal, that

1098

PROCEEDINGS

1. 
2. documents. And I understand your position
3. that the documents -- and you pointed us
4. to specific language in some of the
5. exhibits that you referenced -- I
6. understand your position that the policy
7. documents required fair market value
8. whether because of an appraisal or a right
9. of first refusal. And I understand Upper
10. Deck's argument to the contrary, that the
11. policy documents can be read more broadly,
12. and so that's a question we have to
13. decide, right? If they're right that you
14. can read the policy documents broadly,
15. then as you say, this transaction was
16. covered, right?
17. MR. STROILI: Right.
18. MR. MOXLEY: If you can't, then you
19. have to go to the next level and I'm not
20. sure you do it in the same way, but seem
21. to get there and the Chairman seemed to
22. be, you know, in effect, addressing this.
23. Is it fair to say that the next
24. level -- let me put it this way: A way of
25. looking at the next level of analysis is

1097

PROCEEDINGS

1. 
2. wouldn't have worked. Why isn't it the
3. case that if the generic transaction would
4. not have worked tax wise, why isn't it
5. then the case that, as a matter of
6. causation, the deviation that we have
7. found that they made from what it was
8. supposed to be didn't have any causative
9. effect and so why shouldn't our analysis
10. be well, you know, if the generic deal
11. would not have worked, then there's
12. coverage because the deviation doesn't
13. make any difference?
14. And on the other hand -- why don't
15. you answer that and then I have another
16. level of question I would like for you to
17. address.
18. MR. STROILI: Under point one,
19. insured tax loss, it's our position it
20. wouldn't matter. You don't need causation
21. because you don't get to point number one.
22. It's not what was covered.
23. With respect to the breach of -- I'm
24. sorry. With respect to the exclusions,
25. the arising out of language, especially

1099

EXHIBIT AA, PAGE 802

PROCEEDINGS

1. 
2. the shareholder amendment exclusion,
3. arising out of language at least in New
4. York and I've also looked at California,
5. there's been a recent case on it, it says
6. the same thing.  It's not causation
7. analysis in that sense.  And I saw the
8. arbitrators and the experts struggling
9. with this question, well, would this
10. transaction have succeeded and Mrs. Burke
11. said 60 to 70 percent and Mr. Burke said
12. well if you throw in the wild card of the
13. KPMG investigation, maybe it goes down to
14. 50 percent and Mr. Matters said 0 percent,
15. but all that --
16. CHAIRMAN BYRNE:  No, in fairness, he
17. said 2 percent.
18. MR. STROILI:  Two percent, okay.
19. MR. MOXLEY:  One-and-a-half to two
20. is the variation range.
21. MR. STROILI:  But I was sitting here
22. wondering why is everybody struggling with
23. this question as framed because it seemed
24. like you're over-proving the standard.
25. The standard is arising out of language.

PROCEEDINGS

1. 
2. okay.
3. The problem with that argument is
4. there's a warranty in the policy which
5. says you could not compel redemption.  If
6. we're talking a free country and Upper
7. Deck can do whatever they want, then
8. subsumed within that would be the ability
9. to use coercion and thereby breach the
10. warranty.
11. See, when we put this KPMG opinion
12. and attached it to the policy, we did it
13. to prevent that very thing because without
14. being able to rely on the assumption of
15. fair market value and independent
16. appraisal, we go in the never neverland,
17. the free country where anything can happen
18. and that's why you put that representation
19. in there.  Upper Deck cannot coerce the
20. firefighters to redeem its shares.  And I
21. think an argument at least could be made
22. here that we don't have to prove that it
23. did happen, we only have to prove that it
24. could have happened.
25. I think an argument could be made,

PROCEEDINGS

1. 
2. And with respect to the breach of
3. warranties, it's not even arising out of
4. language.  All you have to show is that it
5. wasn't a collateral risk, it was a primary
6. risk.
7. And the other point I would like to
8. bring up, and I don't know if this is
9. relevant to the question or not, but you
10. had a discussion which I thought was very
11. interesting.  I think it was at page 626
12. of the transcript.  You had a discussion,
13. I think it was with Mr. Burke.  Basically
14. the issue of illusory coverage, at least
15. from my understanding, the insurer's point
16. of view.  In other words, it's a free
17. country.  You look at the shareholder's
18. agreement.  Nothing in the shareholder's
19. agreement prohibits Upper Deck from doing
20. anything they wanted.  That's a very
21. dangerous argument for Upper Deck.  And I
22. don't know if they've made it yet, but
23. it's a dangerous argument.  They're better
24. off making their section one argument
25. which, to me, is grammatically absurd, but

PROCEEDINGS

1. 
2. despite Mr. Stefka's testimony that it did
3. happen because what happened is the very
4. next day they got -- after they got the
5. December 9 letters, one of which says any
6. delay or whatever is going to cause you
7. problems, they approved the transaction,
8. and if you read the minutes, it says they
9. approved the transactions based on the
10. information provided, which we know was
11. incomplete information and I would suggest
12. misleading information.  So I believe
13. coercion did happen because they were told
14. we got to get this done by the end of the
15. year, we're under a lot of pressure, give
16. us an answer, and by the way, your answer
17. has got to be what we say it is.
18. CHAIRMAN BYRNE:  Assuming, and I
19. know Mr. Moxley has a follow-up question,
20. but I'm lazy.  I don't want to try a
21. coercion case.  I don't want to try an
22. agency case.  I don't want to test the
23. validity of what could be called instead
24. of coercion a subsequent KPMG fairness
25. opinion to the extent that KPMG

PROCEEDINGS

1  participated in the negotiation with the
2  firefighters fund.  Oh, come on,
3  Mr. Stroili.  Why do I have to do this
4  like a damn fraud case?  Are you
5  suggesting I have to or is there another
6  way -- or is it easier?  Is there an
7  easier standard on that part of the case
8  because I'm drawing adverse inferences or
9  reverse inferences and I got enough to do
10 whatever I want with it.
11       MR. STROILI:  Well --
12       CHAIRMAN BYRNE:  Based on your broad
13 arising out of.
14       MR. STROILI:  Right.
15       CHAIRMAN BYRNE:  I mean, that's like
16 a broad arbitration clause.
17       MR. STROILI:  Yeah, I think there is
18 an easier way.  All you have to show is
19 that -- to me, the easiest out you have is
20 exclusion 3H.  Doesn't require that much
21 work.
22       CHAIRMAN BYRNE:  I'm going to write
23 that down because you know I'm lazy.
24       MR. STROILI:  Because -- and

1104

PROCEEDINGS

1  Mr. Kushner is supposed to address this.
2       CHAIRMAN BYRNE:  And he will.
3       MR. STROILI:  But the reason why
4  it's easy it because it's so plain on its
5  face.  It's the first on AIG spotted
6  because it's plain on its face.  You amend
7  the shareholder's agreement and if you
8  look at provision 3.5 of the share
9  purchase agreement, to me, that's what it
10 says.  Plain reading of it.
11       CHAIRMAN BYRNE:  Okay.
12       MR. MOXLEY:  I'm sorry, but don't
13 you end up, I mean, I'm still back on my
14 original question, and in light of the
15 Chairman's question and your comment to
16 it, I don't understand how you can say
17 that if there was this deviation, then if
18 I understand the argument, the argument is
19 that the laws came out of the deviation,
20 right?  I mean that's the point.  It arose
21 out of it.  And not out of the kind of
22 transaction that was covered, but how does
23 that, you know, conceptually, how should
24 we assume that should be analyzed?  Should

1105

PROCEEDINGS

1  that be analyzed in the context of how the
2  circuit court would be reviewing what a
3  tax court or a district court did, and
4  doesn't the question then become how do we
5  think the court would look at that?  Would
6  the court say?  Okay, does this problem
7  arise out of the deviation or does it
8  arise out of the fact that the so-called
9  generic deal didn't work anyhow, and I'm
10 not saying it didn't, but for this
11 level --
12       CHAIRMAN BYRNE:  In other words, do
13 we have to make a tax ruling?  I think
14 that, in a way, is what Mr. Moxley is
15 asking.
16       MR. MOXLEY:  Right, and isn't that
17 what it comes from?  I mean, how can we
18 say it arose out of the deviation, if we
19 were also to have concluded the generic
20 deal wouldn't have worked, if we were to
21 see it that way?
22       MR. KUSHNER:  Can I get into this?
23       MR. STROILI:  Yeah, I think I hand
24 it over to Mr. Kushner at this point

1106

PROCEEDINGS

1  because I've spent too much time.
2       CHAIRMAN BYRNE:  Mr. Stroili, thank
3  you very much.
4       MR. KUSHNER:  I've taken my notes
5  and I'm throwing them in the wastebasket.
6       CHAIRMAN BYRNE:  No, please, and I
7  apologize and I assure you that if there
8  is anything you want to bring to our
9  attention, remember, it's not just now,
10 it's also in your written, please.
11       MR. KUSHNER:  We're benefitting very
12 much from the questions.  There's no doubt
13 about it.
14       I suggest the issue isn't under the
15 exclusion now, which is 3H, whether the
16 settlement liability arose out of the
17 deviation in the terms you're putting it
18 because that's causation.  Was there a
19 connection between the settlement
20 liability and the deviation?  Was there a
21 link between the two?  If this were an SEC
22 case, we'd be much better off because we
23 he'd the SEC complaint, the SEC findings
24 and of course the consent judgment.  There

1107

PROCEEDINGS

1
2  is no IRS complaint.  There's a generic,
3  general notice way back then, but there is
4  an IRS coordinated paper which Ms. Burke
5  said is intended to guide the agents in
6  their development of the facts.
7      I don't think there's any doubt in
8  this case that the extensive development
9  of the facts was important to the IRS.
10  It's in that paper.  It's something that
11  they developed through information
12  document requests.  We can look at the
13  document requests and look at the
14  responses.  There's no doubt that every
15  single document you've seen on the share
16  purchase agreement was produced to the
17  IRS.
18      MR. MOXLEY:  Excuse me, but doesn't
19  that line of analysis not work for you?
20      MR. KUSHNER:  Why.
21      MR. MOXLEY:  Because if you're going
22  to look at it from the perspective of how
23  the IRS looked at, the IRS is of the view,
24  obviously, he stated that the generic deal
25  didn't work.

1108

PROCEEDINGS

1
2      MR. KUSHNER:  I'm not trying to read
3  the IRS's mind.  Far be it from me to do
4  it.  What I am saying is look at this
5  objectively.  The IRS, when it resolved to
6  settle this matter, had before this
7  record, in this record you have the link
8  and the connection to the "deviation" and
9  that's enough to trigger the exclusion.
10      CHAIRMAN BYRNE:  In other words,
11  what you're saying is, bottom line, is
12  that there has to be a link.  We have to
13  be able to draw an inference.  Causation
14  does not have to be proof.
15      MR. KUSHNER:  Correct.
16      CHAIRMAN BYRNE:  Bottom line.
17      MR. KUSHNER:  Connection does have
18  to be proved.  Link does have to be
19  proved.
20      CHAIRMAN BYRNE:  But links can be
21  "proven" by inferences.
22      MR. KUSHNER:  Yes, by reasonable
23  inferences.
24      CHAIRMAN BYRNE:  By reasonable
25  inferences based on a reasonable reading.

1109

PROCEEDINGS

1
2      MR. KUSHNER:  Of course, yes.
3      MR. MOXLEY:  Maybe I have this
4  wrong, but it seems to me the way you have
5  a potential to win on this issue and this
6  way of looking at it is not through
7  looking at what the IRS did because the
8  IRS is saying the generic deal was wrong,
9  too, and they nowhere said, as I
10  understand it, that the deviation had any
11  impact, although, they did say you have to
12  look at the facts and you can argue it.  I
13  would have thought that your argument is
14  well, okay, we should really put our head
15  into how an appellate court might look at
16  it and if an appellate court might say
17  that it might have been significantly
18  better, somewhat better, a prospect of
19  success, you know, absent the deviation, I
20  would have thought that would be your
21  argument.  I don't know if it works,
22  but --
23      MR. KUSHNER:  I'll take any argument
24  I can get, but the real argument is what
25  the IRS offered in terms of settlement

1110

PROCEEDINGS

1
2  encompassed this.  There's no doubt about
3  it.  I don't know.  You can guess at all
4  what would the IRS have done if there
5  weren't this deviation in it, but there's
6  no doubt also that this deviation was a
7  scuttling of the entire KPMG tax plan.  It
8  opened the entire transaction not only to
9  the so-called ownership attack that the
10  fund didn't own the shares, but even more
11  important to the C corporation attack that
12  the transfer in December of '02 was
13  substantially below fair market value and
14  even Mr. Mathers said that you need an
15  appraisal as an important safety measure
16  for fair market value.
17      MR. MOXLEY:  Excuse me.  I mean,
18  that's how you potentially win.  Is that
19  if the deviation -- well, Mr. Stroili said
20  this isn't right because it's overriding.
21  Well, you said it, too, the arising out of
22  the language, but if an appellate court
23  looking at it would say that well the
24  deviation made a difference and absent the
25  deviation, you would have won, then you

1111

Nov 2 arb hearing   11/2/2006   10:04:00 AM

PROCEEDINGS

1   can argue well we lost some prospect of
2   being able to win.  I don't know if we
3   would have to quantify what that prospect
4   would be at that point, but absent that,
5   if the basic deal wouldn't have won, too,
6   why wouldn't we have to assume that a --
7   the court would have looked at it and
8   would have figured that out and then they
9   wouldn't have said well it didn't arise
10   out of the deviation, it arose out of this
11   whole situation?
12       MR. KUSHNER:  Well, the responses I
13   would have are one will never know whether
14   or not this KPMG plan would have worked in
15   this transaction and if you want to judge
16   probabilities, fine, you have the experts'
17   opinions, the experts' testimony, you'll
18   have the case law, you'll determine
19   whether Mr. Mathers', I think, single case
20   citation to Sheldon is enough to support
21   his opinion that this was not economic
22   substance or not, but the main fact is
23   that AISLIC was deprived of the
24   opportunity to ever, ever determine for

1112

PROCEEDINGS

1   for an exclusion basis, you're saying look
2   at the record and look at the contract, we
3   win.  Put aside the good faith argument,
4   which may include findings.
5       Am I understanding that right that
6   there is no contest as to the operative
7   facts that would lead one to conclude that
8   summary judgment if we were in a court
9   would apply here because under no
10   version -- under no reading or
11   interpretation of these facts would there
12   be coverage for what happened?  It's a
13   little bit of an oversimplification,
14   but --
15       MR. KUSHNER:  Let me answer in a
16   round about way.
17       CHAIRMAN BYRNE:  Yeah, I asked it in
18   a round about way, so you can answer it in
19   a round about way.
20       MR. KUSHNER:  Early on,
21   Mr. Wahlquist wanted an limite
22   determination which amounted to summary
23   judgment.  I said we're willing to go
24   along, but we want a broader record than

1114

PROCEEDINGS

1   itself whether or not this termination of
2   the KPMG plan was something it would agree
3   to.  And after all, I mean, that's what an
4   insurance contract is all about.
5       CHAIRMAN BYRNE:  I mean, again, I
6   have a tendency to oversimplify, just so I
7   can understand and then I can get into
8   more detail.  Try to.  And frankly, AISLIC
9   raised this early on in the conference, at
10   least, as I recall.
11       You're telling this panel, among
12   other things, that for all intents and
13   purposes, you've made a motion for summary
14   judgment.  You don't have to find
15   anything.  You don't have to make a tax
16   decision.  You don't have to do anything.
17   You don't have to -- in terms of findings
18   of fact.  The facts are admitted.  On
19   these state of facts and documents, et
20   cetera, et cetera, et cetera.  From the
21   date the insurance -- the date of the
22   contract to, I guess, the settlement, on
23   this state of facts in the record, we move
24   for summary judgment because whether it's

1113

PROCEEDINGS

1   you want.  You determined, and I think
2   wisely, yeah, it's no use wasting time.
3       CHAIRMAN BYRNE:  Too late to suck up
4   now.  I tell you that.
5       MR. KUSHNER:  Of course.  At this
6   stage.  If I had to go in for summary
7   judgment earlier, I would have agreed and
8   I did agree.  You've now heard the
9   witnesses.  You've seen the demeanors.  I
10   think it is pretty largely an issue based
11   on undisputed facts, yes.
12       CHAIRMAN BYRNE:  Well, it's not even
13   the witnesses.  We didn't need the
14   witnesses.  Look at the documents.
15       MR. KUSHNER:  And the law, yes, of
16   course.
17       CHAIRMAN BYRNE:  Okay.
18       MR. KUSHNER:  Yeah.  And if I can
19   just --
20       CHAIRMAN BYRNE:  Continue, please.
21       MR. KUSHNER:  No, I don't want to
22   overstay.
23       CHAIRMAN BYRNE:  Five more minutes.
24       MR. KUSHNER:  But on the 3A

1115

EXHIBIT AA, PAGE 806

PROCEEDINGS

1  exclusion, there's one -- that's the
2  intentional misconduct.  There's one thing
3  I do want to emphasize which we didn't do
4  in our briefs.  You have here a non-voting
5  shareholder of a closely held corporation.
6  You have the controlling shareholder and
7  his company buying out the non-voting
8  shareholder to what we say was materially
9  false information, misleading information,
10  deception.  I think you have a fiduciary
11  relationship here and that just aggravates
12  what indeed was done to this fund.
13      CHAIRMAN BYRNE:  Yeah, I hear you,
14  but look, I'll say this on the record and
15  feel free to disabuse us of this notion in
16  your written submissions, but to the
17  extent possible, this panel will keep the
18  disputes and its resolution between you
19  guys.  Other than the facts of what
20  happened, we tend to stay away from
21  motivations, intents, et cetera, so to the
22  extent possible, because frankly, the
23  Austin Firefighters Fund has its rearend
24  or at least had its rearend hanging out a

1116

PROCEEDINGS

1  window in terms of its own accountants.
2  And we heard that testimony and some of
3  the recommendations and why they did what
4  they did and they're a public entity and
5  even though our awards are confidential
6  and between the parties, there is no doubt
7  in my mind that the winner or the loser is
8  going to move to confirm or move to
9  vacate.  Maybe you won't.  But our award
10  becomes "public" in a court filing and we
11  lose control over it.  And in my
12  experience, and it's why we're very
13  careful as experienced arbitrators, we are
14  very careful of what we say and how we say
15  it and I'm just -- I'm not going to put,
16  just as I'm not going to put KPMG on trial
17  and I'm not going to put -- I understand
18  motivations, you know, I know what
19  happened and who said what when to whom.
20  It's a judgment about which I can -- we
21  can talk about until the cows come home,
22  but we're not here to make judgments on
23  anyone's actions other than AISLIC,
24  Mr. McWilliam, the Trust and Upper Deck,

1117

PROCEEDINGS

1  so I'm just --
2      MR. KUSHNER:  I understand.
3      CHAIRMAN BYRNE:  Throwing that out
4  there, can you --
5      MR. KUSHNER:  If I can just, and I'm
6  not in any way disputing or argument
7  because you are the sole deciders, but we
8  have in the past seen other parties who
9  have sealed court records.  It has been
10  done and can be done.
11      CHAIRMAN BYRNE:  However,
12  Mr. Kushner, Counselor, not withstanding
13  your boyish good looks, Mr. Kushner, we
14  have all around this table been around the
15  block many number of times.  And remember
16  the comment I made about the road to hell
17  being paved with good intentions and the
18  carcasses of volunteers.  Same can often be
19  said about court documents that are
20  sealed.  The best way to seal a court
21  document -- the best way to seal a
22  document in court is never submit it to
23  court in the first place.  So appreciate
24  the understanding.  And I have a very,

1118

PROCEEDINGS

1  very -- I'm not screwing around here.
2  We're finished on claimant's side.
3      Counsel, is there any piece of
4  evidence, testimony, part of the factual
5  record that you believe we should still
6  hear whether we wanted to or not because
7  aside from Mr. Bendheim, assuming
8  relevance, are you satisfied -- this is a
9  loaded question -- but are you satisfied
10  you have had a fair opportunity to
11  establish the evidentiary record from
12  which you will argue or is there something
13  else that -- or do you want -- I want to
14  close the evidentiary record today but for
15  certain documentary.
16      MR. KUSHNER:  We're on the same
17  wavelength.  We have nothing other than
18  Mr. Bendheim.
19      CHAIRMAN BYRNE:  All right.  Thank
20  you, Counsel.  And I am not limiting any
21  arguments that you wish to make in your
22  final submission by any means.  I want it
23  very clear and I'll repeat it again in
24  about an hour or so.

1119

PROCEEDINGS

1
2     With all due respect, you are on a
3  fool's errand if you attempt to pursue
4  meaning, finality to the discussion of
5  issues you've had and will have with the
6  panel.  We are vetting issues, not
7  deciding them.  And nothing we say should
8  in any way be misinterpreted as our having
9  defined all of the issues or as agreement
10  with you or as disagreement with you on a
11  position of those issues.
12     What we have tried to do is vet the
13  ones that you have raised with us and to
14  vet ones that we expect to be -- issues
15  that we expect to be addressed orally or
16  in writing because maybe it was just
17  because I had a bad cup of coffee this
18  morning, but they're on my mind or they're
19  on Mr. Moxley's mind.
20     Mr. Kramer, do you have some
21  questions for claimant?
22     MR. KRAMER:  Just a comment.  I
23  learned a century ago in business school
24  that insurance is all about shifting of
25  risk, allocation of risk and I think that

1120

PROCEEDINGS

1
2     CHAIRMAN BYRNE:  Let me put it a
3  different way, if I might:  We have
4  accepted that chart into evidence and will
5  assume the factual underpinnings of what
6  is on that chart for the purpose of either
7  party being able to argue from it by
8  comparison or otherwise if they wish.  If
9  they wish.  And if anyone wishes to bring
10  to our attention now or in argument any
11  inherent falsities of the chart,
12  inaccuracies, we'll deal with it in your
13  briefs.  And I will also tell you if there
14  is a dispute as to the accuracy of it,
15  we'll probably disregard it all together.
16     MR. WAHLQUIST:  If I might on that
17  issue, because I don't want this to come
18  down to your misreading the chart, you're
19  not misreading the chart.  I'd like some
20  clarification on one of these cases, and
21  in particular, I think it's the very first
22  claim the Award Homes case.  AIG
23  characterizes that redemption as having
24  taken place and in what they call the
25  normal case or whatever, not the other

1122

PROCEEDINGS

1
2  one thing I would like to see articulated
3  in the post-hearing memorandum, memoranda
4  is we have a contract here where there is
5  a payment for the shifting of risk.  What
6  is it that does justify or does not
7  justify the allocation of that risk back
8  away from the insurance company?  And
9  that's a way I'd like to see it
10  crystallized.
11     MR. MOXLEY:  A further question I
12  have, and you gentlemen can comment on it
13  now or in the written papers later,
14  Mr. Kushner, you provided last week in
15  response to the Chair's request that
16  schedule of how AIG or related companies
17  have treated various of these policies,
18  and I for one would be interested in
19  hearing your comments as to what we should
20  understand from that, what we should take
21  away from that.
22     MR. KUSHNER:  I had nothing that I
23  wanted to have you take away.  I was asked
24  to give you a schedule and I have no
25  meaning to attribute to it.

1121

PROCEEDINGS

1
2  types of cases, but what they say is they
3  say there was a negotiated redemption
4  after an appraisal was done.  They don't
5  tell us if the redemption was at the
6  appraisal price or not and would I like
7  some clarification on that issue.
8     CHAIRMAN BYRNE:  You know, if you
9  guys want to talk about it, fine.  I'm not
10  going to -- clever, little me.  I accepted
11  it as a demonstrative exhibit, not for the
12  proof of what's on the exhibit.  I will
13  frankly state and appreciate it's being
14  delivered.  It helped me understand most
15  importantly, from my point of view, who
16  was involved, how much was involved and
17  what was basically going on with the other
18  AISLIC insureds.  That's what I looked at
19  it as.  And to be honest with you, I
20  thought it was helping you if you
21  didn't -- helping respondents if you
22  didn't otherwise get that information
23  because I remember from the back of my
24  mind making an evidentiary -- discovery
25  ruling that said no way, Jose, you're not

1123

EXHIBIT AA PAGE 808

PROCEEDINGS

1   PROCEEDINGS
2   getting the underwriting file, you're not
3   getting to examine it, we'll get the bare
4   bones outline, don't read too much into
5   it, pick up the phone and call their
6   lawyer if you want to, pick up the phone
7   and call the lawyer if you know them or
8   find out who they are, and if there is a
9   factual issue and you want us to leave
10  room for a contrary affidavit, God forbid,
11  all power to you, okay?  That's the best I
12  can do for you.
13       MR. WAHLQUIST:  Thank you.
14       CHAIRMAN BYRNE:  Ten minutes.
15       MR. MOXLEY:  I have one more.
16       CHAIRMAN BYRNE:  I'm sorry.
17       MR. STROILI:  I just wanted to point
18  to one thing that was in the record, but
19  we didn't point it out.  It's from Upper
20  Deck's side. Exhibit 281, which is one of
21  their response to an IDR, page seven,
22  response 19.  It points to the fact that
23  KPMG originally asked Upper Deck not about
24  contributing to Austin, but to a Los
25  Angeles fund and the reason given in that

1124

PROCEEDINGS

1   PROCEEDINGS
2   insurer make a partnership before it's too
3   late with respect to the IRS or the IRS's
4   position or coverage under the policy that
5   the chart speaks to the -- also speaks to
6   the proposition that the sooner the
7   better?
8        MR. KUSHNER:  I'm not sure I
9   understand.
10       CHAIRMAN BYRNE:  That the sooner one
11  reaches the partnership, the sooner the
12  cooperation is established between the
13  insured and the insurer?  The better off
14  both parties tend to be?
15       MR. KUSHNER:  As a practical matter,
16  there's no doubt.
17       CHAIRMAN BYRNE:  Okay.
18       MR. MOXLEY:  Thank you.
19       MR. KRAMER:  I just want to make
20  sure because we've misdirected or directed
21  your argument in ways that you may not
22  have planned when you made your outline.
23       Is there anything else you want us
24  to hear now?
25       CHAIRMAN BYRNE:  As opposed to in

1126

PROCEEDINGS

1   PROCEEDINGS
2   response is because Upper Deck didn't want
3   to do that because it established a floor
4   price.  And I just wanted to point that
5   out.
6        MR. MOXLEY:  What I wanted to ask is
7   whether or not we should take from the
8   chart the fact that apparently AIG has
9   paid in some instances, that's it's AIG's
10  position or it isn't its position that if
11  the Upper Deck transaction had been played
12  out in the so-called generic way with the
13  fair market value, there would have been
14  coverage?
15       MR. KUSHNER:  Let me suggest to you
16  yes, if it had been played out in
17  accordance with the terms and conditions
18  of the policy, there would have been an
19  acknowledgement of coverage and Upper Deck
20  today might well be in the same position
21  as the Award Homes and Santa Clara and
22  that is opposing the IRS assessment.
23       CHAIRMAN BYRNE:  So does it also
24  stand for the proposition that if you make
25  a partnership with -- the insured and the

1125

PROCEEDINGS

1   PROCEEDINGS
2   writing?
3        MR. KRAMER:  As opposed to in
4   writing.
5        MR. KUSHNER:  I don't think so.
6        MR. STROILI:  I just had a question
7   in terms of briefing on the bad faith
8   issue.
9        CHAIRMAN BYRNE:  If it's a question
10  as to how to handle it.
11       MR. STROILI:  Yeah.
12       CHAIRMAN BYRNE:  Let's leave that
13  until this afternoon.
14       MR. STROILI:  That's fine.
15       CHAIRMAN BYRNE:  But jot it down,
16  okay?  Ten minutes, please.
17       (Brief recess taken.)
18       CHAIRMAN BYRNE:  Back on the record,
19  please.
20       Before I forget, "burdens" is a --
21  in arbitration, it is an issue analysis,
22  not a case analysis, so you are, for
23  example, and I'll take the main ones,
24  claimant has the burden with respect to
25  things like conditions precedent and

1127

EXHIBIT AA, PAGE 809

PROCEEDINGS

1128

1    PROCEEDINGS
2    exclusion.  Claimant and respondent share
3    a burden on a core coverage issue.
4    Respondent would have a burden on issues
5    like good faith.  And that's in accordance
6    with practice, New York law, how under the
7    FAA a court would review an award, et
8    cetera.
9        With that said, Mr. Howell, thank
10   you for your patience.  Proceed.
11       MR. HOWELL:  Thank you, and I'll
12   start off by echoing Counsel's comments
13   not only about the panel, but
14   reciprocating the comments he made about
15   our office.  Their office has been
16   professional, cooperative, courteous.
17   It's been -- I don't want to say a
18   pleasant surprise, but something akin to
19   that and I appreciate the hospitality all
20   of you have shown us in connection with
21   these proceedings and the months leading
22   up to these proceedings.  It's been a nice
23   exchange.
24       In terms of getting to the merits of
25   this, and this relates a little bit to

PROCEEDINGS

1130

1    PROCEEDINGS
2    AIG ever could have hoped for, and I'll
3    get to the details on that.
4        From my client's standpoint, this
5    isn't a windfall, this is the risk that it
6    paid for.  It put its chips down on the
7    table with respect to the $3.25 million
8    dollars, and I want the panel to keep in
9    mind, the $50 million, it's taxable.  This
10   doesn't go just to the bottom line.  I
11   just think to have that background so that
12   we understand what people were doing when
13   they entered into this policy and what we
14   did when we wrote a $3.25 million check
15   and what our expectations were.
16       Now, there's been a lot of
17   discussion particularly today about what
18   did AIG insure?  And I keep hearing AIG
19   said we insured a plan, we insured a
20   strategy and then they go to provisions
21   that are buried in the opinions or
22   somewhere else and say, see, it's right
23   there.  You don't have to go there to
24   understand what AIG insured.
25       AIG didn't insure a plan, they

PROCEEDINGS

1129

1    PROCEEDINGS
2    what Mr. Kramer asked about, but this is a
3    specialized policy with specialized,
4    unique risks.  It was a fairly narrow set
5    of events that were in issue.  And before
6    I get to the specifics of what they
7    insured, because from our perspective,
8    it's isn't even something that can really
9    be debated or questioned in terms of what
10   was insured, but I want to focus first on
11   the impact on the insureds here.
12       This is a situation where, as
13   Mr. Kramer pointed out, we paid AIG
14   $3.25 million.  We also paid KPMG almost
15   $600,000.  We paid the Austin firefighters
16   $2 million.  We incurred extensive other
17   costs and expenses in the form of
18   attorney's fees, accountant's fees and we
19   have not received a dime of tax benefits.
20   This has been a drain going one way.  And
21   one of the consents I'm going to talk
22   about is a concept of windfall because if
23   there's any result here where AIG pays my
24   client anything else than $50 million, it
25   will be the most fortuitous windfall that

PROCEEDINGS

1131

1    PROCEEDINGS
2    didn't insure a tax strategy.  What AIG
3    insured in endorsement number one was you
4    will have insurance coverage in the event
5    the IRS makes certain assertions against
6    you.  And the most obvious one here is D,
7    the post-gift allocations of Upper Deck's
8    taxable income to the municipal plan are
9    not correct and proper.  And then I think
10   exclusion A talks about if they make an
11   assertion against you about the second
12   class of stock, so in terms of what AIG
13   insured, they insured that kind of
14   argument about income allocation, about
15   second class of stock.  It's endorsement
16   number one for a reason.  It's the
17   definition of insured tax event.
18       Now, I agree with AIG.  That doesn't
19   end the story in terms of understanding
20   whether or not we have absolute coverage
21   here.  But that's the triggering event.
22   That's the event that triggers.  Yes, this
23   is encompassed and there's no dispute that
24   the IRS came after us on income allocation
25   and they came after us on second class of

EXHIBIT AA , PAGE 210

PROCEEDINGS

1. stock, for example.
2. Now, another thing that I want to
3. point out about the opinions, the KPMG
4. opinions, just preliminarily, those
5. opinions contemplated the strategy not
6. working. They say more likely than not,
7. should prevail, likely to prevail. AIG
8. knew that and AIG decided to insure in
9. accordance with the insured tax event
10. these assertions by the IRS. It doesn't
11. say you -- we are insuring this plan or if
12. the IRS attacks this plan. That's not
13. what triggers insurance.
14. Now, Exhibit 104 is the policy. And
15. we've heard a lot of talk about what's in
16. the policy, the references to the opinion
17. and you do look to the insurance policy
18. once you've got this triggering event in
19. terms of an insured tax event, which we
20. clearly have, that's what the policy
21. insured against. You look to the terms
22. and conditions of the policy. And where
23. do you always look to the terms and
24. conditions of the policy to see whether or

1132

PROCEEDINGS

1. and it must be accompanied by an
2. appraisal. That language does not exist.
3. And it does not exist anywhere in Exhibit
4. 104, the policy documents. It does not
5. say that in any of the opinions that KPMG
6. authored either. The language doesn't
7. exist. What they do is they repeatedly go
8. to language that focuses on how the put is
9. to operate and they try to take that
10. language and graft it to other places.
11. Now, what has AIG told us about the
12. significance of the put or fair market
13. value or an appraisal? Well Mr. Laythrop,
14. their in-house attorney, he came in here
15. early on in these proceedings and he told
16. us that the most critical aspect of this
17. transaction was that in any repurchase,
18. there be fair market value. He said I
19. knew that, I knew it ahead of time and I
20. knew this was fundamental and critical and
21. it applied to any effort to get this stock
22. back. AIG knew it. At least that's what
23. they tell us. We don't see a single
24. writing, E-mail, anything from

1134

PROCEEDINGS

1. not coverage applies? Where do you look?
2. You look to the exclusions and you look to
3. representations and warranties. That's
4. where this language is supposed to be.
5. And if you look to the exclusions and the
6. representations and warranties in this
7. case and in the shareholder's agreement or
8. any of the other documents, there is
9. nothing in those documents that says you
10. must follow the put procedure. It's
11. exclusive in any way, shape or form. In
12. the event you don't follow the put
13. procedure, you must pay fair market value
14. and must have an appraisal that
15. accompanies it. That put procedure has a
16. life span of a maximum of 180 days.
17. There's a whole realm of transactions that
18. can take place outside the realm of that
19. put procedure. It is very easy, very
20. easy, to write up language that says you
21. must follow the put procedure. It is very
22. easy to write up language that says if you
23. do any sort of a buy back, redemption or
24. whatever, it must be at fair market value

1133

PROCEEDINGS

1. Mr. Laythrop reflecting that
2. understanding, but that's what he told us.
3. And as I said before, these consents,
4. these critical, fundamental concepts are
5. easy to express in a document. They are
6. easy to draft exclusions for. They are
7. easy to draft representations and
8. warranties for. It's easy to put a
9. provision like that in the shareholder's
10. agreement and it does not exist and it's
11. obvious where they go. They go in those
12. documents. And they don't exist. And
13. they're not in the -- they're not in the
14. KPMG opinions either.
15. Those sorts of wide sweeping
16. propositions, which are the hallmark of
17. AIG's defense in this case, are not in the
18. policy documents anywhere. And guess
19. what, AIG admits it. What does AIG say at
20. page 17 to 18 of their opening brief in
21. this case? This is a quote: "Respondents
22. breached their promissory warranty with
23. respect to the critical assumption that
24. fair market value would be paid for the

1135

EXHIBIT AA, PAGE 311

PROCEEDINGS

1  Austin shares." An assumption. That's
2  where AIG is in this case. We assumed you
3  would pay fair market value for it.
4      Now, near as I can tell, this
5  assumption that these procedures would
6  always be followed, we're not the only
7  ones who had an understanding that that
8  assumption didn't exist. We heard
9  testimony in this case from Austin
10 firefighters about Net Source. They
11 engaged in a voluntary, mutual repurchase
12 outside of the put process without a fair
13 market valuation just like we did. In
14 fact, they did it before we did because
15 presumably, they read the KPMG transaction
16 documents and the insurance documents to
17 allow for the same thing. And guess what
18 else we know from this chart?
19     CHAIRMAN BYRNE: Are you
20 suggesting -- I don't think you mean to
21 suggest that what Austin firefighters did
22 has any relevance to our consideration.
23     MR. HOWELL: What I am suggesting is
24 that AIG first with Mr. Laythrop and then

1136

PROCEEDINGS

1  right up through their briefing in this
2  case has said this is the most critical
3  component of the deal.
4      CHAIRMAN BYRNE: Okay.
5      MR. HOWELL: And to the extent they
6  were involved in other deals. And we know
7  from the chart they were involved in a
8  total of four deals.
9      Now what do we also know from that
10 chart? In three of the four deals, and
11 we're one of them, it wasn't done in
12 accordance with the put process. It
13 was --
14     CHAIRMAN BYRNE: Okay.
15     MR. HOWELL: -- "negotiated."
16     CHAIRMAN BYRNE: Okay.
17     MR. HOWELL: So whatever critical
18 assumptions they made and however they're
19 expressed in the policy documents, we are
20 not the only ones with the understanding
21 that a mutual, voluntary transaction
22 outside the 180-day put procedure is
23 contemplated and is permitted and is
24 nowhere prohibited by anything in the

1137

PROCEEDINGS

1  opinions, anything in the shareholder's
2  agreement or anywhere else in the policy
3  documents including the most obvious
4  places where they would be, in the
5  exclusions and in the representations and
6  warranties.
7      CHAIRMAN BYRNE: All right. That
8  part of it, I got.
9      MR. MOXLEY: What about their point
10 that in one -- I forget exactly which one,
11 I'm looking for it here, but in one of the
12 company's letters to the IRS, the company
13 made the point well, we're going to have
14 appraisal here or something like that.
15     MR. HOWELL: Well, that's not what
16 it said. It was the initial voluntary
17 disclosure made in 2002 before the
18 repurchase, and in that voluntary
19 disclosure, the IRS asks you to explain
20 the deal. And that voluntary disclosure
21 doesn't say we're going to do the put
22 process. What it says is they have the
23 right to do it commencing on this day. It
24 just describes a right that is held by

1138

PROCEEDINGS

1  Austin. Doesn't say it will happen,
2  doesn't say it won't happen. It explains
3  the deal and says that the Austin
4  firefighters have the right to put this
5  back to us commencing in April of '03.
6      MR. MOXLEY: What about their
7  broader argument that if you read -- and
8  maybe you'll say this isn't the right way
9  to read it -- but if you had read the KPMG
10 opinions broadly and in their natural
11 meaning, the justification they give for
12 why this approach will work is that you're
13 not going to run a foul of two classes of
14 shareholder and you're going to have fair
15 market value.
16     MR. HOWELL: Okay, I want to address
17 that and you're getting down further in my
18 outline.
19     MR. MOXLEY: Just go to it when
20 you --
21     MR. HOWELL: I'd like to address it
22 now because to me, that's been one of the
23 fundamental misunderstandings in this case
24 and it's the reason for the existence of

1139

PROCEEDINGS

1   the put.
2
3        The put does not exist because it is
4   fundamental to the SC2 strategy and income
5   allocation working.  The reason the put
6   exists and that right exists is so
7   charities like Austin firefighters will
8   participate in the strategy.  It is their
9   economic bone.  When you go out and try to
10  get a charity to participate in the
11  strategy, you tell them you have the right
12  to liquidate it in accordance with this
13  procedure, redemption procedure or put
14  procedure that we're going to provide to
15  you.  It is an economic bone provided to
16  Austin, but what it does when you enter
17  into a buy/sell agreement, and that's
18  really what a put is, and this is the
19  language that's talked about, in order to
20  avoid a second class of stock, and this is
21  the safe harbor regulations, it says that
22  if you're going to give that economic bone
23  to one set of shareholders and not another
24  set of shareholders, your buy/sell
25  agreement cannot, and this is at the front

1140

PROCEEDINGS

1
2   without using the put procedures, that
3   that somehow creates a second class of
4   stock problem.  That's not true.
5        CHAIRMAN BYRNE:  It's not, but isn't
6   it not true because that's not necessarily
7   all of the second class of stock argument?
8   I'm asking, I guess, isn't there a
9   difference between the second class of
10  stock argument and the safe harbor
11  provision, which at least in my
12  experience, there is.
13       MR. MOXLEY:  What you don't want is
14  for it to look like a parking arrangement
15  and having the buy back be at fair market
16  value, as I understood it, conceptually,
17  takes that out as a -- as what would
18  otherwise have been a fatal problem.
19       CHAIRMAN BYRNE:  Well, isn't that
20  safe harbor?  What I'm saying is a second
21  class of stock issue also arises when you
22  have same stock, same value, one of which
23  gets 10 percent of the earnings, the other
24  of which gets 90 percent of the earnings,
25  doesn't that create two classes of stock

1142

PROCEEDINGS

1
2   end, give them the right to -- it cannot
3   have a provision allowing for the purchase
4   of that stock back in accordance with the
5   buy/sell provisions substantially above or
6   substantially below fair market value.
7   That's the second class of stock issue, so
8   it is defensive in nature.
9        The put doesn't help SC squared.
10  The put creates an additional problem for
11  SC squared, namely, when you're giving the
12  charity a put, you're giving them a right
13  that is different than what the other
14  shareholders have, a buy/sell right, and
15  when you do that, you run the risk of
16  creating a second class of stock and what
17  it says is you can avoid the second class
18  of stock designation if your buy/sell
19  agreement says it will be purchased at
20  fair market value.  You could take the put
21  out of this transaction.  And it wouldn't
22  affect the viability of SC squared at all
23  in terms of the income allocation.  And
24  they keep talking about how when you buy
25  the stock back, voluntarily and mutually,

1141

PROCEEDINGS

1
2   as well?
3        MR. HOWELL:  That is a different
4   second class of stock argument.
5        CHAIRMAN BYRNE:  Okay.  But you were
6   saying the second class.  That's what I --
7        MR. HOWELL:  Okay, well when I say
8   that, I mean the one that they constantly
9   site to in the references, the fair market
10  value, and I'll read the regulation.
11       CHAIRMAN BYRNE:  No.
12       MR. HOWELL:  Okay.
13       MR. KRAMER:  I want to get back to
14  what Arbitrator Moxley just said about a
15  parking arrangement.  I think regardless
16  of whether there's a fair market value or
17  appraisal right in the put, I don't see
18  how you have anything but a parking
19  arrangement unless there's a way to compel
20  the repurchase of this stock.
21       MR. HOWELL:  You could argue that
22  the put provision, if it's mandatory and
23  has to be used, it creates that very
24  parking arrangement because it says you're
25  not really a shareholder and you can't

1143

upper deck-aig arb

EXHIBIT AA, PAGE 813

Page  1140 - 1143

PROCEEDINGS

1  PROCEEDINGS
2  stay in the game past that put option
3  procedure or you can't get out before,
4  that we've got a mandatory, defined time
5  when you have to get out, which is, in
6  effect, what AIG's arguing here.  It
7  increases the chance of being viewed as a
8  parking arrangement.  That's the concern
9  that I see with respect to the put option
10  procedure and when Mr. Laythrop or
11  somebody says you had to use it, it was
12  our expectation it had to be used, it
13  increases the risk of being viewed as a
14  parking arrangement, so that's the way I
15  view that component of it.
16       MR. KRAMER:  The whole thing is
17  construct, but without that put
18  arrangement, you have a situation where if
19  you could convince anybody to take the
20  stock, it was tax exempt, you get
21  90 percent of the income, you don't pay
22  any taxes on it, we get to accumulate all
23  of the income in the company and we don't
24  pay taxes.  We pay taxes on 10 percent.
25  We're not compelling it didn't -- we've

1144

1  PROCEEDINGS
2  already got a resolution that says that
3  there's not going to be any distribution
4  made, so you're getting nothing
5  essentially, and maybe some day, if we
6  feel like it, we'll buy the stock from
7  you, but don't forget, we've also got
8  these warrants where we can dilute
9  whatever you've got into some meaningless
10  participation in the company.  I don't see
11  how you get around having that put be an
12  essential part of the structure.
13       MR. HOWELL:  I think it's an
14  essential part of the structure from the
15  marketing standpoint.  Meaning no one's
16  going to do the deal.  And you referenced
17  that.  How are you going to get somebody
18  to do it?  I'm saying that from the
19  concept of parking stock, with or without
20  the put, subject to that exposure and
21  there is an argument I think that says
22  when the put is deemed to be mandatory,
23  that you have to do it, you've defined not
24  only that the stock is going to be parked,
25  but for how long?

1145

1  PROCEEDINGS
2       MR. KRAMER:  Yeah, but the whole
3  thing, it's like one of these fancy
4  desserts in a nouvelle cuisine restaurant.
5  Everything leans on everything else, but
6  you have to, after all the elements, you
7  have to have the chocolate and the whipped
8  cream.  You have to have the put to and
9  you have to have the -- to avoid the
10  parking arrangement and you have to have
11  the fair market value to avoid the second
12  class of stock.  Otherwise, the whole
13  thing doesn't work.
14       MR. HOWELL:  You have to have -- if
15  you're going to provide the put, you have
16  to have the fair market valuation in there
17  because it's just -- otherwise, you will
18  have a second class of stock.  That's
19  obvious under the regulation.
20       What I'm trying to articulate a
21  different thought about is that I don't
22  agree that you couldn't have a deal
23  without the put option.  I think you could
24  make the exact arguments without the put
25  option in there.  I think you'd have a

1146

1  PROCEEDINGS
2  real hard time finding somebody to do it
3  and I don't think you would be any more or
4  less and perhaps less vulnerable to a
5  parking of stock argument because if
6  you're going to argue that the put is
7  mandatory and the put has to be provided
8  with, you've not only defined that the
9  stock is going to be parked, but you're
10  saying it's going to be parked up until
11  this 180-day window and then it's coming
12  back.
13       CHAIRMAN BYRNE:  Okay.  Let's assume
14  that.
15       MR. HOWELL:  Whereas without the
16  put, it may stay there forever if it's not
17  deemed to be mandatory.
18       MR. KRAMER:  But where is the hair
19  of economic reality in this case?
20       MR. HOWELL:  The hair of economic
21  reality in this case is that you're a
22  shareholder and the company cannot make
23  distributions unless it's going to give
24  distributions to you.  It will have to
25  deny itself during that entire period of

1147

PROCEEDINGS

1        PROCEEDINGS
2 time as well.  That's the economic hair
3 that's on it.
4        CHAIRMAN BYRNE:  What the hell does
5 the company care in denying itself
6 10 percent of the distribution?
7        MR. HOWELL:  The reason the company
8 cares is because the company and its
9 shareholders can't get access to any cash,
10 any distribution.
11        CHAIRMAN BYRNE:  That's a
12 shareholder.  All they have to do is
13 distribute 10 percent.  The burden has
14 shifted dramatically, has it not?  Isn't
15 that the heart of any tax shelter?
16        Here's what I'm suggesting, Mr.
17 Howell, and I genuinely believe that we
18 understand your point, but what I think
19 you really have to get to, and this goes
20 to both sides, if you haven't figured out
21 by now that you should stay away from
22 corporate law, you haven't been listening.
23 If you haven't figured out by now, you
24 should stay away from shareholder's
25 agreement and how they read and stock

            1148

1        PROCEEDINGS
2 repurchase agreements, except for their
3 impact on the bottom line.  Stay away from
4 them.  Let's give you -- personally, I
5 think you're better off saying who cares
6 how you come to fair market value, we came
7 to fair market value in a repurchase, so
8 what's the problem?  That's the --
9        MR. MOXLEY:  I'll get to that.
10        CHAIRMAN BYRNE:  That's a personal
11 opinion.
12        MR. HOWELL:  Okay.
13        CHAIRMAN BYRNE:  What I don't want
14 this to get -- I don't want -- I don't
15 think respondent has to get bogged down --
16 and I know that's a loaded word -- in
17 dealing with the reps and warranties and
18 exclusions and that stuff.  Which is why I
19 said what I did before you started.  I'm
20 not saying you don't address them, but
21 focus on the fact that what happened was
22 not -- assuming that what happened was not
23 the transaction annexed to the agreement,
24 annexed to the insurance contract and made
25 a part thereof.  So what?  And you started

            1149

1        PROCEEDINGS
2 off with a bang in terms of insured tax
3 event and now we really need you to get to
4 insured tax loss.
5        MR. HOWELL:  Okay.
6        CHAIRMAN BYRNE:  Respectfully.
7        MR. HOWELL:  Okay.  Let me finish
8 off the point that I was making.
9        In terms of, again, this critical
10 assumption, and other parties, apparently
11 didn't view this critical assumption any
12 differently than we did and I've indicated
13 what the charge has shown other parties
14 did.  I'll also note that KPMG is involved
15 in this process.  We don't have a note,
16 memo or inkling from KPMG that a
17 repurchase in this time frame was
18 violative or --
19        CHAIRMAN BYRNE:  I agree with you.
20        MR. HOWELL:  -- or wasn't complicit
21 with the strategy.
22        CHAIRMAN BYRNE:  I agree with you.
23 All we have is what happens.
24        MR. HOWELL:  And the fundamental
25 point here that is perhaps lost from a

            1150

1        PROCEEDINGS
2 legal perspective and I want to stress it,
3 is that the law in this area of exclusions
4 and warranties and policies, the law in
5 this area, it's not kind to insurance
6 companies.  The law imposes on insurance
7 companies an enormous burden of clarity
8 and being specific and will quote that law
9 and they don't get to make assumptions or
10 make arguments by implication.  They have
11 to be clear, specific and direct.  And one
12 thing is clear.  You can use -- look at
13 the KPMG opinions and include it in this
14 process.  They are not clear, specific and
15 direct on the issue of the put procedure
16 being mandatory, fair market value or the
17 fact that all redemptions had to be
18 accompanied by an appraisal.
19        CHAIRMAN BYRNE:  Have you ever in
20 your experience seen an IB opinion clear,
21 specific and direct?
22        MR. HOWELL:  Excuse me?
23        CHAIRMAN BYRNE:  Have you ever in
24 your career seen an investment banker's
25 opinion or an accountant's opinion be

            1151

PROCEEDINGS

1 clear, specific and direct?
2 MR. HOWELL: Well, I'll answer your
3 question.
4 CHAIRMAN BYRNE: I mean, I'll put it
5 a different way: The answer to that
6 question is no. Do we have to find, do we
7 have to -- don't you want us to spend more
8 time on the policy being clear and direct
9 and to the extent the opinion is part of
10 the policy --
11 MR. HOWELL: I am simply responding
12 that I think the policy is clear, direct
13 and specific in the sense that it would
14 have been easy to include that type of
15 language about fair market value,
16 appraisal, the put and it's not there.
17 CHAIRMAN BYRNE: Okay.
18 MR. HOWELL: What I'm responding to
19 is the argument from AIG which is a
20 grasping argument. They're diving into
21 paragraph 14 of a given opinion letter,
22 which talks about the specific put
23 procedure and say, see, it calls for fair
24 market value so that means fair market

1152

PROCEEDINGS

1 value is required everywhere. That, to
2 me, is the appendage argument that they've
3 made, not one that I accept, but one that
4 I respond to.
5 CHAIRMAN BYRNE: We don't disagree.
6 MR. MOXLEY: Let me ask you. I
7 mean, I understand your point or what I
8 take to be your point, which is that it
9 would have been quite easy for the
10 in-house lawyers and the coverage people,
11 the underwriting people and so forth at
12 AIG to have made these points explicit.
13 Okay, that these are preconditions, these
14 are bases of exclusion and so forth. And
15 I understand your point that the law is
16 often, one might say, harshly construed
17 against carriers in this kind of situation
18 based on an assumption that carrier is
19 supposed to be providing coverage.
20 Here's the question, and I think
21 it's an issue and it's perhaps one to be
22 briefed as well as addressed now, but what
23 is the relevance of some consideration of
24 the reasonable intent of the transaction

1153

PROCEEDINGS

1 that's going to be covered here? The KPMG
2 opinions are incorporated, as Mr. Stroili
3 pointed out, from the policy and arguably
4 one can read them as saying well, you
5 know, there's some basic assumptions here
6 in terms of one class of shareholder and
7 not undermining that and other elements
8 that were considered crucial here, so the
9 question becomes is there or is there not
10 an obligation upon the respondents here to
11 not do anything in terms of a buy back or
12 anything else that undermines the
13 viability of the strategy which is the
14 subject ultimately of the coverage here?
15 MR. HOWELL: First point is a legal
16 one. If it's not spelled out, no, there
17 is no such responsibility and that's the
18 law. The second point is a voluntary buy
19 back between the parties, after the fact,
20 does not raise a second class of stock
21 issue. A voluntary buy back between
22 the --
23 MR. MOXLEY: That's your argument
24 you just made. I understand. Yeah, I

1154

PROCEEDINGS

1 understand it.
2 MR. HOWELL: It's a little bit
3 different in the sense that the second
4 class of stock issue is when you create a
5 right ahead of time and say you have this
6 buy/sell right that carries forward, but
7 if you come to you voluntarily, outside
8 the confines of that agreement or you come
9 to me, there is no notion that you paid
10 too much or you paid too little for the
11 stock and now you've created a second
12 class of stock.
13 MR. MOXLEY: I take it you'd
14 acknowledge that if the company had had
15 the right to say to the charity, we'll
16 take this back whenever we want and we'll
17 give you whatever we want to give you,
18 that that would be a problem vis-a-vis the
19 tax strategy?
20 MR. HOWELL: I don't think the deal
21 ever would have been entered into at that
22 point in time and this would be something
23 that would be analyzed as part of the
24 component of the tax strategy.

1155

upper deck-aig arb          EXHIBIT AA, PAGE 816          Page 1152 - 1155

PROCEEDINGS

1  MR. MOXLEY: I see. So you'd say
2  AIG wouldn't have entered into it and, in
3  fact, they've presented testimony that's
4  not rebutted that they turned down a
5  transaction because it wasn't going to be
6  what they regarded as a protection.
7  MR. HOWELL: I wasn't saying AIG
8  wouldn't have done it. I was saying the
9  charity wouldn't have done it.
10  MR. MOXLEY: But your point is it
11  has to be explicit. There's no good
12  faith. There's no general carry through
13  unless you have something explicit that
14  says this is a precondition.
15  MR. HOWELL: And here's why it has
16  to be specific. If it's specific and it's
17  clear, as it wasn't clear to anyone who
18  reads these documents including other
19  policyholders, we're not going to do the
20  repurchase. If there's a condition that
21  says this is the most critical assumption
22  and you need to get an appraisal, the
23  deal's not going to go down the way that
24  it does because you're going to get an

1156

PROCEEDINGS

1  appraisal. This is not something that was
2  prohibited anywhere in the policy or any
3  policy documents.
4  CHAIRMAN BYRNE: All right, but that
5  is an act. An act of redeeming the
6  shares. And let's assume that it was for
7  fair market value. Whatever the hell it
8  was at the time it was. Assume you had
9  five appraisals and bought it back for the
10  middle. Okay? Your expert, not
11  personally, but respondent's tax expert,
12  opined that even if it was fair market
13  value, the strategy would not have worked.
14  Stop. Gets to a very basic question,
15  Mr. Howell. What was the insurance for?
16  What was the insured tax loss? I know
17  what the insured tax event was here. What
18  was the insured tax loss? Because if I
19  take your argument to the extreme, which
20  we all tend to do one way or another, part
21  of what you're telling me is that this is
22  isn't prohibited, that's not prohibited,
23  the other thing's not prohibited. I agree
24  with you. Let's assume I agree with you.

1157

PROCEEDINGS

1  That's telling me that I can enter into
2  any kind of tax shelter that I think will
3  work or I can -- whether it can work or
4  not -- I can enter into a tax shelter and
5  get in and out of it if I have a tax loss
6  because I got in and out of the tax
7  shelter, the insurance, whatever it is,
8  tax shelter, AIG has to insure the loss if
9  the IRS says whoops, is that your
10  position? I mean is that the underlying
11  basic position you're taking?
12  MR. HOWELL: The underlying basic
13  position is just that.
14  CHAIRMAN BYRNE: I had a loss, you
15  insured the loss, that's it.
16  MR. HOWELL: And you need to
17  understand, we don't get out of the tax
18  strategy. The tax strategy is implemented
19  and utilized in '01 and '02 and we filed
20  returns as we're obligated to do in order
21  to comply with the policy requirements and
22  what we do is we make a decision not to
23  carry forward with the strategy and
24  frankly expose AIG to more potential risk

1158

PROCEEDINGS

1  in to 2003.
2  CHAIRMAN BYRNE: Don't worry about
3  it. They got lots of money and they got a
4  limitation on there at $50 million, okay,
5  under New York law, which is very strict,
6  unless you can get out of it by good
7  faith, the good faith argument, which we
8  haven't gotten to yet, $50 million, that's
9  it. It's actually $49.5 million is the
10  limit, for all intents and purposes, the
11  way they work a retention and that's legal
12  bills and loss, okay. You did what you
13  did.
14  MR. HOWELL: And let me -- the
15  reason I'm going through the argument in
16  this fashion is because as I've sat here,
17  my perception is certain arguments like
18  fair market value and consents have been
19  morphed into areas and what I'm trying to
20  explain in going through my argument is
21  that I think this hurdle of contract
22  interpretation, I'll call it, under the
23  exclusions, the warranties, if you don't
24  get through that hurdle, you don't even

1159

EXHIBIT AA, PAGE 817

PROCEEDINGS

1  need to get to the tax experts.

2  I intend to talk about what the tax

3  experts have to say and Mr. Moxley

4  referenced in his causation, I intend to

5  address all that, but the reason I'm

6  bringing it up is if there isn't an

7  exclusion or a prohibition or something

8  like that, even if it increased the risk,

9  like smoking in bed.

10  CHAIRMAN BYRNE: Okay.

11  MR. HOWELL: I don't get it there.

12  You still have to pay for the fire.

13  CHAIRMAN BYRNE: Why? Why?

14  MR. HOWELL: I'm saying that --

15  CHAIRMAN BYRNE: No, why? No, why?

16  We'll give you all of those arguments.

17  MR. HOWELL: Because of the law that

18  exists upon insurance companies that they

19  need to be specific and direct in their

20  policy exclusions and in the

21  representations and warranties they get

22  from their insureds and if you don't find

23  an out from coverage under the policy,

24  even if you smoked in bed and increased

1160

PROCEEDINGS

1  MR. HOWELL: And --

2  CHAIRMAN BYRNE: So the insured tax

3  event, you say, is any challenge by the

4  IRS, any successful challenge by the IRS

5  that results in the payment of additional

6  taxes, interest or whatever?

7  MR. HOWELL: Yes, the insured tax

8  event is any assertion by the IRS.

9  CHAIRMAN BYRNE: Okay.

10  MR. HOWELL: Of that. Income

11  allocation, second class of stock, an

12  assertion which has clearly and undeniably

13  been made in this instance.

14  CHAIRMAN BYRNE: Well, how about the

15  assertion goes back to the tax year 2000?

16  In terms of how dividends were distributed

17  and how income was distributed that the

18  shareholders and the frequency thereof,

19  dah, dah, dah, which led the problems in

20  '01 and which led to problems in '02.

21  MR. HOWELL: Well, in 2000, it's

22  outside the policy period, so there isn't

23  going to be any coverage, but the way the

24  policy is written, if -- and this is their

1162

PROCEEDINGS

1  the risk or even if you engaged in a

2  repurchase and one accepts that it

3  increased the risk, it's not excluded.

4  CHAIRMAN BYRNE: Well, wait a

5  second. Let's assume all of the policy is

6  clear and explicit and I agree with you

7  and I agree with you that it is not so

8  clear and specific with respect to the

9  reps and warranties and the exclusions,

10  except there were two parts of that policy

11  that are clear and direct. One, insured

12  tax event. Two, insured tax loss.

13  MR. HOWELL: Well, I agree and I'll

14  turn -- I'm struggling with what the issue

15  is to insured tax loss. The definition

16  means any taxes, interest, fines or

17  penalties owed by any insured to a taxing

18  authority directly related to the insured

19  tax event, the definition we've already

20  covered, subject to all the terms,

21  conditions and exclusions of the policy.

22  I'm trying to deal within the confines of

23  that language.

24  CHAIRMAN BYRNE: Okay.

1161

PROCEEDINGS

1  writing -- if the assertion is made,

2  second class of stock or income

3  allocation, the income allocation is going

4  to be directly related to the charitable

5  contribution, obviously, but if those

6  assertions are made, you're within the

7  scope of coverage and insurance companies

8  don't get to come back and say we really

9  didn't mean to insure that much. They're

10  bound by the scope of the coverage that

11  they offered here. And the coverage they

12  offer here isn't if somebody challenges a

13  plan or challenges the SC squared

14  transaction as implemented or any language

15  like that. It is if an assertion is made

16  about second class of stock and income

17  allocation and that claim was clearly and

18  explicitly made over and over by the IRS.

19  CHAIRMAN BYRNE: At the time that

20  assertion is made, what if anything is the

21  obligation of the insured to the insurer

22  at the time the assertion is made?

23  MR. HOWELL: The very obligation

24  that's defined by the policies, which is

1163

EXHIBIT AA, PAGE 818

PROCEEDINGS
1
2  to work with your carrier, to notify your
3  carrier, and this is something that my
4  client is literally pulling his hair out
5  over, the characterizations about
6  cooperation with AIG.  We were scared to
7  death of the way AIG was going to handle
8  this.  We did everything we could to keep
9  AIG lock step with us in dealing with the
10  Internal Revenue Service.
11      CHAIRMAN BYRNE:  How?  What did you
12  do?
13      MR. HOWELL:  Every single IDR,
14  hundreds of them, before we ever blew a
15  response by them, we shared it with AIG.
16  We gave them boxes full of documents and
17  this includes all the repurchase documents
18  and everything else, everything that we
19  sent to the IRS, be it firefighter's
20  documents, be it KPMG documents, be it our
21  own documents, we would take each box,
22  copy it, one to the insurance company, one
23  to the Internal Revenue Service.
24      What we didn't have here was
25  somebody stepping forward and saying we

1164

PROCEEDINGS
1
2  your point.  I asked you, you know, isn't
3  there some implicit obligation of the
4  policyholder to act in good faith
5  vis-a-vis the objectives of the strategy,
6  and your answer was no, flat out, you
7  know, the law is you have to be specific
8  in the exclusions and the representations,
9  and the warranties and so forth.
10      What's the significance of that
11  language at the very top of the policy
12  under the heading Fiscal Event Insurance
13  Policy where it says, "In consideration of
14  the payment of the premium and reliance
15  upon the representations made," what does
16  that do in terms of the KPMG policies and
17  anything that those policies would seem to
18  emphasize?
19      MR. HOWELL:  That's another point
20  because when you go to the
21  representations, what we said in the
22  representations is that you can rely on
23  the facts that are asserted in the KPMG
24  opinions, the facts, understandings of
25  fact, et cetera.  Each of those KPMG

1166

PROCEEDINGS
1
2  understand, you got a claim here, we
3  understand you have a loss here, let's
4  work together on this.
5      We had somebody, and the documents
6  bear this out, who, from day one, treated
7  this, and I want to get into this because
8  it gets into my bad faith, treated this as
9  a how are we going to get out from under
10  our coverage obligation here?  And they
11  have made ridiculous and fanciful
12  arguments to try and do that from Tiger
13  Woods to Yugio, and I'm going to address
14  this, I don't want to get too off point
15  here.
16      CHAIRMAN BYRNE:  Don't.  Don't.  You
17  don't have to.  You really don't have
18  because we didn't take that it --
19  understand how we understood, you know,
20  what we took it for.
21      MR. HOWELL:  We didn't have the
22  ally.  We had the enemy and we had them
23  day one.  Day one.  But I want to address
24  that later.
25      MR. MOXLEY:  Let me ask, you made

1165

PROCEEDINGS
1
2  opinions is preceded by a heading that
3  says, "Facts," and it lays out what the
4  facts are in those opinions.
5      MR. MOXLEY:  I thought there was
6  language that picked up conclusions or
7  assumptions or the like.  Maybe I'm not
8  remembering.
9      MR. HOWELL:  Assumptions of fact.
10      CHAIRMAN BYRNE:  Assumption of fact.
11      MR. HOWELL:  Yeah, it's all tied to
12  facts.
13      CHAIRMAN BYRNE:  IB opinion.
14      MR. HOWELL:  Has a fact section.
15      Sorry, I don't know if that responds
16  to your question.
17      MR. MOXLEY:  So I think we've
18  essentially covered this point.  Let's
19  move on.
20      MR. HOWELL:  And I'm not suggesting
21  that insureds don't have to cooperate or
22  shouldn't cooperate with insurance
23  companies.
24      What I am suggesting is the notion
25  that didn't happen on this side of the

1167

PROCEEDINGS

1. table is completely without support.
2. MR. MOXLEY:  So what I would have
3. thought would be where you have a
4. nontraditional policy, something that's
5. specific to a particular transaction, in
6. effect, or type of transaction, that there
7. would be some implicit obligation on the
8. part of the insured, broadly speaking, to
9. act consistently with the objectives and
10. the presumptions of the strategy and to
11. consult if there's an issue that comes up
12. like should we do it one way or the other
13. way or the like.  Maybe that's wrong.
14. MR. HOWELL:  And here's why I think
15. if you look at what's in the shareholder's
16. agreement, it tells us when we have to
17. give AIG notice of certain things and --
18. CHAIRMAN BYRNE:  You didn't mean to
19. say that.
20. MR. HOWELL:  I didn't mean the
21. shareholder's agreement.
22. In terms of the policy documents,
23. there are provisions in there about an
24. amendment, for example.  If you're going

1168

PROCEEDINGS

1. to amend the shareholder's agreement, you
2. should give us notice, but in that same
3. agreement, it says the stock can be
4. transferred.  Section one says it allows
5. transfers of the stock and it lays it
6. right out in there, "Can't be transferred
7. without the consent of Upper Deck, the
8. shareholders."  There's an obvious place
9. you could put in there.  And AIG, it also
10. says at section eight of the agreement
11. that if there's a stock transfer and it
12. results in one shareholder remaining, this
13. agreement is going to be automatically
14. terminated.  The shareholder's agreement
15. is part.  It is part of the insurance
16. policy.  The notion that stock transfers
17. couldn't happen without their consent and
18. the agreement couldn't be terminated
19. without their consent, all of that is
20. expressly contemplated within the
21. shareholder's agreement that is annexed to
22. this policy, and if you want to craft an
23. agreement that says that can't happen
24. without us, then it should say that.  The

1169

PROCEEDINGS

1. put procedure here is not drafted as
2. mandatory.
3. CHAIRMAN BYRNE:  Get away from
4. corporate law.
5. MR. KRAMER:  I was going to say the
6. same thing.
7. CHAIRMAN BYRNE:  Get away from
8. corporate law.  Get away from what the
9. shareholder's agreement says or doesn't
10. say.  Get away from the share purchase
11. agreement.  Get away from what was
12. permitted to happen by the corporate
13. documents and/or KPMG or not and focus on
14. what happened.  And in that regard, you
15. spoke about the requests for information
16. being forwarded to AIG.  I'm going to get
17. the dates wrong I am sure, but I saw a
18. couple of requests from coverage counsel,
19. probably to Orrick.  Show me.  Forget
20. about the understanding that came from the
21. company, okay?  Orrick had this problem on
22. the insured's side and Cahill and then
23. Peabody & Arnold had on the insurer's side
24. and I saw a couple of Cahill Gordon

1170

PROCEEDINGS

1. letters that said where are the -- what
2. happened?  Where are the transaction
3. documents that led to the, in effect what
4. could be read as, where's the transaction
5. documents -- where are the documents that
6. evidence the transaction that took place
7. in '02 that starts this mess?
8. MR. HOWELL:  And I think what you'll
9. see when you follow that train of
10. documents through --
11. CHAIRMAN BYRNE:  Your partner is
12. shaking his head no, so --
13. MR. HOWELL:  What I'm going to say
14. is not long after that, I'm seeing the
15. documents being transmitted.
16. CHAIRMAN BYRNE:  Okay.
17. MR. HOWELL:  There is a response
18. invariably.
19. CHAIRMAN BYRNE:  Okay.
20. MR. HOWELL:  And the requests are
21. made.  It's not as though these requests
22. are being made in '02 or even '03.  I
23. think they're coming up towards the latter
24. portion.  It's the exact same time period

1171

EXHIBIT AA , PAGE 820

PROCEEDINGS

1   when all this stuff is being put together
2   for IRS, for the insurance company,
3   everybody else.  We're not keeping anybody
4   in the dark here.  They're getting the
5   information.  The information is being
6   requested and if there's a delay here, it
7   might be a matter of months.
8       Now, one of the issues that does
9   come up is they do ask for financial
10  information and I remember yesterday you
11  addressed the issue about sales and things
12  like that.  And we did tell them we don't
13  want our sales information released, we
14  regard it as proprietary, that it's
15  important for us to -- and we could not
16  get the confidentiality agreement signed.
17  You asked what do you care by
18  confidentiality?  Our concern was that
19  information and the details of what
20  product we're selling, how much we're
21  selling, where it's being sold, that that
22  was proprietary information and you need
23  to sign a confidentiality agreement.  The
24  better question is not why would you ask

1172

PROCEEDINGS

1   for the confidentiality agreement, why
2   would the insurance company ever have a
3   problem signing it?
4       CHAIRMAN BYRNE:  All right.  Go
5   ahead.
6       MR. HOWELL:  I want to move on to
7   what I think is another impediment before
8   you even get to causation.  I'm going to
9   address causation because it's something
10  that Mr. Moxley raised and I think it's
11  important.  But much of their argument is
12  based on this exclusion 3A.  That's the
13  one that says the fraud, criminal
14  conducted exemption.  We think you engaged
15  in fraud, criminal conduct.  You don't get
16  to 3A because 3A requires -- in the
17  preamble to 3A, it says there has to an
18  claim based on that conduct.  An assertion
19  from taxing authorities that this conduct
20  caused a loss.
21      CHAIRMAN BYRNE:  Okay, it says what
22  it says.  Next argument.
23      MR. HOWELL:  You can go through the
24  IDRs, you can go through everywhere else.

1173

PROCEEDINGS

1   That claim has not been asserted and even
2   Linda Burke when she came in and
3   testified, Linda Burke says the IRS has
4   not investigated this strategy beyond the
5   generic strategy.
6       CHAIRMAN BYRNE:  And they ain't
7   going to because it's been settled.
8       MR. HOWELL:  If the exclusion is not
9   triggered by a claim, the exclusion can't
10  apply.  That's just a technical point, but
11  it's an accurate point.
12      CHAIRMAN BYRNE:  Okay.
13      MR. HOWELL:  Now I want to get to
14  the causation because even if you get
15  through what I would consider these
16  disabling hurdles that I've just
17  identified, you get to the issue of the
18  repurchase cannot have caused the loss.
19      Now, what do we know is happening
20  before the repurchase?  Well, we have KPMG
21  internally writing.  This is in December
22  of '01 going back to February 2000 when SC
23  squared first reared its head.  My
24  recollection is that SC squared was

1174

PROCEEDINGS

1   intended to be limited to a relatively
2   number of large S corporations.  The plan
3   made sense because, in my opinion, there
4   was and is a strong risk of successful IRS
5   attack on SC squared if the IRS gets wind
6   of it.  Call me paranoid, but I think such
7   a wide-spread marketing campaign is likely
8   to bring KPMG, SC squared unwelcome
9   attention from the IRS.  That's December
10  of '01.  What do we know?
11      MR. KRAMER:  Who was that written
12  to?
13      MR. HOWELL:  It is the M11 committee
14  record just identified as a KPMG
15  professional expressing internal concerns
16  about the SC squared strategy.  This is
17  internal correspondence.  I don't know who
18  the recipient was.  I can certainly get
19  you that information.
20      CHAIRMAN BYRNE:  Was that in
21  evidence?
22      MR. HOWELL:  The 11 committee report
23  is.
24      MR. KRAMER:  Yeah, it wasn't written

1175

PROCEEDINGS

1  PROCEEDINGS
2  to the insured?
3      MR. HOWELL:  It was not written to
4  the insured.
5      MR. MCWILLIAM:  I wish it would have
6  been.
7      MR. HOWELL:  What do we also know
8  before December 2002?  Already had to
9  identify ourselves.  KPMG has already
10  identified us.  The audit risk is an
11  absolute certainty at that point and this
12  is all happening in April of 2002 before
13  anyone's even contemplated a repurchase.
14      What do we also know that is
15  underway before December 2002?  The 11
16  committee investigation is already
17  underway.  It starts in October of 2002.
18  The IRS is contacting and asserting claims
19  against all 58 SC squared participants.
20  The KPMG articles in the Wall Street
21  Journal about KPMG's tax shelter practice,
22  et cetera, it's already being publicized
23  and put forth that way.
24      CHAIRMAN BYRNE:  What does that have
25  do with the price of potatoes?

1176

1  PROCEEDINGS
2      MR. HOWELL:  Here's what it has to
3  do with it:  It's that the strategy from a
4  causation standpoint is doomed before we
5  had even done anything vis-a-vis a
6  repurchase.  And I want to carry that one
7  step further.
8      CHAIRMAN BYRNE:  Stop.  No.  Stop
9  right there.  Are you suggesting that it
10  was doomed before you entered into a
11  policy of insurance?
12      MR. HOWELL:  I'm not --
13      CHAIRMAN BYRNE:  There's some time
14  between entering into the contract --
15  you're testifying very well, Duke.  You
16  don't have to whisper in his ear.
17      Are you suggesting that?
18      MR. WAHLQUIST:  When the subpoena
19  went to KPMG --
20      CHAIRMAN BYRNE:  Once it was known
21  that the strategy was doomed, what does
22  that have to do with anything?
23      MR. HOWELL:  What I'm focusing on is
24  from a causation standpoint.
25      CHAIRMAN BYRNE:  Causation with

1177

1  PROCEEDINGS
2  respect to what because there are
3  different issues on causation.
4      MR. HOWELL:  Whether the repurchase
5  caused any form of loss.  These are all
6  things that happened before the repurchase
7  was --
8      CHAIRMAN BYRNE:  Nobody is telling
9  you that the repurchase caused a loss.
10  The argument is the repurchase was not
11  contemplated directly or was not
12  contemplated in the KPMG SC squared
13  transaction.  You have already argument
14  that, yeah, well, it didn't exclude the
15  repurchase.  Gotcha.  That's not -- I
16  suggest to you that that's not the
17  causation problem or argument and to the
18  extent that you think it is, you may be
19  mistaken and maybe we can get a little bit
20  of clarification later.  And I told you,
21  Richard, that I will not squeeze you,
22  okay?  But I've got to stop.
23      MR. HOWELL:  Okay.
24      CHAIRMAN BYRNE:  Because some of us
25  have to get to a conference call.  All

1178

1  PROCEEDINGS
2  right, we will resume at 2 o'clock with
3  Bendheim.  After Bendheim, I will
4  literally give you all the time you need
5  provided if I hear anything having to do
6  with corporate law again, I'm cutting you
7  off and you cannot say anything else.  I
8  think you have focused sufficiently on --
9  doesn't mean you can't put in it writing,
10  but you have sufficiently argued your
11  definitional triggering event, insurance
12  law issues, from our point of view.  Focus
13  this afternoon, if you would, on the
14  standards of bad faith, which may be key
15  not only to our interpreting the policy
16  under some cases, but key to excess, over
17  the policy limit, punitive damages, et
18  cetera.  I don't mean from an evidentiary
19  matter.  I mean a little bit from a legal
20  matter because I will grant you that we
21  are not as well versed in California law
22  as you may be, and you are, I'm sure, and
23  we would like you to give us some
24  highlights of that argument before we read
25  them in the final submission, okay?

1179

EXHIBIT _AA_ PAGE_822_

ry

w

is

13      Five minutes.  You're back up,

14  Mr. Howell.

15      MR. HOWELL:  Thank you.

16      (Brief recess taken.)

17      CHAIRMAN BYRNE:  Go ahead.

18      MR. HOWELL:  Thank you.

19      MR. MOXLEY:  Forgive me, but before

20  we move on, I just wanted to go back on

21  the causation issue thinking you may be

22  moving on from that.

23      MR. HOWELL:  I've got more causation

24  coming, though.

25      MR. MOXLEY:  Okay, well let me pose

1226

1       Proceedings

2   this and then you can address it now or as

3   we get into it.

4       MR. HOWELL:  Okay.

5       MR. MOXLEY:  You had before the

6   lunch break had described your sense of

7   causation and you made the point that you

8   made in the written submissions prehearing

9   that all the challenges from the IRS that

10  came out all attacked what we might

11  call -- what's been called the generic

12  deal and so you've said, you know,

13  obviously, any deviation that Upper Deck

14  did isn't the problem here because a

15  generic deal was the problem and you've

16  been saying that all along.

17      Isn't the causation question

18  somewhat different, though?  I mean,

19  granted the IRS had attacked the generic

20  deal or questioned it, challenged it and

21  granted that they never even though they

22  got all these boxes of documents, as I

23  understand it, they never said anything

24  about the difference between the

25  consummated deal and a generic deal, and

1227

upper deck-aig arb                     EXHIBIT AA, PAGE 823                     Page  1224 - 1227

PROCEEDINGS

1   I'm only using those terms for purposes of
2   argument, I know there's an issue whether
3   one should even make that distinction, but
4   isn't the issue more on, as far as the
5   panel should look at it, of whether once
6   the IRS had opposed what Upper Deck did
7   and once it went through the tax court and
8   once it gets to the appellate court,
9   whether in the view of the panel, the
10  difference between the deal as consummated
11  and the generic deal was such as to
12  materially decrease the prospects of
13  upholding SC2?
14      MR. HOWELL:  Yeah, and I think it
15  goes even beyond that.  And this is an
16  issue of contention of law that they
17  raised in their reply that we haven't had
18  an opportunity to deal with yet.  The law
19  of exclusions, for example, is not some
20  causal relation.  Whether it's got arising
21  out of language or not.  The law of
22  causation in the context of an exclusion
23  is is it the dominant and efficient cause
24  of the loss.  It is a very high threshold.

1228

PROCEEDINGS

1   exclusion, fraudulent conduct exclusion,
2   3A, I believe it in the policy, then
3   the standard remains the same.  Is it the
4   dominant and efficient cause of the loss?
5       So that's the causation standard
6   that we deal with here and the way they've
7   tried to shape that standard differently.
8   They have to shape it differently because
9   their experts came into this room and
10  Mr. Burke testified it's a coin flip.
11  It's a 50/50 proposition under the generic
12  strategy.  And then he also said that he
13  can't calculate the wild card that is the
14  fact that this was a template and was mass
15  marketed, but he knows that's a negative.
16  And Linda Burke, she's pretty close to
17  taking them out of the dominant and
18  efficient clause standard.  I'm just
19  relying on their experts here.  Linda
20  Burke was in that 30 to 40 percent range,
21  but look at all the things that she
22  disagreed with and that I think the panel
23  could disagree with the things that she
24  disagreed with Mr. Burke on.  Remember she

1230

PROCEEDINGS

1   And the cases that they've cited for the
2   notion that it's oh, it's a much lower
3   standard and the law on exclusions goes
4   back forever and it continues to get
5   reaffirmed to this day, but the game that
6   they're playing with, the case arises out
7   of, there are a ton of cases that talk
8   about in an exclusion that uses the
9   language arises out of, that that
10  language, arises out of, should be
11  interpreted broadly to capture all conduct
12  within that exclusion.  And I agree with
13  the cases that they've cited for that
14  proposition, but it's the scope of the
15  exclusion, but it doesn't change the
16  causation requirement that exists for the
17  exclusion, and that being, once you've
18  pulled whatever belongs in under an
19  exclusion that is broadly interpreted
20  because it's got arising out of language,
21  once you've determined that conduct the
22  included within the exclusion, for sake of
23  argument, say, the repurchase is broadly
24  interpreted to be within a particular

1229

PROCEEDINGS

1   said tax court, I don't see that as a
2   negative.  KPMG press, claim eight, I
3   don't see that as a negative.  Mass
4   marketing, I don't see that as a negative.
5   So she had all these negatives that I
6   think the panel has sufficient evidence of
7   in front of it to conclude that her 30,
8   40 percent needs to be discounted
9   significantly beyond that.
10      One thing that is I think most
11  telling about this case is that the
12  strongest opinion that they could get
13  about the generic strategy, using that
14  term loosely, near as I can tell, is it's
15  a coin flip and there's another wild card
16  discounting element that comes into it
17  and --
18      MR. MOXLEY:  But, excuse me, but
19  don't we have to work through all that and
20  isn't what it comes down to for us to make
21  an evaluation as to whether the generic
22  deal would or would not have passed tax
23  muster, we're assuming the consummated
24  deal would not and did not, so the

1231

EXHIBIT AA, PAGE 824

PROCEEDINGS

1   question is would it have made any
2   difference if Upper Deck had proceeded
3   pursuant to the generic deal?
4       MR. HOWELL:  And I think that's a
5   big part of what you need to do and what
6   I'm trying to do is beyond that and tell
7   you that the evidence in front of you, I
8   think, is in large part uncontradicted and
9   when you look at the settlement history
10  that exists out there and the treatment of
11  all 58 and the same deal in Burke, both
12  Burkes agree that all 58 are being treated
13  the same, they're not getting offered
14  better or worse deals and the information
15  you have coming before you in this court
16  or in this arbitration is that people in
17  overwhelming numbers are taking that deal
18  and what do we know beyond that from that
19  chart that was produced to us by AISLIC in
20  this case is that when they initially came
21  in here and testified.  They said we've
22  got two other generic deals that we've --
23  and they didn't tell us at the time that
24  they had paid policy limits or paid

                                    1232

PROCEEDINGS

1   anything on it.  There's two other general
2   deals and the general deals should be
3   litigated.
4       But what do we know of the four
5   deals?  When we finally get some glimpse
6   into the claims files.  We know that of
7   the three of the four deals have been
8   settled.  Two of the deals, deals they
9   initially said were generic deals, they
10  paid policy limits on.  Doesn't sound like
11  a confidence that it's a real winning
12  strategy and it's not 500 or $600,000.  I
13  think it's $6 million?  One case.  And
14  maybe $20 million -- I might have those
15  numbers wrong -- in another case.  This is
16  AISLIC paying policy limits on what they
17  call the generic deal and then when we
18  look at those deals, they're not generic
19  at all.  They're negotiated deals.  The
20  price was negotiated.  That's what they
21  put in the form or the chart that they've
22  given you and this speaks, in my mind, to
23  the bad faith issue, but in terms of
24  looking at all that is there in front of

                                    1233

PROCEEDINGS

1   you, look at where their starting point
2   is.  It's at a coin flip that gets
3   discounted from there.  That's really the
4   best they could come up with and then look
5   at all the surrounding circumstances and
6   evidence that you have.  What's happening
7   really out in the field with settlements?
8   What's happening with other AISLIC
9   policyholders?  What AISLIC is doing in
10  other cases.
11      Both Burkes agreed how the IRS
12  handled these things.  Both Burkes agree
13  there really isn't an opportunity to do
14  any deal better than the deal that Upper
15  Deck got and if the repurchase doesn't
16  happen and we do the deal exactly as
17  AISLIC has presented we should have done
18  it in this case and we interpreted the
19  policy exactly the same way, where are we
20  going to be under those circumstances?  We
21  are going to be in a situation that,
22  according to Robert Burke, is no better
23  than a coin flip.  We are going to face
24  the prospect of extensive costs going

                                    1234

PROCEEDINGS

1   forward and we face the genuine risk of a
2   loss of S status and a lot of S status for
3   Upper Deck is double taxation,
4   effectively, and it's not just for the two
5   years in question.  Its 2001, 2002 and
6   it will carry forward another three years.
7   This is a hammer that you're not talking
8   about a thumb that swells up and is red
9   and you get a broken fingernail or a
10  bruised fingernail.  This is the kind of
11  risk even if you accept that that risk is
12  much less than 50/50 on losing S status,
13  because I don't think anybody said that's
14  a 50/50 proposition, not even our experts,
15  but that is a hell of a hammer to have
16  hanging over your head and it's a bet to
17  the company, the kind of proposition, and
18  that's why that's another practical reason
19  for asking yourself where this thing is
20  independent of any repurchase, where are
21  we going to find ourselves?  We're going
22  to find ourselves in the same situation
23  that they've handled their other
24  policyholders.  The other ones who didn't

                                    1235

PROCEEDINGS

1 follow the put procedure.  And we know
2 that now that they've produced that.
3 MR. MOXLEY:  But, excuse me, but
4 don't they then have the option of funding
5 the contest costs and litigating the
6 matter if it's generic deal and if their
7 advice is that it's worth litigating it,
8 putting aside the fact that Upper Deck's
9 losses were so much greater than the
10 policy limits, so you had the risk of --
11 the risk inherent in that situation, but
12 in this other situation in the chart,
13 could go litigate the situation, right?
14 MR. HOWELL:  And I'm not suggesting
15 that they can't go litigate the deal.
16 What I'm suggesting is that they are not
17 litigating the deal and they are not
18 litigating the deal whether they call the
19 generic or whether they call it negotiated
20 and the reason they're not litigating it
21 is because they don't believe the position
22 they've put in front of you here, ie, this
23 is a winnable strategy that we want to
24 litigate.

1236

PROCEEDINGS

1 And I want to point out the one
2 party that hasn't settled, Award Homes who
3 initially was presented as they want to
4 litigate, they want to have at it, Award
5 Homes looks more like they wanted to crawl
6 under a rock.  They didn't take the
7 amnesty and they got identified anyway.
8 And so Award Homes has a whole different
9 layer of analysis that it has go through
10 as to whether the settlement is a good
11 deal because they don't get the deal that
12 Upper Deck got.  They're being proposed a
13 different deal that has penalties and
14 that's the one aspect of the settlement
15 that I think the evidence is without
16 contradiction can be negotiated and that
17 explains, in my mind, why Award Homes is
18 the one party of what I'll call the AIG
19 family of four that haven't taken the
20 exact same deal that Upper Deck does.
21 MR. MOXLEY:  And all the others have
22 settled?
23 MR. HOWELL:  All the others have
24 settled on the exact terms and it looks

1237

PROCEEDINGS

1 like based on -- remember Mr. Burke said I
2 know a lawyer who's handling 35 of them or
3 so and he told me seven or eight of them
4 still intend to litigate, which means
5 80 percent of them have taken the deal?  I
6 don't know what the circumstances are of
7 the seven or eight, but it tells you a lot
8 about the real underlying confidence that
9 anyone has, including AISLIC, about really
10 litigating this strategy.
11 CHAIRMAN BYRNE:  It is irrelevant.
12 Counsel.  Tell me why anybody's confidence
13 in litigating it -- I'm sorry, Charles.
14 MR. MOXLEY:  No.
15 CHAIRMAN BYRNE:  But tell me why,
16 explain to me why I should care because
17 you want us to take a real look at this,
18 at what really is going on here?  What's
19 really going on here is this is the
20 highest policy limit that AISLIC wrote,
21 okay?  One.  Two, it's the biggest risk
22 they took.  Whether they thought it would
23 work or not, what their intent was, a
24 decision was made that the risk was worth

1238

PROCEEDINGS

1 taking, from your point of view.  They
2 took it and lost $66 million.
3 MR. HOWELL:  Eighty.
4 CHAIRMAN BYRNE:  I'm sorry, 80.
5 Didn't mean to minimize it, Mr. McWilliam.
6 MR. MCWILLIAM:  At this date, it's
7 over 100.
8 CHAIRMAN BYRNE:  And it's mounting,
9 all right.
10 And in its simplest term, you shared
11 the risk.  The parties attempted to share
12 the risk by the purchase of insurance.
13 The risk was realized.  Share the risks.
14 Bottom line of what all of this has been
15 about to the unsophisticated.
16 I've got claimant saying look,
17 that's not the risk I shared.  I shared
18 the risk of a transaction that no matter
19 what it was, followed the essential
20 guidelines of the strategy set out when I
21 wrote the insurance and I relied on it.
22 This is all before the notice came out.
23 '02 the notice came out.  We all know
24 about it.  Strategy was exposed.  And from

1239

PROCEEDINGS

1  '02 until -- early '02 until sometime 18
2  to 24 months later, the claim is I didn't
3  know what you were doing.  I just didn't
4  know what you were doing.  That's one
5  side.
6     You're asking me -- that risk,
7  taking the risk was not solely in your
8  control.  I had something to say about it
9  because I agreed to share it.  Your point
10  of view is hey, a risk is a risk.  A risk
11  is from the tax shelter.  A risk is a risk
12  of loss because of a taxable event.  The
13  IRS looking into the tax shelter was a
14  taxable event.  Whatever.  I'm getting
15  killed here.  The jig's up.  I can't
16  shelter income.  It was a nice deal.  It
17  was perfectly reasonable to pay 2 instead
18  of 11 from your point of view.  Why pay an
19  additional 9 when I'm going to have to pay
20  an additional God knows how much to a
21  charity, when I have to pay an additional
22  God knows how much to the IRS because I've
23  got to amend '01 and '02.  So whether it's
24  2 or 9, whether the difference is between

PROCEEDINGS

1  $2 million and $11 million, whatever I
2  paid, I was going to get a loss.  And
3  didn't we share the risk of loss in my
4  attempting to shelter income?  Isn't that
5  why I bought the policy?  Why are you
6  giving me a hard time?  I got a loss.
7  Here it is.  Do it.  And forget the
8  exclusion.  The exclusions come in in
9  justifying the positions that were, in
10  fact, taken.  Didn't give me proper notice
11  of a claim, you didn't let me participate
12  in the defense, you didn't let me know
13  what was going on, you misrepresented what
14  you were going do and the proof is in the
15  pudding.  You did something different.
16  Why aren't you focused on that?
17     MR. HOWELL:  My focus is on that we
18  didn't do anything different and I've --
19     CHAIRMAN BYRNE:  That's okay.  I'll
20  give you that.  I'll give you that.
21     MR. HOWELL:  And beyond that and the
22  issue of -- you brought up the issue of
23  notice.  When we had to make our
24  disclosures to the federal government, we

PROCEEDINGS

1  got a letter from KPMG who said you might
2  want to consider making this disclosure
3  and the letter, it's marked as an exhibit,
4  said contact your insurance carrier about
5  this as well.  That didn't happen with
6  respect to the repurchase.
7     Now, beyond that, there was no
8  obligation to give them notice of the
9  repurchase just like if we had gotten a
10  $2 million offer under the right of first
11  refusal, section two of the policy, and we
12  said -- and somebody comes in to them and
13  says we want $2 million and they say we
14  want to take it.  We could have said let's
15  do it.  It would have been accepted.  The
16  shareholder's agreement would have
17  terminated on its face.  This could have
18  all happened in December of '02 and there
19  is no notice requirement to the insurance
20  company.
21     CHAIRMAN BYRNE:  Bottom line.
22     MR. HOWELL:  It's not something we
23  agreed to.
24     CHAIRMAN BYRNE:  Bottom line is what

PROCEEDINGS

1  happened is the basic premise of your
2  argument that what was, in fact, done in
3  December of 2002 was not prohibited by the
4  policy?  Might have been different, but it
5  wasn't prohibited.
6     MR. HOWELL:  Was not prohibited and
7  even if you can somehow assume that it
8  was, it doesn't have the requisite,
9  causative effect in order to take us
10  outside of coverage.  There is still --
11     CHAIRMAN BYRNE:  Stay there.
12     MR. HOWELL:  There is still the
13  causation requirement.
14     CHAIRMAN BYRNE:  Stay there.  Stay
15  there.
16     Does that mean that the tax payer,
17  the insured could do whatever it wanted
18  and not get out from under the terms of
19  the policy or the exclusions?  Or it's
20  just that what this insured did did not
21  get us out from under the terms and
22  conditions of the policy?  I'll give you
23  an example.
24     What if Mr. McWilliam said screw

PROCEEDINGS

1     PROCEEDINGS
2 this. I'm not paying them a nickel more
3 than $500,000. They've got no choice.
4 They can't go anywhere. I'm wasting money
5 on accountants, lawyers, advisors. Zippo.
6 I'm giving them $500,000, take it or leave
7 it. Would your analysis be any different?
8     MR. HOWELL: My analysis in terms of
9 what the policy requires and doesn't
10 require would not change at all.
11 Insurance carriers, if they want to impose
12 a fair market valuation requirement, they
13 need to draft it as an exclusion or a
14 warranty. And they didn't. They're
15 asking you to assume that it's there. And
16 carriers don't get --
17     CHAIRMAN BYRNE: No, what they're
18 asking us to do is assume that when you
19 incorporate by reference opinions and
20 blah, blah, blah, blah, blah, blah,
21 there's what they're going to argue.
22     MR. HOWELL: But it doesn't say that
23 and there's nothing in the opinion.
24     CHAIRMAN BYRNE: I'm not saying it
25 says it. I'm just saying I know what

1244

1     PROCEEDINGS
2 right? You've highlighted to us that
3 you're going to give us the law with
4 respect to exclusions and we know you have
5 before and we know you're going to argue
6 it. You don't to have do it now.
7     I will tell you that in the next ten
8 minutes, and I know we interrupted you,
9 but -- by pulling teeth sometimes -- but
10 we got certain specific answers to
11 specific questions that we're asking of
12 you, okay? And again, we're asking them
13 for a purpose. Spend ten minutes on good
14 faith.
15     MR. HOWELL: Okay, let me give one
16 more example about something different and
17 I think Mr. Wahlquist is going to address
18 the law of good faith with you. I'm happy
19 to discuss the facts of it because I want
20 to do that, but in terms of the
21 repurchase, I've used this smoking example
22 and another smoking example is the house
23 is on fire, it's burning and if I'm
24 running out the door and I drop a
25 cigarette, that's not the cause of the

1246

1     PROCEEDINGS
2 they're going to argue.
3     MR. HOWELL: It's not in the
4 opinions either, though.
5     CHAIRMAN BYRNE: I didn't say it
6 was. There's a step here. The step is
7 this is what the shareholder's agreement
8 said. This is what the shareholder
9 agreement is annexed thereto. And they
10 can argue that until the cows come home.
11 I'm trying to understand your position.
12     MR. HOWELL: The other way to look
13 at it is we've only looked at it on the
14 front end. The put option has this
15 lifespan of 180 days.
16     CHAIRMAN BYRNE: I warned you.
17     MR. HOWELL: What if we go to the
18 other side of it?
19     CHAIRMAN BYRNE: No. No. No.
20     MR. HOWELL: Where it's not
21 exercised?
22     CHAIRMAN BYRNE: No. No. No.
23 Don't go there. You may not argue any
24 more about the put option, shareholder
25 agreement, corporate law, et cetera, all

1245

1     PROCEEDINGS
2 loss and it's just a different way of
3 addressing this causation requirement.
4     CHAIRMAN BYRNE: Got it.
5     MR. HOWELL: And what the experts
6 said about it.
7     CHAIRMAN BYRNE: Got it.
8     MR. HOWELL: Before.
9     CHAIRMAN BYRNE: And don't think we
10 are relying on the opinion of any expert.
11     MR. HOWELL: Okay. I do want to
12 talk about fair market value for a second.
13     CHAIRMAN BYRNE: No.
14     MR. HOWELL: No?
15     CHAIRMAN BYRNE: You've already
16 talked about it for more than 35 minutes.
17 Rough calculation.
18     MR. HOWELL: I just meant in terms
19 of the valuation itself.
20     CHAIRMAN BYRNE: Move on. Good
21 faith.
22     MR. HOWELL: Okay.
23     CHAIRMAN BYRNE: Because here's what
24 we're having a hard time understanding:
25 If they're right -- they -- if claimant's

1247

PROCEEDINGS

1 right, that there was a chance out there
2 that might have worked with them, at least
3 with respect to defense costs, et cetera,
4 what the hell took you so long?  What took
5 you so long?  You did the deal in '02, all
6 right?  December of '02.  Why didn't you
7 talk to the insurance company before you
8 did the deal to make sure, prudence in
9 good faith, show me, get good faith, bad
10 faith in the context of what, in fact, was
11 done.  That's what I need you to focus on.
12 MR. MOXLEY:  Excuse me.  Maybe the
13 way to put it, you answered a related
14 question earlier saying well, the policy
15 didn't require us to disclose, but I mean,
16 I think the Chair's question is one shared
17 certainly by this member of the panel is
18 well, why can't you tell us as a factual
19 matter, why you didn't tell them?
20 MR. HOWELL:  I don't think anybody
21 on this side of the table even thought it
22 was an issue.  Just like it wouldn't be an
23 issue in a right of first refusal
24 situation.  This is not something that was

1248

PROCEEDINGS

1 related to the 2002 transaction.  Or
2 anything pursuant to a repurchase of the
3 shares other than pursuant to the
4 redemption agreement.  Nobody in AIG
5 dreamed this up in its imagination, ever
6 thought that had anything to do with the
7 buyability of this tax plan.  None.
8 CHAIRMAN BYRNE:  Make sure you
9 underscore that in your brief.
10 MR. HOWELL:  Underscore where?
11 CHAIRMAN BYRNE:  Make sure you
12 underscore it in your written submission.
13 MR. KUSHNER:  As well as the exhibit
14 number of the '03 IDR.  I'd like that
15 read.
16 CHAIRMAN BYRNE:  Counsel, this is
17 our one chance to be our we wish of when
18 we were at the dinner table, people
19 actually listen to us.  Okay?  Go ahead.
20 MR. HOWELL:  From the standpoint on
21 this side of the table, we did not
22 consider a requirement, we did not think
23 it important at the time and if somebody
24 wants to say with the benefit of three or

1250

PROCEEDINGS

1 deemed or characterized or referenced as a
2 policy obligation.
3 MR. MOXLEY:  But how could -- I
4 mean, your side must have talked to tax
5 people along the way, unless you're
6 telling me that they didn't.  If they
7 talked to tax people, how could it not
8 have been seen that it was relevant, that
9 there were arguments that quite obviously
10 can be made that it makes a difference?
11 Whether it does or not.
12 CHAIRMAN BYRNE:  Mr. Wahlquist.
13 MR. WAHLQUIST:  May I respond to
14 that?
15 CHAIRMAN BYRNE:  Sure.
16 MR. WAHLQUIST:  In point of fact, if
17 you look at what happened here, Upper Deck
18 identified itself to the IRS and in the
19 summer of 2003, pursuant to that
20 notification, the IRS sent their first IDR
21 in connection with it.  Here's what we
22 want to know about the SC squared
23 transaction.  You know what's missing from
24 that IDR?  Any requests for something

1249

PROCEEDINGS

1 four years of litigation hindsight, you
2 should have -- you should have or could
3 have handled it differently, the bottom
4 line is from a causation standpoint, what
5 difference does it make?  Would the
6 insurance company have been justified at
7 that point in saying no, don't do the
8 $2 million, and then what different
9 position would that have put us in now?
10 It would have put us right where we are
11 with what their other policyholders are
12 paying.
13 CHAIRMAN BYRNE:  Flip side is you
14 might have had the benefit of this panel's
15 wisdom sometime in '04.  On early '05.
16 You don't think it's covered.  You think
17 this, that and the other thing.  Nonsense.
18 I've got an arbitration clause.  I'm
19 bringing an arbitration.
20 MR. HOWELL:  Well, we brought the
21 arbitration quite some time ago.  I think
22 this did get brought in '04, if I'm
23 correct, the initial filing, not with the
24 AAA, but there was not another federal

1251

PROCEEDINGS

1252

```
 1                PROCEEDINGS
 2    court filing trying to frame these issues,
 3    so it's not as though the issue over
 4    coverage, and remember, too, they're not
 5    taking a coverage position.  There is no
 6    denial of coverage until July of '05.  And
 7    I want to address some of the facts
 8    relating to bad faith because I think
 9    Mr. Cotkin raised a couple of interesting
10    issues in this regard.  That you do look
11    for your carrier to be a protector and an
12    ally and what do we know about what
13    happened in this setting?  Even before the
14    policy got issued, they're drafting
15    internal E-mail communications or they're
16    calling our attorney a jackass and saying
17    just quit dealing with him and then they
18    go on to say -- and they're questioning
19    why our CFO is leaving.  They said, "Let's
20    just let it go.  If something did happen
21    and we can trace it back to him, it gives
22    our claims department a good position to
23    make some arguments.  Just some thoughts.
24    Let me know what you want to do."
25              CHAIRMAN BYRNE:  What's the date of
```

1253

```
 1                PROCEEDINGS
 2    that?
 3              MR. HOWELL:  August 28, 2001.
 4    That's the mindset that AIG brought to
 5    this.  We have an issue now, let it go,
 6    we'll raise it with claims later.  And it
 7    didn't take long for that same position
 8    and that same conduct to manifest in the
 9    context of this case.  First of all, we
10    all talk about the refusal to acknowledge
11    a claim.  That no claim exists.
12              Under the policy, claim is defined
13    as it means, "Any written notice from any
14    taxing authority alleging any insured may
15    be liable for taxes," and what do they do
16    after that?  They write us over and over,
17    after the 2004 notice, they write, "We
18    refuse to acknowledge the existence of a
19    claim."  As late as July of '05 -- let me
20    get the date on it -- I think March of
21    '05, they're still telling us they don't
22    agree any insured tax event has occurred.
23    That's Exhibit 303 from Peabody & Arnold.
24    July 29, 2005.  They're denying the
25    existence of even an insured tax event.  I
```

PROCEEDINGS

1254

```
 1                PROCEEDINGS
 2    showed you what that definition is at the
 3    outset here.  What we encountered --
 4              CHAIRMAN BYRNE:  While you're there,
 5    what do you consider to be the notice, the
 6    2002 request for information, the world is
 7    on notice that we have trouble with these
 8    transactions, or the '04 notice?
 9              MR. HOWELL:  The first one that says
10    disclose is arguably a notice, but once
11    you get to 2004-30, in all of the notices
12    that followed that thereafter and all of
13    the audit notices we get thereafter were
14    clearly on what we clearly have a claim.
15    And another thing, the reason it's
16    arguably a claim in the first place is
17    because once you voluntarily disclose
18    yourself and identify yourself, you've
19    just guaranteed an audit.  Everybody knows
20    that and that is without contradiction in
21    these proceedings.  So you can talk about
22    having an ally and we're not giving them
23    information.  We are getting kicked in the
24    teeth over an issue of whether an insured
25    tax event exists, whether a claim even
```

1255

```
 1                PROCEEDINGS
 2    exists and then what happens when they
 3    first find out about our having an income
 4    spiking over $50 million?  They go
 5    straight to Tiger Woods and start -- and
 6    it's in the letters that they wrote --
 7    talking about how they didn't get enough
 8    information on Tiger Woods and that the
 9    Tiger Woods' endorsement contract should
10    have been referenced in the FMV opinion.
11    You know why they were raising it at that
12    time?  Because they were assuming that the
13    spiking in revenue was attributable to
14    Tiger Woods.  We didn't have a deal with
15    Tiger Woods when the FMV opinion was done,
16    and guess what?  Tiger Woods is littered
17    in the references in the underwriting file
18    that we told them.  Marsh wrote them a
19    letter the day before the policy was
20    issued spelling out Tiger, how it's not
21    included in the FMV opinion.  They spoke
22    directly to FMV about Tiger Woods and what
23    happened?  As soon as this dispute
24    manifested, they start writing us about
25    Tiger Woods and they should have been in
```

EXHIBIT AA, PAGE 830

PROCEEDINGS

1  the FMV opinion. When they figure out
2  that it's not Tiger Woods that is
3  producing this revenue, they immediately
4  go to Yugio, and Yugio is an even more
5  specious argument than the Tiger Woods
6  argument, and let me explain why Yugio is
7  more specious than the Tiger Woods
8  argument.
9      Yugio is an agreement that was
10  entered into, the first binding letter of
11  intent with Yugio was entered into in the
12  spring of 2002. Eight or nine months
13  after this policy was bound. We had
14  negotiations with Yugio prior to that. As
15  did our competitors. We didn't have any
16  certainty with Yugio and we certainly had
17  no knowledge that Yugio would produce what
18  I would call this phenomenal burst of
19  revenue at the end of '02, 15 months after
20  the policy is bound, but we have sat in
21  here and they have alleged we were misled
22  as to the quantum of risk regarding Yugio
23  and they have made these arguments when
24  there is absolutely no basis whatsoever.

1256

PROCEEDINGS

1      CHAIRMAN BYRNE: Well, let's see
2  based on everything that's happened,
3  whether that continues because I think the
4  basic argument is you knew or should have
5  known with respect to the projections and
6  your basic argument is we couldn't have
7  known or should have known with respect to
8  the projections at any relevant time
9  period and the projections go to the
10  extent of damage, not the existence of
11  coverage; isn't that a kind of pointed way
12  of putting that?
13      MR. HOWELL: It is except --
14      CHAIRMAN BYRNE: It also goes to
15  fair market value, which you've already
16  covered.
17      MR. HOWELL: And it also goes to bad
18  faith. Yugio is a deal.
19      CHAIRMAN BYRNE: No, no, no. What
20  was the bad faith?
21      MR. HOWELL: Raising specious
22  coverage defenses.
23      CHAIRMAN BYRNE: When?
24      MR. HOWELL: Well I'll read you what

1257

PROCEEDINGS

1  they put in their brief.
2      CHAIRMAN BYRNE: No, you cannot tell
3  me -- no, as a matter of law, allegations
4  and defenses raised in a legal proceeding
5  like an arbitration will not be used as
6  evidence of bad faith. You want to tell
7  me they hounded you for that information
8  before the arbitration? Go for it. But
9  don't tell me what they said in their
10  brief. That's the only reason I stopped
11  you.
12      MR. HOWELL: I was, for example,
13  also going to tell what you they said in
14  these proceedings, too, about being misled
15  about the quantum of risk. We heard Yugio
16  in testimony in this case and it's in
17  their coverage letters leading up to this
18  that we were misled about the quantum of
19  risk, about Yugio, you knew about Yugio or
20  you didn't tell us about Yugio. The FMV
21  opinion, by the way, talks about Pokemon,
22  talks about negotiating entertainment
23  licenses and the letter that was sent from
24  Marsh the day before the policy was bound

1258

PROCEEDINGS

1  said the FMV opinion doesn't include
2  unsigned entertainment or sports
3  contracts. It's not in there. They had
4  all this information. They had all these
5  disclosures.
6      CHAIRMAN BYRNE: So they weren't
7  misled.
8      MR. HOWELL: They were not misled,
9  but nevertheless --
10      CHAIRMAN BYRNE: They had an
11  accurate picture of -- an accurate
12  snapshot of the company at the time, past
13  present and future, at the time the
14  coverage was issued.
15      MR. HOWELL: And the Yugio
16  projections that got referenced, those
17  Yugio projections, first of all, they are
18  just that. The company is playing with
19  cost numbers and trying to figure out what
20  we can do, but beyond that --
21      CHAIRMAN BYRNE: I said to you at
22  the time I'll take a look at the
23  financials if they're in evidence and what
24  actually happens is more important than

1259

upper deck-aig arb

EXHIBIT AA, PAGE 831

Page 1256 - 1259

PROCEEDINGS

1  what is projected to happen.
2  MR. HOWELL:  And the projections are
3  nowhere close to what was actually
4  realized.  Yugio and the notion that we
5  knew about Yugio -- Yugio was a popular
6  Japanese cartoon.
7  CHAIRMAN BYRNE:  Don't remind me.
8  MR. HOWELL:  That was brought here.
9  Upper Deck was on the ground floor.
10  Nobody knew that Yugio was going to take
11  off the way that it did.  Nobody.  Not
12  Upper Deck.
13  CHAIRMAN BYRNE:  My nieces and
14  nephews obviously did or they wouldn't
15  have been lined outside the stores.  Move
16  on.
17  How is that bad faith?  Are you
18  arguing that to the extent it was raised
19  in the dance, it was a specious argument
20  all the way through to its being used at
21  the time of the denial of coverage in July
22  '05?
23  MR. HOWELL:  Yes.
24  CHAIRMAN BYRNE:  That's the number?

1260

PROCEEDINGS

1  have no reasonable basis for believing,
2  not only is bad faith, it can give rise to
3  punitive damages.
4  CHAIRMAN BYRNE:  Okay.
5  MR. WAHLQUIST:  And in a nutshell,
6  that's California law.
7  CHAIRMAN BYRNE:  Then make sure you
8  summarize the facts relied on that lead
9  one to conclude A, the California law
10  applies; B, that under this marling of the
11  facts we have here, it should be applied,
12  okay?  With the citation of cases.
13  MR. WAHLQUIST:  Okay.
14  CHAIRMAN BYRNE:  You now have 30
15  seconds to give me your best shot.
16  MR. HOWELL:  Free range?
17  CHAIRMAN BYRNE:  Anything.  On
18  anything.  Because that's the last 30
19  seconds you have.
20  MR. HOWELL:  At the end of the day,
21  we paid $3.25 million, which AIG gladly
22  accepted, to get very specific and direct
23  benefits which we've talked about.  The
24  specific risks that we insured against

1262

PROCEEDINGS

1  MR. HOWELL:  Yes.
2  CHAIRMAN BYRNE:  And you're going to
3  give us California law up the whazoo and
4  the basis for applying California law on
5  this issue as opposed to New York law
6  on -- I'm not saying you haven't done it
7  already, but as opposed to New York law
8  with respect to the policy and how you
9  interpret the policy and there within,
10  right?
11  MR. HOWELL:  Correct.
12  CHAIRMAN BYRNE:  You've got 30
13  seconds.  Take your best shot.
14  MR. HOWELL:  Do you want to do
15  the --
16  MR. WAHLQUIST:  Yeah, I'm happy to
17  do the best I can in 30 seconds.
18  California law in general recognizes
19  that asserting a frivolous interpretation
20  of a policy provision can be an act of bad
21  faith giving rise to tort liability.
22  California law recognizes that asserting a
23  coverage defense or a coverage
24  interpretation based on facts that you

1261

PROCEEDINGS

1  manifested and it manifested in spades
2  long before we did anything in connection
3  with the repurchase and you can look at
4  how that risk has manifested across the
5  board and you can look at the cases and
6  the underlying law and you can see that
7  the repurchase, no matter how it's
8  characterized, is of no consequence to
9  where the parties stand today vis-a-vis
10  the IRS with a settlement or anything
11  else.
12  CHAIRMAN BYRNE:  Including with
13  respect to the price of the repurchase,
14  price for the repurchase.
15  MR. HOWELL:  Including with respect
16  to the price because the strategy as
17  designed stripped all the benefits of
18  shareholdership and the only benefit you
19  got was you get 90 percent of the income
20  allocation and you get somewhere between 4
21  and 5 percent of the company valuation at
22  the end of the day.  That's as designed.
23  That's the generic strategy that existed.
24  That is a fundamental flaw with this

1263

EXHIBIT AA, PAGE 332

PROCEEDINGS

1
2  policy.  That combined with the fact that
3  it's a situation where in order to make a
4  $1.38 million donation, and that's the
5  economic substance that exists when the
6  transaction is done, that's why you get
7  the fair market valuation opinion when you
8  make the donation, that in order to make
9  this $1.38 million deduction, what had to
10  happen?  You had to pay almost $600,000 to
11  KPMG, you paid $3.25 million for
12  insurance, you've got the associated other
13  costs and from the standpoint of
14  undermining this strategy, that's
15  something that the IRS, that's the generic
16  strategy, will not find acceptable.
17  You're spending millions of dollars to
18  make a $1.38 million donation.  That's the
19  form over substance.
20      CHAIRMAN BYRNE:  Got it.  I'm going
21  to stop you there.
22      One thing I want each side to argue
23  and on each side of the equation, and it
24  has a little to do with equity, just a
25  little, the argument that if what

1264

PROCEEDINGS

1
2  way, but he's right, if you buy
3  respondent's argument, the insurance was a
4  safeguard.  It was gambling with my money.
5  And he thought there was no risk.  All
6  right.  $3 million was not a lot to pay if
7  you were able to shelter a gagillion
8  dollars for as long as it took can and if
9  you weren't able to shelter anything,
10  ultimately, if the IRS made a claim for
11  the income you tried to shelter, I got to
12  step up to the table for $50 million.  If
13  they're right.  I mean, it's a kind of
14  straight line argument.
15      Question:  Are you also going to
16  argue illusory insurance?
17      MR. WAHLQUIST:  No.
18      CHAIRMAN BYRNE:  Have you determined
19  whether or not the factual basis exists in
20  terms of the bills or what was paid to
21  your need to supplement the record to make
22  a demand for defense costs?
23      MR. WAHLQUIST:  Well, it is pled.
24  Let me say that.
25      CHAIRMAN BYRNE:  I'm going to, you

1266

PROCEEDINGS

1
2  respondent is saying is true on the legal
3  side in terms of coverage and what was
4  covered and what was intended and there
5  was a tax event, whatever, all the
6  conditions of the policy were either met
7  or not excluded, respondents couldn't
8  lose.  If 3.25 might be a small price to
9  pay, 3.25 plus whatever you gave to the
10  charity may be a small price to pay for
11  successfully sheltering 90 percent of what
12  otherwise would be income through a
13  charitable organization for as long as you
14  could, and if you couldn't do it anymore,
15  or had to undo it, $3 million was cheaper
16  to get $50 million of whatever it cost you
17  absorbed by the insurance company.  It's a
18  basic "equitable" argument.
19      Your side of the argument is that's
20  not what the insurance for, all of the --
21  it's not cheap, you didn't know what the
22  exposure was going to be, you assumed
23  cooperation, whatever you want to say.
24      And claimant's going to say well, I
25  know the Chair didn't mean to put this

1265

PROCEEDINGS

1
2  know, I'm going to conform.
3      MR. WAHLQUIST:  What's missing is
4  the DeCastro bills.  I don't have the
5  DeCastro bills.
6      CHAIRMAN BYRNE:  I'm just
7  separating.
8      MR. KUSHNER:  That's an important
9  statement now.  We're talking about the
10  DeCastro bills.  We're not talking about
11  Orrick bills.
12      CHAIRMAN BYRNE:  I just -- that's my
13  point.  I want to know if you're going to
14  make a claim and if so -- for contest
15  costs, and if so, based on what bills or
16  documentary information or whatever else,
17  so I think the answer is yes, I want to
18  make the claim for contest costs, B, the
19  record as it exists now does not quantify
20  what I'm asking for.
21      MR. WAHLQUIST:  Well, only to some
22  degree.  I'd like leave to submit the
23  DeCastro bills, but --
24      CHAIRMAN BYRNE:  By when?
25      MR. WAHLQUIST:  How fast can I get

1267

PROCEEDINGS

1  PROCEEDINGS
2  them?
3  MR. MCWILLIAM:  Wednesday next week.
4  MR. WAHLQUIST:  End of next week.
5  Leave me some time.
6  CHAIRMAN BYRNE:  All right, listen
7  to me.  I tell what you I'm going to do.
8  We are getting the exhibits sent to us the
9  10.  With an index.  Both sides are going
10  to have the index of what was sent to us.
11  Same time.  11-10, okay?
12  MR. KUSHNER:  To be received or sent
13  by the 10.
14  CHAIRMAN BYRNE:  They have to be
15  sent 11-10.
16  MR. KUSHNER:  Okay.
17  CHAIRMAN BYRNE:  Okay, but you guys
18  can E-mail them.  You know.  The list.
19  Here's what we're sending to the
20  arbitrators.  I'm going to give you until
21  11-17 to make application to the panel to
22  expand the evidentiary record with
23  whatever documentary exhibits are attached
24  to your application or included with your
25  application and why.  Okay?  Fair?

1268

1  PROCEEDINGS
2  MR. WAHLQUIST:  That was the 7 you
3  said, right?
4  CHAIRMAN BYRNE:  I'm sorry?
5  MR. WAHLQUIST:  I'm sorry, did you
6  say the 7?
7  CHAIRMAN BYRNE:  I said the 17.
8  MR. WAHLQUIST:  Wonderful, okay.
9  CHAIRMAN BYRNE:  11-10 or so you're
10  going to get the index of what we're
11  getting.
12  By 11-17, either side can make
13  application for such and such.  You will
14  get a ruling promptly and well before you
15  have to do your final submissions.  I want
16  no commentary or opposition to the
17  application.  If I want opposition or I
18  have a question or Mr. Moxley has a
19  question, we will say to each of you why
20  are you asking for this?  We don't get
21  your explanation, all right?
22  MR. KUSHNER:  We're not making an
23  application.  We'll make life easier for
24  everyone.  We're not making an
25  application.

1269

1  PROCEEDINGS
2  CHAIRMAN BYRNE:  I'm just suggesting
3  that maybe you will.  Even a careful
4  lawyer like you, Mr. Kushner, especially
5  with Mr. Stroili looking behind you is
6  going to say oh, damn it, this never made
7  it into the book.  It's not on the index.
8  We talked about it.  Dear panel, whoops.
9  Never can tell.
10  MR. KUSHNER:  If we were that dumb,
11  we're not going to let you know that now.
12  CHAIRMAN BYRNE:  It has nothing to
13  do with being dumb.  You're going to blame
14  it on a secretary anyway.
15  MR. KUSHNER:  No, I won't.
16  CHAIRMAN BYRNE:  But you're not
17  going to blame it on Ms. Thompson.  That's
18  clear.
19  MR. HOWELL:  I do have one question
20  because I'm a little bit confused about
21  the reference to an exhibit list.  I
22  thought that the exhibits that had been
23  marked are deemed admitted into evidence.
24  CHAIRMAN BYRNE:  They are.
25  MR. HOWELL:  See we can use all of

1270

1  PROCEEDINGS
2  those for purposes of briefing.
3  CHAIRMAN BYRNE:  Absolutely.  What
4  I'm talking about exhibit, you will know
5  what made it into the exhibit binder that
6  is coming back to us.  All of which has
7  been in evidence.  The exhibit list that
8  you can look at now or you don't have to
9  wait until 11-10.  I just figure you'll be
10  careful enough to do it and take a look at
11  it and see what it was and I'm giving you
12  a little bit more time.  You will take a
13  look and I will give you the whoops
14  theory.  It never made it into the
15  deliberate.  Your application could be our
16  understanding was you granted leave, here
17  are the bills, blah, blah, blah.  I will
18  then close the evidentiary record upon
19  receipt of and ruling on any such
20  applications soon thereafter.  You'll get
21  notice of that.  It's not going to stop
22  your final submissions from being received
23  at 12-1 and we will get you an award no
24  later than 1-19-07 per our prior
25  arrangements.

1271

EXHIBIT AA, PAGE 834

PROCEEDINGS

1  Mr. Moxley, you have a question.
2  MR. MOXLEY:  I had two suggestions I
3  wanted to put out there as to matters that
4  counsel might want to consider and might
5  want to address in the later papers.
6  One, looking at the arbitration
7  clause in the policy, paragraph 16,
8  there's a reference in there to the effect
9  that the policy shall be construed in the
10  manner most consistent with the relevant
11  terms, conditions, provisions or
12  exclusions of the policy without regard to
13  the authorship or the language and without
14  any presumption in favor of either party.
15  And I must confess, I hadn't noticed
16  that language before.  I looked at it when
17  Mr. Howell was addressing choice of law
18  issues, or Mr. Wahlquist, so what's the
19  impact of that, if any?
20  And then secondly, in the choice of
21  law provision in the arbitration
22  provision, as you've eluded to in the
23  earlier papers, it states that the
24  construction, validity and performance of

1272

PROCEEDINGS

1  what your positions are on that.
2  CHAIRMAN BYRNE:  Just tell us what
3  your positions are so we can deal with it.
4  Respectfully, we probably know more about
5  our powers than you do.
6  MR. KUSHNER:  If I understand it,
7  correctly, all we have to do to the
8  exhibit list is add maybe two or three
9  exhibits at most, so I mean, we don't have
10  too much to do to tell you what is being
11  sent to you.
12  CHAIRMAN BYRNE:  No, no.  Absolutely
13  not.  Absolutely not, Mr. Kushner.  No we
14  don't.  No we don't.  And I really went
15  over that with Ms. Thompson off the
16  record.  You're good.
17  MR. MOXLEY:  (Nodding.)
18  CHAIRMAN BYRNE:  Mr. Kramer has a
19  suggestion.
20  MR. KRAMER:  I just wanted to
21  mention to Mr. Wahlquist in following up
22  on what the Chairman said about
23  underlining the initial IDR from IRS in
24  2003, not requesting anything about the

1274

PROCEEDINGS

1  the policy shall be governed by the law of
2  New York, and there have been some pretty
3  technical arguments made here as to the
4  precise way that courts have or have not
5  interpreted exclusions and representations
6  and warranties and so forth and my
7  question triggered by the Chairman's
8  reference to equity is what is the
9  parties' respective positions on the
10  extent to which on the one hand, the panel
11  should be addressing all these issues that
12  you're presenting to us technically under
13  applicable law as if we were a court as
14  opposed to picking up that other body of
15  law that you're aware exists that gives
16  arbitrators a range of equity and applying
17  practical wisdom as they see it and so
18  forth?
19  CHAIRMAN BYRNE:  Don't spend a lot
20  of time on that because we -- nor does
21  Mr. Moxley suggest that you spend a lot of
22  time on that.  We suggest that you address
23  it.
24  MR. MOXLEY:  Tell us how, you know,

1273

PROCEEDINGS

1  December 2002 transaction, if you're going
2  to address that issue, I'd like you to
3  address also the issue of why and how IRS
4  should have known about that December 2002
5  transaction or why and how IRS should have
6  known or might have known that a
7  transaction outside of the classic generic
8  SC2 occurred.
9  MR. WAHLQUIST:  I understand.
10  MR. KUSHNER:  The 2003 IDR is what
11  Ms. Burke referred to as a mandatory IDR.
12  It had no mention of any SC2 shelter
13  because it was not yet listed until April
14  of 2004.
15  MR. WAHLQUIST:  Exhibits 138 and 184
16  and 185 are drafted specifically with
17  reference to the notice 2002 disclosure.
18  CHAIRMAN BYRNE:  I still have plenty
19  of time to do this.  You heard the
20  question.  Let me talk to your final
21  submissions themselves for two seconds.
22  I rarely or this panel will not tell
23  you how to do it.  You have
24  extraordinarily competent counsel through

1275

PROCEEDINGS

1  this point.  If anything, you have written
2  too much.  I have already suggested that
3  sometimes you pay attention to too many
4  trees and lose your focus on the forest.
5      That being said, I want to remind
6  you that if you are using a case that you
7  have not given us already, give it to us.
8  I am not adverse to your reinventing the
9  wheel if you're willing to and just give
10  us another copy of the cases you cite in
11  the brief, but I want to make it -- in
12  your closing submission, but I want it to
13  be very, very clear that it is not
14  required by any means and I'm not even
15  suggesting it might be easier because an
16  old fogey like me are going to get
17  confused as to what binder he picks up
18  reading what document.  I just mention it
19  because I'm not precluding your wanting to
20  do it if that's what would you normally
21  do.
22      When it comes to citing -- I do not
23  want another copy or an appendix of
24  exhibits used in the brief, but I am not

1276

PROCEEDINGS

1  at all adverse to citations to the
2  exhibits or reference to the exhibits.  In
3  the long run, it saves you using a lot of
4  quotes from exhibits.  Just refer them to
5  us and we'll read them.  Boy that sounds
6  familiar.  You guys have heard that
7  somewhere along the line in these
8  proceedings.
9      When it comes to transcript
10  testimony, one, I am not going to engage
11  in the "settlement of the transcript".  It
12  is what it is.  I have yet -- either as a
13  litigator or as an arbitrator, I never
14  know what's better or worse, not citing a
15  transcript page and having an arbitrator
16  go through ten volumes of transcript and
17  not ever coming across what you said was
18  said and going off the wall or you're
19  citing to a transcript page and having an
20  arbitrator come to the conclusion that it
21  was taken out of context or that was not
22  said.  To me, they're equally bad.  That
23  goes to citing a transcript or not citing
24  a transcript.  It's a long way of saying I

1277

PROCEEDINGS

1  don't care.  Do what you are comfortable
2  with.  Do what you find more persuasive.
3  Do what your regular style and practice
4  is, okay?
5      Most important, everything we've
6  done throughout these proceedings, I hope
7  you understand because it's true, when we
8  ask you questions or when we engage in a
9  give and take, it's in the nature of
10  argument and it's in the nature of helping
11  us understand.  It also helps you focus.
12  By doing that, at any given point in time,
13  we do not mean in any way to limit what
14  you wish to argue to us.  Just because we
15  didn't mention it in the last couple of
16  days, doesn't mean we don't expect to see
17  it, all right?
18      Also, we have never, ever intended
19  to, wanted to or in our opinion did, A,
20  cut you off from giving us any relevant
21  information, giving us any relevant
22  evidence that you wished to give us or for
23  us to consider to the point, my point of
24  view as a pain in the tail Chair when it

1278

PROCEEDINGS

1  comes to certain things to the point of
2  giving you additional time to expand the
3  record if -- for whatever reason.  And
4  when we have cut off what we believe to
5  have been relevant argument, you may have
6  believed was relevant argument, it was
7  more to tell you that you that was not the
8  time or the place to do it.  We weren't
9  cutting off your argument either.  Nor
10  were we commenting on it.  From our point
11  of view, we believe we were forcing to you
12  think and focus.
13      And in that regard, if anyone has a
14  different opinion of what we were doing,
15  speak now or forever hold your peace
16  because I assure you that this panel will
17  give you additional hearing time and, for
18  that matter, we'll even give you
19  additional oral argument time if that's
20  what you want, but I think we've all
21  agreed on final written submission of
22  argument and that should suffice.
23      I personally have rarely experienced
24  such a group of competent, skilled -- more

1279

EXHIBIT *AA*, PAGE 836

PROCEEDINGS

1    PROCEEDINGS
2  than competent -- skilled, experienced,
3  understanding, patient, with it, get it,
4  well-prepared argumentative pains in the
5  rearend advocates as I have had the
6  absolute pleasure of having appearing
7  before this panel of arbitrators nor have
8  I encountered skilled, knowledgeable and
9  experienced experience with respect to the
10  arbitration process or the respect that is
11  due to arbitrators or that has to be
12  earned by arbitrators before they get the
13  respect as we have experienced from the
14  men and women sitting around this table.
15  With the sincerest of thanks on behalf of
16  the entire panel for the manner in which
17  you conduct yourself.
18    The clients, you were
19  extraordinarily well represented. I think
20  you know that. You saw them. You didn't
21  get a chance to see everything they've
22  done to this point because you probably
23  read most of it or at very least you've
24  heard one of the three of us complain
25  about it. You should be very proud of

1280

PROCEEDINGS

1    PROCEEDINGS
2  your counsel and I know you are.
3    We are honored to have had this
4  group of counsel appear in front of us and
5  I truly want to thank you most sincerely
6  from a panel that works pretty hard to
7  earn your respect and I want to thank
8  Mr. Moxley and Mr. Kramer for helping
9  Mr. Byrne and all three of us together to
10  fill the contract we made with you pretty
11  early on. We'll help you, I'll never
12  embarrass you and we'll run a fairly tight
13  ship. We do our homework. We'll earn
14  your respect. I want to thank them, I
15  think, because the way we've been able to
16  cooperate as a panel has something to do
17  with the process as well. And it's rare
18  that a Chair gets to thank his other panel
19  members publicly. Probably because most
20  Chairs then live to regret it somewhere
21  after, but I will take that chance
22  somewhere along the lines.
23    With all of that said, there being
24  nothing else -- there are two matters.
25    Sir.

1281

PROCEEDINGS

1    PROCEEDINGS
2    MR. STROILI: I just had a few
3  questions from before I had a question.
4    CHAIRMAN BYRNE: Sure.
5    MR. STROILI: And I just remembered
6  I had a question.
7    CHAIRMAN BYRNE: Please.
8    MR. STROILI: And I think I know the
9  answer. I take it from what you've said
10  that the panel has not eliminated any of
11  the arguments on either side.
12    CHAIRMAN BYRNE: Not sorely. Indeed
13  I will warn you as I think I did before in
14  one of the sessions -- this reminds me,
15  read over what you heard from us during
16  the transcript. Flip through it. Not
17  that there are any gems in there because
18  there are just as many stupid as
19  statements in there or dumb ass questions
20  that I at least have gone home and said
21  where was I going with that one? But in
22  some instances, I did make it very clear
23  that the award will -- the award language
24  will start with as limited by their final
25  brief, claimant argues that, claimant asks

1282

PROCEEDINGS

1    PROCEEDINGS
2  for, claimant whatever, okay? It's a
3  standard arbitrator's trick in drafting
4  these reasoned awards because there is,
5  therefore, a document to which one, not
6  necessarily in the record, that one can
7  actually point to and say, he said it was
8  limited to the brief, but not. It's a
9  trick. Okay? Keep that in mind. Your
10  final brief is limiting so the more --
11  whatever you address in there, that's
12  fine. That's fine. I expect you to.
13  Just because we didn't talk about it
14  didn't mean it's not important. It may
15  just mean we understand it already and
16  expect to see it. We're not sure of the
17  other stuff.
18    What was the second one, Peter?
19    MR. STROILI: Second question, I
20  take it on the bad faith issue, we still
21  should address both New York and
22  California law or what we think
23  appropriate?
24    CHAIRMAN BYRNE: Well, New York is
25  going to be fairly easy. They know that.

1283

PROCEEDINGS

1
2  That's why it's without -- the burden's on
3  them. Focus on California law. Both
4  sides focus on California law. We kind of
5  know what New York law is. You may want
6  to say not withstanding New York law and
7  you may want to say to get away from New
8  York law. Okay? I mean, there's a reason
9  why insurance -- it's like franchise
10  agreements, guys. There's a reason why
11  controlling law in insurance policies and
12  franchise agreements don't say Florida and
13  they don't say California. New York comes
14  up a lot. And maybe there's a reason for
15  that, too, and you can argue that as well,
16  if you'd like.
17      What else, Peter?
18      MR. STROILI: Nothing.
19      CHAIRMAN BYRNE: Sure?
20      MR. STROILI: Positive.
21      CHAIRMAN BYRNE: Gentlemen, how can
22  we help you?
23      MR. HOWELL: That's it.
24      CHAIRMAN BYRNE: Besides get you out
25  of here and get you on a flight home.

1284

PROCEEDINGS

1
2      MR. HOWELL: Okay.
3      CHAIRMAN BYRNE: Safe travels, all.
4      MR. HOWELL: Thank you.
5      CHAIRMAN BYRNE: If you run if into
6  a problem with any of the scheduling for
7  whatever reason, for any reason, don't
8  wait until the last minute.
9      MR. HOWELL: Okay.
10      CHAIRMAN BYRNE: Let me now because
11  all you're going to do is put me in hot
12  water with the AAA for having expanded the
13  rules, okay? Please. Thanks.
14      MR. HOWELL: Thank you, all.
15      CHAIRMAN BYRNE: We're adjourned.
16      Thank you very much Madame Reporter
17  for your services.
18      (Time noted: 4:29 p.m.)
19
20
21
22
23
24
25

1285

CERTIFICATE

1
2
3  STATE OF NEW YORK    )
4                      :ss
5  COUNTY OF NEW YORK    )
6
7
8      I, STACEY E. RAIKES, CSR, a Notary
9  Public within and for the State of New York, do
10  hereby certify that the within is a true and
11  accurate transcript of the proceedings taken on
12  November 2, 2006.
13      I further certify that I am not
14  related to any of the parties to this action by
15  blood or marriage; and that I am in no way
16  interested in the outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto
18  set my hand this 3rd day of November, 2006.
19
20      _____
          STACEY E. RAIKES, CSR
21
22
23
24
25

1286

1286

1    C E R T I F I C A T E

2

3    STATE OF NEW YORK          )

4                              :ss

5    COUNTY OF NEW YORK         )

6

7

8         I, STACEY E. RAIKES, CSR, a Notary

9    Public within and for the State of New York, do

10   hereby certify that the within is a true and

11   accurate transcript of the proceedings taken on

12   November 2, 2006.

13        I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage; and that I am in no way

16   interested in the outcome of this matter.

17        IN WITNESS WHEREOF, I have hereunto

18   set my hand this 3rd day of November, 2006.

19

20   _____
                  STACEY E. RAIKES, CSR

21

22

23

24

25